Receipt No. 0000000

ORIGINAL

ORIGINAL

FILED
MAR 1 2 2007
U.S. COURT OF FEDERAL CLAIMS

IN THE

UNITED STATES COURT OF FEDERAL CLAIMS

PACIFIC GAS AND ELECTRIC COMPANY, SOUTHERN CALIFORNIA EDISON COMPANY, AND CALIFORNIA ELECTRICITY OVERSIGHT BOARD,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

No. 07-157-C

**CALIFORNIA PARTIES' COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF**

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF**

Plaintiffs Pacific Gas and Electric Company ("PG&E"), Southern California Edison Company ("SCE"), and the California Electricity Oversight Board ("EOB") (collectively, "the California Parties") allege:

**SUMMARY**

1. This is an action for damages and declaratory relief against the United States. The claims in this action arise out of wholesale purchases of electric power and ancillary services (hereinafter "electric power") by PG&E and SCE (the "California IOUs"), and sales of electric power made by the Bonneville Power Administration ("BPA") and the Western Area Power Administration ("WAPA") (collectively, "the Agencies") in the California wholesale electric power markets from May 1, 2000 through June 20, 2001. The California wholesale markets were operated by the California Independent System Operator Corporation ("ISO") and California Power Exchange Corporation ("PX") under tariffs filed with and approved by the Federal Energy Regulatory Commission ("FERC").

2. The Agencies' voluntary sales of electric power in the California wholesale markets pursuant to the ISO and PX Tariffs and pursuant to certain written agreements gave rise to binding contractual obligations that the Agencies owed to the other market participants, including the California IOUs. The California IOUs are direct parties to and expressly intended beneficiaries of the Agencies' contractual obligations. The signatories to the Agencies' agreements had authority to enter into the agreements and to bind the Agencies contractually. The Agencies have breached their contractual obligations, entitling the California Parties to the relief requested in this Complaint.

3. FERC has determined that all sellers in the California wholesale electric markets charged rates that were unjust, unreasonable, and unlawful. Pursuant to the ISO and PX Tariffs that govern those markets, FERC has corrected and reduced the rates that all sellers, including the Agencies, were entitled to charge for sales in those markets for the period October 2, 2000 through June 20, 2001 ("the Refund Period"). To remedy the harm caused by the sellers' unlawful prices, FERC ordered all sellers in the California markets to pay refunds for their unlawful overcharges. On September 6, 2005, however, the United States Court of Appeals for the Ninth Circuit ("Ninth Circuit") held that FERC's statutory refund authority did not extend to governmental entities such as BPA and WAPA. *Bonneville Power Admin. v. Federal Energy Regulatory Comm'n*, 422 F.3d 908 (9th Cir. 2005). The Ninth Circuit's order put the Agencies and other governmental entities in a unique position among ISO and PX market participants in that they alone may seek to benefit from refunds paid by others while escaping liability for their own unlawful overcharges. The Ninth Circuit noted, however, that market participants (such as the California IOUs) could bring claims in court directly against governmental entities like the Agencies to enforce the contractual obligations created by the FERC tariffs and the related agreements under which the Agencies sold power into the ISO and PX markets. *Id.* at 925. The Agencies are now contractually obligated to reimburse the California IOUs for the difference between the rates that the Agencies charged during the Refund Period and the lawful, corrected rates under the tariffs.

4. Amounts the California Parties recover will ultimately benefit California ratepayers in the manner the California Public Utilities Commission ("CPUC") determines.

**PARTIES**

5. PG&E is a corporation formed under the laws of the State of California with its principal place of business in San Francisco, California. PG&E is a subsidiary of PG&E Corporation. PG&E is engaged in the purchase, transmission, distribution and sale of electric power to the public at wholesale and retail within the State of California, and is a "public utility" within the meaning of the California Public Utilities Code and the Federal Power Act ("FPA"). PG&E provides retail electric service to approximately 4.9 million customers in Northern and Central California.

6. SCE is a corporation formed under the laws of the State of California with its principal place of business in Rosemead, California. SCE is a subsidiary of Edison International. SCE is engaged in the purchase, transmission, distribution and sale of electric power at wholesale and retail within the State of California, and is a "public utility" within the meaning of the California Public Utilities Code and the FPA. SCE provides retail electric service to approximately 4.6 million customers in a 50,000 square-mile area of Central, Coastal, and Southern California, excluding the City of Los Angeles and certain other cities.

7. The EOB was created by California statute to oversee the ISO and PX, and to "investigate any matter related to the wholesale market for electric power to ensure that the interests of California's citizens and consumers are served, protected, and represented in relation to the availability of electric transmission and generation and related costs, during periods of peak demand." Cal. Pub. Util. Code § 335. The EOB joins this action pursuant to its statutory authority to sue and to participate in all proceedings relevant to the purposes of the electricity restructuring provisions in the California Public Utilities Code, Cal. Pub. Util. Code §§ 330-398.5, in order to protect the interests of the citizens of California in the subject of this litigation.

8. Defendant is the United States, acting through BPA and WAPA.

9. BPA is a federal power marketing administration within the Department of Energy responsible for marketing hydroelectric power generated by the Federal Columbia River Power System and other electric power generated by federal facilities in the Pacific Northwest.

10. WAPA is a federal power marketing administration within the Department of Energy responsible for marketing electricity from federal water projects in a fifteen-state region of the West.

11. The Agencies sold electric power in California and, in particular, voluntarily elected to transact business in the ISO and PX markets during the relevant time period.

## JURISDICTION

12. This Court has jurisdiction over the California Parties' claims for relief pursuant to the Contract Disputes Act ("CDA"), 41 U.S.C. § 609(a)(1), and the Tucker Act, 28 U.S.C. §§ 1491(a)(1) and 1491(a)(2).

13. With respect to BPA, the California Parties' claims fall within this Court's jurisdiction under the Tucker Act, and not within the Ninth Circuit's jurisdiction under the Northwest Power Act, 16 U.S.C. § 839f(e). This lawsuit is not a challenge to a final agency action or to the implementation of a rate, term, or condition mandated by the Northwest Power Act, or to any other agency action contemplated by the Northwest Power Act's judicial review provision, 16 U.S.C. § 839f(e). Moreover, the contractual provisions at issue are not rates set by BPA under the procedures of the Northwest Power Act. Rather, the contractual obligations at issue involve power sales made by BPA in the ISO and PX markets pursuant to agreements entered into at BPA's discretion, independent of any statutory obligation under the Northwest Power Act, and are not reflected in the administrative record of any BPA proceeding.

## COMMON ALLEGATIONS

14. The California IOUs' claims arise out of the Agencies' sales of electric power from May 1, 2000 through June 20, 2001, in wholesale markets that the ISO and PX operated (the "ISO and PX markets") pursuant to written agreements and tariffs, all of which were filed with FERC. FERC has determined that all sellers in those markets charged rates that were

unjust, unreasonable, and unlawful and, pursuant to the tariffs governing those markets, has corrected and reduced the rates that all sellers, including the Agencies, were entitled to charge for various sales during the Refund Period. As a result of FERC's modification of the tariffs, the Agencies are now contractually obligated to reimburse the California IOUs for the difference between the rates that the Agencies initially charged during the Refund Period and the lawful, corrected rates.

15. In 1996, California enacted Assembly Bill 1890 ("AB 1890") to restructure California's electric power markets in order to facilitate the development of competition for the generation and sale of electric power. AB 1890 separated the California utilities' vertically integrated generation, transmission, and distribution functions into unbundled functions. PG&E and SCE divested a substantial portion of their generation facilities. Under applicable California law, all California investor-owned utilities, including the California IOUs, were required to supply electric power to all retail customers that did not affirmatively elect to purchase electric power elsewhere.

16. AB 1890 provided for the creation of two new wholesale market institutions to facilitate the buying and selling of electric power: the ISO and the PX, which are non-profit, public benefit corporations organized under California law, and subject to FERC's exclusive regulatory jurisdiction.

17. Under rules that the CPUC promulgated and FERC approved, the California IOUs were required, in general, to purchase through the ISO and the PX substantially all of the wholesale electric power that they needed to provide service to their retail customers, including electric energy and certain ancillary services. The ancillary services in this case consist of sales of electric power generation supply to maintain the reliability of the transmission of electricity from generators to customers. Other entities, including the Agencies, were permitted voluntarily to buy or sell electric power in the ISO and PX markets.

18. The ISO and PX are "public utilities" under the FPA, and are therefore subject to FERC's jurisdiction. During all relevant times, all sales and purchases in the ISO and PX

markets were required to be made pursuant to tariffs filed with and approved by FERC that prescribed the terms and conditions of all transactions in these markets, and that contained formulas used to establish prices for sales of energy in the ISO and PX auction markets. The ISO and PX Tariffs are the legal equivalent of federal regulations and also establish contractual obligations among the market participants, prescribing the rules, requirements and/or pricing formulas for all transactions in the ISO and PX markets. The written agreements that the Agencies signed incorporate by reference the entirety of the ISO and PX Tariffs, which thus give rise to contractual obligations on the part of the Agencies. The ISO and PX Tariffs themselves are voluminous and subject to judicial notice by this Court. Excerpts of key provisions of the ISO and PX Tariffs are attached to this Complaint as Exhibit A and are fully incorporated herein.

19. The PX was created to function as California's principal power market. The PX acted as a clearinghouse for daily and hourly markets and submitted schedules of electric power to the ISO in which scheduled generation for the following day equaled scheduled demand. Pursuant to the PX Tariff, sellers into the PX market — including the Agencies — submitted offers to sell electric power, and purchasers submitted demand bids for the quantity of electric power that they wanted to buy. The PX conducted day-ahead and same-day auctions that allowed parties to adjust their hourly commitments based on changing needs and availability. Under its tariff, the PX was charged with responsibility for, among other things, settling energy trades between PX market participants and preparing and distributing to PX market participants invoices reflecting the amounts payable and receivable by them in connection with their trading through the PX.

20. In general, the PX determined, for each hour in each of the markets that it operated, a single market-clearing price that all electric power suppliers were paid, and that all purchasers were charged, under the auction provisions of the PX Tariff. The PX matched offers to buy and sell beginning with the lowest-priced bids and continuing up to the highest-priced bids until the amount of power accepted matched the amount that purchasers sought at that price. The price of the last accepted bid (and therefore the highest-priced bid) set the price for that

entire auction market. *See, e.g.*, PX Tariff § 3.8 (Market Clearing Price Determination); PX Tariff Schedule 3 (formula for determining market clearing price); PX Tariff Appendix B, Master Definitions Supplement ("Market Clearing Price"). All sellers of electric power in a given auction received, and all purchasers paid, the same market-clearing price, even if some sellers had offered to sell at a lower price. Thus, any distortions that inflated the market-clearing price also inflated the price received by each and every seller in the market, including the Agencies.

21. Although the role of the ISO has changed over time, it was created as the entity responsible for operating and maintaining California's electric transmission grid, including resolving transmission congestion and purchasing electric power to maintain system reliability. To meet these obligations, the ISO operated, and still operates, wholesale markets for real-time energy purchases and ancillary services.

22. In general, in operating its real-time market, the ISO set a single market-clearing price based on bids submitted by sellers pursuant to the ISO Tariff. As in the PX market, every seller in the ISO auction market received, and every purchaser paid, the same market-clearing price that the ISO set for any given interval, even if some sellers had offered to sell at a lower price. *See* ISO Tariff § 2.5 (formulas for determining market clearing price in ISO auctions); ISO Tariff Appendix A, Master Definitions Supplement ("Market Clearing Price").

23. Thus, the PX operated a day-ahead and a day-of market intended to supply the electric power needed to meet projected electric power demand. The ISO accepted the PX schedules and then procured any electric power needed to make adjustments in real time to ensure that supply met actual demand and the electric grid operated properly and safely. The ISO charged market participants, including the California IOUs, pursuant to its FERC-approved tariff. Ultimately, as a result of market dysfunction and manipulation, and resulting power shortages, vast quantities of electric power were purchased and sold through the ISO market, rather than through the PX market, during the relevant time period.

24. Although the ISO obtained power primarily through its auction markets, the auction markets did not always provide sufficient electric power to maintain the reliability of California's electric grid. Under such circumstances, the ISO Tariff permitted the ISO to solicit emergency electric power, known as "out-of-market" or "OOM" electric power, through other methods, such as phone calls to electric power marketers or generators. *See* ISO Tariff § 2.3.5.1.5 (permitting such purchases). OOM transactions were contemplated in the ISO Tariff as a backstop to the ISO's auction market. *Pub. Utils. Comm'n of Cal. v. FERC*, 462 F.3d 1027, 1052-53 (9th Cir. 2006) ("*CPUC*"). Prices for these sales were closely linked to the prices in the ISO single-price auction market. *Id.* Because the ISO purchased OOM power in order to maintain the reliability of California's electric grid, the ISO procured the electric power at whatever price it was offered, even if that price exceeded applicable price caps, and then charged market participants, including the California IOUs, for this electric power.

25. As required under the PX Tariff, the Agencies executed pro forma PX Participation Agreements that provided, inter alia, that the PX market participant "will abide by and will perform all of the obligations under the PX Tariff in respect of all matters set forth therein including, without limitation, all matters relating to the trading of Energy by it through the PX Markets . . . [and] billing and payments." PX Tariff Appendix A, Participation Agreement § II(B). The PX Participation Agreement further provided that "[t]he PX Tariff is incorporated herein and made a part hereof." PX Tariff Appendix A, Participation Agreement § 8. A copy of BPA's signed pro forma Participation Agreement is attached hereto as Exhibit B and fully incorporated into this Complaint. A copy of a filing that the PX made at FERC on October 29, 1999, confirming that WAPA signed the pro forma PX Participation Agreement is attached hereto as Exhibit C and fully incorporated into this Complaint. The California Parties are informed and believe on the basis of Exhibit C that WAPA signed pro forma PX Participation Agreements (with minor modifications) on or about September 1, 1999 (for the Colorado River Storage Project division) and June 25, 1999 (for the Sierra Nevada Region), and that Exhibit B reflects the key terms of these agreements. Information regarding the identities of

the contracting officers is in the custody of WAPA and/or the PX. The California Parties do not know the identities of the contracting officers who signed PX Participation Agreements on behalf of WAPA.

26. By executing these agreements, the Agencies also expressly agreed to abide by the terms of the PX's Operating Manual. PX Tariff § 1.4 ("Participation in the PX Markets pursuant to this Tariff shall obligate the PX Participant to conform to all applicable provisions of the PX Operating Manual").

27. Similarly, as required under the ISO Tariff, the Agencies executed ISO Scheduling Coordinator Agreements. The Scheduling Coordinator Agreement provided, *inter alia*, that the ISO Scheduling Coordinator "will abide by, and will perform all of the obligations under the ISO Tariff placed on Scheduling Coordinators in respect of all matters set forth therein including, without limitation, all matters relating to the scheduling of Energy and Ancillary Services on the ISO controlled grid, . . . [and] billing and payments . . . ." ISO Tariff Appendix B, Scheduling Coordinator Agreement § 2(B). The Scheduling Coordinator Agreement further provided that "[t]he ISO Tariff is incorporated herein and made a part hereof." ISO Tariff Appendix B, Scheduling Coordinator Agreement § 8. A copy of BPA's Scheduling Coordinator Agreement is attached to this Complaint as Exhibit D. Copies of WAPA's Scheduling Coordinator Agreement and First Amended Scheduling Coordinator Agreement are attached to this Complaint as Exhibit E. These agreements are fully incorporated into this Complaint.

28. The ISO and PX Tariffs filed with FERC contained the only terms and conditions, including pricing formulas, upon which transactions in the ISO and the PX could lawfully be conducted. The Agencies signed agreements that expressly incorporated the terms and conditions of the ISO and PX Tariffs and expressly agreed to abide by their terms and conditions. Moreover, by voluntarily electing to transact in the ISO and PX markets, the Agencies are charged with knowledge, and are deemed to have accepted the terms, of the Tariffs, which set forth the mutual rights and obligations among market participants. The terms of the ISO and PX Tariffs create enforceable contractual obligations binding on the Agencies. *See,*

*e.g.*, ISO Tariff § 17 ("[o]bligations and liabilities under this ISO Tariff" are binding on parties' successors and assigns); PX Tariff § 17 (same); ISO Tariff § 14.3, PX Tariff § 14.3 (indemnity provisions); ISO Tariff § 20.7, PX Tariff § 19.6 (choice-of-law, venue clauses); ISO Tariff § 15, PX Tariff § 16.1 (provisions covering consequences of uncontrollable force); PX Tariff § 16.2 (duty to mitigate). Market participants may enforce these obligations against one another.

29. During the period at issue, the ISO and PX calculated on a monthly basis the total amount of electric power that each market participant supplied and purchased, including the Agencies. The ISO and the PX then issued individual billing statements, invoices, and supporting data, specifying amounts due to or from each market participant. *See* ISO Tariff § 11.2 ("The ISO shall calculate, account for and settle [charges for ancillary services and imbalance energy] in accordance with this ISO Tariff"); PX Tariff § 6.2 ("The PX shall settle with each PX Participant for Energy traded in the PX Markets in the manner set forth in Schedule 6 ('PX Market Settlements')").

30. The California IOUs, as market purchasers, are counterparties to the Agencies' sales in the ISO and PX markets and have standing to enforce the Agencies' contractual obligations under the ISO and PX Tariffs and related agreements. *See, e.g.*, ISO Tariff § 2.2.1 ("the ISO will not act as a principal but as agent" for Scheduling Coordinators); PX Tariff § 3.1 ("[t]he PX will not be, and shall not be deemed to be, a counterparty to any trade transacted through the PX Markets"). The ISO and the PX were not themselves counterparties to any market transactions, and, instead, operated as revenue-neutral clearinghouses. *Id.*

31. Under their respective tariffs, the ISO and the PX pass through liability for market shortfalls to market participants, including the California IOUs, that bought or sold power in the markets during the period for which there is a shortfall of funds. A market shortfall may result if one market participant defaults on a payment, causing a shortage of total funds collected by either the ISO or the PX for distribution to the other market participants. An entity that fails to pay its bill becomes responsible for a market shortfall, and is deemed an "ISO Debtor" or a "PX Debtor." An entity that is owed money because of the market shortfalls is deemed an "ISO

Creditor" or "PX Creditor," with the right to enforce its contractual right to payment against an ISO or PX Debtor. *See* ISO Tariff Appendix A (Master Definitions Supplement); PX Tariff Appendix B (Master Definitions Supplement). Thus, under the ISO and PX Tariffs, financial obligations created by market transactions were owed by one market participant to another, rather than to the ISO or PX.

32. To ensure that market participants are financially capable of satisfying obligations running from one to the other from these transactions, the ISO and PX Tariffs require market participants to meet certain creditworthiness and collateral requirements, and require the ISO and PX to maintain financial reserve accounts funded by participants and held in trust for their benefit. *See, e.g.*, PX Tariff Schedule 2, §§ 1.1, 2 (noting various creditworthiness and collateral requirements); ISO Tariff § 2.2.3.2 (same); ISO Tariff § 11.8.3 (all ISO accounts to be operated by ISO in trust for ISO Creditors); PX Tariff Schedule 2, § 6.1 (same for PX and PX Creditors). The Tariffs empower the ISO and PX to draw on these assets to satisfy the financial obligations running from a defaulting market participant to other, non-defaulting participants. *See, e.g.*, ISO Tariff § 11.8.2.2; PX Operating Manual (PSABP) §§ 2.1.2, 5.7.1, 5.7.2.

33. Moreover, under the terms of the ISO and PX Tariffs, a shortfall of funds in the ISO or PX "clearinghouse" caused by the default of one market participant must be paid by non-defaulting market participants, rather than by the ISO or PX. *See, e.g.*, ISO Tariff §§ 11.16.1 (if ISO cannot satisfy a market shortfall from a Reserve Account or by enforcing collateral, it shall reduce payments to all ISO Creditors to cover amounts owed to them by defaulting ISO Debtor); 11.2.9 (ISO may levy charges on market participants to cover any financial shortfall); PX Tariff, Schedule 2, §§ 5.2.4, 5.3 (describing method by which PX Debtor's residual liabilities will be allocated to non-defaulting PX Participants); PX Operating Manual (PSABP) § 5.7.3 (if PX cannot satisfy a market shortfall from Reserve Account, collateral, or other methods, it shall reduce payments to PX Creditors to cover amounts owed to them). Indemnity provisions further insulate the ISO/PX from risk. *See* ISO Tariff § 14.3; PX Tariff § 14.3.

34. Tariff provisions also contemplate that market participants will pursue non-payers for payment defaults. ISO Tariff Section 11.19 expressly recognizes market participants' rights to bring suit against one another to enforce rights and obligations created by the Tariffs resulting from sales transactions. ISO Tariff § 11.19 (in event of payment default, "[e]ach ISO Creditor shall give notice to the ISO before instituting any action or proceeding in any court against an ISO Debtor to enforce payments due it"). *See also* ISO Tariff § 11.20.1 ("Without prejudice to the right of any Scheduling Coordinator to bring such proceedings as it sees fit it connection with matters related to the recovery of amounts owed to it," ISO may bring proceedings on behalf of those Scheduling Coordinators that have indicated to ISO their willingness for ISO to act first); ISO Tariff § 11.20.2 (ISO shall, on request, certify in writing the amounts owed by ISO Debtor that remain unpaid and ISO Creditors to whom such amounts are owed; ISO certificate given under this section may be used as prima facie evidence of the amount due by ISO Debtor to ISO Creditors in any legal proceedings). Upon effecting a chargeback, the PX Tariff requires the PX to "identify the defaulting Participant"—who otherwise would have remained anonymous—"to all other affected PX Participants by the most expeditious means available." PX Tariff Schedule 2, § 5.5.

35. In summary, the ISO and PX Tariffs provided the mechanisms through which market participants bought and sold electric power, with the ISO and the PX acting as clearinghouses for such transactions, holding collateral for market participants, and settling the accounts of all market participants. Financial obligations created by market transactions, however, were owed by one market participant to another.

**FERC's Exclusive Jurisdiction Over the ISO and PX Tariffs**

36. Because the ISO and the PX are "public utilities" under the FPA, 16 U.S.C. § 824(e), the tariffs under which they operate were filed with and approved by FERC, and are subject to FERC's exclusive jurisdiction, continual oversight and regulation. These tariffs were subject to amendment or revision by FERC. The ISO Tariff provides, for example, that in signing Scheduling Coordinator Agreements, a market participant agrees "to comply with all

ISO rules, protocols, and instructions, as those rules, protocols and instructions *may be amended from time to time*." ISO Tariff Appendix A, Master Definitions Supplement ("Scheduling Coordinator Agreement") (emphasis added). Similarly, the PX Participation Agreement defines the PX Tariff as "the PX FERC Electric Service Tariff *as amended from time to time* . . . ." PX Tariff Appendix A, Participation Agreement § 1(B). In fact, FERC repeatedly revised the ISO and PX Tariffs during the relevant time period.

37. As entities regulated by FERC, the ISO and the PX were not permitted to act on any terms or conditions other than those contained in the ISO and PX Tariffs. The ISO and PX Tariffs required each participant in the ISO and PX markets to comply with all rules, conditions, and provisions of the ISO and PX Tariffs.

38. Pursuant to the FPA, FERC has exclusive authority to regulate wholesale sales of electric power to ensure, among other things, that the rates charged are just, reasonable, and lawful. FERC thus has exclusive authority to regulate the rates, terms, and conditions of sales made under the ISO and PX Tariffs and to recalculate and correct such rates, terms, and conditions if FERC determines that they are not just, reasonable, and lawful. The ISO and PX Tariffs recognize FERC's authority to regulate the tariffs. *See, e.g.*, ISO Tariff § 18.1 (Tariff "shall become effective on the date it is permitted to become effective by the FERC"); PX Tariff § 18.1 (same); ISO Tariff § 13.1.1 (referring to "rights of any party to file a complaint with FERC"); ISO Tariff § 13.2.4 (disputes may be referred "directly to FERC").

39. The ISO and PX Tariffs provide that parties retain the right to petition FERC to exercise its power under FPA Section 206 to review rates charged under the tariffs and provide for recalculation of charges and resettlement of the accounts of buyers and sellers under the tariffs in the event that FERC determines that any rates charged under the tariffs were unjust, unreasonable, or otherwise unlawful, and thus subject to correction. *See* ISO Tariff § 19; PX Tariff § 13; *see also* FPA § 206, 16 U.S.C. § 824e(a) (2000). ISO Tariff Section 19 states in part:

> Nothing contained in this ISO Tariff or any [Scheduling Coordinator] Agreement shall be construed as affecting the ability of any Market Participant receiving service under this ISO Tariff to exercise its rights under Section 206 of the FPA and FERC's rules and regulations thereunder.

ISO Tariff § 19. *See* PX Tariff § 13 (parallel provision).

40. Under the ISO and PX Tariffs, the amount due to each seller is always subject to revision, and settlements can be re-run, if necessitated by disputes, errors, FERC directives, or for other good cause, at any time. ISO Tariff § 11.6.3 (ISO authorized to perform Settlement Statement re-runs; request to perform Settlement Statement re-run may be made at any time by Scheduling Coordinator); PX Operating Manual (PSABP) §§ 5.3.1 – 5.3.5 (PX authorized to perform Settlement Statement re-runs; request to perform Settlement Statement re-run may be made at any time by PX Participant).

41. By executing written contracts, including ISO Scheduling Coordinator Agreements, PX Participation Agreements, and other agreements with the ISO or PX that incorporate by reference the terms and conditions of the ISO and PX Tariffs and in which the Agencies expressly agreed to abide by the provisions of the ISO and/or PX Tariffs, and by voluntarily electing to sell electric power in the ISO and PX markets, the Agencies are bound by the provisions of the ISO and PX Tariffs and any modifications thereto, including FERC's orders correcting the rates that sellers could lawfully charge for sales governed by those tariffs.

42. The California IOUs are direct parties to and expressly intended beneficiaries of the Agencies' contractual obligations. Because the tariffs are subject to FERC's exclusive jurisdiction, all market participants, including the Agencies, recognized that FERC would exercise its regulatory authority over the tariffs. If the price charged by sellers was found by FERC to be unjust and unreasonable or otherwise unlawful, all market sellers were contractually bound to refund or credit to purchasers the difference between the price initially charged and the lawful, corrected rate determined by FERC. Thus, all market participants were contractually bound to honor the terms and conditions of the tariffs, as revised by FERC, and these terms and conditions can be contractually enforced by the market participants against one another. The

Agencies' obligation to refund or credit their unlawful overcharges is the same obligation owed by all sellers in the ISO and PX markets, although, as public utilities, the California IOUs' obligations for their purchases of electric power in the ISO and PX markets remain under FERC's exclusive jurisdiction.

**The Power Crisis**

43. Beginning in May 2000, the prices demanded by sellers in the ISO and PX markets rose dramatically and sellers continued to demand unprecedented high prices for over a year, resulting in rates far in excess of those charged in prior and later periods. As a result of the auction provisions of the ISO and PX Tariffs, these extremely high prices were charged by all sellers in the markets, even if individual sellers had offered to sell their power in the auctions at lower prices. These artificially inflated prices also affected OOM sales, which were closely intertwined with the ISO single-price auction market. *See CPUC,* 462 F.3d at 1053. The power crisis had severe negative effects on the stability and financial integrity of the California IOUs, and ultimately imposed billions of dollars in additional costs on ratepayers, including business and residential customers throughout California.

44. The first ratepayer impacts of these extraordinarily high prices were felt in the San Diego area because San Diego Gas & Electric Company's ("SDG&E's") rates in the summer of 2000 provided for immediate, direct pass-through to ratepayers of the increased wholesale electric power costs. By January 2001, PG&E and SCE had amassed crippling debt in order to finance the costs of buying electric power, costs that they were not permitted to pass through immediately to their customers. PG&E and SCE became unable to pay the PX in January 2001.

45. The surge in electric power prices also affected the reliability of the electric grid. On June 14, 2000, electric power consumers in Northern California experienced their first wave of rolling blackouts. These blackouts foreshadowed the rolling blackouts and near-continuous power emergencies that California electric customers experienced over the next year.

46. The crisis did not subside with the arrival of cooler weather in the Fall of 2000. Although California's peak electric power usage historically declines by roughly 25 to 33 percent during the cooler months, and declined in the Fall of 2000, prices continued to rise throughout the last quarter of 2000 and the first part of 2001.

47. By January 2001, these events led to the collapse of reliable electric service in California. At times in January 2001, the ISO ordered rolling blackouts throughout large areas of California in order to maintain the reliability of the transmission grid. The crisis became a state of emergency, threatening the safety and welfare of California citizens.

48. On December 15, 2000, FERC issued an order eliminating the requirement that the California IOUs purchase all of their needed electric power through the PX, and the PX ceased operations of its core markets on January 30, 2001. On or about January 5, 2001, the credit ratings of PG&E and SCE fell below investment grade, making PG&E and SCE ineligible to purchase power through the ISO and PX. The State of California was forced to step in as the buyer of last resort to buy electric power on behalf of the California IOUs to ensure continued service to retail customers throughout the territories that the California IOUs served. Unrelenting high prices caused PG&E and SCE to become insolvent.

49. The power crisis ultimately ended when FERC, on June 19, 2001, imposed "must-offer" requirements on electric power generators prohibiting them from withholding generation, and imposed price caps on wholesale sellers of electric power across all western states effective June 21, 2001 ("June 19, 2001 Order"). *San Diego Gas & Electric Co., et al.*, 95 FERC ¶ 61,418 at 62,558, 62,569 (2001). The remedies in the June 19, 2001 Order put an end to the rolling blackouts, catastrophically high prices, and near-continuous power emergencies.

50. The bulk of the crippling costs of the crisis have been passed through to, and paid by, the residential and commercial ratepayers of the California IOUs. These costs are included in current rates assessed to customers of the California IOUs, and will continue to be included in rates until the costs of the crisis have been paid off. By this Complaint, the California IOUs are seeking to recover from the United States the amounts that each Agency received in excess of the

lawful rates for its wholesale sales of electric power to the California IOUs in the ISO and PX markets. Amounts recovered by the California IOUs will ultimately benefit California ratepayers in the manner determined by the CPUC.

**The California Parties Sought Relief From FERC**

51. On August 2, 2000, when it became clear that the extremely high wholesale prices were not returning to the lower levels that had prevailed historically, SDG&E filed a complaint with FERC under the FPA against all sellers of energy and ancillary services into markets operated by the ISO and PX. FERC Docket No. EL00-95. PG&E, SCE, and the EOB intervened in that proceeding on August 14, 2000. The Agencies, as sellers of electric power into markets operated by the ISO and PX, were respondents and also intervened as parties to that proceeding, BPA having intervened on November 22, 2000, and WAPA on October 24, 2000. In that proceeding, the California Parties requested that FERC investigate the justness, reasonableness, and lawfulness of rates being charged in the California ISO and PX markets and that FERC order refunds to the extent that FERC determined that sellers had charged unjust, unreasonable, or otherwise unlawful rates.

52. In response to SDG&E's complaint, FERC commenced its own investigation into the sellers' rates, which it consolidated with SDG&E's complaint. Collectively, the associated proceedings are referred to as the "Remedy Proceeding." In an order issued July 25, 2001 (the "July 25, 2001 Order"), FERC ruled that sellers of electric power in the ISO and PX markets (including the Agencies) had sold electric power at unjust, unreasonable, and unlawful rates, and that the rates charged in the ISO and PX markets should be corrected for the Refund Period. FERC Docket No. EL00-98-000. *See San Diego Gas & Electric Co.*, 96 FERC ¶ 61,120 (2001).

53. In the July 25, 2001 Order, FERC held: "Our action here establishes a revised method for calculating the just and reasonable clearing prices to be applied in those markets for the period beginning October 2, 2000. This is pursuant to the Commission's authority under FPA section 206 to fix the just and reasonable rate. Our action thus revises the market clearing

prices that all market participants previously agreed to accept for their sales." July 25, 2001 Order, 96 FERC at 61,512.

54. FERC also concluded that, on the record before it, its statutory mandate did not grant it authority to order refunds for the Summer Period (i.e., May 1, 2000 through October 1, 2000), and thus denied relief for the Summer Period. *See* July 25, 2001 Order, 96 FERC at 61,504; *see also CPUC*, 462 F.3d at 1043. FERC also refused to correct the rates for "energy exchange" transactions (in which blocks of electric power were sold to the ISO for payment in-kind) and sales to the ISO or PX of greater than twenty-four hours (i.e., "multi-day" sales under FERC's definition) made during the Refund Period. *See* July 25, 2001 Order, 96 FERC at 61,499; *see also San Diego Gas & Electric Co.*, 102 FERC ¶ 61,317 at P 154 (2003); *CPUC*, 462 F.3d at 1059.

55. To remedy the unlawful prices charged in the market during the Refund Period, FERC has, in a series of orders beginning with the July 25, 2001 Order, adopted a methodology to recalculate, on a market-wide basis, the just and reasonable prices that all sellers should have received under the ISO and PX Tariffs. In lieu of the auction pricing mechanism previously provided in the ISO and PX Tariffs, which resulted in unlawful prices, FERC's methodology effectively revised the ISO and PX Tariffs to determine the corrected, maximum rates that could be charged under those tariffs. These corrected, maximum rates were called the "Mitigated Market Clearing Price," or "MMCP." FERC ordered the ISO and PX to apply the MMCP to sales during the Refund Period, including to OOM sales, so as to recalculate the charges that all sellers should have received for each interval during the Refund Period in place of the previous unlawful prices.

56. FERC ordered the ISO and PX to calculate the amounts that sellers were required to refund or credit to buyers under the July 25, 2001 Order. July 25, 2001 Order, 96 FERC at 61,516. Pursuant to FERC's direction, the ISO and the PX have recalculated the accounts of all sellers and buyers in the ISO and PX markets to reflect the corrected rates for the Refund Period in accordance with the July 25, 2001 Order and the subsequent related FERC orders.

57. The California Parties petitioned the Ninth Circuit for review of the July 25, 2001 Order and subsequent FERC rehearing orders on the ground, *inter alia*, that FERC was also required to correct the rates for sales made during the Summer Period. The California Parties also appealed the July 25, 2001 Order on the ground that FERC was required to correct the rates for energy exchange transactions and multi-day sales made during the Refund Period. A number of electricity sellers petitioned the Ninth Circuit seeking to overturn, *inter alia*, FERC's determination that OOM transactions were subject to price mitigation.

58. On August 2, 2006, the Ninth Circuit issued its decision in *CPUC*. In that decision, the Court upheld FERC's determination that ISO OOM transactions should be subject to refund in the Remedy Proceeding. *CPUC*, 462 F.3d at 1052. The Ninth Circuit noted that the "Remedy Proceedings were not limited to the Cal-ISO and CalPX single-price auction markets," and that, with respect to refund liability, "there was no meaningful distinction to be drawn between the in- and out-of-market transactions." *Id.* at 1052-1053.

59. In the same opinion, the Ninth Circuit overturned FERC's categorical rejection of potential relief for the Summer Period and for multi-day and energy exchange transactions, finding FERC's rulings on these points to be arbitrary, capricious, an abuse of discretion, and unsupported by the record, and remanded those issues to FERC. *CPUC*, 462 F.3d at 1051, 1058-1061.

60. The question of relief for the Summer Period and other non-mitigated Refund Period transactions was also at issue in a second FERC proceeding, separate from the Remedy Proceeding. In a petition to the Ninth Circuit for review of orders in that separate FERC proceeding, the Ninth Circuit held that FERC had erred by concluding that it lacked authority to order refunds for the Summer Period transactions and for other non-mitigated transactions during the Refund Period, and remanded the case so that FERC, "in the first instance," could reconsider whether refunds are appropriate for those transactions. *California, ex rel. Lockyer v. FERC*, 383 F.3d 1006, 1016-18 (9th Cir. 2004), *petition for certiorari pending*.

### Market Manipulation Resulted in Windfall Profits for All Sellers

61. FERC recognized early on that market manipulation could have negatively affected the California markets. On November 1, 2000, FERC noted that "there is clear evidence that the California market structure and rules provide the opportunity for sellers to exercise market power when supply is tight and can result in unjust and unreasonable rates under the [Federal Power Act]." *San Diego Gas & Electric Co.*, 93 FERC ¶ 61,121 at 61,350 (2000).

62. FERC initially refused the California Parties' attempts to obtain discovery and introduce into the Remedy Proceeding evidence of sellers' market manipulation and tariff violations, but in May 2002, acting in a separate non-public docket, FERC released memoranda that described how Enron and other sellers had manipulated the ISO and PX markets in order to increase prices throughout the power crisis. In response, FERC propounded discovery requests to all sellers in the ISO and PX markets regarding market manipulation. On August 23, 2002, the Ninth Circuit directed FERC to allow the California Parties to adduce in the Remedy Proceeding evidence of sellers' market manipulation and tariff violations. As a result of the Ninth Circuit's order, the California Parties conducted discovery from late 2002 to early 2003 of sellers in the ISO and PX markets, including the Agencies. That discovery provided evidence of a pattern of market manipulation and tariff violations involving numerous sellers in the ISO and PX markets.

63. The California Parties' discovery uncovered evidence that certain sellers in the market engaged in various forms of market manipulation and tariff violations that created the false perception of scarcity in the market and that drove up market prices. For example, sellers practiced physical and economic withholding of generation. This allowed suppliers to increase the price of electricity by keeping large amounts of electric power off the market. Physical withholding occurred when a generator refused to place a supply bid with the PX even when it had power available, or when it falsely reported an outage at a generating plant. Economic withholding occurred when a seller placed high bids unrelated to its generation costs to create the

false appearance of scarcity, and so to drive prices higher than true competitive levels would have provided.

64. Certain sellers in the market engaged in other gaming strategies — the infamous "Fat Boy," "Death Star," and "Ricochet" schemes, among others — and often used other market participants to assist them with these gaming strategies. Notes and tapes of telephone conversations among energy traders revealed discussions about traders' submission of "fake load" in the market, about their intent to "push the price up and keep the price up," and about their implementation of bidding strategies that would signal other market participants to withhold electric power from the market through physical or economic means.

65. Once this information was available, it became evident that market fraud and manipulation were significant causes of the California energy crisis. Since the end of the California energy crisis, numerous energy traders and executives have pled guilty to, or been indicted on, criminal charges, and many have specifically admitted to market manipulation activities.

66. Because all sellers in the ISO and PX auctions received the same market-clearing prices set by those auctions, the artificially inflated prices created windfall profits for all sellers in the ISO and PX markets, benefiting even those sellers that did not engage in market manipulation. These artificially inflated auction prices also affected OOM sales, which were closely intertwined with the ISO single-price auction market. *See CPUC,* 462 F.3d at 1053. FERC's July 25, 2001 Order and subsequent orders have ameliorated the effects of market manipulation on the transactions that they addressed by correcting the pricing under the ISO and PX Tariffs to reduce the prices that all sellers were authorized to retain for those sales.

**The Ninth Circuit's *Bonneville* Decision**

67. FERC ruled in a series of decisions that its power to enforce sellers' payment of refunds under the FPA extended to governmental entities, including the Agencies. As FERC explained in the July 25, 2001 Order: "[W]e see no reason to treat [the Agencies] differently [from other non-governmental entity sellers], as they are receiving the same price, the just and

reasonable market clearing price established pursuant to market rules approved by this Commission, that they expected to obtain for their wholesale sales in the centralized ISO and PX spot markets." July 25, 2001 Order, 96 FERC at 61,512. Certain governmental entities, including BPA, appealed this decision to the Ninth Circuit. On September 6, 2005, the Ninth Circuit ruled that FERC lacked statutory authority directly to enforce governmental entities' refund obligations under the ISO and PX Tariffs. *Bonneville Power Admin. v. Federal Energy Regulatory Comm'n*, 422 F.3d 908 (9th Cir. 2005) (reh'g and reh'g *en banc* pending). The Court noted, however, that market participants may have, as an alternative remedy, the ability to bring claims in court directly against governmental entities, like the Agencies, to enforce the contractual obligations created by the operative tariffs and related agreements. *Bonneville*, 422 F.3d at 925-926.

68. The Ninth Circuit observed that the governmental entities' agreement to abide by the ISO and PX Tariffs "[serves] to demonstrate that the remedy, if any, may rest in a contract action, not a refund action. Such an approach is not novel . . . ." *Id.* at 925 (citing *Alliant Energy v. Neb. Pub. Power Dist.*, 347 F.3d 1046, at 1050-51 (8th Cir. 2003)). The Ninth Circuit quoted with approval the Eighth Circuit's holding in *Alliant Energy* that "[w]hen a contract provides that its terms are subject to a regulatory body, all parties to that contract are bound by the actions of the regulatory body . . . . As a result, we are not enforcing the FERC order; instead, we are enforcing an agreement, which [the Agency] freely entered."). *Bonneville*, 422 F.3d at 926 (quoting *Alliant Energy*, 347 F.3d at 1050). The Ninth Circuit has not yet issued the mandate in *Bonneville*.

69. In this Complaint, the California Parties seek to enforce in this Court the Agencies' contractual obligations to refund the amounts they charged in excess of the lawful corrected rates, as suggested by the Ninth Circuit in *Bonneville*.

70. Prior to the Ninth Circuit's *Bonneville* decision on September 6, 2005, no claim accrued and no limitations period commenced to run. Following *Bonneville*, on December 2, 2005, the California Parties complied with the CDA by serving copies of written claims on BPA

and WAPA, providing them with notice of the California Parties' present claims for relief. On December 20, 2005, the California Parties served BPA and WAPA with amended claims. Both BPA and WAPA sent letters to the California Parties seeking additional information related to the claims. On March 16, 2006, BPA sent the California Parties a letter explicitly denying their claims. The letter was signed by Allen L. Burns as "Contracting Officer." On March 22, 2006, WAPA sent the California Parties a letter explicitly denying their claims. The letter was signed by Thomas R. Boyko and Bradley S. Warren as "Contracting Officers." These denial letters are attached to this Complaint as Exhibits F and G and fully incorporated herein.

71. The California Parties' claims are timely. 28 U.S.C. § 2501; 41 U.S.C. § 609(a).

## CLAIMS FOR RELIEF

## FIRST CLAIM

### Breach of Contract

72. The California Parties incorporate by reference the allegations set forth above.

73. All sellers in the ISO and PX markets, including the Agencies, were charged with knowledge that the market prices, and the formulas and/or market rules that set the prices, were subject to correction if FERC found that they contravened the requirements of the FPA. By voluntarily choosing to sell electric power at wholesale in the ISO and PX markets, and by executing ISO Scheduling Coordinator Agreements, PX Participation Agreements, and/or other agreements with the ISO or PX, the Agencies contractually agreed to be bound by the provisions of the ISO and PX Tariffs, which incorporate FERC's power to correct prices that it determines to be unjust, unreasonable, or unlawful.

74. Pursuant to its authority under the FPA, FERC revised the tariffs and corrected the prices that market participants were entitled to receive for their sales during the Refund Period by adopting the MMCP. Upon FERC's correction of the rates charged by sellers, including the Agencies, in the ISO and PX markets, the corrected rates became the only lawful and authorized rates for those sales under the applicable tariffs.

75. The United States is now contractually obligated to reimburse the California IOUs for the difference between the rates that the Agencies initially charged for their sales in the ISO and PX markets and the MMCP. The Agencies have refused to refund, and continue to refuse to refund, to the California IOUs the amounts that they received in excess of the MMCP during the Refund Period.

76. The Agencies' conduct constitutes a breach of their contractual obligations to the California IOUs, entitling the California IOUs to judgment against the United States for all amounts that each Agency received in excess of the lawful rate attributable to its wholesale sales of electric power to the California IOUs in the ISO and PX markets during the Refund Period, plus associated interest.

## SECOND CLAIM

## Anticipatory Breach of Contract

77. The California Parties incorporate by reference the allegations set forth above.

78. This Claim is pleaded in the alternative to the First Claim. If it is determined that the date by which the Agencies would be obligated under the applicable contracts to refund to the California IOUs the amounts that they received in excess of the MMCP during the Refund Period has not yet occurred, the Agencies have nonetheless become obligated to make such refunds immediately, and in advance of such date, because they have wrongfully denied and repudiated any legal duty to so repay the California IOUs. Specifically, the Agencies have repudiated, in the FERC proceedings, in appeals from FERC orders, and by their denials of the California IOUs' duly-presented claims, their contractual obligations to the California IOUs, including their obligation to comply with the revised tariff provisions by refunding their unlawful overcharges.

79. Upon the Agencies' repudiation of their contractual obligations, the California Parties became entitled to sue for breach of contract. The Agencies' conduct constitutes an anticipatory breach of their contractual obligations to the California IOUs, entitling the California IOUs to judgment against the United States for all amounts that each Agency received

in excess of the lawful rate attributable to its wholesale sales of electric power to the California IOUs in the ISO and PX markets during the Refund Period, plus associated interest.

## THIRD CLAIM

### Declaratory Relief (Refund Period)

80. The California Parties incorporate by reference the allegations set forth above.

81. A controversy has arisen in that the Agencies have denied any liability to the California IOUs for overcharges associated with transactions during the Refund Period for which FERC has ordered relief. The California Parties seek a declaratory judgment that the California IOUs are contractually entitled to recover from the United States all amounts that each Agency charged in excess of the lawful rate attributable to its sales to the California IOUs in the ISO and PX markets during the Refund Period.

## FOURTH CLAIM

### Declaratory Relief (Energy Exchanges and/or Multi-Day Sales)

82. The California Parties incorporate by reference the allegations set forth above.

83. A controversy has arisen in that the Agencies have denied that they will have any liability to the California IOUs to refund their overcharges associated with energy exchanges and/or sales found by FERC to be "multi-day" sales, at such time as FERC corrects the prices for these transactions. Pursuant to the Ninth Circuit's decision in *CPUC*, FERC's decision not to provide relief for energy exchanges and multi-day sales during the Refund Period has been reversed. The California Parties seek a declaratory judgment that at such time as FERC corrects the rates charged by sellers for energy exchanges or multi-day sales, the California IOUs will be entitled to recover from the United States the difference between the rates the Agencies initially charged and the lawful rates as ultimately determined by FERC, plus associated interest.

**FIFTH CLAIM**

**Declaratory Relief (Summer Period)**

84. The California Parties incorporate by reference the allegations set forth above.

85. A controversy has arisen in that the Agencies have denied that they will have any liability to the California IOUs to refund their overcharges associated with their sales during the Summer Period at such time as FERC corrects the prices for the Summer Period. Pursuant to the Ninth Circuit's decision in *CPUC*, FERC's decision not to provide relief for the Summer Period has been reversed. The California Parties seek a declaratory judgment that at such time as FERC corrects the rates charged by sellers during the Summer Period, the California IOUs will be entitled to recover from the United States the difference between the rates that the Agencies initially charged and the lawful rates as ultimately determined by FERC, plus associated interest.

**SIXTH CLAIM**

**Declaratory Relief (Contractual Liability for Market Shortfall)**

86. The California Parties incorporate by reference the allegations set forth above.

87. Because the ISO and PX are revenue-neutral entities, the Agencies' refusal to honor their repayment obligations will result in a shortfall of funds needed to settle the accounts of ISO and PX participants. Under the terms of the ISO and PX Tariffs, other market participants, including the California IOUs, may therefore be required to pay for any resulting market shortfall.

88. Any reductions in the California IOUs' accounts to pay for any market shortfall caused by the Agencies' refusal to honor their contractual repayment obligations will constitute amounts due and owing by the Agencies, as ISO Debtors and PX Debtors, to the California IOUs as ISO Creditors and PX Creditors. A controversy has arisen in that the Agencies have denied that they have any obligation to refund amounts they received in excess of the lawful rate. The California IOUs, as market participants, are entitled under the ISO and PX Tariffs to bring proceedings directly against the United States to recover these amounts owed.

89. The California Parties seek a declaratory judgment that the United States will be contractually liable to the California IOUs for any amount assessed against the California IOUs' accounts due to the Agencies' refusal to honor their repayment obligations, as well as for all additional costs and expenses incurred by the California IOUs as a result of the Agencies' refusal to honor their repayment obligations.

## SEVENTH CLAIM

## Declaratory Relief (ISO and PX Accounts)

90. The California Parties incorporate by reference the allegations set forth above.

91. This Claim is pleaded in the alternative to the First through Sixth Claims.

92. A controversy has arisen in that the Agencies have denied that they have any liability to the California IOUs to refund their overcharges associated with their sales during the Refund Period, and that they will have any liability to the California IOUs to refund their overcharges associated with energy exchanges and multi-day sales and sales during the Summer Period at such time as FERC corrects the prices for those transactions. The California Parties seek a declaration that the United States is contractually obligated to permit the Agencies' accounts at the ISO and PX to be adjusted to reflect all pricing changes resulting from FERC's determination of the corrected, maximum rates under the ISO and PX Tariffs and the recalculation by the ISO and PX pursuant to FERC's direction of the prices charged under the ISO and PX Tariffs during the relevant time periods, and is contractually obligated to pay any refunds and to otherwise honor the invoices reflecting the refunds associated with all affected transactions.

## PRAYER FOR RELIEF

WHEREFORE, the California Parties pray for relief against the United States as follows:

1. For judgment against the United States in favor of the California IOUs for all amounts that each Agency charged in excess of the lawful rate attributable to its

sales to the California IOUs in the ISO and PX markets during the Refund Period;

2. For a judgment declaring that the California IOUs are entitled to recover from the United States all amounts that each Agency charged in excess of the lawful rate attributable to its sales to the California IOUs in the ISO and PX markets during the Refund Period;
3. For a judgment declaring that at such time as FERC finds that the rates charged by sellers for energy exchanges or multi-day sales during the Refund Period were unlawful, the California IOUs will be entitled to recover from the United States the difference between the rates that each Agency charged and the lawful rates as ultimately determined by FERC;
4. For a judgment declaring that at such time as FERC finds that the rates charged by sellers during the Summer Period were unlawful, the California IOUs will be entitled to recover from the United States the difference between the rates each Agency charged and the lawful rates as ultimately determined by FERC;
5. For a judgment declaring that at such time as the Agencies' refusal to honor their repayment obligations results in a shortfall of funds necessary to settle the California IOUs' accounts, the United States will be liable to the California IOUs for any amount assessed against the California IOUs' accounts, and all additional costs and expenses incurred by the California IOUs, as a result of the Agencies' refusal to honor their repayment obligations;
6. In the alternative, for a judgment declaring that the United States is contractually obligated to permit the Agencies' accounts at the ISO and PX to be adjusted to reflect all pricing changes resulting from FERC's determination of the corrected, maximum rates under the ISO and PX Tariffs and the recalculation by the ISO and PX pursuant to FERC's direction of the prices charged under the ISO and PX Tariffs during the relevant time periods, and that the United States is

contractually obligated to pay any refunds and to otherwise honor the invoices reflecting the refunds associated with such transactions;

7. For an award of pre-judgment and post-judgment interest;
8. For recoverable costs of suit and other expenses; and
9. For such further relief as the Court may deem just and proper.

DATED: 3/8, 2007

By: *Marie L. Fiala*
MARIE L. FIALA

HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA 94104-2878
Telephone: +1.415.772.6000
Facsimile: +1.415.772.6268

**ATTORNEY OF RECORD FOR PLAINTIFF PACIFIC GAS AND ELECTRIC COMPANY**

**OF COUNSEL:**

RUSSELL P. COHEN
CECILIA Y. CHAN
HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA 94104-2878
Telephone: (415) 772-6000
Facsimile: (415) 772-6268

STAN BERMAN
PEGGY J. WILLIAMS
LISA D. HARDIE
HELLER EHRMAN LLP
701 Fifth Ave, Suite 6100
Seattle, WA 98104-7098
Telephone: (206) 447-0900
Facsimile: (206) 447-0849

MARK PATRIZIO
PACIFIC GAS AND ELECTRIC COMPANY
77 Beale Street, MailCode B30A
San Francisco, CA 94105
Telephone: (415) 973-6344
Facsimile: (415) 973-5520

Attorneys for Plaintiff
Pacific Gas and Electric Company

DATED: Mar. 7, 2007

By: [signature]

JANE I. RYAN

STEPTOE & JOHNSON LLP
1330 Connecticut Avenue NW
Washington, DC 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902

**ATTORNEY OF RECORD FOR SOUTHERN CALIFORNIA EDISON COMPANY**

**OF COUNSEL:**

DANIEL C. SAULS
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue NW
Washington, DC 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902

LEON BASS, JR.
SOUTHERN CALIFORNIA EDISON COMPANY
2244 Walnut Grove Avenue
Rosemead, CA 91770
Telephone: (626) 302-6967
Facsimile: (626) 302-3990

Attorneys for Plaintiff Southern California Edison Company

DATED: March 7, 2007

By: ______________________________
STEVEN BENITO RUSSO

CALIFORNIA ELECTRICITY
OVERSIGHT BOARD
770 L Street, Suite 1250
Sacramento, CA 95814
Telephone: (916) 322-8601
Facsimile: (916) 322-8591

**ATTORNEY OF RECORD FOR THE CALIFORNIA ELECTRICITY OVERSIGHT BOARD**