IN THE

UNITED STATES COURT OF FEDERAL CLAIMS

PACIFIC GAS AND ELECTRIC COMPANY, SOUTHERN CALIFORNIA EDISON COMPANY, AND CALIFORNIA ELECTRICITY OVERSIGHT BOARD,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

SAN DIEGO GAS & ELECTRIC COMPANY, a California corporation,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

No. 1:07-cv-00157-LAS

No. 1:07-cv-00167-LAS

Consolidated

**HON. LOREN A. SMITH**

**PLAINTIFFS' MEMORANDUM OPPOSING DEFENDANT'S MOTION FOR STAY AND MORE DEFINITE STATEMENT**

# TABLE OF CONTENTS

Page

INTRODUCTION AND SUMMARY ........ 1

STATEMENT OF THE CASE ........ 4

A. The Agencies' Contracts ........ 4

B. FERC Revised the Prices Under Defendant's Contracts ........ 5

C. The *Bonneville* Decision ........ 6

D. This Action ........ 7

E. Concurrent Proceedings at FERC ........ 8

ARGUMENT ........ 9

A. The United States Has Adopted a Strategy in the Courts and at FERC Designed to Avoid Ever Having to Pay Refunds ........ 9

B. There Is No Basis for Staying This Action Pending a Decision on a Potential Petition for Certiorari in *Bonneville* ........ 11

1. There Is No "Pressing Need" for a Stay ........ 12

2. The Balance of Legitimate Interests Weighs Entirely Against a Stay ........ 14

C. There Is No Basis for the Court to Order a More Definite Statement Because the Complaint More Than Satisfies the Requirements of Rule 12(e) ........ 16

1. Defendant Cannot Plausibly Claim that the Complaint Is So "Unintelligible" that Defendant Is Unable to Admit or Deny the Allegations ........ 16

2. The Complaint Sufficiently Alleges That Defendant Has Breached Its Contract By Retaining Prices That Are Higher Than the Contract Prices As Revised by FERC ........ 18

3. The Complaint Sufficiently Alleges That Defendant Has Anticipatorily Repudiated Its Contractual Obligations, Giving Rise to a Present Claim for Breach ........ 20

CONCLUSION ........ 22

**APPENDIX**
**TABLE OF CONTENTS**

Page

Declaration of Russell P. Cohen in Support of Plaintiffs' Memorandum Opposing Defendant's Motion for Stay and More Definite Statement .......................... A3

Exhibit 1 Excerpts from Bonneville Power Administration's Annual Report for 2006 .......................... A6

Exhibit 2 Opposition of Governmental Entities to Motion of the California Parties to Stay Issuance of the Mandate (Mar. 19, 2007), filed in the United States Court of Appeals for the Ninth Circuit in *Bonneville Power Administration v. FERC*, Docket Nos. 02-70262, *et al*. .......................... A10

Exhibit 3 Motion by and Answer of the Bonneville Power Administration (BPA) and the Western Area Power Administration (Western) to the California Parties' Motion Related to Procedures Following Remand in *Bonneville Power Administration, et al. v. FERC* (Apr. 17, 2007), filed at the Federal Energy Regulatory Commission in *San Diego Gas & Electric Co.*, FERC Docket Nos. EL00-95-000, *et al.*, and EL00-98-000, *et al.* .......................... A19

Exhibit 4 Answer of the Bonneville Power Administration (BPA) and Western Area Power Administration (Western) to the California Parties' Answer to Motions of the Governmental Entities (May 14, 2007), filed at the Federal Energy Regulatory Commission in *San Diego Gas & Electric Co.*, Docket Nos. EL00-95-000, *et al.*, and EL00-98-000, *et al*. .......................... A40

Exhibit 5 Response to Motion of the California Parties for Leave to Answer the Answers of the Governmental Entities to the Earlier Filed Motion of California Parties (May 14, 2007), filed at the Federal Energy Regulatory Commission in *San Diego Gas & Electric Co.*, Docket Nos. EL00-95-000, *et al.*, and EL00-98-000, *et al* .......................... A47

## TABLE OF AUTHORITIES

**CASES**

*Alliant Energy v. Neb. Pub. Power Dist.*, 347 F.3d 1046 (8th Cir. 2003) ............................ *passim*

*Alliant Energy, Inc. v. Neb. Pub. Power Dist.*, Civ. No. 00-2139, 2001 WL 1640132 (D. Minn. Oct. 18, 2001), aff'd, 347 F.3d 1046 (8th Cir. 2003) ................ *passim*

*Allstate Ins. Co. v. Siegel*, 312 F. Supp.2d 260 (D. Conn. 2004)................................................ 18

*Bisson v. Martin Luther King Jr. Health Clinic*, No. 06-CV-6682 (SJF) (WDW), 2007 WL 1395576 (E.D.N.Y., May 11, 2007) ............................................................ 18

*Bonneville Power Administration v. FERC*, 422 F.3d 908 (9th Cir. 2005) ...................... 2, 4, 7, 19

*Cellco P'ship v. United States*, 54 Fed. Cl. 260 (2002) (Wilson, J.) .......................................... 14

*Cherokee Nation of Okla. v. United States*, 124 F.3d 1413 (Fed. Cir. 1997) .................. 12, 14, 15

*Coast-to-Coast Fin. Corp. v. United States*, 52 Fed. Cl. 352 (2002).......................................... 20

*Commonwealth Edison Co. v. United States*, 46 Fed. Cl. 29 (2000) ............................... 12, 15, 16

*Cox v. Maine Maritime Acad.*, 122 F.R.D. 115 (D. Me. 1988) .................................................. 17

*Data General Corp. v. Johnson*, 78 F.3d 1556 (Fed. Cir. 1996) ................................................ 12

*ESI, Inc. v. Coastal Corp.*, 61 F. Supp.2d 35 (S.D.N.Y. 1999) .................................................. 16

*Exxon Corp. v. United States*, 45 Fed. Cl. 581(1999)..................................................................... 5

*Exxon Mobil Corp. v. United States*, 244 F. 3d 1341 (Fed. Cir. 2001)......................................... 6

*Far West Fed. Bank, S.B., v. Dir. Office of Thrift Supervision*, 930 F.2d 883 (Fed. Cir. 1991) ................................................................................................................ 13

*Fed. Air Marshals v. United States*, 74 Fed. Cl. 484 (2006) ...................................................... 21

*First Fed. Sav. Bank of Hegewisch v. United States*, 52 Fed. Cl. 774 (2002) ............................. 16

*Folden v. United States*, 379 F.3d 1344 (Fed. Cir. 2004).......................................................... 14

*Hawkins v. Risley*, 984 F.2d 321 (9th Cir. 1993)........................................................................ 13

*Hoopa Valley Tribe of Indians v. United States*, 4 Cl. Ct. 656 (1984) ....................................... 15

*Kok v. First Unum Life Ins. Co.*, 154 F. Supp. 2d 777 (S.D.N.Y. 2001) ............................... 16, 18

*Landis v. North America Company*, 299 U.S. 248 (1936).................................................... 12, 14

*Leon v. Hotel and Club Employees Union Local 6*, 26 F.R.D. 158 (S.D.N.Y. 1960) .......... 17

*Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545 (Fed. Cir. 1994) .......... 14

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983) .......... 15

*Nat'l Bank of Detroit v. United States*, 1 Cl. Ct. 712 (1983) .......... 15

*New Hampshire v. Maine*, 532 U.S. 742 (2001) .......... 13

*New Lenox Indus., Inc. v. Fenton*, No. 5:06-cv-184-OC-10GRJ, 2007 WL 1303035 (M.D. Fla., May 3, 2007) .......... 17

*New York Power Authority v. United States*, 42 Fed. Cl. 795 (1999) .......... 13

*Pennsylvania Railroad Co. v. United States*, 363 U.S. 202 (1960) .......... 14

*Pub. Utils. Comm'n of Cal. v. FERC*, 462 F.3d 1027 (9th Cir. 2006) .......... 5, 6

*Travelers Cas. & Sur. Co. v. Smith*, Civ. No. 06-297 Erie, 2007 WL 927964 (W.D. Pa., Mar. 26, 2007) .......... 17, 20

*United States v. Board of Harbor Commissioners*, 73 F.R.D. 460 (D. Del. 1977) .......... 17, 22

*U.S. for Use of Argyle Cut Stone Co. v. Paschen Contractors, Inc.*, 664 F. Supp. 298 (N.D. Ill. 1987) .......... 18

*Vaden v. Lantz*, 459 F. Supp. 2d 149 (D. Conn. 2006) .......... 18

*Vapac Music Publ'g, Inc. v. Tuff 'N' Rumble Mgmt.*, No. Civ. A. 99-10656, 2000 WL 1006257 (S.D.N.Y., July 19, 2000) .......... 18

**FERC DECISIONS**

*San Diego Gas & Elec. Co.*, 93 FERC ¶ 61,294 (2000) .......... 5

*San Diego Gas & Elec. Co.*, 96 FERC ¶ 61,120 (2001) .......... 6

**STATUTES**

16 U.S.C. § 791a .......... 1

**MISCELLANEOUS**

William E. Gladstone, in *Respectfully Quoted: A Dictionary of Quotations* (Suzy Platt ed., 1993) .......... 3

James William Moore, et al., *2A Moore's Federal Practice* (2d ed. 1975) .......... 17

*Restatement (Second ) of Contracts* § 245 (1981) ........................................................................ 20

## INTRODUCTION AND SUMMARY

This action is brought by three California public utilities, Pacific Gas and Electric Company ("PG&E"), Southern California Edison Company ("SCE"), and San Diego Gas & Electric Company ("SDG&E") (collectively, the "IOUs") to hold Defendant to its contractual obligation to refund nearly $300 million in overcharges on sales of electricity made by two federal agencies, Bonneville Power Administration ("BPA") and Western Area Power Administration ("WAPA"), to the IOUs during the 2000-2001 California Energy Crisis.[1] Plaintiffs seek this relief for the benefit of California residents, who are still paying off these overcharges in their electricity rates more than six years after the Energy Crisis ended.

As a condition of selling electricity into the California Independent System Operator ("ISO") and California Power Exchange ("PX") wholesale markets, which are regulated by the Federal Energy Regulatory Commission ("FERC"), BPA and WAPA (together, the "Agencies") signed written contracts agreeing to comply in all respects with the federal Tariffs that governed those auction markets. The Tariffs establish the prices for all transactions in those markets, allow FERC to review and amend market prices pursuant to its exclusive jurisdiction under the Federal Power Act ("FPA"), 16 U.S.C. §§ 791a, *et seq.*, and require sellers such as BPA and WAPA to charge no more than the FERC-approved prices and to refund amounts collected in excess of lawful prices. Specifically, by accepting the Tariffs as contracts, the Agencies agreed to be bound by FERC's determination of what constituted just, reasonable and lawful prices in the ISO and PX markets and to refund overcharges if FERC corrected the prices at which they, along with all other sellers, sold power.

Although FERC ruled in July 2001 that the extraordinarily high prices that prevailed in the California markets during the Energy Crisis had been unjust, unreasonable and unlawful, and

[1] The California Electricity Oversight Board ("EOB"), on behalf of the State of California, joins the IOUs as a plaintiff in this action in its oversight role to ensure the proper functioning of California's power markets. We refer to the plaintiffs collectively as the "California Parties" or "Plaintiffs."

re-set the market prices under the Tariffs at lower, lawful levels, the Agencies have consistently refused to refund the overcharges that they collected during the Energy Crisis and insisted on their right to retain their windfall profits. At the same time, the Agencies, which had also purchased power during the Energy Crisis and, like the IOUs, also paid unlawful overcharges, stand to recover refunds for the power that they purchased.

As we explain in more detail below, the IOUs initially filed claims in regulatory proceedings before FERC to recover refunds of overcharges from the Agencies and other sellers. After FERC re-set the tariffed electricity prices, it ordered all sellers to refund amounts that they had collected in excess of the lawful prices. Although the Ninth Circuit Court of Appeals later ruled that FERC lacked jurisdiction to enforce the payment of refunds by governmental sellers like the Agencies, the court also suggested that the California Parties could bring a breach of contract action to recover damages in the amount of the refunds that governmental sellers owed. *Bonneville Power Administration v. FERC*, 422 F.3d 908, 925-26 (9th Cir. 2005) (hereinafter "*Bonneville*").

The IOUs promptly filed claims with the Agencies under the Contract Disputes Act and Plaintiffs timely sued Defendant in this Court.[2] In light of the *Bonneville* decision, this Court is the *only* forum with jurisdiction to hear the Plaintiffs' contract claims against Defendant and to determine Defendant's contractual liability for refunds.

Defendant's current motion for stay and for more definite statement is an effort to further delay the resolution of Plaintiffs' refund claims. Indeed, when this motion is juxtaposed with the positions that the United States has taken in other fora, it is clear that Defendant's strategy is to frustrate forever Plaintiffs' efforts to obtain relief in any forum, no matter what its contractual

---

[2] Two separate but essentially identical complaints were filed against Defendant: one by PG&E, SCE, and EOB and another by SDG&E. On May 23, 2007, this Court consolidated those complaints. Order, Dkt. No. 9 (filed May 23, 2007). For convenience, we refer to those complaints in text in the singular, as "Complaint," and citations are to the complaint on file in *Pacific Gas and Electric et al. v. United States*, Case No. 1:07-cv-00157, which has been designated as the lead case.

obligations are.

There is no basis to stay this case. Defendant has not demonstrated a pressing need for a stay in this case in light of a possible petition for certiorari from the *Bonneville* decision. Indeed, Defendant's request for such a stay is at odds with the position that Defendant took in *Bonneville,* where Defendant successfully opposed a motion to stay the Ninth Circuit's issuance of a mandate on the ground that it was highly unlikely that a potential cert petition would be granted. All the other relevant factors also counsel against the granting of a stay: there is no pending duplicative litigation; the harm to the IOUs and their ratepayers from further delay in Defendant's payment of its obligations is substantial; and Defendant's motive in seeking the stay appears to be the avoidance of adverse precedent in this action. This Court's paramount obligation is to timely exercise its jurisdiction here, and to allow this case to go forward.

Nor is there any basis to require Plaintiffs to provide a more definite statement of their claims. A motion for more definite statement may be granted only where a complaint is so unintelligible that the defendant is unable to admit or deny the claims. The Complaint is more than adequately pled under that standard and—as is apparent from the long procedural history that precedes this lawsuit and Defendant's own motion—Defendant has had no difficulty understanding and responding to Plaintiffs' claims. In fact, Defendant's motion itself reveals that Defendant plainly understands the nature of Plaintiffs' claims, and even previews its responses. As alleged in the Complaint, the parties have been litigating the refund issues before FERC and in the Ninth Circuit for many years, and thus these allegations are hardly new or surprising to Defendant, particularly since the Ninth Circuit in *Bonneville* suggested precisely the remedy that Plaintiffs seek herein. Defendant's professed desire for more detail about specific facts underlying the claims is a matter for discovery and is an improper use of a motion for more definite statement.

If "justice delayed, is justice denied,"[3] then any further delay in resolving the claims

[3] Suzy Platt (ed.), Respectfully Quoted: A Dictionary of Quotations 954 (1993) (William E. Gladstone 1809-1898).

asserted here will work a grave injustice upon the IOUs and the millions of California's citizens who continue to pay for these overcharges in their utility bills every month. Plaintiffs respectfully request that the motion for stay and for more definite statement be denied and the case be allowed to proceed upon the Complaint as presently pled.

## STATEMENT OF THE CASE

### A. The Agencies' Contracts.

Defendant, through BPA and WAPA, bought and sold power in the two California wholesale electricity markets operated by the ISO and the PX during the Energy Crisis. Complt. ¶ 11.[4] The Agencies made enormous profits on their sales in the ISO and PX markets during the Energy Crisis because a combination of market dysfunction and active manipulation by some sellers drove prices to levels at times *more than one hundred times* higher than average prices in prior periods. *Id.* ¶¶ 43, 46, 49. Like other participants in the ISO and PX markets, including the IOUs, the Agencies were required to, and did, sign written contracts agreeing to comply in all respects with the federally-regulated Tariffs that governed those markets. *Id.* ¶ 18. The ISO and PX Tariffs were incorporated by reference into these contracts, making them part of Defendant's agreements (*id.* ¶¶ 18, 25, 27, Exs. B-E), a not-uncommon practice in the energy industry. *See, e.g.*, *Bonneville*, 422 F.3d at 925-26; *Alliant Energy v. Neb. Pub. Power Dist.*, 347 F.3d 1046, 1050-51 (8th Cir. 2003).

The ISO and PX Tariffs to which the Agencies contractually bound themselves specify in detail the rules of the road for the California markets, prescribing the functions of the markets themselves, and the obligations owed by market participants. Complt. ¶¶ 18, 28. Sales of power in the ISO and PX markets could only take place on terms, including prices, approved by FERC. *Id.* ¶ 18. Important for purposes of the claims pled here, the Tariffs contain the formulas used to

[4] For the most part, the FPA gives FERC comprehensive authority over all aspects of wholesale sales and transmission of electricity in interstate commerce, including over the ISO and PX markets. Complt. ¶¶ 36-38.

establish prices for all transactions in the ISO and PX auction markets. *Id.* Under the Tariffs, in general, all sellers during a particular time period received the same price—called a "market clearing price"—for all transactions in a particular market. *Id.* ¶¶ 20, 22. When that price was grossly inflated by market dysfunction or manipulation, all sellers received that same price, whether or not they had participated in any manipulation. *Id.* This market structure produced huge windfalls for sellers, including the Agencies. *Id.* ¶ 66.

FERC actively regulates and frequently modifies the terms of the ISO and PX Tariffs. The Tariffs allow for FERC's review and amendment of the market prices to ensure that they are "just and reasonable," require market participants to charge no more than the FERC-approved prices and to refund amounts collected in excess of lawful prices, and require participants to post collateral to ensure payment. *Id.* ¶¶ 32, 36-42. Thus, the Agencies consented to FERC's modification of the Tariffs, which effectively changes the terms of contracts that the Agencies signed.

**B. FERC Revised the Prices Under Defendant's Contracts.**

As the Energy Crisis escalated in the second half of 2000, with catastrophic consequences for the IOUs and California's citizens (Compl. ¶¶ 43-50), the California Parties initiated proceedings at FERC, invoking FERC's plenary power to investigate and correct the rates that were being charged under the Tariffs, and requesting refunds (*id.* ¶ 51). FERC Docket No. EL00-95; *Pub. Utils. Comm'n of Cal. v. FERC*, 462 F.3d 1027, 1046-1047 (9th Cir. 2006). The Agencies soon joined as intervenors in the FERC proceedings. *San Diego Gas & Elec. Co.*, 93 FERC ¶ 61,294 at 62,021-22 (2000). As mentioned, the Agencies had also purchased power during the Energy Crisis, and like the IOUs, also paid the same unlawful overcharges. BPA Annual Report, Appendix ("App.") at A7-A9.[5] At FERC, Defendant stands to recover refunds

[5] The Appendix to this memorandum includes the Declaration of Russell P. Cohen in Support of Plaintiffs' Memorandum Opposing Defendant's Motion for Stay and More Definite Statement and exhibits thereto filed concurrently with this brief. Plaintiffs have not submitted a Request for Judicial Notice for the exhibits attached to the Cohen Declaration. If such notice is necessary, however, Plaintiffs request that the Court take judicial notice of all documents attached to the Cohen Declaration. *See Exxon Corp. v. United States*, 45 Fed. Cl. 581, 610

*(Footnote Continued)*

for the power that the Agencies purchased. *At the same time, Defendant has denied having any obligation to pay refunds for the transactions in which the Agencies were sellers, and insisted on its right to retain its windfall profits.*

In an order issued July 25, 2001, FERC ruled that sellers of electric power in the ISO and PX markets (including the Agencies) had sold electric power at unjust, unreasonable and unlawful rates, and that the rates charged in the ISO and PX markets should be corrected for the period October 2, 2000 to June 20, 2001 (the "Refund Period").[6] *San Diego Gas & Elec. Co.*, 96 FERC ¶ 61,120 (2001) ("July 25, 2001 Order"). *See also Public Utils. Comm'n*, 462 F.3d at 1043. FERC also adopted a methodology to recalculate, on a market-wide basis, the maximum competitive market prices that would have existed in the ISO and PX markets if sellers had charged just and reasonable rates. July 25, 2001 Order at pp. 61,516-19. The corrected, maximum rates were called the "Mitigated Market Clearing Price," or "MMCP." FERC ordered the ISO and PX to apply the MMCP to sales during the Refund Period in order to recalculate the charges that all sellers should have received for each interval during the Refund Period in place of the previous unlawful prices. *Id.* at p. 61,519. Under this approach, prices that exceeded the MMCP were subject to refund and also were unlawful under the contracts signed by the Agencies and other governmental entities. FERC concluded that, notwithstanding the Agencies' status as governmental entities, it had the authority to order the Agencies—and ultimately Defendant—to pay the same refunds that FERC imposed on all other sellers. Compl. ¶ 67.

**C. The *Bonneville* Decision.**

The Ninth Circuit disagreed with FERC, and in *Bonneville* held that FERC could not compel governmental sellers, including BPA and WAPA, to pay refunds because the FPA places governmental entities outside the perimeters of FERC's refund authority. *Bonneville*, 422 F.3d

(1999) (taking judicial notice of briefs filed in separate proceeding), *aff'd in part rev'd in part on other grounds, Exxon Mobil Corp. v. United States*, 244 F. 3d 1341 (Fed. Cir. 2001).

[6] The Ninth Circuit has affirmed FERC's decision to modify the pricing formulas in the ISO and PX Tariffs. *Pub. Utils. Comm'n*, 462 F.3d at 1035.

at 920. However, the court went out of its way to note that the California Parties could, as an alternative remedy, bring claims in court directly against governmental sellers to enforce the contractual obligations created by the Tariffs. *Id.* at 925-26. The Ninth Circuit observed that the governmental sellers' agreements to abide by the ISO and PX Tariffs "serves to demonstrate that the remedy, if any, may rest in a contract claim, not a refund action. Such an approach is not novel . . . ." *Id*. (citing *Alliant*).

The Ninth Circuit based its analysis on a similar suit brought by WAPA *as one of the plaintiffs* against a governmental entity that had refused to refund its overcharges (in a different market) on the ground that FERC did not have jurisdiction to force it to do so. *Alliant Energy, Inc. v. Neb. Pub. Power Dist.*, Civ. No. 00-2139, 2001 WL 1640132 (D. Minn. Oct. 18, 2001), *aff'd*, 347 F.3d 1046 (8th Cir. 2003). The Ninth Circuit quoted with approval the district court's holding in *Alliant* that the governmental seller was bound by its contract to comply with the tariff regardless of whether FERC had regulatory authority over it. *Bonneville*, 422 F.3d at 926. The court also endorsed the Eighth Circuit's reasoning on appeal:

> "[w]hen a contract provides that its terms are subject to a regulatory body, all parties to that contract are bound by the actions of the regulatory body. As a result, we are not enforcing the FERC order; instead, we are enforcing an agreement, which [the governmental seller] freely entered."

*Id*., quoting *Alliant*, 347 F.3d at 1050. Plaintiffs' suit here is based on the same legal premises that provided the basis for WAPA's lawsuit in *Alliant*. Thus, far from "nullifying" the governmental entities' refund obligations (Def. Mot. at 7), the Ninth Circuit recognized those potential refund obligations and held that courts, rather than FERC, had jurisdiction to enforce them.

**D. This Action.**

As soon as *Bonneville* held that Defendant was not subject to FERC's jurisdiction to order refunds, the IOUs moved to enforce their private remedies, presenting formal claims to the Agencies as required by the Contract Disputes Act and filing this litigation promptly after the

Agencies denied their claims.[7] Compl. ¶ 70, Exs. F & G. The Complaint pleads causes of action for breach of contract, as well as for anticipatory breach and declaratory relief. *Id.* ¶¶ 72-92. The contract theory laid out in the Complaint is relatively simple, mimicking WAPA's successful pursuit of the same theory as a plaintiff in the *Alliant* proceeding: As a condition of selling energy in the ISO and PX markets, the Agencies entered into contracts and agreed to be bound by their terms, which are contained in the ISO and PX Tariffs. Like many contracts, these two contracts describe obligations that can vary based upon external forces and events outside the control of the parties. As relevant here, Defendant, through the Agencies, agreed that the sale price for any transaction was subject to adjustment if FERC determined that the price was unjust, unreasonable or otherwise unlawful. FERC made that determination, concluding that the prices during the crisis were unjust and unreasonable. As WAPA successfully argued in *Alliant*, Defendant is contractually bound to accept the FERC-adjusted price and refund any resulting overcharges, just like every other participant in the market must do. It is not permitted to reap the extraordinary benefits of the contracts it agreed to—including *collecting* refunds for those transactions in which the Agencies acted as buyers rather than sellers—but shrug off the burdens. Defendant's refusal to refund its overcharges is a breach of its contractual obligations.

**E. Concurrent Proceedings at FERC.**

The ISO and PX have now applied the MMCP to recalculate prices on the sales made during the Refund Period, and have determined the refund liability of each seller, including BPA and WAPA. Compl. ¶ 56. That determination may be used by the Plaintiffs—the buyers—in this contract action as evidence of the amount of damages due for Defendant's breach of contract. The ISO and PX have not yet issued invoices for payment, primarily because FERC has had to address requests by sellers who chose to submit certain additional cost information

[7] Plaintiffs have also filed a similar lawsuit for refunds—based on the same contract theory asserted here—against eighteen state or local governmental entities in the Los Angeles Superior Court. Compl. ¶ 69. *See PG&E et al. v. Arizona Elec. Power Cooperative, Inc. et al.*, Case No. BC369141, Los Angeles Superior Court (filed Apr. 9, 2007).

that would *reduce* their refund liability.

## ARGUMENT

### A. The United States Has Adopted a Strategy in the Courts and at FERC Designed to Avoid Ever Having to Pay Refunds.

Defendant's motion, which seeks to delay or prevent this Court from determining its contractual liability, should be considered in the context of a larger strategy that Defendant has pursued here, in the Ninth Circuit, and at FERC to avoid ever having to return to buyers the hundreds of millions of dollars in overcharges that the Agencies collected during the Energy Crisis. That strategy frequently has entailed the Defendant taking different and even conflicting positions on the same issues in different fora.

For example, Defendant argues to this Court that the *Bonneville* decision is somehow unsettled, and asks for a stay pending a decision on a potential petition for certiorari to the United States Supreme Court. Def. Mot. at 13-15. Now, in the first place, that position is nonsensical on its face. Defendant literally spent years trying to escape FERC's regulatory jurisdiction by arguing vigorously at FERC and on appeal at the Ninth Circuit that FERC lacked authority to order it to pay the refunds that are the subject of this litigation. Now that Defendant has succeeded, by *prevailing* in the *Bonneville* appeal, it asks this Court to stay this action on the chance that the IOUs might file a cert petition, the Supreme Court might grant it, and then might reverse the Ninth Circuit's *Bonneville* holding, thus throwing the refund issue back into FERC's lap.

At the same time, when the IOUs sought a stay of the Ninth Circuit's remand of *Bonneville* to FERC during the pendency of any cert petition that might be filed, Defendant successfully opposed that request, arguing that no stay should be granted because it was *"highly unlikely"* that the Supreme Court would grant certiorari and reverse the *Bonneville* decision.[8] Defendant urged the Ninth Circuit to treat the *Bonneville* decision as final because treating

---

[8] Opposition of Governmental Entities to Motion of the California Parties to Stay Issuance of the Mandate (Mar. 19, 2007) at 3-4 (App. at A12-A13) (emphasis added).

*Bonneville* as settled law was "the only responsible view" and would result in "less, and not more, waste of resources and delay."[9]

Also at the same time, Defendant has argued to FERC that it must treat the *Bonneville* decision as final and settled and on that basis has urged FERC to order the ISO and PX to stop calculating refunds owed by the Agencies.[10] That argument proceeds from the simplistic premise that, under *Bonneville*, FERC has no jurisdiction to compel the Agencies to pay refunds, and ignores Defendant's contractual obligation to the IOUs. By this effort, Defendant apparently hopes to prevent the ISO and PX from ever issuing invoices to the Agencies. So far, FERC has not granted Defendant's request. But at the same time as Defendant is, in effect, trying to shut down the invoicing process at the ISO and PX, it has already signaled that it will later argue to this Court that, *absent* issuance of a final invoice (*see* Def. Mot. at 11), it cannot be held contractually liable to repay its overcharges.[11]

Defendant also is moving ahead at FERC to undermine the IOUs' contractual rights to collateral. The ISO and PX also continue to hold collateral to ensure payment of buyers' and sellers' obligations, as the Tariffs require. The IOUs are contractually entitled to the benefits of that arrangement. Compl. ¶ 32. But Defendant has urged FERC—unsuccessfully, so far—to order the ISO and PX to release Defendant's collateral, even though the Plaintiffs' *contract*

---

[9] *Id*. at 4-5 (App. at A13-A14).

[10] Motion by and Answer of the Bonneville Power Administration (BPA) and the Western Area Power Administration (Western) to the California Parties' Motion Related to Procedures Following Remand in *Bonneville Power Administration, et al. v. FERC* (Apr. 17, 2007) at 5-6 (App. at A24-A25) (urging FERC to stop re-calculating BPA's and WAPA's refund liability).

[11] Plaintiffs, of course, dispute that any ISO or PX invoicing is a necessary prerequisite to their pursuit of this contract action. Defendant has no lawful right to retain prices that are higher than the contract prices as revised by FERC, and is in breach of contract for doing so. *See infra* pp. 18-20. Defendant also has made manifestly clear that it has no intention of ever paying refunds to the IOUs, thus repudiating its contractual obligations. Compl., ¶¶ 70, 78-79. *See infra* pp. 20-22. And, at a minimum, no matter what else may ultimately be determined about the invoicing issue, there can be no question that Plaintiffs' declaratory relief claims are ripe and presently justiciable.

claims for refunds—on the same legal theory WAPA successfully used in *Alliant*—are pending.[12]

The Court should reject Defendant's effort, through this motion, to stall any progress in this Court while it is simultaneously seeking to whipsaw the Plaintiffs by urging FERC to take actions designed to undermine Plaintiffs' contractual remedies.

**B. There Is No Basis for Staying This Action Pending a Decision on a Potential Petition for Certiorari in *Bonneville*.**

The sole ground for Defendant's request for a stay of all proceedings in this action is an attenuated theory of "judicial economy" based on the mere possibility that the *Bonneville* decision might become the subject of a petition for certiorari, the Supreme Court might grant the petition, and the Supreme Court might then decide the case in a way that could confer on FERC some unspecified regulatory authority over Defendant. Def. Mot. at 11-12. That is far from a valid ground for a stay in this Court.

The IOUs have not yet finally determined whether they will seek certiorari of the Ninth Circuit's ruling in *Bonneville*. Even if they do file a cert petition, however, that is no basis for a stay of this action. The Ninth Circuit's decision is final, its mandate has issued, and under that decision, this Court is the only forum available in which Plaintiffs may pursue their contract claims to recover Defendant's overcharges.

Defendant cites not a single case, and we are aware of none, in which a court stayed an active lawsuit before it pending the outcome of a cert petition in another proceeding. That is not surprising. Such a stay would contravene the governing legal standard, which Defendant's brief fails to acknowledge or discuss.

The Federal Circuit has made clear the standard a court must apply in deciding whether to stay a lawsuit pending the outcome of other litigation:

---

[12] Motion by and Answer of the Bonneville Power Administration (BPA) and the Western Area Power Administration (Western) to the California Parties' Motion Related to Procedures Following Remand in *Bonneville Power Administration, et al. v. FERC* (Apr. 17, 2007) at 3, 6, 14 (App. at A22, A25, A33).

> [1] [A] trial court must first identify a pressing need for the stay.
>
> [2] The court must then balance interests favoring a stay against interests frustrated by the action.
>
> [3] Overarching this balancing is the court's paramount obligation to exercise jurisdiction timely in cases properly before it.

*Cherokee Nation of Okla. v. United States*, 124 F.3d 1413, 1416 (Fed. Cir. 1997). Where appropriate, a court may also consider principles of comity, judicial economy and the avoidance of duplicative litigation, and the motives of the party seeking the stay, "with courts disfavoring stays where the movant is seeking to avoid adverse precedent." *Commonwealth Edison Co. v. United States*, 46 Fed. Cl. 29, 34 (2000) (Allegra, J.). All of these factors require a denial of any stay here.

**1. There Is No "Pressing Need" for a Stay.**

"Pressing need" for a stay is a high standard, and Defendant does not even attempt to meet it. The Supreme Court held in *Landis v. North America Company* that the movant seeking a stay "must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else." 299 U.S. 248, 255 (1936). None of Defendant's various rationales for a stay identifies any hardship or inequity that would result from this case being litigated now.

First, Defendant has effectively conceded that there is no need whatsoever, much less a "pressing" need, for a stay of litigation pending review of *Bonneville* on certiorari. Defendant argued—successfully—to the Ninth Circuit that the court should treat the *Bonneville* decision as final and immediately remand that case to FERC because a cert petition would raise no substantial question, and that the Supreme Court "is exceedingly unlikely to grant certiorari and reverse *Bonneville*[.]" Opp. to Mot. to Stay Mandate at 2, 4, 6 (App. at A12, A14, A16). Defendant, having succeeded in that argument, and having obtained the relief that it sought, is judicially estopped from arguing the opposite position to this Court. *Data General Corp. v. Johnson*, 78 F.3d 1556, 1565 (Fed. Cir. 1996) ("where a party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent

proceeding where its interests have changed"). All the elements of judicial estoppel are present here: Defendant's position here is "clearly inconsistent" with its argument to the Ninth Circuit; Defendant's argument to the Ninth Circuit was successful since the Ninth Circuit denied the requested stay and immediately remanded *Bonneville*; and Defendant's assertion of its inconsistent position here would give it "an unfair advantage, or impose an unfair detriment on" the Plaintiffs, in light of the Agencies' simultaneous efforts to undercut this litigation by advancing contrary positions at FERC. *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001).

Second, Defendant erroneously states that a stay is warranted until the *Bonneville* decision "becomes final." Def. Mot. at 13. It is already "final." The Ninth Circuit's decision is to be treated as settled law, final for all purposes, unless and until it is overturned. *Hawkins v. Risley*, 984 F.2d 321, 324 (9th Cir. 1993) (district court's judgment dismissing habeas corpus petition was final and conclusive in separate civil rights action even though an appeal of the dismissal was pending).

Third, Defendant's suggestion that this Court should issue a stay in deference to the *Bonneville* litigation because it has "made the most progress" (Def. Mot. at 14), makes no sense. *Bonneville* has in fact "progressed" so far that it is now effectively over. Moreover, Defendant's argument would *always* militate in favor of staying a subsequently filed case in favor of an earlier case, which is not the standard upon which a stay may be granted.

Finally, Defendant is simply wrong in its suggestion that *Bonneville* is "duplicative litigation." Def. Mot. at 14. Defendant's cited authorities involved true duplicative litigation, where—unlike this case—overlapping claims were being pursued in two separate venues, requiring duplicative discovery and resolution of the same factual and/or legal issues. *See* Def. Mot. at 15, citing *New York Power Authority v. United States*, 42 Fed. Cl. 795 (1999) (granting stay where substantially similar breach of contract claims were pending in different federal courts, and absent stay, might result in inconsistent decisions on same issues); *Far West Fed. Bank, S.B., v. Dir. Office of Thrift Supervision*, 930 F.2d 883, 891 (Fed. Cir. 1991) (declining to sever claim for resolution in Court of Claims where severance would result in two courts having

to determine various aspects of the same complex transaction). Neither decision supports a stay here. Defendant cites no authority even suggesting that an active suit, in the only forum available to the Plaintiffs, may be stayed on the chance that the Supreme Court might grant cert and decide the case in a way that might allow Plaintiffs to pursue their quest for a remedy at FERC.[13]

Defendant misstates the holdings of *Pennsylvania Railroad Co. v. United States* and *Loveladies Harbor, Inc. v. United States*, contending that those cases permit a stay of a contract action in this Court to await the outcome of another proceeding that may have "significant legal consequences" or "determine the necessity for proceeding" with the contract case. *See* Def. Mot. at 15. Both cases are inapposite. *Pennsylvania Railroad* holds that a party who *loses* an agency decision, which *defeats* its contract claim against the United States, is entitled to seek review of the decision before the Court of Federal Claims enters judgment against it on its contract claim. 363 U.S. 202, 205 (1960). The cited portion of *Loveladies* adopts that holding. 27 F.3d 1545, 1554-55 (Fed. Cir. 1994). Here, in stark contrast, Plaintiffs did not suffer defeat of their contract claims before the agency. Rather, FERC revised the tariffed/contract prices, thus providing the basis and support for Plaintiffs' claims here. The Ninth Circuit has already reviewed that FERC decision and the Plaintiffs are not seeking any stay. Thus, nothing in either of the cases that Defendant cites supports granting a stay under such circumstances.

In a case where, as here, a defendant has identified no "pressing need," the Federal Circuit has held that a grant of a defendant's proposed indefinite stay would constitute an abuse of discretion. *Cherokee Nation*, 124 F.3d at 1416, citing *Landis*, 299 U.S. at 255.

**2. The Balance of Legitimate Interests Weighs Entirely Against a Stay.**

"Against any purported need for a stay, the trial court must weigh the countervailing

---

[13] In *Cellco Partnership v. United States*, the court found no justification for a stay pending the outcome of an appeal in another case, because the appeal could well be decided on procedural or other grounds that would not affect the merits of plaintiff's contract claims. *Cellco P'ship v. United States*, 54 Fed. Cl. 260, 263 (2002) (Wilson, J.) *rev'd on other grounds*, *Folden v. United States*, 379 F.3d 1344, 1357-58 (Fed. Cir. 2004).

costs of the stay" to the other party. *Cherokee*, 124 F.3d at 1418. The situation here is one of no need and high costs. Defendant requests a stay of indefinite duration, which according to Defendant would be modest if cert is denied (Def. Mot. at 15), but would stretch on for years if cert is granted. As the court observed in *Cherokee*, "To stay the [Plaintiffs'] suit pending these speculative and protracted events is to place the [Plaintiffs] effectively out of court." 124 F.3d at 1418. Every day of a stay further postpones the already long-delayed relief that the IOUs seek on behalf of their ratepayers, without serving any legitimate countervailing interest whatsoever. This Court may properly consider the public's interest—that of the ratepayers—separate from that of the parties, in securing a speedy and just adjudication of rights. *Hoopa Valley Tribe of Indians v. United States*, 4 Cl. Ct. 656, 657 (1984).

In balancing the parties' interests, courts give particular weight to the motive of the party seeking the stay, denying the stay if the movant seems primarily motivated by the desire to avoid an adverse ruling in the stayed action. *Commonwealth Edison*, 46 Fed. Cl. at 34. That is precisely the situation here. Defendant's only evident motive for a stay is to avoid an adverse ruling in this Court on the contract liability issue, while Defendant is simultaneously pushing FERC to take actions, including terminating the invoicing process, that Defendant apparently hopes will deprive Plaintiffs of a contract remedy. As Judge Allegra stated in *Commonwealth Edison*, "[T]his court need not countenance such legal gamesmanship[.]" 46 Fed. Cl. at 34. *See also Nat'l Bank of Detroit v. United States*, 1 Cl. Ct. 712, 714-15 (1983) (stay is inappropriate where it would deprive party of contractual right to which it is entitled).

Finally, "[o]verarching this balancing is the court's paramount obligation to exercise jurisdiction timely in cases properly before it." *Cherokee*, 124 F.3d at 1416. The Federal Circuit held in *Cherokee* that this Court has a "virtually unflagging obligation … to exercise the jurisdiction given [it] to decide controversies." *Id*. at 1418 (internal citations omitted). In balancing the interests that would be benefited or harmed by a stay, "the balance [should be] heavily weighted in favor of the exercise of jurisdiction." *Nat'l Bank of Detroit*, 1 Cl. Ct. at 714, quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp*., 460 U.S. 1, 16 (1983) (internal

citation omitted). *See also Commonwealth Edison*, 46 Fed. Cl. at 34 (court is "solemnly obliged to exercise the jurisdiction that plaintiff … properly invoked"). Under that test, this case must go forward.

**C. There Is No Basis for the Court to Order a More Definite Statement Because the Complaint More Than Satisfies the Requirements of Rule 12(e).**

**1. Defendant Cannot Plausibly Claim that the Complaint Is So "Unintelligible" that Defendant Is Unable to Admit or Deny the Allegations.**

Defendant's request for a more definite statement of Plaintiffs' claim under Rule 12(e) of the Rules of the Court of Federal Claims, professing ignorance and confusion as to the nature of those claims, simply is not credible. Defendant has been actively involved, along with Plaintiffs, in years of regulatory proceedings at FERC concerning the events giving rise to this contract suit. Moreover, the detailed 29-page Complaint here recounts the events and facts underlying Plaintiffs' claims for relief, and Defendant has already taken public positions on the pertinent issues. Thus there is no valid basis for Defendant's request.

Rule 12(e) strictly limits orders for a more definite statement to complaints that are "so vague or ambiguous that [defendant] cannot reasonably be required to frame a responsive pleading." This is not the same standard as that governing a Rule 12(b)(6) motion to dismiss a complaint for failure to state a claim, which addresses sufficiency of the allegations to state the elements of a cause of action. Rather, Rule 12(e) is limited to complaints so unintelligible that the defendant cannot understand the nature of the claim well enough to admit or deny. *See Kok v. First Unum Life Ins. Co.*, 154 F. Supp. 2d 777, 781-82 (S.D.N.Y. 2001), quoting *ESI, Inc. v. Coastal Corp.*, 61 F. Supp.2d 35, 68 (S.D.N.Y. 1999) (Rule 12(e)[14] motion proper only if "complaint is so excessively vague and ambiguous as to be unintelligible and as to prejudice the

[14] Rule 12(e) of the Rules of the Court of Federal Claims ("RCFC") is identical to its counterpart in the Federal Rules of Civil Procedure. This Court, therefore, looks to decisions of district courts in other Circuits for guidance in applying and interpreting that Rule. *See, e.g., First Fed. Sav. Bank of Hegewisch v. United States*, 52 Fed. Cl. 774, 789 (2002).

defendant seriously in attempting to answer it"); *Cox v. Maine Maritime Acad.*, 122 F.R.D. 115, 116 (D. Me. 1988) (motion may be granted "only when a party is unable to determine the issues he must meet"); *Leon v. Hotel and Club Employees Union Local 6*, 26 F.R.D. 158, 159 (S.D.N.Y. 1960) ("Rule 12(e) is designed to enable a litigant to answer, not to move for dismissal."); *Travelers Cas. & Sur. Co. v. Smith*, Civ. No. 06-297 Erie, 2007 WL 927964, at *1 (W.D. Pa., Mar. 26, 2007) (orders for more definite statement under Rule 12(e) "are limited to remedying *unintelligible, rather than insufficiently detailed* pleadings") (emphasis added).

Defendant's motion at most describes a desire for a more detailed explanation of the facts on which Plaintiffs will rely to prove their claims. That is a matter for discovery, not for Rule 12(e). In fact, Defendant has successfully *resisted* a motion for more definite statement in analogous circumstances. In *United States v. Board of Harbor Commissioners*, 73 F.R.D. 460, 462 (D. Del. 1977), the United States' complaint alleged each defendant "took actions causing . . . oil to be discharged" into the Delaware River, and the defendants sought a more definite statement as to the "actions" which allegedly caused the discharge. The court denied the motion, holding the allegations "fairly notifie[d] defendants of the nature of the claim against them," adding:

> Defendants' motion for a more definite statement is really an effort to "flesh out" the government's case; as such *it is a misuse of Rule 12(e)*. . . . The evidentiary information they seek is more properly the subject of discovery under Rules 26 through 36.

73 F.R.D. at 462 (emphasis added), citing 2A Moore's Federal Practice ¶ 12.18(a) (2nd ed. 1975); 5 Wright & Miller, Federal Practice & Procedure: Civil § 1376 at 738.

The same is true here. Defendant's motion merely seeks to "flesh out" Plaintiffs' allegations of Defendant's present breach and Defendant's repudiation, and is a misuse of Rule 12(e). Defendant is free to seek more detail through discovery, but this motion for more definite statement cannot be used as a substitute for the discovery process. *New Lenox Indus., Inc. v. Fenton*, No. 5:06-cv-184-OC-10GRJ, 2007 WL 1303035, at *13 (M.D. Fla., May 3, 2007) ("to the extent that the Defendants need to obtain additional information to defend themselves at trial

discovery is the avenue to pursue, and not a motion for a more definite statement"); *Kok*, 154 F. Supp. 2d at 782, quoting *Vapac Music Publ'g, Inc. v. Tuff 'N'Rumble Mgmt.*, No. Civ. A. 99-10656, 2000 WL 1006257, at *6 (S.D.N.Y., July 19, 2000) ("allegations that are unclear due to a lack of specificity are more appropriately clarified by discovery rather than by an order for a more definite statement"); *U.S. for Use of Argyle Cut Stone Co. v. Paschen Contractors, Inc.*, 664 F. Supp. 298, 303 (N.D. Ill. 1987) ("we also do not want to conduct discovery via the pleading stage").[15] Defendant's motion for a more definite statement should be denied in its entirety.

**2. The Complaint Sufficiently Alleges That Defendant Has Breached Its Contract By Retaining Prices That Are Higher Than the Contract Prices As Revised by FERC.**

Defendant's assertion that it is unaware of the contractual basis for Plaintiffs' allegation that Defendant is currently in breach of its contractual obligations (Def. Mot. at 10-11) is not credible in light of the specificity provided in the Complaint. Plaintiffs have alleged that Defendant agreed to contracts that require the parties to abide by and comply with any modification of prices by FERC, pointing specifically to the contract provisions at ISO Tariff § 19 and PX Tariff § 13 (Compl. ¶¶ 39-42); that FERC did in fact modify the prices applicable to Defendant's sales during the Refund Period (*id.* ¶ 55); and that regardless of FERC's regulatory jurisdiction over Defendant, Defendant's contract with Plaintiffs requires it to adjust its prices accordingly and repay its overcharges. *Id.* ¶¶ 73-75. As WAPA itself successfully argued as a plaintiff in the *Alliant* case, Defendant is now obligated to make that repayment because Defendant no longer has authority under the contract to retain its overcharges now that FERC

[15] *See also Bisson v. Martin Luther King Jr. Health Clinic*, No. 06-CV-6682 (SJF) (WDW), 2007 WL 1395576, at *1 (E.D.N.Y., May 11, 2007) (noting that motions for more definite statement are "disfavored" and "[t]he preferred course is to encourage the use of discovery procedures to apprise the parties of the factual basis of the claims made in the pleadings"); *Vaden v. Lantz*, 459 F. Supp. 2d 149, 151 (D. Conn. 2006), quoting *Allstate Ins. Co. v. Siegel*, 312 F. Supp.2d 260, 277 (D. Conn. 2004) ("[Rule 12(e)] motions are generally disfavored, however, and are not intended to substitute for the 'normal discovery process.'").

has disallowed them. The *Alliant* court entered summary judgment for WAPA and other plaintiffs on that very ground, holding that "after the FERC-ordered revisions, the [Agreement] lacks authority for the tariff monies NPPD [the governmental entity] collected …. *Absent authority for collecting the tariff charges in the first place, NPPD must pay refunds*." *Alliant*, 2001 WL 1640132, at*4 (emphasis added).

Defendant is intimately familiar with the *Alliant* courts' rulings, both because WAPA was a plaintiff in that case, and because the Ninth Circuit extensively discussed the *Alliant* decisions with approval when it suggested in *Bonneville* that the California Parties' remedy lay in a private contract action such as this one. *Bonneville*, 422 F.3d at 925-26. The Complaint alleges, consistent with *Alliant*, that:

> *[u]pon FERC's correction of the rates charged by sellers*, including the Agencies, in the ISO and PX markets, the corrected rates became the only lawful and authorized rates for those sales under the applicable tariffs. … The United States *is now contractually obligated* to reimburse the [Plaintiffs] for the difference between the rates that the Agencies initially charged for their sales in the ISO and PX markets and the MMCP [FERC's modified prices].

Complt. ¶¶ 74-75 (emphasis added).

There is no question that the Complaint sufficiently apprises Defendant of the nature of Plaintiffs' claims to enable Defendant to admit or deny them. In fact, in its own motion Defendant previews to the Court its intended defense that it should not have to refund its overcharges until it receives final invoices from the ISO and PX. Def. Mot. at 11. Defendant has apparently been formulating that defense for some time, as in March 2006, it denied the IOU's refund claims on the very same basis. Complt. Exs. F & G.

In subsequent motion practice, Defendant may argue to the Court that it has no payment obligation because it has not yet received invoices from the ISO or PX—although, given that it is simultaneously working vigorously to prevent those invoices from ever being issued, that defense will have little merit.[16] But, given the specific allegations of the Complaint, the closely

[16] If Defendant contends that the issuance of invoices is a condition precedent to its performance (with which we disagree), it would be a violation of its duty of good faith and fair dealing to actively work to prevent the issuance of those invoices and frustrate the purpose of the

*(Footnote Continued)*

parallel *Alliant* holding, and the fact that Defendant obviously has thought through the issues enough to arrive at a defense and argue it in its motion to this Court, Defendant's protestations of ignorance should not be credited. There simply is no basis for requiring a more definite statement. *Travelers*, 2007 WL 927964, at *1 (denying Rule 12(e) motion when the motion itself clearly indicated that defendants understood the claim and were capable of responding).

**3. The Complaint Sufficiently Alleges That Defendant Has Anticipatorily Repudiated Its Contractual Obligations, Giving Rise to a Present Claim for Breach.**

In light of the long history of litigation between the parties and the Agencies' sustained efforts in multiple fora to avoid having to refund their overcharges to the Plaintiffs, the Complaint alleges that the Defendant's actions constitute an anticipatory breach of its contractual obligations to the IOUs, entitling the IOUs to sue now for breach of contract and recover Defendant's overcharges. Specifically, the Complaint alleges that

> the Agencies have nonetheless become obligated to make such refunds immediately, and in advance of such date, because they have wrongfully denied and repudiated any legal duty to so repay the [Utilities]. Specifically, *the Agencies have repudiated, in the FERC proceedings, in appeals from FERC orders, and by their denials of the [Utilities'] duly-presented claims, their contractual obligations to the [Utilities]*, including their obligation to comply with the revised tariff provisions by refunding their unlawful overcharges.

Complt. ¶ 78 (emphasis added). *See also id.* ¶ 79.[17] Defendant does not need a more definite statement of that claim in order to be able to admit or deny that it has repudiated its contract obligations.

As noted above, Defendant and the Plaintiffs have been involved in years of litigation at FERC following FERC's orders to sellers to pay refunds, and in the Ninth Circuit on appeal by

---

contract. As the Restatement (Second) of Contracts explains: "Where a duty of one party is subject to the occurrence of a condition, the additional duty of good faith and fair dealing imposed on him . . . may require some cooperation on his part, either by refraining from conduct that will prevent or hinder the occurrence of that condition or by taking affirmative steps to cause its occurrence." Restatement (Second) of Contracts § 245, cmt. a (1981). *See also Coast-to-Coast Fin. Corp. v. United States*, 52 Fed. Cl. 352, 362 (2002).

[17] Finally, if the Court finds that no repudiation has in fact occurred, Plaintiffs are nevertheless entitled to declaratory relief. Complt. ¶ 81.

Defendant and others from those FERC orders. At every stage, on matters of both substance and procedure, Defendant has taken actions and positions inconsistent with acknowledging any contractual or other obligations to pay refunds to the IOUs. To cite just the most recent example, Defendant joined[18] in a May 14, 2007 FERC pleading filed by its litigation allies, the "Indicated Public Entities," stating that "we believed that no contractual obligation [to pay refunds] existed."[19] Defendant's course of conduct also includes the efforts, detailed above, to prevent the ISO and PX from issuing invoices to Defendant, and to obtain a release of its collateral, a protection to which the IOUs are contractually entitled to under the Tariffs to ensure Defendant's performance.

Taken as a whole, Defendant's actions and statements are flatly inconsistent with any recognition of its contract obligations, and make clear that it does not intend to pay refunds to the IOUs, *whenever* the time for payment comes, absent a court order. Moreover, Defendant's action reveal a consistent effort to prevent any court from ruling on the merits of Plaintiffs' claims.

It is equally clear that Defendant both understands Plaintiffs' assertion it has repudiated its obligations and it can readily admit or deny them. Defendant's request for Plaintiffs to provide it with a list of its own statements so that it can determine its own position is nonsensical. It knows what its own prior statements are,[20] and it knows what its position is on Plaintiffs' repudiation claim. Rather than engaging in this game, Defendant can and should

---

[18] Answer of the Bonneville Power Administration (BPA) and Western Area Power Administration (Western) to the California Parties' Answer to Motions of the Governmental Entities at 6 (App. at A46), *San Diego Gas & Elec. Co.*, Nos. EL0095-000, EL00-98-000 (F.E.R.C. May 14, 2007).

[19] Response to Motion of the California Parties for Leave to Answer the Answers of the Governmental Entities to the Earlier Filed Motion of California Parties at 6 (App. at A53) *San Diego Gas & Elec. Co.*, Nos. EL0095-000, EL00-98-000 (F.E.R.C. May 14, 2007).

[20] *See, e.g.*, *Fed. Air Marshals v. United States*, 74 Fed. Cl. 484, 488 (2006) (denying Rule 12(e) motion seeking factual information about periods during which plaintiffs allege they were underpaid because defendant had control over those records).

straightforwardly admit or deny that it has a contractual obligation not to retain prices in excess of the FERC-revised contract prices.

Defendant's true interest appears to be the discovery of additional facts underlying Plaintiffs' allegation that it has repudiated. Def. Mot. at 12. Again, that attempt to "flesh out" Plaintiffs' claims is a matter for discovery and a misuse of Rule 12(e). *United States v. Board of Harbor Commissioners*, 73 F.R.D. at 462.

**CONCLUSION**

For these reasons, Plaintiffs request that the Court deny Defendant's requests for a stay and for a more definite statement.

DATED: June 13, 2007

By: s/ Marie L. Fiala
MARIE L. FIALA

HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA 94104-2878
Telephone: (415) 772-6000
Facsimile: (415) 772-6268

**ATTORNEY OF RECORD FOR PLAINTIFF PACIFIC GAS AND ELECTRIC COMPANY**

**OF COUNSEL:**

RUSSELL P. COHEN
CECILIA Y. CHAN
HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA 94104-2878
Telephone: (415) 772-6000
Facsimile: (415) 772-6268

STAN BERMAN
PEGGY J. WILLIAMS
LISA D. HARDIE
RIMA ALAILY
HELLER EHRMAN LLP
701 Fifth Ave, Suite 6100
Seattle, WA 98104-7098
Telephone: (206) 447-0900
Facsimile: (206) 447-0849

MARK PATRIZIO
PACIFIC GAS AND ELECTRIC COMPANY
77 Beale Street, MailCode B30A
San Francisco, CA 94105
Telephone: (415) 973-6344
Facsimile: (415) 973-5520

Attorneys for Plaintiff
Pacific Gas and Electric Company

DATED: June 13, 2007

By: s/ Jane I. Ryan
JANE I. RYAN

STEPTOE & JOHNSON LLP
1330 Connecticut Avenue NW
Washington, DC 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902

**ATTORNEY OF RECORD FOR THE SOUTHERN CALIFORNIA EDISON COMPANY**

**OF COUNSEL:**

DANIEL C. SAULS
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue NW
Washington, DC 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902

LEON BASS, JR.
SOUTHERN CALIFORNIA EDISON COMPANY
2244 Walnut Grove Avenue
Rosemead, CA 91770
Telephone: (626) 302-6967

Attorneys for Plaintiff Southern California Edison Company

DATED: June 13, 2007

By: s/ Steven Benito Russo
STEVEN BENITO RUSSO

CALIFORNIA ELECTRICITY
OVERSIGHT BOARD
770 L Street, Suite 1250
Sacramento, CA 95814
Telephone: (916) 322-8601
Facsimile: (916) 322-8591

**ATTORNEY OF RECORD FOR THE CALIFORNIA ELECTRICITY OVERSIGHT BOARD**

DATED: June 13, 2007

By: s/ Laura Lindgren
LAURA LINDGREN

HENNIGAN BENNETT & DORMAN LLP
J. Michael Hennigan
Laura Lindgren
Robert W. Mockler
865 S. Figueroa Street
Los Angeles, California 90017
Telephone: (213) 694-1200
Facsimile: (213) 694-1234

**ATTORNEY OF RECORD FOR THE SAN DIEGO GAS & ELECTRIC COMPANY**