IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

Nos. 07-157C, 07-167C
(Senior Judge Smith)

---

PACIFIC GAS AND ELECTRIC COMPANY,
SOUTHERN CALIFORNIA EDISON COMPANY,
AND CALIFORNIA ELECTRICITY OVERSIGHT BOARD,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

SAN DIEGO GAS & ELECTRIC CO.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S MOTION TO DISMISS

---

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

MARK A. MELNICK
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 616-0475
Fax: (202) 305-7644

OF COUNSEL:

SEAN B. McNAMARA
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

Peter Burger
Attorney
Bonneville Power Administration
905 NE 11th Avenue
Portland, OR 97232

John D. Bremer
Attorney
Western Area Power Administration
P.O. Box 281213
Lakewood, CO 80228-2802

February 7, 2008

Attorneys for Defendant

# TABLE OF CONTENTS

PAGE(S)

DEFENDANT'S MEMORANDUM. .... 2

STATEMENT OF THE ISSUES. .... 2

STATEMENT OF THE CASE. .... 3

I. Background. .... 3

II. The Power Crisis, FERC's Rulings, And Appellate Review. .... 5

A. FERC's Prospective Price Cap, Retroactive Refund Order, And The Appellate Court's Reversal Of The Retroactive Refund Order's Applicability To The Government. .... 5

1. FERC's Prospective Price Cap And Retroactive Refund Order. .... 5

2. Appellate Reversal Of The Refund Order's Applicability To Government-Owned Sellers. .... 7

B. Exclusions From FERC's July 25, 2001 Refund Order And Appellate Response. .... 7

1. FERC's Exclusions. .... 7

2. Appellate Response To FERC's Exclusions. .... 8

III. Current Claims In This Court. .... 10

A. The IOUs' Claims. .... 10

1. Damages Claims. .... 10

2. Declaratory Claims. .... 11

B. The CEOB's Claim. .... 11

ARGUMENT. .... 12

I. Standards For A Motion To Dismiss For Lack Of Jurisdiction. .... 12

II. The Plaintiffs Lack Standing To Sue. .... 13

A. The CEOB Lacks Standing To Be A Plaintiff In This Case Because It Does Not Even Claim To Be In Privity Of Contract With The Government .......... 13

B. The IOUs Also Lack Standing To Be Plaintiffs .......... 15

1. Federal Law Should Govern The Substantive Issues In This Case .......... 15

2. The IOUs Lack Privity Of Contract With BPA And WAPA Respecting Their Transactions On The PX .......... 22

a. The PX Tarrif Mechanism Does Not Establish Privity Of Contract Between The IOUs And The Agencies .......... 22

b. FERC Has Adopted SCE's Position That There Is No Privity Of Contract Between The IOUs And The Agencies .......... 24

c. The Ninth Circuit Has Adopted SCE's Position That There Is No Privity Of Contract Between The IOUs And The Agencies .......... 26

d. The IOUs Are Estopped From Claiming That There Is Privity Of Contract Between The IOUs And The Agencies .......... 28

e. The Court Should Defer To The Holdings Dictating That There Is No Privity Of Contract Between The IOUs And The Agencies .......... 31

f. The IOUs Are Not Third Party Beneficiaries Of The Contracts Between The Agencies And The PX .......... 33

2. The IOUs Lack Standing On Their Own To Bring Suit Upon ISO Transactions .......... 34

III. The Court Should Dismiss Counts Four Through Six Of The Complaints, And Part Of Count Seven, All Of Which Seek Declaratory Relief, For Lack Of A Case Or Controversy Under Article III Of The Constitution .......... 38

A. Counts Four, Five, And Part Of Seven, Seek Advisory Opinions About Hypothetical FERC Orders That May Or May Not Occur............. 41

B. Count Six Seeks An Advisory Opinion About Hypothetical ISO Or PX Orders That May Or May Not Occur. .................................... 44

IV. This Court Should Dismiss Plaintiffs' Final Two Claims Because They Were Not Presented To The Contracting Officers...................................... 44

A. Introduction .......................................................................... 44

B. Plaintiffs' Claims Are Based Upon New Operative Facts. ....................... 46

1. The Operative Facts Presented To The Contracting Officers. ...... 47

2. The Operative Facts Of Plaintiffs' Claims In This Court. ............ 48

a. Contractual Liability For Market Shortfall Claim. ........... 48

b. ISO And PX Accounts Claim. ........................................ 49

C. Plaintiffs' Claims Are Based Upon New Legal Theories. ........................ 49

V. Count I Should Be Dismissed Because, As Plaintiffs Now Concede, It Fails To State A Claim Upon Which Relief May Be Granted Because No Contractual Obligation To Issue Refunds Has Arisen Yet. ............................ 51

CONCLUSION. ......................................................................................................... 55

# TABLE OF AUTHORITIES

## CASES

**PAGE(S)**

AAB Joint Venture v. United States,
75 Fed. Cl. 414 (2007). .......... 45

Aetna Life Ins. Co. v. Haworth,
300 U.S. 227 (1937). .......... 39, 40

Alaska v. United States,
32 Fed. Cl. 689 (1995). .......... 14

Al-Kurdi v. United States,
25 Cl. Ct. 599 (1992). .......... 16

Alliant Techsystems, Inc. v. United States,
178 F.3d 1260 (Fed. Cir. 1999). .......... 45

Ammex, Inc. v. United States,
384 F.3d 1368 (Fed. Cir. 2004). .......... 29

Anderson v. United States,
344 F.3d 1343 (Fed. Cir. 2003). .......... 39

Arakaki v. United States,
71 Fed. Cl. 509 (2006). .......... 13

Arkla, Inc. v. United States,
37 F.3d 621 (Fed. Cir. 1994). .......... 29

Bernstein Bros. Pipe & Machinery Co. v. Denver & R.G.W.R Co.,
193 F.2d 441 (10th Cir. 1951). .......... 20

Blonder-Tongue Lab. v. Univ. of Ill. Found.,
402 U.S. 313 (1971). .......... 28

Bonneville Power Administration v. FERC,
422 F.3d 908 (9th Cir. 2005), cert. denied, 2007 WL 2273650
(U.S. Dec. 10, 2007) (No. 07-155). .......... 3, 5, 7, 10

Borough of Lansdale v. PP & L, Inc.,
426 F. Supp. 2d 264 (E.D. Pa. 2006). .......... 29

Boston Edison Co. v. FERC,
441 F.3d 10 (1st Cir. 2006). .......... 31

Boyle v. United Technologies Corp.,
487 U.S. 500 (1988). .......... 17

Brunswick Leasing Corp. v. Wisconsin Central, Ltd.,
136 F.3d 521 (7th Cir. 1998). .......... 36, 37, 38

In re: California Power Exchange Corp.,
245 F.3d 1110 (9th Cir. 2001). .......... 3, 5

Calpine Energy Servs. v. FERC,
471 F.3d 1054 (9th Cir. 2006). .......... 31

Casa de Cambio Comdiv. S.A., de C.V. v. United States,
291 F.3d 1356 (Fed. Cir. 2001). .......... 38

Castle v. United States,
301 F.3d 1328 (Fed. Cir. 2002). .......... 13

Cerberonics, Inc. v. United States,
13 Cl. Ct. 415 (1987). .......... 45, 49

Chaveriat v. Williams Pipe Line Co.,
11 F.3d 1420 (7th Cir. 1993). .......... 30

Church v. Jamison,
143 Cal. App. 4th 1568 (2006). .......... 53

Clearfield Trust Co. v. United States,
318 U.S. 363 (1943). .......... 17

Cochran v. Cochran,
56 Cal. App. 4th 1115 (1997). .......... 53

Contract Cleaning Maint., Inc. v. United States,
811 F.2d 586 (Fed. Cir. 1987). .......... 45

County of Cook v. MidCon Corp.,
773 F.2d 892 (7th Cir. 1985). .......... 28

DaimlerChrysler Corp. v. Cuno,
126 S. Ct. 1854 (2006). .......... 39

Data Gen. Corp. v. Johnson,
78 F.3d 1556 (Fed. Cir. 1996)....... 30

Erickson Air Crane Co. v. United States,
731 F.2d 810 (Fed. Cir. 1984)....... 15

Fireman's Fund Ins. Co. v. England,
313 F.3d 1344 (Fed. Cir. 2002)....... 13

Franconia Assocs. v. United States,
536 U.S. 129 (2002)....... 51

Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.,
528 U.S. 167 (2000)....... 40

German Alliance Ins. Co. v. Home Water Supply Co.,
226 U.S. 220 (1912)....... 33

Glass v. United States,
258 F.3d 1349 (Fed. Cir. 2001)....... 33, 34

Gould v. United States,
67 F.3d 925 (Fed. Cir. 1995)....... 13

Gutz v. United States,
45 Fed. Cl. 291 (1999)....... 16

J. Cooper & Assoc., Inc. v. United States,
47 Fed. Cl. 280 (2000)....... 46

Johnson Controls World Servs., Inc. v. United States,
43 Fed. Cl. 589 (1999)....... 49

Kiewit Constr. Co. v. United States,
56 Fed. Cl. 414 (2003)....... 45, 46

Klump v. United States,
38 Fed. Cl. 243 (1997)....... 29

Kuehne & Nagel, Inc. v. United States,
17 Cl. Ct. 11 (1989)....... 16

Laidlaw Envir. Serv. (GS), Inc. v. United States,
43 Fed. Cl. 44 (1999)....... 46

Lampi Corp. v. American Power Products, Inc.,
228 F.3d 1365 (Fed. Cir. 2000)........................................................................... 30

Long Island Savs. Bank v. United States,
503 F.3d 1234 (Fed. Cir. 2007)........................................................................... 38

Manuel Bros., Inc. v. United States,
55 Fed. Cl. 8 (2002). ......................................................................................... 45

McNutt v. Gen. Motors Acceptance Corp. of Ind.,
298 U.S. 178 (1936)........................................................................................... 12

Mobil Exploration and Producing Southeast, Inc. v. United States,
530 U.S. 604 (2000)........................................................................................... 38

Montana v. United States,
440 U.S. 147 (1979)........................................................................................... 28

Nat'l Treasury Employees Union v. United States,
101 F.3d 1423 (D.C. Cir. 1996). ................................................................ 40, 41, 43

O'Neill v. Dept. of Housing and Urban Dev.,
220 F.3d 1354 (Fed. Cir. 2000)........................................................................... 38

In Re Pac. Ry. Comm.,
32 F. 241 (C.C. Cal. 1887)................................................................................. 39

Padbloc Co., Inc. v. United States,
161 Ct. Cl. 369 (1963). ...................................................................................... 16

Palmer v. United States,
168 F.3d 1310 (Fed. Cir. 1999)........................................................................... 12

Pub. Serv. Elec. and Gas Co. v. FERC,
485 F.3d 1164 (D.C. Cir. 2007). ......................................................................... 31

Public Service Co. of Colorado v. United States,
5 Cl. Ct. 818 (1984). ......................................................................................... 33

Public Utilities Commission v. FERC,
456 F.3d 1025 (9th Cir. 2006). ................................................................... passim

Raines v. Byrd,
521 U.S. 811 (1997)........................................................................................... 39

Reg'l Rail Reorganization Act Cases,
419 U.S. 102 (1974). .......... 40

Reliance Ins. Co. v. United States,
931 F.2d 863 (Fed. Cir. 1991). .......... 45

Renda Marine, Inc. v. United States,
71 Fed. Cl. 378 (2006). .......... 45, 46, 47, 49

Reno v. Catholic Soc. Servs., Inc.,
509 U.S. 43 (1993). .......... 40

Reynolds v. Army & Air Force Exch. Serv.,
846 F.2d 746 (Fed. Cir. 1988). .......... 12

Roedler v. Dept. of Energy,
255 F.3d 1347 (Fed. Cir. 2001). .......... 33

Romano v. Rockwell Int'l, Inc.,
14 Cal. 4th 479 (1996). .......... 53

Rothe Dev. Corp. v. Dept. of Def.,
413 F.3d 1327 (Fed. Cir. 2005). .......... 40

S. Cal. Fed. Sav. & Loan Ass'n. v. United States,
422 F.3d 1319 (Fed. Cir. 2005). .......... 13, 24

S. Pac. R. Co. v. United States,
168 U.S. 1 (1897). .......... 28

S.R.A., Inc. v. Minnesota,
327 U.S. 558 (1946). .......... 17

San Diego Gas & Elec. Co.,
92 F.E.R.C. ¶ 61,172 (2000). .......... 5

San Diego Gas & Electric Co.,
95 F.E.R.C. ¶ 61,418 (2001). .......... 6

San Diego Gas & Electric Co.,
96 F.E.R.C. ¶ 61,120 (2001). .......... 6, 53

San Diego Gas & Electric Co.,
121 FERC ¶ 61,067 (2007). .......... 7

San Diego Gas & Electric Co.,
121 FERC ¶ 61,188 (2007). ........................................................................................ 7

Santa Fe Eng's., Inc. v. United States,
818 F.2d 856 (Fed. Cir. 1987)......................................................................... 45, 46, 48

Scheuer v. Rhodes,
416 U.S. 232 (1974)...................................................................................................... 12

Schism v. United States,
316 F.3d 1259 (Fed. Cir. 2002)...................................................................................... 38

Scott Timber Co. v. United States,
333 F.3d 1358 (Fed. Cir. 2003)................................................................................. 45, 46

Simon v. E. Ky. Welfare Rights Org.,
426 U.S. 26 (1976)........................................................................................................ 39

So. Cal. Ed. Co. v. Lynch,
307 F.3d 794 (9th Cir. 2002). ............................................................... 26, 27, 29, 30

Southern California Edison Co.,
80 F.E.R.C. ¶ 61262 (1997). ................................................................ 24, 25, 29, 32

Taylor v. Johnston,
15 Cal. 3d 130 (1975). ................................................................................................ 53

Texas v. United States,
523 U.S. 296 (1998)................................................................................................ 41, 43

Thomas Creek Lumber Co. v. United States,
36 Fed. Cl. 220 (1996). ............................................................................................... 16

Trauma Serv. Group v. United States,
104 F.3d 1321 (Fed. Cir. 1997)...................................................................................... 13

United States v. Kimbell Foods, Inc.,
440 U.S. 715 (1979)...................................................................................................... 17

United States v. Seckinger,
397 U.S. 203 (1970)................................................................................................ 17, 19

United States v. Utah Constr. & Mining Co.,
384 U.S. 394 (1966)...................................................................................................... 28

Univ. of Tenn. v. Elliott,
478 U.S. 788 (1986)........................................................................................ 28

Whitmore v. Arkansas,
495 U.S. 149 (1990)........................................................................................ 40

## STATUTES

16 U.S.C. § 824e........................................................................................................ 5

28 U.S.C. § 1491....................................................................................................... 13

41 U.S.C. § 601(4)..................................................................................................... 13

41 U.S.C. § 605(a)..................................................................................................... 44

41 U.S.C. § 609......................................................................................................... 13

Cal. Pub. Util. Code §§ 330-398.5............................................................................ 3

Cal. Pub. Util. Code § 335(c)..................................................................................... 14

Cal. Pub. Util. Code § 341(c)..................................................................................... 14

## MISCELLANEOUS

4 A. Corbin, Contracts § 959 (1951)......................................................................... 51

13 Samuel Williston, A Treatise on the Law of Contracts, § 37:19 (4th ed. 2000).................... 33

Restatement (Second) of Agency §§ 148, 187, 305 (1958)........................................ 37

Restatement (Second) of Contracts § 235(2) (1979)................................................... 51

Restatement (Second) of Judgments § 83 (1982)........................................................ 29

Restatement (Third) of Agency § 6.05(2) (2006)......................................................... 36

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PACIFIC GAS AND ELECTRIC COMPANY, SOUTHERN CALIFORNIA EDISON COMPANY, AND CALIFORNIA ELECTRICITY OVERSIGHT BOARD,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 07-157C<br>(Senior Judge Smith) |
| SAN DIEGO GAS & ELECTRIC CO.,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 07-167C<br>(Senior Judge Smith) |

**DEFENDANT'S MOTION TO DISMISS**

Pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant respectfully requests that the Court dismiss this case for lack of jurisdiction. First, the California Electricity Oversight Board ("CEOB") does not assert that it is in privity of contract with the Government and therefore does not possess standing to sue. Second, plaintiffs are not in privity of contract with any Government agency respecting their transactions on the California Power Exchange ("PX," "CPX," or "CalPX") and therefore do not

possess standing to sue based upon those transactions. Third, plaintiffs do not possess standing to sue on their own respecting their transactions with the California Independent System Operating Corporation ("ISO" or "CAISO"). Fourth, counts four through six of the complaints, and part of count seven, should be dismissed for lack of a case or controversy under Article III, Section 2 of the Constitution. Fifth, counts six and seven of the complaints should be dismissed for failure to present a claim pursuant to the requirements of the Contract Disputes Act ("CDA").

Additionally, pursuant to RCFC 12(b)(6), defendant respectfully requests that, to the extent the Court determines it possesses jurisdiction to entertain it, count one be dismissed for failure to state a claim. Plaintiffs have now admitted that the alleged contractual performance obligation that the count claims was breached has not yet even arisen.

In support of this motion, we rely upon the complaints filed in these cases, the following memorandum, and the accompanying appendix.

## DEFENDANT'S MEMORANDUM

## STATEMENT OF THE ISSUES

1. Whether the Court should dismiss the CEOB's claim for lack of jurisdiction, given that it fails to allege that it is in privity of contract with the United States and therefore lacks standing to assert the contract claims at issue.

2. Whether the Court should dismiss all of the claims respecting PX transactions for lack of jurisdiction given that the plaintiffs are not in privity of contract with the United States respecting those transactions and therefore lack standing to assert the contract claims at issue.

3. Whether the Court should dismiss all of the claims respecting ISO transactions because plaintiffs lack standing to assert them on their own.

4. Whether the Court should dismiss counts four through six, and part of count seven, for lack of a case or controversy under Article III, Section 2 of the Constitution, given that they seek purely advisory opinions based upon hypothetical sets of facts that may or may not ever happen.

5. Whether the Court should dismiss counts six and seven for failure to present a claim under the CDA.

6. Whether the Court should dismiss count one for failure to state a claim upon which relief may be granted because, as the plaintiffs admit, even if the tariff rates have been reset by the Federal Energy Regulatory Commission ("FERC"), no obligation to pay refunds has arisen under the tariff terms yet.

## STATEMENT OF THE CASE

### I. Background

As noted in prior filings, these cases arise from the California power crisis of 2000 through 2001. Explanations of the facts surrounding these cases can be found in Public Utilities Commission ("CPUC") v. FERC, 456 F.3d 1025, 1035-44 (9th Cir. 2006); Bonneville Power Administration ("BPA") v. FERC, 422 F.3d 908, 911-14 (9th Cir. 2005), cert. denied, 2007 WL 2273650 (U.S. Dec. 10, 2007) (No. 07-155); and In re: California Power Exchange Corp. ("CPX"), 245 F.3d 1110, 1114-19 (9th Cir. 2001). To summarize, in 1996 California enacted Assembly Bill 1890 ("AB 1890"). Cal. Pub. Util. Code §§ 330-398.5. That Act required California's three major electric investor-owned utilities ("IOUs") to divest themselves of substantial amounts of their power generation facilities. CPUC, 456 F.3d at 1035-36. Those utilities, Pacific Gas and Electric Co. ("PG&E"), Southern California Edison Co. ("SCE"), and

San Diego Gas and Electric Co. ("SDG&E"), are now plaintiffs in these consolidated cases.

Instead of generating their own electricity, under AB 1890 the IOUs were initially required to purchase all of their power from a new, centralized market called the PX. The PX ran a price auction in which purchasers and suppliers submitted bids that generated a single market clearing price necessary to meet the entire market's demands for electricity for a particular period of time. All bidders paid or received that single market clearing price for the time period. Because the PX was deemed a public utility pursuant to the Federal Power Act ("FPA"), its operations and transactions were governed by a tariff approved by FERC. CPUC, 456 F.3d at 1036-37. That tariff also provided the mechanism by which payments were made for the power transacted, with the PX generating settlement statements and invoices that billed participants for the amounts they owed. PG&E Complaint ¶ 26; SDG&E Complaint ¶ 23.

AB 1890 also established the California Independent System Operator Corporation ("ISO"). Although the IOUs continue to own their electricity transmission facilities, the legislation required the IOUs to give operational control of these facilities to the ISO. The ISO operates the electricity transmission grid, directing necessary power to the loads of the IOUs as well as others. CPUC, 456 F.3d at 1037. To run the grid, the ISO is authorized to acquire the necessary power to balance it, known as "imbalance energy," as well as operating reserves, known as "ancillary services." Id. The ISO runs its own auction market to obtain these services in which it receives bids from suppliers and then, like the PX, sets a single price necessary to meet the market's demands for a particular time period. Like the PX, the ISO is regulated by FERC and therefore operates under a FERC-approved tariff. Also like the PX, the ISO tariff provides the mechanism for the ISO to generate statements and invoices to bill participants for

the power and services purchased. CPUC, 456 F.3d at 1037; PG&E Complaint ¶ 26; SDG&E Complaint ¶ 23.

## II. The Power Crisis, FERC's Rulings, And Appellate Review

In the summer of 2000, California began to experience a power crisis. Prices in the PX markets spiked sharply. CPX, 245 F.3d at 1115-16. Accordingly, in August, 2000, SDG&E filed a complaint with FERC claiming the PX and ISO markets were producing unjust and unreasonable prices, and sought a price cap. FERC denied the request but initiated an investigation of those allegations under section 206 of the FPA (16 U.S.C. § 824e) on August 23, 2000. BPA, 422 F.3d at 912; San Diego Gas & Elec. Co., 92 F.E.R.C. ¶ 61,172, at 61,603 (2000). FERC's investigation led to several actions.

### A. FERC's Prospective Price Cap, Retroactive Refund Order, And The Appellate Court's Reversal Of The Retroactive Refund Order's Applicability To The Government

#### 1. FERC's Prospective Price Cap And Retroactive Refund Order

Pursuant to section 206(a) of the FPA (16 U.S.C. § 824e(a)), whenever FERC determines that a public utility's rate for a sale, or contract affecting that rate, is unjust or unreasonable, it shall determine a new just and reasonable rate or contract to be thereafter observed by that public utility for its future sales.[1] However, FERC's retroactive powers are more limited. Pursuant to section 206(b) of the FPA (16 U.S.C. § 824e(b)), FERC may only order a public utility to refund any amounts already paid to the utility upon previous sales that exceed the rate or contract that FERC has ordered to be thereafter observed. Thus, in contrast to its power under section 206 to

---

[1] Significantly, a public utility is an investor-owned utility, not a government-owned utility.

prospectively modify a public utility's rates or contracts, FERC is not also empowered to retroactively modify those rates or contracts; it may only order public utilities to issue refunds.[2]

In purported accordance with these provisions, on June 19, 2001, FERC implemented a prospective price cap upon future ISO spot market sales, effective June 20, 2001, through September 30, 2002. CPUC, 456 F.3d at 1041-43; San Diego Gas & Electric Co., 95 F.E.R.C. ¶ 61,418, at 62,545-48 (2001). Respecting prior sales into the markets, on July 25, 2001, FERC set a Mitigated Market Clearing Price ("MMCP") and ordered sellers to refund the difference between the prices paid for sales occurring between October 2, 2000, and June 19, 2001, and what the prices would have been had the June 19 MMCP been in effect, with some modifications. CPUC, 456 F.3d at 1042, 1054; San Diego Gas & Electric Co., 96 F.E.R.C. ¶ 61,120, at 61,502, 61,516 (2001). This time frame is commonly referred to as the "Refund Period."

FERC ordered the ISO and the PX to commence calculating the refund amounts due under MMCP from each seller in the exchanges and to rerun their settlement/billing process in accordance with the order. San Diego Gas & Electric Co., 96 F.E.R.C. at 61,516-17, 61,520; PG&E Complaint ¶ 56, SDG&E Complaint ¶ 50. That process has continued since then, with no final billing statements presented for payment. FERC's order included the unprecedented requirement that government-owned sellers, and not just investor-owned public utilities, pay refunds.

[2] The refunds are limited to amounts paid for electricity sold after an "effective refund date," which is established by FERC pursuant to requirements contained in section 206(b).

2. Appellate Reversal Of The Refund Order's Applicability To Government-Owned Sellers

Various governmental entities that sold electricity into the PX and ISO markets, including BPA, challenged FERC's inclusion of governmental entities within the scope of its July 25, 2001 refund order. In a decision dated September 6, 2005, the United States Court of Appeals for the Ninth Circuit ruled that FERC lacked the authority to order governmental entities to issue refunds. BPA, 422 F.3d at 914. The Court ruled that Congress had limited FERC's refund authority to public utilities, which again means investor-owned utilities, not government-owned entities. The court of appeals remanded the matter to FERC for actions consistent with its decision.[3] Id. at 926. As explained in more detail below, the IOUs now seek these same refunds in this suit.

B. Exclusions From FERC's July 25, 2001 Refund Order And Appellate Response

1. FERC's Exclusions

FERC's July 25, 2001 refund order did exclude certain items from the scope of its MMCP methodology that had been sought by claimants. First, FERC declined to order relief for

[3] Remand proceedings before FERC are continuing. On October 19, 2007, FERC issued an order holding, among other things, that the Commission had not previously "revised the pricing formulations contained in the CAISO/PX tariffs for the period to which the MMCP applies." San Diego Gas & Electric Co., 121 FERC ¶ 61067, at ¶ 36 (2007). This conclusion directly controverted the central premise of plaintiffs' claims in this Court, which is that plaintiffs are entitled to a contractual remedy because FERC has rewritten the tariffs. FERC did not, however, stand by its holding on November 19, 2007, following plaintiffs' request for "clarification," FERC reversed course entirely, and held that the Commission had, in fact, revised the prices contained in the tariffs. San Diego Gas & Electric Co., 121 FERC ¶ 61188, at ¶ 13 (2007). FERC's revised order did not address the agencies' arguments concerning, for example, the filed rate doctrine or the plain language of the Federal Power Act. Accordingly, the agencies moved on December 19, 2007, for reconsideration of FERC's order. FERC has yet to rule upon our motion for reconsideration.

sales into the ISO or PX that occurred prior to October 2, 2000. CPUC, 456 F.3d at 1042. This period is commonly referred to as the "Summer Period." Second, FERC excluded sales into the ISO and PX that were for periods in excess of 24 hours. CPUC, 456 F.3d at 1054.

Finally, FERC excluded Exchange Sellers from the refund proceedings. CPUC, 456 F.3d at 1057-58. In an exchange, the ISO would enter into a transaction with a first seller, the "Exchange Seller," which would agree to provide the ISO with an agreed upon amount of power, in exchange for which it would receive power back from the ISO at a later time, plus some additional amount. Later, the ISO would purchase power on the spot market from a second seller, the "Spot Seller," and use that power to pay back the Exchange Seller. FERC's July 25 refund order applied to mitigate the price paid by the ISO to the Spot Seller, but FERC declined to take action upon the transaction with the Exchange Seller to mitigate the value of the exchange with that entity. Id.

2. Appellate Response To FERC's Exclusions

As part of a comprehensive review of FERC's actions, in CPUC, the United States Court of Appeals for the Ninth Circuit reversed FERC respecting the Summer Period, the 24-hour sales, and the Exchange Sellers. CPUC, 456 F.3d at 1046, 1054, 1057.

Respecting the Summer Period, the court of appeals agreed with FERC that section 206 of the FPA did not authorize FERC to order refunds for transactions occurring during the Summer Period because it predated the earliest date for which refunds could be ordered under that statute, the effective refund date of October 2, 2000. Accordingly, FERC could not order public utilities to issue refunds in response to any complaint under section 206 that the rates generated by the ISO and CPX during the Summer Period might have been unjust or

unreasonable, as FERC did for the Refund Period. CPUC, 456 F.3d at 1044.

The court of appeals did observe, however, that another provision of the FPA, section 309, authorizes FERC to order refunds for tariff violations stemming from market manipulation by certain participants, with no time limits. CPUC, 456 F.3d at 1044, 1046. The court held that it was arbitrary and capricious for FERC to categorically decide not to consider this remedy. Without prejudicing how FERC should address the merits, or whether any remedy under section 309 should be imposed at all, the court ruled that FERC could not simply refuse to entertain the issue; it had to address it upon the merits. CPUC, 456 F.3d at 1058-59. Thus, if any refunds are ultimately to be ordered by FERC for the Summer Period, they will not be based upon a mere determination under FPA section 206 that the ISO or PX generated unreasonable prices, but likely upon a very different finding under FPA section 309 that the public utility being ordered to issue the refund has engaged in a tariff violation resulting from market manipulation.

Respecting transactions exceeding 24 hours, the court of appeals essentially ruled that FERC had not provided a reasonable explanation for limiting its refund order to transactions not exceeding that length of time. CPUC, 456 F.3d at 1057. Regarding Exchange Sellers, the court rejected FERC's suggestion that it was impossible to place a monetary value upon the exchanges to assess whether they were unreasonable. FERC had not performed an adequate analysis to support that conclusion. CPUC, 456 F.3d at 1059.

No mandate has been issued yet in CPUC, and accordingly FERC has yet to commence any remand proceedings respecting the Summer Period, the transactions exceeding 24 hours, or the Exchange Sellers. There is no current schedule for FERC to do so either. As also explained in more detail below, the IOUs now seek declaratory rulings in this case that, should FERC

ultimately determine that the amounts charged by BPA and WAPA for these types of transactions are unlawful, then the Government is contractually obligated to pay the refunds to them.

## III. Current Claims In This Court

### A. The IOUs' Claims

#### 1. Damages Claims

The IOUs have now brought these consolidated contract claims in this Court, attempting to recover here from BPA and WAPA what the Ninth Circuit denied them in BPA v. FERC. The IOUs claim to be in privity of contract with BPA and WAPA as the purchasers from them of power they sold into the ISO and PX during the Refund Period. PG&E Complaint ¶ 42; SDG&E Complaint ¶ 36. The IOUs claim that the PX and ISO tariffs provide the contractual terms of sale. PG&E Complaint ¶ 18, SDG&E Complaint ¶ 12. Notwithstanding that FERC entirely lacks authority to order BPA and WAPA to issue refunds, the IOUs claim that FERC effectively required the agencies to do so anyway in its July 25, 2001 refund order by revising the tariffs and correcting the prices BPA and WAPA were entitled to receive, retroactively imposing new, lower rates upon these Refund Period power sales, reflecting FERC's MMCP price cap. Accordingly, the IOUs claim that BPA and WAPA have been contractually required by the retroactively amended tariffs to issue the same refunds to them that were ordered by FERC and nullified by the Ninth Circuit. They claim that BPA and WAPA have either breached that refund obligation or anticipatorily breached it. They seek damages for all amounts received by BPA and WAPA in excess of the revised prices. PG&E Complaint ¶¶ 55-56, 72-79; SDG&E Complaint ¶¶ 49-50; 64-71.

2. Declaratory Claims

The IOUs also seek the following declaratory rulings:

1) that BPA and WAPA owe the amounts sought for the Refund Period, PG&E Complaint ¶¶ 80-81, SDG&E Complaint ¶¶ 72-73, 78-84;

2) that at such time FERC rules that rates charged by BPA and WAPA for Refund Period exchange transactions, or transactions exceeding 24 hours, are unlawful, that the IOUs are entitled to recover the difference between what was charged and the lawful rates determined by FERC, PG&E Complaint ¶¶ 82-83, SDG&E Complaint ¶¶ 74-75;

3) that at such time FERC rules that rates charged by BPA and WAPA for Summer Period transactions are unlawful, that the IOUs are entitled to recover the difference between what was charged and the lawful rates determined by FERC, PG&E Complaint ¶¶ 84-85, SDG&E Complaint ¶¶ 76-77;

4) that, to the extent BPA and WAPA's failure to pay amounts due causes a shortfall in the IOUs' accounts, the United States is liable for any amount assessed against their accounts, and all other costs and expenses incurred as a result, PG&E Complaint ¶¶ 86-89, SDG&E Complaint ¶¶ 78-81;

5) alternatively, that the United States is contractually obligated to permit BPA and WAPA's accounts at the ISO and PX to be adjusted to reflect all pricing changes resulting from FERC's determinations, PG&E Complaint ¶¶ 90-92, SDG&E Complaint ¶¶ 82-84.

B. The CEOB's Claim

The CEOB claims to be a creature of California statute that oversees the PX and ISO. PG&E Complaint ¶ 7. It quotes California Public Utility Code section 335 to declare that it must

"'investigate any matter related to the wholesale market for electric power to ensure that the interests of California's citizens and consumers are served, protected, and represented in relation to the availability of electric transmission and generation and related costs, during periods of peak demand.'" PG&E Complaint ¶ 7. It claims to "join this action pursuant to its statutory authority to sue and to participate in all proceedings relevant to the purposes of the electricity restructuring provisions [in AB 1890], in order to protect the interests of the citizens of California in the subject litigation." Id. The CEOB does not claim to be in privity of contract with BPA and WAPA regarding their power sales into the ISO and PX, it does not claim that BPA and WAPA owe it anything, and it does not seek an order that they will owe it anything in the future. Accordingly, it does not claim to be entitled to any damages or other relief.

## ARGUMENT

### I. Standards For A Motion To Dismiss For Lack Of Jurisdiction

A challenge to the court's general power to adjudicate in specific areas of substantive law is properly raised by a 12(b)(1) motion. Palmer v. United States, 168 F.3d 1310, 1313 (Fed. Cir. 1999). In determining whether it has subject matter jurisdiction to entertain a plaintiff's complaint, the Court should presume all undisputed factual allegations to be true and construe all reasonable inferences in favor of the plaintiff. Scheuer v. Rhodes, 416 U.S. 232, 236-37 (1974). If this Court's jurisdiction is challenged, a plaintiff cannot rely merely upon allegations in the complaint, but must instead bring forth relevant, competent proof to establish jurisdiction. See McNutt v. Gen. Motors Acceptance Corp. of Ind., 298 U.S. 178, 189 (1936). The plaintiff bears the burden of establishing the Court's jurisdiction by a preponderance of the evidence. Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).

II. The Plaintiffs Lack Standing To Sue

The claims here should be dismissed for several reasons. The first is that plaintiffs lack standing. Standing is a jurisdictional issue. Castle v. United States, 301 F.3d 1328, 1337 (Fed. Cir. 2002); Arakaki v. United States, 71 Fed. Cl. 509, 521 (2006). These are contract claims purported to be brought pursuant to the Tucker Act, 28 U.S.C. § 1491, and the Contract Disputes Act ("CDA"), 41 U.S.C. § 609(a)(1). To possess standing to pursue a contract claim in this Court under the Tucker Act, a plaintiff must be in privity of contract with the United States. S. Cal. Fed. Sav. & Loan Ass'n. v. United States, 422 F.3d 1319, 1328 (Fed. Cir. 2005); Arakaki, 71 Fed. Cl. at 521. Similarly, claims against the Government subject to the CDA may be brought by only a "contractor." 41 U.S.C. § 609. Under the CDA a "contractor" is a "party to a government contract other than the government." 41 U.S.C. § 601(4); Fireman's Fund Ins. Co. v. England, 313 F.3d 1344, 1351 (Fed. Cir. 2002). Additionally, multiple principals that have been bound to a contract by an agent lack standing to sue upon that contract individually.

Here, the CEOB lacks standing because it does not claim to be in privity of contract. Further, the IOUs are not in privity of contract with the Government respecting PX transactions. Finally, even if the IOUs are in privity of contract respecting ISO transactions, they lack standing to sue as individuals concerning those transactions.

A. The CEOB Lacks Standing To Be A Plaintiff In This Case Because It Does Not Even Claim To Be In Privity Of Contract With The Government

If a plaintiff fails to allege privity of contract, its complaint should be dismissed for a lack of subject matter jurisdiction. Trauma Serv. Group v. United States, 104 F.3d 1321, 1324 (Fed. Cir. 1997); Gould v. United States, 67 F.3d 925, 927 (Fed. Cir. 1995). Because the CEOB does

not claim to be in privity with the Government respecting the contracts at issue, or to be a contractor within the definition of the CDA, it lacks standing to pursue these claims. Here, the CEOB does not claim to be in privity of contract with BPA and WAPA. The only parties claiming to be in privity of contract, and to be asserting entitlement to remedies upon those contracts, are the IOUs.

The CEOB seeks no remedy for itself. It is simply attempting to participate as a plaintiff in some sort of status as an interested California regulatory agency. It claims standing to be a plaintiff here based merely upon the California legislative enactments creating it and dictating its functions. It quotes its mandate to "investigate" the wholesale electricity market to "ensure that the interests of California's citizens and consumers are served, protected and represented in relation to the availability of electric transmission . . . and related costs." PG&E Complaint ¶ 7 (quoting Cal. Pub. Util. Code § 335(c)). It then claims to join the suit based upon California's authorization that it may sue and be sued, and its separate authorization to "participate in proceedings" relevant to the purposes of California's electricity restructuring. Id.; see Cal. Pub. Util. Code § 341(c), (m).

The fact that California has created a state entity to investigate the electricity market, clothed it with the power to sue and be sued, and to participate in "proceedings," does not, by itself, vest that entity with standing to participate as a plaintiff in proceedings against the Government in this Court, which is adjudicating the contract claims of the IOUs. California has no power to affect the jurisdiction of this Court. Only Congress may waive the sovereign immunity of the United States, Alaska v. United States, 32 Fed. Cl. 689, 697 (1995), and therefore determine the coextensive jurisdiction of this Court. As we have already

demonstrated, the United States has only "consent[ed] to be sued . . . by those with whom it has privity of contract." Erickson Air Crane Co. v. United States, 731 F.2d 810, 813 (Fed. Cir. 1984). Because the CEOB does not claim to be in privity of contract with the United States respecting the contracts at issue in this case, it should be dismissed as a plaintiff from this case.

### B. The IOUs Also Lack Standing To Be Plaintiffs

As previously explained, the IOUs allege that FERC's July 25, 2001 refund order retroactively lowered the contractual rates dictated by the respective tariffs to be paid for power sold on the PX and ISO during the Refund Period, obligating governmental power sellers such as BPA and WAPA to refund the difference. The IOUs claim to be in privity of contract with BPA and WAPA respecting these Refund Period sales, as well as other PX and ISO transactions that they speculate will be the subject of future FERC orders, granting them standing to pursue these claims. PG&E Complaint ¶¶ 1, 30, 35; SDG&E Complaint ¶¶ 1, 24, 36. As we show below, the IOUs are not in privity of contract with BPA and WAPA regarding PX transactions, and even if they are in privity upon ISO transactions, they do not possess standing to sue on their own. Accordingly, all of their claims based upon PX and ISO transactions should be dismissed. As part of our discussion of this matter, we first address the law to be applied to the interpretation of the contracts at issue.

#### 1. Federal Law Should Govern The Substantive Issues In This Case

To trade energy on the PX, BPA and WAPA executed standard "Participation Agreements" with the PX. Def. App. A14 (PX Tariff § 2.6.2(f)); Def. App. A1156. Among other things, those agreements provided that the PX tariff governed "all aspects of trading in and administration of the PX Market, including (without limitation), . . . bidding, [and] Settlement."

Def. App. A1156. The agencies also promised the PX that their "status as a PX Participant [was] at all times subject to the PX Tariff," and that "[t]he PX Tariff [was] incorporated" into the Participation Agreement and "made a part" of it. Def. App. A1157-58.

To sell energy to the ISO, or to trade with it, BPA and WAPA also executed written "Scheduling Coordinator Agreements" with the ISO. Def. App. A251 (ISO Tariff § 2.2.3.1(f)); Def. App. A1156, A1226. Like their agreements with the PX, the agencies promised the ISO that they would "schedule Energy and Ancillary Services on to the ISO Controlled Grid under the terms and conditions set forth in the ISO Tariff." Id. They also agreed that the ISO tariff was incorporated into the Scheduling Coordinator Agreement, and that the tariff governed in the event of a conflict. Def. App. A1153, A1229. The IOUs were not parties to any of these agreements either.

We do not dispute that, in light of their incorporation into the Participation Agreements and Scheduling Coordinator Agreements executed by BPA and WAPA, the PX and ISO tariffs provide the contractual terms applicable to BPA and WAPA's electricity sales to the PX and ISO. However, prior to considering the meaning of those terms, the Court must first determine what jurisdiction's law governs its analysis.

It is well established that contracts to which the Government is a party are governed by the federal common law of contracts. Padbloc Co., Inc. v. United States, 161 Ct. Cl. 369, 377 (1963); Gutz v. United States, 45 Fed. Cl. 291, 296 (1999); Thomas Creek Lumber Co. v. United States, 36 Fed. Cl. 220, 247 (1996); Al-Kurdi v. United States, 25 Cl. Ct. 599, 601 (1992); Kuehne & Nagel, Inc. v. United States, 17 Cl. Ct. 11, 18 n. 5 (1989). Federal law controls because the Government contracts "pursuant to authority conferred by federal statute and,

ultimately, by the Constitution." United States v. Seckinger, 397 U.S. 203, 209 (1970). The obligations and rights of the United States under its contracts involve "'uniquely federal interests,'" dictating that they be "governed exclusively by federal law." Boyle v. United Technologies Corp., 487 U.S. 500, 504 (1988); see also United States v. Kimbell Foods, Inc., 440 U.S. 715, 726 (1979) (holding that "federal law governs questions involving the rights of the United States arising under nationwide federal programs"); Clearfield Trust Co. v. United States, 318 U.S. 363, 366 (1943) (declaring that state law is inapplicable to Government acts authorized by the Constitution or statutes of the United States). To put it simply, "[i]n determining the meaning and effect of contracts to which the United States is a party, the governing rules of law must be finally declared by the [Supreme Court of the United States]," not by the courts of another jurisdiction. S.R.A., Inc. v. Minnesota, 327 U.S. 558, 564 (1946).

These principles require the application of federal law by the Court to the interpretation of the tariffs in this case, just as in all other cases involving a contract to which the Government is a party. To the extent that plaintiffs may suggest that the language of the tariffs dictates otherwise, that suggestion should be rejected. Clearly, nothing in the PX tariff indicates otherwise, given that it plainly states that "if a party is a federal entity that party shall be governed by applicable federal law." Def. App. A39 (PX Tariff § 19.6). Given the consistency between the applicable law and the language of the PX tariff, there can be no dispute that all of the issues in this case relating to the PX tariff are governed by federal law.

Unfortunately, the ISO tariff is not so simply drafted. Section 20.7 states the following:

> This ISO Tariff shall be governed by and construed in accordance with the laws of the State of California, except its conflict of laws provisions. Market Participants irrevocably consent that any legal

> action or proceeding arising under or relating to this ISO Tariff . . . shall be brought in any court of the State of California or any federal court of the United States of America located in the State of California.

Def. App. A561-62 (ISO Tariff § 20.7). Section 20.8(a) follows with this:

> Nothing in the Tariff shall compel any person or federal entity to: (1) violate federal statutes or regulations; or (2) in the case of a federal agency, to exceed its statutory authority, as defined by any applicable federal statutes, regulations, or orders lawfully promulgated thereunder. If any provision of this Tariff is inconsistent with any obligation imposed on any person or federal entity by federal law or regulation to that extent, it shall be inapplicable to that person or federal entity. No person or federal entity shall incur any liability by failing to comply with a Tariff provision that is inapplicable to it by reason of being inconsistent with any federal statutes, regulations, or orders lawfully promulgated thereunder; provided, however, that such person or federal entity shall use its best efforts to comply with the Tariff to the extent that applicable federal laws, regulations, and orders lawfully promulgated thereunder permit it to do so.

Def. App. A562 (ISO Tariff § 20.8 (a)). Thus, the ISO tariff states that it is to be construed in accordance with California laws. However, it also states that, to the extent any provision of the tariff is inconsistent with the federal law applicable to any federal entity, "it shall be inapplicable to that . . . federal entity."

Here, the ISO tariff provision purporting to apply California law is inconsistent with the cited binding federal precedent requiring federal law to govern the Government's contracts. Therefore, under the tariff's terms, the California law provision is inapplicable. Additionally, given that the requirement to apply federal law flows from the fact that "the contract was entered into pursuant to authority conferred by federal statute and, ultimately, by the Constitution," Seckinger, 397 U.S. at 209, agency contracting personnel could not have disregarded that

requirement on their own to bind the Government to the law of an entirely different sovereign without express statutory authorization to do so. We are unaware of any authorization to the agencies to depart from federal law. Accordingly, the Court should apply federal law to all of the issues in this case relating to the ISO tariff.

Even if the Court follows the California law provision contained in the ISO tariff, as plaintiffs have conceded and advocated themselves in other litigation, this provision applies only to narrow issues going to the proper interpretation of the ISO tariff's language at the margins, not to any substantive issues of law, which remain federal. The plaintiffs readily admit that the primary issues that will be presented here, such as whether those bound to the tariff's terms have actionable contractual responsibilities to one another or only to the ISO, remain questions of federal law.

Prior to filing suit here, all of the plaintiffs filed a similar lawsuit in the United States District Court for the Eastern District of California against local municipalities that, like BPA and WAPA, sold power into the ISO and PX. As they are doing here, the plaintiffs claimed that FERC's July 25, 2001 refund order contractually obligated these municipalities to pay refunds to the IOUs for Refund Period transactions on the PX and ISO. Def. App. A1366. (Complaint at 2, Pac. Gas and Elec. Co. et al. v. Ariz. Elec. Power Coop., Inc. et al., Nos. 2:06-CV-0559-MCE-KJM, 2:06-CV-0592-MCE-KJM (E.D. Cal. March 16, 2006)).

In responding to the municipalities' ultimately successful motion to dismiss the suit for lack of jurisdiction, the plaintiffs carefully explained the limitations of the California law provision contained in the ISO tariff. Plaintiffs began by correctly noting that FERC-approved tariffs are "contracts . . . not only regulated by, and subject to the approval of, a federal agency

under standards prescribed by federal law, but each Tariff literally '*is* federal law' with the same legal effect as a formally promulgated federal regulation." Def. App. A1401 (California Parties' Consolidated Memorandum of Points and Authorities in Opposition to Defendants' Preliminary Motions at 51, Pac. Gas and Elec.Co. et al. v. Ariz. Elec. Power Coop., Inc. et al., Nos. 2:06-CV-0559-MCE-KJM, 2:06-CV-0592-MCE-KJM (E.D. Cal. Aug. 4, 2006) (emphasis in original)). Subsequently, they quoted Bernstein Bros. Pipe & Machinery Co. v. Denver & R.G.W.R Co., where it stated "[e]very question of the construction of an interstate tariff is a question of Federal law." 193 F.2d 441, 444 (10th Cir. 1951). Def. App. 1402.

Plaintiffs proceeded to describe the substantive questions presented, which are among those presented here, by stating:

> The most cursory review of the substantive disputes that have already surfaced reveals numerous disagreements about what these Tariffs these federal laws mean. The parties disagree about such basic interpretational questions as:
>
> - Whether the language of the Tariffs requires all participants in the market to refund their overcharges when prices are corrected.
>
> - Whether the language of the Tariffs creates obligations that run from one participant in the market to another or only obligations that run to the ISO or the PX.
>
> - Whether the language of the Tariffs exhibits an intention to allow Creditors (as that term is defined in the Tariffs) to sue Debtors (as also defined in the Tariffs).
>
> These questions of Tariff interpretation are salient not just to the parties in the dispute, but to any participant in the ISO or PX markets, including those that are within FERC's jurisdiction to compel payment of refunds. And these questions are, therefore, of

> considerable importance to FERC itself.

Id. at 53. Plaintiffs correctly advanced the following conclusion about the applicability of the California law provision, if it is to be applied at all:

> To be sure, the Tariffs, themselves, provide that ancillary rules of contract interpretation are "governed by and construed in accordance with the laws of the State of California." ISO Tariff § 20.7: . . . . FERC itself affirmatively adopted that provision when it approved the rest of the Tariffs. And it means that when any tribunal interprets these Tariffs whether it be this Court, the Court of Appeals, or FERC the tribunal follows interpretive principles prescribed by California law. Contrary to Defendants' assertion, . . . this does not turn the key substantive federal questions into questions of state law. California law does not answer any of the substantive questions enumerated above, or any other substantive issue that will be before this Court; only the language of the federal law at issue the Tariffs can answer those questions. California law serves only the limited role of prescribing a body of interpretive rules such as how to resolve ambiguities, when extrinsic evidence is permissible, and so forth. The questions of Tariff interpretation before this Court do not lose their essentially federal nature just because they import the California rulebook governing interpretive disputes at the margins . . . .

Id. at 52-53 (record citations omitted).

Accordingly, plaintiffs concede that, if the California law provision is to be applied at all, it should be narrowly, and only to resolve questions of interpretation "at the margins." Federal, and not California, law continues to govern the primary issues presented, including the nature of the obligations imposed by the ISO tariff and to whom they are owed, as well as who possesses standing to sue upon its terms. If the California law provision contained in the ISO tariff is to be applied at all, we agree with the plaintiffs that it should be so limited.

### 2. The IOUs Lack Privity Of Contract With BPA And WAPA Respecting Their Transactions On The PX

#### a. The PX Tariff Mechanism Does Not Establish Privity Of Contract Between The IOUs And The Agencies

As explained in its tariff, the PX is a non-profit corporation that provided an energy auction to suppliers and purchasers of electricity in California to meet the loads of market customers at market prices.[4] Def. App. A7 (PX Tariff Introductory Statement). A review of the PX procedures and applicable precedent demonstrates that it performed this service by contracting with sellers to obtain electricity from them, and then with buyers to provide it to them. The PX did not form contracts for the sale of electricity directly between buyers and sellers. Accordingly, although the IOUs are essentially correct that the PX provided "the mechanism through which market participants bought and sold electric power," their suggestion that "[f]inancial obligations created by market transactions . . . were owed by one market participant to another," is incorrect. PG&E Complaint ¶ 35; SDG&E Complaint ¶ 29. Financial obligations were owed only by or to the PX.

As previously noted, any party participating as either a buyer or seller in a PX transaction entered into a "Participation Agreement" solely with the PX. Both BPA and the relevant WAPA entities doing business with the PX executed such agreements. Def. App. A1156, Def. App. A1221, A1235. The Participation Agreement expressly states that it is a bilateral contract "entered into, by and between" the participating party, referred to as the "PX Participant," and the "California Power Exchange." Id. No other participants in the PX market are named as parties to the Participation Agreement, nor does the agreement obligate the PX Participant to perform

[4] A "load" consumes power. Def. App. A235.

any activity for any other PX Participant. The obligations of the Participation Agreement run strictly between the particular PX Participant and the PX.

Among other things, the relatively short Participation Agreement states that the PX Participant has been certified by the PX under the requirements of the PX tariff. Id. It dictates that the PX tariff governs all aspects of trading in the PX, states that the PX Participant will abide by and perform the obligations of the tariff, and incorporates the tariff into the agreement. Id. The PX Participant promises the PX that it will establish an account with a California bank that the PX can debit and credit pursuant to the tariff's terms, and the PX Participant promises the PX that its obligations to make payments will be its own responsibility. Def. App. A1157, A1222, A1236. Nothing in the PX Agreement states that it is in any way contractually binding PX Participants to other PX Participants, nor does it indicate in any way that either party's promise or performance under it is for the benefit of any other PX Participant. In short, the Participation Agreements signed by BPA and WAPA solely established contractual relationships between those agencies and the PX.

Although voluminous, the bidding, market clearing, scheduling, and billing terms contained in the PX tariff itself simply further developed the bilateral relationship the PX established between itself and PX Participants, both buyers and sellers, but did not create contractual obligations between PX Participants. See Def. App. A1-237 (PX Tariff). Pursuant to the PX tariff, participants submitted bids to the PX to either sell or buy electricity for a particular time period. Def. App. A16 (PX Tariff § 3.2). In processing those bids, the PX did not match up particular sellers with particular buyers. Indeed, the identities of bidders and their bids were kept confidential by the PX. Def. App. A20; A28 (PX Tariff §§ 3.5, 9). Instead, the PX developed

aggregate supply and demand curves from the total pool of supply and demand bids it received and set a market clearing price to either be paid to, or received from, the PX Participants whose bids were accepted by it. Def. App. A21 (PX Tariff § 3.8). The PX then performed as an ISO Scheduling Coordinator on behalf of the PX Participants, submitting schedules [statements] to the ISO of PX Participants' generation or demand for the particular period. Def. App. A15 (PX Tariff § 3.1). Finally, the PX prepared financial settlements by issuing statements to PX Participants about the amounts they either owed to it, or were to receive from it, Def. App. A24-25 (PX Tariff § 6); established a calendar for payment, Def. App. A29 (PX Tariff § 11); and then settled directly with each participant by debiting or crediting its PX Bank Account. Def. App. A25 (PX Tariff § 6.2); Def. App. A118-32 (PX Tariff Schedule 6).

Significantly, what the PX tariff did not do was state that it was forming any contracts for the sale of electricity directly between PX Participants, or establishing any other direct obligations between PX Participants. The fact that each PX Participant executed a separate contract agreeing to be bound to the PX pursuant to the terms of its tariff, without more, does not establish privity of contract between the PX Participants. See S. Cal. Fed. Sav. & Loan Ass'n., 422 F.3d at 1330-31 (holding that a party to one contract cannot "be deemed a party to a related contact simply because the separate contracts constitute components of one transaction").

b. FERC Has Adopted SCE's Position That There Is No Privity Of Contract Between The IOUs And The Agencies

Over ten years ago, in Southern California Edison Co., 80 F.E.R.C. ¶ 61262 (1997), SCE accurately and successfully advocated before FERC the proper interpretation of the PX tariff and its resulting transactions. Two of the other plaintiffs in this matter, PG&E and SDG&E,

intervened in the FERC action. Def. App. A1305, A1310; see also 80 F.E.R.C. at ¶ 61946 ("Pursuant to rule 214 of the Commission's Rules of Practice and Procedure . . . , the timely, unopposed motions to intervene of PG&E and SDG&E serve to make them parties to this proceeding."). In seeking a FERC ruling respecting the nature of the sales taking place through the PX, SCE correctly stated the following:

> PX bidders do not and indeed cannot distinguish which part of their bid energy may be sold to resellers or which part, if any, may be bought directly by retail customers. The sellers simply bid a specific amount in each hour. The PX then develops a set of winning generation bids sufficient to meet the PX's aggregate demand, and schedules that generation with the ISO (which may modify the schedule as needed to manage grid congestion). Unlike . . . situations in which a direct unit power sale contract exists, no amount of generation bid into the PX is dispatched to meet any particular load. No entity 'tracks' which generation is used to supply particular customer demands, nor would such tracking even be feasible.

Def. App. A1297 - A1298 (SCE Mot. at 10-11); see also 80 F.E.R.C. at ¶ 61945. Thus, SCE agreed with our description of the mechanics of PX transactions. Even more significantly, SCE also conceded that:

> All purchasers from the PX pay the market-clearing price for pooled energy dispatched by the ISO from the various generators under its control. There is no way to match the source of the energy sold by a supplier through the PX with any particular buyer. Nor is there any contractual relationship in PX transactions between any retail purchaser and any specific generator. Both resellers and direct access purchasers buy out of a common, intermingled pool and send payments to the PX.

Def. App. A1298 (SCE Mot. at 11) (emphasis added); see also 80 F.E.R.C. ¶ 61945. FERC characterized SCE's argument as admitting that "there are no sales contracts between sellers and buyers of electricity sold into the PX, . . . ." Id. at ¶ 61945-46.

FERC then agreed with SCE, holding the following respecting transactions under the PX tariff:

> In this proceeding, we are faced with a new market institution in which sellers and buyers of electric energy will not contract directly with one another, . . . , but instead will contract with the PX. While the PX will not take title to electric energy, and pursuant to the PX Tariff it is not considered a party to a PX trade, it nevertheless will be the intermediary that contracts with the entities that sell into the PX as well as with the wholesale and retail customers that purchase from the PX.
>
> * * * *
>
> Accordingly, we conclude that the bidding PX participants will be engaged in sales of electric energy at wholesale to the PX, who will then resell that energy to wholesale and retail customer participants.

Id. at 61946. Thus, at SCE's urging, FERC has held that the PX tariff did not create a contractual relationship between buyers and sellers of electricity. Instead, sellers contracted to sell power to the PX, which then contracted with buyers to resell to them.

c. The Ninth Circuit Has Adopted SCE's Position That There Is No Privity Of Contract Between The IOUs And The Agencies

SCE's and FERC's determination that the PX tariff does not contractually bind PX buyers and PX sellers was adopted by the United States Court of Appeals for the Ninth Circuit at SCE's urging. In So. Cal. Ed. Co. v. Lynch, 307 F.3d 794, 800-02 (9th Cir. 2002), SCE brought an action in district court against the Commissioners of the California Public Utility Commission, complaining that the Commission was illegally denying it permission to raise its retail electricity rates in light of the high prices it was being required to pay the PX for wholesale power during the power crisis. During those proceedings, Reliant Energy Services and Mirant Americas

Energy Marketing, two wholesale generators that, like BPA and WAPA, sold power into the PX, attempted to intervene, contending that SCE owed them over $260 million arising from their sales into the PX. Id. at 802-03. The district court denied intervention, and its rulings were appealed.

SCE argued the following upon appeal in Lynch:

> . . . [I]n Cal PX transactions, SCE (as buyer) and wholesalers like [Intervenor] (as sellers) were in privity of contract with the Cal PX but not with each other.
>
> ****
>
> [Intervenor's] claim that SCE owes it $260 million is not only unsupported by record evidence, but also hotly disputed. SCE is in privity with the Cal PX, not [Intervenor]; the portion, if any, of SCE's non-payment to the Cal PX that would flow to [Intervenor] has not been established; and the amounts charged by generators such as [Intervenor] to the Cal PX are the subject of FERC refund proceedings.

Def. App. A1326, A1336 (Brief of SCE at 6, 16, So. Cal. Ed. Co. v. Lynch, 307 F.3d 794 (9th Cir. 2002) (Nos. 01-56879, 01-56993, 0-57020)). Thus, SCE conceded again that its privity of contract upon its purchases in the PX market was with the PX, not with sellers such as BPA and WAPA. In turn, SCE also conceded that the sellers' privity of contract upon their sales was with the PX, not with SCE.

The court of appeals affirmed, agreeing with SCE about the generators' claims against it and holding that:

> The pending litigation would not resolve those claims, and SoCal Edison is in privity with the California Power Exchange Corporation, not with Reliant or Mirant. Thus, Reliant and Mirant are claiming a right to intervene based on a contingent, unsecured claim against a third-party debtor.

307 F.3d at 803. Accordingly, the court of appeals agreed that sellers into the PX such as BPA and WAPA are solely in privity of contract with the PX, not buyers such as SCE and the other IOUs, which in turn are also only in privity of contract with the PX. Financial obligations are between the PX Participants and the PX, not between the PX Participants.

d. The IOUs Are Estopped From Claiming That There Is Privity Of Contract Between The IOUs And The Agencies

The IOUs are barred by the doctrine of collateral estoppel from contending that they are in direct privity of contract with sellers on the PX such as BPA and WAPA. Collateral estoppel, which is also known as issue preclusion, requires that once an issue "is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." Montana v. United States, 440 U.S. 147, 153 (1979) (quoting S. Pac. R. Co. v. United States, 168 U.S. 1, 48-49 (1897)). Collateral estoppel applies even when a plaintiff asserts a claim against a defendant who was not a party to the prior litigation. See Blonder-Tongue Lab. v. Univ. of Ill. Found., 402 U.S. 313, 320-330 (1971). Further, collateral estoppel applies against intervenors to a prior suit, even where intervenors did not participate fully in litigating an issue. See, e.g., County of Cook v. MidCon Corp., 773 F.2d 892, 904 (7th Cir. 1985) (holding that plaintiffs in a Federal court action were barred from relitigating issues they had a full and fair opportunity to litigate in state court as intervenors).

Principles of issue preclusion also apply to the decisions of administrative bodies acting in a judicial capacity. Univ. of Tenn. v. Elliott, 478 U.S. 788, 796-99 (1986); United States v. Utah Constr. & Mining Co., 384 U.S. 394, 421 (1966) (affirming the preclusive effect in the

Court of Claims of findings by the Atomic Energy Commission Advisory Board of Contract Appeals); Klump v. United States, 38 Fed. Cl. 243, 247-48 (1997) (giving preclusive effect to findings of the Interior Board of Land Appeals); see also Restatement (Second) of Judgments § 83 (1982) (noting that "a valid and final adjudicative determination by an administrative tribunal has the same effects under the rules of res judicata, subject to the same exceptions and qualifications, as a judgment of a court."). This rule applies to FERC decisions. See, e.g., Borough of Lansdale v. PP & L, Inc., 426 F. Supp. 2d 264, 299-300 (E.D. Pa. 2006) (holding that a prior FERC ruling concerning a utility's duties under a contract was entitled to preclusive effect in a district court contract action, noting that "the issues raised and decided in the FERC proceeding lie at the core of plaintiffs' breach of contract claim . . . .").

Determining whether issue preclusion is appropriate requires the Court to consider whether: (1) the issues decided in the prior proceeding are identical to those before the Court; (2) those issues were actually litigated in the prior proceeding; (3) the resolution of those issues was necessary to the tribunal's resulting judgment; and (4) plaintiffs were afforded a full and fair opportunity to litigate their position. See Ammex, Inc. v. United States, 384 F.3d 1368, 1371 (Fed. Cir. 2004). The Court should not examine the reasoning or the correctness of the prior tribunal's decision. Arkla, Inc. v. United States, 37 F.3d 621, 626 (Fed. Cir. 1994).

FERC's ruling in Southern California Edison Co. collaterally estops the IOUs from contending that they are in privity with BPA and WAPA upon PX power sales. FERC decided the issue of privity in PX transactions, holding that PX buyers and PX sellers did not contract with each other, the same issue presented in this case. The issue was actually litigated, with SCE advocating for FERC's eventual holding. The resolution of the issue was necessary to FERC's

judgment, with FERC's conclusions about the nature and structure of the transactions providing the justification for its rulings. Finally, the IOUs participated as parties and had a full and fair opportunity to litigate their positions. SCE is also estopped, for the same reasons, by the Ninth Circuit's ruling in Lynch.

Additionally, SCE is judicially estopped from taking a contrary position concerning privity in this Court. Pursuant to the doctrine of judicial estoppel, if "a party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed." Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1565 (Fed. Cir. 1996)). The doctrine has been applied on the basis of contrary positions taken before administrative bodies. See Lampi Corp. v. American Power Products, Inc., 228 F.3d 1365, 1377 (Fed. Cir. 2000) (judicial estoppel "also applies to administrative proceedings in which a party obtains a favorable order by making an argument that it seeks to repudiate in a subsequent judicial proceeding.") (relying in a patent appeal upon Chaveriat v. Williams Pipe Line Co., 11 F.3d 1420, 1427 (7th Cir. 1993)); see also Data General Corp., 78 F.3d at 1565 (acknowledging the propriety of an administrative body applying judicial estoppel based upon a prior inconsistent position taken before an administrative body). Here, SCE's successful advocacy before FERC that there are "no sales contracts between sellers and buyers of electricity sold into the PX," and its similarly successful advocacy before the Ninth Circuit in Lynch that it was only in privity of contract with the PX, and not with sellers, should preclude it under the doctrine of judicial estoppel from contending in this Court that it is in privity of contract with BPA and WAPA.

e. The Court Should Defer To The Holdings Dictating That There Is No Privity Of Contract Between The IOUs And The Agencies

In the event that the Court does not estop the IOUs from claiming they are in privity of contract, and even if the PX tariff is susceptible to a reading contrary to the holdings of FERC and the Ninth Circuit, it is well established that courts reviewing FERC rulings defer to its interpretations of ambiguous tariffs so long as they are reasonable. Pub. Serv. Elec. and Gas Co. v. FERC, 485 F.3d 1164, 1168 (D.C. Cir. 2007); Calpine Energy Servs. v. FERC, 471 F.3d 1054 (9th Cir. 2006) (granting deference to FERC's interpretation of sales contracts when they are subject to FERC's regulation); Boston Edison Co. v. FERC, 441 F.3d 10, 12-13 (1st Cir. 2006) (granting deference to FERC's contractual interpretations and stating that close calls go FERC's way). Clearly, this Court should grant to FERC at least the level of deference it receives from its reviewing courts.

All the complaints can muster to supposedly demonstrate that the PX tariff establishes privity between PX Participants is one statement in the tariff saying that "[t]he PX will not be, and shall not be deemed to be, a counterparty to any trade transacted through the PX Markets." PG&E Complaint ¶ 30; SDG&E Complaint ¶ 24.[5] This disclaimer by the PX that it does not serve as a "counterparty to any trade" does not even mention the PX Participants, much less

[5] The complaints also allege that "[t]ariff provisions also contemplate that market participants will pursue non-payers for payment defaults," implying that privity also arises from this assertion. PG&E Complaint ¶ 34; SDG&E Complaint ¶ 28. Putting aside the accuracy of such a conclusion, the complaints only cite ISO tariff provisions to supposedly support the allegation. All they cite from the PX tariff is a requirement that the PX identify to the other PX Participants any participant in default on its required payments. Def. App. A64 (PX Tariff Schedule 2, § 5.5). No one could seriously suggest that a mere identification requirement establishes privity of contract between the PX Participants.

purport to say anything about their relationship with one another. The PX Participants could certainly not have been expected to recognize, in the face of all of the indications to the contrary that exist in both the Participation Agreement and the tariff itself, that the disclaimer established privity of contract between market participants. Indeed, SCE itself obviously did not recognize the disclaimer as such. Nor can this one cryptic statement justify a refusal to defer to FERC's determination in Southern California Edison Co., at the urging of SCE, that no privity exists between PX buyers and sellers. Indeed, FERC fully accounted for this statement in that decision when, after considering the entirety of the tariff's provisions, it held that, "[w]hile the PX will not take title to electric energy, and pursuant to the PX Tariff it is not considered a party to a PX trade, it nevertheless will be the intermediary that contracts with the entities that sell into the PX as well as with the wholesale and retail customers that purchase from the PX." 80 F.E.R.C. at ¶ 61946.

FERC's conclusion is not only reasonable but completely accurate. The PX was indisputably in privity of contract with each of the PX Participants through the PX Participation Agreements it executed with each of them. By virtue of those agreements, which incorporated the terms of the PX tariff, the PX facilitated the transfer of power from generators to purchasers by acting as a contractual intermediary that processed bids to determine a single clearing price, scheduled the generated power onto the ISO grid for direction to the purchasers' loads, and directly settled amounts due. Regardless of the fact that the PX disclaimed status as a counterparty to trades, it nevertheless provided a mechanism through its tariff for the transfer of power from generators to buyers that did not require market participants to be in privity of contract with one another. Given the Ninth Circuit's additional agreement with FERC about the

nature of the transactions that took place under the tariff, the conclusion that the tariff does not establish privity of contract between buyers and sellers is clearly reasonable and should be deferred to by this Court.

f. The IOUs Are Not Third Party Beneficiaries Of The Contracts Between The Agencies And The PX

In their complaints, the IOUs also appear to suggest alternatively that they can sue here as third party beneficiaries to the contracts between the PX and the agencies. PG&E Complaint ¶ 42; SDG&E ¶ 36. This suggestion is groundless. The IOUs are not third party beneficiaries to those contracts.

The right of a party to sue as a third party beneficiary is an "'exceptional privilege.'" Glass v. United States, 258 F.3d 1349, 1354 (Fed. Cir. 2001) (quoting German Alliance Ins. Co. v. Home Water Supply Co., 226 U.S. 220, 230 (1912)). Third party beneficiary status is determined in this Court based upon principles developed in the common law. Roedler v. Dept. of Energy, 255 F.3d 1347, 1351 (Fed. Cir. 2001). These principles require a party to demonstrate both that the contract reflects an express or implied intention to benefit the party, and an intention to benefit the party directly. Glass, 258 F.3d at 1354. Incidental or indirect beneficiaries do not qualify for third party beneficiary status. Id. A third party that stands to benefit from a contract's performance, but is not directly owed a particular benefit or performance under the contract, is a mere incidental or indirect beneficiary. Id. at 1354-55; 13 Samuel Williston, A Treatise on the Law of Contracts, § 37:19 (4th ed. 2000); Public Service Co. of Colorado v. United States, 5 Cl. Ct. 818 (1984).

Nothing in the agencies' transactions with the PX imposed upon the agencies any obligation to perform any act or provide any benefit directly for any PX purchaser, much less the IOUs. Instead, the PX acted as an intermediary that contracted with generators to purchase electricity from them, and then contracted with customers such as the IOUs that bought the electricity. All of the agencies' obligations ran between the agencies and the PX, and all of the performance acts provided by the agencies were for the PX. Sellers such as the agencies did not even know the identities of the entities that bid to purchase electricity from the PX. In turn, purchasers such as the IOUs were not directly entitled to receive anything as a result of the agencies' sales transactions with the PX. Any entitlement purchasers obtained to receive electricity off of the ISO grid flowed instead from their separate transactions with the PX in which they committed themselves to pay the PX for the power they received. At most, the IOUs were incidental or indirect beneficiaries of the agencies' contracts with the PX and possess no standing to sue as third party beneficiaries.

### 2. The IOUs Lack Standing On Their Own To Bring Suit Upon ISO Transactions

Because it addresses the ISO's comprehensive responsibility to manage the California power grid, the ISO tariff is longer and more complicated than the PX tariff. However, among its provisions is the requirement for the ISO to establish a market to obtain necessary power to balance the ISO grid and for operating reserves, known as "ancillary services." Def. App. A312 (Tariff § 2.5). Regardless of whether the IOUs are in privity of contract with the agencies respecting ISO transactions, they cannot pursue claims upon those contracts on their own, without other market participants.

Demanding or providing generation on the ISO grid is performed through a "schedule" provided by "Scheduling Coordinators." Def. App. A259-60 (ISO Tariff § 2.2.6). To be a Scheduling Coordinator on the ISO grid, parties execute a "Scheduling Coordinator Agreement." Def. App. A632. Like the PX Participation Agreement, it is a relatively short, bilateral contract between the Scheduling Coordinator and the ISO that dictates that the ISO tariff governs all aspects of scheduling, and that the Scheduling Coordinator will abide by its terms. BPA and WAPA's Sierra Nevada Region executed such agreements. Def. App A1150, A1226.

The ISO obtains ancillary services and imbalance energy for a particular time period by soliciting binding bids from Scheduling Coordinators that provide generation. The ISO then determines a single price that provides enough generation to meet the anticipated needs. The generation is then scheduled onto the grid, and Scheduling Coordinators representing loads are charged the market clearing price by the ISO on a pro rata basis based upon a particular formula. Nothing in the tariff provides for identification of the Scheduling Coordinators providing generation to those representing loads. Def. App. A298-301, A312, A325, A327-44. Like the PX, the ISO directly settles payments owed by, and to, all of the various Scheduling Coordinators involved. Def. App. A371, A514.

In contrast to the PX tariff, the ISO tariff states that, "[i]n contracting for Ancillary Services and Imbalance Energy the ISO will not act as principal but as agent for and on behalf of the relevant Scheduling Coordinators." Def. App. A249 (ISO Tariff § 2.2.1). Thus, when forming a contract with a particular Scheduling Coordinator bidding to provide generation, the ISO is acting as the agent for the corresponding pool of Scheduling Coordinators, representing loads, that are charged for that power. However, even if the IOUs were Scheduling Coordinators

charged by the ISO for generation sold onto the ISO by BPA and WAPA, something the complaints do not allege and we do not concede, the IOUs still lack standing to sue on their own for refunds allegedly due under those transactions.

Restatement (Third) of Agency § 6.05(2) (2006) states the following:

> Two or more principals may authorize the same agent to make separate contracts for them. If the agent makes a single contract with a third party on the principals' behalves that combines the principals' separate orders or interests and calls for a single performance by the third party,
>
> (c) unless the agent acted with actual or apparent authority to bind each of the principals to the combined contract:
>
> (i) . . . , none of the separate principals is subject to liability on the combined contract; and
>
> (ii) the third party is not subject to liability on the combined contract to any of the separate principals.

Illustration 6 to the section describes the situation addressed here, and is taken from <u>Brunswick Leasing Corp. v. Wisconsin Central, Ltd.</u>, 136 F.3d 521 (7th Cir. 1998). It states the following:

> P is one of 35 owners of piggyback semitrailers suitable for use in intermodal transportation. All 35 owners retain A as their agent to lease their semitrailers to railroads. A enters into a single lease with T, a railroad, covering the semitrailers owned by all 35 owners. The lease provides that T will make payments for the use of each semitrailer to A. A's agreement with each owner requires A to remit each owner's proportionate share of T's payments to the owner after deducting A's commission. A stops making remittances to the owners, including P. P sues T to recover P's proportionate share of the payments that T is obliged by the lease to make to A. Regardless of whether P is a disclosed, unidentified, or undisclosed principal, T is not subject to liability to P. The terms of the lease T made with P do not require T to make proportionate payments to individual owners of semitrailers, such as P.

As the Restatement section and illustration from the Brunswick case make clear, when a single agent has combined the interests and obligations of multiple principals into a single contract with a third party, but has not bound each principal to the total obligations of the contract to the third party, the third party is not subject to liability on the combined contract to separate principals.

Section 6.05(2) applies here to deny the IOUs standing to sue. Here, the ISO accepted the bid of a scheduling coordinator providing generation (such as BPA or WAPA) to form a contract with it as the agent of multiple scheduling coordinators representing loads (which might include the IOUs), with each of those principals paying for a proportionate share of the generation through the ISO. The IOUs seek refunds allegedly owed on those contracts. Just as one of many principals owed money in the Brunswick example above could not pursue payment for itself under such a contract, the IOUs cannot seek refund payments alone from the agencies upon contracts that also included other principals that would be entitled to a proportionate share. BPA and WAPA are not separately liable to the IOUs. As the commentary to Illustration 6 explains, requiring the third party to be separately liable to each principal is inconsistent with the other contracting parties' expectations, which were that the third party obligated itself to the agent acting for the principals as a full group, not to each individual principal separately. Similarly, individual principals are not liable under the contract to the third party either. These are well-established principles, provided for as well in the Restatement (Second) of Agency §§ 148, 187, 305 (1958), and shown to go back over a century in Brunswick, 136 F.3d at 527-28. Moreover, as the Restatement notes also observe, the doctrine does not leave individual principals helpless. Individual principals may join forces with all of the other principals to the contract.

The Supreme Court has recognized restatements as authoritative sources for determining the law applicable to the Government. See, e.g., Mobil Exploration and Producing Southeast, Inc. v. United States, 530 U.S. 604, 608 (2000) (relying upon the Restatement (Second) of Contracts). And the United States Court of Appeals for the Federal Circuit has frequently relied upon the Restatement of Agency as an authoritative source of law. See, e.g., Long Island Savs. Bank v. United States, 503 F.3d 1234, 1249 (Fed. Cir. 2007); Schism v. United States, 316 F.3d 1259, 1289 (Fed. Cir. 2002); Casa de Cambio Comdiv. S.A., de C.V. v. United States, 291 F.3d 1356, 1366 n. 2 (Fed. Cir. 2001); O'Neill v. Dept. of Housing and Urban Dev., 220 F.3d 1354, 1360 (Fed. Cir. 2000). The IOUs' suit involving ISO transactions violates the well-settled rule barring the claims of separate principals upon contracts formed by agents on behalf of multiple principals. Accordingly, it should be dismissed.[6]

## III. The Court Should Dismiss Counts Four Through Six Of The Complaints, And Part of Count Seven, All Of Which Seek Declaratory Relief, For Lack Of A Case Or Controversy Under Article III Of The Constitution

In addition to the grounds given above for dismissal, counts four through six of the complaints, and part of count seven, which solely seek declaratory relief, should also be dismissed for lack of jurisdiction because they are non-justiciable.

[6] We have advanced this point here as a matter of standing, and therefore a matter of jurisdiction under Rule 12(b)(1), based upon Brunswick's explanation that this rule is a limitation upon the ordinary rule permitting principals to bring suit upon contracts entered into on their behalf. 136 F.3d at 530-31. However, the Restatement describes the rule as one of liability, which suggests the possibility that the point could be advanced under Rule 12(b)(6) for failure to state a claim upon which relief may be granted. To the extent the Court understands it to be a rule of liability, we request that the Court consider the point to have been raised under Rule 12(b)(6).

Article III of the Constitution limits the judicial power of the United States to "Cases" and "Controversies." U.S. Const. Art. III § 2; Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 239-40 (1937). Federal courts only possess jurisdiction over suits that present a case or controversy. Raines v. Byrd, 521 U.S. 811, 818 (1997) ("No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 37 (1976))). Indeed, "[i]f a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so." DaimlerChrysler Corp. v. Cuno, 126 S. Ct. 1854, 1860-61 (2006). Though established under Article I of the Constitution, this Court's jurisdiction is also limited by this same Article III case or controversy requirement. Anderson v. United States, 344 F.3d 1343, 1350 n. 1 (Fed. Cir. 2003).

The Supreme Court has instructed that "'[t]he term 'controversies' if distinguishable at all from 'cases,' is so in that it is less comprehensive than the latter, and includes only suits of a civil nature.'" Aetna Life Ins. Co., 300 U.S. at 239 (quoting In Re Pac. Ry. Comm., 32 F. 241, 255 (C.C. Cal. 1887)). It proceeded to explain that

> [a] justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

300 U.S. at 240-41 (citations omitted, emphasis added). Thus, under Article III's case or

controversy requirement itself, the Court is not free to render advisory opinions upon hypothetical fact questions.

Analysis of the Article III case and controversy requirement has also been broken down into what are called "justiciability doctrines," among which are the related doctrines of standing and ripeness. Nat'l Treasury Employees Union v. United States, 101 F.3d 1423, 1427 (D.C. Cir. 1996). "To establish standing, a plaintiff must demonstrate '(1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" Rothe Dev. Corp. v. Dept. of Def., 413 F.3d 1327, 1334 (Fed. Cir. 2005) (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., 528 U.S. 167, 180-81 (2000)). Thus, this standing element to the Article III case or controversy requirement dictates that the alleged injury not be conjectural, hypothetical, remote, speculative, or abstract. Nat'l Treasury Employees Union, 101 F.3d at 1427. "Rather it must be 'certainly impending.'" Id. (quoting Whitmore v. Arkansas, 495 U.S. 149, 158 (1990)).

Finally, ripeness also, at least in part, is a component of the Article III case and controversy requirement. Reno v. Catholic Soc. Servs., Inc., 509 U.S. 43, 57 n. 18 (1993) ("We have noted that ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."); Reg'l Rail Reorganization Act Cases, 419 U.S. 102, 138 (1974) ("[B]ecause issues of ripeness involve, at least in part, the existence of a live 'Case or Controversy,' we cannot rely upon concessions of the parties and must determine whether the issues are ripe for decision in the 'Case or Controversy' sense.").

Ripeness shares the requirement of standing that an injury in fact be pending. Nat'l Treasury Employees Union, 101 F.3d at 1427. "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" Texas v. United States, 523 U.S. 296, 300 (1998).

Given the jurisdictional ban upon claims based upon hypothetical or contingent facts that may or may not occur, counts four through six of the complaints, and part of count seven, should be dismissed for lack of jurisdiction.

A. Counts Four, Five, And Part Of Seven, Seek Advisory Opinions About Hypothetical FERC Orders That May Or May Not Occur

As explained previously, counts one through three of the complaints are based upon plaintiffs' allegation that FERC's July 25, 2001 refund order revised the ISO and PX tariffs, altering prices and imposing contractual refund obligations upon BPA and WAPA that they have supposedly either breached or anticipatorily breached. However, as we explained in some detail in Part IIB of the Statement of the Case, the July 25 refund order declined to include summer transactions, exchanges, and transactions exceeding 24 hours within its scope. Although the United States Court of Appeals for the Ninth Circuit reversed FERC upon those rulings in CPUC, it is anything but certain that FERC will ultimately issue any orders as a result of CPUC that could be characterized as revising the tariff prices for those transactions. Nevertheless, solely on the basis of CPUC, counts four and five seek declaratory judgments that "at such time as FERC corrects the rates charged by sellers" for the exchange transactions, summer transactions, and transaction exceeding 24 hours, the IOUs "will be entitled to recover . . . the difference between the rates the Agencies initially charged and the lawful rates as ultimately

determined by FERC." Additionally, among other things, count seven seeks a declaratory ruling that the agencies will be contractually required to have their accounts at the ISO and PX adjusted to reflect any FERC order in the future correcting prices for exchanges, transactions exceeding 24 hours, or for the Summer Period.

First, no mandate has been issued yet in CPUC and accordingly FERC has not even initiated any remand proceedings, much less issued any rulings. Second, nothing in the CPUC decision dictates the ultimate result of the remand to FERC, much less requires it to somehow "correct the rates" charged by all of the sellers engaging in these transactions, and FERC has in no way indicated that it will issue such an order.

Indeed, as we have previously observed, the court of appeals agreed with FERC that section 206 of the FPA, the statutory basis upon which FERC's July 25 refund order relied, did not authorize FERC to order refunds for the Summer Period transactions. CPUC, 456 F.3d at 1044. The court of appeals remanded the matter for FERC to engage in an entirely different analysis of the Summer Period transactions under an entirely different provision of the FPA, section 309. Unlike section 206's authorization for refunds of unjust or unreasonable prices, section 309 authorizes FERC to order refunds only for tariff violations stemming from market manipulation. CPUC, 456 F.3d at 1044, 1046. The court of appeals stressed that it was not dictating how FERC should ultimately rule upon the remand, or whether any remedy should be issued under section 309 for any of the Summer Period transactions at all. CPUC, 456 F.3d at 1058-59. Whether FERC will ultimately take any further action upon the Summer Period transactions, what that action might be, and what its scope might be, is totally unknown at this time.

Plaintiffs nevertheless seek a ruling now declaring that the unwritten language of FERC's non-existent orders will indeed revise the ISO and PX tariffs, alter the prices charged under them for the Summer Period transactions, and impose contractual refund obligations upon BPA and WAPA. This request that the Court engage in pure speculation is a quintessential attempt to obtain a purely advisory opinion upon a completely hypothetical set of facts that may or may not ever occur. Whether viewed generally through the lens of Article III's case or controversy requirement, or the more specific standing or ripeness doctrines, such claims should be dismissed for lack of jurisdiction. See Texas, 523 U.S. at 300 (holding that a request for a declaratory judgment as to whether certain possible sanctions Texas might impose upon school districts violates Federal law is not ripe given that Texas had not imposed the challenged sanctions yet); Nat'l Treasury Employees Union, 101 F.3d at 1430 (rejecting a challenge to the Line Item Veto Act upon ripeness grounds when no act causing any injury had actually occurred yet).

The same conclusion should apply to the transactions exceeding 24 hours and to the exchanges. The court of appeals held that FERC had not provided an adequate explanation for limiting its refund order to transactions not exceeding 24 hours. CPUC, 456 F.3d at 1057. But it did not order FERC to require refunds for those transactions or otherwise amend the tariff rates respecting them. Similarly, the court rejected FERC's suggestion that it was impossible to place a monetary value upon the exchanges to assess whether they were unreasonable. CPUC, 456 F.3d at 1059. Again, however, the court did not order FERC to require refunds or take some action upon the tariffs respecting them. It remains to be seen just what FERC will do regarding these transactions upon remand, what the language of any such orders might be, or what their scope might be. Again, the plaintiffs ask the Court to speculate upon these matters and issue

advisory opinions about the legal significance of non-existent orders based upon pure conjecture as to what they might say. Such an opinion would be based upon a completely hypothetical state of facts and is beyond the Court's jurisdiction to issue.

### B. Count Six Seeks An Advisory Opinion About Hypothetical ISO Or PX Orders That May Or May Not Occur

In count six of the complaints, the plaintiffs contend that because the Government has allegedly failed to pay refunds due to the IOUs, there will be a shortage of funds to settle the accounts of ISO and PX market participants. Strangely, they then suggest that the ISO and PX might solve that problem by requiring the very parties supposedly owed the absent funds, the IOUs, to somehow pay themselves for the shortfall. They therefore seek a declaratory judgment that, should they be assessed for this shortfall, the Government is contractually obligated to pay them for it. Putting aside the fact that the suggestion simply makes no sense, it again seeks a ruling from the Court about the contractual significance of a purely speculative state of facts that has simply not occurred. Plaintiffs do not contend that they have actually been assessed for anything by the ISO or PX. They seek an advisory opinion about a purely hypothetical set of facts that may never occur. The count should therefore be dismissed for lack of jurisdiction.

## IV. This Court Should Dismiss Plaintiffs' Final Two Claims Because They Were Not Presented To The Contracting Officers

### A. Introduction

Plaintiffs did not present the final two claims in their complaints to BPA and WAPA's contracting officers, and this Court should accordingly dismiss those claims. The CDA requires that "all claims by a contractor against the government . . . shall be in writing and shall be submitted to the contracting officer for decision." 41 U.S.C. § 605(a). While a claim need not

"be submitted in any particular form or use any particular wording," the claim must be a "clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." Contract Cleaning Maint., Inc. v. United States, 811 F.2d 586, 592 (Fed. Cir. 1987). A properly submitted claim, and a resulting contracting officer's decision, are jurisdictional prerequisites for proceeding in this Court on a CDA claim. See Alliant Techsystems, Inc. v. United States, 178 F.3d 1260, 1264 (Fed. Cir. 1999).

Accordingly, a contractor may not raise in this Court any claim not presented to the contracting officer. Scott Timber Co. v. United States, 333 F.3d 1358, 1365 (Fed. Cir. 2003); Reliance Ins. Co. v. United States, 931 F.2d 863, 866 (Fed. Cir. 1991); Santa Fe Eng's., Inc. v. United States, 818 F.2d 856, 858 (Fed. Cir. 1987). Allowing new claims in this Court would circumvent "the statutory role of the contracting officer to receive and pass judgment on the contractor's entire claim." Cerberonics, Inc. v. United States, 13 Cl. Ct. 415, 418 (1987). This Court thus routinely dismisses for lack of subject matter jurisdiction claims not properly presented to contracting officers. See, e.g., AAB Joint Venture v. United States, 75 Fed. Cl. 414, 423 (2007); Renda Marine, Inc. v. United States, 71 Fed. Cl. 378, 392 (2006); Kiewit Constr. Co. v. United States, 56 Fed. Cl. 414, 419-23 (2003).

This Court considers three factors when determining whether a claim in this Court is the same as that presented to a contractor officer. Renda Marine, 71 Fed. Cl. at 388-89 (citing Manuel Bros., Inc. v. United States, 55 Fed. Cl. 8, 33 (2002)). The Court considers whether: (1) the claim is based on the same common or related set of operative facts brought before the contracting officer; (2) the legal theory underlying the claim remains the same as that presented to the contracting officer; and (3) the complaint requests the same relief as requested from the

CO. Id. at 389; see also Scott Timber, 333 F.3d at 1365-66 (applying these factors). The Court also looks to the contracting officer's decision as evidence of whether a claim was properly presented. See Santa Fe, 818 F.2d at 858-59; Laidlaw Envir. Serv. (GS), Inc. v. United States, 43 Fed. Cl. 44, 51 (1999).

Here, the final two claims in plaintiffs' complaints are based upon different facts and legal theories than the claims presented to BPA and WAPA's contracting officers. The claims themselves confirm this conclusion, as do the resulting contracting officers' decisions, both of which rejected plaintiffs' claims on ripeness grounds without discussing any facts concerning plaintiffs' current claims regarding a "market shortfall" or "ISO and PX accounts." See Complaint, Exhibits F & G. Accordingly, the Court should dismiss these claims for lack of subject matter jurisdiction.

### B. Plaintiffs' Claims Are Based Upon New Operative Facts

Operative facts "are the essential facts that give rise to a cause of action." Kiewit, 56 Fed. Cl. at 420. To determine whether a claim in this Court is based upon the same operative facts presented to the contracting officer, this Court considers the cause of action alleged by the contractor in its complaint, determines what facts would support that cause of action, and examines the claims to see if the required facts were presented to the contracting officer. See, e.g., Renda Marine, 71 Fed. Cl. at 389-90 (examining facts required for a differing site conditions claim and a claim relating to a breach of the duty to cooperate); J. Cooper & Assoc., Inc. v. United States, 47 Fed. Cl. 280, 285 (2000). Plaintiffs allege two causes of action in their final two claims. They neither presented these causes of action, nor facts supporting them, to the contracting officers.

1. The Operative Facts Presented To The Contracting Officers

In their claims submitted to BPA and WAPA's contracting officers, plaintiffs asserted breach of contract claims, alleging in detail facts necessary to support these claims. Plaintiffs first noted that BPA and WAPA were participants in the FERC-regulated ISO and PX markets. Def. App. A1161-62, A1186-87. The claims then related how the markets tumbled into crisis, and how plaintiffs sought relief from FERC. Id. at A1163-64, A1187-89. The claims stated that during FERC proceedings, "discovery provided evidence of a pattern of manipulation involving numerous sellers into the ISO and PX markets," and the claims referenced FERC dockets for cases EL00-95 and EL00-98, though they did not allege that either BPA or WAPA engaged in any "manipulation." Id. at A1164, A1189. The claims stated, in summary, that they were "based on the identical facts that were at issue in the proceedings at FERC and in the Ninth Circuit on the California Parties' complaint: the sellers' (including [BPA's and WAPA's]) receipt and retention of rates for sales of wholesale power in the ISO and PX markets that are now unlawful and unauthorized under the ISO and PX tariffs." Id. at A1164, A1189.

The "Description of Claims" sections were similarly specific, alleging that BPA and WAPA were contractually "obligated to reimburse purchasers for the difference between the rates [they] initially charged in [their] sales in the ISO and PX markets and the lower FERC-adjusted lawful rates." Id. at A1165, A1190. These sections also identified the legal theories upon which plaintiffs' claims were based:

> Causes of action for damages or other monetary relief that the California Parties may assert include, but are not limited to, breach and repudiation of contract obligations and contractual indemnification. The California Parties will also seek pre-judgment and post-judgment interest, and such other relief as may

be appropriate.

Id. Finally, these sections limited plaintiffs' claims to particular periods of time, noting that damages were "being calculated by the ISO and PX" or would depend upon "the lawful rates as ultimately determined by FERC." Id. at A1165-66, A1190-91.

2. The Operative Facts Of Plaintiffs' Claims In This Court

Plaintiffs' final two claims encompass and depend upon sets of operative facts that the agencies' contracting officers never considered. These claims should, accordingly, be dismissed. See Santa Fe, 818 F.2d at 859-60.

a. Contractual Liability For Market Shortfall Claim

As noted previously, in count six, the complaints seek a declaratory ruling that the agencies "will be contractually liable to the California IOUs for any amount assessed against the California IOUs' accounts due to the Agencies' refusal to honor their repayment obligations, as well as for all additional costs and expenses incurred by the California IOUs as a result of the Agencies' refusal to honor their repayment obligations." PG&E Complaint ¶ 88. This claim is premised upon an allegation that if the agencies refuse to abide by their "contractual obligations," a "market shortfall" will occur, and plaintiffs will be assessed for that shortfall. Id. No such facts were presented to the contracting officers for review.

Instead, plaintiffs' claims to the contracting officers focused upon plaintiffs' alleged right to recover directly from the agencies for their "overcharges." Def. App. A1165-66, A1177-78. Plaintiffs did not identify any provisions of the ISO or PX tariffs that created a supposed right to recover for a "any amount assessed against them." The contracting officers were thus deprived of an opportunity to consider this claim. This Court accordingly lacks jurisdiction to entertain

the claim.

b. ISO And PX Accounts Claim

In count seven, the complaints seek a declaratory ruling that the United States "is contractually obligated to permit the Agencies' accounts at the ISO and PX to be adjusted to reflect all pricing changes resulting from FERC's determination of the corrected, maximum rates under the ISO and PX Tariffs and the recalculation by the ISO and PX pursuant to FERC's direction of the prices charged under the ISO and PX Tariffs during the relevant time periods, and is contractually obligated to pay any refunds and to otherwise honor the invoices reflecting the refunds associated with all affected transactions." PG&E Complaint ¶ 92. As with plaintiffs' sixth claim, plaintiffs never presented any facts to the contracting officers concerning the agencies' alleged contractual obligation "to permit the Agencies' accounts at the ISO and PX to be adjusted," failing to identify what provisions of the tariffs created such an obligation. This claim should accordingly be dismissed.

C. Plaintiffs' Claims Are Based Upon New Legal Theories

Contractors are free to "augment" in this Court legal theories presented in their claims to a contracting officer, but they may not add entirely new claims. See, e.g., Johnson Controls World Servs., Inc. v. United States, 43 Fed. Cl. 589, 594-95 (1999) (holding that claims based upon differing provisions of a contract, though based upon the same operative facts, depended upon impermissibly different legal theories); Renda Marine, 71 Fed. Cl. at 392 (concluding that a contractor's equitable adjustment and breach claims relied upon "sufficiently distinct legal theories to defeat the court's jurisdiction . . ."); compare Cerberonics, 13 Cl. Ct. at 419-19 (holding that a contractor who sought a "fair and equitable fee" in its claim to the contracting

officer, then sought an equitable adjustment in the Claims Court, had merely augmented the legal theories underlying its claim).

The legal theories presented in plaintiffs' final two claims were not presented to the contracting officers for decisions before plaintiffs filed their complaints in this Court. In their claims before the agencies, plaintiffs sought relief for "breach and repudiation of contract obligations and contractual indemnification." Def. App. A1165, A1190. Plaintiffs described the agencies' "contract obligations" in detail, alleging with specificity that the agencies had agreed to be bound by both FERC tariffs and "FERC's orders adjusting the rates sellers could lawfully charge for sales" in the ISO and PX markets. Id. at A1162, A1187. According to plaintiffs, upon FERC's "adjustment of the prices charged and received by sellers in the ISO and PX markets," the agencies "became contractually obligated to reimburse purchasers for the difference between the rates [the agencies] initially charged in [their] sales in the ISO and PX markets and the lower FERC-adjusted lawful rates." Id. at A1165, A1190.

In their claims, plaintiffs said nothing about the agencies' alleged liability for assessments against plaintiffs for a "market shortfall," which plaintiffs now assert in their sixth claim. See PG&E Compaint ¶ 89. This market shortfall theory is thoroughly distinct from the direct contractual liability theory posited in plaintiffs' claims to the agencies. Likewise, the theory advanced in plaintiffs' seventh claim, that the agencies must "permit" their "accounts at the ISO and PX to be adjusted," was never presented to the contracting officers, who thus never considered it. Both of these claims should accordingly be dismissed.

## V. Count I Should Be Dismissed Because, As Plaintiffs Now Concede, It Fails To State A Claim Upon Which Relief May Be Granted Because No Contractual Obligation To Issue Refunds Has Arisen Yet

In the event any part of it survives the jurisdictional objections we have raised, count one of the complaints should be dismissed for failure to state a claim upon which relief may be granted. Count one asserts that BPA and WAPA have been contractually required by the retroactively amended tariffs to pay the refunds ordered by FERC in its July 25, 2001 order, and that their failure to do so constitutes a current breach of contract. Alternatively, count two contends that, if the contractually required date to make the refunds has not occurred yet, BPA and WAPA have repudiated their alleged obligation to do so in the future. However, in related litigation, plaintiffs have now conceded that count one is invalid by admitting that any contractually required date to issue refunds has not yet occurred. Therefore, count one should be dismissed for failure to state a claim.

"Failure by the promisor to perform at the time indicated for performance in the contract establishes an immediate breach." Franconia Assocs. v. United States, 536 U.S. 129, 142-43 (2002) (citing Restatement (Second) of Contracts § 235(2) (1979)). In contrast, "the promisor's renunciation of a 'contractual duty before the time fixed in the contract for . . . performance' is a repudiation." Id. at 143 (quoting 4 A. Corbin, Contracts § 959, p. 855 (1951)). Thus, assuming BPA and WAPA are contractually required by the tariffs to issue refunds for Refund Period power sales, they are not currently in actual breach of that obligation unless the time required by the tariffs for them to make the actual refund payments has already passed and they have not done so. However, under the IOUs' own theory of this case, that time has not arrived yet, as the IOUs have so admitted.

As the complaints admit, and as described in more detail previously, the IOUs' transactions in the ISO and PX markets were governed by the respective tariffs of those organizations. The tariffs provided for the conduct of single-price auctions that set market prices. Pursuant to the tariffs, the ISO and PX then issued invoices to market participants reflecting amounts payable or receivable, and triggering payment obligations. PG&E Complaint ¶¶ 19, 29; SDG&E Complaint ¶¶ 13, 23. The complaints also allege that the tariffs subject the participants to FERC actions recalculating prior rates or charges for power sales if FERC determines prior rates or charges were unjust or unreasonable. PG&E Complaint ¶¶ 38-39; SDG&E Complaint ¶¶ 32-33. According to the complaints, FERC's July 25, 2001 order allegedly performed such a revision. PG&E Complaint ¶ 53; SDG&E Complaint ¶ 47. FERC then ordered the ISO and PX to calculate the refunds due from each seller. PG&E Complaint ¶ 56; SDG&E Complaint ¶ 50. According to the complaints, the tariffs recognize that the amounts invoiced are always subject to re-calculation to reflect disputes, errors, or FERC directives. PG&E Complaint ¶ 40; SDG&E Complaint ¶ 34.

As previously discussed, the IOUs are also suing the municipalities, now in California state court, under many of the same theories that they pursue here. Count one of the complaint against the municipalities also asserts that FERC's July 25, 2001 order revised the PX and ISO tariffs, correcting the prices that could be received during the refund period, and triggering an obligation by the municipalities to issue refunds that they have breached. Def. App. A1406 (Complaint at 22, Pac. Gas and Elec. Co. et al. v. Ariz. Elec. Power Coop., Inc., No. BC 369141 (Sup. Ct. of Cal., L.A., April 6, 2007)). As is the case here, count two advances an alternative claim of repudiation in the event the time required by the tariffs to actually issue the refunds has

not yet passed. Def. App. A1408.

Subsequently, in response to a statute of limitations argument advanced by the municipalities in a demurrer, the IOUs retracted their claim in state court that the time to pay the refunds under the tariffs has passed, abandoning count one's allegation that sellers are currently in breach of their alleged obligation to pay refunds. The IOUs have conceded the following:

> The July 25, 2001 Order was not the end of the Remedy Proceeding. As instructed by FERC, the ISO and PX went on to apply the MMCP to calculate the prices that should have been charged in the ISO and PX markets and to compute sellers' refund liabilities. That process has not yet concluded. The ISO and PX are still performing calculations to allocate certain cost offsets to the refunds owed by sellers. *San Diego Gas & Elec. Co.*, Thirty-Eighth Status Report, ER03-746-000, *et al.*, at 2-3 (RJN Exh. 24). And no revised invoices have yet issued that would trigger Defendants' obligations to pay those refunds i.e., *the date for contract performance has not yet arrived*. The California Parties' claim therefore did not accrue following the July 25, 2001 Order and, in fact, has not yet accrued to this day.
>
> A breach of contract claim "does not accrue until there has been a breach of the contract." *Church v. Jamison*, 143 Cal. App. 4th 1568, 1583 (2006); *Cochran v. Cochran*, 56 Cal. App. 4th 1115 (1997). Moreover, "'[t]here can be no *actual* breach of a contract until the time specified therein for performance has arrived.'" *Romano v. Rockwell Int'l, Inc.*, 14 Cal. 4th 479, 488 (1996) (quoting *Taylor v. Johnston*, 15 Cal. 3d 130, 137 (1975)).
>
> * * * *
>
> Under normal circumstances, the Tariffs' settlement provisions contemplate that a seller whose prices are reset would be required to refund its overcharges when the ISO or PX recalculates the seller's account to reflect the seller's refund obligation and issues a revised invoice to the seller. ISO Tariff § 11.6.3 (ISO authorized to rerun settlements); ISO Tariff § 11.9 (ISO to send out invoices based on final settlement statements); PX PSABP § 5.3 (PX authorized to rerun settlements); PX PSABP § 5.4 (PX to send out invoices based on final settlement statements). Although the July 25, 2001 Order prescribed the new formulas to

be applied under the Tariffs to calculate prices for sales in the ISO and PX markets, the Order did not set forth the precise amounts of any seller's refund liability, nor a specific deadline for the ISO and PX to assess the amounts of those liabilities against sellers' accounts, indicating each seller's specific obligation to pay refunds under the Tariffs. In other words, the Order did not calculate or set the date for Defendants to pay refunds that is, to perform their contractual obligations. Rather, FERC required further procedures by the ISO and PX to calculate the amount of the refunds owed by each seller and to determine when payments would be due under the Tariffs:

> [M]aterial issues of fact remain that prevent the Commission from ordering refunds at this time. [The Commission orders] an evidentiary hearing before an Administrative Law Judge. . . . to make findings of fact with respect to: (1) the mitigated price in each hour of the refund period; (2) the amount of refunds owed by each supplier according to the methodology established herein; and (3) the amount currently owed to each supplier (with separate quantities due from each entity) by the ISO, the investor owned utilities and the State of California.

July 25, 2001 Order, 96 FERC at 61,520. Because that process is not yet completed, no date has yet been established for Defendants to pay refunds, no contract performance has yet come due, and no breach of contract claim has yet accrued.

FERC is supervising the ISO and PX's calculation and invoicing procedures, and it is possible that FERC may re-define the time or conditions when the ISO and PX will require payment to be made under the Tariffs. All that need be said now is that, on the facts alleged in the Complaint, Defendants' time to perform by paying their refunds has not yet come. Accordingly, the California Parties' claim for breach of contract has not yet accrued . . . .

Def. App. A1410-13 (Plaintiffs' Memorandum In Opposition To Defendants' Demurrers Volume 2 of 2 (Detailed Argument), Pac. Gas and Elec. Co. et al. v. Ariz. Elec. Power Coop, Inc. et al., No. BC 369141 (Sup. Ct. Cal., L.A., April 9, 2007)).

Thus, the IOUs have now admitted that, under their own theory of liability, because "no revised invoices have yet issued that would trigger Defendants' obligations to pay . . . refunds . . . the date for contract performance has not yet arrived." Given the IOUs' concession that the date for contract performance has not arrived, they also admit that their "claim for breach of contract has not yet accrued." Accordingly, they concede that count one is invalid as a matter of law. It, therefore, should be dismissed.

**CONCLUSION**

For the foregoing reasons, the complaints in this case should be dismissed.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

s/ Jeanne E. Davidson
JEANNE E. DAVIDSON
Director

s/ Mark A. Melnick
MARK A. MELNICK
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 616-0475
Fax: (202) 305-7644

Attorneys for Defendant

OF COUNSEL:
Sean B. McNamara
Trial Attorney
Department of Justice

Peter Burger
Attorney
Bonneville Power Administration

John D. Bremer
Attorney
Western Area Power Administration

February 7, 2008

CERTIFICATE OF FILING

I hereby certify that on this 7th day of February, 2008, a copy of the foregoing "DEFENDANT'S MOTION TO DISMISS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. The parties may access this filing through the Court's system.

s/ Mark A. Melnick