IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Nos. 07-157C, 07-167C
(Senior Judge Smith)

PACIFIC GAS AND ELECTRIC COMPANY,
SOUTHERN CALIFORNIA EDISON COMPANY,
AND CALIFORNIA ELECTRICITY OVERSIGHT BOARD,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

SAN DIEGO GAS & ELECTRIC CO.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

**DEFENDANT'S APPENDIX**

## Index to Appendix

PX Tariff ....... 1-237
ISO Tariff ....... 238-1149

ISO Scheduling Coordinator Agreement (BPA) ....... 1150-54
PX Participation Agreement (BPA) ....... 1155-59
IOUs' claim for damages (BPA) ....... 1160-70
California's claim for damages (BPA) ....... 1171-79
Contracting officer's decision on IOUs' claim (BPA) ....... 1180-81
Contracting officer's decision on California's claim (BPA) ....... 1182-84

IOUs' claim for damages (WAPA) ....... 1185-96
California's claim for damages (WAPA) ....... 1197-1205
Contracting officer's decision on IOUs' claim (WAPA) ....... 1206-08
Contracting officer's decision on California's claim (WAPA) ....... 1209-10
PX Participation Agreement (WAPA CRSP) ....... 1221-24
ISO Scheduling Coordinator Agreement (WAPA) ....... 1226-34
PX Participation Agreement (WAPA SNR) ....... 1235-38
PX Account information (WAPA) ....... 1239
PX Terminal Fee election (WAPA) ....... 1240
PX Participation Agreement (WAPA CRSP) ....... 1284-87

SCE FERC brief ....... 1288-1303
PG&E FERC intervention ....... 1304-09
SDG&E FERC intervention ....... 1310-12
SCE 9th Circuit brief in *Lynch* ....... 1315-64
IOU complaint in EDCA ....... 1365-94
IOU brief in EDCA (excerpts) ....... 1395-1404
IOU complaint in California state court (excerpts) ....... 1405-08
IOU brief in California state court (excerpts) ....... 1409-13

ORIGINAL

FILED
OFFICE OF THE SECRETARY
00 AUG -2 PM 4:44
FEDERAL ENERGY REGULATORY COMMISSION

# CALIFORNIA POWER EXCHANGE CORPORATION

# FERC ELECTRIC SERVICE TARIFF NO. 2

Filed with the Federal Energy Regulatory Commission

Communications concerning this tariff should be sent to:

**Scott D. Rasmussen**
**General Counsel**
**200 South Los Robles Avenue**
**Suite 400**
**Pasadena, California 91101-2482**

**Telephone: (626) 537-3127**
**Facsimile: (626) 537-3159**

[Sheet No. 1 is reserved for future use.]

**CONTENTS**

INTRODUCTORY STATEMENT .......... 6

1. DEFINITIONS AND INTERPRETATION .......... 6

2. REQUIREMENTS FOR PARTIES TO PARTICIPATE IN PX MARKET .......... 7

2.1 Open Participation. .......... 7

2.2 Eligibility Requirements for PX Participants .......... 7

2.3 Changes Affecting Eligibility. .......... 9

2.4 Creditworthiness Requirement. .......... 9

2.5 Market Surveillance. .......... 12

2.6 Certification Procedures. .......... 12

2.7 Termination of Participation Agreement. .......... 14

3. RESPONSIBILITIES OF THE PX AND PX PARTICIPANTS. .......... 15

3.1 Responsibilities of the PX. .......... 15

3.2 General Market Rules. .......... 16

3.3 PX Bidding Procedures. .......... 17

3.4 Inter-Scheduling Coordinator Trades. .......... 19

3.5 Public and Private Scheduling Information. .......... 20

3.6 Communication Between the PX and PX Participants .......... 20

3.7 Information Transfer from the PX to PX Participants. .......... 21

3.8 Market Clearing Price Determination .......... 21

3.9 Energy Efficiency Services and Environmental Quality. .......... 21

4. PX ACCOUNTING AND ADMINISTRATION CHARGE .......... 21

4.1 Uniform System of Accounts. .......... 21

4.2 Collection of PX Administration Charge. .......... 21

4.3 Components of the PX Administration Charge. .....22

4.4 Adjustment of PX Administration Charge. .....23

4.5 Operating and Reserve Account. .....23

5. METERING. .....23

5.1 Metering for Scheduling Coordinator Metered Entities. .....23

5.2 Access to PX's Revenue Meter Data Acquisition and Processing System .....23

5.3 Meter Service Agreements .....24

6. SETTLEMENTS AND BILLING. .....24

6.1 General PX Obligations Toward Settlement. .....24

6.2 Settlements Process. .....26

6.3 Payment Procedures. .....26

7. DEFAULTS. .....26

7.1 Proceedings to Recover Overdue Amounts. .....26

7.2 Excessive Imbalance Energy. .....27

8. DATA GATHERING AND STORAGE .....27

8.1 Required Capabilities .....27

8.2 Data Dissemination .....28

9. CONFIDENTIALITY. .....28

10. COMMUNICATIONS. .....28

11. PX PAYMENTS CALENDAR. .....29

12. DISPUTE RESOLUTION PROCEDURES .....29

13. REGULATORY FILINGS. .....29

14. LIABILITY AND INDEMNIFICATION. .....30

14.1 Liability for Damages. .....30



EXH. 2.4

A4

Case 2:07-cv-00591-GEB-KJM Document 38-125-2 Filed 02/05/2008 Page 6 of 50



14.2 Exclusion of Certain Types of Loss. ........ 30

14.3 PX Participant's Indemnity. ........ 30

15. AUDITS. ........ 31

15.1 Materials Subject to Audit. ........ 31

15.2 PX Audit Committee. ........ 31

15.3 Audit Results. ........ 33

15.4 Availability of Records. ........ 33

15.5 Confidentiality of Information. ........ 33

15.6 Payments. ........ 33

16. UNCONTROLLABLE FORCES. ........ 34

16.1 Consequences of Uncontrollable Force. ........ 34

16.2 Duty to Mitigate. ........ 34

17. ASSIGNMENT. ........ 35

18. TERM AND TERMINATION. ........ 35

18.1 Effective Date. ........ 35

18.2 Termination of Tariff. ........ 35

18.3 Termination of Participation Agreement. ........ 35

19. MISCELLANEOUS. ........ 36

19.1 Notice. ........ 36

19.2 Waiver. ........ 37

19.3 Confidentiality. ........ 37

19.4 Accounting Change Notification. ........ 39

19.5 Titles. ........ 39

19.6 Applicable Law and Forum. ........ 39

19.7 Consistency with Federal Laws and Regulations. ....................40

19.8 PX Participant Requested Services....................41

Schedule 1 PX Rate Schedule....................47

Schedule 2 PX Clearinghouse, Credit Policies, Business Practices and Banking....................56

Schedule 3 Determination of Market Clearing Price....................87

Schedule 4 Bidding and Bid Evaluation Schedule....................95

Schedule 5 Market Monitoring Rules ....................123

Schedule 6 PX Market Settlements ....................144

Schedule 7 [Reserved for Future Use]....................158

Schedule 8 PX Bookout Option ....................166

Schedule 9 Dispute Resolution Procedures....................172

Schedule 10 Administrative Sanctions Procedures....................185

APPENDIX A – PARTICIPATION AGREEMENT....................202

APPENDIX B – MASTER DEFINITIONS SUPPLEMENT ....................209

APPENDIX C – MISCELLANEOUS TARIFF SUPPLEMENTS....................242

**INTRODUCTORY STATEMENT**

The California Power Exchange Corporation (hereinafter the "Power Exchange" or "PX") is a nonprofit corporation, incorporated under the laws of the state of California, for the primary purpose of providing an efficient, competitive Energy auction open on a non-discriminatory basis to all suppliers and purchasers, that meets the loads of exchange customers at market prices, and for such other purposes as are provided for in its bylaws. This California Power Exchange Corporation FERC Electric Service Tariff No. 2 (hereinafter the "PX Tariff" or "this Tariff") sets forth the specific FERC-jurisdictional services provided by the PX and the terms, conditions and charges for such services. No party will be provided services by the PX which are subject to the jurisdiction of the FERC except on the terms in this Tariff.

**1. DEFINITIONS AND INTERPRETATION.**

**1.1** Capitalized terms used in this Tariff shall have the meanings set out in the Master Definitions Supplement, attached hereto as Appendix B, unless the context otherwise requires.

**1.2** In this Tariff, "includes" or "including" shall mean "including without limitation."

**1.3** In this Tariff, unless the context otherwise requires:

(a) the singular shall include the plural and vice versa;

(b) references to a Section, Schedule or Appendix shall mean a Section, Schedule or Appendix of this Tariff, as the case may be;

(c) references to any law shall be deemed to be references to such law as it may be amended, replaced or restated from time to time;

(d) any reference to a "person" includes any individual, partnership, firm, company, corporation, joint venture, trust, association, organization or other entity, in each case whether or not having separate legal personality;

(e) any reference to a day, week or month, shall be deemed to be a reference to a calendar day, week or month; and

(f) references to any section of the ISO Tariff shall be deemed to refer to that section and any applicable successor section or provision that the ISO may lawfully make effective from time to time pursuant to applicable FPA and FERC procedures.

**1.4** In this Tariff, the term "PX Operating Manual" means the compilation of detailed operating procedures, practices and activity rules issued by the PX, as modified from time to time by the PX and posted on the PX's Home Page in accordance with the provisions of the PX Operating Manual. Participation in the PX Markets pursuant to this Tariff shall obligate the PX Participant to conform to all applicable provisions of the PX Operating Manual.

## 2. REQUIREMENTS FOR PARTIES TO PARTICIPATE IN PX MARKETS.

### 2.1 Open Participation.

The PX shall permit all PX Participants to trade Energy in the PX Markets on an open and non-discriminatory basis. The PX shall enter into a SC Agreement with the ISO. In relation to all trades transacted through the PX Markets, and subject to Section 2.3.1, the PX shall register with the ISO as the Scheduling Coordinator for all PX Participants and their Eligible Customers for which it is required to act as Scheduling Coordinator pursuant to Section 3.1, unless such person is a Scheduling Coordinator and is only conducting Inter-Scheduling Coordinator Trades with the PX.

### 2.2 Eligibility Requirements for PX Participants.

Except as otherwise provided by tariff, regulation or law, no one shall be eligible to trade Energy or Ancillary Services as a PX Participant unless it demonstrates to the PX's reasonable satisfaction that it meets the following eligibility requirements:

(a) It is an Eligible Trader and, to the extent that it trades Energy or Ancillary Services as an intermediary for third parties (whether it acts as a principal or agent in relation to those trades), those third parties are also Eligible Traders;

(b) It shall (except in relation to Inter-Scheduling Coordinator Trades involving the PX) identify the Eligible Customers (including itself if it trades for its own account) for which it proposes to trade under this Tariff, the meters (for which the certification requirements of Section 10 of the ISO Tariff shall have been met) at which those Eligible Customers will supply or purchase either or both Energy and Ancillary Services and, in relation to a Direct Access End-User connected to a Distribution System, the relevant distribution loss factors approved by the Local Regulatory Authority;

(c) It shall provide the PX with satisfactory evidence of its authority to trade on behalf of the Eligible Customers referred to in Section 2.2(b) and to appoint the PX as their Scheduling Coordinator;

(d) It shall have executed a meter service agreement with the PX unless such an agreement is not required under Section 5.3 of this Tariff; and

(e) Effective July 30, 1998 new PX Participants in the Day-Ahead market and all PX Participants in the Hour-Ahead market shall have successfully completed all PX training and certification programs and shall be able to demonstrate that they can submit to the PX within the time limits and in the manner prescribed by the PX:

(i) valid bids and Schedules acceptable to the PX; and

(ii) Settlement Quality Meter Data or, in the case of an ISO Metered Entity, a written confirmation by the ISO that the applicant has demonstrated compliance with the

ISO metering requirements under its meter service agreement with the ISO and the ISO Tariff.

**2.3 Changes Affecting Eligibility.**

**2.3.1 Changes in Scheduling Coordinator Metered Entities.**

PX Participants shall notify the PX of any changes in the Eligible Customers for which the PX Participant is authorized to act as Scheduling Coordinator under this Tariff, no later than three (3) Business Days before such changes are intended to take effect. The PX shall not be required to register with the ISO as the Scheduling Coordinator for any new Eligible Customers or permit a PX Participant to trade on their behalf under this Tariff until the relevant PX Participant has provided such information as the PX reasonably requires to demonstrate that such Eligible Customers are Eligible Traders and that the PX Participant is authorized to trade on their behalf under this Tariff. A PX Participant shall continue to be accountable for each Eligible Customer for which it has notified the PX it is responsible until it has provided such information as the PX reasonably requires to demonstrate that another PX Participant or Scheduling Coordinator has accepted responsibility for that Eligible Customer.

**2.3.2 Other Changes.**

PX Participants shall promptly notify the PX of any circumstances of which they become aware that may cause them not to satisfy the eligibility requirements of Section 2.2.

**2.4 [Reserved]**

**2.5 Market Surveillance.**

The PX shall keep the operation of the PX Markets under review to determine whether changes to the eligibility requirements for PX Participants (including changes to the definition of Eligible Traders) or any other changes in its operating rules or practices would improve the efficiency of the PX Markets or prevent the exercise of significant market power on the part of any PX

Participant. Changes under this Section 2.5 which affect any PX Tariff provisions on file with the FERC shall be approved and implemented in accordance with Section 13. The PX shall monitor the markets that it administers in order to identify and, where appropriate, institute corrective action to respond to, the exercise of market power in or other abuses of such markets in accordance with the plan set forth in Schedule 5 ("Market Monitoring Rules").

**2.6 Certification Procedures.**

The PX will certify PX Participants in accordance with the following application procedures:

**2.6.1 PX Applications.**

A proposed PX Participant ("PX Applicant") will submit to the PX the following:

(a) a completed PX Participant application ("Application Form") in such form as the PX shall prescribe from time to time, which shall set out details of each of the Eligible Customers for which the PX Applicant proposes to appoint the PX as their Scheduling Coordinator and the technical data relevant to each Eligible Customer's facilities that the PX requires

[These pages intentionally left blank.]

to confirm bid data in accordance with Schedule 4 ("Bidding and Bid Evaluation Procedures") and which is to be included in each PX Participant's Master File; and

(b) a non-refundable application fee in the amount set by the PX from time to time to cover the reasonable direct costs associated with processing the application and providing documentation.

**2.6.2 Procedure.**

(a) The Application Form must be served on the PX in accordance with Section 19, at least sixty (60) days in advance of the date the PX Applicant proposes to commence operating as a PX Participant. The PX will consider applications on shorter notice when feasible, but acceptance of an Application Form on shorter notice does not imply that the application procedure will be completed by the date requested by the PX Applicant.

(b) The PX shall acknowledge receipt of the Application Form, in writing, promptly after receiving it.

(c) The PX shall review the application and may request additional information, clarifications or further documentation from the PX Applicant, that the PX reasonably considers may be relevant in determining the PX Applicant's eligibility under Section 2.2, within the timeframe specified for requesting such information in the registration and certification provisions of the PX Operating Manual.

(d) If the PX Applicant fails to respond appropriately to any request by the PX pursuant to subsection (c), within the period specified for such responses in the PX Operating Manual, the PX may reject the application, without prejudice to any future application by the PX Applicant.

(e) After the PX Applicant has provided all of the additional information requested by the PX pursuant to subsection (c), the PX will notify the PX Applicant in writing whether its application has been accepted or rejected within the period specified for such notification in the PX Operating Manual and, if the application is rejected, the PX will give a written explanation of the reasons for its rejection. The PX Applicant may reapply if it considers that it can overcome the PX's reason for rejection.

(f) The PX Applicant shall become a PX Participant when, following acceptance of its application, it has entered into a participation agreement with the PX and has met the PX creditworthiness requirements set out in Section 2.4.

**2.6.3 Appeals.**

The PX Applicant may appeal a rejection of its application in writing to the PX Governing Board, setting out the grounds for the appeal, within the time period specified for such appeals in the PX Operating Manual. The PX Governing Board will consider the appeal and present an oral decision on the notice of appeal followed by a written decision, both of which shall be issued within the periods specified for such decisions in the PX Operating Manual.

**2.6.4 Dispute Resolution.**

If the PX Governing Board rejects the application on appeal, then the PX Applicant may challenge that decision under the dispute resolution procedures provided for in Section 12. The PX shall agree to mediation of such dispute under the procedures provided for in Section 12 if the PX Applicant so requests.

**2.7 Termination of Participation Agreement.**

A PX Participant's participation agreement may be terminated by the PX on written notice if:

(a) the PX Participant no longer satisfies the conditions for eligibility in Section 2.2;

(b) the PX Participant defaults in making timely payment under this PX Tariff; or

(c) the PX Participant commits any other default under this Tariff which, if capable of being remedied, is not remedied within thirty (30) days after the PX has given it written notice of the default.

Termination of the participation agreement will automatically lead to cancellation of the PX Participant's certification under Section 2.6. Following cancellation of a PX Participant's certification, the PX may take all necessary steps to transfer that PX Participant's Eligible Customers for which the PX acts as Scheduling Coordinator to another PX Participant or Scheduling Coordinator.

## 3. RESPONSIBILITIES OF THE PX AND PX PARTICIPANTS.

### 3.1 Responsibilities of the PX.

The PX shall be the Scheduling Coordinator under the ISO Tariff for those Eligible Customers for which a PX Participant has appointed it to act as the Scheduling Coordinator responsible for their meters or any other Eligible Customers for which the PX is required by tariff, regulation or law to act as Scheduling Coordinator. The PX shall (1) calculate the prices at which trades in Energy are transacted in the PX Markets, (2) settle trades in Energy between PX Participants, (3) receive Meter Data from the Scheduling Coordinator Metered Entities represented by the PX Participants in order to allocate to PX Participants costs incurred by the PX under this Tariff and the ISO Tariff in acting as their Scheduling Coordinator and/or in buying or selling Energy to non-PX Scheduling Coordinators, (4) prepare and distribute to PX Participants invoices reflecting the amounts payable and receivable by them in connection with their trading through the PX, and (5) operate the funds transfer system described in this Tariff to facilitate the payment of such invoices. In carrying out its responsibilities under this Tariff, the PX shall at all

times exercise due care and shall operate in a non-discriminatory manner. The PX will not be, and shall not be deemed to be, a counterparty to any trade transacted through the PX Markets.

**3.2 General Market Rules.**

**3.2.1 Bids and Meter Data.**

Each PX Participant shall submit bids and, if submitting Demand Bids, provide End-Use Meter Data, to the PX in accordance with this Tariff and the requirements of the PX Operating Manual. To be accepted, the bid must be complete, be in a form permitted by Schedule 4 and be submitted by the deadlines established by the PX for each type of bid. Non-conforming or late bids may be rejected by the PX.

**3.2.2 PX Operational Instructions.**

Each PX Participant shall comply with, and shall ensure that its Eligible Customers comply with, operational instructions issued by the PX as their Scheduling Coordinator to enable the PX to comply with its obligations under the ISO Tariff, as well as any operational instructions that the PX is entitled to issue under this Tariff.

**3.2.3 Bids Not Covered By Security.**

The PX shall notify a PX Participant if at any time the outstanding liability of such PX Participant exceeds 80% of the PX Security Amount that such PX Participant has provided pursuant to Section 2.4.3 of the PX Tariff. If the amount of security provided by a PX Participant pursuant to Section 2.4 falls below the amount required by Section 2.4.3, the PX shall promptly notify the PX Participant that it is required to provide additional security at least equal to the shortfall. If the PX Participant fails to provide the additional security within two (2) Business Days after receiving the PX's notice, the PX may refuse to accept any bids (for purchases or sales) from that PX Participant until the PX Participant has provided the required security.

### 3.2.4 Auction Activity Rules

The PX shall prescribe rules from time to time for the conduct of bidding in Schedule 4.

### 3.2.5 Emergencies and System Failures

In the event of an emergency (including system failure or problems in the PX software system), the relevant provisions of the PX Tariff and the PX Operating Manual (including emergency recovery and communications provisions) shall apply.

### 3.3 PX Bidding Procedures.

The sequential process used to develop the Day-Ahead and Hour-Ahead Schedules is set forth in Schedule 4. Each PX Participant shall prepare bids to buy or sell Energy based on piece-wise linear incremental price-quantity curves in accordance with the requirements of Schedule 4. All Energy Bids shall not be less than zero and shall be subject to any maximum price limit set by the PX. In addition, all bids shall be subject to minimum size and maximum size limits set by the PX in accordance with Schedule 4.

### 3.3.1 Losses.

It is the responsibility of the PX Participants selling Generation to account for Transmission Losses in their bids. PX Participants bid their effective Generation which is their actual Generation multiplied by the Generation Meter Multiplier. When the PX requests Generating Unit schedules from portfolio bidders, all bidders (including portfolio bidders) are responsible for scheduling appropriate Generation quantities from their Generating Units so that, when the relevant Generation Meter Multipliers are applied, the total effective Generation will be equal to the quantity of Generation accepted by the PX from the bidder.

### 3.3.2 Validation of Energy Bids.

Upon receipt, the PX shall validate the bid data received from PX Participants in accordance with the procedures in Schedule 4.

### 3.3.3 Portfolio Bids.

The PX shall carry out the confirmation process referred to in Section 3.3.2 in relation to portfolio bids when the portfolio bidder identifies the Generating Units and System Resources to be included in the PX Preferred Schedule and if any bid is inconsistent with the operating parameters as stated in that PX Participant's Master File data, the PX shall give the relevant portfolio bidder a reasonable opportunity to correct the error and, if it fails to correct the error, the PX shall take such action as is reasonably required to enable it to comply with ISO Protocols and shall recover any additional costs incurred in so doing from that portfolio bidder.

### 3.3.4 Rejection of Bids and Schedules.

Bids and Schedules that fail validation due to invalid bid format, violation of the limits specified in the Master File, or violation of the PX's published activity rules will be rejected and the bidder informed. If a corrected bid or schedule is received in time, it will be included.

### 3.3.5 Ancillary Services.

Until such time as the PX Board of Governors determines otherwise, neither the PX nor PX Participants may self-provide Ancillary Services and the PX will purchase all of its Ancillary Services requirements from the ISO. The PX shall, where possible, forward to the ISO any Ancillary Services bids submitted to it by PX Participants in connection with any auction for Ancillary Services conducted by the ISO.

**3.4 Inter-Scheduling Coordinator Trades.**

**3.4.1** Scheduling Coordinators that effect Inter-Scheduling Coordinator Trades shall be permitted to participate in the PX Energy auction to the extent allowed by this Tariff and the PX Operating Manual.

**3.4.2** A Scheduling Coordinator's bid that is accepted in the PX Energy auction is a binding commitment by that Scheduling Coordinator to purchase (if it is a Demand bid) or to sell (if it is a Supply bid) the accepted quantity of Energy in the Zone designated in the bid. The Scheduling Coordinator shall ensure that this binding commitment is accurately reflected in its own Balanced Schedule for the relevant Zone (after making appropriate adjustments for sign conventions and the Generation Meter Multipliers).

**3.4.3** If the ISO determines that there is an inconsistency in the way that an Inter-Scheduling Coordinator Trade has been reflected in a PX Schedule submitted by a Scheduling Coordinator to the ISO and the ISO notifies the PX of the inconsistency, the PX and the relevant Scheduling Coordinator shall attempt to resolve the inconsistency by agreement. Where no agreement is reached within any time limit set by the ISO for such resolution, the PX's Schedule shall be binding on the relevant Scheduling Coordinator and the PX pending the resolution of any dispute in accordance with the PX ADR Procedures. The relevant Scheduling Coordinator shall submit a revised Schedule to the ISO that conforms to the PX's Schedule. If for any reason, the Scheduling Coordinator's revised Schedule does not reach the ISO, the Scheduling Coordinator agrees that the PX shall have authority to direct the ISO to limit any schedule changes it directs to be made under its Tariff or Protocols intended to resolve such imbalance, be made only to the non-PX Preferred Schedule and such Scheduling Coordinator shall give to the PX a written standing instruction in a form suitable to the PX for delivery to the ISO to this effect. If the ISO

for any reason does not accept the PX's instruction and does not follow the PX Schedule, the Scheduling Coordinator shall be obligated to pay the PX all costs, losses and charges incurred by the PX and PX Participants as a result of thereof.

**3.5 Public and Private Scheduling Information.**

The PX will make the following scheduling and pricing information publicly available for the PX Markets: (1) hourly Market Clearing Prices (for each Zone if there is Congestion), and (2) aggregate Supply/Demand quantities. The PX will keep confidential each PX Participant's bid information and individual unit and portfolio schedules.

**3.6 Communication Between the PX and PX Participants.**

**3.6.1 Bid Information Transfer from PX Participants to the PX.**

PX Participants who wish to submit bids to the PX must submit the bid information by direct computer link using software licensed and obtained from the PX, or if this electronic data transfer fails, then bids may be submitted by facsimile or e-mail in a format specified in the PX Operating Manual, provided that the PX is advised by telephone to expect a facsimile or e-mail.

**3.6.1.1 Submitting Information by Direct Computer Link.** In order to submit information by direct computer link, each PX Participant shall establish a network connection with the PX. This connection can be a permanent link with the PX or a dial-up link.

**3.6.2 Other Information Transfer from PX Participants to the PX.**

PX Participants shall provide other information, such as End-Use Meter Data necessary for Settlements, by direct computer link in a format specified by the PX.

**3.7 Information Transfer from the PX to PX Participants.**

The PX will transfer information to PX Participants by means of the direct computer link using software licensed and obtained from the PX or, if this electronic data transfer fails, then by facsimile or e-mail.

**3.8 Market Clearing Price Determination.**

For each of the Settlement Periods in the Trading Day, the PX shall create an aggregate Energy Supply curve by combining all Supply Bids and an aggregate Energy Demand curve by combining all Demand Bids. For each Settlement Period, the Market Clearing Price is determined by the point at which the Supply and Demand curves intersect. The hourly schedule for each Demand, Generation or portfolio is then calculated as the MW bid at the Market Clearing Price on the bid curve. The methodology for determining the Market Clearing Price is set forth in Schedule 3 ("Determination of Market Clearing Price").

**3.9 Energy Efficiency Services and Environmental Quality.**

The PX will implement mechanisms to encourage bids and facilitate offering or seeking of demand-side bids for Energy Efficiency Services.

**4. PX ACCOUNTING AND ADMINISTRATION CHARGE.**

**4.1 Uniform System of Accounts.**

The PX shall maintain a set of financial statements and records in accordance with the FERC's Uniform System of Accounts.

**4.2 Collection of PX Administration Charge.**

The PX shall assess the PX Administration Charge as set forth in Schedule 1 ("PX Administration Charges") as such schedule may be modified and in effect from time to time.

**4.3 Components of the PX Administration Charge.**

The formula adopted for settling the PX Administration Charge shall include the following components:

(a) **Annual Operating Costs.** Budgeted annual operating costs including (1) staffing costs including remuneration of contractors and consultants, salaries, benefits and any incentive programs for employees, (2) costs of operating, replacing and maintaining PX systems, (3) lease payments for facilities necessary for the PX to carry out its business, (4) reasonable contingencies, and (5) annual costs of financing the PX's working capital.

(b) **Financing Costs.** Other financing costs that are approved by the PX Governing Board, including debt service on start-up costs and future capital expenditures. Capital expenditures may be financed over such period as the PX Governing Board shall decide.

(c) **Transition Charges.** The amount (if any) of any start-up and development costs incurred by Pacific Gas & Electric, Southern California Edison, and San Diego Gas & Electric and the total investment made by the Trustee that are to be reimbursed by the PX pursuant to an Order D.96-08-038 issued by the CPUC on August 2, 1996 or a subsequent order in that proceeding.

(d) **Operating and Capital Reserves Costs.** The budgeted annual cost of pay-as-you-go capital expenditures and reasonable coverage of debt service obligations. Such reserves shall be utilized to minimize the impact of any variance between forecast and actual costs throughout the year.

**4.4 Adjustment of PX Administration Charge.**

Any under-recovery, or over-recovery when the Operating and Reserve Account is fully funded, of PX costs through the PX Administration Charge because of differences between actual and forecast costs, the inability to recover from a PX Participant its share of any PX Administration Charge, and any agreement to which the PX is a party during the relevant year shall be carried forward and included in the PX Administration Charge for the next year, or such lesser period as approved by the PX Governing Board and filed with the FERC.

**4.5 Operating and Reserve Account.**

Revenues collected to fund operating reserves shall be deposited in an Operating and Reserve Account until such account reaches a level specified by the PX Governing Board. If the Operating and Reserve Account is fully funded, surplus revenues will be considered revenues in the next fiscal year's operating budget.

**5. METERING.**

**5.1 Metering for Scheduling Coordinator Metered Entities.**

PX Participants which are Scheduling Coordinator Metered Entities or whose customers are Scheduling Coordinator Metered Entities shall provide the PX with Settlement Quality Meter Data in accordance with the metering procedures set forth in the PX Operating Manual.

**5.2 Access to PX's Revenue Meter Data Acquisition and Processing System.**

The PX has complete authority over all rights of access to (and has authority to deny access to) its computerized revenue meter data acquisition and processing system including servers (where used), interface equipment, and software needed to accept Settlement Quality Meter Data for Settlement, billing and related purposes. Each PX Participant, on behalf of itself and

the Scheduling Coordinator Metered Entities that it serves or represents, acknowledges this PX authority as a condition of being a PX Participant.

**5.3 Meter Service Agreements.**

The PX shall enter into meter service agreements with all PX Participants except that (a) meters covered by meter service agreements with the ISO are exempt from this requirement and (b) this requirement shall also not apply to a PX Participant which certifies to the PX in writing that it will trade only across interties. Such agreements shall specify that PX Participants shall require that the Scheduling Coordinator Metered Entities they service adhere to the same meter requirements as those set forth in this Section 5 and the metering procedures set forth in the PX Operating Manual. A PX Participant shall obtain Meter Data in accordance with applicable FERC and CPUC requirements. Meter service agreements shall contain appropriate measures and rights that the PX may exercise upon any failure by a PX Participant to meet any meter standards and accuracy requirements which apply to PX Participants or the Scheduling Coordinator Metered Entities they represent.

**6. SETTLEMENTS AND BILLING.**

**6.1 General PX Obligations Toward Settlement.**

The PX shall have the following general obligations in relation to the operation of the Settlement process:

(a) The PX shall be responsible for calculating Settlement balances for all transactions carried out by PX Participants through the PX in each Settlement Period;

(b) The PX shall create and maintain computer back-up systems, including off-site storage of all necessary computer hardware, software, records and data at an alternative location that, in the event of a Settlement system breakdown at the primary location of

the day-to-day operations of the PX, could serve as an alternative location for day-to-day Settlements operations within a reasonable period of time; and

(c) The PX shall retain all records for a period which, at a minimum, allows for the re-run of data as required by this Tariff or by any Local Regulatory Authority having jurisdiction over the PX Participants.

**6.1.1 Accrual or Allocation of Data.**

So as to pay the ISO in a timely and compatible manner, the PX may in its discretion, accrue or allocate, on a monthly basis, data received from the ISO for pass through to the PX Participants.

**6.2 Settlements Process.**

The PX shall settle with each PX Participant for Energy traded in the PX Markets in the manner set forth in Schedule 6 ("PX Market Settlements").

**7. DEFAULTS.**

**7.1 [Reserved]**

**7.2 Excessive Imbalance Energy.**

To protect the PX Markets against abuse by PX Participants who repeatedly fail by a significant margin to honor commitments to sell Energy in the PX Markets and consequently enjoy the use of interest free money paid in settlement of such forward sales pending later settlement of their purchases of Imbalance Energy, the PX may, in relation to any such PX Participant whose aggregate liability for Imbalance Energy is determined by the PX to be excessive by comparison with the quantities of energy that the PX Participant contracts to sell in the corresponding forward markets, impose restrictions on its right to bid in any PX Markets or increase its Security Amount in relation to the amount of Energy it trades through the PX Markets. The PX may adopt rules to implement this Section 7.2 which shall be included in the PX Operating Manual.

## 8. DATA GATHERING AND STORAGE.

### 8.1 Required Capabilities.

The PX shall ensure that the Settlement process contains, at a minimum, the following data gathering and storage capabilities:

[This page intentionally left blank.]

(a) the accurate, time-sequenced, end-to-end of the Settlements process so that PX Participants can fully verify their Settlement Statements;

(b) the ability to specify and accept data that is specifically needed for audit trail requirements; and

(c) the archiving of Meter Data and other information used to prepare Settlement Statements for a period consistent with the time frame required to re-run the Settlement process by state laws and the rules of the Local Regulatory Authority.

**8.2 Data Dissemination.**

Data shall not be disseminated by the PX except as provided in this Tariff and the PX Operating Manual.

**9. CONFIDENTIALITY.**

The PX shall constitute and maintain a system of communications with PX Participants that includes the strict use of passwords for access to data and shall not disseminate information regarding any bid prices, meter data, customers, settlements or any other information to be kept confidential under Section 19.3 to any person other than the relevant PX Participant, except in accordance with law, judicial or administrative order or this Tariff, without the consent of the relevant PX Participant.

**10. COMMUNICATIONS.**

Preliminary Settlement Statements, Final Settlement Statements, invoices and confirmation notices will be considered issued to PX Participants when released by the PX using a secure electronic interface. If there is a failure of a communication system and it is not possible to communicate by electronic means, then the PX or the PX Participant, as the case may be, shall

communicate by facsimile but only if the recipient is first advised by telephone to expect a facsimile.

**11. PX PAYMENTS CALENDAR**

No later than 15 November in each year, the PX shall publish a PX Payments Calendar, based on the ISO Payments Calendar which it receives from the ISO pursuant to Section 11.24 of the ISO Tariff, showing for the next year, the dates on which Settlement Statements shall be published by the PX and the Payment Dates on which invoices are required to be settled under this Tariff. Any PX Payments Calendar prepared pursuant to this Section 11 shall be distributed promptly to each PX Participant and shall be published on the PX's Home Page. The PX may modify its Payments Calendars on a temporary or permanent basis to the extent reasonably required by any changes to the ISO Payments Calendars or by any delay or failure by the ISO to supply information to the PX necessary to permit compliance with the PX's Payment Calendars. Any temporary or permanent change to the PX's Payment Calendar shall be promptly published on the PX's Home Page and distributed to each PX Participant.

**12. DISPUTE RESOLUTION PROCEDURES.**

Disputes arising in connection with this Tariff shall be subject to the dispute resolution procedures set forth in Schedule 9 ("Dispute Resolution Procedures"), to the extent provided for in said schedule.

**13. REGULATORY FILINGS.**

Any amendment or other modification of any provision of this Tariff must be in writing and approved by the PX Governing Board in accordance with the bylaws of the PX. Any such amendment or modification shall be effective upon the date it is permitted to become effective by FERC. Nothing contained herein shall be construed as affecting, in any way, the right of the

PX to unilaterally make application to FERC for a change in this Tariff or any rates, terms and conditions, charges, classification of service, service agreement, participation agreement, or rate schedule, rule or regulation under Section 205 of the FPA and pursuant to FERC's rules and regulations promulgated thereunder. Nothing contained in this Tariff or any service or participation agreement shall be construed as affecting, in any way, the ability of any PX Participant receiving service under this Tariff to exercise its rights under Section 206 of the FPA and pursuant to FERC's rules and regulations promulgated thereunder.

**14. LIABILITY AND INDEMNIFICATION.**

**14.1 Liability for Damages.**

Except as provided for in Section 3.14 of Schedule 9, the PX shall not be liable in damages to any PX Participant for any losses, damages, claims, liability, costs or expenses (including legal expenses) arising from the performance or non-performance of its obligations under this Tariff, except to the extent that they result from negligence or intentional wrongdoing on the part of the PX.

**14.2 Exclusion of Certain Types of Loss.**

The PX shall not be liable to any PX Participant under any circumstances whatsoever for any consequential or indirect financial loss including but not limited to loss of profit, loss of earnings or revenue, loss of use, loss of contract or loss of goodwill except to the extent that it results from negligence or intentional wrongdoing on the part of the PX.

**14.3 PX Participant's Indemnity.**

Each PX Participant shall, to the extent permitted by law, indemnify the PX and hold it harmless against all losses, damages, claims, liability, costs or expenses (including legal expenses) arising from any act or omission of the PX Participant, except to the extent that they result from

the PX's default under this Tariff or negligence or intentional wrongdoing on the part of the PX or of its officers, directors or employees.

**15. AUDITS.**

**15.1 Materials Subject to Audit.**

The PX's financial books, cost statements, accounting records and any documentation pertaining to its operation as a state chartered independent institution which administers an open competitive market for Energy by operating the PX Markets under this Tariff, shall be subject to audit in accordance with this Section 15.

**15.2 PX Audit Committee.**

The audit requirements of PX Participants shall be carried out exclusively by the PX Audit Committee subject to the PX Governing Board's overall audit responsibility. The PX Audit Committee shall make recommendations to the PX Governing Board in relation to the approval, initiation and scheduling of the following audits:

**15.2.1 Certified Financial Statement Audit.**

Each year, an audit by an independent certified public accounting firm shall be performed. This audit will be conducted in accordance with generally accepted auditing standards to verify that the PX's financial statements are in compliance with generally accepted accounting principles and fairly present, in all material respects, the financial position, results of operation and cash flows for the audit period. The audit report will be addressed to the PX Governing Board, copies provided to the PX Audit Committee, and upon request, to PX Participants.

**15.2.2 Operations Audits.**

Each year, an appropriately qualified independent auditor shall review PX management compliance with the operations, policies, rules and procedures, including but not limited to the

administration of the bid auction process, meter and data access security and other requirements, Settlement process, Preferred Schedules, Ancillary Services bids, and other processes. This audit may also include material issues raised by PX Participants and approved by the PX Audit Committee for inclusion in the audit scope. The audit report will be addressed to the PX Governing Board, copies will be provided to the PX Audit Committee, and upon request, to PX Participants.

**15.2.3 Code of Conduct Audits.**

On a periodic basis, but not less than once a year, the PX Audit Committee shall conduct a management review of officers, employees, substantially full-time consultants, and contractors for compliance with the PX Code of Conduct to ensure adherence to the highest standards of lawful and ethical conduct in their activities. The audit report will be addressed to the PX Governing Board, and upon request, to PX Participants.

**15.2.4 Interim Audits.**

At such other intervals agreed upon by a majority of the PX Audit Committee members, audits may be undertaken for specific issues and concerns of certain PX Participants that the PX Audit Committee believes, at its sole discretion, to be of significant and critical magnitude to the PX. Such audits will be conducted by an independent accounting firm. The costs of such audits will be borne by the requesting PX Participant(s) unless the PX Audit Committee otherwise decides. Interim audits will be conducted during normal business hours after reasonable notice is given to the PX and in accordance with the guidelines to be established by the PX Audit Committee.

**15.3 Audit Results.**

Exceptions identified as a result of an audit will be reviewed with the PX Audit Committee. The results of the audits and actions to be taken by the PX as a result of the audits shall be mailed to PX Participants upon request.

**15.4 Availability of Records.**

The PX will provide full and complete access to all financial books, cost statements, accounting records, and all documentation pertaining to the requirements of the specific audits being performed. Records relating to audits will be retained until the records retention requirements of the PX are satisfied or until the audit issues are fully resolved, whichever is later. The right of access to records does not include the right to require the creation of new records, reports, studies, or evaluations not already available.

**15.5 Confidentiality of Information.**

All proprietary information obtained through any audits will remain strictly confidential. All auditors shall sign a confidentiality agreement prior to being accepted as auditors by the PX Audit Committee.

**15.6 Payments.**

Any payment agreed to be made by the PX to PX Participants or by PX Participants to the PX as a result of an audit, or directed by FERC, or disclosed by the PX in reviews of its own books and records shall include interest, from the due date to the date on which such adjustments are due, computed at the rate calculated in accordance with the methodology specified for interest on refunds in FERC's regulations at 18 CFR § 35.19a(2).

## 16. UNCONTROLLABLE FORCES.

### 16.1 Consequences of Uncontrollable Force.

An Uncontrollable Force means any act of God, labor disturbance, act of the public enemy, war, insurrection, riot, fire, storm, flood, earthquake, explosion, any curtailment, order, regulation or restriction imposed by governmental, military or lawfully established civilian authorities or any other cause beyond the reasonable control of the PX or a PX Participant which could not be avoided through the exercise of Good Utility Practice. Neither the PX nor a PX Participant will be considered in default of any obligation under this Tariff if prevented from fulfilling that obligation due to the occurrence of an Uncontrollable Force.

### 16.2 Duty to Mitigate.

In the event of the occurrence of an Uncontrollable Force, which prevents the PX or a PX Participant from performing any of its obligations under this Tariff, the affected entity shall (i) if it is the PX, immediately notify the PX Participants in writing of such Uncontrollable Force and if it is a PX Participant, immediately notify the PX in writing of such Uncontrollable Forces, (ii) not be entitled to suspend performance of its obligations under this Tariff in any greater scope or for any longer duration than is required by the Uncontrollable Force, (iii) use its best efforts to mitigate the effects of such Uncontrollable Force, remedy its inability to perform and resume full performance of its obligations hereunder, (iv) in the case of the PX, keep the PX Participants apprised of such efforts and in the case of the PX Participants, keep the PX apprised of such efforts, in each case on a continual basis and (v) if it is the PX, provide written notice of the resumption of its performance of its obligations hereunder to PX Participants and if it is a PX Participant, provide written notice of the resumption of its performance of its obligations hereunder to the PX. Notwithstanding any of the foregoing, the settlement of any strike, lockout

or labor dispute constituting an Uncontrollable Force shall be within the sole discretion of the entity involved in such strike, lockout or labor dispute; and the requirement that an entity must use its best efforts to remedy the cause of the Uncontrollable Force and/or mitigate its effects and resume full performance of its obligations hereunder shall not apply to strikes, lockouts, or labor disputes.

**17. ASSIGNMENT.**

Obligations and liabilities under this Tariff and any service or participation agreement relating to this Tariff shall be binding on the successors and assigns of the parties to the service or participation agreement. No assignment of any service or participation agreement shall relieve the original PX Participant from its obligations or liabilities to the PX under this Tariff or any such service or participation agreement arising or accruing due prior to the date of assignment.

**18. TERM AND TERMINATION.**

**18.1 Effective Date.**

This Tariff shall become effective on the date it is permitted to become effective by FERC.

**18.2 Termination of Tariff.**

This Tariff shall terminate upon approval of termination by the PX Governing Board in accordance with the bylaws of the PX and receipt of any necessary regulatory approval from FERC.

**18.3 Termination of Participation Agreement.**

A participation agreement may be terminated by either party upon written notice. The PX shall, within thirty (30) days of being satisfied that the PX Participant who has terminated the participation agreement owes no amount under this Tariff, return or release to that PX

Participant, as appropriate, any monies or credit support provided by that PX Participant to the PX under Section 2.4 of this Tariff.

**19. MISCELLANEOUS.**

**19.1 Notice.**

**19.1.1 Effectiveness.**

Any notice required to be given in accordance with this Tariff shall be in writing and, unless otherwise provided in this Tariff, shall be deemed properly served, given or made: (a) upon delivery if delivered in person, (b) five (5) days after deposit in the mail if sent by first class United States mail, postage prepaid, (c) upon receipt of confirmation by return electronic facsimile if sent by facsimile, or (d) upon delivery if delivered by prepaid commercial courier service.

**19.1.2 Addresses.**

Notices to be given to the PX shall be sent to such address as shall be notified by the PX to PX Participants from time to time. Notices to be given by the PX to any PX Participant shall be sent to it at the address set out in its application to be certified as a PX Participant. The PX and PX Participants may at any time change their address details by notifying the other party in writing.

**19.1.3 Notice of Changes in Operating Rules and Procedures.**

The PX shall give all PX Participants notice of at least thirty (30) days of any changes or proposed changes in the PX Operating Manual, unless (1) a different notice period is specified by state or Federal law or (2) the change is reasonably required to address the PX's operating needs, including emergency conditions, a change in the rules, procedures or practices of the ISO, and any software limitation of the PX, in which case the PX shall give PX Participants as much notice as is reasonably practicable. The PX Operating manual shall set forth procedures

for amending its contents and for consideration of input regarding such amendments from interested PX Participants.

**19.2 Waiver.**

Any waiver at any time by the PX or any PX Participant of its rights with respect to any default under this Tariff, or with respect to any other matter arising in connection with this Tariff, shall not constitute or be deemed a waiver with respect to any subsequent default or other matter arising in connection with this Tariff. Any delay short of the statutory period of limitations in asserting or enforcing any right shall not constitute or be deemed a waiver.

**19.3 Confidentiality.**

**19.3.1 PX.**

The PX shall maintain the confidentiality of all of the documents, data, and information provided to it by any PX Participant that are treated as confidential or commercially sensitive under Section 19.3.2; provided, however, that the PX shall not keep confidential (1) information that is explicitly subject to data exchange through WEnet pursuant to Section 6.1 of the ISO Tariff; (2) information that the PX or the party providing the information is required to disclose pursuant to this Tariff, the ISO Tariff, or applicable regulatory requirements (provided that the PX shall comply with any applicable limits on such disclosure); or (3) information that becomes available to the public on a non-confidential basis (other than as a result of the PX's breach of this Tariff).

**19.3.2 Confidential Information.**

The following information provided to the PX by PX Participants shall be treated by the PX as confidential:

(a) individual Energy bids;

(b) individual Adjustment bids for Congestion Management which are not coded;

(c) individual bids for Ancillary Services; and

(d) transactions between PX Participants.

**19.3.3 Other Parties.**

No PX Participant shall have a right hereunder to receive from the PX or to review any documents, data or other information of another PX Participant to the extent such documents, data or information have been designated as confidential by such other PX Participant in accordance with Section 19.3.2 above; provided, however, that a PX Participant may receive and review any composite documents, data and other information that may be developed based upon such confidential documents, data, or information, if the composite document does not disclose any individual PX Participant's confidential data or information; and provided, further, that the PX may disclose information as provided for in its bylaws.

**19.3.4 Disclosure.**

Notwithstanding anything in this Section 19.3 to the contrary, if the PX is required by applicable laws or regulations, or in the course of administrative or judicial proceedings, to disclose information that is otherwise required to be maintained in confidence pursuant to this Section 19.3, the PX may disclose such information; provided, however, that as soon as the PX learns of the disclosure requirement and prior to making such disclosure, the PX shall notify the affected PX Participant or PX Participants of the requirement and the terms thereof. The affected PX Participant or PX Participants may, at their sole discretion and own costs, direct any challenge to or defense against the disclosure requirement and the PX shall cooperate with such affected PX Participant or PX Participants to the maximum extent practicable to minimize the disclosure of the information consistent with applicable law. The PX shall cooperate with the

affected PX Participants to obtain proprietary or confidential treatment of confidential information by the person to whom such information is disclosed prior to any such disclosure.

**19.4 Accounting Change Notification.**

The PX shall notify the PX Participants of (a) any significant change in the accounting treatment or methodology of any costs or (b) any change in the accounting procedures which is expected to result in a significant cost increase to any PX Participant. Such notice shall be given at the earliest possible time but no later than sixty (60) days before implementation of such change.

**19.5 Titles.**

The captions and headings in this Tariff are inserted solely to facilitate reference and shall have no bearing upon the interpretation of any of the rates, terms, and conditions of this Tariff.

**19.6 Applicable Law and Forum.**

This Tariff shall be governed by and construed in accordance with the law of the State of California, except its conflict of laws provisions; provided however, that if a party is a federal entity that party shall be governed by applicable federal law. PX Participants irrevocably consent that any legal action or proceeding arising under or relating to this Tariff to which the PX ADR Procedures do not apply shall be brought either in a court of the State of California, a federal court of the United States of America located in the State of California, or, with respect to federal entities, a federal court of competent jurisdiction. PX Participants irrevocably waive any objection that they may have now or in the future to courts located in the State of California or, in the case of a federal entity, such other courts consistent with applicable federal law, as the proper and exclusive forum for any legal action or proceeding arising under or relating to this Tariff.

**19.7 Consistency with Federal Laws and Regulations.**

(a) Nothing in this Tariff shall compel any person or federal entity to: (1) violate federal statutes or regulations; or (2) in the case of a federal agency, to exceed its statutory authority, as defined by any applicable federal statutes, regulations, or orders lawfully promulgated thereunder. If any provision of this Tariff is inconsistent with any obligation imposed on any person or federal entity by federal law or regulation, to that extent it shall be inapplicable to that person. No person or federal entity shall incur any liability by failing to comply with a Tariff provision that is inapplicable to it by reason of being inconsistent with any federal statutes, regulations, or orders lawfully promulgated thereunder; provided, however, that such person or federal entity shall use its best efforts to comply with the Tariff to the extent that applicable federal laws, regulations, and orders lawfully promulgated thereunder permit it to do so.

(b) If any provision of this Tariff requiring any person or federal entity to give an indemnity or impose a sanction on any person is unenforceable against a federal entity, the PX shall submit to the Secretary of Energy or other appropriate Departmental Secretary a report of any circumstances that would, but for this provision, have rendered a federal entity liable to indemnify any person or incur a sanction and may request the Secretary of Energy or other appropriate Departmental Secretary to take such steps as are necessary to give effect to any provisions of this Tariff that are not enforceable against the federal entity,

(c) To the extent that the PX suffers any loss as a result of being unable to enforce any indemnity as a result of such enforcement being in violation of federal laws or

regulations to which it is entitled under the Tariff under this Section or otherwise, it shall be entitled to recover such loss through the PX Administration Charge.

**19.8 PX Participant Requested Services.**

The PX may provide additional administrative or support services related to its authorized Tariff services at the request and to accommodate the operating requirements of one or more PX Participants at such PX Participant(s)' cost, provided that, in the judgment of the PX, such service would not have any negative effect on any other PX Participant and the requested service can be reasonably accomplished without undue adverse effect on any PX operating systems or procedures. Any such service outside of those required by the PX Tariff would be funded entirely by the PX Participant(s) requesting the changes.

Case 2:01-cv-05591-MCE-KJM Document 25-2 Filed 02/05/2008 Page 43 of 60



[Original Sheet Nos. 42 through 46 reserved for future use.]

# PX TARIFF SCHEDULE 1

# PX RATE SCHEDULE

## Schedule 1

## PX Administration Charge

The PX Administration Charge (PX Tariff Section 4) is a formula rate designed to recover the following costs:

(1) Startup and Development Costs
(2) Operating Costs
(3) Financing Costs
(4) Operating and Capital Reserve Account

The PX Administration Charge will be levied monthly in arrears on all PX Participants in the manner set forth below. The PX Administration Charge may change once during any calendar year if PX management projects that the year-end Operating and Capital Reserve Account balance will be less than 50% of the current year reserve requirement. Each year the PX Administration Charge will be recalculated using the Administration Charge Formula to reflect the following year's budget estimates and to adjust for any over- or undercollection of reserves based on actual results from the previous year.

The PX Administration Charge will be recovered from participants in the following manner: All participants including buyers and sellers using the exchange services will pay the Monthly Terminal Fee. The Full Requirements and Partial Requirements Customer classes are comprised of buyers only, as additional administration charges are allocated entirely to the consumption side of trading transactions.

### *All PX Participants*

**Monthly Terminal Fee:** All PX participants shall pay monthly terminal fees for use of the trade application software. A fee of $1000 per month will be charged for the first terminal installation of software and a fee of $500 per month shall be paid for each terminal application thereafter.

### *Full Requirements Customers*

Full Requirements Customers are those who must buy their power through the PX in accordance with orders of the California Public Utilities Commission. Full Requirements Customers shall pay:

- Monthly Terminal Fee(s) described above
- An Initial Charge in 1998 only
- The Full Requirements Volumetric Charge relating to all volume transacted through the PX

**Initial Charge:** This is the collection of the charges to be recovered during the first four years of PX operations that are assigned to the three Full Requirements Customers (Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric

Company) who are required to bid all their generation into the PX and must purchase all of the electric energy required to serve their utility service retail customers through the PX during the transition period, projected to be four years. To cover the PX's startup, development, and initial working capital costs, the Full Requirements Customers will be assessed a charge to be paid in four installments of $11,348,662.50 each for Pacific Gas and Electric Company and Southern California Edison Company and $2,521,925.00 for San Diego Gas & Electric Company. The installments will be due on the later of five days after the commencement of PX operations or April 5, 1998; January 4, 1999; January 3, 2000; and January 2, 2001. Each installment will also include an additional amount to include 1) the PX's interest expense due to the Bank of America through the payment due date on the loan made pursuant to the credit agreement entered into between the PX Trust and the Bank of America that is guaranteed by the Full Requirements Customers and 2) the projected expense to the PX of maintaining the trustee required under the PX Trust Agreement for the remainder of the year in which the payment is due, including all fees, costs and indemnities payable by the PX directly to the Trustee or indirectly through the Trustee to the Bank of America 3) adjusted, in each case, for other expenses or interest income reasonably attributable to installment payment for the Initial Charge. In the event that the PX is determined by the Internal Revenue Service or California State tax authorities not to qualify for tax-exempt status, then each Full Requirements Customer shall immediately become liable for such amount as is necessary for the PX to meet fully the PX's federal and/or state tax liability, including the tax on payments made in respect of taxes, interest, and penalties, for each tax year in which a tax payment is due, to be paid in the year in which the tax payment is due, or as soon as the liability is established if the ruling is subsequent to the due date for one or more of the installments. The PX shall file a report with the Federal Energy Regulatory Commission of its calculation of this tax liability as soon as possible after receiving notice of the ruling(s) that determines such liability. The PX will collect such funds as are due under this contingency subject to the right of the Full Requirements Customers to comment on and protest the PX's compliance filling in regard to this contingent tax liability.

**Full Requirements Volumetric Charge (FRVC):** All buyers in the Full Requirements Customer class shall pay a volumetric charge for each MWh of volume transacted through the PX. The formula for this charge is The Full Requirements Target Revenue (FRTR)/Full Requirements Volumetric Target Volume (FRVTV).

***Partial Requirements Customers***

Partial Requirements Customers are all voluntary PX Participants. Partial Requirements Customers shall pay:

- Monthly Terminal Fee(s) described above
- Partial Requirements Volumetric Charge or a Subscription Charge relating to volume transacted through the PX

**Partial Requirements Volumetric Charge (PRVC):** For all buyers in the Partial Requirements Customer class selecting the PRVC, the charge for each MWh transacted through the PX will be equivalent to FRVC * 1.2.

**Subscription Charge:** The buyer will nominate its Subscribed Demand or hourly peak usage during a subscription period at the beginning of the subscription period. The subscription period is either one year or one month. The Subscription Charge varies for each subscription period:

**Option 1:** *Annual Period*: The Partial Requirements Annual Subscription Charge (PRASC) is the annual charge per MW of Subscribed Demand = FRVC * 8760 * 51%.

**Option 2:** *Monthly Period*: The Partial Requirements Monthly Subscription Charge (PRMSC) is the monthly charge per MW of Subscribed Demand = PRASC * 1.25/12.

If a buyer selects option 1 or 2 and exceeds its Subscribed Demand during any hour of the year/month, the Partial Requirements Volumetric Charge will apply to any MWhs exceeding the Subscribed Demand level.

***Administration Charge Formula***

**Administration Charge Revenue Requirement (ACRR)** = **Operating Expenses** included in Accounts 400-426 (tax accounts), 500-598 and 901-935 + **Debt Service** (including principal due on the balances in Accounts 221-226, 231 and interest and amortizations recorded in 427-431) + the greater of **(Coverage Ratio * Senior Lien Debt Service OR Section 4.2.4 Capital Expenditures)** – **Application Fees** booked to Accounts 456 – **Reserve Transfer** which is calculated at year end for the following year's formula.

Where

| | |
|---|---|
| **Coverage Ratio =** | 35% or such other coverage requirements included in financing documents as approved by the PX Board of Governors. |
| **Senior Lien Debt Service =** | all debt service that has a first lien on PX Net Operating Revenues. |
| **Section 4.3(d) Capital Expenditures =** | Pay-as-you-go capital expenditures as defined in the PX Tariff Section 4.3(d). |
| **Application Fee =** | Monies collected for Application Fees which are not included in the Administration Charge Revenue Requirement |
| **Reserve Transfer =** | The projected reserve balance at the end of the previous year less the reserve requirement as adopted by the Board of Governors for the current year |

**Volumetric Charge Target Revenue (VCTR)** = ACRR – **Interest Income** included in Account 419 – **Terminal Fees** included in Account 456 – **Revenues from Other Products/Services** booked to Account 456.

Where

**Revenues from other Products/Services** = Revenues from any products or services provided by the PX apart from those included in the Full Requirements and Partial Requirements rates services described above.

**Target Volume** = The PX will forecast Target Volumes for each element of each rate class as part of its budgeting process. These volumes will reflect PX historical experience and industry trends.

**VCTR** is also the sum of:

Full Requirements Volumetric Target Revenue (FRVTR)
Partial Requirements Volumetric Target Revenue (PRVTR)
Partial Requirements Annual Subscription Target Revenue (PRASTR)
Partial Requirements Monthly Subscription Target Revenue (PRMSTR)

**Full Requirements Volumetric Charge (FRVC)** = Full Requirements Volumetric Target Revenue (FRVTR) / Full Requirements Volumetric Target Volume (FRVTV) in MWh

**Partial Requirements Volumetric Charge (PRVC)** = Partial Requirements Volumetric Target Revenue (PRVTR) / Partial Requirements Volumetric Target Volume (PRVTV) in MWH

also PRVC = FRVC * 1.2 (or such other factor that may be applicable and approved by the Board of Governors).

**Partial Requirements Annual Subscription Charge (PRASC)** = Partial Requirements Annual Subscription Target Revenue (PRASTR) / Partial Requirements Annual Subscription Target Volume (PRASTV) in MW
also PRASC = FRVC * 8760 * 51%

**Partial Requirements Monthly Subscription Charge (PRMSC)** = Partial Requirements Monthly Subscription Target Revenue (PRMSTR) / Partial Requirements Monthly Subscription Target Volume (PRMTV) in MW
also PRMSC = PRASC*1.25/12

**FORMULA FOR DERIVING THE VOLUMETRIC CHARGES:**

FRVC = VCTR / ( FRVTV + (PRVTV*1.2) + (PRASTV*8760*51%) + (PRMTV*8760*51%*1.25/12)
and

PRVC = FRVC * 1.2
PRASC = FRVC * 8760 * 51%
PRMSC = PRASC*1.25 / 12

Formula Derivation

FRVC* FRVTV = FRVTR

= (VCTR - PRVTR - PRASTR - PRMSTR)

= VCTR

- (PRVC * PRVTV)

- (PRASC * PRASTV)

- (PRMSC * PRMTV)

= VCTR

- (FRVC*1.2* PRVTV)

- (FRVC * 8760 * 51% * PRASTV)

- (FRVC * 8760 * 51% * 1.25 / 12 *PRMTV)

FRVTV = VCTR/ FRVC

- (1.2* PRVTV)
- (8760 * 51% * PRASTV)
- ( 8760 * 51% * 1.25 / 12 *PRMTV)

VCTR/FRVC = FRVTV

+ (1.2* PRVTV)
+ (8760 * 51% * PRASTV)
+ ( 8760 * 51% * 1.25 / 12 *PRMTV)

FRVC = VCTR / (FRVTV)

+ (1.2* PRVTV)

+ (8760 * 51% * PRASTV)

+ ( 8760 * 51% * 1.25 / 12 *PRMTV) )