# PX TARIFF SCHEDULE 5

# MARKET MONITORING RULES

**Schedule 5**

**Market Monitoring**

## 1.0 OBJECTIVES, DEFINITIONS AND SCOPE

### 1.1 Objectives

This Market Monitoring Schedule sets forth the workplan and, where applicable, the rules under which the PX will monitor the PX Markets to identify manipulation and other abuses of the PX Markets that may compromise the efficient and equitable working of the PX Markets and to provide for protection of the PX Markets from such abuses in accordance with Section 2.5 of the PX Tariff. Such monitoring activities will be carried out by the PX Compliance Unit and the PX Market Monitoring Committee to be established and to operate under the terms of this schedule, as set forth below.

#### 1.1.1 Means and Actions

This schedule sets forth the means of data collection, analysis, decision-making, formulation of corrective actions, and enforcement actions that will be instituted or undertaken by the PX. It describes the institutions to be created by the PX to serve these purposes.

#### 1.1.2 Reporting Requirements

This schedule sets forth the information dissemination, publication and reporting activities and other means of providing information that the PX will undertake to meet its reporting requirements to regulatory agencies, PX Participants and others. The goal of the reporting provisions of this Protocol is to adequately inform regulatory agencies, PX Participants and others of the state of the PX Markets, especially their competitiveness and efficiency. This function is designed to facilitate efficient corrective actions to be taken by the appropriate body or bodies when required.

### 1.2 Definitions

#### 1.2.1 Master Definitions Supplement

Unless the context otherwise requires, any word or expression defined in the Master Definitions Supplement to the PX Tariff shall have the same meaning where used in this schedule. References to a Section or Appendix are to a Section or an Appendix of the PX Tariff.

#### 1.2.2 Special Terms for this Schedule

In this schedule, the following words and expressions shall have the meanings set opposite them:

**"Activity Rules"** means the rules relating to the activities of PX Participants set forth in or referred to in the PX Operating Manual.

**"Compliance Unit"** means the unit established under Section 3.1 of this schedule.

**"PX Market Monitoring Committee (PMMC)"** means the committee established under Section 5.1 of this schedule.

**"PX Home Page"** means the PX internet home page at http://www.calpx.com or such other internet address as the PX shall publish from time to time.

**1.2.3 Rules of Interpretation**

(a) Unless the context otherwise requires, if the provisions of this schedule and the PX Tariff conflict, the PX Tariff will prevail to the extent of the inconsistency. Certain provisions of the PX Tariff have been summarized or repeated in this schedule only to aid understanding.

(b) A reference in this schedule to a given agreement, rule, procedure or instrument shall be a reference to that agreement, rule, procedure or instrument as modified, amended, supplemented or restated through the date as of which such reference is made.

(c) The captions and headings in this schedule are inserted solely to facilitate reference and shall have no bearing upon the interpretation of any of the terms and conditions of this schedule.

**1.3 Scope**

**1.3.1 Scope of Application to Parties**

This schedule applies to:

(a) PX Participants;

(b) Market Participants whose actions have the potential to influence competitiveness or the achievement of efficiency in the PX Markets; and

(c) the PX.

**1.3.2 Liability of PX**

Any liability of the PX arising out of or in relation to this schedule shall be subject to Section 14 of the PX Tariff as if references to the PX Tariff were references to this schedule.

**2.0 PRACTICES SUBJECT TO SCRUTINY**

**2.1 Practices Subject to Scrutiny - General**

The Compliance Unit shall monitor the activities of PX Participants and other entities described in Section 1.3.1 of this schedule with primary emphasis upon detecting practices or behavior

that indicate that the PX Markets are being manipulated to the detriment of their efficiency or fairness and on instituting appropriate corrective actions within the PX. In the course of such scrutiny, if the Compliance Unit encounters evidence of the exercise of market power by PX Participants or Market Participants, it shall refer such information to the Market Surveillance Unit of the ISO or to the pertinent regulatory or antitrust enforcement action, as appropriate. In pursuit of these goals, the Compliance Unit shall monitor such activities that affect the operation of the PX Markets and that provide indications of the phenomena set forth below in this Section 2.1 and, where appropriate, it will take such further action as it considers necessary under ensuing sections of this schedule.

### 2.1.1 Anomalous Market Behavior

Anomalous market behavior, which is defined as behavior that departs significantly from the normal behavior in competitive markets that do not require continuing regulation or as behavior leading to unusual or unexplained market outcomes. Evidence of such behavior may be derived from a number of circumstances, including:

(a) withholding of Generation capacity under circumstances in which it would normally be offered in a competitive market;
(b) unexplained or unusual redeclarations of availability by Generators;
(c) unusual trades or transactions;
(d) pricing or bidding patterns that are inconsistent with prevailing supply and demand conditions, *e.g.*, prices that appear consistently excessive for or otherwise inconsistent with such conditions; and
(e) unusual activity or circumstances relating to imports from or exports to other markets or exchanges.

The Compliance Unit shall evaluate, on an ongoing basis, whether the continued or persistent presence of such circumstances indicates the presence of behavior that is designed to or has the potential to distort the operation and efficient functioning of a competitive market, *e.g.*, the strategic withholding and redeclaring of capacity, and whether it indicates the presence and exercise of market power or of other proscribed practices.

### 2.1.2 PX and ISO Design Flaws

Design flaws and inefficiencies in the PX Tariff, and operational rules and procedures, including the potential for problems between the PX and other independent power exchanges, or of the ISO insofar as they affect the PX Markets which may be evident from anomalous market behavior monitored under Section 2.1.1 above, from evidence of gaming monitored under Section 2.1.4 below, or from other activities.

### 2.1.3 Abuse of Reliability Must-Run Unit Status

Where Generating Units are determined by the ISO to be Reliability Must-Run Units, circumstances that indicate that such Generating Units are being operated in a manner that will adversely affect the competitive nature and efficient workings of the PX Markets.

### 2.1.4 Gaming

"Gaming", or taking unfair advantage of the rules and procedures set forth in the PX or ISO Tariffs, Protocols or Activity Rules, or of transmission constraints in periods in which exist substantial Congestion, to the detriment of the efficiency of and of consumers in the PX Markets. "Gaming" may also include taking undue advantage of other conditions that may affect the availability of transmission and generation capacity, such as loop flow, facility outages, low hydropower output or seasonal limits on energy imports from out-of-state, or actions or behaviors that may otherwise render the system and the PX Markets vulnerable to price manipulation to the detriment of their efficiency.

### 2.1.5 Market Structure Flaws

With respect to flaws in the overall structure of the California energy markets that may reveal undue concentrations of market power in Generation that permit manipulation of the PX Markets or other structural flaws that permit such manipulation, the Compliance Unit shall provide such information or evidence of such flaws to the PX CEO, the PX Marketing Monitoring Committee or to the PX Governing Board, or to the Market Surveillance Unit of the ISO, subject to due protections of confidential or commercially sensitive information. After due internal consultation, if instructed by any of such PX institutions or persons, or if so requested by the ISO Market Surveillance Unit, the Compliance Unit shall also provide such information or evidence to the appropriate regulatory and antitrust enforcement agency or agencies, subject to due protections of confidential or commercially sensitive information. The Compliance Unit shall provide such other evidence, views, analyses or testimony as may be appropriate or required and as it is reasonably capable of providing to assist the investigations of such agencies.

## 2.2 Practices Subject to Scrutiny Pending Divestiture

In the "transition periods", pending completion of the various divestiture plans undertaken by certain of the IOUs, and the Transition Period within which transition costs or severance fees may be recovered, the Compliance Unit shall undertake the following measures to monitor the special circumstances that may affect the operation of the PX Markets during this period and may recommend corrective actions as provided in this Section 2.2.

### 2.2.1 IOU Mitigation Plans

The Compliance Unit shall review all IOU mitigation plans, as approved and modified by the FERC and other regulatory agencies, that might affect the competitiveness of and the efficient operation of the PX Markets. In consultation with the Market Surveillance Unit of the ISO, the Compliance Unit shall analyze what further actions may be necessary to ensure the effective implementation of these mitigation plans with respect to the PX Markets, and may make such recommendations for further actions as it considers appropriate to the PX CEO, FERC, the CPUC or other regulatory agencies. The Compliance Unit shall monitor the ongoing implementation of such plans to the extent feasible within the area of its responsibility, capability and resources.

### 2.2.2 Effects Pending Divestiture

Pending completion of the IOU divestiture plans ("the pre-divestiture period"), the Compliance Unit shall monitor and analyze the combined effect of the operations of the CTC and the rate freeze under which the Companies are required to operate during the pre-divestiture period (and thereafter as considered necessary during the Transition Period) on the state of competition in and the efficient operation of the PX Markets; and the Compliance Unit shall consult with the Market Surveillance Unit of the ISO with respect to such effects on the PX Markets.

## 2.3 Practices Requiring Action

### 2.3.1 Corrective Actions

Where the monitoring activities or any consequent investigations carried out by the Compliance Unit pursuant to Sections 2 and 4 of this schedule reveal a significant possibility of the presence of or potential for manipulation of the PX Markets that would adversely affect their operation, or manipulation of the energy and ancillary services markets administered by the ISO or otherwise operating in the State of California, the Compliance Unit shall take the appropriate measures under Sections 4, 6, and 7 of this schedule to institute the corrective action most effective and appropriate for the situation or, in the case of markets administered by the ISO or otherwise operating in the State of California, the Compliance Unit may recommend corrective actions to the ISO or to the appropriate regulatory agencies.

### 2.3.2 Further Actions

Where the monitoring activities of or any consequent investigations carried out by the Compliance Unit pursuant to Sections 2.1 and 2.2 of this schedule reveal that activities or behavior of Market Participants in the PX Markets have the effect of, or potential for, undermining the efficiency, workability or reliability of the PX Markets or to give Market Participants an unfair competitive advantage over other Market Participants, the Compliance Unit shall fully investigate and analyze the effect of such activities or behavior and, where appropriate, make recommendations to the PX CEO and the PMMC for further action by the PX or, where necessary, by other entities. In appropriate circumstances, the Compliance Unit may institute or arrange for ADR procedures involving Market Participants with conflicting perspectives. The Compliance Unit may, where appropriate, make specific recommendations for amendment to rules and protocols under its control, or for referral to the ISO as to rules and protocols under the ISO's control, or for changes to the structure of the PX Markets, or by referral to the ISO, of the markets administered by the ISO, and the Compliance Unit may recommend actions, including fines or suspensions, against specific entities in order to deter such activities or behavior.

### 2.3.3 Response to Gaming Behavior

If evidence of "gaming" or taking undue advantage exists, as described in Section 2.1.4 of this schedule, the Compliance Unit shall, in cooperation with the Market Surveillance Unit of the ISO where appropriate, review the "gaming" behavior and/or the relationship between system conditions and market behavior and pricing in order to assess the potential for and impact of such gaming behavior, with a view to recommending that the PX CEO, PX Governing Board or the appropriate agency take appropriate action, if necessary, either with respect to structural changes such as Zone changes, or to changes to the ISO or PX Tariffs, Protocols or Activity Rules, or to proscribe specific behavior by Market Participants.

### 2.3.4 Adverse Effects of Transition Mechanisms

Should the monitoring and analysis conducted under this schedule reveal significant adverse effects of transition mechanisms on competition in or the efficient operation of the PX Markets, the Compliance Unit shall examine and fully assess the efficacy of all possible measures that may be taken by the PX and, in consultation with the Market Surveillance Unit of the ISO, all possible measures that may be taken by the ISO, in order to prevent or to mitigate such adverse effects. The Compliance Unit shall make such recommendations to the CEO of the PX and to the PMMC as it considers appropriate for action in this regard by the PX or the ISO or for referral to the regulatory or antitrust enforcement agencies. Such proposed measures may include, but shall not be limited to the following:

(a) the use of direct bid caps as a mechanism to prevent or mitigate artificially high Market Clearing Prices caused by abuses of market power;
(b) the use of contracts for differences as providing an incentive for bidding Generators not to bid PX prices to artificially high levels enabled by the presence of market power;
(c) use by the ISO of its ability to call upon Reliability Must-Run Units to operate; and
(d) bid floors to prevent or mitigate the possible exercise of below-cost bidding or predatory pricing that may arise from the incentives provided by the combined effect of the CTC and the rate freeze, as described above.

The CEO and the PMMC shall consult on such recommendations and each may, after due consideration, propose any of such measures to the PX Governing Board. In the event that the PX Governing Board adopts, and where necessary obtains regulatory approval for, any measure proposed pursuant to this section, the Compliance Unit shall develop an implementation plan for such measure, and shall submit such plan to the CEO and PMMC. Upon approval of such plan by the CEO or PMMC, the Compliance Unit shall monitor the implementation and effect of such measure on the state of the PX Markets and shall periodically report on them to the CEO and the PMMC.

## 3.0 PX COMPLIANCE UNIT

### 3.1 Establishment

There shall be maintained within the PX a Compliance Unit that shall be responsible for the ongoing development, implementation, and execution of the PX Market monitoring and information scheme described in this schedule and the adherence to its objectives, as set forth in Section 1.1 of this schedule.

### 3.2 Composition

The Compliance Unit shall be adequately staffed by the PX with full-time PX staff with the experience and qualifications necessary to fulfill the functions referred to in this schedule. Such qualifications may include professional training pertinent to and experience in the operation of markets analogous to PX Markets, in the electric power industry, and in the field of competition and antitrust law and policy. The Compliance Unit shall be directed by a Compliance Director.

### 3.3 Accountability and Responsibilities

#### 3.3.1 Compliance Unit: Policy: CEO and PMMC

The Compliance Unit shall report to and be directly accountable to the PX CEO or to such officer of the PX identified by the CEO for such purpose and to the PX Market Monitoring Committee (PMMC) on all matters pertaining to policy and other matters that may affect the effectiveness and integrity of the monitoring function referred to in this schedule, including matters pertaining to market monitoring, information development and dissemination and pertaining to generic or entity-specific investigations, corrective actions or enforcement.

#### 3.3.2 PX Governing Board

The PX CEO and the PMMC shall each have the independent authority to refer any of the matters referred to in Section 3.3.1 of this schedule to the PX Governing Board for approval of recommended actions.

#### 3.3.3 Chief Executive Officer (CEO)

(a) The Compliance Unit shall report to and be directly accountable to the PX CEO or to such officer of the PX identified by the CEO for such purpose on all matters relating to the day-to-day administration of the Compliance Unit and the internal resources and organization of the PX in accordance with Section 3.3.3(b) of this schedule.

(b) The PX CEO shall ensure that the Compliance Unit has adequate resources and full access to data and the full cooperation of all parts of the PX organization in developing the information necessary for the effective functioning of the Compliance Unit and the fulfillment of its monitoring function. The PX CEO shall institute within the PX such data collection, organization and analytic activities as may be necessary for the Compliance Unit to fulfill its functions and responsibilities.

### 3.3.4 Regulatory and Antitrust Enforcement Agencies

Where considered necessary and appropriate and required by PX CEO or the PMMC, or where so ordered by the regulatory or antitrust agency with jurisdiction over the matter in question, or by a court of competent jurisdiction, the Compliance Unit shall refer a matter directly to the regulatory or antitrust enforcement agency concerned, *e.g.*, in cases of serious abuse requiring expeditious investigation or action by the agency. In all such cases of direct referral, the Compliance Unit shall promptly inform the PX Governing Board, the PX CEO and the PMMC of the fact of and the content of the referral.

### 3.3.5 Complaints

Any Market Participant, or any other interested entity, may at any time submit information to or make a complaint to the Compliance Unit concerning any matter that it believes may be relevant to the Compliance Unit's monitoring responsibilities. The Compliance Unit, at its discretion, may request further information from such entity and carry out any investigation that it considers appropriate as to the concern raised. The Compliance Unit shall periodically make reports to the PX CEO and PX Governing Board on complaints received.

## 4.0 SPECIFIC FUNCTIONS OF PX COMPLIANCE UNIT

### 4.1 Information Gathering and Market Monitoring Indices for Evaluation

### 4.1.1 Information Database

The Compliance Unit shall be responsible for developing an information database and criteria for evaluation that will permit it effectively to monitor the PX Markets in order to identify and propose correction of abuses of those markets, whatever the cause.

### 4.1.2 Database Categories

To develop the information database set forth in Section 4.1.1 of this schedule, the Compliance Unit shall initially develop, and shall define on the basis of experience, a detailed catalog of all the categories of data it will have the means of acquiring, and the procedures it will use (including procedures for protecting confidential data) to handle such data.

### 4.1.3 Catalog of Market Monitoring Indices

The Compliance Unit shall initially develop, and shall define on the basis of experience, an initial catalog of PX Market monitoring indices that it will use to evaluate the data so collected.

### 4.1.4 Review of Catalogs

(a) The catalogs developed under Sections 4.1.2 and 4.1.3 of this schedule shall be submitted to the PX CEO and the PMMC for review and shall be revised, if necessary, on the basis of comments received from them.

(b) The catalogs, as amended by the process referred to Section 4.1.4(a) of this schedule, shall then be submitted to all PX Participants and to other entities with a known interest in the PX Markets, and, as appropriate, to such regulatory and antitrust enforcement agencies as have an interest in the monitoring activity or its subject matter, for comment. The catalogs shall be revised by the Compliance Unit, if deemed necessary and appropriate, on the basis of the comments received from such bodies, and shall be submitted to the PX CEO and the PMMC for final approval, subject to the provisions of Section 6.1.2 of this schedule.

(c) The catalogs, as revised pursuant to Section 4.1.4(b) of this schedule, shall be published from time to time by the PX CEO. The catalogs shall be reviewed in accordance with these processes from time to time as deemed appropriate by the Compliance Unit, the PX CEO or the PMMC on the basis of information and experience gained in carrying out the monitoring function. On the basis of such reviews, the Compliance Unit may submit proposals for revisions to either catalog to the PX CEO and the PMMC which may approve such revisions. Subject to the procedures set forth in Section 6.1.2 of this schedule, the Compliance Unit shall implement such revisions.

## 4.2 Evaluation of Information

### 4.2.1 Ongoing Evaluation

The Compliance Unit shall evaluate and reevaluate on an ongoing basis the catalogs of data requirements and market monitoring indices developed in accordance with Section 4.1.4 of this schedule, and the information it collects and receives from various other sources, including and in particular the PX's operation of the PX Markets and information provided by Market Participants or those filing complaints. Such ongoing evaluations shall provide the basis for its reporting and publication responsibilities as set forth in this Protocol, for recommendations on proposed changes to the PX Tariff and PX Protocols and other potential rules affecting the PX Markets, and for the development of criteria or standards for the initiation of proposed corrective or enforcement actions. In evaluating such information, the Compliance Unit may consult the PMMC or such external bodies as may be appropriate.

### 4.2.2 Submission of Evaluation Results

The final results of the Compliance Unit's evaluations shall routinely and promptly be submitted simultaneously to the PX CEO and to the PMMC for comment.

## 4.3 Review of Activity Rules

When an iterative bidding process is developed that requires the application of related Activity Rules, the Compliance Unit shall review such Activity Rules for their effectiveness and

consistency with its market monitoring activities and standards. The Compliance Unit may at that time, and from time to time thereafter based on its experience in monitoring the PX Markets, propose to the PX CEO and PMMC that changes be made in such Activity Rules.

### 4.4 Reports and Recommendations

#### 4.4.1 PX CEO and Governing Board

On the basis of the evaluation conducted under Section 4.2 of this schedule, or the review conducted under Section 4.3, the Compliance Unit shall prepare periodic reports, as required by the PX CEO, and specific ad hoc reports as appropriate, for the PX CEO and PX Governing Board on the state of competition in or the efficiency of the PX Markets; and on its monitoring activities, the results of its evaluation and review activities, and its development and implementation of recommendations. Such reports may publicize violations and proposed corrections. Where appropriate, the PX Compliance Unit may recommend actions to be taken, including the amendment of the PX Tariff and the PX Operating Manual and corrective or enforcement action against specific entities. Such reports shall be made not less frequently than quarterly in the case of the PX CEO and PMMC and annually in the case of the PX Governing Board and shall contain such information and be in such form as specified by such entities. Such reports shall be made public and publicized as specified by such entities except to the extent that they contain confidential or commercially sensitive information or to the extent such entities determine that effective enforcement of the monitoring function dictates otherwise.

#### 4.4.2 Regulatory Agencies

As required in the PX Tariff or by the PX CEO and PX Governing Board, or as required by the regulatory agency with jurisdiction over the matters in question, the Compliance Unit shall prepare reports to the FERC and other regulatory agencies, which shall be reviewed and approved by the PX CEO and Governing Board and then submitted as required. When publicly available reports are made to one regulatory agency with competent jurisdiction, such as the FERC, the Compliance Unit may simultaneously make such reports available to other regulatory agencies with legitimate interests in their contents, such as the CPUC and CEC.

#### 4.4.3 PX Market Monitoring Committee

All reports and recommendations to be made to the PX CEO and PX Governing Board under Section 4.4.1 of this schedule, or to regulatory agencies under Section 4.4.2, unless urgency requires otherwise, shall first be submitted to the PMMC for comments, which comments shall be reflected in the submittal to the PX Governing Board. In addition, the Compliance Unit may submit specific reports to the PMMC itself, as it considers appropriate. All final reports made within the PX or to external regulatory agencies shall be simultaneously submitted to the PMMC.

## 4.5 PX Participants

### 4.5.1 Submission of Data

The Compliance Unit may request the submission of any information or data by PX Participants, determined by the Compliance Unit to be potentially relevant, the ISO or other entities whose activities may affect the operation of the PX market. Failures by PX Participants to provide such data shall be treated under Section 4.5.2 of this schedule. In the event of failures by other entities to provide such data, the Compliance Unit may report the failure to the ISO or the pertinent regulatory agency, as appropriate, after providing such entity the opportunity to respond in writing as to the reason for the alleged failure.

### 4.5.2 Provision of Data by PX Participants

Failure by a PX Participant to provide information requested pursuant to Section 4.5.1 of this schedule, or otherwise to cooperate in the Compliance Unit's data collection or investigation activities, may be treated as grounds for action against the PX Participant entity concerned pursuant to the appropriate provision of the PX Tariff. Such action may include the imposition of such penalties or sanctions as are permitted under the PX Tariff, including, insofar as permitted under the PX Tariff, possible exclusion from the PX Markets or termination of the relevant PX Participation Agreement. Before any such action is taken, the PX Participant shall be provided the opportunity to respond in writing as to the reason for the alleged failures.

### 4.5.3 Provision of Data by Compliance Unit

PX Participants may request that the Compliance Unit provide data collected or proceed to collect data; and, upon approval of the PX CEO, such data may, subject to constraints on the Compliance Unit's or PX's resources, be provided or collected by the PX. Where such activity imposes a significant burden or expense on the PX, the data may be provided or collected on the condition that a reasonable contribution to the cost incurred by the PX is made to the PX by the requesting party.

## 4.6 External Consulting Assistance and Expert Advice

In carrying out any of its responsibilities under this Section 4, including the development of an information database, market monitoring indices and evaluation criteria, and the catalogs associated therewith, and in its analysis and ongoing evaluation of these catalogs and of the Activity Rules under Section 4.3, the Compliance Unit may hire consulting assistance subject to the budgetary approval of the PX CEO and may seek such expert external advice as it believes necessary.

## 4.7 Cooperation with ISO Market Surveillance Unit and Committee

In carrying out its responsibilities under this schedule, the Compliance Unit may at its discretion consult or cooperate in the manner it considers most appropriate with the ISO's Market Surveillance Unit and Market Surveillance Committee with respect to the following:

(a) exchange of data, monitoring methodologies and results, and information on corrective, referral or enforcement actions taken;
(b) monitoring of market performance;
(c) joint analysis of data and monitoring results of markets and Market Participant behavior;
(d) investigations of specific market abuses; and
(e) proposals for concerted action on enforcement measures, e.g., as to suspensions from trading.

**4.8 Liability for Damages**

As provided in Section 14.1 and 14.2 of the PX Tariff, the Compliance Unit, the PMMC, the PX CEO and other PX staff shall not be liable to any PX Participant under any circumstances whatsoever for any matter described in those sections, including but not limited to any financial loss or loss of economic advantage resulting from the performance or non-performance by such PX entities of their functions under this schedule.

**5.0 PX MARKET MONITORING COMMITTEE**

**5.1 Establishment**

A PX Market Monitoring Committee (PMMC) shall provide independent external expertise on the PX market monitoring process as described in this schedule and, in particular, shall provide independent expert advice and recommendations to the PX and to the pertinent regulatory or antitrust enforcement agencies, as requested or as it deems necessary. When requested, the PMMC may also advise the PX on analyses or recommendations made by the PX Compliance Unit or by other entities. The efficacy of and role of the PMMC shall be reviewed by the PX Governing Board on the completion of three (3) years of the PMMC's operation; and the Governing Board may implement such changes as it deems appropriate, including dissolution or possible merger with the ISO's Market Surveillance Committee.

**5.2 Composition**

**5.2.1 Qualifications**

The PMMC shall comprise a body of at least three independent and recognized experts on the electricity industry and who may also have professional expertise and experience in areas pertinent to the PX market monitoring function, including but not limited to, the following areas of expertise:

(a) economics, with emphasis on antitrust, competition, and market power issues in the electricity industry;
(b) experience in market trading mechanisms analogous to the PX market;
(c) experience in operational aspects of trading and related constraints in electricity markets;
(d) experience in operating electricity systems;

(e) experience in antitrust or competition law in regulated industries; and
(f) financial expertise relevant to electricity trading.

**5.2.2 Independence**

Each member of the PMMC must be independent of any PX Participant or stakeholder in the electric power industry in California throughout the term of his or her appointment in accordance with the criteria referred to in Section 5.3.2 of this schedule.

**5.3 Appointments**

**5.3.1 Appointments to the PMMC**

Appointments to the PMMC shall be made by the PX Governing Board, in accordance with Section 5.3.4 of this schedule. Such candidates shall meet the criteria set forth in Section 5.2 and the criteria for independence established in Section 5.3.2 below.

**5.3.2 Criteria for Independence**

Candidates for the PMMC shall meet the following criteria for independence in order to be appointed:

(a) no affiliation, through employment, consulting or otherwise, with any Market Participant or affiliate thereof; and
(b) no financial interest in any Market Participant or affiliate thereof.

In the event that it becomes known to the PX CEO that any member of the PMMC may no longer meet either of these criteria for independence, and has not resigned after a reasonable opportunity to do so, the PX CEO shall promptly report this condition to the PX Governing Board which shall review the matter and, for good cause shown, remove such member from the PMMC and promptly advise the PX CEO to institute action to fill the vacancy.

**5.3.3 Filling of Vacant Positions**

In making appointments to the initial PMMC, and upon any ensuing vacancy, the PX CEO shall expeditiously solicit nominations that meet the criteria set forth in Sections 5.2 and 5.3.2 of this schedule from the PMMC, the PX Governing Board and all known interested stakeholder groups and government or regulatory agencies, other external entities as may be appropriate (e.g. universities), from the public by due publication, and from existing members of the PMMC and the equivalent ISO market monitoring committee.

**5.3.4 Candidate Selection**

Upon receipt of sufficient nominations that meet the qualifications set forth in Section 5.2.1 of this schedule and the conduct of adequate research and due diligence on the candidates so nominated (with the assistance of the Compliance Unit and other PX staff and consultants, as

needed), the PX Governing Board shall expeditiously select a candidate to fill each vacancy on the PMMC. The PX Governing Board may delegate any of such functions in appropriate circumstances to the Executive Committee or to the CEO.

**5.3.5 Election of Chair**

The members of the PMMC, when appointed, shall from time to time elect one of their number to be the chair of the PMMC. The chair shall not be entitled to a second vote.

**5.4 Terms of Office**

The terms of office of the initial members of the PMMC shall be staggered so that the initial term of office of one (1) member shall be one (1) year, the initial term of office of one (1) member shall be for two (2) years, and the initial term of office of one member shall be three (3) years; thereafter, all terms shall be for a period of three (3) years.

**5.5 Compensation and Reimbursements**

Members of the PMMC shall be compensated on such basis as the PX Governing Board shall from time to time determine. Members of the PMMC shall receive prompt reimbursement for all expenses reasonably incurred in the execution of their responsibilities under this Section 5. The budget for the PMMC shall be determined by the PX CEO and shall be identified as a separate line item in the overall PX budget.

**5.6 Proceedings**

Each member of the PMMC shall be entitled to one (1) vote. The quorum for meetings shall be a majority of the members of the PMMC. The PMMC shall develop and publish their own rules with respect to the conduct of their proceedings. Such proceedings shall be open to the public except insofar as necessary to protect confidential or commercially sensitive information or where, in the opinion of the chair, the involvement of the public would be counterproductive or adversely affect the ability of the PMMC or the PX to carry out its functions.

**5.7 Professional Support**

The PX CEO shall provide the PMMC with such administrative support and assistance in its data acquisition or analytical functions and a budget for such professional consulting support as it may, in the opinion of the CEO, reasonably require.

## 6.0 SPECIFIC FUNCTIONS OF PX MARKET MONITORING COMMITTEE

### 6.1 Information Gathering and Evaluation Criteria

#### 6.1.1 PMMC Review and Selection of Data Items

The PMMC shall review the initial catalogs of information and data and of evaluation criteria developed by the Compliance Unit pursuant to Section 4 of this schedule and shall propose such changes, additions or deletions to such catalogs or items therein as it sees fit. In so doing, the PMMC shall have full discretion to independently develop its own database items or evaluation criteria and to propose them for inclusion in the pertinent catalog.

#### 6.1.2 Satisfaction with Data Items for Publication

If, upon the PX's approval of the final catalogs of information and data and of evaluation criteria for publication, as revised pursuant to Sections 4.1.4(a) and 4.1.4(b) of this schedule, the PMMC is not satisfied that items in either catalog are appropriate for publication or that appropriate items are omitted, such catalogs shall become operative. However, if after due consultation with the PX CEO and Staff, its concerns remain, the PMMC may bring its concerns, with specific alternative proposals in each case, to the attention of the PX Governing Board which shall make a final determination as to which version shall be adopted, or impose its own version, in each case. In the event that either the PX CEO or the PMMC is not satisfied with the final outcome or any specific item, it may submit its comments in writing and these shall be included in such reports and publications as the PX shall make on the subject. The PMMC may also publish its comments of its own volition.

### 6.2 Evaluation of Information

The PMMC may, upon request of the Compliance Unit, the PX CEO or the PX Governing Board, or on its own volition, evaluate such information or data as may be collected by the Compliance Unit upon the basis of the evaluation criteria developed by the Compliance Unit or upon such further articulated evaluation criteria developed by the PMMC. In carrying out such evaluations, the PMMC may consult outside experts and may consult the ISO Market Surveillance Unit and the ISO Market Surveillance Committee with respect to any matter relating to such evaluations.

### 6.3 Reports and Recommendations

Upon request of the Compliance Unit, the PX CEO or PX Governing Board, or on its own volition, the PMMC may make such reports and recommendations as it sees fit relating to the monitoring program referred to in this schedule, the analysis of information, the evaluation criteria or any corrective or enforcement actions proposed by the Compliance Unit or proposed of its own volition.

### 6.4 Publication of Reports and Recommendations

Upon request of the PMMC, the PX shall publish reports and recommendations of the PMMC or incorporate them, if consistent, into the PX's own recommendations or reports.

## 7.0 IMPLEMENTATION OF RECOMMENDATIONS

### 7.1 Protocol and Activity Rule Changes

Upon written recommendation of the PX CEO, acting on the advice of the Compliance Unit, any member of the PX Governing Board or of the PMMC, the PX Governing Board may make such changes as it believes are appropriate to any PX Agreement or to the Activity Rules. In cases where it declines to implement or departs from such a recommendation of the PX CEO or PMMC, the PX Governing Board shall publish a written explanation therefor.

### 7.2 Tariff Changes

Upon recommendation of the PX CEO, acting on the advice of the Compliance Unit, or of the PMMC, the PX Governing Board shall consider and may adopt proposed PX Tariff changes; and, where it declines or departs from such a recommendation of the PX CEO or PMMC, the PX Governing Board shall publish a written explanation therefor.

### 7.3 Sanctions and Penalties

Upon written recommendation of the PX CEO, acting on the advice of the Compliance Unit, or of the PMMC, the PX Governing Board may impose such sanctions or penalties as it believes necessary to protect the PX Markets from manipulation and other abuses and as are permitted under the PX Tariff; or it may make any such referral to such regulatory or antitrust agency as it sees fit to recommend the imposition of sanctions and penalties.

## 8.0 PUBLICATION OF INFORMATION

### 8.1 Market Monitoring Data and Indices

The PX Compliance Unit shall, pursuant to Section 4.1 of this schedule, develop a program for the systematic publication, updating and dissemination of the catalogs of data and indices developed under Section 4.1. Upon approval of the PX CEO, such catalogs shall be duly published and disseminated to all PX Participants.

### 8.2 Regular Information Publication

In cooperation with the ISO Market Surveillance Unit, the PX Compliance Unit shall publish, or cause to be published, the following information in a medium and form helpful to Market Participants, on a regular basis:

(a) Market Clearing Prices for Energy;
(b) Market Clearing Prices for Ancillary Services; and

(c) Aggregate Supply and Demand for each Zone.

**8.3 Reports to Regulators**

The Compliance Unit, after due consultation with each pertinent federal or state regulatory agency, if any, which has the authority to and wishes to impose reporting requirements as to the monitoring program described in this schedule, shall develop a timetable, format and proposed table of contents for such reports to each such agency, which shall be submitted as a proposal to the PX CEO and PMMC. Upon approval of such proposal, the Compliance Unit shall proceed to prepare such reports according to such timetable for approval and submission by the PX CEO to the Governing Board and to the regulatory agency concerned.

Case 2:07-cv-05591-CEA Document 38-12 Filed 01/07/2008 Page 58 of 60



[Original Sheet Nos. 141 through 143 reserved for future use.]

Case 2:06-cv-00591-MCE-KJM Document 31-2 Filed 01/31/2008 Page 59 of 60



# PX TARIFF SCHEDULE 6

# PX MARKET SETTLEMENTS

**Schedule 6**

**PX Settlements Process**

**1.0 Settlements for Day-Ahead Commitments.**

**1.1 Energy.**

The PX shall settle with each PX Participant for Energy traded in the Day-Ahead Market in each Settlement Period on the basis of the PX Participant's Day-Ahead commitment and the corresponding Day-Ahead Market Clearing Price in the relevant Zone or at the relevant Scheduling Point, as applicable, for that Settlement period, as follows:

**1.1.1 PX Sellers.**

Each PX Seller shall be credited with an amount equal to its scheduled sales of Energy multiplied by the Generation Meter Multiplier in each Settlement Period multiplied by the Day-Ahead Market Clearing Price applicable to the relevant Zone or Scheduling Point for that Settlement Period.

**1.1.2 PX Buyers.**

Each PX Buyer shall be debited by the PX with an amount equal to its scheduled purchase of Energy in each Settlement Period multiplied by the Day-Ahead Market Clearing Price applicable to the relevant Zone or Scheduling Point for that Settlement Period.

**1.2 Purchase of Ancillary Services from Ancillary Service Providers.**

If a PX Participant sells any Ancillary Services to the ISO or to a PX Buyer through the CTS Ancillary Services Market and schedules the Ancillary Services through the PX for a Settlement Period in the Day-Ahead Market, the PX shall credit the PX Participant charges payable to the PX for those Ancillary Services calculated by the ISO in accordance with Section 2.5.27 of the ISO Tariff for that Settlement Period or shall credit or debit the CTS seller of Ancillary Services for any deviations from the quantity committed in the CTS Ancillary Services Market. If a PX Participant schedules more Ancillary Services to the PX through CTS than committed to a PX Buyer in the CTS Ancillary Services Market, the PX shall pay that PX Seller for such excess quantity at the ISO-determined weighted average price for Ancillary Services to the extent that such excess quantity is accepted by the ISO as used by the market. If a PX Participant schedules less Ancillary Services to the PX than the quantity committed to a PX Buyer in the CTS Ancillary Services Market, the PX shall charge that PX Seller for the deficient quantity at the ISO-determined weighted average price for Ancillary Services.

**1.3 Usage Charges.**

The Day-Ahead Usage Charges related to Energy trades and payable by the PX pursuant to Section 7.3.1 of the ISO Tariff shall not be specifically allocated to PX Participants in the PX

Settlement process but shall be recovered by the PX from the difference in relation to Zonal prices between the amounts debited to PX Buyers and the amounts credited to PX Sellers, in the Day-Ahead Market, in the Settlement Periods in which the Usage Charges were payable. To the extent that a PX Participant's Day-Ahead Final Contract Usage Schedules use Existing Rights, Non-Converted Rights, or any other Usage Charge exemption rights as the ISO may define from time to time, the PX will credit or debit the applicable Usage Charge amount exempted by the ISO. Any over- or undercollection of revenues by the PX with respect to the Usage Charge will be accounted for in accordance with the applicable provisions of the PX Operating Manual.

**1.4 Grid Operations Charges.**

**1.4.1 Allocation Among PX Buyers.**

Grid Operations Charges payable by the PX in accordance with Section 7.3.2 of the ISO Tariff for a Settlement Period in the Day-Ahead Market shall be debited by the PX to the PX Buyers in the Day-Ahead Market in the same manner as the ISO charges the PX.

**1.4.2 Pass-through of Intra-Zonal Congestion Payments to PX Sellers.**

The PX shall credit or debit to the relevant PX Sellers whose Generating Units were scheduled by the ISO in the Day-Ahead Market to relieve Intra-Zonal Congestion the payments or charges received by the PX from the ISO for the account of those PX Sellers on the same basis as the ISO determines such payments or charges.

**2.0 Settlements for Hour-Ahead Commitments.**

**2.1 Energy.**

The PX shall settle with each PX Participant for Energy traded in the Hour-Ahead Market in each Settlement Period on the basis of that PX Participant's purchases or sales and the corresponding Hour-Ahead Market Clearing Price in the relevant Zone for that Settlement Period.

**2.1.1 PX Sellers.**

Each PX Seller that is a Generator shall be credited by the PX with an amount equal to any increase (or shall be debited by the PX an amount equal to any decrease) in its scheduled Generation compared with its scheduled Generation in the Day-Ahead Market multiplied by the Hour-Ahead Market Clearing Price applicable to the relevant Zone or Scheduling Point for that Settlement Period.

**2.1.2 PX Buyers.**

Each PX Buyer that is a Demand shall be debited by the PX with an amount equal to any increase (or shall be credited by the PX with an amount equal to any decrease) in its scheduled

Energy compared with its scheduled Energy in the Day-Ahead Market multiplied by the Hour-Ahead Market Clearing Price applicable to the relevant Zone or Scheduling Point for that Settlement Period.

**2.2 Sales of and Buy Back of Ancillary Services by Ancillary Service Providers.**

If an Ancillary Service Provider sells through the PX additional Ancillary Services to the ISO or buys back a Day-Ahead Ancillary Services sale to the ISO for a Settlement Period in the Hour-Ahead Market compared with its commitment in the Day-Ahead Market, the ISO payments or charges for those Ancillary Services in the Hour-Ahead Market shall be calculated by the ISO in accordance with Section 2.5.27 of the ISO Tariff and shall be credited or debited by the ISO to the PX. The PX shall then credit or debit the PX Ancillary Service Provider in the Hour-Ahead Market for that Settlement Period with an amount calculated by the PX in accordance with Section 2.5.27 of the ISO Tariff.

**2.3 Usage Charges.**

**2.3.1 Hour-Ahead Usage Charges.**

The Hour-Ahead Usage Charges for Energy trades and payable by the PX pursuant to Section 7.3.1 of the ISO Tariff shall not be specifically allocated to PX Participants in the PX Settlement process but shall be recovered by the PX from the difference between the amounts debited to PX Buyers and the amounts credited to PX Sellers in the Hour-Ahead Market in the Settlement Periods in which the Usage Charges were payable. To the extent that a PX Participant's Hour-Ahead final Contract Usage Schedules use Existing Rights, Non-Converted Rights or any other Usage Charge exemption rights the ISO may define from time to time, the PX will credit or debit the applicable Usage Charge amount exempted by the ISO.

**2.3.2 Allocation of Net Transmission Capacity Buy Back Charges or Payments.**

If the ISO charges or pays the PX in connection with reduced scheduling capacity of an Inter-Zonal Interface after the issuance of Final Day-Ahead Schedules for a Trading Day and before the Hour-Ahead Market for a Trading Period of a Trading Day, in accordance with Section 7.3.1.7 of the ISO Tariff or other applicable ISO Tariff provision, the PX will calculate and allocate this charge or payment for the applicable Trading Period to PX Participants in proportion to their Day-Ahead Final Schedules of Supply, Demand and Inter-Scheduling Coordinator Trades for the same Trading Period. Consistent with the ISO Tariff, Contract Usage Schedules of PX Participants using Existing Rights, Non-Converted Rights or any such other Usage Charge exemption transmission usage rights as the ISO may define in the ISO Tariff from time to time are not subject to the sharing of the ISO charge or payment for the Net Transmission Capacity Buy Back.

**2.3.3 Adjustment of Usage Charges.**

If the PX determines the ISO Usage Charges calculated by the PX for the Day-Ahead or Hour-Ahead Market are not equal to charges assessed by the ISO; or the Net Transmission Capacity

Buy Back Charges calculated and collected by the PX are not equal to the charges assessed by the ISO, the PX will allocate any resulting charges or payments to PX Participants *pro rata* based on their Hour-Ahead Final Schedules of Supply, Demand and Inter-Scheduling Coordinator Trades for the applicable trading period.

**2.4 Grid Operations Charges.**

**2.4.1 Allocation Among PX Buyers.**

Grid Operations Charges payable by the PX in accordance with Section 7.3.2 of the ISO Tariff for a Settlement Period in the Hour-Ahead Market shall be debited or credited by the PX to each PX Buyer in the Hour-Ahead Market, in the same manner as the ISO charges the PX.

**2.4.2 Pass-through of Payments or Charges to PX Sellers.**

The PX shall credit or debit to the relevant PX Sellers whose Generating Units were scheduled by the ISO in the Hour-Ahead Market to relieve Intra-Zonal Congestion any payments or charges received by the PX from the ISO for the account of those PX Sellers.

**2.4.3 Rational Buyer.**

The ISO's Rational Buyer Adjustment Charge/Payment to the PX will be debited or credited by the PX to each PX Participant in the same manner as the ISO makes such debits or credits.

**3.0 Settlements for Transactions Traded in the Real Time Market.**

**3.1 Imbalance Energy.**

The PX shall settle with each PX Participant for Imbalance Energy payments or credits in each Settlement Period on the basis of any deviation from its commitments in the Day-Ahead Market as adjusted for its Schedules in the Hour-Ahead Market for each Zone and Scheduling Point, in accordance with ISO practice. The PX will settle for ISO instructed Deviation of Dispatched Ancillary Services and Supplemental Energy at the ISO BEEP Interval Ex Post Price. The PX will settle uninstructed deviations net by participant ID at the corresponding ISO published price. Any remaining payment or charge balances will be allocated pro-rata based on metered loads and exports.

**3.2 Ancillary Services Cost Recovery.**

**3.2.1 Cost Recovery for Spinning Reserve, Non-Spinning Reserve and Regulation Reserve.**

For PX purchases of Spinning Reserve or Non-Spinning Reserve for a Settlement Period, the charges for those Ancillary Services payable by the PX shall be debited to the PX Buyers and

shall be allocated among PX Buyers in the proportion which the recorded metered Demand and firm exports for each PX Buyer in that Settlement Period bears to the total recorded metered Demand and firm exports for all PX Buyers in that Settlement Period, less any amounts committed through the CTS Ancillary Services Market by each PX Buyer and credited by the ISO. For PX purchases of Regulation Up or Regulation Down Reserve for a Settlement period,

the charges for those Ancillary Services payable by the PX shall be debited to the PX Buyers and shall be allocated among PX Buyers in the proportion which the recorded metered Demand (excluding exports) for each Buyer in that Settlement Period bears to the total recorded metered Demand (excluding exports) for all PX Buyers in that Settlement Period, less any amounts committed through the CTS Ancillary Services Market by each PX Buyer and credited by the ISO.

If a PX Buyer purchases Ancillary Services from the CTS Ancillary Services Market, in excess of the amount determined by the PX to be that PX Buyer's Ancillary Services obligation in that Zone, the PX shall pay that PX Buyer for the excess quantity at a price equal to the ISO-determined weighted average price for Ancillary Services in that Zone, provided the excess amount has been accepted by the ISO.

**3.2.2 Cost Recovery for Replacement Reserve.**

For PX purchases of Replacement Reserve, the PX shall allocate the corresponding charges to PX Participants.

The PX shall allocate Deviation Replacement Reserve Charges and Remaining Replacement Reserve Charges as follows:

Deviation Replacement Reserve Charges shall be allocated pro-rata to the accounts of PX Participants whose scheduled generation exceeds their metered generation and whose scheduled load is less than their metered load.

Remaining Replacement Reserve Charges will be allocated pro-rata to the accounts of PX Participants based on metered load.

If the ISO only provides the PX with a combined charge for Replacement Reserves, the PX will divide the charge into two parts:

(i) the Deviation Replacement Reserve Charge which meets the total net Generator and net Load uninstructed deviation; and

(ii) if there is some charge left over after the total net Deviation is offset, the charge will be for Remaining Replacement Reserve.

Charge (i) is allocated pro-rata to both PX Buyers and PX Sellers based on their net Generator and net load uninstructed deviation; charge (ii) is allocated pro-rata to PX Participants based on metered load.

The PX will allocate these Replacement Reserve charges to PX Sellers and PX Buyers on a Zonal basis while giving credit for any Replacement Reserve provided in the Zone from the CTS Ancillary Services Market for the PX Sellers and PX Buyers.

If a PX Buyer purchases Replacement Reserve in the Zone from the CTS Ancillary Services Market, in excess of the amount determined by the PX to be that PX Buyer's Replacement Reserve obligation in the Zone, the PX shall pay that PX Buyer for the excess quantity at a price equal to the ISO-determined weighted average price for Replacement Reserve in that Zone, provided this excess quantity has been accepted by the ISO.

**3.2.3 Allocation of Ancillary Service Costs By Zone.**

If the ISO calculates the prices of any Ancillary Services separately for each Zone in any Settlement Period, the PX shall similarly settle the cost of those Ancillary Services in that Settlement Period among each of the PX Buyers and PX Sellers of those Ancillary Services in each Zone at the relevant Market Clearing Price or other price for each Zone, as described in Section 3.1 above.

**4.0 Settlements for Other Charges.**

**4.1 Wheeling Access Charges.**

Wheeling Access Charges payable by the PX as a Scheduling Coordinator to the ISO in each Settlement Period for exports out of the ISO Controlled Grid will be charged to the relevant PX Buyer of the Energy sold in each such Wheeling-Out transaction.

**4.2 Grid Management Charge.**

The Grid Management Charge levied by the ISO on the PX in accordance with Section 8 of the ISO Tariff shall be allocated to each PX Participant in the proportion which the amount of Demand supplied through the PX Market during a Settlement Period bears to the total amount of Demand supplied through the PX Market during that Settlement Period, or in such other manner as may be determined by the PX Board and filed at FERC. When and to the extent that the ISO provides the ISO Grid Management Charges to the PX on a daily, resource-specific basis, the PX shall allocate these changes to the PX Participants on a daily, resource-specific basis.

**4.3 Transmission Losses.**

The PX will receive total losses allocated to the PX by the ISO, shall settle these transmission losses, and shall determine the PX Participants' responsibility for these transmission losses, in accordance to the methods of calculating such responsibilities as set out in the PX Operating Manual, PSAB Procedures, Appendix 1, Sections 5 and 6.

**4.4 Grid Operations Charges.**

The PX shall credit to the relevant PX Sellers whose Generating Units and/or Reliability Must-Run Units were incremented by the ISO to relieve Intra-Zonal Congestion and/or to provide Reliability Must-Run Generation respectively, the payments received by the PX from the ISO for the account of those PX Sellers. The PX shall debit to the relevant PX Sellers whose

Generating Units were decremented by the ISO to relieve Intra-Zonal Congestion and/or to accommodate Reliability Must-Run Generation called upon by the ISO, the amounts payable by the PX to the ISO pursuant to Section 7.2.6.2 to the ISO Tariff.

**4.5 ISO Reliability Contract Charges and Payments**

The ISO may from time to time enter into special contracts under its Tariff Section 2.3.5 in order to satisfy Reliability Criteria. The PX will pass through all charges and payments related to such contracts to PX Participants in a manner consistent with ISO method of allocating such charges and payments.

**4.6 Maintenance Outage Cancellation Charges**

The ISO may become obligated from time to time to reimburse Transmission Owners for costs associated with cancelled transmission maintenance outages under Section 2.3.3.6 of the ISO Tariff. The PX will pass through any charges related to those obligations to PX Participants in a manner consistent with the ISO's method of allocating such charges.

**5.0 Confirmation, Validation, and Exception Reporting.**

**5.1 Confirmation.**

It is the responsibility of each PX Participant to notify the PX if it fails to receive a Preliminary Settlement Statement or a Final Settlement Statement on the date specified for the publication of such Settlement Statement in the PX Payments Calendar. Each PX Participant shall be deemed to have received its Settlement Statements on the dates specified, unless it notifies the PX to the contrary.

**5.2 The Validation Process.**

Each PX Participant shall have the opportunity to review the terms of the Preliminary Settlement Statements that it receives for errors of price and/or quantity of Energy or Ancillary Services received or sold during the pertinent Trading Day. The PX Participant shall be deemed to have validated the prices and quantities specified in each Preliminary Settlement Statement unless it has raised a dispute or reported an exception:

(a) in relation to Energy traded in the Real Time Market, within three (3) Business Days after receipt of the Preliminary Settlement Statement and the information specified in Section 7.3 below; and

(b) in relation to Energy traded in the Day-Ahead Market, and Hour-Ahead Market within two (2) Business Days after the receipt of the Preliminary Settlement Statement and the information specified in Section 7.3 below.

Once validated, a Settlement Statement will be binding on the PX Participant to which it relates.

When the ISO does not provide the PX with settlement information sufficient to validate a Preliminary Settlement Statement or any new or modified charges or payments included in Final Settlement Statements, the PX shall request that the ISO provide the necessary information. If the ISO does not provide the requested information to the PX in time for PX scheduled production of the Settlement Statement, the PX shall file a dispute in accordance with the ISO's tariff on the basis that the Settlement Statement cannot be validated or processed until such information is provided.

**6.0 Billing and Payment Process.**

**6.1 Energy Traded in the Real Time Market.**

The billing and payment process for Energy and Ancillary Services traded in the Real Time Market shall be based on the issuance of Preliminary and Final Settlement Statements for each hourly Settlement Period in each Trading Day.

**6.2 Energy traded in the Day-Ahead Market and Hour-Ahead Market.**

The billing and payment process for Energy traded in the Day-Ahead Market and Hour-Ahead Market shall be based on the issuance of Preliminary and Final Settlement Statements for each hourly Settlement Period in each Trading Day. All trading through the PX in the Day-Ahead Market and Hour-Ahead Market during each Trading Day shall be settled and paid on the fifteenth (15th) day of the calendar month succeeding the calendar month in which the Trading Day occurs or, if that is not a Business Day, on the next succeeding Business Day.

**6.2.1 [Reserved]**

**6.2.2** The time periods specified in this Schedule 6 and in the PX Payments Calendar may be reviewed and modified from time to time by the PX Governing Board.

**7.0 General Principles for Production of Settlement Statements.**

**7.1 Basis of Settlement.**

The basis of each Settlement Statement shall be the debiting or crediting of an account in the name of the relevant PX Participant set up by the PX to reflect all PX Participants' Energy trading through the PX.

**7.2 Right to Dispute.**

All PX Participants shall have the right to dispute any item or calculation set forth in any Preliminary Settlement Statement in accordance with the PX Tariff.

**7.3 Data Files.**

Settlement Statements relating to each PX Participant shall be accompanied by a data file of supporting information that includes for each hourly Settlement Period of the relevant Trading Day on a Zone-by-Zone basis:

(a) the aggregate quantity (in MWh) of Energy supplied by the metered facilities represented by the PX Participant;
(b) the aggregate quantity (in MWh) of Energy taken by the Scheduling Coordinator Metered Entities represented by the PX Participant;
(c) the quantity of Ancillary Services provided or purchased;
(d) the relevant prices that the PX has applied in its calculations;
(e) details of the scheduled quantities of Energy accepted by the PX in the Day-Ahead Market and Hour-Ahead Market;

(f) details of changes and deviations; and

(g) detailed calculations of all fees, charges and payments allocated amongst PX Participants and each PX Participant's share.

**8.0 Settlement Cycle.**

**8.1 Timing of the Settlements Process in the Real Time Market.**

**8.1.1** The PX shall provide to each PX Participant for validation a Preliminary Settlement Statement of charges payable to or owed by the PX Participant for Energy traded in the Real Time Market. The PX shall provide its Preliminary Settlement Statement within three (3) Business Days of receipt of all necessary settlement information from the ISO for the relevant Trading Day, covering all Settlement Periods in that Trading Day.

**8.1.2** Each PX Participant shall have a period of four (4) Business Days from receipt of the Preliminary Settlement Statement and the information specified in Section 7.3 above during which it may review the Preliminary Settlement Statement and notify the PX of any errors. The PX shall issue a Final Settlement Statement to each PX Participant for that Trading Day within two (2) Business Days of receipt of all necessary settlement information from the ISO for the relevant Trading Day covering all Settlement Periods in that Trading Day.

**8.2 Timing of the Settlement Process in the Day-Ahead Market and Hour-Ahead Market.**

**8.2.1** The PX shall provide to each PX Participant for validation a Preliminary Settlement Statement of charges payable to or owed by the PX Participant for Energy traded in the Day-Ahead and Hour-Ahead Market within two (2) Business Days of the end of the relevant Trading Day covering all Settlement Periods in that Trading Day.

**8.2.2** Each PX Participant shall have a period of two (2) Business Days from receipt of the Preliminary Settlement Statement and the information specified in Section 7.3 above during which it may review the Preliminary Settlement Statement and notify the PX of any errors. Not later than five (5) Business Days after the end of the Trading Day to which it relates for the Day-Ahead Market and Hour-Ahead Market, the PX shall issue a Final Settlement Statement to each PX Participant for that Trading Day.

**8.3 Basis for Billing and Payment.**

**8.3.1** The Final Settlement Statement shall constitute the basis for billing for the Day-Ahead and Day-of Market and the associated funds transfers in accordance with the PX Tariff. Each PX Participant shall pay the charges shown on the Final Settlement Statement on the Payment Date, whether or not there is any dispute regarding the amount of such charges.

**8.4 Basis for Billing and Payment for the Real-Time Market.**

**8.4.1** The Preliminary Settlement Statement and Final Settlement Statement shall constitute the basis for billing and the associated funds transfers in accordance with the PX Tariff. Each PX Participant shall pay the charges shown on the Preliminary Settlement Statement by the Payment Date, whether or not there is any dispute regarding the amount of such charges. Each PX Participant shall also pay the charges shown on the Final Settlement Statement by the Payment Date, whether or not there is any dispute regarding the amount of such charges. Any adjustment(s) to the Preliminary Settlement Statements will be reflected on subsequent settlement statements. These subsequent settlement statements may, or may not, fall within the same invoicing period as the original Preliminary Settlement Statement used as the basis for the adjustment. The invoice for the Final Settlement Statement will reflect any such adjustment(s).

[Sheet Nos. 155 through 157 reserved for future use.]

# PX TARIFF SCHEDULE 7

**[Reserved for Future Use]**

Case 2:07-cv-05591-GAF Document 1-25-4 Filed 03/26/2008 Page 16 of 50



[Original Sheet Nos. 159 through 165 reserved for future use.]

# PX TARIFF SCHEDULE 8

# PX BOOKOUT OPTION

## Schedule 8

## PX Bookout Option

### 1. Availability

The Bookout option is available in the PX Day-Ahead Market to all PX Participants who have valid Participation Agreements in effect. Participation in the Bookout process is strictly optional for any such PX Participant; provided, however, that the PX Participant has registered all applicable Bookout resources in its Master File as prescribed in the Bookout Activity Rules.

### 2. Applicable Terms and Conditions

Notwithstanding any other provision of the PX Tariff and Protocols, the Bookout option described herein shall be governed by the provisions of this Schedule 8 as in effect from time to time. In the event of any inconsistency, the effective terms and conditions of this Schedule 8 shall control.

### 3. Description of Bookout Option

Bookout is a scheduling and billing process by which PX Participants bidding to export power from the ISO Controlled Grid and those bidding to import power to the ISO Controlled Grid may elect to have their participating Schedules netted against other Bookout participating Schedules. To facilitate this process, the PX software will arithmetically net participating import Schedules against participating export Schedules and the PX will submit net Schedules and net Adjustment Bids for affected Scheduling Points to the ISO. For Bookout purposes, the netting of Schedules will apply only to participant-designated import and export Schedules at a common Scheduling Point outside of the ISO Controlled Grid. The Bookout option will operate only the in the PX's Day-Ahead Market.

### 4. Exclusions

Notwithstanding any other provision of this Schedule 8, the following types of import or export Schedules are not eligible for the Bookout option:

- Imports or exports using Existing Rights, Non-Converted Rights or Firm Transmission Rights;
- Imports or exports using Non-Firm or Conditional Firm Schedules;
- Inter-Scheduling Coordinator Trades of imports or exports; and
- Wheeling Through Schedules.

### 5. Definitions

As used in this Schedule 8, the following capitalized terms shall have the meanings set forth opposite them. All other capitalized terms shall have the meanings ascribed to those terms in the Master Definitions Appendix to the PX Tariff.

(a) **Bookout Savings:** The EBCs that would have been charged or paid to Matched Export Schedules absent participation in the Bookout option.

(b) **Export Based Charges (EBCs):** All ISO charges that are based on Real-time export quantities pursuant to the applicable provisions of the ISO Tariff.

(c) **Matched Export:** That part or whole of an export Schedule that has been netted out by import Schedules as a result of the Bookout process. Matched Export quantity always equals matched import quantity.

(d) **Unmatched Export:** The residual part or whole of an export Schedule remaining as a positive quantity after the PX has completed netting against import Schedules under the Bookout option. All Unmatched Exports shall be treated for PX and ISO purposes in the same manner as they would have been treated had they not been subject to the Bookout option.

**6. Application of EBCs and Distribution of Bookout Savings**

All exports, including Matched Exports, will be initially charged or paid their share of EBCs in the Real-Time Market. The EBCs on the Matched Exports will be the EBCs that would have been charged or paid in the absence of the Bookout option. For each Scheduling Point affected by Bookout, the PX software will distribute the Bookout Savings, *pro rata*, among all participating Bookout exports based on their Day-Ahead Final Schedules. The net EBCs on exports participating in the Bookout option shall be the sum of the share of EBCs attributable to those exports and the Bookout savings.

**7. Activity Rules**

The Bookout option shall be subject to such additional Activity Rules as the PX may prescribe from time to time to implement the scheduling and billing provisions of this Schedule 8. Such Activity Rules shall be consistent with and shall not vary the terms of this Schedule 8 and shall be posted on the PX Home Page. Any changes in the Activity Rules shall be authorized by the PX Board of Governors and shall not be implemented without thirty (30) days prior notice on the PX Home Page, unless the Board of Governors determines that circumstances reasonably prevent such notice, in which case the PX shall provide such notice on its Home Page as the Board of Governors shall specify.

**8. Effective Date and Modification**

This Schedule 8 may be changed by the PX pursuant to an appropriate filing with the FERC. Nothing contained herein shall be construed as affecting in any way the right of the PX to unilaterally make application to the FERC for a change in rates or any provision of this Schedule 8 pursuant to Section 205 of the Federal Power Act and pursuant to the FERC's rules and regulations promulgated thereunder.

[Original Sheet Nos. 169 through 171 reserved for future use.]

# PX TARIFF SCHEDULE 9

# DISPUTE RESOLUTION PROCEDURES

**Schedule 9**

**Dispute Resolution Procedures**

**1.0 Applicability**

**1.1 General Applicability**

Except as limited below or otherwise as limited by law (including the rights of any party to file a complaint with FERC under the relevant provisions of the FPA), the PX ADR Procedures shall apply to all disputes between parties which arise under the PX Documents. The PX ADR Procedures shall not apply:

(a) where the decision of the PX is stated in the provisions of the PX Tariff to be final;
(b) where the PX is bound, as a Scheduling Coordinator under the ISO Tariff, by a final determination of the ISO, in which case the final determination of the ISO shall be binding on all PX Participants;
(c) to disputes arising under existing contracts which pre-date the creation of the PX, except as the disputing parties may otherwise agree; or
(d) to disputes as to whether rates and charges set forth in the PX Tariff are just and reasonable under the FPA.

**1.2 Disputes Involving Governmental Agencies**

If a party to a dispute is a governmental agency, the procedures herein which provide for the resolution of claims and arbitration of disputes are subject to any limitations imposed on the agency by law, including, but not limited to, the authority of the agency to effect a remedy. If the governmental agency is a federal entity, the procedures herein shall not apply to disputes involving issues arising under the United States Constitution.

**1.3 Injunctive and Declaratory Relief**

Where the court having jurisdiction so determines, use of the PX ADR Procedures shall not be a condition precedent to court action for injunctive relief nor shall the provisions of the California Code of Civil Procedures Sections 1281, *et seq.* apply to such court actions.

**2.0 Negotiation and Mediation**

**2.1 Negotiation**

The PX and PX Participants who may be parties to a dispute shall make good-faith efforts to negotiate and resolve any dispute between them arising under PX Documents prior to invoking the PX ADR Procedures outlined herein. Each party shall designate an individual with authority to negotiate the matter in dispute in such negotiations.

**2.2 Statement of Claim**

In the event a dispute is not resolved through such good-faith negotiations, any one of the parties may submit a statement of claim, in writing, to each other disputing party, the PX ADR Committee, and the PX Governing Board, which submission shall commence the PX ADR Procedures. The statement of claim shall set forth in reasonable detail (i) each claim, (ii) the relief sought, including the proposed award, if applicable, (iii) a summary of the grounds for such relief and the basis for each claim, (iv) the parties to the dispute, and (v) the individuals having knowledge of each claim. The other parties to the dispute shall similarly submit their respective statements of claim within fourteen (14) days of the date of the initial statement of claim or such longer period as the chair of the PX ADR Committee may permit following an application by the responding party. If any responding party wishes to submit a counterclaim in response to the statement of claim, it shall be included in such party's responsive statement of claim. A summary of the statement of claim shall be published by the PX in the PX newsletter or electronic bulletin board, or any other method adopted by the PX ADR Committee. No Market Participant shall be considered as having received notice of a claim decided or relief granted by a decision made under these procedures unless the summary of the statements of claim published by the PX includes such claim or relief.

**2.3 Selection of Mediator**

After submission of the statements of claim, the parties to a dispute may request mediation, if at least 75% of them so agree, except that where a dispute involves three parties, at least two of the parties must agree to mediation. If the parties agree to mediate, the chair of the PX ADR Committee shall distribute to the parties by facsimile or other electronic means a list containing the names of at least seven prospective mediators with mediation experience, or with technical or business experience in the electric power industry, or both, as he or she shall deem appropriate to the dispute. The parties shall either agree upon a mediator from the list provided or from any alternative source, or alternate in striking names from the list with the last name on the list becoming the mediator. The first party to strike a name off the list shall be determined by lottery. The parties shall have seven days from the date of receipt of the PX ADR Committee chair's list of prospective mediators to complete the mediator selection process and appoint the mediator, unless the time is extended by mutual agreement. The mediator shall comply with the requirements of Section 3.2.

**2.4 Mediation**

The mediator and representatives of the disputing parties, with authority to settle the dispute shall, within fourteen (14) days after the mediator's date of appointment, schedule a date to mediate the dispute. Matters discussed during the mediation shall be confidential and shall not be referred to in any subsequent proceeding. With the consent of all disputing parties, a resolution may include referring the dispute directly to a technical body (such as a WSCC technical advisory panel) for resolution or an advisory opinion, or referring the dispute directly to FERC. The PX shall publish notice of the referral of the dispute in the PX newsletter or electronic bulletin board, and any other method adopted by the PX ADR Committee.

**2.5 Demand for Arbitration**

If the disputing parties have not succeeded in negotiating a resolution of the dispute within thirty (30) days of the initial statement of claim or, if within that period the parties agreed to mediate, within thirty (30) days of the parties' first meeting with the mediator, such parties shall be deemed to be at an impasse and any disputing party may then commence the arbitration process, unless the parties by mutual agreement agree to extend the time for mediation. A party seeking arbitration shall provide notice of its demand for arbitration to the other disputing parties, the PX ADR Committee and the PX Governing Board, who shall publish notice of such demand in the PX newsletter or electronic bulletin board, or any other method adopted by the PX ADR Committee.

**3.0 Arbitration**

**3.1 Selection of Arbitrator**

**3.1.1 Disputes Under $1,000,000**

Where the total amount of claims and counterclaims in controversy is less than $1,000,000 (exclusive of legal costs and interest), the disputing parties shall select an arbitrator from a list containing the names of at least ten (10) qualified individuals supplied by the PX ADR Committee, or if the PX is a party to the dispute, the names of at least ten (10) qualified individuals supplied by the American Arbitration Association within fourteen (14) days following submission of the demand for arbitration. If the parties cannot agree upon an arbitrator within the stated time, they shall take turns striking names from the list of proposed arbitrators. The first party to strike off a name shall be determined by lottery. This process shall be repeated until one name remains on the list, and that individual shall be the designated arbitrator.

**3.1.2 Disputes of $1,000,000 or Over**

Where the total amount of claims and counterclaims in controversy is $1,000,000 or more (exclusive of interest and legal costs), the disputing parties may agree on any person to serve as a single arbitrator, or shall endeavor in good faith to agree on a single arbitrator from a list of ten (10) qualified individuals provided by the PX ADR Committee within fourteen (14) days following submission of the demand for arbitration. However, if the parties are unable to agree on a single arbitrator within the stated time, there shall be a panel of three arbitrators appointed as follows: the party or parties that filed the statement of claim shall collectively designate one arbitrator and the party or parties named as defendants in the statement of claim shall collectively designate one arbitrator, which designation shall be made from the PX ADR Committee's list of arbitrators and not later than the tenth (10th) day thereafter after the expiration of the stated time. The two arbitrators so chosen shall then choose a third arbitrator.

### 3.2 Disclosures Required of Arbitrators

The designated arbitrators shall be required to disclose to the parties any circumstances which might preclude them from rendering an objective and impartial determination. Each designated arbitrator shall disclose:

(a) any direct financial or personal interest in the outcome of the arbitration;
(b) any information required to be disclosed by the California Code of Civil Procedure Section 1281.9; and
(c) any existing or past financial, business, professional or personal interests that are likely to affect impartiality or might reasonably create an appearance of partiality or bias.

Designated arbitrators shall disclose any relationships that they personally have with any party or its counsel, or with any individual whom they have been told will be a witness. They should also disclose any such relationship involving members of their families or their current employers, partners, or business associates. Designated arbitrators shall make a reasonable effort to inform themselves of any interests or relationships described above. The obligation to disclose interests, relationships, or circumstances that might preclude an arbitrator from rendering an objective and impartial determination is a continuing duty that requires arbitrators to disclose, at any stage of the arbitration, any such interests, relationships, or circumstances that arise, or are recalled or discovered. If, as a result of the continuing disclosure duty an arbitrator makes a disclosure which is likely to affect his or her impartiality, or might reasonably create an appearance of partiality or bias or if a party independently discovers the existence of such circumstances, a party wishing to object to the continuing use of the arbitrator must provide written notice of its objection to the other parties within ten (10) days of receipt of the arbitrator's disclosure or the date of a party's discovery of the circumstances giving rise to that party's objection. Failure to provide such notice shall be deemed a waiver of such objection. If a party timely provides a notice of objection to the continuing use of the arbitrator, the parties shall attempt to agree whether the arbitrator should be dismissed and replaced in the manner described in Section 3.1. If, within ten (10) days of a party's objection notice the parties have not agreed how to proceed, the matter shall be referred to the PX ADR Committee for resolution.

### 3.3 Arbitration Procedures

The PX ADR Committee shall compile and make available to the arbitrators and the parties standard procedures for the arbitration of disputes, which procedures (i) shall include provision, upon good cause shown, for intervention or other participation in the proceeding by any party whose interests may be affected by its outcome, (ii) shall conform to the requirements specified herein, and (iii) may be modified or adopted for use in a particular proceeding as the arbitrators deem appropriate, in accordance with Section 3.4. The procedures adopted by the PX ADR Committee shall be based on the latest edition of the American Arbitration Association Commercial Arbitration Rules, to the extent such Rules are consistent with this Schedule 9. Except as provided in Section 3.4, all parties shall be bound by such procedures.

### 3.4 Modification of Arbitration Procedures

In determining whether to modify the standard procedures for use in the pending matter, the arbitrators shall consider (i) the complexity of the dispute, (ii) the extent to which facts are disputed, (iii) the extent to which the credibility of witnesses is relevant to a resolution, (iv) the amount in controversy, and (v) any representations made by the parties. Alternatively, the parties may, by mutual agreement, modify the standard procedures. In the event of a disagreement between the arbitrator and the agreement of the parties regarding arbitration procedures to be utilized, the parties' agreement shall prevail.

### 3.5 Remedies

**3.5.1 Arbitrators' Discretion** The arbitrators shall have the discretion to grant the relief sought by a party, or determine such other remedy as is appropriate, unless the parties agree to conduct the arbitration "baseball" style. Unless otherwise expressly limited herein, the arbitrators shall have the authority to award any remedy or relief available from FERC, or any other court of competent jurisdiction. Where any PX Document leaves any matter to be agreed between the parties at some future time and provides that in default of agreement the matter shall be referred to the PX ADR Procedures, the arbitrators shall have authority to decide upon the terms of the agreement which in their opinion it is reasonable that the parties should reach, having regard to the other terms of the PX Document concerned and their opinion as to what is fair and reasonable in all the circumstances.

**3.5.2 "Baseball" Arbitration** If the parties agree to conduct the arbitration "baseball" style, each party shall submit to the arbitrators and exchange with each other their last best offers in the form of the award they consider the arbitrators should make, not less than seven (7) days in advance of the date fixed for the hearing, or such other date as the arbitrators may decide. If a party fails to submit its last best offer in accordance with this Section 3.5.2, that party shall be deemed to have accepted the offer proposed by the other party. The arbitrators shall be limited to awarding only one of the proposed offers, and may not determine an alternative or compromise remedy.

### 3.6 Summary Disposition

The procedures for arbitration of a dispute shall provide a means for summary disposition of a demand for arbitration, or a response to a demand for arbitration, that in the reasoned opinion of the arbitrators does not have a good faith basis in either law or fact. If the arbitrators determine that a demand for arbitration or response to a demand for arbitration does not have a good faith basis in either law or fact, the arbitrators shall have discretion to award the costs of the time, expenses, and other charges of the arbitrators to the prevailing party. A determination made under this Section 3.6 is subject to appeal pursuant to Section 4.0.

### 3.7 Discovery Procedures

The procedures for the arbitration of a dispute shall include adequate provision for the discovery of relevant facts, including the taking of testimony under oath, production of documents and

other things, the presentation of evidence, the taking of samples, conducting of tests, and inspection of land and tangible items. The nature and extent of such discovery shall be determined as provided herein and shall take into account (i) the complexity of the dispute, (ii) the extent to which facts are disputed, (iii) the extent to which the credibility of witnesses is relevant to a resolution, and (iv) the amount in controversy.

**3.8 Evidentiary Hearing**

The arbitration procedures shall provide for an evidentiary hearing, with provision for the cross-examination of witnesses, unless all parties consent to the resolution of the matter on the basis of a written record. The forms and methods for taking evidence shall be determined by the arbitrator(s) and modified pursuant to Section 3.4. The arbitrators may require such written or other submissions from the parties as they may deem appropriate, including submission of direct and rebuttal testimony of witnesses in written form. The arbitrators may exclude any evidence that is irrelevant, immaterial, unduly repetitious or prejudicial, or privileged. The arbitrators shall compile a complete evidentiary record of the arbitration which shall be available to the parties on its completion upon request.

**3.9 Confidentiality**

Subject to the other provisions of this Tariff, any party may claim that information contained in a document otherwise subject to discovery is "confidential" if such information would be so characterized under the Federal Rules of Evidence. The party making such claim shall provide to the arbitrators in writing the basis for its assertion. If the claim of confidentiality is confirmed by the arbitrators, they shall establish requirements for the protection of such documents or other information designated as "confidential" as may be reasonable and necessary to protect the confidentiality and commercial value of such information. Any party disclosing information in violation of these provisions or requirements established by the arbitrators, unless such disclosure is required by federal or state law or by a court order, shall thereby waive any right to introduce or otherwise use such information in any judicial, regulatory, or other legal or dispute resolution proceeding, including the proceeding in which the information was obtained.

**3.10 Timetable**

Promptly after being appointed the arbitrator(s) shall set a date for the issuance of the arbitration decision, which shall be not later than six months (or such earlier date as the parties and the arbitrators may agree) from the date of their appointment, with other dates, including the dates for an evidentiary hearing or other final submissions of evidence, set in light of this date. The date for the evidentiary hearing or other final submission of evidence shall not be changed, absent extraordinary circumstances. In the interests of the case, the arbitrator(s) may, in their reasonable discretion, extend the date for issuance of the arbitration decision past six months from the date of their appointment. The arbitrator(s) shall have the power to impose sanctions, including dismissal of the proceeding, for dilatory tactics or undue delay in completing the arbitration proceedings.

### 3.11 Decision

**3.11.1** Except as provided below with respect to the "baseball" style arbitrations, the arbitrators shall issue a written decision granting the relief requested by one of the parties, or such other remedy as is appropriate, if any, and shall include findings of fact and law. The arbitrators' decision shall be based on (i) the evidence in the record, (ii) the terms of PX Documents, as applicable, (iii) applicable substantive United States federal law, including the FPA, and any applicable FERC regulations and decisions; and (iv) applicable substantive state law. Additionally, the arbitrators may consider relevant decisions in previous arbitration proceedings. A summary of the disputed matter and the arbitrators' decision shall be published in the PX newsletter or electronic bulletin board or any other method adopted by the PX ADR Committee, and maintained by the PX ADR Committee.

**3.11.2** In arbitrations conducted "baseball" style, the arbitrators shall issue a written decision adopting one of the awards proposed by the parties, and shall include findings of fact and law. The arbitrators' decision shall be based on (i) the evidence in the record, (ii) the terms of PX Documents, as applicable, (iii) applicable substantive United States federal law, including the FPA and any applicable FERC regulations and decisions, and (iv) applicable substantive state law. If the arbitrators conclude that no proposed award is consistent with the factors enumerated in (i) through (iv) above, or addresses all of the issues in dispute, the arbitrators shall specify how each proposed award is deficient and direct that the parties submit new proposed awards that cure the identified deficiencies. A summary of the disputed matter and the arbitrators' decision shall be published in a PX newsletter or electronic bulletin board, or any other method adopted by the PX ADR Committee. An award shall not be deemed to be precedential.

**3.11.3** Where a three-person panel of arbitrators is appointed pursuant to Section 3.1.2, at least two of the arbitrators must agree on the decision, unless the concurrence of all is required by agreement or by law.

### 3.12 Compliance

Unless the arbitrators' decision is appealed to FERC or a court of competent jurisdiction under Section 4.0, the disputing parties shall, upon receipt of the decision, immediately take whatever action is required to comply with the award to the extent the award does not require regulatory action. An award that is not appealed shall be deemed to have the same force and effect as an order entered by the FERC or any court of competent jurisdiction.

### 3.13 Enforcement

Following the expiration of the time for appeal of an award pursuant to Section 4.3, any party may apply to FERC or any court of competent jurisdiction for entry and enforcement of judgment based on the award.

### 3.14 Costs

The costs of the time, expenses, and other charges of the arbitrators shall be borne by the parties to the dispute, with each side on an arbitrated issue bearing its pro-rata share of such costs, and each party to an arbitration proceeding bearing its own costs and fees. If the arbitrators determine that a demand for arbitration or response to a demand for arbitration was made in bad faith, the arbitrators shall have discretion to award the costs of the time, expenses, and other charges of the arbitrators to the winning party. Notwithstanding the above, at the discretion of the arbitrators, the winning party in any dispute which has resulted in the enforcement of an important right affecting the public interest shall not be required to pay any of the costs of the arbitrators and may recover such of its own reasonable attorney fees, expert witness fees and other reasonable costs from the losing party to the dispute if (a) a significant benefit, whether pecuniary or non-pecuniary, has been conferred on the general public, (b) the necessity and financial burden of private enforcement are such as to make the award appropriate, and (c) such fees should not, in the interest of justice, be paid out of the recovery.

## 4.0 Appeal of Award

### 4.1 Basis for Appeal

A party may apply to the FERC or any court of competent jurisdiction to hear an appeal of an arbitration award only upon the grounds that the award is contrary to or beyond the scope of applicable PX Documents, United States federal law, including, without limitation, the FPA and any FERC regulations and decisions, or state law. Appeals shall, unless otherwise ordered by FERC, or the court of competent jurisdiction, conform to the procedural limitations set forth in this Section 4.0.

### 4.2 Appellate Record

The Parties intend that FERC or the court of competent jurisdiction should afford substantial deference to the factual findings of the arbitrators. No party shall seek to expand the record before the FERC or court of competent jurisdiction beyond that assembled by the arbitrators, except (i) by making reference to legal authority which did not exist at the time of the arbitrators' decision, or (ii) if such party contends the decision was based upon or affected by fraud, collusion, corruption, misconduct or misrepresentation.

### 4.3 Procedures for Appeals

**4.3.1** If a party to an arbitration desires to appeal an award, it shall provide a notice of appeal to the PX Governing Board, all parties and the arbitrators within fourteen (14) days following the date of the award. The appellant must likewise provide notice to the PX ADR Committee, which shall publish notice of the appeal in a PX newsletter or electronic bulletin board, or any other method adopted by the PX ADR Committee. Within ten (10) days of filing the notice of appeal, the appellant must file an appropriate application, petition or motion with FERC to trigger review under the FPA or with a court of competent jurisdiction. Such filing shall state that the subject matter has been the subject of an arbitration pursuant to applicable PX Documents.