---

| | |
|---|---|
| **Tie Point Meter** | A revenue meter, which is capable of providing Settlement Quality Meter Data, at a Scheduling Point or at a boundary between UDCs within the ISO Controlled Grid. |
| **TO (Transmission Owner)** | An entity owning transmission facilities or having firm contractual rights to use transmission facilities. |
| **Trading Day** | The twenty-four (24) hour period beginning at the start of the hour ending 0100 and ending at the end of the hour ending 2400 daily, except where there is a change to and from daylight savings time. |
| **Transition Charge** | The charge or periodic charge assessed to customers to recover the reasonable uneconomic portion of costs associated with Generation-related assets and obligations, nuclear decommissioning, and capitalized Energy efficiency investment programs approved prior to August 15, 1996 and as defined in the California Assembly Bill No. 1890 enacted on February 24, 1995. |
| **Transition Period** | The period of time established by the California Legislature and CPUC to allow IOUs and Local Publicly Owned Electric Utilities an opportunity to recover Transition Costs or Severance Fees. |
| **Transmission Losses** | Energy that is lost as a natural part of the process of transmitting Energy from Generation to Load delivered at the ISO/UDC boundary or Control Area boundary. |
| **Transmission Revenue Credit** | The proceeds received by the Participating TO from the ISO for Wheeling service and Usage Charges, plus the shortfall or surplus resulting from any cost differences between Transmission Losses and Ancillary Service requirements associated with Existing Rights or Non-Converted Rights and the ISO's rules and protocols. |
| **TRR (Transmission Revenue Requirement)** | The TRR is the total annual authorized revenues associated with transmission facilities turned over to the Operational Control of the ISO by a Participating TO, and for which FERC jurisdictional entities are permitted to include in their Access Charges for recovery from customers, or in the case of non-FERC jurisdiction entities, the equivalent revenue amount authorized by the appropriate jurisdictional regulatory authority. |

---

**Trustee**

The trustee of the California Power Exchange trust and the California Independent System Operator trust established by order of the California Public Utilities Commission on August 2, 1996 Decision No. 96-08-038 relating to the Ex Parte Interim Approval of a Loan Guarantee and Trust Mechanism to Fund the Development of an Independent System Operator (ISO) and a Power Exchange (PX) pursuant to Decision 95-12-063 as modified.

**UDC (Utility Distribution Company)**

An entity that owns a Distribution System for the delivery of Energy to and from the ISO Controlled Grid, and that provides regulated retail electric service to Eligible Customers, as well as regulated procurement service to those End-Use Customers who are not yet eligible for direct access, or who choose not to arrange services through another retailer.

**Unaccounted for Energy (UFE)**

UFE is the difference in Energy, for each UDC Service Area and Settlement Period, between the net Energy delivered into the UDC Service Area, adjusted for UDC Service Area Transmission Losses (calculated in accordance with Section 7.4.3 of the ISO Tariff), and the total metered Demand within the UDC Service Area adjusted for distribution losses using Distribution System loss factors approved by the Local Regulatory Authority. This difference is attributable to meter measurement errors, power flow modeling errors, energy theft, statistical Load profile errors, and distribution loss deviations.

**Uncontrollable Force**

Any act of God, labor disturbance, act of the public enemy, war, insurrection, riot, fire, storm, flood, earthquake, explosion, any curtailment, order, regulation or restriction imposed by governmental military or lawfully established civilian authorities or any other cause beyond the reasonable control of the ISO or Market Participant or the PX or PX Participant (as the case may be) which could not be avoided through the exercise of Good Utility Practice.

**Usage Charge**

The amount of money, per 1 kW of scheduled flow, that the ISO charges a Scheduling Coordinator for use of a specific congested Inter-Zonal Interface during a given hour.

**Voltage Support**

Services provided by Generating Units or other equipment such as shunt capacitors, static var compensators, or synchronous condensers that are required to maintain

| | |
|---|---|
| | established grid voltage criteria. This service is required under normal or system emergency conditions. |
| **WEnet (Western Energy Network)** | An electronic network that facilitates communications and data exchange among the ISO, Market Participants and the public in relation to the status and operation of the ISO Controlled Grid. |
| **Wheeling** | Wheeling Out or Wheeling Through. |
| **Wheeling Access Charge** | The charge assessed by the ISO that is paid by a Scheduling Coordinator for Wheeling. Wheeling Access Charges shall not apply for Wheeling under a bundled non-economy Energy coordination agreement of a Participating TO executed prior to July 9, 1996. |
| **Wheeling Out** | Except for Existing Rights and Non-Converted Rights exercised under an Existing Contract in accordance with Sections 2.4.3 and 2.4.4 of the ISO Tariff, the use of the ISO Controlled Grid for the transmission of Energy from a Generating Unit located within the ISO Controlled Grid to serve a Load located outside the transmission and distribution system of a Participating TO. |
| **Wheeling Through** | Except for Existing Rights and Non-Converted Rights exercised under an Existing Contract in accordance with Sections 2.4.3 and 2.4.4 of the ISO Tariff, the use of the ISO Controlled Grid for the transmission of Energy from a resource located outside the ISO Controlled Grid to serve a Load located outside the transmission and distribution system of a Participating TO. |
| **WSCC (Western System Coordinating Council)** | The Western Systems Coordinating Council or its successor. |
| **Zone** | A portion of the ISO Controlled Grid within which Congestion is expected to be small in magnitude or to occur infrequently. "Zonal" shall be construed accordingly. |

[Original Sheet Nos. 239 through 241 reserved for future use.]

# PX TARIFF APPENDIX C

## Miscellaneous Tariff Supplements

**BRUDER, GENTILE & MARCOUX, L.L.P.**
**ATTORNEYS AT LAW**

CARMEN L. GENTILE
J. MICHEL MARCOUX
DAVID E. GOROFF
GARY E. GUY
JAMES H. MCGREW
THOMAS L. BLACKBURN

1100 NEW YORK AVENUE, N. W.
SUITE 510 EAST
WASHINGTON, D. C. 20005-3934

(202) 783-1350
FACSIMILE: (202) 737-9117; 347-2644
E-MAIL: degoroff@brugen.com

ANTONIA A. FROST
DAVID M. CONNELLY*

GEORGE F. BRUDER
RETIRED 1997

* ADMITTED IN MARYLAND

January 13, 1999

The Honorable David P. Boergers
Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

**Re: California Power Exchange Corporation**
**Docket No. ER99-__________-000**

**Day-Of Market Proposal**

Dear Mr. Boergers:

The California Power Exchange Corporation ("PX") hereby provides notice of an interim deviation from its Hour-Ahead bidding timeline in order to implement a "Day-Of market" schedule on a temporary, experimental basis. A detailed description of this plan follows.

The PX's Hour-Ahead market is a forward market for energy and ancillary services that affords participants the opportunity to optimize their schedules and reduce real time imbalances as close to dispatch as possible. The Hour-Ahead market has been in operation since July 30, 1998 and operates 24 hours per day. Participants submit bids to increment or decrement their Day-Ahead final schedules three hours prior to the dispatch hour. For each hour, an Hour-Ahead Market Clearing Price is calculated, and revised Day-Ahead schedules are sent to the California Independent System Operator ("ISO"). After the ISO runs its Congestion Management model, final schedules are retrieved and published.

Although market participants have utilized the Hour-Ahead market, it has not developed into a robust market for several reasons. The first reason relates to the complexity of the Hour-Ahead timeline. The second reason is that the ISO frequently

The Honorable David P. Boergers
January 13, 1999
Page 2

has gone outside of the market to procure resources to meet its reliability requirements.[1] A third reason is the volatility of Zonal Market Clearing Prices, which are exacerbated by low volumes in the Hour-Ahead market.

In an effort to increase market efficiency, the PX plans to modify the Hour-Ahead timelines on a short-term, experimental basis in order to test the potential benefits of an alternative Day-Of market. This refinement is expected to improve market efficiencies as compared to the Hour-Ahead market. In essence, the Day-Of experiment will simply advance the time frame for Hour-Ahead bid submittals and running of the auction that produces the initial preferred schedules which are forwarded to the ISO. Instead of running each Hour-Ahead market auction three hours ahead of the particular hour, the auctions will be grouped to include a number of hours during that day. All else, including the production and distribution final prices, final schedules and settlements, will remain unchanged. The PX's Day-Of market experiment will not affect the PX's rates or charges. Implementation of the Day-Of market will not require any additional software. The Day-Of market will consist of three daily auctions occurring at 0600 (for hours ending 1100-1600); 1200 (for hours ending 1700-2400); and 1600 (for hours ending 0100-1000). The Adjustment and Ancillary Service bidding process for each hour will remain open until 2.75 hours before dispatch. Participants will be able to start bidding as soon as Day-Ahead final schedules are available (usually by 1330 hours).

This timeline will allow participants the opportunity to schedule daily loads in a more unified and organized manner. It will also enable PX participants to market surplus capacity remaining after the PX markets.

The PX plans to implement the Day-Of market experiment for three months beginning January 17, 1999. At the end of the three months, the PX will evaluate the success of the Day-Of experiment. Based upon its own analysis and input from the market participants, the PX will decide whether and under what conditions to continue the Day-Of market format. If the PX elects to continue the Day-Of market, it will revise

---

1 The ISO does this based on its own demand forecast, and it appears that, as a result of this procurement which takes place during the early morning hours, there is little supply remaining to bid into the PX's Hour-Ahead market. By moving forward the PX's bidding timeline, the current Day-Of scheduling arrangement is intended to provide initial preferred schedules to the ISO early enough to eliminate the ISO's perceived need to make these out-of-market purchases.

The Honorable David P. Boergers
January 13, 1999
Page 3

the PX Tariff and affected protocols to make the timing changes permanent.[2]

The Commission appears to have recognized and accepted the fact that the participants in the California energy marketplace are wrestling with a variety of start-up issues which call for prompt attention and, where warranted, corrective action. For example, in addressing the PX's Tariff Amendment No. 5, the Commission recently endorsed the idea that the PX should have the flexibility to modify its payments calendar on a temporary or permanent basis to deal with changes or delays in the ISO's timetable for settlements. California Power Exchange Corp., 86 FERC ¶ 61,001, memo at 5-6 (1999). The PX Tariff itself (at Sections 2.1 and 3.1) provides the PX with substantial flexibility to modify its Day-Ahead and Hour-Ahead timelines in order to handle such matters as errors, delays and ISO schedule changes. The PX believes that the Day-Of market can and should be implemented on a trial basis for a period of 90 days, at the conclusion of which the PX will determine the appropriateness of implementing the market on a permanent basis. If the PX concludes at the end of this test period that a permanent market is viable, then as noted above it will make an appropriate filing to effect any necessary tariff amendments. The PX submits that this approach economizes FERC resources and is permitted insofar as the PX already has the necessary flexibility to initiate timeline revisions without further action by the Commission. Moreover, the Day-Of market experiment is not a creature of the PX's own independent creation. Rather, it was developed consentually among the PX participants during a series of teleconferences over the past several months. The PX had intended to implement the Day-Of experiment in mid-December 1998, but the press of other business made this impossible. The PX participants now appear prepared to shift to the new timelines on an interim basis as of January 17th. A number of them have contacted the PX about doing so.

As explained above, the current Hour-Ahead market is not nearly as robust as would be desirable. For example, during December 1998, the average daily volume in the Hour-Ahead market was less than 100 MWh. Thus, there is an immediate need to investigate the Day-Of alternative. Moreover, there is good reason to obtain experience with the Day-Of experiment and to evaluate its results prior to next summer's peak

---

2 The temporary timeline changes are described fully in this letter but are not being memorialized in revised tariff language pending completion of the Day-Ahead experiment. References to the Hour-Ahead market are replete in the PX Tariff and it would make no sense to revise all of those references, if at all, until after the experiment has been concluded and evaluated. At that time, the PX will be in a position to determine exactly how the tariff needs to be fashioned in order to reflect actual market operations.

The Honorable David P. Boergers
January 13, 1999
Page 4

energy consumption periods when PX transaction volumes are expected to increase significantly. Delaying the experiment would extend the three-month test phase into the early summer and would delay any meaningful analysis until even later in the summer. In the meantime, the objective of providing the ISO with the resources it needs for reliability purposes through a robust market instead of having to rely upon extra-market procurement by the ISO also would be reduced or eliminated. In short, the PX believes that the efficiency of California's energy market will be enhanced and that all affected California stakeholders will benefit from immediate commencement of the Day-Of experiment.

Copies of this letter have been served on the PX participants and the California Public Utilities Commission. Additionally, a copy of this submittal is being posted on the PX website at http://www.calpx.com.

Please place the following names on the Official Service List associated with this docket:

Scott D. Rasmussen
General Counsel
California Power Exchange Corp.
1000 South Fremont Avenue
Building A-9 West, 5th Floor
Alhambra, California 91803
Telephone: (626) 537-3127
Facsimile: (626) 281-6265

David E. Goroff
Bruder, Gentile & Marcoux, L.L.P.
1100 New York Avenue, N.W.
Suite 510 East
Washington, D.C. 20005
Telephone: (202) 783-1350
Facsimile: (202) 737-9117

Thank you for your attention to this submittal. Please do not hesitate to direct any questions to the undersigned.

Respectfully submitted,

David E. Goroff
Counsel for the California Power Exchange Corporation

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

California Power Exchange Corporation ) Docket No. ER99-______-000

NOTICE OF FILING

Take notice that on January 13, 1999, the California Power Exchange Corporation ("PX") provided notice of a temporary, experimental deviation from the Hour-Ahead timeline contained in the PX's FERC-authorized tariff in order to test the efficiency benefits of a "Day-Of market" timeline for a three-month period commencing January 17, 1999.

The PX states that it has served copies of its filing on the PX Participants and on the California Public Utilities Commission. The filing also has been posted on the PX website at http://www.calpx.com.

Any person desiring to be heard or to protest said filing should file a motion to intervene or protest with the Federal Energy Regulatory Commission, 888 First Street, N.W., Washington, D.C. 20426, in accordance with Rules 211 and 214 of the Commission's Rules of Practice and Procedure ( 18 CFR 385.211 and 18 CFR 385.214). All such motions or protests should be filed on or before __________, 1998. Protests will be considered by the Commission in determining the appropriate action to be taken, but will not serve to make protestants parties to the proceeding. Any person wishing to become a party must file a motion to intervene. Copies of this filing are on file with the Commission and are available for public inspection.

David P. Boergers
Secretary

BRUDER, GENTILE & MARCOUX, L.L.P.
ATTORNEYS AT LAW

CARMEN L. GENTILE
J. MICHEL MARCOUX
DAVID E. GOROFF
GARY E. GUY
JAMES H. MCGREW
THOMAS L. BLACKBURN

1100 NEW YORK AVENUE, N. W.
SUITE 510 EAST
WASHINGTON, D. C. 20005-3934

(202) 783-1350
FACSIMILE: (202) 737-9117; 347-2644
E-MAIL: jhmcgrew@brugen.com

ANTONIA A. FROST
DAVID M. CONNELLY*

GEORGE F. BRUDER
RETIRED 1997

* ADMITTED IN MARYLAND

May 7, 1999

The Honorable David P. Boergers
Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

Re: California Power Exchange Corporation
Docket No. ER99-________________

Request for Extension of the
Day-Of Market Experiment

Dear Mr. Boergers:

The California Power Exchange Corporation ("PX") respectfully requests a six-month extension of the current Day-Of market experiment followed by a one-month evaluation period, during which time the Day-Of market will continue to operate. This extension, if granted, would terminate the Day-Of market experiment on November 17, 1999. Absent this extension, the experiment will have to be terminated without the empirical data necessary to properly evaluate the market modification.

In its February 11, 1999 order in Docket No. ER99-1262, the Commission authorized the PX to implement the Day-Of market on a three-month experimental basis. The intent of this experiment was to test the potential benefits of a modified Hour-Ahead timeline. At the conclusion of the experiment, the PX planned to evaluate the success of the Day-Of market, and based on this evaluation, decide whether, and under what conditions, to continue the Day-Of market format.

To date, the experiment has yielded favorable results as compared with the Hour-Ahead market configuration. Not only has the number of market Participants increased, but volume has increased as well. Input received from market Participants thus far has been encouraging. However, while the experiment has offered valuable

The Honorable David P. Boergers
May 7, 1999
Page 2

data, three months is an insufficient amount of time to adequately evaluate the potential of the Day-Of market. One of the reasons for modifying the Hour-Ahead timeline was because the ISO has frequently gone outside of the Market to procure resources to meet its reliability requirements. Unfortunately, this occurs primarily during the peak usage period (June to September), which the current Day-Of experiment did not cover. Another reason for modifying the Hour-Ahead timeline was to stabilize the volatility of Zonal Market Clearing Prices ("ZMCP"), which are heightened by low volumes in the Hour-Ahead market. Again, data collected from the peak usage would provide the type of empirical data necessary to measure the efficacy of the Day-Of market with respect to ZMCPs.

Extending the Day-Of market experiment will allow the PX to more accurately gauge the effectiveness of the Day-Of market format, while at the same time continuing to confer the benefits of this auction format on market Participants through the peak usage period. Data collected during this period will allow the PX to better analyze ISO out-of-market procurements and the volatility of Zonal Market Clearing Prices. No additional cost will be incurred by extending the current experiment, and the experience will benefit the PX, market Participants, and California stakeholders. Furthermore, in a series of documented teleconference calls with market Participants to discuss the performance of the Day-Of market, the vast majority favored extending the Day-Of experiment through the peak usage period, in addition to the possibility of modifying the timeline for the peak usage period to allow them to improve generation and/or load responsiveness.

Therefore, the PX plans to continue the Day-Of market experiment for an additional seven months, with the final month being used to evaluate the previous six months of data, beginning retroactively on April 17, 1999. Within that time frame, the PX may modify the experimental timeline to better meet the needs of market Participants. At the conclusion of the experiment, November 17, 1999, the PX will make a decision on the Day-Of market format based upon its own analysis and input from market Participants. If the PX elects to continue with the Day-Of market, it will revise the PX Tariff and affected protocols to make the timing changes permanent.

Thank you for your attention to this request for an extension of the Day-Of market experiment. The PX is posting this request on its web site and is serving copies of this letter on each of its participants.

The following names should be placed on the service list:

The Honorable David P. Boergers
May 7, 1999
Page 3

Scott D. Rasmussen, Esq.
General Counsel
California Power Exchange
Corporation
200 South Los Robles Avenue
Suite 400
Pasadena, California 91101-2482
Telephone: (626) 537-3127

James H. McGrew, Esq.
Bruder, Gentile & Marcoux, L.L.P.
1100 New York Avenue, N.W.
Suite 510 East
Washington, D.C. 20005
Telephone: (202) 783-1350

Please do not hesitate to contact the undersigned with any questions.

Respectfully submitted,

James H. McGrew
Counsel for the California Power
Exchange Corporation

cc: PX Participants

**UNITED STATES OF AMERICA**
**FEDERAL ENERGY REGULATORY COMMISSION**

California Power Exchange Corporation ) Docket No. ER99-_____-000

**NOTICE OF FILING**
(May 7, 1999)

On February 11, 1999 in Docket No. ER99-1262-000, the Commission authorized the California Power Exchange Corporation to conduct an experimental deviation from the Hour-Ahead timeline contained in the PX's FERC-authorized tariff in order to test the efficiency benefits of a "Day-of market" timeline until April 17, 1999, to be followed by a one-month evaluation period. On May 7, 1999, the PX filed in the above docket to request an extension of the experimental program until November 17, 1999. The PX requires more data, particularly during the peak summer period, to properly evaluate the experiment.

The PX states that it has served copies of its filing on the PX Participants and on the California Public Utilities Commission. The filing also has been posted on the PX website at http://www.calpx.com.

Any person desiring to be heard or to protest said filing should file a motion to intervene or protest with the Federal Energy Regulatory Commission, 888 First Street, N.E., Washington, D.C. 20426, in accordance with Rules 211 or 214 of the Commission's Rules of Practice and Procedure (18 CFR §§ 385.211, 385.214). All such motions or protests should be filed on or before ____________________. Protests filed with the Commission will be considered by it in determining the appropriate action to be taken but will not serve to make the protestants parties to the proceeding. Any person wishing to become a party must file a motion to intervene. Copies of this filing are on file with the Commission and are available for public inspection. This filing may also be viewed on the Internet at http://www.ferc.fed.us/online/rims.htm (call 202/208-2222 for assistance).

David P. Boergers
Secretary

BRUDER, GENTILE & MARCOUX, L.L.P.
ATTORNEYS AT LAW

CARMEN L. GENTILE
J. MICHEL MARCOUX
DAVID E. GOROFF
GARY E. GUY
JAMES H. MCGREW
THOMAS L. BLACKBURN

1100 NEW YORK AVENUE, N. W.
SUITE 510 EAST
WASHINGTON, D. C. 20005-3934

(202) 783-1350
FACSIMILE: (202) 737-9117; 347-2644
E-MAIL: degoroff@brugen.com

ANTONIA A. FROST
DAVID M. CONNELLY*

GEORGE F. BRUDER
RETIRED 1997

* ADMITTED IN MARYLAND

May 17, 1999

The Honorable David P. Boergers
Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

**Re: California Power Exchange Corporation**
**Docket No. ER99-________________**

**<u>Post Close Quantity Match Experiment</u>**

Dear Mr. Boergers:

The California Power Exchange Corporation ("PX") hereby provides notice of an interim deviation from its Day-Ahead and Hour-Ahead timelines to test the feasibility of a "Post Close Quantity Match" ("PCQM") mechanism on a temporary, experimental basis commencing June 30, 1999 for six months followed by a one-month evaluation period, during which time the PCQM will continue to operate. In the absence of this market trial, the PX would have to file permanent tariff modifications without the empirical data necessary to determine the effectiveness and formulate the parameters of the PCQM. A description of this plan follows.

The PX's Day-Ahead market is a forward market for energy that affords participants the opportunity to trade for the next delivery day. The Day-Ahead market has been in operation since March 31, 1998. Participants submit supply and demand bids and the PX calculates efficient, competitive Market Clearing Prices ("MCP") for each hour of the next day. Initial Preferred Schedules are accepted from participants, validated by the PX and sent to the California Independent System Operator ("ISO"). After the ISO runs its Congestion Management model, absent congestion, final schedules are retrieved and published.

The Honorable David P. Boergers
May 17, 1999
Page 2

After the close of the PX Day-Ahead and Hour-Ahead markets, the PX plans to implement a PCQM session similar to what several commodity markets currently have in place.[3] These sessions allow traders to "even-up" market positions at the settlement price after the close of the market. The "Post Close" sessions benefit traders by enabling them to better manage their market positions for the next trading day. The PX believes that its PCQM offering will confer upon its participants the same kind of benefits which traders are able to realize in other markets.

The PCQM will be implemented in the Day-Ahead market as follows. After the close of the Day-Ahead market, when the PX publishes awarded schedules, the PX will also notify participants of their eligibility to participate in the PCQM. This determination will be based upon: (1) participant supply and demand bids originally submitted in the Day-Ahead market; and (2) a pre-determined bandwidth, or fixed percentage, above and below the MCP. Those eligible parties opting to participate in the PCQM must so indicate within the defined timelines. The PX will calculate the matched quantities, and then publish the results. This procedure will also apply to the Hour-Ahead market. It should be noted that the PCQM will operate at the MCP. It will not affect the level of the MCP or the manner in which it is determined.

There are two primary reasons why the PX believes the PCQM should first be implemented on an experimental basis, rather than as a permanent part of the Day-Ahead and Hour-Ahead markets. First, the PX would like to accurately gauge the participant demand for this new procedure through the peak usage period and into the early months of the off-peak usage period. In other words, the PX wants to measure the usefulness of the PCQM to its participants. Second, the PX would like to gather empirical data as to the size of the optimal bandwidth around the MCP which determines the volume eligible for the PCQM.

Therefore, the PX plans to implement the PCQM experiment for seven months, with the final month being used to evaluate the previous six months of data, beginning June 30, 1999, or five days after the PX posts notice on its website. Within that time frame, the PX may modify the bandwidth to better meet the needs of market participants. At the conclusion of the experiment, January 30, 2000, the PX will make a decision on the PCQM based upon its own analysis and input from market participants. If the PX elects to continue with the PCQM, it will revise the PX Tariff and affected protocols to make the experimental changes permanent.

3 The Chicago Mercantile Exchange (Rule 550 Post Settlement Session) and the Chicago Board of Trade (Rule 1007.02 Modified Closing Call) each conduct a "Post Close" session in their markets. These "Post Close" sessions are conducted on an "Open Outcry" basis rather than electronically.

The Honorable David P. Boergers
May 17, 1999
Page 3

Thank you for your attention to this notice of the PCQM experiment. The PX is posting this notice on its web site and is serving copies of this letter on each of its Participants. In addition, this notice was also posted on the PX website seven days prior to filing with the FERC to obtain participant input. The PX attaches a draft notice of this filing together with a diskette.

Please place the following names on the Official Service List associated with this docket:

Scott D. Rasmussen, Esq.
General Counsel
California Power Exchange Corporation
200 South Los Robles Avenue
Suite 400
Pasadena, California 91101-2482
Telephone: (626) 537-3127

David E. Goroff, Esq.
James H. McGrew, Esq.
Bruder, Gentile & Marcoux, L.L.P.
1100 New York Avenue, N.W.
Suite 510 East
Washington, D.C. 20005
Telephone: (202) 783-1350

Please do not hesitate to contact the undersigned with any questions.

Respectfully submitted,

David E. Goroff
James H. McGrew
Counsel for the California Power Exchange Corporation

cc: PX Participants

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

California Power Exchange Corporation ) Docket No. ER99-2967-000

**CALIFORNIA POWER EXCHANGE CORPORATION'S ANSWER TO JUNE 4, 1999 COMMENTS OF SOUTHERN CALIFORNIA EDISON COMPANY**

On June 4, 1999, Southern California Edison Company (Edison) filed comments regarding the May 17, 1999 proposal of the California Power Exchange Corporation (PX) to establish a Post Close Quantity Match (PCQM) mechanism on an experimental basis. In sum, Edison's comments raised four questions: (1) Who can participate in the PCQM program and how are the eligible quantities determined? (2) Will Participants use the PCQM program to exert market power or otherwise abuse the market in California? (3) Does the filing provide adequate detail to apprise Participants of its operations? (4) Will PX Participants be able to reconstruct the aggregate market supply and demand curves?

The PX respectfully requests leave to answer Edison's comments. The PX's answer will assist the Commission in understanding the proposal and in determining whether to allow the proposal to go into effect. The Commission has accepted the PX's answers in previous proceedings because the PX's answers assist the Commission in

evaluating PX filings. *See, e.g., California Power Exchange Corporation,* 86 FERC ¶ 61,211 (1999).

The PX has considered Edison's June 4, 1999 comments and has conducted a teleconference with various personnel from Edison. In response to Edison's concerns, the PX offers the following clarifications:

As to the first question, any Participant is eligible for the PCQM program who has submitted a bid in the Day-Ahead auction and who has excess volumes left over from that bid and who falls within a predetermined bandwidth. The bandwidth would be announced prior to the Day-Ahead auction. Although the bandwidth may not be changed on a daily basis, it would be changed from time-to-time as needed to enhance the effectiveness of the PCQM program. Participants who fall within the bandwidth will have the opportunity to "even up" their bids by purchasing or selling excess volumes left over from the Day-Ahead auction. Because the "evening-up" process would occur only at the Market Clearing Price (MCP), the PCQM will have no effect on the MCP.

As to the second question, neither PX operations personnel nor the PX's Market Monitoring Committee believe that the PCQM will result in an abuse of market power or any other type of abuse of the auction process. However, the PX will accept a condition on the PCQM experiment as follows: If the PX detects that the PCQM is being used to materially increase or decrease the MCP, the PX will suspend the PCQM immediately. This "suspension" condition should give Edison comfort that the PCQM will be used only to gather data on an experimental basis and will not be a means for abusing the California

power market. The PX would resume operating the PCQM program only when its was satisfied that the underlying problem had been solved.

Third, Edison questions the sufficiency of the PX's proposal, stating that it does not provide specific tariff sheets and does not provide enough detail on the parameters of the program. In response, the PX would point out that the PCQM proposal was posted on its website a week before it was filed at FERC and that the PX has had an opportunity to discuss the PCQM experiment with several Participants, including Edison. The PX agrees that it will need to file tariff sheets if it decides to convert the experimental program into a permanent service. However, the PX needs a certain amount of flexibility to initiate the PCQM program on an experimental basis. In this regard, the PX's proposal is similar to its Day-of Market experimental program which the Commission approved on an experimental basis in Docket No. ER99-1262-000.

Finally, Edison raises the question of whether the PCQM program will result in releasing so much information to Participants that they will be able to determine the aggregate supply and demand curves in the PX auction. The PX assures the Commission that it will only release a discrete amount of information on prices and volumes within the bandwidth to a discrete number of bidders. The limitations on the release of this information will not enable any Participant to reconstruct the aggregate supply and demand curves. However, as discussed above, if the PX determines that Participants are using the PCQM program to abuse or distort the auction process, it will immediately suspend the program.

In conclusion, the PX assures the Commission that it takes Edison's concerns seriously. The PX encourages Edison or any other Participant to communicate with the PX regarding any problems the Participant may perceive as the PCQM experiment evolves. For its part, the PX will commit to responding to Participant concerns as quickly as practicable and, as stated above, in extreme cases to suspending the program to resolve problems that may develop.

Respectfully submitted,

BRUDER, GENTILE & MARCOUX, L.L.P.

By______________________________

David E. Goroff
James H. McGrew

1100 New York Avenue, N.W.
Suite 510 East
Washington, D.C. 20005-3934
Telephone: (202) 783-1350
Facsimile: (202) 737-9117

Counsel for the California Power Exchange Corporation

June 18, 1999

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day served a copy of the foregoing "California Power Exchange Corporation's Answer to June 4, 1999 Comments of Southern California Edison Company" upon each person designated on the official service list compiled by the Secretary in this proceeding in accordance with the requirements of Rule 2010 of the Commission's Rules of Practice and Procedure (18 C.F.R. § 384.2010).

Dated at Washington, D.C. this 18th day of June, 1999.

James H. McGrew

On behalf of:
California Power Exchange Corporation

# CALIFORNIA POWER EXCHANGE CORPORATION

# FEDERAL ENERGY REGULATORY COMMISSION

# INFORMATIONAL FILING

# DECEMBER 1999

**Approved by the
Board of Governors of the
California Power Exchange Corporation
December 16, 1999**



EXH. 2.221

**California Power Exchange Corporation**
**Federal Energy Regulatory Commission**
**Informational Filing**
**December 1998**

Index


| | Page Reference |
|---|---|
| **Executive Summary** | |
| **Report:** | |
| Summary of the Revenue Requirement and Rates (Basis of Calculation of 2000 Volumetric Charge) | 1 |
| Summary of the Required Reserve Balance at 12/31/99 (Calculation of the Reserve Transfer) | 2 |
| Summary of Expected Disbursements 12/11/99 to 12/31/99 | 3 |
| Summary of 1998 Projected Section 4.2.4 (Capital) Spending | 4 |
| Summary of 1999 Projected Section 4.2.4 (Capital) Spending | 5 |
| Summary of 2000 Planned Section 4.2.4 (Capital) Spending | 6 |
| Summary of 2000 Other Revenues | 7 |
| Summary of Volume Projections for 2000 | 8 |
| Summary of 2000 Operations Budget Compared to 1999 Budget | 9 |
| Summary of Operations Expenses for 1999 | 10 |
| **Appendix** A | |
| Economic Insight Summary of Volume Projections | |

**California Power Exchange Corporation**
**Federal Energy Regulatory Commission**
**Informational Filing**
**December 1999**

## Executive Summary

The California Power Exchange Corporation (CalPX) has completed 19 months of operations as of November 30, 1999. This report is submitted as an informational filing with the Federal Energy Regulatory Commission (FERC). This report details the support for the changes in the Volumetric and Subscription Charge components of the Administration Charge for the Full Requirements Customers (FRC) and the Partial Requirements Customers (PRC) effective January 1, 2000. The rate for 2000 is not changed from the prior year. The rate will be $.3064 per MWh for both classes of customers. Page 1 of the report shows the detail components of the calculation and is referenced to supporting pages within the report.

In August of 1999 the budget process began with a public meeting to obtain input to the budgets for 2000. In September CalPX management prepared the detailed Operations and Section 4.24. (Capital) budgets for 2000. These budgets were prepared under the guideline of consistency with the proposed settlement offer where rates are to be $.3064 per MWh for FRC and PRC. These budgets were presented to the Finance Committee of the Board of Governors (Finance Committee) in public session held on November 4, 1999. On November 11, 1999 the Finance Committee recommended approval of the budgets to the full Board of Governors subject to final updates in December 1999 when the actual Reserve Requirement Surplus or Deficit was determined. The Board approved the budgets recommended by the Finance Committee on the same day. On December 16, 1999 the Finance Committee and the Board of Governors approved this filing and the final budgets for 2000.

The volume forecast for 2000 using the "Most Likely" assumptions is 197.15 TWh (FRC of 181.657 TWh and PRC of 15.493 TWh). The Operations Expenses for 2000 are projected to be $51.8 Million and capital spending is projected to be $11 million. Other Revenues of $2.4 Million are projected in 2000. The Reserve Requirement surplus is $662,000 at the end of 1999. Due to the increase in operations expenses in 2000, the projected reserve requirement for 2000 offset this surplus by $685,000 yielding a total Reserve Transfer Deficit of $23,000 for the 2000 calculation of the Volumetric and Subscription Charges in 2000.





EXH. 2.223

California Power Exchange Corporation
Federal Energy Regulatory Commission
Information Filing December 1999

| | SUMMARY OF REVENUE REQUIREMENT AND RATES | | | | |
|---|---|---|---|---|---|
| | | Page | Factor | | |
| Line | | Ref | | 2000 | 1999 |
| No. | Description | | | Budget | Budget |
| | | | | Dollars | Dollars |
| | | | | (In thousands) | (In thousands) |
| 1 | Operating Expenses | 2+9 | | 51,773 | 47,208 |
| 2 | Section 4.2.4 Spending | 6 | | 11,000 | 11,400 |
| 3 | Reserve Requirement (Surplus)Deficit | 2 | | 23 | 1,924 |
| 4 | **Total Costs** | | | **62,795** | **60,532** |
| 5 | | | | | |
| 6 | **Less Other Revenue:** | | | | |
| 7 | Other Revenue | 7 | | 494 | 5,150 |
| 8 | Terminal Charges | 7 | | 1,311 | 960 |
| 9 | Application Fees | 7 | | 25 | 35 |
| 10 | Interest Income | 7 | | 550 | 150 |
| 11 | | | | | |
| 12 | **Total Other Revenue** | | | **2,380** | **6,295** |
| 13 | | | | | |
| 14 | **Revenue Requirement** | | | **60,415** | **54,237** |
| 15 | | | | | |
| 16 | Annual TWh | 8 | | 197.150 | 177 |
| 17 | | | | | |
| 18 | **Rate (cents per MWh)** | | | **0.3064** | **0.3064** |
| 19 | | | | | |
| 20 | FRVC Rate | | | 0.3064 | 0.3064 |
| 21 | PRVC Rate | | 1.0 | 0.3064 | 0.3064 |
| 22 | | | | | |
| 23 | Subscription Rate $ per MW year = Annual | | | 1,369 | 1,369 |
| 24 | Subscription Rate $ per MW month = Monthly | | | 143 | 143 |



Issued by: Scott D. Rasmussen, General Counsel
Issued on: August 2, 2000

Effective: June 7, 2000

EXH. 2.224

California Power Exchange Corporation
FERC Electric Tariff
Third Revised Volume No. 1

Original Sheet No. 264

California Power Exchange Corporation
Federal Energy Regulatory Commission
Information Filing December 1999

| | SUMMARY OF REQUIRED RESERVE BALANCE AT 12/31/99 | | | |
|---|---|---|---|---|
| Line No. | Description | Page Ref | Amounts (In Dollars) | Amounts Dollars (In thousands) |
| 1 | Operating Cash as of 12/11/99 | | | 957 |
| 2 | Operating Investments as of 12/11/99 | | | 15,500 |
| 3 | Loans to CTS | | | 5,103 |
| 4 | **Total** | | | 21,560 |
| 5 | Plus: | | | |
| 6 | Cash Revenues 12/12/99-12/31/99 | | | 5,489 |
| 7 | Less: | | | |
| 8 | Cash Spending 12/12/99-12/31/99 | 3 | | (12,982) |
| 9 | Less amounts for remaining 1998 and 1999 Section 4.2.4 Spending | 4+5 | | (6,324) |
| 10 | **Total Reserve Cash** | | | 7,743 |
| 11 | | | | |
| 12 | Total Reserve Requirement 12/31/99 | | | (7,081) |
| 13 | | | | |
| 14 | **Reserve Requirement Surplus (Deficit) -- before adjustment for 2000 Operating Budget change from prior year** | | | 662 |
| 15 | | | | |
| 16 | Change in Reserve Requirement Due to change in Operating Budget for 2000 compared to 1999 | | | (685) |
| 17 | (Calculation) | | | |
| 18 | 2000 Expense | 1+9 | 51,773 | |
| 19 | 1999 Expense | 9 | 47,208 | |
| 20 | | 9 | 4,565 | |
| 21 | Percent | | 15% | |
| 22 | | | | |
| 23 | **Reserve Requirement Surplus (Deficit)** | 1 | | (23) |

Page 2 of 10

Issued by: Scott D. Rasmussen, General Counsel
Issued on: August 2, 2000

Effective: June 7, 2000

EXH. 2.225

Case 3:04-cv-05591-MCE-KJM Document 33-125-5 Filed 02/07/2008 Page 28 of 39 of 58



California Power Exchange Corporation
Federal Energy Regulatory Commission
Information Filing December 1999

| Line No. | SUMMARY OF EXPECTED DISBURSEMENTS FROM 12/1/99 TO 12/31/99<br>Description | Page Ref | Dollar Amount (In Thousands) |
|---|---|---|---|
| 1 | Payroll and Taxes 12/17/99 | | 627 |
| 3 | Payroll and Taxes 12/30/99 | | 627 |
| 4 | Year End Life Ins Gross Up | | 20 |
| 5 | Year End Relocations Costs | | 80 |
| 6 | Mirror and 401k contributions | | 177 |
| 7 | **Total Payroll** | | 1,531 |
| 8 | | | |
| 9 | **Accounts Payable Log Items** | | 2,900 |
| 10 | **Other Unpaid Items** | | 1,950 |
| 11 | **Write off of Disputes** | | 2,170 |
| 12 | **Long Term unpaid Comp/Benefits** | | 4,431 |
| 13 | | | |
| 14 | | | |
| 15 | TOTAL | 2 | 12,982 |

California Power Exchange Corporation
Federal Energy Regulatory Commission
Information Filing December 1999

| Line No. | GL Acc No. | SUMMARY OF 1998 PROJECTED SECTION 4.1.4 (CAPITAL) SPENDING<br>Description | Page Ref | Approved Total Amount (In Dollars) | Cash Spending thru Thru 11/30/99 Amount (In Dollars) | Remaining Amount Cash Flow (In Dollars) | Remaining Amount Cash Flow (In Dollars) |
|---|---|---|---|---|---|---|---|
| 1 | 900001 | Compliance Unit Information System Phase I | | 453,491 | 453,574 | Closed | - |
| 2 | 900002 | Compliance Unit Information System Phase II | | 677,250 | 676,411 | Closed | - |
| 3 | 900003 | Application Development Hardware | | 70,063 | 70,063 | Closed | - |
| 4 | 900004 | Furniture for CEO Office | | 15,062 | 15,062 | Closed | - |
| 5 | 900005 | Compliance Group Area Modifications | | 7,458 | 7,458 | Closed | - |
| 6 | 900006 | General Office Move | | 548,900 | 723,590 | Closed | - |
| 7 | 900007 | Unbundling Study-ISO | | 60,000 | 45,699 | Closed | - |
| 8 | 900008 | PX Testbed | | 20,000 | - | Closed | - |
| 9 | 900011 | Disaster Recovery Program Phase I | | 112,500 | 96,761 | Closed | - |
| 10 | 900012 | Y2K Compliance (Year 2000) Phase I | | 113,855 | 79,639 | Closed | - |
| 11 | 900013 | T. App & Settlements Improvements - Phase I | | 100,000 | 103,159 | Closed | - |
| 12 | 900014 | A/S Auction Phase I Study | | 70,000 | 76,976 | Closed | - |
| 13 | 900015 | Data Management Integration | | 286,660 | 227,868 | Closed | - |
| 14 | 900016 | PX Technical Architecture - Phase I | | 80,000 | 103,206 | Closed | 2,800 |
| 15 | 900017 | Unbundling and Revenue Software Model | | 180,000 | 180,104 | Closed | - |
| 16 | [redacted] | [redacted] | | [redacted] | [redacted] | [redacted] | [redacted] |
| 17 | 900020 | PX Website (Intranet) | | 139,750 | 119,035 | Closed | 7,315 |
| 18 | 900021 | NERC tagging Software | | 32,250 | 11,075 | Closed | - |
| 19 | [redacted] | [redacted] | | [redacted] | [redacted] | [redacted] | [redacted] |
| 20 | [redacted] | [redacted] | | [redacted] | [redacted] | [redacted] | [redacted] |
| 21 | [redacted] | [redacted] | | [redacted] | [redacted] | [redacted] | [redacted] |
| 22 | 900023 | ETC (Existing Transmission Contracts) | | 800,000 | 531,740 | Closed | - |
| 23 | 900024 | Market Services Data Mart | | 215,000 | 214,426 | Closed | - |
| 24 | 900025 | Hardware Infrastructure | | 575,000 | 575,036 | Closed | - |
| 25 | 900026 | Ancillary Services | | 82,430 | 94,268 | Closed | - |
| 26 | 900027 | Settlement FTR Processing | | 161,250 | 648 | Closed | - |
| 27 | 900028 | Over-Generation Charges | | 107,500 | 648 | Closed | - |
| 28 | 900029 | ISO retroactive Charges | | 50,000 | 53,969 | Closed | - |
| 29 | 900030 | REPA | | 37,625 | 10,833 | Closed | - |
| 30 | [redacted] | [redacted] | | [redacted] | [redacted] | [redacted] | [redacted] |
| 31 | 900032 | Settlement A/S Self Provision | | 139,750 | - | Closed | - |
| 32 | 900033 | Evaluate Settlement Process | | 100,000 | 11,497 | Closed | 24,995 |
| 33 | 900034 | Settlement Pre Processor Enhancements | | 304,720 | 372,179 | Closed | - |
| 34 | 900035 | Documentation Control System | | 63,372 | 63,848 | Closed | - |
| 35 | 900036 | Book Out | | 1,000,000 | 769,813 | Closed | 133 |
| 36 | 900038 | TO Debits | | 59,000 | 118,506 | Closed | - |
| 37 | 900100 | Special Project -- Buckeye | | 717,552 | 972,157 | Closed | 9,334 |
| 38 | | | | - | | | |
| 39 | | | | | | - | - |
| 40 | | 1998 Total | | 8,364,188 | 7,841,672 | - | 192,250 |
| 41 | | | | | | | |
| 42 | | Total Rounded (In Thousands) | 2 | | | | 192 |

Page 4 of 10



EXH. 2.227

California Power Exchange Corporation
Federal Energy Regulatory Commission
Information Filing December 1999

| Line No. | GL Acc No. | Closed | Estimated Completion Date | SUMMARY OF 1999 PROJECTED SECTION 4.2.4 (CAPITAL) SPENDING<br>Description | Page Ref | Approved Amount Amount (In Dollars) | Final Projections | Cash Spending thru 11/30/99 Amount (In Dollars) | Remaining Amount Cash Flow (In Dollars) |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 900037 | May-99 | | Settlement Data Warehouse | | 500,000 | 566,991 | 566,991 | - |
| 2 | 900040 | Jun-99 | | Data Warehouse Automation | | 385,000 | 395,225 | 395,225 | - |
| 3 | 900043 | Jul-99 | | A/S Redesign Phase I | | 337,800 | 474,643 | 365,174 | 109,469 |
| 5 | 900046 | Jul-99 | | PX Software Remediation | | 34,000 | 48,154 | 48,154 | - |
| 6 | 900047 | Jun-99 | | Post Close | | 279,750 | 288,656 | 282,496 | 6,160 |
| 7 | 900048 | Oct-99 | | Disaster Recovery Phase II | | 1,178,500 | 1,163,125 | 1,086,082 | 77,043 |
| 8 | 900049 | Jun-99 | | Real Time Data Collection | | 75,000 | 158,640 | 158,640 | - |
| 9 | 900050 | Jul-99 | | Compliance - Data Warehouse | | 173,350 | 215,805 | 132,325 | 83,480 |
| 11 | 900052 | Aug-99 | | Settlements Website | | 191,323 | 211,323 | 58,368 | 152,955 |
| 13 | 900054 | Aug-99 | | Analope - Auto Beep | | 67,073 | 67,404 | 10,500 | 56,904 |
| 14 | 900057 | Sep-99 | | Stage 5.0 | | 53,500 | 107,000 | 26,630 | 80,370 |
| 15 | 900039 | | Dec-99 | Business Enhancements Blanket | | 172,520 | 172,645 | 145,295 | 27,350 |
| 16 | 900041 | | Feb-99 | Process ISO Settlement File | | 125,000 | 250,000 | 206,436 | 43,564 |
| 17 | 900042 | | Feb-99 | ISO QF Settlement Process | | 140,000 | 320,000 | 92,702 | 227,298 |
| 18 | 900044 | | Dec-99 | Y2K Compliance (Year 2000) Phase II | | 524,495 | 548,495 | 451,920 | 96,575 |
| 19 | 900045 | | Dec-99 | Computer Peripheral Purchase | | 180,000 | 299,320 | 185,363 | 113,957 |
| 20 | 900051 | | Apr-00 | Settlement Integration Project - Titan | | 2,320,000 | 2,320,000 | 561,417 | 1,758,583 |
| 21 | 900055 | | Dec-99 | Pasadena Move - P2 | | 839,263 | 839,263 | 306,134 | 533,129 |
| 22 | 900056 | | Oct-99 | Scheduling Of Shared Resources | | 139,800 | 139,800 | 175 | 139,625 |
| 23 | 900058 | | Nov-99 | Capacity Planning | | 162,400 | 216,990 | 141,160 | 75,830 |
| 24 | 900059 | | Nov-99 | Stage 6.0 | | 371,460 | 371,460 | 78,324 | 293,136 |
| 25 | 900060 | | Feb-00 | Security | | 375,000 | 375,000 | - | 375,000 |
| 26 | 900062 | | Feb-00 | Real Time Reporting System | | 83,000 | 83,000 | - | 83,000 |
| 27 | 900063 | | Dec-99 | NERC Tagging | | 76,250 | 76,250 | - | 76,250 |
| 28 | 900064 | | Jan-00 | Electrical Upgrade -Alhambra | | 50,000 | 50,000 | - | 50,000 |
| 29 | 900065 | | Feb-00 | ZP24 and NEV4 Zone Add | | 149,000 | 149,000 | - | 149,000 |
| 30 | 900065 | | Jun-00 | Disaster Recovery Phase III | | 859,000 | 859,000 | - | 859,000 |
| 31 | 900066 | | Mar-00 | Leap Year | | 29,000 | 29,000 | - | 29,000 |
| 32 | 900067 | | Jan-00 | Chairs Buy out | | 63,000 | 63,000 | - | 63,000 |
| 33 | 900068 | | Feb-00 | FTRS | | 572,730 | 572,730 | - | 572,730 |
| 34 | | | | | | | | | |
| 35 | | | | 1999 Total | | 10,507,214 | 11,431,919 | 5,299,511 | 6,132,408 |
| 36 | | | | | | | | | |
| 37 | | | | Total Rounded (In Thousands) | 2 | | | | 6,132 |

Page 5 of 10



EXH. 2.228

California Power Exchange Corporation
FERC Electric Tariff
Third Revised Volume No. 1

Original Sheet No. 268

California Power Exchange Corporation
Federal Energy Regulatory Commission
Information Filing December 1999

| Line No. | SUMMARY OF YEAR 2000 PLANNED CAPITAL SPENDING<br>Description | Page Ref | Estimated Amount Dollars (In Thousands) |
|---|---|---|---|
| 1 | **Product Enhancements** | | |
| 2 | Proactive Disputes | | |
| 3 | Disputes Tracking | | |
| 4 | OM Blanket | | |
| 5 | Website Development | | |
| 6 | Participant Credit Reporting | | |
| 7 | Total | | 1,500 |
| 8 | | | |
| 9 | **Process Improvements - Cost Savings** | | |
| 10 | Accounting G/L | | |
| 11 | Network Redesign - Phase I * | | |
| 12 | Compliance Market Analysis Models | | |
| 13 | Data Warehouse Support Complaince | | |
| 14 | Streamline Product code | | |
| 15 | Trade Application | | |
| 16 | Customer Data Base System | | |
| 17 | Total | | 6,000 |
| 18 | * Note: Network Redesign - Phase II $2.0 in 2001 | | |
| 19 | | | |
| 20 | **New Revenue** | | |
| 21 | Trade Desk | | |
| 22 | Green | | |
| 23 | Demand Response | | |
| 24 | New Services - Settlements | | |
| 25 | Market Expansion | | |
| 26 | Predictive Settlements | | |
| 27 | AS Self Provisioning | | |
| 28 | Info Services | | |
| 29 | Total | | 1,500 |
| 30 | | | |
| 31 | **Regulatory/ISO** | | |
| 32 | Market Redesign | | |
| 33 | Analogs - Phase II | | |
| 34 | Total | | 1,600 |
| 35 | | | |
| 36 | **IT Infrastructure** | | |
| 37 | Disaster Recovery | | |
| 38 | Change Management/System Impact Analysis | | |
| 39 | Near Line Storage Capacity Planning | | |
| 40 | Systems Security | | |
| 41 | Test Consolidation | | |
| 42 | Total | | 3,000 |
| 43 | | | |
| 44 | Trade Room Relocation | | |
| 45 | Other | | 1,500 |
| 46 | | | |
| 47 | **Total Projects Under Review** | | 15,100 |
| 48 | | | |
| 49 | Total To Be Spent in 2000 | 1 | 11,000 |

Page 6 of 10

Issued by: Scott D. Rasmussen, General Counsel
Issued on: August 2, 2000

Effective: June 7, 2000

EXH. 2.229

California Power Exchange Corporation
Federal Energy Regulatory Commission
Information Filing December 1999

| Line No. | SUMMARY OF 2000 OTHER REVENUES<br>DESCRIPTION | Page Ref | 2000 Amount Dollars (In Thousands) |
|---|---|---|---|
| 1 | **Terminal Fees** | 1 | 1,311 |
| 2 | Number of Terminals | | |
| 3 | first terminal @ $1,000/month | | |
| 4 | second terminal @ $500/month | | |
| 5 | | | |
| 6 | | | |
| 7 | **Application Fees** | | |
| 8 | $1,000 each application | 1 | 25 |
| 9 | | | |
| 10 | | | |
| 11 | **Interest Income** | 1 | 550 |
| 12 | **Other Revenue** | | |
| 13 | Information Services | | 250 |
| 14 | Section 15.8 Revenue | | 244 |
| 15 | | 1 | 494 |
| 16 | | | |
| 17 | **Total Other Revenue** | 1 | 2,380 |





EXH. 2.230

California Power Exchange Corporation
Federal Energy Regulatory Commission
Information Filing December 1999

| Line No. | SUMMARY OF VOLUME PROJECTIONS FOR 2000<br>Description | Page Ref | 2000 | 1999 | Source | |
|---|---|---|---|---|---|---|
| | | | TWh | TWh | | |
| | **Day Ahead** | | | | | |
| 1 | FRC 2000 | | 161.900 | | Economic Insight Inc. report dated 11/2/99 | See Attachment 1 |
| 2 | Additional Day Ahead | | 2.200 | | Add back 2/3 of the SDG&E revenue at 100% | |
| 3 | FRC 1999 | | | 165 | Economic Insight Inc. report dated 10/20/98 | |
| 4 | PRC 2000 | | 15.300 | | Economic Insight Inc. report dated 11/2/99 | See Attachment 1 |
| 5 | PRC 1999 | | | 12 | Economic Insight Inc. report dated 10/20/98 | |
| 6 | | | | | The Economic Insight Inc. 2000 volume forecast is the most likely case assuming "normal" weather and continued economic growth and reflects estimates of direct access volumes changes and assumes SDG&E is only at 80% for the entire year. | See Attachment 1 |
| 7 | **Day of** | | | | | |
| 8 | FRC | | 0.153 | | | |
| 9 | PRC | | 0.029 | | | |
| 10 | **Real Time** | | | | | |
| 11 | FRC | | 17.404 | | | |
| 12 | PRC | | 0.164 | | | |
| 13 | | | | | | |
| 14 | **Total** | 1 | 197.150 | 177 | | |



EXH. 2.231

California Power Exchange Corporation
Federal Energy Regulatory Commission
Information Filing December 1999

| Line No. | SUMMARY OF 2000 OPERATIONS BUDGET COMPARED TO THE 1999 BUDGET<br>DESCRIPTION | Page Ref | Budget 2000 (In Dollars) (Without CTS) | Budget 1999 (In Dollars) (Without CTS) | Over (Under) 1999 (In Dollars) (Without CTS) |
|---|---|---|---|---|---|
| 1 | EXPENSES | | | | |
| 2 | | | | | |
| 3 | Payroll Tax and Benefits | | 22,144,302 | 18,632,544 | 3,511,758 |
| 4 | | | | | |
| 5 | MCI and Other Telephone | | 5,699,494 | 5,385,736 | 313,758 |
| 6 | | | | | |
| 7 | IBM Lease | | 2,888,568 | 3,384,000 | (495,432) |
| 8 | | | | | |
| 9 | Building Lease and Utilities | | 1,744,729 | 1,612,092 | 132,637 |
| 10 | | | | | |
| 11 | H/W-S/W Maint Prod Support - OM | | 2,472,000 | 2,552,780 | (80,780) |
| 12 | | | | | |
| 13 | H/W-S/W Maint Prod Support - Other | | 3,573,935 | 3,364,600 | 209,335 |
| 14 | | | | | |
| 15 | Contractors/Temp Labor/Consultants | | 4,187,816 | 4,299,160 | (111,344) |
| 16 | | | | | |
| 17 | Legal and Regulatory | | 1,601,200 | 2,076,500 | (475,300) |
| 18 | | | | | |
| 19 | Advertising and Public Awareness | | 2,241,065 | 1,462,000 | 779,065 |
| 20 | | | | | |
| 21 | Other Miscellaneous Expenses | | 5,219,778 | 4,438,351 | 781,427 |
| 22 | | | | | |
| 23 | Total Expense | 1+2 | 51,772,887 | 47,207,763 | 4,565,124 |



Issued by: Scott D. Rasmussen, General Counsel
Issued on: August 2, 2000

Effective: June 7, 2000

EXH. 2.232

California Power Exchange Corporation
Federal Energy Regulatory Commission
Information Filing December 1999

| Line No. | SUMMARY OF 1999 OPERATIONS EXPENSES<br>PX DESCRIPTION | Page Ref | 1999 Actuals Jan-November Dollars (In Thousands) (Without CTS) | FERC Account | FERC DESCRIPTION | 1999 Actuals Jan-November Dollars (In Thousands) (Without CTS) |
|---|---|---|---|---|---|---|
| 1 | **Payroll Tax and Benefits** | | 15,882 | | | |
| 2 | | | | | | |
| 3 | **MCI and Other Telephone** | | 5,194 | 408 | **Taxes Other than Income Taxes** | 760 |
| 4 | | | | | | |
| 5 | **IBM Lease** | | 2,833 | 903 | **Customer Records and Collection** | 1,654 |
| 6 | | | | | | |
| 7 | **Building Lease and Utilities** | | 1,700 | 906 | **Customer Service and Informational** | 1,997 |
| 8 | | | | | | |
| 9 | **H/W-S/W Maint Prod Support - OM** | | 2,772 | | **Administrative and General** | |
| 10 | | | | 920 | Administrative and General Salaries | 10,582 |
| 11 | **H/W-S/W Maint Prod Support - Other** | | 2,620 | 921 | Office Supplies and Expenses | 18,192 |
| 12 | | | | 922 | Duplicate charges transfer (CTS) | (2,246) |
| 13 | **Contractors/Temp Labor/Consultants** | | 6,906 | 923 | Outside Services Employed | 3,173 |
| 14 | | | | 924 | Property Insurance | 749 |
| 15 | **Legal and Regulatory** | | 841 | 925 | Injuries and Damages | 51 |
| 16 | | | | 926 | Employee Pensions and Benefits | 2,773 |
| 17 | **Advertising and Public Awareness** | | 475 | 928 | Regulatory Comm. Expenses | 2,560 |
| 18 | | | | 930 | Miscellaneous General Exp | 865 |
| 19 | **Other Misc. Expense** | | 2,957 | 931 | Rent | 1,044 |
| 20 | | | | | **Total A & G Expense** | 37,743 |
| 21 | | | | | | |
| 22 | | | | 427 | **Interest Exp** | 26 |
| 23 | | | | | | |
| 24 | **Total Expense** | | 42,180 | | **Total Expense** | 42,180 |



Issued by: Scott D. Rasmussen, General Counsel
Issued on: August 2, 2000

Effective: June 7, 2000

EXH. 2.233

# 2000 California Power Exchange Target Volume

*Economic Insight, Inc.*
*3004 S.W. First Avenue*
*Portland, Oregon 97201*

November 2, 1999

Appendix A

## 2000 California Power Exchange Target Volume

### Introduction and Summary of Results

Economic Insight, Inc. has been asked to prepare a range of estimates of reasonable but conservative target volumes for the California Power Exchange (CalPX) for the calendar year 2000.

The CalPX projected volumes for 2000 are presented in Table 1 in two categories: Full Requirements Customer (FRC) volumes, and Partial Requirements Customer (PRC) volumes. The FRC volumes reflect the activities of California's three largest IOUs -- Southern California Edison (SCE), Pacific Gas & Electric (PG&E), and San Diego Gas & Electric (SDG&E). These three utilities are subject to a regulatory requirement that they buy their load through the CalPX. Thus, the estimate of these volumes begins with the projected load in the service areas of these three utilities. These projected loads are then adjusted for estimates of amount of this load (demand) that has been and will be lost due to direct access,[4] and, in the case of SDG&E, any approved purchases expected to be made outside the CalPX. The FRC total also includes volumes associated with existing contracts between the IOUs and municipalities (and others) that are scheduled through the CalPX by the IOUs.

Although total load (demand for electricity) is expected to grow in the IOU service areas, the total load served by these utilities is expected to decline due to increased direct access. As of September 1999, 13.3% of IOU service area loads were being served by direct access providers according to the California Public Utilities Commission. For purposes of this analysis, we have assumed that the percentage of direct access will increase to an average of between 14% and 19% in 2000. The resultant decline is reflected in the projected FRC volumes presented here.

Partial Requirements Customer volumes are comprised of the share of direct access volumes that are captured by the CalPX, as well as other volumes associated with use of the CalPX by municipal utilities and irrigation districts and/or for export from California. As direct access increases, it is expected that the CalPX will capture some portion of this volume. Analysis of detailed CalPX volume data indicates that the CalPX has been capturing between 40% and 50% of direct access volumes. For our target estimates, we have assumed that 40%, 45%, and 50% of the direct access volumes associated with the Low, Mid-Range and High Volume cases are captured by the CalPX in 2000. The residual portion of the PRC volume, comprised of purchases in the CalPX by municipal utilities,

[4] Under the restructured California market, retail consumers may select alternative suppliers rather than buy from the utility in their service district. This is referred to as the direct access market.

and purchases by others for export from California, is projected to remain at the current level of between 8% and 10% of total PRC volumes.

The future is uncertain. As can be seen from the discussion above, there are many assumptions that must be made in developing projections of this nature. Further, as the restructuring process unfolds there may be changes in the regulatory requirements upon which the CalPX volumes and operations rely. In these projections we have assumed that in 2000 San Diego Gas & Electric is required to buy 80% of their load through the CalPX, their minimum obligation under the October 27, 1999, Settlement Agreement filed with the CPUC. This reduces the overall projection by approximately 3 TWhs as compared to SDG&E at the 100% level.

Table 1, below gives low, mid-range, and high target volumes for the CalPX in 2000. Also listed are the primary assumptions underlying each case.

**Table 1**

**California Power Exchange**

**2000 Target Volume Projections (TWh)**

| Customer Category | 1999 Most Likely (Forecast 10/1998) | 2000 Low Volume | 2000 Mid-Range Volume | 2000 High Volume |
|---|---|---|---|---|
| Full Requirements Volume (FRV) | 165.0 | 155.7 | 161.9 | 168.2 |
| Partial Requirements Volume (PRV) | 12.0 | 15.5 | 15.3 | 14.6 |
| Total CalPX Target Volume | **177.0** | 171.2 | 177.2 | 182.8 |
| **Assumptions:** | | | | |
| Direct Access Average % | | 19% | 16.5% | 14% |
| PX Share of Direct Access Volume | | 40% | 45% | 50% |
| Other PRV % of Total PRV | | 8% | 9% | 10% |
| San Diego Gas & Electric - Percentage to the Cal PX | | 80% | 80% | 80% |

Numerous assumptions are necessary in the development of these projections. Many factors including weather, economic activity, direct access and the pace of competition and restructuring can alter the actual CalPX volumes. Given these and other caveats, the CalPX target volume projection for 2000 is a range of 171.2 to 182.8 TWh. Each total is comprised of two major components - the Full Requirements Customer volumes and the Partial Requirements Customer volumes.