# Scheduling Coordinator Agreement

**THIS AGREEMENT** is made this 3rd day of April, 1998 and is entered into, by and between:

(1) **The Bonneville Power Administration** having a registered or principal executive office at 905 NE 11 Avenue, Portland, Oregon 97208-3621 (the "Scheduling Coordinator")

and

(2) **CALIFORNIA INDEPENDENT SYSTEM OPERATOR CORPORATION**, a California nonprofit public benefit Corporation having a principal executive office located at such place in the State of California as the ISO Governing Board may from time to time designate (the "ISO").

Whereas:

A. The Scheduling Coordinator has applied for certification by the ISO under the certification procedure referred to in Section 2.2.3 of the ISO Tariff.

B. The Scheduling Coordinator wishes to schedule Energy and Ancillary Services on the ISO Controlled Grid under the terms and conditions set forth in the ISO Tariff.

**NOW IT IS HEREBY AGREED as follows:**

## 1. Definitions

A. Terms and expressions used in this Agreement shall have the same meanings as those contained in the Master Definitions Supplement to the ISO Tariff.

B. The "ISO Tariff" shall mean the ISO Operating Agreement and Tariff as amended from time to time, together with any Appendices or attachments thereto.

## 2. Covenant of the Scheduling Coordinator

The Scheduling Coordinator agrees that:

A. the ISO Tariff governs all aspects of scheduling of Energy and Ancillary Services on the ISO Controlled Grid, including (without limitation), the financial and technical criteria for Scheduling Coordinators, bidding, settlement, information reporting requirements and confidentiality restrictions;

B. it will abide by, and will perform all of the obligations under the ISO Tariff placed on Scheduling Coordinators in respect of all matters set forth therein including, without limitation, all matters relating to the scheduling of Energy and Ancillary Services on the ISO Controlled Grid, ongoing obligations in respect of scheduling, Settlement, system

security policy and procedures to be developed by the ISO from time to time, billing and payments, confidentiality and dispute resolution;

C. it shall ensure that each UDC, over whose Distribution System Energy or Ancillary Services are to be transmitted in accordance with Schedules, Adjustment Bids or bids for Ancillary Services submitted to the ISO by the Scheduling Coordinator, enters into a UDC operating agreement in accordance with Section 4 of the ISO Tariff;

D. it shall ensure that each Generator for which it schedules Energy or on whose behalf it submits to the ISO Adjustment Bids or bids for Ancillary Services enters in to a Generator agreement in accordance with Section 5 of the ISO Tariff;

E. it shall have the primary responsibility to the ISO, as principal, for all Scheduling Coordinator payment obligations under the ISO Tariff;

F. its status as a Scheduling Coordinator is at all times subject to the ISO Tariff.

**3. Term and Termination**

3.1 This Agreement shall commence on the later of (a) the ISO Operations Date or (b) the date the Scheduling Coordinator is certified by the ISO as a Scheduling Coordinator.

3.2 This Agreement shall terminate upon acceptance by FERC of a notice of termination. The ISO shall timely file any notice of termination with FERC.

**4. Assignment**

Either party may assign its obligations under this Agreement with the other party's consent, such consent shall not to be unreasonably withheld.

**5. Partial Invalidity**

If any provision of this Agreement, or the application of such provision to any persons, circumstance or transaction, shall be held invalid, the remainder of this Agreement, or the application of such provision to other persons or circumstances or transactions, shall not be affected thereby.

6. **Settlement Account**

The Scheduling Coordinator shall maintain at all times an account with a bank capable of Fed-Wire Transfer to which credits or debits shall be made in accordance with the billing and Settlement provisions of Section 11 of the ISO Tariff. Such account shall be the account referred to in Clause 7 hereof or as notified by the Scheduling Coordinator to the ISO from time to time by giving at least 7 days written notice before the new account becomes operational.

7. **Notices**

Any notice, demand or request made to or by either party regarding this Agreement shall be made in accordance with the ISO Tariff and unless otherwise stated or agreed shall be made to the representative of the other party indicated below.

ISO:

Name of Primary Representative: Don Fuller

Name of Alternative Representative: Deborah A. Le Vine

Address: P.O. Box 639014

Folsom

State: CA Zip Code: 95763-9014

E-Mail Address: dfuller@caiso.com

Phone No: (916) 351-4445

Fax No: (916) 351-2263

Scheduling Coordinator:

Name of Primary Representative: Peggy Olds

Name of Alternative Representative: Lauren Nichols

Address: P.O. Box 3621

Portland

State: OR Zip Code: 97208-3621

E-Mail Address: paolds@bpa.gov

Phone No: (503) 230-5002

Fax No: (503) 230-5054

Settlement Account No: 89001401

Title: NA

Sort Code: ABA 021030004

Bank:: Federal Reserve Bank of New York

8. **Agreement to be bound by ISO Tariff**

The ISO Tariff is incorporated herein and made a part hereof. In the event of a conflict between the terms and conditions of this Agreement and any other terms and conditions set forth in the ISO Tariff, the terms and conditions of the ISO Tariff shall prevail, provided, however, that any suit or action to enforce this Agreement or the ISO Tariff as it applies to the Scheduling Coordinator shall be brought before FERC or, where jurisdictionally appropriate, a federal court of the United States of America with jurisdiction.

9. **Electronic Contracting**

All submitted applications, schedules, bids, confirmations, changes to information on file with the ISO and other communications conducted via electronic transfer (e.g. direct computer link, FTP file transfer, bulletin board, e-mail, facsimile or any other means established by the ISO) shall have the same legal rights, responsibilities, obligations and other implications as set forth in the terms and conditions of the ISO Tariff as if executed in written format.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective authorized officials.

California Independent System Operator Corporation:

By: [signature] JRB

Title: PRESIDENT AND CEO

Date: 4-30-98

The Bonneville Power Administration:

By: [signature]

FOR Title: Acting Administrator and CEO

Date: April 28, 1998

# CALIFORNIA POWER EXCHANGE CORPORATION

# PX PARTICIPATION AGREEMENT

**The PX Participation Agreement contains the changes ordered by FERC in its December 17th Order[1] plus an Addendum that has been filed with FERC on December 19, 1997 in**
Docket Nos. EC96-19-0 08 and ER96-1663-009.

[1] Pacific Gas & Electric Company et. al., 81 FERC ¶61,320 (1997).

# PX Participation Agreement

**THIS AGREEMENT** is made the 18th day of March, 1998, and is entered into, by and between:

(1) **BONNEVILLE POWER ADMINISTRATION**, having a principal executive office at 905 N.E. 11th Avenue, P.O. Box 3621, Portland, OR 97208-3621 (the "PX Participant")

and

(2) **THE CALIFORNIA POWER EXCHANGE CORPORATION**, a California nonprofit public benefit Corporation having a principal executive office located at such place in the State of California as the PX Governing Board may from time to time designate (the "PX").

**WHEREAS:**

A. The PX Participant has been certified by the PX under the certification procedure referred to in Section 2.6 of the PX Tariff.

B. The PX Participant wishes to trade Energy through the PX Market under the terms and conditions set forth in the PX Tariff.

**NOW IT IS HEREBY AGREED as follows:**

**I. Definitions**

A. Terms and expressions used in this Agreement shall have the same meanings as those contained in the Master Definitions Supplement to the PX Tariff.

B. The "PX Tariff" shall mean the PX Operating Agreement and Tariff as amended from time to time, together with any Appendices or attachments thereto.

**II. Covenant of the PX Participant**

The PX Participant agrees that:

A. the PX Tariff governs all aspects of trading in and administration of the PX Market, including (without limitation), the financial and technical criteria for PX Participants, bidding, Settlement, information reporting requirements and confidentiality restrictions;

B. it will abide by, and will perform all of the obligations under the PX Tariff in respect of all matters set forth therein including, without limitation, all matters relating to the trading of Energy by it through the PX Market, ongoing obligations in respect of bidding, Settlement, security requirements, billing and payments, confidentiality and dispute resolution; and

C. its status as a PX Participant is at all times subject to the PX Tariff.

3. **Term and Termination**
This Agreement shall commence on the later of (a) March 31, 1998 or (b) the date the PX Participant is certified by the PX as a PX Participant and shall terminate upon acceptance by FERC of the Notice of Termination. The PX shall timely file a Notice of Termination.

4. **Assignment**
Either party may assign its obligations under this Agreement with the other party's prior consent, not to be unreasonably withheld.

5. **Partial Invalidity**
If any provision of this Agreement, or the application of such provision to any persons, circumstance of transaction, shall be held invalid, the remainder of this Agreement, or the application of such provision to other persons or circumstances or transactions, shall not be affected thereby.

6. **Settlement Account**
The PX Participant shall at all times maintain an account with a bank in California to which credits or debits will be made in accordance with the billing and Settlement provisions of Section 6 of the PX Tariff. The details of such account shall be as set out in Section 7 hereof or as notified by the PX Participant to the PX from time to time by giving at least 5 Business Days written notice before the new account becomes operational.

7. **Notices**
Any notice demand or request made to or by either party regarding this Agreement shall be made in accordance with the PX Tariff and unless otherwise stated or agreed shall be made to the representative of the other party indicated below:

PX:

Name of primary representative: Martin Ochotorena

Name of alternative representative: Leslie Sharp

Address: 1000 South Fremont Avenue
Alhambra, CA 91803

E-mail Address: mbochotorena@calpx.com
Phone no.: (626)537-3267
Fax no.: (626) 281-6095

PX Participant: Bonneville Power Administration

Name of primary representative: Stephen Oliver

Name of alternative representative: Peggy Olds

Address: 905 NE 11th Avenue
P.O. Box 3621-PSB - 5
Portland, OR 97208-3621

E-mail Address: sroliver@bpa.gov
Phone no.: (503) 230-3295 (Oliver); (503) 230-5002 (Olds)
Fax no.: (503) 230-7463
Settlement Account:

| | |
|---|---|
| Number: | Acct #89001401 |
| Title: | Bonneville Power Administration |
| Sort Code: | ABA #021030004 |
| Bank: | Federal Reserve Bank of New York |

8. **Incorporation of Tariff.**
The PX Tariff is incorporated herein and made a part hereof. In the event of a conflict between the terms and conditions of this Agreement and any other terms and conditions set forth in the PX Tariff, the terms and conditions of the PX Tariff shall prevail.

9. **Electronic Contracting.**
All submitted applications, schedules, bids, confirmations, changes to information on file with the PX and other communications conducted via electronic transfer (e.g. direct computer link, FTP file transfer, bulletin board, e-mail, facsimile or any other means established by the PX) shall have the same legal rights, responsibilities, obligations and other implications as set

forth in the terms and conditions of the PX Tariff as if executed in written format.

10. **Payment Obligations.**
All obligations to pay amounts or perform obligations due with respect to the PX Tariff and any other charges, taxes or other expenses related to this Agreement (including, without limitation, expenses pursuant to the Meter Service Agreement) or the PX Participant's trading in the PX Market generally shall be the sole responsibility of the PX Participant.

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed by their respective authorized officials.

PX:

By: [signature] CEO 3/24/98
Name Title Date

PX Participant: Bonneville Power Administration

By: [signature]
Jack S. Robertson Acting Administrator and Chief Executive Officer

Date: ____________________

| | | |
|---|---|---|
| Southern California Edison Company, San Diego Gas & Electric Company, Pacific Gas and Electric Company, California Electricity Oversight Board,<br><br>Claimants,<br><br>v.<br><br>Bonneville Power Administration,<br><br>Defendant. | ) | **CLAIM FOR DAMAGES (AMENDED)**<br><br>**(41 U.S.C. § 601 ET SEQ.)** |

To Peggy Olds, Primary Contracting Officer, and Lauren Nichols, Alternate Contracting Officer, California ISO Scheduling Coordinator Agreement:

You are hereby notified that the following claimants, referred to herein as the "California Parties," submit an amended claim for damages from the Bonneville Power Administration ("BPA"):

- Southern California Edison Company ("SCE"), 2244 Walnut Grove Avenue, P. O. Box 800, Rosemead, CA 91770;
- San Diego Gas & Electric Company ("SDG&E"), 8330 Century Park Court, San Diego, CA 92123; and

- Pacific Gas and Electric Company ("PG&E"), 77 Beale Street, P. O. Box 7442, San Francisco, CA 94120;
- California Electricity Oversight Board ("EOB"), 707 L Street, Suite 1250, Sacramento, CA 95814.

The California Parties' claim arises out of BPA's sales of power from May 1, 2000 through June 20, 2001 in wholesale markets operated by the California Independent System Operator Corporation ("ISO") and California Power Exchange Corporation ("PX") under tariffs filed with the Federal Energy Regulatory Commission ("FERC"). FERC has determined that sellers in those markets charged rates that were unjust, unreasonable and unlawful and has modified the tariffs governing those markets to adjust downward the rates that sellers, including BPA, were entitled to charge for those sales. BPA is now contractually obligated to reimburse the California Parties for the difference between the rates that BPA charged and the revised lawful rates under FERC's modification of the tariffs. Amounts recovered by the California Parties will flow to California ratepayers in the manner determined by the California Public Utilities Commission.

**1. The ISO and PX Markets**

At all relevant times, the terms and conditions of BPA's sales were specified in tariffs governing the ISO and PX markets. Pursuant to the tariffs, rates for wholesale sales in the ISO and PX markets were set through auctions conducted by the ISO and PX on an hourly or more frequent basis. The ISO tariff also authorized the ISO to procure power outside the auction process when necessary to maintain reliability. The tariffs were filed with and subject to the exclusive jurisdiction of FERC, and required each participant in the ISO and PX markets to comply with and abide by all rules, conditions and provisions of those markets' respective tariffs. BPA executed a Scheduling Coordinator Agreement expressly agreeing to abide by all provisions of the ISO tariff, and a Participation Agreement expressly agreeing to abide by the provisions of the PX tariff. By entering into the ISO Scheduling Coordinator Agreement and the PX Participation Agreement, and by voluntarily electing to sell power in the ISO and PX markets, BPA agreed to be bound by the

provisions of the ISO and PX tariffs and FERC's regulation and modification thereof, including FERC's orders adjusting the rates sellers could lawfully charge for sales in those markets.

Pursuant to the Federal Power Act, FERC regulates wholesale sales of electric power in order to, among other things, ensure that the rates charged are just, reasonable and lawful. FERC has exclusive authority to regulate the terms and conditions of power sales made under the ISO and PX tariffs, including the responsibility to ensure that all rates charged by sellers in the ISO and PX markets are just, reasonable and lawful, and to recalculate and adjust such rates for prior periods if FERC determines that the rates charged were not just, reasonable and lawful. The ISO and PX tariffs provide that parties retain the right to petition FERC to review rates charged under the tariff and provide for recalculation of charges and resettlement of the accounts of buyers and sellers under the tariffs where FERC determines that rates should be adjusted.

**2. The Power Crisis**

Beginning in May 2000, the rates charged by sellers in the ISO and PX markets rose dramatically and sellers continued to demand unprecedented high prices for over a year. All sellers, including BPA, sold power at those extremely high rates by operation of the pricing provisions of the ISO and PX tariffs. The power crisis had severe negative effects on the stability and financial integrity of PG&E, SCE, and SDG&E ("the California IOUs"), and imposed crippling costs on ratepayers of the California IOUs, including businesses throughout the state.

The first ratepayer impacts were felt in the San Diego area, because SDG&E rates in the summer of 2000 provided for immediate direct pass-through of the increased wholesale power costs to ratepayers. Residents and businesses alike suffered. By January 2001, PG&E and SCE amassed crippling debt in order to finance the costs of buying electricity, costs they were unable to immediately pass through to ratepayers. PG&E and SCE became unable to pay the PX for power purchases, and could no longer find sellers willing to sell them power to serve their millions of retail customers. California ratepayers experienced rolling blackouts and near-continuous power emergencies. The PX market was forced to cease operations entirely on January 30, 2001. The

State of California was forced to step in to buy power to serve retail customers throughout the territories served by the California IOUs. In 2001, unrelenting high prices caused the state's two largest IOUs, PG&E and SCE, to become insolvent. The power crisis ultimately ended when FERC imposed must-offer requirements on power generators and wholesale price caps on wholesale sellers of energy across all western states effective June 20, 2001.

The bulk of the costs of the crisis have been and are being passed through to and paid by the residential and commercial ratepayers of the California IOUs. The cost of paying off those charges is included in current rates assessed to customers of the California IOUs.

**3. The California Parties' Attempts to Obtain Relief From FERC**

On August 2, 2000, when it became clear that the extremely high wholesale prices were not returning to the lower levels that had prevailed historically, SDG&E filed a complaint with FERC, requesting that FERC investigate the markets and correct rates on a forward basis, and correct the rates received by all sellers for past sales to the extent FERC determined that sellers had charged unjust and unreasonable or otherwise unlawful rates. FERC Docket No. EL00-95. PG&E, SCE and the EOB intervened in the proceeding on August 14, 2002. BPA also was a party to the FERC proceedings.

In response to the California Parties' complaint, FERC commenced an investigation into the sellers' rates. In an order issued July 25, 2001 (the "Refund Order"), FERC ruled that sellers of power in the ISO and PX markets (including BPA) had sold power at unjust, unreasonable and unlawful rates, and that the rates charged in the ISO and PX markets should be adjusted. In lieu of the pricing formula previously provided in the ISO and PX tariffs, FERC established a new pricing formula to determine the adjusted rates (the "Mitigated Market Clearing Price" or "MMCP"), and ordered the ISO and PX to recalculate the rates sellers should have received, and to charge sellers — and refund or credit to buyers — all amounts sellers had received in excess of the recalculated rates during the FERC-ordered refund period. FERC interpreted the Federal Power Act as limiting the time period for which FERC could order such refunds to the period from October 2, 2000

through June 20, 2001 (the "Refund Period"), even though comparably high prices had prevailed in the ISO and PX markets since May 2000. The ISO and PX have commenced the recalculation of the accounts of all sellers and buyers in the ISO and PX markets to reflect the revised rates for the Refund Period in accordance with the Refund Order.

In May 2002, evidence became available that Enron had manipulated the ISO and PX markets throughout the power crisis. In response, FERC propounded discovery requests to all sellers in the ISO and PX markets regarding market manipulation. On August 23, 2002, the Ninth Circuit Court of Appeals directed FERC to provide a similar opportunity to the California Parties to adduce evidence of market manipulation. As a result of the Ninth Circuit's order, the California Parties conducted extensive discovery from late 2002 to early 2003 of sellers in the ISO and PX markets, including BPA. That discovery provided evidence of a pattern of manipulation involving numerous sellers into the ISO and PX markets. Further information on the FERC proceedings is available in the FERC record for Dockets Nos. EL00-95 and EL00-98.

Certain governmental entities, including BPA, appealed the Refund Order (and FERC's December 19, 2001 Order on Rehearing) to the Ninth Circuit Court of Appeals. On September 6, 2005, the Ninth Circuit ruled that FERC's power to enforce payment of refunds under the Federal Power Act did not extend to governmental entities, including BPA. The Court further clarified, however, that its decision was without prejudice to any rights that the market purchasers (such as the California Parties) may have to bring claims under the operative tariffs and other contracts directly against the governmental entities to recover from those entities the amounts they received, or claim the right to receive, as sellers in excess of FERC-adjusted rates. *Bonneville Power Administration v. Federal Energy Regulatory Commission*, 422 F.3d 908 (9th Cir. 2005).

This claim is based on the identical facts that were at issue in the proceedings at FERC and in the Ninth Circuit on the California Parties' complaint: the sellers' (including BPA's) receipt and retention of rates for sales of wholesale power in the ISO and PX markets that are now unlawful and unauthorized under the ISO and PX tariffs. The California Parties have at all times acted reasonably and in good faith in seeking relief at FERC and in asserting this claim.

**4. Description of Claims**

Upon FERC's adjustment of the rates charged and received by sellers in the ISO and PX markets, including BPA, the adjusted rates became the only lawful and authorized rates for those sales under the applicable tariffs. BPA became contractually obligated to reimburse purchasers for the difference between the rates BPA initially charged in its sales in the ISO and PX markets and the lower FERC-adjusted lawful rates. BPA has consistently taken the position that it has no obligation to refund or credit to buyers the difference between the initial rates BPA charged and the lawful rates as ultimately determined by FERC. In stark contrast, for transactions in which it was a buyer, BPA seeks to pay only the lower adjusted rates determined by FERC.

Causes of action for damages or other monetary relief that the California Parties may assert include, but are not limited to, breach and repudiation of contract obligations and contractual indemnification. The California Parties will also seek pre-judgment and post-judgment interest, and such other relief as may be appropriate.

The California Parties seek reimbursement from BPA for BPA's sales during the following periods:

**a. The FERC-Ordered Refund Period: Mitigated Sales**

The California Parties are entitled to recover from BPA for its overcharges in the ISO and PX markets from October 2, 2000 through June 20, 2001, the period for which FERC has already revised the permissible rates for sales in those markets under the applicable tariffs. The amount owed by BPA is being calculated by the ISO and PX, and is estimated to be approximately $49.8 million, without consideration of any amounts BPA may claim it is entitled to offset against that liability.

**b. The FERC-Ordered Refund Period: Other ISO/PX Sales**

The California Parties are seeking an order from FERC that the rates charged by sellers in the ISO and PX markets from October 2, 2000 – June 20, 2001 for certain other sales in those markets were also unjust and unreasonable or otherwise unlawful. FERC has concluded that certain

types of sales, including energy exchange sales (in which blocks of energy were sold to the ISO for payment in-kind), and sales to the ISO or PX of greater than 24 hours (i.e., "non-spot" sales, under FERC's definition), are not subject to mitigation. The California Parties have appealed FERC's rulings to the Ninth Circuit Court of Appeals. A controversy has arisen in that BPA has denied that it has any liability to the California Parties for any monetary relief FERC may assess for these types of sales. The California Parties seek a ruling that at such time as FERC finds that the rates charged by sellers for energy exchange sales and "non-spot" sales were unjust and unreasonable, or otherwise unlawful, the California Parties will be entitled to recover from BPA the difference between the rates charged by BPA and the lawful rates as ultimately determined by FERC.

**c. The Summer Period: May 1, 2000 – October 1, 2000**

The California Parties are seeking an order from FERC finding that the rates charged by sellers in the ISO and PX markets from May 1, 2000 through October 1, 2000 (the "Summer Period") were unlawful. The prices that prevailed in the ISO and PX markets during the summer period were comparable to the prices during the refund period. FERC concluded that it would not grant relief for the Summer Period, however, and the California Parties have appealed that ruling to the Ninth Circuit Court of Appeals. A controversy has arisen in that BPA has denied that it has any liability to the California Parties for any monetary relief FERC may assess for the Summer Period. The California Parties seek a ruling that at such time as FERC finds that the rates charged by sellers during the Summer Period were unlawful, the California Parties will be entitled to recover from BPA the difference between the rates charged by BPA and the lawful rates as ultimately determined by FERC.

**5. Final Decision Requested**

Claimants request that the Contracting Officer make a final decision on this claim.

**6. Notices**

All notices or other communications with regard to this claim should be directed to the counsel listed on the following pages.

7. **Certification**

The undersigned claimant hereby certifies that the claim is made in good faith, that the supporting data are accurate and complete to the best of the claimant's knowledge and belief, that the amount requested accurately reflects the contract adjustment to which the contractor believes the United States is liable, and that the person signing the certification is duly authorized to certify the claim on behalf of the claimant.

DATED: Dec. 19, 2005

Respectfully submitted,

SOUTHERN CALIFORNIA EDISON COMPANY

Russell C. Swartz
Its Assistant General Counsel

Richard L. Roberts
Steptoe & Johnson LLP
1330 Connecticut Ave., N.W.
Washington, D.C. 20036

Russell C. Swartz
Michael D. Mackness
Southern California Edison Company
2244 Walnut Grove Avenue
Rosemead, California 91770

*Attorneys for*
*Southern California Edison Company*

**7. Certification**

The undersigned claimant hereby certifies that the claim is made in good faith, that the supporting data are accurate and complete to the best of the claimant's knowledge and belief, that the amount requested accurately reflects the contract adjustment to which the contractor believes the United States is liable, and that the person signing the certification is duly authorized to certify the claim on behalf of the claimant.

DATED: Dec. 14, 2005

Respectfully submitted,

SAN DIEGO GAS & ELECTRIC COMPANY

Nicholas W. Fels

Nicholas W. Fels
Covington & Burling
1201 Pennsylvania Avenue N.W.
Washington, D.C. 20004-2401

W. Davis Smith
General Counsel
San Diego Gas & Electric Company
101 Ash Street
HQ 18
San Diego, CA 92101

*Attorneys for San Diego Gas & Electric Company*

**7. Certification**

The undersigned claimant hereby certifies that the claim is made in good faith, that the supporting data are accurate and complete to the best of the claimant's knowledge and belief, that the amount requested accurately reflects the contract adjustment to which the contractor believes the United States is liable, and that the person signing the certification is duly authorized to certify the claim on behalf of the claimant.

DATED: December 20 2005

Respectfully submitted,

CALIFORNIA ELECTRICITY OVERSIGHT BOARD

Victoria S Kolakowski

Erik N. Saltmarsh, Chief Counsel
Victoria S. Kolakowski,
Acting Assistant Chief Counsel
California Electricity Oversight Board
770 L Street, Suite 1250
Sacramento, CA 95814

*Attorneys for California Electricity Oversight Board*

**7. Certification**

The undersigned claimant hereby certifies that the claim is made in good faith, that the supporting data are accurate and complete to the best of the claimant's knowledge and belief, that the amount requested accurately reflects the contract adjustment to which the contractor believes the United States is liable, and that the person signing the certification is duly authorized to certify the claim on behalf of the claimant.

DATED: 12/20, 2005

Respectfully submitted,

PACIFIC GAS AND ELECTRIC COMPANY

Fong Wan
Vice President, Power Contracts &
Electric Resource Development
Pacific Gas and Electric Company
77 Beale Street, B30A
Post Office Box 7442
San Francisco, CA 94120

Joshua Bar-Lev
Kermit R. Kubitz
Pacific Gas and Electric Company
77 Beale Street, B30A
Post Office Box 7442
San Francisco, CA 94120

*For Pacific Gas and Electric Company*

*BILL LOCKYER*
*Attorney General*

*State of California*
*DEPARTMENT OF JUSTICE*

06 JAN 17 AM 11:00

1515 CLAY STREET, 20[TH] FLOOR
P.O. BOX 70550
OAKLAND, CA 94612-0550

Public: (510) 622-2100
Telephone: (510) 622-2191
Facsimile: (510) 622-2121
E-Mail: kirk.mcinnis@doj.ca.gov

January 11, 2006

***Via First-class mail***

Stephen R. Larson, Special Assistant General Counsel
DEPARTMENT OF ENERGY
BONNEVILLE POWER ADMINISTRATION
P. O. Box 3621, Routing L-7
Portland, OR 97208-3621

**RE:** ***Claim for Damages of the People of California***

Dear Mr. Larson:

Hopefully the third time is a charm.

Sincerely,

KIRK McINNIS
Deputy Attorney General

For BILL LOCKYER
Attorney General

KM/jk
Enclosure

90032460.wpd

| | | |
|---|---|---|
| The People of the State of California *in ex rel.* Bill Lockyer, Attorney General of the State of California, and the California Department of Water Resources<br><br>Claimants,<br><br>v.<br><br>Bonneville Power Administration,<br><br>Defendant. | ) | **SECOND AMENDED CLAIM FOR DAMAGES (41 U.S.C. § 601 ET SEQ.)** |

To Peggy Olds, Primary Contracting Officer, and Lauren Nichols, Alternate Contracting Officer, California ISO Scheduling Coordinator Agreement:

You are hereby notified that the claimants, the People of the State of California by and through Bill Lockyer, Attorney General of the State of California, and the California Department of Water Resources (collectively, "the People") submit a second amended claim for damages from the Bonneville Power Administration ("BPA").

The People's claim arises out of BPA's sales of power from May 1, 2000 through June 20, 2001 in wholesale markets operated by the California Independent System Operator Corporation ("ISO") and California Power Exchange Corporation ("PX") under tariffs filed with the Federal

Energy Regulatory Commission ("FERC"). The People's claim further arises out of BPA's bilateral sales to the California Department of Water Resources ("DWR") as the functional equivalent of the ISO and PX.

FERC has determined that sellers in those markets charged and received prices that were unjust, unreasonable, and unlawful. BPA is now contractually obligated to reimburse the People for the difference between the rates BPA received and the revised lawful rates as determined by FERC.

**1. The Markets**

At all relevant times, the terms and conditions of BPA's sales, including its bilateral says to DWR, were specified in tariffs governing the ISO and PX markets. The ISO tariff authorized the ISO to procure power outside the auction process when necessary to maintain reliability. The tariffs were filed with and subject to the exclusive jurisdiction of FERC and required each participant in the ISO and PX markets to comply with and abide by all rules, conditions, and provisions of those markets' respective tariffs. BPA executed a Scheduling Coordinator Agreement expressly agreeing to abide by all provisions of the ISO tariff, and a Participation Agreement expressly agreeing to abide by the provisions of the PX tariff. By entering into the ISO Scheduling Coordinator Agreement and the PX Participation Agreement and by voluntarily electing to sell power in the ISO and PX markets, BPA agreed to be bound by the provisions of the ISO and PX tariffs and FERC's regulation and modification thereof, including FERC's orders adjusting the rates sellers could lawfully charge for sales in those markets. Additionally by making bilateral trades with DWR as the fiscally responsible stand-in for the ISO and PX, BPA agreed to be bound by the provisions of the ISO and PX tariffs and FERC's regulation and modification thereof, including FERC's orders adjusting the rates sellers could lawfully charge for sales in those markets. The ISO and PX tariffs provide that parties retain the right to petition FERC to review rates charged under the tariff and provide for recalculation of charges and resettlement of the accounts of buyers and sellers under the tariffs where FERC determines that prices should be adjusted.

Moreover, to the extent that the terms and conditions of BPA's sales were also subject to the agreement governing the WSPP, prices for wholesale sales were subject to regulation by FERC. The WSPP Agreement was filed with and subject to the exclusive jurisdiction of FERC and required each participant to comply with and abide by all rules, conditions, and provisions of the Agreement as filed with FERC. BPA executed the Agreement, expressly agreeing to abide by all provisions of the Agreement, including determination of terms by FERC. By entering into the Agreement and by voluntarily electing to sell power under the Agreement, BPA agreed to be bound by the provisions of the Agreement and FERC's regulation and modification thereof, including FERC's determination of the rates sellers could lawfully charge for sales Under the Agreement.

Pursuant to the Federal Power Act, FERC regulates wholesale sales of electric power in order to, among other things, ensure that the prices are just, reasonable, and lawful. FERC has exclusive authority to regulate the terms and conditions of power sales made under the ISO and PX tariffs and the WSPP Agreement, including the responsibility to ensure that all rates charged by sellers are just, reasonable, and lawful, and to recalculate and adjust such rates for prior periods if FERC determines that the prices charged were not just, reasonable, and lawful.

### 2. The Power Crisis

Beginning in May 2000, the prices charged by sellers in the ISO and PX markets rose dramatically and sellers continued to demand unprecedented high prices for over a year. All sellers, including BPA, sold power at those extremely high rates by operation of the pricing provisions of the ISO and PX tariffs. The power crisis had severe negative effects on the stability and financial integrity of PG&E, SCE, and SDG&E, the California investor-owned utilities ("the California IOUs"), and imposed crippling costs on the people of California and businesses throughout the State.

The first ratepayer impacts were felt in the San Diego area, because SDG&E rates in the summer of 2000 provided for immediate direct pass-through of the increased wholesale power costs to ratepayers. Residents and businesses alike suffered. By January 2001, PG&E and SCE amassed

crippling debt in order to finance the costs of buying electricity, costs they were unable to immediately pass through to ratepayers. PG&E and SCE became unable to pay the PX for power purchases, and could no longer find sellers willing to sell them power to serve their millions of retail customers. California ratepayers experienced rolling blackouts and near-continuous power emergencies. The PX market was forced to cease operations entirely on January 30, 2001. The State of California was forced to step in to buy power in the place of the ISO and PX to serve retail customers throughout the territories served by the California IOUs. In 2001, unrelenting high prices caused the state's two largest IOUs, PG&E and SCE, to become insolvent. The power crisis ultimately ended when FERC imposed must-offer requirements on power generators and wholesale price caps wholesale sellers of energy across all western states effective June 20, 2001.

The bulk of the costs of the crisis have been and are being passed through to and paid by the people of the State of California.

### 3. The People's Attempts to Obtain Relief From FERC

On August 2, 2000, when it became clear that the extremely high wholesale prices were not returning to the lower levels that had prevailed historically, SDG&E filed a complaint with FERC, requesting that FERC investigate the markets and correct prices on a forward basis, and correct the prices received by all sellers for past sales to the extent FERC determined that sellers had charged unjust and unreasonable or otherwise unlawful prices. FERC Docket No. EL00-95. The Attorney General intervened in the proceedings to represent the interests of the People of the State of California. BPA was also a party to the FERC proceedings.

In response to the complaint, FERC commenced an investigation into the sellers' rates. In an order issued July 25, 2001 (the "Refund Order"), FERC ruled that sellers of power in the ISO and PX markets (including BPA) had sold power at unjust, unreasonable, and unlawful rates and that the rates charged in the ISO and PX markets should be adjusted. In lieu of the pricing formula previously provided in the ISO and PX tariffs, FERC established a new pricing formula to determine the adjusted prices (the "Mitigated Market Clearing Price" or "MMCP"), and ordered the

ISO and PX to recalculate the prices sellers should have received, and to charge sellers — and refund or credit to buyers — all amounts sellers had received in excess of the recalculated prices during the FERC-ordered refund period. FERC interpreted the Federal Power Act as limiting the time period for which FERC could order such refunds to the period from October 2, 2000 through June 20, 2001 (the "refund period"), even though comparably high prices had prevailed in the ISO and PX markets since May 2000. The ISO and PX have commenced the recalculation of the accounts of all sellers and buyers in the ISO and PX markets to reflect the revised prices for the refund period in accordance with the Refund Order.

In May 2002, evidence became available that Enron had manipulated the ISO and PX markets throughout the crisis. In response, FERC propounded discovery requests to all sellers in the ISO and PX markets regarding market manipulation. On August 23, 2002, the Ninth Circuit Court of Appeals directed FERC to provide a similar opportunity to complainants to adduce evidence of market manipulation. As a result of the Ninth Circuit's order, complainants conducted extensive discovery from late 2002 to early 2003 of sellers in the ISO and PX markets, including BPA. That discovery provided evidence of a pattern of manipulation involving numerous sellers into the ISO and PX markets. Further information on the FERC proceedings is available in the FERC record for Dockets Nos. EL00-95 and EL00-98.

Certain governmental entities, including BPA, appealed the Refund Order (and FERC's December 19, 2001 Order on Rehearing) to the Ninth Circuit Court of Appeals. On September 6, 2005, the Ninth Circuit ruled that FERC's power to enforce payment of refunds under the Federal Power Act did not extend to governmental entities, including BPA. The Court further clarified, however, that its decision was without prejudice to any rights that market purchasers (such as the People) may have to bring claims under the operative tariffs and other contracts directly against the governmental entities to recover from those entities the amounts they received, or claim the right to receive, as sellers in excess of FERC-adjusted rates. *Bonneville Power Administration v. Federal Energy Regulatory Commission*, 422 F.3d 908 (9th Cir. 2005).

This claim is based on the identical facts that were at issue in the proceedings at FERC and in the Ninth Circuit: the sellers' (including BPA's) receipt and retention of prices for sales of wholesale power in the ISO and PX markets that are now unlawful and unauthorized under the ISO and PX tariffs. The People have at all times acted reasonably and in good faith in seeking relief at FERC and in asserting this claim.

**4. Description of Claims**

Upon FERC's adjustment of the prices charged and received by sellers in the ISO and PX markets, including BPA, the adjusted rates became the only lawful and authorized prices for those sales. BPA became contractually obligated to reimburse purchasers for the difference between the rates BPA received for its sales in the ISO and PX markets and the lower FERC-adjusted lawful rates. BPA has consistently taken the position that it has no obligation to refund or credit to buyers the difference between the rates it received and the lawful rate as set by FERC. In fact, for transactions in which it was a buyer, BPA seeks to pay only the lower adjusted prices determined by FERC, but for transactions in which it was a seller, BPA seeks to retain the unadjusted prices which are now unauthorized and unlawful. The People are further entitled to receive refunds reflecting the difference between rates received for any sales made under the WSPP Agreement and a lawful rate as determined by FERC.

Causes of action for damages or other monetary relief that the People may assert include, but are not limited to, breach and repudiation of contract obligations and contractual indemnification. The People will also seek such other relief, including pre-judgment and post-judgment interest, as may be appropriate.

The People seek reimbursement from BPA for BPA's sales during the following periods:

**a. The FERC-Ordered Refund Period: Mitigated Sales**

The People are entitled to recover from BPA for its overcharges in the ISO and PX markets from October 1, 2000 through June 20, 2001, the period for which FERC has revised the lawful price for sales in those markets. The amount to which the People are entitled is being calculated by

the ISO and PX, and is estimated to be in excess of $119 million, without consideration of any amounts BPA may claim it is entitled to offset against that liability.

**b. The FERC-Ordered Refund Period: Other ISO/PX Sales**

The People are seeking an order from FERC that the prices received by sellers in the ISO and PX markets from October 2, 2000 – June 20, 2001 for certain other sales in those markets were also unjust and unreasonable or otherwise unlawful, and awarding monetary relief. FERC has concluded that certain types of sales, including bilateral sales and sales of greater than 24 hours (i.e., "non-spot" sales, under FERC's definition), are not subject to mitigation. The People have appealed FERC's rulings to the Ninth Circuit Court of Appeals. A controversy has arisen in that BPA has denied that it has any liability to the People for any monetary relief FERC may assess for these types of sales. The People seek a ruling that at such time as FERC finds that the rates charged by sellers for energy exchange sales and "non-spot" sales were unjust and unreasonable, or otherwise unlawful, the People will be entitled to recover from BPA the monetary relief FERC determines is appropriate.

**c. The Summer Period: May 1, 2000 – October 1, 2000**

The People are seeking an order from FERC finding that the prices received by sellers in the ISO and PX markets from May 1, 2000 through October 1, 2000 (the "summer period") were unlawful, and awarding monetary relief. The prices that prevailed in the ISO and PX markets during the summer period were comparable to the prices during the refund period. FERC concluded that it would not grant relief for the summer period, however, and the People have appealed that ruling to the Ninth Circuit Court of Appeals. A controversy has arisen in that BPA has denied that it has any liability to the People for any monetary relief FERC may assess for the summer period. The People seek a ruling that at such time as FERC finds that the rates charged by sellers during the summer period were unlawful, the People will be entitled to recover from BPA the monetary relief FERC determines is appropriate.

**5. Final Decision Requested**

Claimants request that the Contracting Officer make a final decision on this claim.

**6. Notices**

All notices or other communications with regard to this claim should be directed to the counsel as listed below.

**7. Certification**

The undersigned claimant hereby certifies that the claim is made in good faith, that the supporting data are accurate and complete to the best of the claimant's knowledge and belief, that the amount requested accurately reflects the contract adjustment to which the contractor believes the United States is liable, and that the person signing the certification is duly authorized to certify the claim on behalf of the claimant.

DATED: January 11, 2006

Respectfully submitted,

BILL LOCKYER
Attorney General of the State of California
TOM GREENE
Chief Assistant Attorney General
MARK BRECKLER
Senior Assistant Attorney General
MARTIN GOYETTE
Supervising Deputy Attorney General
SHARI POSNER
Deputy Attorney General

By: ______________________________

KIRK McINNIS
Deputy Attorney General
1515 Clay Street, 20th Floor
Post Office Box 70550
Oakland, CA 94612-0550
Telephone: (510) 622-2191
Facsimile: (510) 622-2121
Email: Kirk.McInnis@doj.ca.gov

**Department of Energy**

Bonneville Power Administration
P.O. Box 3621
Portland, Oregon 97208-3621

POWER BUSINESS LINE

March 16, 2006

In reply refer to: PT-5

Marie L. Fiala
Heller Ehrman, LLP
333 Bush Street
San Francisco, CA 94104-2878

OVERNIGHT MAIL
CERTIFIED MAIL

Dear Ms. Fiala,

On December 5, 2005, BPA received the California Parties' (SDG&E, SCE, PG&E and EOB) claims for damages with respect to certain BPA transactions in the California markets during 2000 and 2001. Thereafter, BPA received an Amended Claim from the California Parties on December 20, 2005. On December 30, 2005, a BPA attorney sent a letter to the California Parties requesting additional information to support the claims. On February 3, 2006, BPA received your letter stating that the California Parties were working on providing additional information and, to aid in that effort, requesting BPA to authorize the California Parties to access BPA settlement data in the possession of the California Power Exchange (PX) and the California Independent System Operator (ISO). In a February 8, 2006 letter to the California Parties, BPA stated that it had authorized the PX and ISO to release the data requested by the California Parties. The same BPA letter set February 27, 2006 as the date by which the additional information had to be received by BPA to avoid having the claims rejected. The letter also stated that if additional information were provided by February 27, 2006, BPA would make a decision within a reasonable time thereafter. On March 4, 2006, we received your letter claiming both an unwillingness and an inability to provide the requested additional information and asserting that "the process is now concluded" because the claims had been "deemed denied" by BPA.

The following are my determinations with respect to the claims by the California Parties:

1. <u>First Claim</u>.

I reject the first ("FERC Ordered Refund Period: Mitigated Sales") claim. The Federal Energy Regulatory Commission (FERC) has not issued a final order mandating that refunds be paid by market participants in the PX and ISO markets, and the PX and ISO have not issued any demands under their contracts with BPA. Therefore, any alleged BPA liability to repay funds has not accrued, and the California Parties have not incurred the claimed damages. In taking this action, BPA waives no defenses against future claims in the event FERC does issue a final order and the PX and ISO issue demands under their contracts with BPA.

2. Second and Third Claims.

I also reject the second ("FERC-Ordered Refund Period: Other ISO/PX Sales") and third ("The Summer Period: May 1, 2000 - October 1, 2000") claims. Claimants seek a determination from BPA that it will refund "the difference between the rates charged by BPA and the lawful rates as ultimately determined by FERC" *if* (i) certain FERC rulings are, in the future, remanded to FERC by the Ninth Circuit Court of Appeals and (ii) FERC thereafter reverses its rulings and orders jurisdictional entities to refund moneys. Because these claims are based on remote and speculative occurrences, claimants have no right to the requested relief. In taking this action, BPA waives no defenses against claims in the event FERC does reverse its rulings and the PX and ISO issue demands under their contracts with BPA.

I will advise you by Friday, March 24, as to whether BPA is willing to engage in settlement discussions.

This is the final decision of the Contracting Officer. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. With regard to appeals to the agency board of contract appeals, you may, solely at your election, proceed under the board's small claims procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

Allen L Burns

Allen L. Burns
Contracting Officer

cc:
Russell C. Swartz, Assistant General Counsel
Southern California Edison Company

W. Davis Smith, General Counsel
San Diego Gas & Electric Company

Joshua Bar-Lev
Pacific Gas and Electric Company

Erik N. Saltmarsh, Chief Counsel
California Electricity Oversight Board

**Department of Energy**

Bonneville Power Administration
P.O. Box 3621
Portland, Oregon 97208-3621

06 MAR 16 PM 1:55

POWER BUSINESS LINE

March 16, 2006

In reply refer to: PT-5

Kirk McInnis, Deputy Attorney General
Department of Justice
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550

OVERNIGHT MAIL
CERTIFIED MAIL

Dear Mr. McInnis,

On December 5, 2005, BPA received the California Peoples' claims for damages with respect to certain BPA transactions in the California markets during 2000 and 2001. Thereafter, on or about December 29, 2005, BPA received the Peoples' Amended Claim (which was further corrected by a document received on January 17, 2006). On December 30, 2005, a BPA attorney sent a letter to you requesting additional information to support the claims. In a February 8, 2006 letter to you, BPA stated that it had authorized the PX and ISO to release settlement data to you as well as to the California Parties with respect to their separate claims. The same BPA letter set February 27, 2006 as the date by which the additional information had to be received by BPA to avoid having the claims rejected. The letter also stated that if additional information were provided by February 27, 2006, BPA would make a decision within a reasonable time thereafter. On March 10, 2006, we received your letter indicating that no further information supporting the claims would be provided.

The following are my determinations with respect to the California Peoples' claims:

1. First Claim.

I reject the first ("FERC Ordered Refund Period: Mitigated Sales") claim. The Federal Energy Regulatory Commission (FERC) has not issued a final order mandating that refunds be paid by market participants, and the PX and ISO have not issued any demands under their contracts with BPA for payment. In addition, FERC has determined that refund liability does not attach to bilateral transactions with the California Department of Water Resources. Therefore, any alleged BPA liability to repay funds has not accrued, and the California People have not incurred the claimed damages. In taking this action, BPA waives no defenses against future claims in the event FERC does issue a final order and the PX and ISO issue demands under their contracts with BPA.

2. Second and Third Claims.

I also reject the second ("FERC-Ordered Refund Period: Other ISO/PX Sales") and third ("The Summer Period: May 1, 2000 - October 1, 2000") claims. Claimants seek a determination from BPA that "the People will be entitled to recover from BPA the monetary relief FERC determines is appropriate" *if* (i) certain FERC rulings are, in the future, remanded to FERC by the Ninth Circuit Court of Appeals and (ii) FERC thereafter reverses its rulings and orders jurisdictional entities to refund moneys. Because these claims are based on remote and speculative occurrences, claimants have no right to the requested relief. In taking this action, BPA waives no defenses against claims in the event FERC does reverse its rulings and the PX and ISO issue demands under their contracts with BPA.

I will advise you by Friday, March 24, as to whether BPA is willing to engage in settlement discussions.

This is the final decision of the Contracting Officer. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. With regard to appeals to the agency board of contract appeals, you may, solely at your election, proceed under the board's small claims procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

Allen L Burns

Allen L. Burns
Contracting Officer

BPA F 1410.01e
(03-05)

U.S. DEPARTMENT OF ENERGY
BONNEVILLE POWER ADMINISTRATION

Electronic Form Approved by
Forms Mgmt. 03/24/2005

# MAIL SERVICES REQUEST FOR FEDERAL EXPRESS PARCELS

1. Date

3/16/06

1a. FOR FRIDAY SHIPMENTS ONLY ***(Is this considered Time Critical for Saturday delivery?)***

☐ YES ☒ NO

2. SENDER'S INFORMATION: ***(If charging back to your own Organization, fill out 2a & 2b only, then skip to #3)***

| 2a. Name of Sender | Complete Mail Stop *(Dept. ID + Location)* | Phone Number or Ext. | 2b. Contact Person *(If other than Sender)* | Phone Number or Ext. |
|---|---|---|---|---|
| ALLEN BURNS | PT-5 | 3295 | LINDA PALMER | 3833 |

*Please fill out the information below if this is for a charge back to BPA Clients **(2c)**, and for External Clients **(2d)**, please provide the External Client's FedEx Number.*

**2c. ORGANIZATION TO BE CHARGED *(Required)* AND WORK ORDER OR PROJECT NUMBER *(If Known)***

| 2c. 1. Organization to be Charged *(Required)* | 2c. 2. Work Order or Project Number *(If Known)* | 2d. External - *Non*-BPA Mailing Locations Only Do you wish to charge to their FedEx account? If so, please enter account number below: |
|---|---|---|
| PT | 0003786 | |

FOR HQ RECURRING MAILINGS ONLY

3. Will you be sending Mailings to this Client/Company on a Recurring Basis?

☐ YES ☒ NO

*If **"Yes"** Mail Services will issue you a specific Customer Code to expedite your future mailings to this client or company.*

**3a. Customer Code**

_ - _ - _ - _

4. RECIPIENT'S INFORMATION: Recipient's Name, Company, and Address ***(Please print legibly if filling out this form by hand. Federal Express imposes a $10 re-routing charge for Invalid Addresses).***

4a. To KIRK MCINNIS

4b. Phone Number *(If unknown, enter **"N/A"**)* N/A

4c. Company DEPARTMENT OF JUSTICE

4d. Street Address 1. ***Absolutely No Post Office Boxes! (Item will be returned without a valid street address).***

1515 CLAY STREET, 20TH FLOOR

4e. Street Address 2. ***Absolutely No Post Office Boxes! (Item will be returned without a valid street address).***

| 4f. City | 4g State/Province | 4h. ZIP/Postal Code |
|---|---|---|
| OAKLAND | CA | 94612-0550 |

4i. Country ***(If you are sending outside the USA you must provide a phone number in area 4b).***

4j. Commodity Description *(International Shipments Only)*

5. Remarks

SNR ROUTING

| CODE | INITIAL | DATE |
|---|---|---|
| N0000 | | |
| N0010 | | |
| N1000 | | |
| N2000 | | |
| N4000 | | |
| N5000 | | |
| N6000 | | |
| N8000 | | |
| | | |
| Library/Recycle | | |
| F/Code | | |

| | |
|---|---|
| Pacific Gas and Electric Company, Southern California Edison Company, San Diego Gas & Electric Company, California Electricity Oversight Board,<br><br>Claimants,<br><br>v.<br><br>Western Area Power Administration and Western Area Lower Colorado,<br><br>Defendants. | **CLAIM FOR DAMAGES (41 U.S.C. § 601 ET SEQ.)** |

To Jerry W. Toenyes, Acting Regional Manager, Western Area Power Administration, Sierra Nevada Region; Robert Miller, Primary Representative and Bruce Justeson, Alternative Representative, California ISO Scheduling Coordinator Agreement:

You are hereby notified that the following claimants, referred to herein as the "California Parties," claim damages from the Western Area Power Administration and the Western Area Lower Colorado (collectively referred to as "WAPA"):

- Pacific Gas and Electric Company ("PG&E"), 77 Beale Street, P. O. Box 7442, San Francisco, CA 94120;

- Southern California Edison Company ("SCE"), 2244 Walnut Grove Avenue, P. O. Box 800, Rosemead, CA 91770;
- San Diego Gas & Electric Company ("SDG&E"), 8330 Century Park Court, San Diego, CA 92123; and
- California Electricity Oversight Board ("EOB"), 707 L Street, Suite 1250, Sacramento, CA 95814.

The California Parties' claim arises out of WAPA's sales of power from May 1, 2000 through June 20, 2001 in wholesale markets operated by the California Independent System Operator Corporation ("ISO") and California Power Exchange Corporation ("PX") under tariffs filed with the Federal Energy Regulatory Commission ("FERC"). FERC has determined that sellers in those markets charged rates that were unjust, unreasonable and unlawful and has modified the tariffs governing those markets to adjust downward the rates that sellers, including WAPA, were entitled to charge for those sales. WAPA is now contractually obligated to reimburse the California Parties for the difference between the rates that WAPA charged and the revised lawful rates under FERC's modification of the tariffs. Amounts recovered by the California Parties will flow to California ratepayers in the manner determined by the California Public Utilities Commission.

**1. The ISO and PX Markets**

At all relevant times, the terms and conditions of WAPA's sales were specified in tariffs governing the ISO and PX markets. Pursuant to the tariffs, rates for wholesale sales in the ISO and PX markets were set through auctions conducted by the ISO and PX on an hourly or more frequent basis. The ISO tariff also authorized the ISO to procure power outside the auction process when necessary to maintain reliability. The tariffs were filed with and subject to the exclusive jurisdiction of FERC, and required each participant in the ISO and PX markets to comply with and abide by all rules, conditions and provisions of those markets' respective tariffs. WAPA executed a Scheduling Coordinator Agreement expressly agreeing to abide by all provisions of the ISO tariff,

and a Participation Agreement expressly agreeing to abide by the provisions of the PX tariff. By entering into the ISO Scheduling Coordinator Agreement and the PX Participation Agreement, and by voluntarily electing to sell power in the ISO and PX markets, WAPA agreed to be bound by the provisions of the ISO and PX tariffs and FERC's regulation and modification thereof, including FERC's orders adjusting the rates sellers could lawfully charge for sales in those markets.

Pursuant to the Federal Power Act, FERC regulates wholesale sales of electric power in order to, among other things, ensure that the rates charged are just, reasonable and lawful. FERC has exclusive authority to regulate the terms and conditions of power sales made under the ISO and PX tariffs, including the responsibility to ensure that all rates charged by sellers in the ISO and PX markets are just, reasonable and lawful, and to recalculate and adjust such rates for prior periods if FERC determines that the rates charged were not just, reasonable and lawful. The ISO and PX tariffs provide that parties retain the right to petition FERC to review rates charged under the tariff and provide for recalculation of charges and resettlement of the accounts of buyers and sellers under the tariffs where FERC determines that rates should be adjusted.

**2. The Power Crisis**

Beginning in May 2000, the rates charged by sellers in the ISO and PX markets rose dramatically and sellers continued to demand unprecedented high prices for over a year. All sellers, including WAPA, sold power at those extremely high rates by operation of the pricing provisions of the ISO and PX tariffs. The power crisis had severe negative effects on the stability and financial integrity of PG&E, SCE, and SDG&E ("the California IOUs"), and imposed crippling costs on ratepayers of the California IOUs, including businesses throughout the state.

The first ratepayer impacts were felt in the San Diego area, because SDG&E rates in the summer of 2000 provided for immediate direct pass-through of the increased wholesale power costs to ratepayers. Residents and businesses alike suffered. By January 2001, PG&E and SCE amassed crippling debt in order to finance the costs of buying electricity, costs they were unable to immediately pass through to ratepayers. PG&E and SCE became unable to pay the PX for power

purchases, and could no longer find sellers willing to sell them power to serve their millions of retail customers. California ratepayers experienced rolling blackouts and near-continuous power emergencies. The PX market was forced to cease operations entirely on January 30, 2001. The State of California was forced to step in to buy power to serve retail customers throughout the territories served by the California IOUs. In 2001, unrelenting high prices caused the state's two largest IOUs, PG&E and SCE, to become insolvent. The power crisis ultimately ended when FERC imposed must-offer requirements on power generators and wholesale price caps on wholesale sellers of energy across all western states effective June 20, 2001.

The bulk of the costs of the crisis have been and are being passed through to and paid by the residential and commercial ratepayers of the California IOUs. The cost of paying off those charges is included in current rates assessed to customers of the California IOUs.

**3. The California Parties' Attempts to Obtain Relief From FERC**

On August 2, 2000, when it became clear that the extremely high wholesale prices were not returning to the lower levels that had prevailed historically, SDG&E filed a complaint with FERC, requesting that FERC investigate the markets and correct rates on a forward basis, and correct the rates received by all sellers for past sales to the extent FERC determined that sellers had charged unjust and unreasonable or otherwise unlawful rates. FERC Docket No. EL00-95. PG&E, SCE and the EOB intervened in the proceeding on August 14, 2002. WAPA also was a party to the FERC proceedings.

In response to the California Parties' complaint, FERC commenced an investigation into the sellers' rates. In an order issued July 25, 2001 (the "Refund Order"), FERC ruled that sellers of power in the ISO and PX markets (including WAPA) had sold power at unjust, unreasonable and unlawful rates, and that the rates charged in the ISO and PX markets should be adjusted. In lieu of the pricing formula previously provided in the ISO and PX tariffs, FERC established a new pricing formula to determine the adjusted rates (the "Mitigated Market Clearing Price" or "MMCP"), and ordered the ISO and PX to recalculate the rates sellers should have received, and to charge sellers

— and refund or credit to buyers — all amounts sellers had received in excess of the recalculated rates during the FERC-ordered refund period. FERC interpreted the Federal Power Act as limiting the time period for which FERC could order such refunds to the period from October 2, 2000 through June 20, 2001 (the "Refund Period"), even though comparably high prices had prevailed in the ISO and PX markets since May 2000. The ISO and PX have commenced the recalculation of the accounts of all sellers and buyers in the ISO and PX markets to reflect the revised rates for the Refund Period in accordance with the Refund Order.

In May 2002, evidence became available that Enron had manipulated the ISO and PX markets throughout the power crisis. In response, FERC propounded discovery requests to all sellers in the ISO and PX markets regarding market manipulation. On August 23, 2002, the Ninth Circuit Court of Appeals directed FERC to provide a similar opportunity to the California Parties to adduce evidence of market manipulation. As a result of the Ninth Circuit's order, the California Parties conducted extensive discovery from late 2002 to early 2003 of sellers in the ISO and PX markets, including WAPA. That discovery provided evidence of a pattern of manipulation involving numerous sellers into the ISO and PX markets. Further information on the FERC proceedings is available in the FERC record for Dockets Nos. EL00-95 and EL00-98.

Certain governmental entities, including WAPA, appealed the Refund Order (and FERC's December 19, 2001 Order on Rehearing) to the Ninth Circuit Court of Appeals. On September 6, 2005, the Ninth Circuit ruled that FERC's power to enforce payment of refunds under the Federal Power Act did not extend to governmental entities, including WAPA. The Court further clarified, however, that its decision was without prejudice to any rights that the market purchasers (such as the California Parties) may have to bring claims under the operative tariffs and other contracts directly against the governmental entities to recover from those entities the amounts they received, or claim the right to receive, as sellers in excess of FERC-adjusted rates. *Bonneville Power Administration v. Federal Energy Regulatory Commission*, 422 F.3d 908 (9th Cir. 2005).

This claim is based on the identical facts that were at issue in the proceedings at FERC and in the Ninth Circuit on the California Parties' complaint: the sellers' (including WAPA's) receipt

and retention of rates for sales of wholesale power in the ISO and PX markets that are now unlawful and unauthorized under the ISO and PX tariffs. The California Parties have at all times acted reasonably and in good faith in seeking relief at FERC and in asserting this claim.

4. **Description of Claims**

Upon FERC's adjustment of the rates charged and received by sellers in the ISO and PX markets, including WAPA, the adjusted rates became the only lawful and authorized rates for those sales under the applicable tariffs. WAPA became contractually obligated to reimburse purchasers for the difference between the rates WAPA initially charged in its sales in the ISO and PX markets and the lower FERC-adjusted lawful rates. WAPA has consistently taken the position that it has no obligation to refund or credit to buyers the difference between the initial rates WAPA charged and the lawful rates as ultimately determined by FERC. In stark contrast, for transactions in which it was a buyer, WAPA seeks to pay only the lower adjusted rates determined by FERC.

Causes of action for damages or other monetary relief that the California Parties may assert include, but are not limited to, breach and repudiation of contract obligations and contractual indemnification. The California Parties will also seek such other relief as may be appropriate.

The California Parties seek reimbursement from WAPA for WAPA's sales during the following periods:

a. **The FERC-Ordered Refund Period: Mitigated Sales**

The California Parties are entitled to recover from WAPA for its overcharges in the ISO and PX markets from October 2, 2000 through June 20, 2001, the period for which FERC has already revised the permissible rates for sales in those markets under the applicable tariffs. The amount to which the California Parties are entitled is being calculated by the ISO and PX, and is estimated to be approximately $24 million attributable to the Western Area Power Administration, and $334,000 attributable to the Western Area Lower Colorado, for a total of approximately $24.3 million, without consideration of any amounts WAPA may claim it is entitled to offset against that liability.

b. **The FERC-Ordered Refund Period: Other ISO/PX Sales**

The California Parties are seeking an order from FERC that the rates charged by sellers in the ISO and PX markets from October 2, 2000 – June 20, 2001 for certain other sales in those markets were also unjust and unreasonable or otherwise unlawful. FERC has concluded that certain types of sales, including energy exchange sales (in which blocks of energy were sold to the ISO for payment in-kind), are not subject to mitigation. The California Parties have appealed FERC's rulings to the Ninth Circuit Court of Appeals. A controversy has arisen in that WAPA has denied that it has any liability to the California Parties for any monetary relief FERC may assess for these types of sales. The California Parties seek a ruling that at such time as FERC finds that the rates charged by sellers for energy exchange sales were unjust and unreasonable, or otherwise unlawful, the California Parties will be entitled to recover from WAPA the difference between the rates charged by WAPA and the lawful rates as ultimately determined by FERC.

**c. The Summer Period: May 1, 2000 – October 1, 2000**

The California Parties are seeking an order from FERC finding that the rates charged by sellers in the ISO and PX markets from May 1, 2000 through October 1, 2000 (the "Summer Period") were unlawful. The prices that prevailed in the ISO and PX markets during the summer period were comparable to the prices during the refund period. FERC concluded that it would not grant relief for the Summer Period, however, and the California Parties have appealed that ruling to the Ninth Circuit Court of Appeals. A controversy has arisen in that WAPA has denied that it has any liability to the California Parties for any monetary relief FERC may assess for the Summer Period. The California Parties seek a ruling that at such time as FERC finds that the rates charged by sellers during the Summer Period were unlawful, the California Parties will be entitled to recover from WAPA the difference between the rates charged by WAPA and the lawful rates as ultimately determined by FERC.

**5. Final Decision Requested**

Claimants request that the Contracting Officer make a final decision on this claim.

**6. Notices**

All notices or other communications with regard to this claim should be directed to the counsel listed on the following pages.

**7. Certification**

The undersigned claimant hereby certifies that the claim is made in good faith, that the supporting data are accurate and complete to the best of the claimant's knowledge and belief, that the amount requested accurately reflects the contract adjustment to which the contractor believes the United States is liable, and that the person signing the certification is duly authorized to certify the claim on behalf of the claimant.

DATED: Nov. 29, 2005

Respectfully submitted,

PACIFIC GAS AND ELECTRIC COMPANY

Marie L. Fiala

Marie L. Fiala
Heller Ehrman LLP
333 Bush Street
San Francisco, CA 94101

Lisa D. Hardie
Peggy J. Williams
Stan Berman
Heller Ehrman LLP
701 Fifth Ave., Suite 6100
Seattle, WA 98104

Joshua Bar-Lev
Kermit R. Kubitz
Pacific Gas and Electric Company
77 Beale Street, B30A
Post Office Box 7442
San Francisco, CA 94120

*Attorneys for*
*Pacific Gas and Electric Company*

**7. Certification**

The undersigned claimant hereby certifies that the claim is made in good faith, that the supporting data are accurate and complete to the best of the claimant's knowledge and belief, that the amount requested accurately reflects the contract adjustment to which the contractor believes the United States is liable, and that the person signing the certification is duly authorized to certify the claim on behalf of the claimant.

DATED: November 30, 2005

Respectfully submitted,

SOUTHERN CALIFORNIA EDISON COMPANY

By [signature]
Russell C. Swartz
Its Assistant General Counsel

Richard L. Roberts
Steptoe & Johnson LLP
1330 Connecticut Ave., N.W.
Washington, D.C. 20036

Russell C. Swartz
Michael D. Mackness
Southern California Edison Company
2244 Walnut Grove Avenue
Rosemead, California 91770

*Attorneys for*
*Southern California Edison Company*

**7. Certification**

The undersigned claimant hereby certifies that the claim is made in good faith, that the supporting data are accurate and complete to the best of the claimant's knowledge and belief, that the amount requested accurately reflects the contract adjustment to which the contractor believes the United States is liable, and that the person signing the certification is duly authorized to certify the claim on behalf of the claimant.

DATED: 11 / 30, 2005

Respectfully submitted,

SAN DIEGO GAS & ELECTRIC COMPANY

Steven D. Davis
Senior Vice President and Chief Financial Officer
San Diego Gas & Electric Company
8330 Century Park Court, CP33A
San Diego, CA 92123

7. **Certification**

The undersigned claimant hereby certifies that the claim is made in good faith, that the supporting data are accurate and complete to the best of the claimant's knowledge and belief, that the amount requested accurately reflects the contract adjustment to which the contractor believes the United States is liable, and that the person signing the certification is duly authorized to certify the claim on behalf of the claimant.

DATED: November 30 2005

Respectfully submitted,

CALIFORNIA ELECTRICITY OVERSIGHT BOARD

Victoria S Kolakowski

Erik N. Saltmarsh, Chief Counsel
Victoria S. Kolakowski,
Acting Assistant Chief Counsel
California Electricity Oversight Board
770 L Street, Suite 1250
Sacramento, CA 95814

*Attorneys for California Electricity Oversight Board*

SNR ROUTING

| CODE | INITIAL | DATE |
| --- | --- | --- |
| N0000 | | |
| N0010 | | |
| N1000 | | |
| N2000 | | |
| N4000 | | |
| N5000 | | |
| N6000 | | |
| N8000 | | |
| | | |
| Library/Recycle | | |
| F/Code | | |

DEC 2005 RECEIVED

| | | |
| --- | --- | --- |
| The People of the State of California *ex rel.* Bill Lockyer, Attorney General of the State of California, and the California Department of Water Resources<br><br>Claimants,<br><br>v.<br><br>Western Area Power Administration and Western Area Lower Colorado,<br><br>Defendants. | ) | **CLAIM FOR DAMAGES (41 U.S.C. § 601 ET SEQ.)** |

To Jerry W. Toenyes, Acting Regional Manager, Western Area Power Administration, Sierra Nevada Region; Robert Miller, Primary Representative and Bruce Justeson, Alternative Representative, California ISO Scheduling Coordinator Agreement:

You are hereby notified that the claimants, the People of the State of California *ex rel.* Bill Lockyer, Attorney General of the State of California, and the California Department of Water Resources (collectively, "the People") claim damages from the Western Area Power Administration and the Western Area Lower Colorado (collectively, "WAPA").

The People's claim arises out of WAPA's sales of power from May 1, 2000 through June 20, 2001 in wholesale markets operated by the California Independent System Operator

Corporation ("ISO") and California Power Exchange Corporation ("PX") under tariffs filed with the Federal Energy Regulatory Commission ("FERC"). The People's claim further arises out of WAPA's bilateral sales to the California Department of Water Resources ("DWR") as the functional equivalent of the ISO and PX.

FERC has determined that sellers in those markets charged and received prices that were unjust, unreasonable, and unlawful. WAPA is now contractually obligated to reimburse the People for the difference between the rates WAPA received in the aforementioned sales and the revised lawful rates as determined by FERC. WAPA is further contractually obligated to reimburse the People for the difference between rates received for any sales made under the Western Systems Power Pool ("WSPP") Agreement and a lawful rate as determined by FERC.

**1. The Markets**

At all relevant times, the terms and conditions of WAPA's sales, including its bilateral says to DWR, were specified in tariffs governing the ISO and PX markets. The ISO tariff authorized the ISO to procure power outside the auction process when necessary to maintain reliability. The tariffs were filed with and subject to the exclusive jurisdiction of FERC and required each participant in the ISO and PX markets to comply with and abide by all rules, conditions, and provisions of those markets' respective tariffs. WAPA executed a Scheduling Coordinator Agreement expressly agreeing to abide by all provisions of the ISO tariff, and a Participation Agreement expressly agreeing to abide by the provisions of the PX tariff. By entering into the ISO Scheduling Coordinator Agreement and the PX Participation Agreement and by voluntarily electing to sell power in the ISO and PX markets, WAPA agreed to be bound by the provisions of the ISO and PX tariffs and FERC's regulation and modification thereof, including FERC's orders adjusting the rates sellers could lawfully charge for sales in those markets. Additionally, in making bilateral trades with DWR as the fiscally responsible stand-in for the ISO and PX, WAPA agreed to be bound by the provisions of the ISO and PX tariffs and FERC's regulation and modification thereof, including FERC's orders adjusting the rates sellers could lawfully charge for sales in those markets. The ISO and PX tariffs provide that parties retain the right to petition FERC to review rates charged

under the tariff and provide for recalculation of charges and resettlement of the accounts of buyers and sellers under the tariffs where FERC determines that prices should be adjusted.

Moreover, to the extent that the terms and conditions of WAPA's sales were also subject to the agreement governing the WSPP, prices for wholesale sales were subject to regulation by FERC. The WSPP Agreement was filed with and subject to the exclusive jurisdiction of FERC and required each participant to comply with and abide by all rules, conditions, and provisions of the Agreement as filed with FERC. WAPA executed the Agreement, expressly agreeing to abide by all provisions of the Agreement, including determination of terms by FERC. By entering into the Agreement and by voluntarily electing to sell power under the Agreement, WAPA agreed to be bound by the provisions of the Agreement and FERC's regulation and modification thereof, including FERC's determination of the rates sellers could lawfully charge for sales under the Agreement.

Pursuant to the Federal Power Act, FERC regulates wholesale sales of electric power in order to, among other things, ensure that the prices are just, reasonable, and lawful. FERC has exclusive authority to regulate the terms and conditions of power sales made under the ISO and PX tariffs and the WSPP Agreement, including the responsibility to ensure that all rates charged by sellers are just, reasonable, and lawful, and to recalculate and adjust such rates for prior periods if FERC determines that the prices charged were not just, reasonable, and lawful.

**2. The Power Crisis**

Beginning in May 2000, the prices charged by sellers in the ISO and PX markets rose dramatically and sellers continued to demand unprecedented high prices for over a year. All sellers, including WAPA, sold power at those extremely high rates by operation of the pricing provisions of the ISO and PX tariffs. The power crisis had severe negative effects on the stability and financial integrity of PG&E, SCE, and SDG&E, the California investor-owned utilities ("the California IOUs"), and imposed crippling costs on the people of California and businesses throughout the State.

The first ratepayer impacts were felt in the San Diego area, because SDG&E rates in the summer of 2000 provided for immediate direct pass-through of the increased wholesale power costs to ratepayers. Residents and businesses alike suffered. By January 2001, PG&E and SCE amassed crippling debt in order to finance the costs of buying electricity, costs they were unable to immediately pass through to ratepayers. PG&E and SCE became unable to pay the PX for power purchases, and could no longer find sellers willing to sell them power to serve their millions of retail customers. California ratepayers experienced rolling blackouts and near-continuous power emergencies. The PX market was forced to cease operations entirely on January 30, 2001. The State of California was forced to step in to buy power in the place of the ISO and PX to serve retail customers throughout the territories served by the California IOUs. In 2001, unrelenting high prices caused the state's two largest IOUs, PG&E and SCE, to become insolvent. The power crisis ultimately ended when FERC imposed must-offer requirements on power generators and wholesale price caps wholesale sellers of energy across all western states effective June 20, 2001.

The bulk of the costs of the crisis have been and are being passed through to and paid by the people of the State of California.

**3. The People's Attempts to Obtain Relief From FERC**

On August 2, 2000, when it became clear that the extremely high wholesale prices were not returning to the lower levels that had prevailed historically, SDG&E filed a complaint with FERC, requesting that FERC investigate the markets and correct prices on a forward basis, and correct the prices received by all sellers for past sales to the extent FERC determined that sellers had charged unjust and unreasonable or otherwise unlawful prices. FERC Docket No. EL00-95. The Attorney General intervened in the proceedings to represent the interests of the People of the State of California. WAPA was also a party to the FERC proceedings.

In response to the complaint, FERC commenced an investigation into the sellers' rates. In an order issued July 25, 2001 (the "Refund Order"), FERC ruled that sellers of power in the ISO and PX markets (including WAPA) had sold power at unjust, unreasonable, and unlawful rates and that the rates charged in the ISO and PX markets should be adjusted. In lieu of the pricing formula previously provided in the ISO and PX tariffs, FERC established a new pricing formula to determine the adjusted prices (the "Mitigated Market Clearing Price" or "MMCP"), and ordered the ISO and PX to recalculate the prices sellers should have received, and to charge sellers — and refund or credit to buyers — all amounts sellers had received in excess of the recalculated prices during the FERC-ordered refund period. FERC interpreted the Federal Power Act as limiting the time period for which FERC could order such refunds to the period from October 2, 2000 through June 20, 2001 (the "refund period"), even though comparably high prices had prevailed in the ISO and PX markets since May 2000. The ISO and PX have commenced the recalculation of the accounts of all sellers and buyers in the ISO and PX markets to reflect the revised prices for the refund period in accordance with the Refund Order.

In May 2002, evidence became available that Enron had manipulated the ISO and PX markets throughout the crisis. In response, FERC propounded discovery requests to all sellers in the ISO and PX markets regarding market manipulation. On August 23, 2002, the Ninth Circuit Court of Appeals directed FERC to provide a similar opportunity to complainants to adduce evidence of market manipulation. As a result of the Ninth Circuit's order, complainants conducted extensive discovery from late 2002 to early 2003 of sellers in the ISO and PX markets, including WAPA. That discovery provided evidence of a pattern of manipulation involving numerous sellers into the ISO and PX markets. Further information on the FERC proceedings is available in the FERC record for Dockets Nos. EL00-95 and EL00-98.

Certain governmental entities, including WAPA, appealed the Refund Order (and FERC's December 19, 2001 Order on Rehearing) to the Ninth Circuit Court of Appeals. On September 6, 2005, the Ninth Circuit ruled that FERC's power to enforce payment of refunds under the Federal Power Act did not extend to governmental entities, including WAPA. The Court further clarified,

however, that its decision was without prejudice to any rights that market purchasers (such as the People) may have to bring claims under the operative tariffs and other contracts directly against the governmental entities to recover from those entities the amounts they received, or claim the right to receive, as sellers in excess of FERC-adjusted rates. *Bonneville Power Administration v. Federal Energy Regulatory Commission*, 422 F.3d 908 (9th Cir. 2005).

This claim is based on the identical facts that were at issue in the proceedings at FERC and in the Ninth Circuit: the sellers' (including WAPA's) receipt and retention of prices for sales of wholesale power to DWR that are unlawful and unauthorized under the applicable tariffs. The People have at all times acted reasonably and in good faith in seeking relief at FERC and in asserting this claim.

**4. Description of Claims**

Upon FERC's adjustment of the prices charged and received by sellers in the ISO and PX markets, including WAPA, the adjusted rates became the only lawful and authorized prices for those sales. WAPA became contractually obligated to reimburse purchasers for the difference between the rates WAPA received for its sales in the ISO and PX markets and the lower FERC-adjusted lawful rates. WAPA has consistently taken the position that it has no obligation to refund or credit to buyers the difference between the rates it received and the lawful rate as set by FERC. In fact, for transactions in which it was a buyer, WAPA seeks to pay only the lower adjusted prices determined by FERC, but for transactions in which it was a seller, WAPA seeks to retain the unadjusted prices which are now unauthorized and unlawful. The People are further entitled to receive refunds reflecting the difference between rates received for any sales made under the WSPP Agreement and a lawful rate as determined by FERC.

Causes of action for damages or other monetary relief that the People may assert include, but are not limited to, breach and repudiation of contract obligations and contractual indemnification. The People will also seek such other relief as may be appropriate.

The People seek reimbursement from WAPA for WAPA's sales during the following periods:

**a. The FERC-Ordered Refund Period: Mitigated Sales**

The People are entitled to recover from WAPA for its overcharges in the ISO and PX markets from October 1, 2000 through June 20, 2001, the period for which FERC has revised the lawful price for sales in those markets. The amount to which the People are entitled is being calculated by the ISO and PX, and is estimated to be approximately $5.2 million attributable to the Western Area Power Administration and $500,000 attributable to the Western Area Lower Colorado, for a total of approximately $5.7 million, without consideration of any amounts WAPA may claim it is entitled to offset against that liability.

**b. The FERC-Ordered Refund Period: Other ISO/PX Sales**

The People are seeking an order from FERC that the prices received by sellers in the ISO and PX markets from October 2, 2000 – June 20, 2001 for certain other sales in those markets were also unjust and unreasonable or otherwise unlawful, and awarding monetary relief. FERC has concluded that certain types of sales, including bilateral sales and sales of greater than 24 hours (i.e., "non-spot" sales, under FERC's definition), are not subject to mitigation. The People have appealed FERC's rulings to the Ninth Circuit Court of Appeals. A controversy has arisen in that WAPA has denied that it has any liability to the People for any monetary relief FERC may assess for these types of sales. The People seek a ruling that at such time as FERC finds that the rates charged by sellers for energy exchange sales and "non-spot" sales were unjust and unreasonable, or otherwise unlawful, the People will be entitled to recover from WAPA the monetary relief FERC determines is appropriate.

c. **The Summer Period: May 1, 2000 – October 1, 2000**

The People are seeking an order from FERC finding that the prices received by sellers in the ISO and PX markets from May 1, 2000 through October 1, 2000 (the "summer period") were unlawful, and awarding monetary relief. The prices that prevailed in the ISO and PX markets during the summer period were comparable to the prices during the refund period. FERC concluded that it would not grant relief for the summer period, however, and the People have appealed that ruling to the Ninth Circuit Court of Appeals. A controversy has arisen in that WAPA has denied that it has any liability to the People for any monetary relief FERC may assess for the summer period. The People seek a ruling that at such time as FERC finds that the rates charged by sellers during the summer period were unlawful, the People will be entitled to recover from WAPA the monetary relief FERC determines is appropriate.

5. **Final Decision Requested**

Claimants request that the Contracting Officer make a final decision on this claim.

6. **Notices**

All notices or other communications with regard to this claim should be directed to the counsel as listed below.

**7. Certification**

The undersigned claimant hereby certifies that the claim is made in good faith, that the supporting data are accurate and complete to the best of the claimant's knowledge and belief, that the amount requested accurately reflects the contract adjustment to which the contractor believes the United States is liable, and that the person signing the certification is duly authorized to certify the claim on behalf of the claimant.

DATED: December 27, 2005

Respectfully submitted,

BILL LOCKYER
Attorney General of the State of California
TOM GREENE
Chief Assistant Attorney General
MARK BRECKLER
Senior Assistant Attorney General
MARTIN GOYETTE
Supervising Deputy Attorney General
SHARI POSNER
Deputy Attorney General

By: [signature]

KIRK McINNIS
Deputy Attorney General
1515 Clay Street, 20th Floor
Post Office Box 70550
Oakland, CA 94612-0550
Telephone: (510) 622-2191
Facsimile: (510) 622-2121
Email: Kirk.McInnis@doj.ca.gov

**Department of Energy**
Western Area Power Administration
P.O. Box 281213
Lakewood, CO 80228-8213

MAR 2 3 2006

Marie L. Fiala
Heller Ehrman, LLP
333 Bush Street
San Francisco, CA 94104-2878

OVERNIGHT MAIL
CERTIFIED MAIL

Dear Ms. Fiala:

On December 5, 2005, the Western Area Power Administration (Western) received a "Claim for Damages" on behalf of the Pacific Gas & Electric Company, Southern California Edison Company, San Diego Gas & Electric Company, and the California Electricity Oversight Board (Claimants) with respect to certain Western transactions in the California markets during 2000 and 2001. On December 30, 2005, a Western attorney sent a letter to the Claimants requesting additional information to support the claims. On February 6, 2006, Western received your letter stating that the Claimants were working on providing additional information and, to aid in that effort, requesting Western to authorize the Claimants to access Western settlement data in the possession of the California Power Exchange (PX) and the California Independent System Operator (ISO). In a February 9, 2006 letter to the Claimants, Western stated that it was authorizing the PX and ISO to release the data requested by the Claimants. The same Western letter set February 27, 2006 as the date by which the additional information had to be received by Western to avoid having the claims rejected. The letter also stated that if additional information was provided by February 27, 2006, Western would make a decision within a reasonable time thereafter. On March 6, 2006, we received your letter claiming both an unwillingness and an inability to provide the requested additional information and asserting that "the process is now concluded" because the claims had been "deemed denied" by Western.

The following are our determinations with respect to the claims asserted by the Claimants:

1. <u>First Claim</u>.

We reject the first ("FERC-Ordered Refund Period: Mitigated Sales") claim. The Federal Energy Regulatory Commission (FERC) has not issued a final order mandating that refunds be paid by market participants in the PX and ISO markets, and the PX and ISO have not issued any demands under their contracts with Western. Therefore, any alleged Western liability to repay funds has not accrued, and the Claimants have not incurred the claimed damages. In taking this action, Western waives no defenses against future claims that may be submitted by the Claimants, based on future events.

2. <u>Second and Third Claims</u>.

We also reject the second ("FERC-Ordered Refund Period: Other ISO/PX Sales") and third ("The Summer Period: May 1, 2000 - October 1, 2000") claims. Claimants seek a determination

from Western that it will refund "the difference between the rates charged by [Western] and the lawful rates as ultimately determined by FERC" *if* (i) certain FERC rulings are, in the future, remanded to FERC by the Ninth Circuit Court of Appeals and (ii) FERC thereafter reverses its rulings and orders jurisdictional entities to refund moneys. Because these claims are based on remote and speculative occurrences, Claimants have no right to the requested relief. In taking this action, Western waives no defenses against future claims that may be submitted by the Claimants, based on future events.

We note your March 2, 2006 letter expresses a willingness on the part of the Claimants to "provide a valuation of [their] claims in the context of any settlement discussions." Western welcomes and will consider any settlement proposals you wish to submit that are generally related to these matters.

This is the final decision of the Contracting Officers. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals and provide a copy to the Contracting Officers from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. With regard to appeals to the agency board of contract appeals, you may, solely at your election, proceed under the board's small claims procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

Thomas R. Boyko
Contracting Officer and
Power Marketing Manager
Sierra Nevada Region

Bradley S. Warren
Contracting Officer and
Colorado River Storage Project Manager

cc:
Russell C. Swartz, Assistant General Counsel
Southern California Edison Company

Steven D. Davis, Senior Vice President and Chief Financial Officer
San Diego Gas & Electric Company

Victoria S. Kolakowski, Esq.
California Electricity Oversight Board

**Department of Energy**
Western Area Power Administration
P.O. Box 281213
Lakewood, CO 80228-8213

MAR 2 3 2006

Kirk McInnis, Deputy Attorney General
State of California, Department of Justice
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550

OVERNIGHT MAIL
CERTIFIED MAIL

Dear Mr. McInnis:

On December 29, 2005, the Western Area Power Administration (Western) received claims on behalf of the People of the State of California *ex. rel.* Bill Lockyer, Attorney General of the State of California, and the California Department of Water Resources ("California People" or "Claimants") for damages with respect to certain Western transactions in the California markets during 2000 and 2001. On January 10, 2006, a Western attorney sent a letter to you requesting additional information to support the claims. In a February 9, 2006 letter to you, Western stated that it had authorized the PX and ISO to release settlement data to you as well as to the "California Parties" with respect to their separate claims. The same Western letter set February 27, 2006 as the date by which the additional information had to be received by Western to avoid having the claims rejected. The letter also stated that if additional information were provided by February 27, 2006, Western would make a decision within a reasonable time thereafter. On March 13, 2006, we received your letter indicating that no further information supporting the claims would be provided.

The following are our determinations with respect to the California Peoples' asserted claims:

1. <u>First Claim</u>.

We reject the first ("FERC-Ordered Refund Period: Mitigated Sales") claim. The Federal Energy Regulatory Commission (FERC) has not issued a final order mandating that refunds be paid by market participants in the PX and ISO markets, and the PX and ISO have not issued any demands under their contracts with Western. Therefore, any alleged Western liability to repay funds has not accrued, and the Claimants have not incurred the claimed damages. In taking this action, Western waives no defenses against future claims that may be submitted by the Claimants, based on future events.

2. <u>Second and Third Claims</u>.

We also reject the second ("FERC-Ordered Refund Period: Other ISO/PX Sales") and third ("The Summer Period: May 1, 2000 - October 1, 2000") claims. Claimants seek a determination from Western that it will refund "the difference between the rates charged by [Western] and the lawful rates as ultimately determined by FERC" *if* (i) certain FERC rulings are, in the future, remanded to FERC by the Ninth Circuit Court of Appeals and (ii) FERC thereafter reverses its

rulings and orders jurisdictional entities to refund moneys. Because these claims are based on remote and speculative occurrences, Claimants have no right to the requested relief. In taking this action, Western waives no defenses against future claims that may be submitted by the Claimants, based on future events.

We note your March 8, 2006 letter expresses a willingness on the part of the Claimants to "provide a valuation of [their] claims in the context of any settlement discussions." Western welcomes and will consider any settlement proposals you wish to submit that are generally related to these matters.

This is the final decision of the Contracting Officers. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals and provide a copy to the Contracting Officers from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. With regard to appeals to the agency board of contract appeals, you may, solely at your election, proceed under the board's small claims procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

Thomas R. Boyko
Contracting Officer and
Power Marketing Manager
Sierra Nevada Region

Bradley S. Warren
Contracting Officer and
Colorado River Storage Project Manager

Exhibit A

# Form of Participation Agreement to the PX Tariff

**THIS AGREEMENT** is made the 22 day of June, 1999 and is entered into, by and between:

(1) **THE WESTERN AREA POWER ADMINISTRATION COLORADO RIVER STORAGE PROJECT** having a principal executive office at 257 East 200 South, Suite 475, Salt lake City, UT 84147-0606 (the "PX Participant")

and

(2) **THE CALIFORNIA POWER EXCHANGE CORPORATION,** a California nonprofit public benefit Corporation having a principal executive office located at such place in the State of California as the PX Governing Board may from time to time designate (the "PX").

**WHEREAS:**

A. The PX Participant has been certified by the PX under the certification procedure referred to in Section 2.6 of the PX Tariff.

B. The PX Participant wishes to trade Energy through the PX Market under the terms and conditions set forth in the PX Tariff.

**NOW IT IS HEREBY AGREED as follows:**

**I. Definitions**

A. Terms and expressions used in this Agreement shall have the same meanings as those contained in the Master Definitions Supplement to the PX Tariff.

B. The "PX Tariff" shall mean the PX Operating Agreement and Tariff as amended from time to time, together with any Appendices or attachments thereto.

**II. Covenant of the PX Participant**

The PX Participant agrees that:

A. the PX Tariff governs all aspects of trading in and administration of the PX Market, including (without limitation), the financial and technical criteria for PX Participants, bidding, Settlement, information reporting requirements and confidentiality restrictions;

B. it will abide by, and will perform all of the obligations under the PX Tariff in respect of all matters set forth therein including, without limitation, all matters relating to the trading of Energy by it through the PX Market, ongoing obligations in respect of bidding, Settlement, security requirements, billing and payments, confidentiality and dispute resolution;

C. its status as a PX Participant is at all times subject to the PX Tariff and;

D. it will enter onto a software licensing agreement with the PX for use of the trade application software.

**3. Term and Termination**

This Agreement shall commence on the later of (a) __________ or (b) the date the PX Participant is certified by the PX as a PX Participant and shall terminate upon acceptance by FERC of the Notice of Termination. The PX shall timely file a Notice of Termination.

**4. Assignment**

Either party may assign its obligations under this Agreement with the other party's prior consent, not to be unreasonably withheld.

Exhibit A

5. **Partial Invalidity**
If any provision of this Agreement, or the application of such provision to any persons, circumstance of transaction, shall be held invalid, the remainder of this Agreement, or the application of such provision to other persons or circumstances or transactions, shall not be affected thereby.

6. **Settlement Account**
The PX Participant will have an account at the U.S. Treasury to which credits or debits will be made in accordance with the billing and Settlement provisions of Section 6 of the PX Tariff. The details of such account shall be as set out in Section 7 hereof or as notified by the PX Participant to the PX from time to time by giving at least 5 Business Days written notice before the new account becomes operational.

7. **Notices**
Any notice demand or request made to or by either party regarding this Agreement shall be made in accordance with the PX Tariff and unless otherwise stated or agreed shall be made to the representative of the other party indicated below:

PX:

Name of primary representative: Martin Ochotorena
Name of alternative representative: John Melby
Address: 200 S. Robles Ave, Ste 400
Pasadena
State: CA Zip code: 91101
E-mail Address: MEOchotorena@CALPX.COM
Phone no.: 626-537-3267
Fax no.: 626-537-3191

PX Participant:

Name of primary representative: Jeffrey W. Ackerman
Name of alternative representative: Nancy J. Scheid
Address: 1800 S. Rio Grande Ave.
Montrose
State: Colorado Zip code: 81401
E-mail Address: ackerman@wapa.gov
Phone no.: (970) 240-6209
Fax no.: (970) 240-6295
Settlement Account: Debbie Gomez
Number: (303) 275-1336
Title:
Sort Code: ABA# 021030004 ALC# 89001602
Bank: Federal Reserve Bank – New York

8. **Incorporation of Tariff.**
The PX Tariff is incorporated herein and made a part hereof. In the event of a conflict between the terms and conditions of this Agreement and any other terms and conditions set forth in the PX Tariff, the terms and conditions of the PX Tariff shall prevail.

9. **Electronic Contracting.**
All submitted applications, schedules, bids, confirmations, changes to information on file

Exhibit A

with the PX and other communications conducted via electronic transfer (e.g. direct computer link, FTP file transfer, bulletin board, e-mail, facsimile or any other means established by the PX) shall have the same legal rights, responsibilities, obligations and other implications as set forth in the terms and conditions of the PX Tariff as if executed in written format.

10. **Payment Obligations.**
All obligations to pay amounts or perform obligations due with respect to the PX Tariff and any other charges, taxes or other expenses related to this Agreement (including, without limitation, expenses pursuant to the Meter Service Agreement) or the PX Participant's trading in the PX Market generally shall be the sole responsibility of the PX Participant.

11. **Exhibit made part of this Agreement.**
Exhibit A is attached hereto and made a part of this agreement.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective authorized officials.

PX:

By: [signature] CO 8/27/99
Name Title Date

PX Participant:

By: [signature] 6-22-99
Name Date

Title: CRSP Energy Management and Marketing Office Team Lead

## Exhibit A
## Form of Participation Agreement to the PX Tariff

1. **Covenant Against Contingent Fees**
The PX warrants that no person or selling agency has been employed or retained to solicit or secure the Agreement upon an agreement or understanding of a commission, percentage, brokerage, or contingent fees, excepting bona fide employees of bona fide established commercial or selling agencies maintained by the PX for the purpose of securing business..

2. **Contract Work Hours and Safety Standards**
The Agreement, to the extent that it is of a character specified in Section 103 of the Contract Work Hours and Safety Standards Act (Act), 40 U.S.C.A. (329 (1986)), is subject to the provisions of the Act, 40 U.S.C.A. (327—333 (1986)), and to regulations promulgated by the Secretary of Labor pursuant to the Act.

3. **Equal Opportunity Employment Practices**
Section 202 of Executive Order No. 11246, 43 Fed. Reg. 46501 (1978), which provides, among other things, that the PX will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin, is incorporated by reference in the Agreement.

AUTHENTICATED COPY

Contract No. 98-SNR-00006

# Scheduling Coordinator Agreement

THIS AGREEMENT is made this 12th day of February, 1998 and is entered into, by and between:

(1) Western Area Power Administration, Sierra Nevada Region having a registered or principal
(full legal name)
executive office at

114 Parkshore Drive, Folsom, California 95630-4710, the "Scheduling Coordinator."

and

(2) **CALIFORNIA INDEPENDENT SYSTEM OPERATOR CORPORATION**, a California nonprofit public benefit Corporation having a principal executive office located at such place in the State of California as the ISO Governing Board may from time to time designate (the "ISO").

Whereas:

(A) The Scheduling Coordinator has applied for certification by the ISO under the certification procedure referred to in Section 2.2.3 of the ISO Tariff.

(B) The Scheduling Coordinator wishes to schedule Energy and Ancillary Services on the ISO Controlled Grid under the terms and conditions set forth in the ISO Tariff and the ISO Protocols.

**NOW IT IS HEREBY AGREED as follows:**

## 1. Definitions

A. Terms and expressions used in this Agreement shall have the same meanings as those contained in the Master Definitions Supplement to the ISO Tariff.

B. The "ISO Tariff" shall mean the ISO Operating Agreement and Tariff as amended from time to time, together with any Appendices or attachments thereto.

## 2. Covenant of the Scheduling Coordinator

The Scheduling Coordinator agrees that:

- The ISO Tariff and the ISO Protocols govern all aspects of scheduling of Energy and Ancillary Services on the ISO Controlled Grid, including (without limitation), the financial and technical criteria for Scheduling Coordinators, bidding, settlement, information reporting requirements and confidentiality restrictions;
- It will abide by, and will perform all of the obligations under the ISO Tariff and the ISO Protocols placed on Scheduling Coordinators in respect of all matters set forth therein, including, without limitation, all matters relating to the scheduling of Energy and Ancillary



AUTHENTICATED COPY

AUTHENTICATED COPY

Services on the ISO Controlled Grid, ongoing obligations in respect of scheduling, Settlement, ISO Systems Security Policy and Procedures, billing and payments, confidentiality and dispute resolutions;

- It shall ensure that each UDC, over whose Distribution system Energy or Ancillary Services are to be transmitted in accordance with Schedules, Adjustment Bids or bids for Ancillary Services submitted to the ISO by the Scheduling Coordinator, enters into a UDC operating agreement in accordance with Section 4 of the ISO Tariff;
- It shall ensure that each Generator for which it schedules Energy or on whose behalf it submits to the ISO adjustment Bids or bids for Ancillary Services enters into a Generator Agreement in accordance with Section 5 of the ISO Tariff;
- Its status as a Scheduling Coordinator is at all times subject to the ISO Tariff and the ISO Protocols.

## 3. Term and Termination

3.1 This Agreement shall commence on the later of (a) ISO operational date, or (b) the date the Scheduling Coordinator is certified by the ISO as a Scheduling Coordinator.

3.2 This Agreement may terminate in accordance with the provisions set forth in the ISO Tariff, and Scheduling Coordinator Application Protocol.

## 4 Assignment

Either party may assign its obligations under this Agreement with the other party's consent, such consent shall not be unreasonably withheld.

## 5. Partial Invalidity

If any provision of this Agreement, or the application of such provision to any persons, circumstance or transaction, shall be held invalid, the remainder of this Agreement, or the application of such provision to other persons or circumstances or transactions, shall not be affected thereby.

## 6. Settlement Account

The Scheduling Coordinator shall maintain at all times an account with a bank capable of Fed-Wire transfers to which credits or debits shall be made in accordance with the billing and settlement provisions of Section 11 of the ISO Tariff. Such account shall be the account referred to in Clause 7 hereof or as notified by the Scheduling Coordinator to the ISO from time to time by giving at least 7 days written notice before the new account becomes operational.



AUTHENTICATED COPY

AUTHENTICATED COPY

7. Notices

Any notice, demand or request made to or by either party regarding this Agreement shall be made in accordance with the ISO Tariff and unless otherwise stated or agreed shall be made to the representative of the other party indicated below.

ISO:

Name of Primary Representative: Susan Schneider
Title: Vice President, Client Services
Address: P.O. Box 639014
Folsom, CA 95763-9014
E-Mail Address: sschneid@caiso.com
Phone No: (916) 351-2210
Fax No: (916) 351-2350
Name of Alternative Representative: Byron Woertz
Title: Director of Client Relations

Scheduling Coordinator:

Name of Primary Representative: Mr. Robert Miller
Title: Supervisory Power System Dispatcher
Address: 114 Parkshore Drive
Folsom
State: California Zip Code: 95630-4710
E-Mail Address:
Phone No: (916) 353-4559
Fax No: (916) 353-2232
Name of Alternative Representative: Mr. Bruce Justeson
Title: Power Operations Specialist

Fed-Wire Transfer Documentation: (To Be Determined)

Account Name: ______________________
Account Number: ______________________
Bank Name: ______________________
Bank Number (ABA): ______________________
Bank City/State: ______________________



AUTHENTICATED COPY

AUTHENTICATED COPY

8. **Agreement to be bound by ISO Tariff and ISO Protocols**

The ISO Tariff and the ISO Protocols are incorporated herein and made a part hereof. In the event of a conflict between the terms and conditions of this Agreement and any other terms and conditions set forth in the ISO Tariff, the terms and conditions of the ISO Tariff shall prevail.

9. **Agreement Provisions**

The Agreement provisions, attached hereto as Exhibit A, are hereby made a part of this Agreement the same as if they had been expressly set forth herein.

10. **Exhibit made part of Agreement**

Six (6) Agreement provisions are set forth in Exhibit A. Exhibit A is attached hereto, and shall be in force and effect in accordance with the terms until superseded by a subsequent Exhibit.

11. **Electronic Contracting**

All submitted applications, schedules, bids, confirmations, changes to information on file with the ISO and other communications conducted via electronic transfer (e.g., direct computer link, FTP file transfer, bulletin board, e-mail, facsimile or any other means established by the ISO) shall have the same legal rights, responsibilities, obligations, and other implications as set forth in the terms and conditions of the ISO Tariff and the ISO Protocols as if executed in written format.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective authorized officials.

ISO:

By: Jeffrey Tranen (signature) PRESIDENT + CEO 2/12/98
Name Title Date

Scheduling Coordinator:

By: Jerry W Toenyes (signature) Acting Regional Manager 1/30/98
Name Title Date



AUTHENTICATED COPY

AUTHENTICATED COPY



# Exhibit A
# Scheduling Coordinator Agreement

## 1. Contingent Upon Appropriations

Where activities provided for in the contract extend beyond the current fiscal year, continued expenditures by the United States are contingent upon Congress making the necessary appropriations required for the continued performance of the United States obligations under the contract. In case such appropriation is not made, the Contractor hereby releases the United States from its contractual obligations and from all liability due to the failure of Congress to make such appropriation.

## 2. Officials Not to Benefit

No member of or delegate to Congress or Resident Commissioner shall be admitted to any share or part of the contract or to any benefit that may have arisen from the contract, but this restriction shall not be construed to extend to the contract if made with a corporation or company for its general benefit.

## 3. Covenant Against Contingent Fees

The Contractor warrants that no person or selling agency has been employed or retained to solicit or secure the contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fees, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the Contractor for the purpose of securing business. For breach or violation of this warranty, Western shall have the right to annul the contract without liability or in its discretion to deduct from the contract price or consideration the full amount of such commission, percentage, brokerage, or continent fee.

## 4. Contract Work Hours and Safety Standards

The contract, to the extent that it is of a character specified in Section 103 of the Contract Work Hours and Safety Standards Act (Act), 40 U.S.C.A. (329 (1986)), is subject to the provisions of the Act, 40 U.S.C.A. (327-333 (1986)), and to regulations promulgated by the Secretary of Labor pursuant to the Act.

## 5. Equal Opportunity Employment Practices

Section 202 of Executive Order No. 11246, 43 Fed. Reg. 46501 (1978), which provides, among other things, that the Contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin, is incorporated by reference in the contract.

## 6. Use of Convict Labor

The Contractor agrees not to employ any person undergoing sentence of imprisonment in performing the contract except as provided by 18 U.S.C. 4082(c)(2) and Executive Order 11755, December 29, 1973.



AUTHENTICATED COPY

MAY 14 1998

Mr. Charles A. Smart
Chief Financial Officer and Treasurer
California Independent System Operator Corporation
151 Blue Ravine Road
Folsom, CA 95630

Dear Mr. Smart:

Western Area Power Administration (Western) hereby submits to the California Independent System Operator Corporation (ISO), effective immediately, an irrevocable and unconditional Letter of Understanding. Due to the fact that Western is a federal entity as defined by the ISO Tariff Master Definition Supplement, the ISO has not required Western to provide a Letter of Credit, Corporate Guarantee or Cash Deposit. Western is backed by the full faith and credit of the United States. The ISO Tariff recognizes that federal entities are deemed credit worthy. In addition, Section 20.8 of the ISO Tariff recognizes Western's obligations to federal laws and regulations as a federal entity.

Western agrees to be bound by all the payment terms and conditions of the ISO Tariff and the ISO Protocols as they may be applicable to Western acting as a Schedule Coordinator or as otherwise addressed herein.

Western understands that it will be in default if the ISO fails to receive payment for the amount shown on the invoice in good funds not later than 10 a.m. on the Payment Date.

Subject to the provisions in the ISO Tariff, upon presentation of a written demand, facsimile demand, or telephone demand for payment (Demand), Western agrees that it will issue payment instructions through the U.S. Treasury to the Federal Reserve wire transfer system on the same day in order to make payment in good funds. If such presentation occurs after 12 noon, Pacific Time, on the day of default, then Western agrees that the payment will be made within 60 minutes after the opening of business on the next business day.

The payment instructions are listed below. Western understands that written notification will be provided by the ISO Senior Management Contact listed below to the Western Senior Management Contact listed below for any change to these payment instructions.

| | |
|---|---|
| Company Name: | California Independent System Operator Corporation |
| Company Account Number: | 12336-26208 |
| Comment: | [Scheduling Coordinator Number and Invoice Number] |
| Bank Name: | Bank of America, N.T.& S.A. |
| Bank ABA Number: | 1210-0035-8 |
| Bank City/State: | San Francisco, California |

The contact information is listed below for both ISO and Western. Both the ISO and the Western Senior Management Contacts listed below will provide written notification to the other party for any change to this contact information.

Western Senior Management Contact

Anita Wiley
Financial Manager
Western Area Power Administration
114 Parkshore Drive
Folsom, CA 95630-4710
Telephone Number: 916-353-4416
Facsimile Number: 916-985-1934

ISO Senior Management Contact

Charles A. Smart
Chief Financial Officer and Treasurer
California Independent System Operator Corporation
151 Blue Ravine Road
Folsom, CA 95630-4704
Telephone Number: 916-351-4450
Facsimile Number: 916-351-2350

If any portion of the amount specified in the Demand is in dispute, Western shall pay the full amount in accordance with this letter of understanding and the ISO Tariff. The disputed amount shall be addressed under the terms of the ISO Tariff.

Any amendment to this Letter of Understanding shall become effective only upon a written amendment with an acceptance by your signature.

Sincerely,

ORIGINAL SIGNED BY

Jerry W. Toenyes
Regional Manager

cc:
Ms. Susan Schneider
Vice President, Client Services
California Independent System Operator Corporation
151 Blue Ravine Road
Folsom, CA 95630

bcc:
N0000, N0100, N4000, N4200, N6000, N6200, N8000, N6211 (RF OF)

N6211:RKnight:x4523:rr:4-27-98:bl:4-28-98:rr:5-08-98
O:\GROUPS\W_PROCES\WP_DIRS\PWM\KNIGHT\ISO\980402.LOU

ORIGINAL

AUTHENTICATED COPY

Agreement No. 99-SNR-00209

# Form of Participation Agreement to the PX Tariff

**THIS AGREEMENT** is made the 28th day of May, 1999 and is entered into, by and between:

(1) **THE WESTERN AREA POWER ADMINISTRATION-SIERRA NEVADA REGION** having a principal executive office at 114 Parkshore Drive, Folsom, California 95630 (the "PX Participant")

and

(2) **THE CALIFORNIA POWER EXCHANGE CORPORATION,** a California nonprofit public benefit Corporation having a principal executive office located at such place in the State of California as the PX Governing Board may from time to time designate (the "PX").

**WHEREAS:**

A. The PX Participant has been certified by the PX under the certification procedure referred to in Section 2.6 of the PX Tariff.

B. The PX Participant wishes to trade Energy through the PX Market under the terms and conditions set forth in the PX Tariff.

**NOW IT IS HEREBY AGREED as follows:**

I. **Definitions**

A. Terms and expressions used in this Agreement shall have the same meanings as those contained in the Master Definitions Supplement to the PX Tariff.

B. The "PX Tariff" shall mean the PX Operating Agreement and Tariff as amended from time to time, together with any Appendices or attachments thereto.

II. **Covenant of the PX Participant**

The PX Participant agrees that:

A. the PX Tariff governs all aspects of trading in and administration of the PX Market, including (without limitation), the financial and technical criteria for PX Participants, bidding, Settlement, information reporting requirements and confidentiality restrictions;

B. it will abide by, and will perform all of the obligations under the PX Tariff in respect of all matters set forth therein including, without limitation, all matters relating to the trading of Energy by it through the PX Market, ongoing obligations in respect of bidding, Settlement, security requirements, billing and payments, confidentiality and dispute resolution;

C. its status as a PX Participant is at all times subject to the PX Tariff and;

D. it will enter onto a software licensing agreement with the PX for use of the trade application software.

3. **Term and Termination**

This Agreement shall commence on the later of (a) __________ or (b) the date the PX Participant is certified by the PX as a PX Participant and shall terminate upon acceptance by FERC of the Notice of Termination. The PX shall timely file a Notice of Termination.

4. **Assignment**

Either party may assign its obligations under this Agreement with the other party's prior consent, not to be unreasonably withheld.

AUTHENTICATED COPY

AUTHENTICATED COPY

5. **Partial Invalidity**
If any provision of this Agreement, or the application of such provision to any persons, circumstance of transaction, shall be held invalid, the remainder of this Agreement, or the application of such provision to other persons or circumstances or transactions, shall not be affected thereby.

6. **Settlement Account**
The PX Participant will have an account at the U.S. Treasury to which credits or debits will be made in accordance with the billing and Settlement provisions of Section 6 of the PX Tariff. The details of such account shall be as set out in Section 7 hereof or as notified by the PX Participant to the PX from time to time by giving at least 5 Business Days written notice before the new account becomes operational.

7. **Notices**
Any notice demand or request made to or by either party regarding this Agreement shall be made in accordance with the PX Tariff and unless otherwise stated or agreed shall be made to the representative of the other party indicated below:

PX:

Name of primary representative: Martin DeHotorena
Name of alternative representative: John Melbs
Address: 1000 S. Fremont Ave
Alhambra
State: CA Zip code: 91803
E-mail Address: mBotHotorena@CalPX.com
Phone no.: 626-537-3267
Fax no.: 626-537-3163

PX Participant:

Name of primary representative: Robert E. Miller
Name of alternative representative: Sean A. Sanderson

Address: 114 Parkshore Drive
Folsom
State: California Zip code: 95630
E-mail Address: remiller@wapa.gov
Phone no.: (916) 353-4559
Fax no.: (916) 353-2232
Settlement Account: Debbie Gomez
Number: (303) 275-1336
Title:
Sort Code: ABA# 021030004 ALC# 89001602
Bank: Federal Reserve Bank – New York

8. **Incorporation of Tariff.**
The PX Tariff is incorporated herein and made a part hereof. In the event of a conflict between the terms and conditions of this Agreement and any other terms and conditions set forth in the PX Tariff, the terms and conditions of the PX Tariff shall prevail.

9. **Electronic Contracting.**
All submitted applications, schedules, bids, confirmations, changes to information on file with the PX and other communications conducted via electronic transfer (e.g. direct

AUTHENTICATED COPY

AUTHENTICATED COPY

computer link, FTP file transfer, bulletin board, e-mail, facsimile or any other means established by the PX) shall have the same legal rights, responsibilities, obligations and other implications as set forth in the terms and conditions of the PX Tariff as if executed in written format.

10. **Payment Obligations.**
All obligations to pay amounts or perform obligations due with respect to the PX Tariff and any other charges, taxes or other expenses related to this Agreement (including, without limitation, expenses pursuant to the Meter Service Agreement) or the PX Participant's trading in the PX Market generally shall be the sole responsibility of the PX Participant.

11. **Exhibit made part of this Agreement.**
Exhibit A is attached hereto and made a part of this agreement.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective authorized officials.

PX:

By: [signature] Name — CHIEF OPERATING OFFICER Title — 6/22/99 Date

PX Participant:

By: [signature] Name — Regional Manager Title — MAY 28 1999 Date

AUTHENTICATED COPY

AUTHENTICATED COPY

**Exhibit A**
**Form of Participation Agreement to the PX Tariff**

1. **Covenant Against Contingent Fees**
The PX warrants that no person or selling agency has been employed or retained to solicit or secure the Agreement upon an agreement or understanding of a commission, percentage, brokerage, or contingent fees, excepting bona fide employees of bona fide established commercial or selling agencies maintained by the PX for the purpose of securing business..

2. **Contract Work Hours and Safety Standards**
The Agreement, to the extent that it is of a character specified in Section 103 of the Contract Work Hours and Safety Standards Act (Act), 40 U.S.C.A. (329 (1986)), is subject to the provisions of the Act, 40 U.S.C.A. (327—333 (1986)), and to regulations promulgated by the Secretary of Labor pursuant to the Act.

3. **Equal Opportunity Employment Practices**
Section 202 of Executive Order No. 11246, 43 Fed. Reg. 46501 (1978), which provides, among other things, that the PX will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin, is incorporated by reference in the Agreement.

AUTHENTICATED COPY

AUTHENTICATED COPY

Cal PX CALIFORNIA POWER EXCHANGE

June 8, 1999

Mr. Jerry W. Toenyes
Regional Manager
Western Area Power Administration
Sierra Nevada Region
114 Parkshore Drive
Folsom, California 95630

Dear Mr. Toenyes:

The following contact and settlement bank account information was provided to us in your Participation Agreement. Please confirm the accuracy of this information. The California Power Exchange will use your bank information to initiate wire payouts to your account.

**Primary Information**

Primary contact: Robert E. Miller
Street Address: 114 Parkshore Drive – Folsom, California 95630
Phone number: (916) 353-4550
Fax number (please include area code): (916) 353-2232
E-mail address: remiller@wapa.gov

**Secondary Information**

Alternate representative: Sean A. Sanderson
Phone number:
Fax number (please include area code):
E-mail address:

**Bank Information**

Bank name and address: Federal Reserve Bank, New York
Account name:
Bank account number:
ABA Number: 021030004

Please mail back to us a written confirmation on your Company letterhead at least one week prior to commencement of trading. An authorized representative should sign the confirmation. Also, please be aware that any changes to this information must be in writing and received through the mail at least one week prior to the effective date of those changes.

Settlement Bank Account Confirmations should be sent to:

Ms. Lynn M. Miller, Chief Financial Officer and Controller
California Power Exchange Corporation
200 South Los Robles Avenue, Suite 400
Pasadena, California 91101-2482

Thank you for your assistance with this matter.

Sincerely,

Clark Cheng
Manager of Cash and Banking Relations

/ggl



AUTHENTICATED COPY

AUTHENTICATED COPY

Amendment 1
Agreement 99-SNR-00209

## ADDENDUM TO PARTICIPATION AGREEMENT

**entered into, by and between**
**Western Area Power Administration – Sierra Nevada Region**
**and**
**the California Power Exchange Corporation**

### Terminal Fee Election

Under the terms of the PX Tariff, **Western Area Power Administration – Sierra Nevada Region** (PX Participant) understands that to participate in the California Power Exchange Corporation (PX), PX Participant is required to utilize the PX trade application software.

It is understood that to utilize this software all PX Participants must pay Terminal Fees, as set forth in the PX Tariff, Appendix E, Rate Schedule 1, for each workstation on which the trade application software is utilized. It is further understood that PX Participant must also execute a Software Sublicensing Agreement with the PX in order to utilize the trade application software.

PX Participant agrees to subscribe to **2** trade application(s). PX Participant will run **1** concurrently.

PX Participant is permitted to change the total number of trade applications to which it will subscribe by providing notice to the PX at least five business days prior to the start of the month in which PX Participant requires a different number of trade applications. The full monthly assessment of Terminal Fees will be charged for each use of the trade application software during any part of a month.

Notice shall be provided to the PX in any method set forth for Electronic Contracting in Section 9 of the Participation Agreement entered into between the parties on **[insert date of Participation Agreement].**

**IN WITNESS WHEREOF,** the Parties have caused this Addendum to be executed by their respective authorized officials.

By: CALIFORNIA POWER EXCHANGE CORPORATION

[signature] CHIEF OPERATING OFFICER 6.22.99

Name Title Date

By: **Western Area Power Administration – Sierra Nevada Region**

[signature: Jerry W. Toenyes] Regional Manager JUN 16 1999

Name Title Date

AUTHENTICATED COPY

Exhibit A

# Form of Participation Agreement to the PX Tariff

**THIS AGREEMENT** is made the 22 day of June, 1999 and is entered into, by and between:

(1) **THE WESTERN AREA POWER ADMINISTRATION COLORADO RIVER STORAGE PROJECT** having a principal executive office at 257 East 200 South, Suite 475, Salt lake City, UT 84147-0606 (the "PX Participant")

and

(2) **THE CALIFORNIA POWER EXCHANGE CORPORATION,** a California nonprofit public benefit Corporation having a principal executive office located at such place in the State of California as the PX Governing Board may from time to time designate (the "PX").

**WHEREAS:**

A. The PX Participant has been certified by the PX under the certification procedure referred to in Section 2.6 of the PX Tariff.

B. The PX Participant wishes to trade Energy through the PX Market under the terms and conditions set forth in the PX Tariff.

**NOW IT IS HEREBY AGREED as follows:**

I. **Definitions**

A. Terms and expressions used in this Agreement shall have the same meanings as those contained in the Master Definitions Supplement to the PX Tariff.

B. The "PX Tariff" shall mean the PX Operating Agreement and Tariff as amended from time to time, together with any Appendices or attachments thereto.

II. **Covenant of the PX Participant**

The PX Participant agrees that:

A. the PX Tariff governs all aspects of trading in and administration of the PX Market, including (without limitation), the financial and technical criteria for PX Participants, bidding, Settlement, information reporting requirements and confidentiality restrictions;

B. it will abide by, and will perform all of the obligations under the PX Tariff in respect of all matters set forth therein including, without limitation, all matters relating to the trading of Energy by it through the PX Market, ongoing obligations in respect of bidding, Settlement, security requirements, billing and payments, confidentiality and dispute resolution;

C. its status as a PX Participant is at all times subject to the PX Tariff and;

D. it will enter onto a software licensing agreement with the PX for use of the trade application software.

3. **Term and Termination**

This Agreement shall commence on the later of (a) __________ or (b) the date the PX Participant is certified by the PX as a PX Participant and shall terminate upon acceptance by FERC of the Notice of Termination. The PX shall timely file a Notice of Termination.

4. **Assignment**

Either party may assign its obligations under this Agreement with the other party's prior consent, not to be unreasonably withheld.

Exhibit A

5. **Partial Invalidity**
If any provision of this Agreement, or the application of such provision to any persons, circumstance of transaction, shall be held invalid, the remainder of this Agreement, or the application of such provision to other persons or circumstances or transactions, shall not be affected thereby.

6. **Settlement Account**
The PX Participant will have an account at the U.S. Treasury to which credits or debits will be made in accordance with the billing and Settlement provisions of Section 6 of the PX Tariff. The details of such account shall be as set out in Section 7 hereof or as notified by the PX Participant to the PX from time to time by giving at least 5 Business Days written notice before the new account becomes operational.

7. **Notices**
Any notice demand or request made to or by either party regarding this Agreement shall be made in accordance with the PX Tariff and unless otherwise stated or agreed shall be made to the representative of the other party indicated below:

PX:

Name of primary representative: Martin Ochotorena
Name of alternative representative: John Melby
Address: 200 S. Robles Ave, Ste 400
Pasadena
State: CA Zip code: 91101
E-mail Address: MEochotorena@CalPX.com
Phone no.: 626-537-3267
Fax no.: 626-537-3191

PX Participant:

Name of primary representative: Jeffrey W. Ackerman
Name of alternative representative: Nancy J. Scheid
Address: 1800 S. Rio Grande Ave.
Montrose
State: Colorado Zip code: 81401
E-mail Address: ackerman@wapa.gov
Phone no.: (970) 240-6209
Fax no.: (970) 240-6295
Settlement Account: Debbie Gomez
Number: (303) 275-1336
Title:
Sort Code: ABA# 021030004 ALC# 89001602
Bank: Federal Reserve Bank – New York

8. **Incorporation of Tariff.**
The PX Tariff is incorporated herein and made a part hereof. In the event of a conflict between the terms and conditions of this Agreement and any other terms and conditions set forth in the PX Tariff, the terms and conditions of the PX Tariff shall prevail.

9. **Electronic Contracting.**
All submitted applications, schedules, bids, confirmations, changes to information on file

Exhibit A

with the PX and other communications conducted via electronic transfer (e.g. direct computer link, FTP file transfer, bulletin board, e-mail, facsimile or any other means established by the PX) shall have the same legal rights, responsibilities, obligations and other implications as set forth in the terms and conditions of the PX Tariff as if executed in written format.

10. **Payment Obligations.**
All obligations to pay amounts or perform obligations due with respect to the PX Tariff and any other charges, taxes or other expenses related to this Agreement (including, without limitation, expenses pursuant to the Meter Service Agreement) or the PX Participant's trading in the PX Market generally shall be the sole responsibility of the PX Participant.

11. **Exhibit made part of this Agreement.**
Exhibit A is attached hereto and made a part of this agreement.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective authorized officials.

PX:

By: [signature] CEO 8/27/99
Name Title Date

PX Participant:

By: [signature] 6-22-99
Name Date

Title: CRSP Energy Management and Marketing Office Team Lead

**Exhibit A**
**Form of Participation Agreement to the PX Tariff**

1. **Covenant Against Contingent Fees**
The PX warrants that no person or selling agency has been employed or retained to solicit or secure the Agreement upon an agreement or understanding of a commission, percentage, brokerage, or contingent fees, excepting bona fide employees of bona fide established commercial or selling agencies maintained by the PX for the purpose of securing business..

2. **Contract Work Hours and Safety Standards**
The Agreement, to the extent that it is of a character specified in Section 103 of the Contract Work Hours and Safety Standards Act (Act), 40 U.S.C.A. (329 (1986)), is subject to the provisions of the Act, 40 U.S.C.A. (327—333 (1986)), and to regulations promulgated by the Secretary of Labor pursuant to the Act.

3. **Equal Opportunity Employment Practices**
Section 202 of Executive Order No. 11246, 43 Fed. Reg. 46501 (1978), which provides, among other things, that the PX will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin, is incorporated by reference in the Agreement.

EL97-36-000

ORIGINAL

OFFICE OF THE SECRETARY
97 MAY -5 PM 2:11
FEDERAL ENERGY REGULATORY COMMISSION

**UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| **Southern California Edison Company** | ) | **Docket No. EL97-36-000** |

**SOUTHERN CALIFORNIA EDISON COMPANY'S
PETITION FOR DECLARATORY ORDER
AND REQUEST FOR EXPEDITED CONSIDERATION**

Pursuant to Rule 207 of the Rules of Practice and Procedure of the Federal Energy Regulatory Commission ("FERC" or "Commission"), 18 C.F.R. § 385.207 (1996), Southern California Edison Company ("Edison") hereby requests that the Commission issue a declaratory order that sales into the Power Exchange ("PX") qualify as "wholesale sales" for the purposes of Section 32 of the Public Utility Holding Company Act of 1935 ("PUHCA" or the "Act"), 15 U.S.C. § 79z-5a (1994).

Edison further requests that the Commission act on this Petition expeditiously so that the Commission's ruling may be taken into account by bidders for the generation Edison plans to divest beginning this summer.[1] Currently, Edison intends that final bids for Edison's gas-fired

---

[1] In November 1996, Edison filed an Application with the California Public Utilities Commission for authorization to divest all twelve of Edison's gas-fired generating stations. Edison's application addressed the divestiture of these assets through two auctions -- one for those stations not subject to must-run contracts with the Independent System Operator ("ISO"), and a separate auction for those stations subject to must-run contracts. Edison initially proposed a schedule by which the auction for the non-must-run stations would be completed by the end of August 1997, and the auction for the must-run stations would commence as soon as the FERC approved the must-run contract. Edison's timing for the must-run auction is premised on a belief that bidders will need to know the terms and conditions of the must-run contract under which they will operate. Timely action by the FERC is crucial to allow the second auction to proceed expeditiously. The timing for the first auction has slipped slightly to reflect the fact that the ISO

FERC DOCKETED
MAY 5 1997

9705160022

generating stations which are not designated as must-run by the Independent System Operator will be due during the first half of September 1997. Edison therefore urges the Commission to rule on this Petition by no later than September 10, 1997.

## I. Introduction And Summary

In the context of the restructuring of the electric power sector in the State of California, Edison is planning to divest 100% of its fossil generation within its service territory. Successful divestiture of these assets is important to the restructuring effort in a number of ways. In particular, it will mitigate market power concerns in a competitive energy market; spur the entry of new players into that market; and help to quantify and reduce the total amount of transition costs which must be paid by customers.

It is essential that the market for the generating assets to be divested not be depressed by unnecessary regulatory restraints which reduce their attractiveness to potential buyers. Any potential purchaser that wishes to hold the generating assets through a subsidiary to a holding company risks being subjected to the registration requirement of PUHCA unless it can qualify for an exemption from regulation under that statute. Section 32 of PUHCA, which provides such an exemption to Exempt Wholesale Generators ("EWGs"), requires that such entities be engaged exclusively in making wholesale electric sales.

At least initially, the primary marketplace into which the new owners may wish to sell the energy they generate is the PX. However, it has not been determined that an entity making such sales can qualify as an "eligible facility" under the EWG provision, *i.e.*, as a

will designate the must-run stations. The ISO has retained a consultant to prepare the must-run analysis, and its report is due no later than the end of June 1997. Edison now anticipates that the first auction could be completed by mid-September 1997.

"facility . . . used for the generation of electric energy exclusively for sale at wholesale." 15 U.S.C. § 79z-5a(a)(2)(A). As a result, many persons who might wish to purchase Edison's divested generating assets face the risk that they could find themselves subject to pervasive regulation as holding companies. Uncertainty on this question may have the unintended effect of depressing the market prices of these divested generation assets or reducing their salability, thereby harming competition and increasing the residual transition cost burden to be borne by consumers.

The Commission has already held that it has exclusive jurisdiction over the rates, terms and conditions of sales through the PX. *Pacific Gas & Electric Co.*, 77 FERC ¶ 61,265, at 62,088 (1996). This ruling reflects the fact that, under well-established case law interpreting the Federal Power Act ("FPA"), it is appropriate for jurisdictional purposes to treat sales through the PX as exclusively wholesale, because any electrons which may be bought at retail from the PX will be intermingled with, and indistinguishable from, those bought at wholesale. Because the PX is a federally sanctioned electric trading institution under the exclusive jurisdiction of the Commission, sales through the PX should be treated exclusively as sales at wholesale for the purposes of the FPA.

Edison seeks now to have the Commission confirm that sales into the PX are also "wholesale sales" for the purposes of Section 32 of PUHCA, which specifically provides that the term "sale of electric energy at wholesale" shall have the same meaning as provided in the FPA. 15 U.S.C. § 79z-5a(a)(3). Such an order requires the Commission to break no new ground, but would greatly facilitate the implementation of competition in California and promote the legislative intent behind the EWG provision.

Edison seeks expedited consideration of this request because it must begin the divestiture process this summer and receive final bids in early September for the first group of units to be divested in order to complete the divestiture by, or shortly after, the first of the year.

## II. Background

### A. The PX Will Provide A Large Portion Of California's Total Energy Requirements Through An Aggregation Of Generating Supplies.

Both the restructuring plan of the California Public Utilities Commission ("CPUC"), CPUC Decision 95-12-063 (Dec. 20, 1995), and the California restructuring legislation, Assembly Bill No. 1890, authorize the introduction of retail competition and retail wheeling in California and provide for the creation of a PX and an Independent System Operator ("ISO") as the primary institutions to facilitate competition. The PX will be a private corporation that will provide for the purchase and sale of electric energy in each hour at a single, market-clearing price. Energy suppliers will sell energy into the PX and buyers will purchase energy out of the PX. As the Commission has held, the PX will be a FERC-jurisdictional public utility under Section 201(e) of the FPA, 16 U.S.C. § 824(e) (1994), because it will determine the price and other terms under which transactions through the PX will be made and will effectively exercise control over those transactions. *Pacific Gas & Elec. Co.*, 77 FERC ¶ 61,204, at 61,805 (1996).

Unlike brokered transactions, the PX will not match a particular buyer with a particular seller during any given hour. Rather, it will allow the market to determine, in the aggregate, what sellers will supply energy (and at what price) to purchasers that make purchases

out of the PX. Neither electrons nor dollars will be "tracked" to determine which sellers supplied which buyers. Instead, the energy supplied into the PX by all winning bidders will be pooled.

For the first four years of the restructured California electric industry, a large portion of California's electric needs will likely be served out of the PX. During this period, California's three major investor-owned utilities will be required to purchase all of the energy for their utility service customers out of the PX. This requirement is intended, among other things, to help ensure that the PX will be a robust marketplace generating accurate price signals triggering efficient entry into and exit from the market and will provide all consumers, large and small, equal access to the competitive market price.

**B. Purchasers Of Divested Utility Generation Will Likely Seek EWG Status.**

Absent a specific exemption, a purchaser of Edison's divested generation may become an electric utility holding company under PUHCA. EWG status would exempt such a purchaser from pervasive regulation under PUHCA. EWG status would also allow potential purchasers that have interests in Qualifying Facilities ("QFs") to ensure that they would not jeopardize the QF status of those facilities.[2] Thus, EWG exemption is essential to ensure that Edison's generation assets are properly valued according to the market, without the price-depressing effects of PUHCA's registration requirements.

---

[2] To meet the definition of a qualifying small power production facility or cogeneration facility, a facility must be "owned by a person not primarily engaged in the generation or sale of electric power." 16 U.S.C. § 796(17)(C)(ii), § 796(18)(B)(ii) (1994). Purchase of a divested Edison asset by a person owning an interest in one or more QFs could result in that person losing its status as "not primarily engaged" in power generation or sales. Section 32j of PUHCA provides that a person's ownership of one or more EWGs will not adversely affect the QF status of any existing or future cogeneration or small power production facilities that person may own. 15 U.S.C. § 79z-5a(j).

Selling generation assets at proper market values is essential to ensure that any utility transition costs are properly mitigated. California has permitted utilities to recover certain stranded utility costs associated with the restructuring of the industry through a nonbypassable Competition Transition Charge ("CTC"). If generation assets are undervalued, then retail customers in California would pay the amount of that undervaluing through a higher CTC. Such an experience in California may have a chilling effect on ongoing efforts in other states to encourage utilities to divest their generation assets.

### C. PUHCA Requires That EWGs Be Engaged Exclusively In Electricity Sales At Wholesale.

Section 32(a) of PUHCA requires that EWGs be engaged "exclusively in the business of owning or operating, or both owning and operating, all or part of one or more eligible facilities and selling electric energy at wholesale." 15 U.S.C. § 79z-5a(a)(1). Section 32(a) also defines "eligible facility" as an entity "used for the generation of electric energy exclusively for sale at wholesale." 15 U.S.C. § 79z-5a(2)(A). Therefore, in order for potential purchasers to obtain EWG status and make sales through the PX, the Commission would have to determine that sales into the PX fit within the "exclusively wholesale" limitations in the Act.

This issue arises because some direct access customers may purchase power directly out of the PX. While the PX will not actually take title to energy bid into it, it will pool all of that energy together and subject it to all of its bidding and market-pricing activity rules, which, as explained below, the Commission has found are subject to exclusive FERC jurisdiction.

## III. Selling Generation Into The PX Constitutes Selling Electric Energy At Wholesale As Defined By Section 32(a) Of Puhca

### A. The Commission Held In Its Order Conditionally Approving The PX That, For Jurisdictional Purposes, Sales Through The PX Will Be Treated Exclusively As Sales Of Electric Energy At Wholesale.

Section 32(a) of PUHCA provides that "[t]he term 'sale of electric energy at wholesale' shall have the same meaning as provided in Section 201(d) of the Federal Power Act." FPA Section 201(d) defines a "sale of electric energy at wholesale" as "a sale of electric energy to any person for resale." 16 U.S.C. § 824(d) (1994). This section of the FPA establishes the scope of the Commission's exclusive jurisdiction over sales of electric energy in interstate commerce. *See, e.g.*, *FPC v. Southern Calif. Edison Co.*, 376 U.S. 205, 215-16, *reh'g denied*, 377 U.S. 913 (1964).

In its order conditionally approving the PX, the Commission held that all rate schedules, contracts, rules and protocols governing sales into the PX "will be subject to the *exclusive jurisdiction* of the Commission." *Pacific Gas & Elec. Co.*, 77 FERC ¶ 61,204, at 61,804 (emphasis added). Implicit in this holding is a determination that all sales into the PX constitute sales of electric energy at wholesale for purposes of Section 201(d) of the FPA. Edison seeks now to have the Commission make this determination explicit. As explained below, this determination is correct as a matter of both law and policy and is particularly appropriate for purposes of Section 32 of PUHCA.

**B. The Commission's Determination That All Sales Into The PX Will Be Treated Exclusively As Sales Of Electric Energy At Wholesale Is Consistent With Well Established Precedent At This Commission And In The Courts Addressing The Jurisdictional Treatment Of Energy Sales Where Retail and Wholesale Transactions Are Intermingled And Indistinguishable.**

For jurisdictional purposes under the FPA, a sale of commingled retail and wholesale power is properly treated as a wholesale sale in its entirety. In 1952, the Ninth Circuit held that commingled power sold to the Navy for both retail distribution and self-service at a naval depot would be treated in its entirety as wholesale power subject to the jurisdiction of the Federal Power Commission ("FPC"), because "the supposed nonjurisdictional part of the energy is indistinguishable at the point of sale from the remainder." *California Electric Power Co. v. FPC*, 199 F.2d 206, 209 (9th Cir. 1952), *cert. denied*, 345 U.S. 934, *reh'g denied*, 345 U.S. 961 (1953). The court specifically affirmed the FPC's determination that segregating the wholesale and retail sales would not be practicable. *Id.*

In related litigation focused primarily on whether the sales to the Navy were "in interstate commerce," the Supreme Court observed that, assuming *arguendo* that part of the sales might be retail sales jurisdictional to the state, the allocation of jurisdiction between the state and the FPC "would turn . . . on whether an *essentially separate transaction* covering the power directly consumed by the purchaser is identifiable . . . [by] separate rates, separate negotiations, separate contracts . . . ." *United States v. Public Utilities Comm'n of California*, 345 U.S. 295, 317-18 (emphasis added), *reh'g denied*, 345 U.S. 961 (1953). This became the guiding principle for future cases.

In 1990, the Commission looked to these cases for guidance in resolving a dispute between the Navy and Pacific Gas and Electric Co. over the jurisdictional status of electric power

sales to the Navy at the Naval Station Treasure Island in San Francisco. Finding that at least some of the sales were at wholesale, the Commission quoted from the 1953 Supreme Court decision in setting for evidentiary hearing the issue of whether "an essentially separate transaction covering the power directly consumed by the purchaser is identifiable." *Dept. of Navy v. Pacific Gas & Elec. Co.*, 49 FERC ¶ 61,383, at 62,399 (1989). This case was eventually settled by the parties. *See also City of Oakland v. FERC*, 754 F.2d 1378, 1379 n.1 (9th Cir. 1985).

In the recent *Brooklyn Navy Yard* case, the Commission built upon these precedents in defining the standards for determining whether sales by an EWG will be considered "at wholesale." *Brooklyn Navy Yard Cogeneration Partners*, 77 FERC ¶ 61,262 (1996). *Brooklyn Navy Yard* involved a direct contractual sale by Brooklyn Navy Yard Cogeneration Partners ("BNYCP"), a limited partnership,[3] to the Brooklyn Navy Yard Development Corporation ("Brooklyn Development"). Brooklyn Development intended to use the contracted output, in part, to operate common facilities (lobbies, elevators, etc.) at the Brooklyn Navy Yard and to operate its office space. BNYCP asked the Commission to find that the sale was "at wholesale," arguing from the precedents discussed above that, where a sale of power is made up of both wholesale and retail components that are indistinguishable, the Commission should regard the entire sale as a wholesale sale subject to the Commission's exclusive jurisdiction.

In rejecting BNYCP's argument, the Commission clarified the sorts of sales for which retaining EWG status would be appropriate:

> *California*, *Public Utilities*, and *Oakland* do not apply to the situation before us here. In *California* and *Public Utilities*, the retail (non-jurisdictional) portion of the sale was indistinguishable from the wholesale portion of the sale. Here, the retail sale of electric energy to Brooklyn Development for its own use, so that it

[3] BNYCP is an affiliate of Edison.

> can sublease and manage the premises, would be entirely distinct from Brooklyn Development's resale of electric energy to its tenants. In *Oakland*, the court ruled only that the Commission had jurisdiction over the electric energy that an airport resold to individually-metered tenants. The court specifically reserved on the question of the airport's use of electric energy in common areas and for certain unmetered tenants. The court cited *California* to the effect that the Commission has jurisdiction over combined wholesale and retail sales only where "the supposed nonjurisdictional part of the energy is indistinguishable at the point of sale from the remainder." The court further cited *Public Utilities* to the effect that federal jurisdiction, that is, whether there is a sale for resale, turns on whether "an essentially separate transaction covering the power directly consumed by the purchaser is identifiable." Here, the retail and wholesale sales are distinct.

*Id.* at 62,069 (citations omitted).

Thus, whether an EWG is selling electricity at wholesale within the meaning of PUHCA turns on (1) whether the supposed retail part of the energy "is indistinguishable at the point of sale from the remainder" and (2) whether "an essentially separate transaction covering the power directly consumed by the purchaser is identifiable."

Sales by an EWG through the California PX are sales "at wholesale" under both of these criteria. To begin with, the point of sale is the facilities of the winning PX bidders. PX bidders do not and indeed cannot distinguish which part of their bid energy may be sold to resellers or which part, if any, may be bought directly by retail customers. The sellers simply bid a specific amount in each hour. The PX then develops a set of winning generation bids sufficient to meet the PX's aggregate demand, and schedules that generation with the ISO (which may modify the schedule, as needed, to manage grid congestion). Unlike the circumstances in *Brooklyn Navy Yard* and situations in which a direct unit power sale contract exists, no amount of generation bid into the PX is dispatched to meet any particular load. No entity "tracks" which generation is used

to supply particular customer demands, nor would such tracking even be feasible. In short, every bid by a generator into the PX is "indistinguishable at the point of sale from the remainder."

Nor is there any separate transaction identifiable between the purchaser and the seller. All purchasers from the PX pay the market-clearing price for pooled energy dispatched by the ISO from the various generators under its control. There is no way to match the source of the energy sold by a supplier through the PX with any particular buyer. Nor is there any contractual relationship in PX transactions between any retail purchaser and any specific generator. Both resellers and direct access purchasers buy out of a common, intermingled pool and send payments to the PX. There simply is no distinguishable retail sale by an EWG or any other seller. All sales are made via a federally-sanctioned wholesale market institution.

Under the criteria set out in *Brooklyn Navy Yard*, therefore, all sales into the PX would constitute sales "at wholesale," and an EWG may sell energy into the PX without forfeiting its EWG status.

## IV. Permitting EWGs To Sell Energy Into The PX Will Enhance The Competitiveness Of The Industry And Will Minimize Stranded Costs, Consistent With FERC's Stated Goals And With The Policy Objectives Of The Energy Policy Act In Creating EWG Status.

### A. FERC's Stated Competition Policy Goals Support Declaring Sales Into The PX To Be Sales "At Wholesale."

To obtain the benefits of competition in generation markets, many states and regions, including California, have moved toward developing ISOs and PXs. In connection with these developments, Edison is planning to divest certain generation assets, consistent with the stated goal of the CPUC to encourage such competition. California has contemplated that such divestiture will help assure vigorous competition in the PX market, and has adopted CTC charges

that allow utilities to recover stranded utility costs associated with the divestiture of generation. Other states, *e.g.*, Massachusetts, Rhode Island, and New York, have also encouraged generation divestiture as part of restructuring, in the expectation that it will make generation markets more robust and facilitate calculation of stranded costs.

In Orders 888 and 888-A, the Commission stated that it encourages restructuring efforts that will increase competition, including a utility's divestiture of generation assets. *Promoting Wholesale Competition Through Open Access Non-discriminatory Transmission Services by Public Utilities Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, FERC STATS. & REGS. [REGULATIONS PREAMBLES 1991-96] ¶ 31,036, at 31,655-56 (1996) ("Order No. 888"), *on reh'g*, Order No. 888-A, III FERC STATS. & REGS. ¶ 31,048 (1997). Without EWG status, it will be more difficult for the new owners of divested generation, as well as existing EWGs, to participate in the PX. Thus, unless EWGs are allowed to participate in power exchanges, the robustness of energy markets in many regions will be impaired.

Moreover, without EWG status, it will be substantially more difficult for utilities to obtain full market value for their divested generation assets. Sacrificing market value for these assets would have the effect of increasing transition costs, which consumers would have to bear. This would tend to discourage generation divestiture as a vehicle for facilitating competitive transitions, mitigating market power, and valuing stranded costs.

Granting Edison's request for a declaratory order will therefore encourage the continued evolution toward increased competition in the industry.

**B. The Purposes Of The EWG Provision Of EPAct Would Be Served By Declaring Sales Into The PX To Be Sales At "Wholesale."**

The EWG provision, enacted as § 711 of the Energy Policy Act of 1992 ("EPAct"), was enacted to foster competition and remove from independent power producers the shackles that PUHCA otherwise placed upon them. Senate Comm. on Energy and Nat. Resources, Energy Policy Act of 1992, S.Prt. 103-91, at 4612, 4674, 4720, 4799, 4868, 4884, 4938 (Comm. Print 1994). As noted above, if EWGs cannot bid into the PX, competition will suffer, frustrating the very purpose for which EWGs were created. The PX will be less robust, and EWG generation will be withheld from an important portion of the competitive market.

PUHCA was enacted to stop corporate shell games and self-dealing, in order to protect ratepayers and small investors. PUHCA § 1(b)(2), 15 U.S.C. § 79a(b)(2) (1994). Barring EWGs from selling into the PX would not protect ratepayers but instead would harm them. In a competitive market, an EWG cannot foist off on consumers any excessive costs it incurs -- it can only make sales in the PX if it is the lowest cost bidder, thus benefiting consumers. If EWGs are barred from the PX, competition will suffer and consumer prices will increase.

In short, it would be inconsistent with the intent of the EPAct and the goals of PUHCA to bar EWGs from bidding into the PX.

**V. Edison's Request Requires Expedited Commission Action.**

The CPUC seeks to implement its proposed restructuring by January 1, 1998. In order to accomplish this, Edison must begin its divestiture process by this summer and receive final bids during the first half of September for the first group of units to be divested. To enable bidders to take the Commission's decision into account and to ensure proper valuation of its

generation assets during this process, Edison seeks Commission action on its request for a Declaratory Order by September 10, 1997.

Respectfully Submitted,

Douglas G. Green
Richard L. Roberts
William W. Kunze
STEPTOE & JOHNSON LLP
1330 Connecticut Ave., N.W.
Washington, D.C. 20036
(202) 429-3000

Ann P. Cohn
Assistant General Counsel
SOUTHERN CALIFORNIA EDISON COMPANY
2244 Walnut Grove Avenue
P.O. Box 800
Rosemead, CA 91770
(818) 302-2211

ATTORNEYS FOR
SOUTHERN CALIFORNIA EDISON COMPANY

**UNITED STATES OF AMERICA**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| **Southern California Edison Company** | ) | **Docket No. EL97-** |

**NOTICE OF FILING**

( )

Take notice that on ___________, 1997, Southern California Edison Company tendered for filing a Petition for Declaratory Order and Request for Expedited Consideration in the above-referenced docket.

Any person desiring to be heard or to protest said filing should file a motion to intervene or protest with the Federal Energy Regulatory Commission, 888 First Street, N.E., Washington, D.C. 20426, in accordance with Rules 211 and 214 of the Commission's Rules of Practice and Procedure, 18 CFR 385.211 and 385.214 (1996). All such motions or protests should be filed on or before ______________, 1997. Protests will be considered by the Commission in determining the appropriate action to be taken, but will not serve to make Protestants parties to the proceeding. Any person wishing to become a party must file a motion to intervene. Copies of this filing are on file with the Commission and are available for public inspection.

Lois D. Cashell
Secretary

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day served the foregoing Petition for Declaratory Order and Request for Expedited Consideration on those parties required to be served by the Regulations of the Federal Energy Regulatory Commission.

Dated at Washington, D.C., this 5th day of May, 1997.

William W. Kunze
STEPTOE & JOHNSON, LLP
1330 Connecticut Ave., N.W.
Washington, D.C. 20036
(202) 429-6759