MARIE L. FIALA (CA BAR NO. 79676)
RUSSELL P. COHEN (CA BAR NO. 213105)
INGRID S. LEVERETT (CA BAR NO. 148813)
HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA 94104-2878
Telephone: (415) 772-6000
Facsimile: (415) 772-6268
marie.fiala@hellerehrman.com
russell.cohen@hellerehrman.com
ingrid.leverett@hellerehrman.com

Attorneys for Plaintiff
PACIFIC GAS & ELECTRIC COMPANY

[ADDITIONAL PARTIES AND COUNSEL
SHOWN ON SIGNATURE PAGE]

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| Pacific Gas and Electric Company, Southern California Edison Company, and California Electricity Oversight Board,<br><br>Plaintiffs,<br><br>v.<br><br>Arizona Electric Power Cooperative, Inc.; City of Anaheim; City of Azusa; City of Banning; City of Burbank; City of Glendale; City of Los Angeles; City of Pasadena; City of Riverside; City of Santa Clara; City of Seattle; City of Vernon; Eugene Water and Electric Board; Los Angeles Department of Water and Power; Modesto Irrigation District; Northern California Power Agency; Public Utility District No. 2 of Grant County; Sacramento Municipal Utility District; Salt River Project Agricultural Improvement and Power District; and Turlock Irrigation District,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR DAMAGES AND/OR RESTITUTION AND DECLARATORY RELIEF AND JURY DEMAND** |

**COMPLAINT FOR DAMAGES AND/OR RESTITUTION AND DECLARATORY RELIEF AND JURY DEMAND**

Plaintiffs hereby demand trial by jury of all issues properly triable thereby.

Plaintiffs Pacific Gas and Electric Company ("PG&E"), Southern California Edison Company ("SCE"), and the California Electricity Oversight Board ("EOB") (collectively, "the California Parties") allege:

## JURISDICTION

1. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331. Plaintiffs' claims require resolution of a disputed and substantial issue of federal law in that plaintiffs' claims arise out of defendants' sales of electric power in wholesale electricity markets that are within the Federal Energy Regulatory Commission's ("FERC") exclusive regulatory jurisdiction, and plaintiffs are suing to recover for defendants' breaches of their contractual obligations contained in tariffs filed with and regulated by FERC.

## SUMMARY

2. This is an action for damages and declaratory relief against the following defendants: Arizona Electric Power Cooperative, Inc.; City of Anaheim; City of Azusa; City of Banning; City of Burbank; City of Glendale; City of Los Angeles; City of Pasadena; City of Riverside; City of Santa Clara; City of Seattle (Seattle City Light Department); City of Vernon; Eugene Water and Electric Board; Los Angeles Department of Water and Power; Modesto Irrigation District; Northern California Power Agency; Public Utility District No. 2 of Grant County; Sacramento Municipal Utility District; Salt River Project Agricultural Improvement and Power District; and Turlock Irrigation District (collectively, "the Governmental Entities"). PG&E and SCE's (the "California IOUs") claims in this action arise out of their wholesale purchases of electric power and ancillary services (hereinafter "electric power") and the Governmental Entities' sales of electric power in the California wholesale electric power markets from May 1, 2000 through June 20, 2001. The California wholesale markets were operated by the California Independent System Operator Corporation ("ISO") and California Power Exchange Corporation ("PX") under tariffs filed with and approved by the FERC.

3. The Governmental Entities' voluntary sales of electric power into the California wholesale markets pursuant to the ISO and PX tariffs and pursuant to certain written agreements gave rise to binding contractual obligations owed by the defendants to the other market participants,

including the California IOUs. The California IOUs are direct parties to and expressly intended beneficiaries of the Governmental Entities' contractual obligations. The Governmental Entities have breached their contractual obligations, entitling the California IOUs to the relief requested in this Complaint.

4. FERC has determined that sellers in the California wholesale electric markets charged rates that were unjust, unreasonable, and unlawful. Pursuant to the tariffs governing those markets, FERC has corrected and reduced the rates that all sellers, including the Governmental Entities, were entitled to charge for those sales for the period October 2, 2000 through June 20, 2001 ("the Refund Period"). To correct the harm caused by the unlawful prices, FERC ordered all sellers in the California markets to pay refunds for their unlawful overcharges. On September 6, 2005, however, the Ninth Circuit Court of Appeals ("Ninth Circuit") held that FERC's statutory refund authority did not extend to the Governmental Entities. The Ninth Circuit's order put the Governmental Entities in a unique position among ISO and PX market participants in that they alone may seek to benefit from refunds paid by others while escaping liability for their own unlawful overcharges. The Ninth Circuit noted, however, that market participants could bring claims in court directly against the Governmental Entities to enforce the contractual obligations created by FERC tariffs and related agreements under which the Governmental Entities sold power in the ISO and PX markets. Thus, the Governmental Entities are now contractually obligated to reimburse the California IOUs for the difference between the rates that the Governmental Entities charged during the Refund Period and the lawful, corrected rates under the tariffs.

5. Amounts recovered by the California Parties will ultimately benefit California ratepayers in the manner determined by the California Public Utilities Commission ("CPUC").

## PARTIES

6. PG&E is a corporation formed under the laws of the State of California with its principal place of business in San Francisco, California. PG&E is a subsidiary of PG&E Corporation. PG&E is engaged in the purchase, transmission, distribution and sale of electric power to the public at wholesale and retail within the State of California, and is a "public utility" within the meaning of the California Public Utilities Code and the Federal Power Act ("FPA").

PG&E provides retail electric service to approximately 4.9 million customers in Northern and Central California.

7. SCE is a corporation formed under the laws of the State of California with its principal place of business in Rosemead, California. SCE is a subsidiary of Edison International. SCE is engaged in the purchase, transmission, distribution and sale of electric power at wholesale and retail within the State of California, and is a "public utility" within the meaning of the California Public Utilities Code and the FPA. SCE provides retail electric service to approximately 4.6 million customers in a 50,000 square-mile area of Central, Coastal, and Southern California, excluding the City of Los Angeles and certain other cities.

8. The EOB was created by California statute to oversee the ISO and PX, and to "investigate any matter related to the wholesale market for electric power to ensure that the interests of California's citizens and consumers are served, protected, and represented in relation to the availability of electric transmission and generation and related costs, during periods of peak demand." Cal. Pub. Util. Code § 335. The EOB joins this action pursuant to its statutory authority to sue and to participate in all proceedings relevant to the purposes of the electricity restructuring provisions in the California Public Utilities Code, Cal. Pub. Util. Code §§ 330-398.5.

9. Defendant Arizona Electric Power Cooperative, Inc. ("AEPCO") is a rural electric generation and transmission cooperative incorporated in Arizona with its principal place of business in Benson, Arizona. AEPCO provides its generation and transmission services to member distribution cooperatives located in Arizona and California, and is registered to do business in California.

10. Defendants the City of Anaheim; the City of Azusa; the City of Banning; the City of Burbank; the City of Glendale; the City of Los Angeles; the City of Pasadena; the City of Riverside; the City of Santa Clara; and the City of Vernon are California cities.

11. Defendant City of Seattle (Seattle City Light Department) is a city located in the State of Washington.

12. Defendant Eugene Water and Electric Board ("EWEB") is a municipal utility located in Eugene, Oregon.

13. Defendant Los Angeles Department of Water and Power ("LADWP") is a municipal utility and a proprietary department of the City of Los Angeles located in Los Angeles, California.

14. Defendant Modesto Irrigation District is a California irrigation district located in Modesto, California.

15. Defendant Northern California Power Agency is a California agency located in Roseville, California that assists municipalities, rural electric cooperatives, irrigation districts, and other publicly owned entities with the purchase, aggregation, scheduling, and management of electric power.

16. Defendant Public Utility District No. 2 of Grant County ("Grant County PUD") is a public utility district located in Ephrata, Washington.

17. Defendant Sacramento Municipal Utility District is a municipal electric utility located in Sacramento, California.

18. Defendant Salt River Project Agricultural Improvement and Power District ("Salt River Project") is an agricultural improvement district located in the State of Arizona.

19. Defendant Turlock Irrigation District is a California irrigation district located in Turlock, California.

20. All defendants engage or engaged in the business of wholesale and/or retail generation, transmission, distribution, purchase and/or sale of electric power in California and, in particular, voluntarily elected to transact sales in the ISO and PX markets during the relevant time period.

**PERSONAL JURISDICTION AND VENUE**

21. Personal jurisdiction is proper in this district over each Governmental Entity because each Governmental Entity has made sales of electric power in this district, because this controversy arises out of each Governmental Entity's sales of electric power within this district, and because each Governmental Entity has consented to the jurisdiction of this Court in connection with this action pursuant to ISO Tariff § 20.7 and/or PX Tariff § 19.6, as to which the Governmental Entities agreed to be bound.

22. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because defendants are subject to personal jurisdiction in this district and therefore are deemed to reside in this district, because a substantial part of the events or omissions on which the claims are based occurred in this district, and because this is a district wherein an act or transaction constituting the violation occurred. Venue is also proper in this district pursuant to ISO Tariff § 20.7 and/or PX Tariff § 19.6, as to which the Governmental Entities agreed to be bound.

**COMMON ALLEGATIONS**

23. The California IOUs' claims arise out of the Governmental Entities' sales of electric power from May 1, 2000 through June 20, 2001, in wholesale markets operated by the ISO and PX under tariffs filed with FERC. FERC has determined that all sellers in those markets charged rates that were unjust, unreasonable, and unlawful and, pursuant to the tariffs governing those markets, has corrected and reduced the rates that all sellers, including the Governmental Entities, were entitled to charge for various sales during the Refund Period. As a result of FERC's modification of the tariffs, the Governmental Entities are now contractually obligated to reimburse the California IOUs for the difference between the rates that the Governmental Entities charged and the lawful, corrected rates.

**The ISO and PX Markets**

24. In 1996, California enacted Assembly Bill 1890 ("AB 1890") to restructure California's electric power markets in order to facilitate the development of competition for the generation and sale of electric power. AB 1890 separated the California utilities' vertically integrated generation, transmission, and distribution functions into unbundled functions. PG&E and SCE divested themselves of a substantial portion of their generation facilities. Under applicable California law, all California investor-owned utilities, including the California IOUs, were required to supply electric power to all retail customers that did not affirmatively elect to purchase electric power elsewhere.

25. AB 1890 provided for the creation of two new wholesale market institutions to facilitate the buying and selling of electric power: the ISO and the PX, which are non-profit, public

benefit corporations organized under California law, and subject to the exclusive regulatory jurisdiction of the FERC.

26. Under rules promulgated by the CPUC and approved by FERC, the California IOUs were required, in general, to purchase through the ISO and the PX substantially all of the wholesale electric power that they needed to provide service to their retail customers, including electric energy and associated reserves and other ancillary services. Ancillary services are services such as reserve generating capacity that are necessary to maintain the reliability of the transmission of electricity from generators to customers. Other entities, including the Governmental Entities, were permitted voluntarily to buy or sell electric power in the ISO and/or PX markets.

27. The ISO and PX are "public utilities" under the FPA, and are therefore subject to FERC's jurisdiction. During all relevant times, all sales and purchases in the ISO and PX markets were required to be made pursuant to tariffs filed with and approved by FERC that prescribed the terms and conditions of, and contained formulas used to establish prices for, all transactions in these markets. The ISO and PX Tariffs are the legal equivalent of federal regulations and also establish contractual obligations among the market participants, prescribing the rules, requirements and pricing formulas for all transactions in the ISO and PX markets.

28. The PX was created to function as California's principal power market. The PX acted as a clearinghouse for daily and hourly markets and submitted schedules of electric power to the ISO in which scheduled generation for the following day equaled scheduled demand. Pursuant to the PX Tariff, sellers in the PX market — including the Governmental Entities — submitted offers to sell electric power, and purchasers submitted demand bids for the quantity of electric power that they wanted to buy. The PX conducted day-ahead and same-day auctions that allowed parties to adjust their hourly commitments based on changing needs and availability. Under its tariff, the PX was charged with responsibility for, among other things, settling energy trades between PX market participants and preparing and distributing to PX market participants invoices reflecting the amounts payable and receivable by them in connection with their trading through the PX.

29. In general, the PX determined, for each hour in each of the markets that it operated, a single market-clearing price that all electric power suppliers were paid under the auction provisions

of the PX Tariff. The PX matched offers to buy and sell beginning with the lowest-priced bids and continuing up to the highest-priced bids until the amount of power accepted matched the amount sought by purchasers at that price. The price of the last (and therefore the highest-priced) accepted bid set the price for the entire market. All sellers of electric power in a given auction received the same market-clearing price, even if the seller had offered to sell at a lower price. Thus, any distortions that inflated the market-clearing price affected the prices received by each and every seller in the market, including the Governmental Entities.

30. Although the role of the ISO has changed over time, it was created as the entity responsible for operating and maintaining California's electric transmission grid, including resolving transmission congestion and purchasing electric power to maintain system reliability. To meet these obligations, the ISO operated, and still operates, wholesale markets for real-time energy purchases and ancillary services.

31. In general, in operating its real-time market, the ISO set a single market-clearing price based on bids submitted by sellers pursuant to the ISO Tariff. As in the PX market, every seller in the ISO market received the same market-clearing price set by the ISO for any given interval, even if a seller had offered to sell at a lower price.

32. Thus, the PX operated a day-ahead and a day-of market intended to supply the electric power needed to meet electric power demand as projected before the operating hour. The ISO accepted the PX schedules, then procured electric power needed to make the necessary adjustments in real time in order to ensure that the electric grid operated properly and safely. The ISO also charged market participants, including the California IOUs, for these products and services pursuant to its FERC-approved tariff. Ultimately, as a result of market dysfunction and manipulation, and resulting power shortages, vast quantities of electric power were purchased and sold through the ISO market during the relevant time period.

33. In order to obtain sufficient electric power to maintain reliability of California's electric grid, the ISO at times was required to procure electric power through mechanisms other than its regular auction. During the period at issue, the ISO was often forced to solicit such emergency electric power, known as "out-of-market" or "OOM" electric power, to meet the State's

demand for electric power. The ISO Tariff permitted the ISO to solicit this electric power through extraordinary means, such as telephone calls to electric power marketers and generators, including the Governmental Entities. These purchases were subject to certain price caps applicable in the ISO markets, which price caps varied during the relevant period and were intended to prevent price gouging; but suppliers of OOM electric power regularly demanded more than the FERC-approved price cap for such sales to the ISO. In order to maintain the reliability of the State's electric grid, the ISO procured the electric power at whatever price it was offered, even if that price exceeded its price caps, and then charged market participants, including the California IOUs, for these products and services.

34. The ISO and the PX Tariffs filed with FERC contained the only terms and conditions, including the pricing formulas, upon which transactions in the ISO and the PX could lawfully be conducted. The Governmental Entities voluntarily elected to transact sales in the ISO and PX markets and thereby are charged with knowledge of and are deemed to have accepted the terms of the Tariffs, which set forth the mutual rights and obligations among market participants. These obligations may be enforced by market participants against one another.

35. In addition, the PX Tariff required all PX market participants, including the Governmental Entities, to execute a PX Participation Agreement. The PX Participation Agreement was prescribed by the PX Tariff and provided that, *inter alia*, the PX market participant "will abide by and will perform all of the obligations under the PX Tariff in respect of all matters set forth therein including, without limitation, all matters relating to the trading of Energy by it through the PX market." PX Tariff Appendix A, Participation Agreement, § II(B). The PX Participation Agreement further provided that "[t]he PX Tariff is incorporated herein and made a part hereof." PX Tariff Appendix A, Participation Agreement, § 8.

36. The ISO Tariff contemplated that each market participant, including Governmental Entities, would execute an ISO Scheduling Coordinator Agreement. The Scheduling Coordinator Agreement was prescribed by the ISO Tariff and provided that, *inter alia*, the ISO Scheduling Coordinator "will abide by, and will perform all of the obligations under the ISO Tariff placed on Scheduling Coordinators in respect of all matters set forth therein including, without limitation, all

matters relating to the scheduling of Energy and Ancillary Services on the ISO controlled grid, . . . [and] billing and payments . . . ." ISO Tariff Appendix B, Scheduling Coordinator Agreement, § 2(B). The Scheduling Coordinator Agreement further provided that "[t]he ISO Tariff is incorporated herein and made a part hereof." ISO Tariff Appendix B, Scheduling Coordinator Agreement, § 8.

37. Many market participants both bought and sold electric power in the ISO and PX markets during the relevant time period. As a prerequisite to trading in the ISO and PX markets, the tariffs provided that all market participants would be required to meet stated collateral requirements in the ISO and PX to ensure that they would meet their obligations to the other market participants arising from their purchases and sales.

38. Each month during the relevant time period, the ISO and the PX calculated the total amount of electric power supplied and purchased by each market participant, including the Governmental Entities. The ISO and the PX then issued individual billing statements, invoices, and supporting data, specifying amounts due to or from each market participant.

39. The California IOUs, as market purchasers, are counterparties to sales by Governmental Entities in the ISO and PX markets and have standing to enforce the Governmental Entities' contractual obligations under the ISO and PX Tariffs and related agreements. The ISO and the PX operated as revenue-neutral clearinghouses, and were not themselves counterparties to any market transactions.

40. Under their respective tariffs, the ISO and the PX pass through liability for market shortfalls to market participants, including the California IOUs, that bought or sold power in the markets during the period for which there is a shortfall of funds. A market shortfall may result if one market participant defaults on a payment, causing a shortage of total funds collected by either the ISO or the PX for distribution to the other market participants. An entity that fails to pay its bill becomes responsible for a market shortfall, and is deemed an "ISO Debtor" or a "PX Debtor." An entity that is owed money because of the market shortfalls is deemed an "ISO Creditor" or "PX Creditor," with the right to enforce its contractual right to payment against an ISO or PX Debtor.

Case 2:06-cv-00517-LAS Document 33-10-1 Filed 12/15/2006 Page 11 of 30

41. In summary, the ISO and PX Tariffs provided the mechanisms through which electric power was bought and sold by market participants, with the ISO and the PX acting as clearinghouses for electric power bought and sold by market participants, holding collateral for market participants, and settling the accounts of all market participants.

**FERC's Exclusive Jurisdiction Over the ISO and PX Tariffs**

42. Because the ISO and the PX are "public utilities" under the FPA, 16 U.S.C. § 824(e), the tariffs under which they operate were filed with and approved by FERC, and are subject to FERC's exclusive jurisdiction, continual oversight and regulation. These tariffs were subject to amendment or revision by FERC, and, in fact, FERC repeatedly revised them during the relevant time period.

43. As entities regulated by FERC, the ISO and the PX were not permitted to act on any terms or conditions other than those contained in the ISO and PX Tariffs. The ISO and PX Tariffs required each participant in the ISO and PX markets to comply with all rules, conditions and provisions of the ISO and PX Tariffs.

44. Pursuant to the FPA, FERC has exclusive authority to regulate wholesale sales of electric power to ensure, among other things, that the rates charged are just, reasonable, and lawful. FERC thus has exclusive authority to regulate the rates, terms, and conditions of sales made under the ISO and PX Tariffs and to recalculate and correct such rates, terms, and conditions if FERC determines that they are not just, reasonable, and lawful. The ISO and PX Tariffs provide that parties retain the right to petition FERC to review rates charged under the tariffs and provide for recalculation of charges and resettlement of the accounts of buyers and sellers under the tariffs in the event that FERC determines that any rates charged under the tariffs were unjust, unreasonable, or otherwise unlawful, and thus subject to correction.

45. By voluntarily electing to sell electric power in the ISO and PX markets, the Governmental Entities agreed to be bound by the provisions of the ISO and PX Tariffs and any modifications thereof, including FERC's orders correcting the rates that sellers could lawfully charge for sales governed by those tariffs. Almost all of the Governmental Entities also executed written contracts, including ISO Scheduling Coordinator Agreements, and/or PX Participation

Agreements, and/or other agreements with the ISO or PX, expressly agreeing to abide by the provisions of the ISO and/or PX Tariffs. The California IOUs are direct parties to and expressly intended beneficiaries of the Governmental Entities' contractual obligations. Because the tariffs are subject to FERC's exclusive jurisdiction, all market participants, including the Governmental Entities, recognized that FERC would exercise its regulatory authority over the tariffs. If the price charged by sellers was found by FERC to be unjust and unreasonable or otherwise unlawful, all market sellers were contractually bound to refund or credit to purchasers the difference between the price charged and the lawful, corrected rate determined by FERC. Thus, all market participants were contractually bound to honor the terms and conditions of the tariffs, as revised by FERC, and these terms and conditions can be contractually enforced by the market participants against one another. The Governmental Entities' obligation to refund or credit their unlawful overcharges is the same obligation owed by all sellers in the ISO and PX markets, although the California IOUs' obligations for their purchases of electric power and other services in the ISO and PX markets remain under FERC's exclusive jurisdiction.

**The Power Crisis**

46. Beginning in May 2000, the prices demanded by sellers in the ISO and PX markets rose dramatically and sellers continued to demand unprecedented high prices for over a year, resulting in rates far in excess of those charged in prior and later periods. As a result of the auction provisions of the ISO and PX Tariffs, these extremely high prices were charged by all sellers in the markets, even if individual sellers had offered to sell their power in the auctions at lower prices. The power crisis had severe negative effects on the stability and financial integrity of the California IOUs, and ultimately imposed billions of dollars in additional costs on ratepayers, including business and residential customers throughout the State.

47. The first ratepayer impacts of these extraordinarily high prices were felt in the San Diego area, because San Diego Gas & Electric Company's ("SDG&E's") rates in the summer of 2000 provided for immediate, direct pass-through to ratepayers of the increased wholesale electric power costs. By January 2001, PG&E and SCE had amassed crippling debt in order to finance the

costs of buying electric power, costs that they were not permitted to immediately pass through to their customers. PG&E and SCE became unable to pay the PX in January 2001.

48. The surge in electric power prices also affected the reliability of the electric grid. On June 14, 2000, electric power consumers in Northern California experienced their first wave of rolling blackouts. These blackouts foreshadowed the rolling blackouts and near-continuous power emergencies that California electric customers experienced over the next year.

49. The crisis did not subside with the arrival of cooler weather in the fall of 2000. Although California's peak electric power usage historically declines by roughly 25 to 33 percent during the cooler months, prices continued to rise throughout the last quarter of 2000 and the first part of 2001.

50. By January 2001, a confluence of events led to the collapse of reliable electric service in California. At times in January 2001, the ISO ordered rolling blackouts throughout large areas of California in order to maintain the reliability of the transmission grid. The crisis became a state of emergency, threatening the safety and welfare of California citizens.

51. On December 15, 2000, FERC issued an order eliminating the requirement that the California IOUs purchase all of their needed electric power through the PX, and the PX ceased operations of its core markets on January 30, 2001. On or about January 5, 2001, the credit ratings of PG&E and SCE fell below investment grade, making PG&E and SCE ineligible to purchase power through the ISO and PX. The State of California was forced to step in as the buyer of last resort to buy electric power on behalf of the California IOUs to ensure continued service to retail customers throughout the territories served by the California IOUs. Unrelenting high prices caused PG&E and SCE to become insolvent.

52. The power crisis ultimately ended when FERC, on June 19, 2001, imposed "must-offer" requirements on electric power generators prohibiting them from withholding generation, and imposed price caps on wholesale sellers of electric power across all western states effective June 21, 2001 ("June 19, 2001 Order"). *San Diego Gas & Electric Co., et al.,* 95 FERC ¶ 61,418 at 62,558, 62,569 (2001). The remedies in the June 19, 2001 Order put an end to the rolling blackouts, catastrophically high prices, and near-continuous power emergencies.

53. The bulk of the crippling costs of the crisis have been passed through to, and paid by, the residential and commercial ratepayers of the California IOUs. These costs are included in current rates assessed to customers of the California IOUs, and will continue to be included in rates until the costs of the crisis have been paid off. By this Complaint, the California IOUs are seeking to recover from the Governmental Entities the amounts that each Governmental Entity received in excess of the lawful rates for its wholesale sales of electric power to the California IOUs in the ISO and PX markets. Amounts recovered by the California IOUs will ultimately benefit California ratepayers in the manner determined by the CPUC.

**The California Parties Seek Relief From FERC**

54. On August 2, 2000, when it became clear that the extremely high wholesale prices were not returning to the lower levels that had prevailed historically, SDG&E filed a complaint with FERC under the FPA against all sellers of energy and ancillary services into markets operated by the ISO and PX. FERC Docket No. EL00-95. PG&E, SCE, and the EOB intervened in that proceeding on August 14, 2000. The Governmental Entities were also parties to that proceeding. In that proceeding, the California Parties requested that FERC investigate the justness, reasonableness, and lawfulness of rates being charged in the California ISO and PX markets and that FERC order refunds to the extent that FERC determined that sellers had charged unjust, unreasonable, or otherwise unlawful rates.

55. In response to SDG&E's complaint, FERC commenced its own investigation into the sellers' rates, which it consolidated with SDG&E's complaint. Collectively, the associated proceedings are referred to as the "Remedy Proceeding." In an order issued July 25, 2001 (the "July 25, 2001 Order"), FERC ruled that sellers of electric power in the ISO and PX markets (including the Governmental Entities) had sold electric power at unjust, unreasonable, and unlawful rates, and that the rates charged in the ISO and PX markets should be corrected for the Refund Period. FERC Docket No. EL00-98-000. *See San Diego Gas & Electric Co.*, 96 FERC ¶ 61,120 (2001).

56. In the July 25, 2001 Order, FERC held: "Our action here establishes a revised method for calculating the just and reasonable clearing prices to be applied in those markets for the period

beginning October 2, 2000. This is pursuant to the Commission's authority under FPA section 206 to fix the just and reasonable rate. Our action thus revises the market clearing prices that all market participants previously agreed to accept for their sales. In this context, we see no reason to treat [the Governmental Entities] differently, as they are receiving the same price, the just and reasonable market clearing price established pursuant to market rules approved by this Commission, that they expected to obtain for their wholesale sales in the centralized ISO and PX spot markets." July 25, 2001 Order, 96 FERC at 61,512.

57. FERC also concluded that, on the record before it, its statutory mandate did not grant it authority to order refunds for the Summer Period (i.e., May 1, 2000 through October 1, 2000), and thus denied relief for the Summer Period. FERC also refused to correct the rates for "energy exchange" transactions (in which blocks of electric power were sold to the ISO for payment in-kind) and sales to the ISO or the PX of greater than twenty-four hours (i.e., "multi-day" sales under FERC's definition) made during the Refund Period. *See* July 25, 2001 Order, 96 FERC at 61,499; *see also San Diego Gas & Electric Co.*, 102 FERC ¶ 61,317 at 62,065 (2003). The California Parties have appealed to the Ninth Circuit FERC's decisions to limit refunds to the Refund Period and to certain transactions during the Refund Period, and that appeal is currently pending.

58. In order to remedy the unlawful prices charged in the market during the Refund Period, FERC has, in a series of orders beginning with the July 21, 2005 Order, adopted a methodology to recalculate, on a market-wide basis, the just and reasonable prices that all sellers should have received under the ISO and PX Tariffs. In lieu of the auction pricing mechanism previously provided in the ISO and PX Tariffs, which resulted in unlawful prices, FERC's methodology effectively revised the ISO and PX Tariffs to determine the corrected, maximum rates that could be charged under those tariffs. These corrected, maximum rates were called the "Mitigated Market Clearing Price," or "MMCP." FERC ordered the ISO and PX to apply the MMCP to sales during the Refund Period, including to OOM sales, in order to recalculate the charges that all sellers should have received for each interval during the Refund Period in place of the previous unlawful prices.

59. The ISO was ordered to calculate the amounts that sellers were required to refund or credit to buyers under the July 25, 2001 Order. July 25, 2001 Order, 96 FERC at 61,516. Pursuant to FERC's direction, the ISO and the PX have recalculated the accounts of all sellers and buyers in the ISO and PX markets to reflect the corrected rates for the Refund Period in accordance with the July 25, 2001 Order and the subsequent related FERC orders.

60. The California Parties have petitioned the Ninth Circuit for review of the July 25, 2001 Order and subsequent FERC rehearing orders on the ground, *inter alia*, that FERC was also required to correct the rates for sales made during the Summer Period. That petition for review has been briefed and argued and is now pending for decision in the Ninth Circuit. *Public Util. Comm'n of Cal. v. Federal Energy Regulatory Comm'n*, Case No. 01-71051, *et al.* The California Parties have also appealed the July 25, 2001 Order on the ground that FERC was required to correct the rates for energy exchange transactions and multi-day sales made during the Refund Period. The California Parties' challenges to FERC's rulings on energy exchanges and multi-day sales are pending in the Ninth Circuit in the same case.

61. The question of relief for the Summer Period and other non-mitigated Refund Period transactions also was at issue in a second FERC proceeding, separate from the Remedy Proceeding. In a petition to the Ninth Circuit for review of orders in that FERC proceeding, the Ninth Circuit held that FERC had erred by concluding that it lacked authority to order refunds for the Summer Period transactions and for other non-mitigated transactions during the Refund Period, and remanded the case so that FERC, "in the first instance," could reconsider whether refunds are appropriate for those transactions. *California, ex rel. Lockyer v. FERC*, 383 F.3d 1006, 1016-18 (9th Cir. 2004), *pet. for reh'g pending*.

**Market Manipulation Resulted in Windfall Profits for All Sellers**

62. FERC recognized early on that market manipulation could have negatively affected the California markets. On November 1, 2000, FERC noted that "there is clear evidence that the California market structure and rules provide the opportunity for sellers to exercise market power when supply is tight and can result in unjust and unreasonable rates under the [Federal Power Act]." *San Diego Gas & Electric Co.*, 93 FERC ¶ 61,121 at 61,350 (2000) ("November 1 Order").

63. FERC initially refused the California Parties' attempts to obtain discovery and introduce into the Remedy Proceeding evidence of sellers' market manipulation and tariff violations, but in May 2002, acting in a separate non-public docket, FERC released memoranda that described how Enron and other sellers had manipulated the ISO and PX markets in order to increase prices throughout the power crisis. In response, FERC propounded discovery requests to all sellers in the ISO and PX markets regarding market manipulation. On August 23, 2002, the Ninth Circuit directed FERC to allow the California Parties to adduce in the Remedy Proceeding evidence of sellers' market manipulation and tariff violations. As a result of the Ninth Circuit's order, the California Parties conducted discovery from late 2002 to early 2003 of sellers in the ISO and PX markets, including the Governmental Entities. That discovery provided evidence of a pattern of market manipulation and tariff violations involving numerous sellers in the ISO and PX markets.

64. The California Parties' discovery uncovered evidence that certain sellers in the market engaged in various forms of market manipulation and tariff violations that created the false perception of scarcity in the market and that drove up market prices. For example, sellers practiced physical and economic withholding of generation. This allowed suppliers to increase the price of electricity by keeping large amounts of electric power off the market. Physical withholding occurred when a generator refused to place a supply bid with the PX even when it had power available, or when it falsely reported an outage at a generating plant. Economic withholding occurred when a seller placed high bids unrelated to its generation costs to create the false appearance of scarcity, and so to drive prices higher than true competitive levels would have provided.

65. Certain sellers in the market engaged in other gaming strategies — the infamous "Fat Boy," "Death Star," and "Ricochet" schemes, among others — and often used other market participants to assist them with these gaming strategies. Notes and tapes of telephone conversations among energy traders revealed discussions about traders' submission of "fake load" in the market, about their intent to "push the price up and keep the price up," and about their implementation of

bidding strategies that would signal other market participants to withhold electric power from the market through physical or economic means.

66. Once this information was available, it became evident that market fraud and manipulation were significant causes of the California Energy Crisis. Since the end of the California Energy Crisis, numerous energy traders and executives have pled guilty to, or been indicted on, criminal charges, and many have specifically admitted to market manipulation activities.

67. Because all sellers received the same market-clearing prices set by the ISO and PX auctions, the artificially inflated prices created windfall profits for all sellers in the ISO and PX markets, benefiting even those sellers that did not engage in market manipulation. FERC's July 25, 2001 Order and subsequent orders have ameliorated the effects of market manipulation on the transactions that they addressed by correcting the pricing under the ISO and PX Tariffs to reduce the prices that all sellers were authorized to retain for those sales.

**The Ninth Circuit's *Bonneville* Decision**

68. FERC ruled in a series of decisions that its power to enforce sellers' payment of refunds under the FPA extended to governmental entities and rural electric cooperatives, such as the Governmental Entities. Certain of the Governmental Entities appealed this decision to the Ninth Circuit. On September 6, 2005, the Ninth Circuit ruled that FERC lacked statutory authority directly to enforce the Governmental Entities' refund obligations under the ISO and PX Tariffs. *Bonneville Power Admin. v. Federal Energy Regulatory Comm'n*, 422 F.3d 908 (9th Cir. 2005). The Court noted, however, that market participants had, as an alternative remedy, the ability to bring claims in court directly against the Governmental Entities to enforce the contractual obligations created by the operative tariffs and related agreements. *Bonneville Power Admin.*, 422 F.3d at 925-926.

69. The Ninth Circuit observed that the Governmental Entities' agreement to abide by the ISO and PX Tariffs "[serves] to demonstrate that the remedy, if any, may rest in a contract action, not a refund action. Such an approach is not novel . . . ." *id.* at 925 (citing *Alliant Energy v. Neb. Pub. Power Dist.*, 347 F.3d 1046, at 1050-51 (8th Cir. 2003)). The Ninth Circuit quoted with

approval the Eighth Circuit's holding in *Alliant Energy* that "[w]hen a contract provides that its terms are subject to a regulatory body, all parties to that contract are bound by the actions of the regulatory body . . . . As a result, we are not enforcing the FERC order; instead, we are enforcing an agreement, which [the Governmental Entity] freely entered.") *Bonneville*, 422 F.3d at 926 (quoting *Alliant Energy*, 347 F.3d at 1050). The Ninth Circuit has not yet issued the mandate in the *Bonneville* proceeding.

70. In this Complaint, the California Parties seek to enforce in this Court the Governmental Entities' contractual obligations to refund the amounts they charged in excess of the lawful corrected rates, as suggested by the Ninth Circuit in its *Bonneville* decision.

71. On December 2, 2005, without conceding that they were required to take such action at that time, the California Parties complied with state claims presentment statutes by serving copies of written claims on all California defendants and on the Salt River Project, providing them with notice of the California Parties' present claims for relief. Cal. Gov't Code § 910; Ariz. Rev. Stat. 12-821-01. The Arizona claims presentment statutes do not apply to RUS-financed cooperatives; consequently, no notice of claim was presented to AEPCO. On the same date, the California Parties also served claims on EWEB, the City of Seattle, and Grant County PUD, in light of ambiguity as to whether the California Parties were required to present these claims under Oregon and Washington law. Ore. Rev. Stat. § 30.275; Rev. Code. Wash. 4.96.010-020.

72. The waiting periods prescribed by the applicable claims presentment statutes have elapsed. The Cities of Anaheim, Azusa, Banning, Burbank, Glendale, Pasadena, Riverside, Santa Clara, Los Angeles, Seattle and Vernon, and the LADWP, Modesto Irrigation District, Turlock Irrigation District, the Northern California Power Agency, and the Sacramento Municipal Utility District have denied the California Parties' claims. The California Parties' claims presented to Grant County and Salt River Project are deemed denied by operation of law because the statutory period for a decision by these entities has expired. The California Parties' claims against EWEB remain unsatisfied, and Oregon law does not require any formal action by EWEB prior to commencement of suit.

73. Prior to the Ninth Circuit's *Bonneville* order, which was issued on September 6, 2005, FERC asserted and exercised exclusive jurisdiction over claims for refunds from all sellers, including the Governmental Entities. Thus, in accordance with the July 25, 2001 Order and under FERC's rulings and Ninth Circuit authority, the FERC proceedings were the exclusive forum for the California Parties' refund claims, including claims for refunds from the Governmental Entities. No claim accrued and no limitations period commenced to run until September 6, 2005, when the Ninth Circuit ruled, for the first time, that FERC did not, in fact, have jurisdiction to enforce the refund liability of the Governmental Entities.

74. Alternatively, to the extent that any limitations period had commenced to run on the California Parties' right to sue in a court to enforce the Governmental Entities' refund obligations prior to the *Bonneville* order, the limitations period was tolled, at a minimum, from the time the California Parties initiated refund proceedings with FERC on August 2, 2000, through the time the Ninth Circuit issued its decision in *Bonneville* on September 6, 2005.

75. This lawsuit is based on the same facts that were at issue in the Remedy Proceeding and in the various Ninth Circuit appeals from the Remedy Proceeding: the sellers' (including the Governmental Entities') receipt and retention of rates for sales of wholesale electric power in the ISO and PX markets that are unlawful and unauthorized under the ISO and PX Tariffs. The California Parties acted promptly, reasonably, and in good faith in seeking relief from FERC against all sellers in the California markets, including the Governmental Entities. The Governmental Entities were active parties to the FERC Remedy Proceeding, and have had notice throughout the FERC proceedings of the need to gather and preserve relevant evidence. Following the Ninth Circuit's *Bonneville* decision, the California Parties acted expeditiously to present claims to the Governmental Entities and to commence this action.

**CLAIMS FOR RELIEF**

**FIRST CLAIM**

**Breach of Contract**

76. The California Parties incorporate by reference the allegations set forth above.

77. All sellers in the ISO and PX markets, including the Governmental Entities, were charged with knowledge that the market-clearing prices, and the formulas and market rules that set the prices, were subject to correction if they were found by FERC to contravene the requirements of the FPA. By voluntarily choosing to sell electric power at wholesale in the ISO and PX markets, and/or by executing ISO Scheduling Coordinator Agreements, PX Participation Agreements, or other agreements with the ISO or PX, the Governmental Entities contractually agreed to be bound by the provisions of the ISO and PX Tariffs, which incorporate FERC's power to correct prices that it determines to be unjust, unreasonable, or unlawful.

78. Pursuant to its authority under the FPA, FERC revised the tariffs and corrected the prices that market participants were entitled to receive for their sales during the Refund Period by adopting the MMCP. Upon FERC's correction of the rates charged and received by sellers, including the Governmental Entities, in the ISO and PX markets, the corrected rates became the only lawful and authorized rates for those sales under the applicable tariffs.

79. The Governmental Entities are now contractually obligated to reimburse the California IOUs for the difference between the rates that the Governmental Entities initially charged for their sales in the ISO and PX markets and the MMCP. The Governmental Entities have refused to refund, and continue to refuse to refund, to the California IOUs the amounts that they received in excess of the MMCP during the Refund Period.

80. The Governmental Entities' conduct constitutes a breach of their contractual obligations to the California IOUs, entitling the California IOUs to judgment against each Governmental Entity for all amounts that each Governmental Entity received in excess of the lawful rate attributable to its wholesale sales of electric power to the California IOUs in the ISO and PX markets during the Refund Period, plus associated interest.

**SECOND CLAIM**

**Anticipatory Breach of Contract**

81. The California Parties incorporate by reference the allegations set forth above.

82. This Claim is pleaded in the alternative to the First Claim. If it is determined that the date by which the Governmental Entities would be obligated under the applicable contracts to refund to the California IOUs the amounts that they received in excess of the MMCP during the Refund Period has not yet occurred, the Governmental Entities have nonetheless become obligated to make such refunds immediately, and in advance of such date, because they have wrongfully denied and repudiated any legal duty to so repay the California IOUs. Specifically, the Governmental Entities have repudiated, in the FERC proceedings, in appeals from FERC orders, and by their denial of the California IOUs' duly-presented claims, their contractual obligations to the California IOUs, including their obligation to comply with the revised Tariff provisions by refunding their unlawful overcharges.

83. The Governmental Entities' conduct constitutes an anticipatory breach of their contractual obligations to the California IOUs, entitling the California IOUs to judgment against each Governmental Entity for all amounts that each Governmental Entity received in excess of the lawful rate attributable to its wholesale sales of electric power to the California IOUs in the ISO and PX markets during the Refund Period, plus associated interest.

**THIRD CLAIM**

**Unjust Enrichment Arising from Contract**

84. The California Parties incorporate by reference the allegations set forth above.

85. By accepting and retaining prices that are now unlawful under the ISO and PX Tariffs, and by denying their obligations to refund or credit overcharges to buyers in the ISO and PX markets, the Governmental Entities have unjustly enriched themselves at the expense of market purchasers, including the California IOUs and, ultimately, the IOUs' customers, who paid inflated and unlawful prices for electric power. The Governmental Entities' retention of those unlawful prices violates their contractual duty to abide by the provisions of the ISO and PX Tariffs.

86. In addition, the Governmental Entities' retention of prices in excess of the MMCP that are unauthorized under the tariffs is inequitable and unfair: For transactions where they were buyers, the Governmental Entities are seeking refunds from other sellers of prices they paid in excess of the lawful, corrected rate. By contrast, for transactions where they were sellers, the Governmental Entities deny any obligation to pay refunds, and seek to retain the windfall benefits of the original unlawful prices they charged other market participants.

87. The Governmental Entities have been unfairly enriched, entitling the California IOUs to judgment against each Governmental Entity for all amounts that each Governmental Entity received in excess of the lawful rate attributable to its wholesale sales of electric power to California IOUs in the ISO and the PX markets during the Refund Period, plus associated interest.

**FOURTH CLAIM**

**Money Had and Received**

88. The California Parties incorporate by reference the allegations set forth above.

89. By accepting and retaining prices that are unlawful under the ISO and PX Tariffs, and by denying their obligations to refund or credit overcharges to those buyers in the ISO and PX markets, the Governmental Entities have accepted the benefit of illegal profits that rightfully belong to purchasers in the ISO and PX markets, including the California IOUs, that were harmed by the unlawful prices. Any overcharges received by a Governmental Entity from the California IOUs as a result of unlawful prices rightfully belong to and should be returned to the California IOUs.

90. The Governmental Entities are accordingly liable to the California IOUs for all amounts each Governmental Entity received in excess of the lawful rate attributable to its wholesale sales of electric power to the California IOUs in the ISO and PX markets during the Refund Period, plus associated interest.

**FIFTH CLAIM**

**Declaratory Relief (Refund Period)**

91. The California Parties incorporate by reference the allegations set forth above.

92. A controversy has arisen in that the Governmental Entities have denied any liability to the California IOUs for overcharges associated with transactions during the Refund Period for which FERC has ordered relief. The California Parties seek a declaratory judgment that the California IOUs are contractually entitled to recover from each Governmental Entity all amounts that each Governmental Entity charged in excess of the lawful rate attributable to its sales to the California IOUs in the ISO and PX markets during the Refund Period.

**SIXTH CLAIM**

**Declaratory Relief (Energy Exchanges and Multi-Day Sales)**

93. The California Parties incorporate by reference the allegations set forth above.

94. A controversy has arisen in that the Governmental Entities have denied that they will have any liability to the California IOUs to refund their overcharges associated with energy exchanges and multi-day sales if FERC corrects the prices for these transactions. The California Parties seek a declaratory judgment that at such time as FERC finds that the rates charged by sellers for energy exchanges or multi-day sales were unlawful, the California IOUs will be entitled to recover from the Governmental Entities the difference between the rates the Governmental Entities charged and the lawful rates as ultimately determined by FERC, plus associated interest.

**SEVENTH CLAIM**

**Declaratory Relief (Summer Period)**

95. The California Parties incorporate by reference the allegations set forth above.

96. A controversy has arisen in that the Governmental Entities have denied that they will have any liability to the California IOUs to refund their overcharges associated with their sales during the Summer Period if FERC corrects the prices for the Summer Period. The California Parties seek a declaratory judgment that at such time as FERC finds that the rates charged by sellers during the Summer Period were unlawful, the California IOUs will be entitled to recover from the Governmental Entities the difference between the rates that the Governmental Entities originally charged and the lawful rates as ultimately determined by FERC, plus associated interest.

## EIGHTH CLAIM

## Declaratory Relief (Contractual and Equitable Indemnification)

97. The California Parties incorporate by reference the allegations set forth above.

98. Because the ISO and PX are revenue-neutral entities, the Governmental Entities' refusal to honor their repayment obligations will result in a shortfall of funds needed to settle the accounts of ISO and PX participants. Under the terms of the ISO and PX Tariffs, other market participants, including the California IOUs, may therefore be required to indemnify the ISO and PX for the resulting shortfall.

99. Any reductions in the California IOUs' accounts to indemnify the ISO and PX for the Governmental Entities' refusal to honor their repayment obligations will constitute amounts due and owing by the Governmental Entities, as ISO Debtors and PX Debtors, to the California IOUs as ISO Creditors and PX Creditors. The California IOUs, as market participants, are entitled under the ISO and PX Tariffs to bring proceedings directly against the Governmental Entities to recover these amounts owed. A controversy has arisen in that the Governmental Entities have denied that they have any obligation to disgorge amounts they received in excess of the lawful rate.

100. The California IOUs seek a declaratory judgment that the Governmental Entities will be liable to the California IOUs on grounds of contractual and equitable indemnification for any amount assessed against the California IOUs' accounts due to the Governmental Entities' refusal to honor their repayment obligations, as well as for all additional costs and expenses incurred by the California IOUs as a result of the Governmental Entities' refusal to honor their repayment obligations.

## NINTH CLAIM

## Declaratory Relief (ISO and PX Accounts)

101. The California Parties incorporate by reference the allegations set forth above.

102. This Claim is pleaded in the alternative to the First through Eighth Claims.

103. A controversy has arisen in that the Governmental Entities have denied that they have any liability to the California IOUs to refund their overcharges associated with their sales during the

Refund Period, and that they will have any liability to the California IOUs to refund their overcharges associated with Energy Exchanges and Multi-Day Sales and sales during the Summer Period if FERC corrects the prices for those transactions. The California Parties seek a declaration that the Governmental Entities are contractually obligated to permit their accounts at the ISO and PX to be adjusted to reflect all pricing changes resulting from FERC's determination of the corrected, maximum rates under the ISO and PX Tariffs and the recalculation by the ISO and PX pursuant to FERC's direction of the prices charged under the ISO and PX tariffs during the relevant time periods, and are contractually obligated to pay any refunds and to otherwise honor the invoices reflecting the refunds associated with all affected transactions.

## PRAYER FOR RELIEF

WHEREFORE, the California IOUs pray for relief against each Governmental Entity as follows:

1. For judgment against each of the Governmental Entities for all amounts that each Governmental Entity charged in excess of the lawful rate attributable to its sales to the California IOUs in the ISO and PX markets during the Refund Period;
2. For a judgment declaring that the California IOUs are entitled to recover from each Governmental Entity all amounts that each Governmental Entity charged in excess of the lawful rate attributable to its sales to the California IOUs in the ISO and PX markets during the Refund Period;
3. For a judgment declaring that at such time as FERC finds that the rates charged by sellers for energy exchanges or multi-day sales during the Refund Period were unlawful, the California IOUs will be entitled to recover from each Governmental Entity the difference between the rates that each Governmental Entity charged and the lawful rates as ultimately determined by FERC;
4. For a judgment declaring that at such time as FERC finds that the rates charged by sellers during the Summer Period were unlawful, the California IOUs will be entitled to recover from each Governmental Entity the difference between the rates

Case 2:07-cv-05557-LAS Document 33-11 Filed 12/17/2008 Page 27 of 30

each Governmental Entity charged and the lawful rates as ultimately determined by FERC;

5. For a judgment declaring that at such time as the Governmental Entities' refusal to honor their repayment obligations results in a shortfall of funds necessary to settle the California IOUs' accounts, each Governmental Entity will be liable to the California IOUs on grounds of contractual and equitable indemnification for any amount assessed against the California IOUs' accounts;

6. In the alternative, for a judgment declaring that the Governmental Entities are contractually obligated to permit their accounts at the ISO and PX to be adjusted to reflect all pricing changes resulting from FERC's determination of the corrected, maximum rates under the ISO and PX Tariffs and the recalculation by the ISO and PX pursuant to FERC's direction of the prices charged under the ISO and PX tariffs during the relevant time periods, and are contractually obligated to pay any refunds and to otherwise honor the invoices reflecting the refunds associated with such transactions;

7. For an award of pre-judgment and post-judgment interest;

8. For recoverable costs of suit and other expenses; and

9. For such further relief as the Court may deem just and proper.

DATED: March 16, 2006

HELLER EHRMAN LLP

By: /s/ Marie L. Fiala
Marie L. Fiala

Attorney for Pacific Gas & Electric Company

[ADDITIONAL COUNSEL OF RECORD]

STAN BERMAN (WA BAR NO. 29898)
PEGGY J. WILLIAMS (WA BAR NO. 11281)
LISA D. HARDIE (WA BAR NO. 35708)
(*Pro Hac Vice Applications Pending*)
HELLER EHRMAN LLP
701 Fifth Ave, Suite 6100
Seattle, WA 98104-7098
Telephone: (206) 447-0900
Facsimile: (206) 447-0849
stan.berman@hellerehrman.com
peggy.williams@hellerehrman.com
lisa.hardie@hellerehrman.com

Attorneys for Plaintiff
Pacific Gas and Electric Company

DATED: March 16, 2006

STEPTOE & JOHNSON LLP

By: /s/ Lawrence P. Riff (as authorized on March 16, 2006)
LAWRENCE P. RIFF

Attorney for the Southern California Edison Company

[COUNSEL OF RECORD]

LAWRENCE P. RIFF (SBN 104826)
JAY E. SMITH (SBN 162832)
STEPTOE & JOHNSON LLP
633 West Fifth Street, Seventh Floor
Los Angeles, California 90071
Telephone: (213) 439-9400
Facsimile: (213) 439-9599
lriff@steptoe.com
jsmith@steptoe.com

RUSSELL C. SWARTZ (CA BAR NO. 078360)
LEON BASS (CA BAR NO. 127403)
2244 Walnut Grove Ave
Rosemead, CA 91770
Telephone: (626) 302-1212
Facsimile: (626) 302-3990
russell.swartz@sce.com
leon.bass@sce.com

Attorneys for Plaintiff Southern California Edison Company

Case 2:07-cv-00515-LAS Document 32-10-1 Filed 02/07/2008 Page 30 of 49

DATED: March 16, 2006

CALIFORNIA ELECTRICITY OVERSIGHT BOARD

By: /s/ Steven Russo (as authorized on March 16, 2006)
STEVEN RUSSO

Attorney for the California Electricity Oversight Board

[COUNSEL OF RECORD]

ERIK N. SALTMARSH (CA BAR NO. 156919)
STEVEN BENITO RUSSO (CA BAR NO. 104858)
CALIFORNIA ELECTRICITY OVERSIGHT BOARD
770 L Street, Suite 1250
Sacramento, CA 95814
Telephone: (916) 322-8601
Facsimile: (916) 322-8591
Steven.Russo@eob.ca.gov
esaltmarsh@eob.ca.gov

Attorneys for Plaintiff California Electricity Oversight Board

MARIE L. FIALA (CA BAR NO. 79676)
RUSSELL P. COHEN (CA BAR NO. 213105)
INGRID S. LEVERETT (CA BAR NO. 148813)
CECILIA Y. CHAN (CA BAR NO. 240971)
HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA 94104-2878
Telephone: +1.415.772.6000
Facsimile: +1.415.772.6268
marie.fiala@hellerehrman.com
russell.cohen@hellerehrman.com
ingrid.leverett@hellerehrman.com
cecilia.chan@hellerehrman.com

Attorneys for Plaintiff
PACIFIC GAS AND ELECTRIC COMPANY

[ADDITIONAL PARTIES AND COUNSEL SHOWN ON SIGNATURE PAGE]

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| PACIFIC GAS AND ELECTRIC COMPANY, et al.,<br>Plaintiffs,<br>v.<br>ARIZONA ELECTRIC POWER COOPERATIVE, INC., et al.,<br>Defendants. | Related Case Nos.:<br>2:06-CV-0559-MCE-KJM<br>2:06-CV-0592-MCE-KJM<br><br>**CALIFORNIA PARTIES' CONSOLIDATED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' PRELIMINARY MOTIONS**<br><br>Hearing Date: October 24, 2006<br>Time: 2:00 p.m.<br>Location: Courtroom 3<br>Judge: Morrison C. England, Jr. |
| SAN DIEGO GAS & ELECTRIC COMPANY,<br>Plaintiff,<br>v.<br>ARIZONA ELECTRIC POWER COOPERATIVE, INC., et al.,<br>Defendants. | |

## TABLE OF CONTENTS

## FEDERAL QUESTION

**Page**

II. THIS COURT HAS FEDERAL QUESTION JURISDICTION, BECAUSE THIS CASE REVOLVES AROUND INTERPRETATION OF FERC-REGULATED TARIFFS WITH THE FORCE OF FEDERAL LAW. .... 47

A. The Supreme Court's Recent Decision in *Grable* Rejects Defendants' Principal Jurisdictional Argument. .... 48

B. The California Parties' State Law Claims, Alleging Breach of Federally Filed Tariffs, Satisfy the Four-Pronged Test for Federal Jurisdiction That the Supreme Court Articulated in *Grable*. .... 49

1. This Case Requires Resolution of a Federal Issue Because It Revolves Around Interpretation of the FERC-Filed Tariffs, Which Have the Effect of Federal Law. .... 51

2. The Interpretation of Federally Filed Tariffs Is a Matter of Substantial Federal Interest. .... 54

3. Finding Federal Question Jurisdiction Here Will Not Cause a Shift of Traditionally State Matters to Federal Courts. .... 56

C. Defendants' Arguments Against Federal Jurisdiction Ignore Controlling Authority. .... 57

1. Federal Question Jurisdiction Lies Even Though the Claim Is Based on a Contractual Relationship. .... 57

2. It Is Irrelevant That FERC Does Not Have Regulatory Jurisdiction to Compel Defendants to Pay Refunds. .... 60

## II. THIS COURT HAS FEDERAL QUESTION JURISDICTION, BECAUSE THIS CASE REVOLVES AROUND INTERPRETATION OF FERC-REGULATED TARIFFS WITH THE FORCE OF FEDERAL LAW.

This court has jurisdiction because this case "aris[es] under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. In the vast majority of federal question cases, federal question jurisdiction is based on a cause of action created by federal law. *See Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 125 S. Ct. 2363, 2367 (2005). But "for nearly 100 years," the Supreme Court has "recognized . . . that in certain cases federal question jurisdiction will [also] lie over state-law claims," like the contract claims in this case, that require the resolution of a "disputed" and "substantial" issue of federal law. *Id.* at 2366-67; *see Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for So. Cal.*, 463 U.S. 1, 9-10 (1983); *Gully v. First Nat'l Bank in Meridian*, 299 U.S. 109, 112 (1936); *Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180, 199 (1921). And the Ninth Circuit, for its part, has consistently held that state law claims that revolve around the interpretation of federally regulated tariffs—including one of the Tariffs at issue in this case—necessarily raise federal questions. *See, e.g., California ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 841 n.6, 843, *amended by* 387 F.3d 966 (9th Cir. 2004), *cert. denied*, 544 U.S. 974 (2005).

That must be why thirteen of the Defendants, who have filed extensive motions raising all manner of arguments for dismissal, tacitly concede that this Court has federal question jurisdiction. Only four Defendants (Burbank, Turlock, LADWP, and Grant County) dispute jurisdiction, but they build their position largely on a legal foundation that the Supreme Court demolished just last year, in a decision these Defendants do not even cite. *See infra* pp. 48-56.

The jurisdictional basis can be stated simply: The California Parties and Defendants dispute the meaning of language in a contract. But it is not just any contract. The disputed language is contained in federally-regulated Tariff provisions—the ISO and PX Tariffs—that have the status of federal law. To resolve the dispute, this Court will have to decide numerous questions of Tariff interpretation that could have significant legal ramifications for other market participants—including those that are squarely within FERC's jurisdiction to compel refunds. For example, this dispute will require this Court to determine what *the Tariffs* say about the rights of market

participants to sue to enforce Tariff obligations and whether parties that are bound by *the Tariffs* have any contractual obligations to one another, or only to the ISO or the PX. These are all federal questions—questions that can be answered only by scrutinizing the language of Tariffs that have the status of federal law—and this Court, therefore, has federal question jurisdiction. *See infra* 51-54.

To be sure, this particular federal law directs any tribunal interpreting the Tariffs (including FERC) to import certain *rules of interpretation* from California law in the course of resolving the meaning of the Tariffs' substantive provisions. But that does not change the reality that the *substance* of the obligations being interpreted is couched in federal law. *See infra* 51-54. Similarly, the essential federal nature of the questions before this Court does not change just because FERC does not have jurisdiction to provide the relief sought in this case (refunds of overcharges) against these particular Defendants. Interpretation of those substantive Tariff terms is a matter of federal concern justifying a federal forum no matter who the parties before the Court happen to be or what other remedies may or may not be available. *See infra* 54-56.

### A. The Supreme Court's Recent Decision in *Grable* Rejects Defendants' Principal Jurisdictional Argument.

Defendants' challenge to federal question jurisdiction begins, inauspiciously, with this pronouncement: "'[U]nder *Merrell Dow*, if a federal law does not provide a private right of action, then a state law action based on its violation perforce does not raise a 'substantial' federal question.'" LADWP Jur. Br. at 4-6 (quoting *Utley v. Varian Assocs., Inc.*, 811 F.2d 1279, 1283 (9th Cir. 1987), and citing *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804 (1986)); *see* Burbank Br. at 36 (same; citing *Merrell Dow* and *Utley*). They assert that "'[t]his conclusion virtually mandates a finding that plaintiff's claims should not be in federal court.'" LADWP Jur. Br. at 5 (quoting *J.A. Jones Constr. Co. v. City of New York*, 753 F. Supp. 497, 503 (S.D.N.Y. 1990)). This was once a plausible, if aggressive, interpretation of the Supreme Court's 1986 decision in *Merrell Dow*, based upon a single sentence of dicta in that opinion—stressing the significance of Congress's decision not to create a federal cause of action for the plaintiff's claim—en route to finding no federal question jurisdiction over that claim. *See Merrell Dow*, 478 U.S. at

812. In fact, the Ninth Circuit had adopted that interpretation for a time, *see, e.g.*, *Utley*, 811 F.2d at 1283, although it continued to find federal question jurisdiction over state law claims revolving around the interpretation of tariffs, *See infra* 52-53.

But last year in *Grable*, the Supreme Court confronted and rejected that interpretation of *Merrell Dow*. Though one would never know it from reading Defendants' briefs—which never so much as cite *Grable*—the Court unanimously held that "*Merrell Dow* cannot be read whole as overturning decades of precedent . . . and converting a federal cause of action from a sufficient condition for federal-question jurisdiction into a necessary one." 125 S. Ct. at 2369-71. Any such view, the Supreme Court held, defied the "commonsense notion" that certain state law claims premised on federal law "justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Id.* at 2367. Courts have federal question jurisdiction, the Court held, whenever "a state-law claim necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Id.* at 2368.

Thus, any pre-*Grable* opinions holding otherwise, like the cases on which Defendants rely, are no longer good law. LADWP Jur. Br. at 5, 7 (citing *Utley*; *Templeton Bd. of Sewer Comm'rs v. Am. Tissue Mills of Mass., Inc.*, 352 F.3d 33 (1st Cir. 2003); and *J.A. Jones*, 753 F. Supp. at 503); Burbank Br. at 36 (citing *Utley*). Whether Defendants' insistence on invoking those rejected principles here is a matter of revolt, neglect, or nostalgia, it is fatal to their jurisdictional challenge. *See County of Santa Clara v. Astra USA, Inc.*, 401 F. Supp. 2d 1022, 1030 (N.D. Cal. 2005) (explaining that *Grable* has overruled the once-common interpretation of *Merrell Dow*, that it required a federal private right of action).

**B. The California Parties' State Law Claims, Alleging Breach of Federally Filed Tariffs, Satisfy the Four-Pronged Test for Federal Jurisdiction That the Supreme Court Articulated in *Grable*.**

*Grable* did not just demolish the principal premise of Defendants' jurisdictional challenge. It also provided the framework by which jurisdiction must be analyzed, setting out a four-factor test—that Defendants also ignore—for determining whether a particular state law claim warrants federal question jurisdiction: (1) the state law claim must "raise a stated federal issue"; (2) the

federal issue must be "a substantial one, indicating a serious federal interest in claiming the advantages thought to be inherent in a federal forum"; (3) the exercise of federal jurisdiction must be "consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331"; and (4) the federal issue must be "necessarily raise[d]," which is to say necessary to the disposition of the case, and "actually disputed." 125 S. Ct. at 2367-68.

*Grable*'s facts are instructive, for they are so similar, structurally, to the facts of this case. The case was an action to quiet title to a parcel of land—a classic state law cause of action of a sort that rarely wanders into federal court. A former owner of the parcel (Grable) brought the action against the current owner (Darue). The quiet title action did not, of course, arise under federal law, for federal law has nothing to say about who has legitimate title to real property. Nevertheless, the Supreme Court upheld federal question jurisdiction over the action, because the original owner's state law claim for title revolved around a federal question: Five years earlier, the Internal Revenue Service had seized the property to satisfy the former owner's federal tax delinquency, and sold it to the current owner. The former owner asserted that the seizure was invalid because the IRS had not provided the notice prescribed by federal law: The IRS notified the former owner of the seizure in a certified letter, but the former owner asserted that a federal statute, 26 U.S.C. § 6335, required personal service. 125 S. Ct. at 2366. If he were right, and the IRS had unlawfully seized the property, *state law* would have imported the federal notice provision and invalidated the current owner's title. The Supreme Court found that these facts satisfied the four prongs. *Id.* at 2368.

The same is true here. Because there is no dispute about the fourth prong,[46] we address the first three, in turn.

---

[46] Resolution of the federal question is "necessary," because the claims for breach of contract depends entirely on whether the ISO and PX Tariffs impose on Defendants the obligations they allegedly breached. *See, e.g.*, PG&E Compl. ¶¶ 44-45; SDG&E Compl. ¶¶ 39-40. And, as is evident from these motions to dismiss, Defendants are disputing the California Parties' interpretation of Tariff provisions. PG&E Compl. ¶ 72; SDG&E Compl. ¶ 57; *see, e.g.*, NCPA Br. at 14-16, 29-31; G/P Br. at 20-22; Vernon Br. at 12-13.

### 1. This Case Requires Resolution of a Federal Issue Because It Revolves Around Interpretation of the FERC-Filed Tariffs, Which Have the Effect of Federal Law.

Like *Grable*, this case alleges claims based on state law—specifically, a contract claim, as opposed to a common law quiet title claim. But, also like *Grable*, this case, too, revolves around multiple questions of federal law. *See Grable*, 125 S. Ct. at 2367-68. The contracts in question are not mundane commercial transactions negotiated outside any federal oversight or concern. They are federal tariffs. As such, these contracts are not only regulated by, and subject to approval of, a federal agency under standards prescribed by federal law, but each Tariff literally "*is* federal law"—with the same legal effect as a formally promulgated federal regulation. *California ex rel. Lockyer v. Mirant Corp.*, No. C-02-1797-VRW, 2002 WL 1897669, at *6 (N.D. Cal. Aug. 6, 2002) (emphasis added), *aff'd sub nom. California ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, *amended by* 387 F.3d 966 (9th Cir. 2004). As the Ninth Circuit put it, referring to the very ISO Tariff that is the subject of this case, "[o]nce filed with a federal agency, tariffs are the equivalent of a federal regulation," and "define[] the companies' contractual obligation[s] with respect to the conduct at issue." *Dynegy*, 375 F.3d at 841 (internal quotation marks omitted); *accord Evanns v. AT&T Corp.*, 229 F.3d 837, 840 (9th Cir. 2000) (once filed with the federal agency, "the terms of the federal tariff are considered to be 'the law' and to therefore 'conclusively and exclusively enumerate the rights and liabilities'" of the parties) (citation omitted); *Marcus v. AT&T Corp.*, 138 F.3d 46, 56 (2d Cir. 1998) ("[F]ederal tariffs are the law, not mere contracts.") (quoting *MCI Telecomm. Corp. v. Garden State Inv. Corp.*, 981 F.2d 385, 387 (8th Cir. 1992)).

Precisely because federal tariffs have the status of federal law, both the Supreme Court and the Ninth Circuit have consistently held that state law claims—including contract claims—calling for interpretation of federal tariffs raise federal questions. Thus, for example, 20 years ago, in *Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*, 460 U.S. 533 (1983) (per curiam), the Supreme Court found that there was federal question jurisdiction over a contract action seeking to recover charges owed under tariffs filed with and approved by the Interstate Commerce Commission. *Id.* at 533-34. The Ninth Circuit and other circuits have since held that all manner of federally regulated tariffs have the status of federal law for purposes of federal question jurisdiction. *See Dynegy*, 375

F.3d at 839 (citing cases involving telecommunications tariffs for the proposition that the ISO Tariff, having been filed with a federal agency, has the force of a federal regulation); *see also Bernstein Bros. Pipe & Mach. Co. v. Denver & R.G.W.R. Co.*, 193 F.2d 441, 444 (10th Cir. 1951) ("Every question of the construction of an interstate tariff is a question of Federal law."); *Marcus*, 138 F.3d at 56 (federal question jurisdiction existed in suit by AT&T customers premised on breach of warranty, because, although the plaintiffs "do not expressly identify the source of these agreements, the only possible source is the tariffs filed in accordance with the [Federal Communications Act]," and "federal tariffs are the law, not mere contracts").

The Ninth Circuit, and district courts in California, have faithfully applied these principles to state law claims revolving around the very same ISO Tariff that is the basis for the California Parties' claims here. Even in the wake of *Merrell Dow*—when the Ninth Circuit subscribed to the since-discredited notion that federal jurisdiction cannot lie over state law claims—these courts still consistently found federal question jurisdiction over state law claims when those claims depended upon interpretation of federally regulated tariffs.[47] Thus, for example, in *Dynegy*, the Ninth Circuit confronted a case in which the California Attorney General alleged that firms had fraudulently sold energy on the spot market, in violation of the state's Unfair Competition Law. *Dynegy*, 375 F.3d at 836. The Ninth Circuit found federal question jurisdiction, since the complaint revolved around interpretation of the ISO Tariff, which has the effect of a federal regulation. *Dynegy*, 375 F.3d at 840. The court held the suit therefore "turns, entirely, upon the defendant's compliance with a federal regulation. The tariff defines the companies' contractual obligation with respect to the conduct at issue. Absent a violation of the FERC-filed tariff, no state law liability could survive." *Id.* at 841; *accord Mirant*, 2002 WL 1897669, at *6 (finding federal jurisdiction in Attorney

---

[47] *See Sparta Surgical Corp. v. NASD*, 159 F.3d 1209, 1212 (9th Cir. 1998) (finding federal question jurisdiction over state law claims necessarily based on violation of SEC-filed exchange rules); *Dynegy*, 375 F.3d at 841 n.6, 843 (federal question jurisdiction over state claims turning on obligations under ISO Tariff, citing *Sparta*); *T&E Pastorino Nursery v. Duke Energy Trading & Mktg., LLC*, 123 F. App'x 813, 2005 WL 434485, at *1 (9th Cir. Feb. 25, 2005), *aff'g* 2003 WL 22110491 (S.D. Cal. Aug. 27, 2003) (federal jurisdiction over conduct governed by ISO Tariff, citing *Dynegy*).

General's claim under § 17200 where liability was based on defendants' violation of the ISO Tariff); *see also California ex rel. Lockyer v. Powerex Corp.*, Civ-S-05-01216 DFL DAD, 2006 WL 997717, at *2-3 (E.D. Cal. Apr. 14, 2006) (finding federal question jurisdiction over Attorney General's state law claims for manipulation of prices in the ISO and PX markets).

The same is true here. This Court will not be able to decide the ultimate issue in this case—whether the Tariffs oblige Defendants to refund their overcharges—without putting the language of the Tariffs under the microscope. The most cursory review of the substantive disputes that have already surfaced reveals numerous disagreements about what these Tariffs—these federal laws—mean. The parties disagree about such basic interpretational questions as:

- Whether the language of the Tariffs requires all participants in the market to refund their overcharges when prices are corrected.
- Whether the language of the Tariffs creates obligations that run from one participant in the market to another—or only obligations that run to the ISO or the PX.
- Whether the language of the Tariffs exhibits an intention to allow Creditors (as that term is defined in the Tariff) to sue Debtors (as also defined in the Tariffs).

These questions of Tariff interpretation are salient not just to the parties in this dispute, but to any participant in the ISO or PX markets, including those that are within FERC's jurisdiction to compel payment of refunds. And these questions are, therefore, of considerable importance to FERC itself. In fact, as we shall see, Defendants are raising numerous issues of Tariff interpretation that FERC has *already* resolved against them, arguing that FERC reached the wrong conclusion. *See, e.g.*, *infra* pp. 87-92 (addressing Defendants' argument that the price adjustments are inoperative because FERC did not give sufficient notice of its decision to adjust prices retroactively); 69-73 (addressing argument that FERC incorrectly resolved the question whether the Tariffs cover OOM sales). Thus, any rulings on Tariff interpretation in this case will affect future interpretations of these Tariffs, and of other similar tariffs as well, regardless of the identities of the sellers.

To be sure, the Tariffs, themselves, provide that ancillary rules of contract interpretation are "governed by and construed in accordance with the laws of the State of California." ISO Tariff § 20.7; PX Tariff § 19.6. FERC itself affirmatively adopted that provision when it approved the

rest of the Tariffs. PG&E Compl. ¶ 42; SDG&E Compl. ¶ 30. And it means that when any tribunal interprets these Tariffs—whether it be this Court, the Court of Appeals, or FERC—the tribunal follows interpretive principles prescribed by California law. Contrary to Defendants' assertion, *see* LADWP Jur. Br. at 6-7, this does not turn the key substantive federal questions into questions of state law. California law does not answer any of the substantive questions enumerated above, or any other substantive issue that will be before this Court; only the language of the federal law at issue—the Tariffs—can answer those questions. California law serves only the limited role of prescribing a body of interpretive rules such as how to resolve ambiguities, when extrinsic evidence is permissible, and so forth. The questions of Tariff interpretation before this Court do not lose their essentially federal nature just because they import the California rulebook governing interpretive disputes at the margins—any more than the questions before the U.S. Senate lost their federal nature when the Founding Fathers imported British Parliamentary procedure to supply the rules governing debate.[48]

**2. The Interpretation of Federally Filed Tariffs Is a Matter of Substantial Federal Interest.**

For related reasons, the interpretation and application of these Tariffs is of "substantial" federal interest. *Grable*, 125 S. Ct. at 2367-68. If in *Grable* "[t]he Government . . . ha[d] a direct interest in the availability of a federal forum" for the correct interpretation of the tax seizure notice provision, *id.* at 2368, FERC has an even greater interest in the correct interpretation of two federal Tariffs that embody critical federal energy policy in the interstate wholesale electricity markets. *See* October 30, 1997 Order, 81 FERC ¶ 61,122 (1997) (reviewing and authorizing ISO Tariff, with modifications, for compliance with FERC's ISO principles set forth in FERC's Order 888) (RJN Exh. 11); *Pub. Utils. Comm'n of Cal. v. FERC*, No. 01-71051, slip op. 8753 at 8781 (9th Cir. Aug. 2, 2006) (FERC's Order 888 promulgated "regulations that provided for the creation of competitive

[48] If these interpretive provisions could defeat federal question jurisdiction, then the federal courts would have had no jurisdiction over *any* of the cases in which parties invoked these Tariffs as part of their state law claims. *See Dynegy*, 375 F.3d at 841 (district court had federal question jurisdiction in a state law action revolving around violations of the ISO Tariff); *Mirant*, 2002 WL 1897669, at *5-6 (same).

MARIE L. FIALA (Bar No. 79676)
RUSSELL P. COHEN (Bar No. 213105)
CECILIA Y. CHAN (Bar No. 240971)
HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA 94104-2878
Telephone: +1.415.772.6000
Facsimile: +1.415.772.6268
marie.fiala@hellerehrman.com
russell.cohen@hellerehrman.com
cecilia.chan@hellerehrman.com

Attorneys for Plaintiffs
PACIFIC GAS AND ELECTRIC COMPANY

[ADDITIONAL PARTIES AND COUNSEL SHOWN ON SIGNATURE PAGE]

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

APR 09 2007

John A. Clark, Executive Officer/Clerk
By D. Garcia, Deputy

SUPERIOR COURT OF CALIFORNIA

COUNTY OF LOS ANGELES

| | |
|---|---|
| Pacific Gas and Electric Company, Southern California Edison Company, San Diego Gas & Electric Company, and California Electricity Oversight Board,<br><br>Plaintiffs,<br><br>v.<br><br>Arizona Electric Power Cooperative, Inc.;<br>City of Anaheim;<br>City of Azusa;<br>City of Banning;<br>City of Burbank;<br>City of Glendale;<br>City of Los Angeles;<br>City of Pasadena;<br>City of Riverside;<br>City of Santa Clara;<br>City of Seattle;<br>City of Vernon;<br>Los Angeles Department of Water and Power;<br>Modesto Irrigation District;<br>Northern California Power Agency;<br>Public Utility District No. 2 of Grant County;<br>Sacramento Municipal Utility District; and<br>Turlock Irrigation District,<br><br>Defendants. | Case No.: BC369141<br><br>**COMPLAINT FOR (1) BREACH OF CONTRACT, (2) ANTICIPATORY BREACH OF CONTRACT, (3) UNJUST ENRICHMENT, (4) MONEY HAD AND RECEIVED, AND (5) DECLARATORY RELIEF**<br><br>**DEMAND FOR JURY TRIAL**<br><br>***COMPLEX CASE DESIGNATION REQUESTED PURSUANT TO LOCAL RULE 7.3(K)*** |

timely manner against all Governmental Entities named in this Complaint. SDG&E filed a similar complaint on March 21, 2006. The claims pleaded in these two complaints (the "Eastern District Complaints") were based on the same facts that were at issue in the Remedy Proceeding and in the various Ninth Circuit appeals from the Remedy Proceeding: the sellers' (including the Governmental Entities') receipt and retention of rates for sales of wholesale electric power in the ISO and PX markets that are unlawful and unauthorized under the ISO and PX Tariffs. On March 16, 2007, the Eastern District Complaints were dismissed for lack of federal-question jurisdiction.

80. The California Parties have at all times acted promptly, reasonably, and in good faith in seeking relief against all sellers in the California markets, including the Governmental Entities. The Governmental Entities were active parties to the FERC Remedy Proceeding, and have had notice throughout the FERC proceedings of the need to gather and preserve relevant evidence. Following the Ninth Circuit's *Bonneville* decision, the California Parties acted expeditiously to present claims to the Governmental Entities and to commence proceedings in the Eastern District of California. This Complaint is based on the same facts and asserts the same claims against the same defendants as the Eastern District Complaint. To the extent that any limitations period had commenced to run on the California Parties' right to sue in a court to enforce the Governmental Entities' refund obligations prior to the *Bonneville* order, which the California Parties deny, the limitations period was tolled, at a minimum, from the time the California Parties initiated refund proceedings at FERC on August 2, 2000, through the time the Ninth Circuit issued its decision in *Bonneville* on September 6, 2005, and from March 16, 2006 through March 16, 2007 (for PG&E, SCE, and EOB) or from March 21, 2006 through March 16, 2007 (for SDG&E), while the claims alleged in the Eastern District were pending.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**By the California IOUs Against All Defendants for Breach of Contract**

81. The California Parties incorporate by reference the allegations set forth above.

82. All sellers in the ISO and PX markets, including the Governmental Entities, were charged with knowledge that the market prices, and the formulas and/or market rules that set the prices, were subject to correction if FERC found that they contravened the requirements of the FPA. By voluntarily choosing to sell electric power at wholesale in the ISO and PX markets, and/or by executing ISO Scheduling Coordinator Agreements, PX Participation Agreements, or other agreements with the ISO or PX, the Governmental Entities contractually agreed to be bound by the provisions of the ISO and PX Tariffs, which incorporate FERC's power to correct prices that it determines to be unjust, unreasonable, or unlawful.

83. Pursuant to its authority under the FPA, FERC revised the Tariffs and corrected the prices that market participants were entitled to receive for their sales during the Refund Period by adopting the MMCP. Upon FERC's correction of the rates charged by sellers, including the Governmental Entities, in the ISO and PX markets, the corrected rates became the only lawful and authorized rates for those sales under the applicable Tariffs.

84. The Governmental Entities are now contractually obligated to reimburse the California IOUs for the difference between the rates that the Governmental Entities initially charged for their sales in the ISO and PX markets and the MMCP. The California Parties have demanded, and the Governmental Entities have refused to refund, and continue to refuse to refund, to the California IOUs the amounts that they received in excess of the MMCP during the Refund Period.

85. The Governmental Entities' conduct constitutes a breach of their contractual obligations to the California IOUs, entitling the California IOUs to judgment against the Governmental Entities for all amounts that each Governmental Entity received in excess of the lawful rate attributable to its wholesale sales of electric power to the California IOUs in the ISO and PX markets during the Refund Period, plus associated interest. The California Parties estimate the Governmental Entities' liability for damages to be in excess of $100 million.

## SECOND CAUSE OF ACTION

**By the California IOUs Against All Defendants for Anticipatory Breach of Contract**

86. The California Parties incorporate by reference the allegations set forth above.

87. This Cause of Action is pleaded in the alternative to the First Cause of Action. If it is determined that the date by which the Governmental Entities would be obligated under the applicable contracts to refund to the California IOUs the amounts that they received in excess of the MMCP during the Refund Period has not yet occurred, the Governmental Entities have nonetheless become obligated to make such refunds immediately, and in advance of such date, because they have wrongfully denied and repudiated any legal duty to so repay the California IOUs. Specifically, the Governmental Entities have repudiated, in the FERC proceedings, in appeals from FERC orders, and by their denials of the California IOUs' duly-presented claims, their contractual obligations to the California IOUs, including their obligation to comply with the revised tariff provisions by refunding their unlawful overcharges.

88. Upon the Governmental Entities' repudiation of their contractual obligations, the California Parties became entitled to sue for breach of contract. The Governmental Entities' conduct constitutes an anticipatory breach of their contractual obligations to the California IOUs, entitling the California IOUs to judgment against the Governmental Entities for all amounts that each Governmental Entity received in excess of the lawful rate attributable to its wholesale sales of electric power to the California IOUs in the ISO and PX markets during the Refund Period, plus associated interest. The California Parties estimate the Governmental Entities' liability for damages to be in excess of $100 million.

## THIRD CAUSE OF ACTION

**By the California IOUs Against All Defendants for Unjust Enrichment Arising from Contract**

89. The California Parties incorporate by reference the allegations set forth above.

90. By accepting and retaining prices that are now unlawful under the ISO and PX Tariffs, and by denying their obligations to refund or credit overcharges to buyers in the ISO and

MARIE L. FIALA (Bar No. 79676)
RUSSELL P. COHEN (Bar No. 213105)
BRIAN D. McDONALD (Bar No. 224201)
HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA 94104-2878
Telephone: (415) 772-6000
Facsimile: (415) 772-6268
marie.fiala@hellerehrman.com
russell.cohen@hellerehrman.com
brian.mcdonald@hellerehrman.com

Attorneys for Plaintiffs
PACIFIC GAS AND ELECTRIC COMPANY

[ADDITIONAL PARTIES AND COUNSEL SHOWN ON SIGNATURE PAGE]

SUPERIOR COURT OF CALIFORNIA

COUNTY OF LOS ANGELES

| | |
|---|---|
| Pacific Gas and Electric Company, Southern California Edison Company, San Diego Gas & Electric Company, and California Electricity Oversight Board,<br><br>Plaintiffs,<br><br>v.<br><br>Arizona Electric Power Cooperative, Inc.; City of Anaheim; City of Azusa; City of Banning; City of Burbank; City of Glendale; City of Los Angeles; City of Pasadena; City of Riverside; City of Santa Clara; City of Seattle; City of Vernon; Los Angeles Department of Water and Power; Modesto Irrigation District; Northern California Power Agency; Public Utility District No. 2 of Grant County; Sacramento Municipal Utility District; and Turlock Irrigation District,<br><br>Defendants. | Case No.: BC 369141<br><br>Included action within Judicial Council Coordination Proceeding No. 4512 (Electric Refund Cases)<br><br>**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' DEMURRERS, VOLUME 2 OF 2 (DETAILED ARGUMENT)**<br><br>Complaint Filed: April 9, 2007<br><br>Judge: Hon. Wendell Mortimer, Jr.<br>Hearing: November 30, 2007<br>Time: 9:00 a.m.<br>Department: 307 |

The California Parties therefore had only one option during the Energy Crisis: to ask FERC to review and reset the prices that were being generated by the Tariff formulas. *See Public Util. Dist. No. 1 of Snohomish County*, 384 F.3d at 761-62 ("[I]f the defendants sold electricity in violation of the filed tariffs, Snohomish's only option is to seek a remedy before FERC."). That is exactly what they did.[41]

**2. The California Parties Were Not Required to Bring Suit After FERC Reset the Prices Because Their Contract Claim Had Not Yet Accrued—and Still Has Not Accrued Today.**

In its July 25, 2001 Order, FERC reset the ISO and PX market prices and adopted a new formula (the MMCP) to calculate those prices under the Tariffs. FERC explained:

> Our action here establishes a revised method for calculating the just and reasonable clearing prices to be applied in those markets for the period beginning October 2, 2000. This is pursuant to the Commission's authority under FPA section 206 to fix the just and reasonable rate. *Our action thus revises the market clearing prices that all market participants agreed to accept for their sales.*

96 FERC at 61,512 (emphasis added).

Most of the Defendants contend that this Order triggered the California Parties' obligation to present their claim.[42] They are wrong. The July 25, 2001 Order was not the end of the Remedy Proceeding. As instructed by FERC, the ISO and PX went on to apply the MMCP to calculate the

---

rates. *In re Wholesale Elec. Anti-Trust Cases*, 147 Cal. App. 4th at 1316-17 (applying filed rate doctrine to market based rates charged under ISO Tariff); *Pub. Util. Dist. No. 1 of Snohomish County v. Dynegy Power Mktg., Inc.*, 384 F.3d 756, 761-62 (9th Cir. 2004), *cert. denied*, 545 U.S. 1149 (2005) (market-based rates charged under ISO Tariff are subject to filed rate doctrine); *Duke Energy Trading & Mktg., LLC v. Davis*, 267 F.3d 1042, 1056 (9th Cir. 2001) (PX operated pursuant to FERC-approved rate schedules and tariffs which are filed rates).

[41] LADWP claims that the California Parties assert that the filed rate doctrine prevented the California Parties from filing Government Code claims with Defendants at any time prior to *Bonneville*. LADWP Br. at 21. Not so. Rather, prior to FERC's July 25, 2001 Order revising prices under the Tariff, the California Parties had *no cause of action against Defendants* because of the filed rate doctrine and, accordingly, no claim to present.

[42] The Joint Defendants assert that the California Parties could have brought suit immediately following issuance of FERC's November 2000 Order, in which FERC first held that rates charged were not "just and reasonable." JD Br. at 19 n.23. But for the reasons explained at pp. 34-35 *supra*, the California Parties had no claim under the Tariffs at that time because FERC had not yet corrected the prices, and therefore no basis for presenting a Government Code claim.

prices that should have been charged in the ISO and PX markets and to compute sellers' refund liabilities. That process has not yet concluded. The ISO and PX are still performing calculations to allocate certain cost offsets to the refunds owed by sellers. *San Diego Gas & Elec. Co.*, Thirty-Eighth Status Report, ER03-746-000, *et al.*, at 2-3 (RJN Exh. 24). And no revised invoices have yet issued that would trigger Defendants' obligations to pay those refunds—i.e., *the date for contract performance has not yet arrived.* The California Parties' claim therefore did not accrue following the July 25, 2001 Order and, in fact, has not yet accrued to this day.

A breach of contract claim "does not accrue until there has been a breach of the contract." *Church v. Jamison*, 143 Cal. App. 4th 1568, 1583 (2006); *Cochran v. Cochran*, 56 Cal. App. 4th 1115 (1997). Moreover, "'[t]here can be no *actual* breach of a contract until the time specified therein for performance has arrived.'" *Romano v. Rockwell Int'l, Inc.*, 14 Cal. 4th 479, 488 (1996) (quoting *Taylor v. Johnston*, 15 Cal. 3d 130, 137 (1975)). This means that the statute of limitations does not begin to run prior to the time performance is due. *Romano*, 14 Cal. 4th at 489 ("[T]he statute of limitations does not begin to run until the time set by the contract for performance."). In the claims presentment context, the date on which the claim accrued (which starts the clock running on the statutory presentment requirements) is determined by the same general principles as apply to all other contract claims. Cal. Gov't Code § 901.[43]

Under normal circumstances, the Tariffs' settlement provisions contemplate that a seller whose prices are reset would be required to refund its overcharges when the ISO or PX recalculates the seller's account to reflect the seller's refund obligation and issues a revised invoice to the seller. ISO Tariff § 11.6.3 (ISO authorized to rerun settlements); ISO Tariff § 11.9 (ISO to send out invoices based on final settlement statements); PX PSABP § 5.3 (PX authorized to rerun settlements); PX PSABP § 5.4 (PX to send out invoices based on final settlement statements). Although the July 25, 2001 Order prescribed the new formulas to be applied under the Tariffs to

---

[43] Before a court action is commenced against a governmental entity (including most of the Defendants), the claim must first be presented to and rejected by that entity. Cal. Gov't Code §§ 905, 945.4. Claims arising out of contract must be presented within one year *after accrual of the cause of action. Id.* § 911.2.

calculate prices for sales in the ISO and PX markets, the Order did not set forth the precise amounts of any seller's refund liability, nor a specific deadline for the ISO and PX to assess the amounts of those liabilities against sellers' accounts, indicating each seller's specific obligation to pay refunds under the Tariffs. In other words, the Order did not calculate or set the date for Defendants to pay refunds—that is, to perform their contractual obligations. Rather, FERC required further procedures by the ISO and PX to calculate the amount of the refunds owed by each seller and to determine when payments would be due under the Tariffs:

> [M]aterial issues of fact remain that prevent the Commission from ordering refunds at this time. [The Commission orders] an evidentiary hearing before an Administrative Law Judge. . . . to make findings of fact with respect to: (1) the mitigated price in each hour of the refund period; (2) the amount of refunds owed by each supplier according to the methodology established herein; and (3) the amount currently owed to each supplier (with separate quantities due from each entity) by the ISO, the investor owned utilities and the State of California.

July 25, 2001 Order, 96 FERC at 61,520. Because that process is not yet completed, no date has yet been established for Defendants to pay refunds, no contract performance has yet come due, and no breach of contract claim has yet accrued.[44]

FERC is supervising the ISO and PX's calculation and invoicing procedures, and it is possible that FERC may re-define the time or conditions when the ISO and PX will require payment to be made under the Tariffs.[45] All that need be said now is that, on the facts alleged in the

---

[44] The Joint Defendants mischaracterize what the California Parties argued in federal court in this case regarding accrual. JD Br. at 18-19. The California Parties *never* asserted that their breach of contract claim accrued "no later than mid-2001." *Id.* at 18. Rather, they said there exactly what they say here: that this claim *will* accrue when Defendants are required, but fail, to pay refunds.

[45] Defendants have been trying vigorously at FERC to prevent the ISO and PX recalculation and invoicing process from ever being completed. (Of course, they do not seek to prevent the calculation of refunds owing *to* them.) Answer of the Indicated Public Entities in Opposition to the California Parties' Motion for Procedures Following Remand in Bonneville Power Administration, *et al.* v. FERC, *San Diego Gas & Elec. Co.*, Nos. EL00-95-000, *et al.*, (April 17, 2007) (RJN Exh. 22); Answer of City of Los Angeles Department of Water and Power to California Parties' Motion for Procedures Following Remand in Bonneville Power Administration v. FERC, *San Diego Gas & Elec. Co.*, Nos. EL00-95-000 *et al.*, (April 17, 2007) (RJN Exh. 23). Although *Bonneville* held that FERC cannot enforce refund obligations against Defendants, nothing in that decision precludes the ISO and PX from applying the MMCP to recalculate Defendants' accounts, with refund payments
(Footnote Continued)

Complaint, Defendants' time to perform by paying their refunds has not yet come. Accordingly, the California Parties' claim for breach of contract has not yet accrued and is not untimely under either the claims presentment statute or the general statute of limitations.[46]

**B. The California Parties Are Entitled To Sue Now Because Defendants Have Anticipatorily Repudiated Their Contract Obligations.**

The California Parties have the *option* to sue now, in advance of Defendants' breach of contract, because Defendants have anticipatorily repudiated their contract obligations. California law allows a party to bring a claim for breach of contract where "a party to an obligation gives notice to another" that he will not perform the obligation "*before* the time at which performance upon his part is due." Cal. Civ. Code § 1440 (emphasis added). As the California Supreme Court explained in *Romano*,

> In the event the promisor repudiates the contract before the time for his or her performance has arrived, the plaintiff has an election of remedies—he or she may "treat the repudiation as an anticipatory breach and immediately seek damages for breach of contract, thereby terminating the contractual relation between the parties, or he [or she] can treat the repudiation as an empty threat, wait until the time for performance arrives and exercise his [or her] remedies for actual breach if a breach does in fact occur at such time."

14 Cal. 4th at 489 (quoting *Taylor*, 15 Cal. 3d at 137) (alterations in original); *see also County of Solano v. Vallejo Redev. Agency*, 75 Cal. App. 4th 1262, 1275-76 (1999) ("While an actual breach of contract cannot occur until the time for performance has arrived, an anticipatory repudiation of the contract, or anticipatory breach, occurs before performance is due under the contract and results

---

to be enforced as a contractual matter in a court action such as this one. To date, FERC has not taken any action to halt the continuing calculations of amounts owing by and to each market participant, including Defendants. In fact, FERC has indicated that it agrees with the Ninth Circuit and the California Parties that Defendants' contractual obligation can be enforced by a court. *San Diego Gas & Elec. Co.*, 119 FERC ¶ 61,296 at P 27 & n.41 (RJN Exh. 10).

[46] AEPCO, which as an out-of-state entity cannot invoke California's claim presentment requirements, asserts that the California Parties' claims are untimely under Cal. Civ. Proc. Code § 337 (four-year limitation period for contract claims) and Cal. Com. Code § 3118(g) (three-year limitations period for money had and received). For the same reasons that the California Parties' claims are timely under the one-year presentment period in Cal. Gov't Code § 911.2, *see infra* at pp. 44-45, they necessarily are also timely under these longer limitations periods.