IN THE

UNITED STATES COURT OF FEDERAL CLAIMS

PACIFIC GAS AND ELECTRIC COMPANY, SOUTHERN CALIFORNIA EDISON COMPANY, AND CALIFORNIA ELECTRICITY OVERSIGHT BOARD,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

SAN DIEGO GAS & ELECTRIC COMPANY, a California corporation,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

No. 1:07-cv-00157-LAS

No. 1:07-cv-00167-LAS

Consolidated

**HON. LOREN A. SMITH**

**PLAINTIFFS PACIFIC GAS AND ELECTRIC COMPANY, SOUTHERN CALIFORNIA EDISON COMPANY, AND SAN DIEGO GAS & ELECTRIC COMPANY'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

# TABLE OF CONTENTS


Page

STATEMENT OF THE ISSUES....1

STATEMENT OF THE CASE....2

I. INTRODUCTION....2

II. FACTS....3

A. The California Wholesale Markets During the 2000-2001 Energy Crisis....3

B. FERC's Authority Over the ISO and PX Markets....5

C. The Agencies Agreed to Abide by the Tariffs....6

D. The ISO and PX Auction Market Mechanisms....7

E. Market Participants Have the Right, Under the Tariffs, to Bring Actions Directly Against Other Market Participants....9

F. May 2000 to June 2001: The Energy Crisis....10

G. Plaintiffs Seek Relief From FERC....11

1. The FERC Remedy Proceeding....11

2. The Discovery of Market Manipulation....12

H. FERC Remediates the Unlawful Market Prices....12

I. Appeals From FERC's Orders....13

1. Relief for the Summer Period and Excluded Transactions—*CPUC v. FERC*....13

2. FERC's Authority to Order the Agencies to Pay Refunds—The *Bonneville* Decision....14

3. FERC's October 19, 2007 and November 19, 2007 Orders....15

J. The Agencies Repudiate Their Contractual Obligations and Plaintiffs Pursue Their Contract Claims....15

1. Repudiation by the Agencies ....................................................15

2. Claims Presentments and Denials and This Action..........................................................................16

3. The California Action ..............................................................16

ARGUMENT ..........................................................................................................17

I. OVERVIEW OF PLAINTIFFS' CONTRACT CLAIM ....................................17

II. THE U.S.'S ARGUMENTS MAY NOT BE RESOLVED ON THIS MOTION. .........................................................................................20

III. CALIFORNIA LAW GOVERNS THE AGENCIES' CONTRACTUAL OBLIGATIONS UNDER THE ISO AND PX TARIFFS..........................................................................................23

IV. PLAINTIFFS HAVE PLEADED THEIR STANDING TO SUE SUFFICIENTLY TO ESTABLISH THIS COURT'S JURISDICTION............................................................................................26

A. The U.S. and Plaintiffs Are Parties to the Same Multi-Party Contracts. ...................................................................................26

B. The ISO and PX Tariffs Both Create Contractual Obligations That Are Enforceable by the Market Participants...................................................................................30

1. The ISO and PX Tariffs Are Indistinguishable for Purposes of the Privity and Standing Analysis.........................................................................31

2. Both Tariffs Expressly Allow Plaintiffs to Sue to Enforce the Agencies' Refund Obligations. .................................32

3. The Tariffs Establish That the ISO and PX Are Not Parties to the Purchase and Sale Transactions, but That Buyers and Sellers Are. ..........................35

C. Electricity Need Not Be "Traced" to a Particular Seller for Plaintiffs to Be Able to Recover Refunds from Sellers....................................................................................36

D. The *Edison* and *Lynch* Proceedings Do Not Support a Different Interpretation of the Tariffs, and No "Estoppel" Can Be Applied Here. ....................................................38

1. *Southern California Edison Co.*, 80 FERC ¶ 61,262 (1997). .....39

2. *Southern California Edison Company v. Lynch*, 307 F.3d 794 (9th Cir. 2002). .....42

3. There Is No Basis for Invoking Judicial Estoppel Against SCE. .....44

4. Estoppel Is Not an Appropriate Means of Resolving These Issues. .....45

E. The Restatement (Third) of Agency Permits This Action. .....46

F. At a Minimum, Plaintiffs Have Standing as Third-Party Beneficiaries of the Agencies' Agreements to Abide by the ISO and PX Tariffs. .....46

1. For Plaintiffs to Prevail on This Motion, They Need Only Plead That the Multi-Party Contracts Manifest an Intent to Benefit Them. .....47

2. The Tariffs Clearly Manifest an Intent to Benefit Market Participants Such as Plaintiffs. .....47

V. THE COURT HAS JURISDICTION OVER PLAINTIFFS' DECLARATORY RELIEF CLAIMS AND MAY GRANT THE REQUESTED RELIEF. .....49

A. This Court May Grant Declaratory Judgments. .....49

B. The Claims Pleaded Here Warrant the Court's Exercise of Jurisdiction to Award Declaratory Relief. .....50

1. A Declaratory Judgment May Properly Determine the Parties' Contract Obligations Upon the Occurrence of a Future Event. .....50

2. Plaintiffs' Declaratory Relief Claims Raise a "Live Controversy." .....52

VI. THE SIXTH AND SEVENTH CLAIMS WERE PRESENTED TO THE CONTRACTING OFFICER. .....55

A. Plaintiffs May Pursue Their Claims So Long as They Arise from the Same Operative Facts and Seek Essentially the Same Relief as Their CDA Claims. .....55

B. The CDA Claims and the Complaint Are Based on the Same "Operative Facts" and Seek "Essentially the Same Relief." ....................57

VII. PLAINTIFFS PROPERLY PLEADED BREACH OF CONTRACT AND ANTICIPATORY REPUDIATION CLAIMS IN THE ALTERNATIVE. ....................59

CONCLUSION ....................60

## INDEX TO APPENDIX

**Pages**

Index of Key ISO and PX Tariff Provisions .......... 1-31

Order on Demurrers, *Electric Refund Cases*, JCCP 4512
(L.A. Sup. Ct., Dec. 4, 2007) .......... 32-33

Minute Order, *Electric Refund Cases*, JCCP 4512
(L.A. Sup. Ct., Jan. 3, 2008) .......... 34-37

U.S. Notice of Intervention, *Alliant Energy v. Nebraska Pub. Power. Dist.*,
Case No. 62-C5-00-004626 (Minn. Dist. Ct., County of Ramsey, Aug. 18, 2000) .......... 38-42

Brief of Appellee S. Cal. Edison Co., *S. Cal. Edison Co. v. Lynch*,
Case Nos. 01-56879, *et al.* (9th Cir. Feb. 5, 2002) .......... 43-92

Plaintiffs' Memorandum in Opposition to Defendants' Demurrers
(Vol. II, Detailed Argument), *Electric Refund Cases*, JCCP 4512
(L.A. Sup. Ct., Oct. 9, 2007) .......... 93-216

*Southern Cal. Edison Co.*, 80 FERC ¶ 61,262 (1997) .......... 217-222

*Pacific Gas & Elec. Co.*, 81 FERC ¶ 61,122 (1997) (Excerpt) .......... 223-232

*Portland General Elec. Co., et al.*, 83 FERC ¶ 61,315 (1998) .......... 233-237

*Automated Power Exchange, Inc.*, 84 FERC ¶ 61,020 (1998) .......... 238-256

*Automated Power Exchange, Inc.*, 85 FERC ¶ 61,232 (1998) .......... 257-265

*Cal. Power Exch. Corp.*, 92 FERC ¶ 61,096 (2000) .......... 266-270

*San Diego Gas & Elec. Co.*, 92 FERC ¶ 61,172 (2000) .......... 271-283

*San Diego Gas & Elec. Co.*, 93 FERC ¶ 61,121 (2000) .......... 284-355

*San Diego Gas & Elec. Co.*, 95 FERC ¶ 61,418 (2001) .......... 356-407

*San Diego Gas & Elec. Co.*, 96 FERC ¶ 61,120 (2001) .......... 408-450

*San Diego Gas & Elec. Co.*, 109 FERC ¶ 61,218 (2004) .......... 451-499

*San Diego Gas & Elec. Co.*, 121 FERC ¶ 61,067 (2007) .......... 500-533

*San Diego Gas & Elec. Co.*, 121 FERC ¶ 61,188 (2007) .......... 534-539

*California ex rel. Lockyer*, 122 FERC ¶ 61,260 (2008) .......... 540-563

*Fact-Finding Investigation of Potential Manipulation of Electric and Natural Gas Prices*, FERC Docket No. PA02-2-000 (Mar. 26, 2003) (Excerpt)............................ 564-595

MAPP Restated Agreement, FERC Docket No. ER96-1447-000 (Mar. 29, 1996) (Excerpt) ........................................................................... 596-639

Letter from Clark Evans Downs on behalf of APX to David Boergers, Secretary of FERC (Aug. 14, 1998)........................................................................... 640-674

Power Exchange Settlement and Billing Procedures (PSABP), filed May 7, 2002, by the California PX in FERC Docket No. EL00-95................... 675-708

WAPA Motion to Intervene, FERC Docket Nos. EL01-1-000, *et al.* (Oct. 23, 2000)........... 709-714

BPA Motion to Intervene, FERC Docket Nos. EL00-95-000, *et al.* (Nov. 22, 2000)............ 715-722

*Bonneville Power Administration Request for Rehearing and Clarification*, FERC Docket Nos. EL00-95, *et al.* (Jul. 19, 2001).................................................. 723-741

Plaintiffs' Amended Claim for Damages (WAPA) (Dec. 20, 2005) .................................... 742-753

Motion by and Answer of the Bonneville Power Administration (BPA) and the Western Area Power Administration (Western) to the California Parties' Motion Related to Procedures Following Remand in *Bonneville Power Administration, et al. v. FERC*, FERC Docket Nos. EL00-95-000, *et al.* (Apr. 17, 2007) ................. 754-774

Thirty-Eighth Status Report of the California Independent System Operator Corporation on Settlement Re-Run Activity, *San Diego Gas & Elec. Co.*, FERC Docket Nos. ER03-746-000, *et al*. (Sept. 6, 2007).......................................... 775-795

16 U.S.C. § 824 (2000) ........................................................................................ 796-798

16 U.S.C. § 824e (2000) ....................................................................................... 799-801

## TABLE OF AUTHORITIES

**Page**

### CASES

*Acceptance Ins. Co. v. United States*,
503 F.3d 1328 (Fed. Cir. 2007) .......... 21

*Adarbe v. United States*,
58 Fed. Cl. 707 (2003) .......... 21

*Alliant Energy, Inc. v. Nebraska Pub. Power Dist.*,
347 F.3d 1046 (8th Cir. 2003),
*aff'g* No. 00-2139 ADM/FLN, 2001 WL 1640132
(D. Minn. Oct. 18, 2001) .......... 3, 14, 18, 19

*Alliant Energy, Inc. v. Nebraska. Pub. Power Dist.*,
No. 00-2139 ADM/FLN, 2001 WL 1640132 (D. Minn. 2001),
*aff'd*, 347 F.3d 1046 (8th Cir. 2003) .......... 18, 19, 30

*Alliant Techsystems, Inc. v. United States*,
178 F.3d 1260 (Fed. Cir. 1999) .......... 49, 50

*Ammex, Inc. v. United States*,
384 F.3d 1368 (Fed. Cir. 2004) .......... 39

*ATK Thiokol, Inc. v. United States*,
76 Fed. Cl. 654 (2007) .......... 55

*Bell v. Hood*,
327 U.S. 678 (1946) .......... 21

*Bilzerian v. United States*,
41 Fed. Cl. 134 (1998) .......... 44

*Bonneville Power Admin. v. FERC*,
422 F.3d 908 (9th Cir. 2005),
*cert denied*, 128 S.Ct. 804 (Dec. 10, 2007) .......... 2, 3, 14, 17, 18, 19, 35

*Boyle v. United Tech. Corp.*,
487 U.S. 500 (1988) .......... 24, 25

*Brunswick Leasing Corp. v. Wisconsin Cent. Ltd.*,
136 F.3d 521 (7th Cir. 1998) .......... 46

*Cal. Dental Ass'n v. Am. Dental Ass'n*,
23 Cal. 3d 346 (1979) .......... 28

*California ex rel. Lockyer v. FERC*,
383 F.3d 1006 (9th Cir. 2004),
*cert. denied*, 127 S.Ct. 2972 (June 18, 2007) .......... 14

*Casady v. Modern Metal Spinning and Mfg. Co.*,
188 Cal. App. 2d 728 (1961) .......... 28

*Cedars-Sinai Med. Cent. v. Watkins*,
11 F.3d 1573 (Fed. Cir. 1993) .......... 22

*Cerberonics, Inc. v. United States*,
13 Cl. Ct. 415 (1987) .......... 56

*Chaveriat v. Williams Pipe Line Co.*,
11 F.3d 1420 (7th Cir. 1993) .......... 45

*Cleveland Orchestra Comm. v. Cleveland Fed'n of Musicians*,
303 F.2d 229 (6th Cir. 1962) .......... 28

*Client Network Servs., Inc. v. United States*,
64 Fed. Cl. 784 (2005) .......... 22

*Coast Fed. Bank, FSB v. United States*,
48 Fed. Cl. 402 (2000),
*aff'd*, 323 F.3d 1035 (Fed. Cir. 2002) .......... 24

*Coenen v. R. W. Pressprich & Co.*,
453 F.2d 1209 (2d Cir. 1972) .......... 27

*Comair Rotron, Inc. v. Nippon Densan Corp.*,
49 F.3d 1535 (Fed. Cir. 1995) .......... 44

*Commonwealth Edison Co. v. United States*,
56 Fed. Cl. 652 (2003) .......... 44

*Cooke v. United States*,
91 U.S. 389 (1875) .......... 23

*Corrugated Paper Prods., Inc. v. Longview Fibre Co.*,
868 F.2d 908 (7th Cir. 1989) .......... 47

*County of Cook v. Midcon Corp.*,
773 F.2d 892 (7th Cir. 1985) .......... 41

*CW Gov't Travel, Inc. v. United States*,
63 Fed. Cl. 369 (2004) .......... 50, 51

*Data Gen. Corp. v. Johnson*,
78 F.3d 1556 (Fed. Cir. 1996) .......... 44

*Democratic Party v. Reed*,
343 F.3d 1198 (9th Cir. 2003) .......... 45

*Employers Ins. of Wausau v. United States*,
23 Cl. Ct. 579 (1991) .......... 23

*Engineered Demolition, Inc. v. United States*,
70 Fed. Cl. 580 (2006) .......... 55

*First Fed. Sav. & Loan Ass'n of Twin Falls v. East End Mut. Elec. Co.*,
735 P.2d 1073 (Idaho App. 1987) .......... 28

*Flexfab, L.L.C. v. United States*,
62 Fed. Cl. 139 (2004),
*aff'd*, 424 F.3d 1254 (Sept. 27, 2005) .......... 46

*Garrett v. Gen. Elec. Co.*,
987 F.2d 747 (1993) .......... 50

*Gear v. Webster*,
258 Cal. App. 2d 57 (1968) .......... 28, 29

*Glass v. United States*,
258 F.3d 1349 (Fed. Cir. 2001),
*amended by*, 273 F.3d 1072 (Fed. Cir. 2001) .......... 47, 48

*Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*,
545 U.S. 308 (2005) .......... 25, 26

*Grubart, Inc. v. Great Lake Dredge and Dock Co.*,
513 U.S. 527 (1995) .......... 21

*Gulf Oil Corp. v. Copp Paving Co.*,
419 U.S. 186 (1974) ... 21

*Himebaugh v. Smith*,
476 F. Supp. 502 (C.D. Cal. 1978) ... 32

*Holland v. United States*,
75 Fed. Cl. 492 (2007) ... 24

*Johnson Controls World Servs., Inc. v. United States*,
43 Fed. Cl. 589 (1999) ... 56, 57

*Kawa v. United States*,
77 Fed. Cl. 294 (2007) ... 21, 22, 46, 47

*Kennedy v. City of Seattle*,
617 P.2d 713 (Wash. 1980) ... 45

*L-3 Commc'ns Integrated Sys., L.P. v. United States*,
79 Fed. Cl. 453 (2007) ... 22

*Lampi Corp. v. American Home Prods.*,
228 F.3d 1365 (Fed. Cir. 2000) ... 45

*Long Island Sav. Bank, FSB v. United States*,
503 F.3d 1234 (Fed. Cir. 2007) ... 24

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ... 21

*Maltese v. Dubinsky*,
108 N.E.2d 604 (N.Y. 1952) ... 28

*Manuel Bros., Inc. v. U.S.*,
55 Fed. Cl. 8 (2002),
*aff'd*, 95 Fed. Appx. 344 (Apr. 9, 2004) ... 56

*Marrero Land & Imp. Ass'n, Ltd. v. United States*,
26 Cl. Ct. 193 (1992) ... 59

*McNutt v. Gen. Motors Acceptance Corp. of Indiana*,
298 U.S. 178 (1936) ... 21, 22

*Montana v. United States*,
124 F.3d 1269 (Fed. Cir. 1997) .......... 47

*Mother's Restaurant, Inc. v. Mama's Pizza, Inc.*,
723 F.2d 1566 (Fed. Cir. 1983) .......... 39, 44

*Moyer v. United States*,
190 F.3d 1314 (Fed. Cir. 1999) .......... 22

*Muh v. Newberger, Loeb & Co., Inc.*,
540 F.2d 970 (9th Cir. 1976) .......... 27, 28, 29

*Nelson Constr. Co. v. United States*,
79 Fed. Cl. 81 (2007) .......... 22, 23, 47

*New Hampshire v. Maine*,
532 U.S. 742 (2001) .......... 44, 45

*New Orleans Pub. Serv. Inc. v. Council of the City of New Orleans*,
491 U.S. 350 (1989) .......... 39

*New York v. FERC*,
535 U.S. 1 (2002) .......... 5

*Nippon Steel Corp, et al. v. United States*,
219 F.3d 1348 (Fed. Cir. 2000) .......... 21

*Prentis v. Atlantic Coast Line Co.*,
211 U.S. 210 (1908) .......... 39

*Pub. Utils. Comm'n of Cal. v. FERC*,
462 F.3d 1027 (9th Cir. 2006) .......... 4, 12, 14, 19, 53

*Reliance Ins. Co. v. United States*,
931 F.2d 863 (Fed. Cir. 1991) .......... 56

*Renda Marine, Inc. v. United States*,
71 Fed. Cl. 378 (2006) .......... 56

*Reynolds v. Army & Air Force Exch. Serv.*,
846 F.2d 746 (Fed. Cir. 1988) .......... 22, 23

*Richmond, Fredericksburg & Potomac R.R. Co. v. United States*,
75 F.3d 648 (Fed. Cir. 1996) .......... 24, 25

*SanDisk Corp. v. Memorex Prods., Inc.*,
415 F.3d 1278 (Fed. Cir. 2005) .......... 45

*Scott Timber Co. v. U.S.*,
333 F.3d 1358 (Fed. Cir. 2003),
*aff'd*, 224 Fed. Appx. 972 (May 10, 2007) .......... 55, 56, 58

*Shea v. McCarthy*,
953 F.2d 29 (2d Cir. 1992) .......... 28

*Simmons v. United States*,
71 Fed. Cl. 188 (2006) .......... 21

*S. Cal. Edison Co. v. Lynch*,
307 F.3d 794 (9th Cir. 2002),
*order modified*, 353 F.3d 648 (9th Cir. 2003) .......... 42, 43

*S. Cal. Fed. Sav. & Loan Ass'n v. United States*,
422 F.3d 1319 (Fed. Cir. 2005),
*cert. denied*, 126 S.Ct. 2967 (June 26, 2006) .......... 30

*Spruill v. Merit Sys. Prot. Bd.*,
978 F.2d 679 (Fed. Cir. 1992) .......... 21, 49

*Stoica v. Int'l Alliance of Theatrical Stage Employees and Moving Picture Mach. Operators of the U.S. and Can.*,
78 Cal. App. 2d 533 (1947) .......... 28

*Sullivan v. United States*,
54 Fed. Cl. 214 (2002) .......... 20, 23, 47

*Swanson Group, Inc. v. United States*,
76 Fed. Cl. 44 (2007) .......... 55, 56

*The Second Taxing Dist. of the City of Norwalk v. FERC*,
683 F.2d 477 (D.C. Cir. 1982) .......... 39

*Tiger Natural Gas, Inc. v. United States*,
61 Fed. Cl. 287 (2004) .......... 51, 52

*Total Med. Mgmt. v. United States*,
104 F.3d 1314 (Fed. Cir. 1997) .......... 21

*Trauma Serv. Group v. United States*,
104 F.3d 1321 (Fed. Cir. 1997) .......... 21

*United States v. Kimbell Foods, Inc.*,
440 U.S. 715 (1979) .......... 25

*United States v. Seckinger*,
397 U.S. 203 (1970) .......... 24

*United States v. Utah Constr. and Mining Co.*,
384 U.S. 394 (1966) .......... 39

*United States v. Winstar Corp.*,
518 U.S. 839 (1996) .......... 23, 24

*Westfed Holdings, Inc. v. United States*,
407 F.3d 1352 (Fed. Cir. 2005) .......... 24

**ADMINISTRATIVE CASES**

*Automated Power Exch., Inc.*,
84 FERC ¶ 61,020 (1998) .......... 37, 38

*Automated Power Exch., Inc.*,
85 FERC ¶ 61,232 (1998) .......... 37, 38

*Cal. Power Exch. Corp.*,
92 FERC ¶ 61,096 (2000) .......... 10, 34, 42

*California ex rel. Lockyer*,
122 FERC ¶ 61,260 (2008) .......... 14

*Pac. Gas & Elec. Co.*,
81 FERC ¶ 61,122 (1997) .......... 10, 34, 42

*Portland Gen. Elec. Co.*,
83 FERC ¶ 61,315 (1998) .......... 41

*San Diego Gas & Elec. Co.*,
92 FERC ¶ 61,172 (2000) .......... 11

*San Diego Gas & Elec. Co.*,
93 FERC ¶ 61,121 (2000) ........ 11

*San Diego Gas & Elec. Co.*,
95 FERC ¶ 61,418 (2001) ........ 10

*San Diego Gas & Elec. Co.*,
96 FERC ¶ 61,120 (2001) ........ 11, 12, 13

*San Diego Gas & Elec. Co.*,
109 FERC ¶ 61,218 (2004) ........ 9-10, 35

*San Diego Gas & Elec. Co.*,
121 FERC ¶ 61,067 (2007) ........ 15, 20, 34, 35, 54

*San Diego Gas & Elec. Co.*,
121 FERC ¶ 61,188 (2007) ........ 15, 20

*S. Cal. Edison Co.*,
80 FERC ¶ 61,262 (1997) ........ 35, 39, 40, 41

**FEDERAL STATUTES, LAWS, AND RULES**

16 U.S.C. §§ 791a, *et seq.* ........ 2

16 U.S.C. § 824 (2000) ........ 4, 5

16 U.S.C. § 824d (2008) ........ 5

16 U.S.C. § 824e (2000) ........ 5, 6

16 U.S.C. § 824e (2008) ........ 5, 6

16 U.S.C. § 832a(f) (2008) ........ 24

28 U.S.C. § 1491(a)(2) (2008) ........ 49

42 U.S.C. § 7256(a) (2008) ........ 24

Energy Policy Act of 2005,
Pub. L. No. 109-58, 119 Stat. 594 (2005) ........ 5

Fed. R. Evid. 201(b) ........ 4

Rules of the United States Court of Federal Claims 8(e)(2) .......... 59

**OTHER AUTHORITIES**

6 Am. Jur. 2d, *Associations and Clubs*, § 21 (1999) .......... 28

73 Am. Jur. 2d, *Stock and Commodity Exchanges*, § 7 (2001) .......... 28

9 Corbin, *Contracts* § 44.6 (2007) .......... 48

18 C.J.S. *Corporations* § 154 (2007) .......... 28

2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* §201.12 (2d ed. 2008) .......... 4

RESTATEMENT (SECOND) OF JUDGMENTS, § 28 (1982) .......... 44, 45

RESTATEMENT (THIRD) OF AGENCY § 6.05 (2006) .......... 46

Plaintiffs Pacific Gas and Electric Company ("PG&E"), Southern California Edison ("SCE"), and San Diego Gas & Electric Co. ("SDG&E") (together, "Plaintiffs") submit this joint opposition to the U.S.'s motion to dismiss.

## STATEMENT OF THE ISSUES

1. Whether Plaintiffs have sufficiently pled that the Tariffs for the California Independent System Operator ("ISO") and the California Power Exchange ("PX") markets create contractual obligations between Plaintiffs and the Bonneville Power Authority ("BPA") and Western Area Power Authority ("WAPA") (together, the "Agencies") as buyers and sellers in those markets and that Plaintiffs have standing to enforce such contracts against the U.S.

2. Whether Plaintiffs have sufficiently pled, in the alternative, that Plaintiffs are third-party beneficiaries of the Agencies' contractual obligations to abide by the ISO and PX Tariffs provisions.

3. Whether the Court has jurisdiction to grant the declaratory relief sought in Plaintiffs' Fourth through Seventh Claims, which seek interpretations of the parties' disputed rights and obligations under the ISO and PX Tariffs.

4. Whether Plaintiffs' Sixth and Seventh claims were encompassed by or arise from the same operative facts as their Contract Disputes Act Claims ("CDA Claims") and seek essentially the same relief.

5. Whether Plaintiffs have properly pled their First Claim for present breach of contract as an alternative to their Second Claim for anticipatory breach of contract.

## STATEMENT OF THE CASE

### I. INTRODUCTION

In 2000 and 2001, when wholesale electricity prices in California reached stratospheric levels, the California ISO and PX wholesale markets offered an irresistible opportunity for sellers of electric power, including the Agencies. During the Energy Crisis, BPA and WAPA charged more than $500 million for electricity they sold at prices that were grossly inflated by market manipulation and dysfunction. As a condition of gaining entry to these highly-regulated markets, the Agencies had signed *written contracts* agreeing to sell power at only prices approved, and subject to after-the-fact revision, by the Federal Energy Regulatory Commission ("FERC"), and not to retain prices in excess of the FERC-determined rates. In the most massive proceeding in its history, FERC investigated conditions that prevailed in the ISO and PX markets during the Energy Crisis, found that the prices charged had been unjust, unreasonable, and unlawful, and corrected the prices for the period October 2, 2000 to June 20, 2001 (the "Refund Period") to just and reasonable levels, as mandated by the Federal Power Act ("FPA"), 16 U.S.C. §§ 791a, *et seq*.

The Agencies should have honored their contractual promises to accept the corrected prices and refund their overcharges, but they did not. Instead, they—along with other so-called "governmental entities"—vigorously denied any obligation to pay refunds for the transactions in which they had been sellers, and insisted on their right to retain their windfall profits, *while, at the same time, seeking refunds for all of the transactions in which they had purchased power*. In an appeal from the FERC proceeding, they argued, and the Ninth Circuit agreed, that FERC could not compel the Agencies to pay refunds because the FPA places governmental entities outside the perimeter of FERC's refund authority. *Bonneville Power Admin. v. FERC*, 422 F.3d 908, 920 (9th Cir. 2005) ("*Bonneville*"), *cert denied*, 128 S.Ct. 804 (Dec. 10, 2007). However,

the Ninth Circuit did not stop there. It went out of its way to note that the Plaintiffs could, as an alternative remedy, bring claims in court directly against the Agencies to enforce the contractual obligations created by the Tariffs. *Id*. at 925-26.

This is the breach of contract lawsuit expressly recommended by the Ninth Circuit in *Bonneville*. A nearly identical claim was endorsed by the Eighth Circuit in *Alliant Energy, Inc. v. Nebraska Pub. Power Dist.*, 347 F.3d 1046, 1050-51 (8th Cir. 2003), *aff'g* No. 00-2139 ADM/FLN, 2001 WL 1640132 (D. Minn. Oct. 18, 2001) ("*Alliant Energy*"), a case in which the U.S. participated *as a plaintiff* on behalf of WAPA and *recovered refunds* on a breach of contract theory from a recalcitrant governmental entity situated just like BPA and WAPA are here.

The U.S. does not contest these facts. Rather, it continues to try to evade its contract obligations by making various hypertechnical—and misconceived—arguments premised on lack of standing, estoppel, the absence of an Article III case or controversy, and alleged defects in Plaintiffs' CDA Claims. The U.S.'s arguments ignore the meticulous jurisdictional allegations of the Complaint, which must be credited at this stage of the case, and the extensive record that, were it to be considered, establishes Plaintiffs' standing. Not to mention the fact that the U.S. itself, when it wished to recover refunds for overcharges by a governmental seller in *Alliant Energy*, saw no obstacle to asserting its own standing to sue under a strikingly similar contract. The U.S.'s remaining arguments are equally without merit. Plaintiffs respectfully submit that their case must be allowed to proceed.

## II. FACTS

### A. The California Wholesale Markets During the 2000-2001 Energy Crisis

For Plaintiffs, public utilities that serve the vast majority of California's residential and commercial ratepayers, the ISO and PX wholesale power markets were virtually the only game in town during the 2000-2001 Energy Crisis. Plaintiffs were required to purchase through the

ISO and PX nearly all of the wholesale electric power needed to supply their retail customers' needs. California Parties' Complaint ("PG&E Compl.") ¶ 17; SDG&E Complaint ("SDG&E Compl.") ¶ 11.[1] Because the ISO and PX are "public utilities" as defined by the FPA, they are subject to FERC's exclusive regulatory jurisdiction. *See* 16 U.S.C. § 824(b), (d), (e) (2000), Plaintiffs' Appendix ("App."), submitted herewith, at 796. All sales and purchases of power in the ISO and PX markets were governed by FERC-regulated tariffs. The ISO and PX Tariffs specify detailed "rules of the road" for these markets, including when and in what form bids to buy and sell power would be submitted, and the formulas used to establish prices for all purchase-sale transactions.[2] The Tariffs also prescribe the financial settlements resulting from market transactions and allocate risks as between the markets and the market participants. PG&E Compl. ¶¶ 18, 28-35; SDG&E Compl. ¶¶ 12, 22-29; *see also infra* pp. 7-9. All ISO and PX market participants were required to comply with the ISO and PX Tariffs, and transactions in the ISO and PX markets could only take place on the terms and conditions stated in the respective Tariffs. PG&E Compl. ¶¶ 28, 36-37; SDG&E Compl. ¶¶ 22, 30-31.[3] To effectuate

---

[1] A detailed description of the California markets and the Energy Crisis is found in *Pub. Utils. Comm'n of Cal. v. FERC*, 462 F.3d 1027, 1035-1045 (9th Cir. 2006) ("*CPUC*").

[2] The PX operated daily auctions in which buyers purchased power for the following day and hourly auctions that allowed buyers to make any necessary adjustments to their day-ahead purchases. PG&E Compl. ¶¶ 19-20; SDG&E Compl. ¶¶ 13-14. The ISO's role was to safely and reliably operate California's transmission grid, which included maintaining a stable power supply and adequate reserves. To meet these obligations, the ISO operated, and still operates, its own auction markets to acquire the electric power needed to perform these vital functions. PG&E Compl. ¶¶ 21-23; SDG&E Compl. ¶¶ 15-17.

[3] Plaintiffs hereby request judicial notice of the PX and ISO Tariffs, located at A1-A1149 of the U.S.'s Appendix ("U.S. App."); the exhibits at A1150-A1170, A1180-A1181, A1206-A1208, A1221-A1224, A1226-A1238, A1288-A1303 of the U.S. App.; and the exhibits at pages 32-801 of Plaintiffs' Appendix. The Court may judicially notice these exhibits because they are "capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned." Fed. R. Evid. 201(b). *See* 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's*
*(Footnote continued)*

these obligations, buyers and sellers wishing to participate in these markets had to sign agreements contractually binding themselves to comply with the Tariffs.[4]

**B. FERC's Authority Over the ISO and PX Markets**

Subchapter II of the FPA gives FERC exclusive jurisdiction over the sale of electricity at wholesale and the transmission of energy in interstate commerce. 16 U.S.C. § 824(b) (2000); *see generally New York v. FERC*, 535 U.S. 1 (2002). FERC's primary statutory responsibility under the FPA is to ensure that rates charged in the transactions it regulates are just and reasonable.[5] FERC thus has exclusive authority to regulate the rates, terms, and conditions of sales made under the ISO and PX Tariffs and to correct such rates, terms, and conditions if FERC determines that they are not just and reasonable or are otherwise unlawful.[6] In order to carry out this statutory mandate, FERC indisputably has regulatory power to alter or amend the Tariffs,

*Federal Evidence* §201.12 (2d ed. 2008) (listing categories of judicially noticeable materials, such as court orders and pleadings, administrative orders, and governmental records). For ease of reference, Plaintiffs' Appendix also includes an "Index of Key ISO and PX Tariff Provisions," App. at 1-31, which provides excerpts of key Tariff provisions in numeric order with pinpoint cites to the U.S.'s and Plaintiffs' Appendices.

[4] ISO Tariff § 2.2.3.1; PX Tariff § 2.6.2(f). ISO market participants, called "Scheduling Coordinators," were required to sign a Scheduling Coordinator Agreement ("SC Agreement"), in which they explicitly agreed to abide by the terms and conditions of the ISO Tariff. Similarly, participants in the PX market, called "PX Participants," were required to sign a PX Participation Agreement ("PX Agreement"), in which they explicitly agreed to abide by the terms and conditions of the PX Tariff. The ISO and PX Tariffs were incorporated by reference into the SC and PX Agreements, respectively. *See* ISO Tariff Appendix B, SC Agreement §§ 2, 8; PX Tariff Appendix A, PX Participation Agreement §§ II, 8; *see also* PG&E Compl. ¶¶ 25-27; SDG&E Compl. ¶¶ 19-21.

[5] 16 U.S.C. §§ 824d, 824e (2008). The FPA was amended by the Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (2005) ("EPAct 2005"). The FPA provisions discussed herein were in force during the Energy Crisis and at the time of the relevant FERC proceedings, prior to the passage of EPAct 2005.

[6] The Tariffs expressly reference FERC's regulatory authority. *See, e.g.*, ISO Tariff § 18.1; PX Tariff § 18.1. *See also* PG&E Compl. ¶¶ 38-40; SDG&E Compl. ¶¶ 32-34.

including the pricing provisions.[7] Importantly, the ISO and PX Tariffs give market participants the right to petition FERC to review and modify rates charged in these markets. In the event that FERC determines that any rates charged under the Tariffs are unjust, unreasonable, or otherwise unlawful, and corrects the rates, the Tariffs provide for recalculation of charges and resettlement of buyers' and sellers' accounts. ISO Tariff § 19; PX Tariff § 13; *see also* 16 U.S.C. § 824e (2008), 16 U.S.C. § 824e(a) (2000), App. at 799.

**C. The Agencies Agreed to Abide by the Tariffs.**

In order to gain access to the ISO and PX markets, the Agencies signed *written contracts* that expressly incorporated the entire Tariffs as contract terms. PG&E Compl. ¶¶ 25-27, 41; SDG&E Compl. ¶¶ 19-21; 35. *See also* U.S. App. at A1150, A1155 (BPA contracts), U.S. App. at A1221, A1226, A1235 (WAPA contracts). By those contracts, the Agencies agreed that the "obligations and liabilities" of the Tariffs were binding on them, and that, if they sold power in the ISO and PX markets, the prices they charged for their transactions would be set pursuant to the ISO and PX Tariff terms. PG&E Compl. ¶¶ 36, 40-41; SDG&E Compl. ¶¶ 30, 34-35. As a consequence, selling in these two markets exposed the Agencies to the very substantial possibility that FERC would step in and correct the extraordinarily high prices they were receiving under the Tariffs' pricing formulas and order the ISO and PX to recalculate and resettle their accounts. Those events would, in turn, trigger the contractual obligation of all sellers,

[7] The ISO Tariff provides, for example, that in signing SC Agreements, market participants agree "to comply with all ISO rules, protocols, and instructions, as those rules, protocols and instructions *may be amended from time to time*." ISO Tariff Appendix A, Master Definitions Supplement ("SC Agreement") (emphasis added). Similarly, the PX Agreement defines the PX Tariff as "the PX FERC Electric Service Tariff *as amended from time to time*…." PX Tariff Appendix A, PX Participation Agreement, § 1(B) (emphasis added).

including the Agencies, to refund the overcharges to their buyers. PG&E Compl. ¶¶ 36, 38-41; SDG&E Compl. ¶¶ 30, 32-35.

The contracts the Agencies entered into are unambiguous on these points. The ISO SC Agreement provides that the Agencies "will abide by, and will perform all of the obligations under the ISO Tariff . . . in respect of all matters set forth therein including, without limitation, all matters relating to the scheduling of Energy and Ancillary Services on the ISO Controlled Grid, . . . [and] billing and payments . . . ." *See, e.g.*, BPA ISO SC Agreement, U.S. App. at A1150, § 2(B). It further provides that "[t]he ISO Tariff is incorporated herein and made a part hereof." *Id*. § 8. The PX Agreement similarly provides that the Agencies agree, inter alia, that they "will abide by, and will perform all of the obligations under the PX Tariff in respect of all matters set forth therein including, without limitation, all matters relating to the trading of Energy by it through the PX Market, ongoing obligations in respect of bidding, Settlement, . . . billing and payments . . . ." *See, e.g.*, BPA PX Agreement, U.S. App. at A1155, § II(B). The PX Agreement further provides that "[t]he PX Tariff is incorporated herein and made a part hereof." *Id.* § 8.

**D. The ISO and PX Auction Market Mechanisms**

The ISO and PX did not buy electricity on their own behalves. The Tariffs explicitly state that the ISO and PX operated their respective markets not as principals, but on behalf of market participants, who were the counterparties to the sales transactions conducted in those markets.[8] *See infra* pp. 35-36. Power sales in these markets were conducted as so-called "single

[8] ISO Tariff § 2.2.1 provides that, in contracting for wholesale power, "the ISO will not act as principal but as agent for and on behalf of the relevant Scheduling Coordinators." The PX Tariff contains a similar provision stating that the PX will not be deemed a counterparty to any trades in the market. *See* PX Tariff § 3.1. *See also* PG&E Compl. ¶¶ 30, 34; SDG&E Compl. ¶¶ 24, 28.

price auctions." All sellers who sold electricity in a particular auction period received the same price (the *market clearing price*) for their power, even if they had originally offered to sell at a lower price. PG&E Compl. ¶¶ 20, 22, 66; SDG&E Compl. ¶¶ 14, 16, 58. As a consequence, when market dysfunction or manipulation inflated the market clearing price to unjust and unreasonable levels, all sellers—including the Agencies—received, and all buyers were forced to pay, the unjust and unreasonable prices. PG&E Compl. ¶¶ 39-40; SDG&E Compl. ¶¶ 33-34.

Most market participants both bought and sold electric power in the ISO and PX markets. The ISO and PX were responsible for tracking how much power each market participant bought and sold and the price associated with each transaction in those markets. *See* ISO Tariff §§ 11.1, 11.2; PX Tariff §§ 3.1, 6.2; *see also* PG&E Compl. ¶ 29; SDG&E Compl. ¶ 23. This function is called "settlement." For each "Settlement Period," the ISO and PX calculated each Scheduling Coordinator's and PX Participant's respective purchases and sales, netted out the credits and debits attributable to each buyer and seller, and prepared and distributed settlement statements and invoices reflecting the amounts payable and receivable by market participants in connection with their trades. ISO Tariff § 11.9; PX Settlement and Billing Procedures, App. at 675 ("PX PSABP"), § 5.4.

Although the markets established market clearing prices for each auction period, the ISO and PX Tariffs create no expectation that amounts due to each seller are "final" once a sale is made. Even after an auction is completed and settled, the Tariffs provide mechanisms to correct any overpayments made to sellers and to refund the overpaid amounts to affected purchasers, including—as mentioned above—giving market participants the right to petition FERC to correct

the prices. When FERC determines that sellers made improper overcharges, as happened here, the Tariffs provide for correction of the accounts of the buyers and sellers involved.[9]

The market participants, rather than the ISO or PX, bore the risks and rewards of trading in these markets. The Tariffs contain provisions to protect the ISO and PX from the consequences of any shortfall that might result if a market participant defaults on a payment, causing a shortage of total funds collected for distribution to the other market participants.[10] If the funds collected are insufficient, the ISO and PX pass through liability for shortfalls to the non-defaulting market participants that bought or sold power in the markets during a period for which there was a shortfall.[11]

### E. Market Participants Have the Right, Under the Tariffs, to Bring Actions Directly Against Other Market Participants.

The Tariffs leave no doubt that the market participants themselves may sue other participants to enforce contract obligations arising from market transactions. The ISO Tariff expressly gives market participants the right to bring suit against one another to enforce rights and obligations created by the Tariffs resulting from sales transactions.[12] According to FERC, the Tariff "authorizes but does not require [the ISO] to seek payment from recalcitrant Scheduling Coordinators on behalf of sellers of energy. Nor is [the ISO] responsible for making payments to a seller if a Scheduling Coordinator defaults." *San Diego Gas & Elec. Co.*, 109

---

[9] ISO Tariff §§ 11.6.3.3, 11.18.1, 11.18.2; PX PSABP §§ 5.3.1, 5.3.4, 5.3.5. *See* PG&E Compl. ¶ 40; SDG&E Compl. ¶ 34.

[10] ISO Tariff §§ 2.2.3.2, 11.8.2.2; PX PSABP §§ 2.1.2, 5.7.1, 5.7.2; *see also* PG&E Compl. ¶¶ 31-33; SDG&E Compl. ¶¶ 25-27.

[11] *See, e.g.*, ISO Tariff §§ 11.2.9, 11.16.1; PX Tariff, Schedule 2, §§ 5.2.4, 5.3; PX PSABP § 5.7.3; *see also* PG&E Compl. ¶¶ 31-33; SDG&E Compl. ¶¶ 25-27.

[12] *See* ISO Tariff §§ 11.19, 11.20.1, 11.20.2; PG&E Compl. ¶ 34; SDG&E Compl. ¶ 28.

FERC ¶ 61,218 at P 72 (2004), App. at 451 ("November 23, 2004 Order"); *see also Pac. Gas & Elec. Co.*, 81 FERC ¶ 61,122 at 61,508-09 (1997), App. at 223 ("October 30, 1997 Order") ("[I]t should be the responsibility of Scheduling Coordinators to recover amounts that they are owed."); PG&E Compl. ¶¶ 30-35; SDG&E Compl. ¶¶ 24-29. The PX Tariff also creates direct rights of action among market participants.[13] *See infra* pp. 32-35.

**F. May 2000 to June 2001: The Energy Crisis**

Beginning in May 2000, the prices demanded by sellers in the ISO and PX markets shot up to unprecedented levels and stayed there for the next year. At times, prices during the Energy Crisis were over 100 times the prices that prevailed in prior periods. As a result of the single-price auction mechanism in the ISO and PX markets, these extremely high prices generated windfall profits for all sellers, including the Agencies. The power crisis had severe negative effects on the stability and financial integrity of the Plaintiffs, and ultimately imposed billions of dollars in additional costs on business and residential customers throughout California. Plaintiffs, because they were required to buy power in these markets, had no means of escaping the full brunt of these sky-high prices. PG&E Compl. ¶¶ 43-44, 48; SDG&E Compl. ¶¶ 37-38, 42. The Energy Crisis ended on June 19, 2001, when FERC imposed price caps and other remedial measures on wholesale power sellers across the Western region. *San Diego Gas & Elec. Co.*, 95 FERC ¶ 61,418 at 62,558 (2001), App. at 356; PG&E Compl. ¶¶ 47-49; SDG&E

[13] If a PX Participant defaults on its obligations, the PX Tariff allows the PX to "chargeback" or allocate the unsatisfied amount to all non-defaulting participants in the PX markets. PX Tariff, Schedule 2, § 5.3. Upon effecting a chargeback, the PX Tariff requires the PX to "identify the defaulting Participant"—who otherwise would have remained anonymous—"to all other affected PX Participants by the most expeditious means available," so that "non-defaulting Participants *are able to seek recovery from the defaulting party*." *Cal. Power Exch. Corp.*, 92 FERC ¶ 61,096 at 61,379 (2000), App. at 266 ("July 28, 2000 Order") (emphasis added).

Compl. ¶¶ 41-43. The bulk of the crippling costs of the crisis has been, or will be, passed through to, and paid by, Plaintiffs' residential and commercial ratepayers. Amounts recovered in this proceeding will ultimately benefit the California ratepayers who were subjected to the overcharges. PG&E Compl. ¶ 50; SDG&E Compl. ¶ 44.

**G. Plaintiffs Seek Relief From FERC.**

**1. The FERC Remedy Proceeding**

On August 2, 2000, SDG&E filed a complaint with FERC under the FPA against all sellers of electricity into the ISO and PX markets. *See* PG&E Compl. ¶ 51; SDG&E Compl. ¶ 45. PG&E and SCE intervened in that case on August 14, 2000, seeking extensive relief. On August 23, 2000, FERC opened a broad investigation into whether sellers' rates were just and reasonable, which it consolidated with the above proceedings. *San Diego Gas & Elec. Co.*, 92 FERC ¶ 61,172 at 61,603, 61,609 (2000), App. at 271. (Collectively, these dockets are referred to as the "Remedy Proceeding.") FERC established October 2, 2000 as the "refund effective date," after which prices set by the Tariffs became conditional and subject to retrospective adjustment. *Id.*; *San Diego Gas & Elec. Co.*, 93 FERC ¶ 61,121 at 61,370 (2000), App. at 284.

The Agencies were respondents to the initial SDG&E Complaint, and also formally intervened as parties and gained full participatory rights in the Remedy Proceeding. WAPA Motion to Intervene, FERC Docket Nos. EL01-1-000, *et al.*, (Oct. 23, 2000), App. at 709; BPA Motion to Intervene, FERC Docket. Nos. EL00-95-000, *et al.*, (Nov. 22, 2000), App. at 715. *The Agencies, who had both bought and sold power during the Energy Crisis, sought refunds for overcharges on their purchases, while consistently refusing to pay refunds to their purchasers—who had suffered exactly the same injury. See, e.g., San Diego Gas & Elec. Co.*, 96 FERC ¶ 61,120 at 61,513 n.56 (2001), App. at 408 ("July 25, 2001 Order").

**2. The Discovery of Market Manipulation**

In early 2002, documents surfaced indicating deliberate manipulation of the ISO and PX markets by Enron and numerous other sellers, designed to increase prices throughout the Energy Crisis. Following an investigation, FERC identified numerous potential market power abuses and tariff violations, many implemented with the willing cooperation of sellers, including BPA. *See Fact-Finding Investigation of Potential Manipulation of Electric and Natural Gas Prices*, FERC Docket No. PA02-2-000 (Mar. 26, 2003), App. at 564. *See also CPUC*, 462 F.3d at 1039-40 (explaining that evidence showed that many sellers artificially manipulated the markets, destabilizing the electric grid and increasing prices); PG&E Compl. ¶¶ 63-65.

**H. FERC Remediates the Unlawful Market Prices.**

Throughout the Refund Period, FERC issued numerous orders in an attempt to remedy the effects of the dysfunctional ISO and PX markets, culminating in the critical July 25, 2001 Order, which reset prices for sales made in the ISO and PX markets during the Refund Period. July 25, 2001 Order, 96 FERC at 61,512, 61,516; PG&E Compl. ¶ 52; SDG&E Compl. ¶ 46. FERC adopted a methodology to recalculate retrospectively, on a market-wide basis, the maximum competitive energy prices that would have existed in the ISO and PX markets if sellers had charged just and reasonable rates. The corrected prices are called the "Mitigated Market Clearing Prices," or "MMCP." FERC's re-pricing methodology had the effect of revising the ISO and PX Tariffs to establish the corrected "market clearing prices *that all market participants previously agreed to accept for their sales*." July 25, 2001 Order, 96 FERC at 61,512 (emphasis added); PG&E Compl. ¶¶ 53, 55; SDG&E Compl. ¶¶ 47, 49. Prices that exceeded the MMCP during the Refund Period are subject to refund. FERC ordered the ISO and PX to apply the MMCP to sales for each auction interval during the Refund Period in order to recalculate the corrected charges that all sellers should have received, and to re-run their

settlement and billing processes under their respective Tariffs. July 25, 2001 Order, 96 FERC at 61,513, 61,516-20; PG&E Compl. ¶ 55; SDG&E Compl. ¶ 49. Pursuant to this direction, the ISO and the PX have recalculated the accounts of all sellers and buyers in their markets to reflect the corrected rates for the Refund Period. The ISO continues to make adjustments to account for certain cost offsets and interest calculations. PG&E Compl. ¶ 56; SDG&E Compl. ¶ 50.

### I. Appeals From FERC's Orders

#### 1. Relief for the Summer Period and Excluded Transactions—*CPUC v. FERC*

Although FERC corrected prices for a wide swath of transactions, it also concluded that, on the record before it, its statutory mandate did not grant it authority to order refunds for the early part of the Energy Crisis, from May 1, 2000 through October 1, 2000 (the "Summer Period"), and thus denied relief for that period. July 25, 2001 Order, 96 FERC at 61,505. FERC also refused to correct the rates for certain "energy exchange" transactions and sales of power made over multi-day periods made during the Refund Period (the "Excluded Transactions."). *See id*. at 61,499; *see also* PG&E Compl. ¶ 54; SDG&E Compl. ¶ 48.

Plaintiffs petitioned the Ninth Circuit for review of the July 25, 2001 Order and subsequent FERC rehearing orders on the ground, *inter alia*, that FERC was also required to correct the rates for sales made during the Summer Period and for Excluded Transactions. PG&E Compl. ¶ 57; SDG&E Compl. ¶ 51. On August 2, 2006, the Ninth Circuit issued its decision in *CPUC*, granting the Plaintiffs' petitions for review on the Summer Period and Excluded Transactions issues, and remanding to FERC for further proceedings. The court concluded that FERC provided insufficient justification for its refusal to consider a market-wide remedy for tariff violations during the Summer Period and failed to provide any valid reason for

its refusal to apply the MMCP to the Excluded Transactions. *CPUC*, 462 F.3d at 1049-51, 1057, 1060-1061, 1065; *see also* PG&E Compl. ¶¶ 58-60; SDG&E Compl. ¶¶ 52-54.[14]

### 2. FERC's Authority to Order the Agencies to Pay Refunds—The *Bonneville* Decision

FERC ruled in a series of decisions in the Remedy Proceeding that its power to enforce sellers' payment of refunds under the FPA extended to governmental entities such as the Agencies. BPA and a number of other governmental entities appealed this decision to the Ninth Circuit. On September 6, 2005, the Ninth Circuit ruled that FERC lacked statutory authority to directly enforce governmental entities' refund obligations. *Bonneville*, 422 F.3d at 911, 920; *see also* PG&E Compl. ¶ 67; SDG&E Compl. ¶ 59. The court noted, however, that market participants could obtain "the equivalent refund relief" by bringing claims in court directly against the governmental entities to enforce the contractual obligations created by the Tariffs and related agreements. *Bonneville*, 422 F.3d at 925-26. The Ninth Circuit observed that the governmental entities' agreement to abide by the ISO and PX Tariffs "serves to demonstrate that the remedy, if any, may rest in a contract claim, not a refund action. Such an approach is not novel . . . ." *Id*. (citing *Alliant Energy*, 347 F.3d at 1050-51). *See infra* pp. 17-19; PG&E Compl. ¶¶ 67-68; SDG&E Compl. ¶¶ 59-60.

---

[14] In addition to the Remedy Proceeding, the issue of relief for the Summer Period arose in a separate FERC proceeding brought against various electric power sellers that had violated FERC reporting requirements. On appeal from that separate FERC docket, the Ninth Circuit found that FERC had erred in holding that it could not compel refunds on account of those violations and remanded to FERC. *See California ex rel. Lockyer v. FERC*, 383 F.3d 1006, 1017-18 (9th Cir. 2004), *cert. denied*, 127 S.Ct. 2972 (June 18, 2007). FERC recently set for hearing various factual issues relating to that mis-reporting and its impact. *California ex rel. Lockyer*, 122 FERC ¶ 61,260 (Mar. 21, 2008), App. at 540. FERC indicated that it would consider the appropriate remedy after the impacts of the mis-reporting are evaluated. *Id*. at P 37.

#### 3. FERC's October 19, 2007 and November 19, 2007 Orders

On October 19, 2007, FERC issued an Order on Remand of the *Bonneville* decision. *San Diego Gas & Elec. Co.*, 121 FERC ¶ 61,067 (2007), App. at 500 ("October 19, 2007 Order"), FERC subsequently clarified the October 19, 2007 Order in *San Diego Gas & Elec. Co.*, 121 FERC ¶ 61,188 (2007), App. at 534 ("November 19, 2007 Order"). Together, those Remand Orders address a number of issues that directly relevant to this case. First, FERC confirmed that it had amended the Tariffs when it revised market prices in its July 25, 2001 Order. November 19, 2007 Order, 121 FERC ¶ 61,188 at PP 10-13 (confirming FERC "revised the pricing formulations contained in the CAISO/PX tariffs" to "reset[] the market clearing prices" for ISO and PX transactions during Refund Period). Second, FERC held that, although it lacked authority under *Bonneville* to compel governmental entities to pay refunds, the ISO and PX nevertheless should finish calculating the governmental entities' refund liabilities, and that the shortfall resulting from these entities' failures to pay refunds would be re-allocated to other market participants, including Plaintiffs. October 19, 2007 Order, 121 FERC ¶ 61,067 at PP 38-39. FERC also recognized that Plaintiffs could pursue contractual remedies against governmental entities, including the Agencies, in civil actions. *Id.* at PP 37, 68, 76.

### J. The Agencies Repudiate Their Contractual Obligations and Plaintiffs Pursue Their Contract Claims.

#### 1. Repudiation by the Agencies

The Agencies have denied they are contractually obliged to refund any amounts received in excess of the FERC-corrected price for electric power sales during the Refund Period. Since the early days of the Remedy Proceeding, the Agencies have taken the position at FERC that they have no obligation to pay refunds. *See, e.g., Bonneville Power Administration Request for Rehearing and Clarification*, FERC Docket Nos. EL00-95, *et al.*, (July 19, 2001), App. at 723.

In argument before the Ninth Circuit, the Agencies further asserted that they were not even bound by the ISO and PX Tariffs and the contractual terms imposed by the Tariffs. *See* Oral Argument (Mark W. Pennak, counsel for BPA), *CPUC*, 462 F.3d 1027 (Apr. 13, 2005) (No. 01-71051). The Agencies, in an attempt to avoid paying refunds, have been trying vigorously at FERC to prevent the ISO and PX recalculation and invoicing process from ever being completed.[15] In the same briefing, the Agencies continued to insist that they are not bound by the Tariffs, that the Tariff prices had not been amended, and that they have no contractual obligation to pay refunds. *Id*. at 2, 7, 10. The Agencies have reiterated their refusals to pay refunds in this proceeding. *See, e.g.*, U.S. Br. at 23, 37.

**2. Claims Presentments and Denials and This Action**

On December 2, 2005, Plaintiffs served their CDA Claims, which the Agencies denied. PG&E Compl. ¶ 70; SDG&E Compl. ¶ 62. On March 12, 2007, Plaintiffs filed their Complaint in this Court seeking damages and declaratory relief against the U.S. based on the Agencies' breach of contract.[16]

**3. The California Action**

Plaintiffs have been pursuing parallel relief in a California court against eighteen state governmental entities that sold power in the ISO and PX markets during the Energy Crisis, based on the same legal theories and seeking the same kind of relief from those sellers as Plaintiffs

[15] *See, e.g.*, Motion By and Answer of the Bonneville Power Administration (BPA) and the Western Area Power Administration (Western) to the California Parties' Motion Related to Procedures Following Remand in *Bonneville Power Administration, et al. v. FERC*, FERC Docket Nos. EL00-95-000, *et al.*, (Apr. 17, 2007), App. at 754, at 2-3.

[16] On the same day, SDG&E filed a similar complaint, and the two actions have been consolidated. Order Granting Defendant's Motion to Consolidate Case Number 07-157C with 07-167C (May 23, 2007) (Docket No. 9). We refer to the complaints in text jointly as "Complaint."

pursue in this case (the "California Action"). The defendants in that case demurred to all claims on most of the same grounds asserted by the U.S. here. On December 4, 2007, after considering hundreds of pages of briefing, thousands of pages of judicially noticeable materials, and a day-long oral argument, the California court overruled defendants' demurrers virtually in their entirety, and (i) held that the breach of contract cause of action was "properly pled under *Bonneville Power Admin. v. FERC*, 422 F.3d 908 (9th Cir. 2005), and under the contracts themselves which state that they are subject of FERC's authority"; (ii) held that Plaintiffs' anticipatory breach claim was properly pled and raised factual issues that could not properly be decided on demurrer; (iii) overruled demurrers arguing that Plaintiffs lacked standing to pursue these contract claims; and (iv) overruled the demurrers to all of Plaintiffs' declaratory relief claims, which are identical to the declaratory relief claims pled here. Order on Demurrers, *Electric Refund Cases*, JCCP 4512 (L.A. Sup. Ct., Dec. 4, 2007), App. at 32 ("Order on Demurrers"), *modified in* Minute Order (L.A. Sup. Ct., Jan. 3, 2008), App. at 34.

## ARGUMENT

### I. OVERVIEW OF PLAINTIFFS' CONTRACT CLAIM

Before responding to the U.S.'s specific arguments, we provide a brief explanation of the context in which our claims arise. Plaintiffs' contract claim was expressly suggested by the Ninth Circuit in *Bonneville*. While the Ninth Circuit held in *Bonneville* that FERC lacked jurisdiction to order governmental entities to refund their overcharges on sales in the ISO and PX, the Court went on to point out that governmental entities (including the Agencies) could still have contractual liability to pay those same refunds, enforceable in a court action by other market participants. 422 F.3d at 925. The Ninth Circuit quoted extensively, and with approval, from the district court and Court of Appeals' decisions in *Alliant Energy*, a contract action *in which the U.S. successfully sued as a plaintiff on behalf of WAPA* to recover refunds from

another governmental entity on a contract theory nearly identical to Plaintiffs' claim here. *Id.* at 926 ("When a contract provides that its terms are subject to a regulatory body, all parties to that contract are bound by the actions of the regulatory body. . . . [W]e are enforcing an agreement, which [the governmental entity] freely entered.) (quoting *Alliant Energy*, 347 F.3d at 1050); *see* PG&E Compl. ¶ 67-69; SDG&E Compl. ¶ 59-61.

*Alliant Energy* involved an association of power companies, the Mid-Continent Area Power Pool ("MAPP"). As here, both public utilities and governmental entities participated in that market. The market participants entered into an agreement that, like the ISO and PX Tariffs, set forth the parties' contractual rights and obligations. FERC actively regulated that agreement, just as it regulated the Tariffs here, because the public utility participants in the pool were subject to FERC's regulatory jurisdiction. *Alliant Energy, Inc. v. Nebraska. Pub. Power Dist.*, No. 00-2139 ADM/FLN, 2001 WL 1640132, at *1 (D. Minn. 2001), *aff'd*, 347 F.3d 1046 (8th Cir. 2003). The MAPP participants amended their Agreement to raise rates to certain buyers. FERC stepped in, as it did here, disapproved the higher rate as unlawfully discriminatory, and ordered the MAPP members to eliminate the new provision and refund the overcharges they had collected. *Alliant Energy*, 347 F.3d at 1049 & n.4. Although FERC directed its refund order only at the public utilities, all but one of the governmental entity members paid the refunds anyway, acknowledging that their agreement contractually required them to do so. One governmental entity, NPPD, refused. *Id.* at 1051 n.8.

The other MAPP members sued NPPD for breach of contract, seeking refunds of NPPD's overcharges. *Id*. at 1049. The U.S. intervened in the suit as a plaintiff on behalf of WAPA, a MAPP member, and filed a parallel complaint for the same relief—refunds of NPPD's overcharges. The court held that NPPD was bound by the contract to pay refunds following

FERC's disapproval of the higher rate even though FERC did not have regulatory authority to order NPPD to pay those refunds directly. *Alliant Energy*, 2001 WL 1640132, at *3. In an analysis that the Ninth Circuit quoted verbatim in *Bonneville*, the *Alliant* district court observed:

> The [MAPP] Agreement is a contract to which NPPD is a signatory. NPPD is bound by the contract regardless of whether FERC has regulatory authority over NPPD itself. FERC concluded that certain tariff provisions of [the Agreement] did not comply with [FERC regulations] and that MAPP must revise the . . . Agreement. Accordingly, NPPD is contractually obligated to refund the amounts it overcollected under the nullified . . . tariff provisions, even if the contract amendments resulted from a FERC order.

*Id*. at *4 (quoted in *Bonneville*, 422 F.3d at 926) (footnote omitted). The Eighth Circuit affirmed, rejecting NPPD's argument that it could not be held liable for refunds because FERC lacked jurisdiction to order refunds from NPPD. *Alliant Energy*, 347 F.3d at 1050-51 (NPPD, when it signed MAPP Agreement, "bound itself to any FERC-ordered modification of the Restated Agreement—despite the fact that FERC normally would not be able to order NPPD to do anything"), quoted in *Bonneville*, 422 F.3d at 925-26.

This is the contract action that *Bonneville* recommended and the U.S. pursued successfully in *Alliant Energy*. As a condition of selling energy in the ISO and PX markets, the Agencies voluntarily entered into contracts and agreed to be bound by their terms, which are contained in the ISO and PX Tariffs. PG&E Compl. ¶¶ 26-27; SDG&E Compl. ¶¶ 20-21. In so doing, the Agencies agreed to a basic principle: They would not control the price. The price would be set in the first instance by the applicable Tariff formula, with every seller in the same auction period receiving the same "market clearing price." PG&E Compl. ¶¶ 20, 22; SDG&E Compl. ¶¶ 14,16; *CPUC*, 462 F.3d at 1038. The Tariffs contemplated that FERC could intervene to correct the prices if FERC determined them to be unjust, unreasonable or otherwise unlawful. PG&E Compl. ¶¶ 3, 14, 38-40, 42; SDG&E Compl. ¶¶ 3, 8, 32-34, 36; ISO Tariff § 19; PX Tariff § 13. FERC made that determination, corrected the prices retrospectively, and ordered the

ISO and PX to recalculate and adjust the accounts of all market participants. PG&E Compl. ¶¶ 52-53, 55-56; SDG&E Compl. ¶¶ 46-47; 49-50; October 19, 2007 Order, 121 FERC ¶ 61,067 at PP 38-39; November 19, 2007 Order, 121 FERC ¶ 61,188 at PP 10-13. The Agencies were contractually bound to accept the FERC-adjusted prices and to refund any resulting overcharges. PG&E Compl. ¶¶ 2-3, 14, 73-75; SDG&E Compl. ¶¶ 2-3, 8, 65-67. But the Agencies have denied that they are contractually obliged to pay refunds, thus repudiating their contracts.

## II. THE U.S.'S ARGUMENTS MAY NOT BE RESOLVED ON THIS MOTION.

The U.S. must meet a "high standard" in order to prevail on a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"). *Sullivan v. United States*, 54 Fed. Cl. 214, 216 (2002) (Smith, J.). It has not met that standard here. The U.S.'s contention that the Plaintiffs are required to *prove* their case at this initial stage of the litigation is both inaccurate and based on outdated authority. U.S. Br. at 12. As the most recent Federal Circuit cases make clear, a plaintiff must only adequately plead—not prove—jurisdiction to avoid dismissal under Rule 12(b)(1), particularly when, as here, the asserted jurisdictional issues are intertwined with the merits. And even under the U.S.'s dated authority, this Court has no reason to discredit Plaintiffs' allegations when ruling on the 12(b)(1) motion because there is no conflict between the jurisdictional allegations and the record evidence. The well-pleaded allegations of the Complaint entitle Plaintiffs to their day in court.

In arguing that Plaintiffs must establish jurisdiction by a preponderance of the evidence, the U.S. is out of step with recent Federal Circuit authority. Under the current law of this Circuit, the Court must deny a 12(b)(1) motion if Plaintiffs have adequately *pleaded* subject

matter jurisdiction.[17] In making that determination, the Court must accept all of Plaintiffs' undisputed allegations as true and must draw all reasonable inferences in Plaintiffs' favor. *See, e.g.*, *Simmons v. United States*, 71 Fed. Cl. 188, 190 (2006) (Smith, J.). Specifically, to establish jurisdiction over Plaintiffs' claim based on a contract with the U.S., "the law is clear that . . . a valid contract must only be pleaded, not ultimately proven." *Total Med. Mgmt. v. United States*, 104 F.3d 1314, 1319 (Fed. Cir. 1997); *see also Adarbe v. United States*, 58 Fed. Cl. 707, 714 (2003) ("The general rule is that so long as the plaintiffs have made a non-frivolous claim that they are entitled to money from the United States because . . . they have a contract right, this court has jurisdiction to settle the dispute.") (internal quotation and citation removed). Accordingly, if the plaintiff has adequately pleaded the elements of a contract with the United States, the Court must deny the U.S.'s 12(b)(1) motion.[18] *See Kawa*, 74 Fed. Cl. 294 (denying

[17] *See, e.g.*, *Acceptance Ins. Co. v. United States*, 503 F.3d 1328, 1334 (Fed. Cir. 2007) ("A challenge to the Court of Federal Claims' jurisdiction may be overcome on the basis of well-pleaded allegations in the complaint."); *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997) (same); *Spruill v. Merit Sys. Prot. Bd.*, 978 F.2d 679, 687 (Fed. Cir. 1992) ("Jurisdiction, therefore, is not defeated . . . by the possibility that the averments might fail to state a cause of action on which [the plaintiff] could actually recover.") (citing *Bell v. Hood*, 327 U.S. 678, 682 (1946)) (internal quotations removed). Although the U.S. cites *McNutt v. General Motors Acceptance Corp. of Indiana*, 298 U.S. 178 (1936), for the proposition that a plaintiff must prove jurisdiction if it is challenged, U.S. Br. at 12, that decision is contrary to modern Supreme Court authority. *See, e.g.*, *Grubart, Inc. v. Great Lake Dredge and Dock Co.*, 513 U.S. 527, 537 (1995) ("Normal practice permits a party to establish jurisdiction at the onset of a case by means of a non-frivolous assertion of jurisdictional elements."); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice [to satisfy Article III standing requirements], for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.") (citation and internal quotation marks omitted).

[18] Where, as here, the issue of the Court's jurisdiction is intertwined with the merits of the plaintiff's claim, the Court should postpone deciding the jurisdictional issue until it reaches the merits of plaintiff's claim on summary judgment or at trial. *See, e.g.*, *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 203 n.19 (1974); *Nippon Steel Corp, et al. v. United States*, 219 F.3d 1348, 1353 (Fed. Cir. 2000); *Kawa v. United States*, 77 Fed. Cl. 294, 304 n.4 (2007).

12(b)(1) motion because plaintiff had adequately pleaded a breach of contract claim); *Nelson Constr. Co. v. United States*, 79 Fed. Cl. 81, 96 (2007) (denying 12(b)(1) motion because plaintiff had adequately alleged standing as a third-party beneficiary).[19]

The current Federal Circuit rule supplants the holdings of older cases in which courts required plaintiffs to prove jurisdiction, but many of those older cases also are inapplicable on their facts. In *Reynolds v. Army & Air Force Exchange Service*, 846 F.2d 746 (Fed. Cir. 1988) (U.S. Br. at 12), for instance, because the U.S. had introduced record evidence that clearly contradicted the complaint's jurisdictional allegations, the Court discredited the allegations when deciding the 12(b)(1) motion. *Id.* at 747 (allegation that parties had entered into an employment contract contradicted by personnel policy). *See also Moyer v. United States*, 190 F.3d 1314, 1319-20 (Fed. Cir. 1999) (plaintiff's jurisdictional allegation that his resignation was involuntary "completely contradicted" by record evidence).[20] Here the U.S. has done no more than advance its own contradictory *interpretation* of the agreements alleged in the

[19] The U.S. brings one part of its motion under Rule 12(b)(6) of the RCFC. *See* U.S. Br. at 51-55. As on a 12(b)(1) motion, in ruling on a 12(b)(6) motion the Court must accept as true all of the plaintiff's well-pleaded allegations and must draw all reasonable inferences in the plaintiff's favor. *See Client Network Servs., Inc. v. United States*, 64 Fed. Cl. 784, 790 (2005) (Smith, J). The Court may grant a 12(b)(6) motion for failure to state a claim only if it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim that would entitle the plaintiff to relief. *Id.* On a 12(b)(6) motion, the Court may consider matters incorporated by reference, items subject to judicial notice, and exhibits attached to the complaint without converting the motion into one for summary judgment. *See L-3 Commc'ns Integrated Sys., L.P. v. United States*, 79 Fed. Cl. 453, 464 n.23 (2007); *Kawa*, 77 Fed. Cl. at 307.

[20] Similarly, other older cases such as *McNutt* and *Cedars-Sinai Medical Center v. Watkins*, 11 F.3d 1573 (Fed. Cir. 1993), are also inapplicable because in those cases the Court found the plaintiff's jurisdictional allegations were merely conclusory or inadequately pled. That is hardly the case here. *See McNutt*, 298 U.S. at 181 ("The [complaint] is thus destitute of any appropriate allegation as to jurisdictional amount save the general allegation that that matter in controversy exceeds $3,000."); *Cedars-Sinai*, 11 F.3d at 1584 ("[W]e must scrutinize the evidence submitted by [plaintiff] as support for its otherwise naked jurisdictional allegations . . . .").

Complaint. The U.S. has not put forward any *facts* that contradict Plaintiffs' jurisdictional allegations, and the U.S.'s self-serving assertions are not "evidence" that this Court may consider when ruling on the U.S.'s motion. *See, e.g., Nelson*, 79 Fed. Cl. at 97 n.18 (on 12(b)(1) motion, court may not consider counsel's assertions as evidence).[21]

**III. CALIFORNIA LAW GOVERNS THE AGENCIES' CONTRACTUAL OBLIGATIONS UNDER THE ISO AND PX TARIFFS.**

When the U.S. contracts as a buyer or seller in a commercial market, it is governed by the same substantive law that applies to any private individual. *See Cooke v. United States*, 91 U.S. 389, 398 (1875) (when U.S. "comes down from its position of sovereignty, and enters the domain of commerce, it submits itself to the same laws that govern individuals there."); *United States v. Winstar Corp.*, 518 U.S. 839, 895 (1996). Here, the U.S. voluntarily sold power pursuant to the ISO and PX Tariffs, which specify that California law governs all parties, unless some federal law conflicts with or forbids a federal agency from complying with the state law. ISO Tariff § 20.8(a) (*see* U.S. Br. at 18); PX Tariff § 19.6 (*see* U.S. Br. at 17). The U.S. has not pointed to any such circumstances in this case, and thus has identified no reason to excuse the application of the contractual choice of law provision. The U.S. makes the purely abstract argument that its contract obligations must be governed by a federal common law of contracts,[22]

[21] Even if the Court were to examine the record evidence supporting Plaintiffs' jurisdictional allegations, it must deny this motion because: (i) the evidence is entirely consistent with the Complaint's allegations; and (ii) even if it were not, the Court could not resolve any disputed triable issues at this juncture of the proceedings. *See, e.g., Reynolds*, 846 F.2d at 747-48 (improper for court to grant 12(b)(1) motion because factual dispute remained as to jurisdictional issue); *see also Sullivan*, 54 Fed. Cl. at 216-17 (denying 12(b)(1) motion because plaintiffs had raised triable issue regarding their status as third-party beneficiaries); *Employers Ins. of Wausau v. United States*, 23 Cl. Ct. 579, 582 (1991) (Smith, J.) (denying 12(b)(1) motion because court was unable to conclude as matter of law there was no privity between parties).

[22] U.S. Br. at 16. The U.S. is incorrect. Disputes involving U.S. contracts are "governed by federal law" only in that federal law supplies the guidelines for deciding whether the dispute
*(Footnote continued)*

but does not identify any issue that would be resolved differently if decided under California law. U.S. Br. at 15-21. The Court should not address this choice of law issue until it is squarely presented in the context of a particular question of the U.S.'s contractual obligations. *See, e.g., Long Island Sav. Bank, FSB v. United States*, 503 F.3d 1234, 1249 (Fed. Cir. 2007) (en banc) (declining to resolve choice of law issue where state and federal principles led to same result).

Even were it appropriate for the Court to address this issue now, it would confront three basic errors in the U.S.'s proposition. First, there is no question that the U.S. can contractually bind itself to a choice of law provision specifying state law, and it has done so here. *See, e.g., Westfed Holdings, Inc. v. United States*, 407 F.3d 1352, 1361 (Fed. Cir. 2005) (applying contractual provision and holding California law would govern to the extent that federal law did not control); *Coast Fed. Bank, FSB v. United States*, 48 Fed. Cl. 402, 418 (2000), *aff'd*, 323 F.3d 1035 (Fed. Cir. 2002) (same); *Holland v. United States*, 75 Fed. Cl. 492, 494 & n.3 (2007) (applying Illinois law pursuant to contractual choice of law provision). The U.S. cites no authority supporting its suggestion that the Agencies somehow lacked authority to enter into agreements with a choice of law provision specifying state law. *See* U.S. Br. at 18-19.[23]

---

is governed by a substantive rule of decision derived from federal common law or from state law. *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 75 F.3d 648, 654-55 (Fed. Cir. 1996). *See also Boyle v. United Tech. Corp.*, 487 U.S. 500, 503, 507-508 & n.3 (1988).

[23] While the *Seckinger* case establishes the general proposition that statutes and the Constitution are the source of authority for the U.S.'s authority to contract, that case in no way suggests that an agent of the U.S. must receive special authorization before assenting to a contractual choice of law clause. *See* U.S. Br. at 18 (citing *United States v. Seckinger*, 397 U.S. 203, 209 (1970)). Rather, "[t]he authority of the executive to use contracts in carrying out authorized programs is . . . generally assumed in the absence of express statutory prohibitions or limitations." *Winstar*, 518 U.S. at 890 n.36 (citation and internal quotes removed). Here, federal statutes specifically authorize the Secretary of the Department of Energy (the relevant umbrella agency) and Administrators of the Agencies to enter into contracts, but do not limit their authority to agree to a choice of law provision. *See* 16 U.S.C. § 832a(f) (2008) (BPA); 42 U.S.C. § 7256(a) (2008) (WAPA).

Second, the U.S. is wrong to assert that a contract provision specifying state law is necessarily inconsistent with federal decisions holding federal law must govern the U.S.'s contracts. U.S. Br. at 18. It mistakenly cites inapposite authority involving the U.S.'s implementation of a federal program authorized by statute. *See United States v. Kimbell Foods, Inc.*, 440 U.S. 715 (1979) (Small Business Administration lending program). The issue in *Kimbell* was whether the court should fashion a federal substantive rule of decision that is solicitous of federal interests in order to protect against frustration of the Congressional objectives of those statutory programs. *Id.* at 727-28. No such program is involved in this case. Even under *Kimbell*, application of state law here would not frustrate the objectives of any federal statutory program—in fact, it would effectuate the federal energy policy of FERC, which approved the Tariffs' choice of law provisions. Moreover, a special federal rule, applied solely to the U.S., would disrupt the commercial relationships among ISO and PX market participants. *Id.* at 729, 734, 739. Congress does not normally "intend to confer special privileges on agencies that enter the commercial field." *Id.* at 737.

Third, even if there were no choice of law provision in the Tariffs, the U.S. would be incorrect to argue that it has "uniquely federal interests" that require application of the federal common law of contracts. U.S. Br. at 16-17. Even in cases where such interests are involved, federal law does not displace state law unless "a significant conflict exists between an identifiable federal policy or interest and the operation of state law." *Richmond*, 75 F.3d at 654-55 (contract claims) (quoting *Boyle*, 487 U.S. at 507). No such conflict has been shown here.[24]

---

[24] The U.S. misunderstands the argument Plaintiffs made in a federal district court in support of federal question jurisdiction. U.S. Br. at 19-21. Federal question jurisdiction extends to *state law claims* that require resolution of a federal issue for their disposition. *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005). The Tariffs are contracts, governed by contract California law. But interpretation of the Tariffs *also* raises a "federal
*(Footnote continued)*

## IV. PLAINTIFFS HAVE PLEADED THEIR STANDING TO SUE SUFFICIENTLY TO ESTABLISH THIS COURT'S JURISDICTION.

The U.S.'s Rule 12(b)(1) motion, purportedly addressing this Court's jurisdiction, in fact seeks a premature ruling on the central merits issue in this action: whether the Tariffs create a contractual relationship between these parties obligating the U.S. to refund its overcharges. U.S. Br. at 15. But the only proper question for the Court to determine on this motion is whether Plaintiffs have *pled* (not proven) a contract entitling them to money damages. *See supra* pp. 20-23. Plaintiffs have done so—*see, e.g.*, PG&E Compl. ¶¶ 2, 3, 14, 28-35, 42, 67-68, 75, 78; SDG&E Compl. ¶¶ 2, 3, 8, 22-29, 36, 59-60, 67, 70—a fact that the U.S. does not dispute. *See* U.S. Br. at 15 (acknowledging that Complaint alleges privity of contract).

The identical privity and standing arguments the U.S. makes here have already been rejected by one court. Last December, having considered extensive briefing and argument on these same issues, the court in the California Action rejected those arguments and held that Plaintiffs were entitled to proceed with their breach of contract against sellers in the ISO and PX markets who were positioned identically to the Agencies. Order on Demurrers at 1. As the California court recognized, and as shown below, this action is not based on "bilateral" contracts between the market participants on the one hand and the ISO and PX on the other, *cf*. U.S. Br. at 22-23, but on multi-party contracts such as have been enforced in numerous similar contexts.

### A. The U.S. and Plaintiffs Are Parties to the Same Multi-Party Contracts.

The U.S.'s standing argument is premised on a one-dimensional view of what it means to form a contractual relationship. It seems to believe that parties can form contractual

---

issue" within the meaning of *Grable* because the Tariff provisions also have the status of federal regulations, and embody FERC's energy policy. Interpretation of the Tariffs is thus a matter of federal interest, with ramifications for future application of the Tariffs as federal regulations to FERC-regulated entities, and justifies a federal forum. *Id.* at 312, 316.

relationships in only one way: by negotiating a "bilateral" deal directly with one another and memorializing the terms in a single document signed by both parties. U.S. Br. at 22-24. This image of a contract as an exclusively "bilateral" interaction is the contractual equivalent of a stick figure, which ignores both the Tariff terms and the applicable law. The Tariffs create another common, and equally valid, form of contractual relationship—the multi-party contract.

Each participant in the ISO or PX market was required to sign a simple pro forma agreement acknowledging that it agreed to and would abide by the terms of the applicable Tariff, and incorporating the Tariff in its entirety into the body of the contract. Thus, the relevant contracts are not simply the short pro forma agreements, but the Tariffs themselves, which impose contractual duties and obligations that the market participants owe to one another. Defendant is a party to that multi-party contract, and is in contractual privity with each Plaintiff, even though they did not sign the same documents.

A multi-party contract is not uncommon. It typically arises where members of an association or participants in a market are governed by a common set of rules, which may be constitutions, bylaws, codes of conduct, or, as here, tariffs. The participants sign, or otherwise assent to, an agreement to abide by the set of rules. Even though they do not all sign the same document or a web of separate bilateral agreements with one another, the agreed-upon rules *contractually* bind each participant to every other participant. The contractual relationship is not just between each member and the umbrella entity; rather, the set of rules is binding as a contract "*between all members of the exchange with each other* and with the exchange itself." *Muh v. Newberger, Loeb & Co., Inc.*, 540 F.2d 970, 973 (9th Cir. 1976) (quoting *Coenen v. R. W. Pressprich & Co.*, 453 F.2d 1209, 1211 (2d Cir. 1972)) (emphasis added). Multi-party contracts are especially common in complex markets or business associations, the efficient operation of

which depends upon large numbers of participants abiding by a common set of rules. Courts have found such contracts enforceable in relationships as varied as:

- a stock exchange, *see, e.g., Muh*, 540 F.2d at 973; 73 Am. Jur. 2d, *Stock and Commodity Exchanges*, § 7 (2001) ("The constitution and rules of a stock exchange constitute a contract between all members of the exchange with each other and with the exchange itself, and are thus interpreted pursuant to ordinary principles of contract law.");
- a realtors' association, *see, e.g., Gear v. Webster*, 258 Cal. App. 2d 57, 60 (1968); *Maltese v. Dubinsky*, 108 N.E.2d 604, 605 (N.Y. 1952) (unincorporated associations); 6 Am. Jur. 2d, *Associations and Clubs*, § 21 (1999) ("[i]t has been held that the articles and bylaws of an association create a contractual relationship between the members themselves . . . .");
- shareholders of a corporation, *Casady v. Modern Metal Spinning and Mfg. Co.*, 188 Cal. App. 2d 728, 732-33 (1961); 18 C.J.S. *Corporations* § 154 (2007) ("[c]orporate by-laws constitute a contract . . . among the shareholders or members themselves"); and
- an electrical cooperative organized for the purpose of delivering power to its members, *First Fed. Sav. & Loan Ass'n of Twin Falls v. East End Mut. Elec. Co.*, 735 P.2d 1073, 1075 (Idaho App. 1987).[25]

The pertinent case law contradicts the U.S.'s theory that it cannot have any contractual duty to Plaintiffs unless they had all signed the same contract document. *Cf.* U.S. Br. at 22-24. In *Muh*, for example, the Ninth Circuit held that two members of a stock exchange, both of

[25] *See also Shea v. McCarthy*, 953 F.2d 29, 30 (2d Cir. 1992) (labor union); *Cleveland Orchestra Comm. v. Cleveland Fed'n of Musicians*, 303 F.2d 229, 230 (6th Cir. 1962) (same); *Stoica v. Int'l Alliance of Theatrical Stage Employees and Moving Picture Mach. Operators of the U.S. and Can.*, 78 Cal. App. 2d 533, 535-36 (1947) (same); *Cal. Dental Ass'n v. Am. Dental Ass'n*, 23 Cal. 3d 346, 350 (1979) (dental association).

whom had agreed to be bound by the exchange's rules, were contractually bound to each other to comply with those rules. *Muh*, 540 F.2d at 972. The court rejected any suggestion that the two members were not in privity just because they had not signed a contract directly with one another. *Id.* at 973. The California Court of Appeal reached a similar conclusion in a controversy between two realtors who separately agreed to abide by the bylaws of a local realtors' association. *Gear*, 258 Cal. App. 2d at 60-62. The court held the realtors had a contractual relationship *with one another* and were bound *to each other* to comply with the provisions of those bylaws. In other words, the various participants in a multi-party contract are in privity with one another precisely because they owe contractual obligations *to one another* and not just to the umbrella organization.

The U.S. enjoys no dispensation from this rule. The U.S. previously recognized in *Alliant Energy* that WAPA was in privity with other market participants that separately assented to an umbrella agreement like the Tariffs, even though the parties had *not* signed the same document. The MAPP Restated Agreement, an umbrella agreement that governed the dealings among MAPP members, provided that each member was automatically deemed to be a signatory to the Restated Agreement, even though no party signed that Agreement, which in fact contained no signature pages at all. MAPP Restated Agreement, FERC Docket No. ER96-1447-000 (Mar. 29, 1996), App. at 596, § 4.2.1. Each member signed a separate contract with MAPPCORP, the entity that administered the Agreement, for the services performed by MAPPCORP. When the U.S. filed its breach of contract suit on behalf of WAPA against NPPD, *see supra* pp. 18-19, for refusing to refund overcharges NPPD owed under the Restated Agreement, it alleged that WAPA "is entitled to a refund . . . because [NPPD] breached *its contractual obligation to the United States* under the [MAPP] Restated Agreement . . . ." U.S. Notice of Intervention, *Alliant Energy*

*v. Nebraska Pub. Power. Dist.*, Case No. 62-C5-00-004626 (Minn. Dist. Ct., County of Ramsey, Aug. 18, 2000), App. at 38, at 2 (emphasis added); *see also* PG&E Compl. ¶¶ 67-69; SDG&E Compl. ¶¶ 59-61. The court agreed, holding that the "Restated Agreement is a contract that governs the membership of MAPP and sets forth the contractual rights and obligations of all MAPP members." *Alliant Energy*, 2001 WL 1640132, *1. The same principle applies here even though the U.S. is now the entity that owes refunds and would prefer to evade its obligation.

The lone case cited by the U.S. does not hold otherwise. In *Southern California Federal Savings & Loan Association v. United States*, 422 F.3d 1319 (Fed. Cir. 2005), *cert. denied*, 126 S.Ct. 2967 (June 26, 2006) (U.S. Br. at 24), the court held that a plaintiff who was a party to only one of three related but separate agreements—each of which had *different* terms, obligations and parties—could not sue for breach of one of the other agreements to which it was not a party.[26] By contrast, all the market participants, including the U.S. and Plaintiffs, agreed to the *same* terms and bound themselves to the *same* contractual duties and liabilities set forth in the same Tariffs—a classic example of a multi-party agreement.

### B. The ISO and PX Tariffs Both Create Contractual Obligations That Are Enforceable by the Market Participants.

As described above, *see supra* pp. 7-10, every buyer or seller that signed the SC Agreement or PX Agreement undertook specific obligations to the other participants in these

[26] In that case, investors formed a new company to take over a failing thrift, and the new company (SoCal) entered into an "Assistance Agreement" with the FSLIC. FSLIC required the shareholders to execute a separate agreement promising to guaranty the new company's obligations. The court held that the shareholders lacked standing to sue for breach of the Assistance Agreement, to which only SoCal was a party, finding that the guaranty agreement was not part of the same contract as the Assistance Agreement because the guaranty agreement "involves additional parties *and distinct promises, including its own Entire Agreement clause*." 422 F.3d at 1330 (emphasis added).

markets. In fact, FERC has held that the Tariffs authorize individual participants to sue other participants for breach of the Tariff obligations.

### 1. The ISO and PX Tariffs Are Indistinguishable for Purposes of the Privity and Standing Analysis.

Strangely, while the U.S. seemingly concedes that privity exists among participants in the ISO market (*see* U.S. Br. at 15), it goes to great lengths to deny that privity exists among PX market participants (U.S. Br. at 22-24). But no meaningful distinction can be made between the ISO and PX Tariffs for purposes of assessing privity and standing. The two markets were created at the same time as part of the same market restructuring, and had parallel structures, functions, operations and agreements. Both the ISO and PX operated under detailed Tariffs that governed the rights and obligations of buyers and sellers, and both required participants to bind themselves to those Tariffs by signing supplemental participation agreements that incorporated the Tariffs by reference. *See supra* pp 6-7.

While the U.S. points to certain aspects of the PX's agreements and operations in arguing that it is not in privity with Plaintiffs, those features are *the same* for the ISO, where the U.S. apparently acknowledges the contractual relationship among market participants. For example, the U.S. argues that the PX Agreement states that it is "entered into, by and between" the participant and the PX (U.S. Br. at 22), but the SC Agreement uses the same language. *See* BPA SC Agreement, US. App. at 1150, at 1. (Contrary to the U.S.'s assertion, *neither* agreement "expressly states that it is a bilateral contract." U.S. Br. at 22.) Similarly, the U.S. argues that under the PX Tariff, PX participants submit bids to buy or sell in a particular period, and the PX keeps the identities of buyers and sellers confidential at the time of bidding, sets market clearing

prices, invoices participants for amounts owing, and settles their accounts.[27] U.S. Br. at 23-24. But it is undisputed that those facts are also true for the ISO. For *both* markets, the Tariffs make clear—and FERC has held—that the participants themselves have the right and responsibility to sue to enforce each other's obligations under the Tariffs.

**2. Both Tariffs Expressly Allow Plaintiffs to Sue to Enforce the Agencies' Refund Obligations.**

Under the ISO and PX Tariffs, market participants have the right to sue other participants for a default in their Tariff obligations, including non-payment of any amounts owed.[28] The market participants' contractual duties to one another are evident from the debtor-creditor relationship the Tariffs create between defaulting participants and other participants. When one party defaults on a Tariff obligation—for example, when a buyer does not pay the invoiced sum for its power, or a seller refuses to refund overcharges—any resulting shortfall in funds is charged pro rata to the other market participants, who bear the loss. The Tariff then deems the defaulting participant, as an "ISO Debtor" or a "PX Debtor," directly liable to other participants, "ISO Creditors" or "PX Creditors," that incurred financial loss as a result.[29]

---

[27] It is irrelevant that the PX itself participated in the ISO market, acting as an ISO Scheduling Coordinator on behalf of certain ISO buyers and sellers pursuant to a separate contractual arrangement. *See* U.S. Br. at 24. That does not alter the fact that the Agencies, as sellers, and Plaintiffs, as buyers, were members of the ISO market and contracted under the ISO Tariff, and were members of the PX market and contracted under the PX Tariff, for the sales at issue here.

[28] Whether members of a multi-party contract may sue one another to enforce the contract depends on interpretation of the contract terms. *See, e.g.*, *Himebaugh v. Smith*, 476 F. Supp. 502, 506 (C.D. Cal. 1978) (interpreting rules of stock exchange as permitting members to sue one another).

[29] ISO Tariff, Appendix A, Master Definitions Supplement ("ISO Debtor"); PX Tariff, Appendix B, Master Definitions Supplement ("PX Debtor"); ISO Tariff, Appendix A, Master Definitions Supplement (defining "ISO Creditor" as a Scheduling Coordinator to which amounts
*(Footnote continued)*

Under the terms of the Tariffs, ISO or PX Creditors have the right to directly enforce their contractual rights to payment against an ISO or PX Debtor.[30] While the ISO has power to sue a defaulting participant on behalf of Scheduling Coordinators who request it to do so, that power is "[w]ithout prejudice to the right of any Scheduling Coordinator *to bring such proceedings as it sees fit* in connection with matters related to the *recovery of amounts owed to it*." ISO Tariff § 11.20.1 (emphasis added). The ISO Tariff also directs that, on request, the ISO will certify in writing "the amounts owed by an ISO Debtor that remain unpaid and the ISO Creditors *to whom such amounts are owed*," and prescribes that such a certificate "may be used as prima facie evidence of the amount due by an ISO Debtor to ISO Creditors *in any legal proceedings*." ISO Tariff § 11.20.2 (emphasis added). Likewise, the ISO Tariff directs that "[e]ach ISO Creditor shall give notice to the ISO before instituting any *action or proceeding[] in any court against an ISO Debtor* to enforce payments due to it." ISO Tariff § 11.19 (emphasis added). FERC adopted the parallel terms in the PX Tariff[31] in response to SCE's urging that the

are owed by another market participant); PX Tariff, Appendix B, Master Definitions Supplement (same for "PX Creditor"); PG&E Compl. ¶ 31; SDG&E Compl. ¶ 25.

[30] Both Tariffs make clear that sellers owe refunds *to the specific buyers* that were overcharged for electricity. ISO Tariff §§ 11.18.1, 11.18.2 (if for any reason ISO Creditor receives overpayment, it must return overpayment to ISO, which is responsible for ensuring that monies are returned to "those entitled to the sum which has been overpaid"); PX Tariff, Schedule 2, §§ 4.3.3, 4.3.4 (if PX Creditor receives overpayment, it must return overpayment to PX, which is responsible for "ascertaining the identity of those Participants entitled to receive amounts overpaid to another PX Participant" and "disbursing funds to the persons entitled to them").

[31] If a PX Participant defaulted on its obligations, the PX Tariff allows the PX to liquidate collateral or other security provided by the defaulting participant. If these remedies were insufficient to satisfy the liability, the PX would "chargeback" the unsatisfied amount to the non-defaulting participants. PX Tariff, Schedule 2, § 5.3 (describing chargeback methodology). The PX must then "identify the defaulting Participant"—who otherwise would have remained anonymous—"to all other affected PX Participants by the most expeditious means available." PX Tariff, Schedule 2, § 5.5.

provisions were needed to allow market participants to identify non-paying parties "so that non-defaulting Participants *are able to seek recovery from the defaulting party*." July 28, 2000 Order, 92 FERC at 61,379 (emphasis added). FERC agreed, and added the provisions to the PX Tariff to address SCE's point. *Id*.

In fact, FERC has specifically held that market participants are responsible for taking legal action to recover amounts owed by defaulting participants. When the ISO and PX Tariffs were first proposed to FERC, certain sellers argued that the ISO should be responsible for collecting debts of ISO market participants. October 30, 1997 Order, 81 FERC at 61,506-07. The ISO and PX jointly urged FERC not to adopt such a rule, stating that "it is unusual for the administrator of a market to take responsibility for assuming the debts of traders. The traders who take the benefits of trading should also take the payment and bad debt risks." *Id*. at 61,507. FERC agreed with the ISO and PX, and held that "it should be the *responsibility* of Scheduling Coordinators *to recover amounts that they are owed*." *Id*. at 61,508-9 (emphasis added). FERC's holding is directly at odds with the U.S.'s theory that there are no enforceable contractual obligations among market participants. And the context of FERC's comments plainly indicates that FERC did not intend any difference between the ISO and PX on this point.

Since then, FERC has repeatedly and expressly acknowledged the propriety of Plaintiffs' contract actions here and in California, and noted that these lawsuits could ameliorate the "equitable concerns" arising from the fact that Plaintiffs would not be able to obtain refunds from the governmental entities at FERC. *See* October 19, 2007 Order, 121 FERC ¶ 61,067 at P 76 ("[*Bonneville*] court left the door open for parties to bring contract disputes in state and federal court against these [governmental entities]"); *id*. P 59 ("as the court in *Bonneville* noted, *parties can pursue any refund amounts that may be owed by [governmental] entities as a*

*contract claim in the appropriate court*") (emphasis added); *id*. P 3 (FERC's lack of jurisdiction to compel governmental entities to pay refunds "does not preclude [Plaintiffs] from seeking a remedy in state/federal courts.") (citing *Bonneville*, 422 F.3d at 925).

### 3. The Tariffs Establish That the ISO and PX Are Not Parties to the Purchase and Sale Transactions, but That Buyers and Sellers Are.

The ISO and PX were not counterparties to the power sales at issue. As the Tariffs explicitly state, the ISO and PX operated their respective markets not as parties to the transactions, but solely as neutral clearinghouses and administrators on behalf of the market participants.[32] FERC held that under these provisions, "the CAISO does not purchase energy on its own behalf; rather it purchases energy on behalf of the Scheduling Coordinators in the CAISO markets." November 23, 2004 Order, 109 FERC ¶ 61,218 at P 69. FERC has interpreted the PX Tariff in the same way: "While *the PX will not take title* to electric energy, and pursuant to the PX Tariff *it is not considered a party to a PX trade*, it nevertheless will be the intermediary that contracts with the entities that sell into the PX as well as with the wholesale and retail customers that purchase from the PX." *S. Cal. Edison Co.*, 80 FERC ¶ 61,262 at 61,946 (1997), App. at 217 (emphasis added).[33]

---

[32] *See supra* pp. 7-9; ISO Tariff § 2.2.1 ("In contracting for Ancillary Services and Imbalance Energy the *ISO will not act as principal but as agent for and on behalf of the relevant Scheduling Coordinators*.") (emphasis added); PX Tariff § 3.1 ("In carrying out its responsibilities under this Tariff . . . [t]he PX *will not be*, and shall not be deemed to be, *a counterparty to any trade transacted through the PX markets*.") (emphasis added); PG&E Compl. ¶¶ 30-31, 35; SDG&E Compl. ¶¶ 24-25, 29.

[33] Any distinction between the PX Tariff's statement that the PX is not a "counterparty" in the transactions (PX Tariff § 3.1), and the ISO Tariff's description of the ISO as an agent for participants rather than a principal in the transactions (ISO Tariff § 2.2.1) is specious. *Cf*. U.S. Br. at 35. In either case, the PX and ISO clearly are not counterparties. As noted above, FERC perceives no difference at all in their roles.

The U.S., focusing on the PX, acknowledges that the PX itself was not a party to the purchase and sale transactions, but proposes the surprising conclusion that *there were in fact no parties at all* to these transactions. U.S. Br. at 32. The U.S. appears to believe that hundreds of millions of dollars of power changed hands from sellers to buyers without any contracts having been formed to govern the myriad complex rights and obligations that were attendant to those sales. Conveniently, this theory appears designed to leave no one to enforce the U.S.'s refund obligations. This proposition cannot be reconciled with the Tariff terms. The contractual nature of the relationship between the market participants is plain from the expressly contractual terminology found throughout both Tariffs.[34]

### C. Electricity Need Not Be "Traced" to a Particular Seller for Plaintiffs to Be Able to Recover Refunds from Sellers.

It makes no difference that, as is true in any power exchange, including the ISO and PX, electric power delivered through the grid to a particular buyer cannot be physically "traced" or "bilateralized" back to a particular seller. *Cf*. U.S. Br. at 25. In a given auction period, the ISO or PX pooled the electricity supplied by sellers, and then allocated it among buyers of power in that same auction period. But, because electrons are fungible, and every unit of power was sold for exactly the same price during any given period, the amounts owing to and from each market participant for those transactions can be readily calculated based on that participant's percentage of the amounts bought or sold in each time period. PG&E Compl. ¶ 29; SDG&E Compl. ¶ 23. In fact, the ISO and PX have already calculated the amount of the refunds the Agencies owe to

[34] *See, e.g.*, ISO Tariff § 17 ("Obligations and liabilities under this ISO Tariff" are binding on parties' successors and assigns); PX Tariff § 17 (same); ISO Tariff § 14.3, PX Tariff § 14.3 (indemnity provisions); ISO Tariff § 20.7, PX Tariff § 19.6 (choice-of-law, venue clauses); ISO Tariff § 15, PX Tariff §§ 16.1, 16.2 (provisions covering consequences of uncontrollable force and duty to mitigate).

ISO and PX purchasers. *Thirty-Eighth Status Report of the California Independent System Operator Corporation on Settlement Re-Run Activity*, *San Diego Gas & Elec. Co.*, FERC Docket Nos. ER03-746-000, *et al*., at 2-3 (Sept. 6, 2007), App. at 775.

The U.S. points to the fact that the ISO and PX kept confidential the identity of buyers and sellers submitting bids to an ISO or PX auction. U.S. Br. at 23. But that fact is not inconsistent with privity, as FERC ruled in a similar case involving a competitor to the PX, in which the U.S. participated on behalf of BPA. Automated Power Exchange, Inc. ("APX") sought authority from FERC to operate an "automated computerized exchange, through which sellers and buyers will trade in electric power." *Automated Power Exch., Inc.*, 84 FERC ¶ 61,020 at 61,083 (1998), App. at 238.[35] APX operated hourly spot markets in competition with the PX. Like the ISO and PX, APX arrived at a single price that would clear all the bids submitted in each hour auction. *Id*. at 61,083-84.[36] Also like the ISO and PX, APX did not take title to the power traded in its market, *id*. at 61,088, and sent monthly invoices to participants reflecting their net financial position from APX trades. When APX filed its tariff for FERC approval, FERC asked APX to clarify how APX buyers and sellers could enforce what APX characterized as the "binding contracts" between them, "since each deals only with APX and is

[35] *See also Automated Power Exch., Inc.*, 85 FERC ¶ 61,232 at 61,971 (1998), App. at 257 (BPA a party).

[36] FERC noted that APX's operations are fundamentally similar to those of the PX. *Automated Power Exch., Inc.*, 84 FERC at 61,084. The ISO and PX Tariffs provide that electricity from different sellers will be pooled and sold to buyers through an auction sale, each buyer will pay for the share of power it took from that pool in each auction, and each seller will receive payment for the share of power it sold into the auction. While the APX attempted to match bids of specific buyers and sellers, pooling of power also occurred, in that APX combined the power being sold by a group of multiple sellers for sale to a group of multiple buyers because of the mismatch between differing amounts of power offered by individual sellers and sought by individual buyers. *See* Letter from Clark Evans Downs on behalf of APX to David Boergers, Secretary of FERC (Aug. 14, 1998), App. at 640 ("APX Letter"), at 6-7.

blind to the others' identity." *Id*. at 61,091. After APX responded, FERC approved the APX filing, summarizing APX's clarification as follows:

> APX also clarifies how a binding contract could be formed and enforced when the identities of the buying and selling entities for transactions are unknown. APX responds that when buy or sell orders are submitted, APX Participants make unilateral offers, and matching forms a binding contract between APX Participants whose orders are contracted. *APX states that the anonymity of the contracting parties does not bar enforcing this contract since under APX's rate schedule each APX Participant agrees to buy or sell power as required by the contracted order.* According to APX, if a buying or selling APX Participant disputes its obligations, APX will disclose to that participant the identity of the counter party(ies) to the transaction so that it may seek contract law remedies.

*Automated Power Exch., Inc.*, 85 FERC at 61,970-71 (1998) (emphasis added); *see also* APX Letter at 4 ("In exchange transactions, it is common that parties enter into binding agreements without knowing the identity of each other. The fact that the parties are unknown to each other does not result in the lack of a binding agreement to buy or sell power as ordered.").

As in the APX case, participants in the ISO and PX markets need not be able to "trace" specific electrons from a specific seller to a specific buyer to establish a direct contractual relationship. The three Plaintiffs and the State of California (plaintiff in Case No. 1:07-cv-00184-LAS) have paid over ninety percent of the charges for power sold by the U.S. in the transactions for which the Agencies received grossly inflated prices, and Plaintiffs are entitled to recover their pro rata percentage of the refunds owed to all affected purchasers.

### D. The *Edison* and *Lynch* Proceedings Do Not Support a Different Interpretation of the Tariffs, and No "Estoppel" Can Be Applied Here.

In lieu of undertaking a serious analysis of the parallel structure and function of the ISO and PX Tariffs, the U.S. claims that Plaintiffs are simply estopped from asserting their interpretation of the Tariffs. U.S. Br. at 24-33. But the U.S.'s out-of-context quotations, taken from wholly dissimilar proceedings, do not withstand close examination. Neither the *Edison* nor the *Lynch* case supports the U.S.'s position, nor any form of estoppel. Moreover, estoppel is not

a proper means to resolve questions of Tariff interpretation that control the ongoing dealings of these and numerous other parties, and will affect important policies of FERC and the interests of millions of electricity consumers in the State of California.

### 1. *Southern California Edison Co.*, 80 FERC ¶ 61,262 (1997).

The U.S. first attempts to premise a collateral estoppel argument on a FERC proceeding, *Southern California Edison Co.*, 80 FERC ¶ 61,262 (1997), App. at 217 ("*Edison*"), conducted a year before the ISO and PX commenced operations, in which FERC prospectively addressed issues about its jurisdiction over these nascent markets. U.S. Br. at 24-26. The out-of-context statements referenced in the U.S.'s brief provide no basis for collateral estoppel because the issue in the FERC proceeding was plainly not "identical" to the issue being decided here—in fact, it was not even close—and so was not "actually litigated" nor "necessary" to FERC decisions. *See Ammex, Inc. v. United States*, 384 F.3d 1368, 1371 (Fed. Cir. 2004) (U.S. Br. at 29); *Mother's Restaurant, Inc. v. Mama's Pizza, Inc.*, 723 F.2d 1566, 1569 (Fed. Cir. 1983).[37]

The right of buyers and sellers under the PX Tariff terms to sue one another was not even remotely implicated in *Edison*. Rather, FERC was asked to decide an entirely different question concerning its own regulatory jurisdiction, which turned on whether certain PX transactions were

[37] In fact, the *Edison* proceeding does not appear to qualify for collateral estoppel treatment at all. It is well-established that collateral estoppel may only arise from agency proceedings that are quasi-judicial, rather than quasi-legislative, in nature. *United States v. Utah Constr. and Mining Co.*, 384 U.S. 394, 422 (1966) (collateral estoppel applies to agency decisions only when agency "is acting in a judicial capacity" and "resolved disputed issues of fact properly before it"); *The Second Taxing Dist. of the City of Norwalk v. FERC*, 683 F.2d 477, 484 (D.C. Cir. 1982) (collateral estoppel does not apply to quasi-legislative FERC proceedings). Legislative proceedings "look[] to the future and change[] existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power." *New Orleans Pub. Serv. Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 370-71 (1989) (citing *Prentis v. Atlantic Coast Line Co.*, 211 U.S. 210, 226 (1908)). Since FERC in *Edison* was deciding prospectively how to classify transactions that had not yet occurred in markets that did not yet exist, that proceeding appears to fall into the latter category.

classified as "wholesale" or "retail." In general, a sale is considered a retail sale—and would not qualify for the wholesale exemption from regulatory requirements of the Public Utility Holding Company Act of 1935 ("PUHCA")—if a seller sells power in a separate transaction to a specific buyer for retail use. SCE's concern was that, although most of the PX purchasers of SCE's power would be wholesale purchasers that resold the power to others, the PX Tariff also permitted some entities to purchase power for their own use—in effect, "retail" transactions. SCE sought a ruling from FERC that *all* of SCE's sales of power into the PX market would be deemed "wholesale" sales subject to FERC's regulatory jurisdiction so that SCE's sales would qualify for the wholesale exemption.[38] SCE pointed out that a separate retail transaction is not possible when a sale is made through the PX, because sellers in the PX "cannot distinguish which part of their bid energy may be sold to resellers or which part, if any, may be bought directly by retail customers."[39]

In analyzing the question, FERC recognized that the PX (like the ISO) would not take title to the power and would not be a party to the sales transactions and thus, in the traditional legal sense, the sales are made by the sellers to the buyers, whether for "wholesale" or "retail" use. *Edison*, 80 FERC at 61,946. But FERC also concluded that the intermediary role played by the PX, which aggregated the power sold to buyers and established prices for the sales through administration of its auctions, made it appropriate for purposes of the statutory analysis to treat all the transactions as wholesale transactions within FERC's jurisdiction. *Id*. at 61,945-46. Both SCE and FERC referred to seller and buyer being in "privity" with the PX, but only in the sense

[38] Southern California Edison Company's Petition for Declaratory Order and Request for Expedited Consideration, Docket No. EL97-36-000 (May 5, 1997), U.S. App. at A1288, at 1-3.

[39] *Id*. at 10; U.S. Br. at 25.

of assessing whether the PX played a sufficient intermediary role that the transactions were appropriately regulated as wholesale sales, not in the sense of whether the seller and buyer could sue one another.[40] That is a very different issue, decided under a patently different legal standard, from the contract interpretation question presented here.

In the same decision, FERC expressly recognized that the market participants themselves were the true buyers and sellers in the transactions, stating that the PX (like the ISO) does *not* take title to the power and is *not* a party to the sales transactions. *Edison*, 80 FERC at 61,946. In fact, FERC in a later order rejected precisely the erroneous reading that the U.S. advances. In *Portland General Electric Co.*, 83 FERC ¶ 61,315, the PX intervened to object to a form agreement filed with FERC by Portland General. The PX complained that the filing stated "that [the PX] is the purchaser in the agreements, when in fact it does not take title to the power sold through the exchange." FERC agreed, and upheld the PX's objection. *Id*. at 62,287-88. FERC repeated the same language from *Edison* quoted in the U.S. brief, but plainly gave it a different significance, because FERC required the filers to revise the form agreement to "identify buyers and sellers for [PX] exchange transactions as" the *market participants* in the PX, *not* the PX itself. *Id.* at 62,288.[41]

---

[40] The FPA gives FERC jurisdiction over "sales" of power at wholesale. FERC holds that even a neutral intermediary like the ISO or PX is a "seller" within its jurisdiction if it is "*an integral part of the transactional chain*" from seller to buyer, even if the ISO and PX are not themselves parties to the sale. *Portland Gen. Elec. Co.*, 83 FERC ¶ 61,315 at 62,287-88 (1998), App. at 233 (emphasis added).

[41] Neither *County of Cook v. Midcon Corp.*, 773 F.2d 892 (7th Cir. 1985), nor any other authority supports the U.S.'s claim that collateral estoppel could apply to any other participants in the *Edison* proceeding who intervened in order to receive notices but raised no substantive issues. *Cf.* U.S. Br. at 28.

Significantly, where FERC has directly addressed the issue of lawsuits between PX participants, it has expressed a view consistent with Plaintiffs' position here. For example, in assessing a PX tariff amendment addressing collateral and security requirements for PX participants, SCE asked FERC to require the PX to identify defaulting market participants so that participants could bring suit against the defaulter. FERC approved the request, and required the PX to amend the Tariff to require such identification of defaulters "so that non-defaulting Participants *are able to seek recovery from the defaulting party*." July 28, 2000 Order, 92 FERC at 61,379 (emphasis added). Likewise, in its initial order putting in place the ISO and PX Tariffs, FERC ruled that market participants—not the ISO and PX—are responsible for taking legal action to recover amounts owed by defaulting participants. October 30, 1997 Order, 81 FERC at 61,508-09. These FERC orders thoroughly rebut the U.S.'s arguments.

**2. *Southern California Edison Company v. Lynch*, 307 F.3d 794 (9th Cir. 2002).**

The U.S. next invokes dicta from a second case that also did not involve market participants' rights to sue to enforce Tariff obligations, but rather the standard for intervention in a judicial proceeding. *S. Cal. Edison Co. v. Lynch*, 307 F.3d 794, 803 (9th Cir. 2002), *order modified*, 353 F.3d 648 (9th Cir. 2003). *See* U.S. Br. at 26-27. The Tariff interpretation issues here were neither identical to any issue in *Lynch*, nor actually litigated, nor resolved and essential to the judgment there. *See* U.S. Br. at 29. In *Lynch*, SCE sued the California Public Utilities Commission ("CPUC") to compel an increase in its rates to retail customers during the Energy Crisis. After SCE and the CPUC had reached a settlement, two power generators belatedly attempted to intervene to oppose the settlement. They had no direct stake in the rate battle; the most they could allege was that SCE owed them money for trades in the ISO and PX markets,

and a rate increase would improve SCE's financial health, thereby increasing the chances that the generators would recover their pro rata portion of the debt.

The Ninth Circuit upheld the district court's denial of intervention on several grounds. It agreed with the district court that permissive intervention was improper because "no common questions of law or fact exists between [the generators'] claims and the main action," and observed that the intervention rule "is not intended to allow the creation of whole new lawsuits by the intervenors." 307 F.3d at 803-804. The court also rejected intervention as of right, holding the generators did not have "a significant protectable interest relating to" *the settlement of SCE's rate dispute with the CPUC. Id.* at 802. In this context, the court repeated SCE's comment that it was "in privity with the [PX]," and not with the power generators, but only to underscore that the rate increase SCE sought would not directly benefit the generators. The court held that, in any event, "[t]he pending litigation would not resolve" the generators' claims for payment from SCE. *Id.* at 802-03. Neither the court nor SCE's briefing addressed any of the Tariff interpretation issues raised by Plaintiffs' claims here. *See* Brief of Appellee S. Cal. Edison Co., *S. Cal. Edison Co. v. Lynch*, Case Nos. 01-56879, *et al.*, (9th Cir. Feb. 5, 2002), App. at 43. Indeed, none of the briefs even mentioned any of the Tariff provisions that actually define the relationship between buyers and sellers in the PX market, and the court had no occasion to construe them.

Again, there is no basis for collateral estoppel, as the court in the California Action must have concluded in overruling the defendants' demurrers.[42] *See supra* pp. 16-17. The U.S.'s cursory argument (U.S. Br. at 28-30) ignores the fact that the issue in *Lynch* could not have been

[42] Nor does the U.S. explain how its collateral estoppel theory could be extended to PG&E and SDG&E.

"identical" to the issue here since, at that time (prior to the *Bonneville* decision), SCE's refund claims were pending at FERC for resolution under FERC's regulatory policies, not as contract claims.[43] Nor was the court's comment about privity "essential to its judgment," since the court resolved the intervention issue on alternative grounds. *Comair Rotron, Inc. v. Nippon Densan Corp.*, 49 F.3d 1535, 1538-39 (Fed. Cir. 1995) (ruling on alternative ground for judgment did not bar relitigation of issue where it was not essential to prior judgment). Collateral estoppel requires more than the "incidental or collateral determination of a nonessential issue." *Mother's Restaurant*, 723 F.2d at 1571; *Bilzerian v. United States*, 41 Fed. Cl. 134, 141 (1998).

**3. There Is No Basis for Invoking Judicial Estoppel Against SCE.**

The circumstances in both the FERC and Ninth Circuit proceedings make *judicial* estoppel against SCE equally inappropriate.[44] *Cf.* U.S. Br. at 30. There was plainly no "intentional self-contradiction" through "clearly inconsistent" positions, as judicial estoppel requires. SCE's comments as to privity were made in good faith, in entirely different contexts, without the benefit of the Ninth Circuit's later *Bonneville* decision and the intensive contractual analysis pursuant to *Bonneville* that led to this action.[45] Moreover, allowing SCE to fully litigate

[43] The Ninth Circuit later ruled in *Bonneville* that Plaintiffs' refund claims were not a regulatory matter for FERC, but rather a matter of contractual obligation to be brought in a court. Collateral estoppel may not be applied where there is an intervening change in the law, *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 660 (2003), or where there is "a clear and convincing need for a new determination of the issue . . . because it was not sufficiently foreseeable at the time of the initial action that the issue would arise in the context of a subsequent action." RESTATEMENT (SECOND) OF JUDGMENTS, § 28(5)(b) (1982).

[44] Judicial estoppel is an equitable doctrine, designed to prevent parties from "playing fast and loose with the courts," *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001), and the Court's decision as to its application is reviewable only for an abuse of discretion. *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1565 (Fed. Cir. 1996).

[45] *See New Hampshire*, 532 U.S. at 751, 755-56 (collateral estoppel requires "clearly inconsistent" positions, and does not apply if there are intervening changes in facts or law);
*(Footnote continued)*

the contractual issues that are central to this action would not impose any "unfair detriment" on the U.S. *See New Hampshire*, 532 U.S. at 751; *Lampi*, 228 F.3d at 1377.[46]

**4. Estoppel Is Not an Appropriate Means of Resolving These Issues.**

Estoppel is not the proper means to resolve questions of the effect of the ISO and PX Tariffs, which embody important energy policies of FERC, and which control the continuing dealings not only of these parties but many other market participants. The general rule is that a new determination of the issue is required where applying estoppel would adversely affect the public interest, or the interests of persons who were not parties to the original action, or where it was not sufficiently foreseeable in the first proceeding that the issue would arise in the context of a later action. RESTATEMENT (SECOND) OF JUDGMENTS, §§ 28(5)(a), (b) (1982). *See Democratic Party v. Reed*, 343 F.3d 1198, 1202 n.12 (9th Cir. 2003) (issues may be of sufficient public importance to bar the use of collateral estoppel), citing *Kennedy v. City of Seattle*, 617 P.2d 713, 715-16 (Wash. 1980) (refusing to give collateral estoppel effect to municipal court ruling on constitutionality of statute because issue had public importance).

---

*SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1291 (Fed. Cir. 2005) (no collateral estoppel where positions not clearly inconsistent); *Lampi Corp. v. American Home Prods.*, 228 F.3d 1365, 1377 (Fed. Cir. 2000) (estoppel should not apply where there is only appearance of inconsistency, or when former position was result of inadvertence or mistake); *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1428 (7th Cir. 1993) (U.S. Br. at 30) (estoppel not required where positions are not really inconsistent, or where party in first action acted in good faith on best information available, and no double recovery results).

[46] The U.S.'s attempted reliance on estoppel arguments also ignores, and is undercut by, the fact that Plaintiffs here rely on a breach of contract approach that the Ninth Circuit suggested in *Bonneville* in 2005 (well after *Lynch*) and that this action is based on the same approach that the U.S. took to recover overcharges for WAPA in *Alliant*. *See supra* at pp. 17-19, 29-30.

### E. The Restatement (Third) of Agency Permits This Action.

Finally, the Tariffs comprehensively defeat the U.S.'s argument that Plaintiffs—if deemed to be part of a group of principals who purchased through the ISO as their agent—could not pursue refunds against a seller. U.S. Br. at 34-38 (citing RESTATEMENT (THIRD) OF AGENCY § 6.05 (2006)). No decision in the Court of Federal Claims has ever endorsed or even cited that provision, nor has *any* court except for the sole case the U.S. proffers.[47] In addition, the U.S.'s artful abbreviation of Section 6.05 omits the statement that it is trumped by any contrary understanding between the parties. *See* RESTATEMENT (THIRD) OF AGENCY § 6.05(2)(c) (stating the rule applies "*unless* the agent acted with actual or apparent authority to bind each of the principals to the combined contract.") (emphasis added). Here, the Agencies not only expressly bound themselves to the Tariffs, but the ISO and PX indisputably had authority under the Tariffs to "bind" all buyers and sellers of power to the terms of the transactions entered into under the Tariffs. Section 6.05 is simply irrelevant here.

### F. At a Minimum, Plaintiffs Have Standing as Third-Party Beneficiaries of the Agencies' Agreements to Abide by the ISO and PX Tariffs.

Putting aside Plaintiffs' status as *parties* to the multi-party agreements embodied in the Tariffs, at the very least Plaintiffs are third-party beneficiaries of those contracts. That status entitles them to sue to enforce the contracts' terms either under the Tucker Act or the CDA. *See, e.g.*, *Kawa*, 77 Fed. Cl. at 304-05 (Tucker Act); *Flexfab, L.L.C. v. United States*, 62 Fed. Cl. 139, 145 (2004) (CDA), *aff'd*, 424 F.3d 1254 (Sept. 27, 2005).

[47] The U.S. cites the only decision ever to have relied on § 6.05 of the RESTATEMENT (THIRD) OF AGENCY—*Brunswick Leasing Corp. v. Wisconsin Cent. Ltd.*, 136 F.3d 521 (7th Cir. 1998)—and that decision relies on precedent more than 100 years old. *See* RESTATEMENT (THIRD) OF AGENCY § 6.05, Reporter's Note c (*Brunswick Leasing* is the "sole case to apply any of the relevant sections in Restatement Second that correspond to [§ 6.05]").

### 1. For Plaintiffs to Prevail on This Motion, They Need Only Plead That the Multi-Party Contracts Manifest an Intent to Benefit Them.

Under Federal Circuit law, to prevail on the U.S.'s motion, Plaintiffs need only adequately plead—not prove—that the terms of the contracts, and the circumstances in which they were entered into, show that the parties intended to benefit market participants directly.[48] Whether Plaintiffs are third-party beneficiaries is a mixed question of law and fact. *Glass*, 258 F.3d at 1353. The Court therefore must take "all undisputed factual allegations to be true, and construe all reasonable inferences in favor of the plaintiff." *Sullivan*, 54 Fed. Cl. at 215-16. If there are sufficient factual allegations to support the claim of third-party beneficiary status, as there are here in abundance, *see* PG&E Compl. ¶¶ 2, 18, 28-35, 42; SDG&E Compl. ¶¶ 2, 12, 22-29, 36, the Court should deny the Rule 12(b)(1) motion and reserve the issue for determination at a later stage. *Kawa*, 77 Fed. Cl. at 303 n.4; *Sullivan*, 54 Fed. Cl. at 217.

### 2. The Tariffs Clearly Manifest an Intent to Benefit Market Participants Such as Plaintiffs.

This is an uncommonly compelling case for application of third-party beneficiary principles. Multiple provisions in the ISO and PX Tariffs, embodied in hundreds of pages of contract language, create specific rights and obligations flowing amongst the market participants. The scope of these provisions alone confirms that the Tariffs exist for market participants' benefit and protection. *See supra* pp. 32-25; *see also Corrugated Paper Prods., Inc. v. Longview Fibre Co.*, 868 F.2d 908, 913 (7th Cir. 1989) (third-party beneficiary status may be shown by

---

[48] *See, e.g.*, *Glass v. United States*, 258 F.3d 1349, 1354 (Fed. Cir. 2001), *amended by*, 273 F.3d 1072 (Fed. Cir. 2001) (third-party beneficiary status established where alleged contract reflects intent to benefit third party directly); *Montana v. United States*, 124 F.3d 1269, 1273 (Fed. Cir. 1997) (same; intended beneficiary "need not be specifically or individually identified in the contract"); *Nelson Constr. Co. v. United States*, 79 Fed. Cl. 81, 96-99 (2007); *Kawa*, 77 Fed. Cl. at 304-305. The third-party beneficiary standard is similar under California law.

contract terms providing "comprehensive set of rights and obligations between the promisor and third party").

Indeed, the ISO and PX Tariffs give market participants the right to petition FERC to correct prices charged by sellers on the ground that the prices are unjust and unreasonable—precisely the action taken by Plaintiffs that resulted in FERC's correction of the Agencies' prices, and their resulting refund liability. *See* ISO Tariff § 19; PX Tariff § 13; PG&E Compl. ¶ 39; SDG&E Compl. ¶ 33. There could hardly be a clearer, or more pertinent, example of a provision intended to directly benefit overcharged buyers such as Plaintiffs. And because buyers and sellers bear the entire responsibility for indemnifying the ISO and PX in the event of any shortfall due to a participant's default, all the protections directed at ensuring that buyers and sellers pay what was due are entirely for the benefit of the other market participants. As we have shown, the Tariffs repeatedly contemplate that market participants *would* sue for violations of or defaults under the Tariffs. That evidence goes well beyond what is required for third-party beneficiary status. *See Glass*, 258 F.3d at 1354 (test does *not* require that contract give third party direct right to compensation or power to enforce that right against promisor); 9 Corbin, *Contracts* § 44.6 (2007) ("[W]here the terms of the contract expressly state the intention of the promisee and promisor concerning the enforceable rights of third parties, the critical question of whether the parties intended the third party to have such a right is easily answered.").

The U.S. effectively concedes that Plaintiffs are third-party beneficiaries of the ISO Tariff, and its argument that Plaintiffs are not also beneficiaries of the PX Tariff borders on the frivolous. *See* U.S. Br. at 34 (U.S. argues only that its obligations as seller "ran between the [U.S.] agencies and the PX, and all of the performance acts provided by the agencies were for the PX"). That "argument" is no more than *ipse dixit* that is contradicted by the many rights and

obligations expressly imposed by the PX Tariff on the market participants. And, again, the U.S. has failed to explain any functional differences between the ISO and PX that would justify reaching opposite conclusions under their Tariffs. Even if it were proper for this Court to make a determination at this early stage of the proceeding whether Plaintiffs are third-party beneficiaries of the Tariffs, the U.S. has provided this Court with no basis whatsoever for determining that issue in the U.S.'s favor.

## V. THE COURT HAS JURISDICTION OVER PLAINTIFFS' DECLARATORY RELIEF CLAIMS AND MAY GRANT THE REQUESTED RELIEF.

### A. This Court May Grant Declaratory Judgments.

The U.S. argues that because the precise contours of expected FERC orders cannot be known with certainty, the Fourth through Seventh Claims for declaratory relief seek "advisory opinions" and are therefore "non-justiciable." *See* U.S. Br. at 38, 41. But in its zeal to bar the Court's doors before they have even opened, the U.S. conflates two fundamentally distinct issues: (1) whether the Court *has* jurisdiction to grant declaratory relief and (2) whether it *should exercise* that jurisdiction to grant relief in this particular case. The former is the only question that may be asked on a 12(b)(1) motion, and it must be answered in the affirmative.[49]

This Court may grant declaratory judgments. In 1992, Congress expanded the Court's jurisdiction under the Tucker Act to include "nonmonetary disputes on which a decision of the contracting officer has been issued" pursuant to the CDA. 28 U.S.C. § 1491(a)(2) (2008). The

---

[49] *See Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260, 1270 (Fed. Cir. 1999) (jurisdiction to grant declaratory relief raises separate question from whether court should grant relief on merits); *id.* (the "jurisdiction of [the Court of Federal Claims] is defined by Congress, and the 'prudential considerations' that the government presses upon us cannot alter the jurisdictional lines that Congress has drawn"); *Spruill v. Merit Sys. Prot. Bd.*, 978 F.2d 679, 687 (Fed. Cir. 1992) ("The distinction between lack of jurisdiction and failure to state a claim upon which relief can be granted, is an important one.").

Federal Circuit has held that this language extends to claims for declaratory relief, "*including claims requesting an interpretation of contract terms*." *Alliant Techsystems*, 178 F.3d at 1270 (emphasis added); *see also Garrett v. Gen. Elec. Co.*, 987 F.2d 747 (1993) (holding that contractor's claim seeking "nonmonetary substitute[s] for monetary relief" falls within jurisdiction of Court of Federal Claims). Section 1491(a)(2) and cases in which this Court has addressed precisely the type of declaratory relief sought here—an interpretation of the contract terms binding on the parties before the court—provide a complete answer to the U.S.'s jurisdictional argument.

### B. The Claims Pleaded Here Warrant the Court's Exercise of Jurisdiction to Award Declaratory Relief.

If the U.S. is also arguing that declaratory relief should not be granted here on the merits, that argument is misplaced on this motion, and should not be heard on a limited record. But even were the Court to address that question now, the U.S.'s motion should be denied.

#### 1. A Declaratory Judgment May Properly Determine the Parties' Contract Obligations Upon the Occurrence of a Future Event.

The Court enjoys considerable discretion when deciding whether to grant declaratory judgments. *Alliant Techsystems*, 178 F.3d at 1271. Specifically, the Court is "free to consider . . . whether the claim involves a live dispute between the parties, whether a declaration will resolve that dispute, and whether the legal remedies available to the parties would be adequate to protect the parties' interests." *Id*. Declaratory relief is generally appropriate to resolve claims "involving a fundamental question of contract interpretation or a special need for early resolution of a legal issue." *Id.*

The mere fact that a lawsuit requests a declaration regarding the parties' contract rights under future circumstances does not make a declaratory judgment claim improper. In *CW Government Travel, Inc. v. United States*, 63 Fed. Cl. 369 (2004), the court rejected the U.S.'s

motion to dismiss a declaratory judgment claim on the grounds that the dispute was not "live." Plaintiff brought suit against the U.S. seeking a declaratory judgment that it was the exclusive provider of commercial travel services to certain military facilities under travel management contracts with the Army. Wielding the same language it invokes here, the U.S. argued there was no "live dispute" since there was no imminent decision by the Army to reduce plaintiff's provision of services under the contract, and that therefore plaintiff sought "a declaration . . . that is akin to an advisory opinion. It wants the [c]ourt to declare how it would rule upon a possible future event." *Id.* at 388 (internal quotation and citation removed). The court disagreed. Focusing on the first prong in *Alliant Techsystems*, the court acknowledged that the "only possible 'live dispute'" concerned plaintiff's performance under a contract that had not yet been breached, but concluded that the facts "sufficiently evidence" the government's intent to breach the contract in the future to allow the court to entertain the declaratory judgment action. *Id.* at 389-90.

Similarly, in *Tiger Natural Gas, Inc. v. United States*, 61 Fed. Cl. 287 (2004), the court found there was a "live" dispute between the parties despite some uncertainty about future actions by the government. Plaintiff Tiger had installed a propane gas system at a federal facility. When the government failed to realize the energy cost savings supposedly promised by the contractor, the U.S. made a claim against Tiger for damages, invoked a right of setoff, and withheld payments due Tiger under unrelated contracts between Tiger and the U.S. Plaintiff brought suit contesting the U.S.'s claim and the setoff. After the case was filed, the government paid Tiger the amounts that had been setoff, and also represented to the court that it would not assert a claim based on the alleged contractual guarantee for a portion of the contract term. Based on those actions and representations, the government contended the court lacked

jurisdiction to grant declaratory relief because plaintiff's claims no longer presented a "live controversy." Citing *Alliant Techsystems*, the court disagreed, finding that a "live" dispute existed between the parties because the government could assert claims in the future for the balance of the contractual period, even though it had not yet done so. *Id.* at 293-94.[50]

**2. Plaintiffs' Declaratory Relief Claims Raise a "Live Controversy."**

Plaintiffs' Fourth and Fifth Claims seek declarations that the U.S. will be contractually liable to refund the Agencies' overcharges for Excluded and Summer Period Transactions, once FERC corrects the rates for those sales; the Sixth Claim seeks a declaration that the U.S. will be contractually liable for any amount assessed against Plaintiffs' ISO or PX accounts due to the Agencies' refusal to pay refunds; and the Seventh Claim seeks, *inter alia*, a declaration that the U.S. is contractually obligated to permit the Agencies' ISO and PX accounts to be adjusted to reflect the corrected prices for their sales. The U.S. asserts that none of these claims present a live case or controversy because FERC has not yet established the revised rates for the Excluded or Summer Period Transactions, nor is there yet a precise calculation of the ISO or PX shortfalls. But the U.S. misconceives the nature of these claims. There is now most certainly a live dispute concerning the U.S.'s contract obligations in the circumstances described in the Fourth through Seventh Claims, and Plaintiffs have requested that the Court *interpret the parties' rights and obligations under their existing contracts*, which are entirely determinable at this time. *See, e.g.*,

[50] The U.S. fails to cite *Alliant Techsystems* or the cases that follow it. Rather, it relies on various Supreme Court cases for the unremarkable proposition that Article III of the Constitution limits the judicial power of Article III courts to "cases" and "controversies." Unlike *Alliant*, *CW Government Travel*, and *Tiger Natural Gas*, none of the cases the U.S. cites address this Court's jurisdiction to grant declaratory relief, and most of the U.S.'s cases have nothing to do with contracts at all. Rather, they address a variety of unrelated subject matters, including challenges to legislation or regulations, discovery disputes, environmental citizen suits, and criminal law.

PG&E Compl. ¶¶ 83, 85, 87 and 92; SDG&E Compl. ¶¶ 75, 77, 79, and 84. That is enough for this Court to grant relief under *Alliant Techsystems*.

It is also clear, when one examines *CPUC* and FERC's October 19, 2007 Order, that Plaintiffs are not seeking relief based on a "hypothetical" set of facts, and each of these claims satisfies the *Alliant Techsystems* factors:

**Excluded Transactions**. FERC initially declined to award relief for energy exchange sales on the ground that it was too difficult to calculate the refund amounts. The Ninth Circuit rejected FERC's rationale: "The challenge of monetizing the transactions does not give FERC a safe harbor to throw up its hands and say it can't be done." *CPUC*, 462 F.3d at 1060. FERC also had excluded multi-day sales on the ground that they were not encompassed within the scope of the plaintiffs' complaint. The Ninth Circuit rejected this contention as well, holding that FERC's cramped reading of the plaintiffs' original complaint was not supported by the record. *Id.* at 1058. On remand, the parties may well debate how refunds for such transactions will be calculated, but they *will* be calculated.

**Summer Period**. FERC initially declined to grant relief for the Summer Period for three separate reasons. On appeal, the Ninth Circuit rejected each rationale, holding that FERC's first justification was "incorrect as a matter of law," its second reason was contravened by FERC's own holding in a prior docket and by "significant evidence" presented by the plaintiffs, and its third rationale was contradicted by its second justification and also was "unsupportable." *Id.* at 1048-50. The Ninth Circuit concluded that FERC's "categorical rejection of the California Parties' request for [Summer Period] relief was *arbitrary, capricious and an abuse of discretion*," and that FERC "must address the merits." *Id.* at 1051 (emphasis added). Since the Ninth Circuit has cut the legs out from under every reason FERC gave for denying Summer

Period relief, there is a significant likelihood that FERC will correct prices for the Summer Period on remand.

**<u>Market Shortfall</u>**. Plaintiffs' Sixth Claim raises a live—and timely—dispute. In its October 19 Order, FERC ruled that the Agencies (and all other governmental entities) will receive the uncorrected prices for their sales (unless buyers recover refunds in a contract action such as this one). FERC further observed that, as a consequence, "[t]his shortfall in refunds must be allocated somehow among buyers. . . . [A]ll net refund recipients . . . will receive an allocation of the shortfall in proportion to their refunds." October 19, 2007 Order, 121 FERC ¶ 61,067 at P 39. The governmental entities' refusal to pay refunds *will* result in a shortfall, and that shortfall *will* be assessed against Plaintiffs, making their Sixth Claim far from hypothetical.[51]

These claims also satisfy the remaining *Alliant Techsystems* factors. First, the declaratory relief sought would so greatly narrow the issues in dispute that it would effectively end the litigation between the parties. Although damages would remain at issue, in light of the refund calculations by the ISO and PX, the damages computation could be resolved expeditiously. Second, litigating the declaratory relief claims in a later proceeding would be highly inefficient because the Court would be asked to interpret and apply the very same Tariff terms that are at issue in Plaintiffs' First through Third Claims. Third, Plaintiffs' claims involve a fundamental question of contract interpretation: whether the Agencies are contractually liable to Plaintiffs under the Tariffs for overcharges associated with the Excluded and Summer Period Transactions or for shortfalls in the ISO and/or PX markets. Finally, there is a "special need" for early

[51] The U.S. also alleges that the Seventh Claim seeks an advisory opinion about hypothetical events. But that is not the case. The Seventh Claim is pleaded in the alternative to the First through Sixth Claims and seeks to establish that the Agencies are contractually obligated under the terms of the Tariffs to permit the ISO and PX to adjust their accounts. For the same reasons discussed in text, the Seventh Claim also is not impermissibly "hypothetical."

resolution of these issues, in that a declaration of the U.S.'s contractual liability under the Tariffs would avoid years of protracted, costly litigation between the parties.

## VI. THE SIXTH AND SEVENTH CLAIMS WERE PRESENTED TO THE CONTRACTING OFFICER.

### A. Plaintiffs May Pursue Their Claims So Long as They Arise from the Same Operative Facts and Seek Essentially the Same Relief as Their CDA Claims.

The U.S. moves to dismiss the Complaint's Sixth and Seventh Claims on the ground that they were not presented to the Contracting Officer ("CO") and therefore this Court lacks jurisdiction to hear them. U.S. Br. at 44-50. While the CDA and Tucker Act require that an action brought under the CDA must "be based on the same claim previously presented to and denied by the contracting office," *Scott Timber Co. v. U.S.*, 333 F.3d 1358, 1365 (Fed. Cir. 2003), *aff'd*, 224 Fed. Appx. 972 (May 10, 2007) (citation omitted), there is no "requirement under the CDA that a contractor must use a particular form or wording to state a proper claim." *Engineered Demolition, Inc. v. United States*, 70 Fed. Cl. 580, 587 (2006). "All that is required is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." *Scott Timber*, 333 F.3d at 1365. The complaint that ultimately follows need not exhibit "rigid adherence to the exact language or structure of the original administrative CDA claim" to satisfy the requirements of the CDA. *Id.*

The law of this Circuit construes the claims requirement broadly. A plaintiff may pursue even an unpresented claim where it arises from the same operative facts and seeks essentially the same relief as a presented claim, but merely asserts differing legal theories for that recovery. *Scott Timber Co.*, 333 F.3d at 1365. *See also ATK Thiokol, Inc. v. United States*, 76 Fed. Cl. 654, 659 (2007); *Swanson Group, Inc. v. United States*, 76 Fed. Cl. 44, 49 (2007) (Smith, J.). Thus, where a plaintiff has asserted a CDA claim for breach of contract, the complaint may

include an augmented claim asserting breach of additional contractual provisions. *Swanson Group*, 76 Fed. Cl. at 49; *see also Manuel Bros., Inc. v. U.S.*, 55 Fed. Cl. 8, 32 (2002), *aff'd*, 95 Fed. Appx. 344 (Apr. 9, 2004); *Cerberonics, Inc. v. United States*, 13 Cl. Ct. 415, 418-19 (1987). What a plaintiff may not do is pursue a claim for, e.g., breach of contract damages in court if the CDA claim sought an entirely different form of relief, such as equitable adjustment of the contract. *Manuel Bros.*, 55 Fed. Cl. at 32, *citing Reliance Ins. Co. v. United States*, 931 F.2d 863, 866 (Fed. Cir. 1991). For example, in *Scott Timber*, the plaintiff asserted broad CDA claims for damages for breach of contract resulting from the Forest Service's suspension of six timber contracts. 333 F.3d at 1362. The complaint alleged breach of specific contract provisions not mentioned in the CDA claims. *Id*. at 1365. The new allegations of breach, however, entitled the plaintiff to the same relief requested in the CDA claims. *Id*. at 1365-66. The Federal Circuit concluded that the lawsuit could be pursued so long as the relief sought was the same. *Id*.

The cases on which the U.S. relies principally involve government contractors who presented one type of legal claim and then sued on an additional, *different* legal theory. In the parlance of *Manuel Bros.*, the nature of the complaint differed from the nature of the claims presented. 55 Fed. Cl. at 32. Thus, in *Renda Marine, Inc. v. United States*, the contractor presented claims for equitable adjustment of the contract, but sued for breach of the implied duty to cooperate. 71 Fed. Cl. 378, 392 (2006); *see also Reliance Ins. Co.*, 931 F.2d at 866 (complaint alleging breach of contract and of duty of good faith could not be premised on CDA Claims seeking only equitable adjustment).[52] That is not the case here.

[52] The U.S. incorrectly cites *Johnson Controls World Services, Inc. v. United States*, 43 Fed. Cl. 589, 594-95 (1999), for the proposition that "claims based upon differing provisions of a contract . . . depended upon impermissibly different theories." U.S. Br. at 49. That is not the law. *See Scott Timber*, 333 F.3d at 1365-66. Nor does the U.S. accurately explain the *Johnson* holding. In that case, the government asserted a CDA claim against a contractor for $1,192,254
*(Footnote continued)*

### B. The CDA Claims and the Complaint Are Based on the Same "Operative Facts" and Seek "Essentially the Same Relief."

The U.S.'s argument overlooks the plain language of Plaintiffs' CDA Claims, which effectively sought the same relief requested in the Complaint.

**<u>Sixth Claim</u>**. One consequence of the U.S.'s breach of its contract obligations will be a shortfall of funds needed to settle the ISO and PX accounts. PG&E Compl. ¶¶ 31, 33, 87-88; SDG&E Compl. ¶¶ 25, 27, 79-80. Under the Tariffs' indemnification provisions, which require market shortfalls to be passed through to non-defaulting participants, this shortfall will principally be borne by Plaintiffs. PG&E Compl. ¶¶ 33, 87-88; SDG&E Compl. ¶¶ 27, 79-80. The Sixth Claim seeks a declaration that Plaintiffs are entitled to indemnification if they must bear the costs of a shortfall at the ISO and PX resulting from the Agencies' breach of their contractual obligations. PG&E Compl. ¶¶ 86-89, SDG&E Compl. ¶¶ 78-81 The CDA Claims similarly alleged that Plaintiffs will be damaged by the Agencies' refusal to abide by their contractual obligations and pay refunds, and specifically gave notice that Plaintiffs would seek, among other relief, "*contractual indemnification*." Plaintiffs' Amended Claim for Damages (BPA), U.S. App. at A1160 ("BPA CDA Claims"), at 6 (emphasis added); Plaintiffs' Amended Claim for Damages (WAPA), App. at 742 ("WAPA CDA Claims"), at 6 (emphasis added).

**<u>Seventh Claim</u>**. The Complaint alleges that, in accordance with the Refund Order, "the ISO and the PX have recalculated the accounts of all sellers and buyers" in the markets to reflect

---

for failure to refund pension credits under certain Defense Acquisition Regulations ("DAR"), and also presented a CDA claim for $54,923,068 for breach of contract. *Johnson Controls*, 43 Fed. Cl. at 593. In its cross-complaint against the contractor, however, the government asserted an aggregate claim under the DAR which included the $54,923,068 over-billing claim and a separate $845,429 pension credit claim. *Id*. at 591. Because the larger dollar amount CDA claim had been based on a breach of contract theory, the U.S. was precluded from pursuing in its cross-complaint a stand-alone claim for breach of the DAR seeking the same surplus. *Id*. at 593.

the MMCP. PG&E Compl. ¶ 56; SDG&E Compl. ¶ 50. The Seventh Claim seeks a declaration that, in addition to its other contract obligations, "the United States is contractually obligated to permit the Agencies' accounts at the ISO and PX to be adjusted to reflect [those] pricing changes . . . and is contractually obligated to pay any refunds and to otherwise honor the invoices reflecting the refunds associated with all affected transactions." PG&E Compl. ¶ 92; SDG&E Compl. ¶ 84. Plaintiffs' CDA Claims gave notice that they would seek such adjustments. *See* BPA CDA Claims at 5 ("The ISO and PX have commenced the recalculation of the accounts of all sellers and buyers in the ISO and PX markets to reflect the revised rates for the Refund Period in accordance with the Refund Order."); WAPA CDA Claims at 5 (same); BPA CDA Claims at 6 ("Causes of action for damages or other monetary relief that the California Parties may assert include, but are not limited to, *breach and repudiation of contract obligations and contractual indemnification*.") (emphasis added); WAPA CDA Claims at 6 (same).

To the extent there is any variance here between Plaintiffs' Complaint and CDA Claims, Plaintiffs are permitted to advance "slightly different theories for the breach" because the former arises from the same set of operative facts and seeks essentially the same relief as the latter. *Scott Timber*, 333 F.3d at 1366. Any market shortfall that Plaintiffs recover under the Sixth Claim would be measured in the same way as their direct claims for refunds, i.e., the difference between the original, unmitigated prices charged for power and the MMCP. The Seventh Claim also ultimately seeks a refund of the difference between the original sale price and the MMCP via an adjustment of the Agencies' ISO and PX accounts. Thus, Plaintiffs' Sixth and Seventh Claims are simply different avenues under the contract to recover prices received by the Agencies in excess of the MMCP.

## VII. PLAINTIFFS PROPERLY PLEADED BREACH OF CONTRACT AND ANTICIPATORY REPUDIATION CLAIMS IN THE ALTERNATIVE.

The U.S. closes with the argument that Plaintiffs have "conceded" that no contractual obligation to pay refunds has yet arisen and, therefore, the First Claim for breach of contract should be dismissed under RCFC 12(b)(6). U.S. Br. at 51-55. This argument is based on the U.S.'s misleading and partial excerpting of Plaintiffs' briefing in the California Action. Had the U.S. reproduced for the Court the entirety of what Plaintiffs said in that case, it would be obvious that Plaintiffs are asserting alternative legal theories of breach of contract and anticipatory repudiation—a pleading strategy that is permitted in the California court and in this Court.

Plaintiffs' First Claim for present breach of contract asserts that the U.S. is now obliged to reimburse the difference between the rates the Agencies initially charged and the FERC-revised rates, and has refused to do so. PG&E Compl. ¶¶ 72-76; SDG&E Compl. ¶¶ 64-68. The Second Claim for anticipatory breach of contract is expressly pleaded "*in the alternative to the First Claim*." PG&E Compl. ¶ 78; SDG&E Compl. ¶ 70 (emphasis added). It asserts that, if the time for the Agencies' contract performance has not yet come, the Agencies nevertheless are presently in breach of contract because they have repudiated their contract obligations. PG&E Compl. ¶¶ 78-79; SDG&E Compl. ¶¶ 70-71. Such pleading in the alternative is permitted in this Court. *See* RCFC 8(e)(2); *see also Marrero Land & Imp. Ass'n, Ltd. v. United States*, 26 Cl. Ct. 193, 195 (1992). And the U.S. does not suggest that Plaintiffs' Complaint is flawed. Rather, the U.S. contends that Plaintiffs "have admitted" in the California Action that "the date for contract performance has not arrived," and that the claim for breach of contract "has not yet accrued." U.S. Br. at 55. For that reason, it concludes, "count one is invalid as a matter of law." *Id.*

Despite quoting almost two single-spaced pages of Plaintiffs' briefing, *see* U.S. Br. at 53-54, the U.S. conveniently omits a critical footnote that decisively refutes the U.S.'s "concession" argument. Footnote 48 of that brief says:

> It can hardly be disputed that the regulatory overlay and the impact of *Bonneville* make this an especially complicated case, not amenable to a simple analysis. *Although the facts suggest that Defendants' time to pay refunds due under the Tariffs has not yet arrived, the California Parties recognize that the Court may find Defendants were required to perform under the contract at some point after Bonneville ended FERC's ability to require them to pay refunds, and that their failure to do so gives rise to a claim for actual breach of contract. For that reason, the First Cause of Action asserts an alternative claim of actual breach of contract.* Under California law, pleading alternative factual and legal theories is permissible. Under either theory, however, the claims are timely because they did not accrue more than one year before they were presented to Defendants.

Plaintiffs' Memorandum In Opposition To Defendants' Demurrers (Vol. II, Detailed Argument), *Electric Refund Cases*, JCCP 4512 (L.A. Sup. Ct. , Oct. 9, 2007), App. at 93 (emphasis added in part, removed in part) (citations removed). Given Plaintiffs' unequivocal reservation of their claim for actual breach of contract, the U.S.'s disingenuous assertion that Plaintiffs' have conceded that "count one is invalid as a matter of law" is completely without merit.

## CONCLUSION

For the foregoing reasons, the U.S.'s motion to dismiss should be denied in its entirety.

Respectfully submitted,

DATED: April 7, 2008

By: s/ Marie L. Fiala
MARIE L. FIALA

HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA 94104-2878
Telephone: (415) 772-6000
Facsimile: (415) 772-6268

**ATTORNEY OF RECORD FOR PLAINTIFF PACIFIC GAS AND ELECTRIC COMPANY**

**OF COUNSEL:**

RUSSELL P. COHEN
HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA 94104-2878
Telephone: (415) 772-6000
Facsimile: (415) 772-6268

STAN BERMAN
PEGGY J. WILLIAMS
LISA D. HARDIE
HELLER EHRMAN LLP
701 Fifth Ave, Suite 6100
Seattle, WA 98104-7098
Telephone: (206) 447-0900
Facsimile: (206) 447-0849

MARK PATRIZIO
PACIFIC GAS AND ELECTRIC COMPANY
77 Beale Street, MailCode B30A
San Francisco, CA 94105
Telephone: (415) 973-6344
Facsimile: (415) 973-5520

Attorneys for Plaintiff
Pacific Gas and Electric Company

DATED: April 7, 2008

By: s/ Jane I. Ryan
JANE I. RYAN

STEPTOE & JOHNSON LLP
1330 Connecticut Avenue NW
Washington, DC 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902

**ATTORNEY OF RECORD FOR PLAINTIFF SOUTHERN CALIFORNIA EDISON COMPANY**

**OF COUNSEL:**

DANIEL C. SAULS
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue NW
Washington, DC 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902

LEON BASS, JR.
SOUTHERN CALIFORNIA EDISON COMPANY
2244 Walnut Grove Avenue
Rosemead, CA 91770
Telephone: (626) 302-6967

Attorneys for Plaintiff
Southern California Edison Company

DATED: April 7, 2008

By: s/ Laura Lindgren
LAURA LINDGREN

HENNIGAN BENNETT & DORMAN LLP
865 S. Figueroa Street
Los Angeles, California 90017
Telephone: (213) 694-1200
Facsimile: (213) 694-1234

**ATTORNEY OF RECORD FOR PLAINTIFF SAN DIEGO GAS & ELECTRIC COMPANY**

**OF COUNSEL:**

J. MICHAEL HENNIGAN
ROBERT W. MOCKLER
HENNIGAN BENNETT & DORMAN LLP
865 S. Figueroa Street
Los Angeles, California 90017
Telephone: (213) 694-1200
Facsimile: (213) 694-1234

Attorneys for Plaintiff
San Diego Gas & Electric Company