IN THE

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PACIFIC GAS AND ELECTRIC COMPANY, SOUTHERN CALIFORNIA EDISON COMPANY, AND CALIFORNIA ELECTRICITY OVERSIGHT BOARD,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant.<br><br>SAN DIEGO GAS & ELECTRIC COMPANY, a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 1:07-cv-00157-LAS<br><br>No. 1:07-cv-00167-LAS<br><br>Consolidated<br><br>**HON. LOREN A. SMITH** |

**PLAINTIFFS PACIFIC GAS AND ELECTRIC COMPANY, SOUTHERN CALIFORNIA EDISON COMPANY, AND SAN DIEGO GAS & ELECTRIC COMPANY'S APPENDIX TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

**VOLUME 1 OF 3**

# Index to Appendix

**Pages**

Index of Key ISO and PX Tariff Provisions .......... 1-31

Order on Demurrers, *Electric Refund Cases*, JCCP 4512 (L.A. Sup. Ct., Dec. 4, 2007) .......... 32-33

Minute Order, *Electric Refund Cases*, JCCP 4512 (L.A. Sup. Ct., Jan. 3, 2008) .......... 34-37

U.S. Notice of Intervention, *Alliant Energy v. Nebraska Pub. Power. Dist.*, Case No. 62-C5-00-004626 (Minn. Dist. Ct., County of Ramsey, Aug. 18, 2000) .......... 38-42

Brief of Appellee S. Cal. Edison Co., *S. Cal. Edison Co. v. Lynch*, Case Nos. 01-56879, *et al.* (9th Cir. Feb. 5, 2002) .......... 43-92

Plaintiffs' Memorandum in Opposition to Defendants' Demurrers (Vol. II, Detailed Argument), *Electric Refund Cases*, JCCP 4512 (L.A. Sup. Ct., Oct. 9, 2007) .......... 93-216

*Southern Cal. Edison Co.*, 80 FERC ¶ 61,262 (1997) .......... 217-222

*Pacific Gas & Elec. Co.*, 81 FERC ¶ 61,122 (1997) (Excerpt) .......... 223-232

*Portland General Elec. Co., et al.*, 83 FERC ¶ 61,315 (1998) .......... 233-237

*Automated Power Exchange, Inc.*, 84 FERC ¶ 61,020 (1998) .......... 238-256

*Automated Power Exchange, Inc.*, 85 FERC ¶ 61,232 (1998) .......... 257-265

*Cal. Power Exch. Corp.*, 92 FERC ¶ 61,096 (2000) .......... 266-270

*San Diego Gas & Elec. Co.*, 92 FERC ¶ 61,172 (2000) .......... 271-283

*San Diego Gas & Elec. Co.*, 93 FERC ¶ 61,121 (2000) .......... 284-355

*San Diego Gas & Elec. Co.*, 95 FERC ¶ 61,418 (2001) .......... 356-407

*San Diego Gas & Elec. Co.*, 96 FERC ¶ 61,120 (2001) .......... 408-450

*San Diego Gas & Elec. Co.*, 109 FERC ¶ 61,218 (2004) .......... 451-499

*San Diego Gas & Elec. Co.*, 121 FERC ¶ 61,067 (2007) .......... 500-533

*San Diego Gas & Elec. Co.*, 121 FERC ¶ 61,188 (2007) .......... 534-539

*California ex rel. Lockyer*, 122 FERC ¶ 61,260 (2008) .......... 540-563

*Fact-Finding Investigation of Potential Manipulation of Electric and Natural Gas Prices*, FERC Docket No. PA02-2-000 (Mar. 26, 2003) (Excerpt)............................ 564-595

MAPP Restated Agreement, FERC Docket No. ER96-1447-000 (Mar. 29, 1996) (Excerpt) ........................................................................... 596-639

Letter from Clark Evans Downs on behalf of APX to David Boergers, Secretary of FERC (Aug. 14, 1998)................................................................................. 640-674

Power Exchange Settlement and Billing Procedures (PSABP), filed May 7, 2002, by the California PX in FERC Docket No. EL00-95................... 675-708

WAPA Motion to Intervene, FERC Docket Nos. EL01-1-000, *et al.* (Oct. 23, 2000)........... 709-714

BPA Motion to Intervene, FERC Docket Nos. EL00-95-000, *et al.* (Nov. 22, 2000)............ 715-722

*Bonneville Power Administration Request for Rehearing and Clarification*, FERC Docket Nos. EL00-95, *et al.* (Jul. 19, 2001).................................................... 723-741

Plaintiffs' Amended Claim for Damages (WAPA) (Dec. 20, 2005) .................................... 742-753

Motion by and Answer of the Bonneville Power Administration (BPA) and the Western Area Power Administration (Western) to the California Parties' Motion Related to Procedures Following Remand in *Bonneville Power Administration, et al. v. FERC*, FERC Docket Nos. EL00-95-000, *et al.* (Apr. 17, 2007) ................. 754-774

Thirty-Eighth Status Report of the California Independent System Operator Corporation on Settlement Re-Run Activity, *San Diego Gas & Elec. Co.*, FERC Docket Nos. ER03-746-000, *et al*. (Sept. 6, 2007).......................................... 775-795

16 U.S.C. § 824 (2000) ........................................................................................... 796-798

16 U.S.C. § 824e (2000) .......................................................................................... 799-801

# Index of Key ISO and PX Tariff Provisions

## ISO TARIFF

| Citation | Tariff Provision | Page Citation |
|---|---|---|
| § 2.2.1 | **2.2.1 Scheduling Responsibilities and Obligations.** . . . In contracting for Ancillary Services and Imbalance Energy the ISO will not act as principal but as agent for and on behalf of the relevant Scheduling Coordinators. | U.S. App. at A249 |
| § 2.2.3 | **2.2.3 Scheduling Coordinator Certification**. The ISO shall accept Schedules and bids for Energy and Ancillary Services only from Scheduling Coordinators which it has certified in accordance with Section 2.2.4 as having met the requirements of this Section 2.2.3 . . . . | U.S. App. at A250 |
| § 2.2.3.1 | **2.2.3.1** Each Scheduling Coordinator shall: . . . (f) enter into an SC Agreement with the ISO . . . . | U.S. App. at A250-A251 |
| § 2.2.3.2 | **2.2.3.2** Each Scheduling Coordinator, UDC or MSS shall either maintain an Approved Credit Rating (which may differ for different types of transactions with the ISO) or provide in favor of the ISO one of the following forms of security for an amount to be determined by the Scheduling Coordinator, UDC or MSS and notified to the ISO under Section 2.2.7.3:<br>(a) an irrevocable and unconditional letter for credit confirmed by a bank or financial institution reasonably acceptable to the ISO;<br>(b) [an acceptable surety bond];<br>(c) [an acceptable guarantee];<br>(d) [an acceptable cash deposit];<br>(e) [an acceptable certificate of deposit]; or<br>(f) [an acceptable payment bond certificate] . . . . | U.S. App. at A251 |

## ISO TARIFF

| Citation | Tariff Provision | Page Citation |
|---|---|---|
| § 2.2.6 | **2.2.6 Responsibilities of a Scheduling Coordinator.** Each Scheduling Coordinator shall be responsible for:<br><br>**2.2.6.1 Obligation to Pay**. Paying the ISO's charges in accordance with this ISO Tariff;<br><br>**2.2.6.9 ISO Protocols.** Complying with all ISO Protocols and ensuring compliance by each of the Market Participants which it represents with all applicable provisions of the ISO Protocols . . . . | U.S. App. at A259-A260 |
| § 2.3.5 | **2.3.5 Assurance of Adequate Generation and Transmission to meet Applicable Operating and Planning Reserve.**<br><br>**2.3.5.1.5** Notwithstanding the foregoing [reserve planning rules], if the ISO concludes that it may be unable to comply with the Applicable Reliability Criteria, the ISO shall, acting in accordance with Good Utility Practice, take such steps as it considers to be necessary to ensure compliance, including the negotiation of contracts through processes other than competitive solicitations. | U.S. App. at A298-A299 |
| § 2.5 | **2.5 [Auctions.]**<br><br>*See*, *e.g.*, § 2.5.14 (Formula for Market Clearing Price for the ISO Regulation Auction); § 2.5.15 (Formula for Market Clearing Price for Spinning Reserves); § 2.5.16 (Formula for Market Clearing Price for Non-Spinning Reserves); § 2.5.17 (Formula for Market Clearing Price for Replacement Reserve). | U.S. App. at A312; A329; A333; A339-A343 |
| § 11.1 | **11. ISO SETTLEMENTS AND BILLING.**<br><br>**11.1 Settlement Principles.**<br><br>**11.1.1** The ISO shall calculate, account for and settle transactions in accordance with the following principles:<br><br>**11.1.2** The ISO shall be responsible for calculating Settlement balances for all transactions carried out by | U.S. App. at A513-A514 |

## ISO TARIFF

| Citation | Tariff Provision | Page Citation |
|---|---|---|
| | Scheduling Coordinators on the ISO Controlled Grid in each Settlement Period;<br><br>**11.1.3** The ISO shall carry out all Settlements in accordance with Meter Data provided pursuant to the requirements of Section 10 of this ISO Tariff;<br><br>**11.1.6** The ISO shall settle the following charges in accordance with Section 11.2 of this ISO Tariff:<br>(1)Grid Management Charge;<br>(2)Grid Operations Charge;<br>(3)Ancillary Services charges;<br>(4)Imbalance Energy charges;<br>(5)Usage Charges;<br>(6)High Voltage Access Charges and Transition Charges;<br>(7)Wheeling Access Charges;<br>(8)Voltage Support and Black Start charges; and<br>(9)Reliability Must-Run Charges | |
| § 11.2 | **Calculation of Settlements.** The ISO shall calculate, account for and settle the following charges in accordance with this ISO Tariff.<br><br>**11.2.1 – 11.2.4** [Grid Management Charge, Grid Operations Charge, Ancillary Services, Imbalance Energy] | U.S. App. at A514 |
| § 11.2.9 | **Neutrality Adjustments.** The ISO shall be authorized to levy additional charges or payments as special adjustments in regard to:<br><br>(a) amounts required to round up any invoice amount expressed in dollars and cents to the nearest whole dollar amount in order to clear the ISO Clearing Account. These charges will be | U.S. App. at A519-A520 |

## ISO TARIFF

| Citation | Tariff Provision | Page Citation |
|---|---|---|
| | allocated amongst Scheduling Coordinators over an interval determined by the ISO and pro rata based on metered Demand (including exports) during that interval;<br><br>(b) amounts in regard to penalties which may be levied by the ISO in accordance with the ISO Tariff. These charges will be levied on the Market Participants liable for payment of the penalty;<br><br>(c) amounts required to reach an accounting trial balance of zero in the course of the Settlement process in the event that the charges calculated as due from ISO Debtors are lower than payments calculated as due to the ISO Creditors for the same Trading Day. These charges will be allocated amongst the Scheduling Coordinators who traded on that Trading Day pro rata to their metered Demand (including exports) in MWh of Energy for that Trading Day. In the event that the charges due from ISO Debtors are higher than the payments due to ISO Creditors, the ISO shall allocate a payment to the Scheduling Coordinators who traded on that Trading Day pro rata to their metered Demand (including exports) in MWh of Energy for that Trading Day;<br><br>(d) amounts required with respect to payment adjustments for regulating Energy as calculated in accordance with Section 2.5.27.1. These charges will be allocated amongst the Scheduling Coordinators who traded on that Trading Day pro rata to their metered Demand (excluding exports) in MWh for that Trading Day; and<br><br>(e) awards payable by or to the ISO pursuant to good faith negotiations or ISO ADR Procedures that the ISO is not able to allocate to or to collect from a Market Participant or Market Participants in accordance with Section 13.5.3. These charges will be allocated amongst Scheduling Coordinators over an interval determined by the ISO and pro rata based on metered Demand (including exports) during that interval. | |
| § 11.3 | **11.3 Billing and Payment Process.**<br><br>**11.3.1** The billing and payment process shall be based on the issuance of Preliminary and Final Settlement | U.S. App. at A521 |

4

## ISO TARIFF

| Citation | Tariff Provision | Page Citation |
| --- | --- | --- |
| | Statements for each Settlement Period in each Trading Day.<br><br>**11.3.2** Payment for the charges referred to in Section 11.1.6 of the ISO Tariff (except for the charges payable under long term contracts) for each Trading Day in each calendar month shall be made five (5) Business Days after issuance of the Preliminary Settlement Statement for the last day of the relevant calendar month. Payment for adjustments will be made five (5) Business Days after issuance of the Final Settlement Statement for the last day of the relevant month. | |
| § 11.6.3 | **11.6.3 Settlement Statement re-runs.** The ISO is authorized to perform Settlement Statement re-runs following approval of the ISO Governing Board. A request to perform a Settlement Statement re-run may be made at any time by a Scheduling Coordinator by notice in writing to the ISO Governing Board. The ISO Governing Board shall . . . determine in its reasonable discretion, whether there is good cause to justify the performance of a Settlement Statement re-run.<br><br>**11.6.3.1** If a Settlement Statement re-run is ordered by the ISO Governing Board, the ISO shall arrange to have the Settlement Statement re-run carried out as soon as is reasonably practicable following the ISO Governing Board's order, subject to the availability of staff and computer time, compatible software, appropriate data and other resources.<br><br>**11.6.3.2** The cost of a Settlement Statement re-run shall be borne by the Scheduling Coordinator requesting it, unless the Settlement Statement re-run was needed due to a clerical oversight or error on the part of the ISO staff.<br><br>**11.6.3.3** Where a Settlement Statement re-run indicates that the accounts of Scheduling Coordinators should be debited or credited to reflect alterations to Settlements previously made under this ISO Tariff, for those Scheduling Coordinators affected by the statement re-run, the ISO shall reflect the amounts to be debited or credited in the next Preliminary Settlement Statements that it issues following the Settlement Statement re-run to which the provisions of this Section 11 apply. The net balance of all adjustments shall go into a balancing account, on a debit or credit, to the Grid Management Charge. | U.S. App. at A525-A526 |

## ISO TARIFF

| Citation | Tariff Provision | Page Citation |
| --- | --- | --- |
| § 11.8.1 | **11.8.1 All Payments to Be Made Through the ISO.** All Scheduling Coordinators shall discharge their obligations to pay the amounts owed by them and shall receive payments of all amounts owed to them under this ISO Tariff only through the ISO. | U.S. App. at A528 |
| § 11.8.2 | **11.8.2 Accounts to be Established.** The ISO shall establish and operate the following accounts:<br><br>**11.8.2.1.** An ISO Clearing Account to and from which all payments are made;<br><br>**11.8.2.2.** An ISO Reserve Account from which any debit balances on the ISO Clearing Account at the close of banking business on each Business Day shall be settled or reduced in accordance with this ISO Tariff. The ISO shall use the security provided by a Scheduling Coordinator pursuant to Section 2.2.3.2 of this ISO Tariff, if necessary, to clear any debit balances on the ISO Reserve Account that may arise as a result of that Scheduling Coordinator's failure to pay an amount due under this ISO Tariff. | U.S. App. at A528 |
| § 11.8.3 | **11.8.3 Declaration of Trust.** All ISO Accounts established pursuant to Section 11.8.2 of this ISO Tariff shall be opened and operated by the ISO on trust for ISO Creditors, in accordance with this ISO Tariff . . . | U.S. App. at A528 |
| § 11.9 | **11.9 Invoices.** The ISO shall prepare and send to each Scheduling Coordinator two invoices for each calendar month. The first invoice will be based on the Preliminary Settlement Statements and the second invoice will be based on the Final Settlement Statement(s). Each invoice will show amounts which are to be paid by or to each Scheduling Coordinator, the Payment Date, being the date on which such amounts are to be paid or received and details to the ISO Clearing Account to which any amounts owed by Scheduling Coordinators are to be paid. | U.S. App. at A529 |
| § 11.10 | **11.10 Instructions for Payment.** Each Scheduling Coordinator shall remit to the ISO Clearing Account the amount shown on the invoice as payable by that Scheduling Coordinator for value not later than 10:00 a.m. on the Payment Date. | U.S. App. at A529 |

## ISO TARIFF

| Citation | Tariff Provision | Page Citation |
|---|---|---|
| § 11.16.1 | **11.16.1 Pro Rata Reduction to Payments.** If it is not possible to clear the ISO Clearing Account on a Payment Date because of an insufficiency of funds available in the ISO Reserve Account or by enforcing any guarantee, letter of credit or other credit support provided by a defaulting Scheduling Coordinator, the ISO shall reduce payments to all ISO Creditors proportionately to the net amounts payable to them on the relevant Payment Date to the extent necessary to clear the ISO Clearing Account. The ISO shall account for such reduction in the ISO ledger accounts as amounts due and owing by the non-paying ISO Debtor to each ISO Creditor whose payment was so reduced. | U.S. App. at A531 |
| § 11.18 | **11.18 Payment Errors**.<br><br>**11.18.1**. **Overpayments.** If for any reason, including the negligence of the ISO Bank or the ISO, an ISO Creditor receives an overpayment on any Payment Date, the ISO Creditor shall within two (2) Business Days from the date of receipt of the funds into its Scheduling Coordinator Settlement Account, notify the ISO of the amount of the overpayment and shall forthwith pay the overpayment into an ISO Account specified by the ISO.<br><br>**11.18.2. Repayment of Overpayment**. If prior to an ISO Creditor notifying the ISO of the overpayment, the ISO receives notice (from the ISO Bank or otherwise) of the overpayment, the ISO shall within two (2) Business Days notify the recipient of the overpayment. The ISO shall be responsible for payment to those entitled to the sum which has been overpaid.<br><br>**11.18.3**. **Underpayments**. If for any reason, including the negligence of the ISO Bank or the ISO, an ISO Creditor receives on the relevant Payment Date an underpayment, the ISO Creditor shall within two (2) Business Days from receipt into its Settlement Account, notify the ISO of the amount of the underpayment, and the ISO after consultation with the ISO Bank, shall use all reasonable endeavors to identify such entity as shall have received any corresponding overpayment and promptly correct the underpayment. If, by reason of negligence, the ISO holds or has under its control after five (5) Business Days from receipt in the ISO Clearing Account amounts which it ought properly to have paid to ISO Creditors, such ISO Creditors shall be entitled to interest on such amounts at the ISO Default Interest Rate, for such period as the ISO improperly holds or has such amounts under its control. | U.S. App. at A531-532 |

## ISO TARIFF

| Citation | Tariff Provision | Page Citation |
|---|---|---|
| § 11.19 | **11.19 Defaults.** Each ISO Creditor shall give notice to the ISO before instituting any action or proceedings in any court against an ISO Debtor to enforce payments due to it. | U.S. App. at A532 |
| § 11.20 | **11.20 Proceedings to Recover Overdue Amounts.**<br><br>**11.20.1 Proceedings Brought by the ISO**. Without prejudice to the right of any Scheduling Coordinator to bring such proceedings as it sees fit it connection with matters related to the recovery of amounts owed to it, the ISO may bring proceedings against any Scheduling Coordinator on behalf of those Scheduling Coordinators who have indicated to the ISO their willingness for the ISO first so to act . . . .<br><br>**11.20.2 Evidence of Unpaid Amount.** The ISO shall, on request, certify in writing the amounts owed by an ISO Debtor that remain unpaid and the ISO Creditors to whom such amounts are owed and shall provide certified copies of the relevant Preliminary and Final Settlement Statements, invoices and other documentation on which the ISO's certificate was based to the ISO Debtor and the relevant ISO Creditors. An ISO certificate given under this Section 11.20.2 may be used as prima facie evidence of the amount due by an ISO Debtor to ISO Creditors in any legal proceedings. | U.S. App. at A533 |
| § 12 | **12. Audits.**<br><br>**12.6 Payments.** Any payments agreed to between Market Participants and the ISO as a result of an audit, or directed by FERC, or disclosed by the ISO in reviews of its own books and records shall include interest computed at the rate calculated in accordance with the methodology specified for interest on refunds in FERC's regulations at 18 C.F.R § 35.19(a)(2)(iii) (as amended from time to time) from the due date to the date such adjustments are due. | U.S. App. at A535; A538 |
| § 13.1.1 | **13. DISPUTE RESOLUTION.**<br><br>**13.1 Applicability**<br><br>**13.1.1 General Applicability.** Except as limited below or otherwise as limited by law (including the | U.S. App. at A538; A540-A541 |

## ISO TARIFF

| Citation | Tariff Provision | Page Citation |
|---|---|---|
| | rights of any party to file a complaint with FERC under the relevant provisions of the FPA), the ISO ADR Procedures shall apply to all disputes between parties which arise under the ISO Documents except where the decision of the ISO is stated in the provisions of this ISO Tariff to be final . . . .<br><br>**13.2.4 Mediation.** The mediator and representatives of the disputing parties, with authority to settle the dispute, shall within fourteen (14) days after the mediator's date of appointment schedule a date to mediate the dispute. Matters discussed during the mediation shall be confidential and shall not be referred to in any subsequent proceeding. With the consent of all disputing parties, a resolution may include referring the dispute directly to a technical body (such as a WSCC technical advisory panel) for resolution or an advisory opinion, or referring the dispute directly to FERC. The ISO shall publish notice of the referral of the dispute in the ISO newsletter or WEnet, and any other method adopted by the ISO ADR Committee. | |
| § 14.3 | **14.3 Market Participant's Indemnity**. Each Market Participant, to the extent permitted by law, shall indemnify the ISO and hold it harmless against all losses, damages, claims, liabilities, costs or expenses (including legal expenses) arising from any act or omission of the Market Participant except to the extent that they result from the ISO's default under this ISO Tariff or negligence or intentional wrongdoing on the part of the ISO or its officers, directors or employees. | U.S. App. at A553 |
| § 15 | **15. UNCONTROLLABLE FORCES.**<br><br>**15.1** An Uncontrollable Force means any act of God, labor disturbance, act of the public enemy, war, insurrection, riot, fire, storm, flood, earthquake, explosion, any curtailment, order, regulation or restriction imposed by governmental, military or lawfully established civilian authorities or any other cause beyond the reasonable control of the ISO or Market Participant which could not be avoided through the exercise of Good Utility Practice. Neither the ISO nor a Market Participant will be considered in default of any obligation under this ISO Tariff if prevented from fulfilling that obligation due to the occurrence of an Uncontrollable Force.<br><br>**15.2** In the event of the occurrence of an Uncontrollable Force, which prevents the ISO or a Market Participant from performing any of its obligations under this ISO Tariff, the affected entity shall (i) if it is the ISO, immediately notify the Market Participants in writing of the occurrence of such Uncontrollable | U.S. App. at A554 |

## ISO TARIFF

| Citation | Tariff Provision | Page Citation |
|---|---|---|
| | Force and, if it is a Market Participant, immediately notify the ISO in writing of the occurrence of such Uncontrollable Force, (ii) not be entitled to suspend performance of its obligations under this ISO Tariff in any greater scope or for any longer duration than is required by the Uncontrollable Force, (iii) use its best efforts to mitigate the effects of such Uncontrollable Force, remedy its inability to perform and resume full performance of its obligations hereunder, (iv) in the case of the ISO, keep the Market Participants apprised of such efforts, and in the case of the Market Participants, keep the ISO apprised of such efforts, in each case on a continual basis and (v) provide written notice of the resumption of its performance of its obligations hereunder . . . . | |
| § 16 | **16 ISO GRID OPERATIONS COMMITTEE; CHANGES TO ISO PROTOCOLS.**<br><br>**16.2 ISO Protocol Amendment Process.** The ISO Governing Board shall establish an ISO Protocol amendment process in order to ensure that all affected parties have an opportunity to participate. Under that process, the ISO shall file for acceptance at the FERC any amendment to an ISO Protocol that is on file with the FERC. | U.S. App. at A555 |
| § 17 | **17. ASSIGNMENT.** Obligations and liabilities under this ISO Tariff and any SC Agreement or other agreements giving contractual effect to this ISO Tariff shall be binding on the successors and assigns of the parties to such agreements. No assignment of any SC Agreement or other agreements giving contractual effect to this ISO Tariff shall relieve the original party from its obligations or liabilities to the ISO under this ISO Tariff or any such agreement arising or accruing due prior to the date of assignment. | U.S. App. at A556 |
| § 18 | **18. TERM AND TERMINATION.**<br><br>**18.1** This ISO Tariff, shall become effective on the date it is permitted to become effective by the FERC.<br><br>**18.2** This ISO Tariff shall terminate upon approval of termination by the ISO Governing Board in accordance with the bylaws of the ISO and receipt of any necessary regulatory approval from FERC. | U.S. App. at A556 |

11

| ISO TARIFF | | |
|---|---|---|
| **Citation** | **Tariff Provision** | **Page Citation** |
| § 19 | **19. Regulatory Filings**. Any amendment or other modification of any provision of this ISO Tariff must be in writing and approved by the ISO Governing Board in accordance with the bylaws of the ISO. Any such amendment or modification shall be effective upon the date it is permitted to become effective by FERC. Nothing contained herein shall be construed as affecting, in any way, the right of the ISO to furnish its services in accordance with this ISO Tariff, or any tariff, rate schedule or SC Agreement which results from or incorporates this ISO Tariff, unilaterally to make an application to FERC for a change in rates, terms, conditions, charges, classifications of service, SC Agreement, rule or regulation under FPA Section 205 and pursuant to the FERC's rules and regulations promulgated thereunder. Nothing contained in this ISO Tariff or any SC Agreement shall be construed as affecting the ability of any Market Participant receiving service under this ISO Tariff to exercise its rights under Section 206 of the FPA and FERC's rules and regulations thereunder. | U.S. App. at A556-A557 |
| § 20.7 | **20.7 Applicable Law and Forum.** This ISO Tariff shall be governed by and construed in accordance with the laws of the State of California, except its conflict of laws provisions. Market Participants irrevocably consent that any legal action or proceeding arising under or relating to this ISO Tariff to which the ISO ADR Procedures do not apply, shall be brought in any court of the State of California or any federal court of the United States of America located in the State of California**.** Market Participants irrevocably waive any objection that they may have now or in the future to said courts in the State of California as the proper and exclusive forum for any legal action or proceeding arising under or related to this ISO Tariff. | U.S. App. at A561-A562 |
| § 20.8 | **20.8 Consistency with Federal Laws and Regulations.**<br><br>(a) Nothing in the Tariff shall compel any person or federal entity to: (1) violate federal statutes or regulations; or (2) in the case of a federal agency, to exceed its statutory authority, as defined by any applicable federal statutes, regulations, or orders lawfully promulgated thereunder. If any provision of this Tariff is inconsistent with any obligation imposed on any person or federal entity by federal law or regulation to that extent, it shall be inapplicable to that person or federal entity. No person or federal entity shall incur any liability by failing to comply with a Tariff provision that is inapplicable to it by reason of being inconsistent with any federal statutes, regulations, or orders lawfully promulgated thereunder; provided, | U.S. App. at A562 |

| ISO TARIFF | | |
|---|---|---|
| **Citation** | **Tariff Provision** | **Page Citation** |
| | however, that such person or federal entity shall use its best efforts to comply with the Tariff to the extent that applicable federal laws, regulations, and orders lawfully promulgated thereunder permit it to do so. | |
| **APPENDIX A** | **ISO TARIFF APPENDIX A, MASTER DEFINITIONS SUPPLEMENT** | |
| Master Definitions Supplement | **ISO Creditor.** (i) A Scheduling Coordinator to which amounts are payable pursuant to the terms of the ISO Tariff with respect to the amounts standing to the credit of its account; or amounts owing to it by another Scheduling Coordinator . . . . | U.S. App. at A598 |
| Master Definitions Supplement | **ISO Debtor.** A Scheduling Coordinator or a Participating TO that is required to make a payment to the ISO under the ISO Tariff. | U.S. App. at A598 |
| Master Definitions Supplement | **ISO Tariff**. The California Independent System Operator Corporation Operating Agreement and Tariff, dated March 31, 1997, as it may be modified from time to time. | U.S. App. at A600 |
| Master Definitions Supplement | **Market Clearing Price**. The price in a market at which supply equals Demand. All Demand prepared to pay at least this price has been satisfied and all supply prepared to operate at or below this price has been purchased. | U.S. App. at A603 |
| Master Definitions Supplement | **Market Participant.** An entity, including a Scheduling Coordinator, who participates in the Energy marketplace through the buying, selling, transmission, or distribution of Energy or Ancillary Services into, out of, or through the ISO Controlled Grid. | U.S. App. at A604 |
| Master Definitions Supplement | **SC Agreement.** An agreement between a Scheduling Coordinator and the ISO whereby the Scheduling Coordinator agrees to comply with all ISO rules, protocols and instructions, as those rules, protocols and instructions may be amended from time to time. | U.S. App. at A618 |

## ISO TARIFF

| Citation | Tariff Provision | Page Citation |
|---|---|---|
| Master Definitions Supplement | **<u>Scheduling Coordinator</u>.** An entity certified by the ISO for the purposes of undertaking the functions specified in Section 2.2.6 of the ISO Tariff. | U.S. App. at A619 |
| **APPENDIX B** | **ISO TARIFF APPENDIX B, SCHEDULING COORDINATOR AGREEMENT** | |
| Scheduling Coordinator Agreement | [Preamble] Whereas:<br><br>A. The Scheduling Coordinator has applied for certification by the ISO under the certification procedure referred to in Section 2.2.3 of the ISO Tariff.<br><br>B. The Scheduling Coordinator wishes to schedule Energy and Ancillary Services on the ISO Controlled Grid under the terms and conditions set forth in the ISO Tariff. | U.S. App. at A632 |
| Scheduling Coordinator Agreement | **2. Covenant of the Scheduling Coordinator**<br><br>The Scheduling Coordinator agrees that:<br><br>A. the ISO Tariff governs all aspects of scheduling of Energy and Ancillary Services on the ISO Controlled Grid, including (without limitation), the financial and technical criteria for Scheduling Coordinators bidding, settlement, information reporting requirements and confidentiality restrictions;<br><br>B. it will abide by, and will perform all of the obligations under the ISO Tariff placed on Scheduling Coordinators in respect of all matters set forth therein including, without limitation, all matters relating to the scheduling of Energy and Ancillary Services on the ISO Controlled Grid, ongoing obligations in respect of scheduling, Settlement, system security policy and procedures to be developed by the ISO from time to time, billing and payments, confidentiality and dispute resolution; | U.S. App. at A632-A633 |

| ISO TARIFF | | |
|---|---|---|
| **Citation** | **Tariff Provision** | **Page Citation** |
| | F.its status as a Scheduling Coordinator is at all times subject to the ISO Tariff. | |
| Scheduling Coordinator Agreement | **3. Term and Termination**<br><br>**3.2.** This Agreement shall terminate upon acceptance by FERC of a notice of termination. The ISO Shall timely file any notice of Termination with FERC. | U.S. App. at A633 |
| Scheduling Coordinator Agreement | **8. Agreement to be bound by ISO Tariff**<br><br>The ISO Tariff is incorporated herein and made a part hereof. In the event of a conflict between the terms and conditions of this Agreement and any other terms and conditions set forth in the ISO Tariff, the terms and conditions of the ISO Tariff shall prevail. | U.S. App. at A634 |

| PX TARIFF | | |
|---|---|---|
| **Citation** | **Tariff Provision** | **Page Citation** |
| INTRODUCTORY STATEMENT | **INTRODUCTORY STATEMENT.** The California Power Exchange Corporation . . . is a nonprofit corporation, incorporated under the laws of the state of California, for the primary purpose of providing an efficient, competitive Energy auction open on a non-discriminatory basis to all suppliers and purchasers, that meets the loads of exchange customers at market prices, and for such other purposes as are provided for in its bylaws. This [Tariff] sets forth the specific FERC-jurisdictional services provided by the PX and the terms, conditions and charges for such services. No party will be provided services by the PX which are subject to the jurisdiction of the FERC except on the terms in this Tariff. | U.S. App. at A7 |
| DEFINITIONS AND INTERPRETATIONS, §1.3(f) | **1.3** In this Tariff, unless the context otherwise requires: . . . (f) references to any section of the ISO Tariff shall be deemed to refer to that section and any applicable successor section or provision that the ISO may lawfully make effective from time to time pursuant to applicable FPA and FERC procedures. | U.S. App. at A7-A8 |
| DEFINITIONS AND INTERPRETATIONS, §1.4 | **1.4** In this Tariff, the term "PX Operating Manual" means the compilation of detailed operating procedures, practices and activity rules issued by the PX, as modified from time to time by the PX and posted on the PX's Home Page in accordance with the provisions of the PX Operating Manual. Participation in the PX Markets pursuant to this Tariff shall obligate the PX Participant to conform to all applicable provisions of the PX Operating Manual. | U.S. App. at A8 |
| REQUIREMENTS FOR PARTIES TO PARTICIPATE IN PX MARKETS, § 2.6.2 | **2.6.2 Procedure.**<br><br>(f) The PX Applicant shall become a PX Participant when, following acceptance of its application, it has entered into a participation agreement with the PX and has met the PX creditworthiness requirements set out in Section 2.4. | U.S. App. at A14 |
| RESPONSIBILITIES OF THE PX AND PX PARTICIPANTS, § 3.1 | **3.1 Responsibilities of the PX.**<br><br>The PX shall be the Scheduling Coordinator under the ISO Tariff for those Eligible Customers for which a PX Participant has appointed it to act as the Scheduling Coordinator responsible for their meters or any other Eligible Customers for which the PX is required by tariff, regulation, or law to act as Scheduling Coordinator. The PX shall (1) calculate the prices at which trades in Energy are transacted in the PX Markets, (2) settle trades in Energy between PX Participants, (3) receive Meter Data from the Scheduling | U.S. App. at A15-A16 |

| PX TARIFF | | |
|---|---|---|
| **Citation** | **Tariff Provision** | **Page Citation** |
| | Coordinator Metered Entities represented by the PX Participants in order to allocate to PX Participants costs incurred by the PX under this Tariff and the ISO Tariff in acting as the Scheduling Coordinator and/or in buying or selling Energy to non-PX Scheduling Coordinators, (4) prepare and distribute to PX Participants invoices reflecting the amounts payable and receivable by them in connection with their trading through the PX, and (5) operate the funds transfer system described in this Tariff to facilitate the payment of such invoices. In carrying out its responsibilities under this Tariff, the PX shall at all times exercise due care and shall operate in a non-discriminatory manner. The PX will not be, and shall not be deemed to be, a counterparty to any trade transacted through the PX Markets. | |
| RESPONSIBILITIES OF THE PX AND PX PARTICIPANTS, § 3.8 | **3.8 Market Clearing Price Determination**. For each of the Settlement Periods in the Trading Day, the PX shall create an aggregate Energy Supply curve by combining all Supply Bids and an aggregate Energy Demand curve by combining all Demand Bids. For each Settlement Period, the Market Clearing Price is determined by the point at which the Supply and Demand Curves intersect. The hourly schedule for each Demand, Generation or portfolio is then calculated as the MW bid at the Market Clearing Price on the bid curve. The methodology for determining the Market Clearing Price is set forth in Schedule 3 ("Determination of Market Clearing Price"). | U.S. App. at A21 |
| SETTLEMENTS AND BILLING, § 6.2 | **6.2 Settlements Process.** The PX shall settle with each PX Participant for Energy traded in the PX Markets in the manner set forth in Schedule 6 ("PX Market Settlements"). | U.S. App. at A25 |
| REGULATORY FILINGS, § 13 | **13 REGULATORY FILINGS**. Any amendment or other modification of any provision of this Tariff must be in writing and approved by the PX Governing Board in accordance with the bylaws of the PX. Any such amendment or modification shall be effective upon the date it is permitted to become effective by FERC. Nothing contained herein shall be construed as affecting, in any way, the right of the PX to unilaterally make application to FERC for a change in this Tariff or any rates, term and conditions, charges, classification of service, service agreement, participation agreement, or rate schedule, rule or regulation under Section 205 of the FPA and pursuant to the FERC's rules and regulations promulgated thereunder. Nothing contained in this Tariff or any service or participation agreement shall be construed as affecting, in any way, the ability of any PX Participant receiving service under this Tariff to exercise its rights under Section 206 of the FPA and pursuant to FERC's rules and regulations promulgated thereunder. | U.S. App. at A29-A30 |

| **PX TARIFF** | | |
|---|---|---|
| **Citation** | **Tariff Provision** | **Page Citation** |
| LIABILITY AND INDEMNIFICATION, § 14.3 | **14.3 PX Participant's Indemnity.** Each PX Participant shall, to the extent permitted by law, indemnify the PX and hold it harmless against all losses, damages, claims, liability, costs or expenses (including legal expenses) arising from any act or omission of the PX Participant, except to the extent that they result from the PX's default under this Tariff or negligence or intentional wrongdoing on the part of the PX or of its officers, directors or employees. | U.S. App. at A30-A31 |
| AUDITS, § 15.6 | **15.6 Payments.** Any payment agreed to be made by the PX to PX Participants or by PX Participants to the PX as a result of an audit, or directed by FERC, or disclosed by the PX in reviews of its own books and records shall include interest, from the due date to the date on which such adjustments are due, computed at the rate calculated in accordance with the methodology specified for interest on refunds in FERC's regulations at 18 CFR § 35.19a(2). | U.S. App. at A33 |
| UNCONTROLLABLE FORCES, § 16.1 | **16.1 Consequences of Uncontrollable Force.** An Uncontrollable Force means any act of God, labor disturbance, act of the public enemy, war, insurrection, riot, fire, storm, flood, earthquake, explosion, any curtailment, order, regulation or restriction imposed by governmental, military or lawfully established civilian authorities or any other cause beyond the reasonable control of the PX or a PX Participant which could not be avoided through the exercise of Good Utility Practice. Neither the PX nor a PX Participant will be considered in default of any obligation under this Tariff if prevented from fulfilling that obligation due to the occurrence of an Uncontrollable Force. | U.S. App. at A34 |
| UNCONTROLLABLE FORCES, § 16.2 | **16.2 Duty to Mitigate.** In the event of the occurrence of an Uncontrollable Force, which prevents the PX or a PX Participant from performing any of its obligations under this Tariff, the affected entity shall [give written notice of Uncontrollable Force, not be entitled to suspend performance any longer than is required], use its best efforts to mitigate the effects of such Uncontrollable force, remedy its inability to perform and resume full performance of its obligations hereunder . . . . | U.S. App. at A34 |
| ASSIGNMENT, § 17 | **17 ASSIGNMENT.** Obligations and liabilities under this Tariff and any service or participation agreement relating to this Tariff shall be binding on the successors and assigns of the parties to the service or participation agreement. No assignment of any service or participation agreement shall relieve the original PX Participant from its obligations or liabilities to the PX under this Tariff or any such service or participation agreement arising or accruing due prior to the date of assignment. | U.S. App. at A35 |

| **PX TARIFF** | | |
|---|---|---|
| **Citation** | **Tariff Provision** | **Page Citation** |
| TERM AND TERMINATION, § 18.1 | **18.1 Effective Date.** This Tariff shall become effective on the date it is permitted to become effective by FERC. | U.S. App. at A35 |
| TERM AND TERMINATION, § 18.2 | **18.2 Termination of Tariff.** This Tariff shall terminate upon approval of termination by the PX Governing Board in accordance with the bylaws of the PX and receipt of any necessary regulatory approval from FERC. | U.S. App. at A35 |
| MISCELLANEOUS, § 19.1.3 | **19.1.3 Notice of Changes in Operating Rules and Procedures.** The PX shall give all PX Participants notice of at least thirty (30) days of any changes or proposed changes in the PX Operating Manual, unless (1) a different notice period is specified by state or Federal law or (2) the change is reasonably required to address the PX's operating needs, including emergency conditions, a change in the rules, procedures or practices of the ISO, and any software limitation of the PX, in which case the PX shall give PX Participants as much notice as is reasonably practicable. The PX Operating manual [sic] shall set forth procedures for amending its contents and for consideration of input regarding such amendments from interested PX Participants. | U.S. App. at A36-A37 |
| MISCELLANEOUS, § 19.6 | **19.6 Applicable Law and Forum.**<br><br>This Tariff shall be governed by and construed in accordance with the law of the State of California, except its conflict of laws provisions; provided however, that if a party is a federal entity that party shall be governed by applicable federal law. PX Participants irrevocably consent that any legal action or proceeding arising under or relating to this Tariff to which the PX ADR Procedures do not apply shall be brought either in any court of the State of California, a federal court of the United States of America located in the State of California, or, with respect to federal entities, a federal court of competent jurisdiction**.** PX Participants irrevocably waive any objection that they may have now or in the future to courts located in the State of California, or in the case of a federal entity, such other courts consistent with applicable federal law, as the proper and exclusive forum for any legal action or proceeding arising under or relating to this Tariff. | U.S. App. at A39 |

| PX TARIFF | | |
|---|---|---|
| **Citation** | **Tariff Provision** | **Page Citation** |
| **SCHEDULE 2** | **SCHEDULE 2, PX CLEARINGHOUSE CREDIT POLICIES, BUSINESS PRACTICES AND BANKING** | |
| SCHEDULE 2, § 1.1 | **1.1 Initial Financial Requirements**. Each Core Market Participant must meet each of the following minimum financial requirements in order to become certified to trade in the Core Market:<br><br>• Provide the PX with its latest annual audited financial statements or other equivalent evidence of solvency and creditworthiness;<br><br>• Not be in default of any of its obligations to the PX; and<br><br>• Make a collateral deposit, as described in Section 2 of this Schedule, to cover expected collateral requirements resulting from expected Core Market activities. | U.S. App. at A51 |
| SCHEDULE 2, § 2 | **2. PX Participant Collateral**. Each PX Participant shall post collateral for 100% of its requirements in excess of the unsecured line of credit in order to participate in the CTS and Core Markets. PX Participants are expected to maintain sufficient collateral so that, in most instances, additional daily collateral collections will not be required. If a Core Market PX Participant is also a CTS Participant, then the collateral shall be applied to the aggregate collateral requirement for both the Core and CTS Markets. | U.S. App. at A55 |
| SCHEDULE 2, § 4.1 | **4.1 The Monthly Day-Ahead / Day-Of and Real Time Invoice.** The PX shall prepare and send to each PX Participant an invoice which reflects all payments and charges related to PX services or market involvement for the market and timeframe indicated on the invoice. | U.S. App. at A59 |
| SCHEDULE 2, § 4.3 | **4.3 PX Payment Procedures.** . . . . All PX Participants shall honor their obligations to pay all of the amounts owed to the PX in a timely manner. | U.S. App. at A59 |
| SCHEDULE 2, § 4.3.3 | **4.3.3 Overpayments**. If for any reason a PX Creditor receives on any Payment Date more than the amount to which it is entitled under the PX Tariff, it shall notify the PX within two (2) Business Days from the date of receipt of the funds into its Participant Settlement Account of the overpayment and shall forthwith pay the excess amount into a PX Account specified by the PX. | U.S. App. at A60 |

**PX TARIFF**

| Citation | Tariff Provision | Page Citation |
|---|---|---|
| SCHEDULE 2, § 4.3.4 | **4.3.4. Repayment of Overpayments.** If prior to a PX Creditor notifying the PX of the overpayment pursuant to Section 4.3.3 above, PX receives notice (from the PX Bank or otherwise) of the overpayment, the PX shall within two (2) Business Days notify the recipient of the overpayment. The PX shall be responsible for ascertaining the identity of those Participants entitled to receive amounts overpaid to another PX Participant and for disbursing those funds to the persons entitled to them promptly after they are returned in accordance with Section 4.3.3 above. | U.S. App. at A60 |
| SCHEDULE 2, § 5.2.4 | **5.2.4 Defaults in Excess of PX Participant Collateral and Pool Performance Bond**. Any PX debtor's residual liabilities that are not remedied through the mitigation process described above shall be allocated to each non-defaulting PX Participant according to the proportional charge-back methodology described in 5.2 [sic. 5.3] of this Schedule. For the purpose of calculating the proportional charge-back, one PX Participant defaulting on one payment obligation constitutes a single event of default. | U.S. App. at A63 |
| SCHEDULE 2, § 5.3 | **5.3 PX Core Market Proportional Charge-Back Methodology**. In the event that amounts owed to the PX Participants on a payout date cannot be fully paid due to an insufficiency of funds in the PX clearing accounts, the PX will allocate the shortage to the PX Participants using the proportional charge-back methodology described below. If payments are recovered, they will be remitted to the relevant PX Participants on the same basis using the same ratio as the original charge-back.<br><br><u>Default charge-back to PX CORE MARKET participants shall be assessed using the following methodology:</u><br><br>The PX Participant's outstanding default amount will be charged back to all current PX Participants based upon the percentage of its gross sales in MWhs to the total gross MWhs sales in the Core Market during the three calendar months preceding the event plus the current month-to-date. | U.S. App. at A63 |
| SCHEDULE 2, § 5.5 | **5.5 Identification of Defaulting Participant**. When default charge-backs are allocated to PX Participants under Section 5 of this Schedule, the PX will identify the defaulting Participant to all other affected PX Participants by the most expeditious means available. | U.S. App. at A64 |

**PX TARIFF**

| Citation | Tariff Provision | Page Citation |
| --- | --- | --- |
| SCHEDULE 2, § 6.1 | **6.1 Declaration of Trust**. All PX Accounts established pursuant [sic] this section shall be opened and operated by the PX in trust for the PX Participants. Each such account shall be maintained at a bank or other financial institution residing in the United States. | U.S. App. at A64 |
| SCHEDULE 2, § 6.5 | **6.5 PX Authorization to Operate Bank Accounts.** The PX shall establish and operate the following accounts:<br><br>**1**. ***Clearing Account.*** The account in which all payments from and to PX Participants are made during cash clearing cycles.<br><br>**2**. ***Adjustment Account.*** Where, in the course of the Settlement and Billing process referred to in the PSABP, the PX determines that the Charges calculated as due from PX Debtors are higher or lower than the Payments calculated as due to PX Creditors in relation to the same Trading Day, the PX shall on the Payment Date credit or debit the Adjustment Account and transfer such funds from or to the Clearing Account to balance the Clearing Account to zero. . . .<br><br>In the event that there are accumulated funds standing in credit of the Adjustment Account in excess of an amount to be determined by the PX Governing Board, such excess shall be distributed to PX Participants in a manner to be determined by the PX Governing Board. . . .<br><br>Any amounts paid to the PX in respect of acts or defaults giving rise to default interest, penalties, damages, fines, losses, reimbursement of costs or expenses, or other similar payments by PX Participants, shall be first applied to reimburse the PX the expense, loss or cost the PX has incurred or will incur as a result of such act or default. The excess shall then be credited to the Adjustment Account.<br><br>All amounts standing to the credit or debit of the Adjustment Account shall be held at all times in trust for PX Creditors.<br><br>**3.** ***Suspense Account***. If, in the course of the Settlement and Billing process, the PX determines that the charges or payments referred to in the ISO Settlements file contain insufficient information to settle with PX Participants, the PX will, on the Payment Date, credit or debit the Suspense Account and transfer | U.S. App. at A64-A67 |

| PX TARIFF | | |
|---|---|---|
| **Citation** | **Tariff Provision** | **Page Citation** |
| | such funds from or to the Clearing Account.<br><br>The Suspense Account shall only be used for the credits or debits described above in the event that the amount to be credited, or debited, for one or more charges or payments does not exceed a certain amount, the level of which will be determined by the PX Governing Board from time to time. If such amount exceeds the maximum level, the PX will take further actions with the ISO to obtain the information necessary to settle the charges. If, at some point, the PX Governing Board determines that it is necessary to allocate the payments and charges held in this account, the PX will do so in a manner approved by the PX Governing Board and post notice of the action on its Home Page.<br><br>**4**. ***Liquidity Credit Line***. The proceeds of drawings under this credit line shall primarily be used as a means to temporarily bridge any gap in the cash clearing timeline to PX Creditors and the ISO to the extent funds are available in the PX Liquidity Credit Line. Possible causes for timing gaps in the clearing cycle include but are not limited to the following: defaults, bankruptcies, late payments and system malfunctions. Once all outstanding obligations have been collected, the Liquidity Credit Line shall be promptly paid-off. The cost of funding and operating the PX (net of default interest paid by PX Debtors on Default Amounts advanced from the PX Credit Line) shall be recoverable through the PX Administration Charge.<br><br>**5.** ***Other accounts***. The PX may maintain any other accounts that it deems necessary or convenient. Each such account shall be maintained at a bank or other financial institution selected by the PX in its sole discretion. No PX Participant shall have any beneficial or other right to any funds in any PX accounts except in accordance with this Tariff.<br><br>The PX is authorized to establish and maintain bank accounts and obtain lines of credit and other banking facilities it deems necessary or convenient for the operation of its billing and payment systems. The PX shall keep funds standing to the credit of a PX Participant for the PX market completely separate from funds for the CTS markets. | |

| PX TARIFF | | |
|---|---|---|
| **Citation** | **Tariff Provision** | **Page Citation** |
| **SCHEDULE 3** | **SCHEDULE 3, DETERMINING MARKET CLEARING PRICE** | |
| Schedule 3, Determination of Market Clearing Price | **1.0 Methodology**. On each Trading Day, the PX shall, for each Settlement Period in that Trading Day, create an aggregate Energy Supply curve by combining all Supply Bids and an aggregate Energy Demand curve by combining all Demand Bids.<br><br>**1.1 Identifying the Point of Intersection In Certain Cases**. [T]he point of intersection will be determined by a direct calculation. The initial Market Clearing Price will then be set at the intersection price, so that all PX Sellers, with a portion of their output priced at or below the initial Market Clearing Price will be selected . . ., and all Demand priced at or above the Market Clearing Price will be selected . . . . | U.S. App. at A70 |
| **SCHEDULE 6** | **SCHEDULE 6, PX MARKET SETTLEMENTS** | |
| Schedule 6, PX Market Settlement, § 1 | **1.0 Settlements for Day-Ahead Commitments**.<br><br>**1.1 Energy**. The PX shall settle with each PX Participant for Energy traded in the Day-Ahead Market in each Settlement Period on the basis of the PX Participant's Day-Ahead commitment and the corresponding Day-Ahead Market Clearing Price in the relevant Zone or at the relevant Scheduling Point, as applicable, for that Settlement period, as follows:<br><br>**1.1.1 PX Sellers.** Each PX Seller shall be credited with an amount equal to its scheduled sales of Energy multiplied by the Generation Meter Multiplier in each Settlement Period multiplied by the Day-Ahead Market Clearing Price applicable to the relevant Zone or Scheduling Point for that Settlement Period.<br><br>**1.1.2 PX Buyers.** Each PX Buyer shall be debited by the PX with an amount equal to its scheduled purchase of Energy in each Settlement Period multiplied by the Day-Ahead Market Clearing Price applicable to the relevant Zone or Scheduling Point for that Settlement Period. | U.S. App. at A119 |

| PX TARIFF | | |
|---|---|---|
| **Citation** | **Tariff Provision** | **Page Citation** |
| Schedule 6, PX Market Settlement, § 2 | **2.0 Settlements for Hour-Ahead Commitments.**<br><br>**2.1 Energy**. The PX shall settle with each PX Participant for Energy traded in the Hour-Ahead Market in each Settlement Period on the basis of that PX Participant's purchases or sales and the corresponding Hour-Ahead Market Clearing Price in the relevant Zone for that Settlement Period.<br><br>**2.1.1 PX Sellers.** Each PX Seller that is a Generator shall be credited by the PX with an amount equal to any increase (or shall be debited by the PX an amount equal to any decrease) in its scheduled Generation compared with its scheduled Generation in the Day-Ahead Market multiplied by the Hour-Ahead Market Clearing Price applicable to the relevant Zone or Scheduling Point for that Settlement Period.<br><br>**2.1.2 PX Buyers**. Each PX Buyer that is a Demand shall be debited by the PX with an amount equal to any increase (or shall be credited by the PX with an amount equal to any decrease) in its scheduled Energy compared with its scheduled Energy in the Day-Ahead Market multiplied by the Hour-Ahead Market Clearing Price applicable to the relevant Zone or Scheduling Point for that Settlement Period. | U.S. App. at A120-A121 |
| **APPENDIX A** | **PX PARTICIPATION AGREEMENT** | |
| PX PARTICIPATION AGREEMENT, § I | **I. Definitions**<br><br>A. Terms and expressions used in this Agreement shall have the same meanings as those contained in the Master Definitions Supplement to the PX Tariff.<br><br>B. The "PX Tariff" shall mean the PX FERC Electric Service Tariff as amended from time to time, together with any Schedules, Appendices or attachments thereto. | U.S. App. at A167 |
| PX PARTICIPATION AGREEMENT, § II | **II. Covenant of the PX Participant**<br><br>The PX Participant agrees that: | U.S. App. at A167 |

| PX TARIFF | | |
|---|---|---|
| **Citation** | **Tariff Provision** | **Page Citation** |
| | A. the PX Tariff governs all aspects of trading in and administration of the PX Market, including (without limitation), the financial and technical criteria for PX Participants, bidding, Settlement, information reporting requirements and confidentiality restrictions;<br><br>B. it will abide by, and will perform all of the obligations under the PX Tariff in respect of all matters set forth therein including, without limitation, all matters relating to the trading of Energy by it through the PX Markets, ongoing obligations in respect of bidding, Settlement, security requirements, billing and payments, confidentiality and dispute resolution; and<br><br>C. its status as a PX Participant is at all times subject to the PX Tariff . . . . | |
| PX PARTICIPATION AGREEMENT | **3. Term and Termination**<br><br>This Agreement shall commence on the later of (a) [date of agreement] or (b) the date the PX Participant is certified by the PX as a PX Participant and shall terminate upon acceptance by FERC of the Notice of Termination. The PX shall timely file a Notice of Termination.<br><br>**4. Assignment**<br><br>Either party may assign its obligations under this Agreement with the other party's prior consent, not to be unreasonably withheld.<br><br>**8. Incorporation of Tariff.**<br><br>The PX Tariff is incorporated herein and made a part hereof. In the event of a conflict between the terms and conditions of this Agreement and any other terms and conditions set forth in the PX Tariff, the terms and conditions of the PX Tariff shall prevail.<br><br>**10. Payment Obligations.**<br><br>All obligations to pay amounts or perform obligations due with respect to the PX Tariff and any other | U.S. App. at A168-A169 |

| PX TARIFF | | |
|---|---|---|
| **Citation** | **Tariff Provision** | **Page Citation** |
| | charges, taxes or other expenses related to this Agreement (including, without limitation, expenses pursuant to the Meter Service Agreement) or the PX Participant's trading in the PX Markets generally shall be the sole responsibility of the PX Participant. | |
| **APPENDIX B** | **PX TARIFF APPENDIX B, MASTER DEFINITIONS SUPPLEMENT** | |
| Appendix B, Master Definitions Supplement | **Market Clearing Price.** The price in a market at which supply equals Demand. All Demand prepared to pay at least this price has been satisfied and all supply prepared to operate at or below this price has been purchased. | U.S. App. at A187 |
| Appendix B, Master Definitions Supplement | **Market Participant**. An entity, including a Scheduling Coordinator, who participates in the Energy marketplace through the buying, selling, transmission, or distribution of Energy or Ancillary Services into, out of, or through the ISO Controlled Grid. | U.S. App. at A187 |
| Appendix B, Master Definitions Supplement | **PX Creditor**. Each PX Participant to whom monies are payable pursuant to the terms of the PX Tariff in respect of: (i) the amounts standing to the credit of its account with the PX Reserve Account; or (ii) amounts owing to it by another PX Participant. | U.S. App. at A191 |
| Appendix B, Master Definitions Supplement | **PX Debtor**. Each PX Participant that is required to make a payment to the PX under the PX Tariff. | U.S. App. at A191 |
| Appendix B, Master Definitions Supplement | **PX Participant.** An entity that is authorized to buy or sell Energy or Ancillary Services through the PX, and any agent authorized to act on behalf of such entity. | U.S. App. at A192 |

| PX OPERATING MANUAL / POWER EXCHANGE SETTLEMENT AND BILLING PROCEDURES (PSABP) | | |
|---|---|---|
| **Citation** | **Tariff Provision** | **Page Citation** |
| § 1.2.5, Financial Transactions Involving the ISO | **§1.2.5. Financial Transactions Involving the ISO**<br><br>In this PSABP, three different types of financial transactions involving the ISO have been identified. These are described below.<br><br>(a) For some transactions the ISO (acting as agent for the Market Participants) makes payments to or receives payments from the PX (acting as agent for the PX Participants) and identifies to which Resource ID this payment applies. The PX shall make a Payment to, or require a Charge from, the relevant PX Participant equal to this amount.<br><br>(b) For some transactions the ISO (acting as agent for the Market Participants) makes payments to or receives payments from the PX (acting as agent for the PX Participants) and the PX shall share out the Payment or Charge from the ISO across the PX Participants.<br><br>(c) In the case of the ISO's Payments in respect of the ISO's Monthly Grid Management Payment, the ISO is a principal and the monies paid by the PX are to the ISO's Account.<br><br>In the transaction types identified in PSABP Sections 1.2.5(a) and (b) and above, a payment from the ISO to either the PX or the PX Participants is identified as a Charge on the ISO and a payment from the PX or PX Participants to the ISO is identified as a Payment to the ISO. In each case the ISO's Payment and Charge is with the ISO acting as an Agent for the Market Participants and not as a principal in the transaction. Such transaction types are characterized by the inclusion of the words "the PX and ISO both acting as Agents". | App. at 678-679 |
| § 2.1, PX Accounts | **2.1 PX Accounts**. The following PX Accounts have been established pursuant to the provisions of the PX Tariff (Schedule 7):<br><br>**2.1.1 The PX Clearing Account.** The PX Clearing Account is an account to and from which all payments are made. Details of the PX Clearing Account will appear in the invoices sent by the PX to PX Participants.<br><br>**2.1.2 The PX Reserve Account.** The PX Reserve Account is an account from which any debit | App. at 686 |

| PX OPERATING MANUAL / POWER EXCHANGE SETTLEMENT AND BILLING PROCEDURES (PSABP) | | |
|---|---|---|
| **Citation** | **Tariff Provision** | **Page Citation** |
| | balances on the PX Clearing Account are settled in accordance with the PX Tariff.<br><br>(a) The proceeds of drawings under any line of credit or other banking facility of the PX Reserve Account shall be held in trust for PX Creditors;<br><br>(b) If the Reserve Account is replenished as provided for in PSABP Section 5.9, any credits shall be held in trust for all PX Creditors.<br><br>**2.1.3 The PX Adjustment Account.** The PX Adjustment Account is used for the purposes described in PSABP Section 2.2.<br><br>**2.1.4 The PX Suspense Account**. The PX Suspense Account is used for the purposes described in PSABP Section 2.4. | |
| § 5.2, Resolution of Disputes Relating to Preliminary Settlement Statements | **5.2 Resolution of Disputes Relating to Preliminary Settlement Statements**<br><br>**5.2.1 Notice of Dispute.** If a PX Participant disputes any item or calculation set forth in the Preliminary Settlement Statement it received, it shall provide the PX with a notice of dispute in accordance with the provisions of the PX Tariff, Payments Calendar and the [Communications Procedures].<br><br>The notice of dispute shall state clearly the Trading Day, the issue date of the Preliminary Settlement Statement, the item disputed, the reasons for the dispute, the proposed amendment (if appropriate) and shall be accompanied by all available evidence reasonably required to support the claim.<br><br>If the PX agrees with the proposed amendment, it will incorporate the relevant data into the Final Settlement Statement.<br><br>If the PX does not agree with the proposed amendment or if it requires additional information, it will use its reasonable endeavors (depending on how early the PX Participant sent the notice of dispute and the complexity of the issue involved) to contact the relevant PX Participant to resolve the issue before issuing the Final Settlement Statement. If this is not possible, the PX will issue the Final Settlement Statement taking into account the dispute.<br><br>**5.2.2 Resolution of Dispute.** When the dispute has been resolved, the PX will recalculate the amounts | App. at 696-697 |

| PX OPERATING MANUAL / POWER EXCHANGE SETTLEMENT AND BILLING PROCEDURES (PSABP) | | |
|---|---|---|
| **Citation** | **Tariff Provision** | **Page Citation** |
| | payable and receivable and show any required adjustments as a debit or credit in the next Settlement Statement for all affected PX Participants.<br><br>Each PX Participant which receives a Final Settlement Statement shall pay any net debit and shall be entitled to receive any net credit shown in the Final Settlement Statement on the Payment Date, whether or not there is any dispute regarding the amount of the debit or credit. The dispute resolution provisions of Section 12 of the PX Tariff shall apply to the disputed amount. | |
| § 5.3, Settlement Statement Re-runs | **5.3 Settlement Statement Re-runs**<br><br>**5.3.1 PX Participant Requests a Settlement Re-Run.** If a PX Participant, after having made reasonable efforts to resolve with the PX any dispute relating to a Preliminary Settlement Statement pursuant to this PSABP requires a Settlement Statement re-run, it shall send at any time to the PX Governing Board a notice in writing and also notify the PX according to the requirements of the [Communications Procedures]. The PX Governing Board will, in considering whether to approve a request for a Settlement Statement re-run, determine in its reasonable discretion, whether there is good cause to justify the performance of a Settlement Statement re-run.<br><br>**5.3.4 Modification to Settlement Results**. Where a Settlement Statement re-run indicates that the accounts of PX Participants should be debited or credited to reflect alterations to Settlements previously made under the PX Tariff, for those PX Participants affected by the Settlement Statement re-run, the PX will reflect the amounts to be debited or credited in the next Preliminary Settlement Statements that it issues following the Settlement Statement re-run to which this PSABP Section 5.3.4 applies. The net balance of all adjustments will go into the PX Adjustment Account.<br><br>**5.3.5 Additional Settlement Statements.** The PX may, at its discretion, issue additional Settlement Statements for additional charges or payments given to the PX subsequent to the issuance of a Preliminary Settlement Statement for a Trading Day. Such additional Settlement Statements will be subject to the confirmation, validation and dispute resolution procedures applicable to Preliminary Settlement Statements. | App. at 697-698 |
| § 5.4, Invoices | **5.41 Content of Invoice.** Each Invoice issued to a PX Participant will be a financial summary of the Final Settlement Statements for the Trading Period to which the invoice relates . . . . | App. at 698-699 |

| PX OPERATING MANUAL / POWER EXCHANGE SETTLEMENT AND BILLING PROCEDURES (PSABP) | | |
|---|---|---|
| **Citation** | **Tariff Provision** | **Page Citation** |
| | **5.42 Payment of Invoices.** The PX will provide on the day specified in the PX Payments Calendar together with the Final Statement, an invoice in the format set out in PSABP Appendix 4 showing:<br><br>(a) amounts which according to the Final Statements are to be paid by or to each PX Participant;<br><br>(b) the Payment Date, being the date on which such amounts are to b paid by the PX Participant (if any) and the time for such payment;<br><br>(c) the date on which the PX is going to make payments (if any) to that PX Participant in respect of that invoice . . . . | |
| § 5.7, Payment Default | **5.7 Payment Default.** The PX will calculate the amounts available for distribution to PX Creditors (and the ISO if applicable) not later than the end of the day two (2) Business Days after the Payment Date and will instruct the PX Bank to remit via the Fed-Wire System from the PX Clearing Account to the relevant PX Creditor's Settlement Accounts the aggregate of amounts determined by the PX to be available for payment to PX Creditors. If the PX ascertains that all or any part of any amount due to be remitted by a PX Participant to the PX Clearing Account has not be [sic] remitted and there are insufficient funds held in trust for the creditors of the relevant PX Participant at the relevant prepayment account [sic] ("the Default Amount") the PX will take the following actions to enable the PX Clearing Account to clear.<br><br>**5.7.1 Enforcement of defaulting PX Debtor's Security**. Subject to PSABP Section 5.8, the PX will make reasonable endeavors to enforce the defaulting PX Debtor's Security to the extent necessary to pay the Default Amount. If it is not practicable to obtain clear [sic] funds in time to effect payment to the ISO (if applicable) and the PX Creditors of that Training [sic] Period, the PX will proceed in accordance with PSABP Section 5.7.2 or 5.7.3 as applicable.<br><br>**5.7.2 Use of PX Reserve Account**. The PX Reserve Account will be used to advance Default Amounts to PX Creditors and the ISO to the extent funds are available in the PX Reserve Account and in accordance with guidelines approved by the PX Governing Board from time to time. The PX's cost of funding and operating the PX Reserve Account (net of interest earned on cash balances on the PX Reserve Account and default interest paid by PX Debtors on Default Amounts advanced from the PX Reserve Account) will be recoverable through the PX Administration Charge. | App. at 700-702 |

| PX OPERATING MANUAL / POWER EXCHANGE SETTLEMENT AND BILLING PROCEDURES (PSABP) | | |
|---|---|---|
| **Citation** | **Tariff Provision** | **Page Citation** |
| | **5.7.3 Reduction of Payments to PX Creditors**. The PX may, but is not obligated to, request drawings under its lines of credit to fund the PX Reserve Account to advance a Default Amount to PX Creditors. If there are insufficient funds standing to the credit of the PX Reserve Account (including the proceeds of drawings under banking facilities described in PSABP Section 2.1.2(a)), and the proceeds of enforcement of the defaulting PX Participant's Security are insufficient to cover the Default Amount, the PX will reduce payments of PX Creditors on that Payment Date pursuant to PX Tariff Schedule 6 to fund any shortfall which arises as a result of payment default by a PX Participant. The PX will account for such reduction in the PX ledger accounts as amounts due and owing by the defaulting PX Debtor to each PX Creditor whose payment was so reduced. | |

FILED
LOS ANGELES SUPERIOR COURT
DEC 04 2007
JOHN A. CLARKE, CLERK
BY MARIA FRANCES LOPEZ, DEPUTY

**ELECTRIC REFUND CASES - JCCP 4512**

Following a hearing on November 30, 2007, at which time the demurrers were taken under submission, the rulings below are now made:

The court takes judicial notice of the documents as requested.

Demurrer to the first cause of action (breach of contract) is overruled with 20 days to answer. A) As to the statute of limitations, the doctrine of equitable tolling is properly pled. This raises factual issues which cannot properly be decided on demurrer. B) The breach of contract cause of action is proper under Bonneville Power Admin. v. FERC (9th Cir. 2005) 422 F. 3d 908, and under the contracts themselves which state that they are subject of FERC's authority.

Demurrer to the second cause of action (anticipatory breach) is also overruled with 20 days to answer. The cause of action is properly pled and, again, raises factual issues which cannot properly be decided on demurrer.

Demurrer to the third cause of action (unjust enrichment) is sustained without leave to amend except as to P G & E. This cause of action is not recognized under the Government Code pursuant to Government Code, Section 815. As to P G & E however immunity was waived in the Bankruptcy proceeding.

Demurrer to the fourth cause of action (money had and received) is overruled with 20 days to answer based upon the case of Utility Audit Co. v. City of Los Angeles (2003) 112 CA 4th 950.

Demurrers to causes of action 5 through 9 are overruled with 20 days to answer.

Demurrer as to EOB is sustained without leave to amend. Under CCP Section 1060, declaratory relief requires an actual controversy and here defendants had no legal obligations to the EOB, so EOB has no standing to sue. This ruling without prejudice to a motion to intervene.

Demurrer as to AEPCO is sustained without leave to amend for failure to exhaust administrative remedies. This ruling is without prejudice.

As to defendants Burbank and Turlock, the complaint adequately alleges an implied-in-fact contract. The demurrer is overruled with 20 days to answer.

Dated: December 4, 2007

Wendell Mortimer, Jr.
Judge, Los Angeles Superior Court
CCW, Dept. 307

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DATE: 01/03/08 DEPT. 307

HONORABLE Wendell Mortimer, Jr. JUDGE | M.F. LOPEZ DEPUTY CLERK

HONORABLE JUDGE PRO TEM | ELECTRONIC RECORDING MONITOR

#2

R. SANCHEZ, C.A. Deputy Sheriff | NONE Reporter

8:00 am JCCP4512

Coordination Proceeding Special Title Rule (1550(B))

ELECTRIC REFUND CASES

Plaintiff Counsel

Defendant Counsel

(NO APPEARANCES)

RECEIVED JAN 0 7 2008 BY:

NATURE OF PROCEEDINGS:

ORDER

A motion to clarify language in this Court's minute order entered on December 4, 2007 has been made and is scheduled for hearing on January 15, 2008.

This Court will hereby modify the language of the minute order to reflect the intended ruling. Since this was a ruling on a demurrer, the word "proper" means "properly pled". This Court did not make any determination on the factual merits.

With the above clarification, the January 15, 2008 hearing will be taken off calendar.

Counsel Dennis M.P. Ehling is to give notice.

CLERK'S CERTIFICATE OF MAILING/
NOTICE OF ENTRY OF ORDER

I, the below named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served Notice of Entry of the above minute order of 1/03/08 upon each party or counsel named below by depositing in the United States mail at the courthouse in Los Angeles, California, one copy of the original entered herein in a separate sealed envelope for each, addressed as shown below with the postage



MINUTES ENTERED
01/03/08
COUNTY CLERK

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | | | |
|---|---|---|---|
| DATE: 01/03/08 | | | DEPT. 307 |
| HONORABLE Wendell Mortimer, Jr. | JUDGE | M.F. LOPEZ | DEPUTY CLERK |
| HONORABLE | JUDGE PRO TEM | | ELECTRONIC RECORDING MONITOR |
| #2 R. SANCHEZ, C.A. | Deputy Sheriff | NONE | Reporter |

| | | | |
|---|---|---|---|
| 8:00 am | JCCP4512<br>Coordination Proceeding Special Title Rule (1550(B))<br>ELECTRIC REFUND CASES | Plaintiff Counsel<br>Defendant Counsel | (NO APPEARANCES) |

NATURE OF PROCEEDINGS:

thereon fully prepaid.

Date: January 03, 2008

John A. Clarke, Executive Officer/Clerk

By: ____________________
M.F. LOPEZ

Lawrence P. Riff
Jay E. Smith
STEPTOE & JOHNSON
633 West Fifth Street
Suite 700
Los Angeles, CA 90071

Benjamin L. Webster
PILLSBURY WINTHROP SHAW
400 Capitol Mall
Suite 1700
Sacramento, CA 95814-4419

Laura Lindgren
Robert W. Mockler
HENNIGAN BENNET & DORMAN
865 S. Figueroa St
Suite 2900
Los Angeles, CA 90017

Robert D. Rosenberg
SLOVER & LOFTUS
1224 Seventeenth St. N.W.
Washington, D.C. 20036

Dennis M.P. Ehling
KIRKPATRICK & LOCKHART
10100 Santa Monica Blvd
Seventh Floor
Los Angeles, CA 90067

Barry F. McCarthy
McCARTHY & BERLIN, LLP
100 Park Center Plaza
Suite 501
San Jose, CA 95113



MINUTES ENTERED
01/03/08
COUNTY CLERK

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | | | |
|---|---|---|---|
| DATE: 01/03/08 | | | DEPT. 307 |
| HONORABLE Wendell Mortimer, Jr. | JUDGE | M.F. LOPEZ | DEPUTY CLERK |
| HONORABLE | JUDGE PRO TEM | | ELECTRONIC RECORDING MONITOR |
| #2 R. SANCHEZ, C.A. | Deputy Sheriff | NONE | Reporter |

| | | | |
|---|---|---|---|
| 8:00 am | JCCP4512<br><br>Coordination Proceeding Special Title Rule (1550(B))<br><br>ELECTRIC REFUND CASES | Plaintiff Counsel<br><br>Defendant Counsel | (NO APPEARANCES) |

NATURE OF PROCEEDINGS:

Margaret E. McNaul
Bonnie S. Blair
THOMPSON COBURN LLP
1909 K Street, N.W.
Suite 600
Washington, D.C. 20006

Stephen G. Schrey
NIXON PEADODY LLP
One Embarcadero Center
18th Floor
San Francisco, CA 94111

Terry B. Stevenson
(Senior Asst City Atty)
CITY OF BURBANK
275 East Olive Avenue
P.O. Box 6459
Burbank, CA 91510-6459

Moses W. Johnson IV
OFFICE OF THE CITY ATTY
200 S. Anaheim Blvd, #356
Anaheim, CA 92805

Peter J. Scanlon
DUNCAN, WEINBERG, GENZER
Suite 800
1615 M St., N.W.
Washington, DC 20036

Robert C. McDiarmid
SPIEGEL & McDIARMID LLP
1333 New Hampshire Avenue, NW
Washington, DC 20036

Kalia C. Petmecky
AKIN, GUMP, STRAUSS, HAUER
2029 Century Park East
Suite 2400
Los Angeles, CA 90067

Geoffrey Spellberg
MEYERS NAVE RIBACK
575 Market Street
Suite 2600
San Francisco, CA 94105

Harvey L. Reiter
STINSON MORRISON HECKER LLP
1150 18th Street, N.W.
Suite 800
Washington, D.C. 20036

Sean M. Neal
DUNCAN, WEINBERG, GENZER
Suite 1410
915 L Street



MINUTES ENTERED
01/03/08
COUNTY CLERK

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DATE: 01/03/08 DEPT. 307

HONORABLE Wendell Mortimer, Jr. JUDGE | M.F. LOPEZ DEPUTY CLERK

HONORABLE- JUDGE PRO TEM | ELECTRONIC RECORDING MONITOR

#2

R. SANCHEZ, C.A. Deputy Sheriff | NONE Reporter

8:00 am JCCP4512

Coordination Proceeding Special Title Rule (1550(B))

ELECTRIC REFUND CASES

Plaintiff Counsel

Defendant Counsel

(NO APPEARANCES)

NATURE OF PROCEEDINGS:

Sacramento, CA 95814

Robert M. Bruning
Brand Cooper
COOPER & BRUNING LLP
600 South Lake
Suite 402
Pasadena, CA 91106

Leon Bass, Jr.
SOUTHERN CALIFORNIA EDISON
2244 Walnut Grove Avenue
Rosemead, CA 91770

Marie L. Fiala
Russell P. Cohen
HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA 94104

Jon R. Stickman
DUNCAN & ALLEN
1575 I Street, N.W.,
Suite 300
Washington, D.C. 20005

Peggy J. Williams
Stan Berman
HELLER EHRMAN LLP
701 Fifth Avenue
Suite 6100
Seattle, WA 98104-7098



MINUTES ENTERED
01/03/08
COUNTY CLERK

STATE OF MINNESOTA

COUNTY OF RAMSEY

DISTRICT COURT

SECOND JUDICIAL DISTRICT

Case Type: Contract
[Bjorkman]

Alliant Energy; Aquila Power;
Basin Electric Power Cooperative;
British Columbia Hydropower Exchange;
Citizens Power Sales LLC;
Dairyland Power Cooperative;
Gen-Sys Energy; Great River Energy;
Kansas City Power & Light Company;
Lincoln Electric System;
Manitoba Hydro Electric Board;
Mid American Energy Company;
Minnesota Municipal Power Agency;
Minnesota Power; Minnkota Power
Cooperative; Northern States Power
Company; Omaha Public Power District;
Otter Tail Power Company; Rainbow
Energy Marketing; Southern Minnesota
Municipal Power Agency; St Joseph Light
& Power; Sunflower Electric Power Corp.;
Tenaska Power Services Co.;
Utilicorp United Inc.; and Wisconsin Public
Power Inc.,

Plaintiffs,

United States of America, Department of
Energy, Western Area Power Administration

Applicant for Intervention,

v.

Nebraska Public Power District, a public
corporation and political subdivision of the
State of Nebraska,

Defendant.

Case No. 62-C5-00-004626

**NOTICE OF INTERVENTION AS A PLAINTIFF**

The United States of America, Department of Energy, Western Area Power Administration, ("Western") by its undersigned attorneys, pursuant to Minnesota Rules of Civil Procedure Rule 24.01, 24.02 and 24.03 hereby gives Notice of Intervention as a Plaintiff in this action. As grounds for the United States's intervention in this cause of action, and as more fully discussed in the accompanying Complaint, the United States states as follows:

1. Western is an interested party in Case No. 62-C5-00-004626 and, along with the other plaintiffs, is entitled to a refund from Defendant.

2. Western is entitled to a refund in the amount of $238,756.64 because Defendant breached its contractual obligation to the United States under the Mid-Continent Area Power Pool Restated Agreement, as amended through December 7, 1999.

3. The United States' interests in this action are not adequately represented by existing parties.

4. The Amended Complaint was filed on July 12, 2000. The United States' intervention as a party-plaintiff herein is timely and will not unduly delay or prejudice the adjudication of the issues, but, rather, will clarify the issues in this action and assist the Court in reaching a fair, just and informed resolution of the issues.

5. In accordance with Minnesota Rules of Civil Procedure Rule 24.03, in the absence of objection by an existing party to this action within thirty days after service of this Notice of Intervention, the intervention shall be deemed to be accomplished.

Respectfully submitted,

Dated: August 18, 2000

B. TODD JONES

United States Attorney

JOAN D. HUMES (#214462)
Assistant United States Attorney
600 US Courthouse
300 South 4th Street
Minneapolis, MN 55415
(612) 664-5600

DAVID W. OGDEN
Assistant Attorney General

DENNIS G. LINDER (202) 514-3314
Director Federal Programs Branch

C. MAX VASSANELLI
Senior Trail Attorney
Civil Division
United States Department of Justice
901 E Street, N. W., Room 804
Washington, D.C. 20530-0001
(202) 514-4776

THIS PAGE INTENTIONALLY BLANK

THIS PAGE INTENTIONALLY BLANK

ORIGINAL

Nos. 01-56879, 01-56993,
01-57020 (CONSOLIDATED)

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

SOUTHERN CALIFORNIA EDISON COMPANY,
*Plaintiff and Appellee,*

v.

LORETTA M. LYNCH, HENRY M. DUQUE, RICHARD A. BIL[illegible]
CARL W. WOOD, AND GEOFFREY F. BROWN,
IN THEIR OFFICIAL CAPACITIES AS COMMISSIONERS
OF THE CALIFORNIA PUBLIC UTILITIES COMMISSION, AND THE CALIFORNIA
PUBLIC UTILITIES COMMISSION,
*Defe[illegible]dants and Ap[illegible]ellees.*

RECEIVED
CATHY A. CATTERSON, CLERK
U.S. COURT OF APPEALS
FEB 05 2002
FILED
DOCKETED

RELIANT ENERGY SERVICES, [illegible] M[illegible]ANT A[illegible]ERICAS ENERGY MARKETING, LP,
AND CALIFORNIA MANUFACTURERS AND TECHNOLOGY ASSOCIATION,
*Applicants in Intervention and Appellants.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
HONORABLE RONALD S.W. LEW, JUDGE
CASE NO. 00-12056-RSWL (MCX)

# BRIEF OF APPELLEE SOUTHERN CALIFORNIA EDISON COMPANY

Stephen Pickett, Esq. (SBN 97807)
Barbara Reeves, Esq. (SBN 58100)
Kris G. Vyas, Esq. (SBN 162871)
Southern California Edison Company
2244 Walnut Grove Avenue
Rosemead, California 91770
Telephone: (626) 302-1903
Facsimile: (626) 320-2783

Ronald L. Olson, Esq. (SBN 44597)
John W. Spiegel, Esq. (SBN 78935)
Henry Weissmann, Esq. (SBN 132418)
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, Suite 3500
Los Angeles, California 90071
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

Attorneys for Plaintiff and Appellee
SOUTHERN CALIFORNIA EDISON COMPANY

[798513.1]

Nos. 01-56879, 01-56993,
01-57020 (CONSOLIDATED)

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

SOUTHERN CALIFORNIA EDISON COMPANY,
*Plaintiff and Appellee,*

v.

LORETTA M. LYNCH, HENRY M. DUQUE, RICHARD A. BILAS,
CARL W. WOOD, AND GEOFFREY F. BROWN,
IN THEIR OFFICIAL CAPACITIES AS COMMISSIONERS
OF THE CALIFORNIA PUBLIC UTILITIES COMMISSION, AND THE CALIFORNIA
PUBLIC UTILITIES COMMISSION,
*Defendants and Appellees.*

RELIANT ENERGY SERVICES, INC., AND MIRANT AMERICAS ENERGY MARKETING, LP,
AND CALIFORNIA MANUFACTURERS AND TECHNOLOGY ASSOCIATION,
*Applicants in Intervention and Appellants.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
HONORABLE RONALD S.W. LEW, JUDGE
CASE NO. 00-12056-RSWL (MCX)

**BRIEF OF APPELLEE SOUTHERN CALIFORNIA EDISON COMPANY**

Stephen Pickett, Esq. (SBN 97807)
Barbara Reeves, Esq. (SBN 58100)
Kris G. Vyas, Esq. (SBN 162871)
Southern California Edison Company
2244 Walnut Grove Avenue
Rosemead, California 91770
Telephone: (626) 302-1903
Facsimile: (626) 320-2783

Ronald L. Olson, Esq. (SBN 44597)
John W. Spiegel, Esq. (SBN 78935)
Henry Weissmann, Esq. (SBN 132418)
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, Suite 3500
Los Angeles, California 90071
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

Attorneys for Plaintiff and Appellee
SOUTHERN CALIFORNIA EDISON COMPANY

[798513.1]

## TABLE OF CONTENTS

Page


INTRODUCTION .......... 1

JURISDICTIONAL STATEMENT .......... 5

STATEMENT OF THE CASE .......... 5

STATEMENT OF FACTS .......... 5

I. THE REFUND PROCEEDINGS AT FERC .......... 5

II. THE SCE-CPUC SETTLEMENT AGREEMENT .......... 9

III. RELIANT'S AND CMTA'S LAST-MINUTE MOTIONS TO INTERVENE .......... 11

SUMMARY OF ARGUMENT .......... 12

STANDARD OF REVIEW .......... 14

ARGUMENT .......... 15

I. THE DISTRICT COURT DID NOT ERR IN DENYING RELIANT'S AND CMTA'S LAST-MINUTE INTERVENTION MOTIONS .......... 15

A. The District Court Properly Denied Reliant's And CMTA's Motions To Intervene As Of Right .......... 15

1. Reliant And CMTA Cannot Show A Legally Protectible Interest In The Lawsuit, Much Less One That Will Be Impaired By Its Outcome .......... 16

2. Reliant And CMTA Were Untimely In Seeking To Intervene .......... 18

3. CMTA Fails To Demonstrate That The Parties To The Lawsuit Inadequately Protect Its Interests .......... 21

B. The District Court Did Not Abuse Its Discretion In Denying Reliant's And CMTA's Motions To Intervene Permissively .......... 21

1. Neither Reliant Nor CMTA Has An Independent Basis For Jurisdiction .......... 22

2. Reliant's And CMTA's Applications To Intervene Were Untimely .......... 23

**TABLE OF CONTENTS**
**(continued)**

**Page**

3. There Is No Common Question Of Law Or Fact Between Reliant's Claims And The Underlying Action ........ 24

C. Reliant Lacks Article III Standing To Intervene In The District Court Proceedings ........ 26

D. Reliant And CMTA Lack Independent Standing To Appeal From The Stipulated Judgment ........ 28

II. RELIANT AND CMTA PROVIDE NO BASIS FOR OVERTURNING THE STIPULATED JUDGMENT ........ 30

A. Neither The Pre-Settlement Provision Nor The Litigation Cooperation Provision Intrudes On FERC's Jurisdiction ........ 31

B. The Federal Power Act Does Not Preempt The Pre-Settlement And Litigation Cooperation Provisions ........ 34

C. Reliant's and CMTA's Incorporated TURN Arguments For Overturning The Stipulated Judgment Have No Merit ........ 39

CONCLUSION ........ 40

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alaniz v. Tillie Lewis Foods*,
572 F.2d 657 (9th Cir. 1978) .................... 20

*Bank of America v. M/V Executive*,
797 F.2d 772 (9th Cir. 1986) .................... 29, 30

*Beckman Industries, Inc. v. International Insurance Co.*,
966 F.2d 470 (9th Cir. 1992) .................... 22

*Deus v. Allstate Ins. Co.*,
15 F.3d 506 (5th Cir. 1994). .................... 24

*Donnelly v. Glickman*,
159 F.3d 405 (9th Cir. 1998) .................... *passim*

*Duke Energy Trading & Marketing Co. v. Davis*,
267 F.3d 1042 (9th Cir. 2001) .................... 36

*Employee Staffing Servs., Inc. v. Aubry*,
20 F.3d 1038 (9th Cir. 1994) .................... 14

*Idaho Farm Bureau Fed'n v. Babbitt*,
58 F.3d 1392 (9th Cir. 1995). .................... 26

*In re California Power Exchange Corp.*,
245 F.3d 1110 (9th Cir. 2001) .................... *passim*

*League of United Latin American Citizens v. Wilson*,
131 F.3d 1297 (9th Cir. 1997) .................... *passim*

*Marino v. Ortiz*,
484 U.S. 301(1988).................... 29

*Mississippi Power & Light Co. v. Mississippi ex rel. Moore*,
487 U.S. 354 (1988),.................... 35

*Nantahala Power & Light Co. v. Thornburg*,
476 U.S. 953 (1986).................... 36

*Northwest Forest Resource Council v. Glickman*,
82 F.3d 825 (9th Cir. 1996) .................... 15, 16

*Pansy v. Borough of Stroudsburg*,
23 F.3d 772 (3d Cir. 1994) .................... 28

*Pike County Light & Power Co. v. Pennsylvania Public Util. Comm'n*,
77 Pa. Commw. 268, 465 A.2d 735 (1983).................... 36

*Public Serv. Co. of N.H. v. Patch*,
136 F.3d 197 (1st Cir. 1998).................... 18

*Safety-Kleen, Inc. v. Wyche*,
274 F.3d 846 (4th Cir. 2001) .................... 25

*Smith v. Marsh*,
194 F.3d 1045 (9th Cir. 1999) .................... 15, 19, 20

## TABLE OF AUTHORITIES
**(continued)**

**Page(s)**

*Southwest Center for Biological Diversity v. Berg*,
268 F.3d 810 (9th Cir. 2001) .......... 27

*Valley Forge Christian College v. Americans United for Separation of Church & State*,
454 U.S. 464 (1982) .......... 26

*Westlands Water District v. United States*,
700 F.2d 561 (9th Cir. 1983) .......... 18

**STATUTES**

16 U.S.C. § 824e(a) .......... 7, 34

28 U.S.C. § 1331 .......... 5

28 U.S.C. § 1337 .......... 5

28 U.S.C. § 1343 .......... 5

28 U.S.C. § 1367 .......... 22

**OTHER AUTHORITIES**

*San Diego Gas & Elec. Co.*,
92 FERC ¶ 61,172, 2000 FERC LEXIS 1711 (Aug. 23, 2000) .......... 7, 9

*San Diego Gas & Elec. Co.*, 93
FERC ¶ 61,121, 2000 FERC LEXIS 2168 (Nov. 1, 2000) .......... 8

*San Diego Gas & Elec. Co.*,
95 FERC ¶ 61,418, 2001 FERC LEXIS 1440 (June 19, 2001) .......... 9, 34

*San Diego Gas & Elec. Co.*,
96 FERC ¶ 61,120, 2001 FERC LEXIS 1810 (July 25, 2001) .......... 9

*San Diego Gas & Elec. Co.*,
97 FERC ¶ 61,275, 2001 FERC LEXIS 3018 (Dec. 19, 2001) .......... 9

# INTRODUCTION

Appellants Reliant Energy Services and Mirant America Energy Marketing, LP (jointly "Reliant") and California Manufacturers and Technology Association ("CMTA") are Johnnies-come-lately to Southern California Edison Company's ("SCE") lawsuit against the Commissioners of the California Public Utilities Commission ("CPUC"). Although they knew about this litigation from the outset, Reliant and CMTA did not seek to intervene until SCE and the CPUC asked the District Court to approve a consensual resolution of their dispute. Reliant and CMTA say that only then – a year after the lawsuit was filed and months after the parties had asked the District Court to stay proceedings to allow for a possible out-of-Court resolution – did they have the epiphany that SCE and the CPUC were not litigating the suit with an eye only toward advancing Reliant's and CMTA's interests.

The District Court correctly denied Reliant's and CMTA's long-delayed and meritless requests to intervene. Fundamentally, neither Reliant nor CMTA has a protectible interest that SCE's lawsuit against the CPUC could impair – the *sine qua non* of intervention as a matter of right under Federal Rule of Civil Procedure 24(a). The lawsuit concerns Reliant's "interests" no more than the interests of any other entity that claims to be a creditor of SCE, and CMTA's "interests" no more than any of SCE's 4.3 million retail customers. The only difference between the

former and the latter groups – illustrated by Reliant's and CMTA's divergent views on the merits of SCE's federal law claims – is that claimed creditors want SCE to recover as much money as possible while so-called "ratepayer advocates" want SCE to recover as little as possible. If Reliant and CMTA have a "right" to intervene, then so too does every SCE creditor and retail customer. Reliant's and CMTA's asserted "interests" are far too general to justify intervention as a matter of right.

The District Court's decision under Rule 24(a) also was correct because Reliant and CMTA have no good excuse for waiting until the eve of judgment before seeking to become parties. CMTA's application to intervene as of right was also improper given that an existing party, The Utility Reform Network ("TURN"), has made all the arguments that CMTA claims it wants to make and is pursuing the same result, namely, to prevent SCE from rebuilding its financial health by recovering from its customers the costs of power they have consumed.

Many of the same factors support the District Court's highly discretionary decision to deny permissive intervention under Rule 24(b). In particular, Reliant's and CMTA's unexcused tardiness in moving to intervene weighs heavily against their requests for discretionary intervention. Moreover, neither entity identified an independent jurisdictional ground supporting their intervention request. As the District Court explained, Reliant's and CMTA's objections to the settlement

centered on "concerns about the purported vagueness of the terms of the settlement agreement and concerns about its implementation." Reliant ER 258. The District Court correctly found their "concerns" in this regard unwarranted. Finally, Reliant failed to establish the requisite legal and factual nexus between the claims it wants to litigate – namely, "when, how, or even if Reliant, Mirant, or other creditors would be paid" by SCE, Reliant Br. at 12 – and the lawsuit that SCE actually was litigating against the CPUC. Rule 24(b) is "not intended to allow the creation of whole new lawsuits by the intervenors." *Donnelly v. Glickman*, 159 F.3d 405, 412 (9th Cir. 1998).

The decision to deny Reliant intervention also should be affirmed because Reliant lacked Article III standing to participate in the District Court proceedings. Reliant's alleged "injury" (unsupported by evidence) is that SCE owes it money for past sales. Reliant cannot establish Article III standing based on that injury because it cannot show (a) that there is a causal connection between the entry of the stipulated judgment and the alleged nonpayment or (b) that overturning the stipulated judgment will lead to repayment of the money Reliant says it is owed.

Affirming the District Court's intervention rulings obviates consideration of Reliant's and CMTA's arguments on the merits of entering the stipulated judgment. Reliant's and CMTA's failure to provide a substantial basis for

overturning the stipulated judgment, however, underscores the propriety of the District Court's denial of their intervention motions.

CMTA's merits arguments are entirely duplicative of TURN's. Arguing only for itself, Reliant insists that the settlement agreement purports to transfer regulatory control over the wholesale power market from the Federal Energy Regulatory Commission ("FERC") to the CPUC. The agreement does nothing of the kind. SCE and the CPUC are complainants in pending litigation before FERC to obtain refunds from wholesalers (like Reliant) who were found by FERC to have charged "unjust and unreasonable" prices selling power to the California Power Exchange ("Cal PX"). The provisions that Reliant attacks deal only with the extent of litigation cooperation between SCE and the CPUC *before* FERC takes any action to establish a rate. Specifically, the provisions require only that SCE "consider in good faith" the CPUC's views about litigation strategy and that it obtain the CPUC's approval before making its otherwise unilateral and entirely voluntary decision to *settle* a refund claim. This type of cooperation is entirely unobjectionable between co-parties with aligned interests in the FERC refund proceedings. The provisions do not tread on FERC's jurisdiction – something *FERC itself* expressly recognized by soliciting the CPUC's participation in efforts to settle those refund claims.

## JURISDICTIONAL STATEMENT

The District Court's jurisdiction was based on 28 U.S.C. §§ 1331, 1337, and 1343. SCE agrees with Reliant and CMTA's statement of appellate jurisdiction.

## STATEMENT OF THE CASE

Reliant and CMTA appeal both from the District Court's denial of their motions to intervene and from the District Court's entry of a stipulated judgment between SCE and the CPUC.

## STATEMENT OF FACTS

### I. THE REFUND PROCEEDINGS AT FERC

The background of this case, including SCE's claims against the CPUC and their resolution in the stipulated judgment, is set forth in SCE's Brief in TURN's appeal, No. 01-56879, at 4-15.

Like TURN, CMTA is a self-appointed group that purports to represent a narrow class of ratepayer interests. The only difference is that CMTA says it represents the interests of certain "large" ratepayers, whereas TURN claims for itself the right to speak for a class of "small" ratepayers. For purposes of this appeal, CMTA's interests in the case are no different than TURN's: it objects to the settlement because it does not want SCE to achieve any recovery in its suit.

Reliant is the ying to CMTA's yang. Reliant is a wholesale generator of electricity that sold power into the Cal PX. SCE's and Pacific Gas and Electric Company's liquidity crises prevented them from paying the Cal PX, which in turn

failed to pay Reliant and other generators. Reliant therefore wants SCE to get as much money as possible so that it can pay the Cal PX. As Reliant says, it "viewed [SCE's case against the CPUC] as a potential source of significant funds for SCE from which it might pay its outstanding debts." Reliant Br. at 13. Reliant's basic complaint about the stipulated judgment is that it does not go far enough, *i.e.*, that "it includes no provision for actually paying SCE's outstanding debts to Reliant . . . or any other creditor." *Id.* at 12.

Reliant's contention that it is "a substantial creditor of SCE[,]" *id.* at 7, is not supported by evidence in the record. The record citation claimed to support this assertion – Reliant ER at 112 – is not evidence but instead is Reliant's District Court brief, in which Reliant makes the same unsupported assertion.

SCE purchased power from, and failed to pay, the Cal PX. Reliant's claims relate entirely to SCE's purchases from the Cal PX prior to mid-January 2001, when the Cal PX suspended operations in its spot markets. The Cal PX functioned as a clearinghouse, matching competing bids and processing payments from power purchasers (like SCE) and power sellers (like Reliant) at "market-clearing" prices. *See In re California Power Exchange Corp.*, 245 F.3d 1110, 1114-15 (9th Cir. 2001) ("*Cal PX*"). Thus, in Cal PX transactions, SCE (as buyer) and wholesalers like Reliant (as sellers) were in privity with the Cal PX but not with each other. *See* Settlement Agreement § 1.1(n), Reliant ER 206 ("PX Billing Claim" means

claims against SCE for alleged failure "to pay timely any amounts due or claimed to be due to the [Cal PX]"); *id.*, Schedule 1.1 (Procurement Related Liabilities), Reliant ER 227 (listing nearly $1 billion in SCE Procurement Related Liabilities to the Cal PX). The Cal PX cleared trades not only on behalf of SCE, but also on behalf of Pacific Gas and Electric Company and other purchasers. The Cal PX has not attributed any portion of the amounts unpaid by SCE to Reliant or any other specific generator. Reliant's claim – that approximately $260 million of the amount it says it is owed by the Cal PX is attributable to SCE – is therefore speculative and unsupported by any evidence.

SCE and the CPUC vigorously dispute Reliant's claim for payment, and that dispute is the subject of the ongoing proceedings at FERC to which Reliant alludes. Reliant Br. at 7. Following the dramatic upsurge in wholesale electricity prices in the summer of 2000, San Diego Gas & Electric Company (like SCE, an investor-owned utility) filed a complaint with FERC, alleging that prices in the Cal PX were "unjust and unreasonable," in violation of Section 206(a) of the Federal Power Act, 16 U.S.C. § 824e(a). *See San Diego Gas & Elec. Co.*, 92 FERC ¶ 61,172, 2000 FERC LEXIS 1711 (Aug. 23, 2000).

In a November 1, 2000 order, FERC determined that, under certain circumstances, short-term prices in the Cal PX *were* "unjust and unreasonable." *Cal PX*, 245 F.3d at 1116 (citing *San Diego Gas & Elec. Co.*, 93 FERC ¶ 61,121,

at 61,349, 61,366, 2000 FERC LEXIS 2168, at *3, *79 (Nov. 1, 2000)). Among other things, "FERC concluded that the electricity market structure and market rules devised by California's restructuring plan were 'seriously flawed' and a significant cause of the unjust and unreasonable short-term rates in California[.]" *Id.* (quoting *San Diego Gas & Elec. Co.*, 93 FERC ¶ 61,121, at 61,349, 2000 FERC LEXIS 2168, at *3). FERC also "found 'clear evidence' that California's market rules and structures provided electricity wholesale sellers" – *i.e.*, sellers like Reliant – "the opportunity to exercise market power during periods of tight supply[.]" *Id.* (quoting *San Diego Gas & Elec. Co.*, 93 FERC ¶ 61,121, at 61,350, 2000 FERC LEXIS 2168, at *3).

FERC undertook a number of measures to address the "unjust and unreasonable" rates charged in the Cal PX. Most relevant to Reliant's appeal, FERC commenced an inquiry into whether to order refunds for unlawful sales in the Cal PX. *Id.* at 1118 (citing *San Diego Gas & Elec. Co.*, 93 FERC ¶ 61,121, at 61,370-71, 61,376-82, 2000 FERC LEXIS 2168, at *94-99, 145-172). Through a series of orders, FERC has determined that certain sales through the Cal PX – by wholesalers like Reliant – are subject to refund for the period October 2, 2000 through June 20, 2001; FERC directed one of its administrative law judges to oversee the process of instituting settlement discussions and ultimately adjudicating the refund claims. *See San Diego Gas & Elec. Co.*, 96 FERC

¶ 61,120, at 61,499, 2001 FERC LEXIS 1810, at *1 (July 25, 2001); *San Diego Gas & Elec. Co.*, 97 FERC ¶ 61,275, 2001 FERC LEXIS 3018 (Dec. 19, 2001).

Reliant intimates that FERC has walled-off the CPUC from the ongoing litigation and refund proceedings because the federal agency is concerned with "the entire western interconnect," whereas the CPUC's involvement would be limited to advancing the parochial concerns of the State of California. Reliant Br. at 45. In fact, the CPUC has been actively involved in the FERC proceedings – with FERC's full approval. The CPUC intervened on the complainants' side in the *San Diego Gas & Electric* proceedings. *San Diego Gas & Elec. Co.*, 92 FERC ¶ 61,172, at 61,604-605, 2000 FERC LEXIS 1711, at *7-10. SCE intervened on the same side as the CPUC, and Reliant intervened in opposition to the complaint. *Id.* Moreover, in its order directing the parties to engage in settlement discussions, FERC specifically solicited the State's participation:

> [W]e stress that it will be critical to the success of these discussions that the State of California designate one or more representatives, authorized to act on behalf of all affected state interests, to participate fully in the settlement discussions.

*San Diego Gas & Elec. Co.*, 95 FERC ¶ 61,418, at 62,570, 2001 FERC LEXIS 1440, at *116 (June 19, 2001).

## II. THE SCE-CPUC SETTLEMENT AGREEMENT

The settlement agreement between SCE and the CPUC recognizes that the ongoing FERC refund proceedings are a potential source of funds to offset the



[798513.1]

wholesale power procurement costs that SCE would otherwise recover from its customers under the settlement agreement. The settlement agreement mandates that 100% of the net liquidated value of any such FERC refunds, through the period during which SCE is recovering its costs under the settlement, will be passed on to SCE's customers. Settlement Agreement § 3.3(a), Reliant ER 219.

In light of SCE's and the CPUC's common interest in minimizing the burden on SCE's customers by obtaining refunds through the FERC proceedings, the two parties formally agreed to SCE's "cooperat[ing] in good faith with the CPUC and the California Attorney General in order to coordinate the pursuit and resolution of" the refund claims that FERC is adjudicating. Settlement Agreement § 3.1, Reliant ER 217. This provision – one of two that is the principal focus of Reliant's appeal – is hereinafter referred to as the "Litigation Cooperation Provision." It is typical of agreements between co-parties who share a common interest in cooperatively prosecuting a case. SCE will (1) consult with state counsel concerning coordinated litigation strategies and will "consider in good faith" state counsel's views about the litigation; (2) execute "reasonable and customary" joint-defense agreements to preserve privileges; and (3) "seek and consider in good faith" state counsel's comments about briefs SCE files in the refund litigation. *Id.*

The settlement agreement also confirms SCE's right to compromise, at its discretion, its refund claims in the FERC proceedings. Settlement Agreement § 3.2(a)-(b), Reliant ER 218. The CPUC has an obvious interest in any such voluntary settlement by SCE: each dollar that SCE receives through the refund proceedings, either in settlement or judgment, reduces the amount that otherwise would be recovered from SCE's customers. Accordingly, SCE agreed to limit its otherwise unilateral discretion whether to compromise a refund claim:

> *[I]n the event that SCE wishes to compromise*, waive or settle any Seller Claim or PX Billing Claim on or after March 1, 2002 (subject to extension by mutual agreement), *it shall first obtain the CPUC's permission to do so*. In the event the CPUC grants such permission, then SCE may effect such compromise, waiver or settlement. In the event the CPUC does not grant such permission, then SCE shall continue to pursue the claim or defense in question, and any compromise, waiver or settlement thereof shall continue to be subject to CPUC review.

Settlement Agreement § 3.2(c) (emphasis added), Reliant ER 219. This provision – referred to herein as the "Pre-Settlement Provision" – is the second of the two provisions upon which Reliant bases its appeal on the merits.

## III. <u>RELIANT'S AND CMTA'S LAST-MINUTE MOTIONS TO INTERVENE</u>

Reliant first sought to intervene in this case on October 3, 2001, nearly a year after SCE filed its complaint and six months after the District Court stayed it to allow SCE and the CPUC to pursue settlement options. Reliant complained that, because the SCE-CPUC settlement agreement did not address how SCE's creditors



[798513.1]

were to be paid, Reliant could not determine whether the agreement would impair its interests or not. Reliant ER 113. Like Reliant, CMTA waited until October 3, 2001, to attempt to intervene; although TURN, another self-appointed ratepayer group, had moved to intervene nearly a year earlier, CMTA claimed its late filing was justified because it did not know that the CPUC was unable to represent its interests adequately until the settlement agreement was announced. Reliant ER 99. Both Reliant and CMTA asked the District Court not to enter the stipulated judgment. Reliant ER 101 (CMTA), 111 (Reliant).

The District Court reviewed Reliant's and CMTA's applications and concluded they provided no basis for denying entry of the stipulated judgment. The Court explained that "[t]he concerns presently raised by the non-parties [*i.e.*, Reliant and CMTA] are primarily concerns about the purported vagueness of the terms of the settlement agreement and concerns about its implementation. The agreement contains all the fundamental terms necessary for a complete agreement, and the interpretation and implementation of the agreement are only ministerial acts to be performed by the parties." Reliant ER 258.

## SUMMARY OF ARGUMENT

1. The District Court correctly denied Reliant's and CMTA's motions to intervene as a matter of right:

a. Neither Reliant nor CMTA has a protectible interest that SCE's lawsuit against the CPUC threatens to impair.

b. Reliant and CMTA cannot justify their extreme delay in waiting to move to intervene.

c. TURN, which already has intervenor-party status, has more than adequately represented the interests CMTA says it wants to advance in this litigation; indeed, it has represented them identically.

2. The District Court did not abuse its discretion in denying Reliant's and CMTA's requests for permissive intervention:

a. Reliant and CMTA fail to establish an independent jurisdictional basis for their participation as permissive intervenors.

b. Reliant's and CMTA's applications for intervention were untimely.

c. The claims that Reliant wants to assert lack the necessary legal and factual nexus with the lawsuit that SCE brought against the CPUC.

3. The District Court's decision to deny Reliant intervention also should be affirmed because Reliant does not have Article III standing.

4. There is no merit to Reliant's argument that the settlement agreement treads on FERC's exclusive jurisdiction to set wholesale rates. The provisions that Reliant attacks deal solely with SCE's conduct of, and its unilateral decision

whether to settle, FERC refund litigation *before* FERC is presented with or passes on a proposed "rate." Reliant's extreme jurisdictional argument that the CPUC can have no involvement whatsoever in any process preceding FERC's consideration of the appropriate rate is belied both by FERC's express solicitation of the CPUC's participation in refund settlement proceedings and by the very cases that Reliant cites.

5. CMTA's arguments simply repeat TURN's arguments. Its filings with this Court merit no additional response from SCE.

**STANDARD OF REVIEW**

SCE agrees with Reliant's and CMTA's discussion of the standard of review of the District Court's rulings on the motions to intervene *as of right*.

Reliant and CMTA understate the degree of deference this Court gives the District Court concerning the decision whether to allow *permissive* intervention. Because the District Court has discretion to deny permissive intervention *even if* the applicants meet the threshold requirements under Rule 24(b), *Donnelly v. Glickman*, 159 F.3d 405, 412 (9th Cir. 1998), Reliant and CMTA have a heavy burden to overturn the District Court's decision. This Court must have a "definite and firm conviction that the court committed a clear error of judgment in reaching its conclusion after weighing the relevant factors." *Employee Staffing Servs., Inc. v. Aubry*, 20 F.3d 1038, 1042 (9th Cir. 1994) (quotations omitted). This Court thus

has jurisdiction over the District Court's denial of permissive intervention "*only if* the district court abused its discretion in reaching that decision." *Donnelly*, 159 F.3d at 411 (emphasis added) (citing *League of United Latin American Citizens v. Wilson*, 131 F.3d 1297, 1307-08 (9th Cir. 1997) ("*LULAC*")). Accordingly, if this Court determines that the District Court did not abuse its discretion, "it *must* dismiss the appeal for want of jurisdiction." *LULAC*, 131 F.3d at 1308.

The District Court's ultimate decision to enter the stipulated judgment is reviewed for abuse of discretion. *See* SCE Br. in TURN App. at 17-18.

## ARGUMENT

### I. THE DISTRICT COURT DID NOT ERR IN DENYING RELIANT'S AND CMTA'S LAST-MINUTE INTERVENTION MOTIONS

#### A. The District Court Properly Denied Reliant's And CMTA's Motions To Intervene As Of Right

To intervene as of right under Federal Rule of Civil Procedure 24(a)(2), an applicant must satisfy each of four requirements: (1) the applicant must have a significantly protectible interest in the litigation; (2) the application must be timely; (3) the applicant must show that the disposition of the action may practically impair its protectible interest; and (4) the applicant must show that the parties before the Court do not adequately represent its interests. *Northwest Forest Resource Council v. Glickman*, 82 F.3d 825, 836 (9th Cir. 1996); *Smith v. Marsh*, 194 F.3d 1045, 1049 (9th Cir. 1999). Neither Reliant nor CMTA satisfies any of these requirements.

1. Reliant And CMTA Cannot Show A Legally Protectible Interest In The Lawsuit, Much Less One That Will Be Impaired By Its Outcome

Under Rule 24(a)(2), the applicant must show that its asserted interest is protected by some law, and that there is a relationship between the protected interest and the claims at issue. *Northwest Forest Council*, 82 F.3d at 837. Reliant and CMTA fail to meet these standards.

The *only* interest that Reliant identifies in this litigation is the allegation that SCE owes it more than $260 million stemming from past wholesale electricity transactions. Reliant Br. at 25-26. Reliant claims that its "interest" in that sum "is both legally protectible and related to the claims at issue in SCE's lawsuit." *Id.* at 26; *see also* Reliant ER 112 (Reliant's District Court Brief) (Reliant's "interest in the settlement agreement" identified as "how the sums expected to be received by SCE pursuant to it are distributed among creditors"). Reliant's claim that SCE owes it $260 million is not only unsupported by record evidence, but also hotly disputed. SCE is in privity with the Cal PX, not Reliant; the portion, if any, of SCE's non-payment to the Cal PX that would flow to Reliant has not been established; and the amounts charged by generators such as Reliant to the Cal PX are the subject of FERC refund proceedings. *See supra* at 6-8.

Even if Reliant could establish a legal entitlement to collect from SCE the money it claims it is owed, that does not give it a protectible interest in *this*

lawsuit. This case does not dispose of claims by Reliant against SCE arising out of wholesale power purchases by SCE. Nor does it impair any interest that Reliant claims to receive payment for its wholesale power sales. On the contrary, the settlement agreement *benefits* Reliant by enabling SCE to pay the Cal PX. Reliant's complaint about the settlement is not that it *impairs* Reliant's interest in getting paid, but only that it "includes no provision for actually paying SCE's outstanding debts to Reliant, Mirant, or any other creditor." Reliant Br. at 12. Indeed, the stipulated judgment is "silent about the mechanics of payment to creditors," *id.* at 28, and for good reason: the stipulated judgment resolves the dispute that is the subject of SCE's lawsuit against the CPUC, not claims of wholesale power suppliers (or anyone else) claiming that SCE has outstanding debts to them. The fact that the outcome of the SCE-CPUC litigation will not resolve "when, how, or even if Reliant, Mirant, or other creditors would be paid" by SCE, *id.* at 12, shows that Reliant cannot demonstrate an interest entitling it to intervene as a matter of right.

If Reliant's desire to get paid on a disputed claim were enough to entitle it to intervene as of right in litigation in which SCE seeks to obtain additional revenues that might be a source of payment, then any unsecured creditor would have a right to intervene in any lawsuit that its debtor brings against any third party, which might in turn serve as a source of funds that the creditor might be able to tap.

Reliant's interests as a creditor are far too attenuated to justify intervention as of right.

CMTA likewise fails to demonstrate a protectible interest that would entitle it to intervene. CMTA asserts only that it is an association of manufacturing and high-technology companies that "purchase significant quantities of electricity from SCE" and thus will be substantially affected by the outcome of this litigation. Reliant Br. at 26. That CMTA's members purchase electricity from SCE in no way distinguishes them from any of SCE's millions of customers throughout California. Federal law construing Rule 24(a)(2) is clear that "an undifferentiated, generalized interest in the outcome of an ongoing action is too porous a foundation on which to premise intervention as of right." *Public Serv. Co. of N.H. v. Patch*, 136 F.3d 197, 205 (1st Cir. 1998); *see also Westlands Water District v. United States*, 700 F.2d 561, 563 (9th Cir. 1983) (Environmental Defense Fund's interest in water district's water export rights is no different from interest of "substantial portion of the population of northern California" and is thus not "legally protectible" under Rule 24(a)). CMTA's asserted "interest" in the cost of power here is far too general to justify its intervention.

2. Reliant And CMTA Were Untimely In Seeking To Intervene

Reliant and CMTA have no excuse for their nearly year-long delay in seeking to intervene. The determination of timeliness of a motion to intervene is

based on (1) the stage of the proceedings, (2) the length of and reason offered for the delay, and (3) the possible prejudice to the existing parties. *LULAC*, 131 F.3d at 1308. Each of these factors supports the District Court's denial of Reliant's and CMTA's motions.

Reliant and CMTA sought to intervene on the eve of entry of judgment. In these circumstances, the first factor "weighs heavily" against Reliant and CMTA *Id.* at 1303 ("[T]he fact that the district court has substantively – and substantially – engaged in the issues in this case weighs heavily against allowing intervention as of right under Rule 24(a)(2)."); *Smith*, 194 F.3d at 1050-51 (under *LULAC*, proposed intervenor had "uphill battle" to prevail on application 15 months after filing of original suit, even where suit was still in pretrial phases).

Reliant's and CMTA's professed disappointment with the terms of the stipulated judgment does not excuse their tardy motion to intervene. Reliant and CMTA were on notice from the beginning of this litigation of the interests that SCE and the CPUC have each sought to advance. SCE filed suit to vindicate its own federal right to recover the costs of procuring wholesale power, not to litigate a claim for Reliant to money it claims to be owed. Likewise, the CPUC from the beginning has said that it was seeking to vindicate the interests of California ratepayers as a whole, not simply the narrow interests that CMTA claims to represent. Reliant and CMTA knew or should have known that SCE and the

CPUC were not concerned solely with their interests, and that the outcome of the litigation almost certainly would not entirely please either SCE's creditors or its customers. Reliant and CMTA could have sought to intervene at the beginning of the case, as did TURN, and their decision to wait to see how the case came out before seeking to intervene weighs heavily against their motions. *Alaniz v. Tillie Lewis Foods*, 572 F.2d 657, 659 (9th Cir. 1978) ("The crux of appellants' argument is that they did not know the settlement decree would be to their detriment. But surely they knew the risks. To protect their interests, appellants should have joined the negotiations before the suit was settled.").

On the other side of the balance, granting Reliant's and CMTA's motions threatened to prejudice the parties. SCE and the CPUC share an interest in the prompt implementation of the stipulated judgment, which is designed to restore SCE's credit standing and thus enable it to resume procuring power on behalf of its customers. Further delay at this late stage undermines this outcome. Had they been allowed to intervene, Reliant and CMTA undoubtedly would have sought to litigate manifold issues, and therefore their admission would "have the inevitable effect of prolonging the litigation to some degree." *LULAC*, 131 F.3d at 1304. Particularly where the proposed intervenors seek to "inject new issues and matters that are well beyond the scope of [the original parties'] claims and . . . defenses," *Smith*, 194 F.3d at 1051 (quotations omitted) – here, for example, by litigating

putative contract claims against SCE – the District Court is well justified in concluding that intervention would prejudice the existing parties.

3. CMTA Fails To Demonstrate That The Parties To The Lawsuit Inadequately Protect Its Interests

CMTA has no right to intervene for the additional reason that the parties already before the District Court more than adequately protected its claimed interests in this litigation. CMTA does not even dispute the existing parties' ability to adequately represent its interests. CMTA fails to identify a single merits argument that it would seek to make that TURN (which is an existing party) has not made already. Indeed, CMTA's substantive argument does nothing more than incorporate CMTA's amicus brief in the TURN case – which itself makes exactly the arguments that TURN has made in its merits brief. By definition, CMTA's interests are adequately represented by TURN at this juncture.

**B. The District Court Did Not Abuse Its Discretion In Denying Reliant's And CMTA's Motions To Intervene Permissively**

The District Court was well within its discretion in concluding that neither Reliant nor CMTA satisfy Rule 24(b)'s prerequisites for permissive intervention: (1) neither Reliant nor CMTA established an independent ground for jurisdiction; (2) neither timely moved to intervene; and (3) neither demonstrated that they had a claim or defense with a question of law or fact in common with the underlying action. *Donnelly*, 159 F.3d at 412.

1. Neither Reliant Nor CMTA Has An Independent Basis For Jurisdiction

Reliant and CMTA first argue that, notwithstanding the requirements of Rule 24(b), they need not establish an independent basis for jurisdiction because they do not seek to assert any new claim or defense on the merits. Reliant Br. at 29. Reliant and CMTA rely on *Beckman Industries, Inc. v. International Insurance Co.*, 966 F.2d 470 (9th Cir. 1992), but that case hardly supports their novel and broad exception to Rule 24(b). *Beckman* involved a request to intervene following the settlement of the claims on the merits for an extremely limited purpose: to modify a previously entered protective order. The protective order – which, by its own terms, was subject to later modification by the district court, *id.* at 473 – effectively prevented the intervention applicants from accessing discovery materials that they claimed to need in ongoing, separate litigation in state court. Reliant and CMTA, on the other hand, seek to intervene *precisely* to litigate the merits of the settlement agreement. Reliant and CMTA therefore are necessarily bound by Rule 24(b)'s jurisdictional requirement.

Alternatively, Reliant and CMTA argue that the District Court has supplemental jurisdiction to entertain their "claims" because they are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367. That is simply wrong. As the District Court properly recognized,



[798513.1]

"[t]he concerns presently raised by the non-parties are primarily concerns about the purported vagueness of the terms of the settlement agreement and concerns about its implementation. The agreement contains all the fundamental terms necessary for a complete agreement, and the interpretation and implementation of the agreement are only ministerial acts to be performed by the parties." Reliant ER 258. Indeed, the outcome of this litigation between SCE and the CPUC will *not* resolve Reliant's central concern: "when, how, or even if Reliant, Mirant, or other creditors would be paid" by SCE. Reliant Br. at 12.

Finally, Reliant and CMTA suggest they have a laundry list of federal claims they *could* raise in this case, if they were so inclined. Reliant Br. at 32-33. But Reliant and CMTA did not intervene to assert any claim – federal or state – in this case, and they cite no authority for the proposition that a District Court should allow intervention based on claims that a proposed intervenor elected not to bring.

2. Reliant's And CMTA's Applications To Intervene Were Untimely

The timeliness inquiry under Rule 24(b) considers the same factors that are relevant under Rule 24(a): the stage of the proceedings, the prejudice to existing parties, and the length of and reason for the delay. "In the context of permissive intervention, however, we analyze the timeliness element more strictly than we do with intervention as of right." *LULAC*, 131 F.3d at 1308. As this Court has made clear, a conclusion that an application for permissive intervention is untimely

follows "*a fortiori*" from the finding that applicants have untimely sought to intervene of right. *Id.* As discussed above in connection with Rule 24(a), Reliant and CMTA cannot justify the tardiness of their motions to intervene.

3. There Is No Common Question Of Law Or Fact Between Reliant's Claims And The Underlying Action

Finally, Reliant fails to establish a nexus between its asserted interests and SCE's claims against the CPUC. Reliant wanted to litigate a different case than the one that SCE brought against the CPUC and that those parties settled. SCE's case concerns its claim for recovery of costs from its customers. The case that Reliant would like to litigate is how SCE would use that money, *viz.*, claims for the payment of alleged debts to SCE creditors. *See* Reliant Br. at 12 (faulting stipulated judgment for "includ[ing] no provision for actually paying SCE's outstanding debts to Reliant, Mirant, or any other creditor"); *id.* at 28 (stipulated judgment "silent about the mechanics of payment to creditors"). As this Court has made clear, "[t]he intervention rule is . . . not intended to allow the creation of whole new lawsuits by the intervenors." *Donnelly*, 159 F.3d at 412 (quoting *Deus v. Allstate Ins. Co.*, 15 F.3d 506, 525 (5th Cir. 1994)). Reliant's inability to show how this litigation ever was supposed to resolve "when, how, or even if Reliant, Mirant, or other creditors would be paid" by SCE, Reliant Br. at 12, underscores the soundness of the District Court's decision not to allow it to intervene.

Reliant's interest in SCE's claim against the CPUC is no different than the interest of *any* general unsecured creditor in the outcome of litigation brought by a debtor against a third party. If the debtor wins its case, it will have more money that it can use to pay its creditors. If that were enough to entitle the creditor to intervene in the debtor's litigation – or, worse yet, to justify reversing a District Court's exercise of discretion not to allow intervention – the courts would soon be flooded with interventions from expectant creditors. Not surprisingly, the caselaw does not support that result. *Safety-Kleen, Inc. v. Wyche*, 274 F.3d 846 (4th Cir. 2001), does not hold, as Reliant suggests (Reliant Br. at 36-37), that unsecured creditors can intervene in any litigation brought by their debtor. The holding of *Safety-Kleen*, which was expressly "limited to the particular circumstances of this case," 274 F.3d at 867-68, was based on the failure by either the lower court or the parties to articulate "any reason" for denying intervention, *id.* at 867. (Just the opposite is true in this case, as both the District Court and the parties identified multiple grounds for upholding the exercise of the lower court's discretion.) The Fourth Circuit did not accept the intervenors' alternative argument that, as representatives of unsecured creditors, they had an interest in the subject of the action sufficient to give rise to an entitlement to intervene of right.

### C. <u>Reliant Lacks Article III Standing To Intervene In The District Court Proceedings</u>

Even if Reliant could satisfy all of the requirements for either as-of-right or permissive intervention – which it cannot – the District Court's order as to Reliant should be affirmed on an alternative basis: Reliant lacks standing under Article III of the Constitution, and the District Court therefore had no jurisdiction to entertain its arguments. The standing limitation is at the core of federal judicial power and, "at an irreducible minimum" requires a "party who invokes the court's authority to show that he personally has suffered some actual or threatened injury," that the injury "fairly can be traced to the challenged action," and that the injury "is likely to be redressed by a favorable decision." *Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 472 (1982) (quotations omitted); *see also Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1398 (9th Cir. 1995). Reliant cannot establish Article III standing.

Reliant cannot establish any causal connection between the entry of the stipulated judgment and the only "injury" that Reliant asserts in this litigation – that SCE owes it money. *See supra* at 16. Even if Reliant presented real evidence that it is a creditor of SCE – which it does not – Reliant does not suggest that it has suffered nonpayment *because* of the entry of the stipulated judgment. On the contrary, the settlement enables SCE to make payment to the Cal PX, Reliant ER 227, and thus increases the likelihood that Reliant will be paid. Nor would any

injury Reliant claims be redressed by the relief it seeks. Eliminating the particular settlement provisions to which Reliant objects will not result in Reliant being paid. Even apart from the settlement, SCE has the discretion to cooperate with the CPUC in pursuing claims against generators (as it has done in the past), and has the discretion not to settle with generators or to settle only on such terms as SCE elects. Indeed, Reliant's major objection to the settlement is that it *fails* to specify whether and how SCE will pay Reliant. Reversing the stipulated judgment therefore gets Reliant no closer to getting paid what it claims to be owed.

Reliant's position as would-be intervenor does not relieve it of the need to meet the requirements of Article III standing. As this Court has repeatedly recognized, the Article III "standing requirement is at least implicitly addressed by our requirement [for intervention of right] that the applicant must 'assert[] an interest relating to the property or transaction which is the subject of the action.'" *Southwest Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 822 n.3 (9th Cir. 2001) (quotations omitted). Thus, Reliant's failure to show a cognizable injury caused by the settlement that would be redressed by the relief it seeks not only defeats Reliant's argument for intervention as of right, but also demonstrates its lack of Article III standing.

The Article III requirements have even greater bite as applied to Reliant's plea for permissive intervention. Even if Reliant otherwise met the standards for

permissive intervention, it cannot become a party that invokes the Court's jurisdiction unless it meets the irreducible minimum standing requirements. This is particularly so where, as here, a would-be intervenor seeks to raise an issue – the repayment of alleged debt – that was not raised, litigated, or resolved by the parties themselves. *See Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 776 (3d Cir. 1994) (analyzing whether third parties have standing to intervene permissively to raise challenge to a previously entered protective order in an effort to obtain access to information). In these circumstances, a person without Article III standing is asking the federal court to decide an issue that is not otherwise presented as a case or controversy by the real parties in interest. The federal courts are not in the business of rendering opinions at the behest of persons who lack Article III standing. Accordingly, the District Court is without jurisdiction to entertain Reliant's arguments on the merits of the stipulated judgment.

**D. <u>Reliant And CMTA Lack Independent Standing To Appeal From The Stipulated Judgment</u>**

Finally, Reliant and CMTA erroneously contend that they have standing to challenge the stipulated judgment on appeal even if they are not entitled to intervene under Rule 24. Reliant Br. at 40-41. Appellants' own authority makes clear that, as a general rule, "persons who were not parties before the district court may not appeal that court's order." *Bank of America v. M/V Executive*, 797 F.2d 772, 774 (9th Cir. 1986); *see also Marino v. Ortiz,* 484 U.S. 301, 304 (1988) (per

curiam) ("The rule that only parties to a lawsuit, or those that properly become parties, may appeal an adverse judgment, is well settled.").

*Bank of America,* on which Reliant and CMTA rely, recognizes a narrow exception to that rule where "(1) the appellant, though not a party, participated in the district court proceedings, and (2) the equities of the case weigh in favor of hearing the appeal." 797 F.2d at 774. The Supreme Court has expressed deep skepticism about the propriety of such an exception under *any* circumstance, *Marino,* 484 U.S. at 304 (holding that "because petitioners were not parties to the underlying lawsuit, and because they failed to intervene for purposes of appeal, they may not appeal from the consent decree approving that lawsuit's settlement"), and has made clear that whether or not such an exception might exist, "the better practice is for such a nonparty to seek intervention for purposes of appeal." *Id.* The *Bank of America* exception thus *only* comes in to play where a non-party has otherwise failed to seek intervention. That is simply not the case here, and the exception appellants identify is thus inapposite.

In all events, Reliant and CMTA satisfy neither of the *Bank of America* criteria. Apart from their applications for intervention, Reliant and CMTA did not in any sense participate in the District Court proceedings at any time prior to the Court's consideration of the stipulated judgment. The contrast with the non-party/appellant's participation in *Bank of America* is striking: the non-party there

filed papers and presented oral argument to a magistrate judge and the district court on the merits of the case.

Moreover, the equities weigh strongly against allowing Reliant and CMTA to participate at this late stage. Reliant and CMTA do not contend they had no notice of this litigation. On the contrary, Reliant and CMTA deliberately sat out during the initial months of litigation and remained silent when the District Court stayed these proceedings to allow the parties time to reach a consensual resolution. There also is no discernable prejudice to either entity from denying intervention. Reliant candidly acknowledges that its real goal in stepping in is to ensure payment for money it says it is owed. Nothing in the settlement, however, even remotely purports to extinguish any of the "claims" for payment that Reliant asserts it would like to bring. For its part, CMTA has not advanced a single argument that TURN has not already made; there is nothing inequitable about requiring CMTA to limit its participation to submitting amicus briefs echoing TURN's arguments.

## II. <u>RELIANT AND CMTA PROVIDE NO BASIS FOR OVERTURNING THE STIPULATED JUDGMENT</u>

Reflecting their divergent interests in the outcome of the underlying lawsuit, Reliant and CMTA make very different arguments on the merits for reversing the stipulated judgment. Reliant – but not CMTA – argues that the settlement agreement's Pre-Settlement and Litigation Cooperation Provisions put the CPUC in the business of regulating wholesale power rates and thereby intrude on FERC's

exclusive jurisdiction. On the last page of their brief, Reliant and CMTA join together to adopt TURN's merits arguments for overturning the stipulated judgment. None of these arguments supports reversal.

### A. Neither The Pre-Settlement Provision Nor The Litigation Cooperation Provision Intrudes On FERC's Jurisdiction

Reliant's principal merits argument is that the Pre-Settlement and Litigation Cooperation Provisions of the SCE-CPUC settlement agreement intrude on FERC's exclusive jurisdiction to set wholesale power rates. The argument fails because neither provision interferes in any way with FERC's jurisdiction. The Pre-Settlement Provision cabins only *SCE's* decision whether to voluntarily compromise refund litigation relating to its purchases from the Cal PX. FERC would not become involved in reviewing the terms of a proposed settlement to determine its "justness and reasonableness" until *after* SCE consents to settlement terms. SCE has the indisputable right to decide the terms on which it will consent to a strictly voluntary settlement before submitting it to FERC for approval. SCE also has the indisputable right to obligate itself to obtain another's consent, be it a lender which has the right to review proposed litigation settlements or (as here) a co-party on the same side of refund litigation. SCE may be tying its own hands, but there is no preemption issue because it is not tying FERC's.

The Pre-Settlement Provision has no application if FERC decrees a resolution to the refund proceedings. SCE must underscore this point because

Reliant's brief potentially mischaracterizes the Pre-Settlement Provision. Specifically, Reliant states that the Pre-Settlement Provision "forbid[s] [SCE] from actually paying *these rates* to Reliant and Mirant unless [SCE] first obtains the CPUC's approval." Reliant Br. at 46 (emphasis added). If by "these rates" Reliant means to refer to "wholesale rates that FERC decrees," then this statement is incorrect. Nothing in the settlement agreement purports to give the CPUC authority to approve SCE's payment pursuant to a FERC order. The only pricing term as to which the CPUC can have a say under the Pre-Settlement Provision is one that SCE and any wholesaler agree to in a tentative compromise of outstanding disputes: "in the event that SCE wishes to compromise, waive or settle any [refund claim], it shall *first obtain* the CPUC's permission to do so." Settlement Agreement § 3.2(c) (emphasis added), Reliant ER 219. By definition, FERC would not review or set a "rate" proposed through SCE-wholesaler settlement discussions until *after* SCE and the wholesaler agreed to it; because SCE must obtain the CPUC's approval for the settlement before providing its own agreement, the CPUC's involvement is necessarily concluded *before* FERC ever commences to review the settlement. And if there is no compromise or settlement of an SCE-wholesaler claim, and FERC renders a decision on the merits that requires SCE to make a payment, the Pre-Settlement Provision is not implicated and the CPUC has no approval right.

Reliant similarly exaggerates the impact of the Litigation Coordination Provision on FERC's jurisdiction, although even Reliant admits that its impact is "less direct" than the Pre-Settlement Provision's. Reliant Br. at 47. Reliant incorrectly characterizes the Litigation Coordination Provision as giving the CPUC the "power to force SCE to institute and maintain additional legal claims against the sellers, regardless of whether such claims are inconsistent with FERC's exclusive jurisdiction over wholesale rates." *Id.* at 52. In fact, SCE's obligations under the provision are much more narrowly circumscribed: SCE agrees only to consult with state counsel concerning litigation strategies and "consider in good faith" their views about litigation decisions; to execute reasonable joint-defense agreements so as to avoid waiving applicable privileges; and to "seek and consider in good faith" state counsel's input about legal briefs filed in the FERC refund proceedings. Settlement Agreement § 3.1(a)-(c), Reliant ER 217-18. In short, SCE undertakes to do no more than what FERC already has allowed SCE to do by aligning it and the CPUC as complainants in the refund proceedings: to cooperate with each other in pursuing their common claims for refund and to consider "in good faith" the suggestions that each party makes to the other concerning the conduct of the litigation. In no way does the Litigation Cooperation Provision require SCE to institute litigation at the CPUC's insistence or to ignore any FERC rate or refund order.

**B. <u>The Federal Power Act Does Not Preempt The Pre-Settlement And Litigation Cooperation Provisions</u>**

Reliant makes an extreme jurisdictional argument: that the Federal Power Act, 16 U.S.C. § 824e(a), bars a state utilities commission from playing *any* role in any process that could lead to the presentation of a wholesale power rate for FERC's review and approval. Reliant's position is belied, first, *by FERC itself,* which expressly invited the State of California and the CPUC to participate in the very settlement process that Reliant now argues is off-limits to the CPUC:

> [W]e stress that *it will be critical to the success of these discussions that the State of California* designate one or more representatives, authorized to act on behalf of all affected state interests, to *participate fully in the settlement discussions.*

*San Diego Gas & Elec. Co.*, 95 FERC ¶ 61,418, at 62,570, 2001 FERC LEXIS 1440, at *116 (emphasis added).

Reliant cannot square its argument that the CPUC can have no role in the process of arriving at a settlement rate for eventual presentation to FERC and FERC's express solicitation of the State's "critical" participation in that process. The CPUC did not buy any power in the Cal PX. The CPUC is a party to the FERC refund proceedings solely because its status as the State's electricity "regulator" gives it an interest in the outcome of the refund proceedings. Contrary to Reliant's claim that any such interest is necessarily parochial and thus

preempted, FERC has allowed the CPUC to intervene and emphasized the need for it to be involved in any consensual resolution of the refund claims.

Reliant's extended discussion of FERC's exclusive jurisdiction to set wholesale rates, *see* Reliant Br. at 41-50, is beside the point. Reliant's exclusive jurisdiction argument assumes that the settlement agreement implicates conduct that is within FERC's exclusive jurisdiction. But Reliant has failed to show that FERC has jurisdiction over the objects of the Pre-Settlement and Litigation Cooperation Provisions, namely, parties' decisions whether to settle (and if so on what terms) refund claims before presenting them to FERC for review and approval, or their conduct of litigation in coordination with aligned parties having common interests. Because the settlement is limited to these consensual activities preceding a FERC decision, and nothing in the settlement agreement gives the CPUC the authority to interfere with a FERC rate or refund order, the settlement does not implicate FERC's exclusive jurisdiction.

For these reasons, Reliant's citation of *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953 (1986), and *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354 (1988), is misplaced. These cases deal with the preemptive force of FERC's action within its exclusive jurisdiction. Reliant fails to show that the Pre-Settlement and Litigation Cooperation Provisions even

implicate, much less undermine, FERC's exclusive jurisdiction to set wholesale rates.

The CPUC in its brief explains how the so-called "*Pike County*" rule has been interpreted by some courts to limit the scope of FERC preemption to the regulation of the rates charged by a wholesale seller and to preserve a state commission's authority to review the prudence of the utility as purchaser. *See Nantahala*, 476 U.S. at 973 (citing *Pike County Light & Power Co. v. Pennsylvania Public Util. Comm'n*, 77 Pa. Commw. 268, 465 A.2d 735 (1983)). In both *Nantahala* and *Mississippi Power*, the Supreme Court reserved the question whether *Pike County* is a valid exception to the filed-rate doctrine, but distinguished *Pike County* on other grounds. *Nantahala*, 476 U.S. at 972-73; *Mississippi Power,* 487 U.S. at 373-74. Suffice to say that if Reliant's view were correct, the Supreme Court's distinguishing of *Pike County* was unnecessary verbiage; the Court simply could have declared that *Pike County* review is preempted per se because any state commission review of a utility's actions touching upon wholesale power sales necessarily interferes with FERC's exclusive jurisdiction.

Reliant also places unwarranted reliance on *Duke Energy Trading & Marketing Co. v. Davis*, 267 F.3d 1042, 1056-59 (9th Cir. 2001), where this Court, relying on *Nantahala*, held that Governor Davis's commandeering of wholesaler



{798513.1}

contracts approved in FERC tariffs – specifically the Governor's nullification of those contracts' security and mitigation rules in the event of utility defaults – violated the filed-rate doctrine. The Court held the Governor's actions preempted *not* because the Governor's orders touched on the wholesale market – the jurisdictional argument that Reliant makes here – but because there was an *actual conflict* between the Governor's orders and the security and default mitigation provisions set forth in FERC-approved tariffs. The Court makes this point repeatedly in the opinion:

- "Governor Davis's commandeering orders *directly nullify* the security and default mitigation provisions of the FERC-approved CTS rate schedule, and hence cross the 'bright line' between state and federal jurisdiction established by the [Federal Power Act]." *Id.* at 1056 (emphasis added).

- "Governor Davis's commandeering orders *effectively rewrote the terms of the [FERC-approved] CTS rate schedule*, depriving wholesale suppliers such as Duke of their bargained-for collateral and default mitigation rights." *Id.* at 1057 (emphasis added).

- "[B]y [the Governor's] commandeering the block forward contracts, Duke (and, derivatively, the CalPX) lost its FERC-protected right to standard financial protection, *i.e.*, to liquidate its collateral if the buyers default on their obligations. *It is Governor Davis's interference with the block forward contracts' security provisions that is preempted by the federal scheme.*" *Id.* at 1058 (emphasis added).

- "Here, it is the very act of commandeering the block forward contracts that is preempted because in so doing, *the Governor nullified express requirements of a FERC-*

> *regulated and approved scheme.*" *Id.* at 1058 n.11 (emphasis added).

Here, by contrast, Reliant cannot point to *any* FERC tariff or order with which either the Pre-Settlement or Litigation Cooperation Provision conflicts. Its assertion that "the CPUC would directly control the timing and amount of any payment for wholesale electricity purchases by SCE to Reliant or Mirant, *which are governed by FERC-approved wholesale tariffs*[,]" Reliant Br. at 50 (emphasis added), is inaccurate. Reliant has not cited any FERC-approved wholesale tariff that prevents SCE from seeking the CPUC's concurrence before entering into a settlement with wholesale generators, or that prevents SCE from cooperating with the CPUC in pursuing refund claims at FERC. In fact, Reliant has not even identified any FERC tariff that would obligate SCE to pay Reliant at all; and the whole issue of how much, if at all, SCE should pay the Cal PX is the crux of the pending FERC refund proceedings. As discussed above, the Pre-Settlement Provision only comes into play *before* FERC has even reviewed (much less approved) a proposed settlement; once FERC adopts any refund order, the Pre-Settlement Provision does not purport to authorize any entity to ignore it.

In sum, Reliant has no basis for its sweeping assertion that the CPUC is precluded from playing any role in any process that might lead to the presentation of rates for FERC approval. Nothing in the Pre-Settlement or Litigation

Cooperation Provisions even remotely intrudes on FERC's jurisdiction to set wholesale rates.

### C. Reliant's and CMTA's Incorporated TURN Arguments For Overturning The Stipulated Judgment Have No Merit

Reliant announces on the last page of the brief that it also embraces all of TURN's merits arguments. Reliant Br. at 54. For its part, CMTA says that it argued the same issues that TURN did in CMTA's amicus filing in TURN's appeal; CMTA simply incorporates that brief. *Id.* The arguments in CMTA's amicus brief are no different than the arguments that TURN made in its own brief. Accordingly, SCE responds to Reliant and CMTA's arguments on this score by incorporating its discussion of the merits in its brief in TURN's appeal.

## CONCLUSION

The judgment should be affirmed.

Dated: February 1, 2002

Respectfully submitted,

Stephen E. Pickett (SBN 97807)
Barbara Reeves (SBN 58100)
Kris G. Vyas (SBN 162871)
Southern California Edison Company
2244 Walnut Grove Avenue
Rosemead, California 91770
Telephone: (626) 302-1903
Facsimile: (626) 302-2783

Ronald L. Olson (SBN 44597)
John W. Spiegel (SBN 78935)
Henry Weissmann (SBN 132418)
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, Suite 3500
Los Angeles, California 90071
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

By [signature]
Henry Weissmann

## STATEMENT OF RELATED CASES

[9th CIR. R. 28-2.6]

Pursuant to Ninth Circuit Rule 28-2.6, Plaintiff and Appellee Southern California Edison Company states that these consolidated appeals are related to *Southern California Edison Co., Plaintiff-Appellee* v. *Loretta M. Lynch, et al., Defendants-Appellees*, *The Utility Reform Network, Intervenor-Appellant*, No. 01-56879. All of these appeals have been consolidated by Order of this Court filed January 2, 2002.

[798625.1]

**CERTIFICATE OF COMPLIANCE**
**FRAP 32(a)(7)(C) & 9th CIR. R. 32-1**

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Ninth Circuit Rule 32-1, I certify that the foregoing Brief of Appellee Southern California Edison Company is double-spaced and printed in proportionally spaced 14-point Times New Roman type. Exclusive of those portions not subject to the type-volume limitations, *see* FRAP 32(a)(7)(B)(iii), it contains 9,275 words. In completing this word count, I relied on the "word count" function of the Microsoft Word 2000 word processing program.

Dated: February 1, 2002

HENRY WEISSMANN

[798624.1]

***PROOF OF SERVICE***

I am a citizen of the United States, over 18 years of age, employed in the City of Los Angeles and County of Los Angeles, and not a party to the subject cause. My business address is 355 South Grand Avenue, Suite 3500, Los Angeles, California 90071.

On February 1, 2002, I caused to be served via Federal Express (Saturday delivery) two (2) copies of the Brief of Appellee Southern California Edison Company in Nos. 01-56879, 01-56993, and 01-57020, to the following parties:

Gary M. Cohen, Esq.
Public Utilities Commission of the
State of California
505 Van Ness Avenue
San Francisco, California 94102

Robert A. Berliner, Esq.
Berliner Candon & Jimison PC
1225 19th Street, N.W. Suite 800
Washington, D.C. 20036

Terry J. Houlihan, Esq.
McCutchen, Doyle, Brown
& Enersen, LLP
Three Embarcadero Center
San Francisco, California 94111-4067

Michael J. Strumwasser
Fredric D. Woocher
Strumwasser & Woocher LLP
100 Wilshire Boulevard, Suite 1900
Santa Monica, California 90401

Lloyd W. Pellman, Esq.
John F. Krattli, Esq.
Office of the County Counsel
500 West Temple Street, Room 648
Los Angeles, California 90012-2713

Netti Hoge, Esq.
Robert E. Finkelstein, Esq.
The Utility Reform Network
711 Van Ness Avenue, Suite 350
San Francisco, California 94102

[794762.1]

Richard H. Cooper, Esq.
Kirkpatrick & Lockhart LLP
10100 Santa Monica Boulevard
Suite 700
Los Angeles, California 90067

Keith R. McCrea, Esq.
Sutherland Asbill & Brennan
1275 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

Bryan A. Merryman, Esq.
White & Case LLP
633 West Fifth Street
Suite 1900
Los Angeles, California 90071

**COURTESY COPIES SENT TO:**

Bill Lockyer, Esq.
Attorney General for the
State of California
300 South Spring Street
Los Angeles, California 90013

Karen N. Frederiksen, Esq.
Davis, Wright & Tremaine LLP
865 South Figueroa Street
Suite 2400
Los Angeles, California 90017

David S. MacCuish, Esq.
Andrew M. Gilford, Esq.
Weston, Benshoff, Rochefort,
Rubalcava & MacCuish LLP
333 South Hope Street, Sixteenth Floor
Los Angeles, California 90071

I also filed the above documents with the United States Court of Appeals for the Ninth Circuit by mailing them this day to the Clerk of said Court by First-Class United States mail. *See* Fed. R. App. P. 25(a)(2)(B).

I declare under penalty of perjury that the foregoing is true and correct and that I executed this declaration on February 1, 2002 at Los Angeles, California.

Marie S. Young
Marie S. Young

[794762.1]