**PLAINTIFFS PACIFIC GAS AND ELECTRIC COMPANY, SOUTHERN CALIFORNIA EDISON COMPANY, AND SAN DIEGO GAS & ELECTRIC COMPANY'S APPENDIX TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

**VOLUME 1 OF 3**

**Part 2 of 3**

COPY

MARIE L. FIALA (Bar No. 79676)
RUSSELL P. COHEN (Bar No. 213105)
BRIAN D. McDONALD (Bar No. 224201)
HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA 94104-2878
Telephone: (415) 772-6000
Facsimile: (415) 772-6268
marie.fiala@hellerehrman.com
russell.cohen@hellerehrman.com
brian.mcdonald@hellerehrman.com

Attorneys for Plaintiffs
PACIFIC GAS AND ELECTRIC COMPANY

[ADDITIONAL PARTIES AND COUNSEL SHOWN ON SIGNATURE PAGE]

ORIGINAL FILED
OCT 09 2007
LOS ANGELES
SUPERIOR COURT

SUPERIOR COURT OF CALIFORNIA

COUNTY OF LOS ANGELES

| | |
|---|---|
| Pacific Gas and Electric Company, Southern California Edison Company, San Diego Gas & Electric Company, and California Electricity Oversight Board, Plaintiffs, | Case No.: BC 369141 |
| | Included action within Judicial Council Coordination Proceeding No. 4512 (Electric Refund Cases) |
| v. | **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' DEMURRERS, VOLUME 2 OF 2 (DETAILED ARGUMENT)** |
| Arizona Electric Power Cooperative, Inc.; City of Anaheim; City of Azusa; City of Banning; City of Burbank; City of Glendale; City of Los Angeles; City of Pasadena; City of Riverside; City of Santa Clara; City of Seattle; City of Vernon; Los Angeles Department of Water and Power; Modesto Irrigation District; Northern California Power Agency; Public Utility District No. 2 of Grant County; Sacramento Municipal Utility District; and Turlock Irrigation District, Defendants. | Complaint Filed: April 9, 2007<br>Judge: Hon. Wendell Mortimer, Jr.<br>Hearing: November 30, 2007<br>Time: 9:00 a.m.<br>Department: 307 |

Heller Ehrman LLP

# TABLE OF CONTENTS

Page


FACTS ..... 1

THE CALIFORNIA WHOLESALE ELECTRICITY MARKETS ..... 1

- Creation of the ISO and PX Markets ..... 1
- Roles of the ISO and PX Markets ..... 2
- ISO and PX Market Participants Agreed to Abide by the ISO and PX Tariffs. ..... 2

FERC'S EXCLUSIVE AUTHORITY OVER THE WHOLESALE MARKETS ..... 3

- FERC's Regulatory Responsibility over Wholesale Electric Power Sales ..... 3
- FERC's Exclusive Jurisdiction over the ISO and PX Tariffs ..... 4
- FERC May Amend the Tariffs, Including Re-Pricing Market Transactions ..... 5

DEFENDANTS' PARTICIPATION IN THESE MARKETS ..... 5

- Defendants Executed Written Contracts Agreeing to Abide by the ISO and PX Tariffs. ..... 6

THE ISO AND PX AUCTION MARKET MECHANISMS ..... 7

- The ISO and PX Operated as Revenue-Neutral Clearinghouses. ..... 7
- Market Clearing Price ..... 8
- Settlement and Billing ..... 8
- The ISO and PX Were Empowered to Re-Run Settlements to Reflect Pricing Changes. ..... 9
- Market Participants' Liability for Shortfalls ..... 9
- Market Participants Have the Right, Under the Tariffs, to Bring Actions Directly Against Other Market Participants. ..... 10

MAY 2000 TO JUNE 2001: THE ENERGY CRISIS ..... 11

THE CALIFORNIA PARTIES SEEK RELIEF FROM FERC

- The California Parties Initiate the Remedy Proceeding. ..... 12
- Defendants Participate in the Remedy Proceeding. ..... 14
- The Discovery of Market Manipulation ..... 14

FERC REMEDIATES THE UNLAWFUL MARKET PRICES ..... 16

- November 1, 2000 Order ..... 16
- December 15, 2000 Order ..... 16
- April 26, 2001 Order ..... 16


Heller Ehrman LLP

## TABLE OF CONTENTS
**(Continued)**

**Page**

June 19, 2001 Order ..... 17
July 25, 2001 Order ..... 17
Subsequent Orders Clarifying the MMCP Methodology ..... 18
ALL MARKET TRANSACTIONS OCCURRED UNDER THE ISO AND PX TARIFFS ..... 19
APPEAL FROM FERC'S ORDERS ..... 20
Relief for the Summer Period and Excluded Transactions—*Lockyer v. FERC* and *CPUC v. FERC* ..... 20
FERC's Authority to Order Defendants to Pay Refunds—The *Bonneville* Decision ..... 20
THE CALIFORNIA PARTIES PURSUE THEIR CONTRACT CLAIM AND DEFENDANTS REPUDIATE THEIR CONTRACTUAL OBLIGATIONS ..... 21
Claims Presentments and Denials ..... 21
Repudiation by Defendants ..... 22
Lawsuits in the Eastern District of California ..... 23
ARGUMENT ..... 24
I. LEGAL STANDARDS GOVERNING THESE DEMURRERS ..... 24
A. The Court Must Take As True the Complaint's Factual Allegations, All Reasonable Inferences from These Allegations, and Plaintiffs' Interpretation of Any Ambiguous Contract Provision. ..... 24
B. The Court May Consider the Exhibits, But Only for Limited Purposes. ..... 25
C. Defendants May Not Collaterally Attack FERC Orders on These Demurrers. ..... 26
II. CONTRACT CLAIM OVERVIEW. ..... 27
A. Whether or Not FERC May Exercise Regulatory Jurisdiction Over These Defendants Is Irrelevant to the Contract Theory. ..... 29
B. The Ninth and Eighth Circuits Validated This Same Contract Theory in the *Bonneville* and *Alliant Energy* Cases. ..... 30
III. THE COMPLAINT PLEADS FACTS DEMONSTRATING THAT THE CALIFORNIA PARTIES' CLAIMS ARE TIMELY. ..... 34
A. The Breach of Contract Claim Has Not Yet Accrued. ..... 34

Heller Ehrman LLP

## TABLE OF CONTENTS
**(Continued)**

**Page**


1. There Was No Breach of Contract at the Time Defendants' Sales Were Made Because Prices Had Not Yet Been Reset and No Obligation To Pay Refunds Had Arisen. .... 34
2. The California Parties Were Not Required to Bring Suit After FERC Reset the Prices Because Their Contract Claim Had Not Yet Accrued—and Still Has Not Accrued Today. .... 36

B. The California Parties Are Entitled To Sue Now Because Defendants Have Anticipatorily Repudiated Their Contract Obligations. .... 39

C. The California Parties' Efforts to Pursue Refunds from Defendants at FERC Equitably Tolled Any Limitations Period That Might Have Applied to Commencement of This Action. .... 41

1. The Court May Not Go Beyond the Allegations of the Complaint to Decide the Applicability of the Equitable Tolling Doctrine. .... 42
2. The Complaint Properly Alleges That Equitable Tolling Applies. .... 43

a. Legal Standards Governing Equitable Tolling. .... 43

b. Tolling Applies to the One Year Period for Presenting Government Code Claims. .... 44

c. Each of the Elements of Equitable Tolling Is Satisfied Here. .... 45

D. The California Parties' Declaratory Relief Claims Are Indisputably Timely. .... 53

IV. THE CALIFORNIA PARTIES HAVE SUFFICIENTLY ALLEGED THAT THEY HAVE STANDING TO SUE ON THE CONTRACT. .... 55

A. The IOUs Have Standing to Sue Defendants Under the ISO and PX Tariffs, as Parties to the Same Multi-Party Contracts. .... 55

1. Each Defendant, as a Party to a Multi-Party Contract, Is in Contractual Privity with Each IOU, Even Though They Did Not Sign the Same Documents. .... 55
2. The Tariffs Expressly Allow the IOUs to Bring Suit to Enforce Defendants' Refund Obligations Under the Tariffs. .... 62


Heller Ehrman LLP

**TABLE OF CONTENTS**
**(Continued)**

**Page**


B. At a Minimum, the IOUs Have Standing as Third-Party Beneficiaries of Defendants' Agreement to Abide by the ISO and PX Tariffs. .... 64

1. Whether the IOUs Are Third-Party Beneficiaries Is a Question of Fact That Cannot Be Decided on Demurrer. .... 64

2. In Any Event, the Tariffs Clearly Manifest An Intent to Benefit Market Participants Such as the IOUs. .... 65

3. Defendants' Authorities Do Not Contradict the California Parties' Intended Beneficiary Status. .... 66

C. The EOB Has Standing to Participate in This Lawsuit. .... 68

1. The EOB Is Statutorily Authorized to Participate as a Plaintiff in This Action. .... 68

2. The EOB Independently Has Standing to Pursue the Declaratory Relief Sought in the Complaint. .... 70

3. The EOB's Intervention Is Also Proper. .... 72

V. THE COMPLAINT ALLEGES FACTS DEMONSTRATING THAT DEFENDANTS ARE CONTRACTUALLY BOUND TO REFUND THEIR OVERCHARGES. .... 74

A. The Complaint Sufficiently Alleges That Defendants Are Contractually Bound to Pay Refunds as Required Under the Tariffs. .... 74

1. The Complaint Adequately Alleges That Defendants Contractually Bound Themselves to the Terms of the ISO and PX Tariffs. .... 75

2. The Complaint Adequately Alleges the Terms of a Contract That Requires Defendants to Refund Overcharges. .... 78

3. Defendants' Efforts to Offer Alternative Readings of the Contract Are Unavailing. .... 81

B. Defendants' Affirmative Factual Allegations Relating to FERC's Refund Proceeding and the IOUs Performance Under the Contracts Plainly Cannot Be Resolved on Demurrer. .... 88

1. Defendants May Not Collaterally Attack FERC's Rulings or the Procedural Regularity of the Remedy Proceeding. .... 88

2. These Arguments Are Also Irrelevant. .... 89

3. Defendants' Factual Defenses Are Also Simply Wrong. .... 90


Heller Ehrman LLP

# TABLE OF CONTENTS
**(Continued)**

**Page**

VI. THE IOUs MAY PURSUE CLAIMS FOR UNJUST ENRICHMENT AND MONEY HAD AND RECEIVED. .......... 93

A. Defendants Are Liable to the IOUs for Unjust Enrichment and Money Had and Received Because These Claims Arise From Contract, Not Tort. .......... 93

B. The IOUs' Claims for Unjust Enrichment and Money Had and Received Can Proceed Regardless of the Outcome of Their Contract Claims. .......... 95

VII. THE ARGUMENTS SPECIFIC to AEPCO ARE MERITLESS. .......... 97

A. The California Parties Can Pursue Relief Against AEPCO in This Court. .......... 97

B. Judicial Estoppel Bars AEPCO's Argument. .......... 99

CONCLUSION .......... 100

Heller Ehrman LLP

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Adams v. Paul*,
11 Cal. 4th 583 (1995)...... 41

*Addison v. State of California*,
21 Cal. 3d 313 (1978)...... 41, 52

*Aguilar v. Lerner*,
32 Cal. 4th 974 (2004)...... 99

*Alameda County Land Use Ass'n v. City of Hayward*,
38 Cal. App. 4th 1716 (1995)...... 70

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
458 U.S. 592 (1982)...... 71

*Alliant Energy v. Neb. Pub. Power Dist.*,
No. 00-2139 ADM/FLN, 2001 WL 1640132 (D. Minn. Oct. 18, 2001),
*aff'd* 347 F.3d 1046 (8th Cir. 2003)...... passim

*Alliant Energy v. Neb. Pub. Power Dist.*,
347 F.3d 1046 (8th Cir. 2003)...... passim

*Amelco Elec. v. City of Thousand Oaks*,
27 Cal. 4th 228 (2002)...... 93

*Aragon-Haas v. Family Sec. Ins. Servs.*,
231 Cal. App. 3d 232 (1991)...... passim

*Arkansas Elec. Coop. v. Arkansas Pub. Serv. Comm'n*,
461 U.S. 375 (1983)...... 97

*Aubry v. Tri-City Hosp. Dist.*,
2 Cal. 4th 962 (1992)...... 24

*Baillargeon v. Dep't of Water & Power*,
69 Cal. App. 3d 670 (1977)...... 42, 52

*Bancomer, S.A. v. Super. Ct.*,
44 Cal. App. 4th 1450 (1996)...... 64, 66

*Banker's Hill, Hillcrest, Park West Cmty. Pres. Group v. San Diego*,
139 Cal. App. 4th 249 (2006)...... 90

Heller Ehrman LLP

*Blair v. Pitchess*,
5 Cal. 3d 258 (1971) ... 70

*Bonneville Power Admin. v. FERC*,
422 F.3d 908 (9th Cir. 2005),
*petition for cert. filed* (Aug. 6, 2007) (No. 07-155) ... passim

*Brunswick Leasing Corp. v. Wis. Cent. Ltd.*,
136 F.3d 521 (7th Cir. 1998) ... 61, 62

*Butler v. Sequeira*,
100 Cal. App. 2d 143 (1950) ... 74

*Cal. Dental Ass'n v. Am. Dental Ass'n*,
23 Cal. 3d 346 (1979) ... 56, 57

*Calhoun v. Franchise Tax Bd.*,
20 Cal. 3d 881 (1978) ... 89

*California ex rel. Lockyer v. Dynegy, Inc.*,
375 F.3d 831, amended by 387 F.3d 966 (9th Cir. 2004),
*cert. denied*, 544 U.S. 974 (2005) ... 42

*California ex rel. Lockyer v. FERC*,
383 F.3d 1006 (9th Cir. 2004),
*cert. denied*, 127 S. Ct. 2972 (June 18, 2007) ... 20

*California ex rel. Lockyer v. Powerex*,
Civ-S-05-01216 DFL DAD, 2006 WL 997717 (E.D. Cal. Apr. 14, 2006) ... 42

*California Medical Ass'n, Inc. v. Aetna U.S. Healthcare of California*,
94 Cal. App. 4th 151 (2001) ... 95

*Campbell v. The Regents of the University of California*,
35 Cal. 4th 311 (2005),
*cert. denied*, 546 U.S. 938 (2005) ... 98

*Casady v. Modern Metal Spinning and Mfg. Co.*,
188 Cal. App. 2d 728 (1961) ... 56

*Cent. Delta Water Agency v. State Water Res. Control Bd.*,
17 Cal. App. 4th 621 (1993) ... 68

*Cervantes v. City of San Diego*,
5 F.3d 1273 (9th Cir. 1993) ... 43, 48

*Church v. Jamison*,
143 Cal. App. 4th 1568 (2006) ... 37

*City of Frankfort v. FERC*,
678 F.2d 699 (7th Cir. 1982) ........ 81

*City of San Jose v. Super. Ct.*,
12 Cal. 3d 447 (1974) ........ 47

*City of Tacoma v. Taxpayers of Tacoma*,
357 U.S. 320 (1958) ........ passim

*Coachella Valley Mosquito & Vector Control Dist. v. California Pub. Empl. Relations Bd.*,
35 Cal. 4th 1072 (2005) ........ 98

*Cochran v. Cochran*,
56 Cal. App. 4th 1115 (1997) ........ 37

*Coenen v. R. W. Pressprich & Co.*,
453 F.2d 1209 (2d Cir. 1972) ........ 57

*Collier v. City of Pasadena*,
142 Cal. App. 3d 917 (1983) ........ passim

*Comm. on Children's T.V., Inc. v. Gen. Foods Corp.*,
35 Cal. 3d 197 (1983) ........ 88

*Coopers & Lybrand v. Super. Ct*,
212 Cal. App. 3d 524 (1989) ........ 82

*Corrugated Paper Prods, Inc. v. Longview Fibre Co.*,
868 F.2d 908 (7th Cir. 1989) ........ 65

*County of San Bernardino v. Harsh Cal. Corp.*,
52 Cal. 2d 341 (1959) ........ 72-73

*County of San Diego v. Meyers*,
147 Cal. App. 3d 417 (1983) ........ 52

*County of Solano v. Vallejo Redev. Agency*,
75 Cal. App. 4th 1262 (1999) ........ 39

*Crowley v. Katleman*,
8 Cal. 4th 666 (1994) ........ 41

*Crown Coat Front Co. v. United States*,
386 U.S. 503 (1967) ........ 52

*Cruz v. County of Los Angeles*,
173 Cal. App. 3d 1131 (1985) ........ 25

*Daviton v. Columbia/HCA Healthcare Corp.*,
241 F.3d 1131 (9th Cir. 2001) (en banc) ........ 43

*Downs v. Dept. of Water & Power*,
58 Cal. App. 4th 1093 (1997) ........ 44

*Duke Energy Trading and Mktg., LLC v. Davis*,
267 F. 3d 1042 (9th Cir. 2001) ........ 36

*E. Aviation Group, Inc. v. Airborne Express, Inc.*,
6 Cal. App. 4th 1448 (1992) ........ 67-68

*Eisenberg v. Alameda Newspapers, Inc.*,
74 Cal. App. 4th 1359 (1999) ........ 95, 96

*Elkins v. Derby*,
12 Cal. 3d 410 (1974) ........ 44, 48, 51-52

*Envtl. Action v. FERC*,
996 F.2d 401 (D.C. Cir. 1993) ........ 32

*Erich v. Granoff*,
109 Cal. App. 3d 920 (1980) ........ 92

*Escobedo v. Estate of Snider*,
14 Cal. 4th 1214 (1997) ........ 70

*Evanns v. AT&T Corp.*,
229 F.3d 837 (9th Cir. 2000) ........ 77

*Ferrer v. Preston*,
145 Cal. App. 4th 440 (2006),
*rev. denied*, Cal. Sup. Ct. Feb. 14, 2007,
*cert. granted*, 75 U.S.L.W. 3610 (U.S. Sept. 25, 2007) (No. 06-1463) ........ 98

*First Fed. Sav. & Loan Ass'n of Twin Falls v. E. End Mut. Elec. Co.*,
735 P.2d 1073 (Idaho App. 1987) ........ 56, 57

*FPI Dev., Inc. v. Nakashima*,
231 Cal. App. 3d 367 (1991) ........ 74

*Franconia Associates v. United States*,
536 U.S. 129 (2002) ........ 40

*Fremont Indem. Co. v. Fremont Gen. Corp.*,
148 Cal. App. 4th 97 (2007) ........ 25

*Fuhrman v. California Satellite Sys.*,
179 Cal. App. 3d 408 (1986) ........ 24, 88

*Garabedian v. Skochko*,
232 Cal. App. 3d 836 (1991) ........ 52

*Garcia v. Truck Ins. Exch.*,
36 Cal. 3d 426 (1984) ... 64

*Gardiner v. Gaither*,
162 Cal. App. 2d 607 (1958) ... 70

*Gear v. Webster*,
258 Cal. App. 2d 57 (1968) ... 56, 57

*Gilbert Fin. Corp. v. Steelform Contracting Co.*,
82 Cal. App. 3d 65 (1978) ... 68

*Gottlieb v. Kest*,
141 Cal. App. 4th 110 (2006) ... 99, 100

*Harmon v. City and County of San Francisco*,
7 Cal. 3d 150 (1972) ... 24

*Hedging Concepts, Inc. v. First Alliance Mortgage Co.*,
41 Cal. App. 4th 1410 (1996) ... 95

*Hillsman v. Sutter Cmty. Hosps. of Sacramento*,
153 Cal. App. 3d 743 (1984) ... 95

*Himebaugh v. Smith*,
476 F. Supp. 502 (C.D. Cal. 1978) ... 62

*In re De Laurentiis Entm't Group Inc.*,
963 F.2d 1269 (9th Cir. 1992) ... 96

*In re Wholesale Elec. Anti-Trust Cases I & II*,
147 Cal. App. 4th 1293 (2007) ... 34, 35, 36, 42

*Infinet Mktg. Serv., Inc. v. Am. Motorist Ins. Co.*,
150 Cal. App. 4th 168 (2007), ... 70-71

*Inter-City Gas Corp. v. Boise Cascade Corp.*,
845 F.2d 184 (8th Cir. 1988) ... 32

*Janis v. Cal. State Lottery Comm'n*,
68 Cal. App. 4th 824 (1998) ... 93

*Joslin v. H.A.S. Ins. Brokerage*,
184 Cal. App. 3d 369 (1986) ... 25

*Khoury v. Maly's of California, Inc.*,
14 Cal. App. 4th 612 (1993) ... 74

*Kowis v. Howard*,
3 Cal. 4th 888 (1992) ... 25, 62

*L.A. Equestrian Ctr., Inc. v. City of Los Angeles*,
17 Cal. App. 4th 432 (1993) ........ 94

*Laing v. Ashcroft*,
370 F.3d 994 (9th Cir. 2004) ........ 99

*Leasequip, Inc. v. Dapeer*,
103 Cal. App. 4th 394 (2002) ........ 43

*Leoni v. Delany*,
83 Cal. App. 2d 303 (1948) ........ 96

*Levy v. Cohen*,
19 Cal. 3d 165 (1977) ........ 89

*Lockheed Corp. v. Cont'l Ins. Co.*,
134 Cal. App. 4th 187 (2005) ........ 53, 54

*Loehr v. Ventura County Cmty. College Dist.*,
147 Cal. App. 3d 1071 (1983) ........ 45, 49

*Longshore v. County of Ventura*,
25 Cal. 3d 14 (1979) ........ 74

*Louisiana-Pacific Corp. v. Humboldt Bay Mun. Water Dist.*,
137 Cal. App. 3d 152 (1982) ........ 29-30

*Lucas v. Hamm*,
56 Cal. 2d 583 (1961) ........ 65

*Lundeen Coatings Corp. v. Dep't of Water & Power*,
232 Cal. App. 3d 816 (1991) ........ 93, 94

*Marcario v. County of Orange*,
Case No. G037612, 2007 WL 2717197 (Cal. App. Sept. 19, 2007) ........ 43, 44, 48

*Marcus v. AT&T Corp.*,
138 F.3d 46 (2d Cir. 1998) ........ 76

*Marina Tenants Ass'n v. Deauville Marina Dev. Co.*,
181 Cal. App. 3d 122 (1986) ........ 25

*Martinez v. Socoma Cos., Inc.*,
11 Cal. 3d 394 (1974) ........ 68

*Matthau v. Super. Ct.*,
151 Cal. App. 4th 593 (2007) ........ 60

*McBride v. Boughton*,
123 Cal. App. 4th 379 (2004) ........ 96

Heller
Ehrman LLP

*McKell v. Wash. Mut., Inc.*,
142 Cal. App. 4th 1457 (2006) ... 24

*McKesson HBOC, Inc. v. N.Y. State Common Ret. Fund, Inc.*,
339 F.3d 1087 (9th Cir. 2003) ... 96

*Mega Renewables v. County of Shasta*,
644 F. Supp. 491 (E.D. Cal. 1986) ... 26, 89

*Merlino v. West Coast Macaroni Mfg. Co.*,
90 Cal. App. 2d 106 (1949) ... 74

*Midpeninsula Citizens for Fair Hous. v. Westwood Investors*,
221 Cal. App. 3d 1377 (1990) ... 71

*Miller v. McKinnon*,
20 Cal. 2d 83 (1942) ... 94

*Mojica v. 4311 Wilshire LLC*,
131 Cal. App. 4th 1069 (2005) ... passim

*Montana-Dakota Util. Co. v. Nw. Pub. Serv. Co.*,
341 U.S. 246 (1951) ... 35

*Morehart v. Cnty. of Santa Barbara*,
7 Cal. 4th 725 (1994) ... 67

*Muh v. Newberger, Loeb & Co., Inc.*,
540 F.2d 970 (9th Cir. 1976) ... 56, 57

*Myers v. County of Orange*,
6 Cal. App. 3d 626 (1970) ... passim

*Nasser v. Super. Ct.*,
156 Cal. App. 3d 52 (1984) ... 29

*New Hampshire v. Maine*,
532 U.S. 742 (2001) ... 99, 100

*North Bay Constr., Inc. v. Petaluma*,
143 Cal. App. 4th 552 (2006) ... 94

*Ocean Servs. Corp. v. Ventura Port Dist.*,
15 Cal. App. 4th 1762 (1993) ... 94

*Oceanside 84, Ltd. v. Fid. Fed. Bank*,
56 Cal. App. 4th 1441 (1997) ... 29

*Ochs v. PacifiCare of Cal.*,
115 Cal. App. 4th 782 (2004) ... 64

*Pac. Gas & Elec. Co. v. Ariz. Elec. Power Coop., Inc.*,
479 F. Supp. 2d 1113 (E.D. Cal. 2007) .......... 23

*Pac. Gas & Elec. Co. v. FERC*,
373 F.3d 1315 (D.C. Cir. 2004) .......... 92

*Parker v. Bowron*,
40 Cal. 2d 344 (1953) .......... 55

*Pasadena Live, LLC v. City of Pasadena*,
114 Cal. App. 4th 1089 (2004) .......... 94

*People ex rel. Dep't of Conservation v. El Dorado County*,
36 Cal. 4th 971 (2005) .......... 68, 70

*People ex rel. Dep't of Conservation v. Triplett*,
48 Cal. App. 4th 233 (1996) .......... 68-69

*People ex rel. Pub. Util. Comm'n v. Ryerson*,
241 Cal. App. 2d 115 (1966) .......... 72

*People ex rel. Rominger v. County of Trinity*,
147 Cal. App. 3d 655 (1983) .......... 73

*People v. Beaumont Inv., Ltd.*,
111 Cal. App. 4th 102 (2003) .......... 98

*Peterson v. Lamb Rubber Co.*,
54 Cal. 2d 339 (1960) .......... 56

*Pigeon Point Ranch, Inc. v. Perot*,
59 Cal. 2d 227 (1963) .......... passim

*Prouty v. Gores Tech. Group*,
121 Cal. App. 4th 1225 (2004) .......... 64, 66, 67, 68

*Pub. Utils. Comm'n of Cal. v. FERC*,
254 F.3d 250 (D.C. Cir. 2001) .......... 3

*Pub. Utils. Comm'n of Cal. v. FERC*,
462 F.3d 1027 (9th Cir. 2006) .......... passim

*Pub. Util. Dist. No. 1 of Grays Harbor County Wash. v. IDACORP, Inc.*,
379 F.3d 641 (9th Cir. 2004) .......... 34, 35

*Pub. Util. Dist. No. 1 of Snohomish County v. Dynegy Power Mktg., Inc.*,
384 F.3d 756 (9th Cir. 2004) .......... 35, 36, 42

*Residents of Beverly Glen, Inc. v. City of Los Angeles*,
34 Cal. App. 3d 117 (1973) .......... 71

*Romano v. Rockwell Int.*,
14 Cal. 4th 479 (1996) ........ 37, 39, 40

*Ruyle v. Cont'l Oil. Co.*,
44 F.3d 837 (10th Cir. 1994) ........ 89

*S. Cal. Edison Co. v. Lynch*,
307 F.3d 794 (9th Cir. 2002),
*modified by* 353 F.3d 648 (9th Cir. 2003) ........ 60

*Schauer v. Mandarin Gems of Cal., Inc.*,
125 Cal. App. 4th 949 (2005) ........ 64, 66-67

*Schonfeld v. City of Vallejo*,
50 Cal. App. 3d 401 (1975) ........ 67

*Shell v. Schmidt*,
126 Cal. App. 2d 279 (1954) ........ 67

*Shirk v. Vista Unified School Dist.*,
42 Cal. 4th 201 (2007) ........ 45

*Silberg v. Anderson*,
50 Cal. 3d 205 (1990) ........ 24

*Simpson Redwood Co. v. State of California*,
196 Cal. App. 3d 1192 (1987) ........ 72, 73

*Smith v. State Farm Mut. Auto. Ins. Co.*,
93 Cal. App. 4th 700 (2001) ........ 24

*Souza v. Westlands Water Dist.*,
135 Cal. App. 4th 879 (2006),
*cert. denied*, 127 S. Ct. 383 (Oct. 10, 2006) ........ 66, 67

*Stocks v. Irvine*,
114 Cal. App. 3d 520 (1981) ........ 71

*Stoica v. Int'l Alliance of Theatrical Stage Employees and Moving Picture Mach. Operators of the U.S. and Can.*,
78 Cal. App. 2d 533 (1947) ........ 56

*Stoops v. Abbassi*,
100 Cal. App. 4th 644 (2002) ........ 62

*Supermail Cargo, Inc. v. United States*,
68 F.3d 1204 (9th Cir. 1995) ........ 43

*Taylor v. Johnston*,
15 Cal. 3d 130 (1975) ........ 37, 39

*Thompson v. California Fair Plan Assoc.*,
221 Cal. App. 3d 760 (1990)........................................................ 46

*Timberidge Enters. Inc. v. City of Santa Rosa*,
86 Cal. App. 3d 873 (1978)........................................................ 72

*Transmission Agency of N. Cal. v. Sierra Pac. Power Co.*,
295 F.3d 918 (9th Cir. 2002)........................................................ 35, 42

*United Gas Pipe Line Co. v. Memphis Light, Gas and Water Div.*,
358 U.S. 103 (1958)........................................................ 81

*United Pacific-Reliance Ins. Co. v. DiDomenico*,
173 Cal. App. 3d 673 (1985)........................................................ 53, 54

*Util. Audit Co. v. County of Los Angeles*,
112 Cal. App. 4th 950 (2003)........................................................ 93

*Verizon De., Inc. v. Covad Commc'ns Co.*,
377 F.3d 1081 (9th Cir. 2004)........................................................ 35

*W. Coast Truck Lines, Inc. v. Am. Indus., Inc.*,
893 F.2d 229 (9th Cir. 1990)........................................................ 89

*Wal-Noon Corp. v. Hill*,
45 Cal. App. 3d 605 (1975)........................................................ 95

*Watson v. Aced*,
156 Cal. App. 2d 87 (1957)........................................................ 67

*Wegoland, Ltd. v. NYNEX Corp.*,
27 F.3d 17 (2d Cir. 1994)........................................................ 35

*Williams v. Hous. Auth. of Los Angeles*,
121 Cal. App. 4th 708 (2004)........................................................ 25

*Wilson v. Anderson*,
208 Cal. App. 2d 62 (1962)........................................................ 68

*Windham at Carmel Mountain Ranch Ass'n v. Super. Ct.*,
109 Cal. App. 4th, 1162 (2003)........................................................ 59

*Zigas v. Super. Ct.*,
120 Cal. App. 3d 827 (1981)........................................................ 65

**ADMINISTRATIVE CASES**

*Am. Elec. Power Serv. Corp.*,
106 FERC ¶ 61,020 (2004)........................................................ 91

*Cal. Power Exch. Corp.*,
92 FERC ¶ 61,096 (2000) .......... 63

*Cal. Power Exch. Corp.*,
83 FERC ¶ 61,186 (1998) .......... 4

*Cal. Indep. Sys. Op. Corp.*,
103 FERC ¶ 61,331 (2003) .......... 19

*In re Dairyland Power Coop.*,
37 F.P.C. 12 (1967) .......... 97

*Mid-Continent Area Power Pool*,
89 FERC ¶ 61,135 (1999) .......... 31

*Pac. Gas & Elec. Co.*,
77 FERC ¶ 61,204 (1996) .......... 4

*Pac. Gas & Elec. Co.*,
81 FERC ¶ 61,122 (1997) .......... 11, 63

*Pac. Gas & Elec. Co.*,
95 FERC ¶ 61,020 (2001) .......... 63

*Portland Gen. Elec. Co.*,
83 FERC ¶ 61,186 (1998) .......... 68

*San Diego Gas & Elec. Co.*,
92 FERC ¶ 61,172 (2000) .......... 13, 14, 47

*San Diego Gas & Elec. Co.*,
93 FERC ¶ 61,121 (2000) .......... 14, 16, 36

*San Diego Gas & Elec. Co.*,
93 FERC ¶ 61,294 (2000) .......... 16, 47

*San Diego Gas & Elec. Co.*,
93 FERC ¶ 61,350 (2000) .......... 14

*San Diego Gas & Elec. Co.*,
94 FERC ¶ 61,245 (2001) .......... 13, 48

*San Diego Gas & Elec. Co.*,
95 FERC ¶ 61,115 (2001) .......... 16, 17, 47

*San Diego Gas & Elec. Co.*,
95 FERC ¶ 61,418 (2001) .......... 12, 17, 48

*San Diego Gas & Elec. Co.*,
96 FERC ¶ 61,120 (2001) .......... passim

*San Diego Gas & Elec. Co.*,
97 FERC ¶ 61,275 (2001) .......... passim

*San Diego Gas & Elec. Co.*,
99 FERC ¶ 61,160 (2002) .......... 99

*San Diego Gas & Elec. Co*,
102 FERC ¶ 61,317 (2003) .......... 18, 19

*San Diego Gas & Elec. Co.*,
105 FERC ¶ 61,065 (2003) .......... 19

*San Diego Gas & Elec. Co.*,
107 FERC ¶ 61,165 (2004) .......... 19

*San Diego Gas & Elec. Co.*,
109 FERC ¶ 61,218 (2004) .......... 7, 19, 63

*San Diego Gas & Elec. Co.*,
111 FERC ¶ 61,186 (2005) .......... 92

*San Diego Gas & Elec. Co.*,
119 FERC ¶ 61,296 (2007) .......... 33, 39

*Sierra Southwest Coop. Servs., Inc.*,
95 FERC ¶ 61,310 (2001) .......... 100

*Southern Cal. Edison Co.*,
80 FERC ¶ 61,262 (1997) .......... 7

## STATUTES

11 U.S.C. § 106(b) .......... 94

16 U.S.C. § 824e .......... 80, 90

Cal. Civ. Code
§ 1440 .......... 39, 40
§ 1511 .......... 92
§ 1559 .......... 64, 66
§ 1649 .......... 81

Cal. Civ. Proc. Code
§ 337 .......... 39
§ 387 .......... 72
§ 430.10 .......... 55
§ 452 .......... 24
§ 1060 .......... 70

Heller
Ehrman LLP

Cal. Com. Code § 3118(g) .......... 39

Cal. Evid. Code § 452(c) .......... 25

Cal. Gov't Code
§ 814 .......... 93
§ 901 .......... 37
§ 905 .......... 37, 54
§ 910 .......... 21
§ 911.2 .......... 34, 37, 39, 44
§ 945.4 .......... 37

Cal. Pub. Util. Code
§ 330 .......... 71
§ 334 .......... 71, 73
§ 335 .......... 69, 73
§ 341 .......... 69, 73

Energy Policy Act of 2005,
Pub. L. No. 109-58, 119 Stat. 594 (2005) (EPAct 2005) .......... 3

Federal Power Act Section 201, 16 U.S.C. § 824 (2000) .......... 3, 4, 5, 21

Federal Power Act Section 205, 16 U.S.C. § 824d (2000) .......... 3, 4

Federal Power Act Section 206, 16 U.S.C. § 824e (2000) .......... 3, 4, 5, 28

Federal Power Act Section 309, 16 U.S.C. § 825h (2000) .......... 3

Federal Power Act Section 313(b), 16 U.S.C. § 825l (2000) .......... 26

Wash. Rev. Code. § 4.96.010-020 .......... 21

## TREATISES

6 Am. Jur. 2d, *Associations and Clubs*, § 21 (1999) .......... 56

73 Am. Jur. 2d, *Stock and Commodity Exchanges*, § 7 (2001) .......... 56

18 C.J.S. Corporations § 154 .......... 56

Restatement (Third) of Agency § 6.05 (2006) .......... 61

WITKIN, CALIFORNIA PROCEDURE, ACTIONS, CH. 4 § 492 Election of Remedies (2005) .......... 40

WITKIN, CALIFORNIA PROCEDURE, ACTIONS, CH. V § 831 .......... 54

## FACTS

### THE CALIFORNIA WHOLESALE ELECTRICITY MARKETS

#### Creation of the ISO and PX Markets

In 1996, California enacted Assembly Bill 1890 ("AB 1890"), which created two new wholesale electric power markets: the California Independent System Operator ("ISO") and the California Power Exchange ("PX"), both non-profit corporations organized under California law.[1] Under rules promulgated by the California Public Utilities Commission ("CPUC") and approved by the Federal Energy Regulatory Commission ("FERC"), the IOUs were required to purchase through the ISO and the PX substantially all of the wholesale electric power that they needed to provide service to their retail customers. Other entities, including Defendants, were free to buy and sell through the ISO and PX if they chose to do so, but were not required to do so. Complaint ("Compl.") ¶¶ 23-25.

All sales and purchases of power in the ISO and PX markets, as well as all other market operations, were governed by tariffs regulated by FERC. The ISO and PX Tariffs specify detailed market rules, including when and in what form bids to buy and sell power would be submitted and the formulas used to establish prices for all purchases and sales in those markets. The Tariffs also prescribe the financial settlements resulting from market transactions and allocate risks as between the markets and the market participants. Compl. ¶¶ 26, 36, 37; *see also infra* pp. 8-9.

---

[1] The California Parties's Appendices (Volume 1) contain material that may assist the Court by providing relevant background information and organizing the record presented on these motions: **Appendix A** is a description of "Electricity Market Fundamentals"; **Appendix B** is a "Glossary of Terms;" **Appendix C** is a "Matrix of Issues Raised in Defendants' Demurrers," which compiles and provides cites to those pages of Defendants' moving papers that make each of the arguments addressed in this opposition brief, so that the Court can readily find all the arguments in the motions that go to a particular issue; **Appendix D** is an "Index of ISO and PX Tariff Provisions by Subject Matter;" **Appendix E** is an "Index of ISO and PX Tariff Provisions in Numeric Order," providing the text of each Tariff section and pinpoint citations to the Bates Numbered pages of the ISO and PX Tariffs submitted as JD RJN Exhs. 11 and 12 and California Parties' RJN Exhs. 11 and 12; and **Appendix F** is a "Table of Key FERC Orders." In addition, a helpful recital of facts bearing on these same issues is found in *Pub. Utils. Comm'n of Cal. v. FERC*, 462 F.3d 1027, 1035-1045 (9th Cir. 2006) ("*CPUC*").

Heller Ehrman LLP

**Roles of the ISO and PX Markets**

The PX was created to be California's principal power market. It operated daily auctions in which buyers purchased power for the following day, and also operated hourly auctions to allow buyers to make any necessary adjustments to their day-ahead purchases. Compl. ¶¶ 27-28. The ISO's role was to safely and reliably operate California's transmission grid, which included ensuring the system had adequate reserves and maintaining a stable power supply. To meet these obligations, the ISO operated, and still operates, its own auction markets where it can acquire, in real time, the electric power needed to perform these vital functions. The original market design assumed that the bulk of the transactions would be arranged through the PX, and that the power traded in the ISO would be minimal. But, as a result of market dysfunction and manipulation, and resulting power shortages, vast quantities of electric power ended up being bought and sold through the ISO market during the relevant time period.[2] Compl. ¶¶ 29-32.

**ISO and PX Market Participants Agreed to Abide by the ISO and PX Tariffs.**

A party wishing to participate in these markets had to agree to comply with the ISO and PX Tariffs. Generally speaking, ISO market participants were called "Scheduling Coordinators." A party wishing to become a Scheduling Coordinator was required to sign a Scheduling Coordinator Agreement, in which it explicitly agreed to abide by the terms and conditions of the ISO Tariff, which was incorporated by reference into the Scheduling Coordinator Agreement. Parallel provisions existed in the PX Tariff. Participants in the PX market were called "PX Participants." A party wishing to become a PX Participant was required to sign a PX Participation Agreement, in which the PX Participant explicitly agreed to abide by the terms and conditions of the PX Tariff, which was incorporated by reference into the PX Participation Agreement.[3] Compl. ¶¶ 33-35.

---

[2] During the Energy Crisis the ISO obtained emergency power, known as "out-of-market" or "OOM" power because it was sold outside the auction markets, to keep the grid operational. These OOM sales, like auction sales, were made under the ISO Tariffs. *CPUC*, 462 F.3d at 1052-53. *See* ISO Tariff § 2.3.5.1.5 (ISO authorized to enter into OOM contracts if necessary for reliability purposes).

[3] *See* ISO Tariff Appendix B, Scheduling Coordinator Agreement § 8 (ISO Tariff is incorporated and made a part of Scheduling Coordinator Agreement); § 2 (Scheduling Coordinator agrees it will abide by and perform all obligations under ISO Tariff); PX Tariff Appendix A, PX (Footnote Continued)

**FERC'S EXCLUSIVE AUTHORITY OVER THE WHOLESALE MARKETS**

**FERC's Regulatory Responsibility over Wholesale Electric Power Sales**

Subchapter II of the Federal Power Act ("FPA") gives FERC exclusive jurisdiction over the sale of electricity at wholesale and over the transmission of energy in interstate commerce. 16 U.S.C. § 824(b) (2000). FERC's primary statutory responsibility under the FPA is to ensure that rates charged by public utilities, such as the ISO and PX, are just and reasonable. Several key provisions of the FPA are relevant to these motions:[4]

**Section 201**. Section 201 provides that FERC has jurisdiction over all wholesale power transactions by "public utilities." 16 U.S.C. § 824 (2000). Under Section 201(f), FERC does not generally regulate power sales or transmission service provided by governmental entities.

**Section 205**. Section 205 provides that all sales of power must be pursuant to rates filed with and approved by FERC, and that FERC may only approve such rates if they are "just and reasonable," and not unduly preferential or discriminatory. 16 U.S.C. § 824d(a)-(b) (2000). Any rate not consistent with these provisions is "unlawful." *Id.* FERC's ratemaking authority under Section 205 extends not only to particular prices, but also to rate formulas and practices. *See Pub. Utils. Comm'n of Cal. v. FERC*, 254 F.3d 250, 254 (D.C. Cir. 2001) ("[FERC] need not confine rates to specific, absolute numbers but may approve a tariff containing a rate 'formula' or a rate 'rule.'. . . [T]he formula itself is the rate, not the particular components of the formula . . . .") (citations and internal quotation marks omitted).

**Section 206**. Section 206 also tasks FERC with ensuring that rates charged in its markets are just and reasonable and otherwise lawful, and allows interested parties and FERC itself to

---

Participation Agreement § 8 (PX Tariff incorporated and made a part of PX Participation Agreement); § II (PX Participant agrees it will abide by and perform all obligations under PX Tariff).

[4] The FPA itself, including Sections 201 and 206, was amended by the Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (2005) ("EPAct 2005"). The FPA provisions discussed herein were in force during the Energy Crisis and at the time of the relevant FERC proceedings, prior to the passage of EPAct 2005 and are included in Plaintiffs' Non-California and Unpublished Authorities (Appendix Vol. 2) filed herewith. Sections 205 and 309 were not amended.

initiate complaint proceedings to challenge electric rates. 16 U.S.C. § 824e (2000). When an entity files a challenge to a rate or other provision of a FERC tariff under Section 206 of the FPA, as SDG&E did concerning the ISO and PX Tariffs in August 2000 (*see infra* pp. 12-13), FERC must investigate whether the rates being charged under the tariff are unjust, unreasonable, or otherwise unlawful. 16 U.S.C. § 824d (2000) (Section 205). FERC may also, on its own motion, open an investigation into whether tariffed rates are lawful. 16 U.S.C. § 824e (Section 206). If the rates are not lawful, FERC is required to determine the just and reasonable rate, and has authority to order refunds under FPA Section 206(b). 16 U.S.C. § 824e(b) (2000).

**FERC's Exclusive Jurisdiction over the ISO and PX Tariffs**

The ISO and PX are "public utilities" under the FPA and thus within FERC's exclusive regulatory jurisdiction. *See* 16 U.S.C. § 824(b), (d), (e) (2000); *Pac. Gas & Elec. Co.*, 77 FERC ¶ 61,204 at 61,818 n.108 (1996) ("November 26, 1996 Order") (RJN Exh. 2). FERC thus has exclusive authority to regulate the rates, terms, and conditions of sales made under the ISO and PX Tariffs and to recalculate and correct such rates, terms, and conditions if FERC determines that they are not just and reasonable or are otherwise unlawful.[5] All ISO and PX market participants were required to comply with all rules, conditions, and provisions of the ISO and PX Tariffs. Compl. ¶¶ 33, 35. Transactions in the ISO and PX markets could only take place on the terms and conditions stated in the respective Tariffs. PX Tariff (Aug. 2, 2000), Introductory Statement ("No party will be provided services by the PX which are subject to the jurisdiction of the FERC except on the terms in this Tariff."); *Cal. Power Exch. Corp.*, 83 FERC ¶ 61,186 at 61,771 (1998) ("May 19, 1998 Order") (RJN Exh. 28). ("The Commission has determined that the services provided under the PX Tariff are [FERC-]jurisdictional.").

[5] The Tariffs expressly reference FERC's regulatory authority. Each Tariff defines its "effective date" as "the date it is permitted to become effective by FERC." ISO Tariff § 18.1; PX Tariff § 18.1. The termination provisions state that the Tariffs will terminate upon "receipt of any necessary regulatory approval from FERC." ISO Tariff § 18.2; PX Tariff § 18.2. And provisions throughout the Tariffs refer to FERC's authority over the terms and conditions for trading in the ISO and PX markets. *See, e.g.*, ISO Tariff §§ 12.6, 13.1.1, 16.2; PX Tariff §§ 1.3(f), 15.6 (all referencing FERC).

**FERC May Amend the Tariffs, Including Re-Pricing Market Transactions.**

FERC indisputably has regulatory power to alter or amend the Tariffs, including the pricing provisions. The ISO Tariff provides, for example, that in signing Scheduling Coordinator Agreements, a market participant agrees "to comply with all ISO rules, protocols, and instructions, as those rules, protocols and instructions *may be amended from time to time*." ISO Tariff Appendix A, Master Definitions Supplement ("SC Agreement") (emphasis added). Similarly, the PX Participation Agreement defines the PX Tariff as "the PX FERC Electric Service Tariff *as amended from time to time* . . . ." PX Tariff Appendix A, Participation Agreement, § 1(B) (emphasis added).[6]

The ISO and PX Tariffs give market participants the right to petition FERC to review and modify rates charged under the Tariffs, and provide for recalculation of charges and resettlement of buyers' and sellers' accounts in the event that FERC determines that any rates charged under the Tariffs were unjust, unreasonable, or otherwise unlawful, and thus subject to correction. ISO Tariff § 19; PX Tariff § 13; *see also* FPA § 206, 16 U.S.C. § 824e(a) (2000).

**DEFENDANTS' PARTICIPATION IN THESE MARKETS**

With the exception of AEPCO, Defendants in this case are all "political subdivision[s] of a State," commonly known as "governmental entities," under Section 201(f) of the FPA. 16 U.S.C. § 824(f) (2000).[7] Lured by the prospect of making outsized profits during the Energy Crisis, Defendants voluntarily participated in the ISO and PX markets. By availing themselves of these market opportunities, Defendants subjected all their transactions—and the prices they charged—to

---

[6] The Tariffs state that they may be amended and that all such amendments must be approved by FERC. *E.g.*, ISO Tariff § 19 (amendment to ISO Tariff is effective when FERC permits it to become effective); PX Tariff § 13 (same); PX Tariff § 1.3(f) (references to any section of ISO Tariff shall be deemed to include successor sections amended pursuant to FERC procedures); ISO Tariff § 16.2 (amendments to ISO Protocols are subject to FERC approval); PX Tariff § 19.1.3 (PX Operating Manual is subject to amendment).

[7] AEPCO is a non-profit rural electric generation and transmission cooperative relying on financing provided by the United States Rural Utilities Service. As discussed in *Bonneville Power Admin. v. FERC*, 422 F.3d 908, 917 (9th Cir. 2005), *petition for cert. filed* (Aug. 6, 2007) (No. 07-155), such cooperatives are treated like governmental entities when applying Part II of the FPA.

the ISO and PX Tariff terms that were regulated, and regularly amended, by FERC. Compl. ¶¶ 33, 35, 44, 45, 49.

**Defendants Executed Written Contracts Agreeing to Abide by the ISO and PX Tariffs.**

As noted above, the ISO and PX Tariffs contemplate all participants in those markets would execute an ISO Scheduling Coordinator Agreement and a PX Participation Agreement, respectively.[8] Virtually all of the Defendants signed these Agreements acknowledging they were contractually bound by the ISO and PX Tariffs.[9] Compl. ¶¶ 33-35, 49.

The Scheduling Coordinator Agreement provides that, inter alia, the ISO Scheduling Coordinator "will abide by, and will perform all of the obligations under the ISO Tariff . . . in respect of all matters set forth therein including, without limitation, all matters relating to the scheduling of Energy and Ancillary Services on the ISO Controlled Grid, . . . [and] billing and payments . . . ." ISO Tariff Appendix B, Scheduling Coordinator Agreement, § 2(B). It further provides that "[t]he ISO Tariff is incorporated herein and made a part hereof. In the event of a conflict between the terms and conditions of this Agreement and any other terms and conditions set forth in the ISO Tariff, the terms and conditions of the ISO Tariff shall prevail." ISO Tariff Appendix B, Scheduling Coordinator Agreement, § 8.

The PX Participation Agreement similarly provides that the PX Participant agrees, *inter alia*, that:

> A. [T]he PX Tariff governs all aspects of trading in and administration of the PX Market, including (without limitation), the financial and technical criteria for PX Participants, bidding, [and] Settlement . . . .
>
> B. [The Participant] *will abide by, and will perform all of the obligations under the PX Tariff in respect of all matters set forth therein including, without limitation, all matters relating to the trading of Energy by it through the PX Markets, ongoing*

---

[8] ISO Tariff § 2.2.3.1 ("Each Scheduling Coordinator shall: . . . (f) enter into an SC Agreement with the ISO . . . ."); PX Tariff § 2.6.2(f) (requiring PX Participants to "enter[] into a participation agreement with the PX . . . .").

[9] Defendants' signed agreements are submitted as RJN Exh. 13. Burbank and Turlock failed to sign such agreements. In the most chaotic and desperate period of the Energy Crisis, the ISO accepted "OOM" sales from these entities without the formality of a signed agreement.

> *obligations in respect of bidding, Settlement . . . billing and payments* . . . .

PX Tariff Appendix A, Participation Agreement, § II(B) (emphasis added). The PX Participation Agreement further provides that:

> *The PX Tariff is incorporated herein and made a part hereof.* In the event of a conflict between the terms and conditions of this Agreement and any other terms and conditions set forth in the PX Tariff, the terms and conditions of the PX Tariff shall prevail.

PX Tariff Appendix A, Participation Agreement, § 8 (emphasis added).

The ISO and PX Tariffs to which Defendants agreed to be bound contain the formulas that establish the single market clearing price that was paid to every seller. Thus, when Defendants signed the PX Participation and ISO Scheduling Coordinator Agreements, they agreed to accept the prices established under those Tariffs. *See infra* pp. 27-29, 75-81.

**THE ISO AND PX AUCTION MARKET MECHANISMS**

**The ISO and PX Operated as Revenue-Neutral Clearinghouses.**

The ISO and PX did not buy electricity on their own behalves. The ISO and PX Tariffs explicitly state that the ISO and PX operated the markets at issue here not as principals, but on behalf of market participants, who were the counterparties to the power sales transactions conducted in those markets. *See* Compl. ¶ 38.[10]

---

[10] *See also, e.g.*, ISO Tariff § 2.2.1 ("In contracting for Ancillary Services and Imbalance Energy the *ISO will not act as principal but as agent for and on behalf of the relevant Scheduling Coordinators*") (emphasis added); PX Tariff § 3.1 ("In carrying out its responsibilities under this Tariff . . . [t]he PX *will not be*, and shall not be deemed to be, *a counterparty to any trade transacted through the PX Markets*") (emphasis added). *See also San Diego Gas & Elec. Co.*, 109 FERC ¶ 61,218 at P 69 (2004) ("November 23, 2004 Order") (B/T RJN Exh. D) ("[T]he CAISO does not purchase energy on its own behalf; rather it purchases energy on behalf of the Scheduling Coordinators in the CAISO markets."); *Southern Cal. Edison Co.*, 80 FERC ¶ 61,262 at 61,946 (1997) (JD Non-Cal. Auth. Exh. 27) ("While the PX will not take title to electric energy, and pursuant to the PX Tariff it is not considered a party to a PX trade, it nevertheless will be the intermediary that contracts with the entities that sell into the PX as well as with the wholesale and retail customers that purchase from the PX.").

**Market Clearing Price**

Pursuant to the Tariffs, the ISO and PX auction markets were set up so that all sellers who sold electricity in a particular auction received the same price (the *market clearing price*) for their power, even if they had originally offered to sell at a lower price. As a consequence, if market dysfunction or manipulation inflated the market clearing price, the entire market was affected: all sellers received the inflated price, while all buyers were forced to pay that price. The Tariffs allowed market participants to challenge the ISO and PX prices at FERC if they believed that the prices were unjust and unreasonable, but until FERC corrected the prices, all sellers—including the Defendants—received the distorted prices.

The ISO and PX single-price auctions both operated in a similar fashion. Companies who wished to sell power submitted offers in each auction, while those who needed to buy power submitted bids for the quantity of electric power that they wanted to buy. The ISO and PX matched offers to buy and sell beginning with the lowest-priced bids and continuing up to the highest-priced bids until the amount of power accepted matched the amount sought by purchasers at that price. The price of the last accepted bid—and therefore the highest accepted bid—set the market clearing price for the entire market. Compl. ¶¶ 28, 30; *see also San Diego Gas & Elec. Co.*, 97 FERC ¶ 61,275 at 62,179-81 (2001) ("December 19, 2001 Order") (JD Non-Cal. Auth. Exh. 41) (ISO and PX markets are "centralized, single clearing price auction market[s] under which *all* sellers received the same price for a given sale, pursuant to market rules set by [FERC]") (emphasis added).

**Settlement and Billing**

Almost all market participants both bought and sold electric power in the ISO and PX markets. Under their Tariffs, the ISO and PX were responsible for tracking how much power each market participant bought and sold in those markets and the price associated with each transaction, and preparing and distributing to their market participants invoices reflecting the amounts payable and receivable by them in connection with their trades. *See* Compl. ¶ 37; ISO Tariff § 11.2; PX Tariff § 6.2. This function is called "settlement." For each regular "Settlement Period," the ISO and PX calculated each Scheduling Coordinator's and PX Participant's respective purchases and

sales during that period, netted out the credits and debits attributable to each buyer and seller, and issued settlement statements and monthly invoices to market participants for payment. ISO Tariff § 11.9; PX Settlement and Billing Procedures ("PX PSABP") § 5.4.

**The ISO and PX Were Empowered to Re-Run Settlements to Reflect Pricing Changes.**

Although the markets established market clearing prices for each auction period, the ISO and PX Tariffs created no expectation that amounts due to each seller were "final" once an auction was conducted. Even after an auction was completed and settled, the ISO and PX Tariffs provided mechanisms to correct any overpayments made to sellers and to refund the overpaid amounts to affected purchasers. The amount due to each seller was subject to change, and settlements could be re-run, if necessitated by disputes, errors, FERC directives, or for other good cause, at any time.[11] When FERC determines that sellers made improper overcharges, the Tariffs provide for correction of the accounts of the buyers and sellers involved.[12]

**Market Participants' Liability for Shortfalls**

The market participants, rather than the ISO or PX, bore the risks and rewards of trading in these markets. The Tariffs contain provisions to protect the ISO and PX from the consequences of any market shortfall which might result if one market participant defaulted on a payment, causing a shortage of total funds collected by either the ISO or PX for distribution to the other market

---

[11] ISO Tariff § 11.6.3 (ISO authorized to perform Settlement Statement re-runs; request to perform Settlement Statement re-run *may be made at any time* by Scheduling Coordinator); PX PSABP § 5.3.1 (if PX Participant requires Settlement Statement re-run, it shall send notice *at any time* to PX Governing Board); PX PSABP § 5.3.5 (PX may, at its discretion, issue additional Settlement Statements).

[12] ISO Tariff § 11.6.3.3 (after Settlement Statement re-run, ISO shall debit or credit accounts of Scheduling Coordinators to reflect changes to previous settlements under ISO Tariff); ISO Tariff §§ 11.18.1, 11.18.2 (if "for any reason" ISO Creditor receives overpayment, it must return overpayment to ISO, which is responsible for ensuring that monies are returned to "those entitled to the sum which has been overpaid"); PX Tariff, Schedule 2, §§ 4.3.3, 4.3.4 (if PX Creditor receives overpayment, it must return overpayment to PX, which is responsible for "ascertaining the identity of those Participants entitled to receive amounts overpaid to another PX Participant" and "disbursing those funds to the persons entitled to them"); PX PSABP § 5.3.4 (after Settlement Statement re-run, PX shall debit or credit accounts of PX Participants to reflect changes to previous settlements under PX Tariff).

participants.[13] If those sources were insufficient, the ISO and PX passed through liability for market shortfalls to the non-defaulting market participants that bought or sold power in the markets during any period for which there was a shortfall.[14] *See also* Compl. ¶¶ 39, 41.

**Market Participants Have the Right, Under the Tariffs, to Bring Actions Directly Against Other Market Participants.**

Financial obligations created by market transactions were owed by one market participant to another, rather than to the ISO or PX.[15] Under the terms of the ISO and PX Tariffs, any payment default created a debtor-creditor relationship between defaulting market participants and the market participants that were owed money.[16] Compl. ¶ 39. Under the ISO Tariff, it is ultimately the responsibility of market participants, rather than the ISO, to sue to collect money owed under the Tariffs. ISO Tariff Section 11.19 expressly gives market participants the right to bring suit against one another to enforce rights and obligations created by the Tariffs resulting from sales

---

[13] ISO Tariff § 11.8.2.2 (establishing ISO Reserve Account from which debit balances resulting from Scheduling Coordinator's failure to pay amount due under Tariff shall be settled); PX PSABP § 2.1.2 (establishing PX Reserve Account from which debit balances on PX Clearing Account shall be settled); PX PSABP § 5.7.1 (PX to enforce defaulting PX Debtor's collateral to extent necessary to pay default amount); PX PSABP § 5.7.2 (PX Reserve Account to be used to pay default amounts to PX Creditors and to ISO).

[14] *See, e.g.*, ISO Tariff § 11.16.1 (if ISO cannot satisfy shortfall caused by payment default from Reserve Account or by enforcing collateral, ISO shall reduce payments to all ISO Creditors proportionately to net amounts owing to them by defaulting ISO Debtor); ISO Tariff § 11.2.9 (ISO may levy additional charges on market participants to clear Clearing Account); PX Tariff, Schedule 2, §§ 5.2.4, 5.3; PX PSABP § 5.7.3 (if Reserve Accounts and collateral are insufficient to cover default amount, PX will reduce payments to PX Creditors to fund any shortfall which arises from payment default by PX Participant).

[15] Section 2.2.1 of the ISO Tariff provides that, in contracting for wholesale power, "the ISO will not act as principal but as agent for and on behalf of the relevant Scheduling Coordinators." The PX Tariff, as has been noted, contains a similar provision stating that the PX, like the ISO, will not be deemed a counterparty to any trades in the market. *See* PX Tariff § 3.1.

[16] An entity that was owed money because of the market shortfall was deemed an "ISO Creditor" or "PX Creditor," with the right to enforce its contractual right to payment against an ISO or PX Debtor. ISO Tariff Appendix A, Master Definitions Supplement ("ISO Debtor"); PX Tariff Appendix B, Master Definitions Supplement ("PX Debtor"); ISO Tariff Appendix A, Master Definitions Supplement (defining "ISO Creditor" as a Scheduling Coordinator to which amounts are owed, including by another Scheduling Coordinator); PX Tariff Appendix B, Master Definitions Supplement (same for "PX Creditor" and amounts owed by another PX Participant).

transactions.[17] According to FERC, this provision "authorizes but does not require [the ISO] to seek payment from recalcitrant Scheduling Coordinators on behalf of sellers of energy. Nor is [the ISO] responsible for making payments to a seller if a Scheduling Coordinator defaults." November 23, 2004 Order, 109 FERC ¶ 61,218 at P 72 (B/T RJN Exh. D); *see also Pac. Gas & Elec. Co.*, 81 FERC ¶ 61,122, at 61,508-09 (1997) ("October 30, 1997 Order") (RJN Exh. 3) ("[I]t should be the responsibility of Scheduling Coordinators to recover amounts that they are owed."); Compl. ¶¶ 38-43. The PX Tariff also creates direct rights of action among market participants.[18]

**MAY 2000 TO JUNE 2001: THE ENERGY CRISIS**

Beginning in May 2000, the prices demanded by sellers in the ISO and PX markets shot up to unprecedented levels and stayed there for the next year. At times, prices during the Energy Crisis were as high as $3,880/MWh, over 100 times the prices in the range of $30/MWh that prevailed in prior periods. As a result of the single-price auction provisions of the ISO and PX Tariffs, these extremely high prices generated windfall profits for all sellers, including Defendants. The power crisis had severe negative effects on the stability and financial integrity of the IOUs, and ultimately imposed billions of dollars in additional costs on ratepayers, including business and residential customers throughout the State. The IOUs, because of their statutory obligation to buy

---

[17] ISO Tariff § 11.19 (in event of payment default, "[e]ach ISO Creditor shall give notice to the ISO before instituting any action or proceedings in any court against an ISO Debtor to enforce payments due to it"); *see also* ISO Tariff § 11.20.1 ("*Without prejudice to the right of any Scheduling Coordinator to bring such proceedings as it sees fit in connection with matters related to the recovery of amounts owed to it,*" ISO may bring proceedings on behalf of those Scheduling Coordinators who have indicated to ISO their willingness for ISO to act first) (emphasis added); ISO Tariff § 11.20.2 ("ISO shall, on request, certify in writing the amounts owed by an ISO Debtor that remain unpaid and the ISO Creditors *to whom such amounts are owed*; . . . An ISO certificate given under this section 11.20.2 may be used as prima facie evidence of the amount due by ISO Debtor to ISO Creditors *in any legal proceedings*") (emphasis added).

[18] As noted above, if a PX Participant defaulted on its obligations, the PX Tariff grants the PX an array of remedies, including the ability to liquidate collateral or other security provided by the defaulting participant. If these remedies were insufficient to satisfy the liability, the PX would "chargeback" or allocate the unsatisfied amount to all non-defaulting participants in the PX markets. PX Tariff, Schedule 2, § 5.3 (describing chargeback methodology). Upon effecting a chargeback, the PX Tariff requires the PX to "identify the defaulting Participant"—who otherwise would have remained anonymous—"to all other affected PX Participants by the most expeditious means available." PX Tariff, Schedule 2, § 5.5; Compl. ¶¶ 38-43.

power in the markets, had no means of escaping the full brunt of these sky-high prices. Compl. ¶¶ 51-52, 56. By January 2001, a confluence of events led to the collapse of reliable electric service in California. PG&E and SCE had amassed crippling debt in order to finance the costs of buying electric power, costs that they were not permitted immediately to pass through to their customers. Their credit ratings fell below investment grade, making PG&E and SCE ineligible to buy power through the ISO and PX. PG&E ultimately was driven into bankruptcy. Compl. ¶¶ 52, 56.

The PX ceased operation of its core markets on January 30, 2001. The State of California was forced to step in as the buyer of last resort to buy electric power to ensure continued service to California retail customers. From January 18, 2001 to June 20, 2001 the State purchased more than $5 billion in spot market energy. On January 17 and 18, 2001, the ISO ordered rolling blackouts throughout large areas of California in order to maintain the operational reliability of the transmission grid. These measures marked the beginning of an unbroken string of thirty consecutive days in which the ISO was forced to declare Stage Three Emergencies which threatened the safety and welfare of California citizens. The Energy Crisis ultimately ended on June 19, 2001, when FERC imposed requirements on electric power generators prohibiting them from withholding supply, and imposed price caps on wholesale power sellers across the Western region. *San Diego Gas & Elec. Co.*, 95 FERC ¶ 61,418 at 62,558 (2001) ("June 19, 2001 Order") (JD Non-Cal. Auth. Exh. 39); Compl. ¶ 55-57; *see infra* pp. 16-17.

The bulk of the crippling costs of the crisis has been or will be passed through to, and paid by, the residential and commercial ratepayers of the IOUs. Amounts recovered in this proceeding by the IOUs will ultimately benefit the same California ratepayers who were subjected to the overcharges. Compl. ¶¶ 4, 58.

**THE CALIFORNIA PARTIES SEEK RELIEF FROM FERC**

**The California Parties Initiate the Remedy Proceeding.**

On August 2, 2000, SDG&E filed a complaint with FERC under the FPA against all sellers of electricity into the ISO and PX markets (the "FERC Complaint"). *See* Compl. ¶ 59. The FERC Complaint asserted that the California wholesale power markets were not workably competitive,

Heller Ehrman LLP

and that FERC should prescribe relief consistent with its statutory charge to assure that wholesale rates are just and reasonable. Compl. ¶ 59. FERC's public notice of the Complaint issued on August 3, 2000, and was published in the *Federal Register* on August 9, 2000. Notice of Complaint, *San Diego Gas & Elec. Co.*, 65 Fed. Reg. 48,693 (Aug. 9, 2000) (RJN Exh. 15).

The California Parties intervened in that proceeding on August 14, 2000, seeking broad relief. For example, PG&E's motion to intervene requested that FERC investigate the justness, reasonableness, and lawfulness of rates in the ISO and PX markets, that FERC modify the Tariffs to ensure just and reasonable pricing in those markets, and that FERC order refunds to the extent that FERC determined that sellers had charged unjust, unreasonable, or otherwise unlawful rates. Compl. ¶ 59; *see also* Motion to Intervene, Comments, and Request for Relief of Pac. Gas & Elec. Co., *San Diego Gas & Elec. Co.*, FERC Docket No. EL00-95-000 (August 14, 2000) at 5-6 (LADWP RJN Exh. 5).

On August 23, 2000, FERC opened a broad investigation into whether sellers' rates were just and reasonable, which it consolidated with the FERC Complaint proceedings. *San Diego Gas & Elec. Co.*, 92 FERC ¶ 61,172 at 61,603, 61,609 (2000) ("August 23, 2000 Order") (LADWP RJN Exh. 10). (Collectively, the associated proceedings are referred to as the "Remedy Proceeding.") FERC filed formal notice of the proceedings in the Federal Register and ordered the ISO and PX to notify all market participants, including Defendants, of its initiation of Section 206 proceedings. *Id.* at 61,609. FERC's investigation expressly contemplated potential modification of the ISO and PX Tariffs and related agreements.[19] *Id.* at 61,605-06 ("[W]e conclude that it is appropriate to investigate not only the justness and reasonableness of public utility sellers' rates in the PX and ISO markets *but also to investigate the tariffs and agreements of the ISO and PX to determine whether*

---

[19] Defendants suggest that the California Parties did not seek refunds from governmental entities until some time later, in connection with a March 9, 2001 FERC order. *See, e.g.*, JD Br. at 10; G/P Br. at 8. That is not true. The March 9, 2001 Order dealt with a completely separate issue pertaining to a small, distinct set of refunds with an entirely different refund effective date. *See San Diego Gas & Elec. Co.*, 94 FERC ¶ 61,245 at 61,862 (2001) (explaining that refunds at issue in the order dealt with temporary price cap that became effective on January 1, 2001) (LADWP RJN Exh. 11).

*market rules or institutional factors embodied in those tariffs and agreements need to be modified.*") (emphasis added); *see also* Compl. ¶ 60. In the same order, FERC established a "refund effective date," giving notice to all market participants that its investigation might result in refund liability. August 23, 2000 Order, 92 FERC at 61,609. This meant that "in the intervening period—after the refund effective date but before the conclusion of the Commission's investigations—wholesale power suppliers into California markets *will not know for certain the price they ultimately will be allowed to recover*." *Id.* (emphasis added).[20] After the refund effective date, prices set by the ISO Tariff became conditional and subject to adjustment going forward.

**Defendants Participate in the Remedy Proceeding.**

As sellers of power into the ISO and PX, Defendants were all respondents to the FERC Complaint. In the months after the Remedy Proceeding was instituted, each of the Defendants formally intervened as a party and gained full participatory rights in the Remedy Proceeding.[21] *Defendants, who in almost all instances had both bought and sold power during the Energy Crisis, sought refunds for what they perceived as overcharges on their purchases, but at the same time consistently refused to pay refunds to purchasers who had suffered exactly the same injury. See, e.g.*, *San Diego Gas & Elec. Co.*, 96 FERC ¶ 61,120 at 61,513 n.56 (2001) ("July 25, 2001 Order") (LADWP RJN Exh. 12).

**The Discovery of Market Manipulation**

FERC acknowledged early in the Remedy Proceeding that market manipulation could have been a cause of the unjust and unreasonable rates being charged in the California markets. November 1, 2000 Order, 93 FERC at 61,350. Where, as here, all sellers received the same market clearing prices set by the ISO and PX auctions, such artificially inflated prices could create windfall

[20] The August 23, 2000 Order initially established October 29, 2000 as the "refund effective date." 92 FERC at 61,609. Following rehearing, FERC corrected the refund effective date to October 2, 2000. *San Diego Gas & Elec. Co.*, 93 FERC ¶ 61,121 at 61,370 (2000) ("November 1, 2000 Order") (JD Non-Cal. Auth. Exh. 32).

[21] Defendants' pleadings intervening at FERC are submitted as RJN Exh. 14.

Heller Ehrman LLP

profits for all sellers, benefiting even those sellers that did not engage in market misconduct. Compl. ¶¶ 69, 73.

In May 2002, FERC released memoranda that described how Enron and other sellers had manipulated the ISO and PX markets in order to increase prices throughout the Energy Crisis. From late 2002 to early 2003 the California Parties took discovery on these issues from over five dozen sellers in the ISO and PX markets, including Defendants. The information compiled by the California Parties, known as the Hundred Days Evidence, was filed with FERC in March 2003. As the Ninth Circuit later explained, the evidence showed that many sellers developed a number of artificial means of market manipulation designed to destabilize the electric grid and to increase prices. *See CPUC*, 462 F.3d at 1039-40; *see also* Compl. ¶ 72.

On March 26, 2003, FERC issued its Final Staff Report on the investigation that it had initiated over a year earlier. *Fact-Finding Investigation of Potential Manipulation of Electric and Natural Gas Prices*, Docket No. PA02-2-000 (March 26, 2003) ("Final Report") (RJN Exh. 17). The Report identified numerous potential market power abuses and tariff violations, many implemented with the willing cooperation of certain Defendants. Some of the schemes, such as Enron's "Ricochet" trades, required the participation of multiple entities. *Id.* at VI-17. According to the Report, Enron found "an abundance of willing counterparties" for this scheme, particularly among the California municipal entities (such as LADWP), which owned the transmission facilities "critical" to executing the strategy. *Id.* Enron's "Death Star" strategy was "designed to generate payment by 'fooling' the Cal ISO's computerized congestion management program." *Id.* at VI-26. The Final Report found that "*[n]oninvestor-owned California utilities, such as the Northern California Power Agency and LADWP*," were "*particularly crucial to these strategies*." Final Report at VI-27 (emphasis added). The Final Report noted that other municipal entities, including Glendale, consciously implemented market manipulation strategies in concert with Enron. The Report concluded, "the preponderance of evidence suggests that *non-jurisdictional entities such as Redding and Glendale were associated with Enron in executing the trading strategies in a willful and knowing manner*." *Id.* at VI-30; *see also* Compl. ¶¶ 71-73.

**FERC REMEDIATES THE UNLAWFUL MARKET PRICES**

The period from October 2, 2000, the refund effective date, to June 20, 2001, is known as the "Refund Period." During this period, FERC made repeated efforts to remedy the effects of the dysfunctional ISO and PX markets. FERC issued many orders during this period; some of the most salient are discussed here. *See also* Compl. ¶¶ 56-64.

**November 1, 2000 Order**

FERC issued its first order proposing remedies for the problems affecting the California energy markets on November 1, 2000. November 1, 2000 Order, 93 FERC ¶ 61,121 (2000) (JD Non-Cal. Auth. Exh. 32). In that order, FERC found that unjust and unreasonable rates had been charged in the California markets, and that the structure and rules of the ISO and PX markets were "seriously flawed" and were a cause of the unjust and reasonable rates. *Id.* at 61,349-50. FERC proposed "fundamental modifications to the wholesale market structure and rules [i.e., the ISO and PX Tariffs] currently in place in California," as well as temporary price mitigation measures intended to moderate prices while more permanent changes were made. *Id.* at 61,350. FERC again emphasized that changes in "market rules"—i.e., the ISO and PX Tariffs—could result in refund liability. *Id.* at 61,370 ("*[W]e propose that sellers remain subject to potential refund liability* . . . if the Commission finds that the wholesale markets in California are unable to produce competitive, just and reasonable prices, . . . *we may require refunds for sales made during the refund effective period*.") (emphasis added).

**December 15, 2000 Order**

On December 15, 2000, FERC reaffirmed its prior findings that "unjust and unreasonable rates were charged and could continue to be charged unless remedies [we]re implemented," *San Diego Gas & Elec. Co.*, 93 FERC ¶ 61,294 at 61,999 (2000) ("December 15, 2000 Order") (JD Non-Cal. Auth. Exh. 33), and instituted many remedies proposed in the November 1, 2000 Order.

**April 26, 2001 Order**

Despite FERC's efforts, the crisis continued. On April 26, 2001, FERC proposed a plan aimed at calming the prices in the ISO and PX markets. *San Diego Gas & Elec. Co.*, 95 FERC ¶ 61,115 (2001) ("April 26, 2001 Order") (JD Non-Cal. Auth. Exh. 38). FERC proposed that,

Heller Ehrman LLP

*going forward*, all sellers—including Defendants—would be required to abide by a price mitigation plan ("Prospective Mitigation Methodology") which would cap the market clearing price at a "breakpoint" based on the actual cost of generating power. *Id.* at 61,359-60. The order also required all sellers that had signed certain agreements with the ISO to make all power from their generation facilities available to the ISO market during Stage 1 emergencies. *Id.* at 61,356-58.

**June 19, 2001 Order**

On June 19, 2001, the Commission issued an order that expanded and refined the Prospective Mitigation Methodology announced in the April 26, 2001 Order and made this new plan effective for the period between June 21, 2001 and September 30, 2002. June 19, 2001 Order, 95 FERC ¶ 61,418 (2001) (JD Non-Cal. Auth. Exh. 39). FERC ordered the ISO to revise its Tariff to reflect the new mitigation measures, which would govern the ISO market going forward. *Id.* at 62,571. The mitigation measures applied not only to the ISO market, but to all spot market prices and sellers in the West, including Defendants. *Id.* at 62,556-60.

**July 25, 2001 Order**

Pursuant to its authority under Section 206 of the FPA, FERC's July 25, 2001 Order made sellers liable for refunds for sales made in the ISO and PX markets during the Refund Period. July 25, 2001 Order, 96 FERC ¶ 61,120 (2001) (LADWP RJN Exh. 12). FERC adopted a methodology to recalculate, on a market-wide basis, the maximum competitive market energy prices that would have existed in the ISO and PX markets if sellers had charged just and reasonable rates during the Refund Period, and to adjust prices *retrospectively*. *Id.* at 61,516-19. The July 25, 2001 Order provided that refunds would commence on October 2, 2000, the "Refund Effective Date," and would apply to sales made through June 20, 2001, after which the Prospective Mitigation Methodology fixed the market problems. *Id.* at 61,513.

FERC's re-pricing methodology had the effect of revising the ISO and PX Tariffs to establish the corrected, maximum rates that could be charged *for past sales* under those Tariffs. As FERC explained, its action "revise[d] the market clearing prices *that all market participants previously agreed to accept for their sales*." *Id.* at 61,512 (emphasis added). The corrected, maximum rates were called the "Mitigated Market Clearing Price," or "MMCP." FERC ordered

the ISO and PX to apply the MMCP to sales during the Refund Period, including to OOM sales, *id.* at 61,515-16, in order to recalculate the charges that all sellers should have received for each interval during the Refund Period in place of the previous unlawful prices. *Id.* at 61,517. Under this approach, prices that exceeded the MMCP were subject to refund.[22]

FERC established evidentiary hearings to determine the facts necessary to calculate the MMCP and resulting refunds. July 25, 2001 Order, 96 FERC at 61,519-20. It ordered the ISO and PX to recalculate the hourly market clearing prices that would have been (and should have been) set in a competitive market under the revised pricing formula, and ordered them to re-run their settlement and billing processes under their respective Tariffs. *Id.* at 61,519. Pursuant to FERC's direction, the ISO and the PX have recalculated the accounts of all sellers and buyers in the ISO and PX markets to reflect the corrected rates for the Refund Period in accordance with the July 25, 2001 Order and the subsequent related FERC orders. The ISO continues to make adjustments to these settlement statements to account for certain cost offsets and interest calculations necessary to prepare final invoices. *Thirty-Eighth Status Report of the California Independent System Operator Corporation on Settlement Re-Run Activity, San Diego Gas & Elec. Co.*, ER03-746-000, *et al.*, at 2-3 (September 6, 2007) ("Thirty-Eighth Status Report") (RJN Exh. 24).

**Subsequent Orders Clarifying the MMCP Methodology**

In a series of subsequent orders, FERC adjusted and clarified the MMCP methodology. On December 19, 2001, FERC largely reaffirmed both the Prospective Mitigation Methodology and the Refund Methodology. December 19, 2001 Order, 97 FERC ¶ 61,275 (2001) (JD Non-Cal. Auth.

---

[22] Although FERC corrected prices for a wide swath of transactions, it also concluded that, on the record before it, its statutory mandate did not grant it authority to order refunds for the early part of the Energy Crisis, from May 1, 2000 through October 1, 2000 (the "Summer Period"), and thus denied relief for the Summer Period. July 25, 2001 Order, 96 FERC at 61,505. FERC also refused to correct the rates for "energy exchange" transactions (in which blocks of electric power were sold to the ISO for payment in-kind) and sales to the ISO or the PX of greater than twenty-four hours—i.e., "multi-day" sales under FERC's definition—made during the Refund Period. *See id.* at 61,499; *see also San Diego Gas & Elec. Co.*, 102 FERC ¶ 61,317 at P 94 ("March 26, 2003 Order") (JD Non-Cal. Auth. Exh. 44). (These latter two categories are known as the "Excluded Transactions."). In *CPUC*, the Ninth Circuit vacated FERC's orders refusing to grant relief for the Summer Period and Excluded Transactions. 462 F.3d at 1035, 1045-1051.

Exh. 41). Among other things, FERC noted that "[t]he SDG&E complaint docket involves all sellers' rates in the ISO and PX markets." *Id.* at 61,198. The hearings called for in the July 25, 2001 Order were held before a FERC Administrative Law Judge, who issued proposed findings on December 12, 2002. On March 26, 2003, FERC issued its order on the proposed findings. March 26, 2003 Order, 102 FERC ¶ 61,317 (2003). On June 13, 2003, in a related proceeding, FERC accepted Amendment No. 51 to the ISO Tariff. This amendment made changes to the settlement and billing provisions of the ISO Tariff that the ISO claimed were needed to allow it to accurately calculate the market re-runs and resettlements of market participants' liabilities so that new invoices could be issued. *Cal. Indep. Sys. Op. Corp.*, 103 FERC ¶ 61,331 (2003) (RJN Exh. 7). On October 16, 2003, after having reviewed an extensive evidentiary submission, FERC issued two orders related to the Remedy Proceeding, clarifying that FERC had no intention of modifying its prior Orders regarding the MMCP.[23]

**ALL MARKET TRANSACTIONS OCCURRED UNDER THE ISO AND PX TARIFFS**

Defendants Burbank and Turlock argued at FERC and argue again here that their sales were not within the ISO Tariff because they had not signed ISO Scheduling Coordinator or PX Participation Agreements. *See, e.g.*, B/T Br. at 2-4. FERC considered and ultimately rejected this argument in a series of orders involving Turlock, holding that "such purchases are no different than purchases through [the ISO's auction] markets," and those transactions were therefore governed by the Tariff. July 25, 2001 Order, 96 FERC at 61,515. As FERC observed, even the entities that failed to sign an agreement acknowledging the Tariffs "knew or should have known that [their] transactions were governed by the FERC-approved CAISO Tariff" and were subject to refund. *San Diego Gas & Elec. Co.*, 107 FERC ¶ 61,165 at P 85 (2004) (JD Non-Cal. Auth. Exh. 49). After several rehearings, FERC held these Defendants' transactions are governed by the ISO Tariff and subject to refund. November 23, 2004 Order, 109 FERC ¶ 61,218 at PP 66-68.

---

[23] *San Diego Gas & Elec. Co.*, 105 FERC ¶ 61,066 at P 202 (2003) (B/T RJN Exh. C) ("[N]othing in this evidence has caused the Commission to change the refund formula utilized in this proceeding."); *San Diego Gas & Elec. Co.*, 105 FERC ¶ 61,065 (2003) (RJN Exh. 27).

**APPEAL FROM FERC'S ORDERS**

**Relief for the Summer Period and Excluded Transactions—*Lockyer v. FERC* and *CPUC v. FERC***

The question of relief for the Summer Period and other Excluded Transactions was raised in a FERC proceeding that was related to but separate from the Remedy Proceeding. In ruling on a petition for review of orders entered in that separate FERC docket, the Ninth Circuit held that FERC had erred by concluding that it lacked authority to order refunds for the Summer Period and Excluded Transactions, and remanded the case so that FERC could, "in the first instance," reconsider whether refunds are appropriate for those transactions. *California ex rel. Lockyer v. FERC*, 383 F.3d 1006, 1017-18 (9th Cir. 2004); *see also* Compl. ¶ 68.

In the Remedy Proceeding, the California Parties petitioned the Ninth Circuit for review of the July 25, 2001 Order and subsequent FERC rehearing orders on the ground, *inter alia*, that FERC was also required to correct the rates for sales made during the Summer Period and for the Excluded Transactions. Compl. ¶ 65. On August 2, 2006, the Ninth Circuit issued its decision in *CPUC*, granting the California Parties' petitions for review on the Summer Period and Excluded Transactions issues, and remanding to FERC for further proceedings. The court concluded that FERC provided insufficient justification for its refusal to consider a market-wide remedy for tariff violations during the Summer Period and failed to provide any valid reason for its refusal to apply its MMCP Methodology to the Excluded Transactions. *CPUC*, 462 F.3d at 1049-51, 1057, 1060-1061, 1065. *See also* Compl. ¶ 67.

**FERC's Authority to Order Defendants to Pay Refunds—The *Bonneville* Decision**

FERC ruled in a series of decisions in the Remedy Proceeding that its power to enforce sellers' payment of refunds under the FPA extended to governmental entities such as Defendants. Certain of the Defendants appealed this decision to the Ninth Circuit. On September 6, 2005, the Ninth Circuit ruled that FERC lacked statutory authority to directly enforce Defendants' refund obligations under the ISO and PX Tariffs. *Bonneville*, 422 F.3d at 911, 920; *see also* Compl.

¶ 74.[24] The court noted, however, that market participants could, as an alternative remedy, bring claims in court directly against Defendants to enforce the contractual obligations created by the operative tariffs and related agreements. *Bonneville*, 422 F.3d at 925-26. The Ninth Circuit observed that Defendants' agreement to abide by the ISO and PX Tariffs "serves to demonstrate that the remedy, if any, may rest in a contract claim, not a refund action. Such an approach is not novel . . . ." *Id.* (citing *Alliant Energy v. Nebraska Pub. Power Dist.*, 347 F.3d 1046, 1050-51 (8th Cir. 2003). Compl. ¶¶ 74-75.[25]

**THE CALIFORNIA PARTIES PURSUE THEIR CONTRACT CLAIM AND DEFENDANTS REPUDIATE THEIR CONTRACTUAL OBLIGATIONS**

Following the Ninth Circuit's suggestion, and based on Defendants' continuing unwillingness to acknowledge their contractual obligations, the California Parties sought recourse in court under a contract theory.

**Claims Presentments and Denials**

On December 2, 2005, without conceding that they were required to take such action at that time, the California Parties served copies of written claims on all California Defendants pursuant to the California Tort Claims Act and related statutes, providing them with notice of the California Parties' claims for relief. Cal. Gov't Code § 910.[26] Defendants have denied the California Parties' Government Code claims. Compl. ¶ 78.

---

[24] Although Section 201(f) does not apply to AEPCO, *Bonneville* held AEPCO was exempt from FERC's refund authority for a different reason, and that it must be treated as a "non-public" utility under the refund orders, exempt from FERC's refund authority. *See infra* pp. 97-100.

[25] While *Bonneville* is controlling authority for this Court, PG&E has filed a petition for writ of certiorari of the decision, now pending in the United States Supreme Court.

[26] The Arizona claims presentment statutes do not apply to RUS-financed cooperatives; consequently, no notice of claim was presented to AEPCO. On the same date, the California Parties also served claims on the City of Seattle in light of ambiguity as to whether the California Parties were required to present their claims under Washington law. Wash. Rev. Code. § 4.96.010-020.

**Repudiation by Defendants**

Defendants have consistently denied they are contractually obliged to refund any amounts received in excess of the FERC-corrected price for electric power sales during the Refund Period. Defendants have repeatedly asserted at FERC that they have no contractual obligation to pay refunds. For example, Defendants AEPCO, SMUD, NCPA, and City of Riverside stated in a November 28, 2005 FERC submission that "*agreements with the PX to abide by its rules do not constitute any sort of agreement to pay refunds if the rates for sales to the PX by others were found to be too high[.]*" Answer of Non-Jurisdictional Entities to California Parties' Opposition to Motion for Return of Collateral and for Expedited Action, *San Diego Gas & Elec. Co.*, Nos. EL00-95-000 *et al.*, at 4-5 (Nov. 28, 2005) (emphasis added) (RJN Exh. 18).[27] Defendants also denied the California Parties' Government Code claims, thereby rejecting any obligation to pay refunds. Compl. ¶ 78. Defendants have reiterated their refusals to pay refunds in this proceeding.[28]

---

[27] *See also* Answer of the City of Los Angeles Department of Water and Power to the California Parties' Disputes Relating to Cost Offsets and Refund Re-Runs, *San Diego Gas & Elec. Co.*, Nos. EL00-95-000, *et al.*, at 11 (Jan. 3, 2006) ("Without Commission authority to establish governmental entities' refund liability in this proceeding, there is no need for governmental entities to further respond to the California Parties Disputes . . . which are unnecessary because of the *Bonneville* opinion.) (RJN Exh. 20); Amendment to Notification of the Northern California Power Agency Regarding Potential Outstanding Disputes, filed in Nos. EL00-95-000, *et al.*, at 2 (Dec. 12, 2005) ("[T]he ruling in [*Bonneville*] mandates that no sales to non-jurisdctionals [meaning the Defendants] be mitigated . . . .") (RJN Exh. 19); Request of the Northern California Power Agency for Rehearing of Order on Cost Filings, *San Diego Gas & Elec. Co.*, Nos. EL00-95-000, *et al.*, at 2 (Feb. 27, 2006) (RJN Exh. 21).

[28] *See, e.g.*, JD Br. at 19 (by August 24, 2001, "Defendants sought rehearing of the erroneous July 25, 2001 FERC Order and thus unequivocally 'refused to pay refunds.'"); *id.* at 26 ("This Court will search in vain in the Tariffs, the SCAs, and the PXPAs for a single provision which would require these Governmental Entity Defendants to adjust retroactively the rates they charged to the ISO and the PX based on FERC's Orders, or to abide by any FERC Order compelling these Governmental Entity Defendants to make refunds."); B/T Br. at 8 ("The Court cannot imply from Turlock's and Burbank's sales a contract binding them to the ISO Tariff because their sales were subject to express contracts which do not require compliance with the ISO Tariff."); G/P Br. at 21 ("This court can search the Tariffs high and low and will not find contractual language to support any claim for breach of contract against these demurring defendants."); LADWP Br. at 2 ("There is simply no contractual relationship between the IOUs and LADWP in the alleged contracts.").

Defendants have thus made it clear that they will not perform their contractual obligation to pay refunds when the time to make those payment comes due.

Additionally, Defendants have made their repudiation clear by their actions at FERC. Defendants have been trying vigorously at FERC to prevent the ISO and PX recalculation and invoicing process from ever being completed in an attempt to avoid paying refunds. *See* Answer of Indicated Public Entities in Opposition to California Parties' Motion for Procedures Following Remand in *Bonneville Power Admin. v. FERC*, *San Diego Gas & Elec. Co.*, Nos. EL00-95-000, *et al.* (April 17, 2007) (RJN Exh. 22); Answer of City of Los Angeles Department of Water and Power to California Parties' Motion for Procedures Following Remand in *Bonneville Power Admin. v. FERC, San Diego Gas & Elec. Co.*, Nos. EL00-95-000, et al. (April 17, 2007) (RJN Exh. 23).

**Lawsuits in the Eastern District of California**

PG&E, SCE, and EOB filed a complaint in the United States District Court for the Eastern District of California on March 16, 2006, within six months of the earliest claim denial and in a timely manner against all Governmental Entities named in this Complaint. SDG&E timely filed a similar complaint on March 21, 2006.[29] The claims pleaded in these two complaints were based on the identical facts that were at issue in the Remedy Proceeding and in the various Ninth Circuit appeals from the Remedy Proceeding. On March 16, 2007, the district court, without reaching the merits, granted certain Defendants' motions to dismiss for lack of federal subject matter jurisdiction. *Pac. Gas & Elec. Co. v. Ariz. Elec. Power Coop., Inc.*, 479 F. Supp. 2d 1113 (E.D. Cal. 2007). On April 9, 2007, the California Parties brought this lawsuit against the same Defendants. Compl. ¶¶ 78-79.

---

[29] *See PG&E v. AEPCO, et al.*, No. 06-CV-0559 (E.D. Cal. filed March 16, 2006); *SDG&E v. AEPCO, et al.*, No. 06-CV-0592 (E.D. Cal. filed March 21, 2006).

## ARGUMENT

### I. LEGAL STANDARDS GOVERNING THESE DEMURRERS

The California Parties' Complaint is "not vulnerable to a general demurrer if the complaint states the essential and substantial facts to apprise [the] defendant of the nature of the cause of action." *Harmon v. City and County of San Francisco*, 7 Cal. 3d 150, 157 (1972). Because a demurrer tests the legal sufficiency of the Complaint, *Aragon-Haas v. Family Sec. Ins. Servs.*, 231 Cal. App. 3d 232, 238 (1991), the question is not whether the California Parties will ultimately prevail, but whether they are entitled to put forward evidence in support of their claims. *See Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 711 (2001). Under this standard, the Complaint cannot be dismissed under Section 430.10(e) unless it fails to adequately state a cause of action under any possible legal theory. *See Aubry v. Tri-City Hosp. Dist.*, 2 Cal. 4th 962, 967 (1992).[30]

#### A. The Court Must Take As True the Complaint's Factual Allegations, All Reasonable Inferences from These Allegations, and Plaintiffs' Interpretation of Any Ambiguous Contract Provision.

In ruling on these demurrers, the Court must take as true all of the Complaint's properly pled allegations of material fact and all reasonable inferences from these allegations. *See McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457, 1470 (2006). The allegations of the Complaint are "liberally construed, with a view to substantial justice between the parties." Cal. Civ. Proc. Code § 452. Defendants' numerous factual challenges to the Complaint, which appear throughout their briefs, are irrelevant. *Fuhrman v. California Satellite Sys.*, 179 Cal. App. 3d 408, 422-23 (1986), *overruled on other grounds*, *Silberg v. Anderson*, 50 Cal. 3d 205 (1990) (Defendants "cannot set forth allegations of fact in their demurrers which, if true, would defeat plaintiff's complaint").

---

[30] Four Defendants also demur to the Complaint on grounds other than Section 430.10(e). B/T Br. at 14-15 (demurrer based on Cal. Civ. Proc. Code § 430.10(b) (no capacity to sue)); G/P Br. at 16 (demurrer based on Cal. Civ. Proc. Code § 430.10(f) (uncertainty)). These demurrers are addressed, respectively, *infra* at pp. 55-73 and p. 74.

In addition, *to the extent there is ambiguity in any of the contractual provisions underlying the California Parties' claims, the Complaint's interpretation of these ambiguous provisions must be taken as true*, so long as that interpretation is not clearly erroneous. *See Pigeon Point Ranch, Inc. v. Perot*, 59 Cal. 2d 227, 233 (1963), *overruled on other grounds*, *Kowis v. Howard*, 3 Cal. 4th 888 (1992) (holding that because plaintiff's interpretation of the underlying contract was not clearly erroneous, the court must take as true plaintiff's allegations of the contract's meaning); *Aragon-Haas*, 231 Cal. App. 3d at 239 ("So long as the pleading does not place a clearly erroneous construction upon the provisions of the contract, in passing upon the sufficiency of the complaint, we must accept as correct plaintiff's allegations as to the meaning of the agreement.") (citing *Marina Tenants Ass'n v. Deauville Marina Dev. Co.*, 181 Cal. App. 3d 122, 128 (1986)). Most of Defendants' demurrer arguments improperly offer alternative interpretations of ambiguous contract provisions, and should be rejected on this ground alone.

**B. The Court May Consider the Exhibits, But Only for Limited Purposes.**

Although the Court's scope of review on a demurrer is generally limited to the allegations of the complaint, the Court may also consider exhibits attached to the Complaint and incorporated by reference. *See Williams v. Housing Authority of Los Angeles*, 121 Cal. App. 4th 708, 714 n.6 (2004).

The Court may also consider matters properly subject to judicial notice, *see Cruz v. County of Los Angeles*, 173 Cal. App. 3d 1131, 1134 (1985) (citing Cal. Evid. Code § 452(c)), but may *not* judicially notice the truth of any statements contained in such documents, or the documents' proper interpretation, unless those matters are undisputed. "The hearing on demurrer may not be turned into a contested evidentiary hearing through the guise of having the court take judicial notice of documents whose truthfulness or proper interpretation are disputable." *Joslin v. H.A.S. Ins. Brokerage*, 184 Cal. App. 3d 369, 374 (1986). *See also Fremont Indemnity Co. v. Fremont Gen. Corp.*, 148 Cal. App. 4th 97, 115 (2007) ("[A] court cannot by means of judicial notice convert a demurrer into an incomplete evidentiary hearing in which the demurring party can present documentary evidence and the opposing party is bound by what that evidence appears to show").

**C. Defendants May Not Collaterally Attack FERC Orders on These Demurrers.**

Defendants at many points attack the validity of various FERC orders on procedural or substantive grounds, even though the California Parties' claims are based in contract and do not depend on the enforcement of any FERC order against Defendants. This Court lacks subject matter jurisdiction to hear or resolve such collateral attacks on FERC decisions, which may only be appealed to a federal court of appeals. *See City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 336 (1958). In *City of Tacoma* the Supreme Court held that "Congress in § 313(b) [of the FPA] prescribed the specific, complete and exclusive mode for judicial review of the Commission's orders . . . [and] *precluded de novo litigation between the parties of all issues inhering in the controversy* and all other modes of judicial review." *Id.* (citation omitted) (emphasis added). Defendants thus may not relitigate in this forum the merits or procedural validity of FERC's decisions. And, to the extent that specific FERC decisions were not appealed, have not yet been ruled upon by the courts of appeals, or the courts of appeals did not consider specific issues, this Court has no jurisdiction to second-guess or revisit issues that have been settled at FERC. *See Mega Renewables v. County of Shasta*, 644 F. Supp. 491, 498-99 (E.D. Cal. 1986) (refusing to consider arguments in opposition brief or counterclaim that required court to consider correctness of FERC order because such arguments should have been litigated before FERC and appealed to federal appellate court pursuant to FPA).

## II. CONTRACT CLAIM OVERVIEW.

Defendants devote most of their briefing to constructing fictional claims for the California Parties and then attacking their own constructions. None of Defendants' arguments provides a basis for dismissing the contract claim as actually pleaded in the Complaint. Here is the contract theory the California Parties *have* alleged:[31]

- In order to gain access to the ISO and PX markets, Defendants voluntarily entered into contracts in which they agreed—*as a matter of private obligation, not regulation*—to abide by the Tariffs.
- The Defendants' contracts incorporated the Tariffs in their entirety. In other words, the Tariffs themselves became the body of these private agreements. That meant that Defendants agreed to follow the same rules, and accept the same prices, that applied to all other buyers and sellers in these markets. *See* ISO Tariff Appendix B, Scheduling Coordinator Agreement, §§ 2(B), 8; PX Tariff Appendix A, Participation Agreement, §§ II(B), 8; *see also* Compl. ¶¶ 33-35, 49.
- FERC regulates the terms of the ISO and PX Tariffs, including prices in the ISO and PX markets, which are set according to formulas in the Tariffs. *See, e.g.*, ISO Tariff § 19 (amendment or modification to ISO Tariff is effective when FERC permits it to become effective); PX Tariff § 13 (same for PX); ISO Tariff § 16.2 (amendments to ISO Protocols are subject to FERC approval); PX Tariff § 19.1.3 (PX Operating Manual subject to amendment); *see also* Compl. ¶ 44. For any given auction period, the Tariff formulas yielded a single, uniform price that applied to all sales. ISO Tariff § 2.5 (formulas for determining market clearing price in ISO auctions); ISO Tariff Appendix A, Master Definitions Supplement ("Market Clearing Price"); PX Tariff § 3.8 (Market Clearing Price Determination); PX Tariff Schedule 3 (formula for determining market

[31] To be clear, this is not a claim to reset market prices—this Court would have no jurisdiction to order such relief. *See infra* pp. 34-35. Nor is this a claim to recover damages resulting from market manipulation.

clearing price); PX Tariff Appendix B, Master Definitions Supplement ("Market Clearing Price").

- The ISO and PX Tariffs provide on their faces that they are subject to amendment by FERC. *See* PX Tariff § 1.3(f) (references to any section of ISO Tariff shall be deemed to include successor sections amended pursuant to FERC procedures); PX Tariff § 19.1.3 (PX Operating Manual is subject to amendment); *see also* Compl. ¶¶ 44, 46, 49, 82. Specifically, the Tariffs' pricing formulas could be adjusted after the fact by FERC if FERC determined the market prices were unjust, unreasonable or otherwise unlawful. *See* ISO Tariff § 19; PX Tariff § 13; *see also* Compl. ¶¶ 44, 59, 60.
- Acting pursuant to Section 206 of the FPA, FERC investigated and found that prices charged in the ISO and PX markets during the Energy Crisis were unjust, unreasonable and unlawful, and corrected the Tariffs' pricing formulas to recalculate the just and reasonable rates that should have been charged. The new rates set under the revised formulas applied retroactively to all sellers' transactions, and sellers no longer had any right under the Tariffs to retain their original charges.[32] *See* ISO Tariff Appendix A, Master Definitions Supplement, "SC Agreement" (entities that participate in ISO market must agree to comply with all Tariff terms as "amended from time to time"); PX Tariff Appendix A, Participation Agreement, § 1(B) (same for PX); *see also* Compl. ¶¶ 61, 83-85.
- When the ISO and PX resettle participants' accounts and issue revised invoices reflecting the corrected prices, a process that is not yet completed, Defendants, like all

---

[32] It is not the case, as Defendants argue, that the Tariffs only allow FERC to take action that affects non-governmental entities. *See* JD Br. at 27-28; G/P Br. at 21. The relevant FPA provision also refers to "contract[s] affecting" rates of a public utility. 16 U.S.C. § 824e(a) (2000). And, as the courts have held, that authority includes jurisdiction over prices in contracts to which a public utility is a party, even if other parties include government entities. *See Alliant Energy*, 2001 WL 1640132, at *1 (D. Minn. Oct. 18, 2001) (MAPP agreement "is actively regulated by FERC because some MAPP members are public utilities" under FERC's jurisdiction even though other MAPP members were governmental entities). FERC, therefore, has jurisdiction to regulate the pricing provisions of the Tariffs, which the Defendants contractually bound themselves to obey.

other sellers, must honor those invoices and pay refunds. *See* ISO Tariff § 11.6.3 (ISO authorized to rerun settlements); PX PSABP § 5.3 (same for PX); ISO Tariff § 11.9 (ISO to send out invoices based on final settlement statements); PX PSABP § 5.4 (same for PX ); *see also* Compl. ¶¶ 47-50. But Defendants have repudiated their contractual obligations, allowing the California Parties to sue for anticipatory breach.

In light of these allegations, Defendants' principal arguments—that FERC lacks jurisdiction to regulate Defendants' rates (*cf.* JD Br. at 2, 4, 25-26, 28-29; G/P Br. at 3-4, 12, 14-15, 22, 24, 31-32; B/T Br. at 11-12), and that Defendants cannot contractually confer jurisdiction on FERC to regulate them (*cf.* JD Br. at 2, 25, 30-32; G/P Br. at 4, 12, 14-16, 20, 24, 25, 29-31; B/T Br. at 11-12—are simply irrelevant, because the Complaint is not premised on either of those theories.[33]

**A. Whether or Not FERC May Exercise Regulatory Jurisdiction Over These Defendants Is Irrelevant to the Contract Theory.**

Although the Tariffs are federal regulations subject to FERC's exclusive jurisdiction, pursuant to which FERC reviewed and corrected the prices in the ISO and PX markets, the Tariffs are *also* contracts prescribing the Defendants' rights and obligations because Defendants agreed to abide by them. Defendants' refund obligation can be enforced by the IOUs as a matter of state contract law even if FERC cannot compel payment of refunds through its regulatory power.

This form of contract is not unusual. It is commonplace for a party to contract to abide by a standard or price that would not ordinarily be binding on that party. A lender, for example, can voluntarily bind itself to reduce its interest rate on a loan when the Federal Reserve reduces the federal funds lending rate. An employer can voluntarily promise a union to abide by evolving OSHA standards that the employer is not legally required to obey.[34] In the same way, a

---

[33] This section responds to these two broad thematic arguments by which Defendants assert that, in this particular regulatory context, no contract claim of any nature may be pleaded. The California Parties respond to Defendants' specific attacks on the terms of the contract claim at pp. 81-92, *infra*.

[34] For purposes of illustration, *see, e.g.*, *Oceanside 84, Ltd. v. Fid. Fed. Bank*, 56 Cal. App. 4th 1441 (1997) (contractual rate of interest tied to rates set by the Federal Home Loan Bank of San Francisco); *Nasser v. Super. Ct.*, 156 Cal. App. 3d 52 (1984) (rent increases tied contractually to Consumer Price Index); *Louisiana-Pacific Corp. v. Humboldt Bay Mun. Water Dist.*, 137 Cal. App. (Footnote Continued)

governmental entity can contractually bind itself to refund overcharges when the lawful price under a tariff that has been incorporated into the contract is reset by FERC order. Even Defendants are forced to concede this common-sense principle:

> In theory, *parties might agree by contract to accept retroactive changes to the prices they charge tied to some external reference price or index (such as a FERC-approved rate of another seller)* and, had Defendants so intended to bind themselves in this case, they could have done so.

JD Br. at 32 (emphasis added).[35]

The fact that FERC may lack power as a regulatory matter to require Defendants to pay refunds does not absolve Defendants of their obligation to fulfill the contracts they voluntarily entered. In the examples above, the borrower can of course enforce the reduced interest rate, and the union can enforce more stringent OSHA standards, even though the federal agencies could not do so as a regulatory matter. So, too, the buyers here (the IOUs) may enforce the contractual duty to repay overcharges, even if FERC cannot.

**B. The Ninth and Eighth Circuits Validated This Same Contract Theory in the *Bonneville* and *Alliant Energy* Cases.**

Defendants could not be more wrong in suggesting that the IOUs' contract claim is somehow an improper "end-run around *Bonneville*." JD Br. at 3. The IOUs' contract claim is entirely consistent with the Ninth Circuit's *Bonneville* holding. *Cf.* JD Br. at 1, 29, 38; G/P Br. at 10-11. In fact, the IOUs have pleaded a contract claim that the Ninth Circuit itself explicitly suggested in that same decision.

Contrary to Defendants' consistently inaccurate characterization of that decision, *Bonneville* did not overturn FERC's decision to reset prices in the ISO and PX markets. *Bonneville* held only that FERC lacked jurisdiction to enforce the resulting refund obligation against Defendants. But

---

3d 152 (1982) (price for water from municipal water district tied contractually to various indices, including wholesale price index and building cost index).

[35] Despite this theoretical concession, Defendants argue that their contracts do not include a duty to pay refunds. Such arguments over contract interpretation cannot be decided on demurrer. *See infra* pp. 78-86. Of course, if the Tariff provisions require all sellers to abide by pricing changes resulting from FERC orders, as the IOUs claim, it would be no defense that Defendants in agreeing to comply with the Tariffs had not unilaterally "so intended to bind themselves."

the Ninth Circuit also went out of its way to point out that Defendants could still have *contractual* liability to pay those same refunds, enforceable in a court action by other parties to the transactions. 422 F.3d at 925. The Ninth Circuit quoted extensively, and with approval, from the district court and court of appeals' decisions in *Alliant Energy,* 347 F.3d 1046, *aff'g* 2001 WL 1640132, which found a governmental entity liable on a nearly identical contract theory:

> When a contract provides that its terms are subject to a regulatory body, all parties to that contract are bound by the actions of the regulatory body. As a result, *we are not enforcing the FERC order; instead we are enforcing an agreement, which [the governmental entity] freely entered.*

*Bonneville*, 422 F.3d at 926 (quoting *Alliant Energy*, 347 F.3d at 1050) (emphasis added); *see* Compl. ¶ 75.

*Alliant Energy* involved an association of power generators, transmission owners, and marketers called the Mid-Continent Area Power Pool ("MAPP"). There, as here, both "public utilities" (whose rates as sellers were within FERC's regulatory power) and governmental entities (whose rates as sellers were beyond FERC's direct reach) participated in the market. The market participants entered into an agreement that, like the ISO and PX Tariffs here, set forth the parties' contractual rights and obligations. FERC actively regulated that agreement, just as it regulated the Tariffs here, because the public utility participants in the pool were subject to FERC's rate regulation. *Alliant Energy,* 2001 WL 1640132, at *1, *aff'd*, 347 F.3d 1046 (8th Cir. 2003).

At one point the MAPP participants amended their agreement to allow members to charge higher rates to certain buyers. FERC intervened, just as it intervened here. It held that the higher rate was unlawfully discriminatory and ordered the MAPP members to eliminate the new provision and also to refund the overcharges they had collected over the previous two years. *Alliant Energy*, 347 F.3d at 1049 & n.4. FERC directed the refund order only at the public utilities, concluding that it did not have the jurisdiction to force governmental entities to repay the overcharges. *See Mid-Continent Area Power Pool*, 89 FERC ¶ 61,135 at 61,387 (1999) (JD Non-Cal. Auth. Exh. 29). All but one of the governmental members made the refunds anyway, acknowledging that their contract required them to do so, even though FERC could not. One governmental entity, the Nebraska Public Power District ("NPPD"), refused. *Alliant Energy*, 347 F.3d at 1051 n.8.

The other MAPP members sued the renegade governmental entity for refunds on a contract theory. *Id.* at 1049. The court held that the governmental entity was bound by the contract to pay refunds following FERC's modification of the agreement, even though FERC did not have regulatory authority to order it to pay those refunds directly. *Alliant Energy*, 2001 WL 1640132, at *3. In an analysis that the Ninth Circuit quoted verbatim in *Bonneville*, the court observed:

> The [MAPP] Agreement is a contract to which [the governmental entity] is a signatory. [The governmental entity] is bound by the contract regardless of whether FERC has regulatory authority over [the entity] itself. FERC concluded that certain tariff provisions of [the Agreement] did not comply with [FERC regulations] and that MAPP must revise the . . . Agreement. Accordingly, [the governmental entity] is contractually obligated to refund the amounts it overcollected under the nullified . . . tariff provisions, even if the contract amendments resulted from a FERC order.

*Id.* at *4 (quoted in *Bonneville*, 422 F.3d at 926) (footnote omitted). The Eighth Circuit affirmed, rejecting the very same arguments Defendants advance here. *Alliant Energy*, 347 F.3d at 1050-51. In an analysis the Ninth Circuit echoed in *Bonneville,* the Eighth Circuit explained that the governmental entity, "when it signed the [MAPP] Agreement, bound itself to any FERC-ordered modification of the [MAPP] Agreement—despite the fact that FERC normally would not be able to order [the entity] to do anything." *Id.* at 1050, *quoted in Bonneville*, 422 F.3d at 925-26.[36]

Thus it simply does not matter that the Ninth Circuit concluded in *Bonneville* that FERC's refund authority does not extend to the Defendants. That holding simply puts Defendants in the same position as the governmental entity in *Alliant Energy* and the other similar precedents.

---

[36] The Eighth Circuit pointed to several prior decisions reaching the same result. *See Alliant Energy*, 347 F.3d at 1050, citing *Inter-City Gas Corp. v. Boise Cascade Corp*., 845 F.2d 184, 187-89 (8th Cir. 1988) (a private contract set the price by reference to another contract over which FERC had jurisdiction; when FERC approved a rate change in the jurisdictional contract, the seller and the buyer in the private contract were contractually bound by the new rate, even though neither was directly subject to FERC's rate regulation for that contract); *Envtl. Action v. FERC*, 996 F.2d 401, 408-10 (D.C. Cir. 1993) (both governmental and non-governmental members of power pool agreement were bound by FERC's revisions to agreement's proposed pricing scheme, ordered over members' objections).

Not surprisingly, the Ninth Circuit officially took "no position" on whether a breach of contract claim would *ultimately* prevail, since that claim was not before it. *Bonneville,* 422 F.3d at 926. Despite that fact, the Ninth Circuit confirmed the factual basis for the IOUs' contract claim:

> FERC and intervenor California Parties emphasize that the [Defendants] entered into agreements with ISO and CalPX that obligated them to abide by the ISO and CalPX tariffs. They argue that these agreements made it obvious to the [Defendants] that the tariffs setting the prices in the ISO and CalPX markets would be subject to FERC regulation . . . . *All of this is true*.

*Id.* at 925 (emphasis added). The Court went on to virtually invite this breach of contract action:

> The focus on the agreements between the [governmental] entities and ISO and CalPX only serves to demonstrate that the remedy, if any, may rest in a contract claim, not a [FERC] refund action. Such an approach is not novel, as illustrated by FERC's *MAPP* proceedings and the related [*Alliant Energy*] cases in federal district and circuit court.

*Id.* That same "contract claim" that the Ninth Circuit suggested is now embodied in the Complaint before this Court.[37]

---

[37] In a recent order, FERC itself has confirmed that same reading of *Bonneville*, saying, "[b]ecause the Commission does not have the authority to order non-jurisdictional [i.e., governmental] entities . . . to pay refunds into the California markets for the transactions at issue, *[the governmental entity] may still have to litigate whether it owes funds* to the CAISO, the CalPX, and e.g., PacifiCorp [a purchaser], *in an appropriate venue, such as in state court*. . . . Whether a party 'owes' funds is distinguishable from whether the Commission can require that party to pay those funds." *San Diego Gas & Elec. Co.*, 119 FERC ¶ 61,296 at PP 27 & n.41 (2007) (emphasis added) (RJN Exh. 10).

## III. THE COMPLAINT PLEADS FACTS DEMONSTRATING THAT THE CALIFORNIA PARTIES' CLAIMS ARE TIMELY.

The facts pleaded in the Complaint, which must be accepted as true on demurrer, establish that the California Parties' claims are timely under both California's one-year claims presentment requirement for claims against governmental entities, Cal. Gov't Code § 911.2, and the general statutes of limitations.

### A. The Breach of Contract Claim Has Not Yet Accrued.

#### 1. There Was No Breach of Contract at the Time Defendants' Sales Were Made Because Prices Had Not Yet Been Reset and No Obligation To Pay Refunds Had Arisen.

Certain Defendants argue that this case could have been brought at the time their sales were originally made during the Energy Crisis.[38] Any notion that a statute of limitations could have begun to run—and therefore that a Government Code claim was required to be presented—*at the time these sales were made* is an utter fallacy for two reasons. First, the explicit terms of the contracts in this case require Defendants to abide by the prices set under the Tariff rules, subject to FERC's power to revise the prices, and the prices Defendants were charging had not yet been revised by FERC when the sales occurred. Thus, the California Parties could ***not*** have sued at that time because, until prices were reset, there was ***no obligation*** that Defendants repay any amounts. Second, the filed rate doctrine would have barred any court suit challenging Defendants' prices as excessive before FERC corrected those prices.

Federal law gives FERC exclusive jurisdiction to regulate all ISO and PX market operations, including prices. Compl. ¶¶ 44-50; *In re Wholesale Elec. Anti-Trust Cases I & II*, 147 Cal. App. 4th 1293, 1312 (2007) (FERC's "power includes the exclusive authority to determine the reasonableness of wholesale rates.") (quoting *Pub. Util. Dist. No. 1 of Grays Harbor County, Wash. v. IDACORP Inc.*, 379 F.3d 641, 646-47 (9th Cir. 2004)). Accordingly, the Tariffs provide that

---

[38] *See* JD Br. at 18 (claim accrued in mid-2001 when last overcharge occurred); LADWP Br. at 13 (claim accrues when payment was made by buyers at the time of sale); B/T Br. at 7 (claims accrued on January 17, 2001 for Burbank and January 21, 2001 for Turlock).

Heller Ehrman LLP

revisions to the pricing formulas and other terms are effective only when approved by FERC. Compl. ¶¶ 26, 46. That provision is a part of Defendants' contracts. Thus, until FERC corrected the prices that prevailed in those markets, the originally-invoiced prices were the *only* enforceable prices under federal law, under the Tariffs, and under Defendants' contracts.

If, during the crisis, the IOUs had sued in a court to recover damages, alleging that Defendants had overcharged them for power, the action would have been promptly dismissed under the "filed rate doctrine," which is a specific application of federal preemption principles arising out of FERC's exclusive jurisdiction over tariffed prices.[39] No court may award damages on the ground that a rate charged under a FERC-filed tariff (known as a "filed rate") was too high, because only FERC can make that determination. The prices Defendants charged at the time of their sales pursuant to the pricing formulas in the ISO and PX Tariffs therefore were, *at that time*, invulnerable to attack in court. *See, e.g., In re Wholesale Elec. Anti-Trust Cases*, 147 Cal. App. 4th at 1316-17; *Pub. Util. Dist. No. 1 of Grays Harbor*, 379 F.3d at 650 (plaintiffs' state law antitrust and unfair competition claims barred by the filed rate doctrine; "state law . . . may not be used to invalidate a filed rate nor to assume a rate would be charged other than the rate adopted by the federal agency"); *Transmission Agency of N. Cal. v. Sierra Pac. Power Co.*, 295 F.3d 918, 930 (9th Cir. 2002) (filed rate doctrine prohibits court under state law "from setting a rate different from that chosen by FERC, [or] from assuming a hypothetical rate different from that actually set by FERC.").[40]

---

[39] Two principles underlie the filed rate doctrine. First, the doctrine prevents price discrimination between ratepayers. *Wegoland, Ltd. v. NYNEX Corp.*, 27 F.3d 17, 19 (2d Cir. 1994). Second, because ratemaking is an inherently legislative function, courts are not empowered to determine "what the reasonable rates during the past should have been." *Montana-Dakota Util. Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246, 251 (1951). *See also Wegoland*, 27 F.3d at 19; *Verizon Del., Inc. v. Covad Commc'ns Co.*, 377 F.3d 1081, 1086 (9th Cir. 2004) ("[A]n equally important policy underlying the filed rate doctrine is the preservation of the exclusive role of regulatory agencies in approving rates.").

[40] It makes no difference that Defendants are governmental entities, and need not file rates with FERC for their private negotiated sales. These were not private sales between Defendants and the IOUs. Rather, Defendants chose to sell power through the FERC-regulated ISO and PX markets, where prices were set by the ISO and PX Tariff rules. It does not matter who the sellers were. What matters is that the rates for *these* sales were set under a FERC-filed tariff. As the courts have repeatedly found, the rates established by the ISO and PX were therefore FERC-filed (Footnote Continued)

Heller Ehrman LLP

The California Parties therefore had only one option during the Energy Crisis: to ask FERC to review and reset the prices that were being generated by the Tariff formulas. *See Public Util. Dist. No. 1 of Snohomish County,* 384 F.3d at 761-62 ("[I]f the defendants sold electricity in violation of the filed tariffs, Snohomish's only option is to seek a remedy before FERC."). That is exactly what they did.[41]

**2. The California Parties Were Not Required to Bring Suit After FERC Reset the Prices Because Their Contract Claim Had Not Yet Accrued—and Still Has Not Accrued Today.**

In its July 25, 2001 Order, FERC reset the ISO and PX market prices and adopted a new formula (the MMCP) to calculate those prices under the Tariffs. FERC explained:

> Our action here establishes a revised method for calculating the just and reasonable clearing prices to be applied in those markets for the period beginning October 2, 2000. This is pursuant to the Commission's authority under FPA section 206 to fix the just and reasonable rate. *Our action thus revises the market clearing prices that all market participants agreed to accept for their sales.*

96 FERC at 61,512 (emphasis added).

Most of the Defendants contend that this Order triggered the California Parties' obligation to present their claim.[42] They are wrong. The July 25, 2001 Order was not the end of the Remedy Proceeding. As instructed by FERC, the ISO and PX went on to apply the MMCP to calculate the

---

rates. *In re Wholesale Elec. Anti-Trust Cases*, 147 Cal. App. 4th at 1316-17 (applying filed rate doctrine to market based rates charged under ISO Tariff); *Pub. Util. Dist. No. 1 of Snohomish County v. Dynegy Power Mktg., Inc.*, 384 F.3d 756, 761-62 (9th Cir. 2004), *cert. denied*, 545 U.S. 1149 (2005) (market-based rates charged under ISO Tariff are subject to filed rate doctrine); *Duke Energy Trading & Mktg., LLC v. Davis*, 267 F.3d 1042, 1056 (9th Cir. 2001) (PX operated pursuant to FERC-approved rate schedules and tariffs which are filed rates).

[41] LADWP claims that the California Parties assert that the filed rate doctrine prevented the California Parties from filing Government Code claims with Defendants at any time prior to *Bonneville*. LADWP Br. at 21. Not so. Rather, prior to FERC's July 25, 2001 Order revising prices under the Tariff, the California Parties had *no cause of action against Defendants* because of the filed rate doctrine and, accordingly, no claim to present.

[42] The Joint Defendants assert that the California Parties could have brought suit immediately following issuance of FERC's November 2000 Order, in which FERC first held that rates charged were not "just and reasonable." JD Br. at 19 n.23. But for the reasons explained at pp. 34-35 *supra*, the California Parties had no claim under the Tariffs at that time because FERC had not yet corrected the prices, and therefore no basis for presenting a Government Code claim.

prices that should have been charged in the ISO and PX markets and to compute sellers' refund liabilities. That process has not yet concluded. The ISO and PX are still performing calculations to allocate certain cost offsets to the refunds owed by sellers. *San Diego Gas & Elec. Co.*, Thirty-Eighth Status Report, ER03-746-000, *et al.*, at 2-3 (RJN Exh. 24). And no revised invoices have yet issued that would trigger Defendants' obligations to pay those refunds—i.e., *the date for contract performance has not yet arrived*. The California Parties' claim therefore did not accrue following the July 25, 2001 Order and, in fact, has not yet accrued to this day.

A breach of contract claim "does not accrue until there has been a breach of the contract." *Church v. Jamison*, 143 Cal. App. 4th 1568, 1583 (2006); *Cochran v. Cochran*, 56 Cal. App. 4th 1115 (1997). Moreover, "'[t]here can be no *actual* breach of a contract until the time specified therein for performance has arrived.'" *Romano v. Rockwell Int'l, Inc.*, 14 Cal. 4th 479, 488 (1996) (quoting *Taylor v. Johnston*, 15 Cal. 3d 130, 137 (1975)). This means that the statute of limitations does not begin to run prior to the time performance is due. *Romano*, 14 Cal. 4th at 489 ("[T]he statute of limitations does not begin to run until the time set by the contract for performance."). In the claims presentment context, the date on which the claim accrued (which starts the clock running on the statutory presentment requirements) is determined by the same general principles as apply to all other contract claims. Cal. Gov't Code § 901.[43]

Under normal circumstances, the Tariffs' settlement provisions contemplate that a seller whose prices are reset would be required to refund its overcharges when the ISO or PX recalculates the seller's account to reflect the seller's refund obligation and issues a revised invoice to the seller. ISO Tariff § 11.6.3 (ISO authorized to rerun settlements); ISO Tariff § 11.9 (ISO to send out invoices based on final settlement statements); PX PSABP § 5.3 (PX authorized to rerun settlements); PX PSABP § 5.4 (PX to send out invoices based on final settlement statements). Although the July 25, 2001 Order prescribed the new formulas to be applied under the Tariffs to

[43] Before a court action is commenced against a governmental entity (including most of the Defendants), the claim must first be presented to and rejected by that entity. Cal. Gov't Code §§ 905, 945.4. Claims arising out of contract must be presented within one year *after accrual of the cause of action*. *Id.* § 911.2.

Heller Ehrman LLP

calculate prices for sales in the ISO and PX markets, the Order did not set forth the precise amounts of any seller's refund liability, nor a specific deadline for the ISO and PX to assess the amounts of those liabilities against sellers' accounts, indicating each seller's specific obligation to pay refunds under the Tariffs. In other words, the Order did not calculate or set the date for Defendants to pay refunds—that is, to perform their contractual obligations. Rather, FERC required further procedures by the ISO and PX to calculate the amount of the refunds owed by each seller and to determine when payments would be due under the Tariffs:

> [M]aterial issues of fact remain that prevent the Commission from ordering refunds at this time. [The Commission orders] an evidentiary hearing before an Administrative Law Judge. . . . to make findings of fact with respect to: (1) the mitigated price in each hour of the refund period; (2) the amount of refunds owed by each supplier according to the methodology established herein; and (3) the amount currently owed to each supplier (with separate quantities due from each entity) by the ISO, the investor owned utilities and the State of California.

July 25, 2001 Order, 96 FERC at 61,520. Because that process is not yet completed, no date has yet been established for Defendants to pay refunds, no contract performance has yet come due, and no breach of contract claim has yet accrued.[44]

FERC is supervising the ISO and PX's calculation and invoicing procedures, and it is possible that FERC may re-define the time or conditions when the ISO and PX will require payment to be made under the Tariffs.[45] All that need be said now is that, on the facts alleged in the

---

[44] The Joint Defendants mischaracterize what the California Parties argued in federal court in this case regarding accrual. JD Br. at 18-19. The California Parties *never* asserted that their breach of contract claim accrued "no later than mid-2001." *Id.* at 18. Rather, they said there exactly what they say here: that this claim *will* accrue when Defendants are required, but fail, to pay refunds.

[45] Defendants have been trying vigorously at FERC to prevent the ISO and PX recalculation and invoicing process from ever being completed. (Of course, they do not seek to prevent the calculation of refunds owing *to* them.) Answer of the Indicated Public Entities in Opposition to the California Parties' Motion for Procedures Following Remand in Bonneville Power Administration, *et al.* v. FERC, *San Diego Gas & Elec. Co.*, Nos. EL00-95-000, *et al*., (April 17, 2007) (RJN Exh. 22); Answer of City of Los Angeles Department of Water and Power to California Parties' Motion for Procedures Following Remand in Bonneville Power Administration v. FERC, *San Diego Gas & Elec. Co.*, Nos. EL00-95-000 *et al.*, (April 17, 2007) (RJN Exh. 23). Although *Bonneville* held that FERC cannot enforce refund obligations against Defendants, nothing in that decision precludes the ISO and PX from applying the MMCP to recalculate Defendants' accounts, with refund payments (Footnote Continued)

Complaint, Defendants' time to perform by paying their refunds has not yet come. Accordingly, the California Parties' claim for breach of contract has not yet accrued and is not untimely under either the claims presentment statute or the general statute of limitations.[46]

**B. The California Parties Are Entitled To Sue Now Because Defendants Have Anticipatorily Repudiated Their Contract Obligations.**

The California Parties have the *option* to sue now, in advance of Defendants' breach of contract, because Defendants have anticipatorily repudiated their contract obligations. California law allows a party to bring a claim for breach of contract where "a party to an obligation gives notice to another" that he will not perform the obligation "*before* the time at which performance upon his part is due." Cal. Civ. Code § 1440 (emphasis added). As the California Supreme Court explained in *Romano*,

> In the event the promisor repudiates the contract before the time for his or her performance has arrived, the plaintiff has an election of remedies—he or she may "treat the repudiation as an anticipatory breach and immediately seek damages for breach of contract, thereby terminating the contractual relation between the parties, or he [or she] can treat the repudiation as an empty threat, wait until the time for performance arrives and exercise his [or her] remedies for actual breach if a breach does in fact occur at such time."

14 Cal. 4th at 489 (quoting *Taylor*, 15 Cal. 3d at 137) (alterations in original); *see also County of Solano v. Vallejo Redev. Agency*, 75 Cal. App. 4th 1262, 1275-76 (1999) ("While an actual breach of contract cannot occur until the time for performance has arrived, an anticipatory repudiation of the contract, or anticipatory breach, occurs before performance is due under the contract and results

---

to be enforced as a contractual matter in a court action such as this one. To date, FERC has not taken any action to halt the continuing calculations of amounts owing by and to each market participant, including Defendants. In fact, FERC has indicated that it agrees with the Ninth Circuit and the California Parties that Defendants' contractual obligation can be enforced by a court. *San Diego Gas & Elec. Co.*, 119 FERC ¶ 61,296 at P 27 & n.41 (RJN Exh. 10).

[46] AEPCO, which as an out-of-state entity cannot invoke California's claim presentment requirements, asserts that the California Parties' claims are untimely under Cal. Civ. Proc. Code § 337 (four-year limitation period for contract claims) and Cal. Com. Code § 3118(g) (three-year limitations period for money had and received). For the same reasons that the California Parties' claims are timely under the one-year presentment period in Cal. Gov't Code § 911.2, *see infra* at pp. 44-45, they necessarily are also timely under these longer limitations periods.

in a total breach."); *Franconia Associates v. United States*, 536 U.S. 129 (2002) (allowing claim against government agency for anticipatory repudiation).

That is exactly what happened here.

The Complaint alleges that Defendants have repudiated any contractual obligation to repay amounts collected during the Energy Crisis in excess of the FERC-corrected prices, and have said they have no intention of *ever* doing so. Compl. ¶¶ 78, 86-88. Since *Bonneville*, Defendants have consistently taken the position at FERC that they have no contractual obligation to pay refunds. *See supra* pp. 21-22. Defendants also denied the California Parties' Government Code claims. Compl. ¶ 78. And, if there were any doubt of Defendants' repudiation, statements they have made in this case could not be any clearer. *See, e.g.*, JD Br. at 26 ("The Court will search in vain in the Tariffs, the SCAs, and the PXPAs for a single provision which would require . . . these Governmental Entity Defendants to make refunds.") (underlining in original); G/P Br. at 21 ("This court can search the Tariffs high and low and will not find contractual language to support any claim for breach of contract against these demurring defendants."); LADWP Br. at 2 ("There is simply no contractual relationship between the IOUs and LADWP in the alleged contracts.") (underlining in original).[47]

Defendants thus have given notice to the California Parties "before the time at which performance upon [their] part is due[,]" Cal. Civ. Code § 1440, that they will not perform their contractual obligation, and the California Parties have properly exercised their election to file suit for anticipatory breach. *Id.*; *Romano,* 14 Cal. 4th at 488. But even now, despite the fact that suit has been filed, the statute of limitations has not yet begun to run, and will not commence to run until an actual breach occurs. *See* WITKIN, CALIFORNIA PROCEDURE, ACTIONS, CH. 4 § 492 Election of Remedies (2005) ("Where the defendant commits an anticipatory breach, the injured party may

[47] Regardless of whether this Court finds that the Defendants have repudiated their contractual obligations, a substantial and concrete controversy exists between the California Parties and Defendants sufficient to permit the California Parties to seek a declaratory judgment that the "IOUs are contractually entitled to recover from the [Defendants] all amounts that each [Defendant] charged in excess of the lawful rate attributable to its sales to the [] IOUs in the ISO and PX markets during the Refund Period." Compl., Fifth Cause of Action. *See infra* pp. 53-54.

elect to sue at once, or to wait until the time when performance is due. If he waits, the statute does not begin to run until that time, i.e., until the anticipatory repudiation becomes an actual breach.”).[48]

### C. The California Parties' Efforts to Pursue Refunds from Defendants at FERC Equitably Tolled Any Limitations Period That Might Have Applied to Commencement of This Action.

Even if Defendants were correct—which they manifestly are not—that they were obligated to pay refunds under their contracts in 2000 or 2001 and failed to do so, the contract claim would still be timely. The Complaint alleges that the California Parties' good faith effort to obtain relief at FERC would have equitably tolled any limitations period for filing this action, or for presenting claims to Defendants. Compl. ¶ 80. Those allegations establish the elements of the tolling doctrine under California law, and must be accepted for purposes of this motion. *Mojica v. 4311 Wilshire LLC*, 131 Cal. App. 4th 1069, 1074 (2005) (on demurrer, court "must accept the facts as pleaded in the complaint and those facts of which [it] may take judicial notice" regarding tolling).[49]

The application of tolling is inescapable here. The California Parties did not even have the option of bringing a contract action during the period from the July 25, 2001 Order until the Ninth Circuit's *Bonneville* decision. As the Complaint alleges, and as is crystal clear under a long chain of cases arising out of the Energy Crisis, FERC's exercise of exclusive regulatory authority over prices in the ISO and PX markets would have precluded any court action by the California Parties

---

[48] It can hardly be disputed that the regulatory overlay and the impact of *Bonneville* make this an especially complicated case, not amenable to a simple analysis. Although the facts suggest that Defendants' time to pay refunds due under the Tariffs has not yet arrived, the California Parties recognize that the Court may find Defendants were required to perform under the contract at some point after *Bonneville* ended FERC's ability to require them to pay refunds, and that their failure to do so gives rise to a claim for actual breach of contract. For that reason, the First Cause of Action asserts an alternative claim of actual breach of contract. Under California law, pleading alternative factual and legal theories is permissible. *See Adams v. Paul*, 11 Cal. 4th 583, 593 (1995); *Crowley v. Katleman*, 8 Cal. 4th 666, 690-91 (1994). Under *either* theory, however, the claims are timely because they did not accrue more than one year before they were presented to Defendants.

[49] Not only were the claims tolled while the California Parties proceeded at FERC, the California Parties have pleaded that the claims were also tolled while they pursued the same claims against these same Defendants in federal court. Compl. ¶ 80; *see also Mojica*, 131 Cal. App. 4th 1069 (tolling statute of limitations for state court complaint while related federal complaint was pending); *Addison v. State of California*, 21 Cal. 3d 313 (1978) (same).

seeking damages from Defendants arising out of the same transactions that were being investigated by FERC. Compl. ¶¶ 74, 77. California courts and the Ninth Circuit have broadly construed FERC's exclusive jurisdiction and have held that virtually all state law actions that touch on FERC's field of activity are preempted. For example, in *In re Wholesale Elec. Anti-Trust Cases*, 147 Cal. App. 4th at 1312-13, the California Court of Appeal held that California state antitrust law was preempted by the FPA because FERC's power to determine the reasonableness of wholesale rates *precluded* the trial court from making the same determination under the guise of an alleged antitrust violation.[50] On this basis alone, Defendants' timeliness arguments must be rejected.

Defendants' two strategies to oppose tolling—by making contested factual assertions and attacking the procedural validity of FERC actions—are wrong on both the facts and the law. But most important, they have no place at the pleading stage. There will be a time when Defendants may raise factual challenges to the facts alleged in the Complaint supporting equitable tolling of the California Parties' claims. But that time is not now. For that reason, even if the Court concluded that the contract claim *had* accrued, the Court need and should look no further than the tolling allegations in the Complaint in order to find in the California Parties' favor on this issue.

**1. The Court May Not Go Beyond the Allegations of the Complaint to Decide the Applicability of the Equitable Tolling Doctrine.**

Under California law, "[a] demurrer on the ground of the bar of the statute of limitations will not lie where the action may be, but is not necessarily barred. . . . It must appear clearly and affirmatively that, upon the face of the complaint, the right of action is *necessarily* barred."

---

[50] *See also California ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 852 (9th Cir. 2004), *amended by* 387 F.3d 966 (9th Cir. 2004), *cert. denied*, 544 U.S. 974 (2005) ("[H]ere California seeks to impose judicial remedies in addition to those that FERC may impose. . . . California seeks to encroach upon authority entrusted exclusively to FERC by the FPA."); *Pub. Util. Dist. No. 1 of Snohomish County*, 384 F.3d at 761-62 (holding that state antitrust and unfair competition claims are barred by filed rate doctrine, field preemption, and conflict preemption); *Transmission Agency of N. Cal.*, 295 F.3d at 926-27 (upholding dismissal of state law inverse condemnation and breach of contract claims as disguised challenges to a FERC decision that the court had no jurisdiction to review); *California ex rel. Lockyer v. Powerex Corp.*, No. Civ-S-05-01216 DFL DAD, 2006 WL 997717, at *4 (E.D. Cal. Apr. 14, 2006) ("Because federal law exclusively occupies the field of wholesale energy sales, plaintiff's Cartwright Act claim must be dismissed under the doctrine of field preemption.").

*Leasequip, Inc. v. Dapeer*, 103 Cal. App. 4th 394, 400 (2002) (citations and internal quotation marks omitted, emphasis added). Specifically, where equitable tolling is asserted, a court may not go beyond the face of the pleading to resolve factual disputes concerning the applicability of tolling. *Mojica,* 131 Cal. App. 4th at 1074 n.2 (court may not go beyond face of complaint in determining tolling); *Marcario v. County of Orange*, 2007 WL 2717197, at *1, *7 (Cal. App. Sept. 19, 2007) ("Equitable tolling is a fact intensive issue and it is determined based upon evidence.") (citation omitted); *see also Cervantes v. City of San Diego,* 5 F.3d 1273, 1276 (9th Cir. 1993) ("California's fact-intensive test for equitable tolling is more appropriately applied at the summary judgment or trial stage of litigation."). The *Cervantes* court explained,

> At a minimum, determining the applicability of equitable tolling necessitates resort to the *specific* circumstances of the prior claim: parties involved, issues raised, evidence considered, and discovery conducted. Thus, the question ordinarily requires reference to matters outside the pleadings, and is not generally amenable to resolution on a [motion to dismiss], where review is limited to the complaint alone.

*Id.* (citations omitted). Other federal cases considering California's fact-intensive tolling test have reached the same result. *See Daviton v. Columbia/HCA Healthcare Corp.*, 241 F.3d 1131, 1140 (9th Cir. 2001) (en banc) ("[O]nly in the rare case could the [tolling] inquiry proceed at the pleading stage."); *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1207 (9th Cir. 1995) (reversing dismissal on statute of limitations grounds because "applicability of the equitable tolling doctrine depended upon factual questions not clearly resolved in the pleadings," and "factual and legal issues [were] not sufficiently clear to permit [the court] to determine with certainty whether the doctrine could be successfully invoked").

**2. The Complaint Properly Alleges That Equitable Tolling Applies.**

**a. Legal Standards Governing Equitable Tolling.**

Equitable tolling of a statute of limitations involves the application of a three-pronged test: "(1) timely notice to the defendant in filing the first claim; (2) lack of prejudice to defendant in gathering evidence to defend against the second claim; and, (3) good faith and reasonable conduct by the plaintiff in filing the second claim." *Collier v. City of Pasadena*, 142 Cal. App. 3d 917, 924 (1983). The Complaint alleges all of these elements.