# PLAINTIFFS PACIFIC GAS AND ELECTRIC COMPANY, SOUTHERN CALIFORNIA EDISON COMPANY, AND SAN DIEGO GAS & ELECTRIC COMPANY'S APPENDIX TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

**VOLUME 1 OF 3**

**Part 3 of 3**

In addition, important policy considerations support the application of equitable tolling in appropriate cases such as this one:

> First, it secures the benefits of the statutes of limitations for defendants without imposing the costs of forfeiture on plaintiffs. Secondly, it avoids the hardship upon plaintiffs of being compelled to pursue simultaneously several duplicative actions on the same set of facts. Thirdly, it lessens the costs incurred by courts and other dispute resolution tribunals, at least where a disposition in the case filed in one forum may render the proceeding in the second unnecessary or easier and cheaper to resolve.

*Collier*, 142 Cal. App. 3d at 926 (footnotes omitted); *see also Marcario,* 2007 WL 2717197 at *7 (equitable tolling does *not* require "an awkward duplication of procedures" even if party is able to simultaneously file in another forum). Those policies of avoiding the necessity of duplicative actions, and enabling completion of one proceeding before requiring the filing of another, are directly at odds with Defendants' suggestion that the California Parties should have filed a "protective" court action at various times, duplicating the relief they were seeking at FERC.

**b. Tolling Applies to the One Year Period for Presenting Government Code Claims.**

It is settled law in California that equitable tolling also extends the one-year period in Cal. Gov't Code § 911.2(a) for presenting a claim to a government entity. The California Court of Appeal in *Myers v. County of Orange* unambiguously extended the time for filing a claim under Cal. Gov't Code § 911.2 based on tolling principles. 6 Cal. App. 3d 626, 636-37 (1970) (There is "no good reason . . . tolling . . . should not be applied to toll the one-year claim period . . . ."); *see also Downs v. Dept. of Water & Power*, 58 Cal. App. 4th 1093, 1101 n.3 (1997) (applying equitable tolling to similar government claim presentment statute). Remarkably, all Defendants ignore the *Myers* court's holding on this point, and LADWP even contradicts it, without citation to any contrary authority. LADWP Br. at 15. But there can be no question about *Myers*' meaning or application here. Indeed, the California Supreme Court explained in a later case that "[*Myers*] assumed that the plaintiff need not have exhausted her administrative remedies as a prerequisite to her seeking judicial relief, but it nevertheless declared that *the running of the relevant one-year claim period had been tolled during the pendency of the administrative proceeding*." *Elkins v. Derby*, 12 Cal. 3d 410, 415 (1974) (emphasis added). *See also Baillargeon v. Dep't of Water &*

*Power*, 69 Cal. App. 3d 670, 685 (1977); *cf. Loehr v. Ventura County Cmty. College Dist.*, 147 Cal. App. 3d 1071, 1084-85 (1983) (recognizing that claim presentation requirements are subject to equitable tolling, but rejecting application of tolling on the facts).[51]

Furthermore, despite LADWP's suggestion to the contrary (LADWP Br. at 15), nothing in the recent California Supreme Court's decision in *Shirk v. Vista Unified School District*, 42 Cal. 4th 201 (2007), calls into question the application of the equitable tolling doctrine in the government claim presentment context. First, *Shirk* is not a case that addresses equitable tolling of a Government Code claim at all. Equally importantly, as illustrated in the following table, the policy reasons set forth by the Court in *Shirk* for Government Code presentment requirements are fully satisfied on the facts here:

| Policy | Facts |
|---|---|
| Provides an opportunity to promptly remedy the condition giving rise to the injury. | Following commencement of the FERC proceeding in August 2000, Defendants were on notice that the ISO and PX markets were dysfunctional and that prices might be revised and had the option of not making further sales in those markets. |
| Permits an investigation while tangible evidence is still available, memories are fresh, and witnesses can be located. | Defendants were active litigants before FERC for more than six years and helped to develop millions of pages of evidence related to this dispute. |
| Allows an early assessment to settle meritorious disputes without incurring added cost of litigation and engage in appropriate budgetary planning. | Defendants have had numerous opportunities to settle with the California Parties without incurring additional litigation costs. |

*Shirk*, 42 Cal. 4th at 219. Defendants cannot genuinely claim surprise, a lack of opportunity to assess the claim against them, or an inability to prepare a defense under the facts of this case.

**c. Each of the Elements of Equitable Tolling Is Satisfied Here.**

***Defendants Had Ample Notice That the California Parties Were Pursuing Refunds in the Remedy Proceeding.*** Equitable tolling requires, first, that Defendants have had notice of the

---

[51] Moreover, as noted by the Joint Defendants, the claims presentment requirement under the Government Code may not even apply to contract claims. That issue is presently before the California Supreme Court. JD Br. at 17, n. 21 (citing *City of Stockton v. Super. Ct.*, No. S139237) (Cal. *petition for review granted* Feb. 1, 2006; *hearing* on October 3, 2007).

Heller Ehrman LLP

California Parties' initial efforts to seek relief at FERC, in order to alert Defendants to the nature of the California Parties' claims and the need to investigate the facts and preserve relevant evidence. Notice in this case is a fact-specific question and the issue of whether notice was or was not sufficient should not be resolved on a demurrer. *Thompson v. California Fair Plan Assoc.*, 221 Cal. App. 3d 760, 765-66 (1990) (equitable tolling cannot be decided as matter of law where parties dispute facts as to whether first claim alerted defendant to need to investigate facts which form basis for second claim). But it is clear from the Complaint, and facts of which the Court may take judicial notice, that Defendants had abundant notice of the California Parties' "first claim," i.e., the Remedy Proceeding. As FERC held in the July 25, 2001 Order, "From the time the Commission acted on SDG&E's complaint, *all sellers into those markets were on notice that those clearing prices, and the market rules that set the clearing prices, were subject to change if they were found to be unjust and unreasonable*." July 25, 2001 Order, 96 FERC at 61,512 (emphasis added); *see* Compl. ¶¶ 59, 63, 80.

Defendants' complaints about the adequacy of notice focus primarily on their assertion that SDG&E's initial FERC complaint narrowly sought relief only against jurisdictional sellers, not Defendants.[52] *See, e.g.*, JD Br. at 20; LADWP Br. at 16; B/T Br. at 7. The facts are that, within two weeks of that initial filing, the other California Parties intervened and sought relief *from the market as a whole*. *See, e.g.*, Motion to Intervene, Comments, and Request for Relief of Pacific Gas & Elec. Co., *San Diego Gas & Elec. Co.*, No. EL00-95-000 at 5-6 (Aug. 14, 2000) (LADWP RJN Exh. 5). And just three weeks later, on August 23, 2000, FERC announced an investigation that would implicate the entire market:

---

[52] LADWP argues that notice was deficient because the FERC complaint was not a Government Code claim. LADWP Br. at 16. Of course it was not—nor did it have to be. That is the point of *Myers*, which tolled the plaintiff's time for making a Government Code claim while an administrative remedy was being pursued. *Myers*, 6 Cal. App. 3d at 634. LADWP also argues that notice was deficient because LADWP's actual knowledge of the FERC complaint does not excuse compliance with the Government Code claim presentation requirement. LADWP Br. at 18. Again, *Myers* holds otherwise. Moreover, LADWP had more than mere "knowledge" of the proceedings. LADWP was a very active participant in the Remedy Proceeding for *over six years*.

> [W]e conclude that it is appropriate to investigate not only the justness and reasonableness of public utility sellers' rates in the PX and ISO markets but also to investigate the *tariffs and agreements of the ISO and PX to determine whether market rules or institutional factors embodied in those tariffs and agreements need to be modified.*

August 23, 2000 Order, 92 FERC at 61,606 (emphasis added). In other words, FERC announced that it was considering changes to the Tariffs that could affect the sales by *all sellers in the market, including Defendants.*

In the months after the Remedy Proceeding was instituted, each of the Defendants formally intervened as a party and gained full participatory rights in the Remedy Proceeding.[53] December 15, 2000 Order, 93 FERC at 62,020-023. Various Defendants noted that they felt compelled to intervene because FERC had "initiated a broad investigation into the structure and performance of the California Markets" (Anaheim, Azusa, Banning, and Riverside), and because "[t]he instant proceeding may substantially affect the ISO's markets for energy and ancillary services" (SMUD).[54]

Defendants' concern was appropriate. Subsequent FERC orders clearly indicated that it was contemplating relief that would affect Defendants' prior overcharges. *See, e.g.*, December 15, 2000 Order, 93 FERC at 61,982-83, 62,020 (ordering broad market reforms that initially included system of price limits applicable to *all sellers*); April 26, 2001 Order, 95 FERC at 61,356-57 (proposing

---

[53] The Joint Defendants cite *City of San Jose v. Super. Ct.*, 12 Cal. 3d 447, 455 (1974) for the proposition that their participation in the Remedy Proceeding was insufficient notice of the California Parties' contract claims. JD Br. at 23. Defendants' reliance on this case is misplaced. *City of San Jose* was not an equitable tolling case. Plaintiffs there argued that earlier filed class claims satisfied the claims presentment requirement, an argument that the Court rejected. 12 Cal. 3d at 455. They did not argue that the defendant's participation in the proceedings related to their earlier class claims constituted sufficient "notice" to toll the claim presentment requirements.

[54] *See* Motion for Leave to Intervene Out of Time on Behalf of the Cities of Anaheim, Azusa, Banning, Colton, and Riverside, California, *San Diego Gas & Elec. Co.*, Nos. EL00-95-000, *et al.*, at 4 (Sept. 18, 2000) (RJN Exh. 14); Motion to Intervene of the Sacramento Municipal Utility District, *San Diego Gas & Elec. Co.*, Docket No. EL00-95-000, *et al.*, at 3-4 (Aug. 14, 2000) (JD RJN Exh. 2). *See also* Motion to Intervene Out-of-Time of City of Vernon, California, *San Diego Gas & Elec. Co.*, Nos. EL00-95-000, *et al.*, at 3 (Sept. 22, 2000) (RJN Exh. 14) ("[T]he wide ranging scope of the investigation directed by the Commission's August 23 Order has potentially broad implications for all of the California markets for power supply," and "Vernon has a direct and substantial interest in the outcome.").

Heller Ehrman LLP

that *all sellers—including Defendants*—abide by price mitigation plan); June 19, 2001 Order, 95 FERC at 61,548 (imposing price caps on *all sellers*, including Defendants). FERC'S repeated announcements that it was considering pricing modifications to the ISO and PX Tariffs—which by definition affect all market participants—and Defendants' consistent efforts at FERC to prevent that from taking place, eliminate any plausible argument that Defendants were somehow unaware that these proceedings would apply to them.[55]

***A Finding That the Statute of Limitations Was Tolled Will Not Prejudice Defendants.*** Tolling requires that the two proceedings were sufficiently similar such that Defendants' notice of the Remedy Proceeding "afford[ed] [Defendants] an opportunity to identify the sources of evidence which might be needed to defend against" this action seeking refunds, so Defendants would not therefore be prejudiced by the passage of time. *Collier*, 142 Cal. App. 3d at 925.

While Defendants argue that there were various differences in the two proceedings (JD Br. at 21-22; B/T Br. at 7-8; LADWP Br. at 16-18), they wholly fail to explain how those differences caused them prejudice in any way. Whether Defendants were prejudiced in their ability to gather the evidence they would need to defend this case is also a fact question that cannot be resolved on a demurrer. *See Marcario*, 2007 WL 2717197 at *8 (court will not "infer" in the absence of evidence that defendant would be prejudiced by application of equitable tolling). As the Ninth Circuit noted when applying the California equitable tolling test, "'similarity' is less a legal conclusion and more a factual exploration of the contentions and evidence relevant to each claim. As such, '*similarity*' *is not easily resolved as a matter of law, without receiving evidence*." *Cervantes*, 5 F.3d at 1276 (citing *Collier*, 142 Cal. App. 3d at 925) (emphasis added).

The Complaint alleges that the Remedy Proceeding and this case arise out of the same facts and seek to vindicate the same wrong. Compl. ¶¶ 59, 79-80. Both proceedings sought the same

---

[55] Nor did FERC's March 9, 2001 Order change this reality. 94 FERC at 61,245. Although the March 9, 2001 Order initially rejected a request to require governmental entities to pay refunds, the timely filing of requests for rehearing by the California Parties put the parties on notice as a matter of law that the particular ruling was subject to later change. (JD RJN Exhs. 7, 8, 9).

refund relief, albeit under different legal rubrics.[56] Defendants claim that the difference in legal theories is fatal to the equitable tolling claim (JD Br. at 21; LADWP Br. at 16; B/T Br. at 8), but that argument completely misstates the law. The California Supreme Court addressed exactly this issue in *Elkins*. In that case, the Court held that an initial workers' compensation claim was sufficiently similar to a subsequent tort claim against an employer that it tolled the statute of limitations, even though the tort claim "involved a critical element—fault on the part of the employer—which was not an element of the first cause of action." *Collier*, 142 Cal. App. 3d at 929 (citing *Elkins*, 12 Cal. 3d at 418). *Elkins* specifically rejected the employer's argument that it would be prejudiced by having to defend against the second claim: "Although [the employer] may choose not to gather evidence bearing on fault from these parties when faced only with a compensation claim, he will be able in most instances to recontact these people, particularly if they are continuing employees, for further evidentiary contributions should a controversy as to fault later arise in a tort action." *Elkins*, 12 Cal. 3d at 418; *see also Collier*, 142 Cal. App. 3d at 930.

If anything, the Remedy Proceeding and this action have more in common than the two claims in *Elkins* since both proceedings here concern the same transactions and focus on sellers' obligations under the Tariffs.[57] Under California law, it makes no difference that the California Parties did not explicitly seek to enforce "contractual rights" in the Remedy Proceeding.

---

[56] It is worth noting that recovery of the refunds sought by the California Parties at FERC would have completely eliminated the need for their bringing this case, which was a relevant factor in the court's analysis in *Myers*, 6 Cal. App. 3d at 636. This also provides an important basis for distinguishing *Loehr*, 147 Cal. App. 3d 1071, a case on which the Joint Defendants rely heavily. JD Br. at 18, 21-23. In *Loehr*, in contrast with this case, the second-filed complaint included claims that would not have been resolved in the first-filed complaint. Therefore, the second filed complaint was not a true "alternative" to the first. *Loehr*, 147 Cal. App. 3d at 1086.

[57] Nor, as the Joint Defendants argue, does *Loehr*, 147 Cal. App. 3d 1071, suggest a different result. JD Br. at 21-22. In *Loehr*, the Court found that the rights plaintiff sought to vindicate in his later-filed state court suit were "totally unrelated to the constitutional rights which formed the basis for his [earlier-filed] federal claim for relief." *Loehr*, 147 Cal. App. 3d at 1085. Moreover, certain defendants in the *Loehr* state court action were not participants in the federal court action. *Id.* That, of course, is not the situation here.

Moreover, Defendants have no hope of ever proving that they were denied an opportunity to preserve evidence in the Remedy Proceeding. The FERC record incorporates a massive volume of evidence that Defendants helped to develop. Between late November 2002 and early March 2003, Defendants and the California Parties took discovery from over five dozen ISO and PX sellers. Compl. ¶ 71. In addition, evidentiary hearings were conducted before FERC's Presiding Judge, and comprehensive documentary and testimonial filings were made with FERC, totaling over ten thousand pages of documentation, testimony from nine expert witnesses, and over 300 exhibits supporting the expert witnesses' conclusions. *See* July 25, 2001 Order, 96 FERC at 61,520 (establishing evidentiary hearing). Assuming that the Complaint's allegations are substantiated—and the California Parties are confident they will be—Defendants will be unable to show any prejudice from the tolling of the statute of limitations.

***The California Parties Acted Reasonably in Pursuing Their Claims Before FERC.*** From the beginning of the Energy Crisis, the California Parties literally followed the only course of action available to them. *See supra* pp. 34-36, 41-42. But in any event, whether the California Parties were reasonable in pursuing their claims before FERC is also a fact question that cannot be resolved on a demurrer. *See Mojica*, 131 Cal. App. 4th at 1074 n.2 ("Nothing in [*Elkins v. Derby* or *Addison v. State of California*] suggests that trial courts may go beyond the face of the pleading to test whether the filing of an earlier action was reasonable or in bad faith."). Moreover, as the court of appeal in *Mojica* explained, the type of bad faith that would thwart the application of equitable tolling must rise to the level of "trifling with the courts or the other party." *Id.* at 1074 (citing cases where bad faith such as dismissing and refiling to get more convenient trial date, failing to prosecute multiple actions, or judge shopping amounted to the type of act required to thwart equitable tolling) (citations omitted). Nothing remotely suggests that the California Parties acted in such a manner.

As explained above, this lawsuit could not have been brought before *Bonneville* was decided. Until FERC corrected prices in the markets, the filed rate doctrine barred any court challenge to the sales. When FERC did correct prices, its assertion of exclusive jurisdiction over Defendants' refund obligations preempted any contract suit for refunds. Obtusely, Defendants say

that it was "unreasonable" for the California Parties to pursue their claims at FERC rather than commencing a court proceeding, because they should have known that FERC did not have jurisdiction to order them to pay refunds. *See* JD Br. at 24; LADWP Br. at 18-19. Not only does this argument disregard the law, it ignores reality.[58] FERC *did in fact* assert jurisdiction over Defendants. Until the Ninth Circuit reversed FERC's decision, FERC's jurisdiction was exclusive and binding on all concerned, including the California Parties and Defendants, and *ex post facto* rationalizations do not alter that fact.[59]

***Considerations of Judicial Economy and Efficiency Support Application of Tolling Here.*** Defendants' position that the California Parties should have simultaneously pursued a lawsuit in this Court while litigating the massive Remedy Proceeding at FERC is nonsensical and would have proved to be extremely inefficient. FERC and the Court either would have spent years tripping over one another's proceedings and findings, or else the Court wisely would have stayed or dismissed the case until FERC either completed its work or was told by the Ninth Circuit that it was powerless to order relief against the Defendants. Either course would have resulted in a waste of time and resources. As the California Supreme Court has emphasized, a plaintiff should not be put to the burden of litigating in two separate fora. Tolling the time for bringing a second action avoids the inefficiencies that would otherwise result. *See, e.g.*, *Elkins*, 12 Cal. 3d at 420 ("[D]uplicative

---

[58] The respondents in *Mojica* raised a similar argument, asserting that "appellant knew diversity jurisdiction did not exist on which to rest her federal complaints," and arguing that she could not avail herself of equitable tolling on that basis. But the court rejected the argument because "nothing on the complaint's face demonstrates bad faith. A plaintiff's seeming misanalysis of the facts or the law . . . does not amount to the sort of bad faith found to thwart equitable tolling." 131 Cal. App. 4th at 1074.

[59] LADWP argues that the California Parties did not act reasonably because they should have known they had to present a Government Code claim to LADWP instead of filing a claim with FERC. LADWP Br. at 18-19. As noted above in footnote 52, *Myers* refutes this argument and LADWP cites no authority to the contrary. Furthermore, this argument has no place here since even a misunderstanding of the law (of which there was none) is not "unreasonable" in the equitable tolling context. *Mojica*, 131 Cal. App. 4th at 1074. LADWP also contends that the California Parties did not act reasonably because filing a claim with FERC was not a prerequisite to filing a claim against LADWP. LADWP Br. at 20. *Myers*, again, forecloses this argument, allowing equitable tolling even though filing the first claim was not a "pre-requisite" to filing the second claim. 6 Cal. App. 3d at 634.

proceedings are surely inefficient, awkward and laborious. If, in order to avert loss of his rights, an injured party is forced to initiate proceedings in both [an administrative forum] and a . . . court, he brings onerous procedural burdens upon himself, [other parties], and the already overtaxed judicial system."); *Addison*, 21 Cal. 3d at 319 ("We discern no reason of policy which would require plaintiffs to file simultaneously two separate actions based upon the same facts in both state and federal courts since 'duplicative proceedings are surely inefficient, awkward and laborious.'") (quoting *Elkins*, 12 Cal. 3d at 420); *cf. Crown Coat Front Co. v. United States*, 386 U.S. 503, 515 (1967) (holding, in case where exhaustion of administrative remedy was prerequisite for bringing court action, that requiring party to file protective suit "would be a sheer formality in any event—a procedural trap for the unwary and an additional complication for those who manage the dockets of the courts").

In precisely this type of case, where seeking relief at FERC was not only mandatory but could have eliminated the need for a court action entirely, equitable tolling makes good judicial sense. As the Court of Appeal has explained, the equitable tolling doctrine applies "'when an injured person has several legal remedies and, reasonably and in good faith, pursues one.'"[60] *Collier*, 142 Cal. App. 3d at 923 (quoting *Elkins*, 12 Cal. 3d at 414) (disability claim tolled by filing and pursuit of workers' compensation claim); *see also Baillargeon*, 69 Cal. App. 3d at 683 (filing of workers' compensation claim tolled equitable estoppel claim against employer's retirement plan); *Myers v. County of Orange*, 6 Cal. App. 3d at 637 (pursuit of administrative proceedings tolled one-year period for filing damage claim under Cal. Gov't Code § 911.2).[61]

---

[60] This is also known as the "Several Remedies" rule. *See* JD Br. at 24. But even under this standard, these claims should be tolled since "'[the California Parties were] aware of alternative remedies and ma[de] a conscious, rational and reasonable decision to pursue one remedy in order to eliminate the need to pursue the other.'" JD Br. at 24-25 (quoting *Garabedian v. Skochko*, 232 Cal. App. 3d 836, 844 (1991)).

[61] The Joint Defendants cite *County of San Diego v. Meyers*, 147 Cal. App. 3d 417, 420 (1983), for the unremarkable proposition that "[e]quitable tolling does not apply where a plaintiff has no alternative administrative remedy and could not reasonably believe that such a remedy existed." JD Br. at 25. Here, by contrast, the California Parties were required to pursue relief at FERC, which, until *Bonneville*, was the only forum available to them.

* * *

The California Parties have pleaded, and can establish, that all of their claims are timely under tolling principles. Under California's strict legal standard prescribing the credence that must be given to the Complaint at this stage of the case, that is enough to defeat Defendants' demurrers.

**D. The California Parties' Declaratory Relief Claims Are Indisputably Timely.**

In addition to the breach of contract claims, the California Parties pleaded five declaratory relief claims. The Fifth Cause of Action seeks a declaration of present contract liability, and is timely for the reasons discussed above relating to the First and Second Causes of Action (for breach of contract and anticipatory breach of contract). Each of the remaining claims is dependent on events that have not yet occurred, and therefore they cannot be deemed untimely on any conceivable basis. The Sixth and Seventh Causes of Action seek a declaration that Defendants will be contractually liable to the California Parties to pay refunds *when* FERC corrects the prices for the Summer Period and Excluded Transactions. The Eighth Cause of Action seeks a declaration that the California Parties are entitled to indemnification from Defendants *when* any amount is assessed against the IOUs' accounts at the ISO and PX due to Defendants' default on their repayment obligations. The Ninth Cause of Action requests a declaration that Defendants are obligated as a matter of contract to permit their accounts at the ISO and PX to be adjusted to reflect the pricing changes resulting from application of FERC's MMCP, and that Defendants must pay refunds *when* invoices are issued reflecting such recalculations.

As is readily obvious, these claims depend on future events that have not yet occurred. At this point, a substantial and concrete controversy exists between the California Parties and Defendants sufficient to permit the California Parties to sue because Defendants have advised the California Parties that they will deny any liability if and when such events transpire. *See supra* pp. 21-23; *Lockheed Corp. v. Cont'l Ins. Co.*, 134 Cal. App. 4th 187, 221 (2005). But because these claims relate to events that have not yet occurred, no coercive claim has yet accrued and the claims cannot possibly be time-barred (notwithstanding that they are ripe insofar as a present controversy exists between the parties as to the matters alleged). *See United Pacific-Reliance Ins. Co. v. DiDomenico*, 173 Cal. App. 3d 673, 676 (1985) ("Until some conventional right of action has

accrued, the statute of limitations does not operate independently to cut off the right to bring one for declaratory relief.") (citation omitted). Most importantly, California courts have generally held that it is procedurally improper to demur to a declaratory relief action. *Lockheed,* 134 Cal. App. 4th at 221, (citing WITKIN, CALIFORNIA PROCEDURE, Ch. V, § 831).[62]

---

[62] Citing no authority, LADWP asserts that the declaratory relief claims are barred for failure to comply with the Government Code claim presentment requirement. LADWP Br. at 25. The California Parties' claims for declaratory relief did not need to be presented because these claims seek only a declaration of rights, not money or damages. *See* Cal. Gov't Code § 905 (claims presentation statute applies only to claims for "money or damages."). In any event, LADWP's argument is misplaced because the California Parties did give notice to Defendants that they would be seeking other relief, including declaratory relief.

LADWP also argues that even if the Declaratory Relief claims have not yet accrued, the California Parties could have brought similar claims before the *Bonneville* decision was issued. But, as explained above, no court would have considered claims brought by the California Parties—declaratory or otherwise—due to FERC's exclusive jurisdiction over claims related to wholesale energy rates. *See supra* pp. 35-36, 41-42. Moreover, even if the California Parties *could* have brought these declaratory relief claims prior to *Bonneville*, this would not bar them from bringing these claims now because the coercive claims underlying each of these declaratory relief claims have not yet accrued. *See United Pacific-Reliance Ins. Co.*, 173 Cal. App. 3d 673.

## IV. THE CALIFORNIA PARTIES HAVE SUFFICIENTLY ALLEGED THAT THEY HAVE STANDING TO SUE ON THE CONTRACT.

Defendants challenge the IOUs' standing to bring the breach of contract claim. That challenge fails. The IOUs have standing as direct parties to the multi-party agreements embodied *in the Tariffs*, which set forth contractual obligations running among all participants in the markets and provide for suits directly between them, like this one, to enforce those obligations.[63] And even if this were not the case, the Tariff terms make clear that the IOUs would have standing as third-party beneficiaries of the contracts.[64]

### A. The IOUs Have Standing to Sue Defendants Under the ISO and PX Tariffs, as Parties to the Same Multi-Party Contracts.

#### 1. Each Defendant, as a Party to a Multi-Party Contract, Is in Contractual Privity with Each IOU, Even Though They Did Not Sign the Same Documents.

Defendants' standing argument is premised on a one-dimensional understanding of what it means to form a contractual relationship. They seem to believe that parties can form contractual relationships with one another in only one way: by negotiating a deal "directly with one another," G/P Br. at 18, and memorializing the terms in a single document signed by both entities, *see* JD Br. at 40-41; LADWP Br. at 22; B/T Br. at 13-14; G/P Br. at 18-19. This image of a contract as an exclusively "bilateral" interaction is the contractual equivalent of a stick figure. It ignores both the Tariff terms and the applicable law. The Tariffs create another common, and equally valid, form of contractual relationship—the multi-party contract.

---

[63] Burbank and Turlock appear to have brought a demurrer based on Cal. Civ. Proc. Code § 430.10(b) (no capacity to sue) arguing that the Plaintiffs lack standing. B/T Br. at 14-15. That demurrer is flawed, because while lack of standing may be raised in a demurrer based on Cal. Civ. Proc. Code § 430.10(e), it is not a proper ground for a demurrer based on Cal. Civ. Proc. Code § 430.10(b). *See, e.g.*, *Parker v. Bowron*, 40 Cal. 2d 344, 351 (1953). In any event, the argument set forth in this Section is equally applicable to the demurrer based on § 430.10(b).

[64] The EOB, unlike the IOUs, does not claim standing to seek damages under the contracts. As a statutorily empowered protector of the interests of California and its citizens, it has statutory standing to participate as a party, and to seek a declaration of obligations.

Heller Ehrman LLP

***Multi-party Contracts.*** Multi-party contracts are especially common in complex markets or business associations, the efficient operation of which depends upon large numbers of participants abiding by a common set of rules. The courts have found such contracts enforceable in relationships as varied as:

- a stock exchange, *see, e.g., Muh v. Newberger, Loeb & Co., Inc.*, 540 F.2d 970, 973 (9th Cir. 1976); 73 Am. Jur. 2d, *Stock and Commodity Exchanges,* § 7 (2001) ("The constitution and rules of a stock exchange constitute a contract between all members of the exchange with each other and with the exchange itself, and are thus interpreted pursuant to ordinary principles of contract law.");
- a realtors' association, *see, e.g., Gear v. Webster*, 258 Cal. App. 2d 57, 60 (1968); 6 Am. Jur. 2d, *Associations and Clubs*, § 21 (1999) ("[i]t has been held that the articles and bylaws of an association create a contractual relationship between the members themselves . . . .");
- a dental association, *see, e.g., Cal. Dental Ass'n v. Am. Dental Ass'n*, 23 Cal. 3d 346, 350 (1979);
- a labor union, *see, e.g.*, *Stoica v. Int'l Alliance of Theatrical Stage Employees and Moving Picture Mach. Operators of the U.S. and Can.*, 78 Cal. App. 2d 533, 535-46 (1947);
- shareholders of a corporation, *Casady v. Modern Metal Spinning and Mfg. Co.,* 188 Cal. App. 2d 728, 732-33 (1961); 18 C.J.S. *Corporations* § 154 ("[c]orporate by-laws constitute a contract . . . among the shareholders or members themselves");
- and, most apropos here, an electrical cooperative organized for the purpose of delivering power to its members, *First Fed. Sav. & Loan Ass'n of Twin Falls v. East End Mut. Elec. Co.*, 735 P.2d 1073, 1075 (Idaho App. 1987);

Each of these contractual relationships involves a market or other large collective, like the ISO and PX markets. Each involves members or participants that are governed by a common set of rules—whether they are called constitutions, bylaws, codes of conduct, or, as here, tariffs. In each context, the participants sign, or otherwise assent to, an agreement to abide by the set of rules, but

Heller Ehrman LLP

they do not all sign the same master document. When these factors converge, the agreed-upon rules *contractually* bind each participant to every other participant. The contractual relationship is not just between each member and the umbrella entity; rather, the set of rules is "binding as a contract *among* the members," even though the participants do *not* all sign a web of separate bilateral agreements with one another. *First Fed.*, 735 P.2d at 1075 (emphasis added).

The pertinent case law contradicts Defendants' theory that they cannot have any contractual duty to the IOUs unless they had all signed the same contract document. The Ninth Circuit rejected precisely that theory in a suit between two members of a stock exchange, both of whom had agreed to be bound by the exchange's rules, including an arbitration provision. *Muh*, 540 F.2d at 972. The Ninth Circuit held the two members were contractually bound to each other to comply with those rules. The Ninth Circuit rejected any suggestion that the two members were not in privity, just because they had not signed a contract with one another:

> The constitution and rules of a stock exchange constitute a contract *between all members of the exchange with each other* and with the exchange itself . . . . Since the rules of the Exchange constitute a contract between the members, the . . . Exchange provisions requiring arbitration constitute an agreement to arbitrate which is binding upon both [parties].

*Id.* at 973 (quoting *Coenen v. R. W. Pressprich & Co.*, 453 F.2d 1209, 1211 (2d Cir. 1972)) (emphasis added; internal quotation marks omitted; alteration in original).

The California Court of Appeal reached a similar conclusion in a controversy between two realtors who separately agreed to abide by the bylaws of a local realtors' association. *Gear*, 258 Cal. App. 2d at 60. The court found that the two participants had a contractual relationship *with one another* and were bound *to each other* to comply with the provisions of those bylaws. *Id.* at 61-62. *See also California Dental Ass'n*, 23 Cal. 3d at 353 (rights and duties of association's members as between themselves are measured by association's constitution and bylaws). In other words, the various participants in a multi-party contract are in privity with one another precisely because they owe contractual obligations *to one another* and not just to the umbrella organization.

As in other multi-party contract cases, the Tariffs' terms evince an understanding, by Defendants and IOUs alike, that *all participants* are undertaking contractual obligations *to each*

*other*. Each Defendant that signed the ISO Scheduling Coordinator Agreement or the PX Participation Agreement undertook obligations to all other participants in these markets.[65] Defendants' contractual obligations do not run to the ISO or PX alone. *Cf.* JD Br. at 39, 40; G/P Br. at 18, LADWP Br. at 22. As the agreements explicitly state, the ISO and PX were operating these markets not as parties to the transactions, but as neutral clearinghouses and administrators, solely on behalf of the market participants. *See supra* p. 7; ISO Tariff § 2.2.1 ("In contracting for Ancillary Services and Imbalance Energy the *ISO will not act as principal but as agent for and on behalf of the relevant Scheduling Coordinators*.") (emphasis added); PX Tariff § 3.1 ("In carrying out its responsibilities under this Tariff . . . [t]he PX *will not be*, and shall not be deemed to be, *a counterparty to any trade transacted through the PX markets*.") (emphasis added); Compl. ¶¶ 38, 43. That the participants owe the prescribed duties to one another is evident from the structure of the markets. When one party defaults on a Tariff obligation—for example, when a buyer does not pay the invoiced sum for its power, or a seller refuses to refund overcharges—any resulting shortfall in funds is borne by the other market participants. And in that event, the Tariff deems the defaulting participant directly liable, as a "Debtor," to other participants ("Creditors") that incurred financial loss as a result. *See supra* pp. 9-10 n.14 (explaining ISO Tariff § 11.16.1; PX PSABP § 5.7.3); p. 10 n.16 (quoting ISO Tariff Appendix A; PX Tariff Appendix B).

***"Tracing" Purchases.*** It makes no difference that the specific electrons delivered to a particular buyer cannot be "traced" or "bilateralized" back to a particular seller. *Cf.* JD Br. at 40, 45; G/P Br. at 32-33. In a given auction period, the ISO or PX pooled the electricity supplied by sellers, and then allocated it among the buyers of power in that time period. But, because every unit of power was sold for exactly the same price during any given period (the "single-price auction"), the amounts owing to and from each market participant for those transactions can be readily calculated, based on that participant's percentage of the amounts bought or sold in each time period.

---

[65] For reasons explained above, the same is true of Burbank and Turlock, which failed to sign the appropriate agreements. Sales through the ISO and PX are governed by those same Tariff terms and the Complaint alleges that those Defendants assented to the Tariffs' terms by their conduct. *See infra* p. 77 & n.75.

Compl. ¶ 37; *see, e.g.*, ISO Tariff § 11.2 ("The ISO shall calculate, account for and settle [charges for electricity bought and sold through the ISO] in accordance with this ISO Tariff."); ISO Tariff § 22.20.2 (the ISO shall, on request, certify in writing the amounts owed by an ISO Debtor that shall remain unpaid and the ISO Creditors to whom such amounts are owed); PX Tariff, Schedule 2, § 5.5 (where unpaid amounts are charged back to other market participants, the PX shall "identify the defaulting Participant"—who otherwise would have remained anonymous "to all other affected PX Participants"). In fact, the ISO and PX have already calculated the amount of the refunds Defendants owe. Compl. ¶ 64; *Thirty-Eighth Status Report of the California Independent System Operator Corporation on Settlement Re-Run Activity*, *San Diego Gas & Elec. Co.*, ER03-746-000, *et al.*, at 2-3 (Sept. 6, 2007) (RJN Exh. 24).

***Windham.*** Defendants simply ignore the contract terms—i.e., the Tariffs—as if they were irrelevant, and rely instead on case law from product liability and other contexts that is of no use to them here. For example, in casting about for a sufficiently rigid and narrow definition of "privity," Defendants hurt rather than help their own argument by quoting from *Windham at Carmel Mountain Ranch Ass'n v. Super. Ct.*, 109 Cal. App. 4th, 1162, 1169 (2003). JD Br. at 39-40. There the court addressed who, other than the original buyer of a defective product, can sue the seller for breach of implied warranty. It held that a condominium association had standing to sue the builder for defective construction, even though the association had *not* been a party to the builder's sales contracts with buyers of the condominium units. *Windham*, 109 Cal. App. 4th at 1176. The court noted, by analogy, that where an employee has been injured by using a dangerous product purchased by his employer, the employee is treated as a successor to his employer in relationship to the seller of the dangerous product, so that the employee may sue the seller—even though *not* a party to the sales contract—and in that context privity denotes "mutual or successive relationship to the same thing or right of property; it implies succession." *Id.* at 1169-70 (quoting *Peterson v. Lamb Rubber Co.*, 54 Cal. 2d 339, 347 (1960)). If that rule were applied here, it would mean that the IOUs—as the parties who must pay for the power—*may sue* as successors to the ISO and PX, which passed the power and its cost on to the IOUs.

***Matthau.*** Similarly, Defendants get no support from *Matthau v. Super. Ct.*, 151 Cal. App. 4th 593 (2007). JD Br. at 40. There an agreement governing Walter Matthau's relationship with a talent agency contained an arbitration clause. The court held that certain companies Matthau created were not bound by the arbitration clause, because they were not parties to the agreement, and there was no evidence Matthau had any implied authority to bind the companies to his agreement to arbitrate. *Matthau*, 151 Cal. App. 4th at 601. Here, by contrast, under the Tariffs' express terms the ISO and PX had clear authority to act as a clearinghouse to arrange the IOUs' purchases of power from sellers, including Defendants, so that all of them are bound by the terms of the sale. ISO Tariff §2.2.1; PX Tariff § 3.1. So, in a multi-party contract like the Tariffs, the result is the exact opposite of that in *Matthau*.

***Southern California Edison Company v. Lynch.*** Defendants invoke another case that was not about whether buyers in the ISO and PX markets could sue sellers or vice versa, and had nothing to do with the intricate creditor-debtor relationship among parties in the ISO and PX markets: *S. Cal. Edison Co. v. Lynch*, 307 F.3d 794, 803 (9th Cir. 2002), *order modified,* 353 F.3d 648 (9th Cir. 2003). Rather, in that action, SCE sued the CPUC for an increase in the rates it could charge to its California retail customers during the Energy Crisis. Two power generators attempted to intervene as of right pursuant to Fed. R. Civ. P. 24(a). They had no direct stake in the rate battle; the most they could say was that SCE owed money for trades in the ISO and PX markets, and a rate increase would increase SCE's financial health, thereby increasing the chances that the generators would recover their pro rata portion of the debt. The court rejected this argument for intervention, holding that the generators did not "have a significant protectable interest *relating to*" *SCE's suit against the Commission*. *S. Cal. Edison*, 307 F. 3d at 802 (emphasis added). The court reasoned that the resolution of the case before it would have no bearing at all on the generators' claims against SCE. *Id.* at 803. It was only in that context that the court observed that SCE "is in privity with the [PX]," and not with the power generators, *id.*, a passing observation was only intended to underscore that a rate increase would not directly benefit the generators. Neither the court in that dictum nor SCE in its briefing, *see* Brief of Appellee S. Cal. Edison Co., 9th Cir. Nos. 01-56879, *et al.*, filed Feb. 1, 2002 (JD RJN Exh. 17), addressed any contractual issues.

***Restatement (Third) of Agency.*** Finally, the Tariffs comprehensively defeat Defendants' argument that the IOUs—if deemed to be a group of principals who purchased through the ISO or PX as their agents—could not pursue refunds against a seller. JD Br. at 45 (citing RESTATEMENT (THIRD) OF AGENCY § 6.05 (2006)). Because the IOUs are direct parties to the multi-party agreements embodied in the Tariffs or, in the alternative, are third-party beneficiaries of the Tariffs, *see infra* pp. 64-68, they need not rely on a principal/agent relationship with the ISO or PX to establish standing to sue. *See* JD Br. at 44-46. The Complaint refers to the ISO and PX as "revenue-neutral clearinghouses" in order to emphasize that the ISO and PX operate their respective markets on behalf of the market participants, not for their own benefit. Compl. ¶ 38. And in any event, Defendants base their argument on their artful abbreviation of § 6.05 of the RESTATEMENT (THIRD) OF AGENCY; a provision that has never been endorsed by any California court or, indeed, by *any* court except for the sole case cited by Defendants.[66] JD Br. at 45. And Section 6.05 itself states—in a portion omitted by Defendants—that it is trumped by any contrary understanding between the parties. *See* RESTATEMENT (THIRD) OF AGENCY § 6.05(2)(c) (stating the rule applies "*unless* the agent acted with actual or apparent authority to bind each of the principals to the combined contract.") (emphasis added). Here the ISO and PX indisputably had authority under the Tariffs to bind all buyers and sellers of power to the terms of the transactions entered into under the Tariffs. Each Defendant and each IOU also authorized the ISO and PX to pass through the liability of a defaulting market participant to itself and to all other market participants. *See, e.g.*, ISO Tariff § 11.16.1 ("[T]he ISO shall reduce payments to all ISO Creditors proportionally to the net amounts payable to them . . . to the extent necessary to clear the ISO Clearing Account"); PX Tariff, Schedule 2, § 5.3 ("In the event that amount owed to the PX Participants . . . cannot be fully

---

[66] No California court has endorsed § 6.05 of the RESTATEMENT (THIRD) OF AGENCY on which Defendants rely. The only court identified by Defendants to do so—the Seventh Circuit Court of Appeals in *Brunswick Leasing Corp. v. Wis. Cent. Ltd.*, 136 F.3d 521 (7th Cir. 1998)—relies on precedent more than 100 years old. According to the RESTATEMENT (THIRD) OF AGENCY, *Brunswick Leasing* is the "sole case to apply any of the relevant sections in Restatement Second that correspond to [§ 6.05 of the RESTATEMENT (THIRD) OF AGENCY ]." RESTATEMENT (THIRD) OF AGENCY § 6.05, Reporter's Note c.

paid due to an insufficiency of funds in the PX clearing accounts, the PX will allocate the shortage to the PX Participants using the proportional charge-back methodology"); *see supra* p. 9-10. Because the ISO and PX were expressly authorized to bind each market participant to the contract terms for each transaction, the purported rule of Section 6.05 is simply irrelevant here.[67]

**2. The Tariffs Expressly Allow the IOUs to Bring Suit to Enforce Defendants' Refund Obligations Under the Tariffs.**

Whether members of a multi-party contract may sue one another to enforce the contract depends on interpretation of the contract terms. *See, e.g., Himebaugh v. Smith*, 476 F. Supp. 502, 506 (C.D. Cal. 1978) (rules of stock exchange permitted members to sue one another); *Stoops v. Abbassi*, 100 Cal. App. 4th 644, 656 (2002) (contract governing a cooperative specified that it could be enforced only by an action brought by cooperative's board). Defendants avoid any analysis of either the Tariff terms or the law governing this multi-party contract, instead proposing various unsupported conclusions about how the contracts work and what they mean. But these disputes over contract interpretation cannot be resolved on the pleadings. Where the contract is ambiguous, the Complaint's interpretation of the contract provisions must be taken as true so long as that interpretation is not clearly erroneous. *Pigeon Point Ranch, Inc. v. Perot*, 59 Cal. 2d at 233, *overruled on other grounds*, *Kowis v. Howard*, 3 Cal. 4th 888; *Aragon-Haas*, 231 Cal. App. 3d at 239; *see* Compl. ¶¶ 49, 50.

The Tariffs leave no doubt that the market participants themselves may sue other participants to enforce the contract obligations. *See* Compl. ¶ 39; *supra* pp. 10-11. For example, the ISO's power to sue on behalf of Scheduling Coordinators who request it to do so is "[w]ithout prejudice to the right of any Scheduling Coordinator *to bring such proceedings as it sees fit* in connection with matters related to the *recovery of amounts owed to it*." ISO Tariff § 11.20.1 (emphasis added). The ISO Tariff also directs that, on request, the ISO will certify in writing "the

[67] Moreover, as Defendants concede, the purported rule of Section 6.05 is intended to apply only if the parties did not intend that one of a group of purchasers may sue the seller. JD Br. at 45; *see Brunswick Leasing Corp*, 136 F.3d at 528-29. That is not true here. As discussed below, the Tariffs make it abundantly clear that any party may directly sue another party for the recovery of amounts owed to it. *See infra* pp. 62-63.

amounts owed by an ISO Debtor that remain unpaid and the ISO Creditors *to whom such amounts are owed*," and prescribes that such a certificate "may be used as prima facie evidence of the amount due by an ISO Debtor to ISO Creditors *in any legal proceedings*." ISO Tariff § 11.20.2 (emphasis added). That obviously means "legal proceedings" brought by another participant since there would be little need for such a certificate in a suit by the ISO itself. Likewise, the ISO Tariff directs that "[e]ach ISO Creditor shall give notice to the ISO before instituting any action or proceeding in any court against an ISO Debtor to enforce payments due to it." ISO Tariff § 11.19, These provisions leave no doubt that market participants can enforce Tariff obligations against one another. FERC has read the ISO Tariff the same way, noting the ISO Tariff "authorizes but does not require [the ISO] to seek payment from recalcitrant Scheduling Coordinators on behalf of sellers of energy," November 23, 2004 Order, 109 FERC ¶ 61,218 at P 72, and that "it should be the responsibility of Scheduling Coordinators to recover amounts that they are owed." October 30, 1997 Order, 81 FERC at 61,508-9.

The PX Tariff includes provisions to the same effect. *See* Compl. ¶ 39. When a market participant defaults on an invoice, the PX Tariff requires the PX to pass the shortfall through to other market participants, and then to "identify the defaulting Participant"—which would otherwise have remained anonymous "to all other affected PX Participants by the most expeditious means available." PX Tariff, Schedule 2, § 5.5. That device was plainly designed to enable the other participants to sue the defaulting parties, not merely to curse them. *See* July 28, 2000 Order, 92 FERC at 61,379. As FERC explained when it adopted this provision, the whole point was to allow market participants to identify non-paying parties "so that non-defaulting Participants *are able to seek recovery from the defaulting party*." *Id.* (emphasis added). *See also Pac. Gas & Elec. Co.*, 95 FERC ¶ 61,020 at 61,045 (2001) (JD Non-Cal. Auth. Exh. 37) ("The PX operates only as an intermediary to facilitate transactions between buyers and sellers. In this capacity, it collects money from load serving entities [i.e., IOUs] that it then pays to sellers, thus acting solely as a conduit for those funds.").

**B. At a Minimum, the IOUs Have Standing as Third-Party Beneficiaries of Defendants' Agreement to Abide by the ISO and PX Tariffs.**

Putting aside the IOUs' status as *parties* to the multi-party agreements embodied in the Tariffs, at the very least the IOUs are third-party beneficiaries of those contracts, which status entitles them to bring an action to enforce the contracts' terms. Cal. Civ. Code § 1559 ("A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it."). The phrase "expressly for the[ir] . . . benefit," does *not* mean that the IOUs must be individually named as intended beneficiaries. The California courts have confirmed that, "[i]n an action based on a written contract, the plaintiff [asserting rights as a third-party beneficiary] may plead the legal effect of the contract rather than its precise language." *Ochs v. PacifiCare of Cal.*, 115 Cal. App. 4th 782, 795 (2004). The IOUs need only plead that the terms of the contracts, and the circumstances in which they were entered into, show that the parties "clearly manifested" an intent to benefit market participants. *Schauer v. Mandarin Gems of Cal., Inc.*, 125 Cal. App. 4th 949, 957-58 (2005) (citation omitted); *see also Bancomer, S.A. v. Super. Ct.*, 44 Cal. App. 4th 1450, 1459 (1996).

**1. Whether the IOUs Are Third-Party Beneficiaries Is a Question of Fact That Cannot Be Decided on Demurrer.**

Whether the IOUs are third-party beneficiaries is a question of fact, inappropriate for resolution on a demurrer. *Bancomer*, 44 Cal. App. 4th at 1458. Even if the intention were not as clear as it is on the face of the contracts, the IOUs would still have the right to present evidence demonstrating that this was the parties' intent. *See Aragon-Haas*, 231 Cal. App. 3d at 238 (holding that, on demurrer, court was obligated to accept as true plaintiff's allegation so long as complaint does not place clearly erroneous construction upon the provisions of the contract); *Prouty v. Gores Tec. Group*, 121 Cal. App. 4th 1225, 1233 (2004) (in order to determine intent, one must "read[] the contract as a whole in light of the circumstances under which it was entered."); *see also Garcia v. Truck Ins. Exch.*, 36 Cal. 3d 426, 437 (1984) (stating "evidence of the circumstances and negotiations of the parties in making the contract is both relevant and admissible[] [a]nd . . . contracting parties should be allowed to testify as to their actual intention" in determining third-party beneficiary status (citation omitted)).

**2. In Any Event, the Tariffs Clearly Manifest An Intent to Benefit Market Participants Such as the IOUs.**

In fact, this is an uncommonly compelling case for application of third-party beneficiary principles. In the usual case, the parties and the courts scour the contract and surrounding circumstances for clues that the benefit to the third party is sufficiently central to the contract that that benefit shows an intention to allow the claimed third-party beneficiary to sue on the contract. *See Zigas v. Super. Ct.*, 120 Cal. App. 3d 827, 837 (1981) (stating that a court's task in determining whether plaintiffs were third-party beneficiaries was to ascertain whether contract manifested an intention to provide them with legal recourse in the event of nonperformance by contractual parties). The Tariffs short-circuit that inquiry. As demonstrated above, the Tariffs repeatedly refer explicitly to the expectation that these market participants *would* sue for violations of or defaults under the Tariffs. A contract that includes terms expressly authorizing a party to sue to enforce obligations (or a written agreement incorporating those terms) must be treated as a contract designed to benefit that party.

Even though "[n]o specific manifestation by the promisor of an intent to benefit the third person is required," *Lucas v. Hamm*, 56 Cal. 2d 583, 591 (1961), here the contract shows that intent in every conceivable way. As has been demonstrated, the ISO and PX Tariffs exist not for the benefit of ISO and PX, but exclusively *for the benefit* of the market participants, to enable buyers like the IOUs to purchase electric power from sellers like Defendants in an efficient and organized manner. *See supra* pp. 7-11; Compl. ¶¶ 26, 33, 35, 36, 38, 43, 49. Because those buyers and sellers bore the entire responsibility for indemnifying the ISO and the PX in the event of any shortfall or claim of liability, all the protections directed at ensuring that buyers and sellers pay what was due are entirely for the benefit of the other market participants. *See Zigas*, 120 Cal. App. 3d at 837, 838-39 (holding tenants were third-party beneficiaries of agreement between government and landlord because rent cap provisions "were obviously designed to protect the tenant"). And the hundreds of pages of contract language setting forth the rights and obligations of buyers and sellers confirm that the Tariffs are for their benefit and protection. *See Corrugated Paper Prods., Inc. v. Longview Fibre Co.*, 868 F.2d 908, 913 (7th Cir. 1989) (third-party beneficiary status may be

shown by contract terms providing "comprehensive set of rights and obligations between the promisor and third party").

**3. Defendants' Authorities Do Not Contradict the California Parties' Intended Beneficiary Status.**

Defendants do not address any of these provisions. Instead, they try to imply that the phrase in the statutory requirement that "[a] contract [be] made *expressly* for the benefit of a third person," Cal. Civ. Code § 1559 (emphasis added), means that the contract would have to say, in effect, "We hereby designate the IOUs third-party beneficiaries to this Tariff." *See* JD Br. at 42-43; B/T Br. at 15; G/P Br. at 19; LADWP Br. at 23. But contrary to Defendants' assertions, no express words are required to create a third-party beneficiary. "*It is not necessary that the beneficiary be named and identified…;" rather, "[t]he word 'expressly,' by judicial interpretation, has now come to mean merely the negative of 'incidentally.'*" *Prouty*, 121 Cal. App. 4th at 1232-33 (emphasis added) (citation omitted). In other words, "[w]hether a third party is an intended beneficiary or merely an incidental beneficiary to the contract involves construction of the parties' intent," which, like all other questions of contractual intent, is "gleaned from reading the contract as a whole in light of the circumstances under which it was entered." *Bancomer*, 44 Cal. App. 4th at 1458, 1459 (citations omitted); *see* B/T Br. at 14, 15.

Defendants' own cases flatly contradict Defendant's claim that a third-party beneficiary must be "named" in the contract (JD Br. at 43). To the contrary, they hold a beneficiary need *not* be named or identified, and may enforce the contract if the intent otherwise appears from the circumstances, or if he "can show he is a member of a class for whose benefit [the contract] was made." *Prouty*, 121 Cal. App. 4th at 1232 (internal quotation marks and citations omitted). *Accord Souza v. Westlands Water Dist.*, 135 Cal. App. 4th 879, 891 (2006), *cert. denied*, 127 S. Ct. 383 (Oct. 10, 2006). Similarly, Defendants' own authorities contradict Defendants' assertion that the intent to benefit the third party must be "expressly intended and stated." JD Br. at 42 (underlining in original). In fact, the cases Defendants cite actually confirm the point (noted above) that *"[n]o specific manifestation … of an intent to benefit the third party is required,"* so long as the "intent to make the obligation inure to the benefit of the third party [is] clearly manifested . . . ." *Schauer*,

Heller Ehrman LLP

125 Cal. App. 4th at 957-58 (emphasis added; internal quotation marks and citations omitted). *See Souza*, 135 Cal. App. 4th at 891 (JD Br. at 42) (test is whether an intent to benefit a third person appears from the terms of the contract, and parties "are presumed to intend the consequences of a performance of the contract."); *Prouty*, 121 Cal. App. 4th at 1233 (JD Br. at 42) (same); *accord Schonfeld v. City of Vallejo*, 50 Cal. App. 3d 401, 420 (1975), *overruled on other grounds*, *Morehart v. Cnty. of Santa Barbara*, 7 Cal. 4th 725 (1994) (JD Br. at 43).

Indeed, the cases Defendants cite repeatedly reach results on their facts that defeat Defendants' attempt to imply that some express designation is required. *See Watson v. Aced*, 156 Cal. App. 2d 87, 91-92 (1957) (B/T Br. at 14 n.14) (holding real estate broker was third-party beneficiary of exchange agreement between property owners, and could sue for a commission, even though agreement did *not* mention payment of commission to broker); *Shell v. Schmidt*, 126 Cal. App. 2d 279, 286-87, 290 (1954) (G/P Br. at 19) (holding statute authorizing federal funds for veterans' housing made veterans third-party beneficiaries of contract between developer and federal government, even though contract was *silent* as to veterans' authority to enforce the contract); *Prouty*, 121 Cal. App. 4th at 1233 (JD Br. at 42) (reversing summary judgment, and finding employees of acquired company were intended beneficiaries of provisions in the sale contract limiting termination of the employees, *despite contract clause stating there were no intended beneficiaries*); *Schauer*, 125 Cal. App. 4th at 957-58 (wife was third party beneficiary of jeweler's sale of ring to her husband, although *not* named in any sale document, because the jeweler knew the husband was buying the ring for his wife).

Finally, *East Aviation Group, Inc. v. Airborne Express, Inc.*, 6 Cal. App. 4th 1448 (1992), cited by Defendants, serves only to underscore the strength of the IOUs' status as third-party beneficiaries. JD Br. at 42-43; B/T Br. at 14 n.14. That case involved simple sales contracts in which the purported third-party beneficiaries lacked any basis whatsoever for claiming rights in the

contracts at issue. *E. Aviation*, 6 Cal. App. 4th at 1452 (plaintiff, an investor of seller, sued buyer claiming right to portion of proceeds from sale).[68]

### C. The EOB Has Standing to Participate in This Lawsuit.

#### 1. The EOB Is Statutorily Authorized to Participate as a Plaintiff in This Action.

Under California's rules of standing, the state legislature may provide a state agency or department with a statutory grant of standing. While that grant may be express, it need not be. When the California Legislature delegates to a state agency certain duties and powers, that agency or department has standing to sue if participation in the action is within the agency or department's delegated duties and powers, when considered in their totality. *See Cent. Delta Water Agency v. State Water Res. Control Bd.*, 17 Cal. App. 4th 621, 629-30 (1993) (holding that water agencies' delegated duties and powers gave agencies standing to seek declaratory relief and writ of mandamus); *see also People ex rel. Dep't of Conservation v. El Dorado County*, 36 Cal. 4th 971, 988-95 (2005) (holding that Department of Conservation's statutory duties gave Department standing to sue for money owed); *People ex rel. Dep't of Conservation v. Triplett*, 48 Cal. App. 4th

[68] Two final arguments by LADWP warrant little attention. LADWP invokes a purported distinction, based on outdated cases, between donee beneficiaries and creditor beneficiaries. LADWP Br. at 23 (citing *Wilson v. Anderson*, 208 Cal. App. 2d 62, 64 (1962)); *see also* JD Br. at 42, citing *Martinez v. Socoma Companies, Inc.*, 11 Cal. 3d 394, 406 (1974). As the court in *Prouty* explained, the creditor-donee dichotomy was dropped in the RESTATEMENT (SECOND) OF CONTRACTS in favor of the broader term "intended beneficiaries," and the creditor-donee analysis was "vanishing" from California law as early as 1978 "to permit broader application of the doctrine." *Prouty*, 121 Cal. App. 4th at 1236 (2004) (citing *Gilbert Fin. Corp. v. Steelform Contracting Co*., 82 Cal. App. 3d 65, 71 (1978)). Although rare cases still cite the old analysis, it clearly is no longer the only test and does not alter the Court's analysis on whether the IOUs are intended beneficiaries under the modern rule.

Second, LADWP cites a FERC order holding that both market participants and the PX were "engaged in sales of electric energy," apparently for the point that because FERC deemed the PX to be a "seller," the IOUs cannot be third-party beneficiaries. LADWP Br. at 23-24 (citing *Portland Gen. Elec. Co.*, 83 FERC ¶ 61,315 (1998) (LADWP RJN Ex. 9)). The point of this argument is not entirely clear. As noted previously, the key in the third-party beneficiary analysis is whether the agreement was intended to benefit the third party, a point not addressed by this order. In fact, the order notes that the PX contracted to serve as an "intermediary" between buying and selling parties, supporting the IOUs' position that the Tariffs and related agreements were intended to benefit market participants as a whole. *Portland Gen. Elec. Co.*, 83 FERC at 62,287.

233, 254 (1996) (holding that Legislature's grant of power to Department of Conservation gave Department standing to seek writ of mandamus). The same is true of the EOB in this action.

The EOB was created by AB 1890, the same restructuring legislation that created the ISO and PX markets. *See* AB 1890, The Elec. Utility Industry Restructuring Act, Stats. 1996, Ch. 2.3, Art. II (1996). The EOB is required "[t]o investigate any matter related to the wholesale market for electricity to *ensure that the interests of California's citizens and consumers are served, protected, and represented* in relation to the availability of electric transmission and generation and related costs, during periods of peak demand." Cal. Pub. Util. Code § 335(e) (emphasis added). It is also charged with overseeing the ISO and PX and serving as the appeal board for ISO Board decisions within the State of California's jurisdiction. *See id.* §§ 335(a), (c). To fulfill these duties, the Legislature has given the EOB broad powers, including, most notably, the power to "[s]ue and be sued," and to "[p]articipate in proceedings relevant to the purposes of this chapter [restructuring of the state's wholesale electricity] . . . ." *Id.* §§ 341(c), (m). Read together, these sections constitute a delegation of authority by the Legislature for the EOB to bring or participate in an action that directly involves the functioning of California's wholesale electricity markets and the outcome of which will affect California's citizens. That is precisely this action.[69]

For the ISO and PX markets to function effectively and provide citizens with the intended benefits, the markets must operate according to the Tariffs, the agreements at issue in this case. The Tariffs were drafted by the ISO and PX under the EOB's oversight, and enacted pursuant to the FPA. These standard terms are binding not only on Defendants, but on every other ISO and PX market participant, and impose obligations that affect the reliability of California's electric grid, the operational mechanisms of the ISO and PX markets, and, ultimately, the costs passed on to California electricity consumers. Without uniform application of the agreements alleged in the

---

[69] Defendants misstate the EOB's role in their argument that "[t]he EOB cannot favor one group of ratepayers…at the expense of other ratepayers . . ." JD Br. at 48. The EOB's statutory responsibility is to ensure the proper functioning of the ISO and PX markets and the proper application of the Tariffs in the interests of the State as a whole. Defendants may take issue with the EOB's position here, but that has no bearing on the EOB's standing to participate in this action.

Heller Ehrman LLP

Complaint, California citizens have no protection from the consequences of exorbitant electricity prices being passed along to them from the wholesale market. Because protecting these interests falls squarely within the EOB's legislatively delegated duties and powers, the EOB has standing to participate in this action.[70]

**2. The EOB Independently Has Standing to Pursue the Declaratory Relief Sought in the Complaint.**

Moreover, the EOB would have standing to participate in the declaratory relief claims even without its statutory grant of standing. California Code of Civil Procedure Section 1060 does not, as Defendants contend, limit declaratory relief to individuals who are parties to the contract. Rather, Section 1060 also allows "any person interested" in a contract to bring a declaratory relief claim. *See* Cal. Civ. Proc. Code § 1060 ("Any person interested under a written instrument . . . or under a contract, or who desires a declaration of his or her rights or duties with respect to another [may seek a declaration of rights and duties]") (emphasis added); *see also Gardiner v. Gaither*, 162 Cal. App. 2d 607, 621-22 (1958) (rejecting argument that declaratory relief claims are limited to those individuals who are parties to the contract at issue); *Alameda County Land Use Ass'n v. City of Hayward*, 38 Cal. App. 4th 1716 (1995) (holding that plaintiffs had standing to bring declaratory relief action challenging memorandum of understanding between two cities). That standard is met here. The EOB is not a "complete stranger" to this action, JD Br. at 47, nor does it lack an "interest" in its declaratory relief claims, LADWP Br. at 25. Rather, as noted above, the EOB is authorized to ensure the proper functioning of California's energy markets and the proper application of the Tariffs, both of which will be directly affected by the outcome in this case.[71]

---

[70] Any doubt as to the EOB's standing must be resolved in favor of standing, because denying the EOB standing would frustrate the purpose and policy of AB 1980. *See El Dorado County*, 36 Cal. 4th at 993-94 (in determining whether governmental plaintiff has standing to enforce a statute, court "must consider the consequences that might flow from of a particular construction and [that it] should construe the statute so as to promote rather than defeat the statute's policy and purpose") (citing *Escobedo v. Estate of Snider*, 14 Cal. 4th 1214, 1223 (1997)); *see also Blair v. Pitchess*, 5 Cal. 3d 258, 267-70 (1971).

[71] The single California case cited by the Defendants, *Infinet Marketing Services, Inc. v. Am. Motorist Ins. Co.*, 150 Cal. App. 4th 168 (2007), does not hold otherwise and is irrelevant. In that case, the Court of Appeal based its holding that the plaintiff could not seek declaratory relief on (Footnote Continued)

Defendants' argument that the EOB lacks standing because, under federal standards, it does not "'articulate an interest apart from the interests of particular parties'" is misguided for two reasons. JD Br. at 48 (citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982)). First, Defendants are relying on a standard from federal law. Because California does not follow the federal law of standing, it is irrelevant whether the EOB "articulates an interest apart from the private interests of private parties." *See, e.g.*, *Midpeninsula Citizens for Fair Hous. v. Westwood Investors*, 221 Cal. App. 3d 1377, 1386 (1990) ("California courts . . . are not constrained by the case or controversy requirement of Article III of the United States Constitution or by the traditional prudential barriers to standing.") (internal quotations omitted); *Stocks v. Irvine*, 114 Cal. App. 3d 520, 528 (1981) (holding California courts are not bound to follow federal standing requirements). In fact, under California's rules of standing, the standing requirements are *relaxed* in cases involving the public interest, such as this one. *See Stocks*, 114 Cal. App. 3d at 533 (discussing "trend in [California] to apply less stringent rules [of standing] to cases litigating issues in the public interest"); *Residents of Beverly Glen, Inc. v. City of Los Angeles*, 34 Cal. App. 3d 117, 122-123 (1973) (discussing "marked accommodation of formerly strict procedural requirements of standing to sue" in cases involving public interest).

Second, Defendants ignore the statutory duties the EOB must perform under state law. The California Legislature determined that reliable electric power, provided at just and reasonable prices, is vital to the State of California and to its citizens. *See* Cal. Pub. Util. Code § 330 (emphasizing importance of affordable, reliable electricity to health, safety, and welfare of State's citizens and economy). It further declared that the provision of reliable electricity service to the citizens of the state, without exposure to undue economic risk, "is of paramount importance to the safety, health, and comfort of the people of California." Cal. Pub. Util. Code § 334. The Legislature has given the EOB the duty and power to participate in suits that affect these vital

---

specific rules relevant to insurance policies that are irrelevant here. *See id.* at 180 (holding that plaintiff may not seek a declaration of rights under an insurance policy because only "[an] intended beneficiary of an insurance policy who is denied coverage may seek declaratory relief").

interests. The importance of the agreements to the operation of the markets, and therefore to the State's vital interests, gives the EOB an interest apart from the private interests of private parties.

**3. The EOB's Intervention Is Also Proper.**

In any event, EOB possesses an interest in this case sufficient to warrant its participation as an intervenor. Should the Court find that EOB lacks an interest sufficient to allow its participation as an original plaintiff in this action, the EOB hereby seeks leave to participate as an intervenor, or, in the alternative, to file a complaint in intervention.

The right to intervene in a California action is purely statutory. *Timberidge Enters. Inc. v. City of Santa Rosa*, 86 Cal. App. 3d 873, 881 (1978). Intervention is governed by Cal. Code Civ. P. § 387, which provides:

> (a) Upon timely application, any person, who has an interest in the matter in litigation, or in the success of either of the parties, or an interest against both, may intervene in the action or proceeding.

The statute is to be liberally construed in favor of intervention. *Simpson Redwood Co. v. State of California*, 196 Cal. App. 3d 1192, 1200 (1987). The interest required for intervention need not be a pecuniary interest, nor even a specific legal or equitable interest in the subject matter of the litigation; rather, the interest in the matter need only be "direct" or "immediate." *Id.*

Under California law, "[a]ll public agencies have an 'interest' which is 'direct' in meeting their official responsibilities." *Timberidge,* 86 Cal. App. 3d at 882 (holding school district was wrongly denied intervention in action challenging city building fee because fee impacted schools and district had statutory duty to provide education for its children). In *People ex rel. Public Utilities Commission v. Ryerson*, for example, the CPUC was permitted to intervene in a contract lawsuit in which a carrier sued a shipper to collect undercharges based on a Commission rate order. 241 Cal. App. 2d 115 (1966). When a stipulation in the case threatened to undermine the Commission's rate order, the Commission sought to intervene. According to the court, "[t]he interest of the People in maintaining the integrity of the order of the Public Utilities Commission is clearly sufficient" to permit intervention. *Id.* at 119. Similarly, the United States successfully intervened in *County of San Bernardino v. Harsh Cal. Corp.*, 52 Cal. 2d 341 (1959), an action by a county tax assessor to collect taxes from the operator of a military housing project. The local

taxation of the military facility was permitted only by a federal statute. The court held that, although the outcome of the action would not directly affect the federal treasury, the United States "has a vital interest in establishing the validity and correct delineation of the fiscal policy set forth by Congress," an interest that was "fully sufficient" to support intervention. *Id.* at 344, 345.

The EOB's interest in participating in this suit is no less direct. The EOB is charged by statute with overseeing the California ISO and PX, the energy and ancillary services markets they administer, and the reliability of the ISO-controlled grid. *See* Cal. Pub. Util. Code §§ 334, 335, 335(a), 335(e). It thus has a direct and immediate interest in establishing the validity and correct interpretation of the rules and contracts governing these markets. Furthermore, the EOB is required by law to investigate any matter related to California's wholesale markets for energy to ensure that the interests of California citizens and consumers are "served, protected, and represented" in relation to electric transmission and related costs. Cal. Pub. Util. Code § 335(e). It is expressly permitted to "[s]ue and be sued" and to "[p]articipate in proceedings" relevant to its statutory duties in order to discharge these duties. Cal. Pub. Util. Code §§ 335(e); 341(c), (m). In short, it is duty-bound to protect the interests of California in the functioning of the Tariffs and the ISO and PX markets, and the interests of its citizens who will be affected by the judgment in this case.

There is no pragmatic reason to prevent the EOB from participating in this suit. While permissive intervention under Section 387 is within the discretion of the trial court, the EOB's participation in this case would neither unduly delay the main action nor result in a multiplicity of lawsuits. *See Simpson,* 196 Cal. App. 3d at 1203. Because this case is in its early stages, any intervention would be timely. And, as demonstrated by EOB's joinder in the IOUs Complaint and briefs, EOB's participation involves the same issues of fact and law raised by the IOUs, and thus would not expand the scope of the proceedings beyond those issues that would otherwise require resolution. *People ex rel. Rominger v. County of Trinity*, 147 Cal. App. 3d 655, 661 (1983). If the Court deems it necessary for EOB to file a separate complaint in intervention in this case, the EOB requests leave to file such a motion.

## V. THE COMPLAINT ALLEGES FACTS DEMONSTRATING THAT DEFENDANTS ARE CONTRACTUALLY BOUND TO REFUND THEIR OVERCHARGES.

Defendants' specific arguments for dismissal of the contract claims revolve around two strategies, each of them unsound. First, in the face of the straightforward and sensible contract interpretation presented in the Complaint, Defendants offer numerous alternative interpretations—from the spurious to the specious—insisting that they harbored different expectations or that the contracts should be read to absolve them of their contractual duties. But assertions of subjective expectation and competing interpretations of a contract are useless fodder for a demurrer, and in any event all of the competing interpretations are demonstrably incorrect. *See infra* pp. 81-88. Second, Defendants assert various defenses, including attacks on the merits and procedural regularity of FERC's orders leading up to the price adjustment. But collateral challenges to FERC's actions have no place in this case, and these defenses, which are incorrect in any event, cannot defeat the Complaint at the pleading stage. *See infra* pp. 88-92.

### A. The Complaint Sufficiently Alleges That Defendants Are Contractually Bound to Pay Refunds as Required Under the Tariffs.

Having established that the California Parties *may* invoke contract law to enforce the obligations embodied in the Tariffs despite the Defendants' status as governmental entities (*see supra* pp. 27-30), the California Parties are entitled to prevail on these demurrers so long as they have adequately pled (1) that Defendants did, indeed, enter into contracts; and (2) a sufficient description of the contract terms. *See FPI Dev., Inc. v. Nakashima*, 231 Cal. App. 3d 367, 382 (1991). The Complaint amply satisfies both requirements.[72]

---

[72] Two Defendants have demurred on the ground of "uncertainty" under C.C.P. § 430.10(f). G/P Br. at 16. A demurrer on this ground, which these Defendants acknowledge is "disfavored," should not be sustained "if the allegations are sufficiently clear to apprise the defendant of the issues that must be met, even if the allegations of the complaint [are not] as clear and [ ] detailed as might be desired." *Merlino v. W. Coast Macaroni Mfg. Co.*, 90 Cal. App. 2d 106, 108 (1949). *See also Khoury v. Maly's of California, Inc.*, 14 Cal. App. 4th 612, 616 (1993). Moreover, it is improper to sustain a demurrer on the ground of uncertainty if the allegedly ambiguous facts are presumptively within the knowledge of the demurring party. *See, e.g.*, *Longshore v. County of Ventura*, 25 Cal. 3d 14, 30 (1979). "A special demurrer for uncertainty is not intended to reach the failure to incorporate sufficient facts in the pleading, but is directed at the uncertainty existing in the allegations actually made." *Butler v. Sequeira*, 100 Cal. App. 2d 143, 145-146 (1950). The (Footnote Continued)

**1. The Complaint Adequately Alleges That Defendants Contractually Bound Themselves to the Terms of the ISO and PX Tariffs.**

In 2000 and 2001, when wholesale electricity prices in California reached stratospheric levels, the ISO and PX markets offered an irresistible opportunity for any seller, including Defendants, that had power to sell. Compl. ¶ 51. Defendants could have sold their surplus power in untariffed, bilateral sales directly to any number of other buyers. *See supra* pp. 27-29. But Defendants chose to take advantage of the historic opportunity for outsized profits in the ISO and PX markets, where all prices were set by the Tariffs and subject to review and adjustment by FERC.

That choice had consequences. Defendants could not simply start trading in the highly regulated ISO and PX markets as if they were lemonade stands. As a condition of making those sales, Defendants were required to agree to abide by the Tariff rules that governed all transactions in those markets. Compl. ¶¶ 33-36. All except two of the Defendants *signed written contracts* that expressly incorporated the entire Tariffs as contract terms, and agreed that the "obligations and liabilities" of the Tariffs were binding on them. *Id.* By those contracts, Defendants agreed that if they sold power in the ISO and PX markets, all their transactions—and the prices they charged—would be set pursuant to the ISO and PX Tariff terms that were regulated, and regularly amended, by FERC. Compl. ¶¶ 36, 44, 49. More specifically, they agreed that selling in these two markets exposed them to the very substantial possibility that FERC would step in and correct the extraordinarily high prices they were receiving under the Tariffs' pricing formulas and order the ISO and PX to recalculate and reissue invoices. Those events would, in turn, trigger the contractual obligation of all sellers, including Defendants, to refund the overcharges to their buyers. Compl. ¶¶ 44-50.

In the ISO Market, Defendants expressly promised to

> abide by, and [] perform all of the obligations under the ISO Tariff placed on Scheduling Coordinators in respect of all matters set forth therein including, without

---

demurrer should be denied because, as we demonstrate *infra*, the Complaint here provides ample detail of the substance of the California Parties' claims. *Merlino*, 90 Cal. App. 2d at 108, 113.

> limitation, all matters relating to the scheduling of Energy and Ancillary Service on the ISO controlled grid, . . [and] billing and payments . . . .

ISO Tariff Appendix B, Scheduling Coordinator Agreement § 2(B). In the PX Market, they promised to

> abide by and [] perform all of the obligations under the PX Tariff in respect of all matters set forth therein including, without limitation, all matters relating to the trading of Energy by it through the PX Markets . . . [and] billing and payments . . .

PX Tariff Appendix A, Participation Agreement § 8. Both written agreements also stated that the ISO or PX Tariff "is incorporated herein and made a part hereof." PX Participation Agreement § 8; ISO Scheduling Coordinator Agreement § 8. In signing these agreements, Defendants acknowledged that the "obligations and liabilities under this . . . Tariff" are binding on the parties.[73] ISO Tariff § 17; PX Tariff § 17. In other words, the Defendants' signed, written agreements made the entirety of the regulated FERC Tariffs, with their attendant obligations, contractually binding on Defendants.

The courts have consistently held that tariffs create contractual obligations binding on the participants in transactions under the tariffs. *See Marcus v. AT&T Corp.*, 138 F.3d 46, 55-56 (2d Cir. 1998) (where customers claimed phone company's billing practices constituted breach of warranty, court held company's federal tariff was *contract* that "conclusively and exclusively enumerate[s] the rights and liabilities" of parties to transactions governed by tariff) (citation omitted); *Constellation Energy Commodities Group, Inc. v. FERC*, 457 F.3d 14, 21 (D.C. Cir. 2006) (holding parties were bound by FERC ruling re treatment of collateral posted by sellers in connection with ISO and PX markets because, even if FERC's ruling conflicted with FERC precedent, parties had "enter[ed] into an agreement" by accepting tariff that included rule on

[73] Some Defendants allege that they have attached to their Request for Judicial Notice copies of all their relevant agreements relating to the ISO and PX, *see* JD Br. at 25-26. The California Parties dispute that the submissions encompass all relevant agreements, and may pursue further information on that subject in discovery. As one example, Defendants have failed to attach the PX Operating Manual, which is a part of their contractual commitment in the PX market.

collateral). The contractual nature of *these* Tariffs is evident from the most cursory review of the Tariff provisions.[74]

Two of the Defendants—Burbank and Turlock—failed to formally sign agreements acknowledging they were bound by the Tariffs. When power shortages created emergencies during the crisis, these Defendants were able to sell their surplus energy to a distressed ISO market before formally executing any documents. *See* ISO Tariff § 2.3.5.1.5 (ISO may enter into transactions through means other than its ordinary mechanisms where necessary to obtain power to reliably operate grid). Burbank and Turlock now argue that without their signatures on an ISO Scheduling Coordinator Agreement they are not bound by the ISO Tariff. B/T Br. at 2-6, 9-11. The Complaint alleges that these Defendants assented to the contractual terms by voluntarily selling power through the ISO, fully aware of its mandatory rules, which were a matter of public record. Compl. ¶¶ 35-36, 49, 82; *Evanns v. AT&T Corp.*, 229 F.3d 837, 841 (9th Cir. 2000). *See* Cal. Civ. Code § 1621 ("An implied contract is one, the existence and terms of which are manifested by conduct."). On these demurrers, the Court must give effect to the allegations in the Complaint and accept the California Parties' allegations that Burbank and Turlock agreed by their actions to be bound by the terms of the ISO and PX Tariffs.[75]

---

[74] *See, e.g.*, ISO Tariff § 17 ("obligations and liabilities under this ISO Tariff" are binding on parties' successors and assigns); PX Tariff § 17 (same); ISO Tariff § 14.3, PX Tariff § 14.3 (indemnity provisions); ISO Tariff § 20.7, PX Tariff § 19.6 (choice-of-law, venue clauses); ISO Tariff § 15, PX Tariff § 16.1 (provisions covering consequences of uncontrollable force); PX Tariff § 16.2 (duty to mitigate).

[75] In any event, Defendants are merely trying to relitigate arguments that they already unsuccessfully made to FERC and the Ninth Circuit—something they may not do. FERC rejected precisely the same arguments that Turlock and Burbank make in their briefs here, B/T Br. at 3-5, 10-12, and found they were bound by the Tariff. *See* July 25, 2001 Order, 96 FERC at 61,515. This ruling was upheld on rehearing. *See* November 23, 2004 Order, 109 FERC ¶ 61,218 at PP 66, 68-69. Unless and until the Ninth Circuit overturns these rulings on appeal, they are binding on the same parties here. *See City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. at 336; *see also* discussion of collateral attacks *infra* at pp. 88-89.

### 2. The Complaint Adequately Alleges the Terms of a Contract That Requires Defendants to Refund Overcharges.

By entering into these contracts, Defendants agreed to certain basic obligations, created by the Tariffs, that applied to all market participants. When a contract makes clear that its terms are subject to a regulatory body, as it does here, "*all parties to that contract are bound by the actions of the regulatory body*," including the regulatory body's price revisions. *Alliant Energy*, 347 F.3d at 1050 (emphasis added).

***All Sellers Must Accept the Same Price.*** The Complaint pleads that the ISO and PX Tariffs required all sellers in a given auction period to accept a single market clearing price. Compl. ¶¶ 28, 30, 49. This reading of the Tariffs is more than merely reasonable. The Ninth Circuit observed in *CPUC* that the ISO and PX's hourly auctions yielded "a single market clearing price which all suppliers would be paid," and it was inherent in the design of these markets that "all market participants would be paid the same price" for their sales. 462 F.3d at 1038. Because Defendants contractually agreed to accept the single market clearing price set by the Tariffs, FERC's correction of the pricing formulas effectively prescribes a single corrected price for all transactions in each auction period. Thus, when FERC corrects the uniform price for a given time period, the contracts necessarily require all sellers, including Defendants, to refund what they charged in excess of that corrected price. Compl. ¶¶ 28, 30, 49, 73, 82.

Defendants urge an alternative reading, arguing variously that the corrected rates cannot apply to them, JD Br. at 31-32; B/T Br. at 11; that the ISO and PX market rates cannot be reset for sales that have already occurred, G/P Br. at 34-36; and that Defendants could not have known that FERC's proposed changes to pricing formulas in the ISO and PX Tariffs would affect them as well as other sellers, G/P Br. at 34-35. These arguments are all variants of Defendants' broader contention, rebutted at pp. 27-33, *supra*, that FERC does not have jurisdiction to regulate Defendants' rates as sellers in their private contracts, or to compel Defendants to pay refunds. But, as we have shown, any limits on FERC's jurisdiction do not bar the IOUs' claims if, as the

Complaint alleges, Defendants contractually undertook the obligation to comply with the Tariffs, which preserve FERC's power to correct the prices charged under the Tariffs.[76]

In the end, then, Defendants' position amounts to no more than a dispute over the meaning of the contract terms, and is not a ground for demurrer to the pleadings. At the appropriate time, the California Parties will demonstrate that it is clear on the face of the ISO and PX Tariffs that in these markets, all sellers are equally contractually bound by FERC's price corrections, whether or not FERC normally regulates a particular seller's rates. At that time, Defendants will have to explain why other market participants (or FERC, for that matter) would ever have agreed to an arrangement in which one class of sellers had a special entitlement to overcharge with impunity, while still collecting refunds when overcharged by others.

But that is a question for another day. At the present time, all that matters is that the Complaint's reading of the Tariffs is not "clearly erroneous." *Aragon-Haas*, 231 Cal. App. 3d at 239. The Complaint more than meets that standard.

***Prices Were Subject to Review and Correction by FERC.*** In signing agreements agreeing to be bound by the Tariff terms, Defendants, like all other market participants, knew and agreed to a basic principle: They would not control the price. The price would be set in the first instance by the applicable Tariff formula, with every seller in the same auction period receiving the same price. (Or, in some exceptional circumstances, a price was negotiated with the ISO as authorized by the ISO Tariff.) But the Tariffs contemplated that in either case FERC could intervene to correct those prices and order the ISO and PX to issue revised invoices, obliging every market participant to honor the revised prices even as to sales that had already occurred.

The *Alliant Energy* courts' interpretation of the MAPP Agreement is again instructive. That agreement set prices applicable to governmental and non-governmental members alike. The courts

---

[76] Nor is Defendants' reading supported by the fact that the Tariff does not limit the price they can *ask to receive* when they make offers to sell power into the ISO market. G/P Br. at 14 (citing ISO Tariff § 2.5.7.3); JD Br. at 32. The IOUs' claims are not based on Defendants' making unreasonable bids into the market; rather, they allege that Defendants agreed to honor the actual sale prices that result from the price-setting formulas in the Tariffs, as revised by FERC.

found that a governmental entity had *contractually* bound itself to honor FERC-ordered amendments that resulted in refund liability, even though FERC would have had no power to compel the entity to pay a refund. *See Bonneville*, 422 F.3d at 925-26; *Alliant Energy*, 347 F.3d at 1050. Just as in those cases, Defendants here necessarily "recognized that FERC would exercise its regulatory authority over the contract," and were therefore bound to FERC's revisions of the pricing formula in that contract. *Alliant Energy*, 2001 WL 1640132, at *3. Here, as there, Defendants' refusal to respect those amendments is a breach of contract for which this Court may award a remedy—even if FERC could not directly enforce the order against Defendants. *Alliant Energy*, 347 F.3d at 1050-51; *Alliant Energy*, 2001 WL 1640132, at *4.

As described at pp. 27-29, *supra*, listing the elements of the contract claim, the ISO and PX Tariffs specifically memorialize the parties' mutual understanding and agreement. These tariff provisions make it abundantly clear that FERC regulates the terms and conditions of the ISO and PX Tariffs, a proposition no party seriously contests. And, if FERC resets the prices, the parties are contractually obligated to honor the new rates.

Although the fact of FERC's regulatory authority over the Tariffs by itself binds Defendants to any FERC price changes, Section 19 of the ISO Tariff and Section 13 of the PX Tariff make FERC's authority on this point even more explicit. ISO Tariff Section 19 states, in relevant part, that

> [n]othing contained in this ISO Tariff or any [Scheduling Coordinator] Agreement shall be construed as affecting the ability of any Market Participant receiving service under this ISO Tariff to exercise its rights under Section 206 of the FPA and FERC's rules and regulations thereunder.

ISO Tariff § 19 (PX Tariff § 13 parallels this provision).

This quoted language has the following meaning in FERC regulatory parlance: A market participant's ability to "exercise its rights under Section 206 of the FPA" refers to FERC's authority to reset prices to just and reasonable rates. 16 U.S.C. § 824e (2000). Section 206, it may be recalled, requires FERC to ensure that buyers in FERC-regulated markets pay only just and reasonable rates for power. *Id.* Under the terms of the contract, then, any buyer that believes the ISO (or PX) Tariff is yielding unlawful rates can ask FERC to correct those rates and order refunds

to ensure that buyers pay only "just and reasonable" rates. ISO Tariff § 19; PX Tariff § 13. The provisions thus put sellers on notice that their sales prices were subject to adjustment by FERC, and put buyers on notice that they were entitled to a FERC-regulated price under the Tariff.[77]

Thus, every buyer in the ISO and PX markets purchased power subject to a contractual promise that if the Tariff formulas yielded prices that were unjust and unreasonable, FERC could correct that price. Sections 19 and 13 of the ISO and PX Tariffs, in particular, gave buyers every reason to believe that they were contracting to purchase power at a "just and reasonable" rate. Defendants do not explain, nor can they, why buyers in the ISO and PX markets would have expected to pay anything *but* the FERC-regulated rate for power, even if those FERC-tariffed sales were initiated by governmental entities. *See* Cal. Civ. Code § 1649 ("If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.").

**3. Defendants' Efforts to Offer Alternative Readings of the Contract Are Unavailing.**

Not only do Defendants fail to challenge *Alliant Energy*'s contractual analysis, but several of them admit that they could contractually bind themselves to accept price changes in the ISO or PX resulting from a FERC order. The Joint Defendants concede:

> In theory, *parties might agree by contract to accept retroactive changes to the prices they charge tied to some external reference price or index (such as a FERC-approved rate of another seller)* and, had Defendants so intended to bind themselves in this case, they could have done so.

---

[77] The Tariffs are "going rate" contracts, in which rates can be adjusted from time to time by FERC. *See United Gas Pipe Line Co. v. Memphis Light, Gas and Water Div.*, 358 U.S. 103 (1958) (discussing parties' rights under going rate contracts). A "going rate" contract reserves the rights of sellers and buyers to petition FERC under Section 206 of the FPA to modify tariff rates from time to time. When such a clause exists, as it does here, all parties are on notice that the prices in that contract are subject to change by FERC and that they must abide by any revised rates that FERC may prescribe. *Memphis Light, Gas and Water Div.*, 358 U.S. at 111. Municipalities can and do enter into going rate contracts with utilities, and when they do so they are held to be bound by those contract terms. *See, e.g., City of Frankfort v. FERC*, 678 F.2d 699, 702, 708 (7th Cir. 1982) (finding that City had agreed to going rate contract and was bound to accept FERC adjustment to rates under contract).

JD Br. at 32 (emphasis added). Having conceded that they might have entered into such an agreement, they essentially concede that there is a factual issue as to whether they did.

Instead of raising contentions that may be resolved in a demurrer, Defendants offer a series of arguments in support of their own reading of the contracts: (1) the Tariffs do not explicitly state that they were subject to FERC regulation, JD Br. at 31-32, G/P Br. at 20-29; (2) the Tariffs do not expressly require payment of a refund, JD Br. at 32-37; (3) the Tariffs can be read not to require compliance with FERC orders altering the obligations of sellers and buyers under the Tariffs unless those orders formally alter the text of the contract itself, JD Br. at 38-39; and (4) certain provisions of the Tariffs can be read to shield Defendants from liability, G/P Br. at 21-24.

Each argument is an effort to present an alternative reading of the contractual language in the Tariffs. At this early stage in the litigation, Defendants cannot defeat the Complaint by offering alternative versions of contract interpretation, much less by making factual representations about what they intended. When a court considers contractual documents in the context of a demurrer for failure to state a claim, it should strive to resolve any contractual ambiguities in the plaintiffs' favor. *Coopers & Lybrand v. Super. Ct.*, 212 Cal. App. 3d 524, 538 (1989) (holding ambiguous arbitration provision in contract must, on demurrer, be interpreted as plaintiff alleged in complaint (citing *Pigeon Point Ranch*, 59 Cal. 2d at 233)). The construction of ambiguous contract provisions is a factual determination that precludes dismissal on a motion for failure to state a claim. *Id.* at 539. This Court can and should dispense with all of these arguments by holding that now is not the time to resolve disagreements over the meaning of the contracts.

In addition to that fundamental defect in Defendants' showing, their arguments are unmeritorious on their own terms:

***The Contracts Include an Explicit Statement of FERC Regulation.*** Defendants are correct that in *Alliant Energy* the MAPP agreement *stated* that it was subject to FERC regulation. *See* JD Br. at 36-37; G/P Br. at 27-28. But that does not help Defendants distinguish *Alliant Energy*, because the terms of the ISO and PX Tariffs are even more explicit on this point.

In *Alliant Energy*, two provisions in the MAPP Agreement were central to the Eighth Circuit's conclusion that the FERC order created a contractual obligation. One provision said that

the agreement "is subject to the regulation of any regulatory body or governmental agency having jurisdiction thereof," and a second one "ma[de] the entire contract subject to FERC approval." *Alliant Energy*, 347 F.3d at 1050.

Both the ISO and PX Tariffs contain similar provisions, and refer at many additional points to FERC's regulation of the Tariffs. *See*, *e.g.*, ISO Tariff § 18.1 (Tariff "shall become effective on the date it is permitted to become effective by FERC"); PX Tariff § 18.1 (same); ISO Tariff § 13.1.1 (referring to "rights of any party to file a complaint with FERC"); § 13.2.4 (disputes may be referred "directly to FERC"). And most important, as we have seen, the ISO and PX Tariffs explicitly incorporate clauses that affirm FERC's power to review and reset prices charged by sellers in the ISO and PX markets, when a complaint under FPA Section 206 alleges prices are unjust and unreasonable. *See* ISO Tariff § 19; PX Tariff § 13. These very provisions led the Ninth Circuit in *Bonneville* to say it was "true" that, as the California Parties argued, "these agreements made it obvious to the [Defendants] that the tariffs setting the prices in the ISO and CalPX markets would be subject to FERC regulation." *Bonneville*, 422 F.3d at 925. Defendants' attempt to distinguish *Alliant Energy* on this ground cannot be squared with *Bonneville*.

***The Contracts Contain an Express Refund Authorization.*** Equally off base are Defendants' arguments about the absence of express language in the ISO and PX Tariffs concerning refunds. The Defendants' contracts *do* expressly provide mechanisms to correct any overpayments to sellers and to return the funds to the affected purchasers. The ISO and PX Tariffs provide for recalculation of prices, and resettlement and reinvoicing of the amounts owed to and from each market participant, for good cause at any time. ISO Tariff § 11.6.3; PX PSABP § 5.3.1. When FERC determines that sellers made improper overcharges, as FERC did here, the Tariffs provide for correction of the accounts of the buyers and sellers involved. ISO Tariff § 11.6.3.3; PX PSABP § 5.3.4. The seller's account is reduced by the amount of the overcharge, and the affected buyers receive a credit to their accounts. *See* ISO Tariff §§ 11.18.1, 11.18.2 (if "for any reason" an ISO creditor receives an overpayment, it must return the overpayment to the ISO and the ISO is responsible for ensuring that the monies are flowed through to "those entitled to the sum which has been overpaid").

Some Defendants argue that there is no express provision for refunds from governmental entities, G/P Br. at 25-27, and others argue generically that there is no provision requiring *any* seller—even those within FERC's regulatory jurisdiction—to refund their overcharges. JD Br. at 32-33. Of course, even if this were correct, the absence of explicit contractual terms is never a basis for dismissing a breach of contract complaint. Ambiguity in a contract often revolves around the absence of provisions directly addressing the situation at hand, and ambiguity is no ground for demurrer as long as the Complaint's interpretation is not clearly erroneous. *Pigeon Point Ranch*, 59 Cal. 2d at 233; *Aragon-Haas*, 231 Cal. App. 3d at 239. But in any event, Defendants are incorrect.

The Defendants' contracts *do* expressly provide mechanisms to correct any overpayments to sellers and to return the funds to the affected purchasers. The ISO and PX Tariffs provide for re-calculation of prices, and resettlement and reinvoicing of the amounts owed to and from each market participant, for good cause at any time. ISO Tariff § 11.6.3; PX PSABP § 5.3.1. When FERC determines that sellers made improper overcharges, as happened here, the Tariffs provide for correction of the accounts of the buyers and sellers involved. ISO Tariff § 11.6.3.3; PX PSABP § 5.3.4. The seller's account is reduced by the amount of the overcharge, and the affected buyers receive a credit to their accounts. *See* ISO Tariff §§ 11.18.1, 11.18.2 (if "for any reason" ISO creditor receives an overpayment, it must return overpayment to the ISO and ISO is responsible for ensuring that monies are flowed through to "those entitled to the sum which has been overpaid").

Moreover, no express provision for refunds would be required in any event. Since there is now no basis in the Tariffs for the prices Defendants charged during the Refund Period, they must pay refunds. As the *Alliant Energy* district court held, "after the FERC-ordered revisions, the [MAPP] Agreement lacks authority for the tariff monies [the governmental entity] collected after March 1, 1997. . . . *Absent authority for collecting the tariff charges in the first place, [the governmental entity] must pay the refunds*." 2001 WL 1640132, at *4 (emphasis added).

The same defect dooms the argument that there is no Tariff language requiring *identified* governmental entities "to pay refunds if they collected prices higher than FERC-jurisdictional sellers were authorized to charge." JD Br. at 32-33. That argument is something of a red herring. Over time, scores of different entities participated in the ISO and PX markets. It is nonsensical to

argue that the Tariffs governing these markets, *which were written before the markets commenced operations*, should have included specific rules tailored for specific entities. If, as the Complaint establishes, the contract requires all market participants to follow the same rules, and to refund overcharges, it does not matter that the contract did not enumerate every party to which that obligation applies. As the Eighth Circuit observed when it rejected the same argument:

> Admittedly, MAPP did not insert an express provision, which would have required [a governmental entity] to retroactively refund the discriminatory tariffs. However, *MAPP did not have to*. When a contract provides that its terms are subject to a regulatory body, *all* parties to that contract are bound by the actions of the regulatory body.

*Alliant Energy*, 347 F.3d at 1051 (emphasis added). The Eight Circuit agreed, holding that, because the governmental entity was bound by the MAPP Agreement, "it too is contractually required to refund the [disallowed charges], *regardless of whether the contract expressly provides for it*." *Id.* at 1050-51 (emphasis added; citations and footnotes omitted).

This basic tenet of contract interpretation cannot be overcome, as two Defendants try to do, by spinning some stray comments by market participants. *See* G/P Br. at 25-26. Those extrinsic statements have no bearing at all on whether the Complaint's reading of the contract is a reasonable interpretation, not clearly erroneous, and is therefore sufficient against these demurrers.

But even considered on their merits, the comments invoked do not defeat the California Parties' claims. The comments were made in December 2000, when the City of Vernon, a defendant here, sought to sell transmission service (*not* electricity) under the ISO Tariff. The ISO insisted that Vernon's agreement should include particular language to ensure that Vernon would be liable for refunds if FERC adjusted the rates for transmission service. ISO Motion To Treat as Moot and Motion to Strike Motion for Leave to Answer and Answer of City of Vernon, Cal., *Cal. Indep. Sys. Operator Corp.*, No. EL01-14-000, at 12 ("ISO Mot. to Moot") (RJN Exh. 16). The ISO justified the demand for this additional assurance by stating, somewhat hyperbolically, that "[w]ithout [that language], a non-jurisdictional [transmission seller] will not be obligated to adjust rates or make refunds in accordance with the ISO Tariff." *Id.* at 12. PG&E also commented that without such language "there can be no assurance" that transmission sellers would be treated

equally. Motion to Intervene, Supporting Comments and Partial Protest of Pacific Gas and Electric Company, *Cal. Indep. Sys. Operator Corp.*, EL01-724-000, at 5 (Jan. 11, 2001) ("PG&E Mot. to Intervene") (JD RJN Exh. 19).

These concerns were understandable, because at the time they were made, FERC had recently ruled in its own MAPP proceeding that it did *not* have jurisdiction to force a governmental entity to pay refunds, and the *Alliant Energy* courts had *not yet* ruled that the MAPP agreement imposed a *contractual* duty on governmental entities to pay refunds. Plus, Vernon was indicating to the ISO that it was unwilling to voluntarily comply with all the terms of the standard ISO transmission contract. ISO Mot. to Moot at 5, 9, 11; PG&E Mot. to Intervene at 6. FERC approved inclusion of the requested language in the transmission contract, Transmission Control Agreement at 43-44, *Cal. Indep. Sys. Operator Corp.*, No. EL01-14-000 (Dec. 21, 2000) (JD RJN Exh. 20), without endorsing the ISO's statement. And, in any event, the ISO's statement is not an authoritative interpretation of either that contract or the Tariffs at issue here, and is certainly not binding on the California Parties.

***FERC in Fact Formally Revised the Pricing Formulas Under the Tariffs.*** Defendants next try to distinguish *Alliant Energy* based on the precise device by which FERC disallowed the impermissible charges in that case, and here. In *Alliant Energy*, Defendants point out, FERC modified the MAPP agreement itself by ordering a provision to be stricken. *See Alliant Energy*, 2001 WL 1640132 at *2. Here, FERC ordered a revision of the ISO and PX Tariffs' pricing formulas to be applied to transactions during the Refund Period. The difference, according to Defendants, is that here no Tariff pages were physically revised to incorporate the new formula for the Refund Period. *E.g.*, JD Br. at 37-39; G/P Br. at 28.

The distinction is meaningless for purposes of assessing the contractual effect of FERC's action. When the Federal Reserve lowers the federal funds lending rate or OSHA tightens safety regulations, it does not matter whether contracts attaching consequences to those agency actions are formally amended. The same is true here. If, as the Complaint contends, the parties understood that the contracts require all sellers in any auction to accept the same market-clearing price, and to abide by all FERC pricing orders, it does not matter whether FERC achieved the price change by

amending obligations already incorporated into the document, ordering the parties to retype the contract, or stapling the orders to the end of the contract. What matters is that when FERC revised the pricing formulas in the Tariffs, FERC made a price adjustment that Defendants were contractually bound to honor.

***Immunity provision.*** Two Defendants argue that they cannot be contractually liable for price changes under the ISO Tariff because the Tariff itself immunizes them. G/P Br. at 23-24. In support of their argument, they invoke a Tariff provision that reads:

> No person or federal entity shall incur any liability by failing to comply with a Tariff provision that is inapplicable to it by reason of being inconsistent with any federal statutes, regulations, or orders promulgated thereunder; *provided, however, that such person or federal entity shall use its best efforts to comply with the Tariff to the extent the applicable federal laws, regulations, and orders . . . permit it to do so.*

ISO Tariff § 20.8(a) (emphasis added).

But this provision cannot mean that all breaches of contract by a governmental entity are excused. *See* G/P Br. at 24. Only the most obtuse party would invite non-jurisdictional entities to sign and reap the benefits of a contract, but absolve them of any obligation to obey the contract. Rather, the provision means that a party cannot be held liable for breaching a Tariff provision if it can demonstrate that the party would be required to violate federal law in order to comply.

Obviously, nothing in federal law prohibits Defendants from voluntarily binding themselves to the Tariffs and undertaking to obey pricing modifications that FERC has ordered, and holding them to these obligations is in no way "inconsistent with any federal statutes, regulations, or [FERC] orders." The Eighth Circuit rejected precisely the same argument in *Alliant Energy* concerning a similar provision. 347 F.3d at 1051. The court observed that the law "'requires each clause to be read in light of the entire contract.'" *Id.* (citation omitted). The "larger purpose" of the agreement was "to provide nondiscriminatory transmission services in accordance with FERC policies," and the agreement as a whole showed that the governmental entity in question and every other signatory had committed—as they did in this case—to follow FERC-mandated revisions to the agreement. *Id.* In fact, the second clause of the Tariff provision Defendants invoke makes the

point explicit: any party to the contract must obey the contract to the extent that federal law "permit[s] it to do so."

**B. Defendants' Affirmative Factual Allegations Relating to FERC's Refund Proceeding and the IOUs Performance Under the Contracts Plainly Cannot Be Resolved on Demurrer.**

Defendants attempt to avoid their contract liability by making a grab bag of new factual assertions about the proceedings in which FERC reviewed and corrected the ISO and PX market prices, and the IOUs' performance of various obligations under the Tariffs. These arguments are useless on these demurrers as the Court plainly cannot resolve factual disputes at the pleading stage. *Comm. on Children's T.V., Inc. v. Gen. Foods Corp.*, 35 Cal. 3d 197, 213-14 (1983) (factual challenges to complaint are irrelevant to sufficiency of complaint to survive demurrer); *Fuhrman v. California Satellite Systems*, 179 Cal. App. 3d at 422-23 (same). In addition, Defendants are improperly asking this Court to revisit issues already resolved *against* Defendants by FERC. This Court has no jurisdiction to review these FERC decisions, which are binding on these Defendants *in this case*, and Defendants cannot assert any claim or defense here on the premise that FERC's findings were incorrect. *See infra* pp. 88-89. And, in any event, Defendants' claims are simply wrong. *See infra* pp. 90-92.

**1. Defendants May Not Collaterally Attack FERC's Rulings or the Procedural Regularity of the Remedy Proceeding.**

The Remedy Proceeding is one of the largest and most complex FERC proceedings in history. After several trials, thousands of pleadings, and mountains of discovery, Defendants and other sellers failed to persuade FERC not to correct prices in the ISO and PX markets for the Refund Period. In the course of that proceeding, FERC considered and rejected both of the arguments Defendants now tout as defenses before this Court. Even if this Court had the resources, the staff, the time, and the inclination to put the rest of its docket on hold and redo FERC's and the Ninth Circuit's handiwork, it could not lawfully do so.

Defendants are not permitted to collaterally attack those rulings—at any phase of this litigation. Congress conferred exclusive jurisdiction upon the federal courts of appeals to hear challenges to FERC orders, and *precluded de novo litigation of those issues between the parties.*

*See City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. at 336 (interpreting 16 U.S.C. § 825*l*(b)); *Mega Renewables v. County of Shasta*, 644 F. Supp. at 498-99 (refusing to consider arguments in opposition brief or counterclaim that required court to consider correctness of FERC order because such arguments should have been litigated before FERC and appealed to Ninth Circuit). Unless and until the Ninth Circuit overturns these rulings on appeal, they are binding on the same parties here. *Ruyle v. Cont'l Oil. Co.*, 44 F.3d 837, 845-46 (10th Cir. 1994) (holding that ruling of state administrative proceeding must be given preclusive effect even while pending on appeal, and noting that result would be same under federal law).[78]

**2. These Arguments Are Also Irrelevant.**

These collateral challenges are immaterial to this contract action anyway. FERC's regulatory action against Defendants is not at issue here. Once again, the Eighth Circuit's admonition in *Alliant Energy* is apt: "[W]e are not enforcing the FERC order; instead, we are enforcing an agreement, which [the governmental entity] freely entered." 347 F.3d at 1050, *quoted in Bonneville*, 422 F.3d at 926. The only issue properly before this Court is the *contractual* effect, in this suit, of corrected prices established under the ISO and PX Tariffs. The Tariffs contractually bind Defendants to honor corrections to prices resulting from FERC rulings. Nowhere do the contracts say that some defect in FERC's procedures or findings could excuse Defendants' contractual duty to other market participants to honor the new prices. Defendants cannot demur to this contract action by challenging FERC's orders, any more than a lender can resist a change to a contractually prescribed lending rate (tied, say, to the federal funds rate) by arguing that the Federal Reserve erred procedurally or substantively when it altered the federal funds rate.

---

[78] The FERC proceedings were sufficiently judicial in nature to be given collateral estoppel effect. *See W. Coast Truck Lines, Inc. v. Am. Indus., Inc.*, 893 F.2d 229, 234-35 (9th Cir. 1990). Their collateral estoppel effect is determined by federal law. *See Calhoun v. Franchise Tax Bd.*, 20 Cal. 3d 881, 887 (1978) ("A federal judgment is as final in California courts as it would be in federal courts"); *Levy v. Cohen*, 19 Cal. 3d 165 (1977). Under federal law, these rulings must be given preclusive effect even though subject to a pending appeal. *See Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 928 (9th Cir. 2006).

### 3. Defendants' Factual Defenses Are Also Simply Wrong.

In any event, FERC correctly decided these issues against Defendants.

***Notice to Defendants.*** When Defendants argue that they did not have sufficient notice of the possibility that FERC would reset prices "retroactively," *e.g.*, G/P Br. at 35-36, they are invoking a specific and technical limitation on FERC's regulatory power. FERC is generally prohibited from amending retroactively the terms of a tariff; that would be "retroactive ratemaking," which is unfair because sellers and buyers, when they make their transactions, need to be on notice of any uncertainties that might affect the price. *CPUC*, 462 F.3d at 1063. However, the FPA permits FERC, as it did here, to make an announcement putting all market participants on notice that their *future* sales, during the course of a FERC investigation, could be subject to adjustment. *See id*; 16 U.S.C. § 824e(b) (FPA Section 206(b)). Because FERC repeatedly announced it was considering pricing modifications to the ISO and PX Tariffs, Defendants have no basis for complaining that the price correction was "retroactive." *See supra* pp. 45-48.

Defendants had clear notice from the outset of FERC's investigation that FERC was considering broad remedies that could affect Defendants' sales and, in response, Defendants intervened and actively participated in the Remedy Proceeding. Indeed, in an appeal from that proceeding the Ninth Circuit rejected the premise of Defendants' argument, holding that FERC made clear from the outset that its investigation encompassed the possible modification of "rates for *all sales* in the [ISO and PX] markets," and the "market rules … embodied in [the ISO and PX] tariffs and agreements." *CPUC*, 462 F.3d at 1041 (emphasis added), 1047 (quoting August 23, 2000 Order, 92 FERC at 61,606).

***Alleged defaults by the IOUs.*** FERC also rejected arguments that supposed defaults by the IOUs should preclude FERC's adoption of market-wide price corrections. The supposed defaults fall into two categories.

First, some Defendants rely on FERC's finding that the IOUs had not "schedule[d] their full load" with the PX. *See* JD Br. at 51-52. In other words, the PX Tariff required the IOUs to purchase through the PX all of their electricity requirements to serve their ratepayers' demand or "load." *See CPUC*, 462 F.3d at 1038. In an ideal world, the IOUs would have procured virtually

all of their projected load through the PX "day-ahead" market, avoiding the need for any significant last-minute procurement through the ISO. But, during the Energy Crisis, in an attempt to protect California ratepayers against spiking prices, the IOUs submitted bids to purchase power through the PX, with a ceiling on the amount the IOUs were willing to pay. Because sellers were demanding inflated prices, a substantial amount of the IOUs' bids in the PX market were unsuccessful, and the IOUs ended up buying much of their power in the ISO real time market, which at the time was operating under FERC-prescribed price caps.

Defendants somehow rely on those events to assert that this suit arises out of a power crisis "to which the California Parties themselves contributed." JD Br. at 52. That is the equivalent of blaming a mugging victim for trying to hang on to his wallet. These allegations will not excuse Defendants' contractual obligations, even when the time comes to resolve the factual issues they raise. In any event, FERC refused to penalize the IOUs for this practice because FERC found that it had the effect of *lowering*, not increasing, the stratospheric prices charged by sellers, including Defendants, that were creating chaos for the state's utilities and ratepayers. *See Am. Elec. Power Serv. Corp.*, 106 FERC ¶ 61,020 at P 90 (2004) (JD Non-Cal. Auth. Exh. 48) (finding "underscheduling" of load actually reduced prices, so that FERC would not impose any monetary penalty); December 19, 2001 Order, 97 FERC at 62,227 (FERC eliminated penalty for underscheduling entirely, in response to IOUs' showing that chaotic conditions in markets made it virtually impossible to comply with the rule; FERC concluded "it would be unreasonable to impose a penalty in a situation where that penalty could not be avoided"). This is why FERC, despite having found that the IOUs engaged in the practice described above, chose neither to modify the relief due to the IOUs nor to impose any sanctions on them. *Am. Elec. Power Serv. Corp.*, 106 FERC ¶ 61,020 at P 90.

Similarly, the Joint Defendants, without any hint of irony, argue that PG&E and SCE "did not pay their bills to the ISO and the PX" and "did not maintain their creditworthiness." JD Br. at 52. Never mind that these utilities would have made timely payments if they had not been forced, month after month, to pay grossly inflated prices to sellers, including Defendants, in fulfillment of their obligations to ratepayers. Compl. ¶ 56. And in the proper context of a summary judgment

motion, the facts will establish that the IOUs *did* ultimately pay all their bills, with interest. *See* March 26, 2003 Order, 102 FERC ¶ 61,317 at P "J" (preceding P 148) (FERC noted SCE had fully paid its Refund Period invoices from the ISO); *Pac. Gas & Elec. Co. v. FERC*, 373 F.3d 1315, 1321 (D.C. Cir. 2004) (court observed that SCE had paid its PX account in full by March 13, 2002); *San Diego Gas & Elec. Co*, 111 FERC ¶ 61,186 at P 28 (2005) ("May 9, 2005 Order") (RJN Exh. 9) (FERC stated "PG&E has put into an escrow account subject to oversight by the Bankruptcy Court an amount that is sufficient to pay its obligations to the market"). So Defendants' assertion is essentially that Defendants are absolved of contractual liability because the IOUs, due to the natural consequences of the Energy Crisis, made these payments *late*.

But FERC has already factored all these payment issues into the calculations of sellers' and buyers' accounts with the ISO and PX. FERC ordered interest to be added to unpaid amounts owing to sellers, to compensate them for the delay in collecting those funds. July 25, 2001 Order, 96 FERC at 61,519. Similarly, FERC added a ten percent "creditworthiness" adjustment on sales during the Refund Period, giving all sellers a premium to reflect added risk for all their sales after PG&E's and Edison's bond ratings were downgraded in January 2001. *Id.*; December 19, 2001 Order, 97 FERC at 62,210-11. Given that FERC factored the creditworthiness and late payment issues into its pricing determination, Defendants are bound by that determination and cannot challenge it here. And in any event, at the appropriate stage, Defendants will not be able to avoid liability on the ground of the IOUs' alleged default because Defendants' own actions contributed to the impossibility of the IOUs' performance. *E.g.*, *Erich v. Granoff*, 109 Cal. App. 3d 920, 930 (1980); Cal. Civ. Code § 1511.

## VI. THE IOUS MAY PURSUE CLAIMS FOR UNJUST ENRICHMENT AND MONEY HAD AND RECEIVED.

Defendants' sales of electric power at highly inflated prices have been declared unjust, unreasonable, and unlawful, and have conferred on Defendants a benefit that would be unjust for them to retain, particularly as they are *seeking* refunds from sellers for Defendants' *own* purchases of electricity during the crisis. Defendants have not asserted any valid theory for a demurrer on either the "Unjust Enrichment Arising From Contract" or the "Money Had and Received" claim.

### A. Defendants Are Liable to the IOUs for Unjust Enrichment and Money Had and Received Because These Claims Arise From Contract, Not Tort.

Defendants have no "immunity" from these claims for unjust enrichment and money had and received. *Cf.* JD Br. at 49-50. Only claims against a public entity that are based in *tort* are barred—not these claims based in contract. California law is clear that a claim against a public entity seeking a refund of an overpayment is *contractual in nature*, regardless of whether founded on express, implied, or quasi-contract, and is therefore not barred by any immunity. *See* Cal. Gov't Code § 814 ("liability based on contract" is not affected by governmental tort immunity); *Util. Audit Co. v. County of Los Angeles*, 112 Cal. App. 4th 950, 958 (2003) (common count that is contractual in nature is not barred by governmental tort immunity); *cf. Janis v. Cal. State Lottery Comm'n*, 68 Cal. App. 4th 824, 830 (1998) (unjust enrichment claim premised on misrepresentation is tortious in nature and therefore barred by governmental tort immunity).

There is no "'general rule'" that "'a public entity cannot be sued on an implied-in-law or quasi-contract theory.'" *See* JD Br. at 50 (quoting *Lundeen Coatings Corp. v. Dep't of Water & Power*, 232 Cal. App. 3d 816, 831 n.9 (1991)). The true "general rule" is that, "*if a public contract is declared void*, a contractor may not be paid for work performed under that contract." *Amelco Elec. v. City of Thousand Oaks*, 27 Cal. 4th 228, 234 (2002) (emphasis added). The rule protects a government entity from having to pay for goods or services provided where procedural requirements for government purchasing contracts were not observed. The policy underlying the rule is that if the contract is void, the plaintiff's theory of recovery must be merely "based on quantum meruit or restitution considerations which are outweighed by the need to protect and limit

a public entity's contractual obligations." *L.A. Equestrian Ctr. Inc. v. City of Los Angeles*, 17 Cal. App. 4th 432, 449 (1993) (citation omitted).

Consistent with this limitation, *all* of the cases cited by Defendants involved a plaintiff who provided goods or services to a government entity *without properly forming an express contract with that government entity*, and then sought recovery from the governmental entity for the value of the goods or services provided. *See Lundeen Coatings Corp.*, 232 Cal. App. 3d 816 (plaintiff seeking compensation for construction work); *Pasadena Live, LLC v. City of Pasadena*, 114 Cal. App. 4th 1089 (2004) (plaintiff seeking compensation for improvements to public property); *Miller v. McKinnon*, 20 Cal. 2d 83 (1942) (plaintiff suing on behalf of county to recover money spent by county on services); *North Bay Constr., Inc. v. Petaluma*, 143 Cal. App. 4th 552, 563 (2006) (plaintiff seeking compensation for work performed on city land). Each of these cases affirms the strong public policy rationale to protect public funds from "waste and dissipation" that might occur as a result of "fraud, corruption and carelessness" if parties were permitted to foist unwanted or improper contracts on governmental agencies, and courts scrupulously enforce compliance with such requirements. *See, e.g., Miller*, 20 Cal. 2d at 88.

None of those cases has any application to the facts here. Since Defendants were voluntary *sellers*, not buyers, who entered into express contracts to sell power into the ISO and PX markets, there is no corresponding reason to protect them from "fraud, corruption, and carelessness" or worry about "waste and dissipation," and none of the foregoing policy arguments are implicated. Accordingly, the "general rule" does not apply at all, and under these facts, *Utility Audit* establishes that the IOUs' claims for unjust enrichment and money had and received are not barred.[79] 112 Cal. App. 4th at 958.

---

[79] As against PG&E, there is yet another reason why Defendants' assertion of sovereign immunity is flawed: by filing claims against PG&E in its bankruptcy, Defendants have waived their sovereign immunity defenses. 11 U.S.C. § 106(b); *Ocean Servs. Corp. v. Ventura Port Dist.*, 15 Cal. App. 4th 1762, 1779 (1993). Under the bankruptcy code, any government entity that files a proof of claim in bankruptcy waives sovereign immunity as to any claims the bankrupt entity has against it to the extent the parties' claims against each other arise out of the same transaction or occurrence. *Id.* Here, each Defendant filed proofs of claim in the PG&E bankruptcy concerning (Footnote Continued)

**B. The IOUs' Claims for Unjust Enrichment and Money Had and Received Can Proceed Regardless of the Outcome of Their Contract Claims.**

Similarly, there is no merit to Defendants' contention that the California Parties' claims for unjust enrichment and money had and received are barred because the parties' rights are otherwise defined by an express contract. JD Br. at 49-50. These rules apply only when the unjust enrichment claim is *inconsistent with an express contract between the parties*, and here there is no inconsistency. *Eisenberg v. Alameda Newspapers, Inc.*, 74 Cal. App. 4th 1359, 1387 (1999) ("There cannot be a valid express contract and an implied contract, each embracing the same subject, but compelling different results."). The rule simply reflects courts' unwillingness to rewrite the express terms of the parties' bargained-for exchange: "'[W]here the parties have freely, fairly and voluntarily bargained for certain benefits in exchange for undertaking certain obligations, it would be inequitable to imply a different liability . . . .'" *Hedging Concepts, Inc. v. First Alliance Mortgage Co.*, 41 Cal. App. 4th 1410, 1419 (1996) (quoting *Wal-Noon Corp. v. Hill*, 45 Cal. App. 3d 605, 613 (1975)). But it does not apply where, as in this case, "there is no readily ascertainable conflict between [the] implied contract theory and the express terms" of a written agreement. *Hillsman v. Sutter Cmty. Hosps. of Sacramento*, 153 Cal. App. 3d 743, 755 (1984).[80]

Here, the relevant contract does *not* preclude the remedy that the IOUs are seeking by their unjust enrichment and money had and received claims. Indeed, it is the very same remedy they are seeking on their breach of contract claims—refunds for amounts charged in excess of the MMCP. Thus, the unjust enrichment and money had and received claims do not require inconsistent interpretations with the contract claims nor do they "compel[] different results." Accordingly, the

---

PG&E's failure to pay for purchases of electric energy. *See* Compendium of Defendants' Proofs of Claim Filed in PG&E Bankruptcy (RJN Exh. 25). In this case, PG&E, with the other IOUs, seeks refunds for these same transactions. Accordingly, Defendants have waived any sovereign immunity defense they may have had as to PG&E's claims against them for refunds.

[80] *California Medical Ass'n, Inc. v. Aetna U.S. Healthcare of California*, 94 Cal. App. 4th 151 (2001), a case relied upon by Defendants, is fully consistent with this rule. In *California Medical*, the court rejected plaintiff's quasi-contract claim because it sought relief *expressly prohibited* by the contract between the parties. *Id.* at 172-173.

IOUs' contract is not a bar to the unjust enrichment claim or the common count.[81] *Eisenberg*, 74 Cal. App. 4th at 1387; *see also In re De Laurentiis Entm't Group Inc.*, 963 F.2d 1269, 1272 n.3 (9th Cir. 1992) ("As long as [a plaintiff] seeks only one recovery, it is entitled to pursue both contract claims and quantum meruit claims arising out of the same transaction."); *Hillsman*, 153 Cal. App. 3d at 755.

Moreover, even if the Court were to conclude that the IOUs lacked standing to enforce their contract, the IOUs' unjust enrichment and common count claims would still remain viable. *Leoni v. Delany*, 83 Cal. App. 2d 303, 307-09 (1948) (pleading common count is proper where plaintiff may be unable to directly enforce contract); *McKesson HBOC, Inc. v. N.Y. State Common Ret. Fund, Inc.*, 339 F.3d 1087, 1093 (9th Cir. 2003) (applying Delaware law identical to California law and holding that claim for unjust enrichment is available where no enforceable contract governed parties' relationship). Thus, to the extent the Court were to conclude that the Tariffs do not constitute an express contract between the IOUs on the one hand, and Defendants on the other, the IOUs can pursue unjust enrichment and money had and received claims as alternative theories of recovery. *McKesson*, 339 F.3d at 1093 ("[N]o contract govern[ed] the relationship between McKesson and the former . . . shareholders, [leaving] the door . . . open[] to McKesson's claim for unjust enrichment."); *cf. Eisenberg*, 74 Cal. App. 4th at 1387 (rejecting implied-in-fact contract claim where enforceable express contract between parties commanded different result).

---

[81] Nor does *McBride v. Boughton*, 123 Cal. App. 4th 379 (2004), have any application here. The Court in *McBride* merely held that a common count may be demurrable if it seeks the same recovery and is based on the same facts as a specific cause of action and that specific cause of action is also demurrable. *Id.* at 394. Here, for reasons explained in text, the IOUs' contract and unjust enrichment claims are not demurrable. Therefore, the common count for money had and received survives too.

## VII. THE ARGUMENTS SPECIFIC TO AEPCO ARE MERITLESS.

### A. The California Parties Can Pursue Relief Against AEPCO in This Court.

Since 1967, FERC (and its predecessor, the Federal Power Commission) has held that cooperatives such as AEPCO could not be regulated as "public utilities" under the FPA. *In re Dairyland Power Coop.*, 37 F.P.C. 12 (1967) (RJN Exh. 26). In other words, FERC has held that rural cooperatives will be treated the same as the other governmental entity Defendants in this case. As noted by AEPCO, subsequent decisions over the past 40 years have reaffirmed that *Dairyland* is the law. AEPCO Br. at 2.

In its July 25, 2001 Order, FERC reset prices under the ISO and PX Tariffs for all market participants, including cooperatives such as AEPCO. Furthermore, FERC asserted exclusive jurisdiction to enforce the payment of refunds by all sellers, including AEPCO. In *Bonneville,* the Ninth Circuit held that FERC did not have statutory authority to enforce these Defendants' refund obligations. As to AEPCO, the Ninth Circuit specifically held: "[I]n this proceeding we treat AEPCO as a non-public utility." *Bonneville,* 422 F.3d at 918. In other words, consistent with *Dairyland*, the Ninth Circuit held that FERC could not enforce the payment of refunds by AEPCO, in the same way it could not enforce the payment of refunds by the other Defendants here. The Court acknowledged, however, that it was not determining whether or not FERC could, in a later proceeding, reverse 40 years of precedent by revoking or revising the *Dairyland* exemption. *Id.*

The bottom line is that, since *Bonneville*, AEPCO stands in exactly the same position as the other Defendants in this action. Accordingly, contrary to what AEPCO asserts, AEPCO Br. at 6, following *Bonneville*, FERC no longer had exclusive jurisdiction over the California Parties' refund claims against AEPCO, and the California Parties were free to pursue state law claims against AEPCO. Thus, AEPCO's central contention that FERC is the only forum where disputes against rural cooperatives about wholesale power rates may be heard is wrong and, moreover, is directly refuted by the U.S. Supreme Court's decision in *Arkansas Elec. Coop. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 384-5 (1983) (states are free to regulate rates of a rural power cooperative falling outside of FERC's jurisdiction under the *Dairyland* exemption).

Nor does the exhaustion of remedies doctrine bar the California Parties' claims against AEPCO. Exhaustion of remedies applies where a disappointed claimant tries to seek judicial remedies before the final resolution of administrative processes. *See, e.g.*, *Coachella Valley Mosquito & Vector Control Dist. v. California Pub. Empl. Relations Bd.*, 35 Cal. 4th 1072, 1080 (2005) ("[A]n administrative remedy is exhausted . . . upon termination of all available, nonduplicative administrative review procedures.") (internal quotation marks and citations omitted); *see also People v. Beaumont Investment, Ltd.*, 111 Cal. App. 4th 102, 124 (2003) (administrative procedure must "run its course."). The doctrine may also apply where a party prematurely seeks judicial review of administrative action. *Banker's Hill, Hillcrest, Park West Cmty. Pres. Group v. San Diego*, 139 Cal. App. 4th 249, 282 (2006).[82]

Here, the California Parties have done little else for six years *but* try to obtain administrative remedies at FERC against Defendants, including AEPCO.[83] After the California Parties' initial victory at FERC was reversed in *Bonneville*, they properly brought this action. Because the California Parties did nothing to foster judicial interference with FERC's administrative processes

---

[82] Neither of the two California cases cited by AEPCO regarding exhaustion of administrative remedies applies here. In both *Campbell v. The Regents of the University of California*, 35 Cal. 4th 311 (2005), *cert. denied*, 546 U.S. 938 (2005), and *Ferrer v. Preston*, 145 Cal. App. 4th 440, 448 (2006), *rev. denied*, Cal. Sup. Ct. Feb. 14, 2007, *cert. granted*, 2007 WL 1339440 (September 25, 2007)(regarding whether petitioner was required to exhaust his administrative remedies), the parties did not wait for the government agency to issue a decision, but immediately sought to proceed with litigation and arbitration, respectively. By contrast, the California Parties only commenced litigation in this Court following litigation at FERC, a final FERC order granting the relief they sought, and the Ninth Circuit's ruling on appeal that FERC could not grant the relief they sought.

[83] Ultimately, AEPCO appears to argue that the California Parties should have immediately asked FERC to reconsider FERC's July 25, 2001 Order that *granted* the California Parties the very relief they sought, and should have requested FERC to award the same relief but on different grounds (namely, that FERC is entitled to regulate AEPCO as a public utility under the FPA because *Dairyland* does not apply to it). This is absurd. FERC's July 25, 2001 Order provided the California Parties with the very relief they sought. They had no reason to attempt to "snatch defeat from the jaws of victory" by asking FERC to reconsider its Order.

and do not seek judicial review of FERC's rulings in this action, it is inconceivable that they can be accused of failing to exhaust administrative remedies.[84]

**B. Judicial Estoppel Bars AEPCO's Argument.**

AEPCO's argument is also barred by the doctrine of judicial estoppel. AEPCO argues that the only place the California Parties' claims against it can be made is at FERC because it may be a "public utility" under the FPA after all. This is an amazing display of chutzpah, since it directly contradicts AEPCO's successful argument both at FERC[85] and before the Ninth Circuit that it is *not* a public utility. *See Bonneville*, 422 F.3d at 917-18. Judicial estoppel "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (internal quotation marks and citation omitted); *see also Gottlieb v. Kest*, 141 Cal. App. 4th 110, 130-131 (2006). The doctrine applies where "(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position . . . ; (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake." *Aguilar v. Lerner*, 32 Cal. 4th 974, 986-987 (2004) (internal quotation marks and citations omitted); *see also Gottlieb*, 141 Cal. App. 4th at 131. All these conditions are met here. AEPCO has successfully argued, not only in FERC's Remedy

---

[84] AEPCO argues that the California Parties' decision not to seek to revoke the *Dairyland* exemption before FERC was "unreasonable," thereby barring equitable tolling. AEPCO Br. at 9. Not so. As noted above, the California Parties vigorously pursued refunds from AEPCO at FERC and, following *Bonneville,* the California Parties sought relief in this court action. The California Parties' actions cannot possibly be considered "trifling with the courts or the other party." *Mojica v. 4311 Wilshire LLC*, 131 Cal. App. 4th 1069, 1074 (2005). The one case cited by AEPCO, *Laing v. Ashcroft*, 370 F.3d 994 (9th Cir. 2004), does not demonstrate otherwise. In *Laing*—which was not even an equitable tolling or administrative remedies case—the Court held that plaintiff failed to exhaust his judicial remedies due to failure to timely appeal the court order. *Id.* at 998. That is not the situation here, and *Laing* has no application.

[85] AEPCO requested and received clarification from FERC during the Remedy Proceedings that it, like the other Defendants, would be treated as a non-public utility. *Bonneville*, 422 F.3d at 918 n.8 (citing *San Diego Gas & Elec. Co.*, 99 FERC ¶ 61,160 at 61,660 n.62 (2002) (JD Non-Cal. Auth. Exh. 42)).

Proceeding but elsewhere,[86] that it is a non-public utility, and should not now be permitted to "deliberately chang[e] positions according to the exigencies of the moment." *New Hampshire*, 532 U.S. at 750 (citation omitted). AEPCO's argument offends "the essential integrity of the judicial process," is an attempt to play "fast and loose with the courts," and should be rejected. *Gottlieb*, 141 Cal. App. 4th at 131 (internal quotation marks and citations omitted); *see also New Hampshire*, 532 U.S. at 750 (internal quotation marks and citations omitted).

**CONCLUSION**

For all the foregoing reasons, the California Parties respectfully submit that Defendants' demurrers should be overruled.

[86] AEPCO also prevailed on this position before FERC in *Sierra Southwest Cooperative Services, Inc.*, 95 FERC ¶ 61,310, at 62,057 n.7 (2001) (RJN Exh. 6).

Respectfully submitted,

DATED: October 9, 2007

HELLER EHRMAN LLP

By: [signature]
MARIE L. FIALA

Attorney for Pacific Gas and Electric Company

[ADDITIONAL COUNSEL OF RECORD]

STANLEY A. BERMAN (admitted *pro hac vice*)
PEGGY J. WILLIAMS (admitted *pro hac vice*)
RIMA J. ALAILY (admitted *pro hac vice*)
LISA D. HARDIE (admitted *pro hac vice*)
HELLER EHRMAN LLP
701 Fifth Avenue, Suite 6100
Seattle, WA 98104-7098
Telephone: (206) 447-0900
Facsimile: (206) 447-0849
Stan.Berman@hellerehrman.com
Peggy.Williams@hellerehrman.com
Rima.Alaily@hellerehrman.com
Lisa.Hardie@hellerehrman.com

MARK PATRIZIO (Bar No. 108051)
CLIFF J. GLEICHER (Bar No. 172735)
PACIFIC GAS AND ELECTRIC COMPANY
77 Beale Street, MailCode B30A
San Francisco, CA 94105
Telephone: (415) 973-6344
Facsimile: (415) 973-5520
MDP5@pge.com
CJGF@pge.com

Attorneys for Plaintiff
Pacific Gas and Electric Company

DATED: October 9, 2007

STEPTOE & JOHNSON LLP

By: /s/ Lawrence P. Riff (authorized on 10/9/07)
LAWRENCE P. RIFF

Attorney for Plaintiff Southern California Edison Company

[COUNSEL OF RECORD]

LAWRENCE P. RIFF (Bar No. 104826)
JAY E. SMITH (Bar No. 162832)
STEPTOE & JOHNSON LLP
633 West Fifth Street, Seventh Floor
Los Angeles, CA 90071
Telephone: (213) 439-9400
Facsimile: (213) 439-9599
lriff@steptoe.com
jsmith@steptoe.com

RUSSELL C. SWARTZ (Bar No. 078360)
LEON BASS, JR. (Bar No. 127403)
SOUTHERN CALIFORNIA EDISON COMPANY
2244 Walnut Grove Avenue
Rosemead, CA 91770
Telephone: (626) 302-6967
Facsimile: (626) 302-3990
russell.swartz@sce.com
leon.bass@sce.com

Attorneys for Plaintiff Southern California Edison Company

DATED: October 9, 2007

HENNIGAN BENNETT & DORMAN LLP

By: /s/ Laura Lindgren (authorized on 10/9/07)
LAURA LINDGREN

Attorney for Plaintiff San Diego Gas & Electric Company

[COUNSEL OF RECORD]

J. MICHAEL HENNIGAN (Bar No. 59491)
LAURA LINDGREN (Bar No. 82332)
ROBERT W. MOCKLER (Bar No. 200200)
HENNIGAN BENNETT & DORMAN LLP
865 S. Figueroa Street, Suite 2900
Los Angeles, CA 90017
Telephone: (213) 694-1200
Facsimile: (213) 694-1234

Attorneys for Plaintiff San Diego Gas & Electric Company

DATED: October 9, 2007

CALIFORNIA ELECTRICITY OVERSIGHT BOARD

By: /s/ Erik N. Saltmarsh (authorized on 10/9/07)
ERIK N. SALTMARSH

Attorney for Plaintiff California Electricity Oversight Board

[COUNSEL OF RECORD]

ERIK N. SALTMARSH (Bar No. 156919)
STEVEN BENITO RUSSO (Bar No. 104858)
CALIFORNIA ELECTRICITY OVERSIGHT BOARD
770 L Street, Suite 1250
Sacramento, CA 95814
Telephone: (916) 322-8601
Facsimile: (916) 322-8591
Steven.Russo@eob.ca.gov
esaltmarsh@eob.ca.gov

Attorneys for Plaintiff California Electricity Oversight Board

PROOF OF SERVICE THROUGH LEXIS NEXIS - FILE AND SERVE

I, Gary Padilla, the undersigned, hereby declare as follows:

1. I am over the age of 18 years and am not a party to these cases. I am employed by Heller Ehrman LLP in the City of San Francisco, State of California.

4. My business address is 333 Bush Street, 30th Floor, San Francisco, CA 94104.

5. On October 9, 2007, I served a copy of the attached document:

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' DEMURRERS, VOLUME 2 OF 2 (DETAILED ARGUMENT)**

a. _X_ Posting it directly on the Lexis Nexis File and Serve website http://www.lexisnexis.com/fileandserve/ .

b. ___ By sending it via facsimile transmission to File & Serve Lexis/Nexis at the fax number **(887) 667-3549** at approximately _____ a.m./p.m. local time.

c. ___ By placing it in an addressed, sealed envelope clearly labeled to **Lexis/Nexis File & Serve; Attn: Valley Forge Park Place, 1018 West 9th Avenue, King of Prussia, PA 19406** and causing it to be deposited with an overnight mail or courier service for delivery the next business day.

I declare under penalty of perjury under the laws of the State of California, that the foregoing is true and correct. Executed on October 9, 2007, at San Francisco, California.

[Original Signature on File at the Offices of Heller Ehrman LLP]

Gary Padilla

Heller Ehrman LLP