IN THE

UNITED STATES COURT OF FEDERAL CLAIMS

PACIFIC GAS AND ELECTRIC COMPANY, SOUTHERN CALIFORNIA EDISON COMPANY, AND CALIFORNIA ELECTRICITY OVERSIGHT BOARD,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

SAN DIEGO GAS & ELECTRIC COMPANY, a California corporation,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

No. 1:07-cv-00157-LAS

No. 1:07-cv-00167-LAS

Consolidated

**HON. LOREN A. SMITH**

**PLAINTIFFS PACIFIC GAS AND ELECTRIC COMPANY, SOUTHERN CALIFORNIA EDISON COMPANY, AND SAN DIEGO GAS & ELECTRIC COMPANY'S APPENDIX TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

**VOLUME 2 OF 3**

C

80 FERC P 61262, 1997 WL 562380 (F.E.R.C.)

FEDERAL ENERGY REGULATORY COMMISSION

**1

Commission Opinions, Orders and Notices

Southern California Edison Company

Docket No. EL97-36-000

Declaratory Order Concerning Sales of Electricity into the California Power Exchange

(Issued September 10, 1997)

***61944** Before Commissioners: James J. Hoecker, Chairman; Vicky A. Bailey, and William L. Massey.

On May 5, 1997, Southern California Edison Company (SoCal Edison) filed a petition for a declaratory order that all electric power sales into the California Power Exchange (PX) would qualify as wholesale sales for the purposes of section 32 of the Public Utility Holding Company Act of 1935 (PUHCA).[FN1] As discussed below, we will grant SoCal Edison's request. We do so, however, on different grounds than those advanced by SoCal Edison.

**I. Background**

*California Electric Restructuring*

At the direction of the Public Utilities Commission of the State of California (California Commission) and the California State Legislature, Pacific Gas and Electric Company (PG&E), San Diego Gas & Electric Company (SDG&E) and SoCal Edison (collectively, the Companies) made several filings with the Commission.[FN2] The Commission, *inter alia*, conditionally authorized the establishment of an Independent System Operator (ISO) and the PX, and conditionally authorized the transfer of operational control over certain transmission facilities from the Companies to the ISO.[FN3] The PX will be an auction, settlement, and billing entity that will have the operational responsibilities of a scheduling coordinator. The PX is projected to commence operation on January 1, 1998.

*SoCal Edison's Petition*

As part of the electric restructuring in California, SoCal Edison plans to divest itself of all of its fossil fuel-fired electric generation facilities within its service territory. It asserts that, at least in the early years of the PX, purchasers of its divested generation facilities will likely seek EWG status under

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PUHCA. Absent a specific exemption from PUHCA, if a purchaser of SoCal Edison's generation facilities wishes to hold such facilities through a subsidiary to a holding company, the purchaser may be found to be an electric utility holding company under PUHCA.[FN4] EWG status would exempt such a purchaser from PUHCA regulation.[FN5]

SoCal Edison contends that providing assurance of EWG status for the generation facilities that it plans to divest is essential to ensuring that its generation facilities are properly valued in the marketplace, without the price-depressing effects of PUHCA's registration requirements. SoCal Edison claims that, without EWG status, it will be substantially more difficult for utilities to obtain full market value for their divested generation facilities. According to SoCal Edison, this, in turn, would increase transition costs borne by California electricity customers,[FN6] which would tend to discourage generation divestiture as a means for facilitating competitive transitions, mitigating market power, and valuing stranded costs.

****2** Further, SoCal Edison points out that section 32(a)(1) of PUHCA requires that EWGs be engaged "exclusively in the business of owning or operating, or both owning and operating, all or part of one or more eligible facilities and ***61945** selling electric energy at wholesale."[FN7] section 32(a)(2) defines an "eligible facility" as a facility "used for the generation of electric energy exclusively for sale at wholesale, or . . . used for the generation of electric energy and leased to one or more public utility companies; . . ."[FN8] PUHCA section 32(a)(3) states that the term "sale of electric energy at wholesale" shall have the same meaning as provided in section 201(d) of the FPA. Therefore, SoCal Edison argues, in order for potential purchasers of its generation facilities to sell electric energy from those facilities through the PX while retaining their EWG status, all sales through the PX must be deemed wholesale sales under section 201(d) of FPA.[FN9]

SoCal Edison states that this issue arises because some direct access (retail) customers may purchase power directly out of the PX. However, SoCal Edison states that the PX will not take title to the energy that is bid into the PX. Instead, the PX will pool all of that energy together and subject it to all of its bidding and market-pricing activity rules. As SoCal Edison interprets the November Order, the Commission implicitly determined that *all* sales of electric energy into the PX would constitute wholesale sales for purposes of section 201(d) of the FPA. It requests that the Commission explicitly make such a determination in this proceeding.

SoCal Edison argues that under *Brooklyn Navy Yard Cogeneration Partners, L.P.*,[FN10] when electricity for sale at wholesale is commingled with electricity for sale at retail, all of the commingled electricity must be deemed wholesale sales if two criteria are met: (1) the supposed retail part of the energy is indistinguishable at the point of sale from the remainder; and (2) no essentially

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

separate transaction covering the power directly consumed by the purchaser is identifiable.

Concerning the first criterion, SoCal Edison asserts that the point of sale is the facilities of the winning PX bidders (sellers). It describes the PX bidding process as follows:

> PX bidders do not distinguish and indeed cannot distinguish which part of their bid energy may be sold to resellers or which part, if any, may be bought directly by retail customers. The sellers simply bid a specific amount each hour. The PX then develops a set of winning generation bids sufficient to meet the PX's aggregate demand, and schedules that generation with the ISO (which may modify the schedule, as needed, to manage grid congestion). Unlike the circumstances in *Brooklyn Navy Yard* and situations in which a direct unit power sale contract exists, no amount of generation bid into the PX is dispatched to meet any particular load. No entity tracks' which generation is used to supply particular customer demands, nor would such tracking even be feasible. In short, every bid by a generator into the PX is 'indistinguishable at the point of sale from the remainder.' [FN11]

****3** With regard to the second criterion, it states that:

> All purchasers from the PX pay the market-clearing price for pooled energy dispatched by the ISO from the various generators under its control. There is no way to match the source of the energy sold by a supplier through the PX with any particular buyer. Nor is there any contractual relationship in PX transactions between any retail purchaser and any specific generator. Both resellers and direct access purchasers buy-out of a common, intermingled pool and send payments to the PX. [FN12]

Thus, SoCal Edison asserts that there would be no distinguishable retail sale by an EWG or any other seller.

Because, under the PX mechanism: (1) the PX pools together all of the energy that is sold into the PX; and (2) there are no sales contracts between sellers and buyers of electricity sold into the PX, which makes it impossible to trace the sale of electricity from a particular ***61946** seller to a particular customer, SoCal Edison argues that under *Brooklyn Navy Yard*, all sales into the PX should be deemed to be wholesale sales, and, consequently, an EWG would be able to sell energy into the PX without forfeiting its EWG status.

SoCal Edison also asserts that declaring that sales into the PX constitute wholesale sales would advance the policy objectives of the EWG provision of PUHCA. Allowing independent power producers to bid into the PX free of PUHCA regulation would foster more robust competition in the PX, according to the company.

*Notice of Filing, Interventions and Other Comments*

Notice of SoCal Edison's filing was published in the *Federal Register*, [FN13] with

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

motions to intervene and protests due on or before June 3, 1997. PG&E filed a timely motion to intervene stating its support of SoCal Edison's petition. PG&E states that, like SoCal Edison, it is in the midst of proceedings concerning the proposed divestiture of its fossil-fueled power plants, and it contends that it is important for potential purchasers of those plants to understand that the purchasers of those plants could qualify for EWG status.

SDG&E filed a timely motion to intervene raising no substantive issues.

## II. Discussion

*Procedural Matters*

Pursuant to rule 214 of the Commission's Rules of Practice and Procedure, [FN14] the timely, unopposed motions to intervene of PG&E and SDG&E serve to make them parties to this proceeding.

*The Commission's Determination*

As an initial matter, we note that SoCal Edison misinterprets the November Order. Nowhere in that order did the Commission explicitly or implicitly conclude that all sales into the PX would constitute wholesale sales. However, based on the facts represented to us by SoCal Edison in its petition and elsewhere in the WEPEX proceeding, [FN15] we conclude that all sales by PX participants bidding into the PX will be wholesale sales for purposes of section 201 of the FPA. However, we reach this conclusion based on reasons other than those advanced by the petition.

****4** In this proceeding, we are faced with a new market institution in which sellers and buyers of electric energy will not contract directly with one another, as has been traditionally done in the industry, but instead will contract with the PX. While the PX will not take title to electric energy, and pursuant to the PX Tariff it is not considered a party to a PX trade, it nevertheless will be the intermediary that contracts with the entities that sell into the PX as well as with the wholesale and retail customers that purchase from the PX. Additionally, the PX will be the entity that, pursuant to the PX Tariff and Protocols, will determine which power is bought and sold (dispatched), which power goes to wholesale buyers and which power goes to retail buyers (how aggregate wholesale and retail load is served), [FN16] and at what price the power is sold. This means that the PX is an integral part of the transactional chain and that it takes the combined action of both the participants that bid generation into the PX as well as the PX itself to effectuate the sales to the PX customer participants.

In these circumstances, we believe it is reasonable to construe both the bidding participants and the PX to be engaged in sales of electric energy. Accordingly, we conclude that the bidding PX participants will be engaged in sales of electric energy at wholesale to the PX, who will then resell that energy to wholesale and retail customer participants. [FN17] Because the bidding PX participants will be selling electric energy at wholesale as that term is defined in section 201(d) of the FPA, entities that otherwise meet the EWG criteria of section 32 of PUHCA and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that bid energy into the PX will maintain their EWG status.

The conclusion we reach on SoCal Edison's petition is based upon the unique facts presented in this case. Allowing independent power producers to bid into the PX free of PUHCA regulation should foster more robust competition in the PX. Moreover, our conclusion***61947** respects the California Commission's retail jurisdiction.

*The Commission orders*:

SoCal Edison's petition for declaratory order is hereby granted, as discussed in the body of this order.

FN1 15 U.S.C. § 79z-5a (1994).

FN2 The Companies established a formal structure, the Western Power Exchange (WEPEX), to implement the California restructuring objectives. The WEPEX participants subsequently named the PX the California Power Exchange Corporation.

FN3 *Pacific Gas and Electric Company, et al.*, 77 FERC P 61,204 (1996) (November Order), *reh'g pending*.

FN4 In its divestiture application to the California Commission, SoCal Edison has proposed to divest those units through two auctions: one auction, for those stations that are not subject to must-run contracts with the ISO, is scheduled for September 1997; and a separate auction, for those stations that are subject to must-run contracts, would commence after this Commission approves the must-run contract(s).

FN5 Further, EWG status would also allow potential purchasers with interests in qualifying facilities (QFs) to ensure that they would not jeopardize the QF status of those facilities, according to SoCal Edison. *See* PUHCA section 32(j).

FN6 Under the California Commission Decision and the California legislation, SoCal Edison will be permitted to seek recovery in its retail rates of certain stranded utility costs through a nonbypassable Competition Transition Charge for the first four years of the operation of the PX.

FN7 15 U.S.C. § 79z-5a(a)(1) (1994).

FN8 15 U.S.C. § 79z-5a(a)(2)(A) (1994).

FN9 16 U.S.C. § 824(d) (1994).

FN10 77 FERC P 61,282 (1996) (*Brooklyn Navy Yard*). SoCal Edison also *cites* other commingling cases: *Department of the Navy v. Pacific Gas and Electric Company*, 49 FERC P 61,383 (1989); *City ofOakland, California v. FERC*, 754 F.2d 1378 (9th Cir.1985); *United States v. Public Utilities Commission of California*, 345

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

U.S. 295 (1953); *California Electric Power Co. v. FPC*, 199 F.2d 206 (9th Cir. 1952).

FN11 SoCal Edison's Petition for Declaratory Order, pp. 10-11.

Generally, although the sales through the PX involve sales by groups of sellers to groups of buyers,under the PX mechanism, entities selling through the PX and entities purchasing out of the PX will contract with the PX. The sellers will not contract with the buyers. Consequently, the sellers will not know who will purchase the electricity that they bid into the PX or whether such purchases will be for resale or the buyer's own use.

We interpret SoCal Edison's petition as not involving situations in which a seller and buyer contractwith each other for a sale.

FN12 SoCal Edison Petition, p. 11.

FN13 62 Fed. Reg. 27,730 (1997).

FN14 18 C.F.R. § 385.214 (1996).

FN15 *See* SoCal Edison Petition, p. 11 (noting the lack of any contractual relationship between a seller into the PX and any particular buyer). *See also November Order*, 77 FERC at p. 61,804 (noting the Companies' intention to file PX-Seller and PX-Buyer agreements relating to sales made into the PX; their proposal appears to have evolved into the *pro forma* PX Participation Agreement filed as part of the PX Tariff on March 15, 1997, and amended on August 15, 1997).

FN16 Of course, the laws of physics will actually determine which electrons go to which customers.

FN17 This conclusion does not rest on the commingling cases cited in SoCal Edison's petition, and we see no need to address those cases here. While those cases are informative, they nevertheless are distinguishable and not dispositive of the issue before us.

80 FERC P 61262, 1997 WL 562380 (F.E.R.C.)
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

81 FERC P 61122, 1997 WL 805937 (F.E.R.C.)

FEDERAL ENERGY REGULATORY COMMISSION

**1 Commission Opinions, Orders and Notices

Pacific Gas and Electric Company, San Diego Gas & Electric Company and Southern California Edison Company
Pacific Gas and Electric Company
San Diego Gas & Electric Company
Southern California Edison Company

Docket Nos. EC96-19-001, EC96-19-002, EC96-19-003, EC96-19-004, EC96-19-005, ER96-1663-001, ER96-1663-002, ER96-1663-003, ER96-1663-004, ER96-1663-005 and ER96-1663-006
Docket No. OA96-28-000
Docket No. OA96-139-000
Docket Nos. ER96-222-000, OA96-76-000, OA97-602-000 and OA97-604-000

Order Conditionally Authorizing Limited Operation of an Independent System Operator and Power Exchange, Conditionally Authorizing Transfer of Control of Facilities on an Interim Basis to an Independent System Operator, Granting Reconsideration, Addressing Rehearings, Establishing Procedures and Providing Guidance

(Issued October 30, 1997)

*61435 Before Commissioners: James J. Hoecker, Chairman, Vicky A. Bailey, and William L. Massey.

## I. Introduction

On August 15, 1997, the Trustee for the California Independent System Operator Corporation (ISO) and the California Power Exchange Corporation (PX) (collectively the ISO/ PX), Southern California Edison Company (SoCal Edison), San Diego Gas & Electric Company (SDG&E), and Pacific Gas and Electric Company (PG&E) (collectively, “the Companies”) tendered several filings (August 15 Filing) to implement Phase II of the comprehensive restructuring of the California electric marketplace, and to respond to the Commission's July 30, 1997, order in Docket Nos. EC96-19-003 and ER96-1663-003.[FN1]

In this order, we are providing interim and conditional authorization under sections 203 and 205 of the Federal Power Act (FPA), 16 U.S.C. §§ 824b, 824d (1994), to the ISO and PX to commence their operations. We will closely monitor the operations of the ISO and PX, require further studies and reporting by the ISO and PX, and will make modifications to our authorization in the future if circumstances warrant. In addition, as a condition to such interim authorization, we will require the Chief Executive Officers of PG&E, SoCal Edison, SDG&E, the ISO and the PX each to certify to the Commission prior to the date

that ISO and PX operations commence, that all of the necessary features are in place to ensure reliable grid operations when the ISO and PX commence operations, and that sufficient pre- operational testing will be performed.

We find that, with the modifications and conditions discussed herein, the ISO meets the Commission's eleven ISO principles set forth in Order No. 888.[FN2] Therefore, we authorize the ISO and PX each to commence limited initial operations November 1, 1997, and conditionally grant interim section 203 authorization for the transfer of operational control of the Companies' transmission systems to the ISO.

In addition, in this order, we conditionally accept the ISO/PX plan to implement certain elements of the restructuring proposal after the commencement of ISO and PX operations; require staged features of the proposal to be initially removed from the ISO and PX Tariffs and posted on the ISO's electronic network *61436 (WEnet) and refiled under section 205 prior to implementation; direct the PX to file certain Activity Rules under FPA section 205; and conditionally grant the ISO/PX's request to delay the filing deadline for various subsidiary Agreements and to file a compliance filing after operations commence.[FN3] We also address a number of requests for rehearing of our prior orders in these proceedings; accept the ISO/PX proposal to accommodate existing contracts and to phase-out over a five-year transition period existing contracts with new Participating Transmission Owners and to conform operations under existing contracts with ISO Tariff operations; and address a myriad of issues regarding the many duties and responsibilities of the ISO, utilities and Market Participants with respect to such aspects of the proposal as metering, Scheduling Coordinators, the Transmission Control Agreement and Ancillary Services.

**2 As discussed below, we conditionally accept with modifications and conditions the ISO/PX plan for managing congestion on the ISO Grid, including the use of Adjustment Bids to set the Usage Charge and modify the ISO/PX Overgeneration proposal. Moreover, as discussed herein, we approve several aspects of the August 15 ISO and PX proposals on an interim basis while requiring that the ISO and/ or PX conduct further studies and reports. In addition, the Commission orders that these studies and reports be conducted by or under the direction of the ISO or PX monitoring staff, as appropriate.

Also in this order, we conclude that the horizontal market power of PG&E and SoCal Edison will be reduced substantially after their proposed divestiture of certain geothermal and fossil-fuel generating units and find that, pending divestiture, the Companies' proposed mitigation measures, including bid floors and authority for the ISO or PX to impose bid caps and monitoring, are initially adequate to address market power concerns raised by intervenors. In addition, we will continue to monitor and oversee the further development and evolution of the ISO and PX to ensure that potential market power problems are identified and that appropriate mitigation measures are undertaken. Finally, as discussed below, we will accept on an interim basis, and with modifications, the *pro forma* contracts for compensating Must-Run generating units.

In conjunction with these findings, the Commission will grant the ISO and PX request to

file a compliance filing incorporating the modifications to the proposals detailed in this order after the service operation date. In the future, the Commission will order separate comprehensive compliance filings for the ISO and PX. However, the ISO and PX each must fulfill their commitment to file outstanding agreements, protocols, and other related documents proposed to go into effect at the commencement of operations no later than November 1, 1997.

In addition, there are a number of filings that the ISO/PX has indicated that will be filed both in the near future and after ISO and PX operations commence under the staging plans. The Commission does not in this order purport to address any of these yet unfiled documents. To the extent that issues are raised with respect to those filings, they will be addressed in subsequent orders.

The extent of our authorization is subject to several important qualifications. First, this order addresses numerous issues raised by the parties with respect to the filings before us. It is simply not practical (nor manageable) to fully describe all of the comments and proposals that have been put forth. To the extent that the order addresses a proposal put forth by many parties, the Commission's response is applicable to all parties that proposed the modification. On the other hand, to the extent that the order does not address a proposed modification or a related nuance of an issue addressed in the order that is raised by a party, that proposal is deemed denied.[FN4]

**3 Second, appendix I, Part I to the August 15 Filing contains a description of more than three hundred modifications or clarifications of the proposal that the ISO/PX has categorized as resolving outstanding issues with the parties.[FN5] To the extent that the parties have not raised objections to these modifications, the Commission will consider these issues as resolved between the ISO, PX and the stakeholders. Furthermore, unless specifically addressed in this order, the Commission will consider prior arguments addressing these issues as moot and accept these modifications to the proposal.

*61437 A. *Background*

*Phase I Filing*

In Phase I of these proceedings, the Companies filed their Phase I proposals to restructure the California electric marketplace, consistent with decisions of the Public Utilities Commission of the State of California (California Commission) and the California Legislature.[FN6]

In the Phase I filings, the Companies proposed to establish the California ISO and PX as separate entities, to authorize sales of energy at market-based rates, and to establish the rates, terms and conditions for service under the restructured framework. These filings consisted of: (1) the Companies' request for a declaratory order in Docket No. EL96-48-000 determining the jurisdictional split between transmission and local distribution; (2) the Companies' request to sell energy at market- based rates in Docket No. ER96-1663-000; and (3) the Companies' request to transfer operational control of facilities to an independent system operator in Docket No. EC96-19-000.

congestion, and administrative costs. Schedules submitted to the ISO will be the basis for the settlement process with Scheduling Coordinators.

The November 26, 1996, Phase I order accepted, on an interim basis, the ISO's proposal to establish rules for Scheduling Coordinators. The Commission also stated that the Phase II filing must include a detailed description of the technical and financial requirements to qualify as a Scheduling Coordinator. In particular, the November 26 Order stated that the Phase II filing was to provide more detail on all the operational roles that the Scheduling Coordinators will perform and their interaction with the ISO.[FN369]

*The Phase II Filing*

The ISO/PX have proposed detailed requirements for becoming and operating as a Scheduling Coordinator.[FN370] In addition, the ISO/PX have submitted a *pro forma* Scheduling Coordinator Agreement that all potential Scheduling Coordinators will have to execute with the ISO.

*Contested Issues Identified by the ISO/PX*

Turlock contends that Scheduling Coordinators should be relieved of the obligation to provide notice to the ISO of changes in the Eligible Customers they represent.[FN371]

EPUC/CAC contend that the obligation of Scheduling Coordinators (under section 2.2.6.8 of the ISO Tariff) to provide the ISO rolling 12-month Demand Forecasts should be amended to cover only the week ahead. EPUC/ CAC suggest that annual Demand Forecasts will be of limited use because switching of Market Participants between Scheduling Coordinators will make the data highly volatile.[FN372]

Southern Cities/Azusa and Banning contend that the ISO should be responsible for the collection of Scheduling Coordinator's debts and that this should be included as a general obligation*61507 on the ISO under ISO Tariff section 2.2.1.[FN373] Southern Cities/Azusa and Banning argue that if Scheduling Coordinators are made responsible for the collection of bad debts, the transaction costs may prove prohibitive for individual Scheduling Coordinators.[FN374]

**98 CCEM contends that all Scheduling Coordinators, not just those who can meet the criteria for a Metered Sub-System, should be able to use system resources to make adjustment bids and offer ancillary services.[FN375]

*June 23, 1997 ISO/PX Reply Comments*

In response to Turlock's recommendation that Scheduling Coordinators be relieved of the requirement to periodically notify the ISO of changes in the Eligible Customers they represent, the ISO states that this notification provision is essential in order to enable the ISO to know which Scheduling Coordinator is responsible for any Imbalance Energy attributable to the Eligible Customer's meter.[FN376] The ISO/PX states that Turlock's main objection is that it questions whether the ISO would ever make use of this information.

The ISO/PX objects to any change because without this requirement, the ISO's ability to discharge its duties under the Tariff would be adversely affected.

With regard to EPUC/CAC's objection to the provision of annual Demand Forecasts, the ISO/PX maintains that annual forecasts are likely to be of considerable benefit to the ISO for planning purposes. Therefore, the ISO/PX states that it would be inappropriate to limit the obligation of Scheduling Coordinators to publish only weekly forecasts. In addition, the ISO/PX states that requiring each Scheduling Coordinator to produce its forecast on the basis of firm contractual commitments will avoid excessive volatility.

In response to Southern Cities/Azusa and Banning's recommendation that the ISO be responsible for collecting bad debts, the ISO/PX maintains that it is unusual for the administrator of a market to take responsibility for pursuing the debts of traders. The traders who take the benefits of trading should also take the payment and bad debt risks.

September 2, 1997 Comments

Numerous parties oppose the August 15 proposal to prohibit inter-Scheduling Coordinator trades between congestion zones, regardless of the existence of congestion, under sections 2.2.6.4 and 2.2.11.3.3 of the ISO Tariff.[FN377] BPA argues that this prohibition also precludes trades including energy generated outside of California.

BPA and ECI request that the Commission direct the ISO to amend section 2.1 of the ISO Tariff to expressly permit multiple Scheduling Coordinators to trade at each Tie Point Meter and to direct the ISO and PX to amend their software to make trading by multiple Scheduling Coordinators possible at Tie Point Meters by January 1, 1998.[FN378] CMUA requests that the Commission order the PX to correct the one Scheduling Coordinator per meter requirement by July 1, 1998.[FN379] BPA states that if more than one Scheduling Coordinator wants to use a Tie Point Meter then it must coordinate with other Scheduling Coordinators to develop rules for making such allocations and to notify the ISO. This effectively requires all Scheduling Coordinators at a single Point to designate a single Scheduling Coordinator, which would be a competitor, to receive highly sensitive customer and pricing information. Alternatively, the Scheduling Coordinators would have to hire a new Scheduling Coordinator at considerable expense, driving up the price of power at that Point. BPA argues that the ISO has not demonstrated its inability to develop software by January 1, 1998, to accommodate multiple Scheduling Coordinators trading through shared tie points or points of injection. EPUC/ CAC continue to oppose the limitation to using one Scheduling Coordinator.

**99 BPA objects to section 2.5.20.1 of the ISO Tariff, insofar as it does not permit a Scheduling Coordinator, consistent with WSCC Minimum Operating Reliability Criteria (MORC), to subtract from its operating reserve obligation the operating reserves provided by firm power imported from outside of the ISO control area. Thus, for power imported from outside of the ISO grid, the Scheduling Coordinator must pay twice for operating reserves. In contrast, ISO Tariff section 2.5.3.2, provides that the ISO will subtract system firm capacity purchased outside of the ISO control area. According to BPA, this disparate treatment unfairly burdens and discriminates against power imported from

outside the ISO control area. BPA recommends modification of sections 2.5.20.1 and 2.5.28 of the ISO Tariff to permit reduction of the operating reserve share owed by a Scheduling Coordinator by the amount of system*61508 firm capacity purchased from outside the ISO control area.

PG&E points out that "the systems being developed will not support" the requirement to maintain an operating reserve equal to the total amount of interruptible imports scheduled by a Scheduling Coordinator for a given hour, under ISO Tariff section 2.5.3.2. Accordingly, PG&E recommends that the provision be revised to reflect that initially a procedural "work-around" shall be established until the systems can do it automatically. PG&E states that this language is necessary to ensure that the ISO will not charge all Scheduling Coordinators for the ancillary service requirements of a Scheduling Coordinator importing interruptible energy.[FN380]

Also, with respect to this section, BPA notes that the WSCC has additional minimum operating criteria that the ISO has not referenced in its Tariff. Therefore, states BPA, it is unclear whether the ISO intends to comply with them. BPA recommends revision of the Tariff to explicitly state that the ISO will satisfy all WSCC criteria.[FN381]

IEP requests that the list of information provided by Scheduling Coordinators that must be treated as confidential should be supplemented to include: (a) Information submitted by a Scheduling Coordinator under ISO Tariff sections 2.2.3.1 and 2.2.3.3, such as documents demonstrating Scheduling Coordinator capabilities, customer lists, *etc.*; (b) Information, letters of credit, *etc.* submitted by Scheduling Coordinator under ISO Tariff section 2.2.3.2; and information submitted to the ISO in the course of the Application process under ISO Tariff section 2.2.4.2.[FN382]

EPUC/CAC state that ISO Tariff section 2.2.7.3 has not been adequately modified to respond to its concerns regarding excessive security requirements for Scheduling Coordinators. According to EPUC/CAC, the calculation of potential outstanding liability remains onerous and will continue to be a market barrier. EPUC/CAC recommend that the amount be limited to the rolling average daily imbalance times the number of days for which the Scheduling Coordinator's settlements are typically not yet available. (EPUC recommends that initially an arbitrary percentage would be needed, but that it should be much lower than expected gross daily energy scheduled.)[FN383]

*September 16, 1997 Comments*

**100 In response to the overwhelming opposition to the ISO/PX proposal to restrict Inter-Scheduling Coordinator trading between zones, the ISO/PX propose modifications to the ISO and PX tariffs, as well as the Master Definitions Supplement.[FN384]

The PX proposes the following modification to PX Tariff section 3.4.7.3:
Each Inter-Scheduling Coordinator Trade shall be treated as an export schedule in the Balanced Schedule of the selling trader and as an import in the Balanced Schedule of the purchasing trader. The Scheduling Coordinators which are parties to the Inter-Scheduling

Coordinator Trades shall specify a single Zone in which the Energy transaction is deemed to take place.

The ISO proposes the following modification to ISO Tariff section 2.2.6.4:
Billing and settling an Inter-Scheduling Coordinator Trade shall be undertaken in accordance with the agreement between the Scheduling Coordinators who are parties to that trade, provided that they shall specify a single Zone within which the trade is deemed to take place.

In addition, the ISO and PX propose to amend the definition of Inter-Scheduling Coordinator Trades in the Master Definitions Supplement to read, "Energy transactions between Scheduling Coordinators which are permitted under the ISO Tariff to take place."

*Commission Response*

With regard to Turlock's objection to the requirement that Scheduling Coordinators provide notification of change in Eligible Customers, we reject Turlock's recommendation for the reason stated by the ISO. The ISO states that this notification provision is essential in order to enable the ISO to know which Scheduling Coordinator is responsible for any Imbalance Energy attributable to the Eligible Customer's meter.

In response to EPUC/CAC's concern, we believe that, based on the ISO's response, the Annual Forecasting requirement is both reasonable and necessary. Eliminating this source of information may adversely affect the ISO planning abilities.

With regard to Southern Cities/Azusa and Banning's recommendation, we agree with the ISO that the ISO's duties should not be expanded to include the collection of bad debt of *61509 Scheduling Coordinators. The purpose of Scheduling Coordinators is to act as an intermediary between the ISO and customers and in this capacity it should be the responsibility of Scheduling Coordinators to recover amounts that they are owed.

We agree with BPA, ECI and others that the ISO should permit Eligible Customers to be represented by more than one Scheduling Coordinator. As recognized by the ISO/PX, an entity could potentially trade through one or more non-PX Scheduling Coordinators in the bilateral market to secure most of its energy requirements and also purchase stand-by or any additional requirements through the PX, which is another Scheduling Coordinator.[FN385] We recognize that for many Market Participants, the ability to trade through more than one Scheduling Coordinator is an essential feature that will enable them to efficiently procure and utilize various resources. However, as noted by the ISO, the ability of a customer to utilize more than one Scheduling Coordinator depends on the development of the proper software and development by Scheduling Coordinators of rules for the allocation of trades through a single meter.[FN386] Consistent with our earlier discussion, we require the ISO to inform us on the progress of the software development. To the extent that the ISO anticipates that the software will not be ready by the start of ISO operations, the ISO should promptly notify the Commission and request whatever extensions are necessary. In addition, we direct the ISO to coordinate efforts with all

interested Scheduling Coordinators in the development of rules for allocating trades through a single meter. In addition, the ISO should address the concerns raised by commenters with regard to the coordination among competing entities and the exchange of sensitive market information. The ISO must be involved in these efforts in order to ensure that whatever rules are developed are consistent with the ISO's scheduling, metering and other protocols. We emphasize that we consider the development of the necessary software and trade rules to be a critical priority of the ISO that should be accomplished in as quick a time frame as possible.

**101 Numerous parties oppose the ISO's restrictions on Inter-Scheduling Coordinator trades. The ISO has proposed modifications to the ISO and PX Tariffs to address these parties' concerns. We agree with the parties that trades between Scheduling Coordinators should not be restricted to a single zone. The ISO apparently does not contest this issue. The ISO states that the originally proposed tariff language was unclear. The ISO states that the reason a transaction must be deemed to take place within a single, specified zone is to avoid any uncertainty as to the Scheduling Coordinator responsible for paying Usage Charges in the event of congestion between zones.[FN387] We interpret the ISO's proposed language to mean that once the Inter-Scheduling Coordinator trade is deemed consummated in a single zone, the purchasing trader is then responsible for scheduling the transmission of its purchased energy to the proper zone. Therefore, the purchasing trader will be responsible for all Usage Charges associated with transmitting its purchase. We find that the ISO and PX's revised language for section 3.4.7.3 of the PX Tariff and section 2.2.6.4 of the ISO Tariff to be unclear on this point. Moreover, we find that the parties to the Inter-Scheduling Coordinator Trade may wish to assign any applicable Usage Charge to either the selling Scheduling Coordinator or the purchasing Scheduling Coordinator. As long as the ISO is notified as to which Scheduling Coordinator will be responsible for paying any applicable Usage Charge, parties to a trade should be permitted to assign the Usage Charges to either party. We direct the PX to revise section 3.4.7.3 of the PX Tariff to state as follows:
Each Inter-Scheduling Coordinator Trade shall be treated as an export schedule in the Balanced Schedule of the selling trader and as an import in the Balanced Schedule of the purchasing trader. The Scheduling Coordinators which are parties to the Inter-Scheduling Coordinator Trades shall specify a single Zone in which the Energy transaction is deemed to take place. The parties to the Inter-Scheduling Coordinator Trade must notify the ISO, at the time they submit their schedules, as to which Scheduling Coordinator will be responsible for payment of applicable Usage Charges.

In addition, we direct the ISO to revise section 2.2.6.4 of the ISO Tariff to state as follows:

Billing and settling an Inter-Scheduling Coordinator Trade shall be undertaken in accordance with the agreement between the Scheduling Coordinators who are parties to that trade, provided that they shall specify a single Zone within which the trade is deemed to take place. *The parties to the Inter-Scheduling Coordinator Trade must notify the ISO, at the time they submit their schedules, *61510 as to which Scheduling Coordinator will be responsible for payment of applicable Usage Charges.*

We agree with BPA that sections 2.5.20.1 and 2.5.28 of the ISO Tariff should be amended to provide that a Scheduling Coordinator's Operating Reserve requirement be reduced by the amount of system firm capacity purchased from outside the ISO Control Area consistent with all WSCC reliability standards. The ISO has appropriately provided for the exclusion of firm purchases from an outside control area with regard to its own provision of ancillary services[FN388] and should extend the exclusion to Scheduling Coordinators' Self-Provided Ancillary Services. As noted by BPA, the ISO has provided no justification for this disparate treatment. Moreover, we note that the ISO will be able to verify a Scheduling Coordinator's purchase of firm resources from a neighboring control area through the information requirements of section 2.5.20.6 of the ISO Tariff. However, we find that a Scheduling Coordinator must demonstrate that it has firm transmission arrangements in place for the delivery of Operating Reserves or any other Ancillary Service to the interconnection point with the ISO Controlled Grid. We direct the ISO to add a subpart (f) to ISO Tariff section 2.5.20.7 which states:

(f) for self-provided Ancillary Services delivered from another control area, that the Scheduling Coordinator has arranged for the firm transmission of the Ancillary Services to the point of interconnection between the other control area and the ISO Controlled Grid.

**102 We disagree with BPA that the Commission should require the ISO Tariff to explicitly state that the ISO will satisfy particular WSCC criteria. Section 2.3.1.3.1. of the ISO Tariff clearly provides that the ISO shall satisfy criteria no less stringent than those established by WSCC and NERC.

With regard to PG&E's concerns over the requirement to maintain an operating reserve equal to the total amount of interruptible imports scheduled by a Scheduling Coordinator, we agree that language should be added to the ISO Tariff to provide that only those Scheduling Coordinators that are importing interruptible energy will be charged for the ancillary service requirements associated with that energy. We direct the ISO to make conforming tariff changes. In addition, we are concerned with PG&E's statement that the systems being developed will not support the requirement to maintain an operating reserve requirement equal to the total amount of interruptible imports. As we stated previously, to the extent the ISO anticipates that the software will be unable to accommodate certain of its proposed features, the ISO should notify the Commission and keep us informed on future developments. We direct the ISO to file a status report on this issue before the ISO Operations Date. To the extent the ISO's systems will be unable to support the above-stated reserve requirement, we direct the ISO to file a procedure, consistent with PG&E's “work around” suggestion, that will enable the ISO to accurately account and track the reserve requirement associated with interruptible energy imports.

We reject IEP's recommended changes to ISO Tariff section 20.3.2 to add a broad array of information to be treated as confidential by the ISO. IEP has provided insufficient justification for its proposed changes.

We reject EPUC/CAC's recommendation that the ISO's security requirements for

Scheduling Coordinators be reduced. First, the ISO Tariff provides that an ISO Security Amount will be required only for a Scheduling Coordinator that does not maintain an Approved Credit Rating. Second, we find that the ISO's requirement that all Scheduling Coordinators maintain a security amount that is greater than the Scheduling Coordinator's estimated aggregate liability for all charges for that trading day is reasonable and is consistent with our Order No. 888 requirements. In Order No. 888 we stated that a Transmission Provider may require the Transmission Customer to provide and maintain in effect during the term of the service a letter of credit as security to meet its responsibilities and obligations under the Tariff.[FN389]

*Other ISO Tariff Issues*

*Section 2=ISO Operations*

*Contested Issues as Identified by the ISO/PX*

BPA contends that there is a mismatch between the timing of the ISO scheduling process and BPA's scheduling process. Specifically, BPA accepts reserved schedules no later than 10:00 am of a pre-schedule day whereas the ISO pre-schedule process concludes at 3:00 p.m.[FN390]

**103 *61511 Turlock contends that the ISO should have no more than a right to request to use a UDC's Load curtailment program, rather than the right to use the program as spelled out in ISO Tariff section 2.3.2.8.[FN391] Turlock contends that this right will reduce the value of that program to the UDC. Turlock proposes that the ISO should have no more than a right to request Load curtailment, even in the event of a System Emergency.[FN392]

Western contends that PG&E has incorrectly asserted that systems such as that of Western are not qualified to be considered as a Metered Subsystem.[FN393]

Southern Cities/Azusa and Banning contend that an Operator obliged to comply with an ISO order under ISO Tariff section 2.3.3.5.3 should be able to call on the ISO to justify its instructions after the fact. Under section 2.3.3 of the ISO Tariff the ISO, acting through the ISO Outage Coordination Office, has the duty to coordinate and approve all Maintenance Outages of facilities comprised in the ISO Controlled Grid. Each Operator is required to provide to the ISO by October 1 each year a schedule of all planned maintenance of ISO controlled facilities to be undertaken by the Operator during the following calendar year. Section 2.3.3.5.3 entitles the ISO to reject any requested Maintenance Outage where it considers that this is likely to have a detrimental effect on the efficient use and reliable operation of the ISO Controlled Grid.

*June 23, 1997 ISO/PX Response*

The ISO notes that its scheduling process will be concluded by noon only if there is no Congestion. Further, the ISO states that the scheduling requirement does not affect those BPA customers which are holders of Existing Rights or Non-Converted Rights under

83 FERC ¶ 61,315

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: James J. Hoecker, Chairman;
Vicky A. Bailey, William L. Massey,
Linda Breathitt, and Curt Hébert, Jr.

| | | |
|---|---|---|
| Portland General Electric Company | ) | Docket No. ER98-2731-000 |
| | ) | |
| Arizona Public Service Company | ) | Docket No. ER98-2791-000 |

ORDER ACCEPTING UNEXECUTED SERVICE AGREEMENTS AS MODIFIED

(Issued June 25, 1998)

In this order, we accept for filing, as modified, the unexecuted service agreements for sales made through the California Power Exchange (PX) under the market-based rate tariffs of Portland General Electric Company (PGE) and Arizona Public Service Company (Arizona Public Service).

Background

On April 17, 1998, the Commission issued a letter order in Docket No. ER98-1643-000 accepting for filing PGE's market-based rate tariff, effective March 31, 1998. The order prescribes procedures under which PGE will file an umbrella service agreement with the Commission for short-term transactions within 30 days of commencement of short-term service, with quarterly reports summarizing the specific transactions to be filed thereafter. On April 29, 1998, PGE filed an unexecuted service agreement to make sales through the PX. PGE asks for waiver of the notice requirement to permit the service agreement to become effective March 31, 1998, the effective date of its market-based rate tariff.

On April 11, 1997, by letter order, Arizona Public Service received market-based rate authority, in Docket No. ER97-1672-000, effective April 11, 1997. The order prescribes procedures under which Arizona Public Service will file an umbrella service agreement with the Commission for short-term transactions within 30 days of commencement of short-term service, with quarterly reports summarizing the specific transactions to be filed thereafter. On April 30, 1998, Arizona Public Service filed a service agreement to make sales through the PX. Arizona Public Service requests waiver of the notice requirement to permit the service agreement to become effective April 1, 1998, the date its transactions in the PX began.

Notice of PGE's application was published in the Federal Register, 63 Fed. Reg. 26,175 (1998), with comments, protests,

9806260100-1

FERC - DOCKETED
JUN 25 1998

DC-A-13

and interventions due on or before May 19, 1998. Notice of Arizona Public Service's application was published in the Federal Register, 63 Fed. Reg. 26,184 (1998), with comments, protests, and interventions due on or before May 20, 1998.

On May 19, 1998, the PX filed motions to intervene and protests to both filings, making the same arguments in both proceedings. The PX objects to the service agreements as stating that it is the purchaser in the agreements, when in fact it does not take title to the power sold through the exchange. The PX also argues that, since PGE and Arizona Public Service will have to file PX participation agreements to make sales through the exchange, they should not be required to file service agreements under their individual market-based tariffs. The PX alleges that filing the service agreements advances no Commission objective or the public interest. The PX suggests that all PX participants subject to the Commission's jurisdiction (including PGE and Arizona Public Service) should simply report their sales through the PX under the quarterly reporting requirements of their individual market-based tariffs.

Discussion

Pursuant to Rule 214 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214 (1997), the timely, unopposed motions to intervene of the PX serve to make it a party to the proceedings in Docket No. ER98-2731-000 and Docket No. ER98-2791-000.

The Commission requires that service agreements be filed under individual market-based tariffs without regard to where or in what market the sales are being made. The PX participation agreements are not intended to, and do not, satisfy this requirement. We will accordingly deny the PX's request that we reject the unexecuted service agreements.

We addressed the PX's role in PX transactions in Southern California Edison Company, 80 FERC ¶ 61,262 at 61,946 (1997). There, we described the PX as:

> . . . a new market institution in which sellers and buyers of electric energy will not contract directly with one another, as has been traditionally done in the industry, but instead will contract with the PX. While the PX will not take title to electric energy, and pursuant to the PX Tariff it is not considered a party to a PX trade, it nevertheless will be the intermediary that contracts with the entities that sell into the PX as well as with the wholesale and retail customers that purchase from the PX. Additionally, the PX will be the entity that, pursuant to the PX Tariff and Protocols, will determine which power is bought and sold

> (dispatched), which power goes to wholesale buyers and which power goes to retail buyers (how aggregate wholesale and retail load is served), and at what price the power is sold. This means that the PX is an integral part of the transactional chain and that it takes the combined action of both the participants that bid generation into the PX as well as the PX itself to effectuate the sales to the PX customer participants.
>
> In these circumstances, we believe it is reasonable to construe both the bidding participants and the PX to be engaged in sales of electric energy. Accordingly, we conclude that the bidding PX participants will be engaged in sales of electric energy at wholesale to the PX, who will then resell that energy to wholesale and retail customer participants. [footnotes omitted].

Based on these findings, we will direct PGE and Arizona Public Service to modify the service agreements to more accurately reflect the customer under the service agreements. Specifically, the customer under the service agreements should be listed as "Participants in the California Power Exchange." With this modification, we will accept the service agreements filed by PGE and Arizona Public Service.

To avoid any confusion, we also clarify that transactions made through the PX must be included in the quarterly reports required under individual market-based tariffs. When making quarterly reports under their market-based rate authority, PGE, Arizona Public Service and other participants in the PX should identify buyers and sellers for exchange transactions as "Participants in the California Power Exchange."

The Commission will grant PGE's and Arizona Public Service's requests for waiver of the 60-day prior notice requirement to allow the effective dates for the proposed service agreements to be March 31, 1998, and April 1, 1998, respectively.

<u>The Commission orders</u>:

(A) The unexecuted service agreement filed by PGE in Docket No. ER98-2731-000 is hereby accepted for filing, to become effective March 31, 1998, subject to the modification discussed in the body of this order. Within 30 days of the date of issuance of this order, PGE is hereby directed to make a compliance filing containing the modification discussed in the body of this order.

(B) The unexecuted service agreement filed by Arizona Public Service in Docket No. ER98-2791-000 is hereby accepted for filing to become effective April 1, 1998, subject to the modification discussed in the body of this order. Within 30 days

of the date of issuance of this order, Arizona Public Service is hereby directed to make a compliance filing containing the modification discussed in the body of this order.

(C) PGE and Arizona Public Service are hereby informed of the rate schedule designations contained in the Attachment to this order.

By the Commission.

( S E A L )

David P. Boergers

David P. Boergers,
Acting Secretary.

Attachment

Arizona Public Service Co.
Service Agreement No. 45
under FERC Electric Tariff,
First Revised Volume No. 3

Portland General Electric Co.
Service Agreement No. 1
under FERC Electric Tariff,
Original Volume No. 10

H

84 FERC P 61020, 1998 WL 514599 (F.E.R.C.)

FEDERAL ENERGY REGULATORY COMMISSION

**1
Commission Opinions, Orders and Notices

Automated Power Exchange, Inc.

Docket Nos.
ER98-1033-001, ER98-1033-002, ER98-211-003, ER98-210-005, and ER98-1729-004

Order Denying Requests for Rehearing and Rejecting Compliance Filing in Part

(Issued July 15, 1998)

***61082** Before Commissioners: James J. Hoecker, Chairman; Vicky A. Bailey, William L. Massey, Linda Breathitt, and Curt H (acute)ebert, Jr.
This order denies requests for rehearing filed by Automated Power Exchange, Inc. (APX), Electric Clearinghouse, Inc. (Clearinghouse), and the California Power Exchange Corporation (PX), and rejects APX's compliance filing in part. The order also directs APX to submit a revised compliance filing within 30 days of the date of this order, as discussed below.

***61083** I. Background

A. *March 25 Order*
On March 25, 1998, the Commission issued an order in Docket No. ER98-1033-000 finding that Automated Power Exchange, Inc.'s (APX) automated, computerized exchange, through which sellers and buyers will trade in electric power and energy, will make it a public utility subject to the Commission's jurisdiction.[FN1] We conditionally granted APX's request for market-based rate authority, and we directed APX to submit a compliance filing within 30 days of the date of the order containing a complete rate schedule with all the terms and conditions of service. We also directed APX to file a code of conduct that satisfies the Commission's affiliate abuse requirements for market-based rate authorization since APX is presently affiliated with Bechtel which owns interests in several public utilities. In addition, we denied APX's request for waiver of annual charges, but granted all of APX's other requests for waivers, including its request for waiver of our notice requirements so that its service could coincide with the scheduled commencement of PX and the California Independent System Operator's (ISO) operations.

On the jurisdictional issue, we discussed the pertinent statutory provisions and controlling precedent as follows. We stated that under Section 201(e) of the Fed-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

eral Power Act (FPA), a public utility is any person who owns or operates facilities subject to the jurisdiction of the Commission, and jurisdictional facilities are described in Sections 201(a) and 201(b)(1) as facilities for wholesale sales in interstate commerce or for transmission in interstate commerce. We noted that traditionally these facilities have been either physical facilities or wholesale power sales contracts,[FN2] but that changes in technology have changed the way wholesale power sales are now effectuated. We stated that we must ensure that new market institutions, such as power exchanges like PX and APX, protect consumers by providing rate-setting and power sales mechanisms that are just, reasonable, and not unduly discriminatory or preferential.

In finding that APX will be a public utility within our jurisdiction, we applied the tests that we historically used in deciding whether an entity is a public utility, which focused on effective control and/or the role of an entity in effectuating wholesale power sales.[FN3] We stated that the Commission will assert public utility jurisdiction over those persons that are in a position to exert effective control over facilities used for the transmission and/or sale for resale of electric energy in interstate commerce.

****2** We referred to our rationale in finding another power exchange, the PX, jurisdictional. In this regard, we found that PX was a public utility under Section 201(e) of the FPA because, among other things, the PX auction will determine which buyers and sellers will sell or purchase through PX, as well as the price and other terms and conditions under which these transactions will be made. Thus, we found that PX will effectively exercise control over transactions made through the PX.[FN4] In a subsequent order, we further determined that PX would be engaged in sales of energy at both wholesale and retail, and found that while PX will not take title to electric energy or be a party to a PX trade, it will be the intermediary that contracts with the entities that sell into PX and with the wholesale and retail customers that purchase from PX. We stated that since PX will determine what power is bought and sold and at what price the power is sold, PX is an integral part of the transactional chain and that it takes the combined action of both the participants that bid generation into PX as well as PX itself to effectuate the sale to PX customer participants. Therefore, we found that there was no question that PX will exercise effective control over facilities used for the sale of electric energy for resale in interstate commerce.[FN5]

Consequently, in light of the pertinent provisions of the FPA and Commission precedent, we then turned to the facts of the instant case and compared the activities of PX with APX's activities. We found that while APX will match willing buyers and sellers who want to contract at the market price, more importantly, APX will periodically determine the market price at which energy is sold. We noted that APX will adjust the current market price for each hourly energy market based on the balance of buy or sell orders pending, and APX's Market Engine will adjust the market price to move the market to a balance of buy and sell orders. Therefore, we concluded that APX was the necessary vehicle through which ***61084** wholesale sales

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of energy for resale will be made, and thus that it will take the combined actions of the seller and buyer participants and APX to effectuate wholesale sales.

In comparing the PX with APX we stated that APX's actions are fundamentally similar to the PX's actions since both "PX and APX will, through their market processes, adjust the market price to respond to the market supply and demand and both will determine through their respective market processes the price at which power is sold." [FN6] We noted that while PX and APX will not take title to the power sold, nevertheless, both will exert the same type of active control over the sale of electric energy at wholesale in interstate commerce and will be engaged in sales for resale.

We then compared APX to Continental Power Exchange. In *Continental Power Exchange*, 68 FERC P 61,235 (1994) (*Continental*), we found that Continental was not a public utility subject to our jurisdiction because Continental did not exercise effective control over the content of information that subscribers entered into its computerized system. [FN7] Unlike in APX where but for APX's intervention in the process wholesale sales transactions would not occur, in Continental, even without Continental's service parties could make sales transaction by telephone. Moreover, unlike APX, Continental did not set prices and all transactions were entered into by sellers and buyers through their rate schedules on file with the Commission. Therefore, we found that, unlike APX, Continental did not exercise effective control over sales for resale transactions.

****3** Consequently, based on the facts before us, we concluded that APX will own and operate facilities used for wholesale sales in interstate commerce and we construed both the bidding participants that sell generation and APX to be engaged in the sale of electric energy at wholesale in interstate commerce. Therefore, we found that APX will be a public utility subject to our jurisdiction.

B. *Rehearing Requests and Other Pleadings*

On April 16, 1998, the California Electricity Oversight Board (California Board) filed a motion to intervene stating that its late intervention will not disrupt the proceeding or prejudice any party, and raises no substantive issues. On April 23, 1998, the Public Utilities Commission for the State of California (California Commission) filed a request for clarification of the March 25 order. The California Commission states that the March 25 order erroneously stated that the California Commission argued that the Commission should assert jurisdiction.

On April 24, 1998, APX filed a request for rehearing. First, APX argues that it is not subject to the Commission's jurisdiction because it acts like a "high-tech" power broker, and brokers are not subject to the Commission's jurisdiction. APX also states that like a broker, it does not sell or take title to electric power traded over APX, and does not control or exercise decisionmaking authority over the sale of power or over jurisdictional facilities involved in any wholesale sale or transmission of electric energy in interstate commerce. APX claims that its in-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

volvement in setting price is no different from the influence that a power broker has over the price of power for every transaction it arranges. In addition, APX argues that the Commission extended the effective control rationale without explaining how APX effectively controls these facilities or what facilities APX effectively controls.

Second, APX argues that the Commission disregarded its own precedent, citing to *Continental*, and maintains that the Commission incorrectly distinguished APX from Continental in order to assert jurisdiction over APX. Third, APX asserts that the Commission improperly asserted jurisdiction over APX based on an inaccurate comparison of APX and the PX noting that the PX voluntarily submitted itself to the Commission's regulation. Fourth, APX claims that in asserting jurisdiction over APX, the Commission applied vague criteria. APX argues alternatively, that even if the Commission has jurisdiction over APX, the Commission arbitrarily imposed different filing and reporting requirements on APX than it usually imposes on public utilities that lack market power. Lastly, APX claims that the Commission erred in imposing annual charge requirements on APX because the annual charge as applied to APX is unfair relative to the charges imposed on other public utilities.

On April 24, 1998, Electric Clearinghouse, Inc. (Clearinghouse) filed a request for rehearing arguing that the: (1) Commission's control/ role test for finding jurisdiction is vague and unworkable; (2) Commission misapplies its own control/ role test in finding that APX is a public utility since the analysis ignores the differences between APX and PX, and the market participants who use the services of APX may not settle on a transaction price because of APX; and (3) Commission's decision discourages future innovation by new market institutions.

****4** On April 24, 1998, PX filed a request for rehearing in Docket Nos. ER98-210-005, ***61085** ER98-211-003, ER98-1033-001, and ER98-1729-004.[FN8] PX states that it is filing this rehearing request to the extent that *California Independent System Operator Corporation, et al.*[FN9] and *San Diego Gas & Electric Company*[FN10] have been clarified by *dictum* in Docket No. ER98-1033-000 to require PX to pay annual charges. PX states that whether PX is required to pay annual charges affects PX's costs and rates at issue in the proceeding in Docket Nos. ER98-211-000, ER98-210-000, and ER98-1729-000.

PX claims that it does not engage in any of the activities that trigger the Commission's annual charges regulations, 18 C.F.R. § 382.201 (1997), thus the method used by electric utilities to calculate their annual charges cannot be used by PX.[FN11] Specifically, PX maintains that it does not engage in sales, transmission, or exchanges of power, but performs functions not covered by the annual charge regulations, *i.e.*, auction and scheduling coordination services to utilities who already pay annual charges.

Furthermore, PX claims that requiring it to pay annual charges would be arbitrary and capricious since its annual charges would be many times the annual charges

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

paid by the electric utilities which use PX, and the charges are out of proportion to the Commission's oversight expenses. [FN12] PX also argues that such a requirement would adversely affect PX's ability to carry out its mandate under the California restructuring law and California Commission's orders, and would be anticompetitive. PX claims it would have to increase its administrative charge by such a substantial amount that it could not maintain its partial requirements business. Finally, PX states, without explanation, that assessing annual charges would be an unconstitutional taking, and asks that the regulations be waived.

## II. Discussion

A. *Procedural Issues*

We find good cause to grant the untimely motion to intervene of the California Board given the early stage of this proceeding, and the absence of any undue prejudice or delay. We also clarify that while the California Commission filed a notice of intervention, limited protest, and request for hearing, it stated that it did not take a position as to whether the Commission has jurisdiction over the rates charged by APX.

B. *APX's Rehearing*

In its rehearing request APX first argues that it acts as a "high tech" broker, and thus is not subject to this Commission's jurisdiction. APX states that just like a broker the APX Participant, and not APX, controls the price at which it is willing to trade either by not posting a bid unless it finds the posted price attractive or by posting a bid with limits on how high or low a price the APX Participant would be willing to accept. However, what APX ignores is that it is unlike a broker in a significant respect. In our March 25 order, we found that APX, and not the APX Participants, will periodically set the market price from which all bidding actions stem. This activity is materially different from the activities of a power broker=an entity that does not set the market price. Moreover, it is our obligation to assure that rates are just, reasonable and not unduly discriminatory or preferential and in so doing, we must reach beyond the formalities of a transaction to examine what is actually occurring in the market. Thus, although APX does not take title to the energy, we also find that it does not passively provide a mere computer software program, as APX claims. As we discussed in length in our March 25 order, APX will be an integral part of the transactional chain because both APX and the participants that bid generation are necessary to effectuate the sale to the customer participants. [FN13]

****5** Second, APX argues that the *Continental* decision controls here. APX reasserts that it is not different from Continental because participation in APX is voluntary, and an APX Participant is not required to trade at a price posted on the APX Market Window; thus, APX does not control the price. However, APX controls the market price in the first instance, which is vastly different from Continental's bulletin board that merely displayed market information from the market participants themselves. APX also claims that a power sale by a power marketer over the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

APX will be made using the power marketer's market-based rate schedule on file. In effect, APX argues ***61086** that it is like Continental because it is simply facilitating rate schedules on file with the Commission. However, since APX's Market Engine will periodically adjust the market price based on APX's decisions (*e.g.*, APX will be able to change the time intervals between price determinations),[FN14] the price that APX's Market Engine sets may be different from the price that a buyer and seller would have negotiated under their market-based rate schedule. Moreover, unlike in APX, sales using Continental's bulletin board were made using cost-based rate schedules on file with the Commission. Thus, in Continental, unlike in APX, the basis for the price at which energy was sold could be readily examined.

Third, APX claims that the Commission asserted jurisdiction over it because APX is a new technology. APX is incorrect. In our March 25 order we concluded that APX was subject to our jurisdiction not because APX discovered a new way of selling power, but because under the applicable law APX's activities made it jurisdictional. APX also claims that we could assert jurisdiction over certain activities, such as brokering services and the use of the Internet, using the Commission's rationale in this case. However, APX does not justify this argument with any legal support. Moreover, whether the providers of other new technologies will also be subject to our jurisdiction will depend on the facts then before us and the applicable law.

Fourth, APX argues that it is different from PX because under the California Commission's mandate major California investor-owned utilities must bid their entire load and generation into PX. APX asserts that because it does not have such a mandate, it cannot exert control over sales. We disagree. Although APX does not have the same mandate as PX, that mandate was not determinative of the jurisdictional issue. In other words, the fact that APX Participants will voluntarily decide to use APX does not change whether the services APX, in fact, provides are jurisdictional.

Lastly, APX argues that the Commission imposed arbitrarily different filing and reporting requirements on APX than it imposes on others with market-based rate authority. APX claims that requiring it to file rates, terms and conditions of service and how it adjusts prices will impose a significant commercial disadvantage on APX. We disagree. As we stated in our March 25 order, we granted APX the same waivers from Commission regulations that we granted entities that lack market power.[FN15]

C. *Annual Charges*

****6** Both PX and APX argue that the Commission erred in imposing annual charges because: (1) the Commission's annual charges regulations impose annual charges on the sales of an entity and APX does not sell or exchange power; (2) the Commission improperly imposes annual charges twice on the sale link in the transactional chain, *i.e.*, the sale made by public utility sellers through the APX Engine will

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

be assessed the charge as will APX.

We will deny PX's and APX's requests for waiver of annual charges. Both PX and APX erroneously claim that annual charges should not be assessed against them because they do not sell electricity. In fact, we found that PX and APX will own and operate facilities used for the sale of electric energy at wholesale in interstate commerce, and are thus public utilities subject to our jurisdiction. The Commission does not limit its annual charges to the first public utility in a transaction chain and APX has not provided any persuasive rationale for us to make an exception here. Moreover, we have not waived our annual charge for PX or any other public utility selling in the California market.[FN16]

APX argues that by imposing annual charges on it, the Commission will obtain two annual charge fees for the same transaction, and imposing annual charges places it at a competitive disadvantage. PX also maintains that imposing annual charges on it would be anticompetitive and out of proportion to the Commission's expenses. PX further argues that imposing annual charges on power exchanges will be disproportionate to any regulatory burden that PX imposes on the Commission and will also be anticompetitve. In support of this argument, PX notes that: (1) the Commission approved market-based pricing for sales into PX, which lightens the Commission's burden of regulating PX sales; and (2) PX is responsible for the burden of monitoring the market, which relieves the Commission of that burden (PX notes that APX does not have this monitoring function).

In *Morgan Stanley Capital Group, Inc.*,[FN17] we addressed this "diminished regulatory burden" issue in the context of power marketers. Specifically,***61087** we examined whether the Commission's annual charges to power marketers bear a relationship to the Commission's cost to provide services to power marketers. We decided that annual charges should not be waived for power marketers because "the Commission can spend as much (if not more) time evaluating power marketer requests as it can for other types of rate applications."[FN18] In *Morgan Stanley*, we also rejected arguments that the Commission has limited jurisdiction over power marketers, and thus the time and resources expended on regulating power marketers are so insignificant as to compel waiver of the annual charge requirement.[FN19]

We will apply these same principles to PX and APX since, like the power marketers, PX and APX request that we waive annual charges based on diminished regulatory burden. As we discussed above, we rejected the power marketers arguments on this issue, and similarly we will reject PX's and APX's requests since they have not presented us with any additional evidence that would convince us to waive our annual charges regulations. Moreover, contrary to PX's concern that assessing annual charges would be anticompetitve, in *Morgan Stanley* we stated that waiving annual charges for power marketers "would give them a benefit other public utilities do not enjoy and would result in such utilities picking up those costs incurred by the Commission in regulating power marketers."[FN20] Accordingly, we find that PX and APX will be placed in a competitive advantage if we waived their annual

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

charges.

D. *Clearinghouse's Arguments*

****7** We will next address Clearinghouse's argument that the Commission's jurisdictional test is unclear. As with other areas of emerging jurisdiction, we will determine whether an entity is subject to our jurisdiction based on the facts and the law. Our March 25 order amply discussed our jurisdictional finding which was based on the specific provisions of the FPA and controlling Commission precedent.

Clearinghouse next argues that the Commission misapplied the relevant jurisdictional tests noting that, unlike PX, the APX participants voluntarily choose APX's services. In addition, Clearinghouse essentially argues that APX does not control the power sale because APX does not determine whether APX Participants will settle on a transaction at a certain price. Clearinghouse is incorrect. The fact that APX Participants voluntarily use APX's services is not dispositive of the jurisdictional issue, and we fully explained our basis for asserting jurisdiction in our March 25 order. Moreover, we find that Clearinghouse fails to understand APX's crucial role in setting the market. Buyers and sellers settle on a certain price because APX establishes the market price through the operation of its computer program and its deliberate decisions, *e.g.*, *see supra* text accompanying note 14. Indeed, this is one of APX's services for which market participants contract, *i.e.*, APX will determine the market price under which they will trade.

Finally, we disagree with Clearinghouse's assertion that our decision to assert jurisdiction over APX will stifle innovation. Rather, the Commission encourages innovations, and we will not assert jurisdiction merely because an entity is a new institution. In fact, we have found that other nontraditional entities, such as power brokers, are not subject to our jurisdiction. Furthermore, we note that while APX has created an innovative process to establish a market price and sell power, it does so in such a way that makes APX subject to our jurisdiction as a public utility.

## III. APX's Compliance Filing

On April 27, 1998, APX filed its compliance filing in Docket No. ER98-1033-002 one business day out-of-time. APX asks that the Commission hold this filing in abeyance until the Commission acts on APX's request for rehearing, and argues that the information the Commission requested is inconsistent with market- based rate approval.

In its compliance filing, APX provides a general description of its services. APX states that it is a privately owned and operated company that offers computerized information management services that permit any customer to engage in the purchase and sale of electricity and related products subject to the terms and conditions agreed to by APX and the APX Participant. APX states that APX Participants may submit orders to buy or sell electricity using the APX Market Window, and that the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

APX markets consist of 168 hourly electricity markets in each of the Northern California and Southern California zones, as defined by the California ISO. APX states that the Market Participants can attach a limit price and a withdrawal time to each order submitted to the APX Market Engine, and that the limit price function of the APX Market Window is a default field so that an APX Participant cannot enter an order without first attaching a price limit or specifically choosing not to attach a ***61088** price limit to its order. APX states that it will not contract an order if the APX Market Price is outside the price limit that the APX Participant attaches to its order.

****8** APX states that when the APX Market Engine contracts a buy and sell order, a binding contract is formed between the selling APX Participant and the buying APX Participant for the quantities that are contracted. APX states that when a sell order is contracted with a buy order, the APX Market Engine will send a notice via the APX Market Window to each APX Participant whose order has been contracted, informing them of the contract. APX states that it will not take title to the electricity that is traded through the APX, and that title will be transferred from the selling APX Participant to the buying APX Participant at the point at which the electricity is injected into the ISO grid.

APX notes that because of the lag time between the time that the APX Market Engine adjusts the APX Market Price and the time the new APX Market Price is displayed on the APX Market Window, the price displayed on the APX Market Window may at times differ from the APX Market Price assigned to a given market by the APX Market Engine.[FN21] Consequently, APX states that the APX Market Price at which an APX Participant will contract will not always be identical to the price displayed on the APX Market Window when the APX Participant's order is submitted or when the APX Participant is informed that its order has been contracted.

APX also files a schedule setting forth the fees that APX will charge APX Participants including, *e.g.*, APX market transaction fees. APX states that all transactions under this rate schedule will be subject to fees established by agreement between the APX Participant and APX. In addition, APX files a code of conduct but claims that the code is unnecessary since it does not purchase or sell electricity, does not broker electricity in the traditional sense, and does not transmit or rely on others to transmit electricity. APX states that the standard provision in the code of conduct regulating brokering activities among affiliates or the provision that requires affiliated entities to obtain transmission service under an affiliate's transmission tariff, are not applicable to APX. Finally, APX asks that the rate schedule become effective on or after April 1, 1998.

*Notice of Filing, Interventions, and Other Pleadings*

Notice of APX's compliance filing was published in the *Federal Register*, 63 *Fed. Reg.* 25,467 (1998), with comments, protests, and interventions due on or before May 15, 1998.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

On May 13, 1998, ZE PowerGroup Inc. (ZE Power) filed a motion to intervene and "possibly" protests APX's filing without further argumentation.

On May 14, 1998, PX filed a protest to APX's compliance filing arguing that APX's filing fails to include the kind of specificity that the Commission requested in its March 25 order and required under Section 205(c) of the FPA. PX states that both PX and APX will perform comparable functions, and that PX has submitted a comprehensive tariff, extensive operating protocols, and specific rates and charges describing how it will perform as a public utility. However, PX argues that APX proposed rate schedule lacks important details and provides only general concepts.

**9 The PX asks that APX explain: (1) how potential sellers and buyers will communicate with APX and how APX will communicate with the California ISO; (2) what kind of contract or service agreement will APX require of Participants that obtain services from APX; (3) how APX Participants will respond to the lag times in posting APX Market Prices; (4) the statement that APX can reject any buy or sell order "for APX designated reasons"; (5) how APX's "true-up process" will work; (6) what "taxes" APX plans to charge as a direct pass-through to Participants; and (7) what terms and conditions govern "APX Participant's monetary reserve."

Moreover, PX claims that APX failed to specify what it will charge for its services. PX states that Section 3 of APX's rate schedule states that "all transactions under this rate schedule will be subject to fees established by agreement between APX and the APX Participant." Therefore, PX argues that those fees are subject to negotiation since they are not stated.

On May 15, 1998, The Utility Reform Network (TURN) filed a motion to intervene and protest. TURN argues that APX's compliance filing does not fulfill the requirements of the Commission's March 25 order by failing to provide sufficient information and should be rejected. TURN asserts that APX provides only general information about its operations and how it will compute prices. For example, in Section 4.9 of its rate schedule APX states that the Market Engine adjusts the market price to move the market toward a balance of buy and sell orders but does not provide a formula or *61089 algorithm by which it performs these periodic adjustments to its market price.

On May 29, 1998, APX filed a response to the motions to intervene and protests. APX states that it does not oppose any of the motions to intervene, but states that none of the protests has merit. Therefore, APX asks that the Commission accept its compliance filing. In response to the PX, APX argues it is different from the PX because APX cannot exercise market power and thus has market-based rate authority. Therefore, APX claims that it does need not to develop or file rates, terms, conditions, and protocols containing the same level of detail as the PX. APX asserts that entities that operate under market-based rate authority usually file less detailed rate schedules with the Commission, and thus, that the Commis-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

sion did not expect APX to file detailed information. APX argues that, in any event, its rate schedule includes the basic terms and conditions of service, and describes how it will interact with its customers and how the prices at which APX Participants will trade are determined. In addition, APX states that none of the customer-intervenors in this case, *i.e.*, those that operate under the APX rate schedule, have found the filing difficult to understand or claim that the filing is inconsistent with the March 25 order.

In response to the PX's assertion that APX's rate schedule is unclear, APX argues that its rate schedule specifically indicates how potential buyers and sellers may submit buy and sell orders through the APX Market Window and the basic terms and conditions of service. APX's response to the "lag time" issue raised by the PX is that each APX Participant is aware of the lag time and imposes limits on its orders to buy or sell. APX explains that the provision that APX may reject a buy or sell order for "designated reasons" means that APX may deny service to an entity that fails to comply with the requirements of the tariff or service agreement. APX also explains that the true-up mechanism applies to the APX scheduling coordinator function and not its market function which the Commission regulates.

****10** In response to the PX's concern that APX's fees are not stated but will be established by agreement between APX and the APX Participant, APX clarifies that its fees will be the fees set forth on the attachment to its rate schedule.

In response to TURN's claim that APX failed to disclose how it will compute prices, APX states that TURN misunderstands the March 25 order. APX argues that the Commission's order only required APX to describe how it computes prices (which APX claims it complied) and not disclose its proprietary and commercial trade secrets. APX states that its algorithm is its principal asset and is APX's intellectual property, and that TURN's demand for its intellectual property is another attempt to drive a competitor out of business. Regarding TURN's claim that APX must provide further explanation of the intervals at which the APX Market Engine clears each market, APX states that no APX Participant complains about this point. APX further argues that because APX Participants can place limits on their orders to buy or sell power through APX, the frequency at which the APX Market Engine clears a market is not a critical information for the APX Participants. Finally, APX claims that disclosing such timing intervals would injure a properly functioning and efficient market since more sophisticated APX Participants who know when markets clear could game the market, which is why APX claims the intervals are irregular and take account of market activity.

On June 12, 1998, the PX filed a motion to strike APX's answer arguing that it is an impermissible answer to a protest. On June 29, 1998, APX filed an answer opposing the PX's motion to strike requesting that the Commission deny the PX's motion.

## IV. Discussion

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A. *Procedural Issues*
We find persuasive APX's reasons for submitting an untimely compliance filing, and also believe that, in this instance, the one-day late filing will not prejudice any party in this proceeding. Therefore, we will grant APX's request and permit APX to submit it compliance filing one business day late. We also find good cause to grant the untimely motion to intervene of the ZE Power given the early stage of this proceeding, and the absence of any undue prejudice or delay. Because APX's response assisted us in resolving an issue presented in this case, we will accept APX's response to the protests to the limited extent that it clarifies the fees issue addressed below; otherwise we will reject APX's response as an impermissible answer to the protests. *See* 18 C.F.R. § 385.213(a)(2) (1997).

B. *Compliance Filing Issues*
In the March 25 order, the Commission conditionally accepted APX's market-based rate schedule, and ordered APX to submit a complete rate schedule and a code of conduct that would address APX's affiliation with Bechtel Corporation. Specifically, the Commission stated the following:

> The rate schedule must clearly set forth how APX will interact with buyers and sellers, how it will compute prices and what it will ***61090** charge for its services. All relevant terms must be specifically set forth in the rate schedule and must be accompanied by supporting explanations.[FN22]

****11** We agree with the PX and TURN that the rate schedule APX submitted does not meet all of the Commission's requirements. APX argues that it does not need to meet these requirements because they are inconsistent with market-based rate authority. We disagree. APX is not merely selling power at market-based rates. APX is a power exchange, a concept that reflects a fundamental restructuring of the industry which substantially alters the operation of the electric power market. Under a typical market-based transaction the price is determined through arms-length negotiations between the buyer and seller. In contrast, the electronic operation of APX's Market Engine and APX's decisions in that regard will determine the market price.

Moreover, APX's power exchange is starkly different from the traditional way power is sold, *i.e.*, through explicit rates on file with the Commission which guarantees that all market participants have the same information about the market, and protects consumers by providing rates that are just, reasonable, and not unduly preferential or discriminatory. Consequently, in this new power exchange environment the Commission has the same responsibility, and must ensure that, at a minimum, APX operates its power exchange in a way that will provide all market participants with explicit pricing and bidding procedures. The Commission's requirements, which APX has not complied with, are essential to assuring that result.[FN23] Therefore, we will require APX to amend its rate schedule as discussed below.

We find that the compliance rate schedule lacks clarity and does not fully explain how the market price will be developed, and we shall direct APX to submit a re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

vised compliance rate schedule. We emphasize that, while the information provided by APX to date has been limited, we do not believe it is necessary for APX to divulge proprietary computer programs or algorithms. However, the rate schedule must be specific enough for the Commission, APX's customers, and other interested parties to understand the rate setting process. We believe that this should not be a difficult task since APX has apparently provided clear information to prospective customers in order to convince them of the benefits of subscribing to APX. In this respect, we shall give some examples of the lack of clarity. APX is cautioned that these examples are illustrative and APX is expected to review all elements of its rate schedule to ensure clarity and completeness.

While APX's compliance rate schedule provides some additional information about how it will determine the prices that sellers are paid and the charges that buyers will pay, the rate schedule remains unclear in several respects. For example, Section 4.2 of the proposed rate schedule states that, at the beginning of the 168 hour period leading up to each hourly market, a "market price" will be shown on the APX Market Window (a term which is not defined, but which is apparently the computer screen that is viewed by users). Section 4.9 states that the initial market price will be the closing price from the same hour of the prior week (*i.e.*, the last trading hour before the current 168 hour trading period began). Section 4.2 states that the participants may "submit and withdraw orders . to buy or sell in response to this price." Section 4.2 also states that, based on these orders to buy and sell, the "APX server . will clear the market of those orders willing to trade at the market price, adjust the market price to reflect any imbalance between buy and sell orders and transmit the revised market price back to the APX Participants for use in deciding whether to place new orders." Section 4.4 states that each APX participant must attach a price limit to any order, specifying an upper price for any order and a lower price for sell orders.

****12** We find that this explanation is unclear in several respects. For example, it is not clear how APX will "clear the market" after receiving bids in response to the posted price, what it means for APX to "adjust the market price to reflect any imbalance," or why the participants would be posting new orders based on the "revised price," particularly since each participant would have submitted a price limit. Consequently, we direct APX to revise the rate schedule to provide a clearer description of this process. We encourage APX to provide examples illustrating this process in different circumstances, *e.g.*, when the market clears or when it is not in balance.

Another example of APX's lack of clarity is found in Section 4.5 which states that when the APX Market Engine (another term that is undefined,***61091** but which apparently refers to APX's software program):

> contracts a buy and sell order, a binding contract is formed between the selling APX Participant(s) and the buying APX Participant(s) for the quantities that are contracted . Title to the electricity traded through the APX will be transferred from the selling APX Participant(s) to the buying APX Parti-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> cipant(s) at the point at which the electricity is injected into the ISO grid.

We find unclear APX's use of the term "binding contract" among participants that results when APX "contracts a buy and sell order." While APX does not define the term "binding contract," in common usage, this term would refer to an obligation where performance can be enforced. It is not clear how the APX buyer and seller could enforce performance of this binding contract against each other since each deals only with APX and is blind to the others' identity.

Another example of APX's lack of clarity is found in Sections 4.7 through 4.10. Section 4.7 states that "[a]t periodic intervals, the Market Engine reviews the pending orders to determine if it can clear the market." Section 4.8 states that the Market Engine matches the buyers and sellers on a first-come, first-served basis and, if all are not satisfied within the hour, the remaining bids are held over to the next interval. Then, the Market Engine "adjusts the current APX Market Price for each hourly energy market based on the balance of pending buy and sell orders for the hour." Section 4.9 describes this somewhat differently and states that, when there are orders pending, the "Market Engine adjusts the market price to move the Market toward a balance of buy and sell orders." Section 4.10 states:

> The Market Engine will increase the APX Market Price when buy orders exceed sell orders and decrease the APX Market Price when sell orders exceed buy orders. These price changes are intended to move the APX Market Price toward equilibrium as APX Participants adjust their bid position in reaction to the price changes . [D]ue to lag time between the time that the APX Market Engine adjusts the APX Market Price, . the price displayed on the APX Market Window may at times differ from the [actual contract price].

****13** We find that the above statements do not explain how price adjustments are determined by APX, *e.g.*, are these discretionary or formulae incorporated in the software program. We also find that there is an inconsistency between Section 4.8 which indicates that buyers and sellers are matched on a first-come, first-served basis at the initial price, and Section 4.10 which indicates that the parties are matched only after prices are adjusted to reach equilibrium. As noted above, APX may find it helpful, when it submits a revised compliance filing, to provide examples to illustrate the rate setting process under various circumstances.

Finally, we note that APX maintains a web- site which explains to prospective customers that they will be required to execute certain contracts and indicates that these contract forms are provided to prospective customers for their review. We direct APX to submit copies of these contracts for the Commission's review.

We will deny PX's request that APX fully support its proposed fees similar to the Commission's requirement on the PX. We find that APX clearly identified the fees it will charge for APX transactions given that its fees are recovered through its market-based rates. In contrast to APX, the PX's fees are based on the recovery of its stated operating budget. Moreover, as we discussed above, since APX clarified

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that its fees to APX Participants will be the fees that are set forth on the attachment to its rate schedule, we direct APX to revise its rate schedule to delete Section 3 which refers to the fees established by agreement between APX and the APX Participant.

Finally, we find that the code of conduct submitted by APX meets the Commission's established requirements to prevent affiliate abuse.

*The Commission orders*:

(A) APX's, the PX's, and Clearinghouse's requests for rehearing are hereby denied.

(B) APX's compliance filing is hereby rejected in part since APX's revised rate schedule is not in compliance with our initial order, as described above, and accepted in part since APX's code of conduct and fee attachment is in compliance, as discussed above.

(C) APX is hereby directed to submit a revised compliance filing within 30 days of the date of this order, which will contain a detailed description and explanation of its services, including the calculation of market price, fees, and all relevant terms, as discussed in the body of this order.

(D) APX's market-based power sales rate schedule, as modified as discussed above, is hereby accepted for filing, to become effective on April 1, 1998, as requested.

(E) APX is hereby informed of the rate schedule designations and code of conduct shown on the Attachment to this order.

FN1 *See Automated Power Exchange, Inc.*, 82 FERC P 61,287 (1998) (March 25 Order).

FN2 *See Citizens Energy Corporation*, 35 FERC P 61,198, at pp. 61,452-53 (1986).

FN3 *See Pacific Power & Light Company*, 3 FERC P 61,119 (1978); *Bechtel Power Corporation*, 60 FERC P 61,156 (1992).

FN4 *See Pacific Gas and Electric Company, et al.*, 77 FERC P 61,204, at p. 61,805 (1996).

FN5 *See Southern California Edison Company*, 80 FERC P 61,262, at p. 61,946 (1997).

FN6 82 FERC at p. 62,108 & n.17.

FN7 68 FERC P 61,235 (1994).

FN8 We find that PX's request for rehearing was untimely filed in Docket Nos. ER98-210-005, ER98-211-003, and ER98-1729-004, but was timely filed in Docket

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

No. ER98-1033-001. Therefore, we will address PX's request for rehearing in all of thesedockets.

FN9 81 FERC P 61,321 (1997).

FN10 82 FERC P 61,235 (1998).

FN11 *Annual Charges Under the Omnibus Budget Reconciliation Act of 1986,* Order No. 472, *FERC Statutes and Regulations 1986-1990* P 30,746 (1987).

FN12 PX states that the assessment on it could range from $5 million to $11.5 million and be up from 14% to over 30% of its total operating expenses of about $37 million.

FN13 82 FERC at p. 62,108.

FN14 *Id.* at n.15.

FN15 *Id.* at p. 62,110.

FN16 APX also argues, without support, that since the Commission does not impose annual charges on small power producers and cogenerators, it should not impose them on APX. However, we recently considered and rejected the same argument proffered by power marketers. *See Service Comparability in the Electric Industry, et al.,* 80 FERC P 61,373, at pp. 62,265-66 & n.5 (1997).

FN17 69 FERC P 61,175 (1994), *order on reh'g*, 72 FERC P 61,082 (1995) (*Morgan Stanley*).

FN18 69 FERC at p. 61,697.

FN19 72 FERC at p. 61,437.

FN20 *Id. See also Annual Charges Under the Omnibus Budget Reconciliation Act of 1986 (Phibro Inc.)*,81 FERC P 61,308, at p. 62,426 (1997).

FN21 As noted, APX has the authority to revise these time frames and thereby affect the market price presented to its Participants.

FN22 82 FERC at p. 62,109.

FN23 We note that we have directed other entities (with market-based rate authority) that will significantly alter the operation of electric power markets tosubmit extensive monitoring programs that allow the Commission to review for undue discrimination, evaluate the pool and non-pool markets, and determine whether transmission pricing arrangements are working. *See, e.g., Pennsylvania-New Jersey-Maryland Interconnection, et al.,* 81 FERC P 61,257 (1997).

**Attachment**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Automated Power Exchange, Inc.

***61092** Docket No. ER98-1033-002

*Rate Schedule Designations*

*Designation=Description*

****14** (1) Rate Schedule FERC No. 1=Market-Based Rate Schedule

(2) Supplement No. 1 to Rate Schedule FERC No. 1=Fees

(3) Supplement No. 2 to Rate Schedule FERC No. 1=Code of Conduct

**Curt H (acute)'SCebert, J'ECr.**, Commissioner, *dissenting*:

I stand squarely behind my previous arguments against asserting FERC jurisdiction over a computer program. *Automated Power Exchange, Inc.,* (*APX I*), 82 FERC P 61,287, at pp. 62,111-114 (1998). I write to respond to the new description the majority gives of the bounds of our jurisdiction. I also show that, despite the disclaimer against requiring proprietary "computer programs or algorithms," slip op. at 16 , the majority may force Automated Power Exchange, Inc. (APX) to reveal its commercial secrets. How ironic that at a time we profess to encourage the market to develop, we act in a way that stifles innovation.

*The "Invisible Hand" Standard*

The majority supplements the "fundamentally similar" test for our jurisdiction *APX I* established with a new formulation.

> Th[e] activity [APX engages in] is materially different from the activities of a power broker [over which we disclaimed jurisdiction] . .[A]lthough APX does not take title to the energy, we also find it does not *passively provide a mere computer software program.*

Slip op. at 7 (emphasis added).

In the same vein, the order distinguishes APX from a company operating a bulletin board, an entity over which we also disclaimed jurisdiction. The majority finds: (a) the bulletin board "merely displayed market information from the market participants themselves." *Id.*; but (b) the APX "controls the price in the first instance," and that "the price APX . sets may be different from the price that a buyer and seller would have negotiated [on their own]." *Id.*

Parenthetically, I find these statements wrong as a matter of fact. Providing a computer program for transactions and operating a bulletin board involve deliberate effort. Otherwise, traders would not pay to use those services. Also, even if the parties adopt APX's price, they negotiate the transactions as voluntary participants in the computer network.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

More important, I find the distinction between "passive display" and "active price setting"=the "Invisible Hand" standard=wrong as a matter of law. In performing these semantic aerobics, the majority has lost sight of the strictures of the Federal Power Act. APX correctly points out in its rehearing:

> Typically, a broker is informed that a certain customer is willing to sell or buy power at a certain price. The broker then "shops" the market . for a transaction at or near the indicated price. Sometimes the broker will find a customer interested in trading but not at the price suggested by the initiating customer. In that event, the power broker acts as a communications channel through which the buyer and seller will seek to find a price at which they can transact.
>
> ****15** Trades through . APX are conducted in the same manner . only more efficiently. Rather than notify a power broker . and await a return communication, . the APX participant can monitor the APX Market Window.

APX Request for Rehearing at 5-6.

With APX, as with the broker and the bulletin board, buyers and sellers must still decide whether to transact and the price at which they will trade. The buyers and sellers, not APX or the broker or the bulletin board, make the "sales" of electricity. The buyers and sellers, not the broker or the bulletin board, fall within our jurisdiction as public utilities.

*The "Light Handed" Filing Requirements*

Today's order also finds that APX must file more information to enable this agency to regulate the firm's activities. In particular, the majority refuses explicitly to exclude filing of APX's proprietary data, such as its software. Slip op. at 16 ("we believe" APX will not have to divulge proprietary data). More important to me, the order does require a "*clearer description* of th[e] process" by which the computer program " adjusts the market price.' " Slip op. at 17 (emphasis added). In the crunch, that unqualified directive prevails over the majority's expectations that APX need not divulge proprietary data.

To comply with the requirement for a "clearer description" APX almost certainly will have to reveal its formula, for the majority finds inadequate the general description in the compliance filing. APX indicated in its application and again in its request for rehearing (at 14-16) that the very foundation for its existence rests on the formula or algorithm by which the company will "compute prices." The majority, in all likelihood, requires APX=and every other developer of technology=to drive itself out of business.

The majority acknowledges, as it must, that a typical seller at market-based rates may file with us information on successful transactions ***61093** after the fact, without disclosing its underlying trade secrets. The order applies a more intrusive policy because "APX is not merely selling power at market-based rates. APX is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

a power exchange." Slip op. at 15. As such, the company must disclose publicly its behind-the- scenes operations, beyond informing us of transactions after the fact. With the information, the Commission will gain enough knowledge of how the "market works" to decide whether to intervene or stay its hand.

I have no quarrel with the notion that if we have jurisdiction, we need detailed knowledge of APX's new price-setting mechanism, in order to fulfill our responsib-ilities. We already have on file the rate schedules of the buyers and sellers. Regulating APX, therefore, almost certainly requires the formula for calculating the market price, APX's trade secret. The burden may physically "not be a diffi-cult task" slip op. at 16; commercially it will prove quite daunting.

Therefore, I dispute the premise that we need to regulate APX, for the reasons in my earlier dissent and with today's additional comments.

****16** I respectfully dissent.

84 FERC P 61020, 1998 WL 514599 (F.E.R.C.)
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

85 FERC ¶ 61,232

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: James J. Hoecker, Chairman;
Vicky A. Bailey, William L. Massey,
Linda Breathitt, and Curt Hébert, Jr.

Automated Power Exchange, Inc. ) Docket No. ER98-1033-004

ORDER ACCEPTING REVISED RATE SCHEDULE

(Issued November 16, 1998)

This order accepts Automated Power Exchange, Inc.'s (APX) revised rate schedule to become effective on April 1, 1998, as requested. The order dismisses as unnecessary APX's standard terms and conditions of service and standard form contract since the order finds that APX's revised rate schedule, without more, fully complies with Section 205(c) of the Federal Power Act. Therefore, the order does not address APX's request for confidentiality. The order also directs APX to file an updated APX Participant index within 30 days of the commencement of service to an APX Participant.

I. Background

A. March 25 Order

On March 25, 1998, the Commission issued an order finding that APX's automated, computerized exchange, through which sellers and buyers will trade in electric power and energy, will make it a public utility subject to the Commission's jurisdiction. 1/ We also conditionally granted APX's request for market-based rate authority, and directed APX to submit a compliance filing that contained a complete rate schedule with all the terms and conditions of service within 30 days of the date of the order. Specifically, we stated that:

> The rate schedule must clearly set forth how APX will interact with buyers and sellers, how it will compute prices and what it will charge for its services. All relevant terms must be specifically set forth in the rate schedule and must be accompanied by supporting explanations. 2/

---

1/ See Automated Power Exchange, Inc., 82 FERC ¶ 61,287 (1998) (March 25 Order).

2/ Id. at 62,109.

981117-0086-1

FERC - DOCKETED
BN
NOV 16 1998

B. July 15 Order

On April 27, 1998, APX submitted its compliance filing and asked that the Commission hold its filing in abeyance until the Commission acted on APX's request for rehearing. APX also claimed that the information the Commission requested was inconsistent with its market-based rate authority.

On July 15, 1998, the Commission issued an order that rejected APX's compliance filing in part, and directed APX to submit a revised compliance filing within 30 days of the date of the order. The Commission also denied requests for rehearing filed by APX, Electric Clearinghouse, Inc. (Clearinghouse), and the California Power Exchange Corporation (PX). 3/

In response to APX's assertion that the information the Commission requested was inconsistent with market-based rate authority, the Commission noted that APX was not merely selling power at market-based rates, but was a power exchange in which APX's Market Engine 4/ and APX's decisions determined the market price. We also noted that in this new power exchange environment, the Commission's responsibility had not altered; it still must ensure that all market participants have the same information about the market and protect consumers by providing rates that are just, reasonable, and not unduly preferential, or discriminatory. The Commission stated that, at a minimum, it must ensure that APX operated its power exchange with explicit pricing and bidding procedures, and the information the Commission requested was essential to ensuring that result.

The Commission stated that the rate schedule APX submitted did not meet the requirements we listed in the March 25 Order. The Commission found that APX's rate schedule did not fully explain how the market price would be developed and lacked clarity, e.g., the discussion of the trading process and market price that referred to "clearing the market," "adjusting the market price," and "binding contract." Thus, we directed APX to submit a revised rate schedule, and provide examples to illustrate the rate setting process under various circumstances, which would be specific enough for the Commission, APX's customers, and others to understand the rate setting process. We also directed APX to submit to the Commission copies of the form contracts that APX stated it would make available on its web-site

---

3/ See Automated Power Exchange, Inc., 84 FERC ¶ 61,020 (1998) (July 15 Order), appeals docketed, No. 98-1415 (D.C. Cir. Sept. 14, 1998) and No. 98-1419 (D.C. Cir. Sept. 14, 1998).

4/ APX defines the APX Market Engine as the active server and software that administers the APX services and is owned and maintained by APX.

for prospective customers' review. However, we emphasized that we did not believe that it was necessary for APX to divulge proprietary computer programs or algorithms.

We also accepted APX's proposed fee schedule. We stated that APX clarified that its fees to APX Participants will be the fees that are set forth on the attachment to its rate schedule, and we directed APX to revise its rate schedule to delete Section 3 which refers to the fees established by agreement between APX and the APX Participant. 5/

C. APX's August 14 Filing

On August 14, 1998, APX filed a revised compliance filing as directed by the Commission's July 15 Order. APX states that its revised rate schedule: (1) includes a new section which defines the terms used in the rate schedule; (2) revises Section 3 to clearly state that APX's fees set forth in the rate schedule are the fees that APX will charge for its power exchange service; and (3) responds to the Commission's concern that APX clarify its rate schedule.

APX also states that it responded to each of the questions that the Commission raised in the July 15 Order. APX explains, and provides examples of, its operations. APX states that "clearing the market" refers to the process by which the APX Market Engine will review the pending buy and sell orders for a given hour, determine if any of the pending orders can be matched at the APX Market Price and if so, contract the orders. APX states that if the APX market is not in balance (more buy orders than sell orders pending or vice versa) the APX Market Engine will increase (or decrease) the APX Market Price to attract new sell orders (or buy orders) to move the APX Market toward balance. Thus, APX clarifies that "adjusting the APX Market Price to reflect any imbalance" means that the APX Market Engine will adjust the APX Market Price upward or downward to attract new orders to match the remaining orders that were not contracted in the last market clearing interval.

APX also clarifies how a binding contract could be formed and enforced when the identities of the buying and selling entities for transactions are unknown. APX responds that when buy or sell orders are submitted, APX Participants make unilateral offers, and matching forms a binding contract between APX Participants whose orders are contracted. APX states that the anonymity of the contracting parties does not bar enforcing this contract since under APX's rate schedule each APX

---

5/ We stated that APX's fees are recovered through its market-based rates, but we now understand that APX's fees are recovered based on the volume of its sales transactions.

Participant agrees to buy or sell power as required by the contracted order. According to APX, if a buying or selling APX Participant disputes its obligations, APX will disclose to that participant the identity of the counter party(ies) to the transaction so that it may seek contract law remedies.

APX also explains in detail how it sets the price for power traded on APX. APX states that the APX Market Engine price adjustment varies because it includes a small random component in order to minimize gaming. Finally, APX notes that if several price adjustments in one direction do not attract additional orders, the APX Market Engine will increase the size of the price adjustment. APX states that each price adjustment occurs at programmed intervals for each APX market and the timing of these intervals declines as the APX Market moves through the 168 hours in order to allow more opportunity for trading. APX also claims that the frequency of the market clearing intervals and the size of the price adjustments are proprietary information.

Lastly, pursuant to the July 15 Order, APX submits its standard service and participation agreement (standard form contract), which APX requires APX Participants to execute, and its standard terms and conditions of service (standard terms and conditions). However, APX requests that the Commission grant these documents confidential treatment under Section 388.112 of the Commission's regulations, 18 C.F.R. § 388.112 (1998). APX also claims that the standard terms and conditions and the standard form contract are exempt from public disclosure under exemption 4 of the Freedom of Information Act.

## II. Notice of Filing, Interventions, Protest, and Answer

Notice of APX's filing was published in the Federal Register, 63 Fed. Reg. 46,430 (1998), with comments, protests, and interventions due on or before September 2, 1998.

Timely motions to intervene were filed by Bonneville Power Administration (Bonneville), Enron Power Marketing, Inc. (Enron), Public Service Resources Corporation (Resources Corporation), and the California Electricity Oversight Board (Oversight Board) raising no substantive issues.

On September 2, 1998, the PX filed a protest to APX's filing. The PX asserts that APX failed to comply with the Commission's requirements that APX's fees be clearly identified in the rate schedule. The PX argues that the attachment that lists APX's fees is not included with the filing, and that such information was removed for privileged treatment without explanation. The PX also argues that APX failed to comply with the Commission's requirements that it file its contracts since APX requests confidential treatment for this material.

On September 17, 1998, APX filed an answer to the PX's protest, arguing that the Commission should accept APX's compliance filing as submitted to the Commission. APX argues that the Commission accepted APX's fee schedule in the July 15 Order, and thus APX was not required to refile its fee schedule. APX claims that the PX erroneously referred to the fee schedule as privileged, and explains that the privileged information refers to its standard terms and conditions and standard form contract. In response to the PX's assertion that the Commission should deny APX's request for confidentiality, APX notes that the Commission does not require power marketers to file detailed terms and conditions.

III. Discussion

A. Procedural Matters

Pursuant to Rule 214 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214 (1998), the timely, unopposed motions to intervene of Bonneville, Enron, Resources Corporation, and the Oversight Board serve to make them parties to this proceeding. We will reject APX's answer since it is an impermissible answer to a protest. See 18 C.F.R. § 385.213(a)(2) (1998).

B. APX's Revised Rate Schedule

In our July 15 Order we stated that APX's rate schedule must be specific enough for the Commission, APX's customers, and other interested parties to understand the price setting process. We find that APX's instant compliance filing meets the Commission's requirements in this regard. APX's revised rate schedule contains a complete description of APX's services and provides detailed definitions. APX also responds to our questions and clarifies a number of issues regarding the interaction of buyers and sellers and the computation of the market clearing price.

In summary, APX states that a bidding period is established 168 hours in advance of the time when power will be transacted with the California Independent System Operator for each of its hourly markets. The starting price for each bidding period is based on the closing price for the same hour one week previous. For example, the opening price established by APX for power to be sold for the hour beginning at 6:00 a.m. on December 14, 1998, is based on the closing price for power sold for the hour beginning at 6:00 a.m. on December 7, 1998. Bids and orders for the hour of 6:00 a.m. on December 14 will be taken beginning 6 a.m. on December 7 and for each of the next 167 hours leading up to the 6:00 a.m. hour on December 14. An entirely separate 168-hour bidding period will begin at 7:00 a.m. on December 7 for power to be sold at 7:00 a.m. on December 14, and so forth.

APX states that APX Participants submit bids to buy and sell within their own designated limits on price and quantity. If the price and quantity set by APX is within the limits of a buyer and seller, then those APX Participants are obligated by their contract agreements with APX to complete the sale. If buy orders exceed sell offers, APX will raise the price. Conversely, if sell offers exceed buy orders, APX will lower the price. These changes will continue until buy order and sell offers are in balance. As APX searches for the equilibrium price, it will vary the prices by random increments so that its customers do not know in advance how much the market price will increase or decrease when the market does not clear. APX states that if several price adjustments do not attract additional orders or offers, APX will vary the price by greater increments. Price adjustments occur with increasing frequency as APX moves closer to the end of each of the 168-hour bidding periods it conducts for each hour of a week. APX states that the timing of the price adjustments are also random, so that APX Participants cannot predict the timing of the next price adjustment. APX also supplies examples which illustrate the price setting process under various circumstances. Therefore, we find that APX's price setting mechanism, as described in its rate schedule, meets the requirements of our July 15 Order.

In our July 15 Order we accepted the schedule of fees APX will charge APX Participants its power exchange service. The PX now protests that the attachment that includes the fee schedule was removed for privileged treatment. The PX is incorrect, we accepted APX's fee schedule in our July 15 Order, and it is already publicly available as part of APX's rate schedule. Therefore, we will dismiss the PX's protest in this regard.

C. <u>APX's Request for Confidential Treatment</u>

APX asks that we accord privileged treatment to its standard terms and conditions and standard form contract. Although we requested that APX file this material as part of its revised compliance filing, we now find that APX's revised rate schedule contains all the information necessary to comply with Section 205(c) of the Federal Power Act. 6/

---

6/ Section 205(c) states that all "Under such rules and regulations as the Commission may prescribe," every public utility must file schedules "showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classification, practices . . . affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services." 16 U.S.C. § 824d(c) (1994). *See also* 18 C.F.R. § 35.2(b) (1998).

Unofficial FERC-Generated PDF of 19981117-0086 Issued by FERC OSEC 11/16/1998 in Docket#: ER98-1033-004




It is well established that the Commission has the discretion, and follows a rule of reason approach, to determine what jurisdictional documents must be filed here. 7/ "The statutory directive [of section 205(c)] must reasonably be read to require the recitation of only those practices that affect rates and service significantly . . . ." 8/ Moreover, the Commission also has the discretion to determine how much detail a utility must provide in its rate schedule. 9/

The definitions contained in the standard terms and conditions, which describe how APX sets prices and APX Participants' obligation to complete sales when prices fall within the APX Participants' parameters, are identical to those in APX's revised rate schedule. In addition, the standard terms and conditions contain provisions which qualify APX's customers for participation, e.g., installation and maintenance of the required communication links, meter data criteria, and the establishment of accounts and monetary reserves. The standard form contract is a 3 ½-page generic contract that contains typical contractual provisions, e.g., governing laws and transfer and assignment provisions. The standard form contract also incorporates the standard terms and conditions as part of the agreement.

Consequently, we find that the information in these documents are either redundant or not central to APX's provision of jurisdictional service. 10/ In addition, we find that APX's standard terms and conditions and standard form contract contain no other information that would affect APX's market-based rates. Therefore, we will exercise our discretion and dismiss as unnecessary APX's standard terms and conditions and standard form

---

7/ See City of Cleveland v. FERC, 773 F.2d 1368, 1376 (D.C. Cir. 1995); Interregional Transmission Coordination Forum, 64 FERC ¶ 61,278, 62,966 & n.18 (1993) (citing cases). See also Public Service Commission of New York, et al. v. FERC, 813 F.2d 448, 454 (D.C. Cir. 1987).

8/ 773 F.2d 1376. Not requiring such information does not make this material non-jurisdictional, but merely means that the Commission determined that it does not need or want such information. Public Service Company of Colorado, 67 FERC ¶ 61,371, 62,267 (1994).

9/ "[T]he Commission may require filings to be as specific and detailed as (within the law) it wishes." 773 F.2d 1376.

10/ See PacifiCorp, 70 FERC ¶ 61,322, 61,984-85 & n.4 (1995) (invoking our rule of reason we did not require the filing of certain jurisdictional material since they involved only organizational framework and operating procedures).

contract. Accordingly, under these circumstances, we need not address APX's request for confidential treatment. Instead, we will direct APX to simply file an updated APX Participant index within 30 days of commencement of service to an APX Participant.

The Commission orders:

(A) APX's revised rate schedule is hereby accepted, to become effective April 1, 1998.

(B) APX is hereby informed of the rate schedule designations shown on the Attachment.

(C) APX is hereby directed to file an updated APX Participant index within 30 days of commencement of service to an APX Participant.

(D) APX's standard terms and conditions and standard form contract are hereby dismissed as unnecessary.

By the Commission.

( S E A L )

David P. Boergers

David P. Boergers,
Secretary.

Attachment

Automated Power Exchange, Inc.
Docket No. ER98-1033-004
Rate Schedule Designations

| Designation | Description |
| --- | --- |
| (1) Rate Schedule FERC No. 2 (Supersedes Rate Schedule FERC No. 1) | Market-Based Rate Schedule |
| (2) Supplement No. 1 to Rate Schedule FERC No. 2 (Redesignation of Supplement No. 1 to Rate Schedule FERC No. 1) | Administrative Fees |
| (3) Supplement No. 2 to Rate Schedule FERC No. 2 (Redesignation of Supplement No. 2 to Rate Schedule FERC No. 1) | Code of Conduct |

*Discussion*

Section 284.123(b)(2)(ii) provides that a proposed rate will be deemed to be "fair and equitable and not in excess of an amount which interstate pipelines would be permitted to charge for providing similar services," unless within 150 days the Commission either "extends the time for action, or institutes a proceeding in which all interested parties will be afforded an opportunity for written comments and for the oral presentation of views, data and arguments."[4] The 150-day period for review of the Applicant's rates will expire on August 14, 2000. Because the Commission has been unable to make a determination that OTTCO's proposed rates are fair and equitable, the Commission must extend the time for action or institute rate proceedings.

We will extend the time for action until the Commission can make a determination whether OTTCO's rates are fair and equitable. This should serve to encourage settlement of the issues among the parties. Within 120 days, Commission staff will report to the Commission on the status of settlement negotiations. If, at that time, a settlement is not forthcoming, the Commission will institute a formal proceeding under Section 284.123(b)(2)(ii) of the regulations.

*The Commission orders:*

Pursuant to the Commission's authority under Section 311 of the NGPA and Section 284.123(b)(2)(ii) of the Commission's regulations, time for action on Applicant's petition for rate approval is extended until the Commission can make a determination whether Applicant's rates are fair and equitable or until it determines that formal proceedings are necessary.

## [¶ 61,096]

## California Power Exchange Corporation, Docket Nos. ER00-2736-000 and ER00-2737-000 (Not Consolidated)

## Order Conditionally Accepting Tariff and Rate Schedule Amendments for Filing

**(Issued July 28, 2000)**

**Before Commissioners: James J. Hoecker, Chairman; William L. Massey, Linda Breathitt, and Curt Hébert, Jr.**

In Docket No. ER00-2736-000, California Power Exchange Corporation (CalPX) filed proposed Amendment No. 18 to the PX Tariff to implement the redesign of CalPX's credit policies and rules. In Docket No. ER00-2737-000, CalPX filed, on behalf of its CalPX Trading Services Division (CTS), proposed Amendment No. 4 to the CTS Rate Schedule to implement revised credit policies and rules with regard to Participants in the markets operated by CTS. In this order, we conditionally accept the proposed amendments for filing.

### I. Background

A. *Amendment No. 18 to the PX Tariff*

CalPX explains that when it began operations in 1998, it had no prior credit-related operating experience. CalPX states that its experience and comments from stakeholders have shown that its current credit standards and policies are not consistent with industry practices and cause barriers to entry into the markets operated by CalPX. According to CalPX, the barrier to entry results from requiring an entity that does not have an approved credit rating to post security in an amount equal to an estimated 46 days of trading activity.

CalPX states that it undertook a comprehensive review of its credit policies. CalPX: retained a consultant to review its credit policies and to make recommendations; sought review from outside agencies; hosted two customer meetings; and discussed its redesign proposal in public workshop sessions and meetings of the CalPX Finance Committee and Board of Governors.

As a result of that review process and comments by consultants and stakeholders, CalPX proposes to redesign its credit policies and practices to make them consistent with current industry standards by eliminating non-conforming credit practices. CalPX believes that its credit redesign will provide an incentive for more sellers to bid into the CalPX market, which would, in turn, lower costs and increase the certainty of supply within California. CalPX's proposed tariff revisions concern the

[4] 18 C.F.R. § 284.123(b)(2)(ii) (1998).

allocation of losses caused by default;[1] the implementation of a credit scoring methodology for determining unsecured credit limitations; collateral requirements; banking requirements; and a surety pool performance bond.[2]

CalPX requests waiver of notice to permit an effective date of August 1, 2000, which would allow CalPX to implement the changes for the month of August, a critical summer month of power supply. If waiver is denied, CalPX requests an effective date of August 7, 2000.

CalPX also notes that the Commission, in Order No. 614,[3] requires a public utility to file completely-revised tariffs or rate schedules when it files an amendment on or after June 1, 2000. Citing the length of the PX Tariff, CalPX requests waiver of the requirement to serve each of the recipients of Amendment No. 18 with a hard copy of the entire Order No. 614-revised tariff. CalPX states that it will serve all recipients with a copy of Amendment No. 18, and post a copy of the revised tariff on its website. Hard copies would be sent, upon request, to any of its Participants or any intervenor in this docket.

B. *CTS Rate Schedule Amendment No. 4*

CalPX describes CTS Rate Schedule Amendment No. 4 as the companion of Amendment No. 18 to the CalPX Tariff. Amendment No. 4 applies to the CTS Markets (block forward trading of ancillary and energy services and the registration of bilateral contracts). CalPX proposes credit policies and rules for CTS Market Participants which are similar to those proposed under Amendment No. 18. As with Amendment No. 18, CalPX anticipates that this credit redesign will attract more supply into the CTS Market. In addition, CalPX will treat Participants in both markets on a consolidated basis in the creditworthiness determination and monitoring procedures, and will aggregate collateral requirements. Default chargeback will be administered in the respective PX or CTS Market.[4] CalPX requests waiver of notice to permit an effective date of August 1, 2000, for the same reason as it sought waiver for Amendment No. 18. If waiver is denied, CalPX requests an effective date of August 7, 2000.

CalPX requests waiver of the requirement to serve each of the recipients of Amendment No. 4 with a hard copy of the entire Order No. 614-revised CTS Rate Schedule on the same grounds as those cited by CalPX as with respect to the PX Tariff noted above.

## II. Notice of Filings and Responsive Pleadings

Notice of the CalPX's filings was published in the *Federal Register*, 65 *Fed. Reg.* 38,272 (2000), with motions to intervene or protests due on or before June 28, 2000. In Docket No. ER00-2736-000, the Public Utilities Commission of the State of California (California Commission) filed a timely notice of intervention raising no substantive issues. Timely motions to intervene raising no substantive issues were filed by Pacific Gas and Electric Company, Modesto Irrigation District, and Williams Energy Marketing & Trading Company (Williams). In Docket No. ER00-2737-000, the California Commission filed a timely notice of intervention raising no substantive issues. Timely motions to intervene raising no substantive issues were filed by the California Electricity Oversight Board and Williams.

Southern California Edison Company (SoCal Edison) filed a timely motion to intervene and protest, addressing both dockets, in which it challenges whether changes to the credit policies will have a meaningful impact in attracting new supply to the market. SoCal Edison opposes the consolidated approach of the proposed credit redesign and requests rejection of the filing, or alternatively requests various clarifications and revisions.

CalPX filed an answer to SoCal Edison's protest.

## III. Discussion

A. *Procedural Matters*

Pursuant to Rule 214 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214 (2000), the timely notices of intervention and timely motions to intervene serve to make those who filed them parties to this proceeding.

---

[1] CalPX states that it currently allocates losses caused by defaults on the basis of net sales within a billing cycle, which is not the current industry practice. CalPX proposes to allocate losses from defaults based on gross sales in megawatt-hours in order to allocate losses over a larger pool of Market Participants.

[2] CalPX proposes to maintain a surety pool performance bond, initially in the amount of $20 million, to cover defaults in the CalPX Core Market (Day-Ahead, Day-of and Real Time markets).

[3] *See Designation of Electric Rate Schedule Sheets*, Order No. 614, 65 *Fed. Reg.* 18,221 (March 31, 2000), *FERC Statutes and Regulations* ¶ 31,096 (2000).

[4] Credit policies and rules are set forth in detail in the CTS Information Guide that is available to Participants.

Although answers to protests generally are prohibited under 18 C.F.R. § 385.213(a)(2) (1999), we nevertheless find good cause to allow CalPX's answer in this proceeding because it has assisted us in the decision-making process.

B. *Amendment No. 18 and Amendment No. 4*

1. *The Availability of the Revised Credit Policies in the CTS Information Guide*

SoCal Edison raises procedural objections, asserting that CTS has failed to comply with the CTS Rate Schedule provision which requires that the Information Guide be posted on the CTS Website with a 30-day advance notice and 10-day comment period. In its answer, CalPX states that it engaged in an extensive 90-day stakeholder process and posted both Amendments on the website in late May of 2000. In addition, CTS e-mailed its amended Information Guide, showing all relevant credit redesign rules, to SoCal Edison and to other customers on June 1, 2000. In view of direct notification (via e-mail) of the amended Information Guide to Market Participants, CTS' failure to also post the same information on its website does not constitute grounds for rejecting Amendment No. 4. However, CTS should promptly place the Information Guide on its website, as required by CTS Rate Schedule Section 12.1.3, and Amendment No. 4, Section 5, Creditworthiness.

2. *Credit Requirements*

SoCal Edison requests that: (1) CalPX provide more detail as to the creditworthiness determinants imposed on Market Participants in order to guard against arbitrariness; (2) the PX Tariff clarify that an entity without a credit rating will not be provided with an unsecured line of credit; and (3) no waiver of the credit requirement be granted.

All Core and CTS Participants must demonstrate creditworthiness in order to be eligible to participate in the Markets. Participants who wish to obtain an unsecured line of credit must provide CalPX with financial indicators necessary to determine the amount, if any, of the unsecured line of credit to be granted.[5] CalPX states in its answer that the decision on whether or how much it will extend credit in highly-specialized markets such as CalPX is a matter of professional judgment. Moreover, it is not in CalPX's interest to extend credit where it would create unreasonable risk. Stakeholders support the premise that the decision to extend credit should not be dependent on ratings provided by outside agencies, particularly since various large corporations with extensive financial resources have no credit rating because they have no debt.

We believe that CalPX has justified the need for a certain amount of flexibility in its formula for determining creditworthiness, and its approach is consistent with that of other institutions such as banks, investment firms, and exchanges.

3. *Default within the CTS Market and between the CTS and Core Market*

SoCal Edison contends that it should bear no liability for a default in the CTS Bilateral Market if trading solely within the Block Forward Market since SoCal Edison is restricted by state regulation from using the Bilateral option for purchases on behalf of its retail customers.[6] SoCal Edison expresses concern that if there is a default in one market, CalPX could liquidate the Participant's position in the other Markets, possibly causing a default in those Markets, too. Therefore, SoCal Edison requests that the tariff and rate schedule clarify that default chargebacks will not be allocated to a party if the default occurred in a Market in which the party did not participate.

In its answer, CalPX responds that SoCal Edison's argument is misplaced. CTS is not involved with either the price at which Bilateral agreements are made or for the settlement between Bilateral Participants. However, if a party fails to deliver energy into the CalPX Core Market, CalPX (not CTS) will see the difference in the California ISO's billing for imbalances, since all sales and purchases of energy are delivered through the PX Day-Ahead Market, and the performance default will be charged to the CalPX Core Market customer. Prior to settlement of the real-time invoice, CalPX would increase the defaulting party's collateral requirement to cover the performance default amount. If the party then fails to pay its invoice, CalPX could take enforcement action against the defaulting party by taking its collateral. If such company-specific enforcement actions are still inadequate, the Core Market Pool Performance Surety Bond would apply to the default according to the ratio of liability in each Market. Only when all of these actions have failed would SoCal Edison and other Participants be exposed to

---

[5] The amount of the unsecured line of credit is a specified percentage of the Participant's "Adjusted Tangible Net Worth," as determined using the criteria set forth in Schedule 2, Section 1.6 of the PX Tariff. The Amendments state that a Participant with a financial rating of low, or who has no financial rating, would not be eligible to trade with an unsecured line of credit. Therefore, no further clarification, as requested by SoCal Edison, is necessary.

[6] *See Pacific Gas and Electric Co., et al.*, 77 FERC ¶ 61,265, at p. 62,074, pp. 62,088-89 (1996).

pro-rata chargeback procedures in the Core Market.

We believe that CalPX's answer addresses the concerns raised by SoCal Edison. Furthermore, under Amendment No. 18, CalPX may take action to protect Participants from potential loss prior to default under the following circumstances. CalPX's monitoring will ensure that Participants maintain minimum creditworthiness standards, upon which, as previously summarized, the Participant obtained an unsecured line of credit. If this monitoring prompts CalPX to request additional information from a Participant who has an unsecured line of credit, that Participant must furnish the data within a reasonable period of time. Depending upon the specific circumstances, failure to respond to the data request could result in CalPX changing a Participant's credit score to low. This would revoke the participant's unsecured line of credit. If CalPX requests that the Participant post a form of collateral due to circumstances described above, CalPX would give the Participant a time deadline in which to comply. If the Participant is trading in both markets, future trading in both markets would be suspended pending resolution of the call. Under this scenario, continual monitoring and suspension of trading rights should reduce the incidence of default beyond the collateral stage where other Participants could be liable for residual losses. Additionally, the effect of default would be spread among all Market Participants in the respective markets.

4. *Identity of Defaulting Participant*

SoCal Edison argues that the CalPX credit procedures should parallel CTS' credit procedures by revealing the identity of the defaulting party so that non-defaulting Participants are able to seek recovery from the defaulting party. In its answer CalPX agrees to identify the defaulting participant in situations in which default chargebacks are imposed on other Participants. Therefore, CalPX should modify its tariff accordingly.

5. *Waiver Requests*

We will grant CalPX's and CTS' requests for waiver of notice for good cause shown,[7] and we will conditionally accept Amendment No. 18 to the PX Tariff for filing, to become effective on August 1, 2000, subject to the condition that the PX Tariff be revised to provide for identification of defaulting parties, as discussed above. These revisions should be filed in compliance with Order No. 614. We will also conditionally accept CTS' Rate Schedule Amendment No. 4 for filing, to become effective on August 1, 2000, subject to the condition that the details of CTS' revised credit policies be made available in the CTS Information Guide, as discussed above.

Based on CalPX's and CTS' arguments and in view of their commitments to provide hard copies of the Order No. 614-revised PX Tariff and CTS Rate Schedule upon request, we will grant their unopposed request for waiver of the requirement to serve hard copies of the entire Order No. 614-revised PX Tariff on all recipients.

*The Commission orders*:

(A) CalPX's and CTS' requests for waiver of the 60-day notice requirement are hereby granted.

(B) Amendment No. 18 to the CalPX Tariff is hereby conditionally accepted for filing, to become effective on August 1, 2000, subject to the modification ordered herein.

(C) CalPX shall file a compliance filing in accordance with Ordering Paragraph (B) within 30 days of the date of this order.

(D) Amendment No. 4 to the CTS Rate Schedule is hereby conditionally accepted for filing, to become effective on August 1, 2000, subject to the condition in Ordering Paragraph (E).

(E) CTS shall promptly post details concerning the redesign of its credit policies in the Information Guide on the CTS website, as discussed in the body of this order.

(F) CalPX's and CTS' requests for waiver of the Order No. 614 requirement to file copies of the revised PX Tariff and CTS Rate Schedule are hereby granted, and designated on the Attachment to this order.

**Attachment**

California Power Exchange Corporation

*Docket No. ER00-2736-000*

*Designation—Description*

(1) FERC Electric Tariff, Third Revised Volume No. 1 (Supersedes Second Revised Volume No. 1)—Order No. 614 Compliance

CalPX Trading Services Division

*Docket No. ER00-2737-000*

(2) Second Revised Rate Schedule No. 1 (Supersedes First Revised Rate Schedule No. 1)—Order No. 614 Compliance

(3) First Revised Sheet Nos. 2 through 4, 8 through 17, 21, 22, 27 through 50, 53

[7] As noted above, CalPX and CTS state that a grant of waiver of notice will allow CalPX's and CTS' Market Participants to benefit from the redesigned credit policies commencing at the beginning of the critical supply month of August.

through 60, 62, 63, 73 through 80, 84 through 86, and 89 to Second Revised Rate Schedule No. 1 (Supersedes First Revised Sheets)—Revisions to Credit Policies and Rules

## [¶ 61,097]

## Louisiana Intrastate Gas Company, L.L.C., Docket No. PR00-12-000

### Order Extending Time for Action

**(Issued July 28, 2000)**

**Before Commissioners: James J. Hoecker, Chairman; William L. Massey, Linda Breathitt, and Curt Hébert, Jr.**

This order addresses a petition for rate approval filed by Louisiana Intrastate Gas Company, L.L.C. (LIG). For the reasons set forth below, the Commission extends the time for action on LIG's petition for rate approval until it can make a determination whether LIG's rates are fair and equitable or until it determines that formal proceedings are necessary.

*Background*

On March 3, 2000, LIG, an intrastate pipeline with facilities in the state of Louisiana, filed a petition for rate approval pursuant to 284.123(b)(2) of the Commission's regulations.[1] LIG seeks approval of maximum rates for services under Section 311 of the Natural Gas Policy Act of 1978 (NGPA).[2] LIG proposes a firm reservation charge of $6.4914 per MMBtu, a firm usage charge of $0.0000 per MMBtu, and an interruptible rate of $0.2134 per MMBtu. It also proposes an overrun charge of $0.2134 per MMBtu and to continue retaining from its shippers a pro-rata share of gas consumed by LIG as compressor fuel, company use and unaccounted-for gas, subject to a 2% maximum.

Public notice of LIG's filing was issued on March 14, 2000. Pursuant to Rule 214 of the Commission's Rules of Practice and Procedure, all timely unopposed motions or notices are granted.[3]

*Discussion*

Section 284.123(b)(2)(ii) provides that a proposed rate will be deemed to be "fair and equitable and not in excess of an amount which interstate pipelines would be permitted to charge for providing similar services," unless within 150 days the Commission either "extends the time for action, or institutes a proceeding in which all interested parties will be afforded an opportunity for written comments and for the oral presentation of views, data and arguments."[4] The 150-day period for review of LIG's rates will expire on August 1, 2000. Because the Commission has been unable to make a determination that LIG's proposed rates are fair and equitable, the Commission must extend the time for action or institute rate proceedings.

The Commission will extend the time for action until it can make a determination whether LIG's rates are fair and equitable. This action should serve to encourage settlement of the issues among the parties. Within 120 days, Commission staff will report to the Commission on the status of settlement negotiations. If, at that time, a settlement is not forthcoming, the Commission will institute a formal proceeding under Section 284.123(b)(2)(ii) of the regulations.

*The Commission orders*:

Pursuant to the Commission's authority under Section 311 of the NGPA and Section 284.123(b)(2)(ii) of the Commission's regulations, time for action on LIG's petition for rate approval is extended until the Commission can make a determination whether LIG's rates are fair and equitable or until it determines that formal proceedings are necessary.

---

[1] 18 C.F.R. § 284.123(b)(2) (1999). LIG's Eloi Bay facilities are excluded from this petition, as the rates for service on those facilities were established in a separate proceeding. *See*, 76 FERC ¶ 61,071 (1996).

[2] 15 U.S.C. § 3371 (1988).

[3] 18 C.F.R. § 385.214 (1999).

[4] 18 C.F.R. § 284.123(b)(2)(ii) (1999).