# PLAINTIFFS PACIFIC GAS AND ELECTRIC COMPANY, SOUTHERN CALIFORNIA EDISON COMPANY, AND SAN DIEGO GAS & ELECTRIC COMPANY'S APPENDIX TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

**VOLUME 2 OF 3**

**Part 4 of 5**

FN1. San Diego Gas & Electric Company v. Sellers of Energy and Ancillary Services, 95 FERC ¶ 61,115 (2001). On May 25, 2001, the Commission issued an order providing clarification and preliminary guidance on the implementation of the mitigation plan. 95 FERC ¶ 61,275 (2001).

FN2. The price mitigation established in the April 26 Order replaced the price mitigation previously in effect for such sales, and is an outgrowth of a Commission investigation under section 206 of the Federal Power Act (FPA) of the reasonableness of rates for public utility sales through the markets operated by the ISO and the California Power Exchange (PX).

FN3. As used throughout this document, the terms "spot markets" or "spot market sales" means sales that are 24 hours or less and that are entered into the day of or day prior to delivery.

FN4. References throughout this document to the WSCC are intended to refer only to the United States portion of the WSCC.

FN5. San Diego Gas & Electric Company v. Sellers of Energy and Ancillary Services, 93 FERC ¶ 61,294 (2000) (December 15 Order).

FN6. Update of California Department of Water Resources Power Purchase Contract Efforts, California Department of Water Resources (May 31, 2001).

FN7. Platts Power Markets Week, June 11, 2001. Prices of Spot Electricity, Week Ending June 9 - Daily On-Peak Indexes for Calif-Ore Border, Mid-Columbia, Palo Verde, Four Corners, North Path 15, and South Path 15 (Six Western Indexes).

FN8. Megawatt Daily's Market Report, June 11 through June 14, 2001, for Six Western Indexes.

FN9. Platt's Power Markets Week, June 11, 2001, pp. 1, 16. As used throughout this document, "forward contracts" or "forward transactions" means any transactions with a future delivery that are entered into more than 24 hours before commencement of service.

FN10. Our April 26 Order referred to Stage 1 being called by the ISO when reserves in California fall below 7.5%. The correct number is 7%.

FN11. The term "megawatt laundering" describes behavior where a supplier schedules supply out of state and then re-imports that power to avoid a mitigated price.

FN12. Recent data indicates that the reliance on the spot market is higher during off-peak periods.

FN13. As we explain later, the ISO is required to add 10 percent to the market clearing price paid to generators for all prospective sales in its markets to reflect credit uncertainty. This adder will not be reflected in the market price for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the rest of the WSCC.

FN14. We will grant waiver of notice for the ISO's approved rate mechanism to recover the cost of emission requirements to be effective on the day following the date this order is issued. Absent a new reserve deficiency on the ISO's system declared before the effective date of the price mitigation outlined in this order, the market clearing price carried forward for non-reserve deficiency hours is $108.49/MWh (i.e. 85 percent of $127.64/MWh) (May 31, 2001, clock hour ending 1400).

FN15. San Diego Gas & Electric Company, et al., 92 FERC ¶ 61,172 at 61,606 (2000) (August 23 Order).

FN16. On March 9, 2001, the Commission issued an order directing public utility sellers to provide refunds (or offsets to amounts owed) or to provide cost or other justification for prices that exceeded the breakpoint. 94 FERC ¶ 61,245 (2001), reh'g pending.

FN17. 93 FERC ¶ 61,294 at 61,983, 61,996-97.

FN18. San Diego Gas and Electric Company, et al., 95 FERC ¶ 61,115 at 61,356 (2001).

FN19. Id. Since CMUA members already sell power on a regular basis to the ISO, and are assured of recovering their marginal costs when they run pursuant to the must-offer obligation, CMUA has not demonstrated that the Commission's actions would have an adverse effect on them.

FN20. Section 210(e) of PURPA states the Commission shall prescribe rules under which QFs are exempt, in whole or in part, from the FPA, PUHCA, and from state laws and regulations respecting rates or financial or organizational regulation. 16 U.S.C. § 824a-3 (1994). The Commission exempted most QFs from portions of the FPA, 18 C.F.R. § 292.601 (2000), PUHCA, 18 C.F.R. § 292.601 (b) (2000), and from state laws and regulations respecting rates and financial and organizational regulation, 18 C.F.R. § 297.601 (c) (2000).

FN21. CAC/EPUC filed a request to stay the application of the mitigation plan as applied to QFs. Given the resolution of the rehearing request, the request for stay is denied.

FN22. Rehearing Requests by MID, M-S-R, NCPA, TANC.

FN23. Rehearing Requests by Dynegy, Mirant, Reliant.

FN24. See Rehearing Request by Reliant.

FN25. For example, Dynegy maintains that forcing its units to run today will require it to use up emission credits allocated for the year 2003, and that it

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

should be reimbursed for the lost opportunity of being unable to run that unit in the year 2003.

FN26. Rehearing requests by NCPA, NRECA.

FN27. MID, M-S-R, TANC.

FN28. See San Diego Gas & Electric Company v. Sellers of Energy and Ancillary Services, 93 FERC ¶ 61,238 at 61,772 & n.3 (2000) (December 8 Order) (granting temporary waiver of QF regulations); San Diego Gas & Electric Company v. Sellers of Energy and Ancillary Services, 93 FERC ¶ 61,294 at 62,018 (December 15 Order)(extending waivers); Removing Obstacles to Increased Electric Generation and Natural Gas Supply in the Western United States, 94 FERC ¶ 61,272 at 61,970-71 (March 14 Order)(extending QF waivers); Further Order Removing Obstacles to Increased Electric Generation and Natural Gas Supply in the Western United States, 95 FERC ¶ 61,225 at 61,767-68 (2001) (May 16 Order)(waivers extended to entire WSCC and through April 30, 2002). In a second order issued on May 16, the Commission required California Utilities to provide interconnection and transmission service to QFs pursuant to existing agreements to permit certain sales of QF power to third-party purchasers. San Diego Gas & Electric Company v. Sellers of Energy and Ancillary Services, 95 FERC ¶ 61,226 (2001).

FN29. Rehearing Requests by ISO, CMUA, Metropolitan, NCPA, SMUD, San Diego, Edison.

FN30. See Rehearing Request by CMUA,

FN31. Rehearing Requests by ISO, DWR, San Francisco.

FN32. See Chandley, Harvey, & Hogan, Electricity Market Reform in California, at 25 ("The least controversial reform of market design would be to implement all the changes needed to allow for demand side response in the face of higher prices." (Attached to November 22, 2000 Comments of SDG&E).

FN33. Already conservation has helped to reduce demand. See Peter Behr, "Fears of an Energy Crisis Begin to Dim, Consumption Cuts Help Lower Prices for Gasoline, Natural Gas and Electricity," Washington Post, April 8, 2001, at E1 (California has reduced demand 8%). A properly designed demand side response program could improve this performance even more markedly by providing price incentives for reduction.

FN34. Removing Obstacles to Increased Electric Generation and Natural Gas Supply in the Western United States, 94 FERC ¶ 61,272 at 61,972-73(March 14 Order) (DSM programs); Further Order Removing Obstacles to Increased Electric Generation and Natural Gas Supply in the Western United States, 95 FERC ¶ 61,225 (2001) (May 16 Order).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN35. Rehearing Requests by ISO, CEOB, CMUA, Assembly, City of Anaheim, et al., CFA, Metropolitan, PG&E, NCPA, SDG&E, San Diego, San Francisco, Seattle, Edison, SCWC.

FN36. San Diego Gas & Electric Company, et al., 95 FERC ¶ 61,275 (2001).

FN37. Rehearing Requests by CPUC, City of Anaheim, et al., PG&E.

FN38. San Diego Gas & Electric Company, et al., 93 FERC ¶ 61,121, at 61,349 (2000) (limited proceeding to real-time markets).

FN39. See, e.g., ISO, CEOB, CPUC, Assembly, CFA, PG&E, San Francisco, Seattle, and Edison.

FN40. CPUC Request for Rehearing at 7.

FN41. PG&E Request for Rehearing at 13-15.

FN42. CEOB Request for Rehearing at 4.

FN43. FERC's remedial measures "must be construed as a whole in assessing FERC's compliance with FPA § 206". In re California Power Exchange Corp., 245 F.3d 1110, 1120 (9th Cir. 2001).

FN44. The Commission has freedom, "within the ambit of [its] statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances. "FPC v. Natural Gas Pipeline Co., 315 U.S. 575, 586 (1942); In re California Power Exchange Corp., 245 F.3d at 1120 . FPA § 309, 16 U.S.C. § 825h, gives the Commission the necessary flexibility to take unusual remedial action in appropriate circumstances. See Permian Basin Area Rate Cases, 390 U.S. 747, 776 (1968) (applying NGA § 16, the counterpart of FPA § 309, the Court held that "the Commission's broad responsibilities . . . demand a generous construction of its statutory authority."); FPC v. Louisiana Power & Light Co., 406 U.S. 621, 642 (1972)(same).

FN45. See National Rural Telecom Association v. FCC, 988 F.2d 174, 178 (D.C. Cir. 1993).

FN46. Wisconsin v. FPC, 373 U.S.294, 309 (1963).

FN47. Permian Basin Area Rate Cases, 390 U.S. 747, 776-77 (1968).

FN48. FPC v. Hope Natural Gas Company, 320 U.S. 591, 602 (1944).

FN49. Permian Basin, 390 U.S. at 797; see Atlantic Refining Co. v. Pub. Service Comm., 360 U.S. 378, 388 (1959) (same) .

FN50. Permian Basin, 390 U.S. at 796-97; Mobil Oil Corp. v. FPC, 417 U.S. 283, 317-18 (1974); Consumers Union v. FPC 510 F.2d 656, 660 (D.C.Cir. 1974); see also

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Central Iowa Power Coop v. FERC, 606 F.2d 1156, 1165 n. 28 (D.C.Cir. 1979) (affirming rate based on "need to stimulate short-term purchases of excess capacity in lieu of adding new capacity and to discourage reliance on emergency energy when units are less than efficient").

FN51. E.g., Louisiana Energy and Power Authority v. FERC, 141 F.3d 364 (D.C. Cir. 1998); Elizabethtown Gas Company v. FERC, 10 F.3d 866, 870 (D.C. Cir. 1993); see also Midcoast Interstate Transmission, Inc. v. FERC, 198 F.3d 960, 968 (D.C.Cir. 2000). Other agencies subject to ratemaking regimes similar to that of the FPA have been upheld in adopting a market-based, rather than a cost-of-service, approach to setting rates. See Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC, 737 F.2d 1095, 1137 (D.C. Cir. 1984); Nat'l Rural Tel. Ass'n v. FCC, 988 F.2d 174 (D.C. Cir. 1993); Consolidated Rail Corp. v. U.S., 812 F.2d 1444 (3d Cir. 1987); Potomac Elec. Power Co. v. ICC, 744 F.2d 185 (D.C.Cir. 1984).

FN52. In Farmers Union Central Exchange, Inc. v. FERC, 734 F.2d 1486 (D.C. Cir. 1984), cert. denied sub nom. Williams Pipe Line Company v. Farmers Union Central Exchange, Inc., 469 U.S. 1034 (1984), the court explained that it may not invalidate "rate orders that fall within a 'zone of reasonableness,' where rates are neither 'less than compensatory' nor 'excessive."' It added that "when FERC chooses to refer to non-cost factors in ratesetting, it must specify the nature of the relevant non-cost factor and offer a reasoned explanation of how the factor justifies the resulting rates."

FN53. The courts have approved market pricing for other agencies if available remedies assure that market power will not be abused. E.g., Ford Motor Co. v. ICC, 714 F.2d 1157, 1158-59 (D.C. Cir. 1983); Arkansas Power & Light v. ICC, 725 F.3d 716, 718 (D.C. Cir. 1984); Coal Exporters Ass'n v. U.S., 745 F.2d 76, 80 and 90 n. 18 (D.C. Cir. 1984); Arizona Public Service Co. v. U.S., 742 F. 2d 644, 647 (D.C. Cir 1984).

FN54. Rehearing Requests by NCPA, Seattle, Edison.

FN55. Rehearing Requests by ISO, CPUC, Assembly, Metropolitan, PG&E, SDG&E, San Diego, San Francisco, Edison.

FN56. Rehearing Requests by CEOB, Dynegy, Reliant, Williams.

FN57. See Norwood v. FERC, 962 F.2d 20, 22 (D.C. Cir. 1992) (one of the best established principles of classical economics: social welfare is maximized when the marginal cost of purchasing any commodity is equal to the marginal cost of producing it); Electricity Consumers Resources Council v. FERC, 747 F.2d 1511 (D.C. Cir. 1984).

FN58. The three points are SoCal Gas (large packages), Malin, and PG&E city-gate.

FN59. The average for June as reported in the Gas Daily Price Guide is $9.10. The

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

bid-week monthly index prices are SoCal Gas (large packages) $11.71, Malin $5.98, PG&E Citygate $9.61.

FN60. California Energy Commission Staff Draft Report, Natural Gas Infrastructure Issues, Docket No. 00-CEO-Vol-I, at 43 (May 17, 2001).

FN61. California Energy Commission Staff Draft Report, Natural Gas Infrastructure Issues, Docket No. 00-CEO-Vol-I, at 43 (May 17, 2001).

FN62. Amoco Energy Trading Corp. v. El Paso Natural Gas Company, 93 FERC ¶ 61,060 (2000), aff'd 94 FERC ¶ 61,225 (2001).

FN63. California Natural Gas Transportation Infrastructure, Docket No. PL01-4-000.

FN64. Order Proposing Reporting Requirement on Natural Gas Sales to California Market and Requesting Comments, 95 FERC ¶ 61,262 (2001); San Diego Gas & Electric Company, et al., 95 FERC ¶ 61,264 (2001).

FN65. Rehearing Requests by ISO, ARB, CEOB, CPUC, Assembly, PG&E, San Diego, SCAQMD, Edison, SCWC.

FN66. Rehearing Requests by Assembly, PG&E, Edison, SCWC.

FN67. Rehearing Request by Williams.

FN68. Rehearing Requests by Dynegy, Mirant, Reliant.

FN69. See Executive Order D-40-01 by the Governor of the State of California.

FN70. 94 FERC at 61,863, n. 8.

FN71. See http:/www.eia.doe.gov/oiaf/issues/opctbl3.html. Oil and Gas Steam Plant Operations and Maintenance Costs, 1981-1997.

FN72. The emissions data is no longer relevant based upon our aforementioned removal of NOx costs from the proxy market clearing price.

FN73. Rehearing Requests by Avista, Duke Energy, Dynegy, Reliant, PPL.

FN74. This adder will not be reflected in the market price for the rest of the WSCC.

FN75. Currently, emission costs outside of California are de minimis. However, we recognize that this may change, and that sellers could be subject to entirely new costs resulting from changes in circumstances. We will consider such costs on a case-by-case basis.

FN76. Rehearing Requests by ISO, CEOB CMUA, Metropolitan, NCPA, SMUD, San Diego, Edison.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN77. Rehearing Requests by Dynegy, Mirant, Reliant, EPSA, Duke, PPL.

FN78. Duke Energy unequivocally states that it is using the $3,880/MWh bid as a negotiating tool to recover payment for prior transactions. Duke Energy states that it will settle for the proxy price if and when it is paid in full for its prior, unpaid transactions. March 23, 2001 compliance filing in Docket Nos. ER01-1448-003 and ER01-1448-004 at pp. 10-12.

FN79. The Commission notes that there are a number of submittals dealing with sellers' market-based rate authorizations as well as bid justifications. We will address them in separate orders, if not resolved as part of the settlement process established elsewhere in this order.

FN80. San Diego Gas & Electric Company, et al., 93 FERC 61,294 (2000), reh'g pending.

FN81. See Comments by CPUC, DWR, PG&E.

FN82. Rehearing Requests by NCPA, Assembly, SCWC, Edison, San Francisco, PG&E.

FN83. See 18 C.F.R. §§ 388.112 (2000), 385.206(e), 385.213(c)(5), 385.410(c) (providing for confidential treatment for business sensitive information).

FN84. Rehearing Requests by Edison, CPUC, CMUA, Anaheim, SCWC, Metropolitan.

FN85. As pointed out in the April 26 Order, California has committed itself to increasing in-state generation and projects that new generation totaling 4,168 MW will be on line by the end of August 2001 and that there could be as much as 6,879 MW on line for the summer of 2002.

FN86. Rehearing Requests by Seattle, Anaheim, SCWC, San Diego, CPUC, PG&E, CMUA, Metropolitan, CEOB.

FN87. 95 FERC ¶ 61,115, at 61,356.

FN88. 95 FERC ¶ 61,115, at 61,355-57.

FN89. Id. at 61,356 .

FN90. Id. at 61,365.

FN91. See Powerdat database, Resource Data International, Inc., April 2001 data set.

FN92. See Comments of Avista Energy, Duke and Powerex.

FN93. In particular, we seek comments on whether our approach is appropriate given regional differences between California and other regions.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Appendix A

Requests for Rehearing of April 26 Order

| Party | Abbreviation |
|---|---|
| American Public Power Association | APPA |
| Automated Power Exchange | APX |
| Avista Energy, Inc. | Avista Energy |
| California Air Resources Board [FNa1] | ARB |
| California Department of Water Resources | DWR |
| California Electricity Oversight Board | CEOB |
| California Independent System Operator Corporation | ISO |
| California Municipal Utility Association | CMUA |
| California State Assembly | Assembly |
| Calpine Corporation | Calpine |
| Cities of Anaheim, et al. | Anaheim |
| City and County of San Francisco | San Francisco |
| City of Burbank [FNa1] | Burbank |
| City of San Diego | San Diego |
| City of Seattle | Seattle |
| Cogeneration Association of California and Energy Producers and Users Coalition[FN94] | CAC/EPUC |
| Consumer Federation of America [FNa1] | CFA |
| Duke Energy North America, et al., LLC | Duke Energy |
| Dynegy Power Marketing, Inc. et al. | Dynegy |
| Electric Power Supply Association | EPSA |
| Imperial Irrigation District [FNa1] | IID |
| Los Angeles Department of Water and Power | LADWP |
| M-S-R Public Power Agency, et al. | M-S-R |
| Metropolitan Water District of Southern California | Metropolitan |
| Mirant America's Energy Marketing, LP, et al. | Mirant |
| Modesto Irrigation District | MID |
| National Rural Electric Cooperative Association [FNa1] | NRECA |
| Northern California Power Agency | NCPA |
| Pacific Gas and Electric Company | PG&E |
| PPL EnergyPlus, LLC, et al. | PPL |
| Public Utilities Commission of State of California | CPUC |

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

| | |
|---|---|
| Reliant Energy Power Generation, Inc. | Reliant |
| Sacramento Municipal Utility District | SMUD |
| San Diego Gas & Electric Co. | SDG&E |
| South Coast Air Quality Management District [FNa1] | SCAQMD |
| Southern California Edison Company | Edison |
| Southern California Water Company | SCWC |
| Transmission Agency of Northern California | TANC |
| Turlock Irrigation District [FNa1] | TID |
| Williams Energy Marketing & Trading Company | Williams |

FNa1. - denotes request for late intervention

FN94. Request for stay.

Appendix B

WSCC Comments

| Party | Abbreviation |
|---|---|
| AES Southland, Inc. [FNaaa1] | AES |
| American Public Power Association [FNa1] | APPA |
| Attorney General of Washington [FNa1] | Washington Attorney General |
| Automated Power Exchange | APX |
| Avista Energy, Inc. | Avista Energy |
| Avista Utilities | Avista Utilities |
| California Air Resources Board [FNa1] | ARB |
| California Department of Water Resources [FNa1] | DWR |
| California Electricity Oversight Board [FNaaa1] | CEOB |
| California Independent System Operator Corporation | ISO |
| California Municipal Utility Association | CMUA |
| California State Assembly | Assembly |
| Cities of Anaheim, et al. [FNa1] | Anaheim |
| County of San Diego [FNa1] | San Diego |
| City and County of San Francisco [FNa1] | San Francisco |
| City of Burbank [FNa1] | Burbank |
| City of Seattle | Seattle |
| Cogeneration Association of California and Energy Producers and Users Coalition [FNa1] | CAC/EPUC |
| Cogeneration Coalition of Washington [FNa1] | CCW |
| Colorado Association of Municipal Utilities [FNa1] | Colorado AMPS |

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

| | |
|---|---|
| Duke Energy North America, et al., LLC [FNa1] | Duke Energy |
| Electric Power Supply Association | EPSA |
| Enron Power Marketing , Inc. and Coral Power, L.L.C. | Enron |
| Idaho Public Utilities Commission[FNaa1] | Idaho Commission |
| Imperial Irrigation District [FNa1] | IID |
| Los Angeles Department of Water and Power [FNaaa1] | LADWP |
| M-S-R Public Power Agency, et al. | M-S-R |
| Metropolitan Water District of Southern California | Metropolitan |
| Mirant America's Energy Marketing, LP, et al. [FNa1] | Mirant |
| Modesto Irrigation District [FNa1] | MID |
| Morgan Stanley Capital Group Inc. | Morgan Stanley |
| National Rural Electric Cooperative Association[FNa1] | NRECA |
| Nevada Attorney General's Bureau of Consumer Protection [FNa1] | Nevada BCP |
| Nevada Independent Energy Coalition[FNa1] | NIEC |
| Nevada Public Utilities Commission [FNa1] | Nevada Commission |
| Northern California Power Agency | NCPA |
| NRG Power Marketing Inc. | NRG |
| Official Committee of Unsecured Creditors of PG&E [FNa1] | OSC |
| Oregon Office of Energy | Oregon Office of Energy |
| Pacific Gas and Electric Company [FNa1] | PG&E |
| Pinnacle West Capital Corporation, Arizona Public Service Company, Pinnacle West Energy Corporation and APS Energy Services, Inc. | Pinnacle West Companies |
| Portland General Electric Company | PGE |
| Powerex Corporation [FNa1] | Powerex |
| PPL EnergyPlus, LLC, et al. [FNa1] | PPL |
| Public Utilities Commission of State of California[FNaa1] | CPUC |
| Puget Sound Energy, Inc.[FNa1] | Puget Sound |
| Reliant Energy Power Generation, Inc. | Reliant |
| Sacramento Municipal Utility District | SMUD |
| Salt River Project Agricultural Improvement and Power District [FNa1] | SRP |

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

| | |
|---|---|
| San Diego Gas & Electric Co. [FNa1] [FNaaa1] | SDG&E |
| South Coast Air Quality Management District [FNa1] | SCAQMD |
| Southern California Edison Company [FNa1] | Edison |
| Tri-State Generation and Transmission Association, Inc. [FNa1] | Tri-State |
| Turlock Irrigation District [FNa1] | Turlock |
| Utah Municipal Power Agency [FNa1] | UMPA |
| Utility Reform Network and the Utility Consumers' Action Network | TURN/UCAN |
| Washington Utilities and Transportation Commission[FNaa1] | Washington Commission |
| Williams Energy Marketing &Trading Company | Williams |
| Wyoming Public Service Commission [FNaaa1] | Wyoming Commission |

FNa1. - denotes Motions to Intervene)
FNaa1. - denotes Notice of Intervention)
FNaaa1. - denotes late filed comments)
***62573** MASSEY, Commissioner, concurring in part:

Today's order brings expanded price restraints mitigation to a broken market. I support the order because it adopts measures that I have been championing for the past eight months. Price controls are now extended to the entire western interconnection, thereby eliminating the “megawatt laundering” problem that has vexed the mitigation programs adopted by the Commission and the ISO over the past year. Cost-based price constraints are now extended to all hours, not just those of reserve deficiency. We have long needed 24 x 7 coverage, and now we finally have it. The price caps will remain in place until September 2002, giving the market two full summers to correct. I endorse these measures.

While better late than never, I wish this Commission had taken effective action sooner. Until today, the Commission had stubbornly refused to implement full time price constraints, despite rather clear evidence that prices were not just and reasonable. We could have prevented much of the economic carnage in the western interconnection that has occurred over the past year.

Given that the Commission today adopts measures that I have long advocated, I am tempted to declare victory and let it be. But I cannot. There are some aspects of the order that I have reservations about, and for these reasons I concur with the order. One aspect is the addition of a 10 percent surcharge to the market clearing price to reflect credit uncertainty. I do not see the need for this. The Commission has issued orders in the past few months instructing the ISO to abide by the creditworthiness requirements of its tariff. I am concerned that the adder may diminish the ISO's enforcement of those requirements. Moreover, it is my understanding that recently all sales into the ISO's markets have been backed by a creditworthy party. Instituting this surcharge does have a modest bright side, however. Generators may no longer attempt to justify bids on the basis of credit risk above what is provided for in the cost based clearing pricing methodology. This was a major flaw of the old ineffective $150 benchmark in our earlier mitigation program. Eliminating that ground for high prices is a positive development.

Second, the order should have provided guidance to the parties that will participate in the settlement conference we order. I believe we are avoiding our responsibility under the Federal Power Act to set just and reasonable prices by requir-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ing parties to settle a multitude of issues with a price tag in the billions of dollars without at least two cents worth of guidance.

And finally, I do not agree with the rhetoric in this order that characterizes cost of service pricing as irrelevant, and perhaps even downright harmful, on the theory that it would discourage new supply. I do not understand the need nor the logic of this language. We have made a choice in this order to strike a balance ***62574** between strict cost of service regulation and blind reliance on the market. The mitigation program puts in place important cost based price caps while relying on market based pricing. The order sets out reasons for this balanced choice, and articulating them is all that is needed to support our decision. I strongly disagree with the statement in the order that "a cost-based inquiry alone would not be sufficient in these circumstances to fulfill the statutory duty" under the Federal Power Act. I do not read the Federal Power Act, and the relevant court decisions, so restrictively. There is still an important role for cost of service regulation where markets are not adequate.

What is curious about this aspect of the order is that the concern is to avoid discouraging new supply. However, as the well respected economist Alfred Kahn recently said of our long reliance on cost of service regulation, "(i)f the literature agrees on anything about that experience, it is that cost-based regulation, as traditionally practiced, has encouraged the goldplating of service and the very excess capacity that seemed to promise such enormous benefits to consumers during the past decade if rates were deregulated."[FN1] Dr. Kahn believes that cost of service may lead to too much supply. Thus, I do not understand the majority's logic concerning cost-based regulation and supply adequacy.

These concerns notwithstanding, I support today's order and the price protection plan it puts in place. To ensure that this price protection plan is successful, the Commission must exercise all of its statutory powers to keep natural gas prices in the West at just and reasonable levels. It is probably generally true that the marginal plant dispatched in California is fired by natural gas and uses a lot of it. Thus, the success of the plan we adopt today in lowering prices depends in large part on fluctuations in the price of natural gas. The Commission continues to have work to do in ensuring just and reasonable gas prices.

Today's price protection plan gives California and the West breathing room while their electricity markets are brought back to health. A number of items need to be addressed in the next 15 months for the recuperation to be successful. Clearly, there must be substantial amounts of new generation capacity brought on line. A more balanced supply portfolio must be developed as California moves away from an over reliance on the spot markets. A robust demand response program must be implemented through demand bidding and accurate price signals. Transmission constraints must be relieved in some way. And finally, the California ISO should explore a number of market reforms, such as the adoption of security constrained unit commitment dispatch, the creation of an installed capacity market and reserve requirements, and a single integrated day-ahead market. Without these measures, I would be concerned about whether the markets in the West can be brought back to health.

For these reasons, I concur with today's order.

____________________________

William L. Massey
Commissioner

FN1. Statement of Alfred E. Kahn before the Committee on Governmental Affairs, United States Senate, June 13, 2001 at page 3.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Breathitt, Commissioner, concurring;

I concur with the result of today's order, and write separately to highlight one aspect of it. I am concerned about the imposition of a ten percent surcharge on the market clearing price paid to generators to reflect credit uncertainty in California. I have two primary concerns. First, the imposition of such a credit surcharge seems to concede to the California Independent System Operator (ISO) the issue of whether or not the ISO must implement the Commission's creditworthiness standards. We have directed the ISO to ensure the presence of a creditworthy counterparty for certain transactions.[FN1] I am not ready to concede this issue and, therefore, I call upon the ISO immediately to implement our orders regarding creditworthiness.

Second, I believe the imposition of such a credit surcharge may be premature. In today's order we also initiate settlement discussions among all public utility sellers and buyers in the ISO markets. Among the issues we direct the parties to consider in their negotiations are "creditworthiness matters." I am concerned that the credit surcharge could adversely affect the settlement discussions on the issue of prospective credit uncertainty.

Otherwise, I agree with my colleagues that creditworthiness and non-payment of accounts are serious problems in California. I believe the Commission and the ISO must take immeditate steps to address these problems. I just hope this surcharge does not prove to be an inappropriate remedy for this problem. Therefore, I respectfully concur.

———————————

Linda K. Breathitt
Commissioner

FN1. California Independent System Operator Corporation, et al., 95 FERC ¶ 61,026, at 61,081 (2001)

95 FERC P 61418, 2001 WL 1910052 (F.E.R.C.)
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

96 FERC P 61120, 2001 WL 1704964 (F.E.R.C.)

FEDERAL ENERGY REGULATORY COMMISSION

**1

Commission Opinions, Orders and Notices

Before Commissioners: Curt Hébert, Jr., Chairman; William L. Massey, Linda Breathitt, Pat Wood, III and Nora Mead Brownell.

San Diego Gas & Electric Company, Complainant

v.

Sellers of Energy and Ancillary Service Into Markets Operated by the California Independent System Operator Corporation and the California Power Exchange, Respondents.

Investigation of Practices of the California Independent System Operator and the California Power Exchange

Puget Sound Energy, Inc., Complainant

v.

All Jurisdictional Sellers of Energy and/or Capacity at Wholesale Into Electric Energy and/or Capacity Markets in the Pacific Northwest, Including Parties to the Western Systems Power Pool Agreement, Respondents

Docket Nos.
EL00-95-004, EL00-95-005, EL00-95-019, EL00-95-031
Docket Nos.
EL00-98-004, EL00-98-005, EL00-98-018, EL00-98-030
Docket Nos.
EL01-10-000, EL01-10-001

ORDER ESTABLISHING EVIDENTIARY HEARING PROCEDURES, GRANTING REHEARING IN PART, AND DENYING REHEARING IN PART

(Issued July 25, 2001)

***61499** This order establishes the scope of and methodology for calculating refunds related to transactions in the spot markets operated by the California Independent System Operator Corporation (ISO) and the California Power Exchange Corporation (PX) during the period October 2, 2000 through June 20, 2001. The Commission makes clear that transactions subject to refund are limited to spot transactions in the organized markets operated by the ISO and PX during the period October 2, 2000, through June 20, 2001, and include sales by public and non-public utilities into these markets. The order also establishes an evidentiary hearing proceeding in or-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

der to further develop the factual record in Docket No. EL00-95-031, et al., so that refunds may be calculated. The order grants rehearing in part and denies rehearing in part of limited portions of earlier orders issued in this proceeding. In addition, ***61500** the Commission establishes another proceeding before an Administrative Law Judge to explore whether there may have been unjust and unreasonable charges for spot market sales in the Pacific Northwest from December 25, 2000 through June 20, 2001, and the calculation of any refunds associated with such charges.

Background

In an order issued August 23, 2000,[FN1] the Commission instituted formal hearing proceedings under section 206 of the Federal Power Act (FPA) to investigate the justness and reasonableness of the rates for energy and ancillary services of public utility sellers into the ISO and PX spot markets, and also to investigate whether the tariffs, contracts, institutional structures, and bylaws of the ISO and PX were adversely affecting the wholesale power markets in California. In instituting an investigation into the reasonableness of the rates charged, however, the Commission denied a request by San Diego Gas and Electric Company (SDG&E) contained in SDG&E's complaint against all sellers of energy and ancillary services into the ISO and PX markets subject to the Commission's jurisdiction, that the Commission impose a $250 price cap for sales into those markets. The Commission denied this request in the August 23 Order, on the grounds that SDG&E had not provided sufficient evidence to support an immediate seller's price cap.[FN2] The Commission established a refund effective date of 60 days after publication of notice in the Federal Register of the Commission's intent to institute a proceeding[FN3].

****2** The Commission issued an order on November 1, 2000 finding that the "electric market structure and market rules for wholesale sales of electric energy in California were seriously flawed and that these structures and rules, in conjunction with an imbalance of supply and demand in California, have caused, and continue to have the potential to cause, unjust and unreasonable rates for short-term energy . . . under certain conditions."[FN4] The order noted that, "[w]hile this record does not support findings of specific exercises of market power, and while we are not able to reach definite conclusions about the actions of individual sellers, there is clear evidence that the California market structure and rules provide the opportunity for sellers to exercise market power when supply is tight, and can result in unjust and unreasonable rates under the FPA."[FN5]

To deal with these flaws, the November 1 Order proposed remedies intended to reduce over-reliance on spot markets in California, and attempted "to balance, on the one hand, holding overall rates to levels that approximate competitive market levels for the benefit of consumers, with, on the other hand, inducing sufficient investment in capacity to ensure adequate service for the benefit of consumers."[FN6] The November 1 Order changed the refund effective date contemplated in the August 23 Order from 60 days after publication of notice in the Fed-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

eral Register, October 29, 2000, to 60 days after the date of SDG&E's complaint, October 2, 2000. The order also contained extensive discussion of the Commission's authority to direct refunds, for the periods both before and after the refund effective date, and concluded that the Commission is not authorized by the FPA to order refunds prior to the October 2 refund effective date. Several parties sought rehearing of this aspect of the November 1 Order.[FN7]

The Commission adopted many of the proposed remedies presented in the November 1 Order in an order issued December 15, 2000.[FN8] The December 15 Order reiterated the earlier findings that the market structures and rules for wholesale sales of electric energy in California were seriously flawed and that these structures and rules, in conjunction with an imbalance of supply and demand in California, had caused, and continued to have the potential to cause, unjust and unreasonable rates for short-term energy under certain conditions. The Commission, therefore, established a variety of remedies for the California wholesale electric markets, including, in part: (1) eliminating the requirement that the IOUs sell all of their generation into and buy all their energy needs from the PX so as to terminate the over reliance on spot markets; (2) adopting an advisory benchmark for assessing prices of long***61501** -term electric supply contracts in order to provide guidance for market participants to evaluate the reasonableness of long-term prices; (3) requiring market participants to preschedule 95 percent of their load prior to real time and penalizing those who do not, so as to eliminate market participants' chronic underscheduling with the ISO; and (4) requiring an independent governing board for the ISO.

****3** As an interim measure, the Commission also established a $150/MWh breakpoint under which public utility sellers bidding above the breakpoint receive their actual bids, but are subject to monitoring and reporting requirements to ensure that rates remain just and reasonable, including the potential for having to pay refunds for prices charged above the breakpoint. The December 15 Order also required the development of a longer term mitigation plan to replace the interim breakpoint methodology by May 1, 2001. In a separate order, the Commission established a settlement conference to facilitate forward contracting by California investor owned utilities.[FN9] The Chief Administrative Law Judge convened discussions over five days in December 2000 and January 2001.

On January 23, 2001, the Director of the Division of Energy Markets in the Office of Markets, Tariffs and Rates convened a technical conference to develop a plan to replace the interim $150/MWh break-point price. Comments and reply comments on how to replace the interim break-point were filed with the Commission. In March 2001, Commission Staff issued a recommendation for prospective market monitoring and mitigation for the real-time electric market, and comments were filed on this proposal.

On March 9, 2001, the Commission issued an order addressing above-breakpoint transactions that occurred in January.[FN10] The March 9 Refund Order directed re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

funds from sellers for transactions occurring during Stage 3 Emergencies (when ISO reserves fell below 2.5 percent) above a proxy market clearing price ($273/MWh for that month), or alternatively, required sellers to submit additional cost or other justification for those transactions. [FN11] Parties requested rehearing of the March 9 Refund Order on many grounds. Among those were PG&E, SDG&E, and SoCal Edison's objections to the Commission's conclusion that it has no authority to order non-public utility sellers to make refunds. [FN12] Additionally, numerous parties argued that price mitigation should apply during all hours. [FN13]

On April 26, 2001, the Commission issued its order adopting a prospective monitoring and mitigation plan for wholesale sales through the organized real-time markets operated by the ISO. [FN14] The Commission's plan, in pertinent part, enhanced the ISO's ability to coordinate and control planned outages during all hours; required certain sellers to offer the ISO all their available power in real time during all hours; established conditions, including refund liability, on public utility sellers' market-based rate authority to prevent anti-competitive bidding behavior in the real-time ISO markets during all hours; and established a mechanism for price mitigation for all sellers (excluding out-of-state generators) bidding into the ISO's organized markets for real-time sales during system emergencies. In the April 26 Order, the Commission also established an inquiry into whether a price mitigation plan similar to the one for the California ISO's organized spot markets should be implemented in the Western Systems Coordinating Council (WSCC) and invited comment on how such a plan should be structured.

****4** On June 19, 2001, the Commission expanded the price mitigation plan on rehearing, imposing curbs not only on California ISO organized spot market sales during all hours, but also constraining prices for bilateral spot market sales throughout the WSCC for the period June 20, 2001 through September 30, 2002. [FN15] The order retained the use of a single price auction and must-offer and marginal cost bidding requirements when reserves are below 7 percent in the California ISO spot markets. Under the plan, the ISO market clearing price will also serve as a limit on prices in all other spot market sales in the WSCC during reserve deficiencies***61502** in California. Sellers in all spot markets in the WSCC will receive up to the clearing price without further justification. Sellers other than marketers will have the opportunity to justify prices above the market clearing price during reserve deficiency hours.

In the June 19 Order, the ISO market clearing price for reserve deficiency hours was also adapted for use in all Western spot markets when reserves are above 7 percent. Prices during non-reserve deficiency hours cannot, absent justification, exceed 85 percent of the highest hourly clearing price that was in effect during the most recent Stage 1 reserve deficiency period (i.e., when reserves are below 7 percent) called by the ISO. These measures were applied to non-public utility sellers as well as public utilities to the extent they voluntarily sell power in the ISO or other WSCC spot markets or voluntarily use the ISO's or other Commission-jurisdictional interstate transmission facilities elsewhere in the WSCC.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In addition, the Commission announced that it would hold a settlement conference before an Administrative Law Judge in order to resolve refund issues for past periods, among other things. The Commission's Chief Judge convened the conference from June 25 through July 9, 2001.

Chief Judge's Report and Recommendation

On July 12, 2001, the Chief Judge issued a report detailing his efforts to forge a settlement among the parties.[FN16] He explains that, while a global settlement agreement was not achieved, he believes that the negotiations were constructive. The Report finds that refunds owed to purchasers of electricity "amount to hundreds of millions of dollars, probably more than a billion dollars in aggregate sum," although not the $8.9 billion claimed by the State of California.[FN17] The Report mentions offers made by several sellers into the California market totaling $703.6 million, contingent upon reaching a global settlement of all issues.

According to the Report, efforts were hampered by incomplete data. The Chief Judge had requested the parties to provide, among other things: (1) the terms and prices of all forward contracts; (2) the amounts that California Department of Water Resources (DWR), the IOUs, and the ISO believe they owe to sellers; and (3) system load figures broken down by component. These data were not made available in their entirety. The Report also notes that the Pacific Northwest Parties did not have data on the amount of refunds due them nor balances past due from purchasers. For these and other reasons, the Chief Judge was not able to determine the total volume of the spot market, nor were parties able to agree about the size of the market subject to the June 19 Order. The Report concludes that the differences between what the State and the sellers believe should be refunded raise material issues of fact. Further, the Report states, "[t]he appropriate numbers to calculate potential refunds involve factual disputes."[FN18] Thus, the Chief Judge recommends that the Commission order a trial-type evidentiary hearing limited to developing a factual record against which to apply a refund methodology.

****5** The Chief Judge's recommended refund methodology would begin with the price mitigation approach set forth in the June 19 order, with several modifications for dealing with past, as opposed to future, transactions. Key differences include: (1) using actual, rather than hypothetical, heat rates; (2) using daily spot gas prices rather than monthly bid-week prices; (3) separating the state's gas market into northern and southern zones; (4) excluding emission costs from the market clearing price and treating them as an additional expense that may be subtracted from refund calculations; and (5) not using the 85 percent price ceiling for non-emergency hours, and instead recalculating each hour to determine the amount by which actual prices exceeded the mitigated price. The Chief Judge recommends retaining the 10 percent credit adder for sales after January 5, 2001, and not including interest unless the refund amount exceeds payments that are past due to the seller.

Docket No. EL01-10-000

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

On October 26, 2000, Puget Sound filed a complaint in Docket No. EL01-10-000 petitioning the Commission for an order capping the prices at which sellers subject to Commission jurisdiction, including sellers of energy and capacity under the Western Systems Power Pool Agreement, may sell energy or capacity in the Pacific Northwest's [FN19] wholesale power markets. Specifically, Puget Sound sought an order that prospectively capped the prices for wholesale sales of energy or capacity into the Pacific ***61503** Northwest at a level equal to the lowest cap on prices established, ordered, or permitted by the Commission for wholesale purchases in, or wholesale sales of energy or capacity to or through the markets operated by the ISO or the PX. The December 15 Order declined to implement a region-wide price cap because it found that such a pricing methodology was impracticable given the market structure in the Pacific Northwest and because complainant had not met its burden of proof to justify such an action. [FN20] Puget Sound and others timely sought rehearing of the December 15 Order's determination not to impose a regional price cap or other mitigation.

On June 22, 2001, Puget Sound filed a motion to dismiss its complaint and a notice of withdrawal of its complaint and its subsequent rehearing request. Puget Sound explains that the June 19 Order satisfies its complaint because it implements price mitigation measures throughout WSCC. Several parties filed answers to the motion. Bonneville Power Administration (Bonneville) states that the Commission must fully resolve the issues raised in the complaint regardless of whether it grants Puget Sound's motion, arguing that the focus on spot markets in the June 19 Order is not appropriate outside of California, where utilities rely on forward contracts. The City of Tacoma and Port of Seattle jointly filed an answer opposing the motion on the basis that dismissal would unduly prejudice parties outside of California that relied on the existence of the complaint, and arguing that the issues raised in the complaint are an integral part of market issues that the Commission is addressing in the SDG&E proceeding.

****6** The City of Seattle (Seattle) filed an answer and a motion to intervene out-of-time in Docket No. EL01-10-000. Seattle contends that, although the June 19 Order satisfied Puget Sound's complaint, the Commission should keep the proceeding open because non-California market participants have paid prices that are unjust and unreasonable, and because retaining the proceeding would permit the Commission greater flexibility in determining the scope and effective date for refunds.

The Washington Commission and the Attorney General of Washington state several principles that they believe should guide the Commission's determination of whether and how to order refunds for and by the utilities in the Pacific Northwest, i.e., that refunds should be symmetrical as to all purchases and sales, and unbiased with respect to acquisition strategies. In addition, the Attorney General of Washington moves to intervene out-of-time.

On June 22, 2001, unaware of Puget Sound's motion filed on the same day, the Commission issued an order clarifying the June 19 Order to indicate that parties in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the settlement proceeding were not limited to settling only California-related matters, but could also discuss settling past accounts related to sales in the Pacific Northwest. The Chief Judge's Report stated that there was little time to address the issues raised by the parties in Puget Sound's proceeding and noted that they did not have data on unpaid balances nor on refunds due them.

Discussion

A. Procedural Matters

A number of entities filed late motions to intervene in this proceeding, as described below. On December 28, 2000, the Southern California Water Company (SoCal Water) filed an intervention in Docket No. EL00-95-000, et al. [FN21] On January 30, 2001, the New Mexico Regulation Commission (New Mexico Commission) filed a motion to intervene out-of-time in Docket No. EL00-95-000, et al., raising no substantive issues. On February 9, 2001, the Public Utilities Commission of Nevada (Nevada Commission) filed a motion to intervene out-of-time with comments encouraging recognition of the regional scope of the crisis. On April 9, 2001, the American Public Power Association (APPA) filed a motion to intervene and request for rehearing of the March 9 Refund Order. On July 12, 2001, the Washington Utilities and Transportation Commission (Washington Commission) filed a motion for clarification of its intervenor status, or, in the alternative, a motion to intervene out-of-time in Docket No. EL00-95-031, et al. Finally, on July 17, 2001, the People of the State of California, ex rel. Bill Lockyer (Attorney General of California) moved to intervene out-of-time in Docket No. EL00-95-031, et al.

In addition, on December 26, 2000, the Oregon Public Utilities Commission (Oregon Commission) filed a late motion to intervene in Docket No. EL00-10-000, stating that it had not yet developed a position on Puget Sound's complaint. On January 16, 2001, the Washington Commission also filed a late motion to intervene in that proceeding with comments in support of Puget Sound's request for rehearing. The City of Seattle (Seattle) and the Attorney General of Washington filed motions to intervene out-of-time in Docket No. EL01-10-000 on July 9, 2001.

****7 *61504** The Commission ordinarily does not permit late interventions after an order has been issued, particularly for the purpose of requesting rehearing. [FN22] However, over the course of the SDG&E proceeding, the Commission has expanded the scope of its focus from just California to include the entire Western interconnect and also to implicate wholesale spot market transactions of non-public utilities. We find good cause, therefore, to grant the untimely, unopposed motions to intervene in Docket No. EL00-95-000 filed by the entities described above. [FN23]

These intervenors must accept the record as it had developed as of the date of their intervention, and their participation in this proceeding is limited to the issues that arose after the date each requested to participate in these proceedings. Thus, the request for rehearing of the December 15 Order filed by SoCal Water will be dismissed because it was not a party as of the date that order was is-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

sued. Similarly, APPA's request for rehearing of the March 9 Refund Order will be dismissed because it was not a party as of the date that order was issued.

In view of the interest of the Oregon Commission, the Washington Commission, the Attorney General of Washington, and Seattle, and the absence of any undue prejudice or delay, we will grant their untimely, unopposed motions to intervene. We also clarify that the companies listed individually in the caption of the March 9 Refund Order are respondents, and thus, under Rule 102 of the Commission's Rules of Practice and Procedure,[FN24] are parties in the SDG&E proceeding.

B. Scope of Refunds

1. The Commission's Retroactive Refund Authority

a. Introduction and Summary

In the Commission's November 1 Order, we concluded that the FPA and the weight of court precedent strongly suggest that refunds prior to October 2, 2000 are impermissible under the circumstances of this case, which arose in a section 206 complaint context. In the December 15 Order, we addressed prospective remedies necessary to correct market dysfunctions and to assure just and reasonable rates, but did not address the comments on retroactive refund authority. We do so here to clarify our statutory refund authority and the scope of refunds subject to the hearing being ordered below.

We have again examined the statute, its legislative history and the case law, and have analyzed the arguments raised on this issue in comments on and requests for rehearing of the November 1 Order. We conclude that FPA section 206 does not permit the Commission to require refunds of unjust and unreasonable rates charged prior to a date 60 days after the filing of a complaint or 60 days after the initiation of a Commission investigation on its own motion. To order such refunds would contravene explicit refund limitations that Congress put in FPA section 206. While that refund authority can be expanded in limited circumstances (e.g., where sellers have charged a rate other than the filed rate or where an appellate court has found that the Commission committed legal error), as discussed below, none of those circumstances is present here. Thus, in the specific situation present here, we cannot order refunds of unjust and unreasonable rates charged prior to October 2, 2000, the start of the refund effective period.[FN25] Accordingly, we will deny the requests for rehearing of the November 1 Order challenging the order's findings about the Commission's retroactive refund authority, i.e., refund authority prior to October 2, 2000.[FN26]

****8** b. The Commission's Retroactive Refund Authority

Several parties argue that the Commission's statutory duty to protect consumers and its broad legal and equitable authority to do so requires that the Commission remedy unjust and unreasonable rates for the period prior to October 2 by ordering refunds.[FN27] Other parties agree with the November 1 Order's conclusion that the Commission has no legal authority to ***61505** grant refunds for overcharges prior to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

October 2.[FN28] As discussed below, we conclude that the Commission lacks the authority to order retroactive refunds of unjust and unreasonable rates charged prior to October 2.

i. Sections 205 and 206 of the FPA

Comments

Several parties argue that because sections 205 and 206 of the FPA require that the Commission ensure just and reasonable rates, the Commission, having found the preOctober 2 rates to be unjust and unreasonable, is obligated to order refunds for that period. They further argue that the Commission is not prohibited from ordering retroactive refunds of market-based rates.

Other parties argue that neither section 205 nor 206, on its face, grants the Commission authority to order retroactive refunds. Thus, they maintain that the Commission may not order refunds for the pre-October 2 period.

Commission Determination

A number of parties confuse the just and reasonable standard with the authority to order retroactive refunds of unjust and unreasonable rates. Whether rates are unjust and unreasonable is a separate issue from whether the Commission is authorized under the statute to order refunds retroactively. Under FPA section 206, if the Commission finds that rates no longer meet the just and reasonable standard, the Commission has a statutory obligation to fix a new rate or to fix practices "to be thereafter observed."[FN29] In amending FPA section 206, Congress did not give the Commission authority to modify unjust and unreasonable rates retroactively. As discussed in the Appendix to the November 1 Order, when Congress passed the FPA in 1935, it excluded a provision from the original bill that would have authorized the Commission to retroactively order reparations for charges found to be excessive or unreasonable if a complaint were filed within two years from the date of payment. Courts later concluded that this exclusion showed that Congress intended that the Commission have authority to only grant relief in a section 206 proceeding prospectively from the date of its order. See, e.g., City of Bethany v. FERC, 727 F.2d 1131 (D.C. Cir. 1984), cert. denied, 469 U.S. 917 (1984).

As a result, Congress added limited refund authority to section 206 in the Regulatory Fairness Act of 1988 (RFA). S. Rep. No. 491, 100th Cong., 2d Sess. 3-4 (1988), reprinted in 1988 U.S.C.C.A.N. 2685. As amended, FPA section 206 restricts the Commission's authority to establish a refund effective date to no earlier than 60 days after the date that a complaint is filed or the Commission initiates an investigation. Therefore, section 206 does not permit retroactive refund relief for rates covering periods prior to the filing of a complaint or the initiation of a Commission investigation, even if the Commission determines that such past rates were unjust and unreasonable.

****9** ii. The Filed Rate Doctrine and the Rule Against Retroactive Ratemaking

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Parties urging retroactive refunds make several arguments concerning the filed rate doctrine and its corollary, the rule against retroactive ratemaking. Taken together, the doctrine and its corollary stand for the propositions that a utility may charge only those rates that are on file with and approved by the Commission, and conversely that the Commission may not alter those filed rates retrospectively. The arguments against the application of the doctrine and its corollary can be condensed to the following: the filed rate doctrine does not apply to market-based rates; the Commission's past market-based rate authorizations in California markets constituted legal error; and the rates charged were inconsistent with sellers' filed rates. According to these parties, the filed rate doctrine does not preclude retroactive refunds in these specific circumstances.

(a) Whether the Filed Rated Doctrine Applies to Market-Based Rates

Comments

Oversight Board and County of San Diego argue that the filed rate doctrine does not apply to market-based rates because the actual rates have not been filed with the Commission, and because prices fluctuate with the market. Accordingly, they assert that there is no fixed rate on file on which buyers and sellers could rely, and which would prohibit retroactive refunds.

County of San Diego contends that several principles underlying the filed rate doctrine and the rule against retroactive ratemaking do not apply to market-based rates and, thus, are not dispositive in this case. Specifically, it contends that: the principle that regulated companies***61506** can charge only those rates of which the agency is cognizant does not apply to these facts, because the Commission no longer receives prior notice of actual market-based rates; the nondiscrimination principle does not apply, because market-based pricing allows utilities to sell at different rates to different customers; and the principle of predictability is not applicable, because the market, not a fixed rate or published formula, determines prices. Instead, County of San Diego asserts that another principle underlying the filed rate doctrine -- the principle of reasonable expectations -- is dispositive. It contends that market participants and the Commission clearly expected that competitive forces would be adequate to restrain prices in the California markets to just and reasonable levels, whereas sellers had no legitimate or reasonable expectation of being able to demand unjust and unreasonable prices due to an absence of competition. Thus, it argues that the reasonable expectations rationale underlying the filed rate doctrine supports a requirement for refunds in this case.[FN30]

Commission Determination

Under the FPA, sections 205 and 206 are the statutory foundation for the filed rate doctrine and the rule against retroactive ratemaking. FPA section 205(c) states: "Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

as the Commission may designate . . . schedules showing all rates and charges subject to the jurisdiction of the Commission . . . ." This provision does not distinguish between cost-based and market-based rates. Nor does the provision require that the Commission receive prior notice of market-based rates, as San Diego contends. [FN31]

****10** As the Court of Appeals for the District of Columbia Circuit recently recognized, "[t]he Commission has held that traditional utilities and power marketers who engage in market-based rate transactions are required to file quarterly reports summarizing transactions and that these reports satisfy the filing requirements of § 205(c)," [FN32] and the court did not question the Commission's judgment in this regard. Consequently, the Commission's current procedures for quarterly filing of market-based transactions satisfy the section 205(c) filing requirements for market-based rates. The market-based rates at issue here were on file with and approved by the Commission. Second, in response to section 206 complaints and our own investigation, the December 15 Order implemented a number of structural changes to the existing California market mechanisms to eliminate those features that were creating the possibility of unjust and unreasonable rates. The structural changes satisfied our section 206(a) obligation to determine the just and reasonable provisions to be thereafter in force.

We find San Diego's reasonable expectation principle not to be a tenet of the filed rate doctrine, but merely a restatement of our statutory duty to set just and reasonable rates. San Diego's effort to engraft this principle into the filed rate doctrine seeks to evade the distinction, noted above, between our delegated authority under section 206 to find that existing rates are unjust and unreasonable and the statutory restriction on refunds in such cases. The filed rate doctrine cannot give us greater refund authority than that allowed in the FPA, and therefore we reject San Diego's claim that its reasonable expectation rationale supports a requirement for refunds in this case. [FN33]

To conclude, the filed rate doctrine applies to the market-based rates at issue here, and the statutory limitations on our refund authority prohibit retroactive refunds.

(b) Legal Error

Comments

Some parties argue that the Commission's market-based rate authorizations relied on determinations that the markets were competitive, but that the markets have now been shown not to be competitive. They argue that, by allowing market-based rates in markets that ***61507** were not workably competitive, the Commission committed legal error, which constitutes a basis for the Commission to order retroactive refunds to correct its mistakes.

Commission Determination

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The parties' reliance on a "legal error" theory is flawed. First, we disagree that the Commission committed legal error by allowing market-based rates to remain in effect in California. Rather than eliminate market-based rates entirely, as these parties seem to advocate, the Commission reasonably sought to correct the flaws that could cause unjust and unreasonable rates in certain conditions. The December 15 Order contained a number of remedial measures designed to correct those flaws. As found by the Ninth Circuit, "FERC's actions, taken together, appear to be fully consistent with § 206(a)." [FN34] Thus, we disagree that the Commission's approach can be considered to constitute legal error.

****11** Second, while we recognize that retroactive refunds can be ordered where a court reverses a non-final Commission decision on the merits, [FN35] the parties have challenged the Commission's original decisions to grant market-based pricing authority to various applicants. Those orders have, however, become final and non-appealable under FPA section 313, and thus courts would lack jurisdiction to review those decisions. Third, to the extent that the parties are raising questions about the operation of specific sellers' exercise of market-based pricing, those cases must proceed under section 206, as, in fact, this case does. In a section 206 complaint, our refund authority is confined by the statutory language to commence 60 days after the complaint was filed, or October 2, 2000 in the instant case. We do not see how a court could find legal error in our decision to follow the statutory requirement.

(c) <u>Whether the Rates Charged Were Inconsistent with a Competitive Market Rate</u>

<u>Comments</u>

Several parties argue that market-based rates are just and reasonable only if the market is sufficiently efficient and sufficiently free from the ability of market participants to exercise market power so that actual prices charged in the marketplace approximate the "true" market price, <u>i.e.</u>, the price that would obtain in a hypothetically "fully competitive" and efficient market. The parties argue that there was an implied condition in the seller authorizations, [FN36] or that the market power conditions of market-based rate authorizations are analogous to an implied contract between seller and buyer, [FN37] such that if a seller were found, after-the-fact, to have exercised market power, this would be deemed a violation of the seller's market rate tariffs and subject the seller to retroactive refund liability. They contend that the exercise of market power resulted in prices well above what would prevail in a workably competitive market, and, accordingly, prices charged by sellers during the summer of 2000 are contrary to the filed rate authorizations, and refunds should be ordered. [FN38]

The parties further argue that the Commission may order retroactive refunds where the rates charged exceed the filed rate or for violations of the conditions of sellers' market-based rate authority. In support, they cite cases in which the Commission ordered: disgorgement of profits for a period prior to the initiation of the Commission's complaint as a sanction against a public utility that violated

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the standards of conduct that were contained in its market-based tariff; refunds for monies illegally recovered through a fuel adjustment clause; refunds when the utility charges impermissible costs through a filed formula rate; and disgorgement of some revenues resulting from a transaction that lacked necessary Commission authorization.[FN39]

Other parties assert that the rates charged this summer comport with the filed rate doctrine, that there is no evidence that sellers charged rates that were not in compliance with the tariffs on file, and that sellers must be able to rely on the finality of filed rates.

****12** Commission Determination

We agree that the Commission may take retroactive action to address circumstances where a seller did not charge the filed rate or ***61508** violated statutory or regulatory requirements or rules in applicable rate tariffs.[FN40] However, it has not been demonstrated that any conditions or limitations of sellers' market-based rate tariffs have been violated. The conditions hypothesized by the parties are not evident from the market-based rate schedules or our orders. Thus, there is no basis for finding that the sellers acted inconsistently with Commission-filed tariffs or with specific requirements in their filed rate authorizations. To the extent the Commission found that changed conditions in California created the opportunity for unjust and unreasonable rates, it remedied those problems prospectively. If it finds that refunds are appropriate, it can order refunds in accordance with the RFA refund effective date.

iii. Whether Sellers' Market-Based Rate Authorizations Were Provisional, Making the Rates Being Charged Subject to Retroactive Adjustment

Comments

The California Commission argues that the Commission may order refunds without violating the filed rate doctrine or the corollary rule against retroactive ratemaking if buyers and sellers were on notice that the rates being charged were "provisional," and might be subject to adjustment in the future. It argues that the Commission's early California electric restructuring orders contained qualifications that indicate that these decisions were provisional, and which warn that the structure and dynamics of the markets and their resulting rates were subject to adjustment or revision. It cites the November 1996 order (authorizing the establishment of the PX and the ISO) as characterizing the Commission's determination as "conditional" and "preliminary." See PG&E, et al., 77 FERC ¶ 61,204 at 61,793 (1996). It also cites the October 1997 order authorizing the PX and the ISO to commence operations, PG&E, et al., 81 FERC ¶ 61,122 at 61,435 (describing such authorization as "interim" and "conditional"); the December 1997 order authorizing the transfer of operational control of jurisdictional facilities, PG&E, et al., 81 FERC ¶ 62,210 at 64,473 (expressly reserving the right to "place further conditions on the transfer for good cause shown."). Thus, according to the California

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Commission, there was nothing certain on which buyers and sellers could have justifiably relied. Accordingly, there was no predictability as to what rates were being protected by the filed rate doctrine and rule against retroactive ratemaking.[FN41]

Oversight Board argues that the controversy over the high prices during the spring and summer of 2000 effectively put sellers on notice that their rates would be challenged, i.e., no reasonable seller would believe that their rates would go unchallenged.

****13** Commission Determination

While it is correct that the Commission issued conditional orders on the restructuring and indicated that future changes might be made, the conditions went to the restructuring and the market rules, which were at that time not entirely finalized and were being implemented in phases. The Commission did not make changes to the individual sellers' market rate authorizations. The individual market-based rate applications were not made subject to a retroactive refund obligation when accepted, and the applicants had no reasonable expectation of such an obligation.[FN42] The orders give no indication that the Commission would consider retroactively changing rates. The conditions in the authorizations were very explicit, and indicated only that the Commission would revoke market rates if the seller acquired market power, not that it would retroactively change the rates.[FN43] Further, nothing in the restructuring or market rule orders indicates that the Commission was placing such a condition on sales into the ISO or PX.

Moreover, the mere existence of uncertainty or expectation of future controversy concerning sellers' rates would not serve to establish a de facto refund effective date for purposes of retroactive refunds. As discussed above, the establishment of a refund effective period is governed by the statute. As the instant matter arose from a complaint under section 206, we must look to that provision. Its terms specifically provide that the refund effective date is triggered by the filing of a complaint or the initiation of an investigation by the Commission.***61509** Section 206 does not provide for constructive notice. The refund effective date of October 2, 2000 is consistent with the statutory framework.

iv. Section 309 Authority

Comments

Several parties argue that there is substantial evidence that sellers were unjustly enriched by ISO and PX prices above competitive levels because sellers exercised or benefitted from the exercise of market power. They cite the Staff Report and the market monitoring reports prepared by California's independent market monitors.[FN44] They argue that the Commission has broad authority under section 309 of the FPA to restore the status quo and prevent unjust enrichment. In effect, they argue that section 309 gives the Commission retroactive refund authority for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

past unjust and unreasonable rates. They cite Niagara Mohawk Power Corp. v. FPC, 379 F.2d 153, 158 (D.C. Cir. 1967) (upholding decision to backdate a hydro license, and thus require back payments from a licensee who had failed to obtain its license prior to constructing hydro facilities); Mesa Petroleum Co. v. FPC, 441 F.2d 182 (5th Cir. 1971) (requiring a gas supplier to pay a purchaser the difference between what the purchaser would have paid under its contract with the supplier and the amounts it actually had to pay for replacement gas when the supplier abandoned the contract without Commission approval); and Louisiana Public Serv. Comm'n v. FERC, 174 F.3d 218, 224 n.6 (D.C. Cir. 1999) ("[t]he Commission's authority to order refunds of amounts improperly collected in violation of the filed rate derives from FPA § 309."). These parties urge the Commission to use FPA section 309 to order equitable relief that requires sellers to repay buyers the profits above competitive levels that the sellers received as a result of the exercise of market power.[FN45]

****14** Oversight Board further asserts that section 4(i) of the Communications Act is analogous to section 309 of the FPA and that a court interpreted section 4(i) as conferring upon the Federal Communications Commission (FCC) authority to order retroactive refunds, even though sections 204 and 205 of the Communications Act, which it states are analogous to sections 205 and 206 of the FPA, do not authorize the FCC to order retroactive refunds.

SDG&E argues that the imposition of sanctions by the Commission may provide the only means to remedy abuses of market power by sellers. It expresses concern that courts may rule that antitrust claims and state law claims alleging injury due to unlawfully high prices -- even if those prices are shown to have resulted from price-fixing collusion by sellers -- would be preempted by the filed rate doctrine. It asserts that the Commission should investigate whether, and which, sellers have engaged in manipulative conduct including, but not limited to, the submission of phantom schedules to create apparent transmission congestion, the export and later re-importation of power to evade PX and ISO price caps, and the aggregation of significant amounts of supply from multiple sources by one scheduling coordinator for composite bidding in the wholesale markets. According to SDG&E, sellers who engage in such market abuse should be sanctioned by disgorgement of profits that resulted from such abuse.

Oversight Board argues that the Commission's failure to address the legal issue of refund authority for the period prior to October 2, 2000 creates uncertainty and prevents resolution of the issue on appellate review.

Commission Determination

The remedial authority under section 309[FN46] is designed to fill in gaps where the FPA is silent, not to rewrite the explicit Congressional delegations of authority and explicit limitations on that authority. Section 309 and similar provisions "authorize an agency to use means of regulation not spelled out in detail,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

provided the agency's action conforms with the purposes and policies of Congress and does not contravene any terms of the Act." Niagara Mohawk, 379 F.2d at 158. Here, as we have reiterated, Congress explicitly delineated the extent of our ***61510** refund authority under FPA sections 205 and 206. We do not read section 309 to permit us to go beyond that delegation.

Courts interpreting FPA section 309, and its counterpart NGA section 16, have indicated that "[b]oth sections are of an implementary rather than substantive character. . . . These sections merely augment existing powers conferred upon the agency by Congress, they do not confer independent authority to act." New England Power Co. v. FPC, 467 F.2d 425, 430-31 (D.C. Cir. 1972), aff'd, 415 U.S. 345 (1974).[FN47] Contrary to what the parties here seem to suggest, section 309 is not an independent source of authority that allows the Commission to expand its authority beyond that allowed in its governing statutes:

> ****15** The substantive provisions of the [NGA] contemplate certain procedures, as incident to the functions provided. The range of permissible procedures must be derived from these sections, sections like section 4 and 5 of the [NGA], and the functions they describe. Section 16, which uses a broad generality of "necessary and appropriate" that is not rooted in a function, cannot enlarge the choice of permissible procedures beyond those that may fairly be implied from the substantive sections and the functions there defined.

Mobil Oil Corp. v. FPC, 483 F.2d 1238, 1257 (D.C.Cir. 1973). The parties here seek not to introduce new procedures under FPA section 309, but to enlarge the substantive refund limitations in section 206 by expanding the refund period. If section 309 cannot be used to enlarge the permissible procedures under the FPA, as Mobil found, then it surely cannot be used to expand the substantive provisions of the Act.

Oversight Board's reliance on New England Telephone & Telegraph Co. v. FCC[FN48] is misplaced. Although the Communications Act ("CA") contains similar provisions to FPA sections 205, 206, and 309, the statutory language differs in several respects as does the underlying regulatory approaches of the two Acts. The FCC in that case addressed different circumstances from those we face, in particular in that case the FCC used its powers to "prescribe rates of return," rather than to prescribe overall rates.[FN49] That prescription was upheld under CA section 4(i), analogous to FPA section 309, despite a finding that "[CA] section 205 does not authorize the Commission to prescribe rates of return," Nader, 520 F.2d at 203, as being consistent with the purposes of CA section 205. Id. at 204-05.

Importantly for this question, at the same time it prescribed a rate of return, the FCC stated that "the filing of a tariff designed to produce a rate of return in excess of [the allowed amount] is prima facie unlawful." Id. at 205 n. 25. This, the Court stated, meant "the Commission retains full latitude to order refunds on all other grounds," except that the allowed rate of return was too high. Id. Subsequently, when the FCC found that AT&T had earned a rate of return in excess of the allowed amount and ordered refunds, the court upheld this determina-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tion as "a straightforward and legitimate means for the Commission to enforce its 1976 rate-of-return prescription." [FN50] The Court found that this did not represent retroactive ratemaking "because the carriers' obligations were set prospectively in 1976, when the Commission forbade AT&T from earning more than 10%," the allowed rate of return. [FN51] As the FCC had set the 1976 rate of return prescription under its CA section 4(i) authority, it "properly exercised its authority under section 4(i) to remedy the violation by ordering rate reductions in the amount of AT&T's excessive earnings in 1978." Id. at 1109.

****16** There is no parallel in the instant case. The Commission did not use its FPA section 309 power to establish individual market pricing authorizations. Nor did it set an objective standard against which market pricing standards would be measured or indicate that any price above that standard would be considered prima facie excessive. Thus, none of the elements that allowed the FCC to use its CA section 4(i) power to order refunds are presented here. Consequently, use of FPA section 309 as a means now to order retroactive refunds cannot be justified in face of the statutory limitations found in section 206.

c. Equitable Relief

PG&E proposes that, as an equitable alternative to price adjustments and refunds for the past period, the overcharges occurring prior to October 2 be quantified and amortized over a period of time, with the costs to be recovered from power sellers in California through an adjustment to their future bids in the ISO and PX markets. PG&E maintains there are precedents in the gas and electric industry for doing so. PG&E notes that the Commission's restructuring of the natural gas pipeline and electric industries permitted recovery of costs resulting ***61511** from a fundamental change in market rules and regulatory policies. According to PG&E, a finding that the overcharges of the summer relate to flawed market rules and regulatory policies rather than tariff violations makes it equally appropriate that there be recovery of the unjustly incurred costs for buyers of power in California. It asserts that the profound changes in industry rules, brought on by the fundamental shift in regulatory policy in California and at the Commission, required that the California IOUs buy power on the volatile spot market. They were required to participate in the new industry structure, and they have incurred unprecedented costs as a result, according to PG&E.

IEP contends that market participants cannot manage or hedge the risks associated with the November 1 Order's equitable solutions proposal and that the proposal only invites litigation and exacerbates uncertainty that will harm California. If the Commission retains the equitable solutions proposal, IEP argues that the Commission must clarify that it is a temporary transition device only and that it will end on a date certain and not be subject to reopening.

Commission Determination

The electric and gas restructuring cases cited by PG&E are different from this

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

case. They involved a change in regulatory scheme and allowed utilities to recover costs incurred under the pre-existing regulatory scheme. Order No. 637-A, cited by SoCal Edison, is also different from this case, because the equitable relief provided for in the rule under section 16 of the Natural Gas Act pertains to remedies for specific violations. Similarly, other cases cited by the parties involved sanctions for violations of explicit statutory commands.[FN52]

2. Refund Liability Should Apply To All Sellers of Energy In California

****17** The Commission has determined that all sellers of energy in the California ISO and PX spot markets should be subject to refund liability for the period beginning October 2, 2000.[FN53] We have decided to extend refund liability to public and non-public utility sellers based on our review of the controlling law, the involvement of both types of sellers in the California centralized ISO and PX spot markets, and the equities of the situation. Non-public utility sellers as well as public utility sellers of electric energy in those California markets contributed to and benefitted from the dysfunctions that offered the possibilities for the market abuse under certain conditions, on which the call for refunds are based. In these circumstances, as discussed below, we conclude that although we do not have direct regulatory rate authority over power sales by non-public utilities, we do have authority to order them to abide by the market rules we have established and to make refunds of unjust and unreasonable rates for sales pursuant to those market rules. Accordingly, PG&E's, SoCal Edison's, and SDG&E's requests for rehearing of the March 9 Refund Order seeking refund liability for non-public utilities will be granted.

a. Statutory Framework

Analysis of the Commission's authority begins, as it must, with the FPA statutory language. The refund obligations at issue relate to the sale of electricity for resale in the California ISO's and PX's interstate spot markets. The Commission's authority, under FPA section 201(b), encompasses "the sale of electric energy at wholesale in interstate commerce." In the restructured California market, all sales into the PX or ISO meet this definition. See also FPA § 201(b)(2) (defining wholesale sales). The wholesale sales of electricity here thus fall within the subject matter of the Commission's statutory authority.

The question at issue involves the interplay between that subject matter jurisdiction and the express limitations on FPA jurisdiction to public utilities. The Commission's authority under FPA section 206(a) is limited to rates "collected by any public utility for any . . . sale subject to the jurisdiction of the Commission." FPA section 201(d)(2)(f) provides that, except where specifically stated otherwise, no provision of Part II of the FPA applies to "the United States, a state or any political subdivision of a state, or any agency, authority or instrumentality of any one or more of the foregoing").

b. FERC Has Jurisdiction Over the Subject Matter of The Sales At Issue

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

At issue is whether the Commission can assert jurisdiction over the California ISO and PX wholesale electricity markets in a manner that encompasses non-public utility sellers that ***61512** are not subject to our direct jurisdiction under FPA section 206. Under the specific circumstances presented, we conclude that such jurisdiction may properly be asserted over non-public utility sellers of energy. Under the single price auction mechanism that operated in the centralized ISO and PX spot markets, all sellers agreed to accept the same clearing price for any given sale. From the time the Commission acted on SDG&E's complaint, all sellers into those markets were on notice that those clearing prices , and the market rules that set the clearing prices, were subject to change if they were found to be unjust and unreasonable. For example, the November 1 Order states: ". . . if the Commission finds that the wholesale markets in California are unable to produce competitive, just and reasonable prices . . . we may require refunds for sales made during the refund effective period."[FN54]

****18** Our action here establishes a revised method for calculating the just and reasonable clearing prices to be applied in those markets for the period beginning October 2, 2000. This is pursuant to the Commission's authority under FPA section 206 to fix the just and reasonable rate. Our action thus revises the market clearing prices that all market participants previously agreed to accept for their sales. In this context, we see no reason to treat non-public utility sellers differently, as they are receiving the same price, the just and reasonable market clearing price established pursuant to market rules approved by this Commission, that they expected to obtain for their wholesale sales into the centralized ISO and PX spot markets.

When faced with a similar question under the Natural Gas Act, the D.C. Circuit concluded that the Commission could exert rate authority over non-jurisdictional entities to fulfill its statutory responsibilities regarding the subject matter of its NGA jurisdiction. In United Gas Distribution Cos. v. FERC, 88 F.3d 1105 (D.C. Cir. 1996), local distribution companies and municipalities, both of whom are exempt from NGA jurisdiction, challenged application of FERC's open access rules to their release of their own capacity on a pipeline system. The court focused on the subject matter of the transaction, not the parties involved, to determine the Commission's authority to act. The court found that, notwithstanding the LDCs' exemption from the NGA, "the Commission's jurisdiction attaches to the subject of the capacity release transaction: interstate transportation rights." 88 F.3d at 1152. Further, the court found that exempting LDCs would allow them to engage in capacity release "without regard to the principles of open access and nondiscrimination that are at the heart" of the program. Id. That result would be "directly contrary to Congress' intent in enacting the [NGA]." Id. Consequently, the court found the Commission properly included LDCs within the regulatory plan to further the statutory goals.

Similarly, here, Commission jurisdiction attaches to the subject matter of the affected transactions: wholesale sales of electric energy in interstate commerce

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

through a Commission-authorized and Commission-regulated centralized clearinghouse that set a market clearing price for all wholesale seller participants, including non-public utilities. Exempting transactions involving non-public utility sellers from refund scrutiny here would allow them to make such sales without regard to the just and reasonable standard that applies to the market clearing price administered by the ISO (and previously by the PX), and that pervades all Commission ratemaking policies.

It is noteworthy that California may not regulate out of state sellers and has declined to regulate California non-public utilities' sales in the California centralized ISO and PX spot markets. As a result, absent FERC jurisdiction, a regulatory gap for these sales could exist. Such a result could preclude us from protecting consumers from exploitation in these markets, one of our statutory objectives under the FPA.

****19** For essentially the same reasons, the court in UDC found the Commission could require compliance with its capacity release regulations from municipalities.

> FERC may, consistent with the NGA, require municipalities to comply with its capacity release regulations . . . . FERC's transportation jurisdiction extends as a separate matter over capacity release given the involvement of interstate gas pipelines. The pipelines' role in capacity release is absolutely central, and the transaction itself controls access to interstate transportation capacity, entirely independent of the jurisdictional nature of the releasing and replacement shippers.

88 F.3d at 1154 (emphasis in original; footnotes omitted). The court also found "compelling" that prior to adoption of the Commission's capacity release program, neither jurisdictional nor non-jurisdictional entities could release capacity. Thus, as the Commission set up the program that benefitted both jurisdictional and non-jurisdictional parties, it could establish rules by which all parties must abide. Id.

***61513** Here, the central transactions, wholesale sales of energy in interstate commerce, were governed by FERC-approved rules and a FERC-jurisdictional ISO and PX. Those transactions thus fell within FERC's jurisdiction regardless of the jurisdictional nature of the sellers or buyers. Further, the centralized wholesale spot electricity markets operated by the California ISO and PX were established (and have been modified) subject to FERC review and approval. Because the market did not exist prior to FERC authorization, all those who participated in the market had to recognize the controlling weight of FERC authority. Moreover, it is fair that all those who benefitted from this market also bear responsibility for remedying any potential unlawful transactions that might have occurred in the market.

Non-public utility sellers in the California market entered into various arrangements that acknowledged the Commission's authority over the centralized transactions. For example, in Pacific Gas and Electric Co., et al., 82 FERC ¶ 61,326

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(1998), many non-public utility sellers accepted a FERC-authorized, pro-forma Scheduling Coordinator Agreement. Id. at 62,283.[FN55] Among the obligations under the Agreement, parties agreed "to comply with the terms and conditions of the ISO Tariff and ISO Protocols." Id. For the PX, the Commission required that parties sign a FERC-authorized, pro-forma Participation Agreement. California Power Exchange Corp., 83 FERC ¶ 61,186 (1998). Against opposition, the Commission concluded that the Participation Agreement and "the services provided under the PX Tariff are jurisdictional." Id. at 61,771. The Commission indicated that the Agreement "is the contract under which the California PX provides these services to its customers" and, as such, could be required to be filed in accordance with FPA section 205(c). Id. A large number of non-public utility sellers executed the Participation Agreement. See, e.g., PX letter filing of January 25, 2001 (index of parties who executed the Agreement as of December 31, 2000).

****20** Placing jurisdictional and non-jurisdictional sellers on the same footing for refund purposes promotes the underlying goals of the FPA. Under California's restructuring system, interstate, wholesale sales of electric energy were transacted largely through hourly single price auctions, which meant that all bidders into these spot markets received the same price for a specific sale. In fact, prior to Commission modification, California public utilities were required by California to transact exclusively through the PX under the mandatory buy/sell rule.

Consequently, if the price for a specific sale is found to be unjust and unreasonable, then all sellers who obtained that price received an unjust and unreasonable rate. To the extent the Commission determines refunds are an appropriate remedy for that sale, consumers can only be made whole by refunds from all sellers who received the excessive price.[FN56] As non-public utility sellers of energy and ancillary services accounted for up to 30 percent of all sales in the California centralized ISO and PX spot markets, excluding them from a potential refund remedy could have a serious detrimental effect on consumers.

3. Refund Liability Can Apply From October 2, 2000 Through June 20, 2001

The above discussion also largely disposes of any claim that the Commission is impermissibly applying refund liability to non-public utility sellers back to the October 2, 2000, refund effective date that we previously announced. Because refund obligations relate to factual issues concerning past periods, their resolution is considered to be adjudication. Adjudications are generally given retroactive effect. See Harper v. Virginia Dept. of Taxation, 509 U.S. 86, 94-95 (1993)(referring to "the fundamental rule of retrospective operation that has governed judicial decisions for near a thousand years"). The Court has declined to accept equitable reliance as grounds for limiting the retroactive application of an adjudicatory decision. "The federal law applicable to a particular case does not turn on whether litigants actually relied on an old rule [or] how they would suffer from retroactive application of a new one." Id. at n.9 (citation and quotation marks omitted).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Of course, in the instant matter, as explained above, the non-public utility sellers were well aware that these transactions involved wholesale sales of electricity subject to FERC jurisdiction. These sellers had executed the pro forma agreements established by the Commission that indicated, in part, their willingness to comply with the terms of the FERC-jurisdictional ISO or PX tariffs. These factors undermine***61514** possible claims that non-public utility sellers of energy could reasonably have relied on their sales for resale of electricity into the centralized interstate California ISO and PX spot markets not properly being subject to FERC jurisdiction.

****21** The Supreme Court's discussion of retroactivity arose in the context of judicial adjudication, but the same principles counsel strongly for like treatment in agency adjudications. See Southwestern Public Service Co. v. FERC, 952 F.2d 555, 563 (D.C. Cir. 1992) (indicating FERC "should take note" of recent Supreme Court case that "may forbid agencies to apply rules with selective retrospectivity.") (citation omitted). The D.C. Circuit also recently indicated that selective retroactivity[FN57] for remedial purposes "breaches the principle that litigants in similar situations should be treated the same, a fundamental component of stare decisis and the rule of law generally." Nat'l Fuel Gas Supply Corp. v. FERC, 59 F.3d 1781, 1789 (D.C. Cir. 1995) (citation omitted). Here, as discussed above, public utility and non-public utility sellers under the single price auction system used in the affected markets were similarly situated regarding the price they received for their sales for resale of electricity, and thus should be treated similarly in the consideration of whether refunds should be required.

The D.C. Circuit has, however, expressly declined to require that agency adjudications enforcing agency decisions apply retroactively. See, e.g., Power Corp. of America, 245 F.3d at 847. Instead, the court applies a five-part test for deciding if retroactivity is inappropriate. Williams Natural Gas Co. v. FERC, 3F.3d 1544, 1553-55 (D.C. Cir. 1993); see Retail Wholesale & Dept. Store Union v. NLRB, 466 F.2d 380, 390 (D.C. Cir. 1972)(one formulation of criteria). Under these criteria, our determination that non-public utility sellers of energy in the California market can be liable for refunds should apply retroactively.

The initial criterion asks whether the issue is one of first impression. We have no trouble finding that the instant question is, given that California was the first state to restructure its electricity market and the Commission had never dealt with market-wide refunds in a single price auction for widespread centralized spot purchases of wholesale electricity in interstate commerce. The next criterion looks to whether Commission action seeks to fill a void in an unsettled area of the law. For the same reasons mentioned in the first criterion, this factor weighs in favor of retroactivity. The Commission seeks to redress a previously unencountered situation in a manner that furthers the underlying purpose of the FPA.

The third criterion asks the extent to which parties relied on the old rule. Here,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

there was no old rule to apply to the precise situation. But, in any event, non-public utility sellers should have recognized their sales for resale into the centralized ISO or PX spot markets were the subject of FERC jurisdiction and scrutiny. Among other things, FERC's investigation into the ISO and PX market practices and rules, with indications in the August 23 Order that possible remedies included changes to the market clearing price mechanisms and refunds, should have alerted non-public utility (as well as public utility) sellers of FERC's authority over their sales in those markets. Moreover, those sellers signed FERC pro forma agreements that indicated their willingness to comply with FERC-authorized tariffs.

****22** The fourth and fifth criteria also weigh in favor of retroactivity. Ordering non-public utility sellers to refund amounts received in excess of just and reasonable rates does not impose an unfair burden, but merely place those sellers in the same position as public utility sellers. Finally, the statutory interest in protecting consumers against exploitation is furthered by subjecting non-public utility sellers, who represent up to 30 percent of all sales into the California ISO and PX spot markets during the applicable time period, to possible refund liability to the same extent as public utility sellers. Otherwise, consumers will not be made whole for any prices found to be excessive. Moreover, fundamental fairness dictates that in the context of a single price auction, where all bidders received the same price for a specific sale, all those parties should now bear the responsibility of refunding any amounts found to be unjust and unreasonable.

In short, the balance tips decidedly in favor of retroactive application of refund liability to October 2, 2000, for all sellers in the California ISO and PX spot markets.

4. <u>DWR Transactions</u>

By motion dated March 1, 2001, the Oversight Board requested clarification and extension of the December 15 Order, arguing that DWR bilateral contracts should be subject to refund. These contracts became an issue when, on January 17, 2001, the Governor of California issued an emergency proclamation giving DWR authority to enter into arrangements to purchase power. DWR began purchasing under this authority the next day. DWR has purchased substantial amounts of energy in the ISO's Imbalance Energy market and is in the ***61515** process of executing long-term purchases. The California Commission and SoCal Edison supported the motion. Numerous other parties opposed the motion, contending that the relief sought would be inconsistent with the objectives of the December 15 Order and because the proposed changes to parties' market-based rate authorizations would have to be considered under FPA section 206.

Subsequently, a number of parties filed comments on the Chief Judge's Report arguing that the DWR bilateral contracts should remain outside the scope of the Commission's refund orders given that these transactions represent bargained-for ex-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

changes between willing buyers and sellers (with DWR picking and choosing the transactions it wanted, exercising discretion and exhibiting price response).[FN58]

We believe imposing after-the-fact refund liability on California transactions outside of the centralized ISO and PX markets is unjustified. This is particularly true in the instant proceeding when the Commission consistently encouraged California load serving entities to acquire a balanced portfolio of short, medium and long-term contracts. Expanding the scope of transactions subject to refund over the period October 2, 2000, through June 20, 2001 to include transactions outside the ISO and PX centralized markets would simply hinder the ability of parties to enter into new bilateral contracts. Accordingly, the Commission will deny the Oversight Board's motion.[FN59]

****23** Further, we note that while DWR is a market participant that competes with other suppliers and purchasers of energy and ancillary services in the ISO markets, unlike other market participants, DWR has had access to the ISO's control room and associated written materials, visual observations, and oral statements regarding the ISO's markets, systems, operations and activities.[FN60] This has provided DWR a competitive advantage in entering into its bilateral contracts. In addition, by voluntarily entering into bilateral transactions outside the ISO and PX, DWR made a conscious decision to forego the refund protection that the Commission provided for purchases through the ISO and PX. Thus, there is no equitable rationale that supports making DWR's bilateral contracts subject to refund.

The Commission will issue a further order concerning the standards of conduct between the ISO and DWR in Docket No. ER01-889.

5. <u>OOM Transactions</u>

Several parties request clarification that the ISO's out-of-market (OOM) purchases are subject to refund. We grant this clarification. As we stated previously in our November 1 Order, "the electric market structure and market rules for wholesale sales of electric energy in California are seriously flawed and [ ] these structures and rules, in conjunction with an imbalance of supply and demand in California, have caused, and continue to have the potential to cause, unjust and unreasonable rates for short-term energy . . . under certain conditions."[FN61] The order noted that the "California market structure and rules provide the opportunity for sellers to exercise market power when supply is tight and can result in unjust and unreasonable rates under the FPA."[FN62] These statements are most true with respect to the ISO's daily OOM purchases for obtaining the resources it needs to reliably operate the grid.

As stated in the August 23 Order, if there is insufficient supply in the ISO markets, then the ISO must procure additional supplies at the last minute with OOM purchases in order to meet its needs for the operating day. Historically, the ISO

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

procured on a daily basis only the resources needed for the operating day. Not only did this procurement practice put pressure on the grid operator to secure needed resources at the last minute, but the practice was uneconomical. Because the ISO is the supplier of last resort for these services, when OOM calls are made, suppliers realize that the ISO is in a must-buy situation. For this reason, we directed the ISO to immediately institute a more forward approach to procuring the resources necessary to reliably operate the grid.[FN63]

To the extent the ISO made spot market OOM purchases (i.e., 24 hours or less and that were entered into the day of or day prior to delivery), such purchases are no different than purchases through its markets. Both types of purchases are made by the ISO in order to procure the resources necessary to reliably operate the grid. Therefore, we clarify that spot market OOM transactions are subject to refund and subject to the hourly mitigated price established***61516** in the ordered hearing. The hourly price will establish the maximum price with refunds for transactions over this level.

****24** 6. Sales Made Pursuant to DOE Orders

PPL Montana, PPL EnergyPlus, and PPL Southwest Generation Holdings (PPL Parties) state that in the exercise of his authority under section 202(c) of the FPA, the Secretary of Energy (Secretary), in a series of orders directed PPL Montana, among others, to make the necessary arrangements to supply energy as requested by the California ISO. PPL Parties maintain that such sales made pursuant to the orders issued by the Secretary under this authority should not be subject to refund because they were not made pursuant to section 205 of the FPA. The ISO maintains that sales made pursuant to section 202(c) should be subject to refund.

PPL Parties state that section 202(c) has its own mechanism for determining sales prices. Under the section, sales are to be made at an agreed upon price. Only if price and terms cannot be agreed to in accordance with the existing regulations, the terms are to be immediately prescribed by the Secretary and the price referred to this Commission for subsequent determination of a rate it determines is "just and reasonable."[FN64] According to PPL Parties, there is nothing in section 202(c) that authorizes the payment of refunds or the redetermination of sales prices where there has been mutual agreement.

Furthermore, PPL Parties state that the Secretary specifically directed in his orders that "the terms of any arrangement made between the entities subject to this order and the California ISO pursuant to this order are to be agreed to by the parties." Therefore, they assert that any action by the Commission to alter the terms of agreements voluntarily reached by ordering refunds would be inconsistent with the Secretary's mandate.

We agree that rates for transactions entered into under section 202(c) in compliance with the Secretary's orders are outside the scope of this proceeding. The

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Secretary has not referred any sales to this Commission for a rate determination; if any had been referred here, they would have been reviewed in a separate proceeding.

7. PG&E Bankruptcy

We note that on April 6, 2001, PG&E filed for Chapter 11 bankruptcy protection. Although the Bankruptcy Code provides that the filing of a bankruptcy petition automatically stays certain actions against the debtor, [FN65] the Code also provides an exception from this automatic stay for:

> An action or proceeding by a governmental unit . . . to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power. [FN66]

The Commission has found in the past that actions taken under the authority granted it by the Federal Power Act and the controlling regulations fit within this exception, and, therefore, are exempt from the automatic stay provision. [FN67] In the instant matter, we are exercising our regulatory power under section 206 of the Federal Power Act as permitted by section 362(b)(4) of the Bankruptcy Code to issue an order that does not threaten the bankruptcy court's control over the property of the bankruptcy estate. As this order establishes the formula for refunds but does not impose any monetary obligation on PG&E, it has no effect on PG&E's bankruptcy estate.

C. Refund Calculation Methodology

****25** We will adopt the recommendations of the Chief Judge, as modified below, and apply the methodology set out in the June 19 Order from the October 2, 2000, refund effective date, through June 20, 2001 to determine the amount of refunds due to the customers in the ISO and PX spot markets. As the Chief Judge recognized, the methodology in the June 19 Order must be modified in order to be applied to the period October 2, 2000, through June 20, 2001. In this respect, we will direct the ISO to make the modifications discussed below to the methodology presented in the June 19 Order, ***61517** for the purposes of developing a factual record for analyzing these markets during the refund period.

The scope of the June 19 price mitigation extends to all spot market hours. Applying this to the period October 2, 2000, through June 20, 2001, will enlarge the number of hours that the March 9 Refund Order made subject to refund for the period January 1 through May 28, 2001. Accordingly, we will grant the requests for rehearing of the March 9 Refund Order that seek to increase the hours of price mitigation for this period. In addition, we note that the June 19 Order mitigates prices during all hours effective as of June 21, 2001. This leaves a gap from May 29 through June 20, 2001, when price mitigation only applied to periods of system emergencies. In order to maintain a consistent approach during all periods of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

time, the Commission will require application of the refund calculation methodology discussed below to non-reserve deficiency hours from May 29 through June 20, 2001. Transactions that occurred during reserve deficiency hours in this period, already mitigated as a result of the April 26 Order, will not be affected.

The June 19 Order established a mitigated price based upon the marginal cost of the last unit dispatched to meet the load in the ISO's real-time market. The June 19 Order also established a "must offer" requirement that each generator offer all available and uncommitted capacity in real-time. The ISO, County of Los Angeles, California Commission, SDG&E, SoCal Edison, and the Oversight Board (collectively, California Parties) argue that in applying the June 19 Order for the period October 2, 2000 through June 20, 2001, the methodology must include a simulation of the must offer requirement (an assumed economic dispatch). This modification to the actual data lowers the heat rate for establishing the market clearing price because it assumes that all generation that was not dispatched was really available, and that more imports were available than the actual quantities. The California Parties allege that the use of historical dispatch would yield higher prices than the prices resulting from using an assumed economic dispatch, and higher prices would reward the exercise of market power.

We did not institute the must offer requirement or the marginal bidding requirement until May 28, 2001, and it is unreasonable to re-create the markets to apply such requirements for the period October 2, 2000 through June 20, 2001. Generators actually dispatched in the markets during these periods have specific marginal costs that are reasonably recovered under our methodology. The end result of using an assumed economic dispatch (prices lower than the actual marginal costs of the last generator dispatched) unfairly punishes the very generators that helped keep the lights on in California. Therefore, we will require that the ISO determine the last unit dispatched (the marginal unit) by selecting from the actual units dispatched in real-time the maximum heat rate of any unit dispatched each hour in the real-time imbalance market for the period October 2, 2000 through May 28, 2001. [FN68] This should address the concerns of numerous commenters that application of the June 19 methodology from October 2, 2000 forward, particularly with respect to marketers that are price takers, would be confiscatory.

****26** The June 19 Order also established a mitigated price for hours of non-reserve deficiency at 85 percent of the market clearing price established during the last Stage 1 reserve deficiency. The Chief Judge ruled that, on a retroactive basis, the 85 percent maximum price for non-reserve deficiency periods could distort re-creation of a competitive market. Most commenters, including California Parties, Southern California Water Company and Dynegy, agree that the methodology for calculating refunds should not incorporate this element and instead should calculate a competitive price for every hour of the period in question. California Parties argue that including the 85 percent formula in calculating refunds would provide sellers with an unjustified off-peak premium. Due to the support for this modification and because no party has raised a legitimate concern over the Chief Judge's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

rationale, we will adopt his recommendation.

In support of the recommendation to use the daily spot market price for gas, the Chief Judge relied on record evidence that the energy sales at issue were made with spot gas purchases. PG&E maintains that there is no need to alter the treatment of gas costs in the June 19 Order (i.e., averaging the bid-point of the monthly bid-week prices reported by Gas Daily for three spot market prices reported for California). Moreover, PG&E contends that the use of spot gas prices is unreasonable as there have been large differentials between such prices and average costs.

***61518** We note that PG&E has not refuted the underlying record evidence relied upon by the Chief Judge in making his recommendation to use daily spot purchases (i.e., that such sales were typically made with gas purchased in the spot market). [FN69] In addition, we note that spot purchases have traditionally been used to calculate the replacement cost of fuel. Given that the gas treatment in the June 19 Order was intended to address and influence purchasing decisions for prospective sales, there is simply no support for requiring a similar treatment for retroactive application to past sales.

Mirant argues that the use of the Malin delivery point for an input for northern California suppliers is inappropriate because this index price is less than the PG&E City Gate price. According to Mirant, using an average of the two indexes will not reflect the actual fuel cost to the generators in northern California. If sellers in California, such as Mirant, do not believe that these prices sufficiently cover their costs, they can file for cost-of-service rates covering all of their generating units in the WSCC for the duration of the mitigation period and including the refund period.

A number of Marketers and public utilities outside of California state that their purchased power costs, which may be higher than the hourly price calculated under the methodology adopted by the Commission, should be used to offset any potential refunds. Consistent with our prospective ruling in the June 19 Order, we will not allow such a showing for the period October 2, 2000 through June 20, 2001. We note that the public utilities outside of California typically entered into must-take purchase power contracts for weekly, monthly or longer periods. Their short-term purchases were made in order to either meet minimum reserve requirements or to supply their native load. To the extent these public utilities' total resources, both owned and purchased, temporarily exceeded their actual total system load, the surplus was available as opportunity sales in the spot markets including the ISO and PX spot markets. Because the purchased power costs of these utilities were sunk costs similar to their investment in their own plant, any revenues generated from off-system sales at market based rates reduces their initial purchase power costs to serve their native load. Even the lower mitigated hourly prices determined in the hearing will subsidize these public utilities' overall cost of providing native load service. Finally, as noted in the June 19 Order, under the FPA and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

our authorization for market-based rates, sellers are not guaranteed to recover all costs, but are provided the opportunity to do so.

****27** Several sellers support the use of separate gas prices for northern and southern California. The California Parties object to any change in the gas prices used in the June 19 Order, stating that it is unclear how two gas prices could be used under the June 19th methodology. Reliant adds that the methodology should maintain a single price auction mechanism for determining refunds instead of separate northern and southern market clearing prices. We find the approach suggested by the Chief Judge to be a workable addition to the June 19 Order methodology consistent with the determination of the actual running costs of the marginal unit. We will adopt the method proposed by the Chief Judge and direct the ISO to apply the appropriate gas price once the marginal unit is determined. If that marginal unit is located in the North of Path 15 (NP15) zone, then the ISO should calculate the market clearing price by using the average daily spot gas price for PG&E Citygate and Malin. If that marginal unit is located in the South of Path 15 (SP15) zone, the ISO should calculate the market clearing price by using the average daily spot gas price for Southern California Gas large packages. We clarify that these inputs are to be used to calculate a single clearing price.

While we are adopting the Chief Judge's recommendation to use daily spot gas prices and the three delivery points as reported by Financial Times Energy's "Gas Daily," we will adopt one modification based on comments filed by Intelligence Press, Inc. (Intelligence Press). Intelligence Press states that the Commission has in the past used a composite of published market prices and notes that using multiple sources addresses a number of concerns including reducing the effect of errors that might occur in gathering and reporting the spot price data. We believe that these are valid points. Accordingly, the gas inputs recommended by the Chief Judge should be based on the simple average daily spot price as reported by Gas Daily, NGI's Daily Gas Price index and Inside FERC's Gas Market Report. The last published gas prices should be used in calculating the refund price for the days that these publications are not published (weekends and holidays). [FN70]

***61519** The June 19 Order also established an O&M adder of $6/MWh to be included in the calculated market clearing price. The Chief Judge recommended the same adder be included in the methodology for calculating refunds. No parties commented on this adder and we therefore adopt its use in the methodology.

The Chief Judge recommended that the methodology establish a separate expense category for demonstrable emissions costs that sellers may subtract from their respective refund calculations, consistent with the mitigation methodology established in the June 19 Order. Reliant maintains that NOX costs and other environmental mitigation fees represent costs that a generator actually incurred in producing energy and, as such, should be included in the calculation of cost for the marginal unit. Although we note that the inclusion of emissions costs in the calculation of the costs for the marginal unit is sound economic theory, we find that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

in practice, actual emissions costs vary by location, time period, and duration. We find that the incorporation of such costs, which have not been demonstrated to be hourly costs, in the context of calculating hourly marginal costs for the purposes of establishing refund liability, would present an insurmountable burden. We find that allowing full recovery by the generators of all of their demonstrable emissions costs incurred during the refund period is appropriate. Because the emissions cost will not be included in the revised market clearing price, we direct all sellers to submit during the hearing their emissions costs incurred during the refund period for subtraction from their respective refund liabilities.

****28** California Parties object to the inclusion of a ten percent creditworthiness adder, stating that sellers' actions in charging high prices forced SoCal Edison and PG&E to lose their credit rating, and that a credit adder would reward them for these actions. Sellers support the creditworthiness adder although they state that ten percent could be insufficient to accurately reflect the credit risk associated with making sales into California during the refund period. PPL Montana states that sellers making the sales for which refunds are contemplated not only were deterred from obtaining appropriate credit guarantees, but have experienced actual harm in the form of non-payment.

We find that the inclusion of a creditworthiness adder in the methodology to determine refund liability is appropriate and necessary. One result of parties' failure to reach settlement in this proceeding is that payment of overdue amounts has not been assured. The methodology we set forth will determine the just and reasonable rates that buyers will pay, but it cannot provide assurances that buyers, one of which is currently embroiled in bankruptcy proceedings, will pay the full amounts due. Therefore, we will adopt the recommendation of the Chief Judge that the 10 percent adder should be included in the market clearing price. At this time we will limit the adder to all transactions that occurred after the downgrade of SoCal Edison and PG&E's bond ratings on January 5, 2001.

Once the ISO has calculated the hourly market clearing prices for the refund period, this data should be used by both the ISO and PX to rerun their settlement/billing processes and all penalties. These revised settlements should be submitted to the Administrative Law Judge and parties should use this information to form the basis of any offsets (i.e. the amounts to be refunded against the payments past due). We direct the Administrative Law Judge to certify this information, in its entirety, to the Commission.

California Parties support the calculation of interest against refunds and maintain that Commission precedent requires an interest calculation. Sellers believe that if interest charges are assessed that they should be assessed symmetrically to refunded amounts and to amounts past due. We will direct the calculation of interest on both refunds and receivables past due, pursuant to the methodology for the calculation of interest under Section 35.19a of the Code of Federal Regulations.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

D. Evidentiary Hearing Proceeding

The Chief Judge's Report stated that the differences between what the purchasers and the sellers in the California market believe are owed in refunds raise material issues of fact and recommended an evidentiary hearing be ordered in this proceeding. Several parties commented that there were no issues of material fact because there had been no offer of settlement requiring litigation, and urged the Commission to continue the settlement process.[FN71] Others commented that the Commission has sufficient record evidence to support a refund ***61520** remedy and believed there is no need for a hearing to determine the methodology.[FN72] Still others supported the Chief Judge's conclusion but recommended various methods to limit the scope of further proceedings.[FN73]

****29** The Commission agrees that, despite the voluminous record accumulated in this proceeding to date, material issues of fact remain that prevent the Commission from ordering refunds at this time. We believe that the most orderly and expeditious method of determining what refunds are owed will be to convene an evidentiary hearing before an Administrative Law Judge. Accordingly, the Commission will establish an evidentiary hearing to further develop the factual record so that the refund methodology presented in this order may be implemented, to be convened by Administrative Law Judge Birchman. The scope of the hearing will be limited to the collection of data needed to apply the refund methodology prescribed herein; we will direct Judge Birchman not to entertain any arguments relating to the methodology or the scope of transactions subject to refunds, except as otherwise indicated in this order.

In order to develop the factual record , the ISO will be directed to provide Judge Birchman with a re-creation of the mitigated prices that result from using the methodology described herein for every hour from October 2, 2000 through June 20, 2001, within fifteen days of the date this order is issued. The ISO and PX are further directed to rerun their settlement/billing process as described above and provide this data to Judge Birchman.

We will direct Judge Birchman to make findings of fact with respect to: (1) the mitigated price in each hour of the refund period; (2) the amount of refunds owed by each supplier according to the methodology established herein; and (3) the amount currently owed to each supplier (with separate quantities due from each entity) by the ISO, the investor owned utilities, and the State of California. We will require the judge to certify findings of fact to the Commission, without an initial decision, by no later than 45 days after the date that the ISO provides this data.

E. Pacific Northwest Proceeding

The Chief Judge noted that there was little time to address the issues raised by the Pacific Northwest Parties. Moreover, these parties did not have data on what they claim they were owed, nor on an amount of refunds due them. The Chief Judge requested comments on the necessity of convening subsequent settlement conferences

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to address the issues. Comments jointly filed by Pacific Northwest Net Purchasers state that there was inadequate time either to document the harm suffered, or to engage in meaningful settlement discussions with affected sellers. Given these circumstances, they request additional process on this matter.

Spot market sales outside of California were not based on bids into an auction, and instead were made through bilateral contracts.[FN74] Many commenters note the enormity of attempting to unravel such transactions retroactively. Still others claim that this task must be undertaken in order to put other parties on an equal footing with California. In light of the complexities associated with these retroactive bilateral calculations and the absence of any further development of this issue in the settlement proceeding, and in recognition that the prior settlement proceeding focused primarily on California, we will establish a separate preliminary evidentiary proceeding pertaining to the Northwest. The proceeding is intended to facilitate development of a factual record on whether there may have been unjust and unreasonable charges for spot market bilateral sales in the Pacific Northwest for the period beginning December 25, 2000 through June 20, 2001.[FN75] The record should establish the volume of the transactions, the identification of the net sellers and net buyers, the price and terms and conditions of the sales contracts, and the extent of potential refunds. This will help the Commission to determine the extent to which the dysfunctions in the California markets may have affected decisions in the Pacific Northwest. We also strongly encourage the parties to try to settle past accounts.

****30** Accordingly, we direct all parties to the Puget Sound complaint proceeding to participate in the proceeding and to focus on settling past accounts related to spot market sales in the Pacific Northwest. Interested parties to the SDG&E proceeding may participate at their ***61521** discretion. We direct the Chief Administrative Law Judge or his designee to appoint a judge to convene a conference no later than August 2, 2001, and we require the parties to provide the data described above to the presiding judge no later than 15 days thereafter. We direct the presiding judge to complete discussions within 30 days following the submission of this data. The judge shall make a recommendation and certify the record and findings of fact to the Commission within 7 days after the close of the discussions.[FN76]

The Commission orders:

(A) Pursuant to the authority contained in and subject to the jurisdiction conferred upon the Federal Energy Regulatory Commission by Section 402(a) of the Department of Energy Organization Act and the Federal Power Act, particularly sections 205 and 206 thereof, and pursuant to the Commission's Rules of Practice and Procedure and the regulations under the Federal Power Act (18 C.F.R. Chapter I), a public hearing shall be held in Docket Nos. EL00-95-031 and EL00-98-030 concerning refund amounts, as discussed in the body of this order.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(B) Administrative Law Judge Birchman shall convene a conference in this proceeding, to be held as soon as practicable after the date of this order, in a hearing room of the Federal Energy Regulatory Commission, 888 First Street, N.E., Washington, D.C. 20426. Such conference shall be held for the purpose of establishing a procedural schedule. The presiding judge is authorized to establish procedural dates, and to rule on all motions (except motions to dismiss) as provided in the Commission's Rules of Practice and Procedure.

(C) The ISO is hereby directed to provide Judge Birchman with data, as discussed in the body of this order. Judge Birchman is hereby directed to certify the record and findings of fact to the Commission no later than 45 days after such data is provided.

(D) The parties to the proceeding in Docket No. EL01-10-000 are hereby directed to participate in discussions before an Administrative Law Judge, to be designated by the Chief Administrative Law Judge, as discussed in the body of this order.

(E) No later than 7 days after the completion of discussions in Docket No. EL01-10-000, the designated judge shall make a recommendation to the Commission.

(F) Requests for rehearing of the November 1 Order regarding the Commission's retroactive refund authority (i.e., refund authority prior to October 2, 2000) are hereby denied.

(G) Requests for rehearing of the March 9 Refund Order regarding the Commission's authority to require refunds from non-public utilities and regarding the application of price mitigation during all hours are hereby granted.

****31** (H) The Oversight Board's March 1 motion is hereby denied.

(I) The request for rehearing of the December 15 Order filed by Southern California Water Company is hereby dismissed.

(J) The request for rehearing of the March 9 Order filed by American Public Power Association is hereby dismissed.

By the Commission. Commissioner Massey dissented in part and concurred in part with a separate statement attached.

(SEAL) Commissioners Breathitt and Massey jointly dissented in part with a separate statement attached.

Commissioner Breathitt dissented in part with a separate statement attached.

David P. Boergers
Secretary

FN1. San Diego Gas & Electric Company, et al., 92 FERC ¶ 61,172 (2000), reh'g

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

pending (August 23 Order).

FN2. 92 FERC at 61,606.

FN3. Id. at 61,608.

FN4. San Diego Gas & Electric Company, et al., 93 FERC ¶ 61,121 at 61,349-50 (2000), reh'g pending (November 1 Order).

FN5. Id. at 61,350.

FN6. Id.

FN7. See, e.g., requests for rehearing of the California Electricity Oversight Board (Oversight Board), the Public Utilities Commission of the State of California (California Commission), PG&E, SoCal Edison, and the City of San Diego. Other determinations in the November 1 Order are also pending rehearing; these issues will be addressed in a future order.

FN8. San Diego Gas & Electric Co., et al., 93 FERC ¶ 61,294 (2000), reh'g pending (December 15 Order)

FN9. Forward Contracting by California Utilities, 93 FERC ¶ 61,295 (2000).

FN10. San Diego Gas & Electric Co., et al., 94 FERC ¶ 61,245 (2001), reh'g pending (March 9 Refund Order).

FN11. The Director of the Office of Markets, Tariffs and Rates issued notices announcing the proxy market clearing prices for the months of February, March, April, and May 2001 on March 16, April 16, May 14, and June 15, respectively.

FN12. See March 9 Refund Order, 94 FERC at 61,864.

FN13. See, e.g., Rehearings of California Commission, ISO, SDG&E, City of San Diego, County of San Diego, and PG&E. Other determinations in the March 9 Order are also pending rehearing; these issues will be addressed in a future order.

FN14. San Diego Gas & Electric Company, et al., 95 FERC ¶ 61,115 (2001), reh'g pending (April 26 Order).

FN15. San Diego Gas & Electric Company, et al., 95 FERC ¶ 61,418 (2001), reh'g pending (June 19 Order).

FN16. San Diego Gas & Electric Company, et al., 96 FERC ¶ 63,007 (2001) (Report).

FN17. Id., slip op. at 3.

FN18. Id., slip op. at 5.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN19. Puget Sound indicated that, as used in its complaint, the term "Pacific Northwest" has the meaning set forth in the Pacific Northwest Electric Power Planning and Conservation Act, 16 U.S.C. § 839a(14) (1994).

FN20. December 15 Order, 93 FERC at 62,019.

FN21. SoCal Water subsequently requested rehearing of the December 15 Order.

FN22. See, e.g., Southern Company Services, Inc., 92 FERC ¶ 61,167 (2000); Consolidated Edison, Inc. and Northeast Utilities, 92 FERC ¶ 61,014 (2000), order denying reh'g, 94 FERC ¶ 61,079 (2001).

FN23. In the May QF Order, we intended, but inadvertently failed, to grant the timely, unopposed motion to intervene of Carson Cogeneration Company, LP, Mojave Cogeneration Company, LP, O.L.S. Energy-Camarillo, O.L.S. Energy-Chino, and PE Berkeley, Inc. (collectively, QF Petitioners) filed in Docket No. EL00-98-000, and the untimely, unopposed motion to intervene of Berry Petroleum Company in Docket No. EL00-95-020. We do so in this order.

FN24. 18 C.F.R. § 385.102(c)(2) (2001).

FN25. The FPA, with one exception, permits refunds only for a period of 15 months after the refund effective date. The exception is that if a public utility engages in dilatory behavior in a section 206 proceeding, the Commission can extend the refund period beyond 15 months from the refund effective date.

FN26. To the extent parties raise the same arguments on rehearing of the December 15 Order, we similarly deny rehearing.

FN27. E.g., Comments filed November 22, 2000, by Southern California Edison Company (SoCal Edison), Pacific Gas and Electric Company (PG&E), SDG&E, City of San Diego, County of San Diego, California Commission, TURN/UCAN, California State Senator Morrow, Oversight Board, California Legislature, San Diego Association of Governments.

FN28. E.g., Comments of DOE, Enron, Calpine, Dynegy, PPL EnergyPlus, Reliant, Duke Energy, Williams, IEP, WPTF, Xcel Energy. DOE also comments that Congress should examine whether to amend the FPA to provide the Commission with authority to require retroactive refunds in the future.

FN29. 16 U. S.C. § 824e(a) (1994).

FN30. Comments of County of San Diego at 11-13.

FN31. Contrary to County of San Diego, the rationales underlying the filed rate doctrine apply to market-based rates. First, San Diego is incorrect that Section 205(c) requires prior notice of the actual market-based, numerical rates. In addition, the fact that a market-based tariff or rate schedule is on file instead of a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

specific, quantified rate is not dispositive, so long as buyers know (or can know by examining the Commission's public files) the type of rates authorized for each seller. The principle of predictability requires that the parties know the type of rate being used, not necessarily the exact numerical rate. When a buyer knows market-based rates are being used, the buyer can predict that rates will fluctuate with differing conditions, and can plan accordingly. That is all that is required. Thus, the filed rate doctrine and its corollary, the rule against retroactive ratemaking, apply to market-based rates.

FN32. Power Co. of America, L.P. v. FERC, 245 F.3d 839, 846 (D.C. Cir. 2001).

FN33. See Towns of Concord, Norwood and Wellesley v. FERC, 955 F.2d 67, 73 (D.C.Cir 1992) (rejecting argument that assumes a "'right' ceases to exist unless it is backed up by a remedy, that the Commission's denying refunds equals the Commission's authorizing the utility to violate the filed rate doctrine . . . . This is good advocacy but the case cannot be decided on any such theory.").

FN34. In re: California Power Exchange Corp., 245 F.3d 1110, 1121 (9th Cir. 2001).

FN35. See United Gas v. Callery Properties, 382 U.S. 223, 229 (1965) (while the Commission has no power to make reparation orders, its power to fix rates being prospective only, it is not so restricted where its order, which never became final, has been overturned by a reviewing court); Reynolds Metals Co. v. FERC, 777 F.2d 760, 763 (D.C. Cir. 1985)(same). See also Tennessee Valley Mun. Gas Assn. v. FPC, 470 F.2d 446, 453 (D.C. Cir. 1972) (granting of refunds did not violate anti-reparations language in the statute which was designed to protect established expectations under legally established rate schedules. One "cannot claim justifiable reliance or protectable expectations based on [Commission] action which was illegal").

FN36. E.g., Comments of PG&E; Rehearing of PG&E.

FN37. Comments of City of San Diego.

FN38. These parties do not define a "fully competitive" or "workably competitive" market.

FN39. E.g., Comments of PG&E, Oversight Board, City of San Diego, California Commission, SDG&E, County of San Diego; Rehearings of SDG&E, PG&E, Oversight Board.

FN40. For example, in Washington Water Power Co., 83 FERC ¶ 61,282 (1998), the Commission imposed sanctions for violations by Washington Water Power Company (WWP) and its power marketer affiliate Avista Energy, Inc. (Avista), of Avista's market-based rate order, specifically the affiliate conduct, OASIS and Standards of Conduct requirements. Avista was required to disgorge its profits from the power sale at issue, and Avista's market-based rate authority was suspended prospectively for six months with respect to any power sale requiring the use of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

WWP's transmission system.

FN41. See also Comments of PG&E, SDG&E.

FN42. By comparison, with respect to costs collected through fuel adjustment clauses, acceptance of Commission authority to adjust such charges after-the-fact is a condition of acceptance of the fuel adjustment clause filings.

FN43. E.g., Louisville Gas and Electric Company, 62 FERC ¶ 61,016 at 61,143 n. 15 (1993).

FN44. See, e.g., Comments of SoCal Edison, citing the study attached as Exh. A to its comments (Paul Joskow and Edward Kahn, "A Quantitative Analysis of Pricing Behavior in California's Wholesale Electricity Market During Summer 2000" (Nov. 21, 2000)).

FN45. Comments of PG&E, SoCal Edison; Rehearings of SDG&E, PG&E. SoCal Edison cites Order No. 637-A, in which the Commission expressly did not make natural gas transportation rates subject to refund because it could rely on its authority to afford relief pursuant to section 16 of the Natural Gas Act (NGA), which is analogous to section 309 of the FPA. See Regulation of Natural Gas Transmission Services and Regulation of Interstate Natural Gas Transportation Services, FERC Stats. & Regs. ¶ 31,091 (2000), order on reh'g, 91 FERC ¶ 61,191 (2000), appeal pending sub nom. Process Gas Consumers v. FERC, No. 00-1217 (D.C. Cir. filed May 26, 2000). SoCal Edison argues that the Commission could apply section 309 similarly in this case.

FN46. FPA section 309 states in pertinent part: "The Commission shall have power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this Act."

FN47. Accord, e.g., McCombs v. FERC, 705 F.2d 1177, 1184-85 (10th Cir. 1980); Murphy Oil Corp. v. FPC, 431 F.2d 805, 810 (8th Cir. 1970).

FN48. 826 F.2d 1101 (D.C. Cir. 1987), cert. denied, 490 U.S. 1039 (1989).

FN49. 826 F. 2d at 1109-10 and 1104-05; Nader v. FCC, 520 F.2d 182, 204 (D.C. Cir. 1975).

FN50. See 826 F.2d at 1111.

FN51. Id. at 1108.

FN52. Niagara Mohawk (constructing a hydro facility without a license), Mesa Petroleum (abandonment without prior Commission approval), and Louisiana Public Serv. Comm'n (collections in violation of filed rates).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN53. While the Commission in other orders and in other contexts has stated that it does not have jurisdiction over non-public utilities under sections 205 and 206 of the FPA, we have re-examined our authority in the particular circumstances presented here: a centralized single clearing price auction that sets wholesale prices for both public utilities and non-public utilities, pursuant to market rules set by this Commission and administered by public utilities subject to this Commission's jurisdiction (the California ISO and PX).

FN54. 93 FERC at 61,370; see also December 15 Order, 94 FERC at 62,010-11 (same).

FN55. One such seller was City of Los Angeles, Department of Water & Power, whose Agreement was docketed as ER98-1934-000. Id.

FN56. We note that non-public utilities (e.g., Turlock Irrigation District and the City of Burbank) are seeking refunds for what they perceive are excessive charges paid in these markets. Under the maxim that those who seek equity must do equity, McQuiddy v. Ware, 87 U.S. 14,19 (1873); In re Gardenshire, 209 F.3d 1145, 1152 n. 11 (9th Cir. 2000), it would only be fair that these same utilities be willing to pay refunds related to any excessive amounts they may have collected.

FN57. That is, prospective application for some, and retrospective application for others.

FN58. See Statement of the Undersigned Generators to the Chief Judge, dated July 9, 2001, at 8.

FN59. If DWR (or any other party) believes any of its contracts are unjust and unreasonable, it may file a complaint under FPA section 206 to seek modification of such contracts.

FN60. See Confidentiality, Non-Disclosure and Use of Information Agreement dated January 24, 2001 filed as Attachment G by the ISO on June 19, 2001 in Docket No. ER01-889-005.

FN61. 93 FERC at 61,349.

FN62. Id. at 61,350.

FN63. 92 FERC at 61,608.

FN64. 10 C.F.R. § 205.376 (2001)

FN65. 11 U.S.C. § 362(a)(1) (1994 & Supp. 2000).

FN66. 11 U.S.C. § 362(b)(4) (1994 & Supp. 2000).

FN67. See Virginia Electric and Power Company, 84 FERC ¶ 61,254 (1998); and Century Power Corp., 56 FERC ¶ 61,087 (1991). The Commission conclusion on this mat-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ter is consistent with judicial precedent regarding the scope of the exemption to the automatic stay. E.g., Board of Governors of the Federal Reserve System v. MCorp Fin., Inc., 502 U.S. 32 (1991); SEC v. Brennan, 250 F.3d 65 (2nd Cir. 2000); NLRB v. Continental Hagen Corp., 932 F.2d 828 (9th Cir. 1991); United States v. Commonwealth Cos. Inc. 913 F.2d 518 (8th Cir. 1990); NLRB v. Edward Cooper Painting, Inc. 804 F.2d 934 (6th Cir. 1986); Penn Terra Ltd. v. Dept. of Environmental Resources, 733 F.2d 267 (3rd Cir. 1984); In re Pacific Gas and Electric Co., et al., No. 01-30932 (Bankr. N.D.Cal. June 1, 2001)(finding the regulatory exception applies to a California Commission decision affecting PG&E's financial condition); see generally 3 Collier on Bankruptcy § 362.05 (15th ed. rev. 2000).

FN68. For the periods when the ISO instituted 10-minute dispatch protocols, we direct the ISO to take the average of the maximum heat rates for the six 10-minute periods in order to develop a market clearing price for application in the hourly auctions (including the PX markets). For the purposes of rerunning the settlement/billing process in the imbalance market, we direct the ISO to substitute the revised market clearing prices calculated for each 10-minute period in its settlement software.

FN69. Prior to market-based rates, economy sales (or sales from capacity available after a public utility's requirements and other firm customers were served) were the equivalent of spot market sales. Economy sales were priced at incremental or marginal cost, which was based on a fuel charge equal to the replacement cost of fuel. See, e.g., Indiana & Michigan Electric Company, et al., 10 FERC ¶ 61,295 (1980).

FN70. We note that NGI's Daily Gas Price index and Inside FERC's Gas Market Report did not have a listing for Southern California Gas Large Packages during the refund period. Therefore, we instruct the ISO to use the Financial Times Energy's "Gas Daily" for calculation of the southern gas price during the refund period.

FN71. See, e.g., comments of Pinnacle West Companies, Public Service Company of New Mexico.

FN72. See, e.g., comments of PG&E, California Parties.

FN73. Comments of Reliant, Mirant.

FN74. What is a "spot market" sale for bilateral transactions in the Pacific Northwest may differ from what is a "spot market" sale in the California ISO and PX organized spot markets.

FN75. December 25, 2000 is the earliest refund effective date the Commission could establish for Puget's complaint regarding rates in the Pacific Northwest if the Commission determines that it is appropriate to deny Puget Sound's motion to withdraw the complaint, and, further, to grant rehearing of the Commission's previous determination not to set the complaint for hearing.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN76. The Commission intends to take up the Motion to Withdraw in Docket No. EL01-10-000, Puget Sound Energy Inc. v. All Jurisdictional Sellers of Energy, et al., in an expeditious time frame after the judge's certification of the record.

MASSEY, Commissioner, dissenting in part and concurring in part:

****32** I am pleased that the Commission today addresses head on the tough issue of refunds for the victims that took the brunt of the wildly dysfunctional Western power market. The issue comes back to us after a brief attempt by our Chief ALJ to bring the parties together in a voluntary settlement. Judge Wagner did an admirable job under very difficult circumstances and we owe him our gratitude for the valiant effort. But now it is time for the Commission to fulfill its responsibility to the customers of California and other parts of the West.

One of the issues where I disagree with the majority is extending a potential refund obligation to non-public utilities that are otherwise not jurisdictional. Commissioner Breathitt and I are issuing a joint dissent on that issue today.

Today's order also provides very specific guidance on how refunds are to be calculated back to October 2, 2000. In essence, the order applies retrospectively the mitigation measures the Commission set out in our June 19th mitigation order with some adjustments recommended by Judge Wagner in his excellent report on the settlement negotiations. Although I agree with many of the conclusions we reach, I disagree with some aspects of that guidance.

***61522** My first area of disagreement is the use of daily spot gas prices as reported in various publications to determine the fuel cost component of the mitigated market clearing prices. It simply is not clear to me that generators purchased gas at those spot prices to replace the gas used to generate electricity for sale into the spot markets. And we do not have to guess at whether they did or not. We are dealing with an historical locked in period for which expenses are known or knowable. During that period, we can use actual fuel costs to determine the just and reasonable price, and we should do so. In supporting the majority's decision to use a different gas index for the refund calculation than that used for the prospective mitigation, the order says that "the gas treatment in the June 19 order was intended to address and influence purchasing decision for prospective sales" and that "there is simply no support for requiring a similar treatment for retroactive application to past sales." I agree with that. We are not trying to influence future behavior in this order, but instead are determining just and reasonable prices for past periods and refunds for customers. We should use the most accurate data we have, and that is actual fuel costs. Therefore, I will dissent from this aspect of the order.

I also object to the inclusion of a 10% creditworthiness adder in determining the mitigated market clearing price that will be used to calculate refunds. I expressed concerns with including this adder as part of the Commission's forward

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

looking price mitigation plan established in the June 19 order. Today, I conclude that this adder is unnecessary in calculating refunds. Prices skyrocketed in June 2000 and remained high for the better part of a year. Indeed, the Commission found that conditions in the market "have caused, and continue to have the potential to cause, unjust and unreasonable rates...under certain conditions." [FN1] Yet today's order concludes that there is no opportunity for refunds for transactions before October 2, 2000. I support that conclusion but it is clear that sellers charged prices that were not just and reasonable before that date. The fact that there will be no refunds for sales before October 2, 2000 presents strong equity considerations influencing my conclusion that the creditworthiness adder is not necessary in this generous market. Therefore, I will dissent from this aspect of the order.

****33** As a final note on the California portion of this order, I am concerned that the Commission still fails to address squarely the issue of generation withholding during the refund period and before. The market clearing prices for the refund period are determined by a method that uses the dispatch that actually occurred. As some parties suggest here, the actual dispatches reflect the withholding of more efficient units that drove up the market clearing price. The record in this case contains a number of studies that indicate withholding. Two that come to mind are those submitted by the ISO's director of market analysis, Dr. Anjali Sheffrin, and by Drs. Paul Joskow and Ed Kahn. I find these studies instructive. Today's order fails to take the issue of withholding into account in setting a refund formula.

A separate concern is what could the Commission do if we found deliberate withholding in the California spot markets, or anywhere else for that matter. In a section of the order dealing with whether we can go back before the October 2, 2000 date for refund liability, the order says we can do so only if the seller "did not charge the filed rate or violated statutory or regulatory requirements or rules in applicable rate tariffs." My concern is that the Commission would not be able either to find that these conditions were violated or take other actions against sellers that deliberately withheld power from the market because, until April 26, 2001, there were no tariff conditions prohibiting withholding in western markets. This is a major flaw in Commission policy. The Commission must set the rules of the road in our tariffs. As the Commission updates its standards for approving market based rates, we must include generic tariff conditions nationwide that prohibit this kind of bad behavior. I urge my colleagues to consider prompt action to remedy this flaw.

I have one final comment on today's order. The order establishes a 15-day proceeding to facilitate development of a factual record on whether there may have been unjust and unreasonable charges for sales in the Pacific Northwest for the period beginning December 25, 2000. This proceeding has its genesis in the complaint of Puget Sound Energy. Buyers in the Northwest paid outrageous prices for power that caused much economic dislocation. To that end, I am pleased that we finally take

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

up the issue of bringing refund relief to that region. The order states correctly that spot market sales in the Pacific Northwest may differ from the definition of a spot market sale in the California organized spot market. I agree. I believe spot sale in the Pacific Northwest could include sales up to a month's duration or even ***61523** longer. I would be prepared formally to grant rehearing and investigate the Puget complaint today, but it seems that today's order charts an evidentiary path to reach this conclusion ultimately, and I concur with these provisions.

For these reasons, I dissent in part from, and concur in part with, today's order.

FN1. San Diego Gas & Electric Company, et al., 93 FERC ¶ 61,121 at 61,349-50 (2000), reh'g pending.

****34** ____________________

William L. Massey
Commissioner

BREATHITT and MASSEY, Commissioners, dissenting in part:

We respectfully disagree with the conclusion reached in this order to extend a potential refund obligation to sellers into the California spot markets that are not jurisdictional public utilities. The majority concludes that while "we do not have direct regulatory authority over power sales by non-public utilities, we do have authority to order them to abide by the market rules we establish to make refunds of unjust and unreasonable rates for sales pursuant to those market rules."

Although this rationale certainly has strong appeal, especially as a matter of equity, we are not sufficiently comfortable with it. The refund rules of section 206 of the Federal Power Act are rather specific. If Congress had wanted the Commission to have refund authority over non-public utilities, Congress would have surely so specified. The breathtaking conclusion that this agency has the power to tell non-public utilities to pay money back will come as a shock to most observers.

We understand and appreciate the strong equity rationale behind the majority's decision. Perhaps this interpretation of the Commission's refund authority ought to be the law, but we are not yet persuaded that it is allowed by existing law. Unfortunately, the majority's conclusion ensures that the matter of refunds will probably never be settled and will be litigated for years.

For these reasons, we dissent in part from today's order.

____________________

Linda K. Breathitt
Commissioner

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

____________________

William L. Massey
Commissioner

BREATHITT, Commissioner, dissenting in part:

I respectfully disagree with the majority's inclusion of a ten percent creditworthiness adder in the methodology to determine refund liability. The rationale stated in this order, that sellers cannot be assured that buyers will pay the full refunds due, is not persuasive in my opinion.

I was concerned about the creditworthiness adder included on a prospective basis through the market clearing price methodology established in our June 19, 2001 order. There I concurred on this issue. Today I will dissent on this issue because I see even less reason for such an adder to be included on a retroactive basis through the refund methodology.

____________________

Linda K. Breathitt
Commissioner

96 FERC P 61120, 2001 WL 1704964 (F.E.R.C.)
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.