# PLAINTIFFS PACIFIC GAS AND ELECTRIC COMPANY, SOUTHERN CALIFORNIA EDISON COMPANY, AND SAN DIEGO GAS & ELECTRIC COMPANY'S APPENDIX TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

**VOLUME 2 OF 3**

**Part 5 of 5**

109 FERC 61,218
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: Pat Wood, III, Chairman;
Nora Mead Brownell, and Joseph T. Kelliher.

San Diego Gas & Electric Co., Complainant — EL00-95-100

v.

Sellers of Energy and Ancillary Services Into Markets Operated by the California Independent System Operator and the California Power Exchange, Respondents

Investigation of Practices of the California Independent System Operator and the California Power Exchange — EL00-98-088

ORDER ON REHEARING

(Issued November 23, 2004)

1. In this order, the Commission addresses requests for rehearing and or clarification of the May 12 Order on Requests for Rehearing and Clarification.[1] The instant order benefits customers by providing clarification of the method for calculating refunds for electricity purchases made in the organized spot markets in California during the period from October 2, 2000 through June 20, 2001 (the Refund Period).

[1] *See San Diego Gas & Electric Company, et al.*, 107 FERC ¶ 61,165 (2004) (the May 12 Order).

## I. Background and Pleadings

2. In the May 12 Order, the Commission addressed numerous requests for rehearing and/or clarification of two orders issued on October 16, 2003 in these proceedings.[2] The May 12 Order: 1) denied rehearing in part, granted rehearing in part and provided certain requested clarifications of the October 16 Main Order; 2) directed the California Independent System Operator Corporation (CAISO) to provide a full explanation of the form and content of the emissions and fuel cost data it needs to complete its refund rerun calculations; 3) directed the CAISO to complete all phases of its refund process and to submit its financial phase compliance filing by August 31, 2004; 4) directed Automated Power Exchange, Inc. (APX) to submit a compliance filing within 60 days after the Commission accepts CAISO's financial phase compliance filing; 5) directed Scheduling Coordinators to inform the Commission as to whether they will be able to reconcile the CAISO's financial phase compliance report with their market participants and complete any necessary dispute resolution process within two weeks of the Commission's acceptance of the CAISO compliance filing; 6) directed Arizona Electric Power Cooperative, Inc. (AEPCO) to inform the Commission as to whether it intends to file to recover additional fuel cost allowance; 7) directed the parties to submit briefs addressing whether Grant County's transactions with the CAISO were bilateral or Out of Market (OOM) transactions, with reference to evidence stricken by the administrative law judge or already in the record; and (8) directed the parties to file briefs addressing whether Turlock Irrigation District's (Turlock) transactions with the CAISO were bilateral or OOM transactions, with specific reference to facts already in the record.

3. The Commission received fourteen timely requests for rehearing and/or clarification from the following: AEPCO; Allegheny Energy Supply Company, LLC (AE Supply); CAISO; the California Parties;[3] the Indicated California Generators

[2] *See San Diego Gas & Electric Company*, *et al.*, 105 FERC ¶ 61,066 (2003) (the October 16 Main Order) and *San Diego Gas & Electric Company, et al.*, 105 FERC ¶ 61,065 (2003) (the October 16 Second Order).

[3] The California Parties comprise the following: the People of the State of California *ex rel.* Bill Lockyer, Attorney General (the California Attorney General); the California Electricity Oversight Board (CEOB); the California Public Utilities Commission (CPUC); Southern California Edison Company (Edison); and Pacific Gas and Electric Company (PG&E).

(CA Generators);[4] the Competitive Supplier Group;[5] Duke Energy North America, LLC and Duke Energy Trading and Marketing, L.L.C. (collectively, Duke); El Paso Merchant Energy L.P. (EPME); Public Utility District No. 2 of Grant County, Washington (Grant County); Northern California Power Agency (NCPA);[6] and Turlock. In addition, compliance filings from Scheduling Coordinators informing the Commission concerning their ability to reconcile and complete dispute resolution with their respective market participants were made by APX, the California Power Exchange Corporation (CalPX), NCPA and the Western Area Power Administration (Western).

### A. <u>Briefs Addressing the Grant County Jurisdictional Issue</u>

4. As stated above, the Commission directed the parties to file briefs addressing the issue of the Commission's jurisdiction over whether certain transactions by governmental entities such as Grant County and Turlock were bilateral transactions and therefore exempt from mitigation or were OOM transactions subject to mitigation.[7] Initial briefs

---

[4] The California Generators comprise the following: Duke Energy North America, LLC, Duke Energy Trading and Marketing, L.L.C. (collectively, Duke Energy); Dynegy Power Marketing, Inc. (Dynegy); El Segundo Power (El Segundo), LLC; Long Beach Generation, LLC (Long Beach); Cabrillo Power I LLC (Cabrillo I); Cabrillo Power II, LLC (Cabrillo II); Reliant Energy Power Generation, Inc., *et al.*; Williams Power Company, Inc.; and Mirant Americas Energy Marketing, LP and Mirant California LLC (collectively, Mirant).

[5] The Competitive Supplier Group comprise the following: Avista Energy, Inc.; Constellation Power Source, Inc.; Coral Power, L.L.C.; Exelon Corp.; IDACORP Energy LP; PPL EnergyPlus and PPL Montana (collectively, PPL); LLC; Portland General Electric Company; Powerex Corp.; Puget Sound Energy, Inc. (Puget); Sempra Energy Trading Corp. (Sempra); TransAlta Energy Marketing (CA) Inc. and TransAlta Energy (US) Inc.; and Tucson Electric Power Company.

[6] NCPA filed a Motion for Leave to File Out of Time and Comments on May 28 in addition to a Request for Rehearing, filed on June 10. Both of these pleadings were timely filed.

[7] In earlier orders in the Refund Proceeding, the Commission determined that short-term bilateral transactions, other than OOM transactions, would not be subject to mitigation. *See, e.g.*, *Diego Gas & Electric Company, et al.* 95 FERC ¶ 61, 418 (2001) (the June 19 Order) at 62,257; and 97 FERC ¶ 61,275 (2001) (the December 19 Order) at 62,196, 197. The Commission's rationale for requiring that OOM transactions be subject (continued)

were filed by: CAISO; the California Parties; Grant County, the City of Los Angeles Department of Water Power (LADWP); Sempra and Turlock. Replies, answers or other responsive pleadings were filed by CAISO; Grant County; PPL; and Puget. Finally, the Grant County jurisdictional issue was raised by several parties in requests for rehearing and/or clarification. These briefs will be discussed in detail *infra*.

### B. Responsive Pleadings

5. In addition to the rehearing pleadings described above, several pleadings of a responsive nature were filed, in addition to responses to responses. On June 29, APX filed a response to AE Supply's Request for Reconsideration and Clarification, to which AE Supply filed a response on July 14. Subsequently, APX filed another response to AE Supply's response on July 23, which was followed on July 30 with AE Supply's response. The essence of their dispute is whether the Commission erred in denying AE Supply's request to intervene out-of-time in these proceedings in the May 12 Order. AE Supply claims that the Commission's determination to deny it intervenor status was legally flawed, and APX asserts that the Commission was correct and that AE Supply was a market participant and intervenor who chose to withdraw from the proceedings and should not be allowed to re-intervene.

6. The Indicated Generators[8] filed an answer to CAISO's motion for rehearing on June 29, to which CAISO responded in a pleading filed on July 14 jointly with the California Parties and San Diego Gas & Electric Company (SDG&E). The essence of their dispute pertains to issues involving the CT 485 fund and the California Energy Resources Scheduling Division of the California Department of Water Resources (CERS). On July 6, the Indicated California Generators filed another responsive pleading, this time taking issue with a CAISO motion filed on June 18 seeking clarification or, if necessary, reconsideration of paragraph 82 of the Commission's October 16 Order. CAISO's motion alleges that paragraph 82 misconstrues section

---

to mitigation is set out in the July 25 Order, where the Commission observed that "To the extent that the [CA]ISO made spot market OOM purchases (*i.e.*, 24 hours or less and that were entered into the day of or day prior to delivery), such purchases are no different than purchases through its markets. Both types of purchases are made by the [CA]ISO in order to procure the resources necessary to reliably operate the grid." 96 FERC ¶ 61,120 (2001) (July 25 Order) at 61,515.

[8] The Indicated California Generators consist of members of the California Generators except for Dynegy, El Segundo, Long Beach, Cabrillo I, and Cabrillo II.

3.1.1(b) of CAISO's Settlement and Billing Protocol (SABP) and will conflict with CT 485 penalty allocations already approved by the Commission in a 2002 Grid Management Charge (GMC) Settlement.[9] The Indicated California Generators opposed CAISO's motion, stating that the Commission should not deal with the allocation of funds earmarked to reduce the GMC in this proceeding. CAISO filed a response on July 14, asserting that the GMC costs, which are the costs incurred by the CAISO to manage the grid, are calculated and then passed on to those entities that use the grid. CAISO avers that using penalty funds to reduce the GMC is consistent with the SABP of the CAISO Tariff and ensures that those parties most harmed by the actions of the generators (which resulted in the levying of the penalties) will be reimbursed for this harm. With respect to this motion, CAISO claims that it needs a prompt resolution by the Commission, because the manner in which the CAISO allocates CT 485 penalties is necessary for CAISO to complete its refund process calculations.[10]

7. On July 14, the California Parties filed a response to the California Generators' answer to the CAISO request for clarification of the Commission's May 12 Order. The essence of this pleading is to support the CAISO's request that the Commission clarify that if the record shows that all of the CERS energy had been properly classified as imbalance energy, no surcharge (for rectifying the misclassification) would be necessary. The California Generators' answer asserts that the Commission should determine that the majority of CERS transactions were non-mitigable bilateral purchases made to serve the net short load of the investor owned utilities (IOUs).

## **Commission Determination**

8. Rule 213(a)(2) of the Commission's Rules of Practice and Procedure[11] prohibits an answer to a request for rehearing unless otherwise ordered by the decisional authority.

---

[9] The GMC is the CAISO monthly charge on all Scheduling Coordinators intended to recover the CAISO's startup and development costs and the costs associated with the ongoing operation and maintenance of the grid, including financing costs. *See* CAISO Tariff Appendix A, Master Definitions Supplement. The 2002 Settlement was uncontested. *See* California Independent System Operator Corp., 101 FERC ¶ 61,371 (2002).

[10] Joint Response of CAISO, the California Parties and SDG&E to the Indicated California Generators' Answer at 5 – 6.

[11] 18 C.F.R. §385.213(a)(2) (2004).

We will accept the answers filed because they have provided information that assisted us in our decision-making process.

### C. Compliance Pleadings

9. The May 12 Order (Ordering Paragraph C) directed that certain parties file compliance reports addressing several party-specific factual issues. The May 12 Order directed the CAISO to provide a full explanation of the form and content of the emissions and fuel cost data it needs to complete its rerun process. On May 24, CAISO filed a report indicating the steps it intends to take to perform the recalculations that are required to implement the Commission's decision to allow recovery of emissions costs only for mitigated sales. With respect to fuel cost allowance data, the Commission outlined information necessary for suppliers claiming a fuel cost allowance to identify and directed the CAISO to indicate whether the list will meet the CAISO's needs. CAISO's May 24 compliance filing indicated that the list "most likely meets the [CA]SIO's needs in performing the calculations required of it."[12] No comments were filed on the CAISO's report. The Commission will accept this report as complying with the Commission's directive in the May 12 Order.

10. The May 12 Order (Ordering Paragraph F) directed all Scheduling Coordinators to inform the Commission as to whether they will be able to reconcile the CAISO's financial phase compliance report with their market participants within two weeks of the Commission's acceptance of CAISO's financial phase compliance report. Responses were filed by APX, CalPX, NCPA and Western.

11. Finally, the May 12 Order (Ordering Paragraph G) directed AEPCO to notify the Commission if it intends to file to recover additional fuel cost allowance. In its June 1 Response, AEPCO confirms that it will seek additional fuel cost allowance, and it asserts that the Commission needs to resolve a litany of issues that will affect the magnitude of AEPCO's purported additional need. However, these issues implicate the Commission's fuel cost allowance proceeding and will not be addressed in the context of the instant proceeding. The Commission will accept AEPCO's Response.

12. In the many requests for rehearing and/or clarification filed by members of every sector involved in the Refund Proceeding, several issues are prominently discussed by multiple commenters: CERS-related issues, the Commission's treatment of interest, and the issue of the Commission's jurisdiction over transactions involving Grant County and Turlock. In addition, commenters have raised several implementation issues and

[12] Report of the CAISO on Emissions Offsets and Fuel Cost Allowance at 4.

company-specific concerns. This order will address requests for rehearing and/or clarification of the following issues:

- Whether the Commission erred in determining that CERS energy should be mitigated;

- Whether the Commission should clarify that there is no need for a CERS surcharge if all the energy whose prices are to be mitigated by the CAISO was provided in real time;

- Whether the Commission erred in determining that interest on monies held in the CalPX Settlement Trust Account could be assessed at the actual interest rate (as opposed to the Commission interest rate); if not, whether other similar accounts by PG&E, CAISO and CT485 will be required to charge the actual interest rates or the Commission interest rate; and whether interest shortfalls should be allocated *pro rata* to all market participants;

- Whether the Commission misinterpreted the CAISO tariff when determining that Settlement and Billing Protocol Section 3.1.1(b) governs the allocation of CT 485 penalties;

- Whether the Commission erred in asserting jurisdiction over the transactions of governmental entities, such as Grant County and Turlock;

- Whether the Grant County/Turlock transactions were bilateral transactions and therefore not subject to mitigation or OOM transactions, which are subject to mitigation;

- Whether the obligation to pay Grant County for its sales rests with the Scheduling Coordinators or with the CAISO;

- Whether the Commission intends to provide adequate opportunities for parties to comment on the CAISO's process for completing the rerun calculations and reaching a final determination of who owes what to whom;

- Whether two weeks is sufficient time for the Scheduling Coordinators to complete reconciliation and dispute resolution with their customers following the CAISO's completion of the financial settlement phase;

- Whether actual refunds should be paid upon completion of the CAISO's financial settlement phase;

- Whether the Commission erred in determining that AEPCO should be liable for refunds;

- Whether AEPCO's power transmission costs should be considered in lieu of intra-California gas transportation costs in determining AEPCO's MMCPs and fuel allowance;

- Whether the Commission erred in denying AE Supply's motion to intervene out-of-time;

- Whether the Commission erred in denying Duke's motion to lodge the El Paso Master Settlement Agreement;

- Whether the Commission erred in striking from the record of the Refund Proceeding the California Parties' Comments in Opposition to Portland General's settlement in Docket No. EL03-65.

## II. The CERS Issues

### A. Whether the Commission erred in determining that CERS energy should be mitigated.

**Background**

13. In the May 12 Order, the Commission determined that CAISO must treat all of the CERS energy as Imbalance Energy and mitigate all of the CERS sales at the Mitigated Market Clearing Price (MMCP) like any other imbalance sale.[13]

**Comments**

14. California Parties request that the Commission grant rehearing of the May 12 Order's decision to mitigate Imbalance Energy sales by CERS because: 1) it produces

[13] May 12 Order at Paragraphs 61 – 62.

inequitable results,[14] 2) it violates due process rights and is not supported by evidence,[15] and 3) is a futile act.[16]

15. The CAISO also requests rehearing of the Commission's determination in the May 12 Order's to mitigate Imbalance Energy sales by CERS because: 1) it is an unwarranted departure from the course of this proceeding and is not supported by evidence,[17] and 2) results in an unjust shifting of costs for Imbalance Energy by failing to allocate the costs to all net negative deviators who benefited from the Imbalance Energy, including those generators who created the need for Imbalance Energy by failing to generate in real time as committed.[18]

**Discussion**

16. The Commission will deny requests that CERS energy not be mitigated. Since the July 25, 2001 Order [19] establishing the evidentiary procedures, the Commission has been developing and refining the procedure for calculating refunds related to transactions in the spot markets operated by the CAISO and the CalPX during the Refund Period (October 2, 2000 through June 20, 2001). As part of one step in the procedure, the Commission previously ruled that sales into the CAISO imbalance market for the Refund Period are to be mitigated.[20] As the CAISO has not mitigated the CERS energy, the Commission in its May 12 Order specifically directs CAISO to do so. Commenters now argue that the mitigation of CERS energy would have inequitable results. However, the commenters argue as if the mitigation was done in isolation rather than as part of an

---

[14] California Parties at 16.

[15] *Id.* at 25.

[16] *Id.* at 32.

[17] CAISO at 14.

[18] *Id.* at 15 – 17.

[19] 96 FERC ¶61,120.

[20] *See San Diego Gas & Electric Company, et al.*, 96 FERC ¶ 61,120 (2001) (July 25 Order) at 61,499; and San Diego Gas & Electric Company, *et al.* 97 FERC ¶ 61,275 (2001) (December 19 Order) at 62,172.

entire procedure, when it is the result of the entire procedure that is important. Furthermore, commenters do not explain how the procedure could arrive at an equitable result if CERS energy were given a different treatment than all other energy in the imbalance market. The Commission is not convinced that CERS energy should be treated differently from any other energy in the imbalance market.

17. The CAISO treated the approximately $2.9 billion of energy purchased by CERS as Imbalance Energy with the price not being mitigated. Market participants were charged the MMCP for their negative net deviations in the imbalance market. The amount by which the unmitigated CERS price exceeded the MMCP was allocated to the market participants in proportion to their net negative deviations. As the Scheduling Coordinator for the investor owned utilities (IOUs), CERS had about 90 percent of the net deviations. Thus CERS was, in effect, paying itself for about 90 percent of the amount by which the unmitigated CERS price exceeded the MMCP. The non-IOU market participants had about 10 percent of the net negative deviations, so they were charged about 10 percent of the amount by which the unmitigated CERS price exceeded the MMCP. The parties' estimates of the amount charged to non-IOU market participants because the CERS price exceeded the MMCP range from $248 million to $270 million.

18. Because CAISO was ordered to mitigate the price of the CERS Imbalance Energy, CERS must refund all amounts by which the unmitigated CERS price exceeded the MMCP. This refund is allocated back to those who were charged previously in proportion to their negative deviations. Thus, for 90 percent of the refund, CERS is effectively refunding to itself. The real effect of ordering mitigation of CERS energy prices is the refund of the remaining 10 percent share of the amounts by which the unmitigated CERS price exceeded the MMCP. This portion of the refund will be allocated back to the non-IOU participants who were charged initially this $248 to $270 million.

19. Under the procedure the Commission has established, CERS - like other resellers of purchased power, marketers, and those selling hydroelectric power - will be provided an opportunity after the conclusion of the refund hearing to submit evidence that the impact of the refund methodology on CERS' overall revenues over the Refund Period is inadequate.[21] California Parties argument that the mitigation followed by the demonstration of revenue inadequacy is somehow "futile" regarding CERS neither explains why CERS should be treated differently from any other reseller of energy in

[21] December 19 Order at 62,214.

being required to demonstrate the revenue, nor does it address the impact on other participants of CERS' energy not being mitigated. The Commission, to date, has not specified the method by which costs stemming from the cost recovery filings should be allocated.

20. As to arguments of insufficient evidence and opportunity for due process, neither CAISO nor the California Parties dispute that CERS' energy was accounted for by the CAISO as Imbalance Energy. The Commission's orders have been clear - prices of the imbalance energy market are to be mitigated to just and reasonable prices. To exclude CERS' sales would be to allow unjust and unreasonable prices for customers of that energy, even if such customers represent only a small portion of the customers.

### B. Whether there will be a need for a CERS surcharge if all the energy whose prices are to be mitigated by the CAISO were provided in real time.

**Background**

21. The Commission in its May 12 Order directed the CAISO, once it has determined who owes what to whom and refunds have been distributed, to apply a surcharge to the appropriate customers for any amounts that were inappropriately accounted for in treating (and thus mitigating) all CERS energy as Imbalance Energy.[22] The CAISO was directed to remove the mischaracterization as Imbalance Energy of both: 1) bilateral purchases by CERS from sellers that CERS scheduled on a day-ahead basis through the CAISO markets in order to meet the net short load of the IOUs; and, 2) purchases by the CAISO from sellers in real time in order to serve the net short load of the IOUs. The Commission directed the CAISO to submit a separate compliance filing detailing the necessary surcharge, surcharge levels, and allocation of surcharges when these corrections were completed.[23]

**Comments**

22. The CAISO states that it is performing a self-audit of its records of Imbalance Energy transactions during the Refund Period to identify what, if any, transactions fall within the categories that the Commission has directed it to include in the surcharge. The CAISO has committed to file with the Commission the results of this self-audit. The

---

[22] May 12 Order at Paragraph 63.

[23] *Id.* at Paragraph 63.

CAISO seeks clarification that, if its records show that no such transactions were recorded as Imbalance Energy, then there will be no need to develop a surcharge methodology.[24] The California Parties support this request for clarification.[25] The Indicated California Generators oppose this clarification, stating that it would "subvert the rationale of the surcharge" to allow the CAISO to rely on its settlement records, which accounted for the CERS purchases incorrectly in the first place, to identify CERS transactions that would be subject to the surcharge.[26] Instead of allowing CAISO to rely on its settlement records, the Indicated California Generators propose that CAISO deem as Imbalance Energy only that CERS energy purchased in real time in excess of the IOU net short load on an hourly basis that was purchased in response to CAISO instructions for grid reliability purposes.

**Discussion**

23. The Commission will grant the requested clarification. If CAISO's records do not indicate what CERS energy was mischaracterized as Imbalance Energy, then it has no basis on which to develop a surcharge for appropriate customers for any amounts that were inappropriately accounted for in treating (and thus mitigating) all CERS energy as Imbalance Energy.

24. The Commission rejects the Indicated California Generators' proposed answer because it would treat CERS differently from all other suppliers of Imbalance Energy and would generate inequitable results. No other participant in the Imbalance Energy market is required to net their real net short against the real energy supplied in order to determine the imbalance energy supplied. The Indicated California Generators do not provide any explanation as to why CERS should be treated differently. Furthermore, the proposed answer would produce inequitable results. For example, if an IOU were out of balance because a generator failed to produce as planned, and CAISO requested that CERS purchase power to maintain grid reliability, the Indicated California Generators' proposal would not compensate CERS for the cost of the purchased power equaling the IOU's

---

[24] CAISO Motion for Clarification at 13.

[25] California Parties' Response to the Answer of the California Generators to the CAISO Motion for Clarification at 13.

[26] Indicated Generators Answer to the CAISO Motion for Clarification at 10.

actual net short[27] even though CERS purchased that power at CAISO's request to maintain grid reliability. Clearly, this is an inequitable result.

## III. Interest Issues

### A. Whether the Commission erred in determining that interest on monies held in the CalPX Settlement Trust Account could be assessed at the actual interest rate (as opposed to the Commission interest rate); if not, whether other similar accounts held by PG&E and CAISO will be required to charge the actual interest rates or the Commission interest rate; and whether interest shortfalls should be allocated *pro rata* to all market participants.

**Background**

25. In the March 26 Refund Order,[28] the Commission adopted the presiding judge's Proposed Finding that interest on refunds as well as on unpaid balances would be calculated in the manner set out in section 35.19a of the Commission's regulations (the Commission's rate).[29] On rehearing, the California Parties sought clarification that buyers will not, under any circumstances, be required to pay greater interest than the Commission's interest rate. The Commission's October 16 Main Order granted this clarification.[30] Subsequently, the May 12 Order determined that the CalPX's actual interest rate that applies to the CalPX Settlement Trust Account would comply with the Commission's regulations, specifically the Commission's rate. The Commission reasoned that the CalPX was no longer in operation and had only the CalPX Settlement Trust Account to pay its remaining obligations.[31]

---

[27] CERS is eligible to collect the MMCP and to submit evidence that the impact of the refund methodology on its overall revenues over the Refund Period does not provide adequate compensation for only the energy deemed to be Imbalance Energy.

[28] *See San Diego Gas & Electric Company, et al.* 101 FERC ¶ 61,317 (2003) (the March 26 Refund Order).

[29] 18 C.F.R. § 35.19a (2002). The Commission's interest rate is an average of the prime rate for each quarter. The quarterly interest rates are posted on the Commission's website at www.ferc.gov/gas/interest.htm.

[30] October 16 Main Order at Paragraph 109.

[31] May 12 Order at Paragraph 34.

26. The interest rate determination in the Commission's May 12 Order raises subsidiary issues that were brought to the Commission in several requests for rehearing and/or clarification and, in the case of the CAISO, a Motion for Clarification of Paragraph 82 of the October 16 Main Order. On rehearing, parties seek three related clarifications or changes in the May 12 Order's treatment of interest. They assert that: 1) the same interest rate should apply for all payments that include an interest component; 2) shortfalls resulting from the difference between the Commission's interest rate and the CalPX's Settlement Trust Account earned rate should be allocated fairly (*i.e.*, on a *pro rata* basis); and 3) the Commission should allow the CAISO to utilize the earned interest rate for funds in its CT 485 escrow account in lieu of the Commission's higher interest rate, just as the Commission allowed the CalPX to utilize its earned interest rate for the Settlement Trust Account.

**1. <u>Use of earned interest rates as opposed to the Commission's interest rate and implications for interest shortfalls</u>.**

**<u>Comments</u>**

27. On rehearing of the May 12 Order, the California Parties sought further clarification that a reasonable approach for dealing with interest shortfalls from the CalPX Settlement Trust Account would be to permit the CalPX to satisfy its interest obligation from earnings accrued in its Settlement Trust Account rather than utilizing the Commission's rate. In the May 12 Order, the Commission determined that there would be a shortfall in interest that required either a method for raising funds to pay the difference in interest rates or a method for allocating the interest shortfall among CalPX participants.[32] The Commission granted the requested clarification and adopted the California Parties suggestion to "define away the shortfall by deeming the interest rate that applies to the Settlement Trust Account to satisfy the Commission's regulations." The Commission stated that this method was an equitable solution, more easily administered and therefore preferable to the alternative of a *pro rata* allocation of the shortfall.[33]

28. The California Generators, CSG, and EPME assert that: 1) the possibility of an interest shortfall is the result of the CalPX's actions;[34] 2) the May 12 Order inequitably allocated all of the potential interest shortfall resulting from the CalPX Settlement Trust

---

[32] May 12 Order at Paragraph 34.

[33] *Id.* at Paragraph 34.

[34] California Generators at 6; CSG at 6.

Account earning less than the Commission's rate solely to sellers;[35] 3) the May 12 Order results in asymmetrical treatment of funds owed and refunds due, and therefore, it conflicts with previous Commission orders that required symmetrical treatment of these amounts;[36] 4) the May 12 Order is contrary to the October 16 Main Order, which determined that any shortfalls in amounts owed to sellers due to insufficient interest earned on the CalPX Settlement Trust Account would be made up by purchasers;[37] and 5) parties have not been afforded due process through the opportunity to develop a full record concerning potential cash flows that could be available to cover the interest shortfall in the CalPX market.[38]

29. The California Generators also assert that the Commission should withdraw its determination on the CalPX interest shortfall issue and invite parties to brief the issue, submit evidence of all cash flow implications and examine the equitable considerations and potential solutions to the problem that the CalPX created.[39] The California Generators submit the following as an example of a possible solution to the shortfall issue. They submit that the CalPX Settlement Trust Account holds funds that Edison paid into it in amounts due before refunds. The California Generators assert that Edison may have calculated interest on these amounts at a higher rate than was subsequently earned by the CalPX Settlement Trust Account. Consequently, the California Generators raise the possibility that the interest accrued by CalPX on the over funded amounts may be sufficient to cover the interest shortfall that may result from the Settlement Trust Account earning less than the Commission's rate.[40]

30. CSG submits that, to the extent that the Commission upholds the May 12 Order's determination on allocation of the interest shortfall, it should clarify that it did not intend to apply the earned rate on those funds that already have been paid into the CalPX Settlement Trust Account at the Commission's rate.[41] CSG and EPME contend that

[35] CSG at 5 – 7; EPME at 2. EPME's request for rehearing or clarification states that it joins in the positions advocated by CSG in its request for rehearing or clarification.

[36] California Generators at 8; CSG at 9.

[37] *Id.* at 6.

[38] *Id.* at 6 and 9.

[39] *Id.* at 9.

[40] *Id.* at 8 - 9.

[41] CSG at 8.

allowing this interpretation, as advocated by the CalPX,[42] would further disadvantage the sellers.[43] CSG argues that the May 12 Order applied only to the interest shortfall on amounts held in the CalPX Settlement Trust Account after March 2002.[44]

31. CSG further contends that the May 12 Order should in no way apply to PG&E funds because PG&E's escrow account is separate from the CalPX Settlement Trust Account, and there is no basis for similar treatment.[45] Additionally, CSG and EPME ask that the Commission clarify that the CAISO and CalPX should calculate amounts owed and owing by applying the same interest rate to both overcharges and amounts owed to sellers,[46] and only then, if there is a shortfall, should the provisions of the May 12 Order be implemented.[47]

**Commission Determination**

32. The Commission will grant rehearing of the May 12 Order and find that the earned rate on the CalPX Settlement Trust Account will *not* be used to satisfy the Commission's rate. Allowing the use of the earned rate would result in asymmetrical matching of various funds throughout the Refund Period. Furthermore, to the extent a shortfall occurs in the CalPX market as a result of the earned rate on the CalPX Settlement Trust Account being lower than the Commission's rate, both buyers and sellers alike should share the burden of the shortfall equally. The Commission finds this treatment appropriate because the shortfall is attributable to the CalPX's actions, and therefore, it would be inappropriate to require either the buyers or the sellers to shoulder the entire burden. This treatment is similar to what the Commission required in the CAISO market, where the Commission found that both creditors and debtors alike should share the burden of shortfalls when they occur for structural reasons that are not primarily attributable to either the creditors or the debtors.

---

[42] *See* California Power Exchange Corporation's Answer to Motion of City of Los Angeles Department of Water and Power for Order Directing Disbursement of Unmitigated Past Due Principal Amounts at 3 (May 21,2004).

[43] CSG at 8; EPME at 2.

[44] *Id.* at 8.

[45] *Id.* at 8.

[46] *Id.* at 8; EPME at 2.

[47] CSG at 8.

33. In implementing the methodology described above, the Commission believes that the net result will be that the buyers pay a little and the sellers give a little. For example, if the sellers are owed $20 in interest and the buyers owe $15 in interest, the $5 difference will be allocated half to sellers and half to buyers. The end result would be that the buyers pay $17.5 and the sellers receive $17.5. This is a compromising approach and the Commission recognizes that it is imperfect. However, the Commission finds that it will result in unbiased treatment for all parties.

34. In addition, allocating these amounts to participants on an individual basis would require a *pro rata* allocation of sorts. There may be many reasonable methods for allocating these amounts. For example, allocating these amounts based upon the net interest position of each participant may be reasonable. Therefore, the Commission directs the CalPX to file, within 15 days, a proposed methodology, with appropriate support, allocating these amounts to individual participants.

35. The Commission disagrees with assertions by CSG and the California Generators, who argue that they have not been afforded due process and the opportunity to develop a full record concerning potential cash flows that could be available to cover a shortfall in interest in the CalPX market.[48] The Commission finds the California Generator's example of possible overfunding by Edison of amounts paid into the CalPX Settlement Trust Account and the potential to utilize those funds to cover the "interest shortfall" to be speculative.[49] Inasmuch as a final determination of who owes what to whom has not been made, it would be difficult at best to provide evidence that cash is available to reduce a shortfall of an undetermined amount. Thus, the Commission finds that there will be no benefit in allowing parties to present information of a speculative nature into the record at this time.

36. Finally, the CSG urges the Commission not to substitute the PG&E escrow rate for the Commission's rate. It states that there is no basis to apply the May 12 ruling on the CalPX's interest rate to PG&E, "since it has not paid any funds into the CalPX Settlement Clearing Account and thus there is no interest shortfall for any such payments. Only if such payments were made would there be any reason to consider similar treatments for PG&E."[50] It is unclear from these comments where the question of what rate applies to the PG&E escrow funds originated. Nevertheless, the Commission is not aware of any special circumstances, nor have parties presented evidence of special

[48] California Generators at 9; CSG at 6.

[49] California Generators at 8 - 9.

[50] CSG at 8.

circumstances that would warrant exempting PG&E from the Commission's requirement that participants will pay amounts owed with interest calculated at the Commission's rate.

**2. Netting of interest owed by and owed to CAISO from amounts collected from the CalPX Settlement Trust Account.**

**CAISO Proposal and Comments**

37. The CAISO requests that the Commission allow it to allocate *pro rata* to market participants[51] any shortfall resulting from interest collected from the CalPX as a result of the May 12 Order. The CAISO states that the CalPX, which is both the largest debtor and purchaser in the CAISO market during the Refund Period, will owe and be owed large amounts of interest at the completion of the CAISO's interest calculations. The CAISO anticipates that the CalPX will be in the net position of owing the CAISO market interest. To confirm this, however, the CAISO states that it will have to perform several calculations to determine the CalPX's net interest position. The CAISO will calculate interest as set forth in the October 16 Main Order (*i.e.*, at the Commission's rate). These calculations will determine the amount of interest CalPX owes to the CAISO market on all amounts unpaid by the CalPX during the Refund Period. The calculations will also determine the amount of interest the CAISO owes to the CalPX, which the CAISO will calculate by applying the Commission's rate to all refunds it owes to the CalPX as a purchaser in the CAISO market during the Refund Period. The CAISO will then net these two figures to determine the final amount of interest either owed to the CAISO market by the CalPX, or owed to the CalPX by the CAISO market. This calculation process has already been approved in the Refund Proceeding.[52]

38. After it has netted the results of the calculations, the CAISO proposes that the CalPX calculate the amount of interest it *can* pay to the CAISO market based upon the interest it has earned in the CalPX Settlement Trust Account and interest due on amounts not yet paid to it by those for whom it served as Scheduling Coordinator in the CAISO market. If the CalPX can only pay a portion of what it owes the CAISO, then the CAISO will assign this shortfall *pro rata*, based upon each market participant's net interest position, to all market participants, excluding the CalPX during the final invoicing process. The CAISO believes that this is an equitable solution for the participants and is consistent with previous Commission orders that require debtors and creditors to be

---

[51] CAISO at 3 – 6.

[52] October 16 Main Order Paragraphs 88 – 109.

allocated shortfalls equally.[53] The Indicated California Generators agree with the CAISO's proposal.[54]

**Commission Determination**

39. The Commission finds that the CAISO proposal will provide an equitable solution to the problems associated with interest shortfalls in the transactions between CAISO and the CalPX. Therefore, the Commission directs that the CAISO allocate to market participants (excluding the CalPX), on a *pro rata* basis, any shortfall in interest collected from the CalPX as a result of the CalPX Settlement Trust Account earning less than the Commission's rate.

### 3. Interest issues arising from the CAISO's CT 485 Account.

**Background**

40. In its June 16 Motion, the CAISO requests similar treatment on over-collected Charge Type (CT) 485 penalties[55] held in an escrow account. CAISO states that it charged approximately $122 million in CT 485 penalties to generators that failed to respond to CAISO dispatch instructions. To date, the CAISO has collected $60 million, $20 million of which has been applied to reduce the CAISO's revenue requirement recovered through the GMC. The remaining $40 million has been deposited in an escrow account earning approximately 1 percent per annum, which is less than the Commission's rate.[56]

41. The CAISO requests that the Commission allow it to apply the interest rate earned on CT 485 penalties in escrow to satisfy the Commission's rate for the same reasons the Commission allowed the CalPX to apply its earned interest rate in lieu of the Commission's rate. The CAISO asserts that it retains control of the CT 485 funds held in escrow; therefore, as a cash neutral entity, if it were held responsible for the resulting

---

[53] CAISO Motion for Clarification at 4 - 5.

[54] Indicated California Generators' Answer to CAISO at 4 - 5.

[55] CT 485 penalties are penalties imposed by the CAISO during the Refund Period on participating generators that failed to comply with dispatch instructions during an actual or threatened system emergency.

[56] CAISO Motion at 6 - 7.

interest shortfall, it would have to charge market participants to fund that difference.[57]

**Comments**

42. The Indicated California Generators oppose this request, asserting that the CAISO has sufficient funds to pay the Commission's rate. They contend that the CAISO's CT 485 funds differ from the CalPX Settlement Trust Account in that the CalPX Settlement Trust Account has insufficient funds to pay interest at the Commission's rate, and it has no other source of funds. In addition, the Indicated California Generators assert that the CAISO voluntarily chose to apply $20 million of CT 485 penalties to reduce the revenue requirement of the GMC. Finally, the Indicated California Generators submit that the CAISO could, through a reversal of the GMC debits, provide interest on refunds of over-collected CT 485 penalties at the Commission's rate.[58]

**Commission Determination**

43. The Commission is now directing the CalPX to apply the Commission's interest rate to its Settlement Trust Account. As a result, the basis for the CAISO's request to apply the earned interest rate to CT 485 penalties has been rendered moot. Accordingly the Commission denies the CAISO's request.

**B. Whether the Commission misinterpreted the CAISO tariff when determining that Settlement and Billing Protocol Section 3.1.1(b) governs the allocation of CT 485 penalties.**

**Background**

44. In the October 16 Main Order, the Commission stated that the CAISO tariff's settlement and billing protocol (SABP) contained procedures for the allocation of penalties collected by the CAISO to customers. Specifically, the Commission found that SABP section 3.1.1(b) allocated amounts collected as CT 485 penalties to scheduling coordinators (SCs) *pro rata* to their metered demand (including exports) in MWh of energy for the trading day in question.[59]

**Comments**

[57] *Id.* at 7.

[58] Indicated California Generators Answer to CAISO Motion at 6 - 7.

[59] October 16 Main Order at Paragraph 82.

45. The CAISO, California Parties and SDG&E (collectively, the Moving Parties) assert that the Commission misinterpreted both SABP section 3.1.1(b) and the remainder of the CAISO tariff in the October 16 Main Order. They state that this misinterpretation originated in the California Parties' April 25 request for clarification (April 25 Request) of the March 26 Order,[60] in which the Commission found that FPA section 202(c) transactions should be incorporated into the calculation of CT 485 penalties.[61] The California Parties' April 25 Request urged the Commission to clarify that CT 485 penalties would be allocated back to buyers, based on their interpretation of the CAISO tariff,[62] which the Moving Parties now believe was incorrect.

46. According to the Moving Parties, the California Parties erroneously cited SABP section 3.1.1(b) of the CAISO tariff as the controlling provision for the allocation of CT 485 penalties. Similarly, the October 16 Main Order references SABP section 3.1.1 as the basis for the Commission's determination on the allocation of CT 485 penalties. The Moving Parties assert that at the time CT 485 penalties were levied, SABP section 3.1.1(b) authorized the CAISO to "levy additional charges" but not to allocate amounts collected from penalties. Furthermore, the Moving Parties point out that subsection (c) addressed the collection and disbursement of amounts required to reach a trial balance of zero for each trading day, but not the allocation of CT 485 penalties.

47. The Moving Parties also point out that SABP section 6.5.2 (Other Funds in the CAISO Surplus Account) sets forth the methodology for allocating amounts collected from penalties, including CT 485 penalties. They state that, during the time period in which the CAISO collected CT 485 penalties, section 6.5.2 stated that the penalties collected pursuant to in SABP 3.1.1 shall be credited to the CAISO Surplus Account.[63] The Moving Parties assert that, in accordance with SABP section 6.5.2 the CAISO, Edison and PG&E proposed, in a Grid Management Charge (GMC) settlement,[64] that the CAISO apply specific amounts collected from CT 485 penalties to reduce the GMC rates for 2002 - 2004. In 2002, the Commission approved this uncontested settlement,

---

[60] March 26 Order at Paragraph 88.

[61] Moving Parties at 5.

[62] *Id.* at 6.

[63] *Id.* at 8 - 9.

[64] *See California Independent System Operator Corporation*, 101 FERC ¶ 61,371 (2002) (GMC settlement).

pursuant to which the CAISO has applied approximately $20 million of CT 485 penalties collected to reduce the GMC charges.

48. The Moving Parties contend that allocating amounts collected from CT 485 penalties, as provided by the October 16 Main Order, would be inconsistent with the CAISO tariff. In addition, the allocation set forth in paragraph 82 of the October 16 Main Order would render the Commission approved GMC settlement void. Finally, the Moving Parties assert that, if the Commission requires that the CAISO reallocate the approximately $20 million of CT 485 penalties used to reduce the GMC, the CAISO would have to make that distribution from its Operating Reserve Account, which could hinder the CAISO's ability to operate the grid reliably.[65]

49. For these reasons, the Moving Parties request that the Commission clarify that: 1) paragraph 82 of the October 16 Main Order cited the wrong section of the CAISO tariff; 2) SABP section 6.5.2(b) applies to the allocation of CT 485 penalties; 3) the Commission did not intend for the CAISO to reallocate those CT 485 penalties that already have been applied to reduce the GMC pursuant to the GMC settlement; and 4) pursuant to section 6.5.2(b), it is appropriate for the CAISO to apply any remaining CT 485 penalties to reduce the rates of GMC categories that are billed based on load and exports in its next GMC filing. The Moving Parties request that if the Commission disagrees that clarification is the appropriate remedy, then they request that the Commission treat the motion for clarification as a motion for reconsideration.

50. The Indicated California Generators do not dispute that the October 16 Main Order inaccurately describes how CT 485 charges should be calculated. They further assert that: 1) CT 485 charges should not be allocated *pro rata* according to the metered demand as described in the October 16 Main Order; 2) at the time the CAISO was collecting CT 485 penalties, SABP section 6.5.2(b) was the controlling provision; and 3) SABP section 6.5.2(b) provided that funds received from CT 485 penalties should be allocated first toward any expenses, loss, or costs incurred by the CAISO, and thereafter, the excess would be credited to the Surplus Account.[66]

51. The Indicated California Generators oppose the Moving Parties' request that the Commission allow the CAISO to apply any remaining CT 485 penalty funds to reduce the rates of GMC categories that are billed based on load and exports in its next GMC

---

[65] The CAISO states that it maintains this account, currently $23 million, with amounts collected through the GMC.

[66] Indicated California Generators' Answer at 4 – 6.

filing. They assert that using the CT 485 penalty funds in this manner would violate the CAISO tariff provisions in place at the time the CT 485 charges were collected, and they contend that using the CT 485 penalty funds to reduce the rates of GMC categories was never endorsed by the Commission.[67] The Indicated California Generators further assert that these funds should be retained to reimburse suppliers for such penalties that will be mitigated in the refund stage. They contend that only at that point should the issue of allocating excess funds be addressed in the context of reducing the GMC. Finally, the Indicated California Generators submit that the Moving Parties' motion exceeds the scope of clarification and amounts to an impermissible request for rehearing outside the 30 days provided by statute.[68]

52. In a July 19 response, the Moving Parties agree that no disbursements of CT 485 penalties should be made until they have been adjusted by the MMCP. The Moving Parties explain that the CAISO charged the participating generators $122 million in CT 485 penalties during the refund period. The CAISO states that, to date, it has collected approximately $60 million, $20 million of which has been designated to offset the GMC. The remaining $40 million has been deposited in an interest bearing escrow account. The Moving Parties point out that, "if all of the CT 485 penalty amounts currently held in escrow are determined to be owed back to Participating Generators, then the issue of how to allocate those funds is moot."[69] However, the Moving Parties point out that the GMC reflects costs incurred by the CAISO to manage the electric grid and to maintain reliability. Therefore, if funds remain after the disbursements that follow the MMCP adjustment, it is appropriate that the funds should be used to reduce the GMC. In this way, those parties most harmed by the generators' actions that resulted in the levying of penalties, *i.e.*, the entities that serve retail load, will be reimbursed for that harm.[70]

**<u>Commission Determination</u>**

53. Because the Commission directed the CAISO to advise it of any outstanding issues that require the Commission's guidance necessary to complete the refund calculation process, the Commission does not consider the CAISO motion to be an

---

[67] *Id.* at 4.

[68] 18 C.F.R. 385.713(b) (2003) ("[a] request for rehearing by a party must be filed not later than 30 days after issuance of any final decision or other final order in a proceeding.").

[69] Moving Parties' Response to Indicated California Generators' Answer at 4.

[70] *Id.* at 5.

untimely request for rehearing of the October 12 Main Order.[71] The Commission will grant the Moving Parties' requested clarification of the following issues: 1) paragraph 82 of the October 16 Main Order misinterpreted the CAISO tariff; 2) SABP section 6.5.2(b) applies to the allocation of CT 485 penalties; 3) the Commission did not intend for the CAISO to reallocate the CT 485 penalties that have been applied by the CAISO to reduce the GMC pursuant to the GMC settlement. The Commission finds that the tariff sheets submitted in this proceeding support the conclusion that SABP section 6.5.2(b) applies to the allocation of CT 485 penalties. Thus, the Commission's finding in paragraph 82 of the October 16 Main Order was incorrect. Accordingly, the CT 485 penalties applied to reduce the GMC in the GMC settlement should not be reallocated.

54. However, the Commission directs that the CAISO not disburse the remaining $40 million in CT 485 penalties until after these funds have been adjusted by the MMCP. This determination is supported by both the Moving Parties, in their answer to the answer, and the Indicated California Generators. Finally, the Commission finds that the Moving Parties' request to allow the CAISO to apply CT 485 penalties in its next GMC filing to be beyond the scope of these proceedings.

## IV. Jurisdictional Status of Transactions by Grant County and Turlock

### A. Whether the Commission erred in asserting jurisdiction over the transactions of governmental entities, such as Grant County and Turlock.

**Background**

55. In the May 12 Order, the Commission reconsidered its prior determination in the October 16 Order to exclude certain transactions of Grant County and Turlock from its jurisdiction and, hence, from any refund liability that would have accrued to these entities as a result of their transactions with the CAISO during the Refund Period. The Commission's action was based on a reexamination of the record and what it deemed to have been "an incomplete understanding of the transactions in question and their role in the CAISO market."[72] Grant County and Turlock have asserted that the essential question is whether the transactions in question are short-term bilateral agreements that the Commission had previously determined would not be subject to mitigation or whether they are Out-of-Market (OOM) transactions and subject to the price mitigation prescribed in these proceedings.

---

[71] May 12 Order at Paragraph 21.

[72] *Id.* at Paragraph 81.

56. Grant County and Turlock also asserted that evidence essential to their positions had been excluded from the record during the hearing phase of these proceedings. The Presiding ALJ, responding to motions by the California Parties and the CAISO, ultimately ruled to strike the testimony filed by Grant County and Turlock on the OOM issue. The May 12 Order directed parties to submit briefs addressing whether the transactions of Grant County and Turlock were bilateral or OOM transactions. The Commission also directed the parties to cite specific references to the testimony stricken by the presiding administrative law judge that purports to bolster their positions on this issue.[73]

**Comments**

57. Grant County raises a threshold question not addressed by any other party: whether an assertion of jurisdiction over Grant County's transactions contemplated in the May 12 Order would violate the Ninth Circuit's August 21, 2002 Order.[74] Grant County asserts that the Commission's determination to allow Grant County and Turlock to make a showing that their transactions are non-OOM bilateral transactions indicates that the Commission "recognizes that bilateral [CA]ISO transactions other than OOM transactions must exist."[75] Grant County then argues that, if the Commission ultimately determines that its transactions are OOM transactions, it will have "obliterated" any distinction between these types of transactions, and this will, in turn, result in an expansion of the Commission's jurisdiction "in violation of the Ninth Circuit's August 21, 2002 Order."[76]

**Commission Determination**

58. The Commission is not persuaded that its decision to allow the parties to file briefs on the issue of how to characterize the Grant County and Turlock transactions implicates the unpublished Ninth Circuit order cited by Grant County. The Ninth Circuit order in

[73] *Id.* at Ordering Paragraphs (H) and (I).

[74] *See* Initial Brief of Grant County at 11, *citing* Public Util. Comm'n v. FERC, Case Nos. 01-71051, *et al.*

[75] *Id.* at 11.

[76] *Id.*

question addresses a number of procedural motions by parties appealing prior Commission orders in the Refund Proceedings. Among those motions was the Commission's motion for clarification with respect to the issuance of further orders in the Refund Proceeding after filing the certified index to the record with the court. The August 21 Order provided the following clarification:

> The court is asserting exclusive jurisdiction over *matters* in which rehearing was denied and a petition for review was filed from the order denying rehearing. The Commission may issue further orders in the underlying docket Nos. EL00-95, *et al.*, which address matters *not addressed* in earlier rehearing orders, without leave of this court.[77]

Grant County cites this language as indicating the Commission may not address the issue upon which it has directed the filing of briefs, *i.e.*, whether its transactions with the CAISO are subject to mitigation, without running afoul of the August 21 Order. The Commission disagrees. The court's order makes it abundantly clear that the Commission may continue to address issues that involve "matters not addressed" in earlier rehearing orders, including the issue of whether the Grant County transactions (and those of similarly situated entities like Turlock) have been properly characterized as transactions that are subject to mitigation.

**B. Whether the Grant County/Turlock transactions were bilateral transactions and therefore not subject to mitigation or OOM transactions, which are subject to mitigation.**

**Background**

59. In describing the history of the dispute over these transactions, the May 12 Order reiterated the findings in the Commission's prior orders that denied requests for rehearing that challenged the Commission's authority to require refunds for sales by governmental entities in the specific circumstances of this proceeding.[78] It cited the October 16 Main Order, which found that certain circumstances associated with the Grant County

---

[77] *See Public Util. Comm'n v. FERC*, Ninth Circuit Case Nos. 01-71051, *et al.* at 7.

[78] May 12 Order at Paragraph 68, *citing* the October 16 Main Order and *San Diego Gas & Electric Company et al.*, 96 FERC ¶ 61,120 (2001), *reh'g* 97 FERC ¶ 61,275 (2002).

transactions warrant exempting these transactions from the Commission's jurisdiction: Grant County did not make sales into the CAISO centralized, single clearing price auction markets, and it did not have any contracts with the CAISO that specifically acknowledged the Commission's jurisdiction over those sales.

60. The May 12 Order also recounted the history of the debate in these proceedings over the characterization of the Grant County and Turlock transactions. In the hearing phase of these proceedings, both Grant County and Turlock asserted that their transactions should not be subject to mitigation because they were bilateral transactions, which the Commission had previously determined would not be subject to mitigation. Both asserted that their transactions were not OOM transactions, which the Commission had determined would be subject to mitigation, and they filed testimony with the presiding administrative law judge to that effect. The CAISO and the California Parties took the position that these transactions were OOM transactions, and the California Parties filed a motion to strike the Grant County and Turlock testimony. The presiding administrative law judge agreed with the CAISO and California Parties and ordered struck all testimony relating to the characterization of these transactions as bilateral and not OOM transactions.[79]

61. In the October 16 Main Order, the Commission determined that, because of the exemption it was establishing for these transactions, it was not necessary to reach the issue of whether these transactions are bilateral or whether the transactions are OOM transactions.[80] On reconsideration, in the May 12 Order, the Commission determined that its prior analysis of the Grant County transactions was based on an "incomplete understanding" of the transactions at issue.[81] It directed the parties to submit briefs on the characterization of the Grant County and Turlock transactions as either bilateral transactions or OOM transactions.[82]

---

[79] *See San Diego Gas & Electric Company, et al,* 101 FERC ¶ 63,026 (2002) (December 12 Initial Decision) at 65,196 (Paragraph 468 of the December 12 Initial Decision).

[80] October 16 Main Order at Paragraph 177.

[81] May 12 Order at Paragraph 81.

[82] *Id.* at Paragraph 86.

**Comments**

62. Grant County and Turlock continue to assert that their transactions with the CAISO were bilateral transactions, not OOM transactions, and therefore are not subject to mitigation.[83] The briefs filed by Sempra and LADWP and the responsive pleadings filed by PPL and Puget take the same position with respect to their transactions with the CAISO. To support their position that these are bilateral transactions, the parties assert the following:

- These transactions were individually negotiated deals that took place out of the CAISO's organized auction, were beyond the CAISO's dispatch authority, and they were not made pursuant to any agreement that acquiesced to the Commission's jurisdiction.[84] These factors were the basis of the Commission's determination in the October 16 Main Order to exempt the Grant County transactions.

- The CAISO Tariff does not define what constitutes an OOM transaction.[85] However, based upon the way the Commission defined "OOM calls" in a January 2000 Order, none of the transactions at issue would have qualified as OOM transactions.[86] The generators are not Participating Generators and they are not subject to the CAISO's dispatch instructions.

---

[83] *See* Initial Brief of Grant County at 1 – 10; Brief of Turlock at 1 – 16.

[84] Grant County at 2 – 4; LADWP at 4 and 7 – 9; Sempra at 9, 10; Turlock at 2 – 4, 5 – 7.

[85] Grant County at 4 and LADWP at 4.

[86] *See California Independent System Operator Corp.* 90 FERC ¶ 61,006 (2000), at 61,010 – 11, which provided the following description of OOM calls: "There is no dispute that the [CA]ISO has the authority to direct any Participating Generator to change its dispatch when the [CA]ISO deems it necessary to protect system reliability. For example, if the output available from generators bidding into the imbalance and ancillary services markets is inadequate to serve load and manage congestion, the [CA]ISO can direct an idle Participating Generator to start up and deliver energy to meet the [CA]ISO's needs. These are described as OOM calls."

- The CAISO's Operating Procedure S-318 defines OOM in such a way that it would not have covered any of the transactions at issue. That operating procedure distinguishes between OOM transactions, which are managed by Scheduling Coordinators (and subject to the CAISO's dispatch instructions) and Non-scheduling coordinator purchases (which are bilateral purchases).[87] Thus, Operating Procedure S-318 establishes two types of CAISO transactions, those that are out-of-market and those that are consummated between the CAISO and a party that is not a Scheduling Coordinator (*i.e.*, energy or capacity purchases from Non-Scheduling Coordinators). They argue that their bilateral transactions with the CAISO are in the latter category and thus are not OOM transactions.

- The transactions were entered into and payment was made by the CAISO pursuant to section 2.3.5.1.5 of the Tariff, which is an emergency non-bid based provision authorizing the CAISO to negotiate contracts. It gives the CAISO purchasing authority but does not impose any Tariff conditions on the seller. From this, the parties assert that the transactions were not subject to the CAISO Tariff and thus are not subject to mitigation.[88]

63. The briefs filed by the CAISO and the California Parties assert that the transactions in question are OOM transactions, made pursuant to the CAISO Tariff and thus subject to mitigation.[89] The California Parties argue that the testimony stricken by the presiding administrative law judge fails to support the claims that the transactions at issue were not OOM transactions. Instead, the stricken testimony acknowledges that the sales were made at the request of the CAISO, and that the sales were compensated under section 2.3.5.1.5 of the CAISO Tariff.[90]

64. Both CAISO and the California Parties acknowledge that the terms "Out of Market" and "OOM" do not appear in the CAISO Tariff. Likewise, CAISO does not dispute that Operating Procedure S-318 in effect during the Refund Period defined OOM

---

[87] Grant County at 7 – 9 and Turlock at 7 - 12

[88] Grant County at 7; LADWP at 1, 4 – 6, 7, 8; and Puget at 2, 5, 6; Turlock at 12, 13.

[89] CAISO at 5 – 13; and California Parties at 10, 11.

[90] California Parties at 11.

as energy obtained from a Scheduling Coordinator and "Non Scheduling Coordinator" as energy obtained through sources other than Scheduling Coordinators. However, CAISO asserts that this is not significant; rather, "what matters is how the Commission has defined those transactions made outside of the [CA]ISO's formal markets that are subject to mitigation (referred to as OOM transactions) and those that are not (referred to as short-term bilateral transactions) and whether Grant County's transactions fall into the former or the latter category."[91] CAISO asserts that these transactions should be characterized as OOM transactions if they: 1) were spot transactions; 2) were made outside of the CAISO's formal markets; and 3) were entered into pursuant to the CAISO's Tariff in order to procure the resources necessary to operate the grid.[92] Applying these criteria, the Grant County and Turlock transactions would be characterized as OOM transactions, according to CAISO.

65. The CAISO and California Parties do not dispute that Grant County and Turlock were not subject to the CAISO's dispatch authority, but they assert that this is not dispositive of the issue of whether the transactions were OOM transactions. The transactions were not pursuant to Section 5.6.2, which the provision of the Tariff dealing with the dispatch of Participating Generators, but they were made pursuant to Section 2.3.5.1.5 of the Tariff, which authorizes the CAISO to enter into transactions with non-PGA generators for grid reliability purposes.

**Commission Determination**

66. The Commission finds that the transactions at issue were OOM transactions, subject to mitigation and refund liability. The testimony stricken by the presiding administrative law judge, which involves interpretations of the CAISO Tariff, as well as CAISO's Operating Procedure S-318, supports this finding. Although OOM transactions are not defined in the CAISO tariff, the Commission finds that OOM transactions can be appropriately defined as spot transactions made outside the CAISO's organized markets with non-PGA generators pursuant to the CAISO's Tariff section 2.3.5.1.5 in order to support the reliability of the grid.[93] The stricken testimony supports this finding:

---

[91] CAISO at 8.

[92] *Id.* at 9.

[93] In our view, this definition, albeit broader, is consistent with the description in 90 FERC ¶ 61,006 (2001) at 61,010 – 11 (*see supra* n. 43). That earlier statement addresses an "example" of OOM calls; it did not address whether other transactions would also be OOM calls.

1) Grant County is located outside the CAISO Control Area and it did not bid into the organized auction market; 2) it had no contracts with the CAISO; 3) its sales to the CAISO were in response to a call requesting the transactions at negotiated prices; and 4) to the extent it was compensated for these transactions, that compensation was made pursuant to section 2.3.5.1.5 of the CAISO Tariff.[94]

67. Grant County attempts to support its claim that its transactions were not OOM transactions through inferences drawn from several CAISO Tariff Sections and the Operating Procedure S-318. Grant County avers that it was not a Scheduling Coordinator, it was not a Participating Generator, and it was not subject to being dispatched pursuant to "OOM calls."[95] While true, none of this is dispositive of how the transactions with the CAISO at issue should be characterized, based on the finding above of how OOM transactions can be appropriately defined.[96]

68. The briefs of Turlock and Sempra addressed their stricken evidence. Turlock's evidence consists of testimony to the effect that Turlock did not enter into either a PGA or an SCA with the CAISO, and that its sales were bilateral and at a negotiated price that "was not the 'clearing price' (*i.e.*, MCP) but a mutually agreed to price."[97] Sempra's evidence consists of rebuttal testimony of Christine Cantor, who indicated her understanding that the prices for the transactions at issue were the result of separate bilateral negotiations with the CAISO. From this, Ms. Cantor testified that "all of the transactions in Exhibit Nos. SET-10A and SET-10B are mischaracterized by the [CA]ISO as OOM. They are, rather, short-term bilateral transactions that were entered into by the [CA]ISO outside of its formal mechanisms, pursuant to section 2.3.5.1.5. of

---

[94] Grant County at 7.

[95] *Id.* at 8.

[96] Grant County also states that its sales were made pursuant to the Western Systems Power Pool (WSPP) Agreement at negotiated prices. While this may be true for some of Grant County's transactions, it cannot be true for sales into the CAISO markets. The WSPP Agreement applies only to sales between members, and the CAISO is not a member of the WSPP. *See* WSPP Agreement, Rate Schedule FERC No. 6. Original Sheet Nos. 91-93 lists the signatories to the WSPP Agreement.

[97] Turlock at 3 – 4, *citing* Exhibit No. TID 1 at 11:1-20 and 14:2-12 and Exhibit No. TID-6.

the [CA]ISO Tariff."[98] Both Turlock's and Sempra's testimony, even if it had been admitted into the hearing, fails to show that the relevant transactions are not OOM transactions. For example, Turlock's claim that it had not signed a PGA or an SCA is immaterial, as we have found transactions with non-PGA generators are included. Sempra's testimony that its transactions were made pursuant to the CAISO's Tariff section 2.3.5.1.5 is consistent with our finding that spot transactions under that section are OOM transactions. Neither LADWP nor PPL presented evidence on brief, but their arguments are essentially the same: the transactions in question were bilateral and not OOM, were at negotiated rates, and they had no PGA or SCA with the CAISO. Such arguments are unavailing.

69. The Commission has identified only two categories of transactions that it considers to be "short-term bilateral" transactions: 1) transactions between CDWR and third party suppliers,[99] and 2) sales made directly between sellers and purchasers of energy.[100] Neither the stricken evidence nor the additional comments shows that any transaction at issue fits within either category. For example, Grant County's transactions involved short-term sales to the CAISO (and not direct sales to any market participant) at negotiated prices and thus do not fit within either category previously identified by the Commission as "short-term bilateral" agreements. Indeed, no transaction with the CAISO could be truly "bilateral" in nature, as the CAISO does not purchase energy on its own behalf; rather it purchases energy on behalf of the Scheduling Coordinators in the CAISO markets. As stated in section 2.2.1 of the CAISO Tariff, "In contracting for Ancillary Services and Imbalance Energy the [CA]ISO will not act as a principal but as agent for and on behalf of the relevant Scheduling Coordinator." Thus, it is clear to the Commission that the transactions in question were OOM transactions. The Commission is not persuaded by the additional testimony or comments provided by Grant County, Turlock, Sempra, LADWP, PPL and Puget that the transactions at issue are anything other than OOM transactions made under the CAISO Tariff and therefore jurisdictional.

---

[98] Sempra Joint Stipulation Regarding Testimony and Exhibits on Certain Short-term Transactions to be Excluded and Made Offers of Proof, Exhibit No. SET-6 at 8.

[99] July 25 Order at 61,514 – 15.

[100] December 19 Order at 62,196 – 97.

### C. Whether the obligation to pay for the OOM transactions sales rests with the Scheduling Coordinators or with the CAISO.

**Background**

70. Puget asserts that its transactions were covered by the sellers' tariff and not the buyers' (CAISO's) tariff.[101] Only Puget makes this argument, apparently out of a concern that it will not be paid for its transactions. According to Puget, the "CAISO has not revealed the identities of the principal or principals on whose behalf the CAISO purchased power from Puget."[102] If the transactions are deemed to have been made under Puget's tariff, "the CAISO should not be able to evade the filed rate requirements of the Federal Power Act and the obligations that it assumed in its bilateral purchases from individual sellers . . ."[103]

**Comments**

71. CAISO asks that the Commission confirm that the obligation of payment for transactions between Grant County, other similar entities such as Puget, and the CAISO rests with the Scheduling Coordinators and not directly with the CAISO. Citing section 11.11.20.1 of the Tariff, CAISO asserts that it is authorized but not obligated to pursue Scheduling Coordinators who have not made their required payments to sellers.[104]

**Commission Determination**

72. It is unclear what Puget seeks. To the extent that, as CAISO suggests, Puget is concerned about being paid for OOM transactions, we agree with CAISO. The CAISO Tariff authorizes but does not require CAISO to seek payment from recalcitrant Scheduling Coordinators on behalf of sellers of energy. Nor is CAISO responsible for

---

[101] Puget at 2 - 4.

[102] *Id.* at 3.

[103] *Id.* at 6.

[104] CAISO at 16.

making payments to a seller if a Scheduling Coordinator defaults. This is consistent with Commission precedent and the CAISO Tariff.[105]

## V. Issues Relating to Implementation of Refunds

### A. Whether the Commission intends to provide adequate opportunities for parties to comment on the CAISO's process for completing the rerun calculations and reaching a final determination of who owes what to whom.

**Background**

73. A number of questions have been raised on rehearing about how the Commission will deal with the CAISO's process so as to ensure that parties have an opportunity to have any unresolved disputes with the CAISO settled by the Commission before they are required to pay refunds.

74. The CAISO has performed a preparatory rerun that incorporated seventeen issues from the Amendment 51 proceeding, and its purpose is to provide the most accurate and complete information to serve as a baseline for the Refund Rerun that the Commission has required in the Refund Proceeding.[106]

75. In October 2004, the CAISO commenced a rerun of its settlement system in order to implement the Commission's Mitigated Market Clearing Price (MMCP) methodology. According to its October 12, 2004 Status Report, the CAISO estimates that this phase of the process will be completed by mid-January 2005. The CAISO is giving market participants a ten business day window after the last statement is published (trade date – June 20, 2001) to file disputes on the Refund Rerun. The CAISO estimates that it will need two to four weeks to resolve disputes stemming from the Refund Rerun. Following the resolution of disputes, the CAISO estimates that the compliance filing would be submitted to the Commission approximately eight weeks later.[107] The compliance filing will include the financial phase and will involve the calculations that must be performed and applied to the output of the Refund Rerun production, and it will yield an

---

[105] *See Pacific Gas and Electric Company, et al.*, 81 FERC ¶ 61,122 (1997) at 61,506 – 509, and CAISO Tariff section 2.1.1.

[106] *See California Independent System Operator Corporation,* 103 FERC ¶ 61,331 (2003); *reh'g* 105 FERC ¶ 61,203 (2003); *further reh'g* 106 FERC ¶61,099 (2004).

[107] CAISO Ninth Status Report at Attachment A.

identification of "who owes what to whom" in the Refund Proceeding. The financial phase will include offsets relating to emissions, fuel cost adjustments and accounting for interest on refunds and amounts unpaid. According to the CAISO's Ninth Status Report, adjustments required for the multiple global refund settlements will be made in a subsequent filing.

**Comments**

76. Two parties, APX and CalPX, ask that the Commission clarify or provide guidance as to how it will provide opportunities for comments on the results of the preparatory rerun process. APX conditions its ability to complete the reconciliation and dispute resolution process in a timely fashion on its understanding that the Commission will employ the following process in evaluating and resolving disputes arising from the CAISO's final report: 1) CAISO will submit a final compliance report showing who owes what to whom; 2) parties will have a meaningful opportunity to comment on this final report; 3) the Commission will issue an order on the CAISO compliance report; and, 4) APX will be allowed sixty days following acceptance of the CAISO compliance report to submit its compliance filing. APX states that if this process is what the Commission envisions, it will be able to submit a compliance filing showing who owes what to whom on behalf of its customers within sixty days thereafter.[108] In addition, AEPCO raises the question as to whether it could be required to pay refund obligations before fuel cost allowances have been determined.[109]

77. In a similar vein, CalPX describes its understanding of the process: 1) prior to the "Final Financial Phase," it anticipates that the CAISO will submit the results of its rerun process to the Commission for comment by the parties; 2) the Commission will issue an order on the CAISO filing; 3) during the "Final Financial Phase," Scheduling Coordinators will reconcile their accounts with the CAISO, and the CalPX will conduct a corresponding reconciliation with its market participants, which will be accomplished within the two-week timeframe in the May 12 Order; 4) Scheduling Coordinators will then file with the Commission the results of their reconciliation and dispute resolution process, "and the filings will reflect 'who owes what to whom.'"[110] CalPX points out that the preparatory rerun phase has involved a high volume of adjustments that led to

---

[108] APX Request for Clarification or Rehearing at 3.

[109] AEPCO at 2 – 3.

[110] CalPX May 26 compliance filing at 3.

numerous issues and disputes. As is the case with APX, CalPX states that its ability to meet the two-week timeframe outlined in the May 12 Order is contingent upon the resolution of these disputes prior to the Final Financial Phase.[111]

78. Both APX and CalPX indicate that it is difficult to commit to a two-week turnaround on the CAISO's Final Financial Phase compliance filing unless the Commission makes it clear how it will treat the CAISO's reports of its refund calculation process. CAISO also requested clarification of the timeframe for completion of the refund process and submission of the CAISO's compliance report.[112] The Commission entertained comments on this issue in the July 26 Technical Conference, at which the CAISO presented the status of its refund calculation process and its plans for completing the process before the end of the year.

**Commission Determination**

79. The Commission expects the CAISO to send settlement statements to Scheduling Coordinators as they are produced during the Refund Rerun, similar to the process that was in place during the preparatory rerun phase. During this time, the Scheduling Coordinators can review and reconcile discrepancies with the CAISO up until ten business days after the last statement is published (trade date – June 20, 2001). Therefore, by the time the CAISO submits the compliance filing to the Commission, the Scheduling Coordinators already will have had an opportunity to review the majority of the calculations in the compliance filing.

80. The Commission envisions one compliance filing to be made in the Refund Proceeding.[113] This compliance filing will include the preparatory adjustments, the Refund Rerun (which applies the MMCPs to the preparatory rerun baseline) and the

---

[111] *Id.* at 5.

[112] CAISO Motion for Clarification at 8.

[113] To the extent parties avail themselves of the dispute resolution process under the CAISO Tariff, the parties must resolve their dispute before the CAISO files its compliance filing or raise their issues in comments on the compliance filing. Given the need to prevent further delays in the payment of refunds in this case, the Commission directs the CAISO not to delay its compliance filing to await the conclusion of any such dispute resolution processes. The Commission will address any such disputes in an order on the CAISO's compliance filing.

financial settlement phase including adjustments made for emissions offsets, fuel cost allowances and interest. Adjustments required for the multiple global settlements will be made in a subsequent filing. This compliance filing needs to provide details to support the calculations involved in determining the final end product of " who owes what to whom." The compliance filing will be noticed with an opportunity to comment. The Commission plans to issue an order on the entire compliance filing.

81. With respect to AEPCO's concern that it might be required to pay refunds before its fuel cost allowance had been determined, the Commission reiterates what it said in the October 16 Order:

> [I]t is a settled matter that refunds will be offset against amounts still owed as determined in this proceeding. The very concept of an offset precludes any possibility that sellers would be required to remit refunds to buyers without first netting out amounts still owed to sellers. Accordingly, it is also a settled matter that amounts owed both by and to parties, as determined in this proceeding, will be offset against each other and only the net result of this offset will flow to or from parties.[114]

The Commission finds that the process outlined above will provide sufficient opportunities for the parties to comment on the CAISO's determination of "who owes what to whom."

**B. <u>Whether two weeks is sufficient time for the Scheduling Coordinators to complete reconciliation and dispute resolution with their customers following the CAISO's completion of the financial settlement phase</u>.**

**<u>Background</u>**

82. The May 12 Order addressed concerns expressed by a number of parties about the amount of time it will take Scheduling Coordinators to reconcile the results of the CAISO's Financial Settlement Phase results with their respective market participants. The Commission noted its understanding of the CAISO's rerun process and that it would involve the CAISO's sharing of rerun results with Scheduling Coordinators and other parties. The Commission encouraged the parties to avail themselves of every opportunity to raise any disputes they have with the CAISO's process. Based on comments from the participants at the Commission's July 26 Technical Conference, it appears that the rerun process has involved significant dialogue between the CAISO and the parties.

[114] October 16 Order at Paragraph 180.

83. In the May 12 Order, the Commission acknowledged concerns expressed by a number of parties that the Scheduling Coordinators and their market participants should have time at the end of the CAISO's Financial Settlement Phase to complete whatever reconciliation and dispute resolution as may be required by the terms of their tariffs or scheduling coordinator agreements. For this reason, the Commission directed all Scheduling Coordinators to inform the Commission within ten days of the May 12 Order as to whether there were any tariff or contractual impediments to completing reconciliation and dispute resolution with their customers within two weeks of the Final Financial Phase.

**Comments**

84. The Commission received responses from four of the CAISO's Scheduling Coordinators. APX, CalPX, and Western filed responses within the ten day period set in the May 12 Order, while NCPA filed its response two days out-of-time. APX indicates that a two week timeframe for completing reconciliation and dispute resolution with its thirty-seven market participants may be possible if the CAISO shares its rerun data on an ongoing basis, if there are no new data in the Final Financial Phase, and there are no disputes that require arbitration.[115] However, APX also states that it now takes approximately eight weeks to process data from the CAISO, and that is if there are no disputes with its market participants, because the APX contract calls for disputes to be arbitrated. For these reasons, APX asks that the Commission clarify the process that the Commission intends to employ in overseeing the CAISO refund process and whether the Commission will resolve disputes arising from the CAISO's Final Financial Phase filing or will it rely on the dispute resolution mechanism in the APX contract. Finally, APX points out correctly that the Commission erred in a reference to a CAISO compliance filing in Ordering Paragraph E, and that Ordering Paragraph E should have referred to a CAISO compliance filing mandated in Ordering Paragraph D, not Ordering Paragraph C.

85. As with APX, CalPX also states that if it understands what it believes is the Commission's timeline for the CAISO rerun process to be completed, it too can complete the reconciliation and dispute resolution process within two weeks, as it has no tariff provisions that would prevent it from doing so.[116] However, CalPX also provides the caveat that its ability to meet the two-week time frame "assumes that the many disputes

---

[115] APX Comments at 2, 3.

[116] CalPX May 26 compliance filing at 2.

arising from the preparatory rerun, as well as those arising from the refund rerun, are concluded prior to the Final Financial Phase, as the May 12 Order envisions."[117]

86. NCPA states that it will take "significantly longer" than two weeks for it to complete the reconciliation and dispute resolution process, because: 1) its contracts allow thirty days between invoicing and payment;[118] 2) its contracts provide for dispute resolution through good faith negotiation, but there are no firm time tables for resolution of disputes;[119] and 3) as governmental entities, NCPA and its Scheduling Coordinator customers will need to obtain approval by their governing bodies for any appropriations deemed to be owing in the Refund Proceeding.[120]

87. Western states that it serves as Scheduling Coordinator for five market participants, and its General Power Contract Provisions (GPCP) require it to issue monthly bills within ten days of the end of each monthly billing period and that bills are required to be paid within twenty days of issuance. The GPCP does not address dispute resolution, so disputes are handled pursuant to principles of federal contract law. Western also points out that its customers are also governmental entities that may have limitations on staffing, funding and contracting authority that may also affect their ability to complete the reconciliation and dispute resolution process within a two-week time frame. Thus, absent waivers by its SC customers, Western "is not currently in a position to represent that it can meet the Commission's two week standard."[121]

**Commission Determination**

88. The time frame for the Scheduling Coordinators to start reviewing the CAISO financial phase compliance filing begins on the date that the CAISO submits this filing with the Commission. While it is under Commission review and before a Commission order, the Scheduling Coordinators can avail themselves of the opportunity to review the numbers and assess the impact that it will have on the market participants behind them.

[117] *Id.* at 5.

[118] NCPA May 28 compliance filing at 2.

[119] *Id.* at 3.

[120] *Id.* at 3 - 4.

[121] Western May 26 compliance filing at 3.

Once the Commission issues an order on the compliance filing, the Scheduling Coordinators will have two more weeks to complete reconciliation and dispute resolution. We find two weeks to be a reasonable amount of time given that a good estimate of the financial settlement phase will be known on the day that the CAISO submits its compliance filing.

89. The Commission directs the CalPX, as a jurisdictional Scheduling Coordinator, to file its compliance filing no later than two weeks after the date that the CAISO's compliance filing is accepted by the Commission. The Commission directs APX, as a jurisdictional Scheduling Coordinator, to file its compliance filing no later than sixty days after the date that the CAISO's compliance filing is accepted by the Commission.

### C. Whether the Commission erred in determining that AEPCO should be liable for refunds.

**Background**

90. The Commission has repeatedly rejected AEPCO's argument that, as a "non-jurisdictional seller," it cannot be held accountable for refunds, which AEPCO most recently reiterated in its June 1 compliance filing and its request for rehearing and/or clarification of the May 12 Order.[122]

**Comments**

91. AEPCO's compliance filing and its request for rehearing raise the issue in another context: whether it is appropriate for the Commission to order refunds before the appellate process has ruled on appeals of the various orders in this proceeding. In its comments following the Commission's July 26 Technical Conference, AEPCO amplified its concern, arguing that non-jurisdictional sellers will face financial distress during the appellate process over whether, for example, non-jurisdictional sellers are liable for refunds at all. AEPCO stated that it is incumbent upon the Commission to provide non-jurisdictional sellers in advance with a ready means to secure immediate collection of sums which they are entitled to due to a decision of a reviewing court without additional cost, delay, or risk.[123] In its request for rehearing, AEPCO states that the Commission

[122] AEPCO June 1 compliance filing at 3; AEPCO request for rehearing at 4, 5.

[123] AEPCO comments following Technical Conference at 3.

should provide "definitive, incontrovertible assurances that such parties will be made whole in the event those refunds are set aside or even reduced on appeal."[124]

92. The California Parties oppose AEPCO's position, arguing in reply comments following the July 26 Technical Conference that the Commission should reject AEPCO's position. They state that AEPCO made no effort to comply with the procedural requirements necessary to stay a Commission order, and APECO has not explained why it and similarly situated sellers should be granted what amounts to a set-aside of funds. This would constitute an undue and unlawful preference to the detriment of consumers.[125]

**Commission Determination**

93. The Commission will deny AEPCO's request for a ready means for "non-jurisdictional sellers" to secure immediate collection of funds in the event a reviewing court finds non-jurisdictional sellers to be not liable for refunds. The Commission already has determined that it has jurisdiction over the transactions of all participants in the CAISO and CalPX spot markets during the Refund Period. Moreover, AEPCO has not explained why it should be treated any differently from other sellers that have already or will seek judicial review of the Commission's orders in the Refund Proceeding. There is no justification for creating a special class of litigants in this case – the "non-jurisdictional sellers" – and treating them any differently from other sellers. AEPCO has the same rights as any other party in this case to request a stay of the Commission's actions by a reviewing court, and it has not done so thus far.

**D. Whether AEPCO's power transmission costs should be considered in lieu of intra-California gas transportation costs in determining AEPCO's MMCP and fuel allowance.**

**Background**

94. The May 12 Order clarified that it is reasonable, in calculating the AEPCO MMCP, to establish a new data point based on the average gas prices at the Permian and San Juan basins plus an average transportation tariff rate on El Paso Pipeline (but excluding California intrastate transport charges), consistent with the California Parties'

---

[124] AEPCO rehearing request at 4 – 5.

[125] *Id.*

March 3 filing in Exhibit No. CA-16, Appendix N.[126] The Commission also noted that, because AEPCO during the Refund Period was a full requirements customer of El Paso, it is possible that the average transportation tariff rate reflected in Appendix N would not provide for recovery of AEPCO's fuel costs. Therefore, the Commission directed AEPCO to notify the Commission if it intends to file for additional fuel cost allowance. The Commission also stated that, if it pursues the additional fuel cost allowance, it will be subject to the requirements of a soon-to-be-issued order involving fuel cost adjustments.[127]

**Comments**

95. In its response to the Commission's directive on additional fuel cost allowance and in its request for rehearing, AEPCO makes the same arguments it has made previously in seeking to include its power transmission costs in the determination of the MMCP. In addition, in its comments following the July 26 Technical Conference, AEPCO argues that the Commission's existing approach to transmission losses over the CAISO's system creates the potential that a seller will, following mitigation, pay a higher price per MWh for transmission losses than it receives for power sales during the same interval. AEPCO requests the Commission clarify the treatment of transmission losses over the CAISO system.

**Commission Determination**

96. The Commission denies AEPCO's request for rehearing and its request to include power transmission costs in the determination of MMCP. The Commission has previously determined that it will not allow any additional costs to be included in the MMCP.[128] Furthermore, the power transmission costs for which AEPCO seeks recovery are the costs of transmitting electricity and have nothing to do with fuel costs (which go to the cost of generation and electricity sold into the California markets). Thus, it would be inappropriate to include power transmission costs in the fuel allowance.

97. The Commission also will deny AEPCO's request for clarification on the treatment of transmission line loses over the CAISO's system. The Commission has

[126] May 12 Order at Paragraph 15.

[127] *Id.* at Paragraph 15.

[128] *See* December 19 Order at 62,213-15.

previously determined that it will not allow any additional costs such as transmission line loses to be included in the refund formula.[129] The Commission reminds AEPCO and other generators who believe that the refund formula does not fully cover their costs that they may file for cost-of-service rates for their portfolio of generating units.[130]

### E. Whether the Commission erred in denying AE Supply's motion to intervene out-of-time.

**Background**

98. In the May 12 Order, the Commission denied AE Supply's motion to intervene out-of-time and rejected its request for rehearing of the October 16 Main Order, which found that AE Supply, as a seller of energy to APX, would be liable for refunds for APX's resales in the CAISO and CalPX markets.[131] AE Supply asserts that it was not until the October 16 Main Order issued that it was aware that it could be liable for refunds. It claims that it was never named a respondent in the complaint proceeding and thus did not have notice or an opportunity to be heard on its potential refund liability. AE Supply also asserts that it had no contractual or tariff relationship with the CAISO or CalPX and was not subject to any CAISO reliability must run requirements or other dispatch requirements.

99. AE Supply over the past three years had participated in the hearing phase of the Refund Proceeding, but withdrew from the proceedings after the presiding administrative law judge issued his Proposed Findings but before the Commission ruled on them.

**Comments**

100. On rehearing, AE Supply continues to assert that, prior to the October 16 Main Order, it was never put on notice that it could be found liable for refunds. AE Supply continues to assert that due process requires that it be allowed to intervene, saying that

---

[129] *Id.* at 62,213 – 215. Footnote 237 lists several types of costs for which parties sought inclusion in the formula for determining the Proxy Price, which the Commission rejected in that order. The December 19 Order was an order on clarification and rehearing of the Commission's July 25, 2001 Order in these proceedings. *See* 96 FERC ¶ 61,120 (2001) (the July 25 Order).

[130] *See* July 25 Order at 61,518; December 19 Order at 62,214.

[131] *See* May 12 Order at Paragraph 5.

the Commission's May 12 Order "has the absurd result of barring AE Supply, which has been found liable for refunds, from participating in the June 30 settlement conference."[132]

101. In response to AE Supply's rehearing request, APX points out that AE Supply had notice that its interests were at issue, and that it was a party to the proceedings during the hearing phase under Judge Birchman.[133] APX also points out that the Commission's imposition of liability on APX participants in the October 16 Main Order was not based on any contractual relationship with the CAISO but was founded on equity principles:

> Given the unique nature of APX's business operation as an independent scheduling service provider and its similarity to the [Cal]PX and given that sellers who used APX's services, not APX itself, retained the vast majority of the revenue that resulted from the excessively high electricity prices in California during this period, we find it reasonable that customer refunds be paid by these sellers because it "will give offense to equity and good conscience if [they are] permitted to retain [excessive revenues.]" Therefore the Commission is exercising its broad discretion over refunds in this instance to assign refund liability in a way consistent with equitable considerations, including assigning the refund liability to include APX Participants.[134]

APX states that, even though AE Supply has not justified its underlying claim that it should not be held liable for refunds, APX has no objection to allowing AE Supply to re-intervene prospectively in order to allow AE Supply to participate in ongoing settlement discussions.[135]

---

[132] AE Supply Request for Rehearing, Reconsideration and/or Clarification at 4, footnote 5.

[133] APX Response to AE Supply at 2.

[134] APX Response at 5, *citing* October 16 Main Order at Paragraph 166.

[135] *Id.* at 6.

**Commission Determination**

102. The Commission finds AE Supply's lack of notice argument undermined by its participation in the hearing stage of these proceedings. AE Supply's participation as an intervenor in the Refund Proceeding belies the claim that it did not have notice that its interests could be affected. Its substantive arguments as to why it should not be liable for refunds, *e.g.*, that it had no contractual relationship with the CAISO and thus should not be jointly and severally liable for refunds as an APX Participant, are similarly unavailing. As noted above, AE Supply was a seller in the APX market, and thus for the same equitable reasons that support refund liability for all sellers in the APX market, AE Supply is also liable. On reconsideration, the Commission finds merit to allowing AE Supply to re-intervene to participate in settlement discussions that are now underway. The Commission therefore will grant AE Supply's request for rehearing solely for the purpose of allowing it to re-intervene. AE Supply must accept the record of these proceedings as it stands.

## VI. Other Issues

### A. Whether the Commission erred in denying Duke's motion to lodge the El Paso Master Settlement Agreement.

**Background**

103. In the May 12 Order, the Commission denied a motion[136] by Duke to lodge the Master Settlement Agreement from the contested settlement in the *CPUC v. El Paso* complaint proceeding.[137] Duke's motion to lodge also sought to vacate the change in the natural gas price indices to be used in setting the MMCP, which was ordered by the Commission in the March 26 Refund Order.[138] The thrust of Duke's pleadings is that the

[136] Duke actually filed two pleadings seeking to lodge the Master Settlement Agreement and related materials in the Refund Proceeding: a July 22, 2003 Motion to Lodge and Vacate portions of the March 26 Refund Order and a November 26, 2003 Petition to Consider New Evidence and Preclude Collection of Refunds. Duke refers to these pleadings collectively as the Motions to Lodge. Duke Request for Rehearing at 3.

[137] *See CPUC v. El Paso Natural Gas Company, El Paso Merchant Energy – Gas, L.P., and El Paso Merchant Energy Company*, 105 FERC ¶ 61,201 (2003) (the El Paso Settlement Order).

[138] *See* March 26 Refund Order.

payment by El Paso to California electricity customers under the Master Settlement and Allocation Agreements as a result of the settlement will duplicate the refunds ordered by the Commission in the Refund Proceeding. Duke urges the Commission to allow the parties to consider and comment on this "new evidence," which Duke asserts should offset refunds under the gas proxy price methodology, and to prevent the collection of refunds that duplicate the restoration of just and reasonable prices already received by California electricity customers as a result of the El Paso Settlement Order. The Competitive Suppliers Group also requests that the Commission reconsider its denial of the Duke motion to lodge.[139]

**Comments**

104. Duke's request for rehearing renews its efforts to lodge the El Paso Master Settlement Agreement as evidence in the Refund Proceeding. Duke alleges that the "only basis" provided by the Commission's May 12 Order for denying its motion is that the Commission already had spoken to the issues raised by Duke.[140] According to Duke, this basis is "clearly erroneous." Duke states that the May 12 Order "entirely confuses" the Joint Settlement Agreement approved by the Commission in the El Paso Settlement Order with the Master Settlement and Allocation Agreement, which Duke attempted to lodge in the Refund Proceeding.[141] Duke asserts that the El Paso Settlement Order expressly recognizes that the Settlement does not preclude non-settling parties in the El Paso proceeding from asserting their positions in the Refund Proceeding.[142]

**Commission Determination**

105. The Commission will deny the Duke and Competitive Supplier Group requests for rehearing on this issue. It is clear that Duke completely misapprehends the Commission's rationale, in particular the Commission's reliance upon the El Paso Settlement Order in stating that the Commission had "spoken to the issue."[143] Neither

---

[139] Competitive Supplier Group Request for Rehearing and Clarification at 2 – 5.

[140] Duke Request for Rehearing at 5.

[141] *Id.* at 5 - 6.

[142] *Id.* at 6, *citing* Paragraphs 158, 159 of the El Paso Settlement Order.

[143] May 12 Order at Paragraph 91.

Duke nor Competitive Supplier Group understood what the Commission meant by saying that it had "spoken to the issue." So that there will be no further misunderstanding, the El Paso Settlement Order clearly stated that nothing in the settlement was intended to resolve issues in any proceedings other than the El Paso complaint proceeding that was the subject of the El Paso Settlement Order. In other words, the settlement, including all of its underlying documentation (such as the Master Settlement and Allocation Agreements), addresses only the issues in the El Paso complaint proceeding. Although parties to the El Paso proceeding, including non-settling parties, are free to advocate "their positions" in the Refund Proceeding, they cannot do so using documents that were entered into specifically for settlement purposes in the El Paso complaint proceeding. Thus, the Commission has "spoken to the issue" of participation in reminding the parties in Paragraphs 158 and 159 of the El Paso Settlement Order that the settlement would leave them free to advocate *their positions* in other proceedings, including specifically the Refund Proceeding. Implicit in the May 12 Order and explicit in the instant order is that parties may advocate positions taken in the El Paso complaint proceeding in the Refund Proceeding, but they may not rely on (or lodge) documents that were prepared specifically for settlement purposes in the El Paso complaint proceeding.

### B. Whether the Commission erred in striking from the record of the refund proceeding the California Parties' Comments in Opposition to Portland General's Settlement in Docket No. EL03-65.

106. On June 25, 2003, the Commission issued to multiple respondents, including Portland, an Order to Show Cause Concerning Gaming and/orAnomalous Market Behavior (the Gaming Order).[144] The Gaming Order instituted 42 show cause proceedings and directed the Identified Entities, including Portland, to show cause why their behavior during the period from January 1, 2000 to June 20, 2001 does not constitute gaming and/or anomalous behavior as defined by the CAISO and CalPX Tariffs. Subsequently, the Commission's Trial Staff and Portland filed a Stipulation and Agreement (the Stipulation) for certification to the Commission, which Portland states as resolving all issues that were raised in the proceeding regarding allegations of gaming or anomalous market behavior by Portland. The Stipulation was filed only in the dockets established by the Gaming Order to deal with Portland's individual show cause proceedings.[145]

---

[144] *See American Electric Power Service Corporation, et al.*, 103 FERC ¶ 61,345 (2003).

[145] *Id.*

107. The California Parties filed comments opposing the Stipulation in a number of dockets, including the Refund Proceeding. Portland filed a Motion to Strike asserting that these comments were inappropriately filed in the Refund Proceeding. The May 12 Order agreed with Portland and granted Portland's motion to strike the California Parties' comments. The May 12 Order further observed that "the California Parties have filed their Comments on the Agreement in other dockets where they clearly are relevant, so they will not be disadvantaged by the Commission's determination to grant the motion to strike the Comments from the instant proceedings."[146]

**Comments**

108. On rehearing, the California Parties allege that the Commission's decision to grant Portland's motion to strike was erroneous and that "the California Parties' comments, and Portland General's activities, have broader implications, and relate directly to matters that the Commission is pursuing, or should be pursuing, in both the Remedy Proceeding dockets and in PA02-2."[147]

**Commission Determination**

109. The Commission will deny rehearing. The "broader implications" purported to justify inclusion of the California Parties' comments have not been supported. As stated in the May 12 Order, the comments were not appropriately filed in the Refund Proceeding but should have been filed, as they were, in the dockets that were clearly relevant to Portland General's activities in the show cause proceeding. The California Parties have not shown that the Commission's determination to strike their comments will prejudice the outcome of the Refund Proceeding.

The Commission orders:

(A) The Commission hereby denies rehearing in part, grants rehearing in part, of the May 12 Order, as discussed in the body of this order.

(B) The Commission accepts the CAISO's May 24 compliance filing, as discussed in the body of this order.

[146] May 12 Order at Paragraph 98.

[147] California Parties' Request for Rehearing at 33 - 34.

(C) The Commission accepts the May 26 compliance filings of APX, CalPX and Western and the May 28 compliance filing of NCPA, as discussed in the body of this order.

(D) The Commission directs the CalPX to file its proposed methodology, with supporting documentation, for the allocation of the net interest positions of its participants within 15 days, as discussed in the body of this order.

(E) The Commission accepts the June 1 Report of AEPCO, as discussed in the body of this order.

(F) The Commission will grant AE Supply's request to re-intervene, as discussed in the body of this order.

(G) The Commission directs the CAISO to provide an explanation, as part of its December 2004 status report on the Refund Proceeding, of how it will incorporate the adjustments required for the multiple global settlements. The CAISO should provide a detailed description how it will take these multiple global settlements into account and a proposed timeframe for making such filing.

(H) The Commission directs the CalPX to file its compliance filing no later than two weeks after the date that the CAISO's compliance filing is accepted by the Commission.

(I) The Commission directs APX to file its compliance filing no later than sixty days after the date that the CAISO's compliance filing is accepted by the Commission.

By the Commission. Commissioner Kelly not participating.

( S E A L )

Magalie R. Salas,
Secretary.