IN THE

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PACIFIC GAS AND ELECTRIC COMPANY, SOUTHERN CALIFORNIA EDISON COMPANY, AND CALIFORNIA ELECTRICITY OVERSIGHT BOARD,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant.<br><br>SAN DIEGO GAS & ELECTRIC COMPANY, a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 1:07-cv-00157-LAS<br><br>No. 1:07-cv-00167-LAS<br><br>Consolidated<br><br>**HON. LOREN A. SMITH** |

**PLAINTIFFS PACIFIC GAS AND ELECTRIC COMPANY, SOUTHERN CALIFORNIA EDISON COMPANY, AND SAN DIEGO GAS & ELECTRIC COMPANY'S APPENDIX TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

**VOLUME 3 OF 3**

121 FERC ¶ 61,067
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: Joseph T. Kelliher, Chairman;
Suedeen G. Kelly, Philip D. Moeller,
and Jon Wellinghoff.

San Diego Gas & Electric Company — Docket No. EL00-95-164

v.

Sellers of Energy and Ancillary Services
Into Markets Operated by the California
Independent System Operator and the
California Power Exchange

Investigation of Practices of the California
Independent System Operator Corporation
and the California Power Exchange — Docket No. EL00-98-184

ORDER ON REMAND

(Issued October 19, 2007)

1. This case is before the Commission on remand from the United States Court of Appeals for the Ninth Circuit (Ninth Circuit).[1] At issue is whether the Commission has refund authority over wholesale electric energy sales made by governmental entities and other non-public utilities participating in Commission-regulated, organized energy markets administered by public utilities. The Commission originally extended refund liability to governmental entities and non-public utility sellers, for the period of October 2, 2000 to June 20, 2001. The Commission based this decision on the participation of these entities in the California Independent System Operator Corporation (CAISO) and California Power Exchange Corporation (PX) centralized single clearing price auction markets pursuant to market rules approved by the Commission and administered by

[1] *Bonneville Power Admin. v. FERC*, 422 F.3d 908 (9th Cir. 2005) (*Bonneville*).

Commission-jurisdictional entities.[2] Numerous non-public utilities petitioned the Ninth Circuit for review of the Commission's determination that ordered both public and non-public utilities to make refunds. The Ninth Circuit granted the petition, setting aside the Commission's orders related to the 2000 and 2001 energy spot market to the extent that the orders subject governmental entities and non-public utilities to the Commission's refund authority under Federal Power Act (FPA) section 206.[3] The Ninth Circuit remanded to the Commission for proceedings consistent with its findings.

2. In light of the Ninth Circuit's decision, we vacate each of the Commission's California refund orders to the extent that they subject non-public utility entities to the Commission's FPA section 206 refund authority. We further direct the CAISO/PX to complete their refund calculations including all entities that participated in the CAISO/PX markets for the period October 2, 2000 through June 20, 2001.

3. While we sympathize with the equitable concerns raised by some parties that, unlike public utilities, we have no authority under FPA section 206 to order non-public utility entities to pay refunds associated with their sales into the CAISO and PX spot markets during the refund period, we must nonetheless follow the Ninth Circuit's remand decision in *Bonneville*. However, the Commission's inability to order non-public utility entities to pay refunds under FPA section 206 does not preclude such parties from seeking a remedy in state/federal courts.[4]

## I. Background

### A. Refund Order

4. On July 25, 2001, the Commission issued an order that established the scope and methodology for calculating refunds related to transactions in spot markets operated by the CAISO and PX during the period of October 2, 2000 through June 20, 2001.[5] The Commission found that it could, under the specific circumstances of this case, assert FPA section 206 refund authority over non-public utility sellers of energy in the CAISO/PX

---

[2] *See San Diego Gas & Elec. Co. v. Sellers of Energy and Ancillary Servs.*, 96 FERC ¶ 61,120 at 61,499 (Refund Order), *order on reh'g*, 97 FERC ¶ 61,275 (2001) (Refund Rehearing Order).

[3] 16 U.S.C. § 824e (2000).

[4] *See Bonneville*, 422 F.3d at 925.

[5] Refund Order, 96 FERC at 61,499.

markets.[6] It stated that, under the single price auction mechanism operated in the centralized CAISO and PX spot markets, all sellers, including non-public utilities, agreed to the same clearing price for any given sale. Furthermore, the Refund Order stated that California cannot regulate out-of-state sellers and has declined to regulate California non-public utilities' sales in the CAISO and PX spot markets. As a result, absent Commission jurisdiction, a regulatory gap for these sales could exist.

### B. Refund Rehearing Order

5. The Refund Rehearing Order responded to the requests for rehearing of several governmental entities and other non-public utilities arguing that the Commission erred in making refunds applicable to sales by governmental entities and other non-public utilities. These entities asserted that the Commission's rate and refund authority under FPA sections 205[7] and 206[8] applies only to public utilities and that FPA section 201(f)[9] expressly exempts governmental entities and other non-public utilities from Commission jurisdiction unless the statute specifically provides otherwise. These entities further argued that the Commission does not have subject matter jurisdiction over governmental entities and other non-public utilities' sales into the Commission-regulated CAISO and PX markets because section 201(f) overrides the more general statutory provision in section 201(b)[10] and the refund holding here nullifies FPA section 201(f).

6. The Refund Rehearing Order denied the governmental entities and other non-public utilities' requests for rehearing of the Commission's determination that refunds are applicable to sales by all sellers, including governmental entities. The Commission found that the governmental entities and others sold energy in a centralized, single clearing price auction market under which all sellers received the same price for a given sale, pursuant to market rules set by the Commission and administered by public utilities, the CAISO and PX, subject to Commission jurisdiction. The Commission found that the involvement of the CAISO and PX, along with the interstate nature of the wholesale sales, gave it subject matter jurisdiction entirely independent of the jurisdictional nature of the entities.

---

[6] *Id.* at 61,511-13.

[7] 16 U.S.C. § 824d (2000).

[8] 16 U.S.C. § 824e.

[9] 16 U.S.C. § 824(f) (2000).

[10] 16 U.S.C. § 824(b) (2000).

### C. Remand

7. On September 6, 2005, the Ninth Circuit issued an opinion granting a petition for review of the Commission's determination making both public and non-public utilities subject to refunds. As noted by the court, the petitioners[11] are non-public utilities each of whom received the single price for its electric energy sales regardless of whether it was the last and highest bid that cleared the market.

8. The court first considered whether the FPA clearly addresses the Commission's authority to order refunds from governmental entities and other non-public utilities that sold energy in the CAISO and PX markets. The court found that the dispute centers on whether the general applicability of the FPA to "the sale of electric energy at wholesale in inter-state commerce," contained in FPA section 201(b)(1), overrides the more specific FPA provisions, such as FPA sections 205 and 206, that exclude governmental entities from the Commission's authority to enforce just and reasonable rates and to order refunds.[12]

9. The court stated that FPA section 201(f) provides that governmental entities and other non-public utilities are not subject to the provisions of subchapter II of the FPA unless specifically stated in the relevant provisions.[13] The court held that each of the petitioners, with the exception of Arizona Electric,[14] falls within the general exclusion of

---

[11] The petitioners are Bonneville Power Administration (Bonneville); Cities of Anaheim, Azusa, Banning, Colton, and Riverside, California (Southern Cities); Sacramento Municipal Utility District (SMUD); City of Los Angeles Department of Water and Power (LADWP); and Arizona Electric Power Cooperative, Inc. (Arizona Electric). The petitioner-intervenors are the Cities of Burbank, Palo Alto, Pasadena, Redding, and Santa Clara, California; Imperial, Modesto, and Turlock Irrigation Districts; State Water Contractors/the Metropolitan Water District of Southern California (State Water Contractors/Metropolitan); M-S-R Public Power Agency; Northern California Power Agency; and Transmission Agency of Northern California.

[12] *Bonneville*, 422 F.3d at 914-15.

[13] *Id.* at 914-15.

[14] Arizona Electric is a non-profit rural electric generation and transmission cooperative that obtained some of its financing through the Rural Utilities Service (RUS) and is subject to a RUS mortgage under the federal Rural Electrification Act of 1936. The court agreed with the D.C. Circuit's conclusion in *City of Paris v. Fed. Power Comm'n*, 399 F.2d 983, 986 (D.C. Cir. 1968), that the Rural Electrification Administration (now RUS)-financed cooperatives are not government instrumentalities (continued…)

"governmental entities." The court stated that subchapter II of the FPA does not include a specific reference to the Commission's jurisdiction over governmental entities for refund purposes. It stated that the Commission's argument that the identity of the sellers should be ignored and instead the court should look at the subject matter ignores a basic principle of statutory construction: that a specific provision controls a general provision.

10. The court found that Bonneville, as a federal entity, is clearly exempt under section 201(f). According to the court, the Commission acknowledged that it does "not have direct regulatory rate authority over power sales by non-public utilities."[15] The court rejected the Commission's claims that it could still reach the sales of public entities because these transactions were wholesale sales of electric energy in interstate commerce and were governed by Commission-approved rules and a Commission-jurisdictional CAISO and PX. The court also disagreed that the Commission was only resetting the market-clearing price to a just and reasonable level. Instead, the court found that the Commission was ordering governmental and other non-public utilities to pay refunds, an action that lies outside Congress' clearly expressed intent that FPA section 206 only apply to public utilities.[16]

11. The court cited *Mid-Continent Area Power Pool*[17] and noted that the remedy in this case may lie in a contract claim rather than a refund proceeding. The court held that Mid-Continent Area Power Pool (MAPP) is a power pool including public and non-public utilities. The court stated that the Commission found that part of the MAPP tariff violated FPA section 205 and ordered refunds.[18] The court stated that, although the Commission, in *MAPP I*, determined that it could not order Nebraska Public Power District (Nebraska District), a governmental entity/non-public utility, to pay refunds, the Commission suggested that a contract action might provide a remedy for public utility members of MAPP against the Nebraska District. The court found that additional proceedings in federal court demonstrated that, while the Commission could not order refunds from a governmental entity, parties to the MAPP agreement could bring a

---

for the purposes of FPA section 201(f). The court treated Arizona Electric as a non-public utility in these proceedings, but without prejudice to reclassification by the Commission in a different proceeding.

[15] *Bonneville*, 422 F.3d at 910.

[16] *Id.* at 920.

[17] *Mid-Continent Area Power Pool*, 89 FERC ¶ 61,135 (1999) (*MAPP I*).

[18] *Bonneville*, 422 F.3d 908 at 925 (citing *MAPP I*, 89 FERC ¶ 61,135).

contract action that could "result in the equivalent refund relief from Nebraska District."[19]

### D. Procedural Section

12. On April 2, 2007, California Parties[20] filed a motion for procedures following the remand in *Bonneville*. Indicated Public Entities,[21] the CAISO, LADWP, Nevada Companies,[22] Bonneville/Western,[23] PX, Avista Energy, Inc. (Avista) filed answers to California Parties' motion. California Parties filed an April 30, 2007 answer to the answers/motions of Indicated Public Entities, Bonneville/Western, and LADWP. Indicated Public Entities, Bonneville/Western, and State Water Contractors/Metropolitan filed answers to California Parties' April 30, 2007 answer.

13. On May 10, 2007, Nevada Companies filed a motion regarding the remand proceedings. The CAISO filed a response to Nevada Companies' motion. Nevada Companies filed a motion for leave to reply to the CAISO's answer to Nevada Parties' motion.

14. On April 18, 2007, LADWP filed a motion for an order directing disbursement of amounts owed to governmental entities. The City of Pasadena, the CAISO, and Indicated Public Entities filed answers to LADWP's motion. The City of Burbank, the City of

---

[19] *Id.* at 925 (citing *Alliant Energy, Inc. v. Neb. Pub. Power Dist.*, 2001 U.S. Dist. LEXIS 17802 (D. Minn. 2001) (*Alliant I*), *aff'd*, 347 F.3d 1046 (8th Cir. 2003) (*Alliant II*)).

[20] The California Parties include the People of the State of California, *ex rel.* Edmund G. Brown Jr., Attorney General, the California Electricity Oversight Board, the California Public Utilities Commission, Pacific Gas and Electric Company, San Diego Gas & Electric Company, and Southern California Edison Company.

[21] Indicated Public Entities include Arizona Electric, SMUD, Modesto Irrigation District, Turlock Irrigation District, Northern California Power Agency, Metropolitan Water District of Southern California, Public Utility District No. 2 of Grant County, Washington, and the California Cities of Anaheim, Banning, Burbank, Glendale, Pasadena, Redding, Riverside, Santa Clara, and Vernon.

[22] Nevada Companies include Nevada Power Company and Sierra Power Company.

[23] Bonneville/Western include Bonneville Power Administration and Western Area Power Administration.

Glendale, and Turlock Irrigation District also jointly filed an answer to LADWP's motion.

15. Pinnacle West[24] filed a motion for modification of refund procedures and an answer to LADWP's motion. LADWP, Nevada Companies, Indicated Public Entities, and Bonneville/Western filed answers to Pinnacle West's motion. The City of Santa Clara, the City of Redding, and Modesto Irrigation District also jointly filed an answer to Pinnacle West's motion. Salt River Project Agricultural Improvement and Power District (Salt River Project) filed an answer to the motions of Pinnacle West and Nevada Companies.

16. On May 25, 2007, California Parties filed an answer to Nevada Companies and to pleadings of LADWP, Bonneville/Western, and Indicated Public Entities. Indicated Public Entities filed a reply to California Parties' May 25, 2007 answer.

## I. Discussion

### A. Application of Commission refund jurisdiction to governmental entities / non-public utilities

#### Comments

17. California Parties state that the Commission should ensure that the CAISO and PX complete their calculations of wholesale transactions using the mitigated market-clearing price methodology (MMCP), without regard to whether transactions involved governmental entities. They assert that the Commission should order those governmental entities that wish to offset their potential liability overcharges to make cost filings.[25] California Parties assert that *Bonneville* did not invalidate the Commission's finding that all transactions in the CAISO and PX markets during the refund period were overpriced or that all tariff rates for all such transactions should be revised using the MMCP

---

[24] Pinnacle West includes Pinnacle West Capital Corporation and Arizona Public Service Company.

[25] California Parties note that the Commission ordered this in its August 8, 2005 order. *See San Diego Gas & Elec. Co. v. Sellers of Energy and Ancillary Servs.*, 112 FERC ¶ 61,176 (2005) (August 8th Order), *reh'g pending*; *see also San Diego Gas & Elec. Co v. Sellers of Energy and Ancillary Servs.*, 114 FERC ¶ 61,070 (2006), *reh'g pending*.

methodology.[26] They state that the Commission revised the pricing formulations contained in the CAISO/PX tariffs for the period to which the MMCP applies.[27] California Parties contend that these issues were the subject of the *CPUC* appeal, in which the Ninth Circuit rejected all efforts by sellers to limit the scope of transactions subject to the MMCP methodology, not *Bonneville*. They state that because the *CPUC* mandate has not issued yet, these issues remain within the exclusive jurisdiction of the Ninth Circuit, and are not subject to question before the Commission.

18. California Parties note that the Ninth Circuit, in *Bonneville*, states that the most likely remedy for the governmental entities' overcharges is "in a contract claim, not a refund action."[28] They explain that, based upon the Ninth Circuit's opinion, they have initiated civil litigation against the governmental entities in federal and state courts, just as other power pool members sued Nebraska District in federal district court in *Alliant I*. California Parties state that, in the *MAPP* proceeding, the Commission found that members of the power pool, both public utilities and governmental entities, had overcharged for transmission services.[29] Similarly, they assert that the Commission found, in the instant case, that both public utilities and governmental entities overcharged for power sold through the CAISO and PX markets.[30] California Parties contend that the Commission ordered the MAPP to re-calculate transmission charges,[31] just as it has ordered here that the CAISO and PX re-calculate energy and ancillary services charges.[32] They state that one of the governmental entities in MAPP, Nebraska District, refused to refund overcharges, stating that the Commission could not order refunds because it was not a public utility. California Parties assert that other members of MAPP brought a civil

---

[26] California Parties note that they believe that, as a result of the Ninth Circuit's opinions in *Lockyer v. FERC*, 383 F.3d 1006 (9th Cir. 2004) (*Lockyer*), and *Pub. Utils. Comm'n of the State of Cal. v. FERC*, 462 F.3d 1027 (9th Cir. 2006) (*CPUC*), the Commission must also order the CAISO and PX to apply the MMCP to rates charged during the summer period.

[27] California Parties Apr. 2, 2007 Motion for Procedures Following Remand, Docket No. EL00-95 at 13 (California Parties Motion for Remand Procedures).

[28] *Id.* at 9 (citing *Bonneville*, 422 F.3d at 925).

[29] *Id.* at 11 (citing *Alliant II*, 347 F.3d at 1049; *Bonneville*, 422 F.3d at 925).

[30] *Id.* (citing Refund Order, 96 FERC at 61,512).

[31] *Id.* (citing *Alliant I*, 2001 U.S. Dist. LEXIS 17802 at *7-8).

[32] *Id.* (citing Refund Order, 96 FERC at 61,512).

action against Nebraska District for failing to abide by its contractual obligations under the Commission-filed tariff. In the instant proceedings, California Parties note that they have brought a similar civil suit against governmental entities for failing to abide by their contractual obligations under the CAISO and PX tariffs. The district court ruled that Nebraska District was contractually obligated to abide by the Commission's refund order because the MAPP Agreement – like the CAISO and PX tariffs – was subject to Commission jurisdiction "regardless of whether FERC has regulatory authority over [Nebraska District] itself."[33]

19. California Parties contend that, in the *MAPP* proceeding, the Commission did not order MAPP to cease calculating the amount of Nebraska District's overcharge, even after the Commission found that it did not have the authority to compel Nebraska District to refund its overcharges. Rather, they assert, MAPP completed its calculations and then billed Nebraska District.[34] They state that, here, as in the *MAPP* proceeding, the completion of the CAISO and PX's recalculations of all sellers' accounts will facilitate the speedy resolution of court actions to enforce the governmental entities' repayment liabilities.

20. Nevada Companies state that the *Bonneville* decision left in place the netting requirement pertaining to refunds jurisdictional utilities owe. They note that the court stated that the issue was that the Commission cannot require governmental entities to pay refunds, not the Commission's decision to include governmental entities in refund calculations. They contend that the Commission should complete refund calculations without regard to the jurisdictional status of transacting parties. They request that the fundamental attribute of the MMCP methodology, that refunds be calculated only on the basis of hourly net positions, be left in place. They state that this will ensure that jurisdictional utilities retain the ability to net the refunds they owe against the overcharges they already paid, both to jurisdictional and non-jurisdictional entities.[35]

21. LADWP states that there is no precedent for the California Parties' request that the Commission delay implementation of *Bonneville* by ordering the CAISO and PX to

---

[33] *Id.* at 12 (quoting *Alliant I*, 2001 U.S. Dist. LEXIS 17802 at *14).

[34] *Id.* at 14 (citing *Alliant I*, 2001 U.S. Dist. LEXIS 17802, at *8).

[35] Nevada Companies May 10, 2007 Motion, Docket No. EL00-95 at 10-11 (Nevada Companies May 10, 2007 Motion) (citing *Koch Gateway Pipeline Co. v. FERC*, 136 F.3d 810, 812 (D.C. Cir. 1998) (court held that the company was not required to refund money because it "had not garnered a windfall in the process"); *Distrigas of Mass. v. FERC*, 751 F.2d 20 (1st Cir. 1984) (court held that the utility could not refund more money than its rate change brought in)).

continue their refund calculations and to delay payments to governmental entities as if *Bonneville* never issued. It asserts that the *MAPP/Alliant* case precedent does not support the California Parties' request. It contends that, initially, the Commission did not order MAPP to include Nebraska District's refunds in its refund calculations for the purpose of providing a measure of damages for complainants against Nebraska District. LADWP states that the Commission did not order MAPP to refrain from paying amounts due to Nebraska District pending a judicial determination of Nebraska District's contractual liability. LADWP states that MAPP collected the amounts owed to Nebraska District from other MAPP members and placed them in escrow pending resolution of the issues related to Nebraska District's non-payment of refunds.

22. LADWP states that *Bonneville* renders cost recovery offset filings by governmental entities moot. LADWP asserts that the Commission has found that a cost offset filing would be moot if the seller does not have a refund liability.[36] In their answer, Indicated Public Entities agree with this assertion.

23. Indicated Public Entities assert that the Commission must dismiss all claims for refunds asserted against non-jurisdictional sellers and vacate each of its orders to the extent that it purports to order non-jurisdictional sellers to pay refunds in the proceeding. Indicated Public Entities state that the Commission did not amend the CAISO and PX tariffs to reset market prices – it ordered refunds. They contend that the Commission

---

[36] LADWP Apr. 17, 2007 Answer, Docket No. EL00-95 at 13 & n.46 (citing *San Diego Gas & Elec. Co.*, Docket No., EL00-95, Notice of Extension of Time, at 2 n.4 (2007)) (LADWP Apr. 17, 2007 Answer). LADWP noted that the Commission has stated:

> Note that *Bonneville* held that the Commission lacks refund authority over wholesale electric energy sales made by governmental entities. *See Bonneville*, 422 F.3d at 911. The Commission has determined that an entity that ultimately has no refund liability has no liability to offset, *see San Diego Gas & Elec. Co. v. Sellers of Energy and Ancillary Servs.*, 114 FERC ¶ 61,070 (2006), *reh'g pending*, and, therefore, *a cost filing to obtain a cost offset would be moot in such circumstance*. (Emphasis added).

*San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Servs.*, 114 FERC ¶ 61,070 at P 130 (2006) ("If a party does not have a refund liability, then there is no need to determine an appropriate cost offset at this time").

expressly ruled that it was not determining that all sales were made at unjust and unreasonable prices.[37]

24. Bonneville/Western state that the mandate specifically exempts the governmental entities from refund liability. As such, they assert that the Commission has no authority to order the CAISO and PX to continue refund calculations including the governmental entities. They contend that the Commission cannot compel governmental entities to make cost filings.

25. Bonneville/Western state that the refund methodology did not amend the tariff, but instead established the MMCP methodology for the calculation of refunds. Bonneville/Western state that FPA section 206 proceedings do not retroactively amend a tariff, but merely give a legal mechanism for the Commission to impose refunds on jurisdictional entities as a matter of discretion. They assert that California Parties are attempting to have the Commission interpret the *CPUC* decision in a vacuum without regard to *Bonneville*.

26. Bonneville/Western state that the Commission's role for public utilities is to determine if rates are just and reasonable. Under the Northwest Power Act, they note that the Commission reviews Bonneville's rates only to ensure that these rates are sufficient to ensure repayment of the federal investment and based on total system costs, the criteria imposed by section 7(a) of the Act.[38] They contend that, after the Commission approves Bonneville's rates, these rates take effect with no opportunity for the Commission to later reconsider them. They state that, under separate authorities,[39] the process and the results

---

[37] Indicated Public Entities Apr. 17, 2007 Answer, Docket No. EL00-95 at 22 & n.23 (Indicated Parties Apr. 17, 2007 Answer) (citing *San Diego Gas & Elec. Co.*, 93 FERC ¶ 61,294, at 61,998 (2000)).

[38] Bonneville/Western Apr. 17, 2007 Answer, Docket No. EL00-95 at 18 (citing *Aluminum Co. of Am. v. Bonneville Power Admin.*, 903 F.3d 585, 592 (9th Cir. 1989), *cert. denied*, 498 U.S. 1024 (1991) (contrasting Commission role under the FPA to that under the Northwest Power Act); *Cent. Lincoln People's Util. Dist. v. Johnson*, 735 F.2d 1101, 1113 n.6 (9th Cir. 1984) (expressly rejecting the argument that the "substantive provisions of the FPA are meant to govern the rate review under section 7(k)"); *S. Cal. Edison Co. v. Jura*, 909 F.2d 339, 343-44 (9th Cir. 1990) (same)).

[39] *Id.* (citing sections 301 (b), 302(a) and 644 of the Department of Energy Organization Act, Pub. L 95-91 (42 U.S.C. § 7101, *et seq.*); section 5 of the Flood Control Act of 1944 (16 U.S.C. § 825s); the Reclamation Projects Act of 1902 (43 U.S.C. § 372, *et seq.*) as amended and supplemented by subsequent enactments, particularly

(continued…)

are the same with respect to Western. Further, they state that the Commission's review of Western's rates is also limited to sufficiency of repayment and it cannot adjust those rates (only send them back to Western for further consideration). Bonneville/Western assert that, in the event that the Commission continues the calculation of refunds for Bonneville or Western, the Commission would have no jurisdiction under the Northwest Power Act, Western's authorities, or the FPA to put into effect any such recalculated rate.

27. In their answer, California Parties respond that governmental entities have failed to provide any reason why the Commission should not apply *MAPP* case precedent to this proceeding. They assert that *Bonneville* did not hold anything other than the fact that the Commission cannot require governmental entities to repay their overcharges. California Parties state that the *CPUC* decision, which was decided after *Bonneville*, proves that the court did not give the governmental entities a free pass to avoid any future Commission proceedings.[40]

28. Further, California Parties state that they did not request that the Commission force governmental entities to make cost filings. California Parties state that the cost filings are a benefit to sellers that allows them to seek cost offsets to protect them from revenue shortfall. California Parties add that the Northwest Power Act is irrelevant because they are not asking the Commission to put into effect any recalculated rate with regard to Bonneville or Western. Instead, they note that their requests are all directed to the CAISO and PX.

29. In their response to California Parties Apr. 30 Answer, Indicated Public Entities state that California Parties' assertion that cost filings are optional is disingenuous. They contend that, if non-jurisdictional sellers fail to submit cost filings, and the Commission orders the CAISO and PX to proceed with the calculation of refunds attributable to non-jurisdictional sellers, as though *Bonneville* never issued, then California Parties would contend in the contract litigation that the non-jurisdictional seller that declined to submit a cost filing to the Commission waived its right to mitigation of its potential refunds.

---

section 9(c) of the Reclamation Project Act of 1939 (43 U.S.C. § 485h(c)) and the Acts specifically applicable to individual projects or power systems; and which have been codified at 10 C.F.R. Part 903).

[40] California Parties Apr. 30, 2007 Answer, Docket No. EL00-95, at 8 (citing *CPUC*, 462 F.3d at 1061) (California Parties Apr. 30 Answer).

30. In their answer,[41] Indicated Public Entities state that, in the *MAPP* proceeding, the non-jurisdictional entity, Nebraska District, had already been paid, and the Commission found it could not require Nebraska District to provide refunds. They state that the Commission did not find that it could withhold refunds from Nebraska District while the contract litigation went forward in a different forum.

31. The CAISO states that it takes no position as to California Parties' requests. It asserts, however, that the most time-intensive method of recalculating the refunds to remove the amounts attributable to the governmental entities would be the recalculation all of the CAISO and PX calculations from the last four years. The CAISO opposes this approach and, if ordered today, states that the recalculation could take more than two years to complete. The CAISO notes there are a number of ways that *Bonneville* could be implemented. It states that one option is a simplified financial clearing where the total amount of refunds that otherwise would have been collected from governmental entities would be reflected by a *pro rata* reduction to refund recipients based upon their overall share of the CAISO load during the refund period. Avista filed comments in support of the CAISO's response to California Parties Motion for Remand Procedures.

32. Nevada Companies filed a motion contending that the Commission should determine the refunds owed by each non-governmental entity net seller and promptly order money flows based on those findings.

33. The CAISO, in responding to Nevada Companies May 10, 2007 Motion, states that it takes no position on Nevada Companies' argument, but is concerned regarding the practical implications of the proposed approach. The CAISO states that it is concerned that there will be a situation in which it cannot balance its Clearing Account[42] because it is unable to make up amounts that otherwise would have been paid as refunds by non-jurisdictional entities. It asserts that the Commission needs to adopt a mechanism for implementing *Bonneville* that allows the CAISO to match credits with debits on an equal basis or a shortfall will be an unavoidable problem.

34. Nevada Companies responded to the CAISO to clarify their position. They state that they propose a straight path to finality, with the Commission keeping separate non-

---

[41] Bonneville/Western and State Water Contractors/Metropolitan support and adopt each of the arguments made by the Indicated Public Entities in their pleading filed in response to the answer by the California Parties.

[42] The Clearing Account is the account through which the CAISO receives payments from debtors and makes payments to creditors. CAISO May 25, 2007 Answer, Docket EL00-95 at 4 & n.3.

jurisdictional litigation from the refund proceedings. They state that, under their proposal, net purchasers would not receive refunds from the governmental entities. They state no shortfall would exist because the Commission cannot make the CAISO or jurisdictional sellers responsible for refunding additional monies in order to make up for the Commission's lack of refund jurisdiction over the governmental entities.

35. California Parties respond to Nevada Companies' motion by stating that they disagree with Nevada Companies' assertion that the Commission should determine the refunds owed by each non-governmental entity net seller and to promptly order money flows based on those findings, and then close the books as to those net sellers, exempting them from any potential liability for shortfalls if the governmental entities do not pay their refunds. They state that, until the courts have determined the governmental entities' liability for overcharge damages, it is premature to begin liquidating refund obligations. They assert that *Bonneville* said nothing about the disposition of funds that the CAISO/PX are holding in trust for consumers who were overcharged. California Parties state that the Nevada Companies' shortfall allocation proposal is premature. They contend that, since the governmental entities' liability is still unknown, it is currently impossible to assess shortfall issues. California Parties further assert that the CAISO/PX cannot settle their markets until they have completed the Commission-ordered recalculations.[43]

**Commission Determination**

36. California Parties assert that the Commission revised the pricing formulations contained in the CAISO/PX tariffs for the period to which the MMCP applies.[44] We disagree. The *Bonneville* court found that the Commission had ordered refunds rather than amending the CAISO/PX tariffs to reset the market clearing price during the refund period.[45] The court further found that the Commission had acted outside its jurisdiction when ordering non-public utility entities to pay these refunds. Therefore, we vacate each

---

[43] California Parties May 25, 2007 Answer, Docket No. EL00-95 at 16 (citing *Constellation Power Source, Inc.*, 100 FERC ¶ 61,124 (2002), *reh'g denied*, 100 FERC ¶ 61,380 (2002), *reh'g denied*, 111 FERC ¶ 61,148 (2005), *aff'd*, *Constellation Energy Commodities Group, Inc. v. FERC*, 457 F.3d 14 (D.C. Cir. 2006); *PG&E Energy Trading-Power, L.P.*, 102 FERC ¶ 61,119 (2003); *Powerex Corp*, 102 FERC ¶ 61,328, *reh'g denied*, 104 FERC ¶ 61,119 (2003), *aff'd*, *Constellation Energy Commodities Group, Inc. v. FERC*, 457 F.3d 14 (D.C. Cir. 2006); *La Paloma Gen. Co., LLC*, 110 FERC ¶ 61,386 (2005), *reh'g denied*, 118 FERC ¶ 61,189 (2007)).

[44] *See* California Parties Motion for Remand Procedures at 13.

[45] *Bonneville*, 422 F.3d at 919-20.

of the Commission's orders in the California refund proceeding to the extent that they order non-public utility entities to pay refunds.

37. While we sympathize with the equitable concerns raised by some parties that, unlike public utilities, we have no authority under FPA section 206 to order non-public utility entities to pay refunds associated with their sales into the CAISO and PX spot markets during the refund period, we must nonetheless follow the Ninth Circuit's remand decision in *Bonneville*. However, the Commission's inability to order non-public utility entities to pay refunds under FPA section 206 does not preclude such parties from seeking a remedy in state/federal courts.[46]

38. While we recognize the court's finding that the Commission, in the context of this proceeding, has no authority to order non-public utility entities to pay refunds under FPA section 206, we conclude that the CAISO/PX should complete their refund calculations including all entities that participated in the CAISO/PX markets.[47] We believe that halting the refund calculation process would be detrimental to the public interest. We agree with the CAISO that it would be time intensive and unreasonable to recalculate all of the refund calculations in order to remove the non-public utility entities.

39. However, as a result of the court's finding, the total amount of refunds that otherwise would have been paid by non-public utility entities for their sales into the CAISO and PX spot markets during the refund period must be reflected in reduced refund amounts that buyers will receive. This shortfall in refunds must be allocated somehow among buyers. We agree with the CAISO that a reasonable approach to allocate this shortfall is to implement a simplified financial clearing in which refund recipients receive a *pro rata* reduction in their refunds. The CAISO further suggests that the *pro rata*

---

[46] *See id.* at 925.

[47] We note that the Energy Policy Act of 2005 amended FPA section 206 to make certain entities that fall under FPA section 201(f) subject to the Commission's refund jurisdiction if they:

> voluntarily make a short-term sale of electric energy through an organized market in which the rates for the sale are established by Commission-approved tariff (rather than by contract) and the sale violates the terms of the tariff or applicable Commission rules in effect at the time of the sale, the entity shall be subject to refund authority of the Commission under this section with respect to the violation.

Energy Policy Act of 2005, Pub. L. No. 109-58, § 1286, 119 Stat. 594, 981 (2005) (to be codified as 16 U.S.C. § 824e(e)(2)).

reduction could be based on refund recipients' "overall share of CAISO load during the [r]efund [p]eriod."[48] While this option appears to be simple and expedient, we find that it may not be the most equitable, because refund recipients would not share the burden of the shortfall in proportion to their exposure to the CAISO and PX spot markets. Instead we find that the *pro rata* reduction to refund recipients based on their final net refund position in relation to total net refunds is a closer approximation to their exposure to the CAISO and PX spot markets. Under this approach, all net refund recipients, both public utilities and non-public utility entities, will receive an allocation of the shortfall in proportion to their refunds. When faced with similar issues earlier in this proceeding on the allocation of the interest shortfall among PX participants, the Commission examined several alternatives. We find that our approach here is consistent with how the Commission decided to allocate the interest shortfall.[49] In both situations, the shortfall is allocated in a fair and proportional manner.

40. We disagree with governmental entities' argument that their inclusion in the CAISO/PX refund calculations is a violation of the *Bonneville* mandate. The *Bonneville* court found that the Commission lacked the jurisdiction to order governmental entities or other non-public utilities to pay refunds. Here, we are not ordering non-public utility entities to pay refunds. Instead, we are directing Commission-jurisdictional entities, the CAISO and PX, to complete refund calculations as to the level of any potential refund shortfalls so that we may properly order refunds by public utilities.

41. Further, our approach is consistent with the *MAPP* proceeding, in which the Commission did not order the power pool to stop calculating Nebraska District's refund obligations even after the Commission found that it lacked jurisdiction to order Nebraska District to pay refunds.[50] Therefore, we direct the CAISO/PX to continue their refund calculations with all entities that participated in the CAISO/PX markets. We also direct the CAISO to allocate the refund shortfall, discussed above, by implementing a *pro rata*

---

[48] CAISO Apr. 17, 2007 Answer, Docket No. EL00-95 at 5.

[49] *See San Diego Gas & Elec. Co. v. Sellers of Energy and Ancillary Servs.*, 110 FERC ¶ 61,336, at P 41, 56, *reh'g denied*, 112 FERC ¶ 61,226 (2005) (allocating the interest shortfall based upon the final net interest position for each participant in relation to the total amount of the interest shortfall).

[50] California Parties Motion for Remand Procedures at 14-15 (citing *Alliant I*, 2001 U.S. LEXIS 17802 at *8).

reduction to refund recipients based upon their final net refund position in relation to total net refunds.[51]

42. In the case of the non-public utility entities, the court has determined that those parties have no refund obligations under FPA section 206. Therefore, we order below the disbursement of past due amounts owed to non-public utility entities for sales made in the CAISO/PX spot markets from October 2, 2000 through June 20, 2001.[52] Here, however, final refund calculations with respect to jurisdictional entities have yet to be completed. Until these calculations are completed, we will not know the jurisdictional entities' final refund obligations. Therefore, we find that it is premature to discuss disbursement of monies to jurisdictional entities until their refund obligations are determined.

43. Because we are vacating each of the Commission's California refund orders to the extent that they make non-public utility entities liable for refunds, we will not require those entities to make cost filings. The purpose of cost filings is to prevent a confiscatory result for sellers required to make refunds. Here, however, non-public utility entities do not have FPA section 206 refund liability. Therefore, there is no need for them to make cost filings. We are aware of Indicated Public Entities' concern that California Parties could potentially contend in state/federal contract claim proceedings that the non-public utility entities, which do not make cost filings, have waived their rights to mitigation of their potential refunds. However, such assertions are merely speculation. The Commission will not interfere in state/federal contract claims and therefore we will not speculate as to how such courts will view the potential absence of cost filings by non-public utility entities.

44. Finally, because we are not ordering non-public utility entities to pay refunds, we do not find it necessary to address the merits of Bonneville/Western's claims regarding the Commission's ability to review their rates.

---

[51] We note that the disbursement of refunds to non-jurisdictional sellers will occur after a final accounting of who owes what to whom in this proceeding to ensure the accuracy of the *pro rata* allocation.

[52] Past due amounts are monies held in escrow for sales that generators and other sellers made during the refund proceeding but have not received payment.

## B. Disbursement of Past Due Amounts to Non-Public Utility Entities

### LADWP Motion

45. On April 18, 2007, LADWP filed a motion requesting disbursement of amounts owed to governmental entities for sales made in the CAISO/PX spot markets from October 2, 2000 through June 20, 2001.[53] It contends that the Commission has a duty to promptly correct the harm that the Commission has caused.[54] LADWP further states that the expedited payment of principal and interest is also required by the public interest by stopping the running of interest on past due amounts owed to the governmental entities under *Bonneville*. It requests that the Commission direct the CAISO to update its calculations owed to each governmental entity for sales into the CAISO and PX markets during the refund period and disburse the total amount of past due principal amounts and interest owed.

46. The CAISO states that it takes no position on LADWP's request regarding the distribution of past due funds owed to governmental entities. However, the CAISO contends that it will have no part to play in collecting or disbursing funds to governmental entities other than as provided in the CAISO's tariff or the confirmed plan of reorganization of PX. It asserts that any unpaid amounts owed to governmental entities related to activities in the CAISO's markets must come from PX or other market participants. It further notes that the obligation to collect amounts still owed by PX is on the Scheduling Coordinators, not the CAISO. It states that the Commission must be clear, in directing any disbursement of past due funds to governmental entities, that the CAISO will not be responsible for collecting and disbursing any such funds.

---

[53] The City of Pasadena and Indicated Public Entities both filed answers in support of LADWP's motion. The Cities of Burbank and Glendale, along with Turlock Irrigation District, also jointly filed an answer in support of LADWP's motion.

[54] LADWP Apr. 18, 2007 Motion, Docket No. EL00-95, at 5 (LADWP Apr. 18, 2007 Motion) (citing *Exxon Co., U.S.A. v. FERC*, 182 F.3d 30, 49 (D.C. Cir. 1999) ("As we have stated, 'when the Commission commits legal error, the proper remedy is one that puts the parties in the position they would have been in had the error not been made'") (citing *Pub. Utils. Comm'n of the State of Cal. v. FERC*, 988 F.2d 154, 168 (1993)); *see also Panhandle Eastern Pipeline Co. v. FERC*, 907 F.2d 185, 189 (D.C. Cir. 1990); *Office of Consumers Counsel, State of Ohio v. FERC*, 826 F.2d 1136, 1139 (D.C. Cir. 1987)).

47. The CAISO also states that it takes no position regarding LADWP's request that the governmental entities receive interest at the Commission rate on all past due amounts. The CAISO asserts that any interest amounts will have to come from the PX or other market participants. It further contends that there may be an issue with respect to LADWP's request because the PX has been earning interest on the funds in its Settlement Trust Account at a rate less than the Commission interest rate.

48. The CAISO states that it assumes that LADWP intends that any Commission order directing the disbursement of unmitigated past due amounts, relating to transactions in the CAISO/PX spot markets during the refund period, to governmental entities would take into account the adjustments performed as part of the CAISO's preparatory rerun process. If this is the case, the CAISO states that it has two comments. First, it asserts that, if the Commission accepts the LADWP motion, any disbursement of unpaid amounts to governmental entities likely would be made prior to the CAISO invoicing the results of the preparatory rerun. The CAISO states that, in order to accurately reflect the amounts owed to governmental entities, current CAISO balances would need to be adjusted based on the preparatory rerun data. Second, the CAISO contends that several claims that could affect the amounts owed by the PX are being pursued by various market participants in alternative dispute resolution pursuant to CAISO tariff section 13, and that the resolution of these disputes may impact the preparatory rerun.

49. Pinnacle West filed an answer opposing LADWP's motion and asking the Commission to deny governmental entity purchasers refunds to the extent that they refuse to provide refunds based on mitigated prices for their sales into the CAISO and PX markets.[55] It contends that the CAISO and PX should continue to calculate refund amounts for all sellers, including non-jurisdictional entities and that the Commission should follow the *MAPP* proceeding precedent. It asserts that the governmental entity sellers can make such claims, presumably under contract law, in other fora appropriate to their positions and claims. Pinnacle West states that, to the extent governmental entities make such claims against the CAISO/PX, those entities can then pursue any relevant

---

[55] In a responsive brief, California Parties state that they:

> support the basic proposition that the Commission has the authority to direct the ISO and PX to offset amounts associated with overcharges in determining amounts to be paid by the ISO and PX to Governmental Entities. Given that, as of yet, there are no shortfalls, the Commission need not address this issue at this time.

California Parties May 25, 2007 Answer, Docket No. EL00-95 at 14 n.27.

counterclaims based on the parties' contractual commitments, as envisioned by the court in *Bonneville* and more recently by the Commission.[56]

50. Pinnacle West asserts that the plain language of FPA section 206 and its legislative history show that the Commission's refund authority is discretionary. It states that the Commission has found that Congress clearly intended to provide the Commission with discretion under FPA section 206 to determine if public utilities should refund amounts paid in excess of just and reasonable rates in individual instances.[57] Pinnacle West contends that the discretionary nature of refunds has also been repeatedly confirmed by the courts.[58]

51. Due to the *Bonneville* decision, Pinnacle West states that this proceeding resembles the situation faced by the Commission in its investigation of the Pacific Northwest energy markets in *Puget Sound Energy, Inc. v. All Jurisdictional Sellers of Energy and/or Capacity at Wholesale* (*Puget Sound*).[59] It states that, in *Puget Sound*, the Commission found that it was inequitable to allow governmental entities to receive refunds for their high-priced purchases where they are exempt from providing refunds for

---

[56] Pinnacle West May 3, 2007 Motion, Docket No. EL00-95 at 5 (citing *Bonneville*, 422 F.3d at 925-26; *Cal. Indep. Sys. Operator Corp.*, 119 FERC ¶ 61,076 at P 556 (2007)).

[57] *Id.* at 6 (citing *Canal Elec. Co.*, 47 FERC ¶ 61,275 at 61,960 (1989) (citing S. Rep. No. 100-491, 100th Cong., 2d Sess. 6 (1988))).

[58] *Id.* (quoting *Towns of Concord v. FERC*, 955 F.2d 67, 75 (D.C. Cir. 1992) ("Customer refunds are a form of equitable relief, akin to restitution, and the general rule is that agencies should order restitution only when 'money was obtained in such circumstances that the possessor will give offense'"); *Koch Gateway Pipeline Co. v. FERC*, 136 F.3d 810, 816 (D.C. Cir. 1998) (citing *Columbia Gas Transmission Corp. v. FERC*, 750 F.2d 105, 109 (D.C. Cir. 1984); *Ariz. Elec. Power Coop. v. FERC*, 631 F.2d 802, 809 (D.C. Cir. 1980)) ("the difficult problem of balancing competing equities and interest has been given by Congress to the Commission with full knowledge that this judgment requires a great deal of discretion"); *Laclede Gas Co.*, 997 F.2d 936, 944 (D.C. Cir. 1993) (citing *Niagara Mohawk Power Corp. v. FPC*, 379 F.2d 153, 159 (D.C. Cir. 1967)) ("FERC's discretion is at its zenith when the action assailed relates primarily … to the fashioning of … remedies and sanctions").

[59] *Id.* at 7 (citing *San Diego Gas & Elec. Co.*, 93 FERC ¶ 61,294 (2001), *order on reh'g*, 103 FERC ¶ 61,348, *reh'g denied*, 105 FERC ¶ 61,183 (2003), *reviewed sub nom. Port of Seattle v. FERC*, 2007 U.S. App. LEXIS 20217 (9th Cir. 2007)).

any high-priced sales they may have made.[60] Pinnacle West states that many governmental entities, which are seeking immediate distribution of unmitigated receivables, also purchased in the markets at issue and, under the current refund mechanism, may be eligible for refunds from other, jurisdictional sellers. This situation is inequitable and is similar to the proposition rejected by the Commission in *Puget Sound*. Pinnacle West asserts that the Commission has already found that it is only fair that non-public utilities seeking refunds of excessive charges paid in the CAISO and PX markets be willing to pay refunds related to any excessive amounts charged for power sold to the CAISO and PX.[61] It states that, because refunds are "restitutionary" relief,[62] governmental entities have no incontrovertible right to receive them. It notes that, in the past, the Commission has implemented a policy of ordering refunds except where there are equitable considerations to the contrary.[63]

52. In their answer to Pinnacle West, Nevada Companies state that the Ninth Circuit has held that non-jurisdictional entities cannot voluntarily submit to Commission rate regulation.[64] They state that Pinnacle West's suggestion that, in order to receive refunds from public utilities, governmental entities pay refunds under FPA section 206 is a back door approach to regulating the rates charged by governmental entities. Nevada Companies assert that the failure to order refunds to non-jurisdictional entities would depart from Commission practice. They cite *MAPP II*[65] to support their assertion, stating that the Commission ordered refunds from jurisdictional entities, including a public power district even though the Commission lacked jurisdiction over that district which also owed refunds. They further cite *FPC v. Tennessee Gas Co.*[66] where the Commission ordered refunds in certain rate zones before it decided cost allocation among the zones.

---

[60] *Id.* (citing *Puget Sound*, 103 FERC ¶ 61,348 at P 39).

[61] *Id.* at 8 (citing *San Diego Gas & Elec. Co.*, 96 FERC at 61,513 n. 56).

[62] *Id.* (citing *San Diego Gas & Elec. Co.*, 97 FERC at 62,185).

[63] *Id.* (citing *San Diego Gas & Elec. Co.*, 97 FERC at 62,185 (citing *W. Res., Inc. v. FERC*, 9 F.3d 1568, 1581 (D.C. Cir. 1993); *Estate of L.D. French v. FERC*, 603 F.2d 1158, 1162-63 (5th Cir. 1979))).

[64] Nevada Companies May 18, 2007 Answer to Pinnacle West's Motion, Docket No. EL00-95, at 3 (citing *Bonneville*, 422 F.3d at 925).

[65] *Mid-Continent Area Power Pool*, 91 FERC ¶ 61,353 (*MAPP II*), *reh'g denied*, 92 FERC ¶ 61,229 (2000).

[66] *FPC v. Tennessee Gas Co.*, 371 U.S. 145 (1962).

Nevada Companies state that the Supreme Court held that the Commission could order refunds on a portion of a rate and found this procedure proper because the company had separate rates for each zone. Thus, any losses in one zone could not offset refunds in another. They state that the same policy applies here. They contend that the Commission used an hourly refund period. They assert that the Commission tying refunds for net sales in one hour to refunds in another hour is equivalent to tying refunds in one rate zone to the outcome of refunds proceedings in other zones.

53. Salt River Project filed an answer to the motions of Pinnacle West and Nevada Companies. It agrees with Nevada Companies that the CAISO and PX should continue rerunning the bills. It objects to Pinnacle West's request that the Commission deny refunds to governmental entities to the extent that they refuse to provide refunds based upon mitigated prices for their sales into the CAISO/PX markets. It asserts that it paid refunds through offsets in the settlements filed in this proceeding. It states that, until the settlement process is completed, Pinnacle West is premature in concluding that governmental entities are not voluntarily paying refunds.

54. LADWP states that, contrary to Pinnacle West's claims, its motion did not request the immediate disbursement of refunds, if any, that the Commission may determine would be due to governmental entities for purchases in the CAISO and PX markets during the refund period. It further states that, after receiving the money owed to it for sales during the refund period, it would consider any proposal that could bring about the prompt and equitable resolution of the remaining ancillary issues in this proceeding.

55. SVP/Redding/Modesto state that the courts have found that a governmental entity cannot be excluded from refunds ordered by the Commission for purchases from jurisdictional sellers on the basis that the governmental entity sales are exempt from Commission jurisdiction.[67] SVP/Redding/Modesto assert that the Commission, in *Puget Sound*, based its decision on numerous factors when dismissing the proceeding. They further state that *Puget Sound* can be distinguished from the instant proceeding because the Commission was determining whether refunds should be ordered from any jurisdictional sellers for all buyers. Based on all of the factors considered, the Commission found that it would be inequitable to order refunds from any sellers.[68] They, therefore, contend that, if the Commission followed this logic, then it would deny refunds to all parties in California.

---

[67] SVP/Redding/Modesto May 18, 2007 Answer, Docket EL00-95 at 4 (citing *Cal. Elec. Power Co. v. FPC*, 199 F.2d 206, 208-09 (9th Cir. 1952); *U.S. v. Pub. Utils. Comm'n*, 345 U.S. 295, 312-13 (1953)).

[68] *Id.* at 5 (citing *Puget Sound*, 103 FERC ¶ 61,348 at P 35, 28-39).

56. Bonneville/Western state that the Pinnacle West seeks to change the nature of this proceeding by having the Commission interject itself into private litigation. They state that, with the issue of the mandate, the refund proceeding has been terminated with respect to the governmental entities and the Commission should disburse these funds. They state that there is no reason for the Commission to rule on whether or not the governmental entities receive refunds in the remand order.

**Commission Determination**

57. We grant in part and deny in part LADWP's motion requesting disbursement of past due amounts, plus interest, owed to governmental entities for sales they made in the CAISO/PX spot markets during the refund period. Based upon the *Bonneville* remand, the governmental entities have no further FPA section 206 refund liabilities. We agree with LADWP that they should receive the monies that they are owed for sales they made into the CAISO/PX markets during the refund period, and therefore we will grant their motion regarding the disbursement of principal amounts. As stated by the CAISO, any disbursement of unpaid amounts first must be adjusted based upon preparatory rerun data, as finalized upon the completion of alternative dispute resolution matters that are currently pending. Further, as noted below, we are requiring each party that seeks designation as a non-public utility entity for purposes of the California refund proceeding to file a designation request with the Commission in this docket, within 60 days of the date of this order. Once the Commission has ruled on these filings, we will direct the disbursement on past due amounts owed to non-public utility entities for sales they made in the CAISO/PX spot markets from October 2, 2000 through June 20, 2001.

58. However, we deny LADWP's motion to the extent that it requests the expedited release of interest associated with the principal amounts that they are owed on their past due amounts. As the Commission has stated in multiple orders, we are concerned about a potential interest shortfall.[69] The Commission's regulations require a specific rate of interest to be paid to participants for amounts owed, the PX has not earned that rate on the participants' funds that it is holding. The Commission has held that the interest shortfalls should be allocated on a *pro rata* basis. In the instant case, we believe it would be very difficult to determine the governmental entities' *pro rata* share of the interest shortfalls prior to the completion of the refund calculations and disbursement. Therefore, we direct PX to retain any potential interest payments on past due amounts to the governmental entities until the refund calculations are complete and the CAISO/PX can calculate the *pro rata* allocation of the interest shortfalls.

---

[69] *See San Diego Gas & Elec. Co. v. Sellers of Energy and Ancillary Servs.*, 109 FERC ¶ 61,218 (2004), *order on reh'g*, 110 FERC ¶ 61, 336, *order on reh'g*, 112 FERC ¶ 61,226 (2005).

59. We deny Pinnacle West's request to offset the governmental entity purchasers' refunds to the extent that they refuse to provide refunds based on the mitigated prices for their sales into the CAISO/PX markets. Courts have found that the Commission's refund authority is discretionary.[70] However, as the court, in *Bonneville*, noted, parties can pursue any refund amounts that may be owed by non-public utility entities as a contract claim in the appropriate court. Thus, there is no inequity as Pinnacle West argues. Accordingly, in exercising its refund discretion, the Commission finds that it would not be appropriate to offset refunds owed to non-public utility entities in this proceeding. As a result, we will deny Pinnacle West's request.

### C. **Collateral Issues**

#### **Comments**

60. California Parties state that the Commission should require the CAISO and PX to continue to retain the collateral of all market participants, including the governmental entities, until they have completed their calculations and market participants' accounts have been adjusted and settled accordingly.[71] They contend that the PX tariff defines a

[70] *See Niagara Mohawk Power Corp*. v. *FPC*, 379 F.2d 153, 159 (D.C. Cir. 1967) ("Finally, we observe that the breadth of agency discretion is, if anything, at [its] zenith when the action assailed relates primarily not to the issue of ascertaining whether conduct violates the statute, or regulations, but rather to the fashioning of policies, remedies and sanctions, including enforcement and voluntary compliance programs in order to arrive at maximum effectuation of Congressional objectives"); *Town of Concord* v. *FERC*, 955 F.2d 67, 75 (D.C. Cir. 1992) (citing *Moss* v. *Civil Aeronautics Bd.*, 521 F.2d 298, 308-09 (D.C. Cir. 1975) ("Because the 'equitable aspects of refunding past rates are . . . inextricably entwined with the [agency's] normal regulatory responsibility,' . . . absent some conflict with the explicit requirements or core purposes of a statute, we have refused to constrain agency discretion by imposing a presumption in favor of refunds")).

[71] California Parties cite to a series of cases where the Commission has interpreted the CAISO and PX tariffs to require sellers to maintain their collateral until such time as their accounts have been both billed and settled. *See Constellation Power Source, Inc. v. Cal. Power Exch. Corp.*, 100 FERC ¶ 61,124, *reh'g denied*, 100 FERC ¶ 61,380 (2002), *reh'g denied*, 111 FERC ¶ 61,147 (2005), *aff'd*, *Constellation Energy Commodities Group, Inc. v. FERC*, 457 F.3d 14 (D.C. Cir. 2006) (*Constellation*); *PG&E Energy Trading-Power, L.P. v. Cal. Power Exch. Corp.*, 102 FERC ¶ 61,091 (2003); *Powerex Corp. v. Cal. Power Exch. Corp.*, 102 FERC ¶ 61,328, *reh'g denied*, 104 FERC ¶ 61,119 (2003), *aff'd*, *Constellation Energy Commodities Group, Inc. v. FERC*, 457 F.3d 14 (D.C. Cir. 2006); *La Paloma Generating Co., LLC*, 110 FERC ¶ 61,386 (2005), *reh'g denied*, 118 FERC ¶ 61,189 (2007).

PX Participant as "[a]n entity that is authorized to buy or sell Energy or Ancillary Services through the PX, and any agent authorized to act on behalf of such entity."[72] California Parties assert that governmental entities were PX Participants and, as such, they must maintain with the PX "sufficient collateral to cover [their] aggregate outstanding liabilities . . .to and from the PX. . .during the period in which [their] liabilities are incurred and when payment is billed and settled."[73] They state that *Bonneville* does not alter the applicability of the CAISO and PX tariffs. They note that the CAISO tariff section 19 provides for amendment of prices by the Commission and, in section 11.6.3, provides for reruns and re-issuance of settlement statements when prices have been revised. They contend that the PX tariff has similar provisions.[74] California Parties state that rebilling with revised prices established by the Commission may proceed as a contractual matter, regardless of the Commission's ability to order governmental entities to pay refunds. They note that the governmental entities' lack of willingness to abide by such revised invoices is the subject of the federal and state court litigation. As such, they state that, because the court process is not complete yet, the transactions from that period are not yet finally "billed and settled."

61. California Parties state that, the Commission has held (absent settlement with the California Parties), the PX Participants' account cannot be billed and settled until the refund proceeding is complete.[75] California Parties assert that the Commission recently

---

[72] PX Tariff, Appendix B, Master Definitions Supplement, First Revised Sheet No. 229.

[73] *See* PX Tariff, Schedule 2, § 2.2.

[74] PX Tariff section 13 (providing for amendment of prices by the Commission); PX Operating Manual section 5.3.1-5.3.5 (providing for reruns and re-issuance of settlement statements).

[75] *See Constellation Power Source, Inc.*, 100 FERC ¶ 61,124 at P 27 (finding that, due to "numerous ongoing contested proceedings regarding the transactions that occurred in the PX markets," the "final billing and settlement has not yet taken place [and] the trades made in the PX markets are not yet fully resolved"); *PG&E Energy Trading-Power, L.P.*, 102 FERC ¶ 61,091 at P 15 (refusing to release collateral because accounts are not billed and settled and holding that the PX Tariff also "requires that market participants maintain sufficient collateral to cover the estimated potential Cal ISO real-time aggregate outstanding liability to and from the CalPX") (citing Sched. 2, § 2.2 and App. B, Master Definitions Supplement, Real-Time Market Definition); *Powerex Corp.*, 102 FERC ¶ 61,328 at P 26 (refusing to release collateral because, as a result of the Hundred Days Evidence, it would be premature to release Powerex's collateral and that until recalculation is complete "the process of final billing and settling . . . cannot
(continued…)

affirmed this holding stating that "the Commission will not be able to determine [the final amount of refund liabilities] until the conclusion of the refund proceeding."[76] They state that the D.C. Circuit upheld the Commission's interpretation of the PX tariff.[77] They further assert that the governmental entities' collateral should be maintained because the amount they owe is likely to go up based upon the *Lockyer* court's holding that the Commission must reconsider whether refunds should also be available for sales made during the summer period.[78]

62. Indicated Public Entities assert that non-jurisdictional sellers have no refund obligations that the Commission can enforce and, therefore, there is no lawful purpose for requiring non-jurisdictional sellers to maintain collateral with the CAISO or PX in terms of transactions related to the refund period. They state that *Constellation Power Source, Inc. v. FERC*[79] does not address, much less suggest, that the Commission has the authority to require non-jurisdictional sellers to maintain collateral to cover liability refunds. They counter that it is Commission policy that, absent extraordinary circumstances, it will not require even jurisdictional utilities to post bond to assure their ability to pay refunds.[80] They cite several cases in which the Commission has authorized

---

takeplace because its outstanding liabilities have not yet fully been resolved"); *La Paloma Generating Co., LLC*, 110 FERC ¶ 61,386 at P 12-13, (refusing to release ISO collateral because, *inter alia*., "the Refund Proceeding has not yet been completed and . . only after its completion will the liabilities of each supplier be determined").

[76] *La Paloma Generating Co*., LLC, 118 FERC ¶ 61,189 at P 17 (2007) (*La Paloma*). California Parties state that, while the D.C. Circuit case and many of the Commission collateral orders relate to the PX, the collateral at issue in *La Paloma* was held in the CAISO. They assert that the same considerations that apply to PX collateral apply to CAISO collateral.

[77] *Constellation Energy Commodities Group, Inc. v. FERC*, 457 F.3d 14, 21 (D.C. Cir. 2006) (referring to *Distrigas of Mass. Corp*., 33 FERC ¶ 61,406 at 61,776 (1985)).

[78] *See Lockyer*, 383 F.3d at 1018.

[79] *Constellation Power Source, Inc. v. FERC*, 100 FERC ¶ 61,124, at P 27.

[80] Indicated Public Entities cite to *Columbia Gas Transmission Corp*., 57 FERC ¶ 61,271, at 61,869 (1991); *Transcontinental Gas Pipe Line Corp*., 61 FERC ¶ 61,074 at 61,303 (1992). Indicated Public Entities Apr. 17, 2007 Answer, Docket No. EL00-95 at 7.

the release of collateral when a seller resolves its refund obligations through settlement.[81] They state that, for non-jurisdictional sellers, the refund obligation was resolved by the Ninth Circuit as a matter of law. They further state that California Parties continue to falsely assert that the Ninth Circuit opinions in *Lockyer* and *CPUC* require the CAISO and PX to apply the refund calculation methodology to all rates charged during the summer of 2000. They note that the Commission need not address this assertion given that the mandate has not issued in either *Lockyer* or *CPUC*. Indicated Public Entities state that, in both proceedings, the court determined that the Commission should have considered remedies under FPA section 309,[82] but did not require such remedies.

63. LADWP states that provisions of the CAISO and PX tariffs pertaining to collateral apply only to obligations enforceable by the Commission. LADWP disputes California Parties' interpretation of the PX tariff stating that collateral needs to be maintained until a seller's liabilities are billed and settled under the tariff and the Commission's orders, not in litigation outside the scope of the Commission's jurisdiction. Further, it asserts that the state court will protect California Parties' financial interests if they prevail in that court. It contends that the distribution of governmental entities collateral is now appropriate.[83]

64. Nevada Companies state that the Commission has allowed the CAISO and PX to hold security posted by or impounded from jurisdictional sellers, but only as a direct surety as to refund obligations of the particular jurisdictional sellers for their own refund obligations.[84] They cite *Coral Power* as an example of how impounded security may

---

[81] *See, e.g.*, *San Diego Gas & Elec. Co. v. Sellers of Energy and Ancillary Servs.*, 118 FERC ¶ 61,168 at P 91 (2007) (approving Enron motion for release of collateral); *San Diego Gas & Elec. Co. v. Sellers of Energy and Ancillary Servs.*, 111 FERC ¶ 61,017 at P 43 (2005) (authorizing PX to release collateral to Mirant after amounts are retained for refund liability).

[82] 16 U.S.C. § 825h (2000).

[83] LADWP Apr. 17, 2007 Answer, Docket EL00-95 at 15 (citing *San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Servs.*, 110 FERC ¶ 61,086, at P 9 (2005) (finding that distribution of PX collateral for refund period transactions was appropriate after some parties settled their refund period claims against jurisdictional sellers, because non-settling parties' financial interests were protected by their right to continue to litigate their claims for refunds against the sellers under the refund period orders)).

[84] Nevada Companies May 10, 2007 Motion on Remand Proceeding, Docket No. EL00-95 at 15 (Nevada Companies May 10, 2007 Motion) (citing *Constellation Power Source, Inc. v. Cal. Power Exchange Corp.*, 100 FERC ¶ 61,124, *order on reh'g*,
(continued…)

only be held in relation to the particular obligations of a specific seller and not as a means to satisfy the obligations of other market participants. Nevada Companies further note that the Commission has found that the agency may not use FPA section 206 as a proxy to order refunds that a cooperative utility might owe to an ultimate consumer.[85]

65. Nevada Companies further state that, even in those situations where the Court of Appeals have broadly read FPA section 309, these courts have not read it to state that this section gives the Commission authority to contravene other FPA sections.[86] Nevada Companies state that FPA section 309 cannot override the prohibition in FPA section 206 against retroactive application of refunds. According to Nevada Companies, the *CPUC* court described refunds under section 206 as making customers whole for having paid an unjust and unreasonable rate; section 309 considers tariff violations.[87] As a result, they state that refunds under the Commission's rate-setting authority in section 206 cannot start prior to October 2, 2000.

66. California Parties answer that the governmental entities signed contracts agreeing to be bound to the terms of the CAISO and PX tariffs, including the collateral provisions, and, therefore, the *Bonneville* court's holding that the Commission cannot force governmental entities to pay refunds is irrelevant to the collateral issue. They respond that LADWP asserts that the California Parties would be fully protected if the collateral

---

100 FERC ¶ 61,380 (2002); *Constellation Power Source, Inc. v. Cal. Power Exch. Corp.*, 111 FERC ¶ 61,147 at 61,778 (2005); *Powerex Corp. v. Cal. Power Exch. Corp.*, 102 FERC ¶ 61,328 at 62,121 (2003); *Coral Power, LLC v. Cal. Power Exch. Corp.*, 110 FERC ¶ 61,288 (2005) (*Coral Power*)).

[85] *Id.* at 17 (citing *N. Star Steel Co. v. Az. Pub. Serv. Co.*, 116 FERC ¶ 61,022 (2006) (holding that a retail customer could not seek refunds from the wholesale seller and bypass the retail utility because the customer had no contractual relationship with the wholesale sellers).

[86] Nevada Companies Apr. 17, 2007 Answer, Docket No. EL00-95 at 5 (Nevada Companies Apr. 17 Answer) (citing *Niagara Mohawk Power Corp. v. FPC*, 379 F.2d 153, 158 (D.C. Cir. 1967); *Mobile Oil Corp. v. FPC*, 483 F.2d 1238, 1257 (D.C. Cir. 1973); *City of Chicago v. FPC*, 458 F.2d 731 (D.C. Cir. 1971); *Gulf Oil Corp. v. FPC*, 563 F.2d 588, 607 (3rd Cir. 1977) ("The substantive provisions of the Act contemplate certain procedures as incident to the functions provided. The range of permissible procedures must be derived from these sections. . . ."); *Mesa Petroleum v.* FPC, 441 F.2d 182 (5th Cir. 1971) (analogous section in Natural Gas Act gives the FERC added remedies, not additional jurisdiction); *Murphy Oil Corp. v. FPC*,431 F.2d 805, 810 (8th Cir. 1970) (same)).

[87] *Id.* at 6 (citing *CPUC*, 462 F.3d at 1048).

would be released. However, they state that the D.C. Circuit has held that a party is injured by the premature release of another party's collateral because the first party loses valuable security.[88] They believe that the Nevada Companies are asking for a premature ruling on issues related to future Commission proceedings concerning relief for the summer 2000 period. The California Parties ask that the Commission indicate only that these issues will arise in the future, but not to try to resolve any issues now, especially since the *Lockyer* and *CPUC* decisions are still pending.

67. In their response to the California Parties' answer, the Indicated Public Entities note that requiring non-jurisdictional sellers to maintain collateral in the face of the *Bonneville* mandate amounts to a de facto form of rate regulation that *Bonneville* does not allow. Indicated Public Entities state that requiring the release of monies unlawfully held does not prejudice anyone in the contract litigation.

**<u>Commission Determination</u>**

68. We deny California Parties' request that the Commission direct the CAISO and PX to retain the collateral of governmental entities until the CAISO and PX have completed their calculations and market participants' accounts have been billed accordingly. California Parties cite a series of cases in which the Commission ordered the retention of collateral until entities' outstanding liabilities have been billed and settled, as required by the tariff.[89] However, the *Bonneville* court ruled that the Commission has no authority to impose refund obligations upon governmental entities. The court's ruling indicates that the governmental entities have no refund liabilities under FPA section 206, but may have some liability related to a contract dispute. As noted above, California Parties have filed contract claims against governmental entities in state and federal courts. These contract claims are not before the Commission and, as a result, we will not interfere in those proceedings. As far as the Commission's jurisdiction is concerned, the governmental entities have no refund liabilities under FPA section 206, therefore, we direct the CAISO and PX to release the governmental entities' collateral. Parties that oppose the release of the governmental entities' collateral may seek relief from the courts, in the state and federal contract proceedings, to determine whether it would be appropriate for the CAISO and PX to retain the collateral in question until those proceedings are completed.

[88] Id. at 13 (quoting *Constellation Energy Commodities Group, Inc. v. FERC*, 457 F.3d at 20).

[89] *See, e.g.*, *Constellation Power Source, Inc. v. Cal. Power Exch. Corp.*, 100 FERC ¶ 61,124 at P 27.

69. We will not consider California Parties' claims that the refund period should encompass the summer of 2000. We find that this issue is outside the scope of the *Bonneville* remand proceeding.

**D. Contract Issue**

**Comments**

70. California Parties state that they are pursuing claims in federal and state courts to enforce contractual obligations against governmental entities. They request that the Commission defer for now the treatment of any shortfall or allocation issues that may arise as a result of implementation of *Bonneville*.

71. Indicated Public Entities state that the contract issues are not before the Commission. They assert that the Commission should not serve as a data source for the California Parties' contract disputes because weighing the merits of state law contract claims is not within the Commission's authority. They assert that the so-called precedent established by *MAPP I*[90] and *Alliant I*[91] "simply does not exist." They state that the California Parties have conflated two distinct cases. They also contend that the California Parties have ignored the *MAPP* case, which makes clear that there is no shortfall issue for the Commission to resolve.

72. Bonneville/Western contend that the Commission should not interfere in a legal proceeding over which it has no jurisdiction. They state that no market shortfall will result from the dismissal of the governmental entities. They assert that the concept of a market shortfall is premised on the idea that all transactions in the CAISO and PX markets have been adjusted by the Commission. They dispute this assertion, stating that *Bonneville* specifically rejects the concept that this proceeding has adjusted the prices for all transactions in the CAISO and PX markets. Therefore, they contend that removing the governmental entities does not result in a market shortfall, but only a smaller pool of refunds to be distributed to buyers.

73. California Parties, in their answer, state that there will be shortfalls if governmental entities refuse to refund their overcharges. They further state that the governmental entities raised the issue of whether the Commission amended the CAISO and PX tariffs in order to re-set prices so that the governmental entities can claim that

[90] *MAPP I*, 89 FERC ¶ 61,135.

[91] *Alliant I*, 2001 U.S. Dist. Lexis 17802.

their contractual obligation to abide by the terms of the CAISO and PX tariffs does not require the governmental entities to abide by the re-set prices.

74. In their response to California Parties' answer, Bonneville/Western state that the California Parties misrepresent the nature of this proceeding. First, Bonneville/Western assert that the Ninth Circuit specifically rejected the notion that this proceeding involved resetting the CAISO and PX rates. Second, the rates at issue are market-based rather than formula rates of the jurisdictional sellers not the rates of the CAISO or PX.

75. In their response to California Parties' answer, Indicated Public Entities state that, by the express terms of the *Bonneville* decision, governmental entities do not have FPA obligations with which they have not complied.

**Commission Determination**

76. We find that, while the *Bonneville* court clearly limited Commission authority to order non-public utility entities to pay refunds under FPA section 206, the court left the door open for parties to bring contract disputes in state and federal court against these non-public utility entities. It is our understanding that California Parties have filed state and federal contract claims against non-public utility entities. However, we also find that those contract claims are not before the Commission, and therefore, we will not interfere in those proceedings. Amounts owed and payments thereof by non-public utility entities, if any, as a result of those contractual claims are a matter to be resolved by the relevant court. We deny California Parties' request that the Commission wait until the outcome of the state and federal court proceedings to distribute refunds. We will not delay refunds any further based upon the uncertain timeline of contract litigation.

## E. Miscellaneous

77. PX states that it has completed the modifications of its database necessary to remove the governmental entities from PX's day-ahead and day-of markets, but not yet the California PX Trading Service (CTS) market.[92] In order to begin this work, it asserts that it needs Commission direction as to what, if any, calculation process is necessary for mitigation or if the Commission will order mitigation at all. PX states that it will need confirmation from the Commission as to who is a governmental entity in order to remove them from any of its markets. It also wants Commission direction on how to treat resources jointly-owned by governmental and non-governmental entities.

---

[92] The CTS provided an exchange for purchase and sale of energy on a monthly forward basis by matching bids to buy power with offers to sell power. Ninety percent of CTS transactions were delivered through the PX day-ahead market and later mitigated under the Commission's refund methodology.

**Commission Determination**

78. We agree with PX that there is some confusion about which entities constitute non-public utility entities for purposes of the refund orders. Therefore, we direct all entities remaining in this proceeding that believe they should be classified as a non-public utility entity to make a filing in this docket, within 60 days of the date of this order, so designating themselves. These filings should include a detailed explanation for their classification as a non-public utility entity. After reviewing these filings, the Commission will make a ruling on the jurisdictional status of filing entities for purposes of this proceeding.

79. The PX seeks Commission guidance regarding how to account for non-public utility sellers in the CTS market "if mitigation is ordered".[93] We find that the Commission has already determined that the transactions through PX's CTS market were exempt from mitigation, except for nine percent of the transactions that were not delivered through PX's day-ahead and day-of markets as part of the CTS obligations.[94] Given Commission precedent on this issue, it is unclear why PX requires further guidance on this issue and therefore we deny its request as unnecessary.

80. On the issue of how to treat resources jointly-owned by governmental and non-governmental entities, the Commission has generally held that refund liability in this proceeding attaches to the Scheduling Coordinator of the transaction.[95] Therefore, we direct PX to consider the jurisdictional status of the Scheduling Coordinator for the transaction in determining how to treat resources that are jointly owned by governmental and non-governmental entities.

<u>The Commission orders</u>:

(A) The Commission hereby vacates each of the Commission's orders in the California refund proceeding to the extent that they order non-public utility entities to pay refunds, as described in the body of this order.

---

[93] PX Apr. 17, 2007 Answer, Docket No. EL00-95 at 2.

[94] *See San Diego Gas and Electric Co.*, 102 FERC ¶ 61,317, *order on reh'g*, 105 FERC ¶ 61,066 (2003), *order on reh'g*, 107 FERC ¶ 61,165 (2004).

[95] *See, e.g.*, *San Diego Gas & Electric Co. v. Sellers of Energy and Ancillary Serv.*, 107 FERC ¶ 61,166 at P 18, *clarified*, 108 FERC ¶ 61,219, *reh'g denied and partial clarification granted*, 108 FERC ¶ 61,311 (2004); *see also San Diego Gas & Electric Co. v. Sellers of Energy and Ancillary Serv.*, 116 FERC ¶ 61,167, at P 45 (2006).

(B) The Commission hereby orders the CAISO and PX to complete their refund calculations including all entities that participated in the CAISO/PX markets, as described in the body of this order.

(C) The Commission hereby directs the CAISO to allocate the refund shortfall by implementing a *pro rata* reduction to refund recipients based upon their final net refund position in relation to total net refunds, as described in the body of this order.

(D) The Commission hereby grants LADWP's motion to disburse past due amounts owed to non-public utility entities for sales made in the CAISO/PX spot markets during the refund period, as described in the body of this order.

(E) The Commission hereby denies LADWP's motion for the expedited release of interest associated with the principal past due amounts owed, as described in the body of this order.

(F) The Commission hereby denies Pinnacle West's motion that governmental entities refunds be offset to the extent that those entities do not provide refunds based on the mitigated prices for their sales into the CAISO/PX markets, as described in the body of this order.

(G) The Commission hereby directs the CAISO and PX to release the non-public utility entities' collateral, as described in the body of this order.

(H) The Commission hereby denies California Parties motion that the Commission wait until the outcome of state and federal court proceedings to distribute refunds, as described in the body of this order.

(I) The Commission hereby directs all entities seeking designation as a non-public utility entity for purposes of the California refund proceedings to make a filing in this docket, within 60 days of the date of this order, so designating themselves, as described in the body of this order.

(J) The Commission hereby denies, as unnecessary, PX's request for it further guidance on the issue of how to account for non-public utility sellers in the CTS market if mitigation is ordered, as described in the body of this order.

(K) The Commission hereby directs PX to consider the jurisdictional status of the Scheduling Coordinator for the transaction in determining how to treat resources that are jointly owned by governmental and non-governmental entities, as described in the body of this order.

By the Commission. Commissioner Spitzer not participating.

( S E A L )

Nathaniel J. Davis, Sr.,
Acting Deputy Secretary.

121 FERC ¶ 61,188
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: Joseph T. Kelliher, Chairman;
Suedeen G. Kelly, Philip D. Moeller,
and Jon Wellinghoff.

San Diego Gas & Electric Company

v. Docket No. EL00-95-200

Sellers of Energy and Ancillary Services
Into Markets Operated by the California
Independent System Operator and the
California Power Exchange

Investigation of Practices of the California Independent System Operator Corporation and the California Power Exchange — Docket No. EL00-98-185

ORDER ON CLARIFICATION

(Issued November 19, 2007)

1. On October 25, 2007, the California Parties[1] filed an expedited motion for clarification of paragraph 36 of the Commission's October 19, 2007 Order in this proceeding.[2] For the reasons discussed below, we grant the California Parties' motion for clarification.

[1] The California Parties are the People of the State of California *ex rel*. Edmund G. Brown, Attorney General, the California Electricity Oversight Board, the Public Utilities Commission of the State of California, Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company.

[2] *San Diego Gas & Elec. Co.*, 121 FERC ¶ 61,067 (2007) (October Order).

## I. Background

2. The October Order contains a detailed description of the background and history of this proceeding.[3]

3. In brief, the Commission ordered certain governmental entities and other non-public utilities that participated in the centralized single clearing price auction markets operated by the California Independent System Operator Corporation (CAISO) and the California Power Exchange Corporation (PX) to make refunds for the period of October 2, 2000 to June 20, 2001 (refund period).[4] However, the United States Court of Appeals for the Ninth Circuit (Ninth Circuit) subsequently held that section 206 of the Federal Power Act (FPA)[5] did not grant the Commission refund authority over wholesale electric energy sales made by such entities during the relevant period.[6] Accordingly, the Commission issued the October Order vacating its prior orders to the extent that they subjected governmental entities and other non-public utilities to the Commission's refund authority.

## II. Motion for Clarification

4. The California Parties seek clarification of paragraph 36 of the October Order.[7] In paragraph 36, the Commission addressed the California Parties' claim that the Commission revised the pricing formulations contained in the CAISO/PX tariffs. The Commission stated:

> California Parties assert that the Commission revised the pricing formulations contained in the CAISO/PX tariffs for the period to which the MMCP [mitigated market-clearing price] applies. *We disagree*. The *Bonneville* court found that the Commission had ordered refunds *rather than amending the CAISO/PX tariffs to reset the market clearing price*

---

[3] October Order, 121 FERC ¶ 61,067 at P 4-16.

[4] *See San Diego Gas & Elec. Co.*, 96 FERC ¶ 61,120 at 61,499 (Refund Order), *order on reh'g*, 97 FERC ¶ 61,275 (2001) (Refund Rehearing Order).

[5] 16 U.S.C. § 824e (2000).

[6] *Bonneville Power Admin. v. FERC*, 422 F.3d 908 (9th Cir. 2005) (*Bonneville*).

[7] The California Parties note that they have other objections to the October Order that they will raise in a separate rehearing request.

> *during the refund period*. The court further found that the Commission had acted outside its jurisdiction when ordering non-public utility entities to pay these refunds. Therefore, we vacate each of the Commission's orders in the California refund proceeding to the extent that they order non-public utility entities to pay refunds.[8]

The California Parties contend that the italicized language is misleading because it implies that the Commission did not reset the market clearing prices under the CAISO/PX tariffs and suggests that the Ninth Circuit held as much in *Bonneville*. The California Parties dispute both of these conclusions.

5. The California Parties maintain that the Commission "unambiguously" reset the market clearing prices in its July 25, 2001 Refund Order.[9] The California Parties state that, beginning with the Refund Order, the Commission has consistently held that the MMCP formula sets the maximum prices that may be charged to customers under the CAISO/PX tariffs, and that in the Refund Order, the Commission explained that it was "'revis[ing] the market clearing prices that all market participants previously agreed to accept for their sales.'"[10] Moreover, the California Parties assert that section 206 of the FPA requires the Commission to establish the just and reasonable rate before ordering refunds, and that here, the Commission followed that procedure by resetting the market clearing prices in the Refund Order, even though the Ninth Circuit subsequently held that the Commission did not have authority to order governmental entities and other non-public utilities to make refunds.[11]

6. The California Parties also claim that the Commission mischaracterized the Ninth Circuit's opinion in *Bonneville* by making it appear that the Ninth Circuit determined that the Commission did not or should not have revised the market clearing prices. The California Parties assert that the Ninth Circuit made no such finding; rather, the California Parties maintain that the Ninth Circuit held only that the Commission lacked jurisdiction to take the additional step of ordering governmental entities and other non-public utilities to pay the refunds resulting from the reset prices.

---

[8] October Order, 121 FERC ¶ 61,067, at P 36 (emphasis added) (internal footnotes omitted).

[9] California Parties' Motion for Expedited Clarification at 16 (Motion).

[10] *Id.* at 5- 6 (citing Refund Order, 96 FERC ¶ 61,120 at 61,152).

[11] *Id.* at 11, 16.

7. Finally, the California Parties argue that expedited action is necessary because the current language in paragraph 36 may be used against the California Parties in ongoing contract litigation. The California Parties state that the Commission's decision to reset the market clearing prices is a required element of their contract claims, and that Commission failure to clarify paragraph 36 in an expedited fashion might "irreversibly prejudice" their ability to pursue their cases.

## III. Notice, Intervention and Protest

8. On October 29, 2007, the Commission issued a Notice Shortening Answer Period for responses to the California Parties' motion, requiring answers by November 5, 2007. The Bonneville Power Administration (BPA) and the Western Area Power Administration (Western) filed a timely joint answer, and the City of Los Angeles Department of Water and Power (LADWP) and the Indicated Parties[12] separately filed timely answers.

9. BPA, Western, LADWP, and the Indicated Parties (collectively, the Answering Parties) argue that the Commission did not reset the market clearing prices. In their view, the Commission's prior orders merely developed a methodology to calculate a just and reasonable rate that created an hourly cap on sellers' prices and established that hourly refunds would be computed using the difference between the market clearing price and the MMCP calculated for each hour of the refund period, subject to certain adjustments. The Answering Parties also argue that the current language in paragraph 36 is consistent with the limits of the Commission's refund authority under section 206 of the FPA, and that it correctly characterizes the Ninth Circuit's decision in *Bonneville*.

## IV. Discussion

10. We grant the California Parties' motion for clarification. We agree with the California Parties that the Commission inadvertently mischaracterized both its prior orders and the Ninth Circuit's decision in *Bonneville*. As the California Parties have

[12] The Indicated Parties are: Arizona Electric Power Cooperative, Inc., Cities of Anaheim, Azusa, Banning, Burbank, Glendale, Pasadena, Redding, Riverside, and Vernon, Metropolitan Water District of Southern California/State Water Contractors, Modesto and Turlock Irrigation Districts, Northern California Power Agency, the City of Santa Clara, d/b/a Silicon Valley Power, Sacramento Municipal Utility District, and Public Utility District No. 2 of Grant County, Washington.

correctly pointed out, establishing a just and reasonable rate is a prerequisite for ordering refunds.[13] Accordingly, the Commission made clear that it was resetting the market clearing prices in the Refund Order:

> Our action here establishes a revised method for calculating the just and reasonable clearing prices to be applied in those markets [the CAISO and PX wholesale electricity markets] for the period beginning October 2, 2000. This is pursuant to the Commission's authority under FPA section 206 to fix the just and reasonable rate. *Our action thus revises the market clearing prices that all market participants previously agreed to accept for their sales.*[14]

However, paragraph 36 of the October Order inadvertently fails to acknowledge this point.

11. We also find that the language in paragraph 36 mischaracterizes the Ninth Circuit's decision in *Bonneville*. In *Bonneville*, the Ninth Circuit rejected the Commission's claim that it merely reset the market clearing prices and did not order governmental entities and other non-public utilities to pay refunds. The court did not hold that the Commission failed to reset the market clearing prices:

> FERC attempts to deflect our attention away from the fact that it is ordering refunds from the Public Entities [governmental entities and other non-public utilities] by arguing that FERC is simply using its *§§ 205* and *206* authority to reset the prices . . . to a just and reasonable level . . . . [CA]ISO similarly tries to cast FERC's orders as resetting the market clearing price under FERC jurisdictional tariffs and characterizes the refunds . . . as just a "byproduct" of the resettlement . . . . The rationale advanced by FERC and [CA]ISO is flawed. Perceiving FERC's orders as effecting a reset market clearing prices of all spot market sales under the ISO and CalPX tariffs, *rather than as a order for refunds under §206(b), ignores the explicit language of FERC's July 25, 2001 Order* [Refund Order] ….We cannot conclude that FERC said "refund" but meant resettlement of the market-clearing price.[15]

---

[13] We note that the Indicated Parties acknowledge this point. See Indicated Parties' Answer at 6.

[14] Refund Order, 96 FERC ¶ 61,120 at 61,152 (emphasis added).

[15] *Bonneville*, 422 F.3d at 919 (emphasis added).

12. Moreover, in the next sentence, the court emphasized that it was objecting to the fact that the Commission *went beyond resetting the market clearing prices*:

> FERC's order *does more than simply reset the market-clearing price* for power in the FERC-jurisdictional [CA]ISO and CalPX markets. FERC specifically ordered governmental entities/non-public utilities to pay refunds, an action that lies outside Congress' clearly expressed intent.[16]

13. Contrary to the language in paragraph 36, the Ninth Circuit did not find that the Commission had ordered refunds rather than resetting the market clearing prices. Rather, the court rejected the Commission's attempt to order *refunds in addition to resetting the market clearing prices*. Accordingly, we clarify that paragraph 36 should be amended to read as follows:

> California Parties assert that the Commission revised the pricing formulations contained in the CAISO/PX tariffs for the period to which the MMCP applies. We *do not* disagree. The *Bonneville* court found that the Commission had ordered refunds *by non-jurisdictional entities* rather than *merely* amending the CAISO/PX tariffs to reset the market clearing price during the refund period. The court further found that the Commission had acted outside its jurisdiction when ordering non-public utility entities to pay these refunds. Therefore, we vacate each of the Commission's orders in the California refund proceeding to the extent that they order non-public utility entities to pay refunds.[17]

<u>The Commission orders</u>:

(A) The California Parties' motion for clarification is hereby granted, and paragraph 36 is hereby clarified as discussed in the body of this order.

By the Commission. Commissioner Spitzer not participating.

( S E A L )

Kimberly D. Bose,
Secretary.

---

[16] *Id*. at 919-920 (emphasis added).

[17] Inserted text shown in italics. We omit the footnotes only for ease of clarification.

122 FERC ¶ 61,260
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: Joseph T. Kelliher, Chairman;
Suedeen G. Kelly, Marc Spitzer,
Philip D. Moeller, and Jon Wellinghoff.

State of California, *ex rel*. Bill Lockyer,
Attorney General of the State of California

v. Docket No. EL02-71-004

British Columbia Power Exchange Corporation,
Coral Power, LLC, Dynegy Power
Marketing, Inc., Enron Power Marketing,
Inc., Mirant Americas Energy Marketing, LP,
Reliant Energy Services, Inc., Williams
Energy Marketing & Trading Company,

All Other Public Utility Sellers of Energy and
Ancillary Services to the California Energy
Resources Scheduling Division of the
California Department of Water Resources, and

All Other Public Utility Sellers of Energy and
Ancillary Services into Markets Operated by the
California Power Exchange and California
Independent System Operator

ORDER ON REMAND

(Issued March 21, 2008)

1. In this order, the Commission addresses the remand by the United States Court of Appeals for the Ninth Circuit, *State of California ex rel. Lockyer v. FERC*.[1] In the Ninth

[1] 383 F.3d 1006 (9th Cir. 2004), *cert. denied, Coral Power, L.L.C. v. Cal. ex rel. Brown*, 127 S. Ct. 2972, 168 L. Ed. 2d 719 (2007) (Ninth Circuit Decision).

Circuit Decision, the court held that the Commission's authorization of market-based rate tariffs in these proceedings complied with the Federal Power Act (FPA), but that the Commission erred in ruling that it lacked authority to order refunds for violations of its reporting requirement and remanded the case for further refund proceedings. The court did not itself order any refunds, leaving it to the Commission to consider appropriate remedial options.

2. This order establishes a trial-type hearing before an Administrative Law Judge (ALJ) to address whether any individual public utility seller's violation of the Commission's market-based rate quarterly reporting requirement led to an unjust and unreasonable rate for that particular seller in California during the 2000-2001 period. In order to make such a determination, the Commission will need to supplement the record and permit wholesale purchasers that made short-term market-based rate purchases through the California Independent System Operator (CAISO) and California Power Exchange (PX), as well as those making spot market purchases of energy through the California Energy Resources Scheduling Division of the California Department of Water Resources (CERS), from January 1, 2000 to October 1, 2000, to present evidence that any seller that violated the quarterly reporting requirement failed to disclose an increased market share sufficient to give it the ability to exercise market power and thus cause its market-based rates to be unjust and unreasonable, as discussed below. Sellers similarly will be permitted to present evidence to the contrary. The hearing will focus on the individual facts and circumstances relevant to each seller. When the Commission receives the factual determinations of the ALJ with respect to each seller, it will exercise its remedial discretion to determine whether a disgorgement of profits[2] or other remedy is appropriate for a particular seller.

---

[2] It should be noted that the term "refunds" has often been used loosely in these proceedings. For purposes of clarity, we note that "refunds" refers to monies returned to customers as a result of a Commission order to reset the rate to make it just and reasonable under section 205 or 206 of the FPA. A disgorgement of unjust profits, although it also may result in a return of monies to customers, relates to a violation of a rule, statute, regulation, or order which has a causal connection to unjust profits obtained by the violator as a result of its violation. As discussed below, in this proceeding the Commission is focused on potential remedies in terms of disgorgement of unjust profits of individual sellers that violated the quarterly reporting requirement where an individual seller's violation had a nexus to the reasonableness of its rates.

# I. Background

## A. Prior Commission Orders

3. On March 20, 2002, a year after the Commission initiated an FPA section 206[3] refund proceeding to investigate whether the rates charged in California were just and reasonable during 2000-2001 and established a refund effective period,[4] the State of California, *ex rel.* Bill Lockyer, Attorney General of the State of California (California) filed a complaint against all generators and marketers selling power into markets operated by the CAISO and PX, as well as those making spot market sales of energy to CERS during 2000-2001.[5] In that complaint, California alleged that the FPA section 205(c)[6] filing requirement was not met by the Commission's requirements for obtaining the authority to make sales at market-based rates.[7] Those rules require power marketers to

---

[3] 16 U.S.C. § 824e (2000).

[4] The Commission established the refund effective period as October 2, 2000 through June 20, 2001. *See San Diego Gas & Electric Co.*, 93 FERC ¶ 61,121 (2000).

[5] *See State of California, ex rel. Bill Lockyer v. British Columbia Power Exchange Corp.*, 99 FERC ¶ 61,247 (*Lockyer I*), *order on reh'g*, 100 FERC ¶ 61,295 (2002) (*Lockyer II*).

[6] 16 U.S.C. § 824d(c) (2000). Section 205(c) of the FPA provides that:

> [u]nder such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classification, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

[7] *See Lockyer I*, 99 FERC at 62,055 (citing *MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*, 512 U.S. 218, 229-231 (1994) (*MCI*); *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 132-33 (1990) (*Maislin*)). Specifically, California argued that the filing of rates is essential to the Commission's (continued…)

establish that they lack market power in order to obtain market-based rate authority and to thereafter file quarterly transaction reports.[8] It further alleged that the quarterly reports filed by power marketers did not contain transaction-specific information about their sales and purchases at market-based rates as required by section 205(c) and the Commission's filing requirements.[9]

4. To remedy the alleged violations, California asked that the Commission: (1) require California wholesale sellers to comply, on a prospective basis, with section 205(c) requirements; (2) require California wholesale sellers to provide transaction-specific data to the Commission on all short-term sales to the ISO, PX and CERS for the calendar years 2000-2001; (3) to the extent that rates for short-term power sold to the ISO, PX or CERS are found to exceed just and reasonable levels, require the California wholesale sellers to refund the difference between the rate charged and a just and reasonable rate, plus interest; (4) issue a declaration that the California wholesale sellers failed to file their rates in accordance with the filed-rate doctrine; and (5) institute proceedings to determine whether any other relief is necessary, including revocation of the California wholesale sellers' market-based rate authority.[10]

5. In *Lockyer I*, the Commission denied California's complaint with respect to the allegations that the Commission's market-based rate filing requirements violate the FPA as a matter of law, finding that the complaint constituted an impermissible collateral attack on prior Commission orders relating to the Commission's market-based rate authority.[11] However, the Commission granted the complaint in part holding that where California wholesalers reported aggregated rather than transaction-specific data, the quarterly reports failed to comply with section 205(c) of the FPA. Thus, the Commission directed all marketers and other public utility sellers that made short-term sales at market-

---

functions and, without filed rates, the Commission cannot carry out its statutory duty to ensure that all rates charged for jurisdictional services are just and reasonable. California March 20, 2002 complaint at 14-15.

[8] *Lockyer I*, 99 FERC at 62,062 (citing *Louisiana Energy and Power Authority v. FERC*, 141 F.3d 364, 365 (D.C. Cir. 1998). The Commission established the quarterly reporting requirement in *Citizens Power & Light Corp.*, 48 FERC ¶ 61,210 (1989).

[9] *Lockyer I*, 99 FERC at 62,055.

[10] *Id.* at 62,057.

[11] *Id.* at 62,062.

based rates to CERS or into the PX or ISO markets since October 2, 2000 to the date of the order, May 31, 2002, to file in compliance with our reporting requirement new quarterly reports showing transaction-specific information.[12]

6. The Commission denied California's request to require refunds as a remedy from those sellers who previously filed aggregated data. The Commission stated that the reporting deficiencies, while serious and in need of correction, did not invalidate market-based rate tariffs as lawful filed rates.[13] Further, because FPA section 206 bars retroactive refunds, the Commission would not extend refund responsibility to transactions prior to 60 days from the date of California's March 16, 2002 complaint.[14] Finally, the Commission stated that "the failure to report transactions in the format required by the Commission for quarterly reports is essentially a compliance issue" and that re-filing them "to include transaction-specific data is an appropriate and sufficient remedy."[15]

7. On rehearing, California reiterated the argument that the FPA prohibits the use of market-based rates for sales of electric energy. It also argued that the Commission abused its discretion by not ordering refunds as a remedy for the finding that sellers in the California markets did not comply with the requirement to report transaction-specific data. In *Lockyer II*, the Commission denied California's request for rehearing of *Lockyer I*.[16]

---

[12] *Id.* at 62,067. Specifically, the Commission stated that these new quarterly transaction reports must contain the following description of each transaction: identification of the buyer/seller; description of the service (e.g., purchase/sale, firm/non-firm); delivery point(s); price(s) (power marketer must provide price per transaction, not price ranges); quantities (e.g., MWh/MW); and dates/duration of service (e.g., daily, monthly, hourly).

[13] *Id.*

[14] The Commission explained that, under section 206 of the FPA, it can institute a refund proceeding only for the refund effective period, which can begin no sooner than 60 days after the filing of a complaint. *Id.*

[15] *Id.* at 62,068.

[16] *Lockyer II*, 100 FERC at 62,329.

8. California filed a timely petition for review from the United States Court of Appeals for the Ninth Circuit.[17]

### B. <u>The Ninth Circuit Decision</u>

9. In the Ninth Circuit Decision, the court considered two main issues: (1) whether the Commission's market-based rate tariffs complied with the FPA; and (2) if so, whether the Commission failed to administer the tariffs in accordance with their terms and abused its discretion in limiting available remedies (such as refunds) for regulatory violations.

10. With regard to the first issue, the court found that California's facial challenge to market-based rate tariffs failed. Specifically, the court held that the Commission's regulatory scheme consisting of "the dual requirement of an *ex ante* finding of the absence of market power *and* sufficient post-approval reporting requirements" is consistent with the FPA.[18] The court explained that Commission approval of market-based rate tariffs is conditioned on a finding that the applicant lacks market power (or has sufficiently mitigated market power) coupled with a strict reporting requirement to ensure that the rate is "just and reasonable" and that markets are not subject to manipulation.[19] It stated that "so long as [the Commission] has approved a tariff within the scope of its FPA authority, it has broad discretion to establish effective reporting requirements for administration of the tariff."[20] In this case, the court noted, the Commission required the wholesale seller to file certain reports summarizing its transactions during the preceding three months (including summaries of both long and short-term contracts). Thus, the court concluded that the Commission's reporting oversight mechanism distinguished the Commission's market-based rate regulatory scheme from those previously prohibited by the Supreme Court in *MCI* and *Maislin* with respect to other regulated industries.[21]

---

[17] Ninth Circuit Decision, 383 F.3d at 1008.

[18] *Id.* at 1013 (*emphasis in the original*).

[19] *Id.* at 1012 (citing *Elizabethtown Gas Co. v. FERC*, 10 F.3d 866, 870 (D.C. Cir. 1993) and *Louisiana Energy and Power Authority v. FERC*, 141 F.3d 364, 365 (D.C. Cir. 1998)).

[20] Ninth Circuit Decision, 383 F.3d at 1012.

[21] *Id.* at 1013 (citing *MCI*, 512 U.S. at 234 (holding that the FCC could not eliminate rate-filing requirements for any class of carrier, even when necessary to promote competitive markets)); *Maislin*, 497 U.S. at 132-33 (holding that the ICC could

(continued…)

11. Regarding the second issue, the court agreed with California that the Commission failed to administer the tariffs in accordance with their terms and abused its discretion in limiting available remedies for regulatory violations. The court found that the Commission's transactional reporting requirement was not followed in the period at issue.[22] It explained that the crucial oversight mechanism that distinguished the Commission's tariff from those prohibited by the Supreme Court in *MCI* and *Maislin* "was, for all practical purposes, non-existent while energy prices skyrocketed and rolling brownouts threatened California's businesses and citizens."[23] Further, the court stated that *MCI* and *Maislin* affirm that the filed rate doctrine is undermined when market-based rate tariffs are "structured so as to virtually deregulate an industry and remove it from statutorily required oversight."[24] Thus, the court determined that, without the required filings, which were "an integral part of a market-based [rate] tariff that could pass legal muster," the ability to effectively monitor the market or gauge the just and reasonable nature of the rates was eliminated and, "under such circumstances, there is no filed tariff in place at all."[25]

12. The court also found that the power to order retroactive refunds under the FPA when a company's non-compliance has been so egregious that it eviscerates the tariff is inherent in the Commission's authority to approve a market-based rate tariff.[26] The court clarified that the Commission's "construed limitations on its own authority are not supported by a careful examination of the FPA" and that the Commission indeed possesses "broad remedial authority to address anti-competitive behavior" and impose retroactive refunds for section 205 violations.[27] Specifically, the court noted that the

---

not allow common carriers to charge unfiled, privately negotiated rates lower than the filed rates, even when the carriers were in highly competitive markets).

[22] Ninth Circuit Decision, 383 F.3d at 1014. Specifically, the court stated that non-compliance with the Commission's reporting requirement "was rampant throughout California's energy crisis." *Id.*

[23] *Id.* at 1014-15 (citing *Enron Power Marketing, Inc.*, 65 FERC ¶ 61,305 (1993), *order on reh'g*, 66 FERC ¶ 61,244 (1994) (*Enron*)).

[24] Ninth Circuit Decision, 383 F.3d at 1014.

[25] *Id.* at 1016-17.

[26] *Id.* at 1016.

[27] *Id.* at 1017.

Commission has ordered refunds in the past where utilities violated FPA section 205, either by violating the terms of an accepted rate, or by charging rates without first seeking approval under FPA section 205.[28] Thus, the court determined that the refund remedy is legally available and that the Commission "abused its administrative discretion by declining to order refunds for violations of its reporting requirements."[29] The court, however, declined to order refunds itself stating that, on remand, the Commission should "reconsider its remedial options in the first instance."[30] The court also noted that the Commission "may elect not to exercise its remedial discretion by requiring refunds, but it unquestionably has the power to do so."[31]

13. Subsequently, parties petitioned the Supreme Court for a *writ of certiorari*, which was denied in June 2007.[32]

### C. Responsive Pleadings

14. On December 10, 2007, the California Parties[33] filed a motion requesting that the Commission hold in abeyance its consideration of the proceeding in Docket No. EL02-71, following the Ninth Circuit Decision, pending the issuance of the mandates by the Ninth Circuit in *Pub. Util. Comm'n of the State of Cal. v. FERC*, 462 F.3d 1027 (9th Cir. 2006), *reh'g pending* (*CPUC*), and *Port of Seattle, Washington v. FERC*, 499 F.3d 1016 (9th Cir. 2007) (*Port of Seattle*). The California Parties explain that all three proceedings involve common issues of law and fact, including many of the same parties, same sellers, same customers, same transactions, same overlapping time periods, as well as the same

---

[28] *Id.* at 1015, 1017 (citing *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 686 (D.C. Cir. 2000)).

[29] *Id.* at 1008.

[30] *Id.* at 1018.

[31] *Id.* at 1015.

[32] *Coral Power, L.L.C. v. Cal. ex rel. Brown*, 127 S. Ct. 2972, 168 L. Ed. 2d 719 (2007).

[33] The California Parties include the People of the State of California, *ex rel.* Edmund G. Brown Jr., Attorney General, the California Electricity Oversight Board (EOB), the Public Utilities Commission of the State of California (CPUC), Pacific Gas and Electric Company (PG&E), and Southern California Edison Company.

evidence.[34] They asserted that if the *Lockyer* remand proceeding is not held in abeyance, it could be necessary for parties to submit the same evidence in all of the cases, and thus the same facts relating to the same transactions could end up being tried multiple times in separate dockets. Further, the California Parties assert that when the mandates issue in *CPUC* and *Port of Seattle*, they anticipate seeking partial consolidation of all three proceedings. Thus, the California Parties argue that holding the *Lockyer* remand proceeding in abeyance would be administratively efficient and would avoid conducting multiple separate proceedings with overlapping issues and parties resulting in potentially inconsistent determinations.

15. On December 17, 2007, Competitive Supplier Group (Competitive Supplier)[35] filed comments suggesting procedures the Commission should use in addressing the Ninth Circuit Decision. Specifically, Competitive Supplier argues that the Commission's action on remand should remain circumscribed by the scope of California's original complaint, which was limited to market-based rate sales during 2000-2001 to CAISO and the PX, and to the CERS on a bilateral spot basis. It asserts that the complaint did not encompass other bilateral transactions in California or the West, including those made under the Western Systems Power Pool (WSPP) Agreement. Competitive Supplier also asserts that, on remand, California must demonstrate that individual seller misconduct occurred with respect to market-based rate quarterly reports, and that such misconduct alone resulted in an "overcharge" that should now be disgorged.[36] They assert that, if California is unable to establish a causal link between an individual seller's reporting deficiency and unjust enrichment, the Commission should reaffirm its prior conclusion that no remedies are in order against that seller.

16. Further, Competitive Supplier argues that, if the Commission decides to impose remedies on remand, then it must do so via an evidentiary hearing process that permits each accused seller to present fully its individual facts, circumstances and defenses.[37]

---

[34] California Parties Motion at 10.

[35] Competitive Supplier includes Aquila Merchant Services, Inc.; Avista Energy, Inc; Coral Power, L.L.C.; Exelon Corporation, on behalf of Exelon Generation Company, PECO Energy Company, and Commonwealth Edison Company; PPL EnergyPlus, LLC; PPL Montana, LLC; Powerex Corp.; Puget Sound Energy, Inc.; Sempra Energy Trading LLC; TransCanada Energy Ltd.; and Tucson Electric Power Company.

[36] Competitive Supplier Comments at 4-5, 18-19.

[37] *Id.* at 6.

Within this context, it asserts, the Commission must resolve a number of issues before it may order retroactive remedies for any sales that were not reported by individual sellers on a disaggregated basis, including: (A) the precise extent of the individual seller's reporting obligations under the seller's then-applicable market-based rate authorization; (B) the extent to which the seller complied with its quarterly reporting obligations; (C) if a seller did not comply with applicable reporting obligations, whether the seller furnished the requisite information through alternative means; (D) whether there were other sources of information available to the Commission, market participants, and the public to monitor price spikes and market behavior, such as the CAISO and PX postings of hourly and ten-minute interval pricing information upon closing of the relevant market; and (E) equitable and policy considerations that mitigate against imposition of retroactive remedies in these circumstances, as well as other defenses and mitigation factors that sellers may wish to assert.[38] Ultimately, Competitive Supplier argues, the Commission must determine whether any deviation by a seller from quarterly reporting obligations was so "egregious" as to "eviscerate" its market-based rate schedule.[39]

17. On December 21, 2007, Puget Sound Energy, Inc. (Puget) filed a motion to extend the period to file answers to the California Parties' motion to hold the Ninth Circuit Decision in abeyance until January 4, 2008. On December 26, 2007, in a *Notice Granting Extension of Time*, the Commission granted Puget's request.

18. On January 4, 2008, Nevada Power Company and Sierra Pacific Power Company (Nevada Companies) and Puget Sound Energy, Inc.; PPL EnergyPlus, LLC and PPL Montana, LLC; Tucson Electric Power Company; Public Service Company of New Mexico; Idacorp Energy, LP and Idaho Power Company; Avista Corporation; TransCanada Energy Ltd.; Coral Power, L.L.C.; Exelon Corporation, on behalf of Exelon Generation Company, LLC, PECO Energy Company and Commonwealth Edison Company, Powerex Corporation, and Constellation Energy Commodities Group, Inc. (collectively, the Indicated Parties) filed answers opposing the California Parties' motion.

19. Specifically, Nevada Companies argue that the Commission should deny the California Parties' motion because the nature and scope of any proceedings on remand of *Lockyer* remain quite narrow and distinct from the *CPUC* refund proceedings. They assert that the remand requires the Commission to exercise remedial discretion informed by the record already established, not to take new evidence. Nevada Companies note that now that the Ninth Circuit has confirmed that the Commission has the authority to

---

[38] *Id.* at 20-28.

[39] *Id.* at 8, 28-39 (citing Ninth Circuit Decision, 383 F.3d at 1016).

retroactively require refunds in connection with past reporting violations, the Commission must weigh the equities and explain the basis for its decision.[40] Nevada Companies argue that if, upon reconsideration of its remedial options on the record already established in these proceedings, the Commission determines that it will require refunds in connection with failure to file quarterly reports in sufficient particularity as to satisfy the Commission's requirement, it should continue its deliberations. They assert that the Commission must then focus on seller-specific culpability, seller-specific remedies, and allocation or distribution of such remedies (if any). However, Nevada Companies assert that, if the Commission decides that retroactive monetary remedies will not be required under the circumstances, then no proceedings on remand (other than an order on remand) will be required.

20. The City of Tacoma, Washington; Port of Seattle, Washington; and City of Seattle, Washington (collectively, the Pacific Northwest Parties) and CAlifornians for Renewable Energy, Inc. (CARE) filed timely answers supporting the California Parties' motion to hold in abeyance the remand proceedings resulting from the Ninth Circuit Decision. Portland General Electric Company and PacifiCorp filed timely answers taking no position on the motion, but support the idea of concurrent Commission action on the Ninth Circuit Decision and *CPUC* remand. AES Companies filed an answer stating that the California Parties' motion presents factual inaccuracies concerning which AES affiliates are parties to which of the three proceedings.

21. On January 16, 2008, the California Parties filed an answer to the answers and the Competitive Supplier's comments. On January 23, 2008, the Nevada Companies filed an answer to the California Parties' request for waiver to file an answer to the answers.

## II. Discussion

### A. Procedural Matters

22. Rule 213(a)(2) of the Commission's Rules of Practice and Procedure[41] prohibits an answer to an answer unless otherwise ordered by the decisional authority. We will accept the California Parties' and the Nevada Companies' answers because they have provided information that assisted us in our decision-making process.

---

[40] Nevada Companies Answer at 6.

[41] 18 C.F.R. § 385.213(a)(2) (2007).

23. We will deny the California Parties' motion to hold in abeyance our consideration of the Ninth Circuit Decision pending the issuance of the mandates by the Ninth Circuit in *CPUC* and *Port of Seattle*. First, we find that, while all three proceedings involve many of the same parties and overlapping time periods, the nature and scope of the proceedings remain distinct. The focus of this proceeding is centered on the market-based rate program and the related quarterly reporting requirement and potential remedies for violations of this filing requirement. The *CPUC* proceeding, however, is focused on tariff violations (such as gaming and anomalous bidding behavior) as a basis for ordering refunds.[42] Further, the *Port of Seattle* proceeding addresses potential refunds to wholesale buyers of electricity that purchased energy in the short-term supply market at unusually high prices in the Pacific Northwest. Thus, the issues in *CPUC* and *Port of Seattle* are more appropriately addressed in those other proceedings.

### B. <u>Commission Determination</u>

24. In response to the Ninth Circuit Decision, the Commission will address its remedial options and discretion to order disgorgement for violations of the Commission's reporting requirement prior to the October 2, 2000 refund effective date established in these proceedings.[43] In order to make such a determination, the Commission must consider the issue of whether, and to what extent, based on the facts associated with each seller who failed to comply with the Commission's market-based rate quarterly reporting requirement, the Commission should now require disgorgement or take other remedial action for that individual seller.[44]

25. The Commission's market-based rate program presumes that, so long as a seller lacks, or has adequately mitigated, market power, it is unable to significantly influence prices in the market and, thus, that seller's resulting rates are presumed to be just and reasonable.[45] As the court in the Ninth Circuit Decision explained, the crucial factor

---

[42] We also note that the *CPUC* proceeding does not include CERS transactions, while the proceeding here does.

[43] The period after the refund period (i.e., after June 20, 2001), is covered and discussed in detail in the California refund orders. *See San Diego Gas & Elec. Co.*, 95 FERC ¶ 61,418, at 62,545 (2001); *San Diego Gas & Elec. Co.*, 93 FERC ¶ 61,294 (2000).

[44] *See supra* note 2 (clarifying the term "refunds").

[45] *See, e.g.*, *Consumers Energy Co. v. FERC*, 367 F.3d 915, 923 (D.C. Cir. 2004) ("The Commission approves applications to sell electric energy at market-based rates

(continued…)

distinguishing the Commission's market-based rate approach as just and reasonable "is the dual requirement of an ex ante finding of the absence of market power *and* sufficient post-approval reporting requirements."[46] We note that these quarterly transaction reports, which are available for public review, and a triennial review of the seller's continued ability to satisfy the Commission's market power screens, enable the Commission, as well as the public, to monitor signs of potential gains in a seller's market share or ability to exercise market power in order to ensure that market-based rates remain just and reasonable over time. If it appears that the market share has increased sufficiently to convey market power, the Commission may step in to revoke the seller's market-based rate authority or take other appropriate action. The court emphasized the crucial nature of the transactional reports stating that they "are an integral part" to "an effective market-based tariff."[47] We agree and note that, since the 1990s, the Commission has clarified to sellers that quarterly reports may not be filed in aggregate and that transaction-specific reporting is "necessary so that the marketer's rates will be on file as required by section 205(c) of the FPA, to evaluate the reasonableness of the charges, and to provide for ongoing monitoring of the marketer's ability to exercise market power."[48]

---

only if the seller and its affiliates do not have, or adequately have mitigated, market power in the generation and transmission of such energy, and cannot erect other barriers to entry by potential competitors") (citing *Louisiana Energy and Power Authority v. FERC*, 141 F.3d 364, 365 (D.C. Cir. 1998)). *See also Tejas Power Corp. v. FERC*, 908 F.2d 998, 1004 (D.C. Cir. 1990). We note that, recently, in *Market-Based Rates for Wholesale Sales of Electric Energy, Capacity, and Ancillary Services by Public Utilities*, Order No. 697, 72 Fed. Reg. 39,904 (July 20, 2007), FERC Stats. & Regs. ¶ 31,252, at P 955, 963 (2007), *clarified*, 121 FERC ¶ 61,260 (2007), the Commission modified the analysis for market-based rates that was in effect at the time of these transactions. However, here, we are applying the analysis that was in effect at the time of the transactions in this proceeding. The Commission's market-based rate program that was in place at that time generally relied on a 20 percent market share threshold and looked at additional market power factors if the 20 percent threshold was reached by a particular seller. This is discussed *infra*.

[46] Ninth Circuit Decision, 383 F.3d at 1013 (emphasis in the original).

[47] *Id.* at 1015.

[48] *Enron*, 65 FERC ¶ 61,305 at 62,406. In *Enron*, the Commission specifically denied Enron's request to "waive the requirement that a power marketer file informational reports detailing the purchase and sale transactions undertaken in the prior quarter," and instead that Enron "be permitted to report data on an aggregate basis (i.e.,

(continued…)

26. Our focus on remand is the exercise of the Commission's broad remedial discretion to address violations of the filed rate requirements of FPA section 205.[49] Courts have long held that the breadth of the Commission's "discretion is, if anything, at its zenith" when it is "fashioning [] remedies and sanctions, including enforcement and voluntary compliance programs in order to arrive at maximum effectuation of Congressional objectives."[50] In considering our "broad remedial authority" to determine appropriate remedies, if any, for sellers that violated our quarterly reporting requirement, we will weigh the equities for each individual seller.[51]

without identifying the other parties or the terms of the individual transactions)." *Id.* In California's March 20, 2002 complaint at 16-17, it points to the *Enron* case (as well as other cases), stating that the Commission "has repeatedly held that sellers with market-based rate authority must report their short-term sales and purchases … on a transaction-specific" and that the Commission has refused do deviate from this requirement. *Id.* at 17-18 (citing *National Elec. Assoc's. Ltd. P'ship*, 50 FERC ¶ 61,378 (1990) (rejecting request to report transactions on a confidential basis); *Enron Power Marketing, Inc.*, 66 FERC ¶ 61,244 (1994) (rejecting request to report only the maximum price charged to each customer)).

[49] Ninth Circuit Decision, 383 F.3d at 1015 (citing *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 686 (D.C. Cir. 2000; *The Washington Water Power Co.*, 83 FERC ¶ 61,097, *order on responses to show cause*, 83 FERC ¶ 61,282 (1998) (*Washington Water*); *Delmarva Power & Light Company*, 24 FERC ¶ 61,199 at 61,461, *on reh'g*, 24 FERC ¶ 61,380, *reh'g denied*, 25 FERC ¶ 61,308 (1983) (*Delmarva*)).

[50] *Niagara Mohawk Power Corp.* v. *FPC*, 379 F.2d 153, 159 (D.C. Cir. 1967). *See also Towns of Concord* v. *FERC*, 955 F.2d 67, 75 (D.C. Cir. 1992) (citing *Moss* v. *Civil Aeronautics Board*, 521 F.2d 298, 308-09 (D.C. Cir. 1975) ("Because the 'equitable aspects of refunding past rates are . . . inextricably entwined with the [agency's] normal regulatory responsibility,' . . . absent some conflict with the explicit requirements or core purposes of a statute, we have refused to constrain agency discretion by imposing a presumption in favor of refunds")); *Con. Edison Co. of N.Y., Inc. v. FERC*, No. 06-10-25, slip op. at 13-14, 2007 U.S. App. 29,213 (D.C. Cir. 2007); *Connecticut Valley Elec. Co. v. FERC*, 208 F.3d 1037, 1043 (D.C. Cir. 2000); *La. Pub. Serv. Comm'n v. FERC*, 174 F.3d 218, 225 (D.C. Cir. 1999); *Public Utilities Com'n of Cal. v. FERC* 462 F.3d 1027, 1053 (9th Cir. 2006).

[51] Ninth Circuit Decision, 383 F.3d at 1015.

27. We note that the Commission has, in the past, used its discretional authority to fashion various remedies in response to FPA section 205 violations. In the relatively early stages of the market-based rate program in 1991, the Commission announced a policy on public utilities' failure to comply with FPA section 205 filing requirements in *Central Maine Power Co.*[52] Noting that the Commission does not look favorably at utilities undertaking sales in violation of the FPA section 205 requirement that a rate schedule be on file for any wholesale sale in interstate commerce,[53] *Central Maine* addressed utilities' failure to properly comply with the Commission's 60-day prior notice filing requirement for cost-based as well as market-based rates. In that order, the Commission established an amnesty window and directed all sellers providing jurisdictional service without agreements on file with the Commission to submit rates for such pre-existing service within a certain period of time. *Central Maine* also set a refund obligation and found that the remedy for non-traditional (market-based) rates that had not been filed previously but were filed within 60 days after the order would be to permit the seller to recover no more than 100 percent contribution to fixed costs from the date of service until the date the Commission accepted the rates; with respect to non-traditional rates that were not timely filed at all, the Commission would permit the seller to recover no more than the variable operation and maintenance costs plus interest.[54]

---

[52] 56 FERC ¶ 61,200 at 61,818, *order on reh'g*, 57 FERC ¶ 61,083 (1991) (*Central Maine*).

[53] *Id.* at 61,817 (finding that this is particularly true "in a case such as this, where nontraditional rates are being sought for a long-term power sale and our ability to effectively remedy the defect in rates is restricted as a result of the sales taking place without Commission approval.").

[54] *Id.* The Commission explained the importance of the section FPA section 205 requirement that a rate schedule be on file for any wholesale sale in interstate commerce, stating that:

> in several recent cases public utilities have delayed tendering rate filings to the Commission until after service has begun, and in some cases, as here, completed. Such delay has occurred in instances where utilities have sought to justify their rates on a cost basis, as well as in instances where nontraditional (market-based) rates have been requested. Delay in tendering rate filings can place the Commission in a difficult position, regardless of whether the rates are cost- or market-based. However, this problem is most acute when

(continued…)

28. The situation present in this case, however, is different than the situation in *Central Maine*. Here, the California sellers were pre-authorized to sell at market-based rates and had market-based rate tariffs on file with the Commission at the time they made the sales at issue. As discussed above, prior to granting such market-based rate authorization, the Commission had undertaken an inquiry into the market power of each seller and had made specific findings that the seller lacked market power in transmission and generation, and could not erect other barriers to entry and therefore could sell at market rates subject only to the filing of quarterly reports and triennial reviews. Thus, unlike the *Central Maine* case where no rates were ever filed and the public had no notice under the FPA of the rates being charged, the California sellers in this case made an initial showing that they lacked market power and received up-front market-based rate approval from the Commission. The proceedings to grant market-based rates for each seller were publicly noticed and interested persons had the opportunity to intervene and protest. Once the market-based rate authorizations were granted by the Commission under section 205, the public was on notice that future rates to be charged by the seller would be market-based.[55]

29. We note that the type of remedy announced in *Central Maine* is not appropriate in all cases; for instance, for marketers that do not have physical assets and "fixed" costs. In more recent cases, the Commission has adopted other remedies. For example, in *Washington Water*, the Commission ordered profits disgorged because the public utility had violated posting requirements and "the conditions upon which the Commission authorized [it] to make sales at market-based rates" when it conferred undue preferences on its marketing affiliate.[56] The Commission emphasized that, due to the serious nature

---

market-based rates are requested. Timing is critical in such cases. The Commission cannot cure a defective market or market process retroactively. *See id.* at 61,818.

[55] We also note that the *Central Maine* case differs from the California situation, because in that case, the Commission based its decision on a prior, similar case where it took the same remedial action. *Id.* at 61,817-18 (citing *Central Vt. Public Service Com'n*, 54 FERC ¶ 61,153, at 61,484-85 (1991)). Whereas, at the time of the California situation, the Commission had never taken any monetary remedial action with respect to filings containing aggregate, as opposed to transaction-specific, information.

[56] 83 FERC at 61,464. *See also Delmarva*, 24 FERC at 61,461 (the Commission ordered refunds for all periods prior to the filed rates at issue because a utility illegally collected spent nuclear fuel disposal costs through its fuel adjustment clause without prior Commission approval. The Commission explained that "[t]o do otherwise would allow companies to flout our regulations, and overcharge consumers with impunity.").

of the violations, any further violations could lead to the Commission limiting the utilities' market-based rate authority. In *El Paso Electric Company*,[57] the Commission required that a public utility refund the time value of the revenues collected during the time period the rates were collected without Commission authorization because it violated the Commission's prior notice requirement. In that case, the Commission stated that "[o]ur imposition of time value refunds here redresses injury to the Commission's ability to carry out its statutory duties."[58]

30. With respect to the Commission's quarterly reporting requirement specifically, we note that, since *Lockyer I* was issued, the Commission has also revoked the market-based rate authority of sellers that have failed to comply with the Order No. 2001[59] electronic quarterly reporting (EQR) filing requirement.[60] More recently, in Order No. 890,[61] the Commission concluded that it would revoke an entity's market-based rate authority in

---

[57] *El Paso Elec. Co.*, 101 FERC ¶ 61,276 (2002), *order denying reh'g*, 105 FERC ¶ 61,131 (2003).

[58] The Commission also stated that "[i]mposition of time value refunds is the Commission's method of encouraging compliance by public utilities with the requirements of Section 205, and compensating customers that have been deprived of the use of their monies for the period that the rates had not been filed." *Id.* P 40.

[59] *Revised Public Utility Filing Requirements*, Order No. 2001, FERC Stats. & Regs. ¶ 31,127, *reh'g denied*, Order No. 2001-A, 100 FERC ¶ 61,074, *reh'g denied*, Order No. 2001-B, 100 FERC ¶ 61,342, *order directing filing*, Order No. 2001-C, 101 FERC ¶ 61,314 (2002), *order directing filing*, Order No. 2001-D, 102 FERC ¶ 61,334 (2003). Under Order No. 2001, which was adopted after the transactions at issue in this docket, failure to file an EQR (without an appropriate request for extension), or failure to report an agreement in an EQR, may result in forfeiture of market-based rate authority, requiring filing of a new application for market-based rate authority if the seller wishes to resume making sales at market-based rates.

[60] *See Electric Quarterly Reports*, 115 FERC ¶ 61,073 (2006); *Electric Quarterly Reports*, 114 FERC ¶ 61,171 (2006); *Electric Quarterly Reports*, 69 Fed. Reg. 57,679 (Sept. 27, 2004); *Electric Quarterly Reports*, 105 FERC ¶ 61,219 (2003).

[61] *Preventing Undue Discrimination and Preference in Transmission Service*, Order No. 890, 72 Fed. Reg. 12,266, at P 1743 (Mar. 15, 2007), FERC Stats. & Regs. ¶ 31,241 (2007), *order on reh'g*, Order No. 890-A, 73 Fed. Reg. 2984, at P 1036-42 (Jan. 16, 2008), FERC Stats. & Regs. ¶ 31,261 (2007).

response to an open access transmission tariff (OATT) violation upon a finding of a specific factual "nexus" between the violation and the entity's market-based rate authority. The Commission reasoned that the "nexus condition" is required in order to ensure that the Commission's actions are not arbitrary or capricious or based on an inadequate factual record. The Commission stated that "our view is that the nexus condition requires us to find both that a substantial OATT violation has occurred and that the violation either related to the exercise of the violator's market-based rate authority or violated a specific condition of that authority."[62] The Commission also emphasized that it has discretion to fashion remedies for tariff violations that relate to the violator's market-based rate authority in instances in which we do not find a factual nexus justifying revocation of that authority.[63] The Commission stated that, in appropriate circumstances, it might modify or add additional conditions to the violator's market-based rate authority or impose other requirements to help ensure that the violator does not commit future, similar misconduct.

31. In this case, California complainants alleged that all sellers that violated the Commission's filing requirement were charging an unjust and unreasonable rate and implied that there is a link between the failure of these particular sellers to properly file quarterly reports and the reasonableness of their individual rates. However, it is not clear on the record developed thus far that there has been any demonstration of a nexus between a particular seller's reporting failures and any gain in market share that would have given that particular seller the potential to exercise market power, thus making the rates charged by the seller unjust and unreasonable. As the court indicated, the reporting requirement is a means by which the Commission can "monitor the market or gauge the 'just and reasonable' nature of the rates. . .".[64] The court did not say that failure to comply with the Commission's quarterly reporting requirement automatically makes the rate charged by a particular customer unjust and unreasonable.

32. Thus, a central question before us is whether, based on the facts and circumstances associated with each individual seller, that seller's improper or untimely filing of its quarterly transaction reports masked an accumulation of market power such that the market rates were unjust and unreasonable.

---

[62] *Id.* P 1744.

[63] *Id.* P 1745.

[64] Ninth Circuit Decision, 383 F.3d at 1015.

33. To make this determination, the Commission will allow both buyers and sellers that made short-term purchases or sales to the ISO, PX and CERS for the calendar years 2000-2001 to supplement the record by presenting evidence of individual facts and circumstances that any seller that violated the quarterly reporting requirement did or did not gain an increased generation market share sufficient to give it the ability to exercise market power and cause market-based rates to be unjust and unreasonable as a result. Therefore, our initial action on remand will be to establish a trial-type hearing before an ALJ to make findings of fact regarding whether, based on the facts and circumstances associated with each individual seller, that seller's improper or untimely filing of its quarterly transaction reports masked an accumulation of market power such that the market rates were unjust and unreasonable, during the relevant period, as discussed below.[65] After such hearing is completed, the Commission will determine what remedy, if any, will be ordered for particular sellers.

34. Regarding the relevant time periods at issue in this case, we note that California's March 2002 complaint concerned the calendar years 2000 and 2001. We clarify that the 2000/2001 time period may be divided into three segments for purposes of this case: (1) from January 1, 2000 until the day before the date that the refund period began, or October 1, 2000; (2) from October 2, 2000 until June 20, 2001, the date that the price cap was imposed in California (i.e., the refund period established in the refund proceedings);[66] and (3) from June 21, 2001 until December 31, 2001, which includes the final period covered in California's complaint during which a price cap was in place. Here, on remand, we address only the first of these three periods. During the second period, the Commission ordered refunds by establishing a mitigated market clearing price (MMCP) in an attempt to replicate what it believed to be the just and reasonable rates that a competitive energy market would have produced. The MMCP methodology disregarded prices actually bid by sellers and instead calculated a price using the heat rate of the marginal unit, certain gas prices and miscellaneous costs.[67] During this period, any retroactive finding that a seller had gained market power would not alter the MMCP,

---

[65] In directing this hearing, we remind parties that this is not a proceeding to address any tariff violations (such as gaming and anomalous bidding behavior) raised in the *CPUC* remand case. This proceeding focuses solely on whether, based on the facts and circumstances associated with each individual seller, that seller's improper or untimely filing of its quarterly transaction reports masked an accumulation of market power such that the market rates were unjust and unreasonable.

[66] *San Diego Gas & Elec. Co.*, 95 FERC ¶ 61,418, at 62,545 (2001).

[67] *San Diego Gas & Elec. Co.*, 96 FERC ¶ 61,120 (2001).

since even a seller with cost-based rates could have bid the marginal unit. During the third period at issue here, the Commission set a hard price cap, which limited prices to a just and reasonable level. Thus, any finding now that a seller had market power (and should potentially be required to disgorge profits) during the period covered in California's complaint would apply only to the first of the three periods in these years.

35. We find that issues of material fact exist with respect to the question of whether, based on the facts and circumstances associated with each individual seller, that seller's improper or untimely filing of its quarterly transaction reports masked an accumulation of market power (as defined by the Commission's test for approving market-based rates in effect at the time of the transaction) such that the market rates were unjust and unreasonable. In other words, since the time of the Commission's approval of the seller's market-based rates, did the seller gain the ability to exercise market power? In examining this issue, the parties and presiding judge should first address whether the seller at any point reached a 20 percent generation market share threshold and, if the seller did reach a 20 percent market share, whether other factors were present to indicate that the seller did not have the ability to exercise market power.[68] These issues of material fact cannot be resolved on the record before us. Therefore, we will set the issues for hearing and settlement judge procedures.[69] If the parties do not settle, the presiding judge is directed to make findings of fact with respect to these issues, for each seller, and to submit those findings of fact to the Commission. The Commission will then exercise its remedial discretion to determine whether a disgorgement of profits or other remedial

---

[68] Such factors could include: (1) what was the magnitude and duration of the failure to stay below a 20 percent generation market share (*e.g.*, was the seller at or above 20 percent for just one season and below it at all other times)?; (2) if the seller tripped the 20 percent threshold based on installed capacity, was the seller under 20 percent using uncommitted capacity?; or (3) what was the ability of traditional franchised utility sellers and non-utility (*e.g.*, independent and affiliated power producer) sellers to enter the market (*e.g.*, was there evidence of ample and recent ease of entry)? We note that this is a non-exclusive list of factors that may be relevant.

[69] We note that the settlement "time-out" that had been in effect at the Ninth Circuit since August 2, 2006 for issuance of the remand mandate in the *Lockyer* appeal, as well as for the filing of petitions for rehearing in related Ninth Circuit appeals, recently has expired. While the time-out was lifted, the court noted that parties should continue to try to settle. *See Pub. Utils. Comm'n of Cal., et al. v. FERC,* Order of August 6, 2007 (Ninth Circuit Nos. 01-71051, *et al.*). By appointing a settlement judge in this order, the Commission does not intend to interfere with -- and indeed encourages -- any ongoing court-mediated settlement efforts.

action is appropriate for a particular seller. In the hearing, for purposes of determining whether a particular wholesale seller had accumulated market power, we will direct the parties to supplement the record by presenting evidence of individual facts and circumstances that any seller that violated the quarterly reporting requirement did or did not gain an increased generation market share sufficient to give it the ability to exercise market power and cause market-based rates to be unjust and unreasonable as a result.[70] We note that the Commission, in *Lockyer I*, directed all marketers and other public utility sellers that made short-term sales at market-based rates to CERS or into the PX or ISO markets since October 2, 2000 to the date of the order, May 31, 2002, to file new, proper quarterly reports. For the convenience of the parties to the hearing ordered herein, we will direct such sellers to submit for the hearing record copies of the previously filed proper quarterly reports for the period January 1, 2000 – October 1, 2000.[71] We will also direct such sellers to submit for the hearing record copies of any improper quarterly reports that were filed for that period.

36. While we are setting these matters for a trial-type evidentiary hearing, we encourage the parties to make every effort to settle their dispute before hearing procedures are commenced. To aid the parties in their settlement efforts, we will hold the hearing in abeyance and direct that a settlement judge be appointed, pursuant to Rule 603 of the Commission's Rules of Practice and Procedure.[72] If the parties desire, they may, by mutual agreement, request a specific judge as the settlement judge in the proceeding;

---

[70] We note that the Commission has long used a 20 percent generation market share as an indicator of potential generation market power. In the early years of its market-based rate program, which began in the 1980s, the Commission employed the "hub-and-spoke" analysis to determine whether an individual entity and its affiliates had the ability to exercise generation market power (the first part of the four-part test). In a hub-and-spoke analysis, the applicant computed its market share of both installed and uncommitted generation capacity in its control area market and separately for each of the control area markets to which it is directly interconnected (first-tier markets). While the Commission did not employ a bright-line test, it looked to a benchmark for generation market power of whether a seller had a market share of 20 percent or less in each of the relevant markets. *See, e.g., Western Resources*, 83 FERC ¶ 61,110, at 61,532 (1998) and *Louisville Gas & Electric Co.*, 62 FERC ¶ 61,016, at 61,146 (1993).

[71] *See Lockyer I*, 99 FERC at 62,067.

[72] 18 C.F.R. § 385.603 (2007).

otherwise, the Chief Judge will select a judge for this purpose.[73] The settlement judge shall report to the Chief Judge and the Commission within 30 days of the date of the appointment of the settlement judge, concerning the status of settlement discussions. Based on this report, the Chief Judge shall provide the parties with additional time to continue their settlement discussions or provide for commencement of a hearing by assigning the case to a presiding judge.

37. As discussed above, the Commission has considerable discretion in shaping an appropriate remedy and has exercised such discretion in past situations where filing requirements were violated. Once the Commission is presented with the ALJ's findings of facts at issue in these proceedings, the Commission will issue a further order regarding what remedies, if any, we will impose on individual sellers.

The Commission orders:

(A) All marketers and other public utility sellers that made short-term sales at market-based rates to CERS or into the PX or ISO markets are directed to submit for the hearing record copies of all previously filed quarterly reports for the period January 1, 2000, to October 1, 2000. This includes both the properly filed, and improperly filed quarterly reports for that period.

(B) Pursuant to the authority contained in and subject to the jurisdiction conferred upon the Federal Energy Regulatory Commission by section 402(a) of the Department of Energy Organization Act and by the Federal Power Act, particularly sections 205, 206 and 309 thereof, and pursuant to the Commission's Rules of Practice and Procedure and the regulations under the Federal Power Act (18 C.F.R., Chapter I), a public hearing shall be held concerning whether, based on the facts and circumstances associated with each individual seller, that seller's improper or untimely filing of its quarterly transaction reports masked an accumulation of market power such that the market rates were unjust and unreasonable. However, the hearing shall be held in abeyance to provide time for settlement judge procedures, as discussed in Ordering Paragraphs (C) and (D) below.

---

[73] If the parties decide to request a specific judge, they must make their joint request to the Chief Judge by telephone at (202) 502-8500 within five days of this order. The Commission's website contains a list of Commission judges and a summary of their background and experience (www.ferc.gov – click on Office of Administrative Law Judges).

(C) Pursuant to Rule 603 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.603 (2007), the Chief Administrative Law Judge is hereby directed to appoint a settlement judge in this proceeding within fifteen (15) days of the date of this order. Such settlement judge shall have all powers and duties enumerated in Rule 603 and shall convene a settlement conference as soon as practicable after the Chief Judge designates the settlement judge. If the parties decide to request a specific judge, they must make their request to the Chief Judge within five (5) days of the date of this order.

(D) Within thirty (30) days of the appointment of the settlement judge, the settlement judge shall file a report with the Commission and the Chief Judge on the status of the settlement discussions. Based on this report, the Chief Judge shall provide the parties with additional time to continue their settlement discussions, if appropriate, or assign this case to a presiding judge for a trial-type evidentiary hearing, if appropriate. If settlement discussions continue, the settlement judge shall file a report at least every sixty (60) days thereafter, informing the Commission and the Chief Judge of the parties' progress toward settlement.

(E) If settlement judge procedures fail and a trial-type evidentiary hearing is to be held, a presiding judge, to be designated by the Chief Judge, shall, within fifteen (15) days of the date of the presiding judge's designation, convene a prehearing conference in these proceedings in a hearing room of the Commission, 888 First Street, N.E., Washington, DC 20426. Such a conference shall be held for the purpose of establishing a procedural schedule. The presiding judge is authorized to establish procedural dates and to rule on all motions (except motions to dismiss) as provided in the Commission's Rules of Practice and Procedure.

By the Commission.

( S E A L )

Nathaniel J. Davis, Sr.,
Deputy Secretary.

Document Content(s)

19063186.DOC.....................................................1-23