# PLAINTIFFS PACIFIC GAS AND ELECTRIC COMPANY, SOUTHERN CALIFORNIA EDISON COMPANY, AND SAN DIEGO GAS & ELECTRIC COMPANY'S APPENDIX TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

**VOLUME 3 OF 3**

**Part 2 of 6**

# FINAL REPORT ON
# PRICE MANIPULATION IN WESTERN MARKETS

## FACT-FINDING INVESTIGATION OF
## POTENTIAL MANIPULATION OF
## ELECTRIC AND NATURAL GAS PRICES

## DOCKET NO. PA02-2-000

**Prepared by the Staff of the**
**Federal Energy Regulatory Commission**

**March 2003**

**VI. Trading Strategies, Economic Withholding, Inflated Bidding, and Other Anomalous Activities ........ VI-1**

Initial Recommendations ........ VI-1

Background ........ VI-2

Overview of the Cal PX and Cal ISO Operations ........ VI-4

The Cal ISO's and Cal PX's MMIP Contains an Antigaming Provision and an Anomalous Market Behavior Provision ........ VI-6

Staff Finds That There May Have Been Numerous Instances of the Misconduct Addressed in the MMIP ........ VI-10

The Enron Trading Strategies and Their Impact on Prices ........ VI-11

Price Manipulation—Load Shift ........ VI-12

Price Maximization—Exports ........ VI-15

Trading Strategies Based on False Information ........ VI-19

Transmission Congestion Strategies ........ VI-26

Ancillary Services Strategies ........ VI-31

Recommended Commission Responses ........ VI-35

Enron's Business Model ........ VI-37

Enron's Business Partners ........ VI-39

Gaining Control of Assets ........ VI-40

Recommended Commission Responses ........ VI-42

Filing Requirements ........ VI-44

Economic Withholding of Generation and Inflated Bidding During May to October 2000 ........ VI-45

The California Parties' Analysis of Bidding Practices by In-State Generators and Certain Importers ........ VI-48

Responses Filed by the In-State Generators and Importers ........ VI-51

Recommended Commission Responses ........ VI-52

Physical Withholding of Generation ........ VI-54

Reliant and BP Energy Traders Appear To Have Engaged in Coordinated Efforts To Manipulate Market Prices ........ VI-55

Spot Prices in the Pacific Northwest—Docket No. EL01-10-000, et al. ........ VI-56

Recommended Commission Responses ........ VI-59

**VII. Wash Trading on EnronOnline ........ VII-1**

Wash Trading on EnronOnline ........ VII-1

Choice Markets ........ VII-2

Wash Trades Within Choice Markets ........ VII-4

Affiliate Price Manipulation ........ VII-12

One-to-Many Versus Many-to-Many Trading Platforms ........ VII-13

Summary and Conclusions Regarding Wash Trades on EnronOnline ........ VII-14

Recommendations ........ VII-15

**VIII. The Profitability of EnronOnline Information Advantage ........ VIII-1**

Measuring Trading Profits ........ VIII-2

EOL Market-Making Profits ........ VIII-5

Conclusions ........ VIII-7

Recommendation ........ VIII-8

**IX. Enron's Manipulation of the Natural Gas Markets, Portions of the Enron Black Box Revealed, and Forward Looking Recommendations ........ IX-1**

Background ........ IX-1

The Relationship Between Natural Gas Financial Derivatives and the Underlying Physical Gas Contracts ........ IX-2

General Purpose for Physical and Financial Natural Gas Markets ........ IX-2

Importance of Liquidity in the Natural Gas Markets ........ IX-3

Physical Transaction Values Dictate the Pricing of Financial Derivatives ........ IX-4

Relative Differences in Liquidity Across Markets Combined With Correlated Values Between Those Markets Provides an Opportunity for Profitable Manipulation ........ IX-6

# VI. Trading Strategies, Economic Withholding, Inflated Bidding, and Other Anomalous Activities

**Initial Recommendations**

In this chapter, Staff will conclude its analysis of the Enron trading strategies (first discussed in the Initial Report) and describe further developments and investigations since the Initial Report was issued. This chapter builds upon the Cal ISO report released on January 6, 2003, which identified potential transactions and parties that may have used the Enron trading strategies. This chapter also discusses potential economic withholding during the summer of 2000. We discuss evidence indicating that Enron worked in concert with other entities, both inside and outside California, to implement these strategies in ways that manipulated market outcomes. In this regard, Enron's business model is discussed along with Staff's recommendations.

We also discuss whether the Enron trading strategies, underscheduling, economic withholding, and inflated bidding fall within the scope of the antigaming and/or anomalous market behavior provisions in the Cal ISO's and Cal PX's Market Monitoring and Information Protocol (MMIP). The MMIP is part of both the Cal PX and Cal ISO tariffs, which have been on file with the Commission since the Cal ISO began operations in April 1998. Staff recommends that the Commission issue orders to show cause why these behaviors did not constitute "gaming" in violation of the MMIP, with disgorgement of unjust profits associated with the violations or other appropriate remedies. Such disgorgement would be in addition to any refunds owed to establish just and reasonable rates in the California Refund Proceeding.

The preponderance of evidence reviewed by Staff during this investigation indicates that Enron and its affiliates intentionally engaged in a variety of market manipulation schemes that had profound adverse impacts on market outcomes. Due to this overwhelming evidence, Staff recommends that the Commission issue an order to show cause why its market-based rate authorizations and blanket certificate authority should not be revoked. This order should cover Enron and its affiliates with the exception of Portland General Electric Company, which is the subject of an ongoing investigation in Docket No. EL02-114-000. Staff recommends that such revocation be made effective prospectively so that any preexisting contracts are not affected.

**Background**

On May 6, 2002, Enron's Washington, DC counsel provided the Commission with three internal memoranda, two of which date from December 2000, that describe certain trading strategies employed by Enron's electricity traders in the West. Enron's counsel informed Staff that Enron's Board of Directors had voted to disclose the documents and to waive all claims of privilege. The Commission made these documents publicly available on the Web site for Docket No. PA02-2-000 within hours of receiving them.

Staff immediately requested followup information from Enron to better understand the trading strategies discussed in the memoranda, including Enron's receiving transmission congestion payments without actually relieving any congestion. Among other things, Staff sought any comparable memoranda that discuss trading strategies for natural gas products. Finally, the data request asked Enron to provide all correspondence related to the subject matter of the memoranda.

The documents provided by Enron indicated that traders from other companies were also employing several of the trading strategies discussed in the memoranda. In order to pursue this issue, on May 7, 2002, Staff issued a notice to all sellers of wholesale electricity and/or ancillary services in the West, informing them that Staff would soon be sending them a data request seeking information about their use of the trading strategies discussed in the Enron memoranda, and directing them to preserve all documents related to such trading strategies.

On May 8, 2002, Staff issued a data request to more than 130 sellers of wholesale electricity and/or ancillary services in the West during 2000–2001, with a due date of May 22, 2002. This data request contained a series of requests for admissions in which an officer of each company was required to admit or to deny, under oath, whether his or her company had engaged in specific activities described in the request. The specific activities were based on the trading strategies discussed in the Enron memoranda; in addition, there was an additional request asking the corporate officer to admit or deny, under oath, whether the company had engaged in any other trading strategies. The data request also sought production of all internal documents relating to trading strategies that the company may have engaged in during the relevant time period, including correspondence between companies, reports, and opinion letters. Staff also requested specific information in regard to any megawatt laundering transactions between any of these sellers and Enron.

This data request required a senior officer of the company to state, in an affidavit and under oath, that he or she conducted a thorough investigation of the company's trading activities in the West during 2000–2001 and that the information being provided in response to the data request was complete and accurate to the best of that person's knowledge and belief.

In our Initial Report, Staff concluded that, while the exact economic impact of the trading strategies is difficult to determine precisely, these now infamous trading strategies have adversely affected the confidence of markets far beyond their dollar impact on spot prices. Even those trading strategies that are not anticompetitive have been viewed by customers as clever exploitations of overly complex rules by companies that do not account for the impact of their decisions on prices and customers. Market participants from all sectors of the industry may have engaged in these trading strategies along with Enron, and in trading strategies of their own, including nonpublic utility entities such as municipal and governmental agencies in California and jurisdictional public utilities (including power marketers).

Staff's initial review of the evidence indicated that Enron, as a corporate entity, displayed great eagerness to experiment with all aspects of market rules and protocols in an effort to "game the system" or to simply provide false information. In fact, shortly after the issuance of our Initial Report, Enron's former chief West Coast trader, Timothy N. Belden, pleaded guilty to Federal fraud charges for his role in implementing these trading strategies. Enron's corporate culture fostered a disregard for the American energy customer; the success of the company's trading strategies, while temporary, demonstrates the need for explicit prohibitions on harmful and fraudulent market behavior and for aggressive market monitoring and enforcement.

In a market environment, one expects that traders, working within Commission-approved market rules, will use various strategies in an effort to maximize profits. But a fundamental aspect of some of the Enron trading strategies was the deliberate use of false information. A market cannot operate properly without accurate information. Implicit in Commission orders granting market-based rates is a presumption that the power marketer's behavior will not involve fraud or deception. For this reason, our Initial Report recommended that the Commission explicitly prohibit the use of false information as a condition for granting all market-based rate authorizations. Staff recommends that this condition also be added to all open access transmission tariffs.

### Overview of the Cal PX and Cal ISO Operations

The Enron trading strategies and Enron's use of them to game the system are best understood in the specific context of Western energy markets. Thus, we provide a brief overview of the Cal PX and Cal ISO operations and trading rules.

The Cal ISO operates much of the transmission grid in California and is responsible for all real-time operations, such as continually balancing generation and load and managing congestion on the transmission system it controls. In California, a certified scheduling coordinator is the intermediary between the Cal ISO and the ultimate customer. Under California's restructuring legislation, the Cal PX was created primarily to operate two markets in which energy was traded on an hourly basis. These were the day-ahead and day-of markets. These markets established a single clearing price for each hour across the entire Cal ISO control area, provided there were no transmission constraints. Where transmission congestion existed, a separate clearing price was established for each transmission constrained area or zone in California. Each individual zonal clearing price was based on adjustment bids submitted by buyers and sellers. The adjustment bids represented the value to an entity of increasing or decreasing (i.e., adjusting) its use of the system. In essence, this is a redispatch of the system to deal with congestion.

California's restructuring plan required the three California public utilities (SoCal Edison, San Diego, and PG&E) to sell all of their generation resources into the Cal PX and to buy all of their energy needs from the Cal PX. This made the Cal PX by far the largest scheduling coordinator in California, representing at times close to 90 percent of the load served by the Cal ISO grid. This requirement that the three public utilities exclusively use the Cal PX was critical in the restructuring program, since this was how the three public utilities were to calculate savings from using the new market structure and apply those savings to recover their stranded costs.

Under the California restructuring rules, the three California public utilities were both buyers and sellers in the Cal PX. The prices paid for buying back their own resources through the Cal PX served to value those resources for stranded cost purposes. As long as the three public utilities paid less than the frozen retail rates, they used the difference to write off stranded costs. As noted in the Commission's December

15, 2000 Order, stranded cost estimates show PG&E collected $8.3 billion, SoCal Edison collected $9.3 billion, and San Diego fully recovered its stranded costs early in 2000. This formula broke down, however, when the public utilities had to buy back their resources at more than the retail rate.

All scheduling coordinators (including the Cal PX before it ceased operations in January 2001) were required to submit a balanced schedule of load and generation to the Cal ISO for the following day. The Cal ISO then performed a security analysis to determine if the generation selected could serve customer demand without causing congestion on the transmission system. Although the rules were being modified constantly during 2000–2001, the basic steps of the day-ahead auction process were as follows:

- 7:00 a.m.—The Cal PX conducts 24 hourly energy auctions for the following day.
- 9:00 a.m.—The unconstrained market-clearing prices (i.e., a single price for all of the Cal ISO system) become publicly available.
- 10:00 a.m.—The Cal PX (like all scheduling coordinators) submits to the Cal ISO the estimated load for the next day and the generating resources that will produce the energy necessary to serve that load.
- 11:00 a.m.—The Cal ISO either determines that the initial schedule is feasible (no congestion) using the available transmission facilities or requires that the schedule be modified by redispatch using adjustment bids.
- 12:00 p.m.—Modified schedules are submitted. At this time, the Cal ISO can automatically modify schedules to relieve any remaining congestion.
- 1:00 p.m.—The Cal ISO calculates the day-ahead charge for congestion on any congested paths.
- 3:00 p.m.—The Cal PX publishes zonal price information when there is transmission congestion in the day-ahead market. The zonal price differences are equal to the Cal ISO's hour-ahead congestion charges along the relevant paths.

The Cal ISO operates a variety of markets in order to procure the resources necessary to reliably operate the transmission system, including a day-ahead market and an hour-ahead market for relieving transmission congestion and an energy market to continuously balance the system's energy needs in real time. The Cal ISO's real-time market is the final energy market to clear chronologically, after all other

markets in the region. Bilateral spot markets at trading hubs outside California generally operated in the time period between the close of the Cal PX market and the Cal ISO real-time market.

Understanding the interaction of the Cal PX and Cal ISO spot markets with all their complexities, together with the different market operations outside of California, is crucial to understanding and analyzing the impact of the various Enron trading strategies. An example of the market complexities in California market rules is the transmission congestion management system. A transmission path is "congested" when total schedules exceed the available transmission capacity of the facilities. The Cal ISO used a zone-based approach to alleviate congestion. Buyers and sellers submitted adjustment bids identifying the prices they were willing to use to increase or decrease their generation on demand to relieve congestion in a particular zone. However, the software used by the Cal ISO to evaluate adjustment bids did not accept prices that were higher than the Cal ISO price cap. These and other market rules not only caused market inefficiencies but also contributed to bidding strategies that circumvented the market design, such as underscheduling by the three California IOUs. This, in turn, created an opportunity for Enron to develop strategies that capitalized on the market rules and the trading behavior of others.

### The Cal ISO's and Cal PX's MMIP Contains an Antigaming Provision and an Anomalous Market Behavior Provision

The MMIP is one of several protocols that (as explained below) the Commission required the Cal ISO and Cal PX to include as part of their filed rate schedules.[1] The underlying purposes of the MMIP are discussed in the Objectives section of the MMIP. In pertinent part, this section reads:

> This Protocol (MMIP) sets forth the workplan and, where applicable, the rules under which the ISO will monitor the ISO markets to identify abuses of market power, to ensure to the extent possible the efficient working of the ISO Markets immediately upon commencement of their operation, and to provide for their protection from abuses of market power in both the short term and the long term, and from other abuses that have the potential to undermine their effective functioning

[1]Both the Cal PX and Cal ISO have substantially similar MMIPs. For convenience sake, we will refer to the language of the Cal ISO's MMIP.

> rate or violated statutory or regulatory requirements or rules in applicable rate tariffs.[13]

However, in the July 25 Order, the Commission stated that there had been no demonstration that there were any violations of any Commission-filed tariffs.[14]

The July 25 Order preceded the initiation of this investigation, and Staff finds that the Commission's statement that there were no tariff violations that would warrant refunds prior to October 2, 2000 appears to be no longer accurate. In short, Staff believes that numerous participants in the Cal ISO and Cal PX markets violated the terms of the Cal ISO's or Cal PX's tariff, specifically the MMIP; thus, the Commission could order disgorgement of unjust profits prior to October 2, 2000 if it determines there have been such violations.

### The Enron Trading Strategies and Their Impact on Prices

As stated in our Initial Report, quantifying the exact economic impact of the trading strategies is difficult because we have not identified a way to definitively associate particular transactions with particular strategies. A passage from an undated Enron document entitled "Public Service of New Mexico California Service Overview" illustrates this point. The document describes a partnership arrangement providing mutual benefits and services, e.g., Enron acting as a scheduling coordinator on behalf of Public Service of New Mexico for certain trades. The document states that in Enron's opinion no Cal ISO forms or notifications are required: "in fact the ISO will not even be aware that PNM is in the path."

On January 6, 2003, the Cal ISO Department of Market Analysis released a 34-page report entitled "Analysis of Trading and Scheduling Strategies Described in Enron Memos" (January 6 Cal ISO Report), originally dated October 4, 2002. While the Cal ISO indicates that some of the results of its analysis require further verification, the analysis is generally consistent with our Initial Report as to the effect these strategies had on the market.

The Cal ISO's Department of Market Analysis issued a report on November 15, 2002 entitled "Did Any of Enron's Trading and

---

[13] Id at 61,507-80 (citing *Washington Water Power Co.*, 83 FERC ¶ 61,282 (1998), in which the Commission imposed sanctions and required public utilities to disgorge profits derived from past violations of the companies' market-based rate orders).
[14] Id.

Scheduling Tactics Contribute to Outages in California?" (November 15 Cal ISO Report). This report concludes that while Enron strategies could have financial impacts on the markets, they did not contribute to the outages during the winter of 2000–2001. Staff notes that the Cal ISO Report was submitted in a state proceeding before the California Select Committee to Investigate Price Manipulation of the Wholesale Energy Market (California Committee). The November 15 Cal ISO Report addresses and specifically refutes statements and allegations made by Mr. Robert McCullough in two earlier memoranda presented as part of his testimony before the state proceeding. In the memoranda he argues that the Enron strategies played a role in the blackouts during the winter of 2000–2001.

The Enron trading strategies clearly fall within the scope of the MMIP's antigaming and anomalous market behavior prohibitions. Indeed, one of the now infamous Enron memoranda that the Commission posted on the Web site for this proceeding even lists these prohibitions in a discussion of the trading strategies (however, the memorandum does not conclude whether or not the trading strategies are gaming or anomalous market behavior).

We will discuss the various trading strategies in the same order as in the Initial Report. We first focused on "load shift" because, by Enron's own admission, this was an explicit attempt to manipulate prices.

The second set of trading strategies discussed includes marketing power and energy in an effort to sell the product where it is needed the most. These strategies include various forms of exports and imports.

The last set of trading strategies involves deceitful tactics, such as providing false information or reporting imaginary transactions.

#### Price Manipulation—Load Shift

As described in the May 8, 2002 Data Request, the trading strategy known as load shift involves a company submitting an artificial load schedule in order to receive interzonal transmission congestion payments. Load shift involves deliberately creating congestion on a transmission line to increase the value of Enron's transmission rights and is clearly an attempt to manipulate prices. This Enron trading strategy is particularly complicated and its success was dependent, in part, on the independent bidding behavior of other entities.

By Enron's own admission, the load shift strategy was not very successful. Enron was not able to move the price paid for congestion

management. However, whether successful or not, it was a clear attempt to manipulate prices.

As described in the Enron memoranda, the load shift trading strategy involves creating the appearance of congestion by deliberately overscheduling in one zone (e.g., the southern zone) and underscheduling by a corresponding amount in another zone (e.g., the northern zone). For example, assume Enron's true load and resources were balanced by zone. Enron schedules an additional 100 MW of load in the southern zone and underschedules by the same 100 MW in the northern zone. This inaccurate schedule requires 100 MW of additional north-to-south transmission relative to Enron's true loads and resources. By shifting load in this manner, Enron created congestion and potentially raised congestion prices. This benefited Enron because it owned Firm Transmission Rights (FTRs) on the paths that it attempted to congest.

As stated in the Initial Report, Enron purchased 1,000 MW (62 percent) of the 1,621 MW in rights to north-to-south transmission on Path 26. The purchase of these FTRs cost Enron a total of $3.6 million. Path 26 is one of the two main transmission interfaces linking northern and southern California.[15] Enron's FTRs entitled it to collect a significant portion of all congestion revenues on Path 26 that were due to north-to-south congestion, the typical direction of congestion during periods of peak demand in the summer. This gave Enron an incentive to try to create—through a load shift—north-to-south congestion over this transmission line. If Enron could shift load and thereby increase the congestion price, it would be paid the higher price for all 1,000 MW of the FTRs.

The vast majority of Enron's congestion revenues were from Path 26 during July and August 2000, and totaled approximately $33 million for those 2 months for that path alone. This amount represented a considerable profit above the $3.6 million that Enron paid for the Path 26 FTRs, even though (as explained below) it was not able to manipulate the prices of congestion payments.

Enron was generally not able to move the cost of congestion because two large market participants, SoCal Edison and PG&E, often set the price for congestion relief over a large band of load used for congestion relief. Nonetheless, the false schedules that Enron

[15]It is useful to think of the California system as an hourglass figure, with the two transmission paths connecting the northern and southern zones. During the winter, these paths constrain lower-cost generation in the south from reaching load in the north. Conversely, during the summer, these paths constrain lower-cost generation in the north from reaching load in the south.

submitted added unneeded confusion to the already complex congestion management program that the Cal ISO administered. In this manner, Enron harmed the market. It is also important to not view the Enron trading strategies in isolation.

In an FTR Market Report dated December 1, 2000, the Cal ISO states that it actively monitored the FTR market and closely scrutinized Enron's scheduling behavior. The FTR Market Report noted that PG&E's underscheduling of load in the Cal PX day-ahead market could cause or exacerbate north-to-south congestion on Path 26. The Report concluded:

> It is important to note that the [Cal ISO's] examination of bidding behavior has revealed that the primary FTR owners on Path 26 were not the entities causing these congestion and load scheduling patterns. Rather, these patterns are the result of behavior by other load-serving entities. Thus the major FTR holders were the beneficiaries of usage charge revenues resulting from the cost minimizing bidding strategy of load-serving entities in northern California.[16]

While Enron's load shift trading strategy by and large did not move the price paid to relieve congestion, Enron nevertheless attempted to raise the price of congestion by artificially scheduling load in the hopes that it could collect higher revenues. This trading strategy was defeated, not by market rules or oversight, but rather by the actions of other companies (primarily PG&E in the north and SoCal Edison in the south) that were underscheduling load, contrary to the market design rules. Both of these behaviors would be prohibited by Staff's recommendation to prohibit submission of false information. Market rules should also be designed to economically discourage infeasible schedules.

Finally, we note that in Mr. McCullough's testimony before the California Committee, he references a letter from a former Enron employee named David Fabian to Senator Boxer. The letter refers to Enron's rights to north-to-south transmission on Path 26. According to Mr. McCullough's testimony, this person "heard" that Enron overbooked the line and that Enron "was allowed to price-gouge at will." Both Staff's analysis and the Cal ISO analysis of the economic impact of this Enron strategy indicate that this allegation is wrong. Additionally, this former Enron employee alleged that this overbooking strategy resulted in 2 days of rolling blackouts in northern California in the summer of 2000. Staff notes that this Enron scheme was designed to increase its congestion revenues. However, there is no

[16] FTR Market Report, p. 35.

evidence to suggest that any of the schemes or other practices discussed in the Enron memos contributed to the blackouts that occurred in California. As a general matter, congestion schemes such as this raise prices but do not factor into actual power flows.

Staff concludes that load shift falls within the definition of gaming because it involves taking unfair advantage of the Cal ISO's or Cal PX's tariffs or rules, "to the detriment of the efficiency of, and of consumers in, the ISO [or PX] Markets."[17] To the extent that load shift involves creating false congestion or the receipt of excess congestion revenues, it also involved "taking undue advantage of . . . transmission constraints in periods in which exist substantial Congestion."[18] Finally, since load shift is a prime example of price manipulation, it is also a behavior that makes the Cal PX or Cal ISO markets "vulnerable to price manipulation to the detriment of their efficiency."[19] In short, we conclude that all companies, including Enron, that engaged in load shift violated at least MMIP 2.1.3.

#### Price Maximization—Exports

The following two trading strategies involve using exports and imports in some way to sell power where or when it is most valued.

##### Export of California Power

The trading strategy known as "export of California power" involved buying energy at the Cal PX to export outside of California in order to take advantage of the price spread between the California market (which was capped) and the uncapped markets outside of California.

As noted in our Initial Report, fewer than a dozen entities either admitted to engaging in exports of California power or gave answers other than a denial. However, Staff notes that data indicate an increase in total exports from California during this period.

In narrative responses to the May 8 Data Request, various market participants argue that some of the Enron trading strategies, such as exports of California power, are examples of economically rational behavior, or legitimate arbitrage. They note that the Cal PX, Cal ISO, and the Commission have never implemented market rules prohibiting the export of energy from California. Respondents maintain that exporting power outside of California in order to reach other market opportunities, or to take advantage of a price spread, is good business

[17] MMIP 2.1.3.
[18] Id.
[19] Id.

practice. They argue that, from an individual entity's perspective, an export may have provided an optimal business opportunity.

For example, some respondents state that California generators may have wanted to make a long-term sale to avoid being entirely exposed to the California spot markets. Staff notes that, under California's restructuring plan, the three California public utilities were required to buy their energy in the spot market. This created an incentive for entities with in-state generation who desired to enter into forward sales to seek markets outside of California. Also, they simply may have exported spot sales to avoid the price cap in California.

While it may have been a rational economic decision for an individual company to export its power to a market with higher prices, the large amount of exports collectively contributed to the scarcity in California during 2000–2001. The Enron trading strategy called "thin man" (described as the opposite of the strategy called "fat boy") involved submitting a false schedule that artificially decreased load in California and an equal amount of energy exports. Moreover, if entities other than Enron acted in concert on a coordinated basis to implement this strategy, it would represent a form of cooperative corporate behavior with significant ramifications.

Historically, California has relied heavily on generation imports to meet its peak summer needs. However, the summer of 2000 did not follow this pattern. In fact, compared to earlier periods, the total amount of power exported from California during that summer was significantly larger than expected. This anomaly has been the subject of prior reports and studies. For example, a report by the General Accounting Office (GAO) on California restructuring indicated that monthly exports from May through October 2000 were between 40 and 230 percent higher than the same months in 1998 and 1999. Overall, exports were approximately 200 percent higher from May through October 2000 than in the same period in either 1998 or 1999.[20]

When California deregulated its retail electric market, the three California public utilities sold their oil- and gas-fired generation assets to other entities that did not have franchised service areas or an obligation to serve particular customers. At the time, this was a unique retail market structure in the West. The differences in retail market structures, including the mandated reliance on the spot market in California, contributed to the regional market problems. A merchant

[20]U.S. General Accounting Office, *Restructured Electricity Markets: California Market Design Enabled Exercise of Market Power*, Report No. GAO-02-828 (released July 2002), p. 32 (GAO California restructuring report).

generator who exported power out of California in search of a better price or the opportunity to sell in forward (rather than spot) markets was behaving in a rational economic manner. Existing, vertically integrated utilities in neighboring states still had an obligation to serve their native load from their own generation resources. When it was economical, these utilities also bought generation from California to serve their load or for resale in other Western markets, whichever was most valuable.

Staff concludes that the export trading strategy was largely the result of asymmetrical market rules under which products were sold where they brought the highest price.

### Ricochet or Megawatt Laundering

The trading strategy known as "ricochet" or "megawatt laundering" involved one entity buying energy from the Cal PX in the day-ahead market and exporting it to a second entity, which received a fee from the first company. The energy was later sold to the Cal ISO in the real-time market (or as an out-of-market sale).[21]

Ricochets necessarily involve multiple entities, and the responses to Staff's data requests indicate that there was an abundance of willing counterparties. Because both generation and transmission were required, Enron needed others to move power into and out of the Cal ISO system. As noted in our Initial Report, most of the transmission facilities critical for these trading strategies that are directly connected to the Cal ISO system are owned or controlled by nonpublic utility California municipals, including the Transmission Agency of Northern California (TANC) and the City of Los Angeles Department of Water and Power (LADWP).

In addition to California transmission systems not operated by the Cal ISO, Enron also relied on transmission systems in the Pacific Northwest, specifically, those of Bonneville Power Administration (BPA), Avista, and Enron's public utility affiliate, Portland. Transcripts of Portland traders and transmission personnel include detailed instructions by Enron personnel on how the various participants (Portland and Avista) were to record transactions and how to report the various parts of the transactions consistent with NERC requirements and the Commission's regulations.

[21]If there were insufficient bids in the Cal ISO real-time market, the Cal ISO, as a last resort to procure the resources necessary to operate the system, would purchase energy out of its market. These out-of-market resources were paid their bid, but did not affect the market-clearing price paid to other generators.

Entities routinely try to capture profits from price differences that exist between different time periods, e.g., purchasing power in the day-ahead market and selling it in real time. The actual price in the real-time market can be higher or lower than the original price paid in the day-ahead market. Entities that engage in these strategies assume this arbitrage risk where others are unwilling to do so.

During the 2-year review period, this trading strategy could also be used to avoid the price caps that were set in the Cal ISO real-time market. This is because the Cal ISO also bought power out of market at the last minute when there was insufficient supply bid into its market. These out-of-market purchases were typically priced above the price cap. Suppliers knew that the Cal ISO would pay any price in an effort to avoid blackouts. In the Initial Report, Staff concluded that this behavior (raising prices at the last minute, when buyers are unable or incapable of saying no) was not legitimate arbitrage, but was an exercise of market power. We reaffirm this conclusion and view it as inappropriate gaming of the system.

Staff concludes that the ricochet trading strategy, at a minimum, is an example of anomalous market behavior—that is, "behavior that departs significantly from the normal behavior in competitive markets that do not require continuing regulation or behavior leading to unusual or unexplained market outcomes."[22] Indeed, the MMIP includes as one of the examples of anomalous market behavior "unusual activity or circumstances relating to imports from or export to other markets or exchanges."[23] In short, Staff concludes that all entities that engaged in the ricochet trading strategy violated at least MMIP 2.1.1.5.

The Enron memoranda indicate that Enron included the generation of other sellers, such as British Columbia Power Exchange (Powerex) and Puget Sound Energy, Inc. (Puget), when employing this trading strategy. In addition, Cal ISO data indicate that during the critical period of the first week in December 2000, 10 market participants may have engaged in this trading strategy and may have generated close to $10 million in profits. The 10 market participants are listed in descending order of potential profits:[24]

---

[22]MMIP 2.1.1.

[23]MMIP 2.1.1.5.

[24]These transactions represent exports and imports by the same entity; therefore, the screen used by the Cal ISO is very conservative because it does not include transactions in which the import and export legs were performed by two or more parties. (See Issue 3 Chart in Cal ISO's Response to Staff's February 10, 2003 Data Request.)

- Puget Sound Energy
- Powerex or British Columbia
- Avista Energy Inc.
- Los Angeles Department of Water and Power
- PacifiCorp
- Enron Energy Services, Inc.
- Portland General Electric
- Bonneville Power Administration
- Arizona Public Service Corporation
- Idaho Power Company (also referred to as Ida Corp.)

Staff concludes that, to the extent these 10 market participants used exports from California prior to real time in order to withhold generation until the last minute for sales to the Cal ISO, such activity is an exercise of market power and a violation of the Cal ISO tariff.

Staff recommends that the potential ricochet transactions of the 10 entities listed in this section be part of the show cause order discussed later in this section.

**Trading Strategies Based on False Information**

The following trading strategies are all premised on submitting false information schedules. One trading strategy, fat boy, was designed to offset the bidding strategies of the California public utilities. In addition, this strategy itself did not affect market outcomes. The other trading strategies are all attempts to fabricate transactions for profit and to change market outcomes.

After the Staff Initial Report was released, Jeffrey Richter, an employee of Enron and the manager of the Short-Term California trading desk in 2000, pleaded guilty to several counts. The February 3, 2003 Plea Agreement states that he and other individuals at Enron agreed to devise and implement fraudulent schemes through the California spot markets. In this regard, the schemes required them to submit false information to the Cal ISO in the electricity and ancillary services markets. The Plea Agreement states the following:

> Among other things, we knowingly and intentionally filed energy schedules and bids that misrepresented the amount and geographic location of the load we intended to serve. We

> did so for the purpose of increasing the appearance of congestion on transmission lines, increasing the market price for congestion fees for transmission between zones, earning congestion payments that otherwise would not have been available, and increasing the values of our FTRs (which only generated revenue when congestion existed).
>
> We also submitted bids to supply ancillary services that we did not have, or did not intend to supply, in the ISO's day-ahead ancillary services market. The bids we submitted contained fabricated information regarding the source and nature of the ancillary services we proposed to supply to the ISO. Once the bids were accepted, we would cancel our obligation to supply the ancillary services by purchasing them in the ISO's hour-ahead ancillary services market. Enron would then profit by capturing the difference in price between the two markets.

### Fat Boy (or Inc-ing Load)

The fat boy trading strategy involved a scheduling coordinator, such as Enron, artificially increasing ("inc-ing") load on the schedule it submits to the Cal ISO to correspond with the amount of generation in its schedule.[25] Under California market rules, all schedules submitted to the Cal ISO had to be balanced (i.e., load and generation had to be equal). The company then dispatched the generation it scheduled, which was in excess of its actual load. This resulted in the Cal ISO paying the company for the excess generation at the clearing price established in the real-time market.[26]

Staff emphasizes that this trading strategy was conceived and used in response to the procurement strategy used by the three California public utilities, which itself was a response to the unintentional interplay of Cal PX and Cal ISO market rules. The Cal PX, as the scheduling coordinator for the three California public utilities, was required to send the Cal ISO a schedule that balanced an equal amount of generation and load. The Cal PX day-ahead market cleared before the Cal ISO market, which was capped at various levels (depending on the date). Under the original California restructuring program, PG&E and the two other California public utilities were supposed to "bid all

---

[25]An Enron strategy with the opposite market effect was called thin man, in which a load is artificially reduced and a corresponding amount of generation is exported out of California.

[26]Staff performed an electronic search of the Enron transaction database (Enpower) with an explicit reference to "fat boy." This search produced approximately 100 transactions predominantly in coordination with the Cities of Glendale and Redding, California and Valley Electric.

of their generation into the Power Exchange and satisfy their need for electric energy on behalf of their full service customers with purchase made from the Exchange" (D.95-12-063). California required this buy-sell procedure in order to: (1) provide price transparency, (2) mitigate market power and reduce the burden of regulatory issues, (3) ensure that customers would receive the benefit of competitive market prices, and (4) provide sufficient depth to the PX such that its market signals could be relied on as a benchmark.

In an effort to minimize their procurement costs under the California market rules, the three California public utilities, especially PG&E, habitually underscheduled their load in the Cal PX market. In other words, they would only buy energy in the Cal PX market that was priced at or below the capped Cal ISO real-time market, relying on the fact that residual load could be supplied in the Cal ISO real-time market at capped prices. PG&E's strategy involved a deliberate attempt to push the Cal PX price below the capped price in the Cal ISO real-time market.[27]

PG&E's load makes up a significant portion of the load in California. Its load represents approximately 85 percent of the demand in northern California, the NP15 zone. Therefore, PG&E's decisions on how to bid its demand have a significant impact on both buyers and sellers in the market. Due to PG&E's large size, changes in the company's bidding behavior that represented a shift from the market design not only caused uncertainty and volatility but also greatly influenced a number of market outcomes, including market-clearing prices. The most obvious problem was shifting a large percentage of its load out of the Cal PX day-ahead market, causing the load to be met with the Cal ISO's real-time market, resulting in increased reliability problems.

Bid data submitted by PG&E to the Cal PX on August 26, 2000 demonstrated its bidding strategy. PG&E's expected load between 12:00 and 1:00 p.m. was 9,060 MW. PG&E's bid indicated that it was only willing to purchase its total expected load if the price was less than or equal to $75/MW in that hour. As the Cal PX price increased, PG&E was willing to purchase decreasing amounts. For example, if the expected price rose to $200/MW, PG&E was only willing to purchase half of its total expected load (4,530 MW). Because the actual clearing price in NP15 that hour was $249.39/MW, PG&E actually purchased 3,813 MW in the Cal PX. As a result, the

[27] As initially proposed in the November 1, 2000 Order and as adopted in the December 15 Order, the Commission halted the practice of near-total reliance on the spot market to allow the three California public utilities to procure a more balanced portfolio and to procure resources under long-term contracts.

remainder of PG&E's load (5,242 MW) would have to be served by purchases in the Cal ISO's real-time market. Due to this bidding strategy, an equal amount of supply was not committed in the Cal PX day-ahead market.

The obvious short-term effect of PG&E's bidding strategy was to reduce the amount of load in the Cal PX day-ahead market, which reduced the price for every megawatt purchased in that market. However, this bidding strategy had the opposite effect on the Cal ISO real-time market. By increasing the amount of load served by the Cal ISO's real-time market, the price for every megawatt served increased. Due to PG&E's large size, its actions caused the market prices to move up and down appreciably.

Another disruptive market outcome caused by PG&E's bidding strategy occurred in December 2000. During this period, other market participants were willing to pay more for energy in the Cal PX market, which resulted in PG&E's transition from a net buyer of generation (including its own resources bid into the market) to a net seller. In other words, PG&E's bidding strategy resulted in the loss of its own generation to buyers, including out-of-state entities. This, of course, resulted in an even greater amount of PG&E load relying on service from the Cal ISO in real time. According to PG&E, after it began losing its own generation to other buyers, it sought California Public Utilities Commission (CPUC) support to use an alternative bidding approach to keep its own low-cost generation for its retail customers. Even after discussions with CPUC President Lynch's office and the head of the Energy Division, it did not receive support to use the alternative bidding approach. Furthermore, the Cal ISO raised new reliability concerns.[28] Only after the FERC lifted the requirement that utilities sell their generation into the Cal PX market on December 15, 2000 was PG&E able to keep all of its own generation and contracts to meet its customers' demand.

While this procurement strategy attempted to minimize the public utilities' wholesale electricity costs, underscheduling caused chronic operational and reliability problems for the Cal ISO (as documented in numerous filings with the Commission). The Cal ISO's real-time market was designed to supply only the small amount of energy (less than 5 percent) needed to constantly balance generation with actual load. Chronic underscheduling in the Cal PX day-ahead market transformed this "balancing" market into an energy commodity market that served far more load than it was designed to supply. The uncertainty of not knowing how to supply a much larger percentage of

[28]PG&E e-mail dated January 30, 2001 (p. 0221) of their response to Staff's data request.

the load until real time caused considerable reliability problems for the Cal ISO. In short, California load-serving entities were using the real-time market for a purpose for which it was not intended.

Shifting load out of the day-ahead market into the real-time market put additional market pressure on the Cal ISO. When insufficient supplies were available in the Cal ISO real-time market, the Cal ISO was forced to procure necessary supplies through out-of-market purchases that were not subject to a price cap. The uncertainty of this last-ditch effort to procure necessary resources was significant. In addition, the end result was that energy prices in real time were often much higher than the Cal PX clearing price. The effect of both the higher Cal ISO clearing prices and the still higher out-of-market prices was felt by all load-serving entities until December 8, 2000, when the Commission issued its Order Accepting Tariff Amendment on an Emergency Basis. On that date, the Cal ISO made an emergency filing to amend its tariff in an effort to curb the underscheduling problem and to protect the reliability of the system. After this order, only entities that underscheduled or caused the imbalance were directly assigned the costs of out-of-market purchases.

In its filing, the Cal ISO stated that it had been forced to declare Stage 2 Emergencies for the previous 4 days, and saw no immediate relief. The Cal ISO requested three tariff modifications as follows:
(1) increase the amount of generation in the real-time market by allowing bids above the then-current $250 cap (such bids would not set the market-clearing price); (2) assess penalties (twice the highest price paid by the Cal ISO) against generators that refused to operate in response to a Cal ISO dispatch instruction and, if firm load was curtailed, an additional penalty of $1,000/MWh for energy a generator failed to deliver; and (3) underscheduling entities such as PG&E would be allocated the highest priced energy and out-of-market purchases. Given the extraordinary circumstances, the urgency of the request, and the overriding reliability concerns, Commission acted immediately to accept the Cal ISO's proposed tariff changes.

The fat boy trading strategy was a response to this underscheduling problem. Under California market rules, all scheduling coordinators (e.g., Cal PX and others, such as Enron) were required to submit to the Cal ISO day-ahead schedules that were balanced. The fat boy trading strategy was a way to preschedule on a day-ahead basis an imbalance sale in the Cal ISO's real-time market. While neither underscheduling nor inc-ing load was an intentional part of California restructuring, it is clear to Staff that underscheduling was of far greater concern to the Cal ISO, no doubt because it led directly to reliability problems. Indeed, some of the respondents informed Staff that the Cal ISO

actually helped them to engage in the fat boy trading strategy by providing them with artificial or simulated load and delivery points. For example, an entity with only generation and no load could not submit a balanced schedule to the Cal ISO. According to Reliant, the Cal ISO created an artificial load point that enabled Reliant to submit a balanced schedule to the Cal ISO.

Enron's use of the fat boy trading strategy did not set the market-clearing price in the Cal ISO's real-time market. Under California market rules, entities are price takers for the amount of generation in excess of actual load; that is, they are paid the clearing price that is established in the Cal ISO market.[29] Nevertheless, the submission of false schedules, and the Cal ISO's encouragement of such fabrications to circumvent the balanced schedule rule, would be prohibited under Staff's recommendations in the Initial Report. The Initial Report included a recommendation that all tariffs for market-based rates include an express prohibition against submitting false information. In addition, all open access transmission tariffs should be amended to include this prohibition. Flawed market rules that are not working as intended should be amended by the Commission, not circumvented by market participants. More significant was the elimination of the market rule that held the three California public utilities in the spot market. As stated in the Initial Report, allowing a greater use of forward contracting resulted in far less reliance on the spot market, thus reducing the economic incentive for this trading strategy.

While Staff has concluded that the fat boy trading strategy alone did not set the market-clearing price in the Cal ISO's real-time market, and may in fact have been encouraged by at least one Cal ISO employee, this trading strategy nonetheless involves the deliberate submission of false information and falls within the scope of the antigaming provision because it necessarily involves taking "unfair advantage" of the Cal ISO's rules and may otherwise have made the "ISO Markets vulnerable to price manipulation to the detriment of their efficiency."[30]

---

[29]The day-ahead and real-time imbalance pricing during May 20-23, 2000 illustrates this trading strategy. Unexpected high loads occurred on May 20-21, which caused prices in the Cal ISO real-time market to reach the $750 price cap while the Cal PX day-ahead prices were in the $40 to $50 range. Reacting to these prices, Enron and British Columbia Power Exchange Corporation overscheduled between 1,000 and 2,000 MW of generation as "price takers" in the Cal ISO real-time market on May 22. Because the Cal ISO market continued to exceed the Cal PX day-ahead prices, the fat boy strategy was profitable relative to selling in the Cal PX. On May 23, 2000, these two scheduling coordinators continued to overschedule more than 1,000 MW in the Cal ISO imbalance market. However, the Cal ISO's market dropped to the $200 range, while prices in the Cal PX rose to the $300 to $500 range. Thus, this overscheduling strategy ceased, for a time, to be profitable relative to selling in the Cal PX.
[30]MMIP 2.1.3.

### Underscheduling by the Three California Public Utilities

California public utilities submitted false schedules when they knowingly underscheduled their loads to the Cal PX. Their underscheduling violated the California restructuring plan and the antigaming provisions of the Cal ISO and Cal PX tariffs. Both of these conclusions are true irrespective of the fact that the California public utilities viewed this practice as a cost minimization strategy. While the Commission has the authority to order disgorgement of profits, there are no profits to disgorge from a price-reducing strategy.

### Cal ISO Actions

Staff is also concerned that a review of certain Cal ISO reports indicates a complacency with the submission of false schedules, such as in the fat boy trading strategy. The Cal ISO issued a report by its Department of Market Analysis entitled, "Did Any of Enron's Trading and Scheduling Practices Contribute to Outages in California?" This report, which was reviewed by the Market Surveillance Committee, addressed issues raised by Robert McCullough before the California Committee. The report concludes that, based on data available to the Cal ISO, the Enron practices reviewed by Mr. McCullough did not cause the blackouts during the winter of 2001. Rather, the blackouts were caused by a combination of the limited supply of energy that was made available to the Cal ISO and limited transmission capacity available to deliver energy from southern to northern California.

Within this context, an addendum to the report discusses the fat boy trading strategy. Again, the Cal ISO report criticizes Mr. McCullough's previous analysis, but in doing so, the Cal ISO appears to view this strategy as benign or even helpful because it "simply has the effect of reducing the Cal ISO's projected demand for imbalance energy that must be procured by the Cal ISO to meet real time load." The Cal ISO also describes how, in performing its daily operations (such as system load projections and reserve requirements), it ignored the false information contained in the schedules submitted by Enron and others. The report seems to indicate that the Cal ISO was aware of the false underscheduling by the California public utilities and the counterbalancing effects of the false overscheduling of load by Enron and others.

Because the Cal ISO is the control area operator of the transmission grid, it is imperative that the Cal ISO identify poorly designed market rules and make filings with the Commission proposing solutions. However, the Cal ISO must implement the Commission-approved

Commission issued the April 26, 2001 Order, it stopped using hockey stick bidding.

In response to the California Parties' allegations of noncompetitive bidding behavior by these entities, they renew arguments previously made in various proceedings before the Commission in an effort to justify their high bids. Their explanations include: (1) the difficulty in determining the marginal cost of a unit, particularly with respect to startup costs; (2) because there is no capacity market in California, using a marginal cost standard is inappropriate; and (3) a marginal cost standard does not recognize market uncertainty, "scarcity rents," and legitimate opportunity costs during the summer of 2000. Examples of plants with opportunity costs are limited run-time units, including fossil-fuel plants in California that have operating time limits in their air emissions permits or that must acquire scarce emissions credits. The generators maintain that such units should be bid at the price one would expect to receive during the highest-priced period in the future. They also argue that hockey stick bidding is appropriate for the last increment of a unit because it recognizes the risk of a forced outage. In this event, the seller must purchase replacement energy to meet its commitment. They also argue that it is appropriate to hold units in reserve as a physical hedge against the unexpected loss of a unit.

Staff finds that these arguments are unpersuasive and do not adequately explain the dramatic rise in prices starting in May 2000. Such high bids and clearing prices far exceed the level needed to recover the capacity costs of generation. Market uncertainty existed prior to and after the summer of 2000, and this does not explain the price spike. The argument regarding opportunity costs is not persuasive because the units were first bid at $750 and then progressively lower through the summer of 2000. Using hockey stick bidding plus a physical hedge as insurance for a possible forced outage appears duplicative. Finally, Staff has explained that the MMIP was part of the Cal ISO's and Cal PX's filed rate schedules.

**Recommended Commission Responses**

Staff recommends that the Commission issue an order to LADWP, Dynegy, Mirant, Reliant, Williams, BPA, Powerex, Enron, and Idaho Power directing them to show cause why their behavior during May 2000 through October 2, 2000 does not constitute a violation of the Cal ISO or Cal PX tariffs, with disgorgement of unjust profits associated with the violation or other appropriate remedies.

The market participants discussed in this section of the Report displayed bidding patterns that were higher early in the summer (May and June) than in subsequent summer months even though input costs

(such as the cost of natural gas) nearly doubled during that same time period. The data suggest that these market participants' high bidding behavior was not disciplined by their cost inputs; they simply bid the then-existing price cap—riding the cap from $750 to $500 and then to $250. Taking the example of a hypothetical unit with a 15,000 Btu/kWh heat rate, a bid of $250/MWh in September when gas costs were $6/MMBtu would generate $90 for the cost of fuel and $160 as a margin to recover fixed costs, scarcity, etc. A $250 bid in May for the same unit when gas costs were $3.72/MMBtu would generate $56 for the cost of fuel and $194 as a margin to recover fixed costs, scarcity, etc. Conversely, a $750 bid in May would produce a margin of approximately $700.

Staff notes that during the summer of 2000, legitimate scarcity costs should have increased from May to September as the California ISO weather-dependent demand increased. Yet, bidding patterns of these generators show that their bids were not directly related to load levels and associated scarcity levels. Staff also notes that the creditworthiness issue did not arise until after the summer period, so credit risk is not valid support for anomalous bids during this period. Similarly, the emission costs rose steadily in 2000 as the year progressed. If suppliers were willing to voluntarily supply at $250 in August and September as cost inputs rose dramatically, their bids above this level earlier in the summer (when cost inputs were far less) are highly questionable. However, Staff believes that there is reasonable support for prices that include a scarcity premium above marginal costs to reflect the severe scarcity that occurred during the summer of 2000. Bids at the $250 level during August and September reflect the supply/demand imbalance in the Western markets, emission restrictions in the California market, and risks involved in pushing older generating units to their operating limits day after day. Given these circumstances, Staff recommends that the Commission investigate all bids over $250 during the period May 1 through October 1, 2000.

During the summer of 2000, Staff notes that one large in-state generator (Duke) submitted bids that appear to be more representative of its actual generation input costs. A possible explanation is that during this time period, unlike the other four large in-state generators, Duke was not heavily exposed to the spot market. During this period, Duke had committed a large amount of its generation to forward purchases. While Duke may have benefited during this period, like all other entities that received a clearing price above their bid, this does not constitute a violation of the Cal ISO or Cal PX tariffs. As noted, Duke's high bids are covered by the refund proceeding.

Staff notes that the transactions with the Cal ISO during the October 2, 2000 forward period are already subject to refunds. This appears to be an appropriate remedy for excessively high bidding. The Commission's June 19, 2001 Order discussed an example of Duke's high bidding behavior in February 2001. In that order, the Commission noted that Duke had bid $3,880/MWh. Duke maintained that this bid was a negotiating tool to recover payment for prior transactions and that it included a credit premium. The Commission noted that this premium exceeded Duke's variable costs by an order of magnitude. The Commission found that Duke's bidding at multiples of its marginal costs in an attempt to recover past-due amounts can in no way be found to be just and reasonable. The entire period in which Duke submitted high bids to the ISO is covered by the refund proceeding.

Finally, as for any transactions with CERS, Staff notes that such transactions are not under the Cal ISO tariff and are therefore not subject to the MMIP. The California Parties submitted a comprehensive list of all transactions with CERS in Exhibit No. CA-197. Staff's review of these data indicates that Duke's transactions, like most transactions with other parties, were under the Western Systems Power Pool Agreement. Therefore, Staff recommends that Duke not be subject to a show cause order.

**Physical Withholding of Generation**

During two days in June 2000, certain Reliant employees reduced the quantity of megawatts offered to the Cal PX on a day-ahead basis below the amount that normally would have been offered under the existing market conditions. Specifically, on Monday, June 20, Reliant reduced the capacity it bid into the Cal PX for delivery on June 21 by approximately 1,000 MW. Reliant increased only slightly the amount of capacity it bid into the Cal PX on June 21 for delivery on June 22. Reliant elected to perform discretionary maintenance on generating units whose output otherwise would have been offered to the Cal PX for those days.

By order dated January 31, 2003, in Docket No. PA02-2-001, the Commission approved a Stipulation and Consent Agreement (Agreement) between Staff conducting the investigation in this proceeding and Reliant resolving the actions taken on these two days with respect to sales that would have occurred in the Cal PX market. Under the Agreement, Reliant agreed to pay approximately $13.8 million directly to customers of the Cal PX that purchased energy in the Cal PX's day-ahead market on June 21 and 22. As explained in the

order, the payment reflects the worst-case scenario of the maximum effect of Reliant's withholding on the California market.

Since the issuance of this order, various entities have submitted evidence regarding other alleged incidents of physical withholding by various market participants in the California markets. These allegations are not dealt with in this Staff Report. The issue of potential physical withholding is the subject of a separate and ongoing investigation.

### Reliant and BP Energy Traders Appear To Have Engaged in Coordinated Efforts To Manipulate Market Prices

In the course of the investigation, Staff uncovered instances of traders from Reliant and BP Energy (BP) apparently coordinating their efforts to manipulate western electricity prices. Specifically, on three occasions a trader from BP contacted a Reliant trader and asked him to buy electricity from an offer he was going to place on an electronic trading platform (Bloomberg). The BP trader would then sell the power back to the Reliant trader at the same price, but the transaction would not take place on the electronic trading platform.

On at least one of the occasions, the BP trader is seemingly manipulating the market price (in this case, electricity delivered at Palo Verde, a large trading hub in Arizona) in order to affect the value of his trading position for mark-to-market accounting purposes. The Reliant trader appears to have no particular interest in manipulating the market price; he simply goes along with the BP trader's scheme. The evidence comes from recorded telephone conversations and transcripts provided to Staff by Reliant under Docket No. PA02-2-000.

Staff has evidence that in April 2000, the BP trader contacted the Reliant trader and asked him to do him a favor. The BP trader (1) will offer to sell electricity on the Bloomberg electronic platform, (2) the Reliant trader will buy at the posted price, and (3) the BP trader will buy back the power (off the exchange) at the same price to negate the deal. The BP trader goes on to explain that he is trying to move the market price to $43.10 but no one will buy it at that price, so he needs the Reliant trader to "lift his offer" in order to increase the price.

Our evidence indicates that several days later, the same BP trader contacted the same Reliant trader and offered him a similar proposal. Again, the BP trader is trying to manipulate the price in order to

increase the value of his trading position under the company's mark-to-market accounting.

The BP trader goes on to explain that they are marking their books on the October Palo Verde price. He notes that power for delivery in October at Palo Verde had traded as high as $44. He wants to move the price even higher because of his long position. He indicates that he will post an offer to sell at $44.15 and asks the Reliant trader to lift that offer and then he will buy it back from him at the same price. The BP trader then posts the offer on Bloomberg.

Later that day, the BP trader instructs the Reliant trader to lift the offer because he senses the market beginning to move. The Reliant trader lifts the offer and asks the BP trader what they should do next. The evidence indicates that the BP trader informed the Reliant trader that he will buy the power back at the same price.

Significantly, when Staff asked BP for information and telephone transcripts of these events, BP simply stated that it had no information regarding the activity of its trader.

One of the concerns regarding the apparent price manipulation described above is that it occurred at an important trading hub (Palo Verde) that was presumed to be very liquid and thus not subject to price manipulation. Electricity price indices are a critical part of the market price formation process, and this market was clearly being manipulated.

Therefore, Staff recommends that the Commission initiate proceedings to revoke Reliant's and BP's ability to sell power at market-based rates.

**Spot Prices in the Pacific Northwest—Docket No. EL01-10-000, et al.**

The proceeding in Docket No. EL01-10-000, et al. was established to "facilitate development of a factual record on whether there may have been unjust and unreasonable charges for spot market bilateral sales in the Pacific Northwest" for the period December 25, 2000 through June 20, 2001. On September 24, 2001, the presiding Administrative Law Judge (ALJ) issued her proposed findings of fact and recommendations. The ALJ found that while California spot electricity prices affected electricity prices in the Pacific Northwest, prices in the region were driven up by a combination of factors, including reduced hydro generation due to the drought, increased demand, and relatively high

natural gas prices. In essence, the ALJ concluded that the record did not support allegations of market manipulation.

In numerous orders, the Commission has stated that the spot markets in the West are integrated. Staff's Final Report concludes that the California spot electricity markets were manipulated. This chapter explains that a variety of strategies were used by Enron and various market participants in an effort to manipulate various market outcomes in California. The manipulations used a variety of techniques, including submitting false information, creating false transmission congestion, and importing and exporting power into and out of California. All of these manipulations may have affected spot prices in the Pacific Northwest.

During the course of its investigation, Staff sent a blanket data request to all sellers of electricity in the West for specific transaction data, including actual monthly sales data for bilateral transactions at the Mid-Columbia (Mid-C) trading hub and the California-Oregon Border (COB) trading hub. These are the two primary trading locations in the Pacific Northwest for bilateral electric sales and purchases. These transaction data indicate that, especially during the refund period (January 2001 to June 2001), there was a significant increase in spot prices in the Pacific Northwest similar to the rise in spot prices in California. Because there are no single clearing price markets in the Pacific Northwest, Staff has used bilateral sales of 1 month or less that are entered into no more than 1 month in advance of delivery for spot transactions. Staff has calculated average monthly implied heat rates based on the cost of gas at Malin and Sumas (the two main gas hubs that correspond to power delivered at Mid-C and COB). To perform this calculation, Staff divided the average cost of spot sales (approximately 650 transactions) by the average monthly cost of gas. Table VI-2 illustrates Staff's results.

**Table VI-2. Implied Heat Rate**

| Delivery Month | Cost of Gas ($/MMBtu) | Average Spot Price ($/MWh) | Implied Heat Rate |
|---|---|---|---|
| January 2001 | $9.08 | $393 | 43,282 |
| February 2001 | $7.99 | $275 | 34,418 |
| March 2001 | $6.20 | $291 | 46,935 |
| April 2001 | $7.32 | $293 | 40,137 |
| May 2001 | $4.79 | $318 | 66,388 |
| June 2001 | $3.33 | $285 | 85,585 |

Staff's preliminary analysis indicates that the run-up of spot prices in the Pacific Northwest region is not fully explained by input prices such as the cost of natural gas. The transaction data reviewed by Staff indicate that during the previous 7 months (May to December 2000) there were approximately 2,000 transactions with average monthly prices ranging from $51/MWh to $167/MWh.

Staff has also analyzed the spot sales transaction data in order to estimate the variable cost of production and the remainder, which could be considered the capital cost recovery of the generation plant. As previously discussed, the capital recovery requirement of a new combined cycle gas turbine is between $85 and $100/kW per year, or approximately $16 to $19/MWh at a 60-percent plant factor (see Table VI-3).

**Table VI-3. Estimated Capital Cost Recovery**

| Delivery Month | Cost of Gas ($/MMBtu) | Average Spot Price ($/MWh) | Cost Recovery at 15,000 Heat Rate | Remainder for Capital Cost |
|---|---|---|---|---|
| January 2001 | $9.08 | $393 | $136.20 | $256.80 |
| February 2001 | $7.99 | $275 | $119.85 | $155.15 |
| March 2001 | $6.20 | $291 | $93.00 | $198.00 |
| April 2001 | $7.32 | $293 | $109.80 | $183.20 |
| May 2001 | $4.79 | $318 | $71.85 | $246.15 |
| June 2001 | $3.33 | $285 | $49.95 | $235.05 |

An analysis of the transaction data indicates that, assuming a heat rate of 15,000 Btu/kWh to generate the spot sales, the average monthly

sales prices recover the cost of gas and the remainder (the last column of the table) would far exceed the capital costs needed for the plant.

**Recommended Commission Responses**

Based on Staff's preliminary analysis, Staff recommends that the Commission remand this proceeding back to the ALJ in order to consider the additional evidence received after her initial findings.