**PLAINTIFFS PACIFIC GAS AND ELECTRIC COMPANY, SOUTHERN CALIFORNIA EDISON COMPANY, AND SAN DIEGO GAS & ELECTRIC COMPANY'S APPENDIX TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

**VOLUME 3 OF 3**

**Part 3 of 6**

ORIGINAL

HUNTON & WILLIAMS
2000 PENNSYLVANIA AVENUE, N.W.
WASHINGTON, D.C. 20006-1812
TELEPHONE (202) 955-1500
FACSIMILE (202) 778-2201

BRUSSELS, BELGIUM
WARSAW, POLAND
HONG KONG
NEW YORK, NEW YORK
ATLANTA, GEORGIA
RICHMOND, VIRGINIA

MCLEAN, VIRGINIA
NORFOLK, VIRGINIA
RALEIGH, NORTH CAROLINA
CHARLOTTE, NORTH CAROLINA
KNOXVILLE, TENNESSEE

ER96-1447-000

FILE NO.: 49148.000002
DIRECT DIAL: (202) 955-1542

March 29, 1996

FILED
OFFICE OF THE SECRETARY
96 MAR 29 AM 10: 13
FEDERAL ENERGY REGULATORY COMMISSION

By Hand

Ms. Lois D. Cashell, Secretary
Federal Energy Regulatory Commission
Dockets Room, Room 1A
888 First Street, N.E.
Washington, D.C. 20426

Restated Agreement for
Mid-Continent Area Power Pool

Dear Ms. Cashell:

The Mid-Continent Area Power Pool (MAPP), by counsel, on behalf of its members who are subject to the jurisdiction of the Federal Energy Regulatory Commission (Commission) as "public utilities" as defined in Section 201(e) of the Federal Power Act (FPA), hereby files its Restated Agreement to amend and restate the existing MAPP Agreement, including six exhibits (Attachment I hereto). The existing MAPP Agreement is on file with the Commission as MAPP Electric Rate Schedule FERC No. 1. With the exception of the continuing obligations identified in Sections 4.2.1 and 4.7.1. of the Restated Agreement, the MAPP Agreement will terminate when the Restated Agreement becomes effective in accordance with its terms.

This filing is made pursuant to Section 205 of the FPA and the Commission's Policy Statement on Regional Transmission Groups, 64 FERC ¶ 61,138 (1993) (RTG Policy Statement).

9604050275

FERC DOCKETED
MAR 29 1996

MAPP requests that the Commission: (1) accept the Restated Agreement for filing, (2) find the Restated Agreement to be just, reasonable, nondiscriminatory and in the public interest, (3) expressly approve the provisions of Section 4.1 (relating to the eligibility for membership generally), Sections 9.1 and 9.2 (relating to participation in the Power and Energy Market) and Section 4.6.2. (relating to suspension or termination of membership), (4) expressly approve the dispute resolution provisions of Article 11 and the related provisions of Sections 5.1.7, 5.2.6, 6.5.8, 6.6.7, 8.8.7, and 9.4.6, and (5) confirm, consistent with prior RTG orders, that changes in membership not require filings under Section 205 of the FPA and that written notice to the Commission of the addition, withdrawal, suspension or termination of Members is sufficient. MAPP also requests that the Commission recognize MAPP as a Regional Transmission Group (RTG) under the RTG Policy Statement and afford substantial deference to outcomes resulting from its decision-making procedures, including its alternative dispute resolution procedures.

Communications concerning this filing should be addressed to:

Mr. James Van Epps
General Manager
Mid-Continent Area Power Pool
Suite 430
1111 Third Avenue South
Minneapolis, Minnesota 55404-1008
(612) 341-4650

Arnold H. Quint
William F. Young
Hunton & Williams
2000 Pennsylvania Avenue, N.W.
Suite 9000
Washington, DC 20006
(202) 955-1542

## I. BACKGROUND

MAPP was established and continues to operate as a regional reliability council and generation and reserve-sharing power pool to ensure that the interconnected electric systems in the MAPP region are operated reliably and efficiently, consistent with reasonable utilization of natural resources and effects on the environment, and to achieve the economic benefits of power pooling through coordinated planning and operations, the sharing of reserves, and economic sales and purchases.

MAPP is a voluntary organization of 28 Participants and 30 Associate Participants, a group that includes investor-owned utilities, generation and transmission cooperatives, municipals, joint action agencies, public power districts, independent power producers, power marketers, a federal power marketing agency, and two Canadian Crown Corporations, and serves over 16 million people. The Restated Agreement represents the culmination of negotiations that began over two years ago. It contains a number of carefully crafted compromises in an effort to achieve the approval of the "Participants" and to satisfy the Commission's requirements.

The MAPP region is depicted on a map included as Exhibit F to the Restated Agreement. It embraces all of the states of Nebraska, Iowa, North Dakota and Minnesota and portions of the states of South Dakota, Montana, Wisconsin, Michigan and Illinois together with the Canadian provinces of Saskatchewan and Manitoba.

MAPP is unlike any other organization in North America because it serves as both a pool and as one of the nine Regional Reliability Councils of the North American Electric Reliability Council (NERC). MAPP also differs from a number of other pools in that it is not centrally dispatched or operated. MAPP consists of 16 separate control areas, with each controlling generation to maintain system frequency and interchange over ties with neighboring control areas. Nevertheless, MAPP provides a mechanism for coordinated daily operation of generating and transmission facilities and achieves economies of operation similar to those of centrally dispatched pools. Each Participant maintains full responsibility for serving its own customers' demands.

The Restated Agreement filed herein is the product of two years of negotiation. Substantial compromise by all parties has been necessary to obtain the requisite vote within MAPP. The Restated Agreement opens up the membership of MAPP in light of changes in the industry that were not anticipated when the original MAPP Agreement was drafted. The Restated Agreement recognizes the diversity within the industry and balances the interests of the diverse members by carefully tailored voting and participation requirements. Because MAPP will go forward under the Restated Agreement, the investigation of MAPP's

membership criteria under the existing MAPP Agreement in Docket No. EL95-77-000 should be terminated.

The Restated Agreement preserves and enhances the reliability and power pool functions of MAPP and, in addition, (1) incorporates into MAPP an RTG to provide for the comparable and efficient provision of transmission service within and contiguous to the MAPP region, to realize and further the benefits of coordinated regional transmission planning and to resolve disputes over the provision of transmission service and (2) establishes a Power and Energy Market to obtain the benefits of the efficient voluntary purchase and sale of electric capacity and energy at competitive rates.

## II. MEMBERSHIP IN MAPP (RESTATED AGREEMENT, SECTION 4.1)

Membership in MAPP is open without geographic limitations: (1) to any "Electric Utility," defined as any entity, person, Federal agency (including any Federal Power Marketing Agency and the Tennessee Valley Authority) or State agency (including any municipality) which sells electric energy, (2) to any "Transmitting Utility," defined as any Electric Utility, qualifying cogeneration facility as defined in the FPA, qualifying small power production facility as defined in the FPA, or other entity which owns, operates, or has rights equivalent to ownership in electric power transmission facilities used for the transmission of electric energy for sale at wholesale and (3) to any other entity generating electric energy for sale for resale. The Restated Agreement also permits small entities to participate jointly as "Joint Members."

"Regulatory Agencies," defined as state or provincial agencies in the United States or Canada exercising regulatory authority over the rates, terms or conditions of electric service of an entity other than itself within the MAPP region or over the planning, siting, construction or operation of electric facilities of an entity other than itself within the MAPP region, may become Regulatory Participants. Regulatory Participants will receive notice of meetings and may participate in such meetings, but not vote.

## III. STRUCTURE OF MAPP

### A. Management Committee (Restated Agreement, Section 5.1)

The Management Committee is a committee of the whole whose principal responsibilities are to select an Executive Committee, hear appeals from the Executive Committee, review budget and dues proposals and terminate a Member for continued failure to comply with the provisions of the Restated Agreement. Its limited responsibilities result from the need in an umbrella organization such as the new MAPP to tailor the voting with respect to each of the principal functions of MAPP to the interests of the Members as they relate to that function. As a result, the principal decision-making entities are the MAPP Reliability Council, the Regional Transmission Committee and the Power and Energy Market Committee.

### B. Executive Committee (Restated Agreement, Section 5.2)

The Executive Committee is comprised of 12 representatives from a cross-section of the Members as a whole, each with one vote. Among its responsibilities are to: (1) oversee

the activities of the MAPP Center, which furnishes the facilities, equipment, personnel and services to carry out the Restated Agreement;[1] (2) adopt an annual budget, including allocation of costs to the various functions within MAPP; (3) resolve jurisdictional disputes among the Regional Transmission Committee, the Power and Energy Market Committee and the MAPP Reliability Council; (4) suspend the membership of any Member that fails to perform its reliability and other obligations; and (5) appoint the MAPP representatives to the NERC Board of Trustees.

C. MAPP Reliability Council (Restated Agreement, Section 6.5)

Membership on the MAPP Reliability Council (Section 6.5.1) is mandatory: (1) for any "End-Use Load Member," defined as a Member that has an obligation imposed by law, regulation or contract to serve "End-Use Load" within the NERC reliability region, i.e., the load of persons or other entities which purchase or produce electric energy for their own consumption and not for resale, and (2) for any "Transmission Owning Member," one who owns, or has by contract rights equivalent to ownership in, facilities for the transmission of electric power at 115 kV or greater and extending for 500 miles or more and meets other requirements. Membership is also open to any other Member desiring to participate in the activities of the MAPP Reliability Council and willing to assume its share of the costs of MAPP reliability functions. Voting is based on Reliability Megawatts, a concept that,

---

[1] Each member will enter into a standard form of service agreement with the MAPP Center.

simplified, reflects a Member's End-Use Load Obligation plus other firm power sales or, for a transmission only Member, its level of firm transmission service. To prevent any large Member from dominating the MAPP Reliability Council, the votes of any Member in excess of twenty (20) percent are not counted.

**D. <u>Regional Reliability Committee (Restated Agreement, Section 6.6)</u>**

Because the MAPP Reliability Council is expected to have too many members to operate effectively as a committee of the whole, a representative Regional Reliability Committee will carry out the reliability functions of MAPP, subject to review by the MAPP Reliability Council. The Regional Reliability Committee will consist of large and small Members, those who have no End-Use Load Obligation and a minimum number of Transmission Owning Members and "Transmission Using Members," defined as any Member that is an actual or potential user of transmission service within the MAPP region and that is not a Transmission Owning Member.

**E. <u>Regional Transmission Committee (Restated Agreement, Section 8.8)</u>**

The Regional Transmission Committee is MAPP's RTG. It reviews tariffs for conformity with the Restated Agreement and sets standards and requirements for the use of the MAPP transmission grid. It is also a committee of the whole, but voting is based on a Member's status as a Transmission Owning Member or as a Transmission Using Member. A vote of two-thirds of the Transmission Owning Members and of two-thirds of the Transmission Using Members is required to take action.

F. Power and Energy Market Committee (Restated Agreement, Section 9.4)

The Power and Energy Market Committee consists of 12 representatives of the Members utilizing the voluntary Power and Energy Market.

G. Alternate Dispute Resolution Committee (Restated Agreement, Section 11.3)

An Alternate Dispute Resolution Committee will administer the dispute resolution provisions of the Restated Agreement, but will not itself resolve disputes. Instead, the Restated Agreement defines, with respect to each of the four functions of MAPP, the extent to which disputes will be resolved by mediation, arbitration, resort to the Commission or other recourse.

## IV. OBLIGATIONS AND RIGHTS OF MEMBERSHIP

A. Regional Reliability and Generation Reserve-Sharing Pool (Restated Agreement, Articles 6 and 7)

All reliability requirements and standards in place under the current MAPP Agreement at the time the Restated Agreement goes into effect are to remain in full force and effect until they are revised under the terms and procedures of the Restated Agreement. Those requirements and standards, which have served the region well, may be no less stringent than NERC standards or guidelines, shall not be unduly discriminatory in substance and application, shall be applied consistently to all Members and shall not impose unreasonable or unduly discriminatory costs on a Member or class of Members.

Any Member with end-use load must maintain sufficient accredited generating capability and purchased capacity to meet its load and reserve capacity obligation, and maintain transmission capability adequate for delivery of its capacity to load. A Member must also maintain operating reserves.

Members with an obligation to maintain generating reserves are members of the Generation Reserve-Sharing Pool and are referred to as "Pool Participants." Pool Participants are required to: (1) supply emergency energy in accordance with the provisions of Service Schedule C, (2) supply scheduled outage energy pursuant to Service Schedule C1, and (3) supply operating reserves pursuant to Service Schedule D. Pursuant to Service Schedule B, a Pool Participant is deemed to have requested capacity to meet a planning reserve capacity deficiency from all other Pool Participants for a MAPP season in which it is found to be deficient in meeting its reserve capacity obligation. The rate provisions in Service Schedules C, C1 and D have not changed from those currently on file with the Commission. An energy charge provision in Service Schedule B has been deleted because it is not currently utilized. Copies of Service Schedules B, C, C1 and D are provided as Exhibit B to the Restated Agreement.

**B. Regional Transmission (Restated Agreement, Article 8)**

The provisions of Article 8 of the Restated Agreement, when read in the context of the Restated Agreement, are intended to create a Regional Transmission Group (RTG) under the umbrella of MAPP. Subject to the details provided in the Restated Agreement,

> All Members are entitled to receive comparable, not unduly discriminatory transmission service over the transmission facilities of Members. Owners of transmission facilities, whether or not identified as Transmission Owning Members, shall be entitled to recover all of their prudently incurred costs of providing transmission service. A Member's rates and terms and conditions for transmission service over its transmission facilities shall be just and reasonable, and not unduly discriminatory or preferential.

Restated Agreement, Section 8.2

**1. Obligation to Provide Transmission Service (Restated Agreement, Section 8.3)**

Each Member owning transmission facilities, or controlling access to or the use of transmission facilities by third parties, is required to provide transmission service comparable to its own use of such facilities.

**2. Transmission Service for Coordination Transactions**

Service Schedule F - Transmission Service for Coordination Transactions, attached to the Restated Agreement as Exhibit C, provides pool-wide transmission service for coordination transactions, as defined. The megawatt-mile rates utilized in Service Schedule F are derived on the same basis as those contained in Service Schedule F that was accepted for filing in Mid-Continent Area Power Pool, 69 FERC ¶ 61,347 (1994); clarification, 72 FERC ¶ 61,223 (1995).[2] To the extent Service Schedule F is not applicable, transmission

---

[2] The rates contained in Service Schedule F should be regarded as settlement rates between those who argued they are too low and those who argued they are too high. An important limiting factor was the establishment of rates for MAPP that would be less than those
(continued...)

service will be provided under a Member's own tariff or tariffs until such time as the Regional Transmission Committee develops additional tariffs for region-wide or subregional service.[3]

The Procedure for Calculation and Administration of the Transmission Service Charge is included as Appendix C to Service Schedule F. By way of cost support, MAPP submits the following material included in Attachment IV hereto:

a. Calculations of a composite fixed charge rate for each voltage class, based on weighted fixed charge rates for each MAPP Participant (Attachment IV(a));

b. Sample matrices for application of the Transmission Service Charge (Attachment IV(b)) and a summary of the monthly net distribution of transmission service payments under the existing Service Schedule F for the period May 1, 1995 through January 31, 1996 (Attachment IV(c));

---

[2] (...continued)
available from a single large transmission-owning entity in the region. See the last five pages of Attachment IV(d). Service Schedule F also provides that reservations for coordination transactions may be made for up to two years, and that such reservation can be made for up to a full year in advance of the commencement of service. These terms are also part of the same compromise underlying the adoption of Service Schedule F.

[3] The Participants could not agree on a rate schedule for long-term pool-wide service and concluded that the package presented herein as the Restated Agreement should be submitted without waiting to determine if a consensus could be reached on the terms of a tariff for long-term service. Pursuant to Section 8.8.8(g) of the Restated Agreement, the Regional Transmission Committee is required to endeavor to establish, and if possible establish, tariffs for the MAPP region or subregions thereof in addition to Service Schedule F.

c. A demonstration that the Transmission Service Charge will not overcollect revenues on a pool-wide basis (Attachment IV(d)); and

d. A summary of waivers (Attachment IV(e)).

The Effective Operating Capacity (EOC) is intended to adjust the rates for firm capacity and energy transactions to reflect reserves in the regional transmission system. In order to provide an express constraint on the EOC factor, MAPP will, for the purpose of this filing, limit any upward adjustment in the EOC factor to 1.75.

The MAPP Center serves as an impartial administrator with responsibility for a number of provisions of the Restated Agreement. Most importantly, it will maintain a transmission service information network; determine whether transmission capacity is available; determine whether a System Impact Study is needed, and performs such studies; approve or deny requests for coordination transaction transmission service; direct the implementation of line loading relief procedures; administer loss repayments; and perform certain billing and collection functions.

**3. Obligation to File Tariffs (Restated Agreement, Section 8.3.2)**

With one limited exception, not related to "public utilities" as defined in Section 201(e) of the FPA, each Member owning transmission facilities, or controlling access to or the use of transmission facilities by third parties, whether or not subject to this Commission's jurisdiction because it is a "public utility" as defined in Section 201(e) of the FPA, must file with MAPP a tariff complying with the requirements of the Restated Agreement. Each tariff

must provide flexible point-to-point service and network service and conform to the minimum standards for transmission service established by the Commission.

**4. Requests for Transmission Service and Responses to Such Requests (Restated Agreement, Sections 8.4 and 8.5)**

The Restated Agreement provides a mechanism for requesting transmission service and for responding to such requests to the extent such mechanisms are not defined in Service Schedule F, in a Member's own tariff or in an applicable regional or subregional tariff. In each case, the Commission's policies are used as a default position.

**5. Transmission Planning (Restated Agreement, Section 8.6)**

**a. Development of the Plan**

Each Transmitting Utility is required to prepare and maintain a plan for its transmission facilities, taking into account current and anticipated requirements and the coordination of the Member's plan with the transmission plans of neighboring systems. The Regional Transmission Committee will establish procedures, standards and requirements to accomplish, among other matters, the communication of bona fide requirements for transmission service, the utilization of subregional working groups for coordination and informal resolution of disputes and the development of subregional plans into a transmission plan for the MAPP region.

Not less often than biennially the Regional Transmission Committee will develop a coordinated transmission plan for the MAPP region. The plan may include alternatives and will cover all facilities at a capacity of 115 kV or greater. The plan will integrate

transmission plans developed by individual Members and by subregional working groups to enable the transmission needs of the region to be met on a consistent, reliable, environmentally acceptable and economic basis. Regulatory Participants and non-Members may attend any meeting of the Regional Transmission Committee or one of its subcommittees dealing with the plan.

**b. Support of the Plan**

Subject to the appeal and dispute resolution procedures established in the Restated Agreement, and subject to the compensation requirements and obligations of Section 8.7 of the Restated Agreement, each Member is required to support the plan before any regulatory or governmental agency or authority having jurisdiction over matters affecting implementation of the plan and use its best efforts to implement the plan.

**c. Obligation to Build**

Subject to the requirements of applicable law, government regulations or approvals, the availability of required financing and to the right to recover all reasonably incurred costs plus a reasonable return on investment, Members designated in the Plan to construct and own facilities shall construct and own such facilities or enter into appropriate contracts to fulfill such obligations. Unless a Member otherwise agrees, a Member will not be required to construct facilities unless they are contiguous with, or an upgrade to, a Member's own facilities. The Restated Agreement permits assignment of the incremental costs to those

entities for whose needs the facilities are being constructed or upgraded, but incidental benefits must also be recognized.

### 6. Cost Support for Service Schedule F - Transmission Service for Coordination Transactions

A demonstration that the Transmission Service Charge contained in Service Schedule F will not overcollect revenues on a pool-wide basis provided as Attachment IV hereto.

## V. POWER AND ENERGY MARKET (RESTATED AGREEMENT, ARTICLE 9) AND TRANSITION ARRANGEMENTS

The Restated Agreement establishes a wholesale market for the voluntary purchase and sale of electricity at market-based rates. Non-Members may participate subject to their agreement to the established rules. The initial Service Schedules A, J, K, L and M are set forth in Exhibit E to the Restated Agreement and are based on the existing Service Schedules that are not part of the Generation Reserve-Sharing Pool. Other schedules can be added to the Power and Energy Market. The Service Schedules simply establish uniform terms and conditions for services that will facilitate trading, but Members may continue to participate in bilateral transactions and participate in other available market mechanisms.

Attachment III provides interim schedules that will be in place until the Service Schedules utilizing market-based rates can become effective. See Sections VII and VIII.B below. The interim schedules continue to use the rates currently on file with the Commission. Schedules K, L, and M have been revised for interim use by incorporating language relative to cost-based pricing from the existing MAPP Agreement. No changes to

the rates in Schedules A and J are required for interim use, since both employ negotiated rates now and in the Restated Agreement. Schedule E (Economy) and Schedule G (Operational Control) are cost-based and are being retained only on an interim basis. After the interim period, Schedules E and G have been included in the revised Schedule M to permit parties to consummate transactions under such terms, or on any other basis they may agree to.

Schedule H (Peaking) and Schedule I (Short-Term Firm) of the existing Agreement are special-use variations of Firm Power and are not included in the Restated Agreement. The unique justification for Schedule I is no longer valid under the Restated Agreement. The limited-energy attributes of the existing Schedule H have been included in Schedule J of the Restated Agreement. Neither Schedule will be retained when the MAPP Agreement becomes effective in accordance with its terms.

## VI. CONFORMITY WITH THE COMMISSION'S REGIONAL TRANSMISSION GROUP REQUIREMENTS

In the RTG Policy Statement, the Commission established seven minimum components for an RTG Agreement. The Commission has further defined those minimum requirements in its orders accepting the RTG agreements filed to date. This filing meets each of those requirements.

A. **Broad Membership and Geographic Area**

Under the Restated Agreement, membership is available without regard to regional boundaries to Electric Utilities, Transmitting Utilities or any other entity generating electric energy for sale for resale. Although those terms are defined in the Restated Agreement, the definitions provide for broad membership and allow any entity that is subject to, or eligible to apply for, an order under Section 211 of the FPA to be a Member. Moreover, the area encompassed is that of the entire MAPP Regional Reliability Council, which is all of the states of Nebraska, Iowa, North Dakota and Minnesota, most of South Dakota and portions of Montana, Wisconsin, Michigan and Illinois. It also includes the Canadian provinces of Saskatchewan and Manitoba. Because 26 of the 28 Participants in MAPP, representing more than 94.5% of the load in MAPP, voted in favor of the Restated Agreement and will automatically become Members, as will existing Associate Participants unless they decline to do so, the new MAPP is expected to have an extensive membership.

B. **Consultation and Coordination with State Authorities**

State or Canadian provincial agencies may become Regulatory Participants. As such, they participate in the activities of MAPP. With respect to transmission planning, they may attend and participate in any meeting of the Regional Transmission Committee or any of its subcommittees dealing with the Regional Plan for transmission facilities. Moreover, the state and provincial regulatory agencies have been invited to the meetings at which the Restated Agreement has been discussed with the public and have been separately briefed on the

Restated Agreement. As is indicated by the letters MAPP has received, copies of which are provided as Attachment V, numerous state agencies have indicated that they are comfortable with their role under the Restated Agreement.

C. Obligation to Provide Service (Restated Agreement, Section 8.3)

The Restated Agreement requires all MAPP Members, whether or not they are "public utilities" as defined in Section 201(e) of the FPA, that own transmission facilities or control access to or the use of transmission facilities by third parties to provide transmission service. With a limited exception, all such Members are required to file transmission tariffs with MAPP within 90 days[4] of the Effective Date of the Restated Agreement. Such tariffs must provide flexible point-to-point service and network service that conform to the minimum standards for transmission service established by the Commission. The obligation to provide transmission service explicitly includes all forms of interconnection, transmission and ancillary service that would be available under Sections 210, 211 and 212 of the FPA and explicitly requires the enlargement of transmission capacity where necessary to provide such service.

Consistent with the deference to be accorded to an RTG, the Commission should recognize and accept that a Member has no obligation, under the Restated Agreement, to

[4] Of course, utilities subject to the Commission's jurisdiction may be required to submit tariffs earlier pursuant to the Final Order in Docket No. RM95-8-000, Promoting Wholesale Competition Through Open Access Non-discriminatory Transmission Services by Public Utilities, Notice and Supplemental Notice of Proposed Rulemaking, 60 Fed. Reg. 17,662 (April 7, 1995), IV FERC Stats. & Regs. ¶ 32,514 (1995) (hereinafter Open Access NOPR).

provide any form of transmission service or interconnection of a type not available pursuant to an order requiring such service under Sections 210, 211, or 212 of the FPA as in effect on the Effective Date of the Restated Agreement, or to any entity not eligible to obtain an order requiring such service under Sections 210, 211 or 212 of the FPA as in effect on the Effective Date of the Restated Agreement. As a result, service that could not be required by the Commission will not be made available on a voluntary basis pursuant to the Restated Agreement. As an RTG, MAPP will stand in the place of the Commission for certain purposes. Because the limitations in Sections 212(g) and 212(h) apply to any order of the Commission under the FPA, the Members have concluded that MAPP should have no greater authority than the Commission to order service. The converse is also true, however. Nothing in the Restated Agreement is to be construed as prohibiting any Member from providing voluntarily or pursuant to a state statute or lawful decision of a regulatory agency or court any type of transmission service to any entity.

The terms and conditions under which transmission services will be offered are specified either in Service Schedule F, or in the provisions of Section 8.3.1(c) of the Restated Agreement that require tariff provisions conforming to the minimum standards for transmission service established by the Commission.

D. Coordinated Transmission Planning (Restated Agreement, Section 8.6)

Transmission planning in MAPP will result in a coordinated transmission plan on a regional basis. The bona fide requirements of non-Members are incorporated. The process is open to Members and non-Members alike.

MAPP utilizes subregional working groups to coordinate the plans of the individual Members. The integration of the subregional plans into a transmission plan for the MAPP region should permit the needs of the region to be met on a consistent, reliable, environmental and economic basis.

Subject to the appeal and dispute resolution procedures and subject to the compensation requirements and obligations, each Member is required to support the plan before any regulatory or governmental agency and to use its best efforts to implement the plan. Thus, a Member is committed to the outcome of the process. A Member required to construct or upgrade facilities who opposed the inclusion of such facilities in the plan may, nevertheless, present its position regarding those facilities to its regulatory Commission. That provision simply acknowledges that a Member will, as a practical matter, express its reservations to a regulatory Commission while supporting the plan. Section 8.7 of the Restated Agreement provides a strong obligation to build.

E. Fair and Non-Discriminatory Governance and Decisionmaking

Each Member has one vote on the Regional Transmission Committee. The Members are divided into two classes, Transmission Owning Members and Transmission Using

Members. Action by the Regional Transmission Committee requires the votes of two-thirds of each class. The Transmission Owning Members and the Transmission Using Members, voting separately, may in the future adopt weighted voting within their respective groups, but passage of measures would still require two-thirds of the votes of each group. The Chair and Vice Chair alternate between the Transmission Owning Members and the Transmission Using Members. Subcommittees are required to have an equal number of Transmission Owning Members and Transmission Using Members.

**F. Voluntary Dispute Resolution (Restated Agreement, Article 11)**

The dispute resolution procedures contained in Article 11 of the Restated Agreement are designed to assure that the Commission will not be the first recourse for resolving disputes concerning technical, reliability and economic issues.

Members who disagree with the decision of any representative committee can seek review of the decision by the appropriate committee of the whole. Members who believe that any resulting decision does not comport with the Restated Agreement can go to arbitration. In addition, parties that cannot resolve differences with each other are required to participate in mediation, unless the Alternate Dispute Resolution Committee determines that mediation would be highly unlikely to lead to resolution of the dispute. Binding arbitration is available for most disputes not otherwise resolved, unless a Member exercises its right under the Restated Agreement to take the matter to the Commission or to another regulatory agency or to a court for matters not within Commission jurisdiction.

A Member may insist on taking a dispute to the Commission only if the dispute involves the provision or denial of transmission service or the use of or obligation to build or enlarge transmission facilities, or a rate, term or condition of transmission service, and then only if the Commission has jurisdiction over the subject matter of the dispute, jurisdiction to grant the relief sought and jurisdiction over the party from which relief is sought.

Under the Restated Agreement, the transmission owners cannot exert market power or control over non-owners. Moreover, an arbitral decision that affects matters subject to the jurisdiction of the Commission under Section 205 of the FPA will be filed with the Commission. As a result, the Commission should give appropriate deference to voluntary resolutions or resolutions reached pursuant to arbitration.

### G. Exit Provision

Section 4.6.1 of the Restated Agreement provides the procedure for withdrawal from Membership. Moreover, Section 4.7 provides the obligations on suspension, withdrawal or termination.

## VII. LACK OF MARKET POWER AND MARKET-BASED RATES

"In general, the Commission allows power sales at market-based rates if the seller (and each of its affiliates) does not have, or has mitigated, market power in generation and transmission and cannot control other barriers to entry." Western Resources, Inc., 74 FERC ¶ 61,136 (1996).

A. Transmission Market Power

Before the market-based rates contained in the Power and Energy Market Schedules become effective, each of the Members subject to this Commission's jurisdiction will have filed transmission tariffs conforming to this Commission's requirements. Such filings will have been made pursuant to the final order in the Open Access NOPR or pursuant to the provisions of Section 8.3.2 of the Restated Agreement. With such tariffs on file, the Members will not have, or will have mitigated, market power in transmission.

B. Generation Market Power

Likewise, no Commission-jurisdictional Member has market power in generation in the MAPP region.[5] The owner of the largest share of generation in MAPP is Northern States Power Company (Northern States) with 22.8% (summer) and 23.3% (winter) of the accredited generation in MAPP. The Commission has recently confirmed that Cenergy, Inc., an affiliate of Northern States, may charge market-based rates, not subject to refund. Northern States Power Co. (Minnesota), et al., 74 FERC ¶ 61,142 (1996). By Letter Order issued December 7, 1994, the Commission had authorized Cenergy to provide sales at market-based rates. Cenergy, Inc., 69 FERC ¶ 61,316 (1994). The Commission has thus recently confirmed that Northern States does not have market power in generation and cannot erect barriers to entry.

[5] Several mergers involving MAPP Participants are pending before the Commission. This filing by MAPP assumes the Commission will not permit a merger to go forward if it finds that the merger creates an unacceptable effect on competition that has not been mitigated.

The next largest share of generation owned by a Commission-regulated utility in MAPP is that owned by Mid-American Energy Company with 13.4% (summer) and 13.9% (winter) of the accredited capacity. The Commission has recently approved the merger of Midwest Power Systems, Inc. and Iowa-Illinois Gas and Electric Company to form Mid-American Energy Company. Midwest Power Systems, Inc., 71 FERC ¶ 61,386 (1995). In so doing, the Commission found that "the merger will not significantly increase concentration in any of our identified markets" and there was "no basis for concern that the merged company will be able to raise barriers to entry." 71 FERC at 62,510.

Based on accredited capacity, IES Utilities is the third largest investor-owned utility in MAPP, with 7.4% (summer) and 7.3% (winter) of the region's accredited capacity. It has established Industrial Energy Applications, Inc. (Industrial Energy) as a power marketing affiliate. The Commission has authorized the affiliate to sell at market-based rates, having concluded that Industrial Energy will not be able to exercise generation dominance and cannot erect barriers to entry. IES Utilities, Inc., 72 FERC ¶ 61,296 (1995).

Every other Commission-regulated utility has less than 5% of the accredited generation, whether measured on a summer or winter basis. Stated somewhat differently, no other Commission-regulated utility has more than 1500 megawatts of generation out of the over 30,000 megawatts in MAPP. The Commission has generally held that a seller possessing less than 20 percent of the relevant market does not have market power. See Heartland Energy Services, Inc., 68 FERC ¶ 61,183 at 62,063, n.12 (citing Public Service

Co. of Indiana, Inc., 51 FERC ¶ 61,367 at 62,205, reh'g denied, 52 FERC ¶ 61,260 (1990); Entergy Services, Inc., 58 FERC ¶ 61,234 at 61,758, n.79 (1992) and Southern Company Services, 72 FERC ¶ 61,324 at 62,405-06 (1995), order on reh'g, 74 FERC ¶ 61,141 (1996).

As a result, the market-based rates contained in the Power and Energy Market Schedules should be permitted to become effective in accordance with their terms.

## VIII. COMPLIANCE WITH SECTION 35.13

### A. List of Documents Submitted

See Attachment II hereto.

### B. Proposed Effective Date and Requests for Waiver

MAPP requests an "effective date," pursuant to Section 35.2(e) of the Commission's Regulations, 18 C.F.R. § 35.2(e) (1995), for the Restated Agreement, including Service Schedules B, C, C1, D and F, 60 days from the date of this submission.[6] MAPP requests the same effective date for the interim Market Schedules A, E, G, J, K, L and M included in Attachment III hereto and that Schedules A, E, G, J, K, L and M now on file with the Commission be superseded as of that date. Existing Schedules H and I should be terminated as of that same date. MAPP requests an "effective date" for the initial Power and Energy

[6] By its terms, the Restated Agreement will become effective on the first May 1 or November 1 following the Commission's approval of the Restated Agreement in its entirety without condition or modification. Those dates correspond to the beginning of the MAPP seasons.

Market Schedules, provided as Exhibit E to the Restated Agreement, as the first May 1 or November 1 following the date on which the Restated Agreement becomes effective in accordance with its terms. Waiver of the Notice requirements pursuant to 18 C.F.R. § 35.11 is appropriate so that the Power and Energy Market Schedules will not go into effect until each of the public utilities subject to this Commission's jurisdiction has filed transmission tariffs in accordance with Section 8.3.2 of the Restated Agreement or has filed such tariffs earlier in accordance with the requirements of the Open Access NOPR.

MAPP also requests a waiver of any of the provisions of Section 35.13 of the Commission's Regulations, 18 C.F.R. § 35.13 (1995), not satisfied by this filing. Such requirements are not applicable to a filing such as this one.

**C. Names and Addresses of Persons to Whom a Copy of the Rate Schedule Has Been Mailed**

See Attachment VI hereto.

**D. Brief Description of the Rate Schedule Change**

See Sections I through V above.

**E. A Statement of the Reasons for the Change**

See Section I above.

F. Federal Register Notice

A form of notice suitable for publication in the Federal Register is provided as Attachment VII.

Very truly yours,

Arnold H. Quint
Counsel for Mid-Continent Area Power Pool

Attachments
cc: Elizabeth Anne Moler, Chair
Vicky A. Bailey, Commissioner
James J. Hoecker, Commissioner
William L. Massey, Commissioner
Donald F. Santa, Jr., Commissioner
Mr. J. Steven Herod
Mr. Kevin A. Kelly
Mr. Donald J. Gelinas
Mr. Richard P. O'Neill
Mr. J. Stephen Henderson
Susan Tomasky, Esq.
Cynthia A. Marlette, Esq.
Daniel L. Larcamp, Esq.
Persons Listed on Attachment VI
Service List in Docket No. EL95-77-000

mapp

mid-continent area power pool

# RESTATED AGREEMENT

January 12, 1996

## TABLE OF CONTENTS

ARTICLE 1

PREAMBLE . . . . . . . . . . 1
1.1 Regional Reliability and Power Pool . . . . . . . . . . 1
1.2 Regional Transmission and Power and Energy Market . . . . . . . . . . 1

ARTICLE 2

PURPOSE . . . . . . . . . . 2
2.1 Purpose of the Restated Agreement . . . . . . . . . . 2

ARTICLE 3

DEFINITIONS . . . . . . . . . . 2
3.1 Accredited Capability . . . . . . . . . . 2
3.2 Accredited Capacity . . . . . . . . . . 3
3.3 Affiliate . . . . . . . . . . 3
3.4 Affiliated Members . . . . . . . . . . 3
3.5 All-Requirements Service . . . . . . . . . . 3
3.6 Annual System Demand . . . . . . . . . . 4
3.7 Applicant . . . . . . . . . . 4
3.8 Associate Member . . . . . . . . . . 4
3.9 Associate Participant . . . . . . . . . . 4
3.10 Available Accredited Capacity . . . . . . . . . . 4
3.11 Canadian Laws . . . . . . . . . . 4
3.12 Canadian Regulatory Authority . . . . . . . . . . 4
3.13 Canadian Transmission Requester . . . . . . . . . . 5
3.14 Canadian Transmission Supplier . . . . . . . . . . 5
3.15 Contractor . . . . . . . . . . 5
3.16 Control Area Operator . . . . . . . . . . 5
3.17 Designating Entity . . . . . . . . . . 5
3.18 Effective Date . . . . . . . . . . 5
3.19 Electric Revenues . . . . . . . . . . 5
3.20 Electric Utility . . . . . . . . . . 6
3.21 End-Use Load . . . . . . . . . . 6
3.22 End-Use Load Member . . . . . . . . . . 6
3.23 End-Use Load Obligation . . . . . . . . . . 6
3.24 Federal Power Marketing Agency . . . . . . . . . . 6
3.25 FERC . . . . . . . . . . 6
3.26 Firm Power . . . . . . . . . . 7
3.27 Fiscal Year . . . . . . . . . . 7
3.28 FPA . . . . . . . . . . 7
3.29 Good Utility Practice . . . . . . . . . . 7
3.30 Interruptible Load . . . . . . . . . . 7

3.31 **Joint Member** . . . . 7
3.32 **MAPP** . . . . 7
3.33 **MAPP Agreement** . . . . 8
3.34 **MAPP Region** . . . . 8
3.35 **Market** . . . . 8
3.36 **Market Participant** . . . . 8
3.37 **Member** . . . . 8
3.38 **NERC** . . . . 8
3.39 **Net Generating Capability** . . . . 9
3.40 **Non-Spinning Reserve** . . . . 9
3.41 **Operating Reserve** . . . . 9
3.42 **Operating Reserve Obligation** . . . . 9
3.43 **Partial Requirements Service** . . . . 9
3.44 **Participant** . . . . 10
3.45 **Pool Participant** . . . . 10
3.46 **Power and Energy Market Member** . . . . 10
3.47 **Regulatory Agency** . . . . 10
3.48 **Regulatory Participant** . . . . 10
3.49 **Reliability Dues** . . . . 10
3.50 **Reliability Megawatts** . . . . 10
3.51 **Reliability Member** . . . . 11
3.52 **Representative** . . . . 12
3.53 **Reserve Capacity Obligation** . . . . 12
3.54 **Restated Agreement** . . . . 12
3.55 **Rights Equivalent to Ownership** . . . . 12
3.56 **Service Schedules** . . . . 13
3.57 **Spinning Reserve** . . . . 13
3.58 **System Demand** . . . . 13
3.59 **Total Operating Reserve Obligation** . . . . 14
3.60 **Transmission Owning Member** . . . . 14
3.61 **Transmission Provider** . . . . 14
3.62 **Transmission Requester** . . . . 14
3.63 **Transmission Using Member** . . . . 14
3.64 **Transmitting Utility** . . . . 14
3.65 **Uncontrollable Forces** . . . . 15

ARTICLE 4

MEMBERSHIP . . . . 15
4.1 **Eligibility** . . . . 15
4.2 **Membership Process** . . . . 16
4.2.1 **Participants and Associate Participants** . . . . 16
4.2.2 **New Members** . . . . 17
4.2.3 **Joint Members** . . . . 17
4.2.4 **Review of Applications** . . . . 18

4.2.5 **Change in Membership Categories** . . . 19
4.3 **State and Provincial Agencies** . . . 19
4.4 **Associate Members** . . . 20
4.5 **Joint Members** . . . 20
4.6 **Withdrawal, Suspension or Termination** . . . 21
4.6.1 **Withdrawal** . . . 21
4.6.2 **Suspension or Termination** . . . 21
4.6.3 **Joint Members** . . . 22
4.6.4 **Members in Good Standing** . . . 23
4.7 **Obligations on Suspension, Withdrawal or Termination** . . . 23
4.7.1 **Stability and Reliability** . . . 23
4.7.2 **Transactions** . . . 24
4.7.3 **Financial Obligations** . . . 24
4.7.4 **Regulatory Obligations** . . . 24

ARTICLE 5

GOVERNANCE AND MANAGEMENT . . . 25
5.1 **Management Committee** . . . 25
5.1.1 **Membership** . . . 25
5.1.2 **Number of Votes** . . . 25
5.1.3 **Voting Requirements** . . . 26
5.1.4 **Officers** . . . 26
5.1.5 **Meetings** . . . 27
5.1.6 **Nominating Committee** . . . 27
5.1.7 **Dispute Resolution** . . . 28
5.1.8 **Review of Executive Committee** . . . 29
5.1.9 **Responsibilities** . . . 29
5.2 **Executive Committee** . . . 30
5.2.1 **Membership** . . . 30
5.2.2 **Voting Requirements** . . . 33
5.2.3 **Officers** . . . 33
5.2.4 **Meetings** . . . 34
5.2.5 **Reconsideration and Appeal of Decisions** . . . 34
5.2.6 **Dispute Resolution** . . . 36
5.2.7 **Responsibilities** . . . 36
5.3 **MAPP Center** . . . 39
5.3.1 **Establishment of MAPP Center** . . . 39
5.3.2 **Agreement with the Contractor** . . . 39
5.4 **Fees and Dues** . . . 40
5.4.1 **Fee upon Joining** . . . 40
5.4.2 **Dues** . . . 40

ARTICLE 6

REGIONAL RELIABILITY . . . . . . . . . . . . . . . . . . 41
6.1 **Objective** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
6.2 **Standards** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
6.3 **Adoption of Existing Reliability Requirements** . . . . . . . . . . . . . . . 42
6.4 **Obligations of Members** . . . . . . . . . . . . . . . . . . . . . . . 42
6.4.1 **Reliability** . . . . . . . . . . . . . . . . . . . . . . . . . 42
6.4.2 **End-Use Load** . . . . . . . . . . . . . . . . . . . . . . . 42
6.4.3 **Assignment of End-Use Load Obligation** . . . . . . . . . . . . 43
6.4.4 **Operating Reserves** . . . . . . . . . . . . . . . . . . . . . 44
6.4.5 **Interconnected Operations** . . . . . . . . . . . . . . . . . . 45
6.4.6 **Accreditation of Generation** . . . . . . . . . . . . . . . . . . 45
6.4.7 **System Disturbances** . . . . . . . . . . . . . . . . . . . . . 45
6.4.8 **Interconnection** . . . . . . . . . . . . . . . . . . . . . . . 46
6.4.9 **Information** . . . . . . . . . . . . . . . . . . . . . . . . . 46
6.5 **MAPP Reliability Council** . . . . . . . . . . . . . . . . . . . . . . 46
6.5.1 **Membership** . . . . . . . . . . . . . . . . . . . . . . . . 46
6.5.2 **Reliability Dues** . . . . . . . . . . . . . . . . . . . . . . 47
6.5.3 **Number of Votes** . . . . . . . . . . . . . . . . . . . . . . 48
6.5.4 **Voting Requirements** . . . . . . . . . . . . . . . . . . . . 48
6.5.5 **Officers** . . . . . . . . . . . . . . . . . . . . . . . . . . 49
6.5.6 **Meetings** . . . . . . . . . . . . . . . . . . . . . . . . . 49
6.5.7 **Nominating Committee** . . . . . . . . . . . . . . . . . . . . 50
6.5.8 **Dispute Resolution** . . . . . . . . . . . . . . . . . . . . . 51
6.6 **Regional Reliability Committee** . . . . . . . . . . . . . . . . . . . 52
6.6.1 **Membership** . . . . . . . . . . . . . . . . . . . . . . . . 52
6.6.2 **Voting Requirements** . . . . . . . . . . . . . . . . . . . . 56
6.6.3 **Officers** . . . . . . . . . . . . . . . . . . . . . . . . . . 56
6.6.4 **Meetings** . . . . . . . . . . . . . . . . . . . . . . . . . 57
6.6.5 **Subcommittees** . . . . . . . . . . . . . . . . . . . . . . . 57
6.6.6 **Reconsideration and Appeal of Decisions** . . . . . . . . . . . . 59
6.6.7 **Dispute Resolution** . . . . . . . . . . . . . . . . . . . . . 60
6.6.8 **Responsibilities** . . . . . . . . . . . . . . . . . . . . . . 61
6.7 **Participation in North-American Electric Reliability Council** . . . . . . 65

ARTICLE 7

GENERATION RESERVE-SHARING POOL . . . . . . . . . . . 66
7.1 **Objective** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
7.2 **Membership** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
7.3 **Obligations of Members of the Pool** . . . . . . . . . . . . . . . . . . 66
7.3.1 **Emergency Energy** . . . . . . . . . . . . . . . . . . . . . . 66
7.3.2 **Scheduled Outage Energy** . . . . . . . . . . . . . . . . . . . 67
7.3.3 **Operating Reserves** . . . . . . . . . . . . . . . . . . . . . 67

7.3.4 **Reserve Capacity Deficiency** . . . . . . . . . . 67
7.3.5 **Service Schedules** . . . . . . . . . . 67

ARTICLE 8

REGIONAL TRANSMISSION . . . . . . . . . . 68
8.1 **Objectives** . . . . . . . . . . 68
8.2 **Standards** . . . . . . . . . . 68
8.3 **Obligation to Provide Transmission Service** . . . . . . . . . . 69
8.3.1 **Members Generally** . . . . . . . . . . 69
8.3.2 **Filing of Tariffs** . . . . . . . . . . 70
8.3.3 **Review of Tariffs** . . . . . . . . . . 71
8.3.4 **Canadian Transmission Suppliers** . . . . . . . . . . 72
8.4 **Requests for Transmission Service** . . . . . . . . . . 73
8.5 **Response to a Request for Service** . . . . . . . . . . 73
8.6 **Transmission Planning** . . . . . . . . . . 74
8.6.1 **Member Plans** . . . . . . . . . . 74
8.6.2 **Availability of Plans and Information** . . . . . . . . . . 75
8.6.3 **Planning Standards** . . . . . . . . . . 76
8.6.4 **The Regional Plan** . . . . . . . . . . 76
8.6.5 **Reliability Catalogue** . . . . . . . . . . 77
8.6.6 **Support of the Plan** . . . . . . . . . . 78
8.7 **Construction and Ownership of Transmission Facilities** . . . . . . . . . . 78
8.7.1 **Obligation to Build** . . . . . . . . . . 78
8.7.2 **U.S. and Canadian Members** . . . . . . . . . . 80
8.8 **Regional Transmission Committee** . . . . . . . . . . 80
8.8.1 **Membership** . . . . . . . . . . 80
8.8.2 **Dues** . . . . . . . . . . 80
8.8.3 **Voting Requirements** . . . . . . . . . . 81
8.8.4 **Officers** . . . . . . . . . . 81
8.8.5 **Meetings** . . . . . . . . . . 82
8.8.6 **Subcommittees** . . . . . . . . . . 83
8.8.7 **Dispute Resolution** . . . . . . . . . . 85
8.8.8 **Responsibilities** . . . . . . . . . . 86

ARTICLE 9

POWER AND ENERGY MARKET . . . . . . . . . . 90
9.1 **Establishment of Market** . . . . . . . . . . 90
9.2 **Participation** . . . . . . . . . . 90
9.2.1 **Non-Members** . . . . . . . . . . 90
9.2.2 **Suspension or Termination** . . . . . . . . . . 91
9.3 **Transaction Fees and Service Schedules** . . . . . . . . . . 91
9.4 **Market Committee** . . . . . . . . . . 92
9.4.1 **Membership** . . . . . . . . . . 92

9.4.2 **Voting Requirements** . . . . 93
9.4.3 **Officers** . . . . 93
9.4.4 **Meetings** . . . . 93
9.4.5 **Subcommittees** . . . . 94
9.4.6 **Dispute Resolution** . . . . 94
9.4.7 **Responsibilities** . . . . 95

ARTICLE 10

METERING AND RECORDS . . . . 96
10.1 **Metering** . . . . 96
10.2 **Records** . . . . 96
10.2.1 **Power and Energy Movements** . . . . 96
10.2.2 **Meter Registrations** . . . . 97

ARTICLE 11

DISPUTE RESOLUTION . . . . 97
11.1 **Mediation** . . . . 97
11.1.1 **When Required** . . . . 97
11.1.2 **Procedures** . . . . 98
11.2 **Arbitration** . . . . 100
11.2.1 **When Required** . . . . 100
11.2.2 **Initiation** . . . . 101
11.2.3 **Selection of Arbitrator(s)** . . . . 102
11.2.4 **Procedures** . . . . 102
11.2.5 **Summary Disposition and Interim Measures** . . . . 102
11.2.6 **Discovery of Facts** . . . . 103
11.2.7 **Evidentiary Hearing** . . . . 104
11.2.8 **Confidentiality** . . . . 105
11.2.9 **Timetable** . . . . 106
11.2.10 **Advisory Interpretations** . . . . 106
11.2.11 **Decisions** . . . . 107
11.2.12 **Costs** . . . . 107
11.2.13 **Enforcement** . . . . 108
11.3 **Alternate Dispute Resolution Committee** . . . . 108
11.3.1 **Membership** . . . . 108
11.3.2 **Voting Requirements** . . . . 109
11.3.3 **Officers** . . . . 109
11.3.4 **Meetings** . . . . 109
11.3.5 **Responsibilities** . . . . 110

ARTICLE 12

PARTICIPATION BY THE WESTERN AREA POWER ADMINISTRATION . 111
12.1 **Participation by the United States** . . . 111
12.3 **Officials Not To Benefit** . . . 112
12.4 **Covenant Against Contingent Fees** . . . 112
12.5 **Contractor Agreement** . . . 112
12.5.1 **Equal Opportunity Employment Practices** . . . 113
12.5.2 **Contract Work Hours and Safety Standards** . . . 113
12.5.3 **Use of Convict Labor** . . . 113

ARTICLE 13

GENERAL PROVISIONS . . . 114
13.1 **Effect of Prior Obligations** . . . 114
13.2 **Pending FERC Proceedings** . . . 114
13.3 **Notice and Conduct of Meetings** . . . 114
13.3.1 **Notice** . . . 114
13.3.2 **Alternative Means of Meeting** . . . 115
13.3.3 **Participation in Meetings** . . . 116
13.3.4 **Minutes** . . . 116
13.3.5 **Written Votes** . . . 116
13.3.6 **Reimbursement of Expenses** . . . 117
13.4 **Delivery of Notices and Minutes** . . . 117
13.5 **Terms of Office** . . . 118
13.6 **Waivers** . . . 118
13.7 **Successors and Assigns** . . . 118
13.7.1 **Successors** . . . 118
13.7.2 **Assignments** . . . 119
13.7.3 **Rights and Obligations** . . . 119
13.8 **Choice of Law** . . . 119
13.9 **Regulation** . . . 119
13.10 **Amendment and Termination** . . . 119
13.11 **Tax Exempt Financing** . . . 120
13.11.1 **No Impairment** . . . 120
13.11.2 **Counsel Opinion or IRS Ruling** . . . 121
13.11.3 **Elimination of Impairment** . . . 121
13.11.4 **New Tax-exempt Debt** . . . 123
13.11.5 **Applicability to Obligation to Build** . . . 124
13.11.6 **Participation in the Generation Reserve-Sharing Pool** . . . 124
13.11.7 **IRS Rule or Regulation** . . . 124
13.12 **Uncontrollable Forces** . . . 124
13.13 **Political Activities** . . . 125
13.14 **Laws of the United States** . . . 125
13.15 **Compliance with Applicable Laws** . . . 125

13.16 **Effect of Canadian Laws** . . . . . . . . . . 126
13.17 **Independent Contractors** . . . . . . . . . . 126
13.18 **Currency** . . . . . . . . . . 127
13.19 **Weighted Voting for Transmission Owning Members** . . . . . . . . . . 127
13.20 **Weighted Voting for Transmission Using Members** . . . . . . . . . . 128
13.22 **Affiliate Relationships** . . . . . . . . . . 128

ARTICLE 14

<u>TERM</u> . . . . . . . . . . 128
14.1 **Effective Date** . . . . . . . . . . 128
14.2 **Termination of MAPP Agreement** . . . . . . . . . . 129

# EXHIBITS

EXHIBIT A

INITIAL REGIONAL RELIABILITY COMMITTEE SUBCOMMITTEES . . . A-1
DESIGN REVIEW SUBCOMMITTEE . . . A-1
OPERATING REVIEW SUBCOMMITTEE . . . A-2
ACCREDITATION SUBCOMMITTEE . . . A-3
OPERATING PROCEDURES SUBCOMMITTEE . . . A-6
POOL PERFORMANCE SUBCOMMITTEE . . . A-9
RELIABILITY STUDIES SUBCOMMITTEE . . . A-10
ENVIRONMENTAL SUBCOMMITTEE . . . A-13

EXHIBIT B

INITIAL GENERATION RESERVE-SHARING POOL SCHEDULES . . . . B-1
GENERAL TERMS AND CONDITIONS . . . B-1
Section 1. General Description . . . B-1
Section 2. Accreditation . . . B-1
Section 3. Scheduling . . . B-1
Section 4. Line Loading Relief . . . B-2
Section 5. Transmission Service and Loss Repayment . . . B-2
Section 6. Billing and Payment . . . B-3
Section 7. Definitions . . . B-5
SCHEDULE B: RESERVE CAPACITY DEFICIENCY SERVICE . . . B-6
Section 1. Service to be Provided . . . B-6
Section 2. Conditions of Service . . . B-6
Section 3. Schedule of Rates . . . B-7
SCHEDULE C: EMERGENCY ENERGY INTERCHANGE SERVICE . . . B-9
Section 1. Service to be Provided . . . B-9
Section 2. Scheduling of Deliveries . . . B-9
Section 3. Schedule of Rates . . . B-9
SCHEDULE C1: SCHEDULED OUTAGE ENERGY INTERCHANGE SERVICE . . . . B-10
Section 1. Service to be Provided . . . B-10
Section 2. Scheduling of Deliveries . . . B-10
Section 3. Schedule of Rates . . . B-10
SCHEDULE D: OPERATING RESERVE SERVICE . . . B-13
Section 1. Service to be Provided . . . B-13
Section 2. Schedule of Rates . . . B-13

EXHIBIT C

SCHEDULE F: TRANSMISSION SERVICE FOR COORDINATION TRANSACTIONS . . . C-1
Preamble . . . C-1
1. Definitions . . . C-1
1.1 Application . . . C-1

1.2 **Buyer** . . . . . . C-1
1.3 **Completed Application** . . . . . . C-1
1.4 **Contractor** . . . . . . C-1
1.5 **Coordination Transaction** . . . . . . C-1
1.6 **Delivering Member** . . . . . . C-2
1.7 **Firm Transmission Service** . . . . . . C-2
1.8 **Line Loading Relief Procedure** . . . . . . C-2
1.9 **Loss Repayment Procedure** . . . . . . C-2
1.10 **Native Load Customers** . . . . . . C-2
1.11 **Network Customers** . . . . . . C-2
1.12 **Non-firm Transmission Service** . . . . . . C-3
1.13 **Parties** . . . . . . C-3
1.14 **Receiving Member** . . . . . . C-3
1.15 **Regional Transmission Committee** . . . . . . C-3
1.16 **Seller** . . . . . . C-3
1.17 **System Impact Study** . . . . . . C-3
1.18 **Transmission Customer** . . . . . . C-3
1.19 **Transmission Provider** . . . . . . C-4
1.20 **Transmission System** . . . . . . C-4
2. **Scope** . . . . . . C-4
3. **Nature of Firm Transmission Service** . . . . . . C-6
3.1 **Term** . . . . . . C-6
3.2 **Service Priority** . . . . . . C-6
3.3 **Curtailment of Service** . . . . . . C-7
3.4 **Classification of Firm Transmission Services** . . . . . . C-8
4. **Nature of Non-firm Transmission Service** . . . . . . C-9
4.1 **Term** . . . . . . C-9
4.2 **Service Priority** . . . . . . C-10
4.3 **Classifications of Non-firm Transmission Service** . . . . . . C-10
4.4 **Scheduling of Non-firm Transmission** . . . . . . C-11
4.5 **Curtailment of Service** . . . . . . C-12
5. **Service Availability** . . . . . . C-12
5.1 **General Conditions** . . . . . . C-12
5.2 Determination of Capacity Availability . . . . . . C-13
5.3 **Policy on Facility Additions or Redispatch of Generation** . C-13
6. **Electronic Information Network** . . . . . . C-13
7. **Standards of Nondiscrimination** . . . . . . C-14
8. **Conditions Required of Transmission Customers** . . . . . . C-14
9. **Procedures for Arranging Firm Service** . . . . . . C-14
9.1 **Application** . . . . . . C-14
9.2 **Completed Application** . . . . . . C-15
9.3 **Reservation of Firm Transmission Services** . . . . . . C-15
9.4 **Notice of Deficient Application** . . . . . . C-16
9.5 **Response to Completed Applications** . . . . . . C-17
9.6 **Completed Application Approvals** . . . . . . C-17

10. Procedures for Arranging Non-firm Transmission Service . . . . . . . C-18
10.1 Application . . . . . . . C-18
10.2 Completed Application . . . . . . . C-18
10.3 Reservation of Non-firm Transmission Service . . . . . . . C-19
10.4 Determination of Capacity Availability . . . . . . . C-19
10.5 Transmission Customer Responsibility for Third-Party Arrangements . . . . . . . C-20
11. Determination of Capacity Availability and Responsibility for Costs Incurred in Providing System Impact Studies . . . . . . . C-20
11.1 Notice of Need for System Impact Study . . . . . . . C-20
11.2 Study Agreement and Cost Reimbursement . . . . . . . C-21
11.3 Performance of System Impact Study . . . . . . . C-22
11.4 Partial Interim Service . . . . . . . C-22
12. Sale or Assignment of Transmission Service . . . . . . . C-23
12.1 Procedures for Assignment or Transfer of Service . . . . . . . C-23
12.2 Information on Assignment or Transfer of Service . . . . . . . C-23
13. Compensation for Transmission Service . . . . . . . C-23
13.1 Compensation for Use of Transmission Facilities . . . . . . . C-23
13.2 Capacity and Energy Losses . . . . . . . C-24
13.3 Other Charges . . . . . . . C-24
13.4 Waivers or Exclusions of Payments . . . . . . . C-24
14. Billing and Payment . . . . . . . C-26
14.1 Billing Procedure . . . . . . . C-26
14.2 Interest on Unpaid Balances . . . . . . . C-27
14.3 Customer Default . . . . . . . C-27
15. Regulatory Filings . . . . . . . C-28
16. Liability and Indemnification . . . . . . . C-28
16.1 Liability . . . . . . . C-28
16.2 Release . . . . . . . C-28
16.3 Damages . . . . . . . C-29
17. Creditworthiness . . . . . . . C-30
18. Dispute Resolution Procedures . . . . . . . C-30
19. Appointment of Representative . . . . . . . C-30
20. Effectiveness . . . . . . . C-31
Appendix A . . . . . . . C(A)-1
RATE SCHEDULE FCTS . . . . . . . C(A)-1
Firm Capacity Transmission Service . . . . . . . C(A)-1
RATE SCHEDULE FETS . . . . . . . C(A)-3
Firm Energy Transmission Services . . . . . . . C(A)-3
RATE SCHEDULE RNF . . . . . . . C(A)-5
Reserved Non-firm Transmission Service . . . . . . . C(A)-5
RATE SCHEDULE HNF . . . . . . . C(A)-7
Hourly Non-firm Transmission Service . . . . . . . C(A)-7
Appendix B . . . . . . . C(B)-1
APPLICATION FOR TRANSMISSION SERVICE . . . . . . . C(B)-1

Appendix C . . . . . . . . . . C(C)-1
PROCEDURE FOR CALCULATION AND ADMINISTRATION OF THE TRANSMISSION SERVICE CHARGE . . . . . . . . . . C(C)-1
1. Introduction . . . . . . . . . . C(C)-1
2. Definitions, Models and Parameters Used . . . . . . . . . . C(C)-1
2.1 Composition of the Network Model . . . . . . . . . . C(C)-1
2.2 Calculating the Cost Parameters . . . . . . . . . . C(C)-4
2.3 Transmission Facility Ownership Representation . . . . . . C(C)-6
3. Calculating the Rate for Transmission Service . . . . . . . . . . C(C)-7
3.1 History of the Technique and Computer Programs . . . . C(C)-7
3.2 Detailed Explanation of the Rate Calculation . . . . . . . . C(C)-8
3.3 The "Megawatt-Mile" Method . . . . . . . . . . C(C)-8
3.4 Application to Service Charge Rates . . . . . . . . . . C(C)-10
3.5 Generator and Load Dispatch . . . . . . . . . . C(C)-10

EXHIBIT D

INITIAL REGIONAL TRANSMISSION COMMITTEE SUBCOMMITTEES . . D-1
TRANSMISSION PLANNING SUBCOMMITTEE . . . . . . . . . . D-1
TRANSMISSION SCHEDULES AND COMPENSATION SUBCOMMITTEE . . . . . . . . D-3
OPERATIONS AND COMPLIANCE SUBCOMMITTEE . . . . . . . . . . D-4

EXHIBIT E

INITIAL POWER AND ENERGY MARKET SCHEDULES . . . . . . . E-1
GENERAL TERMS AND CONDITIONS . . . . . . . . . . E-1
Section 1. General Description . . . . . . . . . . E-1
Section 2. Accreditation . . . . . . . . . . E-1
Section 3. Scheduling . . . . . . . . . . E-1
Section 4. Line Loading Relief . . . . . . . . . . E-2
Section 5. Transmission Service and Loss Repayment . . . . . . . . . E-2
Section 6. Billing and Payment . . . . . . . . . . E-2
SCHEDULE A: PARTICIPATION POWER INTERCHANGE SERVICE . . . . . . . . . . E-5
Section 1. Service to be Provided . . . . . . . . . . E-5
Section 2. Conditions of Service . . . . . . . . . . E-5
Section 3. Schedule of Rates . . . . . . . . . . E-5
SCHEDULE J: FIRM POWER INTERCHANGE SERVICE . . . . . . . . . . E-7
Section 1. Service to be Provided . . . . . . . . . . E-7
Section 2. Conditions of Service . . . . . . . . . . E-7
Section 3. Schedule of Rates . . . . . . . . . . E-8
SCHEDULE K: SYSTEM PARTICIPATION POWER INTERCHANGE SERVICE . . . . E-9
Section 1. Service to be Provided . . . . . . . . . . E-9
Section 2. Conditions of Service . . . . . . . . . . E-9
Section 3. Schedule of Rates . . . . . . . . . . E-10
SCHEDULE L: INTERRUPTIBLE LOAD REPLACEMENT ENERGY SERVICE . . . E-11
Section 1. Services to be Provided . . . . . . . . . . E-11
Section 2. Conditions of Service . . . . . . . . . . E-11

**Section 3. Schedule of Rates** . . . . . . . . . . . . . . . . . . . . . . . . E-12
**SCHEDULE M: GENERAL PURPOSE ENERGY SERVICE** . . . . . . . . . . . . . . . . E-13
**Section 1. Service to be Provided** . . . . . . . . . . . . . . . . . . . . . . E-13
**Section 2. Conditions of Service** . . . . . . . . . . . . . . . . . . . . . . E-13
**Section 3. Schedule of Rates** . . . . . . . . . . . . . . . . . . . . . . . . E-13

EXHIBIT F
MAP OF THE MAPP REGION . . . . . . . . . . . . . . . F-1

4.2 **Membership Process**

4.2.1 **Participants and Associate Participants** — All Participants shall automatically become Members and be deemed signatories to this Restated Agreement upon the Effective Date; provided, however, that a Participant that votes against adoption or readoption of the Restated Agreement pursuant to Section 14.1 may decline such automatic membership and shall not be a Member by providing to the Secretary of the Executive Committee written notice of its intent to decline membership not later than the thirtieth day following the Effective Date; and provided, further, that an Associate Participant under the MAPP Agreement or Manitoba Hydro may decline such automatic membership and shall not be a Member by providing to the Secretary of the Executive Committee written notice of its intent to decline membership not later than the thirtieth day following the Effective Date. A Participant declining such automatic membership shall continue to be liable for any obligations incurred prior to giving notice of such decision. The Secretary of the Executive Committee shall provide immediate notice to all Participants of the commencement of any thirty day period specified in Section 14.1. Notice of intent to decline membership pursuant to the provisions of this paragraph shall become effective immediately and may be given without regard to the termination provisions contained in Paragraph 2.03 of the MAPP Agreement, but any Participant providing such notice shall be subject to any obligations it would have had as a terminated or a terminating Participant under the MAPP Agreement, including, without limitation, the obligations of Paragraph 2.07 of the MAPP Agreement. Upon written request, the Secretary of the Executive Committee shall provide a statement quantifying those obligations. Any Participant or Associate Participant electing to decline membership under the provisions of this Section shall not be eligible to have a Representative

on any council, committee or subcommittee. Within thirty days after the Effective Date, each Participant or Associate Participant intending to become a Member (i) shall provide written notification to the Secretary of the Executive Committee of its identification as a Transmission Owning Member or a Transmission Using Member and as an End-Use Load Member as may be appropriate, (ii) shall provide to the Executive Committee the information necessary for the Executive Committee to determine its number of votes on the Management Committee and the MAPP Reliability Council, and (iii) shall execute an agreement with the Contractor pursuant to 5.3.2. The Secretary of the Executive Committee shall designate the appropriate classifications for any Member that does not provide the foregoing notification.

4.2.2 **New Members** — An entity other than a Participant or Associate Participant meeting the definition of a Member and desiring to become a Member shall submit to the Secretary of the Executive Committee an application for membership in such form, and providing such information, as specified by the Executive Committee. Such application for membership shall include: (i) a brief description of the Applicant; (ii) an indication of whether the Applicant is a Transmission Owning Member or Transmission Using Member and whether it is an End-Use Load Member, (iii) information necessary to determine the Applicant's number of votes, and (iv) such additional information as may be required by the Executive Committee to incorporate the Applicant into all aspects of MAPP, including, without limitation, any models, line loading relief procedures, loss repayment and transmission service charges. The application shall obligate the Applicant to be bound by the provisions of this Restated Agreement if the Applicant becomes a Member.

4.2.3 **Joint Members** — Any entity desiring to become a Joint Member shall submit a written application to the Secretary of the Executive Committee demonstrating

ORIGINAL [redacted]

JONES, DAY, REAVIS & POGUE PUBLIC

ATLANTA
BRUSSELS
CHICAGO
CLEVELAND
COLUMBUS
DALLAS
FRANKFURT
GENEVA
HONG KONG
IRVINE
LONDON
LOS ANGELES
NEW DELHI
NEW YORK
PARIS
PITTSBURGH
RIYADH
TAIPEI
TOKYO

METROPOLITAN SQUARE
1450 G STREET, N.W.
WASHINGTON, D.C. 20005-2088

TELEPHONE: 202-879-3939
FACSIMILE: 202-737-2832
WRITER'S DIRECT NUMBER:

(202) 879-3939

FILED
OFFICE OF THE SECRETARY
98 AUG 14 PM 3:23
FEDERAL ENERGY
REGULATORY COMMISSION

August 14, 1998

David P. Boergers
Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, DC 20426

[redacted]

Re: Automated Power Exchange, Inc., Docket No. ER98-1033-~~000~~ 004

Dear Mr. Boergers:

By order issued July 15, 1998 (July 15 Order), the Federal Energy Regulatory Commission (Commission) accepted Automated Power Exchange, Inc.'s (APX) rate schedule in part and rejected it in part. Automated Power Exchange, Inc., 84 FERC ¶ 61,020 (1998). In the July 15 Order, the Commission directed APX to revise its rate schedule, further explain its operations, and further specify how APX "sets" the price for power traded on APX. By this filing, APX complies with the Commission's July 15 Order.

This filing consists of the following:

1. this transmittal letter;
2. the revised rate schedule;
3. a redlined version of the APX rate schedule showing the changes APX has made to its previously filed APX rate schedule;
4. APX's form of terms and conditions and forms of service agreements; and
5. a form of Notice of Filing suitable for publication in the *Federal Register*.

APX has responded to each of the questions that the Commission raised in its July 15 order regarding the operation of the APX market. APX continues to contend, however, that its method of operation is no different than the method of operation of other electronic power exchanges, such as the Continental Power Exchange and several other similar entities, which the

WAGREG01: 195776_1.WPD
Printed: 08/14/98 04:30PM

9808190482-1

FERC - DOCKETED
AUG 14 1998

Commission does not regulate. Indeed, APX believes that the examples set forth below demonstrate that APX's operations are similar to the operations of those other unregulated power exchanges. Those other unregulated power exchanges are not required to pay the annual charge imposed by the Commission. The imposition of the annual charge on APX places APX at a competitive disadvantage as compared to these other unregulated power exchanges. In addition, those unregulated entities with whom APX competes are not required to file the mode of their operations. The disclosure of the information in this filing places APX at a further competitive disadvantage.

**The Revised Rate Schedule**

To comply with the Commission's order, APX has revised its rate schedule in several respects. APX has included a new section in which it defines the terms used in the rate schedule. APX has revised Section 3 of the rate schedule to make clear that the APX Fees set forth in the rate schedule will be the fees that APX will charge for the power exchange service that it offers until such time that APX seeks to revise those fees. APX has also revised other provisions to the rate schedule in an effort to respond to the issues that the Commission raised in its July 15 Order and in an attempt to further clarify the rate schedule.

**Clarifications of APX's Operations**

In the July 15 Order, the Commission raised several questions with regard to APX's operations and rate schedule. The Commission questioned what APX means by the term "clear the market" and the phrase "adjust the market price to reflect any imbalance." July 15 Order at 61,090. The Commission also questioned whether Section 4.8 of APX's rate schedule is consistent with Section 4.10 of APX's rate schedule, why APX Participants will post new Buy or Sell Orders if they include a limit price in their initial Orders, and how the APX Participants can form and enforce contracts when the identity of the APX Participants is not disclosed. Id. at 61,091. The following sections seek to respond to these questions.

Clearing the Market

The phrase "clear the market" refers to the process by which the APX Market Engine will review the pending Buy Orders and Sell Orders for a given hour, determine if any of the pending Orders can be matched (referred to as "contracted") at the APX Market Price and, if so, contract the orders. The examples set forth below illustrate how the APX Market Engine clears the APX Market.

Adjusting the APX Market Price to Reflect an Imbalance

If the APX Market is not in balance (more Buy Orders than Sell Orders pending, or vice versa), the APX Market Engine will increase (or decrease) the APX Market Price in an effort to

WAGREG01: 195776_1.WPD
Printed: 08/14/98 04:30PM

attract new Sell Orders (or Buy Orders) to move the APX Market toward balance. By the phrase "adjust the market price to reflect any imbalance," APX means that the APX Market Engine will adjust the APX Market Price upward or downward to attract new Orders to match with the remaining Orders that were not contracted in the last market clearing interval. This scenario is described in example 3 below.

Section 4.8 and Section 4.10 of the APX Rate Schedule

The Commission also questioned the seeming inconsistency between Section 4.8 of the rate schedule, which contemplates that the APX Market Engine will match Orders on a first-come, first-served basis, and Section 4.10, which indicates that Orders are matched only after prices are adjusted to reach equilibrium. July 15 Order at 61,091. There is no inconsistency between the two Sections. At the beginning of any market-clearing interval, the APX Market Engine will determine whether there are any pending Orders that can be contracted. The APX Market Engine will prioritize the pending Orders on a first in time basis, sum the total of the megawatts of Buy Orders and the total megawatts of Sell Orders eligible for contracting, and contract the minimum of these two totals. If the totals of the eligible Sell Orders and Buy Orders match, then no imbalance will exist in the APX Market. If unmatched Orders remain, the APX Market Engine will adjust the APX Market Price to attract new Orders that can be contracted with the Orders that remain after the APX Market Engine cleared the APX Market of matchable Orders. Example 3 below illustrates how the first in time prioritization and the price adjustment process are implemented.

Multiple Orders by APX Participants

The Commission questioned why an APX Participant would post new Buy Orders or Sell Orders at the adjusted APX Market Price if the APX Participants impose limit prices on their Orders. Id. The limit price provides APX Participants protection from buying or selling power at a price at which they do not want to trade. However, changes in the market generally may cause an APX Participant to change its Order or to submit an additional Order. For example, an APX Participant may experience a change in its load obligation or generation after it posts an Order for a given APX hourly market. In addition, an APX Participant may want to change its pending Order to respond to changes in the market generally, such as a change in the gas market. As hown in example 3 below, an APX Participant may submit more than one Order for a given hourly APX Market (Buyer A in example 3 submits two Orders at different times for the same APX hourly market). Alternatively, an APX Participant may withdraw a limit Order and later submit a new Order with a different limit price in response to new opportunities perceived by the APX Participant. An APX Participant is free to withdraw an Order up to the time that the Order is contracted.

WAGREG01: 195776_1.WPD
Printed: 08/14/98 04:30PM

Binding Contracts and Enforcement

The Commission questioned how a binding contract may be formed and enforced among APX Participants when, in fact, the identity of the buying entities and the selling entities for any transaction are unknown. Id. In exchange transactions, it is common that parties enter into binding agreements without knowing the identity of each other. The fact that the parties are unknown to each other does not result in the lack of a binding agreement to buy or sell power as ordered. By submitting a Buy Order or a Sell Order, an APX Participant makes a unilateral offer, the matching of which forms a binding contract among the APX Participants whose Orders were contracted.[1]

The anonymity of the contracting parties is not a barrier to enforcing the agreement. Under the APX rate schedule, each APX Participant agrees to sell or buy power as required by a contracted Order. In the event a selling APX Participant fails to deliver as contracted, the buying APX Participant will receive the power it contracted to buy as imbalance power delivered by the California Independent System Operator (ISO). The ISO would then render a bill to APX, as the scheduling coordinator for the transaction, for the imbalance caused by the selling APX Participant's failure to deliver. Pursuant to the APX rate schedule, APX will pass through to the responsible APX Participant any ISO Imbalance Energy Charges assessed by the ISO. APX Rate Schedule, Section 4.12. In those rare instances where APX is not the scheduling coordinator for the APX Market transaction, the ISO would render the bill to the scheduling coordinator that scheduled the transaction and any Imbalance Energy Charges would be allocated pursuant to that scheduling coordinator's procedures. The fact remains, however, that the APX Participants have a binding contract among themselves. In situations in which a buying APX Participant and a selling APX Participant continue to dispute their obligations to each other, APX will disclose to those Participants the identity of the counter-party (ies) to a transaction so that those Participants may seek contract law remedies.

**Examples of Transactions on APX**

The following examples are designed to clarify how APX operates. Each example involves the same hourly APX Market and the initially posted APX Market Price for the hour is $20.00/MW.[2]

1 See Williston on Contracts § 4.3 (4th ed.) (1990).

2 The APX Market Price posted at the opening of each hourly market is based on the closing price for the same hour of the same day of the previous week.

**Example 1**

In this example, only one APX Participant submits an Order to buy 50 MW (Buyer A) for the designated hour at the APX Market Price with a limit price of no more than $21.00/MW. Only one APX Participant (Seller Y) submits an Order to sell power, also 50 MW, for the same APX Market and price, with a limit price of no less than $19.00/MW. The APX Market Engine receives these Orders and then attempts to "clear the market" at $20.00/MW. As explained above, by "clear the market" APX means that the APX Market Engine will contract the matchable pending Buy Orders and the pending Sell Orders. In this example, market clearing is possible because the Buy Order and the Sell Order match exactly in quantity and under the terms of both limit Orders the $20.00/MW APX Market Price is acceptable. Once the APX Market Engine clears the APX Market of these Orders, the APX Market Engine would inform Buyer A and Seller Y that their respective Orders had been contracted. In this example, the clearing of the market results in no remaining Orders for the hour in question and the market is in balance. Hence, in this example, the APX Market Engine will not adjust the APX Market Price.

**Example 2**

In this example, Buyer A submits an Order to purchase 50 MW of power for the hour in question at the APX Market Price of $20.00/MW with a limit price of no more than $21.00/MW. However, in this example, no seller submits an Order to sell power at a price as low as $20.00/MW. After a certain time elapses in which no Sell Order for a given hour will accept a price of $20.00/MW, the software logic of the APX Market Engine determines that $20.00/MW does not clear this APX Market and the APX Market Engine will then adjust the APX Market Price upward in an attempt to find an APX Market Price that would attract a Sell Order to contract with the pending Buy Order. (The adjustment occurs as a result of the logic of the APX algorithm and not as a result of any action (discretionary or otherwise) on the part of APX employees.)

For example, the APX Market Engine may increase the APX Market Price to $20.10/MW for the hour in question. If further time lapses and no seller submits an Order to sell power at the new APX Market Price, the APX Market Engine will again increase the APX Market Price, this time, for example, to $20.18/MW.[3] Seller Y finds $20.18 to be an acceptable price and submits an Order to sell 50 MW of power at that price. At that point, the APX Market Engine will "clear the market" by contracting Buyer A's Order (which is subject to a limit price of no more than $21.00/MW) with Seller Y's order for the 50 MW. The Market Engine will inform both buyer

---

[3] In this example, the first price increase was $.10 and the second price increase was $.08. As explained later in this transmittal letter, the amount of the adjustment to the APX Market Price has a random component.

and seller that their Orders were contracted. Because there are no unmatched Orders remaining after the Market Engine contracts Buyer A's and Seller Y's Orders, the market is in balance.

**Example 3**

Assume that several buyers and sellers have posted Orders on APX. Buyer A enters its Order to purchase 50 MW at a limit price of no more than $21.00/MW, later Buyer B enters its Order to purchase 47 MW at a limit price of no more than $20.50/MW, and later still, Buyer C enters its Order to purchase 5 MW at a limit price of no more than $19.90.[4] For the designated hour, Seller Y enters its Order to sell 50 MW at the APX Market Price of $20.00/MW at a limit price of no less than $19.50/MW and later Seller Z posts an Order to sell 57 MW at a limit price of no less than $19.00/MW. The following table summarizes the submitted Orders:

| Buyer/Seller | Volume | Limit Price/MW |
|---|---|---|
| Buyer A | 50 MW | $21.00 |
| Buyer B | 47 MW | $20.50 |
| Buyer C | 5 MW | $19.90 |
| TOTAL | 102 MW | |
| | | |
| Seller Y | 50 MW | $19.50 |
| Seller Z | 57 MW | $19.00 |
| TOTAL | 107 MW | |

The Market Engine receives all of these Orders and attempts to clear the APX Market at $20.00/MW, the APX Market Price. In the previous examples, clearing the market was relatively simple because the APX Market Engine had to contend only with one seller and one buyer. When the APX Market Engine is confronted with several Orders, the market clearing process involves an additional step that was not necessary in the previous examples. As is the case in the two previous examples, the Market Engine will seek to clear the market by first reviewing the pending Buy and Sell Orders to determine whether any of the pending Orders can be contracted at the APX Market Price for the hour. At an APX Market Price of $20.00/MW, the Market Engine would consider all Orders except Buyer C's Order to purchase 5 MW (because the $20.00/MW APX Market Price is above the limit price set by Buyer C).

Then, because the total power offered in the Sell Orders exceeds the total power demanded in the Buy Orders, the APX Market Engine will rank the pending Orders based on a first-come, first-served basis and contract the minimum of the totals of the buy Orders and the sell Orders at the APX Market Price. In this example, the APX Market Engine has received Orders

---

[4] An APX Participant may submit a Buy Order at a price lower than the APX Market Price and a Sell Order at a price higher than the APX Market Price.

to buy a total of 97 MW (excluding Buyer C's 5 MW Order) and Orders to sell a total of 107 MW at limits that make the APX Market Price of $20.00/MW acceptable. All of Buyer A's 50 MW buy Order is contracted and all of Buyer B's 47 MW Order is contracted. Seller Y posted its Order before Seller Z. As a result, all of Seller Y's Order is contracted but only 47 MW of Seller Z's 57 MW Order is contracted.

After the APX Market Engine clears the APX Market, there remains an imbalance of Sell Orders in the amount of 10 MW at the APX Market Price of $20.00/MW, which is the portion of Seller Z's initial Order that is still pending after the APX Market Engine cleared the APX Market. In an effort to attract more Buy Orders for the remaining 10 MW Sell Order, the APX Market Engine will then decrease the APX Market Price. Just as the APX Market Engine will increase the APX Market Price to clear an imbalance of Buy Orders, it will lower the APX Market Price in the same manner to attempt to clear the remaining Sell Orders.

Assume that the $20.00/MW APX Market Price is lowered to $19.80/MW. The lower price induces Buyer A to submit an additional Buy Order for 10 MW at $19.80/MW with a limit price of $21.00/MW. The Market Engine then attempts to clear the market at $19.80/MW. The Market Engine first reviews the pending Orders and finds that at a Market Price of $19.80/MW it can now consider Buyer C's Order of 5 MW (because the Market Price of $19.80 is below the limit price set by Buyer C) and Buyer A's new Order of 10 MW. At this interval in this example, the pending Buy Orders are for 15 MW (Buyer C's 5 MW and Buyer A's 10 MW) and the pending Sell Order is Seller Z's remaining 10 MW. Again, the APX Market Engine will rank the Buy Orders by arrival sequence. Because Buyer C's 5 MW Order preceded Buyer A's new 10 MW Order, the Market Engine will contract Buyer C's 5 MW Order and only 5 MW of Buyer A's new 10 MW Order. As a result, all of Seller Z's 10 MW Sell Order is contracted. However, the Market Engine now finds an imbalance of 5 MW of Buy Orders, which is the remaining amount of Buyer A's Order not contracted. Hence, the APX Market Engine will increase the APX Market Price to attract Sell Orders to satisfy the demand evidenced by Buyer A's pending Order. The APX Market Engine will continually implement the market clearing process and contracting process for each APX hourly market to move toward a balance of Buy and Sell Orders (e.g., no uncontracted pending Orders) until the APX Market closes.

**Explanation of the Rate Setting Process**

In its July 15 Order, the Commission directed APX to explain in more detail the manner by which APX "sets" the price for power traded on APX. The Commission stated that this directive did not require APX to divulge its confidential and proprietary trade secret algorithm.[5]

---

[5] The Commission stated that disclosing additional explanation as to how APX market prices are established should not be a difficult task because "APX has apparently provided (continued...)

APX does not "set" the APX Market Price in its hourly APX Markets. Instead, the APX Market Engine adjusts the APX market Price to move toward a balance of Buy and Sell Orders. If an APX Market has excess demand, the APX Market Price will rise and if this Market has excess supply, the APX Market Price will decline.

When the APX Market Engine increases or decreases the APX Market Price, it does not adjust the APX Market Price in the same amount each time it makes such an adjustment. Instead, the APX Market Price adjustment varies due to the inclusion of a small random component drawn from a uniform distribution which has a narrowly defined range. The range of the uniform distribution is proprietary information. The APX Market Engine includes this random component in the price adjustment in order to minimize gaming. If several price adjustments in one direction (up or down) do not attract additional Orders, the APX Market Engine will increase the size of the price adjustment.

Each adjustment in the APX market Price occurs at programed intervals for each APX Market. The time between these intervals declines as the APX Market moves through the 168 hours from opening to closing. The interval declines in size to allow more opportunity for trading. The frequency of the market clearing intervals is proprietary and disclosure of such information would destroy APX's effectiveness in providing an efficient market for buyers and sellers.

Although APX posts the APX Market Price on the APX Market Window, APX does not control the APX Market Price at which an APX Participant trades. APX Participants protect themselves by posting a limit price and by responding to an APX Market Price by withdrawing their pending Orders prior to contracting.

**APX Terms and Conditions**

In its July 15 Order, the Commission requested that APX submit for the Commission's review the terms and conditions and service agreement that APX requires APX Participants to execute. Those terms and conditions and service agreements are filed herewith.

Pursuant to 18 C.F.R. § 388.112 (1998) of the Commission's regulations, APX requests confidential treatment of the terms and conditions and service agreements (collectively "Terms and Conditions"). Confidential treatment of the Terms and Conditions is warranted because the disclosure of the Terms and Conditions would result in competitive business harm to APX. APX

---

5 (...continued)
clear information to prospective customers in order to convince them of the benefits of subscribing to APX." However, as is evidenced by the attached Terms and Conditions, APX does not disclose its algorithm to its customers.

incurred approximately $100,000 of expense to develop and draft the Terms and Conditions. If APX is required to disclose its terms and conditions to the public, the value of its investment in the Terms and Conditions is diminished.[6]

No party would be harmed by treating APX's Terms and Conditions as confidential. In addition, the Commission's regulatory responsibilities would not go unfulfilled if APX's Terms and Conditions are kept confidential. APX discloses the full Terms and Conditions to any APX Participant.[7] However, such disclosure does not mean that the information is of the nature typically disclosed to APX competitors or the general public. Indeed, the Terms and Conditions specifically require that APX Participants not disclose the Terms and Conditions to the public. Finally, much of the Terms and Conditions addresses the APX scheduling coordinator function. APX notes that the Commission has required no other scheduling coordinator operating in California to file its terms and conditions of service or rates for such service.

APX believes that giving confidential treatment to APX's Terms and Conditions would not interfere with the Commission's statutory obligations. APX has publicly filed its rate schedule with the Commission. The rate schedule contains the principal and relevant terms and conditions under which APX operates and provides its market service. By the publicly filed rate schedule, all consumers will have access to the same relevant and principal terms and conditions under which APX provides service and thereby may ensure that APX is not operating on an unduly discriminatory basis.

APX notes that none of the APX Participants has urged that APX file the full Terms and Conditions with the Commission or that such a filing is necessary to ensure that APX does not treat them in an unduly discriminatory manner. In fact, it is only APX's competitor, the California

---

6 The Terms and Conditions also come within exemption 4 of the list of information exempt from public disclosure under the Freedom of Information Act. 5 U.S.C. § 552(b)(4) (1994); 18 C.F.R. § 388.107(d) (1998). The Terms and Conditions are commercial information, obtained from a person outside of the government, and are confidential. Courts have indicated that information is confidential if it is "not the type usually released to the public and is of the type that, if released to the public, would cause substantial harm to the person from whom the information was obtained." Gulf & Western Industries v. United States, 615 F.2d 527, 529-30 (D.C. Cir. 1979). APX does not disclose its Terms and Conditions to the general public, but only to APX Participants. In addition, if the Terms and Conditions are released, APX's significant investment in formulating unique contractual provisions to govern its unique operations would be wasted because another entity could easily copy the Terms and Conditions for its own competing power exchange.

7 APX discloses the contents of the Terms and Conditions to prospective Participants on the condition that those entities maintain the confidentiality of the Terms and Conditions.

Power Exchange Corporation (and TURN, an entity that is little more than the alter ego of the California PX) that has demanded that APX disclose its terms and conditions. The Commission should look at such demands with a skeptical eye.[8]

Finally, other public utilities that actually sell power at market-based rates file only limited terms and conditions with the Commission, typically much less than what is contained in APX's rate schedule. Obviously, the single-page rate schedules filed by those power marketers are not the only instruments that such parties sign in order to engage in transactions. The Commission does not require the filing of those more detailed agreements. However, the duty to ensure that those power marketers not engage in unduly discriminatory behavior is no less than the Commission's perceived duty to ensure that APX does not engage in unduly discriminatory behavior.

Pursuant to 18 C.F.R. § 388.112 (1998), APX is submitting the Terms and Conditions in a separate envelope stamped with the following legend: **"Contains Privileged Information -- Do Not Release."** APX is submitting fourteen copies of this letter without the Terms and Conditions and a statement indicating that the Terms and Conditions have been removed for privileged treatment. Pursuant to 18 C.F.R. § 388.112(b)(1)(iv) (1998), the persons to be contacted regarding this request for privileged treatment of the Terms and Conditions are:

Clark Evans Downs
Martin V. Kirkwood
Jones, Day, Reavis & Pogue
1450 G Street, N.W.
Washington, D.C. 20005
Phone: (202) 879-3939
Fax: (202) 737-2832

---

[8] The Commission has recently acknowledged that the Commission's reporting and filing requirements may need to be reviewed to take account of changes in the electricity market. As the Commission has acknowledged, power exchanges raise new issues as to the Commission's regulation of these entities. APX submits that this case presents a situation in which the Commission should not apply its reporting and filing requirements in a cookie-cutter fashion.

A copy of this compliance filing has been served on all parties to this proceeding and on all APX Participants. All orders, correspondence and communications regarding this filing should be served on the undersigned:

Dr. Edward Cazalet
President and Chief Executive Officer
Automated Power Exchange, Inc.
10455 Bandley Drive
Cupertino, CA 95014

and

Clark Evans Downs
Martin V. Kirkwood
Jones, Day, Reavis & Pogue
1450 G Street, N.W.
Washington, D.C. 20005

Respectfully submitted,

AUTOMATED POWER EXCHANGE, INC.

By [signature]
Clark Evans Downs
Martin V. Kirkwood

Its counsel

WAGREG01: 195776_1.WPD
Printed: 08/14/98 04:30PM

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Automated Power Exchange, Inc. ) Docket No. ER98-1033-000

NOTICE OF FILING
( 1998)

Take notice that on August 14, 1998, Automated Power Exchange, Inc. filed its compliance filing in the above-captioned proceeding.

Any person desiring to be heard or to protest said filing should file a motion to intervene or protest with the Federal Energy Regulatory Commission, 888 First Street, N.E., Washington, D.C. 20426, in accordance with Rules 211 and 214 of the Commission's Rules of Practice and Procedure (18 CFR §§ 385.211 and 385.214). All such motions or protests should be filed on or before , 1998. Protests will be considered by the Commission in determining the appropriate action to be taken, but will not serve to make protestants parties to the proceeding. Any person wishing to become a party must file a motion to intervene. Copies of this filing are on file with the Commission and are available for public inspection.

David Boergers
Secretary

AUTOMATED POWER EXCHANGE, INC.
FERC ELECTRIC RATE SCHEDULE NO. 1

***1.0 General Description of APX and APX Services and Definitions:***

1.1 Automated Power Exchange, Inc. (APX) is a privately owned and operated company that offers computerized information management services that permit any customer (APX Participant) to engage in transactions for electric energy with other APX Participants for the purchase and sale of electricity and related products subject to terms and conditions agreed to by APX and the APX Participant. APX Markets operate twenty-four hours a day in an electronic, automated environment.

1.2 APX Participants may submit orders to buy or sell electricity using the APX Market Window. The APX Markets consist of 168 hourly electricity Markets in each of the Northern California and Southern California zones, as defined by the California ISO. APX offers separate Markets in conventional source generation (APX electricity market) and in power generated from renewable resources (APX green power market). APX collectively refers to these markets as the "APX Markets."

**1.3 Definitions**

1.3(a) "APX" means Automated Power Exchange, Inc., a California corporation.

1.3(b) "APX Fees" means the fees and charges imposed by APX upon Participants using the APX Services that are set forth in Attachment 1 hereto.

1.3(c) "APX Markets"™ means the APX electricity market (power generated from conventional source generation) and the APX green power market (power generated from renewable generation resources).



© 1998 AUTOMOATED POWER EXCHANGE, INC.

1.3(d) "APX Market Engine"™ means the active server and software that administers the APX services and is owned and maintained by APX.

1.3(e) "APX Market Price" means the price that the APX Market Engine assigns to each open Market, as adjusted from time to time.

1.3(f) "APX Market Window"™ means the software that provides the electronic graphical user interface between APX Participants and the APX Market Engine.

1.3(g) "Buy Order" means an offer to purchase electricity in the APX Markets.

1.3(h) "Clearing Account" means the account maintained with the Depository and Clearing Agent for the benefit of the Participants and APX in which all monies owing from Participants are deposited and disbursed to (i) Participants, and (ii) APX for APX Fees and ISO Pass-Through Charges.

1.3(i) "Contracting" or "Contract" means the process by which a Buy Order(s) is matched with a Sell Order(s).

1.3(j) "Depository and Clearing Agent" means Bankers Trust Company, a New York State chartered bank, or a successor entity appointed by APX in its sole discretion.

1.3(k) "FERC" means the Federal Energy Regulatory Commission, or successor agency.

1.3(l) "ISO" means the California Independent Operator Corporation, or successor entity.

1.3(m) "ISO Pass-Through Charges" means any charge or fee imposed by the ISO in connection with a Contracted Order, delivery or a schedule submitted to the ISO by APX. The ISO Pass-Through Charges include the Imbalance Energy Charge, Unaccounted For Energy



© 1998 AUTOMOATED POWER EXCHANGE, INC.

Charge, ISO Grid Management Charge, Ancillary Service Charges, ISO Grid Operations Charge, Usage Charge and Wheeling Access Charge.

1.3(n) "ISO Controlled Grid" has the meaning set forth in the ISO Tariff.

1.3(o) "ISO Grid Management Charge" means the charge imposed by the ISO on all Scheduling Coordinators that is intended to recover the ISO startup, development, operation and maintenance costs.

1.3(p) "ISO Tariff" means the tariff, together with all associated appendices and agreements, filed by the ISO and approved by FERC, as amended and modified from time to time.

1.3(q) "Market" means an hour in which there is an opportunity to buy or sell electricity or related products using the APX services.

1.3(r) "Market Clearing" or "Clear the Market" means the process by which the APX Market Engine reviews pending Buy Orders and Sell Orders for the purpose of Contracting pending Buy Orders and Sell Orders at the APX Market Price.

1.3(s) "Monetary Reserve Account" means the account maintained with the Depository and Clearing Agent on behalf of an APX Participant.

1.3(t) "Monetary Reserve Facility" means an approved form of reserves that an APX Participant maintains as required by APX. A Monetary Reserve Facility shall be one of the following: an irrevocable and unconditional letter of credit that has been approved by APX and issued by a bank or other financial institution acceptable to APX on its reasonable discretion or a Monetary Reserve Account.



© 1998 AUTOMOATED POWER EXCHANGE, INC.

1.3(u) "Monetary Reserve Requirement" means the minimum amount of funds (in U.S. dollars) that a Participant must maintain in its Monetary Reserve Facility at any given time to cover the Participant's net exposure, as determined by APX.

1.3(v) "Order" means a Buy Order or a Sell Order.

1.3(w) "Pending Order" means an Order, or any portion of an Order, that is available to be Contracted.

1.3(x) "PX" means the California Power Exchange Corporation, a California corporation, or successor entity.

1.3(y) "Sell Order" means an offer to sell electricity in the APX Markets.

13.(z) "Settlement Account" means the account maintained by each APX Participant with the Depository and Clearing Agent.

***2.0 Availability:***

2.1 APX offers to APX Participants the use of a computerized trading service for use in submitting orders to purchase or sell energy in designated hourly APX Markets.

2.2 Service under this Rate Schedule is available to any entity who may lawfully engage in transactions.

***3.0 Fees:***

All transactions under this Rate Schedule will be subject to fees set forth in Attachment 1 hereto.



© 1998 AUTOMOATED POWER EXCHANGE, INC.

***4.0 Description of Interaction with Buyers and Sellers (APX Participants) and Computation of the APX Market Price***

4.1 APX offers to APX Participants a computerized platform for continuous trading of hourly electric energy during the week prior to delivery. Such trading will occur in a set of 168 hourly APX Markets. APX will support separate sets of 168 hourly APX Markets in each of the two active California zones established by the ISO. Each hourly APX Market in each zone will function entirely independently. At the beginning of each hour, APX will open a new hourly APX Market for each zone, which will remain open continuously until that hour reaches the time for delivery, 168 hours later, at which time it closes.

4.2 APX will display an APX Market Price for each of the 168 hours on the APX Market Window. APX Participants may submit and withdraw Orders through the APX Market Window to buy or sell in response to the APX Market Price displayed on the APX Market Window. The APX Market Engine will receive the Orders, Clear the Market of those Orders willing to trade at the APX Market Price, adjust the APX Market Price to reflect any imbalance between Buy Orders and Sell Orders and transmit the revised APX Market Price back to the APX Participants for use in deciding whether to place new Orders.

4.3 For the convenience of the APX Participants' ordering and delivery, the APX Market Window does not require APX Participants to submit Orders with a fixed standard megawatt size. Therefore, APX Participants can submit Orders of varying size.

4.4 The APX Market Window allows an APX Participant to choose to attach a limit price to an Order that it submits. The APX Market Window also allows an APX Participant to impose a withdrawal time on its Order. The limit price feature allows the APX Participant to



© 1998 AUTOMOATED POWER EXCHANGE, INC.

specify an upper limit price for Buy Orders and a lower limit price for Sell Orders. The Market Engine will not contract a Buy Order with a limit price if the APX Market Price moves above the stated limit and will not contract a Sell Order with a limit price if the APX Market Price moves below the stated limit. An APX Participant may choose to override the limit price default option on the APX Market Window. By doing so, the APX Participant indicates its willingness to contract at any APX Market Price generated by the Market Engine at the time the APX Participant's Order is Contracted with an opposite Order of a counter-party or -parties. The APX Market Engine will not contract an Order if it has a withdrawal time and that withdrawal time has expired.

4.5 When the APX Market Engine Contracts a Buy and Sell Order, a binding contract is formed between the selling APX Participant(s) and the buying APX Participant(s) for the quantities that are Contracted. At such time a Sell Order is Contracted with a Buy Order, the APX Market Engine will send a notice via the APX Market Window to each APX Participant whose Order has been Contracted informing such APX Participants that their Orders have been Contracted. At no time will APX take title to the electricity that is traded through the APX. Title in the electricity traded through the APX will be transferred from the selling APX Participant(s) to the buying APX Participant(s) at the point at which the electricity is injected into the ISO Controlled Grid. An APX Participant may withdraw its Order prior to the time the Order is Contracted. However, once the Order is Contracted, the APX Participant cannot withdraw its Order.

4.6 APX uses an automated process, which APX calls its Market Engine, to Clear the Markets that APX supports and to report and adjust the APX Market Price.



© 1998 AUTOMOATED POWER EXCHANGE, INC.

4.7 As each new hourly Market opens for the first time, the APX Market Window will display an initial indicated price for the Market that is based on the closing price for the same hour in the same day of the previous week. At periodic intervals, the Market Engine reviews the pending Buy Orders and Sell Orders to determine if it can Clear the Market. Before attempting to clear an hourly Market, the APX Market Engine will suspend any Buy Order and Sell Order whose limit price or withdrawal limit currently disqualifies it and rejects any Order for APX designated reasons, including those Orders for which the APX Participant's credit is insufficient. The remaining Orders are viewed by the APX Market Engine as eligible for Contracting because they represent a willingness to Contract at the APX Market Price.

4.8 The APX Market Engine will then seek to Contract the eligible orders at the APX Market Price. The Market Engine Clears the Market by totaling the megawatts of the Buy Orders on a first-come, first-served basis, by totaling the megawatts of the Sell Orders also on a first-come, first-served basis and by Contracting the lesser of these two totals. This Contracting may involve only one buying APX Participant and one selling APX Participant or several buying APX Participants or several selling APX Participants. Any Order not Contracted will remain pending and available for Contracting at the next Market Clearing interval.

4.9 When an APX Market has Orders pending, the APX Market Engine adjusts the APX Market Price to move the Market toward a balance of Buy Orders and Sell Orders. Thereafter, the APX Market Engine will adjust the current APX Market Price each time after the Market Engine attempts to clear an APX hourly Market if pending Orders remain in that Market after clearing. Dynamic competitive Markets are unlikely to balance exactly at any given time because in a competitive market buyers and sellers do not coordinate their order submittal.



© 1998 AUTOMOATED POWER EXCHANGE, INC.

4.10 The APX Market Engine will adjust the current APX Market Price for each hourly Market based on the balance of pending Buy Orders and Sell Order for the hour. The Market Engine will increase the APX Market Price when Buy Orders exceed Sell Orders and decrease the APX Market Price when Sell Orders exceed Buy Orders. When the APX Market Engine increases or decreases the APX Market Price, it does not adjust the price in the same amount each time it makes such an adjustment. Instead, the APX Market Price adjustment varies due to the inclusion of a small random component drawn from a uniform distribution which has narrowly defined range. If several price adjustments in one direction (up or down) do not attract additional Orders, the APX Market Engine will increase the size of the price adjustment. Each price adjustment occurs at programed intervals for each APX Market. The time between these intervals declines as the APX market moves through the 168 hours from opening to closing to allow more opportunity for trading. These changes in the APX Market Price are intended to move the APX Market toward a balance of Buy and Sell Orders as APX Participants adjust their Order positions in response to the APX Market Price changes. Changes in the APX Market Price made by the APX Market Engine will be transmitted to the APX Market Window. However, due to lag time between the time that the APX Market Engine adjusts the APX Market Price and the time the new APX Market Price is displayed on the APX Market Window, the price displayed on the APX Market Window may at times differ from the APX Market Price assigned to a given Market by the APX Market Engine. Therefore, the APX Market Price at which an APX Order will be Contracted will not always be identical to the price displayed on the APX Market Window for the Contracted Market at the time the APX Participant's Order was submitted or at the time the APX Participant is informed that its Order has been Contracted.



© 1998 AUTOMOATED POWER EXCHANGE, INC.

4.11. The Market Engine attempts to Clear the Market periodically. The frequency of Market Clearing intervals is determined by the APX Market Engine. The interval between clearing times will generally grow shorter as the hourly Markets move toward closure in order to accommodate greater Market volume. Because the APX Market Engine maintains 168 independent hourly Markets in each of the California zones, the APX Market Engine will not clear all Markets simultaneously.

4.12 After the end of each month, APX will send an invoice to each APX Participant. The invoice will reflect such APX Participant's net financial position, which is net of actual or estimated amounts owed and owing. This includes amounts related to Contracted Orders, APX Fees, ISO Pass-Through Charges, taxes and any true-up amounts. The true-up process works continuously, beginning with the first Contracted Order record and applying newly available information to update the record. By working continuously, this true-up process can accommodate an on-going settlement process and can avoid unnecessary delays. Examples of updated information include actual meter data to replace estimated usage data and current actual charges to replace estimated charges. ISO Pass-Through Charges include charges for its Grid Management Fee, Grid Usage Fee, Ancillary Services, Imbalance Energy, and Unaccounted for Energy.

4.13 Each APX Participant shall maintain a Settlement Account and a Monetary Reserve Facility. The APX Participant will pay funds into its Settlement Account to cover its purchases and other obligations owed to APX. An APX Participant will be paid funds owed to it through its Settlement Account. Transfers among these Settlement Accounts will be made through a collective Clearing Account at an independent Depository and Clearing Account Agent.



© 1998 AUTOMOATED POWER EXCHANGE, INC.

Non-payment by an APX Participant into its Settlement Account will result in a draw on the APX Participant's Monetary Reserve Facility.

### *5.0 Regulatory Filings:*

Nothing contained in this Rate Schedule shall be construed as affecting or limiting in any way the right of APX unilaterally to file with the FERC, or make application to the FERC for, changes in rates, charges, classifications, or service, or any rule or regulation relating hereto, in this Rate Schedule under section 205 of the Federal Power Act pursuant to the FERC's rules and regulations promulgated thereunder, or under other applicable statutes or regulations.

### *6.0 Other Terms and Conditions:*

All other terms and conditions shall be established by agreement between Automated Power Exchange, Inc. and the APX Participant.

### *7.0 Effective Date:*

This Rate Schedule shall be effective on and after April 1, 1998.



© 1998 AUTOMOATED POWER EXCHANGE, INC.

AUTOMATED POWER EXCHANGE, INC.
FERC ELECTRIC RATE SCHEDULE NO. 1

***1.0 General Description of APX and APX Services and Definitions:***

1.1 Automated Power Exchange, Inc. (APX) is a privately owned and operated company that offers computerized information management services that permit any customer (APX Participant) ~~that desires~~ to engage in transactions for electric energy with other APX Participants for the purchase and sale of electricity and related products subject to terms and conditions agreed to by APX and the APX Participant. APX Markets operate twenty-four hours a day in an electronic, automated environment.

1.2 APX Participants may submit orders to buy or sell electricity using the APX Market Window. The APX ~~markets~~ Markets consist of 168 hourly electricity ~~markets~~ Markets in each of the Northern California and Southern California zones, as defined by the California ISO. APX offers separate Markets in conventional source generation (APX electricity market) and in power generated from renewable resources (APX green power market). APX collectively refers to these markets as the "APX Markets."

**1.3 Definitions**

**1.3(a) "APX" means Automated Power Exchange, Inc., a California corporation.**

**1.3(b) "APX Fees" means the fees and charges imposed by APX upon Participants using the APX Services that are set forth in Attachment 1 hereto.**

**1.3(c) "APX Markets"™ means the APX electricity market (power generated from conventional source generation) and the APX green power market (power generated from renewable generation resources).**

WAGREG01: 196064_2.wpd
Printed: 08/14/98 03:51PM

© 1998 AUTOMOATED POWER EXCHANGE, INC.

1.3(d) "APX Market Engine"™ means the active server and software that administers the APX services and is owned and maintained by APX.

1.3(e) "APX Market Price" means the price that the APX Market Engine assigns to each open Market, as adjusted from time to time.

1.3(f) "APX Market Window"™ means the software that provides the electronic graphical user interface between APX Participants and the APX Market Engine.

1.3(g) "Buy Order" means an offer to purchase electricity in the APX Markets.

1.3(h) "Clearing Account" means the account maintained with the Depository and Clearing Agent for the benefit of the Participants and APX in which all monies owing from Participants are deposited and disbursed to (i) Participants, and (ii) APX for APX Fees and ISO Pass-Through Charges.

1.3(i) "Contracting" or "Contract" means the process by which a Buy Order(s) is matched with a Sell Order(s).

1.3(j) "Depository and Clearing Agent" means Bankers Trust Company, a New York State chartered bank, or a successor entity appointed by APX in its sole discretion.

1.3(k) "FERC" means the Federal Energy Regulatory Commission, or successor agency.

1.3(l) "ISO" means the California Independent Operator Corporation, or successor entity.



© 1998 AUTOMOATED POWER EXCHANGE, INC.

1.3(m) "ISO Pass-Through Charges" means any charge or fee imposed by the ISO in connection with a Contracted Order, delivery or a schedule submitted to the ISO by APX. The ISO Pass-Through Charges include the Imbalance Energy Charge, Unaccounted For Energy Charge, ISO Grid Management Charge, Ancillary Service Charges, ISO Grid Operations Charge, Usage Charge and Wheeling Access Charge.

1.3(n) "ISO Controlled Grid" has the meaning set forth in the ISO Tariff.

1.3(o) "ISO Grid Management Charge" means the charge imposed by the ISO on all Scheduling Coordinators that is intended to recover the ISO startup, development, operation and maintenance costs.

1.3(p) "ISO Tariff" means the tariff, together with all associated appendices and agreements, filed by the ISO and approved by FERC, as amended and modified from time to time.

1.3(q) "Market" means an hour in which there is an opportunity to buy or sell electricity or related products using the APX services.

1.3(r) "Market Clearing" or "Clear the Market" means the process by which the APX Market Engine reviews pending Buy Orders and Sell Orders for the purpose of Contracting pending Buy Orders and Sell Orders at the APX Market Price.

1.3(s) "Monetary Reserve Account" means the account maintained with the Depository and Clearing Agent on behalf of an APX Participant.

1.3(t) "Monetary Reserve Facility" means an approved form of reserves that an APX Participant maintains as required by APX. A Monetary Reserve Facility shall



© 1998 AUTOMOATED POWER EXCHANGE, INC.

be one of the following: an irrevocable and unconditional letter of credit that has been approved by APX and issued by a bank or other financial institution acceptable to APX on its reasonable discretion or a Monetary Reserve Account.

1.3(u) "Monetary Reserve Requirement" means the minimum amount of funds (in U.S. dollars) that a Participant must maintain in its Monetary Reserve Facility at any given time to cover the Participant's net exposure, as determined by APX.

1.3(v) "Order" means a Buy Order or a Sell Order.

1.3(w) "Pending Order" means an Order, or any portion of an Order, that is available to be Contracted.

1.3(x) "PX" means the California Power Exchange Corporation, a California corporation, or successor entity.

1.3(y) "Sell Order" means an offer to sell electricity in the APX Markets.

13.(z) "Settlement Account" means the account maintained by each APX Participant with the Depository and Clearing Agent.

***2.0 Availability:***

2.1 APX offers to APX Participants the use of a computerized trading service for use in submitting orders to purchase or sell energy in designated hourly ~~markets~~ APX Markets.

2.2 Service under this Rate Schedule is available to any ~~customer~~ entity who may lawfully engage in transactions.



© 1998 AUTOMOATED POWER EXCHANGE, INC.

***3.0 Fees:***

All transactions under this Rate Schedule will be subject to fees ~~established by agreement between the APX Participant and APX. The current APX fee schedule is~~ **set forth in** Attachment 1 hereto.

***4.0 Description of Interaction with Buyers and Sellers (APX Participants) and Computation of the APX Market Price***

4.1 APX offers to APX Participants a computerized platform for continuous trading of hourly electric energy during the week prior to delivery. Such trading will occur in a set of 168 hourly ~~markets~~ **APX Markets**. APX will support separate sets of 168 hourly ~~markets~~ **APX Markets** in each of the two active California zones established by the ISO. Each hourly ~~market~~ **APX Market** in each zone will function entirely independently. At the beginning of each hour, APX will open a new hourly ~~market~~ **APX Market** for each zone, which will remain open continuously until that hour reaches the time for delivery, 168 hours later~~. Correspondingly, each hour the market nearest delivery will close~~**, at which time it closes**.

4.2 APX will display ~~a market price~~ **an APX Market Price** for each of the 168 hours on the APX Market Window~~, a graphical user interface~~. APX Participants may submit and withdraw ~~orders~~ **Orders** through the APX Market Window to buy or sell in response to ~~this price~~ **the APX Market Price** displayed on the APX Market Window. The APX ~~server~~ **Market Engine** will receive the ~~orders, clear~~ **Orders, Clear** the ~~market~~ **Market** of those ~~orders~~ **Orders** willing to trade at the ~~market price,~~ **APX Market Price,** adjust the ~~market price~~ **APX Market Price** to reflect any imbalance between ~~buy and sell orders~~ **Buy Orders and Sell Orders** and



© 1998 AUTOMOATED POWER EXCHANGE, INC.

transmit the revised ~~market price~~ **APX Market Price** back to the APX Participants for use in deciding whether to place new ~~orders~~ **Orders**.

4.3 For the convenience of the APX Participants' ordering and delivery, the APX Market Window does not require APX Participants to submit ~~orders~~ **Orders** with a fixed ~~size in megawatts~~ **standard megawatt size**. Therefore, APX Participants can submit ~~orders~~ **Orders** of varying size.

4.4 The APX Market Window ~~requires~~ **allows** an APX Participant to **choose to** attach a **limit** price ~~limit~~ to an ~~order~~ **Order** that it submits. The APX Market Window also allows an APX Participant to impose a ~~duration limit~~ **withdrawal time** on its ~~order.~~ **Order.** The **limit** price ~~limit order~~ feature allows the APX Participant to specify an upper **limit** price ~~limit~~ for ~~buy orders~~ **Buy Orders** and a lower **limit** price ~~limit~~ for ~~sell orders~~ **Sell Orders**. The Market Engine will not contract ~~an order so limited~~ **a Buy Order with a limit price** if the APX Market Price moves ~~beyond the stated price~~ **above the stated limit and will not contract a Sell Order with a limit price if the APX Market Price moves below the stated** limit. An APX Participant may choose to override the limit price ~~order~~ default option on the APX Market Window. ~~If~~ **By doing** so, the APX Participant ~~is willing~~ **indicates its willingness** to contract at ~~the current~~ **any** APX Market Price generated by the Market Engine at the time the APX Participant's ~~order~~ **Order** is ~~contracted~~ **Contracted** with an opposite ~~order~~ **Order** of a counter-party or -parties. The APX Market ~~Window~~ **Engine** will not contract an ~~order beyond the stated duration limit. An order will remain pending until the order is contracted, the order is withdrawn, or the market for which the order was submitted closes~~ **Order if it has a withdrawal time and that withdrawal time has expired**.



© 1998 AUTOMOATED POWER EXCHANGE, INC.

4.5 When the APX Market Engine ~~contracts~~ **Contracts** a ~~buy~~ **Buy** and ~~sell order~~ **Sell Order**, a binding contract is formed between the selling APX Participant(s) and the buying APX Participant(s) for the quantities that are ~~contracted~~ **Contracted**. At such time a ~~sell order is contracted~~ **Sell Order is Contracted** with a ~~buy order~~ **Buy Order**, the APX Market Engine will send a notice via the **APX** Market Window to each APX Participant whose ~~order~~ **Order** has been ~~contracted~~ **Contracted** informing such APX Participants that their ~~orders~~ **Orders** have been ~~contracted~~ **Contracted**. At no time will APX take title to the electricity that is traded through the APX. Title in the electricity traded through the APX will be transferred from the selling APX Participant(s) to the buying APX Participant(s) at the point at which the electricity is injected into the ISO ~~grid.~~ **Controlled Grid. An APX Participant may withdraw its Order prior to the time the Order is Contracted. However, once the Order is Contracted, the APX Participant cannot withdraw its Order.**

4.6 APX uses an automated process, which APX calls its Market Engine, to ~~clear the hourly markets APX will support~~ **Clear the Markets that APX supports** and to report and adjust the APX Market Price.

4.7 **As each new hourly Market opens for the first time, the APX Market Window will display an initial indicated price for the Market that is based on the closing price for the same hour in the same day of the previous week.** At periodic intervals, the Market Engine reviews the pending ~~orders~~ **Buy Orders and Sell Orders** to determine if it can ~~clear~~ **Clear** the ~~market~~ **Market**. Before attempting to clear an hourly ~~market,~~ **Market,** the **APX** Market Engine ~~suspends any order~~ **will suspend any Buy Order and Sell Order** whose limit price **or withdrawal limit** currently disqualifies it and rejects any ~~order~~ **Order** for APX



© 1998 AUTOMOATED POWER EXCHANGE, INC.

designated reasons, including those ~~orders whose withdrawal time has expired or~~ **Orders** for which the APX Participant's credit is insufficient. The remaining ~~orders~~ **Orders** are viewed by the APX Market Engine as ~~representing~~ **eligible for Contracting because they represent** a willingness to ~~contract~~ **Contract** at the ~~current~~ APX Market Price.

4.8 The ~~Market Engine totals~~ **APX Market Engine will then seek to Contract the eligible orders at the APX Market Price. The Market Engine Clears the Market by totaling** the megawatts of the ~~buy orders ordered~~ **Buy Orders** on a first-come**,** first-served basis ~~and totals~~**, by totaling** the megawatts of the ~~sell orders~~ **Sell Orders** also ~~ordered~~ on a first-come**,** first-served basis and ~~contracts~~ **by Contracting** the lesser of these two totals. ~~The Market Engine leaves the remaining orders as~~ **This Contracting may involve only one buying APX Participant and one selling APX Participant or several buying APX Participants or several selling APX Participants. Any Order not Contracted will remain** pending and available for ~~contracting at the next interval. APX refers to this process of order contracting as market clearing. The~~ **Contracting at the next Market Clearing interval.**

**4.9 When an APX Market has Orders pending, the APX** Market Engine adjusts **the APX Market Price to move the Market toward a balance of Buy Orders and Sell Orders. Thereafter, the APX Market Engine will adjust** the current APX Market Price ~~for each hourly energy market~~ **each time after the Market Engine attempts to clear an APX hourly Market if pending Orders remain in that Market after clearing. Dynamic competitive Markets are unlikely to balance exactly at any given time because in a competitive market buyers and sellers do not coordinate their order submittal.**



© 1998 AUTOMOATED POWER EXCHANGE, INC.

**4.10 The APX Market Engine will adjust the current APX Market Price for each hourly Market** based on the balance of pending **Buy Orders and Sell Order for the hour. The Market Engine will increase the APX Market Price when Buy Orders exceed Sell Orders and decrease the APX Market Price when Sell Orders exceed Buy Orders. When the APX Market Engine increases or decreases the APX Market Price, it does not adjust the price in the same amount each time it makes such an adjustment. Instead, the APX Market Price adjustment varies due to the inclusion of a small random component drawn from a uniform distribution which has narrowly defined range. If several price adjustments in one direction (up or down) do not attract additional Orders** ~~buy and sell orders for the hour. 4.9 As each new hourly market opens, the APX Market Window will display an initial indicated price for the market that is based on the closing price for the same hour in the day of the previous week. When an APX Market has orders pending, the Market Engine adjusts the market price to move the Market toward a balance of buy and sell orders. Thereafter~~, the APX Market Engine will **increase the size of the price adjustment. Each price adjustment occurs at programed intervals for each APX Market. The time between these intervals declines as the APX market moves through the 168 hours from opening to closing to allow more opportunity for trading. These changes in** ~~adjust the current market price each time after the Market Engine attempts to clear an APX hourly market if pending orders remain in that market after clearing. Dynamic competitive markets are unlikely to balance exactly at any given time because in a competitive market buyers and sellers do not coordinate their order submittal.~~

~~4.10 The Market Engine will increase~~ the APX Market Price ~~when buy orders exceed sell orders and decrease the APX Market Price when sell orders exceed buy orders. These price changes~~ are



© 1998 AUTOMOATED POWER EXCHANGE, INC.

intended to move the APX Market toward ~~equilibrium~~ **a balance of Buy and Sell Orders** as APX Participants adjust their ~~bid~~ **Order** positions in ~~reaction to price~~ **response to the APX Market Price** changes. Changes in the APX Market Price made by the APX Market Engine will be transmitted to the APX Market Window. However, due to lag time between the time that the APX Market Engine adjusts the APX Market Price and the time the new APX Market Price is displayed on the APX Market Window, the price displayed on the APX Market Window may at times differ from the APX Market Price assigned to a given ~~market~~ **Market** by the APX Market Engine. Therefore, the APX Market Price at which an APX ~~Participant~~ **Order** will ~~contract~~ **be Contracted** will not always be identical to the price displayed on the APX Market Window for the ~~contracted market~~ **Contracted Market** at the time the APX Participant's ~~order~~ **Order** was submitted or at the time the APX Participant is informed that its ~~order~~ **Order** has been ~~contracted~~ **Contracted**.

4.11. The Market Engine attempts to ~~clear each hourly market periodically.~~ **Clear the Market periodically. The frequency of Market Clearing intervals is determined by the APX Market Engine.** The interval between clearing times will generally grow shorter as the hourly ~~markets~~ **Markets** move toward closure in order to accommodate greater ~~market~~ **Market** volume. Because the **APX** Market Engine maintains 168 independent hourly ~~markets~~ **Markets** in each of the California zones, the **APX** Market Engine will not clear all ~~markets~~ **Markets** simultaneously.

4.12 After the end of each month, APX will send an invoice to each APX Participant. The invoice will reflect such APX Participant's net financial position, which is net of actual or estimated amounts owed and owing. This includes amounts related to ~~contracted orders, APX~~



© 1998 AUTOMOATED POWER EXCHANGE, INC.

~~fees, ISO pass-through charges~~ **Contracted Orders, APX Fees, ISO Pass-Through Charges,** taxes and any true-up amounts. The true-up process works continuously, beginning with the first ~~contracted order~~ **Contracted Order** record and applying newly available information to update the record. By working continuously, this true-up process can accommodate an on-going settlement process and can avoid unnecessary delays. Examples of updated information include actual meter data to replace estimated usage data and current actual charges to replace estimated charges. ISO ~~pass-through charges~~ **Pass-Through Charges** include charges for its Grid ~~management~~ **Management** Fee, Grid Usage Fee, Ancillary Services, **Imbalance Energy,** and Unaccounted for Energy.

4.13 **Each APX Participant shall maintain a Settlement Account and a Monetary Reserve Facility.** The APX Participant will pay ~~or be paid through individual settlement accounts with transfers among these settlement accounts occurring~~ **funds into its Settlement Account to cover its purchases and other obligations owed to APX. An APX Participant will be paid funds owed to it through its Settlement Account. Transfers among these Settlement Accounts will be made** through a collective ~~clearing account~~ **Clearing Account** at an independent ~~depository and clearing account agent~~ **Depository and Clearing Account Agent**. Non-payment by an APX Participant ~~results~~ **into its Settlement Account will result** in a draw on the APX Participant's ~~monetary reserve~~ **Monetary Reserve Facility**.



© 1998 AUTOMOATED POWER EXCHANGE, INC.

***5.0 Regulatory Filings:***

Nothing contained in this Rate Schedule shall be construed as affecting or limiting in any way the right of APX unilaterally to file with the FERC, or make application to the FERC for, changes in rates, charges, classifications, or service, or any rule or regulation relating hereto, in this Rate Schedule under section 205 of the Federal Power Act pursuant to the FERC's rules and regulations promulgated thereunder, or under other applicable statutes or regulations.

***6.0 Other Terms and Conditions:***

All other terms and conditions shall be established by agreement between Automated Power Exchange, Inc. and the APX Participant.

***7.0 Effective Date:***

This Rate Schedule shall be effective on and after April 1, 1998.



© 1998 AUTOMOATED POWER EXCHANGE, INC.

Information
Removed for Privileged Treatment