# PLAINTIFFS PACIFIC GAS AND ELECTRIC COMPANY, SOUTHERN CALIFORNIA EDISON COMPANY, AND SAN DIEGO GAS & ELECTRIC COMPANY'S APPENDIX TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

**VOLUME 3 OF 3**

**Part 5 of 6**

ORIGINAL

**Department of Energy**

Bonneville Power Administration
P.O. Box 3621
Portland, Oregon 97208-3621

GENERAL COUNSEL

July 19, 2001

In reply refer to: LP-7

Mr. David P. Boergers, Secretary
Docket Room, Office of the Secretary
Federal Energy Regulatory Commission
888 1st Street NE, Room 1A East
Washington, DC 20426

**Re: Bonneville Power Administration's Request for Rehearing**
**Docket No. EL00-95-031** 039
EL00-98-037
RT01-85-002
EL01-68-002

Dear Mr. Boergers:

Enclosed for filing are an original and 14 copies of Bonneville Power Administration's Request for Rehearing in the above-captioned docket. Please date/time stamp the additional copy labeled "Duplicate Original" and return it in the enclosed, self-addressed, stamped envelope.

Thank you for your assistance.

Sincerely,

for Crystal Ball

Barry Bennett
Attorney

Enclosures

DOCKETED

010723-0021.1

ORIGINAL

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| San Diego Gas & Electric Company, Complainant, v. Sellers of Energy and Ancillary Service Into Markets Operated by the California Independent System Operator Corporation and the California Power Exchange, Respondents. | ) | Docket No. EL00-95-0~~31~~ 039 |
| Investigation of Practices of the California Independent System Operator and the California Power Exchange | ) | Docket Nos. EL00-98-3~~0~~ 037 EL00-98-~~0~~33 |
| California Independent System Operator Corporation | ) | Docket Nos. RT01-85-00~~0~~ 002 RT01-85-0~~0~~1 |
| Investigation of Wholesale Rates of Public Utility Sellers of Energy and Ancillary Services in the Western Systems Coordinating Council | ) | Docket Nos. EL01-68-00~~0~~ 002 EL01-68-0~~0~~1 |

BONNEVILLE POWER ADMINISTRATION
REQUEST FOR REHEARING AND CLARIFICATION

Pursuant to Rule 713 of the Commission's Rules of Practice and Procedure, the Bonneville Power Administration (BPA) requests rehearing of the Commission's June 19, 2001, *Order On Rehearing of Monitoring and Mitigation Plan For The California Wholesale Electric Markets, Establishing West-Wide Mitigation, and Establishing Settlement Conference*, 95 FERC ¶ 61,418 (2001) *(West-Wide Mitigation Order)*. In the June 19th order, the Commission established a market monitoring and mitigation plan for

the Western Systems Coordinating Council (WSCC) region. Under the plan the Commission capped the price sellers in the WSCC may receive for power sold in the spot market. In addition, generators in the WSCC must offer in a spot market of their choice all of their power (other than the output of hydroelectric resources) that is available and not scheduled to run. The Commission applied the price mitigation plan and the must-offer obligation to all non-public utility generators in the WSCC that sell into markets subject to the Commission's jurisdiction or that use interstate transmission facilities that are subject to the Commission's jurisdiction.

BPA believes the Commission erred in applying the west-wide mitigation plan and the must-offer obligation to BPA. In addition, BPA believes that the Commission should clarify its order to ensure that price mitigation takes into account the fact that the peak demand periods in California and the Pacific Northwest occur at different times of the year. This request for rehearing and clarification addresses each issue in turn.

1. The Commission Has No Authority To Apply The West-Wide Mitigation Plan And The Must-Offer Obligation To BPA

a. The Federal Power Act Does Not Give The Commission Jurisdiction Over BPA

The Commission initiated this proceeding under section 206 of the Federal Power Act, which provides that the Commission may determine the just and reasonable rate to be charged by "any public utility." 16 U.S.C. § 824e(a). Section 201(f) of the Act provides that

> [n]o provision in this Part shall apply to, or be deemed to include, the United States, a State or any political subdivision of a state, or any agency, authority, or instrumentality of any one or more of the foregoing . . . unless such provision makes specific reference thereto.

*Id.* § 824(f). The Commission has no authority under the Federal Power Act to regulate the rates and power marketing activities of governmental entities such as BPA and has a long history of refusing to do so.

In *New West Energy Corp.*, 83 FERC ¶ 61,004 (1998), New West, a wholly-owned subsidiary of a political subdivision of the state of Arizona, filed a rate schedule with the Commission pursuant to section 205 of the FPA and insisted that "in the new competitive climate" the Commission was required to regulate its rates. *New West Energy Corp.*, 83 FERC at 61,015. The Commission rejected the filing on the ground that section 201(f) prohibited it from regulating governmental entities. In its order the Commission expressed a cogent and expansive view of this section:

> Tucson [Electric Power Company, which supported New West's filing] itself cites to us a case where the FPC examined Section 201(f) and its legislative history, and concluded:
>
> > We think this obviously discloses a Congressional intent to subject private enterprise alone to regulation by the Federal Power Commission, and not to extend that regulation to government and its instrumentalities.
> >
> > ***
> >
> > [I]t is apparent that the Act is a highly remedial one enacted by Congress upon consideration and in reference to the abuses by private utilities which had been brought to the attention of Congress. Nothing in the legislative history or in the provisions of the Act indicates any necessity or purpose for remedial regulation directed against sovereign governments engaged in the proprietary function of generating, transmitting, and selling electric energy.

*New West Energy Corp.*, 83 FERC at 61,018. (citing *Nebraska Power Co.*, 5 FPC 8, 19 (1946)). The Commission added that section 201(f) was included in the bill "'to remove

all doubt that the act is not to apply to public projects, Federal, State, or municipal.'" *Id.* (quoting S. Rep. No. 74-621, at 18-19 (1935)).

Similarly, in *New York Power Authority*, 82 FERC ¶ 61,078 (1998), the New York Power Authority (NYPA), a political subdivision of the state of New York, filed a reciprocity tariff pursuant to Order No. 888. Intervenors argued that NYPA's rate design methods were inconsistent with the Commission's ratemaking standards. The Commission reviewed the filing only to determine whether the rates NYPA charged itself were comparable to the rates it charged others (the reciprocity standard) and otherwise dismissed the intervenors' arguments:

> Because NYPA is not a public utility, section 205 of the FPA . . . under which we assess the justness and reasonableness of proposed public utility rates is not applicable to NYPA's submission; for this reason, the intervenors' rate objections are, for the most part, beside the point . . . .

*New York Power Authority*, 82 FERC at 61,291.

As an agency of the United States, BPA is exempt from rate regulation under the Federal Power Act.

b. <u>The Northwest Power Act Gives The Commission Only Limited Jurisdiction Over BPA's Power Rates</u>

The Commission reviews BPA's power rates under sections 7(a)(2) and 7(k) of the Pacific Northwest Electric Power Planning and Conservation Act, which provides that the Commission shall approve BPA's rates upon finding that they

> (a) are sufficient to assure repayment of the Federal investment in the Federal Columbia River Power System over a reasonable number of years after first meeting the Administrator's other costs,

(b) are based upon the Administrator's total system costs, and

(c) insofar as transmission rates are concerned, equitably allocate the costs of the Federal transmission system between Federal and non-Federal power utilizing such system.

16 U.S.C. § 839e(a)(2).

In *Central Lincoln People's Util. Dist. v. Johnson*, 735 F.2d 1101 (9th Cir. 1984), the Ninth Circuit Court of Appeals reviewed a challenge to the first rates filed under the Northwest Power Act, which was enacted in 1980. The court noted that "the heart of the dispute" was "whether Congress intended to limit FERC's review of regional rates to the three findings set forth in section 7(a)(2)." *Central Lincoln*, 735 F.2d at 1110. The Commission had concluded that these findings defined the limits of its authority over BPA. The court agreed, holding that in adopting a "narrow scope of review limited to the three items listed in section 7(a)(2), FERC properly interpreted and gave effect to the Congressional desire to remove FERC from actual rate-making and to limit FERC's role to financial oversight of the regional rates." *Id.* The court added that under section 7(k) of the Northwest Power Act the Commission reviews BPA's nonfirm energy rates pursuant to the Bonneville Project Act, the Flood Control Act of 1944, and the Federal Columbia River Transmission System Act, none of which apply a just and reasonable standard to BPA's rates. *Id.* at 1112 (citing 16 U.S.C. § 839e(k)). *See also Aluminum Co. of America v. Bonneville Power Admin.*, 903 F.2d 585, 591 (9th Cir. 1989) (no "fair and reasonable" standard is applicable to BPA ratemaking), *cert denied sub nom., Cal. Pub. Util. Comm'n v. FERC*, 498 U.S. 1024 (1991).

Most recently the Commission has observed:

> Unlike our statutory authority under the Federal Power Act, the Commission's authority under sections 7(a) and (k) of the Northwest Power Act does not include the power to modify Bonneville's rates. The responsibility for developing rates in the first instance lies with Bonneville's Administrator which provides for a public process to hear concerns about a Bonneville proposal. Once rates are approved by the Administrator, the rates are submitted to the Commission for approval or disapproval. The Commission's review of Bonneville's regional power and transmission rates is limited to determining whether Bonneville's proposed rates are sufficient to assure repayment of the Federal investment in the Federal Columbia River Power System over a reasonable number of years after first meeting the Administrator's other costs. In this regard, the Commission's role can be viewed as appellate: to affirm or remand the rates submitted to us for review. [citing *Aluminum Co. of America*]

*Order Granting, With Modification, RTO West Petition For Declaratory Order And Granting TransConnect Petition For Declaratory Order*, 95 FERC ¶ 61,114, slip op. at 44 (2001). Thus, Congress has crafted a unique set of statutes that limit the Commission's authority over BPA's power rates both substantively and procedurally.

c. The Commission's Assertion of "Conditioning Authority" Over BPA Is Not Supported By Statute And Cannot Override The Limitation On Its Jurisdiction Under The Federal Power Act And The Northwest Power Act

Despite a long string of precedent disputing its authority to do so, the Commission applied the June 19th order to BPA. The Commission denied that that it was asserting jurisdiction over non-jurisdictional entities. Instead, the Commission asserted, it was exercising its "conditioning authority" to assure that generators that "voluntarily" sell into markets subject to the Commission's exclusive jurisdiction or that use jurisdictional interstate transmission facilities abide by the mitigation plan. *West-Wide Mitigation Order*, slip op. at 12-13. The Commission concluded that it could not "meet [its] statutory

responsibilities under the FPA to ensure just and reasonable rates in the Western spot markets" unless it required non-public utilities to adhere to the plan. *Id.* at 13.[1]

For three reasons this conclusion is misplaced. First, there is nothing voluntary about the Commission's "must-offer" requirement. Under the Commission's order, non-public utilities in the WSCC, as well as public utilities, are *required* to offer all unscheduled generation into a spot market. Moreover, even absent this mandate, BPA has a statutory obligation under the Northwest Power Act to serve the regional net firm requirements of its preference and investor-owned utilities. BPA would violate this obligation if it did not use interstate transmission facilities. Finally, any non-public utility's sales into jurisdictional markets or use of jurisdictional transmission facilities cannot truly be considered voluntary. Given the extent of the Commission's jurisdiction in the WSCC, a non-public utility has a choice of selling into jurisdictional markets and using jurisdictional facilities or shutting down operations. The "voluntariness" the utility exhibits in making such sales is its voluntary decision to remain in the energy business.

Second, the Commission has subtly but significantly recast its jurisdiction under the Federal Power Act. The Commission does not have responsibility to ensure just and reasonable rates in the Western spot markets. As shown above, the Commission has responsibility only to ensure that *public utilities* charge just and reasonable rates. If its jurisdiction over public utilities is insufficient to establish an appropriate market in the West (or the nation), that is a matter for Congress to remedy.

Finally, the Commission's reasoning has no logical end point. To cap a utility's prices and order the utility to offer its capacity into the market is to exercise the same

[1] The Commission made this statement in regard to rehearing of its April 26th order, which was directed to California utilities. The June 19th order, however, was based on the same reasoning.

powers over that utility that sections 201, 205, and 206 grant the Commission over public utilities but that section 201(f) denies it with respect to non-public utilities. If the Commission can exercise such authority over non-public utilities whenever it believes the action is necessary to assure just and reasonable rates in a region, then the line between public and non-public utilities has disappeared.

In any case the Commission's "conditioning authority" is of dubious provenance. In *Richmond Power & Light v. FERC*, 574 F.2d 610 (D.C. Cir. 1978), Richmond objected to the rate schedules filed by a number of jurisdictional utilities and asked the Commission to order the utilities to provide wheeling. The Commission refused because it had no authority to do so. On appeal Richmond sought "the same end through less direct means." *Richmond Power & Light*, 574 F.2d at 620. Although it no longer argued that the Commission had the authority to mandate wheeling, it asserted that "the Commission must have the power to condition its approval of [the] rates on continued, albeit involuntary, wheeling." *Id.* The court rejected this assertion:

> This logic is superficially persuasive; the Commission does have authority to impose requirements and conditions "necessary or appropriate to promote the policies" of the Act. [quoting *Elizabethtown Gas Co. v. FERC*, 575 F.2d 885, 888 (D.C. Cir. 1978)]. But such conditions may not contravene the Act . . . .
>
> . . . What the Commission is prohibited from doing directly it may not achieve by indirection.

*Richmond Power & Light*, 574 F.2d at 620.

In its June 19th order the Commission placed conditions on entities it is prohibited from regulating at all, thus asserting authority even more expansive than the authority the court rejected in *Richmond*. As *Richmond* demonstrates, however, the Commission's "conditioning authority" is merely the assertion of jurisdiction cloaked in another name.

In *Office of Consumers' Counsel v. FERC*, 655 F.2d 1132 (D.C. Cir. 1980), the court held that, because the Commission has no jurisdiction over the production, sale, or transportation of coal gas before its commingling with natural gas, it has no authority to issue a certificate of public convenience and necessity for a coal gasification (or synthetic gas) plant simply by casting it as authorization for the future sale of commingled natural and synthetic gas. Although the Commission had cast the order in this light, the court concluded that the order's true function was to facilitate the financing and construction of a non-jurisdictional coal gasification plant. The court added that the Commission's order substantially regulated the workings of the coal gasification plant, and concluded that the Commission cannot "at the same time disclaim authority to regulate the [gasification] facility, and also issue [an opinion] which has all the characteristics of regulation except the name." *Office of Consumers' Counsel*, 655 F.2d at 1144.

The cases on which the Commission relies also do not support its position.[2] The Commission cited *American Gas Assoc. v. FERC*, 912 F.2d 1496 (D.C. Cir. 1990), in which the court upheld a mechanism under which jurisdictional pipelines that carried gas under open access, thus displacing their own gas sales, obtained a credit against their take-or-pay obligations under contracts with the producer of the gas. The pipeline could deny the producer the benefit of open access unless the producer allowed the credit.

In *American Gas* the Commission did not impose any obligation on non-jurisdictional entities or seek to regulate them in any respect. It did not deny them the right to transport natural gas if they failed to agree to the crediting mechanism, but provided only that in such case the jurisdictional entity would not have to extend them

[2] The Commission cited these cases in its April 26th order covering the California market. It cited no additional authority in the June 19th order.

open access benefits. Moreover, the provision in question was narrowly tailored, intended only to ensure that natural gas companies that carried a competitor's gas were kept whole.

The Commission itself argued in *American Gas* that it could not regulate non-jurisdictional contracts. The court agreed, quoting *FPC v. Conway Corp.*, 426 U.S. 271, 279 (1976), for the proposition that, although the Commission may compare nonjurisdictional with jurisdictional rates to determine whether the jurisdictional rates are just and reasonable, "'[t]he remedy, if any, would operate *only* against the rate for jurisdictional sales.'" *American Gas Assoc.*, 912 F.2d at 1507. The court added that "the potential impact of nonjurisdictional contracts' prices on the justness and reasonableness of jurisdictional rates provides no license for the Commission to monkey with the former"—thus explicitly rejecting the very reasoning the Commission used in its June 19th order. *Id.*

In *FPC v. Louisiana Power & Light Co.*, 406 U.S. 621 (1972), the Court upheld a Commission order requiring jurisdictional pipelines to file tariffs for curtailments of deliveries to both wholesale customers and end users. Louisiana argued that Congress had withheld authority from the Federal Power Commission (FPC) to apply its curtailment regulations to direct sales to end users. In a close analysis of the statutory language, the Court concluded that Congress had withheld rate-setting authority over direct sales, but had otherwise granted the FPC authority to regulate the transportation of gas for direct sales. Hence, the FPC had explicit statutory authority for its action.

Here, by contrast, the Commission is asserting authority that Congress has explicitly withheld under section 201(f) of the Federal Power Act. Hence its action is

analogous to the rate-setting authority the *Louisiana* Court rejected rather than the curtailment authority the Court accepted.

In *Mississippi River Transmission Corp. v. FERC*, 969 F.2d 1215 (D.C. Cir. 1992), the issue was the extent of the Commission's authority when a pipeline simultaneously transports gas for direct sale (an action over which the Commission has jurisdiction) and sells the gas (an action over which the Commission does not have jurisdiction) in a bundled service. The court held that the Commission was not barred from regulating a pipeline's interstate transportation of gas merely because the sale of the gas was not subject to the Commission's jurisdiction. In *Mississippi River*, therefore, the court held simply that the intermingling of jurisdictional and non-jurisdictional activity in one transaction did not remove the Commission's jurisdiction over the former. The case involved no attempt to regulate a non-jurisdictional entity.

Finally, in *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), the court dismissed as not ripe a challenge to the reciprocity provision of the *pro forma* tariff. Under this provision, a jurisdictional utility need not offer non-discriminatory open access service to a non-jurisdictional utility unless the non-jurisdictional utility offers non-discriminatory access in return. For two reasons this opinion is unhelpful to the Commission. First, since the court dismissed the challenge without addressing it, the case created no precedent for future actions. Second, unlike the June 19th order, which mandates a rate cap and includes a "must-offer" provision, the reciprocity provision does not require any action on the part of the non-jurisdictional utility. In Order No. 888 the Commission said that the reciprocity provision did "not requir[e] non-public utilities to provide transmission access. . . . Non-public utilities can

choose not to take service under public utility open access tariffs and can instead seek voluntary service from the public utility on a bilateral basis." *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, FERC Stats. and Regs. ¶ 31,036, at 31,761. Thus, non-jurisdictional utilities that refuse open access to public utilities are not denied the right to buy any service from public utilities, let alone denied the right to utilize jurisdictional facilities. In the June 19th order, however, the Commission denied non-jurisdictional utilities that do not adhere to the price mitigation plan the right to offer their power in the California ISO and WSCC spot markets, as well as the right to use the interstate transmission grid. Thus, the Commission's action here is not analogous to the action it took in Order No. 888.

The Commission's reliance on the above cases is belied by its holding in this very docket that it has no authority to order non-public utility sellers to make refunds. *San Diego Gas & Electric Co. v. Sellers of Energy and Ancillary Services into Markets Operated by the Cal. ISO and the Cal. PX*, 94 FERC ¶ 61,245, at 61,864 (2001). In fact the case law draws a clear line regarding the Commission's authority to address non-jurisdictional rates and contracts: the Commission may consider the effect of non-jurisdictional rates and contracts on jurisdictional matters, but may not issue orders that operate against non-jurisdictional utilities. In *City of Vernon, Cal.*, 93 FERC ¶ 61,103 (2000), the City of Vernon sought to become a participating transmission owner in the California System Operator Corporation and therefore filed its transmission revenue requirement with the Commission. The Commission carefully delimited the extent of its authority over non-public utilities:

> The Commission does not have jurisdiction under Sections 205 and 206 of the Federal Power Act (FPA) over municipal entities such as Vernon. However, the Commission does have the authority to evaluate non-jurisdictional activities to the extent that they affect the Commission's jurisdictional activities. . . . [T]he purpose of our review is to determine whether Vernon's rate methodology, in the context of Vernon's participation in a Commission jurisdictional public utility ISO, will result in a just and reasonable component of *the ISO's rates*.

*City of Vernon*, 93 FERC at 61,285 (emphasis added).

Similarly, in *New York State Electric & Gas Corp. v. FERC*, 638 F.2d 388 (2d Cir. 1980), a non-jurisdictional utility (PASNY) asked the Commission to invalidate a provision of a contract under which it sold power to a jurisdictional utility (NYSEG) and accepted other power in return. The Commission invalidated the provision over NYSEG's objection that it had no jurisdiction over the contract because PASNY was non-jurisdictional. The court upheld the Commission's assertion of jurisdiction, noting that the Commission's orders

> do not require PASNY to take or to refrain from taking action; they do not place any limitations on PASNY's powers or prerogatives. Rather, the Commission's order is directed strictly to NYSEG . . . . The entire burden of the Commission's order is placed on NYSEG, over which jurisdiction is clear.

*New York State Electric & Gas Corp.*, 638 F.2d at 395.

The burden of the June 19th order falls directly and to a very significant extent on non-jurisdictional utilities. The Commission has overstepped the authority that has been carefully crafted by Congress, the courts, and its own past decisions. It should grant rehearing and withdraw its order insofar as it applies to non-public utilities.[3]

[3] BPA has acted consistently with the June 19th order, and plans to continue to do so. Nevertheless, BPA believes the Commission should grant its request for rehearing.

2. The Commission Should Clarify The Must-Offer Obligation And Ensure That Prices Are Not Set At An Artificially High Level

The order's "must-offer" obligation is designed to ensure that all available generation is offered, particularly during times of peak demand. BPA is concerned that recent events indicate that the must-offer obligation may not be fully understood or may not be working as intended. BPA is also concerned that without a mechanism to adjust the rate cap, outside of the ISO's declaration of an emergency, the mitigation plan may result in an artificially high price cap during peak demand periods in the Pacific Northwest. The Commission should clarify the order on these points to ensure full compliance and to guarantee that the price cap reflects the actual marginal cost of generation.

a. The Mitigation Plan May Threaten Reliable Service To Pacific Northwest Loads And Therefore The Commission Should Clarify The Plan To Ensure The Availability Of Adequate Power Supplies To Meet Winter Peak Demand In The Pacific Northwest

The WSCC mitigation plan established by the June 19th order presents a reliability problem for BPA and other purchasers in the Pacific Northwest. BPA has a statutory obligation to serve the regional net firm requirements of its preference and investor-owned utilities, including their peak demands. 16 USC § 839c(b)(1). Peak loads in the Pacific Northwest typically occur when arctic fronts invade the region. At these times, loads increase dramatically and the flows on the hydro system decrease due to freezing. Studies by the Northwest Power Planning Council show that during extreme winter conditions the Pacific Northwest cannot meet loads without importing power from other parts of the WSCC.

The order limits the price of power to eighty-five percent (85%) of the price of power during the last Stage 1 emergency in California. *West-Wide Mitigation Order*, slip op. at 57-58. That price is the maximum price for power until the next Stage 1 emergency, unless a generator can justify a higher price. *Id.* at 58. Although the order contains a "must-offer" obligation that applies to all non-hydro generation, recent experience of the Stage 2 emergency in California and other similar events in the WSCC suggest the must-offer obligation is either not fully understood or is not working properly to ensure all available generation is offered into the spot market at times of peak demand. BPA is concerned that recent events may be repeated this winter during its peak demand period and would like assurance that during these periods generators will comply with the must-offer obligation. If power is unavailable during times of peak demand, BPA may be unable to fulfill its statutory mandate.

The Commission also recognized in the order that the 85% price cap may not reflect the marginal cost of generation in some circumstances. An increase in natural gas prices or other circumstances during the winter could make the capped price uneconomical for the marginal units to generate power. The order provides for the recovery of gas costs and the potential for recovery of higher actual costs if conditions change significantly. At a minimum the Commission should explain the circumstances under which a generator will be allowed to recover prices above the capped limits. Recent events suggest that generators may not understand how to ensure that they can recover a higher price even if it is justified. BPA requests that the Commission clarify the June 19th order to provide generators with a clear understanding of the must-offer obligation and the requirements necessary to recover costs in excess of the cap.

b. The Commission Should Clarify Its Order To Ensure That Prices Are Not Set At An Artificially High Level

The order also raises the potential for the price of power to be capped at an artificially high level, resulting in BPA customers paying unnecessarily high prices for power. This potential exists because a price cap established during California's summer peak may be inappropriate in the Pacific Northwest during its winter peak. Absent the unlikely event of a Stage 1 emergency in California during the winter in which the cap is adjusted downward, no mechanism exists to adjust the price cap.

As previously noted, BPA has a statutory obligation to meet the needs of its customers, even when those requirements exceed its resources. 16 USC §839c(b)(1). In times of peak demand, BPA must make spot purchases to serve its customer base. In an artificially high market BPA could also see increased demand for its relative low-cost mix of hydro power and purchased power, forcing it to acquire more resources that it had planned. Thus, BPA may need to raise its rates to ensure cost recovery.

BPA respectfully suggests that the Commission issue a clarification so that the order takes into account the fact that California and the Pacific Northwest experience their peak demands at different times of year.

For the reasons set forth above, BPA respectfully requests that the Commission grant BPA's request for rehearing.

DATED this 19th day of July, 2001.

Respectfully submitted,

for Crystal Ball

Barry Bennett
Peter Burger
Attorneys
Bonneville Power Administration
Office of General Counsel
P.O. Box 3621
Portland, OR 97208-3621

CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing Bonneville Power Administration's Request for Rehearing upon each person designated on the official service list compiled by the Secretary in this proceeding in Docket No. EL00-95-031.

Dated at Portland, Oregon, this 19th day of July, 2001.

for Crystal Ball

Barry Bennett, Attorney
Bonneville Power Administration
905 N.E. 11th Avenue
P.O. Box 3621, LP-7
Portland, OR 97208-3621
Phone: (503) 230-4201