# PLAINTIFFS PACIFIC GAS AND ELECTRIC COMPANY, SOUTHERN CALIFORNIA EDISON COMPANY, AND SAN DIEGO GAS & ELECTRIC COMPANY'S APPENDIX TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

**VOLUME 3 OF 3**

**Part 6 of 6**

| | | |
|---|---|---|
| Pacific Gas and Electric Company, Southern California Edison Company, San Diego Gas & Electric Company, California Electricity Oversight Board,<br><br>Claimants,<br><br>v.<br><br>Western Area Power Administration and Western Area Lower Colorado,<br><br>Defendants. | ) | **CLAIM FOR DAMAGES (AMENDED)**<br><br>**(41 U.S.C. § 601 ET SEQ.)** |

To Jerry W. Toenyes, Acting Regional Manager, Western Area Power Administration, Sierra Nevada Region; Robert Miller, Primary Representative and Bruce Justeson, Alternative Representative, California ISO Scheduling Coordinator Agreement:

You are hereby notified that the following claimants, referred to herein as the "California Parties," submit an amended claim for damages from the Western Area Power Administration and the Western Area Lower Colorado (collectively referred to as "WAPA"):

- Pacific Gas and Electric Company ("PG&E"), 77 Beale Street, P. O. Box 7442, San Francisco, CA 94120;

- Southern California Edison Company ("SCE"), 2244 Walnut Grove Avenue, P. O. Box 800, Rosemead, CA 91770;
- San Diego Gas & Electric Company ("SDG&E"), 8330 Century Park Court, San Diego, CA 92123; and
- California Electricity Oversight Board ("EOB"), 707 L Street, Suite 1250, Sacramento, CA 95814.

The California Parties' claim arises out of WAPA's sales of power from May 1, 2000 through June 20, 2001 in wholesale markets operated by the California Independent System Operator Corporation ("ISO") and California Power Exchange Corporation ("PX") under tariffs filed with the Federal Energy Regulatory Commission ("FERC"). FERC has determined that sellers in those markets charged rates that were unjust, unreasonable and unlawful and has modified the tariffs governing those markets to adjust downward the rates that sellers, including WAPA, were entitled to charge for those sales. WAPA is now contractually obligated to reimburse the California Parties for the difference between the rates that WAPA charged and the revised lawful rates under FERC's modification of the tariffs. Amounts recovered by the California Parties will flow to California ratepayers in the manner determined by the California Public Utilities Commission.

### 1. The ISO and PX Markets

At all relevant times, the terms and conditions of WAPA's sales were specified in tariffs governing the ISO and PX markets. Pursuant to the tariffs, rates for wholesale sales in the ISO and PX markets were set through auctions conducted by the ISO and PX on an hourly or more frequent basis. The ISO tariff also authorized the ISO to procure power outside the auction process when necessary to maintain reliability. The tariffs were filed with and subject to the exclusive jurisdiction of FERC, and required each participant in the ISO and PX markets to comply with and abide by all rules, conditions and provisions of those markets' respective tariffs. WAPA executed a Scheduling Coordinator Agreement expressly agreeing to abide by all provisions of the ISO tariff,

and a Participation Agreement expressly agreeing to abide by the provisions of the PX tariff. By entering into the ISO Scheduling Coordinator Agreement and the PX Participation Agreement, and by voluntarily electing to sell power in the ISO and PX markets, WAPA agreed to be bound by the provisions of the ISO and PX tariffs and FERC's regulation and modification thereof, including FERC's orders adjusting the rates sellers could lawfully charge for sales in those markets.

Pursuant to the Federal Power Act, FERC regulates wholesale sales of electric power in order to, among other things, ensure that the rates charged are just, reasonable and lawful. FERC has exclusive authority to regulate the terms and conditions of power sales made under the ISO and PX tariffs, including the responsibility to ensure that all rates charged by sellers in the ISO and PX markets are just, reasonable and lawful, and to recalculate and adjust such rates for prior periods if FERC determines that the rates charged were not just, reasonable and lawful. The ISO and PX tariffs provide that parties retain the right to petition FERC to review rates charged under the tariff and provide for recalculation of charges and resettlement of the accounts of buyers and sellers under the tariffs where FERC determines that rates should be adjusted.

**2. The Power Crisis**

Beginning in May 2000, the rates charged by sellers in the ISO and PX markets rose dramatically and sellers continued to demand unprecedented high prices for over a year. All sellers, including WAPA, sold power at those extremely high rates by operation of the pricing provisions of the ISO and PX tariffs. The power crisis had severe negative effects on the stability and financial integrity of PG&E, SCE, and SDG&E ("the California IOUs"), and imposed crippling costs on ratepayers of the California IOUs, including businesses throughout the state.

The first ratepayer impacts were felt in the San Diego area, because SDG&E rates in the summer of 2000 provided for immediate direct pass-through of the increased wholesale power costs to ratepayers. Residents and businesses alike suffered. By January 2001, PG&E and SCE amassed crippling debt in order to finance the costs of buying electricity, costs they were unable to immediately pass through to ratepayers. PG&E and SCE became unable to pay the PX for power

purchases, and could no longer find sellers willing to sell them power to serve their millions of retail customers. California ratepayers experienced rolling blackouts and near-continuous power emergencies. The PX market was forced to cease operations entirely on January 30, 2001. The State of California was forced to step in to buy power to serve retail customers throughout the territories served by the California IOUs. In 2001, unrelenting high prices caused the state's two largest IOUs, PG&E and SCE, to become insolvent. The power crisis ultimately ended when FERC imposed must-offer requirements on power generators and wholesale price caps on wholesale sellers of energy across all western states effective June 20, 2001.

The bulk of the costs of the crisis have been and are being passed through to and paid by the residential and commercial ratepayers of the California IOUs. The cost of paying off those charges is included in current rates assessed to customers of the California IOUs.

**3. The California Parties' Attempts to Obtain Relief From FERC**

On August 2, 2000, when it became clear that the extremely high wholesale prices were not returning to the lower levels that had prevailed historically, SDG&E filed a complaint with FERC, requesting that FERC investigate the markets and correct rates on a forward basis, and correct the rates received by all sellers for past sales to the extent FERC determined that sellers had charged unjust and unreasonable or otherwise unlawful rates. FERC Docket No. EL00-95. PG&E, SCE and the EOB intervened in the proceeding on August 14, 2002. WAPA also was a party to the FERC proceedings.

In response to the California Parties' complaint, FERC commenced an investigation into the sellers' rates. In an order issued July 25, 2001 (the "Refund Order"), FERC ruled that sellers of power in the ISO and PX markets (including WAPA) had sold power at unjust, unreasonable and unlawful rates, and that the rates charged in the ISO and PX markets should be adjusted. In lieu of the pricing formula previously provided in the ISO and PX tariffs, FERC established a new pricing formula to determine the adjusted rates (the "Mitigated Market Clearing Price" or "MMCP"), and ordered the ISO and PX to recalculate the rates sellers should have received, and to charge sellers

— and refund or credit to buyers — all amounts sellers had received in excess of the recalculated rates during the FERC-ordered refund period. FERC interpreted the Federal Power Act as limiting the time period for which FERC could order such refunds to the period from October 2, 2000 through June 20, 2001 (the "Refund Period"), even though comparably high prices had prevailed in the ISO and PX markets since May 2000. The ISO and PX have commenced the recalculation of the accounts of all sellers and buyers in the ISO and PX markets to reflect the revised rates for the Refund Period in accordance with the Refund Order.

In May 2002, evidence became available that Enron had manipulated the ISO and PX markets throughout the power crisis. In response, FERC propounded discovery requests to all sellers in the ISO and PX markets regarding market manipulation. On August 23, 2002, the Ninth Circuit Court of Appeals directed FERC to provide a similar opportunity to the California Parties to adduce evidence of market manipulation. As a result of the Ninth Circuit's order, the California Parties conducted extensive discovery from late 2002 to early 2003 of sellers in the ISO and PX markets, including WAPA. That discovery provided evidence of a pattern of manipulation involving numerous sellers into the ISO and PX markets. Further information on the FERC proceedings is available in the FERC record for Dockets Nos. EL00-95 and EL00-98.

Certain governmental entities, including WAPA, appealed the Refund Order (and FERC's December 19, 2001 Order on Rehearing) to the Ninth Circuit Court of Appeals. On September 6, 2005, the Ninth Circuit ruled that FERC's power to enforce payment of refunds under the Federal Power Act did not extend to governmental entities, including WAPA. The Court further clarified, however, that its decision was without prejudice to any rights that the market purchasers (such as the California Parties) may have to bring claims under the operative tariffs and other contracts directly against the governmental entities to recover from those entities the amounts they received, or claim the right to receive, as sellers in excess of FERC-adjusted rates. *Bonneville Power Administration v. Federal Energy Regulatory Commission*, 422 F.3d 908 (9th Cir. 2005).

This claim is based on the identical facts that were at issue in the proceedings at FERC and in the Ninth Circuit on the California Parties' complaint: the sellers' (including WAPA's) receipt

and retention of rates for sales of wholesale power in the ISO and PX markets that are now unlawful and unauthorized under the ISO and PX tariffs. The California Parties have at all times acted reasonably and in good faith in seeking relief at FERC and in asserting this claim.

**4. Description of Claims**

Upon FERC's adjustment of the rates charged and received by sellers in the ISO and PX markets, including WAPA, the adjusted rates became the only lawful and authorized rates for those sales under the applicable tariffs. WAPA became contractually obligated to reimburse purchasers for the difference between the rates WAPA initially charged in its sales in the ISO and PX markets and the lower FERC-adjusted lawful rates. WAPA has consistently taken the position that it has no obligation to refund or credit to buyers the difference between the initial rates WAPA charged and the lawful rates as ultimately determined by FERC. In stark contrast, for transactions in which it was a buyer, WAPA seeks to pay only the lower adjusted rates determined by FERC.

Causes of action for damages or other monetary relief that the California Parties may assert include, but are not limited to, breach and repudiation of contract obligations and contractual indemnification. The California Parties will also seek pre-judgment and post-judgment interest, and such other relief as may be appropriate.

The California Parties seek reimbursement from WAPA for WAPA's sales during the following periods:

**a. The FERC-Ordered Refund Period: Mitigated Sales**

The California Parties are entitled to recover from WAPA for its overcharges in the ISO and PX markets from October 2, 2000 through June 20, 2001, the period for which FERC has already revised the permissible rates for sales in those markets under the applicable tariffs. The amount owed by WAPA is being calculated by the ISO and PX, and is estimated to be approximately $24 million attributable to the Western Area Power Administration, and $334,000 attributable to the Western Area Lower Colorado, for a total of approximately $24.3 million, without consideration of any amounts WAPA may claim it is entitled to offset against that liability.

**b. The FERC-Ordered Refund Period: Other ISO/PX Sales**

The California Parties are seeking an order from FERC that the rates charged by sellers in the ISO and PX markets from October 2, 2000 – June 20, 2001 for certain other sales in those markets were also unjust and unreasonable or otherwise unlawful. FERC has concluded that certain types of sales, including energy exchange sales (in which blocks of energy were sold to the ISO for payment in-kind), are not subject to mitigation. The California Parties have appealed FERC's rulings to the Ninth Circuit Court of Appeals. A controversy has arisen in that WAPA has denied that it has any liability to the California Parties for any monetary relief FERC may assess for these types of sales. The California Parties seek a ruling that at such time as FERC finds that the rates charged by sellers for energy exchange sales were unjust and unreasonable, or otherwise unlawful, the California Parties will be entitled to recover from WAPA the difference between the rates charged by WAPA and the lawful rates as ultimately determined by FERC.

**c. The Summer Period: May 1, 2000 – October 1, 2000**

The California Parties are seeking an order from FERC finding that the rates charged by sellers in the ISO and PX markets from May 1, 2000 through October 1, 2000 (the "Summer Period") were unlawful. The prices that prevailed in the ISO and PX markets during the summer period were comparable to the prices during the refund period. FERC concluded that it would not grant relief for the Summer Period, however, and the California Parties have appealed that ruling to the Ninth Circuit Court of Appeals. A controversy has arisen in that WAPA has denied that it has any liability to the California Parties for any monetary relief FERC may assess for the Summer Period. The California Parties seek a ruling that at such time as FERC finds that the rates charged by sellers during the Summer Period were unlawful, the California Parties will be entitled to recover from WAPA the difference between the rates charged by WAPA and the lawful rates as ultimately determined by FERC.

**5. Final Decision Requested**

Claimants request that the Contracting Officer make a final decision on this claim.

**6. Notices**

All notices or other communications with regard to this claim should be directed to the counsel listed on the following pages.

7. **Certification**

The undersigned claimant hereby certifies that the claim is made in good faith, that the supporting data are accurate and complete to the best of the claimant's knowledge and belief, that the amount requested accurately reflects the contract adjustment to which the contractor believes the United States is liable, and that the person signing the certification is duly authorized to certify the claim on behalf of the claimant.

DATED: 12-19, 2005

Respectfully submitted,

PACIFIC GAS AND ELECTRIC COMPANY

Marie L. Fiala
Heller Ehrman LLP
333 Bush Street
San Francisco, CA 94101

Lisa D. Hardie
Peggy J. Williams
Stan Berman
Heller Ehrman LLP
701 Fifth Ave., Suite 6100
Seattle, WA 98104

Joshua Bar-Lev
Kermit R. Kubitz
Pacific Gas and Electric Company
77 Beale Street, B30A
Post Office Box 7442
San Francisco, CA 94120

*Attorneys for*
*Pacific Gas and Electric Company*

**7. Certification**

The undersigned claimant hereby certifies that the claim is made in good faith, that the supporting data are accurate and complete to the best of the claimant's knowledge and belief, that the amount requested accurately reflects the contract adjustment to which the contractor believes the United States is liable, and that the person signing the certification is duly authorized to certify the claim on behalf of the claimant.

DATED: Dec. 19, 2005

Respectfully submitted,

SOUTHERN CALIFORNIA EDISON COMPANY

[signature]

Russell C. Swartz
Its Assistant General Counsel

Richard L. Roberts
Steptoe & Johnson LLP
1330 Connecticut Ave., N.W.
Washington, D.C. 20036

Russell C. Swartz
Michael D. Mackness
Southern California Edison Company
2244 Walnut Grove Avenue
Rosemead, California 91770

*Attorneys for*
*Southern California Edison Company*

**7. Certification**

The undersigned claimant hereby certifies that the claim is made in good faith, that the supporting data are accurate and complete to the best of the claimant's knowledge and belief, that the amount requested accurately reflects the contract adjustment to which the contractor believes the United States is liable, and that the person signing the certification is duly authorized to certify the claim on behalf of the claimant.

DATED: Dec. 19, 2005

Respectfully submitted,

SAN DIEGO GAS & ELECTRIC COMPANY

Nicholas W. Fels

Nicholas W. Fels
Covington & Burling
1201 Pennsylvania Avenue N.W.
Washington, D.C. 20004-2401

W. Davis Smith
General Counsel
San Diego Gas & Electric Company
101 Ash Street
HQ 18
San Diego, CA 92101

*Attorneys for San Diego Gas & Electric Company*

**7. Certification**

The undersigned claimant hereby certifies that the claim is made in good faith, that the supporting data are accurate and complete to the best of the claimant's knowledge and belief, that the amount requested accurately reflects the contract adjustment to which the contractor believes the United States is liable, and that the person signing the certification is duly authorized to certify the claim on behalf of the claimant.

DATED: December 20, 2005

Respectfully submitted,

CALIFORNIA ELECTRICITY OVERSIGHT BOARD

Victoria S. Kolakowski

Erik N. Saltmarsh, Chief Counsel
Victoria S. Kolakowski,
Acting Assistant Chief Counsel
California Electricity Oversight Board
770 L Street, Suite 1250
Sacramento, CA 95814

*Attorneys for California Electricity Oversight Board*

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| San Diego Gas & Electric Company,<br>Complainant, | ) | |
| v. | ) | Docket No. EL00-95-000, *et al*. |
| Sellers of Energy and Ancillary Services Into Markets Operated by the California Independent System Operator and the California Power Exchange,<br>Respondents. | ) | |
| Investigation of Practices of the California Independent System Operator and the California Power Exchange | ) | Docket No. EL00-98-000, *et al*. |

**MOTION BY AND ANSWER OF THE BONNEVILLE POWER ADMINISTRATION (BPA) AND THE WESTERN AREA POWER ADMINISTRATON (WESTERN) TO THE CALIFORNIA PARTIES' MOTION RELATED TO PROCEDURES FOLLOWING REMAND IN *BONNEVILLE POWER ADMINISTRATION, et al. v. FERC***

Pursuant to Rules 212 and 213 of the Commission's Rules of Practice and Procedure, 18 C.F.R. §§ 385.212 and 213 (2003), BPA and Western respectfully submit this Motion and Answer to the California Parties[1] motion to establish procedures (Cal. Parties Motion) following the issuance of the mandate in the *BPA v. FERC*

[1] The motion describes the California Parties as: the People of the State of California, *ex rel*. Edmund G. Brown Jr., Attorney General; the California Electricity Oversight Board; the California Public Utilities Commission; Pacific Gas &Electric Company; San Diego Gas &Electric Company; and Southern California Edison Company.

decision.[2] The California Parties Motion was filed on April 2, 2007. For the reasons set forth below, the motion should be denied and as to the governmental entities specifically, the Commission must terminate these proceedings, vacate all orders in these proceedings as to the governmental entities, order all outstanding accounts receivable paid plus interest accrued, and return any collateral retained by the California Power Exchange (PX).[3]

**1. The California Parties motion asks FERC to ignore the legal directions of the *BPA* decision.**

The California Parties filed their motion in anticipation of the issuance of the mandate by the Ninth Circuit in the *BPA* appeal. The Ninth Circuit's docket now shows the Court's mandate issued on April 5, 2007, and is thus controlling on these remand proceedings. As to governmental entities, the California Parties' motion seeks to have FERC order the California Independent System Operator (ISO) continue to conduct refund calculations, continue to withhold the collateral and receivables, and require the immediate filing of cost offset data, despite the fact that all of these actions are inconsistent with the Court's decision. The Ninth Circuit ruled that FERC lacked jurisdiction in these proceedings to order governmental entities to pay refunds for transactions in the ISO and PX markets. Despite the unambiguous determination by the Court that FERC lacks jurisdiction, the California Parties nevertheless plead with the Commission to ignore the specific holding of the Court's decision and effectively continue this proceeding as if the Ninth Circuit never issued its opinion.

---

[2] *BPA v. FERC*, 422 F3d 908, 911 (9th Cir. 2005), *reh'g denied*. (*BPA*).

[3] While BPA and Western believe that there is no legal basis to retain the PX collateral, neither BPA or Western posted collateral with the PX as a condition of trading in those markets.

**2. The Ninth Circuit's decision specifically exempts governmental entities from refund liability.**

Contrary to the California Parties' contentions, the Ninth Circuit's opinion does not give FERC the discretion to continue to include governmental entities in this refund proceeding. Rather the Court's decision specifically sets aside the Commission's orders in this proceeding to the extent that they impact governmental entities. The decision states:

> We conclude that FERC does not have refund authority over wholesale electric energy sales made by governmental entities and non-public utilities.
>
> ****
>
> Consequently, we grant the petition and set aside FERC's orders related to the 2000 and 2001 spot market to the extent the orders subject the governmental entities and non-public utilities to FERC's refund authority under FPA subchapter II.

*BPA*, 422 F.3d at 911.

The Court's language makes it clear that FERC cannot continue the refund proceeding against the governmental entities and sets aside all prior FERC orders to the extent they subject governmental entities to FERC's refund authority. As a consequence, the Commission has no authority to continue the refund calculations for BPA, Western and the other governmental entities. Rather, the Court's opinion requires the Commission to terminate these proceedings as to the governmental entities. This naturally includes a cessation of the refund calculation by the ISO and PX, as well as a return of the collateral and receivables that have been frozen pending the resolution of these refund proceedings.

**3. The Ninth Circuit rejected the characterization of this proceeding as one that reset the market clearing prices.**

The California Parties' motion is replete with references to what they contend the *BPA* case does and does not stand for. One such contention is that the calculation of the refund liability for the governmental entities is somehow consistent with the *BPA* opinion. In particular, the California Parties characterize the Court's decision as one that does not hold that the Commission erred by requiring that the tariffed rates for all such transactions be revised using the mitigated market clearing price (MMCP) methodology. Cal. Parties Motion at 7. The California Parties support this argument by asserting that FERC reset the market clearing price for all ISO and PX transactions in the refund proceeding as a part of the Commission's mandate under the Federal Power Act (FPA). As a result, they conclude that FERC must continue to calculate refunds for all transactions, including those by the governmental entities. Cal. Parties Motion at 7. That argument is manifestly wrong. The Ninth Circuit expressly rejected the argument, now repeated by the California Parties, that these proceedings reset the clearing price for all spot market sales, holding instead that this was a refund proceeding against FERC jurisdictional sellers. As the Court noted:

> FERC attempts to deflect our attention away from the fact that it is ordering refunds from the Public Entities by arguing the FERC is simply using its §§ 205 and 206 authority to reset the prices of the single-price auction to a just and reasonable level … ISO similarly tries to cast FERC's orders as resetting the market clearing price under FERC-jurisdictional tariffs and characterizes the refunds by the Public Entities as just a "byproduct" of the resettlement of the ISO and CalPX markets.

> The rationale advanced by FERC and ISO is flawed. Perceiving FERC's orders as effecting a reset market clearing prices of all spot market sales under the ISO and CalPX tariffs, rather than as a order for refunds under § 206(b), ignores the explicit language of FERC's July 25, 2001 Order. … We cannot conclude that FERC said "refund" but meant resettlement of the market-clearing price.

*BPA,* 422 F.3d at 919.

Indeed, the Court of Appeals took pains to stress that FERC's jurisdiction over the market could not justify its attempt to exercise jurisdiction over governmental entities. As the Court explained, "FERC's attempt to order refunds based on its *general* jurisdiction over wholesale sales of electric energy contravenes the more *specific* provisions of the FPA that limit FERC's authority over governmental entities and limit FERC's authority to ensure just and reasonable rates and to order refunds to public utilities." *BPA,* 422 F.3d at 920 (emphasis in original, citations omitted). As the Court of Appeals ruled, this limitation on FERC's jurisdiction cannot be countered "by shifting the analysis away from the identity of the [parties it wishes to regulate], and focusing instead on the nature of their transactions and the markets and tariffs under which these transactions were conducted." *BPA,* 422 F.3d at 918. This same point has been made by the D.C. Circuit in *Columbia Gas*, where the court rejected FERC's attempt to enforce tariff language against a non-jurisdictional entity simply because it participated in a regulated market. *Columbia Gas Transmission Corp. v. FERC*, 404 F.3d 459, 462-63 (D.C. Cir. 2005).

These holdings bar the California Parties' argument that *BPA* did not address the issue. The Court explicitly finds that this is not a case of resetting the market and consistent with FERC's limited jurisdiction in this area, expressly directs the Commission

to discontinue the process of including BPA, Western and the other governmental entities in the calculation of refunds. The Court's opinion makes it clear that the "imposition of refunds is a regulatory action that falls outside of FERC's jurisdiction with respect to non-public utilities and governmental entities." *BPA*, 422 F.3d at 920. The California Parties' motion flies in the face of this ruling, by improperly urging the Commission to continue to exercise jurisdiction over governmental entities in these proceedings, precisely the jurisdiction that the Ninth Circuit has held the Commission does not have under the FPA. The only option available to the Commission under the Court's mandate is dismissal of the governmental entities from this proceeding and the release of any collateral and the accounts receivable owed to the governmental entities.

**4. FERC lacked authority to amend the tariff retroactively on sales by governmental entities**

The California Parties also err when they claim that the Commission "effectively amended the tariffs" when it revised the market clearing prices. Cal. Parties Motion at 13. First, there is no reason or occasion in these remand proceedings for the Commission to opine as to whether its proceedings "amended the tariffs" on sales by the governmental entities. The Commission simply has no jurisdiction as to such sales. All that is required is a simple dismissal of the governmental entities from these proceedings and a release of the governmental entities' collateral and account receivables. As discussed *infra*, the Commission should especially decline the request of the California Parties to issue dicta for the purpose of aiding the contract suits brought by the California Parties in state and federal courts, suits in which the Commission has no role or jurisdiction.

Second, in any event, the California Parties are wrong in arguing this Section 206 proceeding retroactively "amends" a tariff. Nothing in the Commission's orders purports to establish an "amended" tariff. Rather, the price cap established by the June 19, 2001 order was "prospective," as were all the changes to the market rules ordered prior to June 19, 2001, in the Commission's March 9, 2001 and April 6, 2001 orders. *See CPUC v. FERC*, 462 F.3d 1027, 1042-43 (9th Cir. 2006) (noting that the April 26 order established "a prospective mitigation and monitoring plan for wholesale prices"). The refund methodology was not established until the Commission issued its July 25, 2001 order. *Id.*, 462 F.3d at 1043. That refund methodology likewise did not purport to "amend the tariff" for the refund period. Rather, it established a MMCP methodology for the calculation of refunds under which "refunds were to be determined by the difference between the market clearing price . . . and the MMCP calculated for each hour of the Refund Period, subject to certain adjustments." *Id.* Specifically, the Commission's refund methodology allowed for cost offsets for each individual seller. *See San Diego Gas & Elec. Co.*, 115 FERC ¶ 61,171, at P 33 (2006) (stating that "the purpose of the cost offsets is to ensure that the refund methodology does not result in a confiscatory rate for any individual seller" and that the "refund methodology is not complete without the offsets").

Indeed, FERC has no authority under the filed rate doctrine and the rule against retroactive ratemaking to retroactively change an existing tariff. The filed rate doctrine, of course, "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority." *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 577 (1981). *See also Western Resources, Inc. v. FERC,*

72 F.3d 147, 149 (D.C. Cir.1995); *Columbia Gas Transmission Corp. v. FERC,* 831 F.2d 1135, 1139-42 (D.C. Cir.1987). "The related rule against retroactive ratemaking 'prohibits the Commission from adjusting current rates to make up for a utility's over- or under-collection in prior periods.'" *ConEd v. FERC*, 347 F.3d 964, 969 (D.C. Cir. 2003). (Citation omitted). Thus, "[t]he retroactive ratemaking doctrine is thus a logical outgrowth of the filed rate doctrine, prohibiting the Commission from doing indirectly what it cannot do directly." *Associated Gas Distribs. v. FERC,* 898 F.2d 809, 810 (D.C. Cir.1990) (per curiam) (Williams, J., concurring). *See also CPUC*, 462 F.3d at 1063 ("One of the fundamental tenets in FERC jurisprudence is the rule against retroactive ratemaking").

Stated differently, until a new tariff is established in a Section 206 proceeding (or otherwise), the existing tariff controls. As the Ninth Circuit explained in *CPUC*, the point of the Section 206 investigation is not to change the tariff retroactively but "to determine whether market rules required modification." *CPUC v. FERC*, 462 F.3d at 1047. Indeed, if a Section 206 determination were to constitute a retroactive "amendment" to the tariff as the California Parties suggest, it would mean that every sale made under the prior binding tariff during the Section 206 investigation period would be retroactively illegal, should the investigation result in a change. Such a holding would effectively convert a Section 206 proceeding into a Section 205 "violation of the tariff" proceeding, a patently absurd and illegal result. *See, e.g.*, *Public Utility Dist. v. FERC*, 471 F.3d 1053, 1058 (9th Cir. 2006) (distinguishing the two types of proceedings); *ConEd v. FERC,* 347 F.3d 964, 967 (D.C. Cir. 2003) (same). As *BPA* makes plain, no such Section 205 violation, of course, could be found on sales by governmental entities,

which are no more subject to Section 205 than to Section 206.

The bar against retroactive amendments to tariffs is also embodied in the text of Section 206. Section 206 provides that if the Commission creates a new "charge, classification, rule, regulation, practice, or contract," then the change must be "thereafter observed." *See* 16 U.S.C. § 824e(a). Pursuant to this section, the Commission "can effect no change prior to the date of the order." *FPC v. Sierra Pacific Power Company*, 350 U.S. 348, 352 (1956). *See also Montana-Dakota Utilities Co. v. Northwestern Public Services Co.*, 341 U.S. 246, 254 (1951) (citing legislative history for the proposition that "Congress withheld from the Commission power to grant reparations."). This principle is reflected in the Commission's orders entered in this case -- nothing in the Commission's orders including the June 19, 2001 order establishing a price cap and a new pricing mechanism for the market, purports to change retroactively pre-existing tariffs. To the contrary, those rulings expressly apply prospectively only. For example, the Commission's June 19, 2001 order provides that "[t]he mitigation plan [established by the order] will become effective beginning on the day following the date this order is issued." 95 FERC ¶ 61,418, at 62,548. *See also* Answer of Indicated Public Entities at Paragraphs 33-39, which BPA and Western adopt and incorporate herein.

Refunds under Section 206 for sales by jurisdictional entities do not violate the filed rate doctrine and the rule against retroactive ratemaking because the Section 206 notice effectively alerts jurisdictional sellers that their sales under that tariff could be subject to a refund obligation to be later determined by the Commission after a properly instituted Section 206 investigation. *See CPUC*, 462 F.3d at 1046, 1063. *See also Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 709 (D.C. Cir. 2000).

Proper actual notice is crucial to this "notice exception" to the rule. As the D.C. Circuit very recently opined, "[n]otice to affected parties, we have explained, 'changes what would be purely retroactive ratemaking into a functionally prospective process by placing the relevant audience on notice at the outset that the rates being promulgated are provisional only and subject to later revision.'" *NSTAR Elec. & Gas Corp. v. FERC*, __F.3d. __, 2007 WL 701631 at 6 (D.C. Cir. 2007), quoting *Columbia Gas*, 895 F.2d at 797. See also *Exxon Co. v. FERC*, 182 F.3d 30, 49 (D.C. Cir.1999). As the Ninth Circuit stated in *CPUC*, "the remedies afforded pursuant to a third party § 206 complaint must have a sufficient nexus to the substantive allegations of the complaint so that market participants are placed on notice that they are at risk for sales made after the refund effective date." *CPUC*, 462 F.3d at 1063.

The Section 206 notice in this case did not put governmental entities on any such notice for two reasons. First, as *BPA* holds, Section 206 simply does not apply to sales by governmental entities. Thus, even assuming *arguendo* that Section 206 somehow accorded the Commission the power to "amend a tariff" retroactively, that Section 206 power simply could not authorize the Commission to amend tariffs retroactively as applied to sales by the non-jurisdictional governmental entities. Stated differently, since FERC has no Section 206 legal authority over sales by governmental entities, it likewise has no authority to alter the filed rate doctrine and the rule against retroactive ratemaking as to sales by those governmental entities. The rates in effect at the time of sales by the governmental entities are thus controlling as a matter of law and cannot be retroactively changed by any invocation of Section 206.

Second, the Section 206 notice, in fact, purported to apply only to "public utilities." The original complaint filed by San Diego Gas & Electric, the claim on which the Section 206 refund date is based and calculated, only addressed such sales by "public utilities." *See CPUC*, 462 F.3d at 1046-47 & 1063. The Commission did not even purport to give notice that it was applying these refund proceedings to sales by governmental entities until the Commission's July 25, 2001 order applying its prior rulings to governmental entities. *San Diego Gas & Elec. Co.*, 96 FERC ¶ 61,120 at 17 (2001). That is undisputed. Certainly, given the legal bar to assessing refund liability against governmental entities, reaffirmed by the court in *BPA*, the governmental entities could not have reasonably anticipated that they would ever be subject to an illegal Section 206 refund order in making desperately needed sales of power into the California market during the refund period. It bears repetition that, but for these sales, the power crisis in California would have been much worse. The governmental entities might have chosen to limit their sales if they had been put on notice of any refund liability -- precisely the point of the notice requirement. For all these reasons, the filed rate doctrine and the rule against retroactive ratemaking bar any retroactive amendments to the tariffs for sales by governmental entities.

In any event, even as to jurisdictional entities, Section 206 proceedings do not retroactively "amend" the tariff itself, but simply provide a legal mechanism for the Commission to impose refunds on jurisdictional entities *as a matter of discretion*. *See, e.g., Towns of Concord, Norwood, & Wellesley, Mass. v. FERC*, 955 F.2d 67, 73 (D.C. Cir. 1992) (sustaining FERC's equitable discretion over whether to order refunds). As *Towns of Concord* holds, the Commission "need only show that it 'considered relevant

factors and . . . struck a reasonable accommodation among them,' *Las Cruces TV Cable v. FCC*, 645 F.2d at 1047, and that its order granting or denying refunds was 'equitable in the circumstances of this litigation,' *Wisconsin Elec. Power Co. v. FERC*, 602 F.2d 452, 457 (D.C. Cir.1979)." Under that standard, a refund proceeding does not create an "amended tariff" or any "tariff." Rather, refunds simply involve the Commission's equitable discretion. *See also City of Vernon*, 115 FERC ¶ 61,297, 62,061 (2006) (applying the *Towns of Concord* test).

That discretion is evident in this case. Here, FERC's own orders make clear that the Commission did not bind itself to applying the MMCP in calculating refunds. Rather, the Commission has allowed each jurisdictional entity to show that a different refund calculation would be applicable to its sales by making a cost filing. *See San Diego Gas & Elec. Co.*, 105 FERC ¶ 61,066 at 61,372 (2003) ("In the December 19 and May 15 Orders, the Commission provided marketers with the opportunity to demonstrate that their portfolio costs exceeded their cost recovery under the MMCP methodology."). The Commission has continually refined that approach. *See also San Diego Gas & Elec. Co.* 107 FERC 61,166 (2004); *San Diego Gas & Elec. Co.*, 108 FERC ¶ 61,311 (2004). Such a case-by-case refund inquiry is the antithesis of a "tariff," which generally must be uniform and non-discriminatory. *See generally* 18 U.S.C. 824d(b); *California ex rel Lockyer v. FERC,* 383 F.3d 106, 111 (9th Cir. 2003). Stated differently, such an individualized refund approach makes clear that the refund calculation is not a "tariff" matter, much less a matter of retroactively applying an "amended tariff," as the California Parties mistakenly suggest.

As the Indicated Public Entities point out (Answer at Paragraph 31), the settlements accepted by the Commission to date also belie the notion that the Commission has somehow retroactively reset the tariff. In each of those cases, the refund liability of the settling jurisdictional seller was offset by the receivables that were owed to the jurisdictional seller under the *tariff rate in effect at the time of the sale*. *See, e.g. San Diego Gas & Electric Co. v. Sellers of Energy and Ancillary Services, et al.*, 111 FERC ¶ 61,017 (2005) ("Under the Settlement, Mirant will assign to the California Parties approximately $283 million in receivables claimed by Mirant to be due to it from the CAISO and CalPX".) *Accord San Diego Gas & Electric Co. v. Sellers of Energy and Ancillary Services, et al.*, 113 FERC ¶ 61,308 (2005); *San Diego Gas & Electric Co. v. Sellers of Energy and Ancillary Services, et al.*, 111 FERC ¶ 61,354 (2005); *San Diego Gas & Electric Co. v. Sellers of Energy and Ancillary Services, et al.*, 113 FERC ¶ 61,308 (2005); *San Diego Gas & Electric Co. v. Sellers of Energy and Ancillary Services*, et al., 118 FERC ¶ 61,168 (2007). In sum the California Parties' suggestion that the Commission retroactively amended the tariff on sales by governmental entities is thus wrong both as a matter of law and as a matter of fact.

**5. FERC should not become embroiled in a legal proceeding outside the scope of its jurisdiction.**

The California Parties spend a significant portion of the motion trying to convince the Commission of the relative strength of the various contract claims they have filed against the governmental entities. They explain how the *BPA* decision, along with the *MAPP/Alliant*[4] cases, supposedly creates a basis for their contract claims. Because of the

[4] *Alliant Energy v. Nebraska Public Power District,* 347 F.3d 1046 (8th Cir. 2003); *Mid-Continent Area Power Pool,* 89 FERC ¶ 61,135 (1999).

purported strength of their contract claims, the California Parties then argue that FERC should "ensure that the ISO and PX calculate the refunds owed by all sellers including the Governmental Entities." Cal. Parties Motion at 16.

Whether the California Parties are correct regarding the merits of those claims has no relevance in this proceeding. The presence in this case of a contract between jurisdictional and non-jurisdictional parties is irrelevant because FERC has no legal authority to regulate a party over which it lacks FPA jurisdiction. Certainly, BPA and Western feel strongly that the contract claims asserted against them are not meritorious, as portrayed by the California Parties. That, too, is irrelevant to this proceeding. The relative strength of the California Parties' contract cases and the questions regarding whether *BPA* and the *MAPP/Alliant* cases stand for the propositions for which the California Parties contend, are not for the Commission to decide. The Commission should not interfere in the disposition of cases involving parties over which it has no jurisdiction.

The *BPA* case has drawn a bright line when it comes to the refund liability of governmental entities in these proceedings and the Commission's role; post-*BPA* the Commission's role is very limited. Very simply, the governmental entities are not subject to FERC's refund authority. As a result, the string of FERC decisions asserting jurisdiction, as well as the underlying rationale for that assertion of jurisdiction, are set aside and no longer have any force and effect. The California Parties' motion essentially asks the Commission to continue to enforce provisions that are no longer valid under binding law. The Commission must reject this request that it simply nullify the Ninth Circuit's order and continue to retain collateral over which it lacks jurisdiction, calculate

refunds that it has no right to order, and otherwise conduct this proceeding in the very same manner as it was being conducted prior to the Ninth Circuit's order denying jurisdiction. Similarly, the Commission must reject the California Parties' blatant attempt to encourage the Commission to meddle in state and Federal court litigation over which it has no jurisdiction.

With the issuance of the mandate, the Commission has no power in this proceeding to issue any order having binding effect on the governmental entities. Thus, there is no reason for FERC to continue to include governmental entities in the refund calculation. Certainly, it is not within the Commission's jurisdiction to assist the California Parties in their contract litigation. The Commission has no role in these unrelated contractual disputes and should not take any action in these remand proceedings that could prejudice the rights of the non-jurisdictional utilities in litigation that does not implicate the Commission's regulatory authority, as defined by the Ninth Circuit in its mandate.

**6. The California Parties' reliance on the *CPUC* decision is misplaced.**

The California Parties contend that the Ninth Circuit's decision in *CPUC v. FERC* requires the Commission to mitigate all transactions from the refund period in the ISO and PX markets. They conclude from this that the Commission should therefore continue the calculation of refunds for the governmental entities. Their conclusion is fundamentally flawed because it ignores the holding in the *BPA* case.[5]

The California Parties argument essentially asks the Commission to read the *CPUC* case in a vacuum. The *CPUC* and *BPA* cases have been linked together by the

---

[5] We note that no mandate has issued in *CPUC* so, even if the case could be read as the California Parties suggest, it is not before the Commission.

Ninth Circuit since the scheduling conference. The two cases were briefed on the same general schedule and argument was heard by the same panel on both cases on consecutive days. The *BPA* decision was issued approximately 11 months prior to the *CPUC* decision by the Court, so to the extent that one reads the *CPUC* decision, it must be read in the context of its companion case, *BPA v. FERC*. Therefore, to suggest that the *CPUC* case somehow requires the Commission to mitigate all transactions in ISO and PX markets ignores the clear holding of the *BPA* decision, discussed above. The *CPUC* case cannot be read to somehow require the Commission to continue to mitigate the transactions of BPA, Western and the other governmental entities. The two opinions must be read consistent with each other. To the extent that the *CPUC* case suggests that all transactions in the ISO and PX markets must be mitigated, it is illogical to extend transactions by governmental entities.

**7. The Commission cannot compel governmental entities to make cost filings.**

As part of their motion, the California Parties ask FERC to require the governmental entities to make cost filings within five days of the Commission's ruling on this motion.[6] They contend that it remains the Commission's responsibility to both determine the market-wide pricing under the ISO and PX tariffs, as well as adjudicate cost filing issues for the governmental entities. As noted above, the *BPA* decision forecloses both of these contentions. The Commission has no jurisdiction over governmental entities in this proceeding and this matter is not, as the California Parties suggest, one in which the Commission is establishing a market-wide price applicable to all transactions in the ISO and PX markets. As a consequence of the absence of any

---

[6] Cal. Parties' Motion at 18 -20.

jurisdiction over the governmental entities, the Commission cannot require them to make offset cost filings in a refund proceeding in which the Commission lacks jurisdiction over the governmental entities.

The Indicated Public Entities have also filed an answer in to the California Parties' motion on this point. BPA and Western support and adopt the arguments made therein. Indicated Public Entities Answer paragraph 17-25.

**8. No market shortfall will result from dismissal of the governmental entities.**

The California Parties ask the Commission to defer determining how to address the market shortfall that will result from the failure of the governmental entities to pay refunds until after their contract claims are completed. The request assumes that a market shortfall will result from dismissal of the governmental entities. The whole notion of a market shortfall is premised upon the California Parties contention that all transactions in the ISO and PX markets have been adjusted by the Commission. As previously noted, this is a flawed assumption. The *BPA* decision specifically rejects the concept that this proceeding adjusted the prices for all the transactions in the ISO and PX markets. FERC's jurisdiction cannot be countered "by shifting the analysis away from the identity of the [parties it wishes to regulate], and focusing instead on the nature of their transactions and the markets and tariffs under which these transactions were conducted. *BPA*, 422 F.3d at 918. As a consequence, the removal of the governmental entities as source of potential refund does not result in a market shortfall, only a smaller pool of refunds to be distributed to buyers.

Additionally, as noted in the answer of the Indicated Governmental Entities, the California Parties reliance on the *MAPP* case is misplaced. BPA and Western adopt and

support the arguments made therein. Indicated Public Entities Answer paragraph 27-32. *MAPP* specifically rejected the notion that a market shortfall resulted from FERC's lack of jurisdiction over the non-public utilities in that proceeding.

**9. FERC's jurisdiction over BPA's and Western's rates are not governed by the FPA.**

As noted, under the FPA, FERC's role is to determine whether the rates for public utilities are "just and reasonable." Under the Northwest Power Act, FERC reviews BPA's rates (as determined by the BPA Administrator) only to ensure that these rates are sufficient to ensure repayment of the federal investment and based on total system costs, the criteria imposed by Section 7(a) of the Act.[7] Upon FERC's approval, those BPA rates take effect and are then controlling. There is no avenue for FERC to reconsider those rates at a later time under the Northwest Power Act or under the FPA. Under separate authorities[8], the process and the results are the same for Western. FERC's review is limited to sufficiency of repayment and it may not adjust the rates. FERC either confirms Western's rates or returns them to Western for further consideration. As with BPA, the Commission lacks jurisdiction to review justness and reasonableness of Western's rates.

---

[7] *See Aluminum Co. of America v. BPA*, 903 F.3d 585, 592 (9th Cir. 1989), *cert. denied*, 498 U.S. 1024 (1991) (contrasting FERC role and proceedings under the Federal Power Act to those created by the Northwest Power Act); *Central Lincoln People's Utility District v. Johnson*, 735 F.2d 1101, 1113 n.6 (9th Cir. 1984) (expressly rejecting the argument that the "substantive provisions of the FPA are meant to govern the rate review under section 7(k)"); *Southern Calif. Edison Co. v. Jura*, 909 F.2d 339, 343-44 (9th Cir. 1990) (same).

[8] *See* Sections 301 (b), 302(a) and 644 of the Department of Energy Organization Act, Pub.L 95-91 (42 U.S.C. 7101, *et seq*.); section 5 of the Flood Control Act of 1944 (16 U.S.C. 825s); the Reclamation Projects Act of 1902 (43 U.S.C. 372, *et seq*.) as amended and supplemented by subsequent enactments, particularly section 9(c) of the Reclamation Project Act of 1939 (43 U.S.C. 485h(c)) and the Acts specifically applicable to individual projects or power systems; and which has been codified at 10 C.F.R. Part 903.

Given these vastly different statutory goals, it is quite possible, for example, that a "reasonable rate" under the FPA could be insufficient to meet the goals of the Northwest Power Act. Even assuming *arguendo* that "reasonable" rates under the Federal Power Act could satisfy the criteria set forth in the Northwest Power Act, FERC's exercise of such FPA jurisdiction would obviate the primary role accorded the judgment of the Administrator of BPA for making those rate determinations by the Northwest Power Act and would mean that FERC would be exercising *de novo* rate-setting jurisdiction instead of the appellate role required by the Northwest Power Act.

In the event the Commission entertains the California Parties' recommendation and continues the calculation of refunds for BPA or Western, the Commission would have no jurisdiction under the Northwest Power Act, Western's authorities, or the FPA to put into effect any such recalculated rate. Stated differently, the refund calculation would be a nullity as it would effectively impose on BPA or Western the same "reasonable" rate the Commission intends to apply to jurisdictional sellers of electrical power over which FERC may exercise ratemaking authority under the FPA. In essence, FERC would be applying the "reasonable" rate standard of the Federal Power Act, a result that is flatly barred under *BPA* and controlling precedent applying the Northwest Power Act, cited above.

The obvious answer to these difficulties is to reject the California Parties' attempt to have the Commission circumvent the *BPA* decision and for the Commission to refuse to continue to calculate the just and reasonable rate for these transactions. Such a decision gives full effect to the exclusion of BPA and Western from FERC's jurisdiction under Section 201(f), while properly limiting FERC's role to that specifically delineated

by Congress in BPA and Western's authorizing statutes. Only that determination will give full effect to the objectives and goals set forth in both statutory schemes.

**10. Conclusion.**

Based on the foregoing, the California Parties' motion should be denied. The Commission should dismiss BPA, Western and the other governmental entities from these proceedings and release the governmental entities' collateral and accounts receivable from Commission jurisdiction.

Respectfully submitted this 17th day of April, 2007

*<u>/s/ Peter Burger</u>*
Peter Burger
Attorney for the
Bonneville Power Admin.
905 NE 11th Avenue
Portland, OR 97232
Phone: (503) 230-4201
Fax: (503) 230-7405
pjburger@bpa.gov

*<u>/s/ John D. Bremer</u>*
John D. Bremer
Attorney for the
Western Area Power Admin.
12155 W. Alameda Parkway
Lakewood, CO 80228-8213
Phone: (720) 962-7019
Fax: (720) 962-7009
bremer@wapa.gov

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing document upon each person designated on the ListServ established in Docket Nos. EL00-95, *et al.*, in these proceedings.

Dated this 17th day of April 2007.

*/s/ Peter Burger*
Peter Burger
Attorney for the
Bonneville Power Admin.
905 NE 11th Avenue
Portland, OR 97232
Phone: (503) 230-4201
Fax: (503) 230-7405
pjburger@bpa.gov

ALSTON&BIRD LLP

The Atlantic Building
950 F Street, N.W.
Washington, DC 20004

202-756-3300
Fax: 202-756-3333

Michael Kunselman Direct Dial: 202-756-3395 Email: Michael.Kunselman@alston.com

September 6, 2007

The Honorable Kimberly D. Bose
Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

**Re: California Independent System Operator Corporation**
**Docket Nos. ER03-746-000, *et al.***
**San Diego Gas & Electric Co., *et al.***
**Docket Nos. EL00-95-081, *et al.***
**California Independent System Operator Corporation and California Power Exchange**
**Docket Nos. EL00-98-069, *et al.***

Dear Secretary Bose:

Enclosed please find one original and fourteen copies of the Thirty-Eighth Status Report of the California Independent System Operator Corporation on Re-Run Activity filed in the above-captioned dockets.

Also enclosed are two extra copies of this cover letter to be time/date stamped and returned to us by the messenger. Thank you for your assistance. Please contact the undersigned if you have any questions regarding this filing.

Sincerely,

Michael Kunselman

Counsel for the California Independent System Operator Corporation

Enclosures

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | | |
|---|---|---|---|
| **California Independent System Operator Corporation** | ) | **Docket No.** | **ER03-746-000** |
| **San Diego Gas & Electric Company, Complainant,** | ) | | |
| **v.** | ) | **Docket Nos.** | **EL00-95-081 EL00-95-074 EL00-95-086** |
| **Sellers of Energy and Ancillary Services Into Markets Operated by the California Independent System Operator and the California Power Exchange, Respondents.** | ) | | |
| **Investigation of Practices of the California Independent System Operator and the California Power Exchange** | ) | **Docket Nos.** | **EL00-98-069 EL00-98-062 EL00-98-073** |

**(not consolidated)**

## THIRTY-EIGHTH STATUS REPORT OF THE CALIFORNIA INDEPENDENT SYSTEM OPERATOR CORPORATION ON SETTLEMENT RE-RUN ACTIVITY

The California Independent System Operator Corporation ("ISO") hereby provides its thirty-eighth status report pursuant to the Order Granting Clarification and Granting and Denying Rehearing of the Federal Energy Regulatory Commission ("Commission" or "FERC"), issued on February 3, 2004, in the above-captioned dockets ("February 3 Order").

New information can be found in Sections II(A) (Fuel Cost Allowance Data) and II(C) (Cost-Based Recovery Filings).

Any comments on this report that are received by October 2 will be considered for incorporation in next month's status report, scheduled to be filed on or about October 10.

The CAISO did not receive any comments on the status report that it filed on July 11, 2007.

## I. BACKGROUND ABOUT THESE STATUS REPORTS[1]

In the February 3 Order,[2] the Commission directed the ISO[3] "to submit to the Commission on a monthly basis, beginning on February 10, 2004, a report detailing the status of the preparatory adjustment re-runs and the dates that it expects to complete both the preparatory re-runs and the settlements and billing process for calculating refunds." February 3 Order at P 21. The first such status report was filed with the Commission on February 9, 2004. This filing is the thirty-eighth such report required by that Commission Order. While the preparatory and FERC refund re-runs are now complete, the ISO will continue to provide status reports throughout the resettlement and financial phases of the process because the ISO believes that these reports have been a valuable tool

---

1 In its October 16, 2003 Order on Rehearing, 105 FERC ¶ 61,066 (2003), the Commission ordered the ISO to file within five months of the date of the order the results of the preparatory re-runs along with the appropriate explanations. The ISO considers that this directive has been overtaken by FERC's later recognition in the Amendment No. 51 proceeding that the ISO could not possibly comply with the deadline in the October 16 Rehearing order, as well as the deadlines in the previous Amendment 51 orders. The ISO is endeavoring to comply, however, with FERC's directive that the ISO work as fast as practicable, keep the parties well informed, and file monthly status reports. For this reason, in addition to the Amendment No. 51 docket, the ISO is also filing this report in the dockets associated with the California refund proceeding.

2 106 FERC 61,099 (2004). The context of the February 3 Order in prior versions of the ISO's status report.

3 Capitalized terms not otherwise defined herein shall have the meanings set forth in the Master Definitions Supplement, Appendix A to the ISO Tariff.

for communicating with the Commission and Market Participants, in addition to meeting the Commission-mandated reporting requirement.

## II. CURRENT STATUS OF RE-RUN ACTIVITY

The ISO has finished publishing settlement statements reflecting the refund rerun, and is still in the financial adjustment phase, in which the ISO is making adjustments to its refund rerun settlement data to account for fuel cost allowance offsets, emissions offsets, cost-based recovery offsets, and interest on amounts unpaid and refunds. As of the date of this report, the ISO has finished processing activities associated with the emissions cost offsets, is actively working on offsets associated with fuel costs and cost-based recovery filings, and has distributed several interest calculations as well.

For the Fuel Cost Allowance offset, the ISO circulated the latest round of fuel cost offset data to parties on July 16, with comments due on July 23. The ISO subsequently extended the comment period on this data until August 8, 2007. Comments on this data were received from Bonneville Power Administration ("BPA") and Pacific Gas and Electric ("PG&E").

As noted in the last status report, the ISO will need to complete modifications to the fuel cost data, as receive updated fuel cost data from the PX, before it can complete calculations relating to the allocation of cost recovery filing amounts. When the ISO determines the date on which the updated cost filing allocation data is ready to be distributed, the ISO will inform parties of this date,

along with the relevant comment period, through a market notice and an email to Listserv.

A summary of previous circulations and relevant Commission orders can be found in previous status reports.

**A. FUEL COST ALLOWANCE DATA**

As explained in greater detail in previous status reports, the ISO has pursued a two-track approach with respect to calculating fuel cost allowances. First, the ISO calculated, for each entity that participated in the ISO's markets during the Refund Period (*i.e.*, October 2, 2000 through June 20, 2001), the percentage of the total fuel cost claim amounts to be allocated to these entities for each hour, consistent with the methodology approved by the Commission for doing so. Second, the ISO will use these validated numbers to calculate the final allocation percentages, as well as the final allocation of actual dollar amounts.

On December 22, 2005, the ISO distributed the first set of fuel cost allocation percentages to parties, and received comments from several parties. The ISO made several revisions to this data set and distributed the revised allocation percentages for another round of review on June 1, 2006. Since then, the ISO made various further modifications to the fuel cost percentages, most recently to adjust its calculations in order to allocate an additional $7 million from the fuel cost claim of Los Angeles Department of Water and Power in the ISO markets. This modification was described in detail in the ISO's last status report. The ISO circulated the most recent fuel cost data on July 16, and accepted comments on this data through August 8.

In an effort to finalize the fuel cost allowance allocation calculations, the ISO plans to make two additional adjustments, as follows. First, in response to comments from PG&E, which pointed out that the fuel cost allowance may not result in claimants receiving more than their pre-mitigated amount for each interval during the Refund Period, the ISO has run an additional check on its fuel cost data. This check is being performed pursuant to the Commission's directive in Paragraph 55 of its May 12, 2004 "Order Addressing Fuel Cost Allowance Issues," 107 FERC ¶ 61,166 (2004) ("May 12 Order") in which the Commission accepted the California Parties' request for clarification that, regardless of whether there was a soft cap in effect during particular intervals in the Refund Period, "the fuel cost allowance should not result in generators recovering more than the pre-mitigated amount." Because the Commission explicitly permitted parties to raise issues regarding the verified fuel cost claims as protests of the ISO's refund compliance filing,[4] failing to conduct this check could have resulted in rejection of the compliance filing based on a protest from PG&E. Accordingly, the ISO concluded that it is most efficient to conduct this check now to ensure that any potential deviations from Paragraph 55 of the May 12 Order are corrected.

This adjustment will reduce total Fuel Cost Allowance claims by approximately $1.7 million, as follows:

---

[4] *See Order Denying Rehearing, Clarifying Fuel Cost Allowance Issues, and Accepting in Part Compliance Filing*, 108 FERC ¶ 61,311 (2004) at P 93.

| SC_ID | Sum of FCA_TOTAL | Sum of EXCESS_OF_REFUND | Sum of FCA_TOTAL_CAPPED | Name |
|---|---|---|---|---|
| ANHM | 297,779.77 | 12,649.50 | 285,130.26 | City of Anaheim, CA |
| APX1 | 299,782.90 | 12,193.24 | 287,589.66 | Midway Sunset with APX1 as the SC |
| DETM | 33,860,925.35 | 291,874.09 | 33,569,051.25 | Duke Energy North America LLC |
| ECH1 | 68,632,696.89 | 130,726.82 | 68,501,970.06 | Dynegy |
| LDWP | 23,008,803.25 | 67,322.84 | 22,941,480.41 | LA Dept. of Water and Power |
| NES1 | 66,345,317.29 | 491,685.41 | 65,853,631.88 | Reliant Energy Services, Inc. |
| NEVP | 860,684.22 | 0.00 | 860,684.22 | Nevada Power Company |
| PSE1 | 3,387,794.54 | 2,099.75 | 3,385,694.79 | Puget Sound Energy, Inc. |
| PXLA | 7,330,042.90 | 0.00 | 7,330,042.90 | LADWP with PXC1 as the SC |
| PXMS | 2,596,740.51 | 0.00 | 2,596,740.51 | Midway Sunset with PXC1 as the SC |
| PXNV | 2,424,617.48 | 0.00 | 2,424,617.48 | Nevada Power with PXC1 as the SC |
| SETC | 5,584,701.71 | 32,326.40 | 5,552,375.31 | Sempra Energy Trading Corp. |
| WESC | 86,641,321.89 | 696,516.19 | 85,944,805.70 | Williams Power |
| Grand Total | 301,271,208.69 | 1,737,394.25 | 299,533,814.44 | |

Second, the ISO plans to make a small adjustment to the fuel cost allocation data to reflect an issue raised by BPA concerning the allocation of fuel costs to energy exchange transactions. Specifically, the ISO will undo the allocation of fuel costs to several energy exchange transactions, and re-allocate those costs to the remainder of the market during the relevant time periods. The monetary impact of this adjustment is only $38,856.35.

The ISO does not plan to circulate the fuel cost data for an additional review and comment period after it performs these tasks. Rather, the ISO believes that the most efficient course of action at this time is to complete its financial adjustment calculations as soon as possible and share them with the PX, which has been in a "holding pattern" with its fuel cost allowance data due to maintenance on the mainframe computer of one of its participants. To allow that party to comment on its calculations, the PX extended the comment date on its fuel cost data to September 24. The ISO completed revisions to its own fuel cost allowance data and sent them to the PX on August 31, which will permit the PX to incorporate the ISO's corrections in its data, recirculate its own data, and still

maintain the September 24 comment date. Thus, by omitting the comment period for these changes, the ISO avoided any further delay to the proceeding. The ISO believes that, on balance, the value of avoiding further delay outweighs the risk of being required to recalculate the numbers again.

## B. EMISSIONS OFFSETS

The ISO's work on the Emissions offset is completed and uploaded. By way of background, in the Findings of Fact in the Refund proceeding[5] and again in the Commission's Order of March 26, 2003,[6] the Commission found that 3 entities, Duke, Dynegy, and Williams, had supported their requested emissions allowance. Three other entities – Reliant, the City of Pasadena, and the Los Angeles Department of Water and Power ("LADWP") – were ordered to reallocate and recalculate their emissions allowances.[7] Also, in the Commission's October 16, 2003 order, the Commission clarified that emissions offsets would be recoverable only for mitigated intervals.

On September 20, 2005, the Commission issued an order accepting the recalculated emissions claims of Pasadena and LADWP. 112 FERC ¶ 61,323 (2005). The Commission also acknowledged receipt of Reliant's informational filing detailing a pro rata allocation of its emissions costs offset among mitigated and non-mitigated intervals. *Id.* at P 40.

5 Certification of Proposed Findings on California Refund Liability, Issued December 12, 2002, PP 729-760.

6 102 FERC ¶ 61,317 (2003) item BB.

7 With respect to Reliant, the Commission, in its March 26 Order, accepted the Presiding Judge's finding that although Reliant would be required to recalculate its emissions on a pro-rata basis, Reliant would be permitted to use the California Generators' existing pro rata allocation exhibit, and would not be required to re-file that information.

In its most recent status reports, the ISO noted that it had received revised emissions claims for all outstanding entities, and will incorporate these data into the financial adjustment phase.

On April 25, 2006, the ISO distributed data reflecting the allocation percentages for emissions for each party during the refund proceeding. The ISO provided a several week period for party comments on these data, and received none. On September 21, 2006, the ISO circulated the final approved emissions claim amounts that it will use in its calculations, as well as an explanation of the methodology for determining the resulting refund offsets. As explained in the market notice accompanying that distribution, the ISO intends to use these claim amounts, along with the percentages distributed on April 25, 2006, to determine the final refund offsets associated with approved emissions claims.

**C. COST-BASED RECOVERY FILINGS**

The ISO has received from various parties all of the cost-based filing data mandated by the Commission in its orders of January 26, 2006 and November 2, 2006. In the February 2007 status report, the ISO included a list of the claims that it intended to process.

As also noted above, the Commission issued an order approving an allocation methodology for cost filings on May 12, 2006. Therein, the Commission concluded that offsets from cost filings should be allocated to purchasers based on their net refunds. In its June 2006 status report, the ISO explained the methodology that it intends to adopt in order to implement the Commission's methodology. However, after considering questions posed by

several parties, the ISO recognized that certain portions of its methodology discussion in the June 2006 status report should be clarified. Therefore, the ISO made several modifications to its methodology, which it set forth in its status report filed July 10, 2006 in these dockets (pages 10-12).

In its last several status reports, the ISO also noted that there is an important issue about how to account for refunds in both the ISO and PX markets when allocating the cost-based filing offsets. The ISO had discussions concerning this issue with several parties, and based on these conversations, the ISO and PX agreed to a methodology for accounting for net refunds in both the ISO and PX markets, which the ISO set forth in its March status report. A full explanation of the methodology is included on the CDs that were circulated to parties on April 10.

The ISO issued updated cost filing allocation data on May 22, 2007. The primary adjustment in this distribution was to properly net the PX position to zero between the ISO and PX markets so that PX participants receiving refunds would be allocated the entire PX portion of the offset. Comments on this data were due to the ISO and PX jointly by June 12. The only comment received was from PG&E, which did not raise any new issues based on this most recent distribution.

The ISO will need to update its cost filing allocation calculations in order to account for modifications that it has recently made to its fuel cost allocation data, as well as changes in the PX's fuel cost allowance allocations that result from these modifications. As noted above in the section addressing fuel cost claims, the ISO anticipates that the PX data will be ready by September 24, at

which time the ISO can begin processing the cost filing allocations. Therefore, at this time, the ISO is not certain when the cost filing allocation calculations will be complete. When the ISO determines the date on which the updated cost filing allocation data is ready to be distributed, the ISO will inform parties of this date, along with the relevant comment period, through a market notice and an email to Listserv.

**D. INTEREST CALCULATIONS**

As noted in previous reports, the ISO has made several distributions of interest data to parties. First, on January 12, 2006, the ISO distributed to parties via the listserv a spreadsheet showing the reversal of all interest amounts originally charged to entities that transacted with the ISO during the Refund Period, along with an explanatory memorandum.

The calculation of interest on unpaid invoices during the Refund Period, pursuant to the methodology approved by the Commission was made available on May 1, 2006. The ISO also posted to listserv on that date a memorandum explaining these calculations. In response to comments from the parties, the ISO revised these calculations and, on September 29, 2006, the ISO released new calculations and announced that it was seeking comments no later than October 27. Based on comments received during that review period, the ISO released an updated calculation of interest on unpaid invoices on February 27. The comment period closed on March 15.

Once all other outstanding financial adjustment activities (*i.e.* fuel cost and cost filing allocations) are completed, the ISO will calculate interest on refunds,

which is the last interest calculation that the ISO will do as part of the financial adjustment phase. The ISO estimates that this will take 2 weeks, at which time the ISO will make this data available to parties. ISO will also need to perform adjustments to balances in the ISO market to account for any allocation that the ISO receives as a result of a shortfall in the PX markets between interest earned in the PX Settlement Trust Account and the Commission's rate.[8] However, the ISO plans to wait to make these adjustments until after it completes the financial adjustment phase and begins accounting for the impacts of the settlements entered into in this proceeding. The ISO proposes to proceed in this manner because even if it calculates these adjustments during the financial adjustment phase, they will almost certainly have to be re-done when it accounts for settlements in this proceeding.

In the March 2007 status report, the ISO announced its intention to assess interest on preparatory rerun adjustments relating to transactions with trading dates during the Refund Period. The ISO will determine the date on which interest begins to run by using the trade date on which the original transaction took place. For example, if a particular preparatory rerun adjustment was made for a transaction that originally took place on March 12, 2001, then the ISO would begin to calculate interest as of that date. This corresponds to the ISO's methodology for calculating interest on refunds, and is consistent with the

[8] In its November 23, 2004 "Order on Rehearing" issued in this proceeding, the Commission accepted the ISO's request to allocate any portion of such shortfall assigned to the ISO pro rata to its participants. 109 FERC ¶ 61,218 at P 39 (2004).

Commission's directive that interest should be computed from the "date of collection."[9]

The ISO made calculations of this component of interest available through a listserv announcement on March 29, 2007. Comments were due April 19, 2007. A number of parties commented on these calculations, some disputing the ISO's proposal, others supporting it. The ISO responded to all of these comments in a filing made with the Commission on May 1, 2007.

### E. STATUS OF ADR CLAIMS

As noted in previous reports, a number of claims that relate to the Refund period are being pursued by various Market Participants in Alternative Dispute Resolution ("ADR") pursuant to Section 13 of the ISO Tariff. In previous monthly reports, the ISO noted that charges resulting from certain disputes may be assessed to the Scheduling Coordinators during the period affected by this case – both the refund rerun and the preparatory rerun. In the February 2007 status report, the ISO provided an update on the status of these matters, most of which are also posted on the ISO website at http://www.caiso.com/clientserv/adr/.

The ISO continues to suspend conference calls with Market Participants on the status of re-run activity until any issues surface that suggest the need for additional calls. The ISO will likely schedule another conference call after it distributes the data from the financial adjustment phase, in order to field questions from Market Participants on that data. The ISO will inform Market Participants when it schedules that call.

---

9 *San Diego Gas & Electric Co., et al*, 105 FERC ¶ 61,066 at P 107 (2003).

### F. DECEMBER 1 DISPUTES

On December 1, 2005, pursuant to the Commission's August 8, 2005 order on cost-based recovery issues,[10] several entities filed with the Commission pleadings raising actual, or potential, disputes with respect to reruns and offsets. In the August 23 Order, the Commission acted on these disputes, rejecting the majority of them. With respect to the dispute filed by Puget Sound concerning ISO settlement data, the Commission required the ISO and Puget to attempt to resolve the issues raised by Puget, and to file periodic status reports concerning these efforts. The ISO and Puget filed three status reports, and ultimately, on October 16, 2006, their final positions on the single issue that could not be resolved.

## III. ESTIMATED SCHEDULE FOR COMPLETION OF THE REFUND RE-RUN ACTIVITY

Attachment A to this status report contains the ISO's estimate of the time that will be required to complete the financial adjustment phase. This schedule could be extended if errors are discovered during the review periods for the ISO's calculations. It may also change as the result of any number of legal challenges to Commission orders, including the decisions by the Ninth Circuit Court of Appeals in *BPA v. FERC* concerning the refund liability of non-FERC jurisdictional entities, and *CPUC v. FERC* concerning certain "scope/transactions" issues. The ISO recognizes that the Commission will be taking up the issues from *BPA v. FERC* in the near future. Until the Commission

---

[10] 112 FERC ¶ 61,176 (2005) at P 116.

issues direction on how to implement that decision, however, there is no basis for the ISO to depart from the schedule directed by the Commission for completing the refund process.

Attachment B to this status report contains a list of the major ISO refund calculation distributions and the associated review and comment periods provided to parties by the ISO to date. In some cases, the ISO did not provide any specific closing date for comments, but rather, continued to solicit and consider comments and make appropriate corrections until the data were utilized to make further calculations.

## IV. CONCLUSION

The ISO respectfully requests that the Commission accept the ISO's thirty-eighth refund status report in compliance with the Commission's February 3 Order, referenced above.

Respectfully submitted,

/Sean A. Atkins/
Michael Kunselman
Alston & Bird LLP
The Atlantic Building
950 F Street, N.W.
Washington, DC 20004
Tel: (202) 756-3300

Anthony J. Ivancovich
Daniel J. Shonkwiler
The California Independent System
Operator Corporation
151 Blue Ravine Road
Folsom, CA 95630
Telephone: (916) 608-7015

Dated: September 6, 2007

# ATTACHMENT A

**CURRENT TIMELINE FOR COMPLETION OF**
**FINANCIAL ADJUSTMENT PHASE OF REFUND PROCEEDING**
**SEPTEMBER 2007**

| DATE (ESTIMATED) | ITEMS |
|---|---|
| September 24, 2007 | Comments due on the latest iteration of the PX's fuel cost allowance data |
| *TO BE ANNOUNCED AFTER PX FINALIZES FCA DATA* | ISO circulates updated data on cost filing allocations. |
| *TO BE ANNOUNCED AFTER PX FINALIZES FCA DATA* | Comments due on updated cost filing allocation data. |
| 2 Weeks After All Offsets are Finalized | ISO distributes to parties interest calculations on refunds |

# ATTACHMENT B

**TABLE OF MAJOR REFUND CALCULATIONS DISTRIBUTED BY ISO AND ASSOCIATED REVIEW PERIODS**
**(July, 2007)**

| Item | Date Issued | Review Period/Comments Due Date |
|---|---|---|
| Preparatory Settlement Rerun Calculations | Published by the ISO on a rolling basis between December 15, 2003 to July 16, 2004 | Disputes accepted on a rolling basis between February 17, 2004 to September 11, 2004 |
| Refund Settlement Rerun Calculations | Published by the ISO on a rolling basis between October 25, 2005 to February 17, 2006 | Several due dates for disputes, the first being March 2, 2005, the last being March 1, 2006 |
| Preliminary Mitigated Market Clearing Prices | May 28, 2004 | No explicit comment period specified |
| Final Mitigated Market Clearing Prices | July 8, 2004 | No explicit comment period specified |
| List of Transactions Exempt from Mitigation | November 4, 2004 | No explicit comment period specified |
| Fuel Cost Allocation Percentages | December 22, 2005 | 4 Weeks |
| Revised Fuel Cost Allocation Percentages | June 1, 2006 | June 8, 2006 |
| Second Revised Fuel Cost Allocation Percentages | February 12, 2007 | February 26, 2007 |
| Third Revised Fuel Cost Allocation Percentages | March 29, 2007 | April 12, 2007 |
| Emissions Allocation Percentages | April 25, 2006 | May 23, 2006 |
| Final Approved Emissions Claim Amounts | September 21, 2006 | No explicit comment period, as the ISO did not receive any objections to its previous emissions distribution |

| | | |
|---|---|---|
| Cost Recovery Allocation Data | April 10, 2007 | May 1, 2007 |
| Reversal of Interest Charged During Refund Period | January 12, 2006 | No explicit comment period specified |
| Interest on Unpaid Invoices | May 1, 2006 | No explicit comment period specified |
| Revised Interest on Unpaid Invoices | September 29, 2006 | October 27, 2006 |
| Second Revised Interest on Unpaid Invoices | February 27, 2007 | March 15, 2007 |
| Interest on Preparatory Rerun Adjustments Relating to Refund Period Transactions | March 29, 2007 | April 19, 2007 |
| Revised Cost Allocation Data | May 22, 2007 | June 12, 2007 |
| Fourth Revised Fuel Cost Allocation Percentages | May 22, 2007 | June 12, 2007 |
| Fifth Revised Fuel Cost Allocation Percentages | July 16, 2007 | August 8, 2007 |

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day served the foregoing document upon each person designated on the official service list for the captioned proceeding, in accordance with Rule 2010 of the Commission's Rules of Practice and Procedure (18 C.F.R. § 385.2010).

Dated at Folsom, CA, on this 6th day of September, 2007.

Susan Montana

190 of 861 DOCUMENTS

UNITED STATES CODE SERVICE
Copyright 2000, LEXIS Law Publishing, a division of Reed Elsevier Inc.
All rights reserved.

*** ARCHIVE MATERIAL ***

*** THIS SECTION IS CURRENT THROUGH 106TH CONGRESS, 2ND SESSION ***

TITLE 16. CONSERVATION
CHAPTER 12. FEDERAL REGULATION AND DEVELOPMENT OF POWER
REGULATION OF ELECTRIC UTILITY COMPANIES ENGAGED IN INTERSTATE COMMERCE

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

*16 USCS § 824* (2000)

§ 824. Declaration of policy; application of Part

(a) Federal regulation of transmission and sale of electric energy. It is hereby declared that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, and that Federal regulation of matters relating to generation to the extent provided in this Part [*16 USCS §§ 824* et seq.] and the Part next following [*16 USCS §§ 825* et seq.] and of that part of such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States.

(b) Use or sale of electric energy in interstate commerce.
(1) The provisions of this Part [*16 USCS §§ 824* et seq.] shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but except as provided in paragraph (2) shall not apply to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line. The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this Part [*16 USCS §§ 824* et seq.] and the Part next following [*16 USCS §§ 825* et seq.], over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter.
(2) The provisions of sections 210, 211, and 212 [*16 USCS §§ 824i,* 824j, and 824k] shall apply to the entities described in such provisions, and such entities shall be subject to the jurisdiction of the Commission for purposes of carrying out such provisions and for purposes of applying the enforcement authorities of this Act [*16 USCS §§ 791a* et seq.] with respect to such provisions. Compliance with any order of the Commission under the provisions of section 210 or 211 [*16 USCS §§ 824i* or 824j], shall not make an electric utility or other entity subject to the jurisdiction of the Commission for any purposes other than the purposes specified in the preceding sentence.

(c) Electric energy in interstate commerce. For the purpose of this Part [*16 USCS §§ 824* et seq.], electric energy shall be held to be transmitted in interstate commerce if transmitted from a State and consumed at any point outside thereof; but only insofar as such transmission takes place within the United States.

(d) "Sale of electric energy at wholesale". The term "sale of electric energy at wholesale" when used in this Part [*16 USCS §§ 824* et seq.] means a sale of electric energy to any person for resale.

(e) "Public utility" defined. The term "public utility" when used in this Part [*16 USCS §§ 824* et seq.] or in the Part next following [*16 USCS §§ 825* et seq.] means any person who owns or operates facilities subject to the jurisdiction of the Commission under this Part [*16 USCS §§ 824* et seq.] (other than facilities subject to such jurisdiction solely by reason of section 210, 211, or 212 [*16 USCS §§ 824i,* 824j, or 824k.]).

(f) United States, State, political subdivision of a State, or agency or instrumentality thereof exempt. No provision in this Part [*16 USCS §§ 824* et seq.] shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State, or any agency, authority, or instrumentality of any one or more of the foregoing, or any corporation which is wholly owned, directly or indirectly, by any one or more of the foregoing, or any officer, agent, or employee of any of the foregoing acting as such in the course of his official duty, unless such provision makes specific reference thereto.

(g) Books and records.
(1) Upon written order of a State commission, a State commission may examine the books, accounts, memoranda, contracts, and records of--
(A) an electric utility company subject to its regulatory authority under State law,
(B) any exempt wholesale generator selling energy at wholesale to such electric utility, and
(C) any electric utility company, or holding company thereof, which is an associate company or affiliate of an exempt wholesale generator which sells electric energy to an electric utility company referred to in subparagraph (A),

wherever located, if such examination is required for the effective discharge of the State commission's regulatory responsibilities affecting the provision of electric service.
(2) Where a State commission issues an order pursuant to paragraph (1), the State commission shall not publicly disclose trade secrets or sensitive commercial information.
(3) Any United States district court located in the State in which the State commission referred to in paragraph (1) is located shall have jurisdiction to enforce compliance with this subsection.
(4) Nothing in this section shall--
(A) preempt applicable State law concerning the provision of records and other information; or
(B) in any way limit rights to obtain records and other information under Federal law, contracts, or otherwise.
(5) As used in this subsection the terms "affiliate", "associate company", "electric utility company", "holding company", "subsidiary company", and "exempt wholesale generator" shall have the same meaning as when used in the Public Utility Holding Company Act of 1935 [*15 USCS §§ 79a* et seq.].

**HISTORY:** (June 10, 1920, ch 285, Part II, § 201, as added Aug. 26, 1935, ch 687, Title II, § 213, 49 Stat. 847; Nov. 9, 1978, P.L. 95-617, Title II, § 204(b), 92 Stat. 3140; Oct. 24, 1992, P.L. 102-486, Title VII, Subtitle A, § 714, 106 Stat. 2911.)

**HISTORY; ANCILLARY LAWS AND DIRECTIVES**

Amendments:
1978. Act Nov. 9, 1978, in subsec. (b) designating existing provision as para. (1); in para. (1) as so designated, in the sentence beginning "The provisions . . ." inserted "except as provided in paragraph (2)"; added para. (2); in subsec. (e) inserted "(other than facilities subject to such jurisdiction solely by reason of section 210, 211, or 212)".
1992. Act Oct. 24, 1992, added subsec. (g).

Transfer of functions:
All executive and administrative functions of the Federal Power Commission were, with certain reservations, transferred to the Chairman of such Commission, with authority vested in him to authorize their performance by any officer, employee, or administrative unit under his jurisdiction, by 1950 Reorg. Plan No. 9, §§ 1, 2, effective May 24, 1950, *15 Fed. Reg. 3175,* 64 Stat. 1265, which appears as *16 USCS § 792* note.
The Federal Power Commission was abolished and its functions, personnel, property, funds, etc., were transferred to the Secretary of Energy, with the exception of certain functions, which were transferred to the Federal Energy Regulatory Commission, pursuant to the Department of Energy Organization Act (Act Aug. 4, 1977, P.L. 95-91, 91 Stat. 565), which is classified generally as *42 USCS §§ 7101* et seq. See, in particular, *42 USCS §§ 7151*(b), 7171(a), 7172(a), 7291, and 7293.

Other provisions:

Prior actions; authority of Commission or other agencies. Act Nov. 9, 1978, P.L. 95-617, Title II, § 214, 92 Stat. 3149, provided:

"(a) Prior actions. No provision of this title [this note among other things; for classification, consult USCS Tables volumes] or of any amendment made by this title shall apply to, or affect, any action taken by the Commission before the date of the enactment of this Act [Nov. 9, 1978].

"(b) Other authorities. No provision of this title [this note among other things; for classification, consult USCS Tables volumes] or of any amendment made by this title shall limit, impair or otherwise affect any authority of the Commission or any other agency or instrumentality of the United States under any other provision of law except as specifically provided in this title [this note among other things; for classification, consult USCS Tables volumes].".

196 of 861 DOCUMENTS

UNITED STATES CODE SERVICE
Copyright 2000, LEXIS Law Publishing, a division of Reed Elsevier Inc.
All rights reserved.

*** ARCHIVE MATERIAL ***

*** THIS SECTION IS CURRENT THROUGH 106TH CONGRESS, 2ND SESSION ***

TITLE 16. CONSERVATION
CHAPTER 12. FEDERAL REGULATION AND DEVELOPMENT OF POWER
REGULATION OF ELECTRIC UTILITY COMPANIES ENGAGED IN INTERSTATE COMMERCE

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

*16 USCS § 824e* (2000)

§ 824e. Power of Commission to fix rates and charges; determination of cost of production or transmission

(a) Unjust or preferential rates, etc.; statement of reasons for changes; hearing; specification of issues. Whenever the Commission, after a hearing had upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order. Any complaint or motion of the Commission to initiate a proceeding under this section shall state the change or changes to be made in the rate, charge, classification, rule, regulation, practice, or contract then in force, and the reasons for any proposed change or changes therein. If, after review of any motion or complaint and answer, the Commission shall decide to hold a hearing, it shall fix by order the time and place of such hearing and shall specify the issues to be adjudicated.

(b) Refund effective date; preferential proceedings; statement of reasons for delay; burden of proof; scope of refund order; refund orders in cases of dilatory behavior; interest. Whenever the Commission institutes a proceeding under this section, the Commission shall establish a refund effective date. In the case of a proceeding instituted on complaint, the refund effective date shall not be earlier than the date 60 days after the filing of such complaint nor later than 5 months after the expiration of such 60-day period. In the case of a proceeding instituted by the Commission on its own motion, the refund effective date shall not be earlier than the date 60 days after the publication by the Commission of notice of its intention to initiate such proceeding nor later than 5 months after the expiration of such 60-day period. Upon institution of a proceeding under this section, the Commission shall give to the decision of such proceeding the same preference as provided under section 205 of this Act [*16 USCS § 824d]* and otherwise act as speedily as possible. If no final decision is rendered by the refund effective date or by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, whichever is earlier, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision. In any proceeding under this section, the burden of proof to show that any rate, charge, classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly discriminatory, or preferential shall be upon the Commission or the complainant. At the conclusion of any proceeding under this section, the Commission may order the public utility to make refunds of any amounts paid, for the period subsequent to the refund effective date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, practice, or contract which the Commission orders to be thereafter observed and in force: Provided, That if the proceeding is not concluded within fifteen months after the refund effective date and if the Commission determines at the conclusion of the proceeding that the proceeding was not resolved within the fifteen-month period primarily because of dilatory behavior by the public utility, the Commission may order refunds of any or all amounts paid

for the period subsequent to the refund effective date and prior to the conclusion of the proceeding. The refunds shall be made, with interest, to those persons who have paid those rates or charges which are the subject of the proceeding.

(c) Refund considerations; shifting costs; reduction in revenues; "electric utility companies" and "registered holding company". Notwithstanding subsection (b), in a proceeding commenced under this section involving two or more electric utility companies of a registered holding company, refunds which might otherwise be payable under subsection (b) shall not be ordered to the extent that such refunds would result from any portion of a Commission order that (1) requires a decrease in system production or transmission costs to be paid by one or more of such electric companies; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company: Provided, That refunds, in whole or in part, may be ordered by the Commission if it determines that the registered holding company would not experience any reduction in revenues which results from an inability of an electric utility company of the holding company to recover such increase in costs for the period between the refund effective date and the effective date of the Commission's order. For purposes of this subsection, the terms "electric utility companies" and "registered holding company" shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended.

(d) Investigation of costs. The Commission upon its own motion, or upon the request of any State commission whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transmission of electric energy by means of facilities under the jurisdiction of the Commission in cases where the Commission has no authority to establish a rate governing the sale of such energy.

**HISTORY:** (June 10, 1920, ch 285, Part II, § 206, as added Aug. 26, 1935, ch 687, Title II, § 213, 49 Stat. 852; Oct. 6, 1988, P.L. 100-473, § 2, 102 Stat. 2299.)

**HISTORY; ANCILLARY LAWS AND DIRECTIVES**

References in text:
"The Public Utility Holding Company Act of 1935", referred to in subsec. (c), is Act Aug. 26, 1935, ch 687, 49 Stat. 803, which generally appears as *15 USCS §§ 79* et seq. For full classification of such Act, consult USCS Tables volumes.

Amendments:
1988. Act Oct. 6, 1988 (applicable as provided by § 4 of such Act, which appears as a note to this section), in subsec. (a)(1), after the sentence ending ". . . and shall fix the same by order.", added the material beginning "Any complaint or motion of the Commission to initiate a proceeding . . ."; redesignated former subsec. (b) as subsec. (d); and added new subsecs. (b) and (c).

Transfer of functions:
All executive and administrative functions of the Federal Power Commission were, with certain reservations, transferred to the Chairman of such Commission, with authority vested in him to authorize their performance by any officer, employee, or administrative unit under his jurisdiction, by 1950 Reorg. Plan No. 9, §§ 1, 2, eff. May 24, 1950, *15 Fed. Reg. 3175,* 64 Stat. 1265, which appears as *16 USCS § 792* note.
The Federal Power Commission was abolished and its functions, personnel, property, funds, etc., were transferred to the Secretary of Energy, with the exception of certain functions, which were transferred to the Federal Energy Regulatory Commission, pursuant to the Department of Energy Organization Act (Act Aug. 4, 1977, P.L. 95-91, 91 Stat. 565), which is classified generally as *42 USCS §§ 7101* et seq. See, in particular, *42 USCS §§ 7151*(b), 7171(a), 7172(a), 7291, and 7293.

Other provisions:
Limitation on authority provided by subsec. (c). Act Oct. 6, 1988, P.L. 100-473, § 3, 102 Stat. 2300, provides:
"Nothing in subsection (c) of section 206 of the Federal Power Act, as amended *(16 U.S.C. 824e*(c)) shall be interpreted to confer upon the Federal Energy Regulatory Commission any authority not granted to it elsewhere in such Act to issue an order that (1) requires a decrease in system production or transmission costs to be paid by one or more electric utility companies of a registered holding company; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered

holding company. For purposes of this section, the terms 'electric utility companies' and 'registered holding company' shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended.".

Effective date of amendments made by Act Oct. 6, 1988. Act Oct. 6, 1988, P.L. 100-473, § 4, 102 Stat. 2300 provides:

"The amendments made by this Act [amending this section] are not applicable to complaints filed or motions initiated before the date of enactment of this Act pursuant to section 206 of the Federal Power Act [this section]: Provided, however, That such complaints may be withdrawn and refiled without prejudice.".

Study of effect of amendments made by Act Oct. 6, 1988. Act Oct. 6, 1988, P.L. 100-473, § 5, 102 Stat. 2301, provides:

"No earlier than three years and no later than four years after the date of enactment of this Act, the Federal Energy Regulatory Commission shall perform a study of the effect of the amendments to section 206 of the Federal Power Act made by this Act [this section]. The study shall analyze (1) the impact, if any, of such amendments on the cost of capital paid by public utilities; (2) any change in the average time taken to resolve proceedings under section 206 [this section]; and (3) such other matters as the Commission may deem appropriate in the public interest. Upon completion the study shall be sent to the Committee on Energy and Natural Resources of the Senate and the Committee on Energy and Commerce of the House of Representatives.".