IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

Nos. 07-157C, 07-167C
(Senior Judge Smith)

---

PACIFIC GAS AND ELECTRIC COMPANY,
SOUTHERN CALIFORNIA EDISON COMPANY,
AND CALIFORNIA ELECTRICITY OVERSIGHT BOARD,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

SAN DIEGO GAS & ELECTRIC COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

**DEFENDANT'S REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

---

GREGORY G. KATSAS
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

MARK A. MELNICK
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 616-0475
Fax: (202) 305-7644

OF COUNSEL:

SEAN B. McNAMARA
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

Peter Burger
Attorney
Bonneville Power Administration
905 NE 11th Avenue
Portland, OR 97232

John D. Bremer
Attorney
Western Area Power Administration
P.O. Box 281213
Lakewood, CO 80228-2802

May 21, 2008

Attorneys for Defendant

# TABLE OF CONTENTS

**PAGE(S)**


STATEMENT OF THE CASE ........ 2

I. Introduction ........ 2

II. The Ninth Circuit And FERC Did Not "Recommend" This Suit ........ 2

III. FERC Has Not Retroactively Revised The Tariffs ........ 3

IV. BPA Did Not Manipulate The Market ........ 4

ARGUMENT ........ 5

I. Standards For A Motion To Dismiss ........ 5

II. The Electricity Oversight Board's Claims Should Be Dismissed ........ 7

III The Agencies Are Not Parties To Any Multi-Party Contract Created By The PX Tariff ........ 7

A. Introduction ........ 7

B. The Federal Common Law Of Contracts That Typically Applies In This Court Governs These Transactions ........ 8

1. Introduction ........

2. BPA Agreed With The ISO And PX That Federal Law Applies ........ 8

3. Federal Law Supplies The Source Of Rules Here ........ 9

4. Richmond Does Not Alter The General Rule ........ 10

5. The IOUs Ignore The Tariffs' Plain Language ........ 11

6. The Agencies Lacked Authority To Abandon Federal Law ........ 13

7. The IOUs Have Admitted That Federal Law Applies ........ 15

C. The Federal Circuit Does Not Recognize Multi-Party Contracts ........ 15

D. The Cases Cited By The IOUs Do Not Support Their Theory ........ 16

1. The IOUs' Multi-Party Contract "Rule" Applies To Only Associations ........ 17

2. The Parties' Intent Must Control ........ 18

E. The ISO And PX Tariffs Differ For Purposes Of Privity ........ 18

F. *Alliant Energy* Supports Our Reading Of The Contract ........ 22

G. The APX Is Irrelevant ........ 25

IV. The IOUs Lack Standing To Sue On ISO Transactions ........ 25

V. The IOUs Have Not Demonstrated That They Are Third Party Beneficiaries Of PX Transactions ........ 27

VI. The IOUs Fail To Allege That They Were Parties To Any Contracts ........ 28

VII. FERC's Rulings Should Be Followed ........ 29

A. This Court Should Defer To FERC ........ 29

B. The *Edison* And *Lynch* Proceedings Estopp The IOUs ........ 29

C. Judicial Estoppel Should Apply Against SCE ........ 32

D. Estoppel Is An Appropriate Means Of Resolving This Dispute ........ 33

VIII. This Court Lacks Jurisdiction Over The IOUs' Declaratory Relief Claims ........ 34

A. The IOUs Cannot Sue Absent A "Case" Or "Controversy" ........ 34

B. The IOUs' Claims Do Not Present A Case Or Controversy ........ 35

IX. The IOUs' Final Two Claims Were Not Presented To The Contracting Officers ........ 38

X. The IOUs Have Conceded That Their First Count Is Invalid ........ 39

CONCLUSION ........ 39

# TABLE OF AUTHORITIES

## CASES

**PAGE(S)**

Alabama State Federation of Labor v. McAdory,
325 U.S. 450 (1945) .......... 34

Alliant Energy v. FERC,
253 F.3d 748 (D.C. Cir. 2001) .......... 24

Alliant Energy v. Nebraska Pub. Power Dist.,
2001 WL 1640132 .......... passim

Alliant Energy v. Nebraska Pub. Power Dist.,
347 F.3d 1046 (8th Cir. 2003) .......... 2, 23, 24

Alliant Techsystems, Inc. v. United States,
178 F.3d 1260 (Fed. Cir. 1999) .......... 34, 37

Anderson v. United States,
344 F.3d 1343 (Fed. Cir. 2003) .......... 6, 15

Ariz. Pub. Serv. Co.,
106 FERC ¶61,021 (2004) .......... 4, 5

Belton v. Hatch,
109 N.Y. 593 (1888) .......... 17

Bonneville Power Admin. v. FERC,
422 F.3d 908 (9th Cir. 2005) cert. denied, 128 S.Ct. 804 (Dec. 10, 2007) .......... 2, 3, 32

Boyle v. United Technologies Corp.,
487 U.S. 500 (1988) .......... 10, 11, 12, 14

Brunswick Leasing Corp. v. Wisconsin Cent. Ltd.,
136 F.3d 521 (7th Cir. 1998) .......... 25

Public Utilities Commission v. FERC,
462 F.3d 1025 (9th Cir. 2006) .......... 35, 36

CW Government Travel, Inc. v. United States,
63 Fed. Cl. 369 (2004) .......... 37

Casady v. Modern Metal Spinning and Mfg. Co.,
10 Cal. Rptr. 790 (2nd Dist. 1961) .................................................................... 17

Castle v. United States,
301 F.3d 1328 (Fed. Cir. 2002) .......................................................................... 7

Cienega Gardens v. United States,
194 F.3d 1231 (Fed. Cir. 1998) ............................................................... 6, 15, 16

Coast Fed. Bank, FSB v. United States,
48 Fed. Cl. 402 (2000), aff'd, 323 F.3d 1035 (Fed. Cir. 2002) ...................................... 14

Coenen v. R. W. Pressprich & Co.,
453 F.2d 1209 (2nd Cir. 1972) .......................................................................... 17

Cooke v. United States,
91 U.S. 389 (1875) ........................................................................................... 9

DaimlerChrysler Corp. v. Cuno,
547 U.S. 332 (2006) ................................................................................... 5, 35

Erickson Air Crane Co. v. United States,
731 F.2d 810 (Fed. Cir. 1984) ........................................................................... 6

FW/PBS, Inc. v. Dallas,
493 U.S. 215 (1990) ......................................................................................... 5

Forman v. United States,
767 F.2d 875 (Fed. Cir. 1985) ........................................................................... 9

Garcia v. Department of Homeland Security,
437 F.3d 1322 (Fed. Cir. 2006) .......................................................................... 6

Garrett v. Gen. Elec. Co.,
987 F.2d 747 (1993) ....................................................................................... 37

Gear v. Webster,
65 Cal. Rptr. 255 (5th Dist. 1968) ..................................................................... 18

Holland v. United States,
75 Fed. Cl. 492 (2007) .................................................................................... 14

MacGregor v. Rutberg,
478 F.3d 790 (7th Cir. 2007) ............................................................................ 18

McNutt v. Gen. Motors Acceptance Corp. of Ind.,
298 U.S. 178 (1936) .......... 5

MedImmune, Inc. v. Genentech, Inc.,
127 S. Ct. 764 (2007) .......... 34

Muh v. Newberger, Loeb & Co., Inc.,
540 F.2d 970 (9th Cir. 1976) .......... 17, 18

New Hampshire v. Maine,
532 U.S. 742 (2001) .......... 32, 33

Padbloc Co. v. United States,
161 Ct. Cl. 369 (1963) .......... 10, 12, 13

Price v. United States,
46 Fed. Cl. 640 (2000) .......... 10, 12, 13

Pub. Serv. Elec. and Gas Co. v. FERC,
485 F.3d 1164 (D.C. Cir. 2007) .......... 29

Reynolds v. Army & Air Force Exch. Serv.,
846 F.2d 746 (Fed. Cir. 1988) .......... 5

Richmond, Fredericksburg & Potomac Railroad Co. v. United States,
75 F.3d 648 (Fed. Cir. 1996) .......... 10, 11, 13

S.R.A., Inc. v. Minnesota,
327 U.S. 558 (1946) .......... 12

San Diego Gas & Elec. Co.,
121 FERC ¶ 61,188 .......... 3, 4

Scott v. Lee,
24 Cal. Rptr. 824 (1st Dist. 1962) .......... 18

Seaboard Lumber Co. v. United States,
15 Cl. Ct. 366 (1988) .......... 9, 13

Southern California Edison Co.,
80 FERC ¶ 61,262 (1997) .......... 29, 30, 31

Southern California Edison Co. v. Lynch,
307 F.3d 794 (9th Cir. 2002) .......... 31, 32

Southern California Federal Sav. & Loan Ass'n. v. United States,
422 F.3d 1319 (Fed. Cir. 2005) .......... 6, 15

Spruill v. Merit Sys. Prot. Bd.,
978 F.2d 679 (Fed. Cir. 1992) .......... 6

Steel Co. v. Citizens for a Better Environment,
523 U.S. 83 (1998) .......... 5, 35

Stiller v. Rogers,
159 P.2d 457 (Cal. App. Dep't Super. Ct. 1945) .......... 21

Sullivan v. United States,
54 Fed. Cl. 214 (2002) .......... 5

The Second Taxing Dist. of the City of Norwalk v. FERC,
683 F.2d 477 (D.C. Cir. 1982) .......... 31

Thompson Tower Ltd. Dividend Housing Ass'n,
228 Ct. Cl. 766 (1981) .......... 6

Tiger Natural Gas, Inc. v. United States,
61 Fed. Cl. 287 (2004) .......... 37

Total Med. Mgmt. v. United States,
104 F.3d 1314 (Fed. Cir. 1997) .......... 6

Trauma Serv. Group v. United States,
104 F.3d 1321 (Fed. Cir. 1997) .......... 6

United States v. Allegheny County,
322 U.S. 174 (1944) .......... 9, 12

United States v. Kimbell Foods, Inc.,
440 U.S. 715 (1988) .......... 13

United States v. Seckinger,
397 U.S. 203 (1970) .......... 10, 11, 14

United States v. Winstar Corp.,
518 U.S. 839 (1996) .......... 9

Webco Lumber, Inc. v. United States,
677 F.2d 860 (Ct. Cl. 1982) .......... 7

Westfed Holdings, Inc. v. United States,
407 F.3d 1352 (Fed. Cir. 2005) .......................................................................... 14

**MISCELLANEOUS**

Restatement (Second) of Judgments, § 28(5) ................................................................. 33

1 Williston on Contracts 3rd ed. 31 ........................................................................... 18

73 Am. Jur. 2d, Stock and Commodity Exchanges § 1 (2001) .................................................. 17

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PACIFIC GAS AND ELECTRIC COMPANY, SOUTHERN CALIFORNIA EDISON COMPANY, AND CALIFORNIA ELECTRICITY OVERSIGHT BOARD,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 07-157C<br>(Senior Judge Smith) |
| SAN DIEGO GAS & ELECTRIC COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 07-167C<br>(Senior Judge Smith) |

**DEFENDANT'S REPLY TO PLAINTIFFS'**
**<u>OPPOSITION TO DEFENDANT'S MOTION TO DISMISS</u>**

Defendant, the United States, respectfully submits this reply to plaintiffs' response to our motion to dismiss. As our motion to dismiss establishes, and plaintiffs' response confirms, we are being sued by the wrong parties at the wrong time. We are not in privity of contract with the plaintiffs on any transactions occurring in the PX market, and plaintiffs' suit on the ISO sales violates the law of agency. Further, most of the relief requested by plaintiffs is premature — no case or controversy now exists concerning four of plaintiffs' claims, contingent as they are upon uncertain future events. Two of those claims were never even presented to the contracting

officers. Finally, plaintiffs effectively concede that their first claim, for breach of contract, has yet to accrue. This Court lacks jurisdiction over such defective claims, and it should accordingly dismiss this case.

## STATEMENT OF THE CASE

### I. Introduction

We set out in detail this case's factual underpinnings in our motion to dismiss. Mot. 3-12.[1] Plaintiffs, investor-owned utilities ("IOUs"), respond in their statement of facts with half-truths and legal conclusions. They paint themselves as victims, asserting that the markets run by the California Independent System Operator Corp. ("ISO") and California Power Exchange ("PX") offered "an irresistible opportunity for sellers of electric power, including the Agencies," in 2000 and 2001. Res. 2. They claim that amounts recovered in this proceeding "will ultimately benefit the California ratepayers who were subjected to the overcharges." Res. 11. The merits of this case, and whatever equities weigh upon those merits, are not now before this Court. Instead, this Court need consider only whether the proper parties have brought this suit at the proper time. As we establish below, this is not the case.

### II. The Ninth Circuit And FERC Did Not "Recommend" This Suit

The IOUs consistently portray Bonneville Power Admin. v. FERC, 422 F.3d 908 (9th Cir. 2005) cert. denied, 128 S.Ct. 804 (Dec. 10, 2007), as recommending that they bring this suit, or even as establishing that the tariffs created contractual obligations between market participants. Res. 3, 14, 17, 19. BPA said nothing of the sort. Instead, the court in BPA merely speculated "that the remedy, if any, may rest in a contract claim, not a refund action," and suggested that Alliant Energy v. Nebraska Pub. Power Dist., 347 F.3d 1046 (8th Cir. 2003)

---

[1] "Mot. ___" refers to our motion to dismiss. "Res. ___" refers to plaintiffs' response. "Def. App. ___" refers to our appendix. "Pl. App. ___" refers to the plaintiffs' appendix.

might be analogous. BPA, 422 F.3d at 925-26. The court did not go beyond this superficial treatment. It did not consider the terms of the tariffs in this case or the terms of the tariff in the Alliant Energy case. The IOUs' attempt to co-opt BPA's limited holding and transform the case into an endorsement of their claims is thus entirely unfounded.

The IOUs likewise stretch the truth when they assert that "FERC has repeatedly and expressly acknowledged the propriety of Plaintiffs' contract actions here and in California . . . ." Res. 34. Though FERC has acknowledged the existence of the IOUs' contract claims, the commission has, in fact, declined to comment upon their validity, stating that "[a]mounts owed and payments thereof by non-public utility entities, if any, as a result of those contractual claims are a matter to be resolved by the relevant court." October 19, 2007 Order, 121 FERC ¶ 61,067 at P 76.

## III. FERC Has Not Retroactively Revised The Tariffs

The IOUs base a portion of their claims upon the premise that FERC has retroactively revised the ISO and PX tariffs, entitling them to compensation. Our motion does not implicate FERC's actions; whether FERC has retroactively revised the tariffs involves the merits of the case, which this Court should not consider at this time. We note, however, that the issue is nowhere near as clear cut as the IOUs represent. On October 19, 2007, FERC issued an order stating that the "California Parties assert that the Commission revised the pricing formulations contained in the CAISO/PX tariffs for the period to which the MMCP applies. We disagree." San Diego Gas & Elec. Co., 121 FERC ¶ 61,067 at P 36; Pl. App. 513. Worried that this language "may be used against the California Parties in ongoing contract litigation," the IOUs immediately requested that FERC "clarify" its order. On November 19, 2007, FERC issued such a "clarification," in which it categorically reversed the October 19, 2007 decision by holding that it had, in fact, reset market prices. San Diego Gas & Elec. Co., 121 FERC ¶ 61,188 at PP 10-13;

Pl. App. 537-39. The agencies have moved for rehearing upon the grounds that FERC had no authority under the Federal Power Act to retroactively revise the tariffs, an issue that FERC's reconsideration decision flatly ignores. Accordingly, whether FERC retroactively "rewrote" the ISO and PX tariffs remains unsettled pending rehearing, and, potentially, appellate review. This Court should disregard the IOUs' suggestion to the contrary.

## IV. BPA Did Not Manipulate The Market

For the first time in this litigation, the IOUs allege that the Bonneville Power Administration engaged in manipulation of the ISO and PX markets. Res. 12. This allegation is entirely unsupported, false, and irresponsible. The IOUs misleadingly cite to and include in their appendix a report issued by the staff of FERC in March 2003. Pl. App. 564. This report identifies a variety of trading strategies allegedly used by market participants to manipulate the ISO and PX markets. Id. at 573-95. One of the strategies involved "'ricochet' or megawatt 'laundering.'" Id. at 579-81. The report tentatively states that certain market participants, including BPA, "may have engaged in this trading strategy and may have generated close to $10 million in profits." Id. at 580-81.

The IOUs fail to disclose that FERC later cleared BPA of any wrongdoing. The report cited by the IOUs recommended that FERC issue an order to BPA and other utilities "directing them to show cause why their behavior during May 2000 through October 2, 2000 does not constitute a violation of the Cal ISO or Cal PX tariffs . . . ." Id. at 588. FERC accepted this recommendation and conducted further proceedings. See Ariz. Pub. Serv. Co., 106 FERC ¶ 61,021 (2004). The result of these proceedings was unambiguous. FERC's Trial Staff itself recommended that the FERC terminate proceedings against BPA, noting, among other things, that "[a]s a result of its review of the record, Trial Staff concludes that the False Import allegations against BPA include no transactions that meet the definition of False Import because

none of the identified out-of-market transactions were in excess of the price cap and also did not involve a third party." Id. at P 21. FERC adopted this recommendation and terminated the case against BPA. Id. at PP 116-18. The IOUs, which are certainly sophisticated enough to know better, have absolutely no basis for asserting that BPA engaged in market manipulation. The Court should not be misled by their carelessness.

## ARGUMENT

### I. Standards For A Motion To Dismiss

The IOUs begin their argument by mischaracterizing our brief and misstating the law. First, we did not say in our motion to dismiss that the IOUs "are required to *prove* their case at this initial stage," as the IOUs claim. Res. 20. Instead, we noted that a plaintiff bears the burden of establishing the Court's jurisdiction by a preponderance of the evidence, citing McNutt v. Gen. Motors Acceptance Corp. of Ind., 298 U.S. 178, 189 (1936), and Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988). Mot. 12. The IOUs do not need to prove their case on the merits at this stage, but they do, unquestionably, bear the burden of proving that this Court has the power to entertain their case.

The IOUs do not like this rule, and they assert that "[i]n arguing the Plaintiffs must establish jurisdiction by a preponderance of the evidence, the U.S. is out of step with recent Federal Circuit authority." Res. 20. The IOUs do not appear to have read the very first case upon which they rely, Sullivan v. United States, 54 Fed. Cl. 214, 216 (2002), which expressly notes that "[p]laintiff does, however, bear the burden of establishing subject matter jurisdiction by a preponderance of the evidence." The rule that a "party invoking federal jurisdiction bears the burden of establishing its existence" is certainly good law. See Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 104 (1998) (citing FW/PBS, Inc. v. Dallas, 493 U.S. 215, 231 (1990), which in turn cites McNutt); DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 342 n.3

(2006) ("the party asserting federal jurisdiction when it is challenged has the burden of establishing it"); Garcia v. Department of Homeland Security, 437 F.3d 1322, 1337 (Fed. Cir. 2006) (en banc) (distinguishing Spruill v. Merit Sys. Prot. Bd., 978 F.2d 679 (Fed. Cir. 1992), upon which the IOUs rely, and recognizing the validity of McNutt).

The IOUs cannot satisfy their burden of proof merely by alleging that they are parties to contracts with the United States. See Res. 20. We agree with the IOUs that a well-pleaded allegation of a contract is typically sufficient to grant the Court jurisdiction to entertain a contract claim. See Trauma Serv. Group v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997). Accordingly, we could not argue at this stage, for example, that the Court lacks jurisdiction because the Government agent who signed the contracts lacked the requisite authority to bind the United States or because the contracts were illegal. Id.; see also Total Med. Mgmt. v. United States, 104 F.3d 1314, 1319 (Fed. Cir. 1997).

The United States Court of Appeals for the Federal Circuit has held repeatedly, however, that privity of contract implicates standing and jurisdiction. See, e.g., Southern California Federal Sav. & Loan Ass'n. v. United States, 422 F.3d 1319, 1329-30 (Fed. Cir. 2005); Anderson v. United States, 344 F.3d 1343, 1351 (Fed. Cir. 2003) ("To have standing to sue the sovereign on a contract claim, a plaintiff must be in privity of contract with the United States."); Cienega Gardens v. United States, 194 F.3d 1231, 1246 (Fed. Cir. 1998) ("[T]here must be privity of contract between the plaintiff and the United States."); Erickson Air Crane Co. v. United States, 731 F.2d 810, 813 (Fed. Cir. 1984) ("The government consents to be sued only by those with whom it has privity of contract . . . ."); see also Thompson Tower Ltd. Dividend Housing Ass'n, 228 Ct. Cl. 766, 770 (1981) ("In order to maintain a suit on a contract basis in this court, a plaintiff must be in privity of contract with the Government.").

Because privity of contract implicates standing, the Court should consider the issue now.

See Castle v. United States, 301 F.3d 1328, 1337 (Fed. Cir. 2002) ("Standing is a threshold jurisdictional issue, which implicates Article III of the Constitution and therefore may be decided without addressing the merits of a determination."). Standing here is not, contrary to what the IOUs assert, "intertwined with the merits" of the IOUs' claim. See Res. 21 n.18. We are not asking the Court to consider whether the terms of the ISO and PX tariffs entitle the IOUs to the relief that they seek. We do not even contest, for the purposes of our motion to dismiss, that a contract exists; we admit that the agencies signed agreements with the ISO and PX. Def. Mot. 15-16. We merely contest whether the agencies were parties to any contract with the IOUs for transactions occurring in the PX market and whether the IOUs have complied with the law of agency concerning the ISO tariff. These issues implicate the Court's jurisdiction and are appropriate for disposition on a motion to dismiss.

## II. The Electricity Oversight Board's Claims Should Be Dismissed

As an initial matter, we note that the California Electricity Oversight Board ("CEOB") has not responded to our argument that it lacks standing to sue upon the tariffs and transactions at issue in this suit. Mot. 13-15. Accordingly, the Court should dismiss any claims brought by the CEOB. See, e.g., Webco Lumber, Inc. v. United States, 677 F.2d 860, 864 (Ct. Cl. 1982).

## III. The Agencies Are Not Parties To Any Multi-Party Contract Created By The PX Tariff

### A. Introduction

The IOUs' supposed contract with the PX gives the IOUs no remedy against the Government. Privity of contract, that nettlesome concept, stands in the way. Finding the law inconvenient, the IOUs make up their own, unconstrained by the sort of "one-dimensional view of what it means to form a contractual relationship" that has weighed upon courts like the United States Court of Appeals for the Federal Circuit for so long. See Res. 26. According to the IOUs,

they have standing to sue the Government because we are all parties to a "multi-party contract" that circumvents the need for direct privity. This fiction is entirely unsupported.

### B. The Federal Common Law Of Contracts That Typically Applies In This Court Governs These Transactions

#### 1. Introduction

As an initial matter, the Court should decide what law governs this dispute. As we suspected in our opening brief, the IOUs have indeed contended that this case is controlled by the contract law of California. This issue is not academic. The IOUs base their PX privity of contract argument in part upon California precedent. Res. 27-28. As we demonstrate below, the IOUs do so in error. These tariffs are governed by federal law.

#### 2. BPA Agreed With The ISO And PX That Federal Law Applies

Before it agreed to be bound by the ISO and PX tariffs, BPA requested and received assurances from both the ISO and PX that the tariffs would be governed by federal law. Def. App. A1686-91. In the case of the PX, that assurance was expressly incorporated into the tariff, following BPA's request. Def. App. A39 (PX Tariff § 19.6); Def. App. A1686-87. In the case of the ISO, the ISO expressly agreed that "both the ISO Tariff and the Scheduling Coordinator Agreement shall be governed by federal law to the extent applicable." Def. App. 1689. The ISO's agreement is dispositive of this issue.

We note that we received these documents from BPA shortly before filing this reply. We endeavored to gather all documents relevant to this matter before the filing of our initial brief; these documents were inadvertently overlooked. Consideration of these documents is necessary, however, for an accurate decision on this issue, and we thus rely upon them now, recognizing that we should have produced them earlier. Accordingly, we would not oppose a motion for leave to file a sur-reply to this brief to address these documents, should the IOUs choose to file

such a motion.

### 3. Federal Law Supplies The Source Of Rules Here

The IOUs purport to support their choice-of-law argument by citing a reference made by the Supreme Court 133 years ago that the Government's commercial acts are subject to the laws applicable to individuals, Cooke v. United States, 91 U.S. 389, 398 (1875), while ignoring the entrenched precedent and practices in this jurisdiction that have occurred since. See Res. 23. We do not dispute Cooke's declaration that when the Government contracts it is generally governed by the rules applicable to private individuals, United States v. Winstar Corp., 518 U.S. 839, 895 (1996), but Cooke does not identify the body of precedent to which this Court should turn as the source of those rules.

Contrary to the IOUs' suggestion, that source is not the precedent of the Supreme Court of California. Instead, as our opening brief demonstrated, and this Court is well aware, it has long been "undisputed that the law to be applied in cases related to federal contracts is federal and not state law." Mot. 16-17; Seaboard Lumber Co. v. United States, 15 Cl. Ct. 366, 369 (1988) (citing United States v. Allegheny County, 322 U.S. 174, 183 (1944) (holding that "[t]he validity and construction of contracts through which the United States is exercising its constitutional functions, their consequences on the rights and obligations of the parties, the titles or liens which they create or permit, all present questions of federal law not controlled by the law of any state); Forman v. United States, 767 F.2d 875, 879-80 (Fed. Cir. 1985)). Indeed, "[t]he federal law applied in breach of contract claims . . . for the most part has been developed by the Court of Appeals for the Federal Circuit and the Court of Claims, with [this Court], or the Boards of Contract Appeals applying the law in the first instance." Seaboard Lumber Co., 15 Cl. Ct. at 369.

This practice of applying a "uniform federal 'common law' which governs the contracts

of the United States," is hardly a novel or special concept that we seek to have applied to this case for the first time. See Padbloc Co. v. United States, 161 Ct. Cl. 369, 377 (1963) (holding a contract claim against the Government is "not to be measured by state law . . . but by the uniform federal 'common law' which governs the contracts of the United States"). As the Court is aware, federal common law is applied nearly all of the time in both the decisions of this Court and the United States Court of Appeals for the Federal Circuit. In addition to the authorities already cited, this application stems from the Supreme Court's conclusion "that obligations to and rights of the United States under its contracts are governed exclusively by federal law" because the area involves "'uniquely federal interests'" that "are so committed by the Constitution and laws of the United States to federal control that state law is preempted . . . ." Boyle v. United Technologies Corp., 487 U.S. 500, 504-05 (1988). This "federal common law of contracts . . . avoid[s] the uncertainty of conflicting state laws, Price v. United States, 46 Fed. Cl. 640, 646 (2000), and also "results from the fact that [Government contracts are] entered into pursuant to authority conferred by federal statute and, ultimately, by the Constitution." United States v. Seckinger, 397 U.S. 203, 210-11 (1970).

**4. Richmond Does Not Alter The General Rule**

Ignoring the unambiguous precedent dictating that the federal common law of contracts governs contract cases against the Government, and the Court's consistent history of applying such law, the IOUs would have the Court misread the United States Court of Appeals for the Federal Circuit's decision in Richmond, Fredericksburg & Potomac Railroad Co. v. United States, 75 F.3d 648 (Fed. Cir. 1996), abandon its consistent practice, and apply federal law to a Government contract dispute only after it has identified "a significant conflict . . . between an identifiable federal policy or interest and the operation of state law." Pl. Br. 25. This is obviously not the law.

In Richmond, the court of appeals was interpreting property rights provided by an indenture and needed to decide what property law construing deeds conveying property rights applied to its interpretation. As part of its analysis, the court noted that, under Boyle, the state's property law would not be displaced unless, in addition to demonstrating that there are "uniquely federal interests," a "conflict exists between an identifiable federal policy or interest and the operation of state law." 75 F.3d at 654. The court held that Virginia law governing property transactions did not present such a conflict and therefore that state's property law would be applied. Id. at 655.

Here, the issue is not about what property law to apply; it is what contract law governs a dispute over electricity sold by the Government pursuant to tariffs. And as demonstrated both above and in our opening brief, binding precedents dictate that law to be the federal common law of contracts because, among other reasons, and as the IOUs concede, Res. 24 n. 23, the tariffs were entered into pursuant to authority conferred by federal statute and, ultimately, by the Constitution. Seckinger, 397 U.S. at 211. Clearly, Richmond cannot overrule these clear precedents, nor does it purport to do so. Nothing in Richmond suggests that in every contract case before it the Court should only displace state contract law if it determines that a significant conflict exists between an identifiable federal policy or interest and the operation of state law, and to our knowledge neither the court of appeals nor this Court have ever engaged in such an exercise for a case such as this.

**5. The IOUs Ignore The Tariffs' Plain Language**

Lumping together the ISO and PX tariffs, the IOUs also incorrectly claim that California contract law governs here because they "specify that California law governs all parties, unless some federal law conflicts with or forbids a federal agency from complying with the state law." Res. 23. As our opening brief demonstrated, the IOUs are simply ignoring the true terms of the

PX tariff, which, far from saying "California law governs all parties," actually provides that "if a party is a federal entity that party shall be governed by applicable federal law." Def. App. A39 (PX Tariff § 19.6). This language, inserted into a tariff that could apply to a variety of different participants, ensures that the normally applicable federal common law of contracts will govern when one of the participants happens to be the Government.

The ISO tariff is different, as our opening brief observed. Mot. 17–18. The ISO tariff says it is to be construed in accordance with California law. However, it also says that to the extent any provision of the tariff is inconsistent with the federal law applicable to a federal entity, "it shall be inapplicable." As we have already demonstrated, "[t]he validity and construction of contracts through which the United States is exercising its constitutional functions, . . . all present questions of federal law not controlled by the law of any state," Allegheny County, 322 U.S. at 183; the "obligations to and rights of the United States under its contracts are governed exclusively by federal law," Boyle, 487 U.S. at 504-05; "the governing rules of law" that "determine the meaning and effect of contracts to which the United States is a party . . . must be finally declared by [the United States Supreme] Court," S.R.A., Inc. v. Minnesota, 327 U.S. 558, 564 (1946); and a contract claim against the Government is "not to be measured by state law . . . but by the uniform federal 'common law' which governs the contracts of the United States," Padbloc Co., 161 Ct. Cl. at 377; Price, 46 Fed. Cl. at 646. These federal court holdings constitute "federal law applicable to [the] federal entit[ies]," BPA and WAPA, and they dictate that contracts with these federal agencies "are governed exclusively by federal law," and are "not controlled by the law of any state." The ISO tariff's requirement that it be construed in accordance with California law is directly inconsistent with this federal law applicable to these agencies. By the tariff's own terms, California law is thus inapplicable.

The IOUs present no real response to this demonstration. They simply declare the

conclusion to be wrong without any explanation. Res. 23-24. They then try to direct the Court away from the subject by suggesting that one of the many cases cited in our opening brief, United States v. Kimbell Foods, Inc., 440 U.S. 715 (1988), does not stand for the proposition that the federal common law of contracts governs contracts with the Government. Res. 25. We did not cite Kimbell for the proposition that the federal common law of contracts applies here, but only more generally for the proposition that "federal law governs questions involving the rights of the United States arising under nationwide programs." Kimbell, 440 U.S. at 726. The IOUs' reliance upon Kimbell fairs no better for them than their reliance upon Richmond. Like Richmond, Kimbell did not involve the choice of law governing contracts, but instead the choice of law governing lender priority. The court ruled that, although federal law controlled the subject, the matter did not require adoption of a set of uniform federal rules as opposed to incorporating state law as the federal rule of decision. 440 U.S. at 727-29. In contrast, and as the Court is aware, this Court has long applied a uniform federal common law of contracts. Padbloc Co., 161 Ct. Cl. at 377; Price, 46 Fed. Cl. at 646; Seaboard Lumber Co., 15 Cl. Ct. at 369. Given the ample authority supporting application of the federal common law of contracts, the IOUs' reliance upon Kimbell fails to refute our demonstration that the ISO's California law provision does not apply to BPA and WAPA.

### 6. The Agencies Lacked Authority To Abandon Federal Law

Our opening brief also observed that, even if the proper reading of the ISO tariff dictates that the California law provision should apply here, the Court should consider that provision invalid and disregard it. Where the Supreme Court has held as a matter of law that federal law governs the Government's contracts, it simply makes no sense that an agency official can ignore that rule on his own whim and, without being authorized to do so, commit the Government to be ruled by whatever law he chooses. The IOUs' response is to suggest that as long as the agencies

are authorized by federal statute to contract they should be free to bind the Government to the laws of their choice. Res. 24 n. 23. This argument should be rejected. It is because Government contracts are authorized by federal statute and the Constitution that the Supreme Court has held federal law applies to them. Seckinger, 397 U.S. at 211; see also Boyle, 487 U.S. at 504-05 (stressing that Government contracts "are so committed by the Constitution and laws of the United States to federal control that state law is preempted . . . "). To permit Government contracting officials to bind the Government to some other body of laws without specific statutory authorization to do so completely undermines these principles. Given the Court's emphasis upon the federal Constitutional and legal origins of Government contracts, the expectation should be that when a statute authorizes an agency to contract, that authorization contemplates that federal law will govern. Only if a statute affirmatively permits an agency to bind the Government to some other body of law should such a provision be recognized.

The IOUs contend that Westfed Holdings, Inc. v. United States, 407 F.3d 1352, 1361 (Fed. Cir. 2005); Coast Fed. Bank, FSB v. United States, 48 Fed. Cl. 402, 418 (2000), aff'd, 323 F.3d 1035 (Fed. Cir. 2002); and Holland v. United States, 75 Fed. Cl. 492, 494 & n.3 (2007), permit agencies to agree to dispense with the application of federal law to Government contracts. The IOUs are incorrect. None of those cases involve contracts where agencies agreed to ignore federal law. All the agencies agreed to was that, to the extent federal law either did not control for some reason, Westfed, 407 F.3d at 1361, Coast, 48 Fed. Cl. at 418, or controlling federal law was absent, Holland, 75 Fed. Cl. at 494, the law of a particular state would govern. Identifying an alternative source of law as a contingency in case it is found that federal law does not apply for some reason is far different than dispensing with federal law from the outset when it otherwise would control. Using state law as an alternative source of law in no way undermines the Supreme Court's mandate that federal law should apply as a general rule.

**7. The IOUs Have Admitted That Federal Law Applies**

Finally, our opening brief also observed that, given the fact that the ISO tariff is just that, a federal tariff, even the IOUs previously conceded in their nearly identical federal suit against local municipalities that federal law, and not California law, should govern the primary issues presented by their claim upon it. Mot. 19-21. As is the case here, the IOUs identified those issues to be the nature of the obligations under the tariff, to whom they are owed, and who possesses standing to sue upon them. Def. App. A1403. California law should only resolve questions "at the margins." Def. App. A1404. The IOUs now try to retreat from their prior admission, contending that all of the issues presented here are governed by California contract law, and that all they suggested before was that any interpretation under that law also constituted a "federal issue" justifying a federal forum for their suit. Res. 25 n. 24. The IOUs' entire admission is already provided in our opening brief, and we will not repeat it here; that admission, by its terms, is sweeping enough to be dispositive of this issue.

**C. The Federal Circuit Does Not Recognize Multi-Party Contracts**

Consistent with their view that California law governs here, the IOUs ignore the law of this circuit concerning privity of contract — wisely, from their perspective, because the United States Court of Appeals for the Federal Circuit has strictly construed the need for privity as a jurisdictional prerequisite for suit in this Court. In SoCal, the court expressly rejected the idea "that a party to one contract can be deemed a party to a related contract simply because the separate contracts constitute components of one transaction." 422 F.3d 1330. Likewise, in Anderson, the court held that two trust beneficiaries were not in privity of contract with the United States because their trust, and not them, signed a contract with the Federal Home Loan Bank Board. 344 F.3d at 1351. The Court reached a similar result in Cienega Gardens, holding that the Department of Housing and Urban Development was not a party to contracts between

housing owners and lenders. 194 F.3d at 1246. In reaching this result, the Federal Circuit overruled this Court's conflation of two contemporaneously executed contracts, noting that "[t]he documents evidence separate agreements between distinct parties." Id. at 1243.

These cases demonstrate that this Court should examine the alleged agreements in this case to determine whether the IOUs and the United States are parties to the same contracts. The IOUs ask the Court to take a less focused approach, as if reading the PX tariff is unduly burdensome. In the IOUs' view, privity arises automatically from the fact that multiple parties here signed agreements incorporating the same tariff, regardless of that tariff's terms. Res. 26-29. These circumstances, they say, are just like those present in the Alliant Energy case, where the United States did not contest privity — though, again, they pay no mind to the actual terms of the tariff in Alliant Energy. See Res. 17-20, 29-30. As we show below, the IOUs' approach suffers from irredeemable flaws.

**D. The Cases Cited By The IOUs Do Not Support Their Theory**

The Federal Circuit's jurisprudence offering no help, the IOUs patch together various state and Federal cases in an attempt to support their argument. As these cases themselves demonstrate, the IOUs' position is hollow at its core, for two reasons. First, the "rule" espoused by the IOUs is limited in application to a particular type of multi-party contract — contracts entered into by members of associations and corporations. Second, even in the context of an association, privity of contract between members is not automatic, as the IOUs suggest it is. Instead, as with any other contract, courts look to the parties' intent to determine whether a contract has been formed. As we show below, these limitations decisively undercut the IOUs' theory that privity of contract arose here merely because multiple parties agreed to abide by the PX tariff.

**1. The IOUs' Multi-Party Contract**
**"Rule" Applies To Only Associations**

With the exception of Casady v. Modern Metal Spinning and Mfg. Co., 10 Cal. Rptr. 790 (2nd Dist. 1961), which involved shareholders of a corporation and is of no relevance here, all of the cases upon which the IOUs rely involve associations. For example, in Muh v. Newberger, Loeb & Co., Inc., 540 F.2d 970, 973 (9th Cir. 1976), the United States Court of Appeals for the Ninth Circuit quoted Coenen v. R. W. Pressprich & Co., 453 F.2d 1209, 1211 (2nd Cir. 1972), for the proposition that "[t]he constitution and rules of a stock exchange constitute a contract between all members of the exchange with each other and with the exchange itself." The rule in Coenen derived from, among other New York State court cases, Belton v. Hatch, 109 N.Y. 593 (1888), which makes clear that a stock exchange "is a voluntary association of individuals, united, without a charter, in an organization for the purpose of affording to the members thereof certain facilities for the transaction of their business as brokers in stocks and securities, and a convenient exchange or sales-room for the conduct of such transactions." Belton, 109 N.Y. at 596. The American Jurisprudence article upon which the IOUs rely also defines a stock exchange as "a voluntary association or corporation organized for the purpose of furnishing to its members a convenient and suitable place to transact their business." 73 Am. Jur. 2d, Stock and Commodity Exchanges § 1 (2001). The article expressly notes that "[a]n exchange, however, is not a public market." Id.

None of the IOUs' cases — most of which state their multi-party contract "rules" only in dicta — have no applicability to this case. The PX market was not an association, club, cooperative, or union. It was a market. See Def. App. A8 (PX Tariff § 2.1). Participants in the PX market were not allied to one another for a common purpose; participants bought and sold electricity from one another in a competitive environment. The IOUs cite no authority for the

proposition that a market participant who agrees to conduct business in a market pursuant to a common set of rules is thereby automatically bound in contract to other market participants, regardless of whether those participants are parties to a contract.

**2. The Parties' Intent Must Control**

Even if we ignore that special multi-party contract rules, if any, apply only to associations, the IOUs' argument still fails because market participants expressed no intent to be bound to one another in the PX tariff. Contrary to the IOUs' argument, multi-party contracts do not mechanically give rise to privity. Whether an association's members "are entitled to enforce the rules against each other, or whether just the association's management is authorized to enforce the rules . . . is a question about the intentions of the parties concerning who should be able to enforce the contract or selected parts of it." MacGregor v. Rutberg, 478 F.3d 790, 793 (7th Cir. 2007); Gear v. Webster, 65 Cal. Rptr. 255, 257 (5th Dist. 1968); Scott v. Lee, 24 Cal. Rptr. 824 (1st Dist. 1962) ("Whether the by-laws themselves constitute such an agreement turns on whether the elements of a contract are present," noting that a "'manifestation of mutual assent'" is required, quoting 1 Williston on Contracts 3rd ed. 31)). The cases relied upon by the IOUs illustrate this rule. See, e.g., Muh, 540 F.2d 970, 873 (parties agreed to arbitrate disputes with one another); Gear, 65 Cal. Rptr. at 257 (same). As we demonstrated in our motion to dismiss and reiterate below, the PX Participants never manifested any intent to be bound in contract to one another for transactions occurring on the PX. See Mot. 22-24.

**E. The ISO And PX Tariffs Differ For Purposes Of Privity**

The IOUs chide us for attempting to distinguish, for the purposes of a privity of contract analysis, between the ISO and PX tariffs. Res. 31. The IOUs' design here is transparent — they want to prevent the Court from recognizing that the PX tariff does not create any obligations between PX participants. Accordingly, the IOUs close their eyes and cite repeatedly to

provisions of the ISO tariff, hoping the Court will overlook their complete failure to acknowledge the plain terms of the PX tariff. This approach is patently misguided. There are two tariffs involved here, not one — two tariffs with distinct terms giving rise to distinct relationships between the parties. Each tariff must be evaluated on its own terms.

One crucial distinction between the ISO and PX tariffs, as we established in our motion to dismiss, concerns agency. Mot. 34-38. The ISO tariff states that "[i]n contracting for Ancillary Services and Imbalance Energy the ISO will not act as principal but as agent for and on behalf of the relevant Scheduling Coordinators." Def. App. A249 (ISO Tariff § 2.2.1). Accordingly, we do not dispute that the ISO tariff creates privity of contract between Scheduling Coordinators — though we show below, as we did in our motion to dismiss, that the IOUs' position violates the law of agency. Mot. 36-38. Pursuant to the terms of the ISO tariff, sellers did business with the ISO, which acted as an agent for buyers, creating privity of contract between buyers and sellers. Def. App. A249 (ISO Tariff § 2.2.1).

No such agency term exists in the PX tariff. This leaves the IOUs to distort provisions of the PX tariff that simply do not establish any contractual relationship between buyers and sellers. Instead, the terms relied upon by the IOUs reinforce the fact that obligations under the PX tariff ran between participants and the PX, not between participants themselves. The IOUs cite first to Sections 4.3.3 and 4.3.4 of Schedule 2 of the PX tariff. Res. 33; Def. App. A60. Section 4.3.3 reads:

> If for any reason a PX Creditor receives on any Payment Date more than the amount to which it is entitled under the PX Tariff, it shall notify the PX within two (2) Business Days from the date of receipt of the funds into its Participant Settlement Account of the overpayment and shall forthwith pay the excess amount into a PX Account specified by the PX.

Def. App. A60.

Section 4.3.4 reads:

> If prior to a PX Creditor notifying the PX of the overpayment pursuant to Section 4.3.3. above, PX receives notice (from the PX Bank or otherwise) of the overpayment, the PX shall within two (2) Business Days notify the recipient of the overpayment. The PX shall be responsible for ascertaining the identity of those PX Participants entitled to receive amounts overpaid to another PX Participant and for disbursing those funds to the persons entitled to them promptly after they are returned in accordance with Section 4.3.3. above.

Def. App. A60.

The IOUs read these provisions to support the proposition that the tariff states that "sellers owe refunds *to the specific buyers* that were overcharged for electricity." Res. 33. This is plainly wrong. By the plain terms of the tariff, sellers owe refunds to the PX, and the PX then owes refunds to buyers. The first part of Section 4.3 says this expressly: "Each PX Participant acknowledges that it incurs separate financial obligations to the PX in respect to its PX Core Market transactions . . . . All PX Participants shall honor their obligations to pay all of the amounts owed to the PX in a timely manner." Def. App. A59 (PX Tariff, Schedule 2, § 4.3). The IOUs' interpretation of the PX tariff ignores the tariff's plain language, and this Court should accordingly reject that interpretation.

The IOUs cite only one other provision of the PX tariff to support their assertion that the tariff creates privity of contract between PX participants. Res. 33 n.31. That provision states, in full, that "[w]hen default charge-backs are allocated to PX Participants under Section 5 of this Schedule, the PX will identify the defaulting Participant to all other affected PX Participants by the most expeditious means possible." Def. App. A64. The IOUs assert that this provision was inserted into the tariff by the PX "to allow market participants to identify non-paying parties 'so that non-defaulting Participants *are able to seek recovery from the defaulting party*.'" Res. 34 (citing July 28, 2000 Order, 92 FERC ¶ 61,096, 61,379) (emphasis in original).

The IOUs conclude that privity must exist between PX Participants because the tariff contemplates that Participants will be "able to seek recovery" against one another in the event of a payment default. Res. 34. This conclusion is flawed. Beyond the requirement that the PX identify defaulting market participants, the tariff itself provides no mechanism for PX Participants to "recover" anything from one another. Instead, the tariff sets forth a process for the PX — and the PX alone — to draw upon a defaulting participant's collateral and the PX's "Pool Performance Bond" to satisfy any debts, and to seek a set-off from any amount owed to a defaulting participant. Def. App. A62-63 (PX Tariff, Schedule 2, §§ 5.2-5.2.5). The tariff even contains a section entitled "Remedies Upon Default by a PX Participant," which empowers the PX to "in its sole discretion and without further notice to the defaulting PX Participant or regard to formalities of any kind, pursue all remedies under Section 5." Def. App. A63-64 (PX Tariff, Schedule 2, § 5.4). This section by its terms creates no rights for individual PX Participants.

That the tariff may recognize the possibility that PX Participants would seek to "recover" certain debts from one another does not mean that the tariff creates privity of contract between participants. The meaning of "recover" is far too broad. With knowledge of a defaulting participant's identity, a PX Participant could, in the first instance, seek recovery through non-judicial means — by simply asking for payment or by exerting typical marketplace pressures, for example. Even if a PX Participant resorted to filing suit against a defaulting participant, such a suit would not necessarily require express privity of contract. The IOUs have demonstrated as much in their litigation against the municipalities in California state court, where they have sought relief for money had and received, a cause of action that does not depend upon a finding of express privity of contract. Def. App. A1685; see Stiller v. Rogers, 159 P.2d 457, 460 (Cal. App. Dep't Super. Ct. 1945) ("An action for money had and received may be successfully maintained even though not founded upon allegations showing an express privity of contract

between the parties." (internal quotation marks omitted)).

The IOUs accuse us of proposing the "surprising conclusion" that "*there were in fact no parties at all to these transactions*." Res. 36 (emphasis in original). We propose no such thing. We were a party to the transactions, and so was the PX, but we never did business with the IOUs. It is simply untrue that the "contractual nature of the relationship between the market participants is plain from the expressly contractual terminology found throughout both Tariffs," as the IOUs claim, citing in a footnote a variety of tariff provisions. Res. 36. These provisions may highlight the "contractual nature" of the tariffs, but they also demonstrate that PX Participants contracted with the PX, not one another. For example, Section 17 of the PX tariff, which concerns assignment, provides that "[n]o assignment of any service or participation agreement shall relieve the original PX Participant from its obligations or liabilities to the PX under this Tariff . . . ." Def. App. A35 (PX Tariff § 17) (emphasis added). In short, the IOUs fail to identify any provisions of the PX tariff that support their claim. They have failed to prove that they are in privity of contract with the United States on any PX transactions, and the relevant portions of their claims should thus be dismissed.

**F. *Alliant Energy* Supports Our Reading Of The Contract**

The IOUs rely upon the posture of the United States in the Alliant Energy litigation to support their multi-party contract theory, but Alliant Energy in fact illustrates why the theory does not apply in this case. Just as they do with the PX tariff, the IOUs neglect to consider the actual terms of the agreement at issue in Alliant Energy, though they deem it a "strikingly similar contract" to the PX tariff. Res. 3. As even a cursory comparison reveals, the two agreements look nothing alike. The IOUs' superficial analogy is thus meritless.

In the first place, the Mid-Continent Area Power Pool ("MAPP") at issue in Alliant Energy is an association, as the IOUs admit. See, e.g., Res. 18; Def. App. A1434 (defining

MAPP as "the organization created by and existing pursuant to the MAPP Agreement and this Restated Agreement."); Def. App. A1442-51 (setting forth membership criteria); Def. App. 1467-68 (requiring members to pay fees and dues). Though MAPP's Restated Agreement also created a market for energy trading, the parties to the Alliant Energy case were all members of MAPP, in contrast to the PX market, which had no affiliated association. See Alliant Energy v. NPPD, 2001 WL 1640132, *1 ("All Plaintiffs and NPPD are members of [MAPP]"); see Def. App. A7 (PX Corporation exists for the purpose of "providing an efficient, competitive Energy auction open on a non-discriminatory basis to all suppliers and purchasers . . . ."). If Alliant Energy stands for the proposition that privity of contract exists in a multi-party context, that rule is limited by the facts of the case to privity between members of an association, as with all of the other cases cited by the IOUs for the rule. Any such rule is plainly inapplicable to the market at issue in our case.

Moreover, the Restated Agreement at issue in the MAPP litigation by its terms creates obligations between signatories to the agreement, unlike the PX tariff. We note as an initial matter that the IOUs assert that each member of MAPP "signed a separate contract with MAPPCORP, the entity that administered the Agreement, for services performed by MAPPCORP." Res. 29. This may be true, but these agreements had little to do with the contract case brought by the United States in Alliant Energy. MAPPCORP is not even mentioned in the case. Instead, as the Alliant Energy case itself makes plain, the United States sued another member of MAPP, the Nebraska Public Power District ("NPPD"), directly on the Restated Agreement. Alliant Energy, 347 F.3d at 1050. All MAPP members were signatories to the Restated Agreement. Id. at 1048; see also Def. App. A1443 (all members deemed signatories unless they declined membership).

In particular, the United States sued NPPD for failing to refund charges NPPD collected

pursuant to the Restated Agreement's Schedule F, after FERC ordered MAPP members to refund the charges. Alliant Energy, 347 F.3d at 1049. We had standing to maintain this suit because the Restated Agreement, by its terms, was a contract between members of MAPP, and we were a party to that contract. This is evidenced forcefully by the Restated Agreement's numerous billing provisions. For example, the agreement required "all bills for services supplied in connection with the Generation Reserve-Sharing Pool" to be "rendered monthly by the supplying Pool Participant to the purchasing Pool Participant after the end of the period to which such bills are applicable." Def. App. A1573. Even if the purchaser disputed the bill, it was required to "nevertheless pay the full amount of the charges when due . . . ." Id. at A1574. The market created by the Restated Agreement was governed by essentially the same terms. Def. App. A1645-46.

The particular portion of the Restated Agreement at issue in Alliant Energy, Section 2.4 of Schedule F, required members to compensate one another for doing business with non-MAPP members in certain circumstances. Alliant Energy v. FERC, 253 F.3d 748, 750-51 (D.C. Cir. 2001). FERC deemed Section 2.4 to be invalid, ordered MAPP to remove it, and required MAPP members to refund any charges they had collected under the provision. Alliant Energy, 347 F.3d at 1050. NPPD, over which FERC had no jurisdiction, refused to comply with FERC's order, so we sued in contract. Schedule F contemplated that transactions taking place pursuant to the Schedule would be "between Members" and provided that members were responsible for paying for services, though unlike the billing provisions in other portions of the Restated Agreement, under Schedule F, MAPPCOR collected and distributed payments, acting expressly as a representative for the members. Def. App. A1585, A1607, A1610-11, A1614.

As we established in our motion to dismiss and again above, the PX tariff contains no terms comparable to the Restated Agreement at issue in Alliant Energy. The tariff creates no

obligations between market participants, only between participants and the PX itself. See, e.g., Def. App. A24 (PX Tariff § 6.2). The IOUs are thus not a party to any contract with the United States, and this suit should be dismissed for a lack of jurisdiction.

**G. The APX Is Irrelevant**

In our motion to dismiss, we noted that the identities of bidders and their bids were kept confidential by the PX. Mot. 23; Def. App. A20; A28 (PX Tariff §§ 3.5, 9). The IOUs assert that confidentiality is not inconsistent with privity. Res. 37. To support this notion, the IOUs cite to the procedures of the Automated Power Exchange ("APX"), which they claim was comparable to the PX, and to the contracts formed pursuant to the APX's tariff. Res. 37-38. Again, the IOUs have not read with care the agreement upon which they rely. The APX tariff's terms make the confidentiality of buyers and sellers irrelevant because the tariff expressly and unequivocally states that privity of contract exists between buyers and sellers: "When the APX Market Engine Contracts a Buy and Sell Order, a binding contract is formed between the selling APX Participant(s) and the buying APX Participant(s) for the quantities that are Contracted." Pl. App. 657. This is exactly what the PX tariff does not say. The IOUs' citation to the APX tariff only illuminates the flaw at the heart of their case.

**IV. The IOUs Lack Standing To Sue On ISO Transactions**

The IOUs virtually ignore our argument concerning their standing to sue on ISO transactions. They cite no authority contrary to ours. They do not contest the recognition by the United States Court of Appeals for the Federal Circuit and the United States Supreme Court that restatements are authoritative sources of the law. They make no attempt to distinguish Brunswick Leasing Corp. v. Wisconsin Cent. Ltd., 136 F.3d 521 (7th Cir. 1998), upon which we rely. Nor do they challenge the rationale underlying the restatement's rule.

Instead, the IOUs respond to our argument by accusing us of an "artful abbreviation" of

Section 6.05 of the Restatement (Third) of Agency. Res. 46. Then, strangely, they quote the same language that we quote — that the rule applies "'*unless* the agency acted with actual or apparent authority to bind each of the principals to the combined contract'" — adding only emphasis. Id. This language, the IOUs claim without analysis, renders Section 6.05 "irrelevant" because "the ISO and PX indisputably had authority under the Tariffs to 'bind' all buyers and sellers of power to the terms of the transactions entered into under the Tariffs." Id.

Once again, the IOUs do not read carefully, though they quote only a single sentence. That sentence does not condition the applicability of Section 6.05 on whether a contract binds principals "to the terms entered into under" a contract, as the IOUs claim. It says that an agent must bind the principals "to the combined contract." Here, according to the IOUs' own description of the ISO tariff, that never happened. The ISO did not bind each of the IOUs to the "combined contract" to pay sellers. Instead, if a buyer defaulted on its obligations, that default would be covered not by the other buyers, but by the sellers — this is the basis for the IOUs' "market shortfall" claim. That claim relies upon ISO Tariff § 11.16.1, which provides that in the event of a Scheduling Coordinator's default, "the ISO shall reduce payments to all ISO Creditors proportionately to the net amounts payable to them on the relevant Payment Date to the extent necessary to clear the ISO Clearing Account." Def. App. A531; see also PG&E Compl. ¶ 33 (citing provision). The tariff continues: "The ISO shall account for such reduction in the ISO ledger accounts as amounts due and owing by the non-paying ISO Debtor to each ISO Creditor whose payment was so reduced." Def. App. A531. The tariff does not contemplate that all buyers would be liable on their "combined contract" with the sellers. Accordingly, application of the restatement's rule in this case is entirely appropriate here. The IOUs have no standing to sue unless they are joined by all of the principals to their alleged contracts. Because this is not the case, this case should be dismissed.

## V. The IOUs Have Not Demonstrated That The They Are Third Party Beneficiaries Of PX Transactions

In our opening brief, we addressed whether, assuming there is no direct privity of contract between the agencies and the IOUs, the IOUs are third party beneficiaries of the sales contracts between the PX and generators, and we demonstrated they were not. Mot. 33. In their response, the IOUs claim to be both third party beneficiaries of sales by generators to the PX as well as to the ISO. Res. 47. Respecting ISO transactions, we have already conceded that, to the extent the IOUs functioned as Scheduling Coordinators charged by the ISO for generation sold by the agencies, the ISO acted as the IOUs' agent to form contracts with the generators. Mot. 35-36. If they were not Scheduling Coordinators charged by the ISO to pay for power, then they have provided no basis for a recovery.

Respecting PX transactions, the IOUs baldly claim that "hundreds of pages of contract language, create specific rights and obligations flowing amongst the market participants." Res. 47. As support, they generally cite the prior sections of their brief purporting to establish contractual obligations between the market participants. Id. As we demonstrated previously, none of the PX provisions the IOUs cite support their contention. For example, they rely upon the fact that when a buyer defaults on its contractual obligation to pay the PX, the PX can allocate the deficiency among non-defaulting participants. Res. 32. Such a provision hardly dictates that sellers' contractual performance is for the direct benefit of buyers. Similarly, they claim the PX tariff grants market participants the right to enforce contractual rights against other participants. However, nothing in the provisions they purport to rely upon — PX Tariff Schedule 2, §§ 4.3.3, 4.3.4, 5.3 or 5.5 — says anything of the kind. Res. 33-34.

The IOUs also incorrectly state that the PX tariff "give[s] market participants the right to petition FERC to correct prices charged by sellers on the ground that the prices are unjust and

unreasonable — precisely the action taken by Plaintiffs that resulted in FERC's correction of the Agencies' prices, and their resulting refund liability." Res. 48. According to the IOUs "[t]here could hardly be a clearer, or more pertinent, example of a provision intended to directly benefit overcharged buyers such as Plaintiffs." Id. The PX tariff does not purport to confer any such right. What the IOUs actually did was to pursue a claim under section 206 of the FPA. Mot. 5. As previously discussed in the briefing, generally, that statute provides national jurisdiction to FERC to review rates charged by public utilities, prospectively adjust those rates or contracts found to be unjust and unreasonable, and to order refunds by public utilities going back a limited period of time.[2] BPA and WAPA are not public utilities. Not surprisingly, the PX tariff, which governs all transactions with the PX, whether purchases or sales made by either public or non-public utilities, acknowledges the existence of this national statutory review scheme by saying that nothing in either it or the Participation Agreement "shall be construed as affecting, in any way, the ability of any PX Participant receiving service under this Tariff to exercise its rights under Section 206 . . . ." Def. App. A30 (PX Tariff ¶ 13). Merely because federal law permits FERC to review the rates set by the PX upon its transactions has absolutely nothing to do with whether the contracts the PX executed to purchase power from generators provided a direct benefit to the IOUs.

## VI. The IOUs Fail To Allege That They Were Parties To Any Contracts

We note, also, that although the IOUs take great care to establish that BPA and WAPA "signed *written contracts* that expressly incorporated the entire Tariffs as contract terms," Res. 6-7, the IOUs are not as diligent about their own contractual obligations — their complaint fails even to allege that they were signatories to any agreements incorporating these tariffs. We

[2] As also previously noted, the IOUs contend that it permits FERC to retroactively rewrite contract terms, which we dispute.

highlighted this shortcoming in our motion to dismiss, but the IOUs ignore it. Mot. 36. Given that the IOUs' claims are founded exclusively upon their roles as Scheduling Coordinators in the ISO market and Market Participants in the PX market, this oversight is striking. This Court should dismiss any portions of the IOUs' claims that relate to transactions sued upon by the IOUs for which they did not serve as Scheduling Coordinators or Market Participants.

## VII. FERC's Rulings Should Be Followed

### A. This Court Should Defer To FERC

Although the IOUs vigorously contend that they should not be collaterally or judicially estopped for their prior inconsistent positions before other tribunals concerning privity, the IOUs ignore entirely our argument that this Court should defer to FERC's ruling on the matter. As we established in our motion, courts reviewing FERC rulings defer to its interpretations of tariffs so long as they are reasonable. Mot. 31; Pub. Serv. Elec. and Gas Co. v. FERC, 485 F.3d 1164, 1168 (D.C. Cir. 2007). Even if this Court chooses not to apply estoppel here, it should still defer to FERC's interpretation of the PX tariff.

### B. The *Edison* And *Lynch* Proceedings Estopp The IOUs

We demonstrated in our motion to dismiss that collateral estoppel should prevent the IOUs from relitigating the issue of privity of contract under the PX tariff. Mot. 28-30. The IOUs respond by asserting that collateral estoppel should not apply because the issue before FERC and the Ninth Circuit was not "identical" to the issue being decided here. Res. 39. To reach this conclusion, the IOUs significantly distort the decisions of FERC and the Ninth Circuit, and this Court should accordingly reject their position.

We agree with the IOUs that the central issue before FERC in the Edison proceedings was whether sales into the PX should be classified as "wholesale" or "retail." Res. 39-40. To rule upon this issue, however, it was necessary for FERC to decide the subsidiary issue of

whether buyers and sellers in the PX market formed contractual relationships. SCE itself framed the question before FERC this way:

> SoCal Edison argues that . . . when electricity for sale at wholesale is commingled with electricity for sale at retail, all of the commingled electricity must be deemed wholesale sales if two criteria are met: (1) the supposed retail part of the energy is indistinguishable at the point of sale from the remainder; and (2) no essentially separate transaction covering the power directly consumed by the purchaser is identifiable.

Southern California Edison Co., 80 FERC ¶ 61,262, 61,945 (1997) (emphasis added); Pl. App. 218-19. Opining on the second criterion, SCE asserted that:

> There is no way to match the source of the energy sold by a supplier through the PX with any particular buyer. Nor is there any contractual relationship in PX transactions between any retail purchaser and any specific generator. Both resellers and direct access purchasers buy-out [sic] of a common, intermingled pool and send payments to the PX.

Id. FERC echoed SCE's argument in its holding, finding that it was "faced with a new market institution in which sellers and buyers of electric energy will not contract directly with one another, as has been traditionally done in the industry, but instead will contract with the PX." Edison, 80 FERC at 61,946; Pl. App. 220. While FERC noted that the PX would not take title to the power and was "not considered a party to a PX trade," FERC held that the PX "nevertheless will be the intermediary that contracts with the entities that sell into the PX as well as with the wholesale and retail customers that purchase from the PX." Id.

FERC's decision makes clear that its holding on the issue of contractual privity is necessary to its ultimate conclusion that sellers were engaged in wholesale transactions of power with the PX, noting:

> In these circumstances, we believe it is reasonable to construe both the bidding participants and the PX to be engaged in sales of electric energy. Accordingly, we conclude that the bidding PX participants will be engaged in sales of electric energy at wholesale

> to the PX, who will then resell that energy to wholesale and retail customer participants.

Id. (emphasis added). The IOUs' assertion that FERC did not actually and necessarily decide the issue of contractual privity is simply wrong.

The IOUs cannot escape the consequences of FERC's decision merely by claiming that the proceeding "does not appear to qualify for collateral estoppel treatment at all." In Edison, SCE asked FERC for a declaratory order concerning the meaning of the PX tariff, an action in which the other IOUs joined, giving all of the IOUs the opportunity to litigate the issue if they disagreed — though PG&E expressed its support for SCE's position. Edison, 80 FERC at 61,944-46; Pl. App. 217-20. SCE sought a ruling from FERC because it intended to divest its generation facilities and needed to ensure that they were "properly valued in the marketplace," which required a ruling from FERC on the meaning of the PX tariff. Edison, 80 FERC at 61,9144; Pl. App. 218. Accordingly, FERC was not merely "deciding prospectively how to classify transactions that had not yet occurred in markets that did not yet exist," as the IOUs contend. FERC was interpreting an existing tariff and ruling upon the existing rights of the parties to that tariff, as any tribunal would do in a valid declaratory relief action. FERC was not engaged in ratemaking, the issue in The Second Taxing Dist. of the City of Norwalk v. FERC, 683 F.2d 477, 484 (D.C. Cir. 1982), upon which the IOUs rely without foundation. Collateral estoppel thus applies to FERC's ruling.

The IOUs are likewise wrong about the Ninth Circuit's decision in Southern California Edison Co. v. Lynch, 307 F.3d 794, 803 (9th Cir. 2002). They advance a tortured reading of the court's straightforward holding in the case. The court held simply that the potential intervenors lacked the "significant protectable interest in the litigation" necessary for intervention because "[t]he pending litigation would not resolve [their] claims, and SoCal Edison is in privity with the

California Power Exchange Corporation, not with [the potential intervenors]." Lynch, 307 F.3d at 803. Deciding whether intervention of right was allowable required the court to decide the issue of privity, and the court did so, at SCE's urging. The issue of privity was not incidental to the court's judgment, and no alternative basis exists for the court's decision, as the IOUs claim. Further, the issue in Lynch and the issue here are identical: the interests of the IOUs may have changed since Bonneville, but the PX tariff has stayed the same.

**C. Judicial Estoppel Should Apply Against SCE**

SCE adopted and maintained a position on privity of contract under the PX tariff in two separate proceedings before this dispute arose. The IOUs now euphemistically contend that SCE has changed that position following an "intensive contractual analysis pursuant to *Bonneville* that led to this action." Res. 44. In truth, SCE finds its previous stance inconvenient. This discomfort may be rational, but it is inexcusable. SCE should not be permitted to tailor its litigation posture to its own shifting, expedient ends.

The principle case upon which the IOUs rely in support of their judicial estoppel argument, New Hampshire v. Maine, 532 U.S. 742, 751-52 (2001), demonstrates why the doctrine applies here. All of the New Hampshire factors work against SCE. See id. at 750-51. First, SCE cannot dispute that its former position concerning contractual privity is entirely at odds with its current stance on the issue. As we noted above, nothing about the tariff has changed between then and now; Bonneville may have shifted SCE's interests, but it did not change the tariff. Second, SCE persuaded both FERC and the Ninth Circuit to adhere to its view. Either SCE misled those tribunals, or it is misleading this one. Third, SCE certainly gained an advantage from its former successful position at FERC and the Ninth Circuit, and allowing it to reverse that position now would be manifestly unfair, either to the United States or to the parties to the prior litigation. In short, for these reasons and the reasons established in our

motion to dismiss, SCE should be judicially estopped from now claiming that it is in privity of contract with other PX market participants.

**D. Estoppel Is An Appropriate Means Of Resolving This Dispute**

The IOUs contend that estoppel is not the proper means to resolve this dispute because the tariffs "embody important energy policies of FERC," and because the tariffs "control the continuing dealings not only of these parties but many other market participants." Res. 45. They assert that the "general rule" is that estoppel should not apply if application of the doctrine would adversely affect "the public interest" or "the interests of persons who were not parties to the original action" or "where it was not sufficiently foreseeable in the first proceeding that the issue would arise in the context of a later action." Id. We note, in the first instance, that this is not the "general rule." As the comment to the restatement section cited by the IOUs notes, deviations from the rule of estoppel "must be the rare exception, and litigation to establish an exception in a particular case should not be encouraged. Thus it is important to admit an exception only when the need for a redetermination of the issue is a compelling one." Restatement (Second) of Judgments, § 28(5) cmt. g. (1982).

The IOUs do not demonstrate a compelling need to redetermine the issue of privity of contract in the PX market. If, as the IOUs argue, the tariff embodies "important energy policies of FERC," this Court should let FERC's ruling on the matter stand. That "many other market participants" beyond the plaintiffs here might be affected is no reason for this Court to usurp FERC's role (and the judgment of its reviewing court) solely because the IOUs are unsatisfied now with what FERC held at their behest. Nor is the "public interest" theory persuasive — the consequence of the IOUs' former position is not that the "public" is deprived of a remedy, it is that the IOUs cannot recover in this case. We do not dispute that we are in privity of contract with the PX. If the IOUs are entitled to any remedy here, it is against the PX, not us.

Finally, if the IOUs failed to understand the implications of their privity argument when they made it, that should not relieve them of the consequences now. If anything, the lack of foreseeability then only emphasizes the correctness of our argument now — the PX is obviously the contractual party to these transactions, and no one could have foreseen that the IOUs would argue now that this is not the case. This Court should apply collateral and judicial estoppel to prevent such a result.

## VIII. This Court Lacks Jurisdiction Over The IOUs' Declaratory Relief Claims

### A. The IOUs Cannot Sue Absent A "Case" Or "Controversy"

As we established in our motion to dismiss, this Court lacks jurisdiction to entertain claims four through seven in the IOUs' complaints because those claims do not present a case or controversy. The IOUs argue that we have conflated "two fundamentally distinct issues: (1) whether the Court *has* jurisdiction to grant declaratory relief and (2) whether it *should exercise* that jurisdiction to grant relief in this particular case," and they assert that only the first question is appropriate for the Court to consider at this stage. Res. 49.

The IOUs do not seem to grasp our argument. We do not contest that the Court possesses jurisdiction, in certain instances, to entertain claims for declaratory relief. See Alliant Techsystems, Inc. v. United States, 178 F.3d 1260, 1270 (Fed. Cir. 1999). This power, however, like the power of all Federal courts, depends upon the existence of a "case" or "controversy" between the parties. See, e.g., Alabama State Federation of Labor v. McAdory, 325 U.S. 450, 461 (1945) ("The requirements for a justiciable case or controversy are no less strict in a declaratory judgment proceeding than in any other type of suit."); MedImmune, Inc. v. Genentech, Inc., 127 S.Ct. 764, 771 (2007) (noting that action for declaratory relief brought under the Declaratory Judgment Act must satisfy Article III's justiciability requirements). Without a case or controversy, a court lacks jurisdiction to entertain a suit, regardless of the sort

of relief sought by the plaintiff. See DaimlerChrysler, 547 U.S. at 341. Further, and contrary to the IOUs' objections, this Court should decide this threshold issue now; if the IOUs lack standing, this Court has no power to entertain this suit. See Steel Co., 523 U.S. at 94.

**B. The IOUs' Claims Do Not Present A Case Or Controversy**

This Court's declaratory powers simply do not extend to the consideration of hypothetical questions, and there is nothing concrete about the IOUs' fourth through seventh claims. The IOUs assert that they are merely asking the Court to "*interpret the parties' rights and obligations under their existing contracts*, which are entirely determinable at this time," but this is untrue. See Res. 52 (emphasis in original). The fundamental premise of the IOUs' first, second, and third claims is that FERC retroactively rewrote the ISO and PX tariffs in its July 25, 2001 order, and that we breached or will breach contractual obligations as a result. See, e.g., PG&E Compl. ¶ 78 (asserting that the agencies have repudiated their contractual obligations, "including their obligation to comply with the revised tariff provisions by refunding their unlawful overcharges."). The premise of the IOUs' fourth through seventh claims is entirely different. Those claims do not depend upon any interpretation of the tariffs as they exist now; they depend instead upon assumptions that FERC will rewrite the tariffs again, or that the ISO and PX might take action in the future. The IOUs thus ask this Court to opine about contractual terms that do not even exist, and they ask this Court to resolve disputes that may never ripen. The Court should decline to entertain such speculative claims.

In particular, the IOUs predict that FERC will revise the tariffs to account for energy exchanges, multi-day sales, and summer transactions. Res. 53-54. As we pointed out in our motion to dismiss, nothing in Public Utilities Commission v. FERC, 456 F.3d 1025 (9th Cir. 2006), compels the result at FERC that the IOUs forecast with such confidence. Mot. 42. FERC's consideration of the Summer Period transactions is not even governed by the refund

provisions of FPA section 206; the Ninth Circuit made plain that it was not telling FERC how to decide the matter; and the IOUs themselves will not wager anything more than a "significant likelihood" that FERC will correct prices. Res. 54; CPUC, 456 F.3d at 1050 ("We do not prejudge how FERC should address the merits or fashion a remedy if appropriate."). The broad remedy requested by the IOUs, that this Court should declare that we will be bound by whatever FERC does, is simply inappropriate at this time — we can have no meaningful dispute about FERC's actions until FERC actually acts.

The same is true of the IOUs' sixth claim, which involves a supposed "market shortfall." The IOUs assert that FERC has already allocated a shortfall that "*will* be assessed against Plaintiffs," making their claim "far from hypothetical." Res. 54. The IOUs misrepresent what has gone on at FERC. Before the Ninth Circuit's decision in BPA, FERC ordered all market participants to pay refunds. The IOUs remain bound by FERC's order, though the governmental entities do not, following BPA. The problem FERC confronted in its October 19, 2007 order was that the ISO and PX began calculating refund amounts before BPA was decided. The ISO asserted that "it would be time intensive and unreasonable to recalculate all of the refund calculations in order to remove the non-public entities." San Diego Gas & Elec., 121 FERC 61,067 at P 38. FERC needed to figure out how to account for this "shortfall in refunds," which resulted from BPA, not from any refusal to pay on the part of the agencies. FERC solved the problem by simply requiring everyone who was owed refunds — including governmental entities — to take less than they were originally owed, not by requiring the IOUs to pay more, as they misleadingly suggest. Id. at P 39. No "shortfall" has been allocated against the IOUs, and the notion that the ISO and PX would or could deem such a shortfall to exist is entirely speculative.

None of the cases cited by the IOUs support their position. The IOUs assert that "[t]he

mere fact that a lawsuit requests a declaration regarding the parties' contract rights under future circumstances does not make a declaratory judgment claim improper." Res. 50. This not the law. The rule advanced by the IOUs would eviscerate the case or controversy requirement. A controversy was obviously present in Alliant Techsystems, 178 F.3d at 1263, where the contracting officer ordered the contractor to perform under an option and the contractor disputed any such obligation. Likewise, in Garrett v. Gen. Elec. Co., 987 F.2d 747, 748-49 (1993), a contracting officer's final decision required a contractor to replace defective parts in aircraft engines at no cost to the Government, and to return $1.25 million in prior compensation — a live and actionable dispute. Neither of these cases support the IOUs' unduly expansive reading of the Constitution's case or controversy requirement.

Much like Alliant and Garrett, in Tiger Natural Gas, Inc. v. United States, 61 Fed. Cl. 287, 290-91 (2004), a contracting officer issued a final decision requiring a contractor to provide the Government with cost savings. Though counsel for the United States asserted that the agency would not seek these savings under the contract for a particular period of contract performance, the contracting officer's decision remained in effect and binding, creating a "continuing obligation" for the contractor "to guarantee GSA a certain level of savings" over the course of the contract's ten-year term. Id. at 293. In these circumstances, the Court found that a live dispute existed between the parties. Id. at 294. This Court's decision in CW Government Travel, Inc. v. United States, 63 Fed. Cl. 369, 390 (2004), is comparable. There, a contractor sued after the Government issued a solicitation for contracts that, when awarded, would deprive the contractor of work under its contract. Id. at 390. The Court found even this scenario to be a "very close issue . . . quite different" than the situation presented in Alliant.

The IOUs' claims for declaratory relief before this Court are far more speculative and contingent than the claims in any of the cases cited by the IOUs. The IOUs ask this Court to

proceed on faith that FERC, the ISO, and the PX will act as the IOUs predict, a purely hypothetical situation. Nothing about these claims compels such an extraordinary result. If the IOUs' predictions come to pass, they can sue in the future just as easily as they can sue now. If the IOUs' clairvoyance proves faulty, the parties might avoid litigation altogether. Either way, this Court need not act now, before any real dispute has arisen between the parties.

## IX. The IOUs' Final Two Claims Were Not Presented To The Contracting Officers

The IOUs unpersuasively contest our argument that they failed to present their final two claims to the contracting officers. Res. 55-58. These claims are based upon operative facts and legal theories never presented to the contracting officers, and this Court accordingly lacks jurisdiction to entertain them.

The IOUs first mistakenly conflate the tariffs' "indemnification provisions" with their alleged claim for "contractual indemnification." Res. 57. The tariffs say that the ISO and PX will pass through to the market participants any failure by a market participant to pay its bills. See Def. App. A531 (ISO Tariff § 11.16.1); Def. App. A63 (PX Tariff, Schedule 2, § 5.3). The IOUs did not cite these provisions in their claims to the contracting officer, and they certainly did not allege that the ISO and PX would pass along any "shortfall" to them. Instead, the IOUs' claims asserted merely that the IOUs were entitled to recover directly from the agencies for their "overcharges." Def. App. A1165-66, A1177-78. The factual predicate of the IOUs' current claim — that the ISO and PX will hold them liable for the agencies' refusal to pay refunds — has yet even to occur. Accordingly, no such facts were presented to the contracting officers.

The IOUs' seventh claim is no different. As they note, the IOUs alleged in their claims that the ISO and PX have begun "the recalculation of the accounts of all sellers and buyers in the ISO and PX markets to reflect the revised rates for the Refund Period in accordance with the Refund Order." See, e.g., Def. App. A1164. The ISO and PX have yet to "adjust" the agencies'

accounts in any way that gives rise to contractual liability, and the IOUs' claims gave the contracting officers no notice that the IOUs would "seek such adjustments," as they now claim. Res. 58. Accordingly, neither the operative facts nor the legal theory underlying the IOUs' current seventh claim were ever presented to the contracting officers for decision. This Court thus lacks jurisdiction to consider that claim.

## X. <u>The IOUs Have Conceded That Their First Count Is Invalid</u>

In our motion to dismiss, we cited to a brief filed by the IOUs in California state court in which they admit that the time for performance of any contractual refund obligations incurred by the governmental entities has yet to arise. Res. 51-55. This concession is obviously fatal to the IOUs' first claim for breach of contract in this Court. Oddly, the IOUs accuse us of a "disingenuous" omission of a footnote to their brief. In that footnote, the IOUs recognize that the court could disagree with their argument, and so they note that they have pleaded actual breach of contract in the alternative. The trouble for the IOUs is, while they may have attempted to reserve their rights concerning their first claim, they have abandoned the claim by conceding it is currently meritless. We simply ask the Court to give credence to the IOUs' own admission — which they make no substantive effort here to refute and which is correct — and dismiss the claim.

## <u>CONCLUSION</u>

For the foregoing reasons, the complaints in this case should be dismissed.

Respectfully submitted,

GREGORY G. KATSAS
Acting Assistant Attorney General

<u>s/ Jeanne E. Davidson</u>
JEANNE E. DAVIDSON
Director

s/ Mark A. Melnick
MARK A. MELNICK
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 616-0475
Fax: (202) 305-7644

Attorneys for Defendant

OF COUNSEL:
Sean B. McNamara
Trial Attorney
Department of Justice

Peter Burger
Attorney
Bonneville Power Administration

John D. Bremer
Attorney
Western Area Power Administration

May 21, 2008

CERTIFICATE OF FILING

I hereby certify that on this 21st day of May, 2008, a copy of the foregoing "DEFENDANT'S REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. The parties may access this filing through the Court's system.

s/ Mark A. Melnick