IN THE

UNITED STATES COURT OF FEDERAL CLAIMS

PACIFIC GAS AND ELECTRIC COMPANY, SOUTHERN CALIFORNIA EDISON COMPANY, AND CALIFORNIA ELECTRICITY OVERSIGHT BOARD,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

SAN DIEGO GAS & ELECTRIC COMPANY, a California corporation,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

No. 1:07-cv-00157-LAS

No. 1:07-cv-00167-LAS

Consolidated

**HON. LOREN A. SMITH**

**PLAINTIFFS PACIFIC GAS AND ELECTRIC COMPANY, SOUTHERN CALIFORNIA EDISON COMPANY, AND SAN DIEGO GAS & ELECTRIC COMPANY'S SURREPLY IN FURTHER OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

I. SURREPLY ARGUMENTS ....................1

A. Legal Standards ....................1

B. Choice of Law ....................3

C. Multi-party Contracts Are Consistent with Federal Circuit Law. ....................6

D. The Contracts Contemplate That Participants May Sue One Another to Enforce Tariff Obligations. ....................7

E. FERC's APX Decision Demonstrates That Privity Exists By Virtue of a Power Exchange Transaction, Without Requiring Bilateral Dealings Between Buyers and Sellers. ....................10

F. The U.S. Concedes Privity Under the ISO Tariff and Its Sole Argument for Lack of Standing Fails. ....................11

G. Plaintiffs Adequately Allege, in the Alternative, That They Are Third Party Beneficiaries of the Tariffs. ....................13

H. The Court Should Not Apply Collateral Estoppel on the PX Standing Issue. ....................14

I. The Court Should Not Apply Judicial Estoppel Against SCE. ....................17

J. Plaintiffs Sufficiently Allege That They Are Parties to the ISO and PX Agreements. ....................18

K. Plaintiffs' Declaratory Relief Claims Present a Case or Controversy. ....................18

L. Plaintiffs' Claims Were Properly Presented to the Contracting Officers. ....................19

M. Plaintiffs Have Not Waived Any Claims. ....................19

N. Plaintiffs' Market Manipulation Allegations Were Fairly and Accurately Stated. ....................20

II. CONCLUSION ....................20

## TABLE OF AUTHORITIES

**Page**

### CASES

*Alliant Energy, Inc. v. Neb. Pub. Power Dist.*,
No. 00-2139 ADM/FLN, 2001 WL 1640132 (D. Minn. Oct. 18, 2001),
*aff'd*, 347 F.3d 1046 (8th Cir. 2003) ........ 1, 5

*Belton v. Hatch*,
109 N.Y. 593 (1888) ........ 6

*Bonneville Power Admin. v. FERC*,
422 F.3d 908 (9th Cir. 2007),
*cert. denied*, 128 S. Ct. 804 (2007) ........ 17

*Brunswick Leasing Corp. v. Wis. Cent., Ltd.*,
136 F.3d 521 (7th Cir. 1998) ........ 11, 12

*Clark v. Bear Stearns & Co.*,
966 F.2d 1318 (9th Cir. 1989) ........ 14

*Comair Rotron, Inc. v. Nippon Densan Corp.*,
49 F.3d 1535 (Fed. Cir. 1995) ........ 16

*Commonwealth Edison Co. v. United States*,
56 Fed. Cl. 652 (2003) ........ 17

*County of Cook v. MidCon Corp.*,
773 F.2d 892 (7th Cir. 1985) ........ 15

*CPUC v. FERC*,
462 F.3d 1027 (9th Cir. 2006) ........ 20

*Data Gen. Corp. v. Johnson*,
78 F.3d 1556 (Fed. Cir. 1996) ........ 17

*Dureiko v. United States*,
209 F.3d 1345 (Fed. Cir. 2000) ........ 15

*Eureka Fed. Sav. & Loan v. Am. Cas. Co.*,
873 F.2d 229 (9th Cir. 1989) ........ 16

*Garcia v. Dep't of Homeland Sec.*,
437 F.3d 1322 (Fed. Cir. 2006) ........ 2

*Himebaugh v. Smith*,
476 F. Supp. 502 (C.D. Cal. 1978) ........................................................................... 7

*Jim Beam Brands Co. v. Beamish & Crawford Ltd.*,
937 F.2d 729 (2d Cir. 1991)........................................................................................ 16

*Johnson v. Or. Dep't of Human Res.*,
141 F.3d 1361 (9th Cir. 1998) ................................................................................... 17

*Kawa v. United States*,
77 Fed. Cl. 294 (2007) ................................................................................................ 1

*Kearns v. Gen. Motors Corp.*,
94 F.3d 1553 (Fed. Cir. 1996)..................................................................................... 14

*Muh v. Newberger, Loeb & Co., Inc.*,
540 F.2d 970 (9th Cir. 1976) ....................................................................................... 6

*Reynolds v. Army & Air Force Exch. Serv.*,
846 F.2d 746 (Fed. Cir. 1988)....................................................................................... 2

*RF Del., Inc. v. Pac. Keystone Tech.*,
326 F.3d 1255 (Fed. Cir. 2003)................................................................................... 14

*Scott Timber Co. v. United States*,
333 F.3d 1358 (Fed. Cir. 2003)................................................................................... 19

*S. Cal. Edison Co. v. Lynch*,,
307 F.3d 794 (9th Cir. 2002) .................................................................... 15, 16, 17, 18

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998)......................................................................................................... 2

*Texaco, Inc. v. United States*,
579 F.2d 614 (Ct. Cl. 1978) ........................................................................................ 14

**ADMINISTRATIVE CASES**

*Am. Elec. Power Serv. Corp*,
106 FERC ¶ 61,020 (2004) .......................................................................................... 20

*Ariz. Pub. Serv. Co.*,
106 FERC ¶ 61,021 (2004) .......................................................................................... 20

*Automated Power Exch., Inc.*,
84 FERC ¶ 61,020 (1998) ............................................................................................ 11

*Automated Power Exch., Inc.*,
85 FERC ¶ 61,232 (1998) .......... 10, 11

*Cal. Power Exch. Corp.*,
92 FERC ¶ 61,096 (2000) .......... 9, 15

*Pac. Gas & Elec. Co.*,
81 FERC ¶ 61,122 (1997) .......... 7, 15

*Portland Gen. Elec. Co.*,
83 FERC ¶61,315 (1998) .......... 15

*S. Cal. Edison Co.*,
80 FERC ¶ 61,262 (1997) .......... passim

**FEDERAL RULES**

Rules of the United States Court of Federal Claims 12(b)(1) .......... 1, 2, 5

**OTHER AUTHORITIES**

RESTATEMENT (THIRD) OF AGENCY § 6.05 (2006) .......... 12

Plaintiffs Pacific Gas and Electric Company ("PG&E"), Southern California Edison ("SCE"), and San Diego Gas & Electric Company ("SDG&E") (together, "Plaintiffs") submit this joint surreply brief, authorized by the Court in its June 2, 2008 Order, in further opposition to the U.S.'s motion to dismiss. Several points should not be lost in the fog of arguments raised in the U.S.'s lengthy Reply:

- **<u>Plaintiffs' contract theory is amply supported in law.</u>** Indeed, the leading Eighth Circuit decision authorizing precisely this type of multiparty contract claim is a case in which the U.S., on behalf of WAPA, sued as a *plaintiff* to recover refunds for breach of contract from a governmental entity. *Alliant Energy, Inc. v. Nebraska Pub. Power Dist.*, 347 F.3d 1046 (8th Cir. 2003), *aff'g*, No. 00-2139 ADM/FLN, 2001 WL 1640132 (D. Minn. Oct. 18, 2001) ("*Alliant Energy*").

- **<u>The U.S.'s motion goes far beyond the permissible scope of a Rule 12(b)(1) motion.</u>** The U.S. asks the Court to make determinations that would only be appropriate at summary judgment—such as, *inter alia*, the parties' intentions with respect to key contract provisions—and then only if there were no contested issues of fact. Virtually none of the U.S.'s arguments may be resolved on a motion to dismiss under Rule 12(b)(1) of the Rules of the Court of Federal Claims.

- **<u>Plaintiffs have pleaded facts sufficient to establish this Court's jurisdiction.</u>** Plaintiffs' jurisdictional allegations (and, if the Court chooses to consider it, the extensive record submitted by both sides in connection with this motion) more than suffice to establish their standing to bring these claims, and thus, this Court's jurisdiction. Whether Plaintiffs will ultimately prevail on the merits of their claims is a question for another day; for purposes of this motion, their jurisdictional allegations, which are entirely consistent with the evidentiary record, are enough.

## I. SURREPLY ARGUMENTS

### A. Legal Standards

Under modern Federal Circuit authority, in order to defeat the U.S.'s 12(b)(1) motion, Plaintiffs must plead—but need not prove—subject matter jurisdiction. *See* Plaintiffs' Opposition brief ("Pl. Opp.") at 20-21 (citing cases). The truism that "privity of contract implicates standing and jurisdiction," U.S. Reply at 6, does not heighten that standard. *See, e.g.*, *Kawa v. United States,* 77 Fed. Cl. 294, 304-05 (2007) (denying 12(b)(1) motion based on lack of privity because plaintiff had adequately pleaded third party beneficiary status). Plaintiffs'

Complaint alleges detailed facts that amply support a finding of a contractual relationship among market participants, including the Agencies and Plaintiffs. No more is required to establish this Court's jurisdiction.

While the U.S. concedes that "a well-pleaded allegation of a contract is typically sufficient to grant the Court jurisdiction to entertain a contract claim," U.S. Reply at 6, it argues inconsistently that Plaintiffs must establish jurisdiction by a preponderance of the evidence. *See id.* at 5. The cases on which the U.S. relies for that latter proposition are inapposite, since in those cases the party challenging jurisdiction proffered specific evidence contradicting the complaints' jurisdictional allegations. *See, e.g.*, *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746 (Fed. Cir. 1988) (U.S. Reply at 5) (discrediting complaint's jurisdictional allegations which were contradicted by record evidence).[1] That is not the case here. The U.S. has not put forward any evidence going to the jurisdictional issue, let alone evidence that might call into question the allegations of the Complaint. At most, the U.S. has advanced a competing interpretation of the contract (which, at least for purposes of this motion, the U.S. concedes exists). U.S. Reply at 7. Straying even further outside the boundaries of a Rule 12(b)(1) motion, the U.S. asserts that the question of whether there is privity among the parties under the PX tariff

[1] The U.S. also cites *Garcia v. Department of Homeland Security*, 437 F.3d 1322 (Fed. Cir. 2006) (en banc) (U.S. Reply at 6), but that case is wholly irrelevant. *Garcia* involved the statutory interpretation of 5 U.S.C. § 7701, which defines the subject matter jurisdiction of the Merit Systems Protection Board, not the Court of Federal Claims. *See Garcia*, 437 F.3d at 1335 (stating the issues before the Court). The U.S.'s reliance on *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998) (U.S. Reply at 5) in similarly misplaced, since in that case the Court fully credited the complaint's jurisdictional allegations when ruling on the jurisdictional issue. *See id.* at 104 ("This case is on appeal from a Rule 12(b) motion to dismiss on the pleadings, so we must presume that the general allegations in the complaint encompass the specific facts necessary to support those allegations.")

is governed by the parties' intent. U.S. Reply at 18. Questions of intent can hardly be resolved at this stage and on this record. *See, e.g.*, Pl. Opp. at 22-23.

**B. Choice of Law**

Nothing in the pending motion turns on the U.S.'s choice of law argument. Because the U.S. has not identified any federal law that is inconsistent with state law on any pertinent issue, its extensive discussion on this point is an irrelevant theoretical exercise. And, at this stage, it is inappropriate for the U.S. to ask the Court resolve the meaning of the Tariffs' disputed choice of law provisions, especially by relying on parol evidence. The full record, including filings made at FERC by the ISO and PX, and comments submitted to FERC by the Agencies, supports Plaintiffs' assertion that the Agencies contractually bound themselves to a choice of law provision specifying that California law governs except where some specific federal law applies to federal agencies or is inconsistent with the Tariffs. *See* ISO Tariff §§ 20.7, 20.8; PX Tariff §§ 19.6, 19.7.[2] However, resolution of that issue must be left for another day.

To briefly respond to the U.S.'s arguments, on their faces the Tariffs simply do not say that federal law completely displaces California law, as the U.S. suggests. U.S. Reply at 8. As the U.S. acknowledges, the ISO Tariff is "to be construed in accordance with California law," except to the extent that a Tariff provision is inconsistent with the federal law applicable to a federal entity. U.S. Reply at 12. Where such an inconsistency arises, the provision "shall be inapplicable" to the federal entity *Id.*; ISO Tariff § 20.8. The ISO Tariff nowhere says that "California law is thus inapplicable" *in toto*. *Cf.* U.S. Reply at 12.

[2] The PX and ISO Tariffs are located, respectively, at A1-A237 and A238-A1149 of the U.S.'s Appendix ("U.S. App.").

The PX Tariff also provides that California law governs, but with the further proviso that "if a party is a federal entity that party shall be governed by *applicable* federal law." PX Tariff § 19.6 (emphasis added). The meaning of "*applicable*" federal law is amplified in the following section, which says that "[i]f any provision of this Tariff is inconsistent with any obligation imposed on any person or federal entity by federal law or regulation, *to that extent it shall be inapplicable* to that person." PX Tariff § 19.7 (emphasis added). The Tariff language read in context, as well as FERC filings made by the ISO, PX, and the Agencies at the time the Tariffs were amended to include the choice of law language, make clear that "applicable federal law" refers to federal laws that impose specific obligations on federal agencies or are inconsistent with the Tariff, not wholesale adoption of all federal law.[3]

Going well beyond the scope of this motion, the U.S. in its Reply points to parol evidence that it claims supports its interpretation of the choice of law provisions. The U.S. submits two newly discovered letters, written by BPA to the ISO and the PX, in early 1998, when BPA was commencing operations in California's wholesale markets. U.S. App. at A1686-A1691. These letters do not show that the ISO and PX agreed that federal law applies wholesale to BPA.[4] *Cf.* U.S. Reply at 8, 10. Rather, they clarify that, as a federal entity, BPA is subject to California law as specified in the Tariffs, except where a specific federal law applies, or conflicts with the Tariff. If the U.S.'s reading of this correspondence were correct, the choice of law provisions

[3] Consistent with that meaning, WAPA, in its PX Participation Agreement, designated two specific federal statutes that would be "applicable" to it in its transactions under the PX Tariff. WAPA attached an exhibit to its PX Participation Agreement stating that the agreement may be subject to the Contract Work Hours and Safety Standards Act, 40 U.S.C. § 327 *et seq*., regulations promulgated thereunder, and Section 202 of Executive Order No. 11246, 43 Fed. Reg. 46501 (1978), concerning employment discrimination. *See* U.S. App. at A1224.

[4] WAPA was not a party to these communications and these letters reveal nothing of its understanding of the application of the Tariffs' choice of law provisions.

specifying California law would have been rendered meaningless, as federal law would have displaced California law in every case. Nothing in these newly identified documents supports the U.S.'s sweeping assertion that the Agencies are wholly exempt from all state law and governed exclusively by federal substantive contract law. *Cf.* U.S. Reply at 10. But again, this is simply not the motion, or the record, on which these contract interpretation questions can be decided.

Finally, the U.S.'s position here contrasts acutely with its position in *Alliant Energy*, where WAPA agreed to a virtually identical choice of law provision in the MAPP Restated Agreement.[5] As here, there was no apparent conflict between Minnesota contract law and any federal statute, and the district court and the Eighth Circuit decided WAPA's contract claims under Minnesota law pursuant to the choice of law provision.[6] *Alliant Energy, Inc. v. Nebraska Pub. Power Dist.*, No. 00-2139 ADM/FLN, 2001 WL 1640132 at *3 & n.3 (D. Minn. Oct. 18, 2001) (citing § 13.8 of the Restated Agreement), *aff'd*, 347 F.3d 1046, 1050 & n.6 (8th Cir. 2003) (Eighth Circuit also noted Minnesota law controlled pursuant to § 13.8).

---

[5] Section 13.8 states: "Subject to the provisions of Section 13.15 and to the extent permitted by law, to promote uniformity of interpretation of this Restated Agreement the laws of the State of Minnesota, with the exception of its laws governing choice of law, or United States federal law or Canadian Laws *as applicable*, shall control the obligations and procedures established by this Restated Agreement and the performance and enforcement thereof." MAPP Restated Agreement, § 13.8 (emphasis added), U.S. App. at A1546. Section 13.15, like the PX Tariff, states no member is required to comply with a provision if it would be *prohibited* by federal law, but the member must make every effort to comply to the maximum extent *permitted* by federal law. *Id*. § 13.15, U.S. App. at A1552-A1553; *see* PX Tariff § 19.7(a).

[6] The fact that WAPA signed on to a choice of state law provision in the MAPP Restated Agreement also belies the U.S.'s current contention that its officials somehow lacked authority to sign a contract that is generally governed by state law; in fact such authority is presumed. *See* Pl. Opp. Br. at 24 n.23; *cf.* U.S. Reply at 13-14. Moreover, the U.S. admits that such an argument is improper on this Rule 12(b)(1) motion: "[W]e could not argue at this stage . . . that the Court lacks jurisdiction because the Government agent who signed the contracts lacked the requisite authority to bind the United States or because the contracts were illegal." U.S. Reply at 6.

### C. Multi-party Contracts Are Consistent with Federal Circuit Law.

The U.S.'s Reply cites no Federal Circuit law that is inconsistent with the decisions from the Second, Eighth and Ninth Circuits recognizing multi-party agreements, nor does it provide any basis not to credit Plaintiffs' allegation that such a contract was formed here. U.S. Reply at 15-16; *see* Pl. Opp. at 27-30. Each of the U.S.'s cited cases involves two or more separate agreements with *different* terms and *different* purposes, which clearly did not constitute a unified multi-party contract. *Id*. In contrast, the Complaint alleges that participants in the ISO and PX agreed to a *standardized* contract with the *same* terms binding on all of them, in order to facilitate and create a structure enabling them to transact *with each other* on those terms.

The U.S.'s attempt to limit multi-party agreements to cases involving "associations" (or, more precisely, stock exchanges), U.S. Reply at 17, is also illusory. The ISO and PX markets do not differ in any material way from the market entities at the hub of other multi-party contracts—indeed, "PX" stands for the California Power *Exchange*. Just as the rules of the stock "exchange" in *Muh v. Newberger, Loeb & Co., Inc.*, 540 F.2d 970 (9th Cir. 1976), gave rise to binding multi-party contracts among exchange participants, so too do the terms of the ISO and PX Tariffs. Just like the members of the stock exchange described in *Belton v. Hatch*, 109 N.Y. 593 (1888) (U.S. Reply at 17), ISO and PX market participants voluntarily agreed to rules that mutually bind and benefit all participants "to provide facilities to transact [trades in electric power] and to provide an exchange . . . for the conduct of such transactions."[7] *Belton* at 596. Both types of exchanges involve buyers and sellers engaged in millions of transactions governed by a common set of rules; both exchanges involve market participants "allied for the common

[7] *See* PX Tariff Introductory Statement (U.S. App. at A7): The PX "is a nonprofit corporation, . . . for the primary purpose of providing an efficient, competitive Energy auction . . . [to] suppliers and purchasers, that meets the loads of exchange customers at market prices[.]"

purpose" (*cf*. U.S. Reply at 17) of providing facilities and rules to enable those transactions to take place in an efficient, predictable, and enforceable manner; and both groups of market participants enter into multi-party agreements to accomplish that purpose.

Nor is the Power Exchange a mere "public market." U.S. Reply at 17. Like stock exchanges, no entity may trade in the PX unless it agrees to abide by the voluminous rules that mutually bind all participants, posts adequate collateral, and meets other requirements for participation. California Parties' Complaint ("PG&E Compl.") ¶ 32; SDG&E Complaint ("SDG&E Compl.") ¶ 26; *see* PX Tariff § 2.6.2(f) (PX participants must sign agreement to abide by terms of PX Tariff and meet creditworthiness requirements).

### D. The Contracts Contemplate That Participants May Sue One Another to Enforce Tariff Obligations.

Plaintiffs agree that whether members of a multi-party contract may sue one another to enforce the contract depends on interpretation of the contract terms. U.S. Reply at 18. *See, e.g., Himebaugh v. Smith*, 476 F. Supp. 502, 506 (C.D. Cal. 1978) (interpreting rules of stock exchange as permitting members to sue one another). That alone should put an end to the standing inquiry because, once again, this issue is not suited to disposition at the pleadings stage.

Plaintiffs' reading of the Tariffs is eminently reasonable, having been endorsed by FERC, and thus cannot be gainsaid on a motion to dismiss. FERC expressly adopted the position—jointly urged by both the PX and ISO—that those two entities, as exchange administrators, should not be responsible for collecting debts of market participants, and that it was up to the participants to recover amounts they were owed, whether by suit or otherwise. *Pac. Gas & Elec. Co.*, 81 FERC ¶ 61,122 at 61,508-09 (1997), Plaintiffs' Appendix ("App.") at 223.[8]

[8] The U.S. itself urges that "this Court should defer to FERC's ruling on the matter" of whether market participants can sue one another to enforce the Tariff. U.S. Reply at 29.
*(Footnote continued)*

Standing is equally clear under the PX Tariff as under the ISO Tariff. *Cf.* U.S. Reply at 20-21. In the first place, the PX Participation Agreement—the very contract the Agencies signed—explicitly provides that "[a]ll obligations to pay amounts *or perform obligations due with respect to the PX Tariff* . . . [or the Agencies'] trading in the PX Market generally *shall be the sole responsibility of the PX Participant*." PX Participation Agreements at 4, ¶ 10, *see e.g.*, U.S. App. at A1159 (BPA), A1223 (WAPA) (emphasis added). It is hard to imagine language that could be more to the point and unambiguous on the standing issue.

The Complaint alleges facts sufficient to demonstrate that the PX is a revenue-neutral intermediary that acts as a representative for its participants, just as the ISO acts as an "agent" for traders in that market. The PX takes no risk, no profit, and no loss; it charges back the debt of any defaulter to other participants. The PX does not take title to the power, and is not a counterparty to the trades. *See* PG&E Compl. ¶¶ 29-35; SDG&E Compl. ¶¶ 23-29; PX Tariff § 3.1 ("In carrying out its responsibilities under this Tariff . . . [t]he PX *will not be*, and shall not be deemed to be, *a counterparty to any trade transacted through the PX markets*.") (emphasis added).

The PX's powers to draw on collateral (U.S. Reply at 21) are consistent with the PX's role as neutral administrator; the PX may draw on collateral of a defaulting participant to cover a shortfall from a nonpayment so that the PX can "clear" its account. But if a shortfall remains, the other participants—not the PX—bear the loss. PG&E Compl. ¶ 33; SDG&E Compl. ¶ 27. Money owed by PX participants is paid to the PX (U.S. Reply at 19-20, 22) not for the PX's own

---

Erroneously, however, the U.S. urges the Court to follow dictum from an older FERC ruling, made in an entirely different context, that did not expressly consider the question at hand. As further discussed below, FERC's later decisions authoritatively hold that market participants may enforce Tariff obligations against one another.

benefit, but so that the PX, as intermediary, can determine which counterparty is entitled to it and adjust the participants' accounts accordingly.[9] The U.S. concedes that in *Alliant Energy*, the administrator, MAPPCORP, similarly collected and distributed payments, acting as a representative for the members, including WAPA. U.S. Reply at 24.

As the U.S. acknowledges, the PX Tariff contains a provision that allows market participants to identify non-paying parties. U.S. Reply at 20 (citing PX Tariff § 5.5). As FERC has explained, that provision was inserted in the PX Tariff "so that non-defaulting Participants *are able to seek recovery from the defaulting party*." *California Power Exchange Corp.*, 92 FERC ¶ 61,096 at 61,379 (2000) (emphasis added), App. at 266. In this context, "seeking recovery" necessarily includes the right to bring a breach of contract suit. That right is fundamental to any contractual relationship, and does not need to be more directly specified within the four corners of the instrument in order to exist. The U.S.'s assertion that the contract must contain a provision explicitly authorizing the suit, or provide a specific contractual "mechanism" for the parties to recover from each other, is at odds with basic contract law. U.S. Reply at 21. With rare exceptions, contracts virtually never say, "Party A may sue Party B in the event of a breach." Neither FERC, the Agencies, nor the sophisticated energy companies trading millions of dollars in the PX market would have contemplated that in the event of a default, the non-defaulting participants would have been limited to going to the defaulter, hat in hand, politely asking for payment, or suing on non-contractual causes of action. *Cf.* U.S. Reply at 21.

---

[9] *See*, *e.g.*, PX Tariff, Schedule 2, §§ 4.3.3, 4.3.4 (if PX Creditor receives overpayment, it must return overpayment to PX, which is responsible for "ascertaining the identity of those PX Participants entitled to receive amounts overpaid to another PX Participant" and "disbursing those funds to the persons entitled to them").

The U.S.'s bottom line position is: "If the IOUs are entitled to any remedy here, it is against the PX, not us." U.S. Reply at 33. But in fact, the PX is *immune from suit*, precisely because it has no financial stake in the market transactions. *See* PX Tariff § 14.1 (the PX is immune from liability to PX participants for any loss or claim arising from its performance or nonperformance of obligations under the Tariff); PX Tariff § 14.3 (PX Participant must hold the PX harmless from any loss, claim or liability arising from any act or omission of the Participant).

### E. FERC's APX Decision Demonstrates That Privity Exists By Virtue of a Power Exchange Transaction, Without Requiring Bilateral Dealings Between Buyers and Sellers.

FERC's APX decision demonstrates that buyers and sellers in a power exchange like the PX are in privity even though they do not have direct, bilateral dealings with each other, and may not know their counterparties' identity when a sales transaction occurs.[10] Pl. Opp. at 37-38; *cf.* U.S. Br. at 23. The U.S. attempts to distinguish the APX decision by asserting that the APX Tariff included language stating that the bidding process creates "binding contracts" between the buyer and seller. That Tariff provision was not the basis for FERC's holding; it was the reason FERC considered the issue in the first place. FERC initially rejected APX's Tariff because APX had not adequately explained, *inter alia*, how a "binding contract" could be formed, in light of the fact that the buyers' and sellers' identities would be unknown to each other at the time of their sales transaction. In other words, the "binding contract" language did not itself *create* privity, which is why FERC demanded to know whether the proposed Tariff provision accurately reflected the actual relationships among the market participants. APX explained, to FERC's satisfaction, that the anonymity of the contracting parties "does not bar enforcing this contract since under APX's rate schedule each APX Participant agrees to buy or sell power as required by

[10] *Automated Power Exch., Inc.*, 85 FERC ¶ 61,232 at 61,971 (1998), App. at 257.

the contracted order." *Automated Power Exch.*, 85 FERC at 61,970. APX further elaborated that, "if a buying or selling APX Participant disputes its obligations, APX will disclose to that participant the identity of the counter party(ies) to the transaction so that it may seek contract law remedies." *Id.* at 61,970-71. These assurances convinced FERC that a binding contract was indeed created. The Tariff language that FERC subsequently approved correctly described, but did not give rise to, the contractual relationship that exists in a power exchange transaction, where power is sold by one participant and bought by another through a neutral intermediary that is not itself a party to the transaction. As FERC observed, the operation and functions of the PX are "fundamentally similar" to the APX. *Automated Power Exch., Inc.*, 84 FERC ¶ 61,020 at 61,084 (1998), App. at 238. The relationships of the market participants are of the same nature, and equally produce a binding contract among them.

**F. The U.S. Concedes Privity Under the ISO Tariff and Its Sole Argument for Lack of Standing Fails.**

The U.S. does not dispute that Plaintiffs are in privity with the Agencies under the ISO Tariff, and in fact concedes privity exists. U.S. Reply at 19. The U.S.'s motion to dismiss Plaintiffs' claims as to ISO transactions therefore rests *solely* on an obscure provision of the Restatement (Third) of Agency, a slim reed that cannot support the weight the U.S. seeks to put upon it. That provision has no applicability here, and in any event cannot supplant the specific billing and payment provisions of the ISO Tariff.

In the one case cited by the U.S., and *the only case ever to apply the section, Brunswick Leasing Corp. v. Wisconsin Central, Ltd.*, 136 F.3d 521 (7th Cir. 1998) (U.S. Reply at 25), the court applied the Restatement only as a matter of Illinois state law (and whatever law ultimately is determined to apply here, it is not that of Illinois). *Id*. Moreover, the *Brunswick* court's reasoning shows it would reach the opposite result in this case.

The court held that, where a railroad had a lease agreement for semi-trailers with a company that acted as an agent for dozens of trailer owners, the railroad's contract did not require it to begin dealing directly with one of the owners (after a fallout between that owner and the agent), because that would be contrary to the railroad's expectations in its lease agreement with the agent. "[I]f [the owner] could sever the [lease agreement], it would work a fundamental change in the parties' rights and obligations. [The railroad] would have to pay [the owner] directly and would also have had to perform all of [the agent's] obligations under the [lease agreement]. . . .This is exactly what [the railroad] had contracted to avoid." *Id*. at 528-29. Unlike *Brunswick*, the Plaintiffs' claims here enforce, rather than alter, the original bargain.

In addition, Restatement Section 6.05 deals with situations in which an agent *acts contrary to its instructions*. *See* RESTATEMENT (THIRD) OF AGENCY § 6.05 (2006), Comment a. The portion the U.S. cites addresses the situation where a group of principals directs an agent "to make *separate* contracts for them," and the agent instead, without authority, makes a *single combined* contract for all the principals with a third party, improperly making each of the principals liable for the entire combined performance of all the principals. *See id.*, Comments a, c. Where such an unauthorized "combined" contract has been made, the Restatement unwinds the mess by stating an individual principal is not liable to the third party for the entire combined performance, because the principal never authorized such an undertaking. By the same token, the third party is not liable to any single principal for that principal's pro rata share of the performance due from the third party, because the third party's improper "combined" contract with the agent required only a single payment to the agent. *See id.*, Comment c.

Restatement Section 6.05 is simply inapposite here. No unauthorized or "combined" contract has been made, as the U.S. notes. *See* U.S. Reply at 26. To the contrary, the Agencies

expressly consented to be bound to their obligations under the ISO Tariff to each and every buyer with respect to the power the Agencies sold, and each of those buyers, including the IOUs, is an "ISO Creditor" which is entitled to "institut[e] [an] action or proceedings in any court against an ISO Debtor [here, the Agencies] to enforce payments due to it." ISO Tariff § 11.19.

### G. Plaintiffs Adequately Allege, in the Alternative, That They Are Third Party Beneficiaries of the Tariffs.

In addressing Plaintiffs' third-party beneficiary status, the U.S. confines its argument to the PX Tariff provisions, having effectively conceded that privity exists in the ISO market. The Court should have no trouble rejecting the U.S.'s argument that its obligation as a seller to refund the amount it overcharged purchasers is solely for the benefit of the PX itself, and that the purchasers whom the Agencies overcharged are not the beneficiaries of that obligation. Once again, the Court should not resolve contested issues of contract interpretation on this motion. Furthermore, that argument is not merely counterintuitive, but contrary to the Tariff, which requires the PX to pass on any such refunds to the affected buyers. *See, e.g.*, PX Tariff, Schedule 2, §§ 4.3.3, 4.3.4 (if seller receives an overpayment, it must return overpayment to PX, which is responsible for "ascertaining the identity of those PX Participants entitled to receive" amounts they overpaid and "disbursing those funds to the persons entitled to them."). The PX holds those refund payments only in trust for the participants. PX Tariff, Schedule 2, § 6.1 (all PX accounts are "operated by the PX in trust for the PX Participants"); ISO Tariff § 11.8.3 (same for ISO).

Notably, the U.S.'s position is markedly different as to transactions (not involved in this case) in which the Agencies were *buyers* of power: the Agencies are actively seeking refunds of overcharges—*not* from the PX itself, *but from the sellers* who overcharged them. Pl. Opp. at 2.

**H. The Court Should Not Apply Collateral Estoppel on the PX Standing Issue.**

The U.S. ignores the heavy burden it bears, as the party asserting issue preclusion, to prove all necessary estoppel elements. *RF Del., Inc. v. Pac. Keystone Tech.*, 326 F.3d 1255, 1261 (Fed. Cir. 2003). Federal Circuit "precedent weighs heavily against denying litigants a day in court unless there is a clear and persuasive basis for that denial." *Kearns v. Gen. Motors Corp.*, 94 F.3d 1553, 1557 (Fed. Cir. 1996). Therefore, all ambiguities concerning the breadth of the prior decision must be resolved in Plaintiffs' favor. *See Clark v. Bear Stearns & Co.*, 966 F.2d 1318, 1321 (9th Cir. 1989).

For collateral estoppel to apply, the issues in the prior and subsequent proceedings must be identical "*in all respects*." *Texaco, Inc. v. United States*, 579 F.2d 614, 616 (Ct. Cl. 1978) (emphasis added). That condition is not met with respect to FERC's *Edison* decision, from which the U.S. extracts a single sentence to the effect that sellers and buyers in the PX do not contract by dealing directly with one another "as has been traditionally done in the industry," while ignoring the broader context in which this statement was made. *See* U.S. Reply at 30; *S. Cal. Edison Co.*, 80 FERC ¶ 61,262 (1997), App. at 217. In *Edison*, the issue was whether it was appropriate, considering statutory and regulatory provisions that relate to wholesale power sellers, to treat suppliers into the PX markets as wholesale sellers, even though some retail purchasers participated in the market. The cited sentence reflects FERC's conclusion that the non-traditional market set up by the PX merits treatment under the FERC wholesale regulatory regime for various statutory and regulatory purposes, notwithstanding the retail participation in the market. *See* Pl. Opp. at 41-42. The fallacy of the U.S.'s reliance on this decision as establishing some sort of precedent on the privity issue is clearly illustrated by the fact that, immediately after the sentence to which the U.S. cites, FERC made abundantly clear that the market participants, and not the PX, were the buyers and sellers in this new market, saying that

the PX: did "not take title to electric energy"; "is not considered a party to the PX trades"; served only as "an intermediary" between buyers and sellers; and was part of a "transactional chain" between the buyers and sellers. *Edison*, 80 FERC at 61,946.

Subsequent FERC rulings confirm that market participants may sue one another under the PX and ISO Tariffs. In one such later order, FERC amended the PX Tariff to allow the PX to identify defaulting parties "so that non-defaulting Participants *are able to seek recovery from the defaulting party*." *Cal. Power Exch. Corp.*, 92 FERC at 61,379 (emphasis added). *See also Pac. Gas & Elec. Co.*, 81 FERC at 61,508-09 (ruling that "it should be the responsibility of Scheduling Coordinators to recover amounts that they are owed [under the ISO Tariff]"). And in *Portland General Electric Co.*, 83 FERC ¶ 61,315 (1998), App. at 233, FERC confirmed that the PX is not the purchaser of electricity, does not take title to the electricity, and is simply an intermediary. FERC required Portland General to revise a proposed service agreement to reflect that the purchasers of power were the PX Participants, not the PX itself. *Id.* at 62,287-88. These orders completely contradict the U.S.'s position.[11]

*Southern California Edison Co. v. Lynch*, 307 F.3d 794 (9th Cir. 2002), also did not involve the same issue, much less the "identical issue." *See* Pl. Opp. at 42-44. Collateral estoppel is particularly inappropriate because the legal standards involved in the two cases are significantly different. *See Dureiko v. United States*, 209 F.3d 1345, 1354-55 (Fed. Cir. 2000) (no preclusion for issue determined in tort claim because different standards apply to contract

---

[11] Further, there is no authority to support any claim that "estoppel" could apply to entities who were not parties to the litigation, or who intervened but "rais[ed] no substantive issues." *S. Cal. Edison*, 80 FERC at 61,946. The case relied on by the U.S., *County of Cook v. MidCon Corp.*, 773 F.2d 892 (7th Cir. 1985), does not hold otherwise. There, the estopped parties intervened as defendants and counterplaintiffs, and filed counterclaims asserting allegations addressing the matters in issue. *Id.* at 894-895 & 904.

claim). In *Lynch*, the issue was whether SCE's creditors, which sought to intervene, had "a significant protectable interest relating to the property or transaction that is the subject of the action" under Fed. R. Civ. P. 24. *Lynch*, 307 F.3d at 802. The court decided the issue under the standards governing intervention, without any reference to or discussion of the PX Tariff. *See id.* at 803-4. Estoppel does not turn on "labels" used by the prior court where, as here, "the standards governing them are significantly different." *Jim Beam Brands Co. v. Beamish & Crawford Ltd.*, 937 F.2d 729, 734 (2d Cir. 1991).

In addition, the privity language in *Lynch* was not necessary to the court's judgment. No preclusive effect is accorded to alternative findings that were independently sufficient to support a judgment. *See Comair Rotron, Inc. v. Nippon Densan Corp.*, 49 F.3d 1535, 1538 (Fed. Cir. 1995); *Eureka Fed. Sav. & Loan v. American Cas. Co.*, 873 F.2d 229, 233 (9th Cir. 1989). In *Lynch*, the creditors sought intervention as of right, arguing that they had a significant protectable interest in SCE's settlement with the state because SCE purportedly owed them money for power purchased through the PX. *Lynch*, 307 F.3d at 803. SCE responded that, even if the creditors could establish a legal entitlement to this sum, they did not have a significant protectable interest because the *Lynch* litigation would not resolve their separate claims against SCE. U.S. App. at A1336-A1337. The Ninth Circuit agreed, denying intervention because "[t]he pending litigation would not resolve those claims." *Lynch*, 307 F.3d at 803. SCE also argued, alternatively, that its creditors lacked a significant protectable interest because their claim was speculative and contingent for several reasons, including that the amount of SCE's debt had not yet been determined. It was in this context that SCE and the court made the comment about privity on which the U.S. relies. Pursuant to *Comair*, however, this alternative basis for the *Lynch* court's ruling is insufficient to support collateral estoppel.

Even assuming, for purposes of argument only, that *Edison* and *Lynch* have some bearing on the issues here, the Ninth Circuit subsequently found that Plaintiffs' most likely remedy against BPA and WAPA for tariff overcharges is "in a contract claim, not a [FERC] refund action." *Bonneville Power Admin. v. FERC*, 422 F.3d 908, 925 (9th Cir. 2005), *cert denied*, 128 S.Ct. 804 (2007). Because the Ninth Circuit specifically left open the opportunity for Plaintiffs to pursue a contract remedy against BPA and WAPA, collateral estoppel should not be applied. *See Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 661-62 (2003).

**I. The Court Should Not Apply Judicial Estoppel Against SCE.**

The U.S.'s judicial estoppel arguments against SCE similarly lack merit. The extreme remedy of judicial estoppel is reserved only for situations where the "particular representations are so inconsistent that they amount to an affront to the court," and even then, the Court has discretion to decline to apply the doctrine. *Johnson v. Oregon Dept. of Human Res.*, 141 F.3d 1361, 1369-70 (9th Cir. 1998). This case does not fit that picture. Because *Edison* and *Lynch* did not involve "identical issues," the statements made in the SCE briefs in those cases are not clearly inconsistent with its position in this case, and judicial estoppel cannot apply.

For example, SCE's comment about privity in its *Lynch* brief was part of an argument that the creditor/intervenors lacked a significant protectable interest under Fed. R. Civ. P. 24. SCE contended that the creditors' claim was too speculative, inter alia, because the amount, if any, owed by SCE to these creditors had not yet been determined. Significantly, SCE did not purport to characterize the terms of the PX Tariff at issue here, which was not even referred to in SCE's brief. Instead, SCE cited to its settlement agreement with the CPUC, under which its payments would flow through the PX, not directly to creditors. U.S. App. at A1326-A1327. As a result, the PX Tariff was not construed or even considered by the Ninth Circuit in *Lynch*.

Moreover, SCE's position that it has standing to sue BPA and WAPA to recover overcharges is clearly appropriate in light of the Ninth Circuit's decision in *Bonneville*.

Finally, rejecting the U.S.'s estoppel arguments regarding privity in the PX market would not be "manifestly unfair" to the U.S. U.S. Reply at 32. Judicial estoppel "is intended to protect the courts rather than the litigants," to prevent the perversion of the judicial process. *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1565 (Fed. Cir. 1996). Moreover, the U.S. was not a party in *Edison* or *Lynch* and has not even alleged that it, BPA or WAPA took or deferred any action in reliance on those decisions. It is not unfair to require BPA and WAPA to live up to their contracts. For all these reasons, the "harsh remedy" of judicial estoppel against SCE is entirely inappropriate here.

**J. Plaintiffs Sufficiently Allege That They Are Parties to the ISO and PX Agreements.**

The U.S.'s suggestion that this case should be dismissed because Plaintiffs did not specifically allege in the Complaint they were signatories to the ISO Scheduling Coordinator and PX Participation Agreements is frivolous. U.S. Reply at 28-29. Plaintiffs have pleaded that the ISO and PX Tariffs required all market participants to execute ISO Scheduling Coordinator and PX Participation Agreements, and that they are "direct parties" to the Agencies' Tariff obligations. *See, e.g.*, PG&E Compl. ¶¶ 2, 25, 27; SDG&E Compl. ¶¶ 2, 19, 21. There is no genuine dispute that each of the IOUs executed an ISO Scheduling Coordinator Agreement and a PX Participation Agreement. If the Court finds the Plaintiffs' allegations on this point unclear, Plaintiffs request leave to amend their Complaint to allege these facts with more particularity.

**K. Plaintiffs' Declaratory Relief Claims Present a Case or Controversy.**

Having made the argument that Plaintiffs' Fourth through Seventh declaratory relief claims should be dismissed for lack of a case or controversy, the U.S. is unable to point to a

single case in which this Court has dismissed a declaratory claim on that theory. The cases have uniformly held that the courts have jurisdiction to order the type of relief sought here; whether the claim raises a "live" controversy is a question that goes to the *exercise* of the Court's jurisdiction, and should not be decided as a threshold matter. *See* U.S. Reply at 35-37; Pl. Opp. at 52-53. Plaintiffs' Fourth through Seventh declaratory relief claims seek interpretations of the Tariffs—the very same Tariffs at issue in the First through Third claims—and resolution of the declaratory relief claims at the same time will avoid years of further, unnecessary litigation.

**L. Plaintiffs' Claims Were Properly Presented to the Contracting Officers.**

The U.S. asserts that Plaintiffs failed to present their final two claims to the contracting officers because (1) they did not cite the specific Tariff provisions under which they were seeking contractual indemnification, and (2) by indicating the ISO and PX had begun "the recalculation" of sellers' accounts, it was not clear they were actually making a claim based on "adjustments" to sellers' accounts. U.S. Reply at 38-39. This formalistic argument is inconsistent with the law of this Circuit, which construes the claims requirement broadly. *See, e.g., Scott Timber Co. v. United States*, 333 F.3d 1358 (Fed. Cir. 2003); Pl. Opp. at 55-58.

**M. Plaintiffs Have Not Waived Any Claims.**

The U.S. does not appear to dispute that Plaintiffs can pursue alternative claims for breach of contract and anticipatory repudiation. U.S. Reply at 39. Nor could it. *See* Pl. Opp. at 59-60. Plaintiffs have not relinquished their right to pursue alternative theories here. Merely acknowledging, before another court, that the complex facts at issue are susceptible to more than one legal interpretation cannot amount to a waiver of Plaintiffs' rights to pursue alternative claims in this Court. The U.S.'s argument lacks any merit.

### N. Plaintiffs' Market Manipulation Allegations Were Fairly and Accurately Stated.

The U.S. takes umbrage at the suggestion that BPA engaged in market manipulation during the California Energy Crisis. U.S. Reply at 4. Although it is correct that FERC dismissed certain gaming allegations against BPA, that is far from the whole story. *See Arizona Pub. Serv. Co.*, 106 FERC ¶ 61,021 (2004) (rehearing pending). The U.S. omits to mention that FERC's dismissal was based on procedural, not substantive, grounds. FERC did not undertake any analysis or consideration of the evidence presented against BPA. Instead, FERC, relying on its claimed non-reviewable discretion to limit the issues it chose to prosecute in enforcement actions it initiated, concluded that the evidence was outside the scope of what FERC chose to investigate in that docket.[12] And this is far from a closed chapter. While FERC elected not to consider the market manipulation evidence in its prosecution proceeding, the Ninth Circuit Court of Appeals has held that FERC must consider the evidence of market manipulation by sellers, including BPA, in the separate Refund Proceeding. *See CPUC v. FERC*, 462 F.3d 1027, 1051 (9th Cir. 2006). The upshot is that the evidence of market manipulation will be considered in one proceeding rather than another—not remotely an exoneration of BPA on the merits.

## II. CONCLUSION

For these reasons, and those set forth in Plaintiffs' Opposition brief, the U.S.'s motion should be denied in its entirety.

[12] *See Arizona Pub. Serv. Co.*, 106 FERC ¶ 61,021 at P 116 (holding that the California Parties' evidence would not be "addressed here" in light of the scope rulings in a concurrently issued order, *American Electric Power Service Corp.*, 106 FERC ¶ 61,020 (2004) (petition for review pending)).

Respectfully submitted,

DATED: June 16, 2008

By: s/ Marie L. Fiala
MARIE L. FIALA

HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA 94104-2878
Telephone: (415) 772-6000
Facsimile: (415) 772-6268

**ATTORNEY OF RECORD FOR PLAINTIFF PACIFIC GAS AND ELECTRIC COMPANY**

**OF COUNSEL:**

RUSSELL P. COHEN
HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA 94104-2878
Telephone: (415) 772-6000
Facsimile: (415) 772-6268

STAN BERMAN
PEGGY J. WILLIAMS
HELLER EHRMAN LLP
701 Fifth Ave, Suite 6100
Seattle, WA 98104-7098
Telephone: (206) 447-0900
Facsimile: (206) 447-0849

MARK PATRIZIO
PACIFIC GAS AND ELECTRIC COMPANY
77 Beale Street, MailCode B30A
San Francisco, CA 94105
Telephone: (415) 973-6344
Facsimile: (415) 973-5520

Attorneys for Plaintiff
Pacific Gas and Electric Company

DATED: June 16 , 2008

By: s/ Jane I. Ryan
JANE I. RYAN

STEPTOE & JOHNSON LLP
1330 Connecticut Avenue NW
Washington, DC 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902

**ATTORNEY OF RECORD FOR PLAINTIFF SOUTHERN CALIFORNIA EDISON COMPANY**

**OF COUNSEL:**

DANIEL C. SAULS
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue NW
Washington, DC 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902

LEON BASS, JR.
SOUTHERN CALIFORNIA EDISON COMPANY
2244 Walnut Grove Avenue
Rosemead, CA 91770
Telephone: (626) 302-6967

Attorneys for Plaintiff
Southern California Edison Company

DATED: June 16, 2008

By: s/ Laura Lindgren
LAURA LINDGREN

HENNIGAN BENNETT & DORMAN LLP
865 S. Figueroa Street
Los Angeles, California 90017
Telephone: (213) 694-1200
Facsimile: (213) 694-1234

**ATTORNEY OF RECORD FOR PLAINTIFF SAN DIEGO GAS & ELECTRIC COMPANY**

**OF COUNSEL:**

J. MICHAEL HENNIGAN
ROBERT W. MOCKLER
HENNIGAN BENNETT & DORMAN LLP
865 S. Figueroa Street
Los Angeles, California 90017
Telephone: (213) 694-1200
Facsimile: (213) 694-1234

Attorneys for Plaintiff
San Diego Gas & Electric Company