# In the United States Court of Federal Claims

Nos. 07-157C & 07-167C Consolidated
No. 07-184C
Filed: March 16, 2015

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| PACIFIC GAS AND ELECTRIC COMPANY, and SOUTHERN CALIFORNIA EDISON COMPANY, | * |
| | * |
| Plaintiffs, | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant. | * |
| | * |
| SAN DIEGO GAS & ELECTRIC COMPANY, | * |
| | * |
| Plaintiff, | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant. | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA EX REL. EDMUND G. BROWN JR., ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, and the CALIFORNIA DEPARTMENT OF WATER RESOURCES BY AND THROUGH ITS CALIFORNIA ENERGY RESOURCES SCHEDULING DIVISION, | * |
| | * |
| Plaintiff, | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant. | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Cal. Pub. Util. Code §§ 330-398.5;
Certification, 28 U.S.C. § 1292(d)(2);
Contracts Disputes Act,
    41 U.S.C. §§ 601–13;
Department of Energy Organization Act,
    42 U.S.C. §§ 7101, *et seq.*;
Department of Energy Power Marketing
    Rates Delegation Order Confirmation
    And Approval, 43 FED. REG. 60,636–37;
Federal Energy Regulatory Commission;
Federal Power Act,
    16 U.S.C. §§ 791a *et seq.*;
Judgment on Multiple Claims or Involving
    Multiple Parties, RCFC 54(b);
Jurisdiction;
Law-of-the-Case Doctrine;
Motion for Reconsideration,
    RCFC 59;
Public Utility Regulatory Policies Act, 16
    U.S.C. §§ 2601 *et seq.*;
Standing;
Submitting Claims To Contracting Officer,
    41 U.S.C. § 7103(a)(2), (b)(1).

**Marie L. Fiala**, Sidley Austin, LLP, San Francisco, California, Counsel for Plaintiff, Pacific Gas & Electric Company.

**Jane I. Ryan**, Steptoe & Johnson, LLP, Washington, D.C., Counsel for Plaintiff, Southern California Edison Company.

**Mark Fogelman**, Friedman & Springwater, LLP, San Francisco, California, Counsel for Plaintiff, San Diego Gas & Electric Company.

**Kenneth D. Woodrow**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for Defendant.

**Gary Alexander**, Deputy Attorney General, Counsel for Plaintiff The People of the State of California et al., Office of the Attorney General, San Francisco, California.

**BRADEN**, *Judge*.

### MEMORANDUM OPINION AND FINAL ORDER REGARDING PLAINTIFFS' BREACH OF CONTRACT CLAIMS

This case arises from the California Energy Crisis of 2000–2001, during which electricity prices soared to record levels. Plaintiffs first attempted to obtain relief from the Federal Energy Regulatory Commission ("FERC") or the United States Court of Appeals for the Ninth Circuit. These efforts were unsuccessful. *See Bonneville Power Admin. v. FERC*, 422 F.3d 908, 911 (9th Cir. 2005) ("*Bonneville*") ("We conclude that FERC does not have refund authority over wholesale electric energy sales made by governmental entities and non-public utilities."), *cert. denied*, 552 U.S. 1076 (2007); *see also City of Redding v. FERC*, 693 F.3d 828, 841 (9th Cir. 2012) ("FERC clearly acknowledged that it did not have authority to order refunds from the non-public utilities and explained that it was establishing just and reasonable rates in order to determine the appropriate refund amount for public entities[.]"). On March 12, 2007, three California-based investor-owned or public utilities and the State of California filed refund claims for overcharges in the above-captioned cases in the United States Court of Federal Claims. The Complaints allege that because two federal power authorities were liable for breach of power exchange agreements with two non-profit California corporations, these federal power authorities were in breach of contract with Plaintiffs, because the power exchange agreements were subject to the FERC tariffs incorporated therein.

To facilitate review of this Memorandum Opinion and Final Judgment, the court has provided the following outline.

## I.    REGULATORY BACKGROUND.

### A.    Prior To September 24, 1996, The Electric Utility Industry In The State Of California Was Subject Both To Federal And State Regulation.

B.      **On September 24, 1996, The State Of California Decided To Deregulate The Electric Utility Industry, But That Decision Resulted In An Energy Crisis In 2000–Mid-2001.**

## II.    PROCEDURAL HISTORY.

A.      **2000–2006 Proceedings In The Federal Energy Regulatory Commission And The United States Court Of Appeals For The Ninth Circuit.**

B.      **2007–2012 Proceedings In The United States Court Of Federal Claims And May 12, 2012 Liability Decision.**

C.      **The August 27, 2012 Decision Of The United States Court Of Appeals For The Ninth Circuit.**

D.      **The Government's November 2, 2012 Motion For Reconsideration In The United States Court Of Federal Claims And April 2, 2013 Order Denying Reconsideration.**

E.      **2013 Reassignment Of This Case, December 20, 2013 Decision To Vacate, And Subsequent Proceedings In The United States Court Of Federal Claims.**

## III.    DISCUSSION.

A.      **Whether Plaintiffs Have Standing.**

1.      **Neither The California Investor-Owned Utilities Nor The State Of California Were In Privity Of Contract, Either With The Western Power Administration Or The Bonneville Power Administration.**

2.      **Neither The California Investor-Owned Utilities Nor The State Of California Were Third-Party Beneficiaries To A Contract With Either The Western Power Administration Or The Bonneville Power Administration.**

3.      **Neither Cal-PX Nor Cal-ISO Was An Agent Of The Cal-IOUs Or The State Of California.**

B.      **Jurisdiction**

C.      **Assuming *Arguendo*, Plaintiffs Have Standing, Count I Of Plaintiffs' Refund Period Breach Of Contract Claims Must Be Dismissed.**

1.      **The Government's Argument.**

2.      **Plaintiffs' Response.**

3.      The Government's Reply.

4.      The Court's Resolution.

D.      **Plaintiffs' July 1, 2014 Motion To Reinstate The May 2, 2012 Liability Decision And For Certification Of Orders For Interlocutory Appeal Is Denied.**

IV.    **CONCLUSION.**

\* \* \*

I.      **REGULATORY BACKGROUND.**

　　To understand this *sui generis* case, a review of the labyrinth of state and federal law and regulations that governed the electric utility industry in the State of California is required.

A.      **Prior To September 24, 1996, The Electric Utility Industry In The State Of California Was Subject Both To Federal And State Regulation.**

　　In 1935, Congress enacted the Federal Power Act, 16 U.S.C. §§ 791a *et seq.*  This Act "had two primary and related purposes:  to curb abusive practices of public utility companies by bringing them under effective control, and to provide effective federal regulation of the expanding business of transmitting and selling electric power in interstate commerce." *Gulf States Utils. Co. v. Fed. Power Comm'n*, 411 U.S. 747, 758 (1973).  To accomplish this end, Congress created the Federal Power Commission ("FPC").  *Id.*

　　In 1977, in response to power shortages and rising energy costs, Congress consolidated all federal energy-related programs and agencies in the new Department of Energy ("DOE"). *See* Department of Energy Organization Act, *codified at* 42 U.S.C. §§ 7101 *et seq.* (1977).  That Act established the Federal Energy Regulatory Commission ("FERC") as an independent agency to assume most of the functions previously delegated to the FPC, including expanded regulatory authority over the interstate sale of all wholesale electricity and transmission service.[1]  *Id.* §§ 7171–72; *see also* Department of Energy, Power Marketing Rates, Delegation Order For Confirmation and Approval, 43 FED. REG. 60636–60637 (Dec. 22, 1978).

　　In 1978, Congress enacted the Public Utility Regulatory Policies Act to conserve the use of fossil fuels and promote development of new generating facilities with equitable rates. *See* 16 U.S.C. §§ 2601 *et seq.*  By that time, the number of electricity generators in the country was

---

[1] The sale of wholesale electric power entails "generation, transmission, and distribution functions."  *See Pub. Utils. Comm'n of Cal. v. FERC*, 462 F.3d 1027, 1036 (9th Cir. 2006). "Generation" is defined as "the production of power."  *Id.*  "Transmission" is defined as the "conveyance of high voltage electric power from the points of generation to substations for conversion to delivery voltages."  *Id.*

growing, because technological advances made it possible to transmit electric power over long distances at a lower cost by "wheeling," *i.e.*, "an arrangement in which one electric company allows another company to use its lines to transmit power to customers in its service area." FED. REGULATORY DIRECTORY 172 (16th ed. 2014).

On April 24, 1996, FERC issued Order No. 888, finding that the nation's larger public utilities had discriminated in "the wholesale bulk power marketplace" by providing inferior or no access to third-party power wholesalers. *See* 61 FED. REG. 21540, 21541 ("FERC Order No. 888"); *see also Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667, 683 (D.C. Cir. 2000) ("[T]he open access requirement of [FERC] Order 888 is premised . . . on FERC's identification of a fundamental systemic problem in the industry."), *aff'd, New York v. FERC*, 535 U.S. 1 (2002). To remedy this situation, FERC ordered all investor-owned electric utilities engaged in interstate transmission to file a single open access, non-discriminatory tariff that offered "network, load-based service and point-to-point, contract-based service." FERC Order No. 888, at 21,541. "The theory behind separating these functions, known as 'unbundling,' was that wholesale power competition would be promoted, and consumers would benefit, if public utilities were required to provide nondiscriminatory, open access, transmission." *Pub. Utils. Comm'n of Cal. v. FERC*, 462 F.3d 1027, 1036 (9th Cir. 2006) ("*CPUC*").

**B.  On September 24, 1996, The State Of California Decided To Deregulate The Electric Utility Industry, But That Decision Resulted In An Energy Crisis In 2000–Mid-2001.[2]**

On September 24, 1996, in response to FERC Order No. 888, California enacted Assembly Bill 1890 ("AB 1890") to establish a deregulated market for wholesale electric power in California, where prices would be set by a competitive process to facilitate consumer choice. *See* Cal. Pub. Util. Code §§ 330–398.5. At this time,  three investor-owned electric utilities operated in the State of California: Pacific Gas & Electric Company ("PG&E"); San Diego Gas and Electric Company ("SG&E"); and Southern California Edison ("SC Edison") (collectively hereinafter "the Cal-IOUs"). The Cal-IOUs generated and purchased wholesale power and also owned, operated, and maintained transmission and distribution systems. PE Ex. 214 at 316–17. The terms, conditions, and prices for these services were set forth in tariffs and rates filed with FERC. *See Pac. Gas & Elec. Co. v. FERC*, 306 F.3d 1112, 1114 (D.C. Cir. 2002) (explaining that the Cal-IOUs "originally consisted of three investor-owned utilities (PG&E, [SC] Edison, and [SG&E]), each of which is subject to FERC's jurisdiction"). Retail rates, however, were subject to the jurisdiction of the California Public Utilities Commission ("CPUC"). *See* Cal. Pub. Util. Code § 330(c)–(d); *see also CPUC*, 462 F.3d at 1037.

_____

[2] The facts discussed herein were adjudicated in related FERC or federal district court proceedings and adopted by the United States Court of Appeals for the Ninth Circuit in: *CPUC*, 462 F.3d at 1033–46; *Bonneville*, 422 F.3d at 911–14; *In re Cal. Power Exch. Corp.*, 245 F.3d 1110, 1114–19 (9th Cir. 2001). Additional facts were derived from 3/23/10 Stipulated Facts of the parties in the United States Court of Federal Claims in Case Nos. 07-157 and 07-167 ("SF ¶¶ 1–26"); Plaintiffs' Exhibits ("PE 1–256") and the Government's Exhibits ("DE 1–626") admitted at trial.

AB 1890 first required that the Cal-IOUs divest their fossil fuel generating plants and then sell all wholesale power generated by hydroelectric and nuclear power plants to the California Power Exchange ("Cal-PX"), a non-profit corporation established to conduct wholesale electric power transactions.[3]   *See* Cal. Pub. Util. Code § 300(k)(1), (*l*)(1).  The process was to work in the following manner: Cal-PX would file a tariff with the FERC, establishing the terms and conditions of service and rates, known as the "Cal-PX FERC Tariff."  The potential purchasers would enter into Participation Agreements with Cal-PX incorporating the Cal-PX FERC Tariff.  A central provision of this tariff provided that the participants agreed to "abide by, and . . . perform all of the obligations under the [Cal-PX FERC Tariff,] in respect of all matters set forth therein including, without limitation, all matters relating to the trading of Energy by it through the [Cal-PX] markets . . . [and] billing and payments[.]"  PE 57 at 1056 (Cal-PX FERC Tariff, Participation Agreement § II (B)).

Next, potential purchasers or sellers would submit bids to Cal-PX to buy or sell wholesale power.   Based on the bids received, Cal-PX set a "market price" for those transactions.[4]   Initially, Cal-PX set prices on an hourly basis to satisfy short-term demand or spot markets, *i.e.*, "sales that are 24 hours or less and that are entered into the day of or day prior to delivery."  95 FERC ¶¶ 61418, 62545 n.3.

AB 1890 also established a non-profit corporation, the California Independent System Operator ("Cal-ISO"), to assume operational control over all of California's electric transmission facilities and ensure supply and demand on a real-time basis.  *See CPUC*, 462. F.3d at 1038.  The Cal-ISO scheduled requested transmission services for day-after purchase or spot market sales, subject to FERC oversight and regulation.  The Cal-ISO also was required to file a tariff setting forth the terms and conditions of services and rates ("Cal-ISO FERC Tariff").  PE 66 at 1−390; *see also CPUC*, 462 F.3d at 1038−39.  The Cal-ISO FERC Tariff also was incorporated into Scheduling Coordinator Agreements ("SC Agreements") between Cal-ISO and each firm that scheduled wholesale power and ancillary services on the Cal-ISO controlled grid.  PE 66 at 388 (Cal-ISO FERC Tariff § (A)).  A central provision of the Cal-ISO FERC Tariff provided that the participants agreed to "abide by, and . . . perform all of the obligations under the [Cal-ISO FERC] Tariff placed on Scheduling Coordinators in respect of all matters set forth therein including, without limitation, all matters relating to the scheduling of Energy and Ancillary Services on the [Cal-]ISO Controlled Grid . . . [and] billing and payments[.]"  PE 66 at 388 (Cal-ISO FERC Tariff, § 2 (B)); PE 30 at 616−17 (SC Agreement between Bonneville and Cal-ISO

---

[3] Subsequently, this tariff was revised on three occasions.   The last revision was on August 2, 2000 and is cited herein as Cal-PX FERC Tariff.  PE 57.

[4] On each trading day, the Cal-PX compiled energy supply and demand curves, based on offers to supply and demands for energy.  The "market price" was then determined by the price point at which supply equals demand, so that all participants paid the same price.  PE 57 at 910 (Cal-PX PX FERC Tariff § 3.8 (Market Clearing Price Determination)); PE 57 at 959−62 (Cal-PX FERC Tariff Schedule 3 ("market price" formula)); PE 57 at 1076 (Cal-PX FERC Tariff App'x B ("Market Clearing Price" defined)).

with identical language); PE 23 at 601–02 (SC Agreement between WAPA and Cal-ISO with identical language). The Cal-IOUs entered Participation Agreements with Cal-PX and SC Agreements with Cal-ISO. PE 15, PE 23, PE 25, PE 26, PE 37, PE 234, PE 250, PE 251. The California Department of Water Resources also executed a Participation Agreement with Cal-PX and an SC Agreement with Cal-ISO. PE 248, PE 249.

The Western Area Power Administration ("WAPA"), a federal power-marketing administration, generated and transmitted wholesale power into California. *See N. Star Steel Co. v. United States*, 477 F.3d 1324, 1326 (Fed. Cir. 2007) (WAPA "market[ed] and deliver[ed] cost-based hydroelectric power and related services within a 15-state region of the central and western United States," including California). In all, fifty-seven "power plants operated by the Department of the Interior's Bureau of Reclamation, the U.S. Army Corps of Engineers, and the International Boundary and Water Commission," utilize WAPA's transmission system. *Id.* "By [federal] statute, the rates [that] WAPA charge[d] in selling power [had to] be at least sufficient to recover the costs associated with its operations, maintenance, and the federal construction investment." *Id.* (citing 43 U.S.C. § 485h(c)).

The Bonneville Power Administration ("BPA"), also a federal power-marketing administration, generated wholesale power from the Federal Columbia River Power System and other federal hydroelectric facilities in the Pacific Northwest, and transmitted and sold excess power into California. *See* 16 U.S.C. §§ 832–832*m*, 839–839h; *see also* 42 U.S.C. § 7152(a)(1)(C) ("There are transferred to, and vested in, the Secretary all functions of the Secretary of the Interior . . . with respect to the Bonneville Power Administration including but not limited to the authority contained in the Bonneville Power Act of 1937[.]"); *City of Burbank v. United States*, 273 F.3d 1370, 1373 (Fed. Cir. 2001) ("The BPA markets, transmits, purchases, exchanges, and sells electric energy in the wholesale market. Federal dams in the Pacific Northwest generate the hydroelectric energy the BPA sells in this market.").

In 1999, WAPA and Bonneville decided to participate in the wholesale power and transmission transactions conducted by Cal-PX and Cal-ISO. Consequently, on May 28, 1999 and June 22, 1999, WAPA executed Participation Agreements with Cal-PX that incorporated, by reference, a tariff filed with FERC. PE 43 at 657 PE 45 at 662; PE 57 (Cal-PX FERC Tariff). On February 12, 1998, WAPA executed a SC Agreement with the Cal-ISO. PE 23. On March 18, 1998, BPA entered into a Participation Agreement with Cal-PX. PE 26. On April 30, 1998, BPA entered into an SC Agreement with Cal-ISO. PE 30.

In the summer of 1999, the CPUC authorized the Cal-IOUs to purchase some wholesale power in the Cal-PX long-term or "forward contract" market, but the remainder had to be purchased in the Cal-PX spot market. *See In re Cal. Power Exch. Corp.*, 245 F.3d 1110 (9th Cir. 2001) (explaining that over-reliance on the spot market "prevented [the Cal-IOUs] from managing their risks more effectively through long-term contracting"). But, the Cal-IOUs became reliant on unstable spot market purchases that were higher priced. *Id.* at 1116.

By May 2000, the price of wholesale power in the Cal-PX spot markets doubled. *See CPUC*, 462 F.3d at 1040. Rolling blackouts also began to occur, requiring Cal-ISO to declare thirty-nine system emergencies. *Id.*

Blame for the high prices was placed on the hot weather and other externalities, including a retail rate freeze imposed by the CPUC and the inability of the Cal-IOUs "to hedge through forward markets, bilateral contracts, and self-provision,"[5] but the truth was, as the United States Court of Appeals for the Ninth Circuit observed, that:

> the best laid regulatory plans went astray, [because California's] plan to establish a competitive market . . . failed to account for energy economics and the sophistication of modern energy trading.  As became clear in hindsight, even those who controlled a relatively small percentage of the market had sufficient market power to skew markets artificially. . . .  With the new [market] structure, over 80% of the [wholesale electric power] transactions were being made in spot markets—the converse of most other electricity markets, in which more than 80% of the transactions are made through long term forward contracts, lending stability to the markets.  Sellers quickly learned that the California spot markets could be manipulated by withholding power . . . to create scarcity and then demanding extremely high prices when scarcity was probable.

*Id.* at 1039.

## II.   PROCEDURAL HISTORY.

### A.   2000–2006 Proceedings In The Federal Energy Regulatory Commission And The United States Court Of Appeals For The Ninth Circuit.

By August 2000, SG&E experienced price increases "by a multiple of three or four."  *See* 92 FERC ¶ 61172, 61604 (2000).[6]   In response, SG&E filed a petition with FERC for an

---

[5] PE 225 at 01365 (8/14/00 Motion To Intervene And Response Of SG&E in FERC Dkt. No. El-00-95-000).

[6] PG&E and SC Edison also experienced a dramatic spike in wholesale prices at this time; however, because they were subject to a rate freeze imposed by AB 1890, they were prohibited from passing on those increases to retail and industrial customers, forcing them to assume billions in debt.  *See S. Cal. Edison Co. v. Peevey*, 74 P.3d 795, 789–90 (Cal. 2003).

On October 5, 2001, the United States District Court of the Central District of California entered a Stipulated Judgment with the CPUC to allow SC Edison to maintain retail rates for a two-year period to recover $3.3 billion of the $6.3 billion losses that were incurred during the CPUC-imposed retail rate freeze.  *See* Stipulated Judgment Order, *S. Cal. Edison Co. v. Lynch*, No. 00-cv-12056, Dkt. No. 290 (C.D. Cal. Oct. 5, 2011).  On September 23, 2002, the United States Court of Appeals for the Ninth Circuit affirmed the District Court's entry of the Stipulated Judgment, but certified certain questions of state law.  *See S. Cal. Edison Co. v. Lynch*, 307 F.3d 794, 809–15 (9th Cir. 2002).  On August 21, 2003, the Supreme Court of California concluded that the Stipulated Judgment "did not violate California law."  *S. Cal. Edison Co.*, 74 P.3d at 797.  On January 12, 2004, the United States Court of Appeals for the Ninth Circuit issued a mandate,

emergency order to cap alleged "unjust [and] unreasonable" prices for wholesale and ancillary services set by Cal-PX and Cal-ISO and to amend the market-based rate schedules. *Id*. at ¶ 61605.

On November 1, 2000, however, FERC declined to issue an emergency order, but initiated an investigation that found:

- short-term wholesale power rates in California were "unjust and unreasonable";
- the restructuring plan required by AB 1890 was "seriously flawed"; and
- there was "clear evidence" that the California market structure provided electricity sellers with opportunities to exercise market power that can result in result in unjust and unreasonable rates under the FPA.

93 FERC ¶¶ 61121, 61349–50 (2000).

Subsequently, FERC also made structural changes to the operation of Cal-PX and Cal-ISO by: eliminating the requirement that the Cal-IOUs must buy and sell wholesale power exclusively through Cal-PX; allowing participants to schedule 95 percent of their transactions in the day-ahead market; replacing Cal-PX and Cal-ISO board members; and requiring Cal-ISO to file generation interconnection procedures with FERC. *See id*. ¶¶ 61350–51. In addition, on September 11, 2000, FERC convened a congressional hearing to ascertain whether refunds were due to the Cal-IOUs for spot market transactions conducted from October 2, 2000 through December 31, 2002. *See id*. ¶ 61370.

On December 15, 2000, FERC issued an Order allowing the Cal-IOUs to resume generating some of their wholesale requirements. *See* 93 FERC ¶ 61294, 61982 (2000). That Order eliminated the Cal-PX requirement that the Cal-IOUs must sell and purchase all their wholesale power requirements through the Cal-PX, relieving the Cal-IOUs from dependence on the spot market. *See id*. FERC also terminated the Cal-PX wholesale tariff and rate schedules and, instead imposed a "soft cap" on all purchases of electric power from in the Cal-PX and Cal-ISO markets. *Id*. ¶¶ 61982–83. In addition, as it had in the November 1, 2000 Order, FERC observed that retroactive relief funds from the wholesale sellers of electric power may be warranted for the period October 2, 2000 through December 31, 2000. *Id*. ¶¶ 62010–11.

On December 22, 2000, the City of San Diego filed a petition with the United States Court of Appeals for the Ninth Circuit, contending that "FERC . . . unreasonably delayed taking action on California wholesale power purchasers' request for refunds" and requesting a Writ of Mandamus requiring FERC to "come to a decision as to [California] wholesale sellers' refund liability" for the period of October 2, 2000 to December 31, 2000. *See In re Cal. Power Exch. Corp.*, 245 F.3d 1110, 1119, 1124 (9th Cir. 2001). On December 26, 2000, SC Edison also

---

affirming the District Court's decision in all respects. *See S. Cal. Edison Co. v. Lynch*, No. 00-cv-12056, Dkt. No. 339 (C.D. Cal. Jan. 12, 2004).

challenged FERC's failure to ensure that wholesale electricity was sold at "reasonable" rates. *CPUC*, 462 F.3d at 1042.

On January 17, 2001, the Governor of California declared a State of Emergency and ordered the California Department of Water Resources to purchase sufficient power to end the rolling blackouts that cost California more than $5 billion. *See* Proclamation by the Governor of the State of California (January 17, 2001).[7]

On January 30, 2001, Cal-PX suspended operations and, on March 9, 2001, filed for bankruptcy. *See In re Cal. Power Exch. Corp.*, 245 F.3d at 1119.

On March 9, 2001, FERC issued an Order directing wholesale sellers of electric power to provide refunds to customers for sales made during January 2001 that were in excess of a proxy market clearing price or, in the alternative, provide additional justification for the surcharges. *See* 94 FERC ¶¶ 61245, 61863 (2001).  FERC specified, however, that any refunds were to be extended only to "public utility sellers," *i.e.*, investor-owned utilities, not federal governmental entities, like WAPA and BPA.  *Id.* ¶ 61864.

On April 6, 2001, PG&E filed for bankruptcy, but SC Edison and SG&E were able to achieve arrangements with creditors.  *See CPUC*, 462 F.3d at 1042–43.

On April 11, 2001, the United States Court of Appeals for the Ninth Circuit held that FERC's December 15, 2000 decision to give higher priority to structural remedies, instead of retroactive refund requests, did not warrant a writ of mandamus.  *See In re Cal. Power Exch. Corp.*, 245 F.3d 1110, 1119, 1125 (9th Cir. 2001).

On April 26, 2001, FERC issued an Order establishing a new market monitoring and mitigation plan for sales made in the ancillary services and spot markets operated by Cal-ISO. *See* 95 FERC ¶¶ 61115, 61351.  In addition, FERC authorized an investigation into the reasonableness of the rates, terms, and conditions of public utility sales in the spot markets in the entire Western Systems Coordinating Counsel, because "the California [energy] market is integrated with those of other states." *Id.* ¶ 61356.

On June 19, 2001, FERC issued an Order imposing prospective price caps on all spot market sales in California from June 20, 2001 to September 30, 2002.  *See* 95 FERC ¶¶ 61418, 62545–49.  FERC also implemented other steps to mitigate prices.  *Id.* ¶¶ 62547–49.

On July 25, 2001, FERC issued an Order to establish the "scope of and methodology for calculating refunds related to transactions in the spot markets operated by [Cal-ISO] and [Cal-PX] during the period October 2, 2000 through June 20, 2001." 96 FERC ¶¶ 61120, 61499. Refunds were to be determined by the difference between the market clearing prices charged by

---

[7]  Available at http://www.calema.ca.gov/ChiefofStaff/Pages/Emergency-Proclamations.aspx (last visited March 10, 2015).

electric power suppliers and a mitigated market clearing price ("MMCP"), calculated for each hour from October 2, 2000 to June 20, 2001 ("the Refund Period"), subject to certain adjustments.  *See* 96 FERC ¶¶ 61516–17.  The amount of refunds due was estimated at $2.3 billion, plus $3.5 billion from sales to the California Energy Resources Scheduler ("CERS").  *See CPUC*, 462 F.3d at 1043.

On December 19, 2001, FERC issued an Order to reaffirm price mitigation plans for all regulated spot market sales and established October 2, 2000 as the effective date for refunds.  *See* 97 FERC ¶ 61275.

On February 13, 2002, FERC initiated an enforcement proceeding concerning market manipulation of energy in the western United States.  *See* 98 FERC ¶ 61165.  This proceeding initially was aimed at the conduct of the bankrupt Enron Corporation.  On March 20, 2002, however, the California Attorney General filed a Complaint alleging that sellers in markets operated by Cal-PX and Cal-ISO, as well as those making spot market energy sales to CERS, violated FPA § 205.  *See* 99 FERC ¶¶ 61247, 62055.

On March 20, 2002, California filed a Complaint "against all sellers of power and ancillary services subject to FERC jurisdiction in markets operated by the ISO and Cal[-]PX and sellers of power to CERS . . . alleging that FERC's market-based rate filing requirements violated the FPA and that, even if valid, the reports filed by electricity sellers did not contain the transaction-specific information the FPA requires."  *California ex rel. Lockyer v. FERC*, 383 F.3d 1006, 1010 (9th Cir. 2004).

On May 31, 2002, FERC dismissed California's March 20, 2012 action as an impermissible collateral attack on prior FERC orders.  99 FERC ¶ 61247, 62055.  Also on May 31, 2002, FERC issued an opinion that "the failure to report transactions in the format required by [FERC] for quarterly reports is essentially a compliance issue," for which "re-filing of quarterly reports to include transaction-specific data is an appropriate and sufficient remedy."  *Id.* ¶ 62068.

On December 12, 2002, a FERC Administrative Law Judge ("ALJ") determined that the sellers of wholesale power in the spot markets owed Cal-PX and Cal-ISO refunds of approximately $1.8 billion.  101 FERC ¶¶ 63026, 65132–33.  But, the ALJ also found that these sellers were owed approximately $3 billion in refunds, or a net total of $1.2 billion after refunds.  *See id.*[8]

On March 26, 2003, FERC reaffirmed its prior Orders, substantially adopting the ALJ's December 12, 2002 refund findings, and advised the public that refunds would be distributed by the end of summer 2003.  *See* 102 FERC ¶ 61317.

---

[8] Of the total $3 billion owed to sellers of wholesale power, approximately $1.8 billion specifically was owed to PG&E, with the $1.2 billion remainder to Cal-PX.  *See* 102 FERC ¶¶ 61317, 62063.

On September 9, 2004, the United States Court of Appeals for the Ninth Circuit granted California's petition to review FERC's May 31, 2002 Order, but held that FERC's decision to approve market-based tariffs in the wholesale electric market did not violate the FPA.  *See California ex rel. Lockyer*, 383 F.3d at 1013–17.  But, the appellate court held that FERC erred in concluding that retroactive refunds were not available under FPA § 205.  *Id.* at 1017–18.

On September 6, 2005, in response to approximately 200 petitions for review of various FERC Orders, the United States Court of Appeals for the Ninth Circuit held that "FERC does not have refund jurisdiction under FPA § 206 with respect to governmental entities and non-public utilities."  *Bonneville*, 422 F.3d at 926.[9]  By this holding, the Ninth Circuit affirmed Congress' decision to not subject federal power marketing administrations to FERC jurisdiction.  *Id.* at 924.

On August 31, 2006, the United States Court of Appeals for the Ninth Circuit considered scope/transaction issues concerning refunds, not addressed in *Bonneville*, and held that, although FERC may order public utilities to issue refunds *after* a "refund effective date," FERC is not authorized under FPA § 206(a) to order refunds *prior* to the filing of a complaint.  *See CPUC v. FERC*, 462 F.3d 1027, 1045 (9th Cir. 2006) ("Under the express language of § 206, however, FERC may not order refunds for any period prior to the filing of the complaint.").  The Ninth Circuit also held that FPA § 309 authorized FERC to "order refunds if it finds violations of the filed tariff and imposes no temporal limitations."  *Id.*  The Ninth Circuit concluded that the FERC Order establishing October 2, 2000 as the refund effective date for FPA § 206 proceedings did not violate the FPA and remanded that case to FERC for further proceedings.  *Id.* at 1046, 1065.

## B.     2007–2012 Proceedings In The United States Court Of Federal Claims And May 12, 2012 Liability Decision.

On March 12, 2007, PG&E, and SC Edison filed a Complaint in the United States Court of Federal Claims, alleging that the "voluntary sales of electric power in the California wholesale markets[,] pursuant to the ISO and PX Tariffs[,] and pursuant to certain written agreements[,] gave rise to binding contractual obligations that [WAPA and BPA] owed to the other market participants, including the [Cal-IOUs,] . . . direct parties to and expressly intended beneficiaries of [WAPA and BPA's] contractual obligations."  3/12/07 Compl. ¶ 2.  "The signatories to the [WAPA and BPA] agreements had authority to enter into the agreements and to bind [WAPA and BPA] contractually.  [WAPA and BPA] have breached their contractual obligations[.]" 3/12/07 Compl. ¶ 2.  This case was assigned to now-retired Senior Judge Loren Smith ("the prior trial court").

On March 13, 2007, SG&E filed an almost identical complaint in the United States Court of Federal Claims.  *See San Diego Gas & Elec. Co. v. United States*, No. 07-167 ("3/13/07 Compl.").    And, on March 16, 2007, California and the California Department of Water Resources filed a similar complaint.  *See California v. United States*, No. 07-184 ("3/16/07 Compl.").  Both of these cases also were assigned to the prior trial court.

---

[9] SC Edison and California were also parties subject to this decision.

On February 7, 2008, the Government filed a Motion To Dismiss Cases 07-157 and 07-167.  On March 28, 2008 the Government also filed a Motion To Dismiss Case 07-184.[10]

On June 24, 2008, the prior trial court heard oral argument on the Government's February 7, 2008 Motion.  6/24/08 TR at 1–175.  On July 9, 2008, the prior trial court issued an Order denying the Government's February 7, 2008 Motion without providing either the basis of or reasoning for this ruling.  *See* Order, Dkt. No. 47 (July 9, 2008).

On October 3, 2008, the Government filed a Motion to Dismiss the California Electricity Oversight Board ("CEOB"), and a Motion For Joinder, seeking to join Cal-PX and Cal-ISO as plaintiffs, pursuant to RCFC 19 and 21.  On that date, the Government also filed an Answer.  On November 4, 2008, the Government's February 7, 2008 Motion To Dismiss all claims alleged by the CEOB was granted.

On February 10, 2009, the prior trial court convened an oral argument on the Government's October 3, 2008 Motion for Joinder.  On February 17, 2009, the court denied the Government's October 3, 2008 Motion for Joinder, again without providing either the basis of or reasoning for this ruling.[11]  *See* Order, Dkt. No. 78 (Feb. 17, 2009).

On December 22, 2009, the Government filed a third Motion to Dismiss, arguing that the Cal-IOUs failed to submit certified claims to a contracting officer, before filing a complaint in the United States Court of Federal Claims, as required by the Contracts Disputes Act, 41 U.S.C. §§ 601–13 ("CDA").

On April 16, 2010, the prior trial court held oral argument on the Government's December 22, 2009 Motion.  On May 5, 2010, the prior trial court denied the Government's December 22, 2009 Motion, without providing either the basis of or reasoning for this ruling, and set a trial date on liability.  *See* Order, Dkt. No. 142 (May 5, 2010).

On July 12–15, 19–22, 26–29, and August 2, 2010, the prior trial judge convened a trial in San Francisco regarding the breach of contract claims alleged by the Cal-IOUs and California.  TR 1–2380.[12]

---

[10] The procedural history for Case 07-184, regarding substantive matters, are identical to the procedural history in Cases 07-157 and 07-167.

[11] On November 19, 2009, FERC ordered an ALJ to convene an evidentiary hearing to determine: (1) whether public utility sellers violated relevant tariffs prior to October 2, 2000 in markets operated by the Cal-ISO or Cal-PX; and (2) if such violations occurred, whether any violation affected the market clearing price for the trading hour within which it occurred.  *See* 129 FERC ¶¶ 61147, 61622.

[12] On September 7, 2010, FERC requested public comment on whether the "list of violations under consideration in [the FERC remand proceedings should] be expanded."  132 FERC ¶ 61209, 62087.  On May 26, 2011, FERC issued an Order expanding the scope of the ALJ's inquiry to include whether: "(1) market practices that were previously excluded from the

13

On May 2, 2012, the prior trial court issued an Opinion and Order determining that privity of contract existed between the parties in this case. *See Pac. Gas & Elec. Co. v. United States*, 105 Fed. Cl. 420, 432–33 (2012); *see also California ex rel. Brown v. United States*, 105 Fed. Cl. 18, 28–29 (2012) (same regarding Case No. 07-184) (collectively, "May 2, 2012 Opinions"). In addition, the prior trial court ruled that WAPA and BPA "breached its present contractual duty to pay the refunds they owe, and they have breached that duty by nonpayment." *Pac. Gas & Elec.*, 105 Fed. Cl. at 440.

### C.     The August 27, 2012 Decision Of The United States Court Of Appeals For The Ninth Circuit.

On August 27, 2012, approximately three months after the prior trial judge issued a decision in *Pacific Gas & Electric*, the United States Court of Appeals for the Ninth Circuit reaffirmed its holding in *Bonneville* that FERC had authority, under FPA § 206, to "investigate rates and to order refunds only from public utilities," but *not from governmental entities such as BPA and WAPA. See City of Redding*, 693 F.3d at 831 (emphasis added); *see also id.* at 839 ("FERC has asserted that it has the authority to retroactively reset the market rates for all market participants through the exercise of its § 206(b) refund authority over public utilities. *We hold that it does not . . . .* As we previously held in *Bonneville*, FERC's refund authority does not *extend to non-jurisdictional governmental entities*[.]") (emphasis added). In addition, to the extent that FERC revised or reset the market rate for the Refund Period, the Ninth Circuit held that this discrete activity was within FERC's authority, as it "necessarily involved reevaluating the price previously charged by all market participants[,] because the market clearing price was the same for all of them[.]" *Id.* at 841. PG&E, SC Edison, and California were parties to that case.

Significantly, the Ninth Circuit observed:

We are not blind to the potential impact of FERC's determination of the just and reasonable prices. In the contract actions brought in other forums, it is claimed that the Petitioners before us are liable for charges collected by them in excess of the just and reasonable prices subsequently calculated by FERC. Petitioners seek to protect themselves against those claims by preventing FERC from recalculating the market rates. But FERC's recalculation was not an empty exercise, because it

---

list and definitions of [Market Monitoring and Information Protocol] violation categories in the Show Cause Proceedings; (2) other [Cal-ISO] and [Cal-PX] tariff violations [occurred]; (3) [other] violations of Commission orders [occurred]; (4)] violations of individual sellers' tariffs [occurred; and (5)] market practices, such as wash trading, gas market manipulation, false reporting to publications that compile price indices, and collusion, to the extent such conduct violated [the] current tariff." 135 FERC ¶¶ 61183, 62088. PG&E, SC Edison, and California, among others, requested a rehearing, arguing that they also should be allowed to introduce evidence of tariff violations by sellers in the Cal-PX and Cal-ISO markets, even if those sellers reached a settlement with other Cal-IOUs. *See* 141 FERC ¶ 61087. On November 2, 2012, FERC denied the rehearing. *Id.* at P 1.

had to determine just and reasonable market clearing prices in order to calculate the refunds to be ordered from [jurisdictional entities] from which it could order refunds.  What impact this calculation might have on the contract actions pending in [the United States Court of Federal Claims concerning non-jurisdictional governmental entities] is not for us to say.

*Id*. at 842.

### D.    The Government's November 2, 2012 Motion For Reconsideration In The United States Court Of Federal Claims And April 2, 2013 Order Denying Reconsideration.

On November 2, 2012, the Government filed a Motion For Reconsideration of the prior trial court's decision in *Pacific Gas & Electric Co.*  Therein, the Government argued that *City of Redding* held that FERC had no retroactive rate-setting authority; thus, the prior trial court erred in finding that the PX and ISO tariffs "bind the Government to FERC action with respect to past sales."  Gov't Recon. Mot. at 3.  According to the Government, the court "misinterpreted FERC's May 29, 2009 [O]rder as creating for BPA and WAPA contractual obligations through something . . . that the [O]rder did not accomplish, and could not have accomplished."  Gov't Recon. Mot. at 6.

On April 2, 2013, the Government's November 2, 2012 Motion For Reconsideration was denied by the prior trial court.  *See Pac. Gas & Elec. Co. v. United States*, 110 Fed. Cl. 135 (2013).

### E.    2013 Reassignment Of This Case, The December 20, 2013 Decision To Vacate, And Subsequent Proceedings In The United States Court Of Federal Claims.

On April 15, 2013, former Chief Judge Emily C. Hewitt reassigned this case to the undersigned judge.  On May 9, 2013, the court convened telephone conference to discuss the May 2, 2012 Opinions, because the court was concerned about the lack of citations to the record supporting the factual findings in *Pacific Gas & Electric*, 105 Fed. Cl. at 424–26, 432–33.  The court requested that the parties supply these citations.  On June 21, 2013, the Government submitted a Status Report "respectfully declin[ing] to furnish annotations or citations for the [c]ourt's May 2, 2012 interlocutory decision[s]."  Gov't Status Report at 2.  Instead, the Government proposed five alternatives, including, *inter alia*, that the court vacate the May 2, 2012 Opinion or allow the parties to file proposed findings of fact and conclusions of law to assist the court in issuing new opinions.  Gov't Status Report at 3.  On July 3, 2013, Plaintiffs submitted a Status Report that included a copy of the May 2, 2012 Opinion, annotated with record citations, and responded to the Government's June 21, 2013 Status Report.  On July 17, 2013, the Government filed a Response.  On September 27, 2013, Plaintiffs filed a Reply.  On October 9, 2013, the court began an independent examination of each sentence of the May 2, 2012 Opinion, together with the record citations provided by Plaintiffs.

On December 20, 2013, the court determined that the interests of justice required that the May 2, 2012 Opinions be vacated[13] and reconsidered in light of jurisdictional issues that previously were raised, but summarily rejected without an opinion. *See Pac. Gas & Elec. Co. v. United States*, 114 Fed. Cl. 146 (2013).

On February 26, 2014, the court requested that the parties appear at an oral argument to provide their views as to "why the court, on reconsideration, should not dismiss these cases, because of plaintiffs' failure to establish the requirements of standing to sue on a government contract, thereby depriving the court of jurisdiction." Notice of Oral Argument, Case No. 07-157, Dkt. No. 312, at 2.

On June 5, 2014, the court heard oral arguments from the parties regarding standing and the court's jurisdiction. *See* Case No. 07-157, Dkt. No. 332 (6/5/14 TR 1–141).

On July 1, 2014, the Government filed a Motion For Dismissal Or Entry Of Judgment Upon Plaintiffs' Refund Period Claims ("Gov't Mot."). On July 25, 2014, Plaintiffs filed a Response ("Pl. Resp."). On August 4, 2014, the Government filed a Reply ("Gov't Reply").

On July 1, 2014, Plaintiffs also filed a Motion To Reinstate The May 2, 2012 Liability Decision And For Certification For Orders For Interlocutory Appeal ("Pl. Mot."). On July 18, 2014, the Government filed its Opposition ("Gov't Opp."). On August 8, 2014, Plaintiffs filed a Reply ("Pl. Reply").

On November 18, 2014, Plaintiffs filed a Notice Of Additional Authority that brought to the court's attention FERC's November 10, 2014 decision in 149 FERC ¶ 61116 (2014). On November 19, 2014, the Government also filed a Notice Of Additional Authority regarding the same FERC decision. On November 26, 2014, Plaintiffs filed a Response.

On January 22, 2015, the court held a final oral argument in San Francisco, California ("1/22/15 TR 1–92").

## III. DISCUSSION.

### E. Whether Plaintiffs Have Standing.

As a matter of law, a "plaintiff must be in privity with the United States to have standing to sue the sovereign on a contract claim." *S. Cal. Fed. Sav. & Loan Ass'n v. United States*, 422 F.3d 1319, 1328 (Fed. Cir. 2005). Privity "takes on even greater significance in cases such as this, because the 'government consents to be sued only by those with whom it has privity of contract.'" *Id.* (quoting *Erickson Air Crane Co. of Wash. v. United States*, 731 F.2d 810, 813 (Fed. Cir. 1984)); *see also Anderson v. United States*, 344 F.3d 1343, 1351 (Fed. Cir. 2003) (holding that "privity is lacking," where plaintiffs were not signatories to the contractual

---

[13] Specifically, the court vacated *Pac. Gas & Elec. Co. v. United States*, (No. 07-157C), 105 Fed. Cl. 420 (2012) and *California ex rel. Brown v. United States*, (No. 07-184C), 105 Fed. Cl. 18 (2012).

documents); *see also id.* ("To have standing to sue the sovereign on a contract claim, a plaintiff must be in privity of contract with the United States."). "Absent privity between [Plaintiffs] and the [G]overnment, there is no case." *Katz v. Cisneros*, 16 F.3d 1204, 1210 (Fed. Cir. 1994).

Two exceptions to the general rule of privity are relevant here: third-party beneficiary status and agency relationships. *See First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1289 (Fed. Cir. 1999) (stating that, "despite [a] lack of privity, . . . suits may be brought against the [G]overnment in the [United States] Court of Federal Claims by an intended third-party beneficiary"); *see also Christos v. United States*, 48 Fed. Cl. 469, 477–78 (2000) ("Third-party beneficiary status is an exception to the privity requirement. . . . Another exception to the privity requirement is an agency relationship."), *aff'd*, 300 F.3d 1381 (Fed. Cir. 2002).

Therefore, to establish standing, the Cal-IOUs and California must be in privity of contract with WAPA and BPA, or have a third-party beneficiary relationship with Cal-PX and Cal-ISO, or an agency relationship Cal-PX and Cal-ISO.

> 1. **Neither The California Investor-Owned Utilities Nor The State Of California Were In Privity Of Contract, Either With The Western Power Administration Or The Bonneville Power Administration.**

The Cal-IOU Complaint in the United States Court of Federal Claims alleges that WAPA and BPA:

> signed agreements that . . . expressly agreed to abide by their terms and conditions. Moreover, by voluntarily electing to transact in the ISO and PX markets [WAPA and BPA] are charged with knowledge, and are deemed to have accepted the terms of the Tariffs, which set forth the mutual rights and obligations among market participants. The terms of the [Cal-ISO FERC and Cal-PX FERC] Tariffs create enforceable contractual obligations binding on [WAPA and BPA].

03/12/07 Compl. ¶ 28 (citing Cal-PX Tariff ¶ 17 ("Obligations and liabilities under this Tariff" are binding on the "successors and assigns of the parties")[14]; Cal-ISO Tariff ¶ 17 (same); Cal-PX Tariff ¶ 14.3 (indemnity provisions); Cal-ISO Tariff ¶ 14.3 (same); Cal-ISO Tariff ¶ 20.7 (choice-of-law, venue clauses); Cal-PX Tariff ¶ 19.6 (same); Cal-ISO Tariff ¶ 15 (consequences of uncontrollable force); Cal-PX Tariff ¶ 16.11 (same); Cal-PX Tariff ¶16.2 (duty of mitigate).

---

[14] Paragraph 17 of the Cal-PX Tariff did not set forth any obligations between buyers and sellers of wholesale power, but only addressed obligations and liabilities between the Cal-PX Participant and the Cal-PX:

> No assignment of any service or participation agreement shall relieve the original PX Participant *from its obligations or liabilities to the PX* under this Tariff or any such service or participation agreement arising or accruing due prior to the date of assignment.

PE 57 ¶ 17 (emphasis added).

The California Complaint is substantially similar.  *See* 03/16/07 Compl. ¶ 24, Case No. 07-184
(citing Cal-ISO Tariff ¶¶ 14.3, 15, 17, 20.7).

        None of these tariff provisions, however, evidence any the three core elements required
to "form an agreement binding upon the government . . . (1) mutuality of intent to contract;
(2) lack of ambiguity in offer and acceptance; (3) consideration[.]"  *Anderson*, 344 F.3d at 1353.
Instead, the Cal-PX and Cal-ISO Tariffs set forth only the legal duties and obligations WAPA
and BPA owed to Cal-PX and Cal-ISO.

        Nevertheless, the prior trial court found that:

        the *facts at trial* showed that [WAPA and BPA] *contracted with and owe contract*
        *obligations* to the Plaintiffs.  First, the evidence showed that the PX . . . [was a]
        'public utilit[y]' under the FPA.  Second, as a public utility, all the sales and all
        the purchases of power in those markets were governed by FERC-regulated
        tariffs.  Third, the applicable Tariffs in this case which were filed with FERC,
        specified the rules to abide by in order to participate in these markets.  The Tariffs
        included when and in what form participants would submit bids to buy and sell
        power, and the formulas used to establish prices for all purchase-sale
        transactions[,] as well as prescribing the financial settlements resulting from
        market transactions.  The Tariffs also allocated risks as between the markets and
        the market participants.  Fourth, because the Tariffs were FERC regulated, FERC
        could alter or amend them, including their pricing formulas, and to review and
        correct the market-clearing prices.  And finally, the Tariffs authorized market
        participants to seek FERC's review and correction of prices set under the Tariff
        formulas.

*Pac. Gas & Elec. Co.*, 105 Fed. Cl. at 432 (emphasis added).

        Although each of these statements is true, none individually or collectively establishes a
contractual relationship between WAPA and BPA either with the Cal-IOUs or California.  First,
the fact that Cal-PX was a public utility is not relevant to whether the Cal-IOUs and California
were in privity of contract with WAPA or BPA.  Second, the fact that a public utility is subject to
FERC regulated tariffs likewise is irrelevant.  Third, although the Cal-PX and Cal-ISO Tariffs
specified the terms and conditions of service, neither of these Tariffs reflects any express or
implied intent by WAPA or BPA to undertake any legal duties to or assume obligations of either
the Cal-IOUs or California.  PE 57 ¶ 3 (Cal-PX Tariff "Responsibilities of the PX and PX
Participants"); PE 66 ¶ 5 (Cal-ISO Tariff "Relationship Between ISO and Generators").  In fact,
as FERC recognized, "[W]e are faced with a new market institution, in which sellers and buyers
of electric energy *will not contract* directly with one another, as has been traditionally done in
the industry, but instead will contract with the [Cal-PX and Cal-ISO]."  80 FERC ¶¶ 61262,
61946 (1997) (emphasis added).

The prior trial court found that WAPA and BPA had privity of contract with the Cal-IOUs and California:

> [I]n order for [WAPA and BPA] to have access to the [Cal-PX] Markets, [they] were required to sign written contracts that incorporated these Tariffs, as well as agreeing to abide by the Tariffs' terms and subsequent changes to those Tariffs. In the ISO, the Scheduling Coordinators were also required to sign a Scheduling Coordinator Agreement.   Thus, the evidence is clear and uncontested that when [WAPA and BPA] signed the PX and SC Agreements, they agreed to accept the prices, terms, and conditions established by the [Cal-PX FERC Tariff and Cal-ISO FERC Tariff], as determined and modified from time to time by FERC.

*Pac. Gas & Elec. Co.*, 105 Fed. Cl. at 432–33.

But, the undersigned judge has concluded otherwise.   The fact that WAPA and BPA agreed to abide by FERC's "policies, terms, and conditions" does not establish, as a matter of law, contractual privity between WAPA and the Cal-IOUs or California or BPA with the Cal-IOUs or California.   WAPA and BPA's promises were made to Cal-PX and Cal-ISO, not to the Cal-IOUs or California.   Moreover, there is no text in the Cal-PX Agreements or Cal-ISO SC Agreements manifesting any intent by WAPA or BPA to assume any legal duties to the Cal-IOUs or California.   Nor was there any "direct, unavoidable contractual liability [that is] necessary to trigger a waiver of sovereign immunity."   *Nat'l Leased Hous. Ass'n v. United States*, 105 F.3d 1432, 1436 (Fed. Cir. 1997).

In the alternative, the prior trial court judge also concluded that the Cal-IOUs and California had privity with WAPA and BPA, because it viewed Cal-PX as a:

> *facilitator*[] *only*, and that the payment obligations were between the buyer and seller. Since the [Cal-]PX [was a] pass-through entit[y] or clearinghouse[], the contractual relationships of offer, acceptance, and mutual intent ran between the Agencies and the [Cal-]IOUs, the Plaintiffs. The [Government's] argument is illogical that there is no relationship between [WAPA and BPA] and [the Cal-IOUs and California].   For example, when one pays a bill with a check, the money may go into the creditor's bank account, but it is the legal property of the creditor. It meets the debtor's legal obligations. The same relationship existed here. The [Cal-]PX . . . [was] like a bank, and [WAPA and BPA] and the [Cal-IOUs and California] had the obligations.

*Pac. Gas & Elec. Co.*, 105 Fed. Cl. at 433.

The prior trial court's analogy, however, is unsupported by any record citations and misconstrues the record that evidences that Cal-PX and Cal-ISO were not passive, neutral "banks," simply facilitating pass-throughs of electricity and money.   Instead, the Cal-PX and the Cal-ISO actively engaged in trading, price-setting, and adjusting rates.   PE 66 at § 2.2.2 ("To fulfill its obligations with respect to scheduling Energy and Ancillary Services, the ISO shall: provide Scheduling Coordinators with operating information and system status . . . ; determine whether Preferred Schedules submitted by Scheduling Coordinators meet [certain]

requirements . . . ; prepare Suggested Adjusted Schedules . . . ; validate all Ancillary Services bids . . . ; reduce or eliminate Congestion based on Adjustment Bids . . . ; and [i]f necessary, make mandatory adjustments to Schedules[.]"); PE 57 at § 3.1 ("The PX shall (1) calculate the prices at which trades in Energy are transacted in the PX Markets, (2) settle trades in Energy between PX Participants, (3) receive Meter Data from the Scheduling Coordinator Metered Entities . . . , (4) prepare and distribute to PX Participants invoices reflecting the amounts payable and receivable . . . , and (5) operate the funds transfer system[.]").  Thus, Cal-PX and Cal-ISO were active, independent parties to the contracts with WAPA and BPA, not simply facilitators such that WAPA and BPA were in privity with the Cal-ISOs and California.

For these reasons, the court has determined that WAPA and BPA were not in privity of contract either with the Cal-IOUs or California.

> **2.    Neither The California Investor-Owned Utilities Nor The State Of California Were Third-Party Beneficiaries To A Contract With Either The Western Power Administration Or The Bonneville Power Administration.**

The prior trial court also decided that there was no need to "address whether the Plaintiffs are third party beneficiaries as the evidence proved that they are direct beneficiaries."  *Pac. Gas & Elec. Co.*, 105 Fed. Cl. at 433 n.2.  In light of today's privity ruling, the court is obligated to reconsider that determination, because a third-party beneficiary status is a jurisdictional exception to privity, *i.e.*, only an intended third-party beneficiary has standing to enforce a contract to which it is not a direct party.  *See* 13 WILLISTON ON CONTRACTS § 37.1 (4th ed. 2013) ("[A]n exception to the need for privity was developed through the doctrine of third party beneficiaries."); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 302 (1981) ("[A] beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either[:] (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.").

To establish third-party beneficiary status, a contract need not afford a third-party the "direct right to compensation or the power to enforce that right against the promisor."  *Glass v. United States*, 258 F.3d 1349, 1354 (Fed. Cir. 2001); *see also Montana v. United States*, 124 F.3d 1269, 1273 (Fed. Cir. 1997) (same); *Flexfab, L.L.C. v. United States*, 424 F.3d 1254, 1260 (Fed. Cir. 2005) ("[T]hird-party beneficiary status is not reserved [solely] for those parties who benefit expressly under a given contract.").  Instead, third-party beneficiary status may be established where the party "fall[s] within a class clearly intended to be benefited" by the contract.  *See Montana*, 124 F.3d at 1273; *see also JGB Enters., Inc. v. United States*, 497 F.3d 1259, 1261 n.1 (Fed. Cir. 2007) (observing that a subcontractor was a third-party beneficiary, where "the [contracting officer] knew or should have known that the [G]overnment's payment on the contract was intended to directly benefit the subcontractor").

The United States Court of Appeals for the Federal Circuit has held that third-party beneficiary status is not established "merely because [a] contract would benefit [a party]."  *Fed. Deposit Ins. Corp. v. United States*, 342 F.3d 1313, 1319 (Fed. Cir. 2003) ("*FDIC*"); *see also US*

*Ecology, Inc. v. United States*, 245 F.3d 1352, 1356 (Fed. Cir. 2001) (holding that the Government's cooperation with a third-party is not sufficient to establish a third-party beneficiary relationship). Instead, "[t]hird party beneficiary status is an 'exceptional privilege' and, to avail oneself of this . . . privilege, a party must 'at least show that [the contract] was intended for his direct benefit.'" *FDIC*, 342 F.3d at 1319 (quoting *Glass*, 258 F.3d at 1354); *see also Flexfab*, 424 F.3d at 1259 (holding that an "incidental beneficiary"[15] does not have standing to sue for breach of a contract). And, that privilege "should not be granted liberally." *Id.*; *see also Anderson*, 344 F.3d at 1352 (referring to "the stringent requirements which must be satisfied to establish third-party beneficiary status."); *see also G4S Tech. LLC v. United States*, 2015 WL 968116, at *7 (Fed. Cir. Mar. 6, 2015) (holding that there was no third-party beneficiary status, despite contrary circumstantial evidence, when "the [G]overnment's actions never deviated from the scope of its sovereign responsibilities to safeguard taxpayer funds and advance the public interest").

In addition, a government contract must reflect the express or implied intention of the contracting parties to benefit a specific third-party. *See Montana*, 124 F.3d at 1273 (holding that a plaintiff "must fall within a class clearly intended to be a beneficiary thereby"). The party asserting third-party beneficiary status also must "at least, show that [the contract] was intended for his *direct* benefit." *German Alliance Ins. Co. v. Home Water Supply Co.*, 226 U.S. 220, 230 (1912). In sum, the trial court must consider the intent of the contracting parties as the "cornerstone" of the third-party beneficiary status inquiry. *See Flexfab*, 424 F.3d at 1259.

In this case, neither the specific language of the Cal-PX Participation Agreements nor the Cal-ISO SC Agreements refer to the Cal-IOUs or California by name, much less reflect any benefit intended on their behalf by WAPA or BPA. In addition, neither the PX Agreements nor SC Agreements demonstrate "that a [G]overnment agent with authority to contract on behalf of the [G]overnment intended to [convey a] benefit" on Cal-IOUs or California. *See Flexfab*, 424 F.3d at 1256. And, there is no testimony in the record that establishes any authorized agent of WAPA or BPA intended to convey any benefit to the Cal-IOUs or California. At most, the Cal-IOUs and California were incidental beneficiaries. As such, they lack third-party beneficiary standing. *See* RESTATEMENT (SECOND) OF CONTRACTS § 315 (stating that an incidental beneficiary "acquires by virtue of the promise no right against the promisor or the promisee").

For these reasons, the court has determined that the Cal-IOUs and California were not third-party beneficiaries to the contract between Cal-PX and Cal-ISO with WAPA and BPA.

### 3.    Neither Cal-PX Nor Cal-ISO Was An Agent Of The Cal-IOUs Or The State Of California.

An agency relationship can arise when:

Two or more principals . . . authorize the same agent to make separate contracts for them. If the agent makes a single contract with a third party on the principals'

---

[15] The RESTATEMENT (SECOND) OF CONTRACTS § 302 (1981) defines an "incidental beneficiary" as "a beneficiary who is not an intended beneficiary."

behalves that combines the principals' separate orders or interests and calls for a single performance by the third party . . . , unless the agent acted with actual or apparent authority . . . , the third party is not subject to liability on the combined contract to any of the separate principals.

RESTATEMENT (THIRD) OF AGENCY § 6.05(2)(c). "An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes . . . that the principal wishes the agent so to act." *Id.* at § 2.01. "Apparent authority is the power held by an agent . . . to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." *Id.* at § 2.03.

The cases that United States Court of Appeals for the Federal Circuit has considered to date concerning agency arise in the context of a prime/subcontractor relationship. For example, the appellate court has recognized that privity may be established by an agency relationship between the Government and a subcontractor, only if the "prime" contractor is an agent for the Government. *See United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1551 (Fed. Cir. 1983) (citing *Kern-Limerk, Inc. v. Scurlock*, 347 U.S. 110, 120–21 (1954) and *W. Union Tel. Co. v. United States*, 66 Ct. Cl. 38, 50 (1928)). But to do so, the facts must establish that the "prime" contractor was "(1) acting as a *purchasing* agent for the [G]overnment, (2) the agency relationship between the [G]overnment and the prime contractor was established by clear contractual consent, and (3) the contract stated that the [G]overnment would be directly liable to the vendors for the purchase price." *Johnson Controls*, 713 F.2d at 1531 (internal citations omitted) (emphasis in original); *see also Nat'l Leased Hous. Ass'n*, 105 F.3d at 1435–36 (same).

In this case, the record reflects that no financial transaction ever took place between the Cal-IOUs or California and WAPA or BPA. Cal-PX obtained bids for wholesale power from utilities that signed a Participation Agreement. PE 57 at ¶ 3 (Responsibilities of PX and PX Participants). Then, Cal-PX set a market price, "based in the most expensive generation needed to meet demand" and awarded wholesale power at that market price. PE 199 at 32060; 6/24/08 TR at 27–29. Thereafter, each of the Cal-IOUs received individual billing statements, invoices, and supporting data specifying the amount due to or from Cal-PX. PE 57 at ¶ 4 (PX Accounting and Administrative Charge), ¶ 6 (Settlements and Billing); 7/14/10 TR at 587–93 (confirming that Cal-PX and Cal-ISO handled billing and settlements). The Cal-IOUs then made payments directly to Cal-PX for power purchased. PE 57 at ¶ 4 (PX Accounting and Administrative Charge). The Cal-PX also required that all signatories to a Participation Agreement provide collateral and maintain a financial reserve account, held in trust. PE 188 (Cal-PX Operating Manual ¶ 2 (Bank Accounts)). The Participation Agreements indemnified Cal-PX for the risk of any losses. PE 57 at ¶ 14.3. Although market participants reserved the right to pursue delinquent or non-paying participants by a separate lawsuit, they could do so only after providing notice to Cal-PX. PE 66 at § 11.19; *see also* 6/24/08 TR at 29–33. These facts evidence that Cal-PX was not an agent of the Cal-IOUs and California.

Moreover, in *Johnson Controls*, the United States Court of Appeals for the Federal Circuit emphasized that, in that case, although the Government "retained a great deal of control" over the prime contractor, it was "also apparent that the [G]overnment meant to use [the prime

contractor] as a buffer between it and the claims of the subcontractors." 713 F.2d at 1552. Thus, the subcontractor did not have standing to pursue its claim. *Id.* at 1557. Similarly here, WAPA and BPA were in privity with Cal-ISO and Cal-PX; thus, the Government intended Cal-ISO and Cal-PX to be legal buffers between them and the Cal-IOUs and California. Moreover, the third *Johnson Controls* factor, *i.e.* "the contract stated that the [G]overnment would be directly liable to the vendors for the purchase price," is not satisfied here. *Id.* at 1551. Nothing in the Cal-PX or Cal-ISO contracts provides that WAPA or BPA would be liable to the Cal-IOUs or California.

Likewise, *Christos v. United States*, 48 Fed. Cl. 469 (2000), *aff'd*, 300 F.3d 1381 (Fed. Cir. 2002), is instructive. There, plaintiffs were employees who had been laid off by Westinghouse Savannah River Company ("WSRC"). *Id.* at 472. WSRC contracted with DOE for cost-reimbursement management and operation. *Id.* The contract between WSRC and DOE included "a Personnel Appendix setting forth allowable personnel administration costs," including severance pay. *Id.* at 472–73. Plaintiffs sued DOE for severance pay. *Id.* at 474. The court analyzed the *Johnson Controls* factors and determined that "DOE specifically stated in the [relevant] Contract's disclaimer provision that it is not directly liable to third parties like plaintiffs. . . . [Thus,] plaintiffs cannot establish the third prong of the agency test," *i.e.*, "the contract stated that the government would be directly liable." *Id.* at 478. Importantly, the contract contained "no 'reasonably clear indications' that the [G]overnment intended to create a relationship or that it permits the type of suit plaintiffs have filed. Plaintiffs, therefore, cannot establish the second prong of the agency test either." *Id.* The same analysis applies to this case. The Cal-IOUs and California contracted with Cal-PX and Cal-ISO, not WAPA or BPA. PE 23 (Scheduling Coordinator Agreement between WAPA and Cal-ISO); PE 26 (PX Participation Agreement between BPA and Cal-PX); PE 30 (Scheduling Coordinator Agreement between BPA and Cal-ISO; PE 43 (05/28/99 PX Participation Agreement between WAPA and Cal-PX); PE 45 (06/22/99 PX Participation Agreement between WAPA and Cal-PX). There is no "reasonably clear indication" in any contract that WAPA or BPA was to be directly liable to the Cal-IOUs or California. *See Christos*, 300 F.3d at 478; *see also S. Cal. Edison Co. v. Lynch*, 307 F.3d at 803 ("SoCal Edison is in privity with [Cal-PX] *not* with [other wholesale electric] power companies." Instead, the latter's relationship is based on a contingent "*unsecured claim against a third-party debtor.*") (emphasis added).

The fact that the term "agency" appears in the Cal-PX and Cal-ISO contracts does not change this conclusion. PE 188 at ¶ 5 (Determination of Real Time Market Supplier Trading) (referring throughout to the Cal-PX and Cal-ISO as "acting as agents"); PE 57 ¶ 3.1 (Cal-PX "will not be, and shall not be deemed to be a counterparty to any trade transacted through the PX Markets."). As a matter of law, however, Cal-ISO stated it would "not act as principal but as agent for and on behalf of the relevant Scheduling Coordinators." PE 66 ¶ 2.2.1. Cal-PX acted as the Scheduling Coordinator for some of the Cal-IOUs and California. PE 57, Schedule 4, ¶ 1.1.1 ("The PX operates as an Energy auction for the PX Markets on behalf of PX Participants. The PX also acts as a Scheduling Coordinator for certain PX Participants . . . for submitting Schedules to the [Cal-]ISO."); PE 25 (SCE PX Participation Agreement); PE 37 (PG&E PX Participation Agreement); PE 249 (California PX Participation Agreement). Each of these three Agreements incorporates the Cal-PX tariff; but none exempts the Participant from using Cal-PX as its Scheduling Coordinator with Cal-ISO. PE 25, PE 37, PE 249. Thus, because Cal-ISO acted as an agent on behalf of Scheduling Coordinators, and Plaintiffs contracted with Cal-PX to

be their Scheduling Coordinator, on first impression, it appears that Plaintiffs met the agency exception to privity.

But, WAPA and BPA also entered into similar Participation Agreements with Cal-PX and Cal-ISO. PE 23 (WAPA ISO Scheduling Coordinator Agreement), PE 43, 45 (WAPA PX Participation Agreements), PE 26 (BPA PX Participation Agreement), PE 30 (BPA ISO Scheduling Coordinator Agreement). Cal-ISO cannot be an agent to parties on both sides of a transaction. *See* RESTATEMENT (THIRD) OF AGENCY § 8.01 (2006) ("An agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship."); *see also Pegram v. Herdrich*, 530 U.S. 211, 224 (2000) ("[T]he common law (understood as including what were once the distinct rules of equity) charges fiduciaries with a duty of loyalty[.]"). To the extent that Cal-ISO purports to be an agent to parties on both sides of this dispute, the Cal-IOUs and California cannot claim an agency exception to privity.

For these reasons, the court has determined that the Cal-IOUs and California have established neither privity nor either of the exceptions thereto.

## F.    Jurisdiction.

The United States Court of Federal Claims has jurisdiction under the Tucker Act, 28 U.S.C. § 1491, "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act, however, is "a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages . . . . [T]he Act merely confers jurisdiction upon [the United States Court of Federal Claims] whenever the substantive right exists." *United States v. Testan*, 424 U.S. 392, 398 (1976).

To pursue a substantive right under the Tucker Act, a plaintiff must identify and plead an independent contractual relationship, Constitutional provision, federal statute, and/or executive agency regulation that provides a substantive right to money damages. *See Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act[.]"); *see also Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (*en banc*) ("The Tucker Act . . . does not create a substantive cause of action; . . . a plaintiff must identify a separate source of substantive law that creates the right to money damages. . . . [T]hat source must be 'money-mandating.'"). Specifically, a plaintiff must demonstrate that the source of substantive law upon which he relies "can fairly be interpreted as mandating compensation by the Federal Government[.]" *Testan*, 424 U.S. at 400. And, the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *See Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988) ("[O]nce the [trial] court's subject matter jurisdiction [is] put in question . . . . [the plaintiff] bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence.").

Plaintiffs claim that the court "has jurisdiction over [their] claims for relief pursuant to the Contract Disputes Act ("CDA"), 41 U.S.C. § 609(a)(1), and the Tucker Act, 28 U.S.C.

§§ 1491(a)(1) and 1491(a)(2)."  Compl. ¶ 12.  The Government has not contested subject-matter jurisdiction under either statute, but the court has an obligation to consider the issue *sua sponte*. *See Gonzalez v. Thaler*, 132 S. Ct. 641, 648 (2012) ("When a requirement goes to subject-matter jurisdiction, courts are obligated to consider *sua sponte* issues that the parties have disclaimed or have not presented.  Subject-matter jurisdiction can never be waived or forfeited.") (internal citation omitted).

Plaintiffs first assert that the court has jurisdiction under the CDA § 609(a)(1).[16]  But, "[t]he CDA applies to contracts entered into by an executive agency for: (1) the procurement of property, other than real property in being; (2) the procurement of services; (3) the procurement of construction, alteration, repair or maintenance of real property; or (4) the disposal of personal property." *N. Star Steel Co. v. United States*, 477 F.3d 1324, 1332–33 (Fed. Cir. 2007) (citing 41 U.S.C. § 602(a)).  WAPA "markets and delivers cost-based hydroelectric power and related services[.]" *Id.* at 1326.  Similarly, "BPA markets, transmits, purchases, exchanges, and sells electric energy in the wholesale market." *City of Burbank*, 273 F.3d at 1373.  In the relevant *North Star Steel* contract, "WAPA agreed to provide both non-firm transmission service . . . and regulating services[.]" *N. Star Steel Co.*, 477 F.3d at 1327.  The United States Court of Appeals for the Federal Circuit held that "[t]he CDA does not apply to [WAPA's contract] because it was a contract for the provision of services *by* the [G]overnment." *Id.* at 1332.  This case is different, because WAPA and BPA were both buying *and* selling electric services.  *See* 95 FERC ¶ 61418, 62546 (2001) (eliminating the mandatory buy-sell requirement).  Thus, the court has jurisdiction over claims relating to WAPA and BPA's procurement of electric power and scheduling services of electric power under the CDA; it does not have jurisdiction over claims relating to their sales. *See* 41 U.S.C. § 7102(a)(2).[17]

In *North Star Steel*, the United States Court of Appeals for the Federal Circuit nonetheless held that "[b]ecause North Star's claim arose out of . . . an express contract with the United States, the exercise of jurisdiction by the Court of Federal Claims was proper under the Tucker Act." *N. Star Steel Co.*, 477 F.3d at 1332.  In this case, Plaintiffs assert that the Tucker Act provides the court with jurisdiction over their claims. Compl. ¶ 12. But, unlike *North Star Steel*, the court has determined that there was no "express contract with the United States." *See supra* Section III.A.  For the same reasons Plaintiffs lack standing, the court also does not have jurisdiction to adjudicate Plaintiffs' contract claims under the Tucker Act.

---

[16] At the time of Plaintiff's March 12, 2007 Complaint, Section 609(a)(1) provided:

Except as provided in paragraph (2), and in lieu of appealing the decision of the contracting officer under section 605 of this title to an agency board, a contractor may bring an action directly on the claim in the United States Court of Federal Claims, notwithstanding any contract provision, regulation, or rule of law to the contrary.

41 U.S.C. § 609(a)(1) (effective to Jan. 3, 2011).

[17] On January 4, 2011, 41 U.S.C. § 602 was renumbered 41 U.S.C. § 7102.

**G.    Assuming *Arguendo*, Plaintiffs Have Standing, Count I Of Plaintiffs' Refund Period Breach Of Contract Claims Must Be Dismissed.**

**1.    The Government's Argument.**

The Government argues that the court should enter judgment as to Count I of the Plaintiffs' Complaints "because the predicate for those breach of contract claims—the alleged correction by [FERC] of refund period sales prices pursuant to section 206 of the Federal Power Act (FPA), 16 U.S.C. § 824e—never happened." Gov't Mot. at 4.[18]  "[P]laintiffs' theory of recovery is factually dependent on FERC having retroactively reset the Market Clearing Price for *all* market participants." Gov't Mot. at 8 (emphasis added). Plaintiffs' Complaints allege that WAPA and BPA are "contractually obligated to reimburse [the IOUs and California] for the difference between the rates that [BPA and WAPA] initially charged for [their] sales in the ISO and PX markets . . . and the [Mitigated Market Clearing Price]." Gov't Mot. at 8 (quoting Compl., Nos. 07-157C ¶ 75, 07-167C ¶ 75; 2nd Am. Compl., No. 07-184C ¶ 71). The problem is that "FERC never 'corrected' or 'revised' refund period sales prices; indeed, it never had any authority to do so." *City of Redding*, 693 F.3d at 840–41. As the United States Court of Appeals for the Ninth Circuit held, FERC had "authority to determine a rate only prospectively, and cannot engage in the retroactive resetting of rates . . . either on a market-wide basis or on an individual basis." Gov't Mot. at 9 (citing *City of Redding*, 693 F.3d at 840). Because FERC cannot order retroactive refunds under FPA § 206, the factual predicate for Plaintiffs' breach of contract never occurred. Gov't Mot. at 9.

The Government further disputes Plaintiffs' position that the Cal-PX FERC Tariff Section 13 and Cal-ISO FERC Tariff Section 19 "mean that 'the Agencies contractually committed to abide by FERC-established pricing[.]'" Gov't Mot. at 10 (quoting Pl. Reply in Response to the court's March 19 and March 20 Orders, at 9 (May 23, 2014) (Dkt. No. 327)). Instead, these sections reserve the "Participant's ability 'to exercise its rights under Section 206 of the FPA.'" Gov't Mot. at 10 (quoting PE 57 at 919; PE 66 at 316–17). Those rights, however, extend only as far as FPA § 206 permits. Gov't Mot. at 10. In other words, a Participant is free to petition FERC to exercise its refund authority under FPA § 206(b), but the FERC's authority is limited to "determin[ing] what the just and reasonable price 'would have been' for any refund period," not "establish[ing] any actual rates." Gov't Mot. at 10–11. Section 206(b) of the FPA authorizes FERC only to assess refund liability over "jurisdictional sellers." Gov't Mot. at 11. WAPA and BPA are not subject to FERC jurisdiction.

According to Plaintiffs, *Alliant Energy v. Nebraska Public Power Dist.*, 347 F.3d 1046 (8th Cir. 2003), "support[s] the notion that . . . FERC refund orders, otherwise unenforceable

---

[18]  The Government also argues the court should dismiss Count 1 of the Plaintiffs' Complaints, because they "did not present sum-certain claims to a contracting officer." Gov't Mot. at 2. The Contract Disputes Act, however, does not require sum-certain claims. Instead, the sum-certain language appears in the Federal Acquisition Regulations ("FAR"). The FAR applies to Government acquisitions, not sales. *See Precision Pine & Timber, Inc. v. United States*, 75 Fed. Cl. 80, 87 (2006) (holding that the FAR does not apply when "the Government is not 'acquiring,' but rather, is selling a commodity"). Here, the Government sold electricity. As such, the FAR does not apply, and Plaintiffs were not required to submit a sum-certain claim.

against a non-jurisdictional utility, may nevertheless be enforced via contract." Gov't Mot. at 11–12 (citing Pl. Br. in Response to the court's March 19 and March 20 Orders, at 41 (Apr. 18, 2014) (Dkt. No. 324); Pl. Reply in Response to the court's March 19 and March 20 Orders, at 10, 12 (May 23, 2014) (Dkt. No. 327)). "[T]he reference to *Alliant* in *Bonneville* only suggested that the remedy, 'if any,' would be contractual. Gov't Mot. at 12. Moreover, the United States Court of Appeals for the Ninth Circuit "[took] no position on remedies available outside of the FPA." Gov't Mot. at 12 (quoting *Bonneville*, 422 F.3d at 926). "*Alliant* did not once mention the FPA, let alone § 206[.]" *City of Redding*, 693 F.3d at 840. In addition, the tariff in *Alliant* was established under FPA § 205, but this tariff was issued under FPA § 206. Gov't Mot. at 12. "*Alliant* presented an entirely different basis for contractual liability" under Section 205—not subject to the same jurisdictional constraints as Section 206. Gov't Mot. at 12. The *Alliant* tariff was a provisional rate that FERC accepted "subject to refund if that tariff was ultimately found to be unreasonable under FPA Section 205"; thus, the Government expressly was liable for a rate it knew could be subject to a refund. Gov't Mot. at 13 (citing *Mid-Continent Area Power Pool*, 87 FERC ¶ 61075, 61324 (April 15, 1999) ("*MAPP*")). In this case, however, "FERC itself said that these rates were accepted as final and were not subject to revision under Section 205." Gov't Mot. at 13 (citing 96 FERC ¶ 61120, 61508 (July 25, 2001)). As such, "[t]here is no corresponding contractual obligation," because "*City of Redding* now makes plain that no such retroactive change of a rate may ever be made under Section 206[.]" Gov't Mot. at 14.

## 2. Plaintiffs' Response.

Plaintiffs respond that *City of Redding* does not concern the court's jurisdiction, but "whether the parties' contracts were breached." Pl. Resp. at 10 n.13. The prior trial court "previously rejected the same argument . . . concerning FERC's correction of Refund Period PX and ISO prices." Pl. Resp. at 10 (citing Reconsideration Order, 110 Fed. Cl. at 136; *California ex rel. Brown v. United States*, 110 Fed. Cl. at 140). The Government has not "provide[d] any reason why that order may be reconsidered now." Pl. Resp. at 11. Indeed, at trial, the Government "pursued . . . the very same 'retroactive ratemaking' argument it makes here and that the Court made fact-based determinations rejecting that argument." Pl. Resp. at 12 (citing *Pac. Gas & Elec.*, 105 Fed. Cl. at 435–36, *vacated*, 114 Fed. Cl. 146 (2013)). Plaintiffs recite the relevant evidence produced at trial[19] and insist that "this Court must defer" to the findings in the May 2, 2012 Order. Pl. Resp. at 12–13.

Plaintiffs also argue that "FERC was authorized under the FPA to correct prices in the PX and ISO markets." Pl. Resp. at 14. The Government contrasts Sections 205 and 206, but

---

[19] Plaintiffs claim that, at trial, they "demonstrated that [the Government's expert] Mr. [Jeffrey] Tranen did not correctly apprehend [sic] the FPA or the nature and scope of FERC's price correction authority." Pl. Resp. at 12. Plaintiffs' expert, Robert Gee, however, testified that the PX and ISO tariffs contained clauses that "represent a contractual agreement that market participants could petition FERC to investigate whether prices being charged are just and reasonable and, if FERC found they were not, to correct those prices to just and reasonable levels." Pl. Resp. at 12 (citing TR 1656–1657 (A-0334–335)). The prior trial court concluded that Mr. Tranen "misunderstood how FPA Section 206(b) operates" and his testimony had "no probative value." *Pac. Gas & Elec. Co.*, 105 Fed. Cl. at 435–36. Therefore, the prior trial court concluded that the tariff clauses did "represent a contractual agreement[.]" *Id.* at 435.

"[t]his putative distinction . . . is make-believe." Pl. Resp. at 14.  Plaintiffs view Sections 205 and 206 as "grant[ing] FERC parallel authority to keep new or contested rates in place on a provisional basis, subject to correction and refund at the end of the FERC proceeding." Pl. Resp. at 14 (citing *Port of Seattle v. FERC*, 499 F.3d 1016, 1031–32 (9th Cir. 2007); *CPUC*, 462 F.3d at 1046–47).    Section 205 governs rate proposals filed by public utilities.  *See* 16 U.S.C. § 824d(d).  Section 206 governs the investigation of existing rates initiated on behalf of the customers of public utilities.  *See* 16 U.S.C. § 824e.  The only difference between the two Sections is "which entity initiates the proceeding." Pl. Resp. at 15.  Therefore, "[s]ection 206(b), just like Section 205, allows FERC to correct prices from the effective date established for the proceeding[.]" Pl. Resp. at 15 & n.17 (citing *FirstEnergy Serv. Co. v. FERC*, 758 F.3d 346, 352 (D.C. Cir. 2014) ("The statutory 'just and reasonable' standard is the same under section 205 and section 206.")).  In 1988, Congress added Section 206(b) to "establish[] more symmetry between the procedures for rate reductions and rate increases." Pl. Resp. at 16 (quoting 134 Cong. Rec. S12063, S12064 (1988)).  The key elements of Section 206(b) "parallel the procedures for rate increase applications under Section 205." Pl. Resp. at 16 (quoting H.R. Rep. No. 100-384, at 3 (1987)).  Under Section 206(b), "[FERC] may order refunds of any amounts paid . . . in excess of those which would have been paid under the just and reasonable rate[.]"  16 U.S.C. § 824e(b).  Just like Section 205, Section 206 also "permit[s] FERC to correct prices under the PX and ISO tariffs, because the [Cal-]PX and [Cal-]ISO are 'public utilities' under the FPA." Pl. Resp. at 17 (citing *CPUC*, 462 F.3d at 1038–39).  "The *Bonneville* decision addresses Sections 205 and 206 in tandem throughout, making clear that there is no distinction with respect to FERC's ratesetting authority under either statute." Pl. Resp. at 18 (citing *Bonneville*, 422 F.3d at 911, 913–19, 921–22, 925).

Therefore, correcting prices under Section 206(b) "is not unlawful retroactive ratemaking, any more than is FERC's correction of rates under Section 205." Pl. Resp. at 18.  In fact, the Government concedes that FERC lawfully may correct prices under Section 205.  *See* Gov't Mot. at 13–14.  And, since "the statutory structure of Sections 205 and 206 is identical," FERC may lawfully correct prices under 206.  Pl. Resp. at 19 (citing *La. Pub. Serv. Comm'n v. FERC*, 482 F.3d 510, 520 (D.C. Cir. 2007) (remanding FERC's decision that it was unauthorized to order refunds back "for a more considered determination")).  Although *City of Redding* held that FERC does not have "the authority to retroactively reset the market rates for all market participants," it also held "that the specific FERC price correction orders on which this action is based did not overstep that boundary."  693 F.3d at 839.  Therefore, *City of Redding* did not "reject[] FERC's correction of the PX and ISO market clearing prices." Pl. Resp. at 20–21.  Instead, that decision clarified that "FERC had authority to correct prices in the PX and ISO markets from the effective date established in the FERC proceeding and forward." Pl. Resp. at 21.  For this reason, the United States Court of Appeals for the Ninth Circuit repeatedly upheld FERC orders correcting prices for all PX and ISO sales.  Pl. Resp. at 21 (citing *City of Redding* and *CPUC*).  In sum, *City of Redding* says "exactly what Plaintiffs have been arguing all along . . . as the basis for their contract claim—FERC corrected the prices charged by all market participants[.]" Pl. Resp. at 25 (citing *City of Redding*, 693 F.3d at 841).  And, since *City of Redding*, FERC has continued "to issue orders holding that it has corrected prices for all transactions during the Refund Period."  Pl. Resp. at 26 (citing 148 FERC ¶ 61006 at P 11 (2014)).

Next, Plaintiffs argue that "[u]nder the FPA, th[e c]ourt does not have subject matter jurisdiction to review FERC's orders." Pl. Resp. at 26. FPA Section 213(b) "confer[s] exclusive jurisdiction upon the federal courts of appeals to hear challenges to FERC orders." Pl. Resp. at 26 (citing 16 U.S.C. § 825*l*). The FPA "prescribe[s] the specific, complete and exclusive mode for judicial review of the Commission's orders[.]" *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 336 (1958). As such, the United States Court of Federal Claims may not "consider, much less decide, whether [FERC's price correction] orders were correctly made." Pl. Resp. at 27. The Government admitted as much at the *City of Redding* oral argument. Pl. Resp. at 28 (citing *City of Redding v. FERC*, Court of Appeals, Ninth Circuit, Nos. 09-72775, 09-72789, 09-72791, 09/23/14 TR 14 ("If FERC says that the moon is made of green cheese under the Federal Power Act, Court of Federal Claims is [going to] have that as binding[.]")).

For this reason, *Alliant* is "exactly on point." Pl. Resp. at 29. In *Bonneville*, the Government argued that the *Alliant* circumstances were "directly analogous to those presented here." Joint Brief of Public Entity Petitioners and Petitioner/Intervenors on the Jurisdictional Cases, *Bonneville Power Admin. v. FERC* (9th Cir. Dec. 23, 2004) at 41 (A-0135). The Government "embraced" *Alliant*, even though it "arose under Section 205 rather than Section 206." Pl. Resp. at 29. "[T]he fact that *Alliant* arose under Section 205 does not affect the outcome here in the least." Pl. Resp. at 32. "Because FERC lacks authority under either Sections 205 or 206 to order governmental entities to pay refunds, the outcome in *Alliant* is due solely to the fact that [the Government] was contractually bound by the FERC determination changing the tariffed charges it had previously collected. That conclusion is directly applicable here." Pl. Resp. at 32–33.

Finally, prior to the PX and ISO markets becoming operational, BPA and WAPA "actively pursued authority to receive the same PX and ISO prices as all other sellers." Pl. Resp. at 33 (citing Motion to Intervene and Protest of Bonneville Power Administration (June 6, 1997), PE 11 at 533–36 (A-0417–420)). In addition, since 2001, "the Agencies have fought to avoid honoring the very contract terms that they wanted and eagerly solicited from FERC in the first place[.]" Pl. Resp. at 33. The Agencies "have sought and obtained refunds from other market participants for overcharges on the Agencies' purchases, while consistently refusing to pay refunds for the Agencies' sales to their purchasers in the market, who suffered exactly the same injury." Pl. Resp. at 33–34 (citing 96 FERC ¶ 61120, 61513 n.56). There is just no reason why the Agencies "should be allowed to retain their windfall profits, and [the Government] offers no such reason—only hypertechnical excuses for why it should not be held to the contracts that it eagerly sought and freely entered." Pl. Resp. at 35.

### 3.       The Government's Reply.

The Government makes five points in its Reply. First, "[i]t has long been recognized that courts have the inherent power to modify interlocutory orders before entering a final judgment." Gov't Reply at 1 (quoting 12/20/13 Order at 3). All relevant orders in this case are interlocutory pursuant to Rule of the United States Court of Federal Claims ("RCFC") 54(b); thus, the court may revisit them now. Gov't Reply at 1–2. The law-of-the-case doctrine requires trial courts to follow appellate court rulings, but it "does not otherwise bind a court to strict adherence to its own prior interlocutory decisions." Gov't Reply at 2. Therefore, Plaintiffs wrongly impose

RCFC 59(a)'s "showing of extraordinary circumstances" standard onto the RCFC 54(b) orders in this case. Gov't Reply at 2–3.

Second, "Plaintiffs ignore the public entity exemption in Section 201(f) of the Federal Power Act." Gov't Reply at 8. As the Ninth Circuit held, Section 201(f) is "a 'huge' exemption [that] removes Governmental entities from FERC's regulatory powers under sections 205 and 206." Gov't Reply at 8 (quoting *Bonneville*, 422 F.3d at 915–16). BPA and WAPA fall into that "huge" exemption. Gov't Reply at 8–9 (citing 125 FERC ¶ 61297).

Third, Plaintiffs also fail to respond to *Bonneville*'s holding that "FERC's authority to investigate rates and to order refunds is limited to any rate collected by 'any public utility'; the statute carries no reference to nonpublic utilities." *Bonneville*, 422 F.3d at 911. According to the United States Court of Appeals for the Ninth Circuit, "the fact that ISO and CalPX were public utilities is irrelevant because FERC is ordering refunds from the governmental entities/non-public utilities, not ISO or CalPX themselves." *Id.* at 920. FERC's actions "have no effect on" governmental entities; thus, the proper focus is on sellers' rates, not PX and ISO tariffs. Gov't Reply at 10.

Fourth, *City of Redding* is clear that "FERC has no authority to retroactively change rates for the Refund Period rates. Instead, FERC may calculate the 'would have been' rate for the Refund Period for the sole and limited purpose of assessing a refund liability on jurisdictional sellers." Gov't Reply at 10 (citing *City of Redding*, 693 F.3d at 839–41). "[B]oth the majority and the dissent in *City of Redding* agree that FERC does not have authority retroactively to change prices market-wide for the Refund Period." Gov't Reply at 11 (citing *City of Redding*, 693 F.3d at 842). The Government contends that Plaintiffs' "entire basis for breach is their belief [is] that FERC's May 29, 2009 order retroactively reset the Market Clearing Price for *all* market participants." Gov't Reply at 11 (citing Pl. Resp. at 23–24). FERC, however, has no authority to revise any past prices, either individually or market-wide. Gov't Reply at 12 (citing *City of Redding*, 693 F.3d at 842 ("[W]e reject the argument that FERC has an expansive statutory authority to retroactively reset rates.")).

Finally, the Government accuses Plaintiffs of "badly mischaracterize[ing] the *Alliant* case" and the Public Entity Petitioners' brief to the Ninth Circuit in *Bonneville*. Gov't Reply at 12–13. That brief simply noted that FERC's position in *MAPP* was inconsistent with that in *Bonneville*. Gov't Reply at 13. Moreover, "[t]here are major factual and legal differences between" *MAPP* and this case. Gov't Reply at 13. *MAPP* involved a provisional rate under Section 205, giving FERC the undisputed power to subsequently alter the rate. Gov't Reply at 13–14 (citing 87 FERC ¶ 61323, 61324 (1999)). In this case, however, "FERC specifically held that the rates at issue in the Refund Period were final rates, not provisional, and refused to change those rates on that basis." Gov't Reply at 14 (citing 96 FERC ¶ 61120, 61508 (2001)). Here, FERC did not change any rate under Section 205. Gov't Reply at 14. As for Section 206, "*City of Redding* expressly rejected [P]laintiffs' and FERC's argument that FERC's Section 206 powers were analogous to FERC's power to change provisional rates filed under Section 205." Gov't Reply at 14 (citing *City of Redding*, 693 F.3d at 840–41). Plaintiffs' attempt to characterize FERC's actions as retroactive ratemaking is misguided, because "that retroactive revision never occurred." Gov't Reply at 15. Any "provisions in the ISO and PX tariffs to return the settlement amounts owed to sellers if errors, FERC directives, or other good cause

dictates" are "immaterial to the resolution of this case." Gov't Reply at 15. Such an obligation would arise only if FERC revised BPA's and WAPA's rates, which it did not, as *City of Redding* held. Gov't Reply at 15.

### 4.     The Court's Resolution.

"If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." RCFC 12(h)(3). Plaintiffs argue that the United States Court of Federal Claims may not "review" the FERC Orders that are the predicate for their contract claim. *See* 16 U.S.C. § 825*l*(b) (requiring that parties aggrieved by FERC orders "obtain a review to such order in the United States Court of Appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia"). But, the court is not "reviewing" FERC's Orders or questioning its factual findings. Instead, the court has analyzed the FERC Orders to determine whether Plaintiffs have a valid contract-based claim against the Government.

In that regard, two issues require resolution. First, does Section 206 of the FPA, 16 U.S.C. § 824e, authorize FERC retroactively to correct the Market Clearing Price of wholesale electricity sales for participants in the Cal-PX and Cal-ISO markets? Second, is the Government contractually liable for the difference between the rates that it charged wholesale customers and the rates that FERC later determined to be "just and reasonable"?

The United States Court of Appeals for the Ninth Circuit extensively examined these very issues in *Bonneville* and again in *City of Redding*. Although not bound by the Ninth Circuit's holdings,[20] the court finds that appellate court's reasoning to be persuasive and Plaintiffs here have done little to refute the conclusion that FPA Sections 201, 205, and 206 do not authorize the FERC to issue retroactive refunds.

Section 201(f) states:

No provision in this subchapter shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State, . . . or any corporation which is wholly owned, directly or indirectly, by any one or more of the foregoing, or any officer, agent, or employee of any of the foregoing acting as such in the course of his official duty, unless such provision makes specific reference thereto.

16 U.S.C. § 824(f).

As the United States Court of Appeals for the Ninth Circuit observed:

---

[20] *See, e.g.*, *Gibralter Fin. Corp. of Cal. v. United States*, 825 F.2d 1568, 1572 (Fed. Cir. 1987) ("We are, of course, not bound by the Ninth Circuit's ruling."). Federal courts, however, generally "do not create conflicts among the circuits without strong cause." *Wash. Energy Co. v. United States*, 94 F.3d 1557, 1561 (Fed. Cir. 1996) (citation omitted). Although each circuit has an obligation independently to analyze the cases before it, the court "accord[s] great weight to the decisions of the other circuits on the same question." *Id.*

> The sweep of this exemption is huge. . . . [BPA] falls within the general exclusion.   The BPA is an agency of the United States. . . .   A search of subchapter II for specific reference to FERC's jurisdiction over governmental entities for refund purposes comes up empty-handed for FERC.

*Bonneville*, 422 F.3d at 915–16.[21]

The United States Court of Appeals for the Ninth Circuit further explained that "[w]hen Congress wanted a provision of the FPA subchapter II to apply to governmental entities, it knew how to so specify." *Id.* at 916 (citing FPA Sections 210–213).  Congress, however, did not state that Sections 205 or 206 should apply to governmental entities in any respect.  In fact, it limited those Sections' application to "public utilities."  *See* 16 U.S.C. § 824d(a) ("All rates and charges made, demanded, or received by any public utility[.]"); 16 U.S.C. § 824e(a) ("Whenever the Commission . . . shall find that any rate . . . collected by any public utility[.]").  A public utility is defined as "any person who owns or operates facilities *subject to the jurisdiction of the Commission* under this subchapter."  16 U.S.C. § 824e (emphasis added).  Neither BPA nor WAPA falls within this definition, because, pursuant to Section 201(f), they are not "subject to the jurisdiction of [FERC]."  Thus, Sections 205 and 206 do not apply to BPA or WAPA.

In fact, FERC recently issued an Order affirming that it "is precluded from ordering a remedy for the transactions involving BPA, and WAPA[.]"  149 FERC ¶ 61116 at P 22 (2014).  And, it dismissed BPA and WAPA from that proceeding, because "at the current stage of the proceeding, where the Commission will be ordering a remedy . . . , it is appropriate to dismiss the non-jurisdictional entities from the proceeding."  *Id.*  As FERC stated, there was "no reason for [BPA and WAPA's] continued participation," because FERC had no authority to order a retroactive remedy from a non-public utility.[22]  *Id.*  Based on this recent FERC Order, as well as the United States Court of Appeals for the Ninth Circuit's rulings in *Bonneville* and *City of Redding*, the court concludes that Section 206 of the FPA does not authorize FERC retroactively to correct the market clearing price for participants in the Cal-PX and Cal-ISO Markets.  Plaintiffs contend that if they cannot obtain relief from the FERC, they should at least be entitled to the difference between actual and corrected prices under contract law.  Compl. ¶ 3 ("The Agencies are now contractually liable to reimburse the California IOUs for the difference between the rates that the Agencies charged during the Refund Period and the lawful, corrected rates under the tariffs.").  According to Plaintiffs, "the Agencies contractually agreed to be bound

---

[21] Although WAPA was not a party in *Bonneville*, it too falls within the Section 201(f) exemption as an agency of the United States.  *See* Western Area Power Administration, History, http://ww2.wapa.gov/sites/western/about/history/pages/default.aspx (last visited March 10, 2015) ("On Dec. 21, 1977, high gas prices and an emphasis on conservation led Congress to create the Department of Energy, including Western Area Power Administration—a new agency to sell and deliver hydropower across 15 central and western states.").

[22] FERC declined to vacate earlier "findings regarding the transactions involving these non-jurisdictional entities, as there are no grounds to do so.  The Commission precedent is clear that while it is precluded from ordering these entities to pay refunds, the Commission may consider the facts and circumstances of governmental entities as part of its investigation of jurisdictional rates."  149 FERC ¶ 61116 at P 23 (2014).

by the provisions of the ISO and PX Tariffs, which incorporate FERC's power to correct prices that it determines to be unjust, unreasonable, or unlawful." Compl. ¶ 73.  But, even assuming that the FERC Tariffs included the full extent of the FPA's Section 206 authority, Plaintiffs still have no cognizable contract claim against WAPA or BPA.  Section 206 does not authorize FERC to order retroactive refunds, and neither the Cal-PX Agreements nor the SC Agreements contained any textual direction obligating them to do so.

### H.    Plaintiffs' July 1, 2014 Motion To Reinstate The May 2, 2012 Liability Decision And For Certification Of Orders For Interlocutory Appeal Is Denied.

Plaintiffs July 1, 2014 Motion requests that the court reinstate the prior trial judge's May 2, 2012 Order and certify it to the United States Court of Appeals for the Federal Circuit.

For the reasons stated in the court's December 20, 2013 Order, the former trial court's May 2, 2012 Orders required reconsideration, because "jurisdictional issues that were previously raised, but summarily rejected without a formal opinion." Reconsideration Order, *Pac. Gas & Elec.*, Dkt. No. 311 at 2 (Dec. 20, 2013).  As discussed herein, the United States Court of Appeals for the Ninth Circuit's recent decision in *City of Redding* completely undercuts the May 2, 2012 Order.

Reinstating and certifying the May 2, 2012 Order would not expedite this litigation.  The most efficient way to resolve the jurisdictional issues raised is by "entry of a final judgment as to one or more, but fewer than all, claims or parties."  RCFC 54(b).[23]

## IV.    CONCLUSION.

For the reasons discussed herein, the April 2, 2013 Orders denying the Government's November 2, 2012 Motion For Reconsideration, *Pac. Gas & Elec. Co. v. United States*, 110 Fed. Cl. 135 (2013), are **vacated**; Plaintiffs' July 1, 2014 Motion To Reinstate The May 2, 2012 Liability Decision And For Certification Of Orders For Interlocutory Appeal is **denied**; the Government's July 1, 2014 Motion for Entry of Judgment Dismissing Claim I of Pacific Gas &

---

[23] RCFC 54(b) provides:

When an action presents more than one claim for relief—whether as a claim, counterclaim, or third-party claim—or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.  Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be

revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

RCFC 54(b).

Electric Co.'s March 12, 2007 Complaint, pursuant to RCFC 54(b), is **granted**; the Government's July 1, 2014 Motion for Entry of Judgment Dismissing Claim I of San Diego Gas & Electric Co.'s March 13, 2007 Complaint is **granted**; the Government's July 1, 2014 Motion for Entry of Judgment Dismissing Claim I of California's March 16, 2007 Complaint is **granted**; and the Government's July 1, 2014 Motion To Dismiss is **denied**.

Pursuant to RCFC 54(b), there being no just cause for delay, the Clerk is directed to dismiss Claim 1 of Plaintiffs' March 12, 2007, March 13, 2007, and March 16, 2007 Complaints.

**IT IS SO ORDERED.**

/s/ Susan G. Braden
**Susan G. Braden, Judge**